5487-15 TMP/ALS

## IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| KELLI ANDREWS, AS ADMINISTRATOR OF THE ESTATE OF TIFFANY ANN RUSHER, DECEASED, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Law No. 18-cv-01100-SEM-TSH |
| SANGAMON COUNTY ILLINOIS, WES BARR, LARRY BECK, JR., ADVANCED CORRECTIONAL HEALTHCARE, INC., ARUN ABRAHAM, MICHAEL SHMIKLER, KYLE MEYER, Z. WHITLEY, JENNIFER EALEY, GUY BOUVET III, and DOES 1-5, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT[1]

NOW COME Defendants WES BARR, LARRY BECK, GUY BOUVET, III, JENNIFER EALEY, KYLE MEYER, SANGAMON COUNTY, ILLINOIS, and ZACH WHITLEY, by THERESA M. POWELL, of HEYL, ROYSTER, VOELKER & ALLEN, P.C., their attorneys, and for their response to Plaintiff's First Amended Complaint, state as follows:

### I. NATURE OF THE ACTION

1. Tiffany Rusher, who was a pre-trial detainee in the Sangamon County Detention Facility ("Sangamon Jail"), suffered from severe mental illness. When she entered the Sangamon Jail in December 2016, the Defendants knew that she was severely mentally ill, that she was at high risk of suicide, and that she was in need of intensive mental health treatment. The defendants also knew, or at the very least should have known, that placing a person with

---

[1] Pursuant to Federal Rule of Civil Procedure 15(a)(2), Plaintiff has received the Defendants' written consent to the filing of this First Amended Complaint.

Tiffany's mental state in solitary confinement would only exacerbate her deteriorated mental condition, cause severe psychological trauma, and make it more likely that Tiffany would try to kill herself.

> **ANSWER:** **Defendants admit that Tiffany Rusher ("Rusher") was a pre-trial detainee in the Sangamon County Jail at certain times relevant to this cause of action. Defendants admit that she had a history of mental illness as documented by her medical and mental health records. Defendants deny that each individual Defendant had equal understanding of Rusher's mental illness. Defendants admit that they were aware of certain aspects of Rusher's mental history at the time she was admitted to the Sangamon County Jail in December of 2016. Defendants admit that Rusher had a documented history of prior suicide attempts. Defendants deny that each individual Defendant had equal knowledge of Rusher's prior history of suicide attempts. Defendants admit that Rusher was in need of mental health treatment. Defendants deny that Rusher required mental health treatment beyond what was provided to her or recommended by mental health staff. Defendants deny that any of them participated in providing mental health treatment to Rusher. Defendants deny that the duty owed by each of the Defendants is accurately set forth in this paragraph. Defendants deny the remaining allegations of paragraph 1.**

2.      Nevertheless, the defendants placed Tiffany in solitary confinement, and kept her there for more than four months. This solitary confinement caused Tiffany's mental condition to deteriorate further, but the defendants failed to provide Tiffany with mental health treatment, compounding the harmful effects of solitary and increasing the risk that she would try to harm herself.

**ANSWER:      Defendants deny the allegations of paragraph 2.**

3.      What is more, the defendants failed to take adequate steps to guard against the possibility of suicide, making it easier for Tiffany to harm herself severely. As a direct result of defendants' actions and failures to act, Tiffany was found asphyxiated in her cell on March 18, 2017. She died on March 30, 2017, after spending 12 days on life support.

**ANSWER:      Defendants deny the allegations of paragraph 3.  Defendants admit, however, that Rusher died on March 30, 2017, after spending a certain amount of time on life support.**

4.      This is an action for compensatory, nominal, and punitive damages, with claims brought under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA") to redress violations of Tiffany's rights. Plaintiff also asserts claims against the Defendants pursuant to the Illinois Wrongful Death Act, 740 ILCS 180, and the Illinois Survival Act, 755 ILCS 5/27-6.

**ANSWER:      Defendants admit that Plaintiff has asserted the claims referenced in this paragraph.  Defendants deny that Plaintiff's claims are valid and further deny that any act or omission on the part of the Defendants caused the injuries sustained by the Plaintiff.  Defendants further**

**deny that all of the counts referenced in this paragraph may be brought against all of the Defendants referenced herein.**

## II.     JURISDICTION AND VENUE

5.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff's claims are brought under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.

**ANSWER:     Defendants admit that jurisdiction is proper.  Defendants deny that all of the claims set forth in this paragraph are properly brought against all of the undersigned Defendants.**

6.     The Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims asserted in this Complaint that Plaintiff's state law claims form part of the same case or controversy.

**ANSWER:     Defendants admit that the Court may exercise jurisdiction over Plaintiff's state law claims under § 1367.**

7.     Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because one or more of the defendants resides in the Central District of Illinois and all events giving rise to the claims asserted in this lawsuit arose in this judicial district.

**ANSWER:     Defendants admit that venue is proper in the Central District of Illinois.**

### III. PARTIES

8.     Plaintiff's decedent is Tiffany Rusher, who at the time of her death was a twenty-seven-year-old resident of the State of Illinois. At all times relevant hereto, Tiffany was a pretrial detainee at the Sangamon Jail.

> **ANSWER:** **Defendants admit that Rusher was 27 years old and a resident of the State of Illinois. Defendants admit that Rusher was a pre-trial detainee at certain times relevant to this lawsuit.**

9. Plaintiff Kelli Andrews ("Plaintiff") is Tiffany Rusher's mother and is the administrator of Tiffany's estate, pursuant to an order entered by the Circuit Court for the Seventh Judicial Circuit of Illinois, Sangamon County.

> **ANSWER:** **Defendants admit the allegations of paragraph 9 based upon information provided by the Plaintiff.**

10. Wes Barr is the Sheriff of Sangamon County. In this capacity, he is responsible for the operation of the Sangamon Jail, which is the pretrial detention facility—*i.e.*, the jail—of Sangamon County. This responsibility includes a duty to safely house and to provide adequate medical care for the Sangamon Jail's detainees. At all times relevant to this case, Sheriff Barr acted under color of law. He is sued in his individual and official capacities.

> **ANSWER:** **Defendants deny that Wes Barr is the Sheriff of Sangamon County. Defendants deny that paragraph 10 accurately sets forth the legal duty owed, if any, by Wes Barr at all relevant times. Defendants acknowledge that Plaintiff is claiming to be suing Wes Barr in both his individual and official capacities. Defendants deny personal involvement as pertains to addressing Rusher's needs as an inmate in the Sangamon County Jail.**

11. Larry Beck is the Superintendent of the Sangamon Jail. In this capacity, he is responsible for the day-to-day operation of the Sangamon Jail. This includes making cell assignments and ensuring that medical and mental health services are provided to those detainees

who need such services. At all times relevant to this case, Superintendent Beck acted under color of law. He is sued in his individual capacity.

> **ANSWER:** **Defendants admit that Larry Beck is the Superintendent of the Sangamon County Jail. Defendants admit that Larry Beck does have certain responsibilities as it pertains to the Sangamon County Jail. Defendants deny that paragraph 11 accurately sets forth the legal duty of Larry Beck, if any, as it relates to his responsibilities in the Jail in connection with the claims against him by Rusher. Defendants admit that any actions in his capacity as Superintendent would be under color of law. Defendants acknowledge that the Plaintiff is claiming that he is a Defendant in his individual capacity. Defendants deny personal involvement as it pertains to many of the claims set forth herein.**

12. Advanced Correctional Healthcare, Inc. ("ACH") is a private company that contracted to provide healthcare, including mental healthcare, to detainees of the Sangamon Jail. In this capacity, ACH also employed defendants Abraham and Shmikler.

> **ANSWER:** **Defendants admit that ACH is a private company contracted to provide medical healthcare and mental healthcare to detainees at the Sangamon County Jail. Defendants admit Abraham and Shmikler are agents of ACH.**

13. Dr. Arun Abraham was a medical doctor at the Sangamon Jail and, on information and belief, was responsible for overseeing the provision of medical and mental health care of all pretrial detainees at the jail, including Tiffany.

**ANSWER:** **Defendants admit that Dr. Abraham was, and is, a medical doctor who provided services at the Sangamon County Jail pursuant to Sangamon County's contract with ACH. Defendants admit that Dr. Abraham owed a duty to provide medical and mental health care for certain pre-trial detainees at the Sangamon County Jail, including Rusher.**

14.     Michael Shmikler was a licensed clinical social worker and, on information and belief, the "qualified mental health professional" described in the contract between ACH and Sangamon County.

**ANSWER:** **Defendants admit that Michael Shmikler was a licensed clinical social worker and provided mental health care pursuant to the contract between Sangamon County and ACH.**

15.     Kyle Meyer is a guard at the Sangamon Jail.

**ANSWER:** **Defendants admit the allegations of paragraph 15.**

16.     Z. Whitley is a guard at the Sangamon Jail.

**ANSWER:** **Defendants admit the allegations of paragraph 16.**

17.     Jennifer Ealey is a guard at the Sangamon Jail.

**ANSWER:** **Defendants admit the allegations of paragraph 17.**

18.     Sgt. Guy Bouvet is a supervising guard at the Sangamon Jail.

**ANSWER:** **Defendants admit the allegations of paragraph 18 as it pertains to encounters involving Rusher.**

19.     Sangamon County provides for the budget of the Sangamon County Sheriff's Office, including the budget for the Sangamon Jail. Sangamon County contracted with defendant

ACH for the provision of healthcare, including mental healthcare, to detainees at the Sangamon Jail, during the time of Tiffany's detention there. Additionally, Sangamon County is named for indemnification purposes pursuant to 55 ILCS § 5/5-1002.

  **ANSWER: Defendants admit the allegations of paragraph 19.**

20. Does 1-5 are sued herein by fictitious names for the reason that their true names are unknown to Plaintiffs. Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of these Defendants when their identities have been ascertained. Plaintiffs are informed and believe, and based thereon allege, that these fictitiously-named defendants are responsible in some manner for the misconduct alleged herein.

  **ANSWER: Defendants make no response to paragraph 20 as this paragraph does not appear to be directed towards any of the named Defendants in this case. Defendants have no knowledge as to whom Plaintiff is referring as pertains to Does 1-5 at this time.**

## IV. FACTS

21. On or about December 8, 2016, Tiffany was accused of battery while she was a patient at the McFarland Mental Health Center ("McFarland"), which is located in Springfield, Illinois. She was arrested at McFarland on December 15, 2016, and she was transported directly from McFarland for pretrial detention at the Sangamon Jail.

  **ANSWER: Defendants admit that Rusher committed battery while a patient at McFarland, which is located in Springfield, Illinois, in December of 2016. Defendants admit that Rusher was arrested on December 15, 2016, and that she was transported from McFarland to the Sangamon County Jail thereafter.**

22.     Upon her arrival at the jail, the Defendants placed her in solitary confinement, and kept her there until she strangled herself on March 18, 2017.

**ANSWER:     Defendants deny the allegations of paragraph 22.**

23.     Throughout Tiffany's incarceration at Sangamon Jail, the Defendants were aware of Tiffany's mental health history, including her multiple suicide attempts.

**ANSWER:     Defendants admit that certain information was provided to certain individuals at the Sangamon County Jail regarding Rusher's mental health history.  Defendants admit that this history included suicide attempts.  Defendants deny that every Defendant had the same information relating to Rusher.  Defendants further deny that all actions taken by Rusher were suicide attempts.**

24.     Upon Tiffany's arrival at the Sangamon Jail, jail personnel received a discharge summary that had been prepared by staff at McFarland. That summary contained a comprehensive account of Tiffany's history of severe mental illness, recurrent self-harming behavior, and numerous suicide attempts. Among other things, the Discharge Summary noted the following:

(i)     From October 19, 2014 to April 14, 2016, while incarcerated at the Logan Correctional Center in Lincoln, Illinois, Tiffany made at least ten attempts to hang herself, including by strangulation with a towel.

(ii)     During the same time period, Tiffany engaged in at least twenty-seven instances of self-harming behavior, including cutting herself, biting herself, banging her head against a wall, and repeatedly swallowing

inedible objects such as ink pens, toilet paper, large segments of celery and carrot sticks, eating utensils, and toothbrushes.

(iii)    Due to Tiffany's self-harming behavior, Logan Correctional Center placed her on constant watch from approximately September 11, 2015 to May 3, 2016.

(iv)    On May 3, 2016, Tiffany was discharged directly from Logan Correctional Center to McFarland.

(v)    Tiffany engaged in self-harming and suicidal behavior during her hospitalization at McFarland. On multiple occasions she swallowed large objects requiring endoscopic removal and on at least two occasions, in June 2016 and September 2016, she attempted self-strangulation.

(vi)    McFarland provided Tiffany with mental health treatment and monitored her to protect her from harming herself.

(vii)    Upon her discharge from McFarland on December 15, 2016, Tiffany's diagnoses included Depression, Antisocial Personality Disorder, and Posttraumatic Stress Disorder.

**ANSWER:**    **Defendants admit that certain jail personnel received a discharge summary that had been prepared by certain staff at McFarland. Defendants admit that the discharge summary contained certain information regarding Rusher's prior history of mental illness, self-harming behaviors and suicide attempts. Defendants admit that the discharge summary contains certain information referenced in subparagraphs (i)-(vii). To the extent the information in**

subparagraphs **(i)-(vii) is verbatim contained in the discharge summary, Defendants admit that the allegation to the extent Plaintiff is asserting that the summary contains the information. Defendants deny said allegations to the extent the information is not contained word for word in the discharge summary. Defendants admit that there is such a summary. However, since the document is not attached, Defendants cannot be certain of the exact report and language that Plaintiff is relying upon for this allegation.**

**(iv)     Defendants admit that Rusher was transferred from the Logan County Correctional Center to McFarland. Defendants deny that the discharge was direct as counsel believes a hearing regarding her placement was held prior to the transfer and release from the Logan County Correctional Center.**

25.     Additionally, on the day after her admission to the Sangamon Jail, Sangamon Jail personnel received a phone call from a nurse at McFarland, who explained that Tiffany had been subject to one-to-one care at McFarland and that she had a history of attempting to asphyxiate herself.

**ANSWER:     Defendants admit that certain personnel was contacted by personnel at McFarland regarding Rusher. Defendants deny each one of them personally was provided the information set forth in paragraph 25. Defendants further deny that Rusher's history was limited to attempts to asphyxiate herself. Defendants deny the remaining allegations of paragraph 25.**

26.     All inmates entering the Sangamon Jail are supposed to undergo a medical screening, performed as the person enters the facility, and an examination completed by medical staff within the first fourteen days of incarceration.

> **ANSWER:    Defendants admit that the policies of the Sangamon County Jail require that medical personnel, pursuant to the contract with ACH, will perform a medical examination within the first 14 days of incarceration.  Defendants deny that paragraph 26 accurately sets forth any constitutional duties, if any, on the part of the Defendants.**

27.     Upon information and belief, Tiffany received a medical screening and underwent a full medical examination by medical staff at Sangamon Jail within the first fourteen days of her arrival at the jail, which provided Defendants with additional information about Tiffany's mental health, including her risk for suicide.

> **ANSWER:    Defendants admit that Rusher received a medical screening within the first 14 days at the Sangamon County Jail.  Defendants admit that medical and mental health staff were aware of Rusher's history relating to her health status and potential risks for suicide.  Defendants admit that certain jail personnel were also made aware of this information including, but not limited to, Larry Beck.  Defendants deny that each of the undersigned Defendants was provided with this information at the same time.**

28.     Indeed, on December 15, 2017 a nurse at Sangamon Jail wrote an order that Tiffany should be allowed to eat only "finger foods" in light of her tendency to asphyxiate herself by swallowing things.

**ANSWER:** **Defendants admit that nurses at the Sangamon County Jail wrote orders limiting Rusher to finger foods at certain times in order to protect herself. Defendants deny that each of them was personally aware of said information at all times. However, Defendants admit that such orders were in place for Rusher at certain times.**

29.     Then on December 16, 2017, Tiffany was evaluated by Michael Shmikler, LCSW, who was designated as a "mental health professional" at the jail. Indeed Mr. Shmikler would evaluate Tiffany repeatedly during her detention at the Sangamon Jail, by interviewing her through the door of her cell.

**ANSWER:** **Defendants admit the allegations of paragraph 29 to the extent the same is documented in Rusher's mental health or medical records. Defendants admit that Shmikler would have interviewed Rusher through the door of her cell, but cannot confirm that this was always the case unless specifically documented.**

30.     On multiple occasions in 2017, Dr. Arun Abraham, a physician at the Sangamon Jail employed by ACH, assessed Tiffany as having Bipolar Disorder and Schizoaffective Disorder, and documented that assessment in a medical progress note.

**ANSWER:** **Defendants admit that Dr. Abraham assessed Rusher and documented her as suffering from bipolar disorder and schizoaffective disorder as same may be documented in his progress notes. As this allegation is not directed towards the undersigned Defendants, Defendants would defer to Dr. Abraham's response as to whether he conducted his own personal assessment of Rusher's**

> **mental health status or if he relied upon others' assessments and merely documented an existing diagnosis or one that had been previously made.**

31. On January 19, 2017, Tiffany attempted suicide by strangling herself in her cell with the strap of a medical boot.

> **ANSWER:** **Defendants admit that Rusher attempted to harm herself by using the strap of a medical boot. Defendants deny the remaining allegations of paragraph 31.**

32. On multiple occasions be, Michael Shmikler, a social worker for ACH, described Tiffany as "high-risk" due to the known danger that she presented to herself.

> **ANSWER:** **Defendants admit the allegations in paragraph 32.**

33. Upon information and belief, all Defendants knew about Tiffany's mental illness, her numerous prior attempts to commit suicide, her need for mental health treatment, and the substantial risk of self-harm that she presented to herself. Indeed, jail staff even taped a "HIGH RISK" sign outside of her cell:



**ANSWER:** Defendants deny the allegations of paragraph 33 to the extent Plaintiff alleges that all Defendants were aware of Rusher's mental illness to the extent described in her medical records and/or in this complaint. Defendants admit that Rusher was designated as high risk. Defendants deny that a sign was taped onto Rusher's cell. Defendants admit that the clipboard associated with Rusher at her cell included reference to her being high risk with specific information about the nature of her risks attached to the clipboard.

34. Even though the Defendants knew that Tiffany was mentally ill and required mental health treatment, they provided her with no treatment and instead kept her in solitary confinement—which they knew would damage her further and increase her risk of suicide.

**ANSWER:** Defendants deny the allegations of paragraph 34.

35. While in solitary confinement, Tiffany was deprived of all property. She was deprived of all meaningful social contact with other people. She was stripped naked, barred from having any undergarments or other clothing, but for an anti-suicide blanket. She was not permitted a television or radio, books, magazines, paper, pen or pencil, or anything else she could possibly have used to pass her time in jail while awaiting trial. The only thing she was permitted was a suicide blanket. This is a photograph[2] of her cell:

---

[2] All photographs in this complaint were produced to Plaintiff by the Defendants.



ANSWER:    Defendants   deny   that   Rusher   was   in   solitary   confinement.

Defendants admit that Rusher was deprived of certain property due

to her propensity to eat inanimate objects.  Defendants admit that

Rusher's access to clothing was limited but deny the claims set forth

in paragraph 35.  Defendants admit that Rusher was restricted from

having certain property at certain times.  Defendants deny that any

restrictions on Rusher were done for punitive purposes or for any

reason other than to prevent her from harming herself or others.

Defendants admit that the above photograph does appear to be a

photograph of Rusher's cell at certain times relevant to this lawsuit.

Defendants deny that the photograph fairly and accurately depicts the

way the cell would have looked at any time Rusher was in it as

pertains to items viewed in the photograph.  Defendants admit that

**the photograph was provided to Plaintiff by defense counsel in discovery.**

36.     It is universally recognized that isolation and solitary confinement for any significant period of time is likely to make a person suffering from mental illness even worse, creating a substantial and increased risk of harm. Indeed, decades before the Defendants placed Tiffany in solitary confinement, one federal court observed that "placing [mentally ill prisoners in solitary confinement] is the mental equivalent of putting an asthmatic in a place with little air to breathe," *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995), because such prisoners "are at a particularly high risk for suffering very serious or severe injury to their mental health, including overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions" in solitary confinement. *Id*. Federal courts around the country have recognized the same thing; the U.S. Court of Appeals for the Seventh Circuit has observed that the conditions of solitary confinement "aggravate[] the symptoms of [a prisoner's] mental illness and by doing so inflict[] severe physical and especially mental suffering," *Scarver v. Litscher*, 434 F.3d 972, 977 (7th Cir. 2006), and that there is a "scientific consensus . . . that prisoners held in solitary confinement experience serious, often debilitating— even irreparable— mental and physical harm[] . . . ." *Wallace v. Baldwin*, 895 F.3d 481, 484-85 (7th Cir. 2018) (citation omitted)).

**ANSWER:     Defendants deny the allegations of paragraph 36 and further deny that citations to the law are appropriate allegations of fact in a federal pleading and would move to strike said allegations.  Defendants deny that Rusher was placed in solitary confinement as that term is used in**

**paragraph 36. Defendants deny that the cases cited in paragraph 36 address a situation or condition of confinement at issue in this case.**

37.     Depriving a person who is actively suicidal of all meaningful social contact for an extended period of time is not a method of treatment recognized by any competent medical authority. It is certain to make the person worse, not better, increasing their risk of suicide. For this reason, leading correctional standard-setting bodies provide specifically that such confinement should not occur. For example, the National Commission on Correctional Health Care Standards for Mental Health Services in Correctional Facilities states that "[i]nmates who are seriously mentally ill should not be confined under conditions of extreme isolation." The American Correctional Association has concluded that seriously mentally ill prisoners such as Tiffany should not be placed in solitary confinement for more than 30 days. The Association of State Correctional Administrators "believe[s] that lengthy stays [in solitary confinement] manufacture or increase mental illness." And the American Bar Association Treatment of Prisoner Standards similarly advises that "[p]risoners diagnosed with serious mental illness should not be housed in settings that exacerbate their mental illness or suicide risk, particularly in settings involving sensory deprivation or isolation."

**ANSWER:     Paragraph 37 is a paragraph of opinions with which Defendants may or may not agree with depending on the situation. Defendants deny that Rusher was denied all meaningful social contact for an extended period of time. Defendants deny that Rusher was deprived of all meaningful social contact as a method of treatment. Defendants deny that Rusher was confined under conditions of extreme isolation. Defendants deny that Rusher was housed in solitary confinement nor**

**was she housed in solitary confinement for more than 30 days. Defendants deny that Rusher was housed in a manner involving sensory deprivation or isolation.**

38.     The Defendants' policies, and their conduct, flatly ignored and contradicted this accepted knowledge. It was the policy of the Sangamon County Sheriff's Office to place persons suffering from mental illness or in danger of suicide in solitary confinement for indefinite periods. That was precisely the policy the Sheriff's Office pursued with Tiffany, holding her in solitary confinement for more than four months, from the day she arrived in December 2016 to the day she strangled herself in March 2017. Over the course of Tiffany's confinement, no effort was made to provide her with any form of regular social interaction outside her cell, or otherwise ameliorate the conditions of her isolation.

**ANSWER:     Defendants deny the allegations of paragraph 38.**

39.     Over the multiple months of Tiffany's confinement, the Defendants provided no counseling or mental health treatment to her. It was not ordered or sought by Dr. Abraham, Mr. Shmikler, or any other official in the jail. The only interaction Tiffany had with any mental health professional was with Mr. Shmikler, who would occasionally interview her through a slot in the locked door of her cell. These sessions with Mr. Shmikler were not therapeutic, however; they were intended simply to assess Tiffany's housing assignment.

**ANSWER:     Defendants deny the allegations of paragraph 39.  Defendants deny that paragraph 39 sets forth a duty owed by any of the undersigned Defendants.  Defendants deny that they had a duty to recommend medical or mental health care treatment beyond or different from the treatment recommended by medical or mental health staff who were**

**seeing Rusher. Defendants deny Plaintiff's assessment of the treatment provided by agents of ACH.**

40.     The Sheriff's Office had an agreement with an outside entity so that detainees whose mental health needs are beyond the services that can be provided at the jail could be transferred to an appropriate facility, but even though Tiffany was transferred to the jail *from* a state mental hospital, no effort was made by any of the Defendants, including Dr. Abraham and Mr. Shmikler, to determine whether Tiffany should be transferred to an outside mental health facility—instead, upon her admission Tiffany was simply put in solitary confinement, and was kept there.

**ANSWER:     Defendants admit that Sangamon County had an agreement with ACH to provide mental health and medical needs to inmates in the Sangamon County Jail. Defendants deny the remaining allegations of paragraph 40.**

41.     Despite their actual knowledge of Tiffany's need for intense mental health treatment, defendants Barr, Beck, Abraham, Shmikler, and/or Does 1-5 failed to provide any mental health treatment for Tiffany. Instead, these defendants arranged for Tiffany to be placed in solitary confinement, where they knew she would be harmed instead of helped, from December 2016 through March 18, 2017.

**ANSWER:     Defendants deny the allegations of paragraph 41. Defendants deny that paragraph 41 accurately sets forth the duty, if any, owed by Defendant Barr and Beck to Rusher. Defendants deny the remaining allegations of paragraph 41.**

42.     The placement of Tiffany in solitary confinement and the failure to provide her with mental health treatment or a referral to outside services was additionally the result of policies consciously chosen by Sangamon County, ACH, and the Sangamon County Sheriff:

(i)     Sangamon County's final decisionmakers repeatedly agreed to contracts with ACH that provided for minimal-to-no coverage by mental health professionals;

(ii)    ACH agreed to contracts in which its employees provided no mental health treatment whatsoever, including to detainees as seriously mentally ill as Tiffany, and pursuant to ACH's policies and practices its employees, including Defendants Abraham and Shmikler, indeed provided Tiffany with no mental healthcare;

(iii)   The Sangamon County Sheriff had no policies prohibiting placement of mentally ill prisoners in prolonged solitary confinement, had no policies mandating assessment for referrals to outside mental health facilities, and had no policies that actually mandated treatment and counseling of mentally ill prisoners.

**ANSWER:    Defendants deny the allegations of paragraph 42 and all subparagraphs thereunder.**

43.     By placing Tiffany in prolonged solitary confinement, the Defendants increased the risk that she would commit suicide. They then compounded this risk by failing adequately to protect her from harming herself.

**ANSWER:    Defendants deny the allegations of paragraph 43.**

44. Tiffany was not under observation, as required by all recognized suicide prevention protocols. Rather, her cell was placed in a hallway with no direct line of sight by jail staff, meaning that the only time jail staff saw her was on 15-minute intervals during their tours of the jail.

**ANSWER:    Defendants deny the allegations of paragraph 44.**

45. At the same time Defendants Barr, Beck, and/or Does 1-5 compounded the risk that Tiffany would harm herself by failing adequately to prevent Tiffany from accessing a number of items that she used to harm herself.

**ANSWER:    Defendants deny the allegations of paragraph 45.**

46. As a direct result of the actions and failures to act of defendants Barr, Beck, and/or Does 1-5, Tiffany was able to engage in open and obvious self-harming and suicidal behavior consistent with her diagnosis upon entering the Sangamon Jail. For example:

(i)     On January 12, 2017, Tiffany swallowed a plastic spoon and was transferred from the Sangamon Jail to Memorial Medical Center in Springfield, Illinois, for treatment.

(ii)    On January 19, 2017, Tiffany tried to strangle herself with a strap from a protective medical boot worn on an injured foot.

(iii)   On January 29, 2017, Tiffany swallowed a toothbrush and was transferred from the Sangamon Jail to Memorial Medical Center in Springfield, Illinois, for treatment.

(iv)    On February 3, 2017, Tiffany tried to swallow a whole apple core.

(v)     On February 10 and 11, 2017, Tiffany was placed in restraints because she cut a wound in her hand and chewed on her hand until it bled.

(vi)     On February 12, 2017, Tiffany swallowed mattress stuffing.

(vii)    On February 24, 2017, Tiffany put toilet paper up her nose and said she could not breathe.

(viii)   On February 25, 2017, Tiffany was again placed in restraints because of self-harming behavior that caused her arm to bleed.

(ix)     On March 12, 2017, Tiffany was again placed in restraints for engaging in self-harm by scratching her arms on the underside of the concrete bunk in her cell until her arms bled.

(x)      On March 15, 2017, Tiffany swallowed a plastic bag.

**ANSWER:    Defendants deny the allegations of paragraph 46 and all subparagraphs thereunder.**

47.     On March 18, 2017 Tiffany asked Defendants Meyer or Whitley to allow her to take a shower; the shower facilities were located down the hall from her cell.

**ANSWER:    Defendants admit the allegations of paragraph 47.**

48.     Meyer or Whitley asked the supervisor, Defendant Bouvet, who approved the shower without giving any special instruction, even though he knew that allowing Tiffany to shower unmonitored would present multiple opportunities for self-harm.

**ANSWER:    Defendants deny the allegations of paragraph 48.**

49.     Meyer and Whitley escorted Tiffany to the shower and allowed her to shower alone behind a closed door.

**ANSWER:    Defendants admit that Meyer and Whitley escorted Rusher to the shower. Defendants admit that Rusher was allowed to shower alone. Defendants deny the remaining allegations of paragraph 49.**

50.     At some point before, during or after her shower, Meyer, Whitley, or Defendant Ealey provided Tiffany with a bright orange towel and let her use it unsupervised, also behind a closed door. On information and belief, when the defendants gave Tiffany the towel it was in good condition, with all its stitched edges intact.

**ANSWER:     Defendants admit that the towel was in good condition to the extent that it was appropriate for an inmate to use to dry off after a shower. Defendants deny that all of the towels had perfectly stitched edges intact.**

51.     When Tiffany was down toweling off, Meyer, Whitely, and/or Ealey allowed to Tiffany to dress unsupervised into a suicide-proof "turtle suit."

**ANSWER:     Defendants deny the allegations of paragraph 51 as stated. Defendants admit that Officer Ealey assisted Rusher in helping her put on her new smock after she came out of the shower.**

52.     On information and belief, during the time that the officers left Tiffany unsupervised, she tore off a long strip of towel along one of its stitched edges, and hid the strip under her turtle suit so that she could use it to harm herself in her cell.

**ANSWER:     Defendants deny the allegations of paragraph 52.**

53.     Although Meyer, Whitely, and/or Ealey may not have personally observed Tiffany tear the towel, one or more of them would or should have noticed that the towel was now ripped, and that Tiffany left several strands of towel thread behind in the shower area.

**ANSWER:     Defendants deny the allegations of paragraph 53.**

54.     Photos taken by investigators in the shower area show that anyone who inspected the shower area after Tiffany dressed unsupervised would have seen the bright orange threads and realized that Tiffany tore the towel in some way while she was alone.

**ANSWER:     Defendants deny the allegations of paragraph 54.  Defendants further deny that the photographs taken reflect an accurate and fair depiction of the shower as it looked at the time Rusher left it on March 18, 2017.**

55.     Indeed, after Tiffany completed her shower, Defendant Ealey entered the shower room, saw the towel on the shower floor, and noted that it was ripped, but decided not to investigate further. Had she done so, or had she simply inspected the shower room, Ealey would have discovered multiple strands of ripped towel in the shower-room toilet, indicating that Tiffany had ripped the towel:



**ANSWER:     Defendants deny the allegations of paragraph 55.**

56.     Instead of conducting any sort of sweep or inspection, however, Ealey simply escorted Tiffany back to her cell.

**ANSWER:     Defendants deny the allegations of paragraph 56.**

57.    There was then a prolonged period, lasting approximately 15 minutes, during which Tiffany was unsupervised. None of the defendants responsible for monitoring Tiffany, including Defendants Meyers or Whitley, checked on her. She used this time to strangle herself inside her cell.

> **ANSWER:    Defendants admit that after Rusher took her shower, she apparently had taken strips of her towel to use in an effort to strangle herself. Defendants deny that this period of time lasted more than 15 minutes. Defendants admit that Rusher was allowed to remain in her cell without constant monitoring.   Defendants deny that they were personally responsible for monitoring Rusher on a constant basis at any time.   Defendants admit that Rusher committed suicide by using a portion of a towel she used to dry herself on March 18, 2017.**

58.    Despite the known risk that Tiffany would strangle herself and that jail inmates who are at risk of suicide require special care, defendants Barr, Beck, and Bouvet failed to develop policies and protocols to warn correctional officers of the specific risks of suicide and establish protocols to prevent suicide.

> **ANSWER:    Defendants deny the allegations of paragraph 58 and deny that paragraph 58 accurately sets for the duties, if any, owed by the Defendants.**

59.    These same defendants also failed to establish protocols or policies that would prevent suicidal inmates from using towels to strangle themselves. They failed to provide such inmates with only rip-proof towels; they failed to require that use of towels be supervised to

ensure they would not be ripped; and they failed to require that towels be checked afterwards to ensure they had not been ripped.

**ANSWER:** **Defendants deny the allegations of paragraph 59. Defendants further deny that paragraph 59 sets forth a duty, if any, owed to Rusher.**

60. As a result, Tiffany was deprived of oxygen to her brain for a lengthy period of time sufficient to cause irreparable damage to her brain. An autopsy later conducted by the Sangamon County Coroner noted that Tiffany "was found unresponsive in her cell, with a strip of hand towel wrapped tightly around her neck."

**ANSWER:** **Defendants admit that Rusher was deprived of oxygen to her brain for a lengthy period of time sufficient to cause irreparable brain damage. Defendants deny that such was the result of any wrongdoing on their part. Defendants admit that an autopsy was later conducted. To the extent the coroner's report specifically contains the words set forth in paragraph 60, Defendants admit that the report so states. Defendants admit that there was a strip of hand towel around Rusher's neck. Defendants deny the remaining allegations of paragraph 60.**

61. On March 18, 2017, Tiffany was transferred from Sangamon Jail to St. John's Hospital in Springfield, Illinois and was placed on life support.

**ANSWER:** **Defendants admit the allegations of paragraph 61.**

62. On March 30, 2017, Tiffany died as a result of the injuries she had sustained while in Defendants' custody. An autopsy conducted by the Sangamon County Coroner concluded that Tiffany's death was caused by self-inflicted and deliberate ligature strangulation.

**ANSWER:** **Defendants admit that Rusher died on March 30, 2017. Defendants admit the remaining allegations of paragraph 62.**

### COUNT I: Fourteenth Amendment
### Against: All Defendants

63.     Each paragraph of this complaint is incorporated as if fully restated here.

**ANSWER:** **Defendants assert each response to the paragraphs of this complaint as incorporated and fully restated herein.**

64.     Tiffany suffered from a serious condition that presented a substantial risk to her health or safety.

**ANSWER:** **Defendants admit that Rusher posed a substantial risk of harm to herself at certain times.**

65.     In the manner described more fully above, each of the Defendants acted with deliberate indifference to Tiffany's condition and/or they acted in an objectively unreasonable manner in response to her condition.

**ANSWER:** **Defendants deny the allegations of paragraph 65.**

66.     The misconduct described in this count caused harm to Tiffany, including severe emotional distress and physical injuries during the time she was confined to the jail, and ultimately her death.

**ANSWER:** **Defendants deny the allegations of paragraph 66.**

WHEREFORE, Defendants pray that this Court would enter judgment in favor of the Defendants and against the Plaintiff, plus costs of suit.

### AFFIRMATIVE DEFENSES TO COUNT I

NOW COME Defendants WES BARR, LARRY BECK, GUY BOUVET, III, JENNIFER EALEY, KYLE MEYER, SANGAMON COUNTY, ILLINOIS, and ZACH

WHITLEY, by THERESA M. POWELL, of HEYL, ROYSTER, VOELKER & ALLEN, P.C., their attorneys, and for their affirmative defenses to Count I of Plaintiff's First Amended Complaint, state as follows:

1.      Each Defendant sued in his or her individual capacity is entitled to qualified immunity.

### DEFENDANTS DEMAND TRIAL BY JURY

### COUNT II: Americans with Disabilities Act
### Against: Barr (official capacity)

67.     Each paragraph of this complaint is incorporated as if fully restated here.

**ANSWER:**     **Defendant reasserts the Defendants' responses to paragraphs 1 through 66 as and for Defendant Barr's responses to paragraph 67 as fully set forth herein as pertains to the claim against him in his official capacity.**

68.     Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

**ANSWER:**     **Defendant admits that there is a statute passed by Congress referred to as the Americans with Disabilities Act.  Defendant admits that the statute was directed to eliminate discrimination against individuals with disabilities.   Defendant denies any violation of the Act. Defendant denies that Wes Barr, as Sheriff  had a custom, policy or**

**practice which resulted in unlawful discrimination against Rusher due to any qualifying disability she may have suffered as defined by the Act.**

69. To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

**ANSWER: Defendant admits that 28 C.F.R. § 35.130(b)(7) contains the language set forth in paragraph 69. Defendant denies that this provision supports a claim that Rusher was discriminated against in the Sangamon County Jail or that she was discriminated against due to a qualifying disability in the context of the ADA.**

70. The Sangamon County Sheriff's Office is a public entity as defined in 42 U.S.C. § 12131(1).

**ANSWER: Defendant admits that 42 USC § 12131(1) defines the term "public entity" as any State or local government. Defendant admits that the County is a local government. Defendant denies that the Sheriff's Office is a public entity as the Sheriff is an elected official.**

71. At all times relevant to this Complaint, in light of her severe mental illness, Tiffany was a qualified individual with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12131(2), and had a right not to be subjected to discrimination on the basis of her disability by Defendant.

**ANSWER:** **Defendant denies the allegations of paragraph 71.**

72. Due to her mental illnesses, Tiffany frequently contemplated and engaged in suicidal behavior and could not take adequate care of herself.

**ANSWER:** **Defendant admits that Rusher took actions to harm herself at certain times. Defendant admits that Rusher had difficulty with certain tasks at certain times. Defendant denies the remaining allegations of paragraph 72.**

73. As a detainee at the Sangamon Jail, Tiffany was wholly dependent upon Sheriff Barr for basic daily needs and appropriate accommodations, including mental health care and accommodation. Individuals in the custody of defendant are also dependent on the defendant for all of their basic daily needs, including food, exercise, and safety.

**ANSWER:** **Defendant denies that Rusher was dependent on Sheriff Barr personally as alleged in paragraph 73. Defendant admits that while Rusher was incarcerated in the Sangamon County Jail, she was provided appropriate accommodations and mental health care. Defendant admits that Rusher's basic daily needs were provided for by the jail during her incarceration there.**

74. Under the Title II of the ADA and 28 C.F.R. § 35.130(a), Sheriff Barr is responsible for ensuring that individuals in his custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of services, programs, or activities because of their disability.

**ANSWER:** **Defendant denies the allegations of paragraph 74 and denies that paragraph 74 accurately sets forth the duties owed to Rusher by this Defendant.**

75.    In the manner described more fully above, Sheriff Barr failed reasonably to accommodate Tiffany's known and obvious disability and discriminated against her because of her disability.

**ANSWER:** **Defendant denies the allegations of paragraph 75.**

76.    As a result of the wrongful conduct of the Sheriff's Office, Tiffany's mental health condition was greatly exacerbated, and she was subjected to unnecessary pain and suffering, and she died.

**ANSWER:** **Defendant denies the allegations of paragraph 76.**

WHEREFORE, Defendants pray that this Court would enter judgment in favor of the Defendants and against the Plaintiff, plus costs of suit.

## AFFIRMATIVE DEFENSES TO COUNT II

NOW COMES Defendant WES BARR, by THERESA M. POWELL, of HEYL, ROYSTER, VOELKER & ALLEN, P.C., his attorneys, and for his affirmative defenses to Count II of Plaintiff's First Amended Complaint, states as follows:

1.    Defendant is entitled to qualified immunity.

## DEFENDANTS DEMAND TRIAL BY JURY

### COUNT III: Rehabilitation Act
### Against: Barr (official capacity)

77.    Each paragraph of this complaint is incorporated as if fully restated here.

**ANSWER:** **Defendant asserts each response to the paragraphs of this complaint as incorporated and fully restated herein.**

78.    The purpose of the Rehabilitation Act is to ensure that no "qualified individual with a disability in the United States . . . shall, solely by reason of [ ] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

**ANSWER:    Defendant admits the allegations of paragraph 78.**

79.    Tiffany was, at all times relevant to this complaint, a qualified individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(2), and has a right not to be subjected to discrimination on the basis of her disability. 29 U.S.C. § 794(a).

**ANSWER:    Defendant denies that Rusher was a qualified individual under the Act.  Defendant denies that Rusher was discriminated against in any way which violates the Act referenced in paragraph 79.**

80.    The Sangamon County Sheriff's Office receives Federal financial assistance within the meaning of 29 U.S.C. § 794(a).

**ANSWER:    Defendant admits that Sangamon County may receive federal funds associated with certain programs.  Defendant denies that the Sheriff's Office specifically receives funding directly from the federal government.  Defendant denies that Rusher was denied access to any program or activity in violation of the Act referenced herein.**

81.    The Sheriff's Office constitutes "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(1)(A)-(B) and/or (b)(2)(B) and was required to comply with the Rehabilitation Act.

**ANSWER:    Defendant denies the allegations of paragraph 81.  Defendant admits that Sangamon County may be required to comply with the Act.**

**Defendant denies that he as an elected official must personally comply with the Act.**

82.    In the manner described more fully above, Sheriff Barr failed reasonably to accommodate Tiffany's known and obvious disability and discriminated against her because of her disability.

**ANSWER:    Defendant denies the allegations of paragraph 82.**

83.    As a result of the wrongful conduct of the Sheriff's Office, Tiffany's mental health condition was greatly exacerbated, and she was subjected to unnecessary pain, suffering, and death.

**ANSWER:    Defendant denies the allegations of paragraph 83.**

WHEREFORE, Defendant prays that this Court would enter judgment in favor of the Defendant and against the Plaintiff, plus costs of suit.

**AFFIRMATIVE DEFENSES TO COUNT III**

NOW COMES Defendant WES BARR, by THERESA M. POWELL, of HEYL, ROYSTER, VOELKER & ALLEN, P.C., his attorneys, and for his affirmative defenses to Count III of Plaintiff's First Amended Complaint, state as follows:

1.    Defendant is entitled to qualified immunity.

**DEFENDANTS DEMAND TRIAL BY JURY**

**COUNT IV: Wrongful Death (740 ILCS 180)**
**Against: All defendants**

84.    Each paragraph of this complaint is incorporated as if fully restated here.

**ANSWER:    Defendants assert each response to the paragraphs of this complaint as and for the responses to the paragraphs Plaintiff incorporates herein.**

85. Defendants had a duty to protect Tiffany from harm when such harm was reasonably foreseeable.

**ANSWER:** **Defendants deny this allegation and further deny that the allegations of paragraph 85 accurately set forth the duty (duties), if any, owed by each Defendant to Rusher.**

86. Defendants breached that duty.

**ANSWER:** **Defendants deny the allegations of paragraph 86.**

87. As a result of defendants' breach of that duty, Tiffany died.

**ANSWER:** **Defendants deny the allegations of paragraph 87.**

88. Tiffany's next of kin have suffered damages from the loss of Tiffany, including grief, sorrow, mental suffering, and loss of society.

**ANSWER:** **Defendants deny the allegations of paragraph 88.**

WHEREFORE, Defendants pray that this Court would enter judgment in favor of the Defendants and against the Plaintiff, plus costs of suit.

## AFFIRMATIVE DEFENSES TO COUNT IV

NOW COME Defendants WES BARR, LARRY BECK, GUY BOUVET, III, JENNIFER EALEY, KYLE MEYER, SANGAMON COUNTY, ILLINOIS, and ZACH WHITLEY, by THERESA M. POWELL, of HEYL, ROYSTER, VOELKER & ALLEN, P.C., their attorneys, and for their affirmative defenses to Count IV of Plaintiff's First Amended Complaint, state as follows:

1. To the extent any state law claim is based upon an act or omission occurring more than one year before the filing of this action, said claims are barred by the statute of limitations. 745 ILCS 10/8-101(a).

2.    Defendants are entitled to tort immunity under 745 ILCS 10/4-105 which provides that:

> Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care. Nothing in this Section requires the periodic inspection of prisoners.

3.    Defendants are entitled to tort immunity under 745 ILCS 10/4-103.

4.    Defendants are entitled to tort immunity under 745 ILCS 10/2 which prohibits punitive damages.

5.    Defendants are entitled to tort immunity under 745 ILCS 10/2-202 as it relates to any claim sounding in negligence.

6.    Defendants are entitled to tort immunity under 745 ILCS 10/2-109 for any claim against the governmental entity based upon an act or omission of its employee where the employee is not liable.

7.    Defendants are entitled to tort immunity under any applicable provision relating to Plaintiff's state law claims.

**DEFENDANTS DEMAND TRIAL BY JURY**

**COUNT V: Survival Act and Funeral Expenses**
**Against: All defendants**

89.    Each paragraph of this complaint is incorporated as if fully restated here.

**ANSWER:    Defendants assert each response to the paragraphs of this complaint as incorporated and fully restated herein.**

90.     Count VI is alleged against Defendants in their individual capacities and brought by Plaintiff as Tiffany's personal representative in her capacity as administrator of Tiffany's estate.

**ANSWER:     Defendants admit the allegations of paragraph 90 but deny the validity of the claims asserted.**

91.     This count is brought pursuant to the Survival Act, 755 ILCS 5/27-6, for the medical, funeral and burial expenses and the pain and suffering experienced by Tiffany prior to her death.

**ANSWER:     Defendants admit that Plaintiff has brought such claims, under paragraph 91 but deny its applicability to all Defendants.**

92.     As a result of one or more of the willful and wonton acts or omissions described in the previous paragraphs, Tiffany experienced suicidal thoughts, decline in mental health, agitation, mental abuse, punishment, pain and suffering, and other injuries including medical expenses prior to her death.

**ANSWER:     Defendants deny the allegations of paragraph 92.**

93.     As a direct and proximate result of the death of Tiffany, the estate incurred funeral and burial expenses.

**ANSWER:     Defendants deny the allegations of paragraph 93.**

WHEREFORE, Defendants pray that this Court would enter judgment in favor of the Defendants and against the Plaintiff, plus costs of suit.

## AFFIRMATIVE DEFENSES TO COUNT V

NOW COME Defendants WES BARR, LARRY BECK, GUY BOUVET, III, JENNIFER EALEY, KYLE MEYER, SANGAMON COUNTY, ILLINOIS, and ZACH

WHITLEY, by THERESA M. POWELL, of HEYL, ROYSTER, VOELKER & ALLEN, P.C., their attorneys, and for their affirmative defenses to Count V of Plaintiff's First Amended Complaint, state as follows:

1.      To the extent any state law claim is based upon an act or omission occurring more than one year before the filing of this action, said claims are barred by the statute of limitations. 745 ILCS 10/8-101(a).

2.      Defendants are entitled to tort immunity under 745 ILCS 10/4-105 which provides that:

> Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care. Nothing in this Section requires the periodic inspection of prisoners.

3.      Defendants are entitled to tort immunity under 745 ILCS 10/4-103.

4.      Defendants are entitled to tort immunity under 745 ILCS 10/2 which prohibits punitive damages.

5.      Defendants are entitled to tort immunity under 745 ILCS 10/2-202 as it relates to any claim sounding in negligence.

6.      Defendants are entitled to tort immunity under 745 ILCS 10/2-109 for any claim against the governmental entity based upon an act or omission of its employee where the employee is not liable.

7.      Defendants are entitled to tort immunity under any applicable provision relating to Plaintiff's state law claims.

**DEFENDANTS DEMAND TRIAL BY JURY**

**COUNT VI: Respondeat Superior**
**Against: Barr**

94.     Each paragraph of this complaint is incorporated as if fully restated here.

**ANSWER:     Defendants assert each response to the paragraphs of this complaint as incorporated and fully restated herein.**

95.     Sheriff Wes Barr employed various Sangamon Jail personnel and staff who provided inadequate care to Tiffany and/or insufficiently monitored Tiffany while working in the course and scope of their employment.

**ANSWER:     Defendant denies the allegations of paragraph 95.**

96.     Sheriff Wes Barr, by and through his employees, is liable for all Defendants' aforementioned unlawful acts that were the direct and proximate cause of Tiffany's injuries, and her death on March 30, 2017.

**ANSWER:     Defendant denies the allegations of paragraph 96.  Defendant further denies that paragraph 96 accurately states the duty, if any, owed by Defendant Barr as pertains to the actions of County employees.**

WHEREFORE, Defendants pray that this Court would enter judgment in favor of the Defendant Barr and against the Plaintiff, plus costs of suit.

**AFFIRMATIVE DEFENSES TO COUNT VI**

NOW COMES Defendant WES BARR, by THERESA M. POWELL, of HEYL, ROYSTER, VOELKER & ALLEN, P.C., his attorneys, and for his affirmative defenses to Count VI of Plaintiff's First Amended Complaint, states as follows:

1.      To the extent any state law claim is based upon an act or omission occurring more than one year before the filing of this action, said claims are barred by the statute of limitations. 745 ILCS 10/8-101(a).

2.      Defendant is entitled to tort immunity under 745 ILCS 10/4-105 which provides that:

> Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care. Nothing in this Section requires the periodic inspection of prisoners.

3.      Defendant is entitled to tort immunity under 745 ILCS 10/4-103.

4.      Defendant is entitled to tort immunity under 745 ILCS 10/2 which prohibits punitive damages.

5.      Defendant is entitled to tort immunity under 745 ILCS 10/2-202 as it relates to any claim sounding in negligence.

6.      Defendant is entitled to tort immunity under 745 ILCS 10/2-109 for any claim against the governmental entity based upon an act or omission of its employee where the employee is not liable.

7.      Defendant is entitled to tort immunity under any applicable provision relating to Plaintiff's state law claims.

**DEFENDANT DEMANDS TRIAL BY JURY**

**COUNT VII: Indemnification**
**Against: Sangamon County**

97.      Each paragraph of this complaint is incorporated as if fully restated here.

**ANSWER:    Defendant asserts each response to the paragraphs of this complaint as incorporated and fully restated herein.**

98.    Illinois law provides that public entities are directed to pay any tort judgments for compensatory damages for which employees are liable within the scope of their employment activities.

**ANSWER:    Defendant admits the allegations of paragraph 98.**

99.    Defendants Barr, Beck, and Does 1-5 were employees and agents of Defendants Sangamon County and/or the Office of the Sheriff of Sangamon County and acting within the scope of their employment in committing the misconduct described herein.

**ANSWER:    Defendant Barr was not an employee of Sangamon County but an elected official to the office of Sheriff of Sangamon County during certain times relevant to Plaintiff's claim.  Defendant Beck admits that he was, and is, an employee of Sangamon County.  Defendant denies knowledge of any status of Does 1-5 as such persons are unknown and unidentified.  Defendants Barr and Beck deny committing any misconduct and all remaining allegations of paragraph 99.**

100.    Sangamon County is obligated by Illinois law to pay any judgment relating to the operation of the Sangamon Jail entered against the Sangamon County Sheriff's Office and its agents and employees.

**ANSWER:    Defendant admits that there is an indemnification statute applicable to certain judgments.  Defendant admits that the County is a necessary party pursuant to the Indemnification Statute. Defendant**

**denies that this statute provides that the County is obligated to pay "any" judgment without restriction.**

WHEREFORE, Defendant prays that this Court would enter judgment in favor of the Defendant and against the Plaintiff, plus costs of suit.

## AFFIRMATIVE DEFENSES TO COUNT VII

NOW COMES Defendant SANGAMON COUNTY, ILLINOIS, by THERESA M. POWELL, of HEYL, ROYSTER, VOELKER & ALLEN, P.C., its attorneys, and for its affirmative defenses to Count VII of Plaintiff's First Amended Complaint, state as follows:

1.      To the extent any state law claim is based upon an act or omission occurring more than one year before the filing of this action, said claims are barred by the statute of limitations. 745 ILCS 10/8-101(a).

2.      Defendant is entitled to tort immunity under 745 ILCS 10/4-105 which provides that:

> Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care.  Nothing in this Section requires the periodic inspection of prisoners.

3.      Defendant is entitled to tort immunity under 745 ILCS 10/4-103.

4.      Defendant is entitled to tort immunity under 745 ILCS 10/2 which prohibits punitive damages.

5.      Defendant is entitled to tort immunity under 745 ILCS 10/2-202 as it relates to any claim sounding in negligence.

6.      Defendant is entitled to tort immunity under 745 ILCS 10/2-109 for any claim against the governmental entity based upon an act or omission of its employee where the employee is not liable.

7.      Defendant is entitled to tort immunity under any applicable provision relating to Plaintiff's state law claims.

8.      Sangamon County asserts all of the aforementioned affirmative defenses identified herein as and for its affirmative defenses to the claims for indemnification against it.

9.      Sangamon County's duty to indemnify can be no greater that the duty of its agents.

## DEFENDANTS DEMAND TRIAL BY JURY

## V.  RELIEF REQUESTED

WHEREFORE, Defendants pray that this Court would enter judgment in favor of the Defendants and against the Plaintiff, plus costs of suit, as well as any other relief the Court may deem appropriate.

## VI.      DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendants hereby demand a trial by jury in this action of all issues and affirmative defenses so triable.

## DEFENDANTS DEMAND TRIAL BY JURY AS TO
## ALL ALLEGATIONS, DEFENSES AND AFFIRMATIVE DEFENSES

Respectfully Submitted,

WES BARR, LARRY BECK and
SANGAMON COUNTY, ILLINOIS,
Defendants

s/ Theresa M. Powell
Theresa M. Powell, IL ARDC #: 6230402
Alisha L. Sheehan, IL ARDC #: 6320311

HEYL, ROYSTER, VOELKER & ALLEN, P.C.
3731 Wabash Avenue
Springfield, IL 62711-6261
Phone: 217.522.8822, Ext. 2222/2219
Fax:    217.523.3902
Email: tpowell@heylroyster.com
        asheehan@heylroyster.com

## PROOF OF SERVICE

I hereby certify that on January 11, 2019, I electronically filed the foregoing instrument, ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Alexis G. Chardon                                          Attorneys for Plaintiff
Stephen H. Weil
WEIL & CHARDON LLC
333 South Wabash Avenue
Suite 2700
Chicago, IL  60604
Email: ali@weilchardon.com
Email: steve@weilchardon.com

-and-

Nicole Rae Schult
Alan Mills
Elizabeth Mazur
UPTOWN PEOPLE'S LAW CENTER
4413 North Sheridan
Chicago, IL  60640
Email: nicole@uplcchicago.org
Email: alan@uplcchicago.org
Email: liz@uplcchicago.org

and I hereby certify that I have mailed on January 11, 2019, by United States Postal Service the foregoing instrument, ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, to the following non-CM/ECF participants:

None

s/ Theresa M. Powell
Theresa M. Powell

TMP/cs (5487-15)
35635092_1.docx