E-FILED
Tuesday, 26 February, 2019  07:54:34 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| KELLI ANDREWS, as Administrator of the<br>Estate of Tiffany Ann Rusher, deceased,<br><br>    Plaintiff,<br><br>v.<br><br>SANGAMON COUNTY, ILLINOIS, WES BARR,<br>LARRY BECK JR., ADVANCED CORRECTIONAL<br>HEALTHCARE, INC. ARUN ABRAHAM, MICHAEL<br>SHMIKLER, KYLE MEYER, Z. WHITLEY, JENNFER<br>EALEY, GUY BOUVET III, AND DOES 1-5,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)   Case No. 18-cv-1100<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ARUM ABRAHAM, M.D.'S
## ANSWER TO FIRST AMENDED COMPLAINT

NOW COMES Defendant Arum Abraham, M.D., by his attorneys, QUINN, JOHNSTON, HENDERSON, PRETORIUS & CERULO, and for his Answer to the First Amended Complaint state as follows:

### I.      NATURE OF THE ACTION

1.      Tiffany Rusher, who was a pre-trial detainee in the Sangamon County Detention Facility ("Sangamon Jail"), suffered from severe mental illness. When she entered the Sangamon Jail in December 2016, the Defendants knew that she was severely mentally ill, that she was at high risk of suicide, and that she was in need of intensive mental health treatment. The defendants also knew, or at the very least should have known, that placing a person with Tiffany's mental state in solitary confinement would only exacerbate her deteriorated mental condition, cause severe psychological trauma, and make it more likely that Tiffany would try to kill herself.

**ANSWER:**

**Defendant admits that Tiffany Rusher was a pre-trial detainee at certain times in the Sangamon County Jail.   Defendant admits that Tiffany Rusher suffered from serious mental health issues.   Defendant denies the remaining allegations of paragraph 1.**

2.      Nevertheless, the defendants placed Tiffany in solitary confinement, and kept her there for more than four months. This solitary confinement caused Tiffany's mental condition to deteriorate further, but the defendants failed to provide Tiffany with mental health treatment, compounding the harmful effects of solitary and increasing the risk that she would try to harm herself.

**ANSWER:**

**Defendant admits that Tiffany Rusher placed in a cell by herself.   Defendants deny the remaining allegations of paragraph 2.**

3.      What is more, the defendants failed to take adequate steps to guard against the possibility of suicide, making it easier for Tiffany to harm herself severely. As a direct result of defendants' actions and failures to act, Tiffany was found asphyxiated in her cell on March 18, 2017. She died on March 30, 2017, after spending 12 days on life support.

**ANSWER:**

**Defendants admit that Rusher died on March 30, 2017 but deny the remaining portions of paragraph 3.**

4.      This is an action for compensatory, nominal, and punitive damages, with claims brought under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA") to redress violations of Tiffany's rights. Plaintiff also asserts claims against the Defendants

pursuant to the Illinois Wrongful Death Act, 740 ILCS 180, and the Illinois Survival Act, 755 ILCS 5/27-6.

**ANSWER:**

    **Defendant admits that Plaintiff is attempting to bring claims under the various Acts as referenced.**

## II.       JURISDICTION AND VENUE

    5.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff's claims are brought under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.

**ANSWER:**

    **Defendant admits the allegation of paragraph 5.**

    6.    The Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims asserted in this Complaint that Plaintiff's state law claims form part of the same case or controversy.

**ANSWER:**

    **Defendant admits the allegations of paragraph 6.**

    7.    Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because one or more of the defendants resides in the Central District of Illinois and all events giving rise to the claims asserted in this lawsuit arose in this judicial district.

**ANSWER:**

    **Defendant admits the allegation of paragraph 7.**

### III. PARTIES

8.     Plaintiff's decedent is Tiffany Rusher, who at the time of her death was a twenty-seven-year-old resident of the State of Illinois. At all times relevant hereto, Tiffany was a pretrial detainee at the Sangamon Jail.

**ANSWER:**

**Defendant admits the allegation on paragraph 8.**

9.     Plaintiff Kelli Andrews ("Plaintiff") is Tiffany Rusher's mother and is the administrator of Tiffany's estate, pursuant to an order entered by the Circuit Court for the Seventh Judicial Circuit of Illinois, Sangamon County.

**ANSWER:**

**Defendant admits the allegations of paragraph 9 based of information provided by Plaintiff.**

10.     Wes Barr is the Sheriff of Sangamon County. In this capacity, he is responsible for the operation of the Sangamon Jail, which is the pretrial detention facility—*i.e.*, the jail—of Sangamon County. This responsibility includes a duty to safely house and to provide adequate medical care for the Sangamon Jail's detainees. At all times relevant to this case, Sheriff Barr acted under color of law. He is sued in his individual and official capacities.

**ANSWER:**

**Defendant admits that at the time of the incident described in the Complaint that Wes Barr was the Sheriff of Sangamon County.   Defendant lacks sufficient information to respond to the remaining allegations of paragraph 10.**

11.     Larry Beck is the Superintendent of the Sangamon Jail. In this capacity, he is responsible for the day-to-day operation of the Sangamon Jail. This includes making cell

assignments and ensuring that medical and mental health services are provided to those detainees who need such services. At all times relevant to this case, Superintendent Beck acted under color of law. He is sued in his individual capacity.

**ANSWER:**

   **Defendant admits that Larry Beck is the Superintendent of the Sangamon County Jail.   Defendant lacks sufficient information to respond to the remaining allegations of paragraph 11.**

   12.   Advanced Correctional Healthcare, Inc. ("ACH") is a private company that contracted to provide healthcare, including mental healthcare, to detainees of the Sangamon Jail. In this capacity, ACH also employed defendants Abraham and Shmikler.

**ANSWER:**

   **Defendant admits the allegation of paragraph 12.**

   13.   Dr. Arun Abraham was a medical doctor at the Sangamon Jail and, on information and belief, was responsible for overseeing the provision of medical and mental health care of all pretrial detainees at the jail, including Tiffany.

**ANSWER:**

   **Defendant admits that he was a medical doctor at the Sangamon County Jail and in this role provided and oversaw medical and mental health services to pre-trial detainees at the Jail.**

   14.   Michael Shmikler was a licensed clinical social worker and, on information and belief, the "qualified mental health professional" described in the contract between ACH and Sangamon County.

**ANSWER:**

**Defendant admits the allegations of paragraph 14.**

15.    Kyle Meyer is a guard at the Sangamon Jail.

**ANSWER:**

**Defendant lacks sufficient information to respond to the allegations of paragraph 15.**

16.    Z. Whitley is a guard at the Sangamon Jail.

**ANSWER:**

**Defendant lacks sufficient information to respond to the allegations of paragraph 16.**

17.    Jennifer Ealey is a guard at the Sangamon Jail.

**ANSWER:**

**Defendant lacks sufficient information to respond to the allegations of paragraph 17.**

18.    Sgt. Guy Bouvet is a supervising guard at the Sangamon Jail.

**ANSWER:**

**Defendant lacks sufficient information to respond to the allegations of paragraph 18.**

19.    Sangamon County provides for the budget of the Sangamon County Sheriff's Office, including the budget for the Sangamon Jail. Sangamon County contracted with defendant ACH for the provision of healthcare, including mental healthcare, to detainees at the Sangamon Jail, during the time of Tiffany's detention there. Additionally, Sangamon County is named for indemnification purposes pursuant to 55 ILCS § 5/5-1002.

**ANSWER:**

**Defendant admits that ACH contracted with Sangamon County for the provision of health care to detainees at the Sangamon County Jail.   Defendant lacks sufficient information to respond to the remaining allegations of paragraph 19.**

20.     Does 1-5 are sued herein by fictitious names for the reason that their true names are unknown to Plaintiffs. Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of these Defendants when their identities have been ascertained. Plaintiffs are informed and believe, and based thereon allege, that these fictitiously-named defendants are responsible in some manner for the misconduct alleged herein.

**ANSWER:**

**Defendant lacks sufficient information to respond to the allegations of paragraph 20.**

### IV. FACTS

21.     On or about December 8, 2016, Tiffany was accused of battery while she was a patient at the McFarland Mental Health Center ("McFarland"), which is located in Springfield, Illinois. She was arrested at McFarland on December 15, 2016, and she was transported directly from McFarland for pretrial detention at the Sangamon Jail.

**ANSWER:**

**Defendant admits that Tiffany Rusher was accused of battery while a patient at McFarland Mental Health Center and was transported to the Sangamon County Jail.**

22.     Upon her arrival at the jail, the Defendants placed her in solitary confinement, and kept her there until she strangled herself on March 18, 2017.

**ANSWER:**

**Defendant denies the allegations of paragraph 22.**

23.     Throughout Tiffany's incarceration at Sangamon Jail, the Defendants were aware of Tiffany's mental health history, including her multiple suicide attempts.

**ANSWER:**

**Defendant admits the allegations of paragraph 23.**

24.     Upon Tiffany's arrival at the Sangamon Jail, jail personnel received a discharge summary that had been prepared by staff at McFarland. That summary contained a comprehensive account of Tiffany's history of severe mental illness, recurrent self-harming behavior, and numerous suicide attempts. Among other things, the Discharge Summary noted the following:

(i)      From October 19, 2014 to April 14, 2016, while incarcerated at the Logan Correctional Center in Lincoln, Illinois, Tiffany made at least ten attempts to hang herself, including by strangulation with a towel.

(ii)     During the same time period, Tiffany engaged in at least twenty-seven instances of self-harming behavior, including cutting herself, biting herself, banging her head against a wall, and repeatedly swallowing inedible objects such as ink pens, toilet paper, large segments of celery and carrot sticks, eating utensils, and toothbrushes.

(iii)    Due to Tiffany's self-harming behavior, Logan Correctional Center placed her on constant watch from approximately September 11, 2015 to May 3, 2016.

(iv)     On May 3, 2016, Tiffany was discharged directly from Logan Correctional Center to McFarland.

(v)      Tiffany engaged in self-harming and suicidal behavior during her hospitalization at McFarland. On multiple occasions she swallowed large objects requiring endoscopic removal and on at least two occasions, in June 2016 and September 2016, she attempted self-strangulation.

(vi)    McFarland provided Tiffany with mental health treatment and monitored her to protect her from harming herself.

(vii)   Upon her discharge from McFarland on December 15, 2016, Tiffany's diagnoses included Depression, Antisocial Personality Disorder, and Posttraumatic Stress Disorder.

**ANSWER:**

**Defendant admits that a discharge summary from McFarland was provided to Jail personnel.**

25.    Additionally, on the day after her admission to the Sangamon Jail, Sangamon Jail personnel received a phone call from a nurse at McFarland, who explained that Tiffany had been subject to one-to-one care at McFarland and that she had a history of attempting to asphyxiate herself.

**ANSWER:**

**Defendant admits that a phone call was placed by a nurse form McFarland reporting on the patient's history including one-to-one care and a history of attempting to asphyxiate herself.**

26.    All inmates entering the Sangamon Jail are supposed to undergo a medical screening, performed as the person enters the facility, and an examination completed by medical staff within the first fourteen days of incarceration.

**ANSWER:**

**Defendant admits that inmates entering the Sangamon County Jail undergo a medical screening upon booking and a subsequent examination but denies the remaining allegations of paragraph 26.**

27.     Upon information and belief, Tiffany received a medical screening and underwent a full medical examination by medical staff at Sangamon Jail within the first fourteen days of her arrival at the jail, which provided Defendants with additional information about Tiffany's mental health, including her risk for suicide.

**ANSWER:**

**Defendant admits the allegation of paragraph 27.**

28.     Indeed, on December 15, 2017 a nurse at Sangamon Jail wrote an order that Tiffany should be allowed to eat only "finger foods" in light of her tendency to asphyxiate herself by swallowing things.

**ANSWER:**

**Defendant neither admits nor denies the allegation of paragraph 27 at the present time pending further investigation.**

29.     Then on December 16, 2017, Tiffany was evaluated by Michael Shmikler, LCSW, who was designated as a "mental health professional" at the jail. Indeed Mr. Shmikler would evaluate Tiffany repeatedly during her detention at the Sangamon Jail, by interviewing her through the door of her cell.

**ANSWER:**

**Defendant admits the allegations of paragraph 29.**

30.     On multiple occasions in 2017, Dr. Arun Abraham, a physician at the Sangamon Jail employed by ACH, assessed Tiffany as having Bipolar Disorder and Schizoaffective Disorder, and documented that assessment in a medical progress note.

**ANSWER:**

**Defendant admits the allegation of paragraph 30.**

31.    On January 19, 2017, Tiffany attempted suicide by strangling herself in her cell with the strap of a medical boot.

**ANSWER:**

**Defendant admits that on January 19, 2017, Tiffany Rusher, in an apparent suicide attempt, removed straps from a soft cast and secured them around her neck in an apparent attempt at self-strangulation.**

32.    On multiple occasions be, Michael Shmikler, a social worker for ACH, described Tiffany as "high-risk" due to the known danger that she presented to herself.

**ANSWER:**

**Defendant admits the allegations in paragraph 32.**

33.    Upon information and belief, all Defendants knew about Tiffany's mental illness, her numerous prior attempts to commit suicide, her need for mental health treatment, and the substantial risk of self-harm that she presented to herself. Indeed, jail staff even taped a "HIGH RISK" sign outside of her cell:

**ANSWER:**

**Defendant lacks sufficient information to admit or deny that "all defendants' had the knowledge attributed to them in this allegation.   Defendant admits that ACH and Shmikler were aware of the detainee's mental illness and her history and risk of self-harm.**

34.    Even though the Defendants knew that Tiffany was mentally ill and required mental health treatment, they provided her with no treatment and instead kept her in solitary confinement—which they knew would damage her further and increase her risk of suicide.

**ANSWER:**

**Defendant denies the allegations of paragraph 34.**

11

35.     While in solitary confinement, Tiffany was deprived of all property. She was deprived of all meaningful social contact with other people. She was stripped naked, barred from having any undergarments or other clothing, but for an anti-suicide blanket. She was not permitted a television or radio, books, magazines, paper, pen or pencil, or anything else she could possibly have used to pass her time in jail while awaiting trial. The only thing she was permitted was a suicide blanket.

**ANSWER:**

**Defendant denies that Rusher was in solitary confinement.   Defendant admits that Rusher was deprived of certain property due to her propensity to eat inanimate objects. Defendant admits that Rusher's access to clothing was limited but deny the claims set forth in paragraph 35.   Defendant admits that Rusher was restricted from having certain property at certain times.   Defendant denies that any restrictions on Rusher were done for punitive purposes or for any reason other than to prevent her from harming herself or others.   Defendant admits that the above photograph does appear to be a photograph of Rusher's cell at certain times relevant to this lawsuit.   Defendant denies that the photograph fairly and accurately depicts the way the cell would have looked at any time Rusher was in it as pertains to items viewed in the photograph.   Defendant admits that the photograph was provided to Plaintiff by defense counsel in discovery.**

36.     It is universally recognized that isolation and solitary confinement for any significant period of time is likely to make a person suffering from mental illness even worse, creating a substantial and increased risk of harm. Indeed, decades before the Defendants placed Tiffany in solitary confinement, one federal court observed that "placing [mentally ill prisoners in solitary confinement] is the mental equivalent of putting an asthmatic in a place with little air to

breathe," *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995), because such prisoners "are at a particularly high risk for suffering very serious or severe injury to their mental health, including overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions" in solitary confinement. *Id*. Federal courts around the country have recognized the same thing; the U.S. Court of Appeals for the Seventh Circuit has observed that the conditions of solitary confinement "aggravate[] the symptoms of [a prisoner's] mental illness and by doing so inflict[] severe physical and especially mental suffering," *Scarver v. Litscher*, 434 F.3d 972, 977 (7th Cir. 2006), and that there is a "scientific consensus . . . that prisoners held in solitary confinement experience serious, often debilitating— even irreparable— mental and physical harm[] . . . ." *Wallace v. Baldwin*, 895 F.3d 481, 484-85 (7th Cir. 2018) (citation omitted)).

**ANSWER:  Defendant neither admits nor denies the statements contained in paragraph 36 as they are not factual allegations, but legal and medical conclusions of the pleader.**

37.     Depriving a person who is actively suicidal of all meaningful social contact for an extended period of time is not a method of treatment recognized by any competent medical authority. It is certain to make the person worse, not better, increasing their risk of suicide. For this reason, leading correctional standard-setting bodies provide specifically that such confinement should not occur. For example, the National Commission on Correctional Health Care Standards for Mental Health Services in Correctional Facilities states that "[i]nmates who are seriously mentally ill should not be confined under conditions of extreme isolation." The American Correctional Association has concluded that seriously mentally ill prisoners such as Tiffany should not be placed in solitary confinement for more than 30 days. The Association of State Correctional

Administrators "believe[s] that lengthy stays [in solitary confinement] manufacture or increase mental illness." And the American Bar Association Treatment of Prisoner Standards similarly advises that "[p]risoners diagnosed with serious mental illness should not be housed in settings that exacerbate their mental illness or suicide risk, particularly in settings involving sensory deprivation or isolation."

**ANSWER:   Defendant neither admits nor denies the statements contained in paragraph 36 as they are not factual allegations, but legal and medical conclusions of the pleader.**

38.    The Defendants' policies, and their conduct, flatly ignored and contradicted this accepted knowledge. It was the policy of the Sangamon County Sheriff's Office to place persons suffering from mental illness or in danger of suicide in solitary confinement for indefinite periods. That was precisely the policy the Sheriff's Office pursued with Tiffany, holding her in solitary confinement for more than four months, from the day she arrived in December 2016 to the day she strangled herself in March 2017. Over the course of Tiffany's confinement, no effort was made to provide her with any form of regular social interaction outside her cell, or otherwise ameliorate the conditions of her isolation.

**ANSWER:**

**Defendant denies the allegations of paragraph 38.**

39.    Over the multiple months of Tiffany's confinement, the Defendants provided no counseling or mental health treatment to her. It was not ordered or sought by Dr. Abraham, Mr. Shmikler, or any other official in the jail. The only interaction Tiffany had with any mental health professional was with Mr. Shmikler, who would occasionally interview her through a slot in the

locked door of her cell. These sessions with Mr. Shmikler were not therapeutic, however; they were intended simply to assess Tiffany's housing assignment.

**ANSWER:**

    **Defendant denies the allegations of paragraph 39.**

40.    The Sheriff's Office had an agreement with an outside entity so that detainees whose mental health needs are beyond the services that can be provided at the jail could be transferred to an appropriate facility, but even though Tiffany was transferred to the jail *from* a state mental hospital, no effort was made by any of the Defendants, including Dr. Abraham and Mr. Shmikler, to determine whether Tiffany should be transferred to an outside mental health facility—instead, upon her admission Tiffany was simply put in solitary confinement, and was kept there.

**ANSWER:**

    **Defendant admits that ACH and Sangamon County had an agreement providing that ACH would provide medical and mental health services to detainees at the Sangamon County Jail and that the agreement allowed for ACH to recommend transfer of an inmate. Defendant denies the remaining allegations of paragraph 40.**

41.    Despite their actual knowledge of Tiffany's need for intense mental health treatment, defendants Barr, Beck, Abraham, Shmikler, and/or Does 1-5 failed to provide any mental health treatment for Tiffany. Instead, these defendants arranged for Tiffany to be placed in solitary confinement, where they knew she would be harmed instead of helped, from December 2016 through March 18, 2017.

**ANSWER:**

    **Defendant denies the allegations of paragraph 41.**

42.    The placement of Tiffany in solitary confinement and the failure to provide her with mental health treatment or a referral to outside services was additionally the result of policies consciously chosen by Sangamon County, ACH, and the Sangamon County Sheriff:

(i)    Sangamon County's final decisionmakers repeatedly agreed to contracts with ACH that provided for minimal-to-no coverage by mental health professionals;

(ii)    ACH agreed to contracts in which its employees provided no mental health treatment whatsoever, including to detainees as seriously mentally ill as Tiffany, and pursuant to ACH's policies and practices its employees, including Defendants Abraham and Shmikler, indeed provided Tiffany with no mental healthcare;

(iii)    The Sangamon County Sheriff had no policies prohibiting placement of mentally ill prisoners in prolonged solitary confinement, had no policies mandating assessment for referrals to outside mental health facilities, and had no policies that actually mandated treatment and counseling of mentally ill prisoners.

**ANSWER:**

**Defendant denies the allegations of paragraph 42 and all subparagraphs thereunder.**

43.    By placing Tiffany in prolonged solitary confinement, the Defendants increased the risk that she would commit suicide. They then compounded this risk by failing adequately to protect her from harming herself.

**ANSWER:**

**Defendant denies the allegations of paragraph 43.**

44. Tiffany was not under observation, as required by all recognized suicide prevention protocols. Rather, her cell was placed in a hallway with no direct line of sight by jail staff, meaning that the only time jail staff saw her was on 15-minute intervals during their tours of the jail.

**ANSWER:**

**Defendant denies the allegations of paragraph 44.**

45. At the same time Defendants Barr, Beck, and/or Does 1-5 compounded the risk that Tiffany would harm herself by failing adequately to prevent Tiffany from accessing a number of items that she used to harm herself.

**ANSWER:**

**Defendant provides no answer to paragraph 45 as the allegations are directed against other Defendants.**

46. As a direct result of the actions and failures to act of defendants Barr, Beck, and/or Does 1-5, Tiffany was able to engage in open and obvious self-harming and suicidal behavior consistent with her diagnosis upon entering the Sangamon Jail. For example:

(i) On January 12, 2017, Tiffany swallowed a plastic spoon and was transferred from the Sangamon Jail to Memorial Medical Center in Springfield, Illinois, for treatment.

(ii) On January 19, 2017, Tiffany tried to strangle herself with a strap from a protective medical boot worn on an injured foot.

(iii) On January 29, 2017, Tiffany swallowed a toothbrush and was transferred from the Sangamon Jail to Memorial Medical Center in Springfield, Illinois, for treatment.

(iv) On February 3, 2017, Tiffany tried to swallow a whole apple core.

17

(v)     On February 10 and 11, 2017, Tiffany was placed in restraints because she cut a wound in her hand and chewed on her hand until it bled.

(vi)     On February 12, 2017, Tiffany swallowed mattress stuffing.

(vii)     On February 24, 2017, Tiffany put toilet paper up her nose and said she could not breathe.

(viii)     On February 25, 2017, Tiffany was again placed in restraints because of self-harming behavior that caused her arm to bleed.

(ix)     On March 12, 2017, Tiffany was again placed in restraints for engaging in self-harm by scratching her arms on the underside of the concrete bunk in her cell until her arms bled.

(x)     On March 15, 2017, Tiffany swallowed a plastic bag.

**ANSWER:**

**Defendant provides no answer to paragraph 46 as the allegations are directed against other Defendants.**

47.     On March 18, 2017 Tiffany asked Defendants Meyer or Whitley to allow her to take a shower; the shower facilities were located down the hall from her cell.

**ANSWER:**

**Defendant lacks sufficient information to respond to the allegations of paragraph 47.**

48.     Meyer or Whitley asked the supervisor, Defendant Bouvet, who approved the shower without giving any special instruction, even though he knew that allowing Tiffany to shower unmonitored would present multiple opportunities for self-harm.

**ANSWER:**

**Defendant lacks sufficient information to respond to the allegations of paragraph 48.**

49.     Meyer and Whitley escorted Tiffany to the shower and allowed her to shower alone behind a closed door.

**ANSWER:**

   **Defendant lacks sufficient information to respond to the allegations of paragraph 49.**

50.     At some point before, during or after her shower, Meyer, Whitley, or Defendant Ealey provided Tiffany with a bright orange towel and let her use it unsupervised, also behind a closed door. On information and belief, when the defendants gave Tiffany the towel it was in good condition, with all its stitched edges intact.

**ANSWER:**

   **Defendant lacks sufficient information to respond to the allegations of paragraph 50.**

51.     When Tiffany was down toweling off, Meyer, Whitely, and/or Ealey allowed to Tiffany to dress unsupervised into a suicide-proof "turtle suit."

**ANSWER:**

   **Defendant lacks sufficient information to respond to the allegations of paragraph 51.**

52.     On information and belief, during the time that the officers left Tiffany unsupervised, she tore off a long strip of towel along one of its stitched edges, and hid the strip under her turtle suit so that she could use it to harm herself in her cell.

**ANSWER:**

   **Defendant lacks sufficient information to respond to the allegations of paragraph 52**

53.     Although Meyer, Whitely, and/or Ealey may not have personally observed Tiffany tear the towel, one or more of them would or should have noticed that the towel was now ripped, and that Tiffany left several strands of towel thread behind in the shower area.

**ANSWER:**

>   **Defendant lacks sufficient information to respond to the allegations of paragraph 53.**

54.     Photos taken by investigators in the shower area show that anyone who inspected the shower area after Tiffany dressed unsupervised would have seen the bright orange threads and realized that Tiffany tore the towel in some way while she was alone.

**ANSWER:**

>   **Defendant lacks sufficient information to respond to the allegations of paragraph 54.**

55.     Indeed, after Tiffany completed her shower, Defendant Ealey entered the shower room, saw the towel on the shower floor, and noted that it was ripped, but decided not to investigate further. Had she done so, or had she simply inspected the shower room, Ealey would have discovered multiple strands of ripped towel in the shower-room toilet, indicating that Tiffany had ripped the towel:

**ANSWER:**

>   **Defendant lacks sufficient information to respond to the allegations of paragraph 55.**

56.     Instead of conducting any sort of sweep or inspection, however, Ealey simply escorted Tiffany back to her cell.

**ANSWER:**

>   **Defendant lacks sufficient information to respond to the allegations of paragraph 56.**

57.     There was then a prolonged period, lasting approximately 15 minutes, during which Tiffany was unsupervised. None of the defendants responsible for monitoring Tiffany, including Defendants Meyers or Whitley, checked on her. She used this time to strangle herself inside her cell.

**ANSWER:**

> **Defendant lacks sufficient information to respond to the allegations of paragraph 57.**

58.     Despite the known risk that Tiffany would strangle herself and that jail inmates who are at risk of suicide require special care, defendants Barr, Beck, and Bouvet failed to develop policies and protocols to warn correctional officers of the specific risks of suicide and establish protocols to prevent suicide.

**ANSWER:**

> **Defendant lacks sufficient information to respond to the allegations of paragraph 58.**

59.     These same defendants also failed to establish protocols or policies that would prevent suicidal inmates from using towels to strangle themselves. They failed to provide such inmates with only rip-proof towels; they failed to require that use of towels be supervised to ensure they would not be ripped; and they failed to require that towels be checked afterwards to ensure they had not been ripped.

**ANSWER:**

> **Defendant lacks sufficient information to respond to the allegations of paragraph 59.**

60.     As a result, Tiffany was deprived of oxygen to her brain for a lengthy period of time sufficient to cause irreparable damage to her brain. An autopsy later conducted by the Sangamon County Coroner noted that Tiffany "was found unresponsive in her cell, with a strip of hand towel wrapped tightly around her neck."

**ANSWER:**

> **Defendant lacks sufficient information to respond to the allegations of paragraph 60.**

61.     On March 18, 2017, Tiffany was transferred from Sangamon Jail to St. John's Hospital in Springfield, Illinois and was placed on life support.

**ANSWER:**

    **Defendant lacks sufficient knowledge to respond to the allegations of paragraph 61.**

62.    On March 30, 2017, Tiffany died as a result of the injuries she had sustained while in Defendants' custody. An autopsy conducted by the Sangamon County Coroner concluded that Tiffany's death was caused by self-inflicted and deliberate ligature strangulation.

**ANSWER:**

    **Defendant lacks sufficient knowledge to respond to the allegations of paragraph 62.**

**COUNT I: Fourteenth Amendment**
**Against: All Defendants**

63.    Each paragraph of this complaint is incorporated as if fully restated here.

**ANSWER:**

    **Defendant reassert his responses to paragraphs 1-62 of this Complaint.**

64.    Tiffany suffered from a serious condition that presented a substantial risk to her health or safety.

**ANSWER:**

    **Defendant admits that Tiffany Rusher suffered from a mental illness which presented the risk for self-harming behavior.**

65.    In the manner described more fully above, each of the Defendants acted with deliberate indifference to Tiffany's condition and/or they acted in an objectively unreasonable manner in response to her condition.

**ANSWER:**

    **Defendant denies the allegations of paragraph 65.**

66.     The misconduct described in this count caused harm to Tiffany, including severe emotional distress and physical injuries during the time she was confined to the jail, and ultimately her death.

**ANSWER:**

**Defendant denies the allegations of paragraph 66.**

### COUNT II: Americans with Disabilities Act
### Against: Barr (official capacity)

This Defendant provides no answers to Count II as it is directed against other Defendants.

### COUNT III: Rehabilitation Act
### Against: Barr (official capacity)

This Defendant provides no answers to Count III as it is directed against other Defendants.

### COUNT IV: Wrongful Death (740 ILCS 180)
### Against: All defendants

Defendant moves for a dismissal of Count IV as set forth in a separately filed Motion to Dismiss.

### COUNT V: Survival Act and Funeral Expenses
### Against: All defendants

Defendant moves for a dismissal of Count V as set forth in a separately filed Motion to Dismiss.

### COUNT VI: Respondeat Superior
### Against: Barr

This Defendant provides no answers to Count VI as it is directed against other Defendants.

### COUNT VII: Indemnification
### Against: Sangamon County

This Defendant provides no answers to Count VII as it is directed against other Defendants.

WHEREFORE, Defendant Arum Abraham, M.D. requests that this Court enter a judgment in his favor and against the Plaintiff.

DEFENDANT DEMANDS TRIAL BY JURY.


**FIRST AFFIRMATIVE DEFENSE-QUALIFIED IMMUNITY**

1.     At the time and place alleged in Plaintiff's Complaint, the law was not clearly established such that Defendant would have known that his actions were unlawful and in violation of Plaintiff's constitutional rights.   Defendant is therefore entitled to qualified immunity for the allegations in Plaintiff's Complaint.

2.     This affirmative defense is asserted in the alternative to the denials set forth above.

WHEREFORE, Defendant, Arum Abraham, prays that this Court enter a judgment in bar of Plaintiff's Complaint, that Defendant has his attorney's fees and costs at Plaintiff's expense, and for such other and further relief as this Court deems just.

DEFENDANT DEMANDS TRIAL BY JURY.

**SECOND AFFIRMATIVE DEFENSE-GOOD FAITH IMMUNITY**

1.     In the alternative to the denials and affirmative defense set forth above, Defendant is entitled to immunity, as his actions were at all times made in good faith. See, Richardson v. McKnight, 521 U.S. 399, 413-414 (1997) (discussing whether the court might recognize a good faith defense for private actors if they were not entitled to qualified immunity).

WHEREFORE, Defendant, Arum Abraham, prays that this Court enter a judgment in bar of Plaintiff's Complaint, that Defendant has his attorney's fees and costs at Plaintiff's expense, and for such other and further relief as this Court deems just.

DEFENDANT DEMANDS TRIAL BY JURY.

Arum Abraham, M.D., Defendant

By:  _____*s/Matthew J. Maddox*_____
Matthew J. Maddox
QUINN, JOHNSTON, HENDERSON, PRETORIUS & CERULO

Matthew J. Maddox (Illinois Bar No. 6185870)
Betsy A. Wirth (Illinois Bar No. 6298163)
QUINN, JOHNSTON, HENDERSON, PRETORIUS & CERULO
400 South Ninth Street, Suite 102
Springfield, IL 62701
Telephone:    (217) 753-1133
Facsimile:    (217) 753-1180
E-mail:    mmaddox@quinnjohnston.com
E-mail:    bwirth@quinnjohnston.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 26, 2019, I electronically filed the foregoing ARUM ABRAHAM, M.D.'S ANSWER TO FIRST AMENDED COMPLAINT with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Stephen H. Weil
Alexis G. Chardon
Weil & Chardon LLC
333 S. Wabash Ave., Suite 2700
Chicago, IL 60604
steve@weilchardon.com
ali@weilchardon.com

Alan Mills
Elizabeth Mazur
Nichole Schult
Uptown People's Law Center
4413 North Sheridon Road
Chicago, IL 60640
alan@uplcchicago.org
liz@uplcchicago.org
Nicole@uplcchicago.org

Teresa M. Powell
Alisha Lynne Sheehan
Brett Eric Siegel
Heyl Royster Voelker & Allen
3731 Wabash Avenue
PO Box 9678
Springfield, IL 62971
tpowell@heylroyster.com
asheehan@heylroyster.com
bsiegel@heylroyster.com

*s/Matthew J. Maddox*
Matthew J. Maddox (Illinois Bar No. 6185870)
Betsy A. Wirth (Illinois Bar No. 6298163)
QUINN, JOHNSTON, HENDERSON, PRETORIUS & CERULO
400 South Ninth Street, Suite 102
Springfield, IL 62701
Telephone:      (217) 753-1133
Facsimile:       (217) 753-1180
E-mail:            mmaddox@quinnjohnston.com
E-mail:            bwirth@quinnjohnston.com
4811-2885-9784, v. 1