E-FILED
Friday, 29 March, 2019  01:59:19 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| KELLI ANDREWS, as Administrator of the Estate of Tiffany Ann Rusher, deceased, )<br><br>Plaintiff, )<br><br>v. )<br><br>SANGAMON COUNTY, ILLINOIS, JACK CAMPBELL, WES BARR, LARRY BECK JR., ADVANCED CORRECTIONAL HEALTHCARE, INC. ARUN ABRAHAM, MICHAEL SHMIKLER, KYLE MEYER, ZACH WHITLEY, JENNIFER EALEY, GUY BOUVET III, and DOES 1-5, )<br><br>Defendants. | No. 1:18-cv-1100-SEM-TSH<br><br>JURY TRIAL DEMANDED |

## SECOND AMENDED COMPLAINT[1]

COMES NOW Plaintiff, Kelli Andrews, by and through counsel, and for her Complaint against Sangamon County, Jack Campbell, Wes Barr, Larry Beck Jr., Advanced Correctional Healthcare, Inc., Arun Abraham, Michael Shmikler, Kyle Meyer, Zach Whitley, Jennifer Ealey, Guy Bouvet III, and Does 1-5 (collectively, "Defendants"), states as follows:

### I.     NATURE OF THE ACTION

1.     Tiffany Rusher, who was a pre-trial detainee in the Sangamon County Detention Facility ("Sangamon Jail"), suffered from severe mental illness.  When she entered the Sangamon Jail in December 2016, the Defendants knew that she was severely mentally ill, that she was at high risk of suicide, and that she was in need of intensive mental health treatment. The defendants also knew, or at the very least should have known, that placing a person with Tiffany's mental state in solitary confinement would only exacerbate her deteriorated mental

---

[1]  Pursuant to Federal Rule of Civil Procedure 15(a)(2), Plaintiff has received the Defendants' written consent to the filing of this Second Amended Complaint.

condition, cause severe psychological trauma, and make it more likely that Tiffany would try to kill herself.

2.     Nevertheless, the defendants placed Tiffany in solitary confinement, and kept her there for more than four months.  This solitary confinement caused Tiffany's mental condition to deteriorate further, but the defendants failed to provide Tiffany with mental health treatment, compounding the harmful effects of solitary and increasing the risk that she would try to harm herself.

3.     What is more, the defendants failed to take adequate steps to guard against the possibility of suicide, making it easier for Tiffany to harm herself severely.  As a direct result of defendants' actions and failures to act, Tiffany was found asphyxiated in her cell on March 18, 2017.  She died on March 30, 2017, after spending 12 days on life support.

4.     This is an action for compensatory, nominal, and punitive damages, with claims brought under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA") to redress violations of Tiffany's rights.  Plaintiff also asserts claims against the Defendants pursuant to the Illinois Wrongful Death Act, 740 ILCS 180, and the Illinois Survival Act, 755 ILCS 5/27-6.

## II.     JURISDICTION AND VENUE

5.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff's claims are brought under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.

6.     The Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims asserted in this Complaint that Plaintiff's state law claims form part of the same case or controversy.

7.      Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because one or more of the defendants resides in the Central District of Illinois and all events giving rise to the claims asserted in this lawsuit arose in this judicial district.

### III.    PARTIES

8.      Plaintiff's decedent is Tiffany Rusher, who at the time of her death was a twenty-seven-year-old resident of the State of Illinois.  At all times relevant hereto, Tiffany was a pretrial detainee at the Sangamon Jail.

9.      Plaintiff Kelli Andrews ("Plaintiff") is Tiffany Rusher's mother and is the administrator of Tiffany's estate, pursuant to an order entered by the Circuit Court for the Seventh Judicial Circuit of Illinois, Sangamon County.

10.     Jack Campbell is the current Sheriff of Sangamon County.  In this capacity, he is responsible for the operation of the Sangamon Jail, which is the pretrial detention facility—*i.e.*, the jail—of Sangamon County.  This responsibility includes a duty to safely house and to provide adequate medical care for the Sangamon Jail's detainees.  He is sued in his official capacity.

11.     At times relevant to this complaint, Wes Barr was the Sheriff of Sangamon County.  In this capacity, he was responsible for the operation of the Sangamon Jail, which is the pretrial detention facility—*i.e.*, the jail—of Sangamon County.  This responsibility includes a duty to safely house and to provide adequate medical care for the Sangamon Jail's detainees.  At all times relevant to this case, Sheriff Barr acted under color of law.  He is sued in his individual capacity.

12.     Larry Beck is the Superintendent of the Sangamon Jail.  In this capacity, he is responsible for the day-to-day operation of the Sangamon Jail.  This includes making cell assignments and ensuring that medical and mental health services are provided to those detainees

who need such services.  At all times relevant to this case, Superintendent Beck acted under color of law.  He is sued in his individual capacity.

13.     Advanced Correctional Healthcare, Inc. ("ACH") is a private company that contracted to provide healthcare, including mental healthcare, to detainees of the Sangamon Jail. In this capacity, ACH also employed defendants Abraham and Shmikler.

14.     Dr. Arun Abraham was a medical doctor at the Sangamon Jail and, on information and belief, was responsible for overseeing the provision of medical and mental health care of all pretrial detainees at the jail, including Tiffany.

15.     Michael Shmikler was a licensed clinical social worker and, on information and belief, the "qualified mental health professional" described in the contract between ACH and Sangamon County.

16.     Kyle Meyer is a guard at the Sangamon Jail.

17.     Zach Whitley is a guard at the Sangamon Jail.

18.     Jennifer Ealey is a guard at the Sangamon Jail.

19.     Sgt. Guy Bouvet is a supervising guard at the Sangamon Jail.

20.     Sangamon County provides for the budget of the Sangamon County Sheriff's Office, including the budget for the Sangamon Jail.  Sangamon County contracted with defendant ACH for the provision of healthcare, including mental healthcare, to detainees at the Sangamon Jail, during the time of Tiffany's detention there.  Additionally, Sangamon County is named for indemnification purposes pursuant to 55 ILCS § 5/5-1002.

21.     Does 1-5 are sued herein by fictitious names for the reason that their true names are unknown to Plaintiffs.  Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of these Defendants when their identities have been ascertained.  Plaintiffs

are informed and believe, and based thereon allege, that these fictitiously-named defendants are responsible in some manner for the misconduct alleged herein.

## IV.    FACTS

22.    On or about December 8, 2016, Tiffany was accused of battery while she was a patient at the McFarland Mental Health Center ("McFarland"), which is located in Springfield, Illinois.  She was arrested at McFarland on December 15, 2016, and she was transported directly from McFarland for pretrial detention at the Sangamon Jail.

23.    Upon her arrival at the jail, the Defendants placed her in solitary confinement, and kept her there until she strangled herself on March 18, 2017.

### A.    The Defendants knew Tiffany suffered from severe mental illness and presented a substantial risk of self-harm

24.    Throughout Tiffany's incarceration at Sangamon Jail, the Defendants were aware of Tiffany's mental health history, including her multiple suicide attempts.

25.    Upon Tiffany's arrival at the Sangamon Jail, jail personnel received a discharge summary that had been prepared by staff at McFarland.  That summary contained a comprehensive account of Tiffany's history of severe mental illness, recurrent self-harming behavior, and numerous suicide attempts.  Among other things, the Discharge Summary noted the following:

(i)    From October 19, 2014 to April 14, 2016, while incarcerated at the Logan Correctional Center in Lincoln, Illinois, Tiffany made at least ten attempts to hang herself, including by strangulation with a towel.

(ii)    During the same time period, Tiffany engaged in at least twenty-seven instances of self-harming behavior, including cutting herself, biting herself, banging her head against a wall, and repeatedly swallowing inedible objects such as ink pens,

toilet paper, large segments of celery and carrot sticks, eating utensils, and toothbrushes.

(iii)  Due to Tiffany's self-harming behavior, Logan Correctional Center placed her on constant watch from approximately September 11, 2015 to May 3, 2016.

(iv)  On May 3, 2016, Tiffany was discharged directly from Logan Correctional Center to McFarland.

(v)  Tiffany engaged in self-harming and suicidal behavior during her hospitalization at McFarland.  On multiple occasions she swallowed large objects requiring endoscopic removal and on at least two occasions, in June 2016 and September 2016, she attempted self-strangulation.

(vi)  McFarland provided Tiffany with mental health treatment and monitored her to protect her from harming herself.

(vii)  Upon her discharge from McFarland on December 15, 2016, Tiffany's diagnoses included Depression, Antisocial Personality Disorder, and Posttraumatic Stress Disorder.

26.  Additionally, on the day after her admission to the Sangamon Jail, Sangamon Jail personnel received a phone call from a nurse at McFarland, who explained that Tiffany had been subject to one-to-one care at McFarland and that she had a history of attempting to asphyxiate herself.

27.  All inmates entering the Sangamon Jail are supposed to undergo a medical screening, performed as the person enters the facility, and an examination completed by medical staff within the first fourteen days of incarceration.

28.  Upon information and belief, Tiffany received a medical screening and underwent a full medical examination by medical staff at Sangamon Jail within the first fourteen days of her

arrival at the jail, which provided Defendants with additional information about Tiffany's mental health, including her risk for suicide.

29.     Indeed, on December 15, 2017 a nurse at Sangamon Jail wrote an order that Tiffany should be allowed to eat only "finger foods" in light of her tendency to asphyxiate herself by swallowing things.

30.     Then on December 16, 2017, Tiffany was evaluated by Michael Shmikler, LCSW, who was designated as a "mental health professional" at the jail.  Indeed Mr. Shmikler would evaluate Tiffany repeatedly during her detention at the Sangamon Jail, by interviewing her through the door of her cell.

31.     On multiple occasions in 2017, Dr. Arun Abraham, a physician at the Sangamon Jail employed by ACH, assessed Tiffany as having Bipolar Disorder and Schizoaffective Disorder, and documented that assessment in a medical progress note.

32.     On January 19, 2017, Tiffany attempted suicide by strangling herself in her cell with the strap of a medical boot.

33.     On multiple occasions be, Michael Shmikler, a social worker for ACH, described Tiffany as "high-risk" due to the known danger that she presented to herself.

34.     Upon information and belief, all Defendants knew about Tiffany's mental illness, her numerous prior attempts to commit suicide, her need for mental health treatment, and the substantial risk of self-harm that she presented to herself.  Indeed, jail staff even taped a "HIGH RISK" sign outside of her cell:



**B.      Despite knowing that Tiffany suffered from mental illness and was a risk of suicide, the Defendants kept her in solitary confinement.**

35.      Even though the Defendants knew that Tiffany was mentally ill and required mental health treatment, they provided her with no treatment and instead kept her in solitary confinement—which they knew would damage her further and increase her risk of suicide.

36.      While in solitary confinement, Tiffany was deprived of all property.  She was deprived of all meaningful social contact with other people.  She was stripped naked, barred from having any undergarments or other clothing, but for an anti-suicide blanket.  She was not permitted a television or radio, books, magazines, paper, pen or pencil, or anything else she could possibly have used to pass her time in jail while awaiting trial.  The only thing she was permitted was a suicide blanket.  This is a photograph[2] of her cell:

---

[2]  All photographs in this complaint were produced to Plaintiff by the Defendants.



37.     It is universally recognized that isolation and solitary confinement for any

significant period of time is likely to make a person suffering from mental illness even worse,

creating a substantial and increased risk of harm.  Indeed, decades before the Defendants placed

Tiffany in in solitary confinement, one federal court observed that "placing [mentally ill

prisoners in solitary confinement] is the mental equivalent of putting an asthmatic in a place with

little air to breathe," *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995), because such

prisoners "are at a particularly high risk for suffering very serious or severe injury to their mental

health, including overt paranoia, psychotic breaks with reality, or massive exacerbations of

existing mental illness as a result of the conditions" in solitary confinement.  *Id.*  Federal courts

around the country have recognized the same thing; the U.S. Court of Appeals for the Seventh

Circuit has observed that the conditions of solitary confinement "aggravate[] the symptoms of [a

prisoner's] mental illness and by doing so inflict[] severe physical and especially mental

suffering," *Scarver v. Litscher*, 434 F.3d 972, 977 (7th Cir. 2006), and that there is a "scientific

consensus . . . that prisoners held in solitary confinement experience serious, often debilitating—

even irreparable—mental and physical harm[] . . . ." *Wallace v. Baldwin*, 895 F.3d 481, 484-85

(7th Cir. 2018) (citation omitted)).

38.     Depriving a person who is actively suicidal of all meaningful social contact for an

extended period of time is not a method of treatment recognized by any competent medical

authority.  It is certain to make the person worse, not better, increasing their risk of suicide.  For

this reason, leading correctional standard-setting bodies provide specifically that such

confinement should not occur.  For example, the National Commission on Correctional Health

Care Standards for Mental Health Services in Correctional Facilities states that "[i]nmates who

are seriously mentally ill should not be confined under conditions of extreme isolation."  The

American Correctional Association has concluded that seriously mentally ill prisoners such as

Tiffany should not be placed in solitary confinement for more than 30 days.  The Association of

State Correctional Administrators "believe[s] that lengthy stays [in solitary confinement]

manufacture or increase mental illness."  And the American Bar Association Treatment of

Prisoner Standards similarly advises that "[p]risoners diagnosed with serious mental illness

should not be housed in settings that exacerbate their mental illness or suicide risk, particularly in

settings involving sensory deprivation or isolation."

39.     The Defendants' policies, and their conduct, flatly ignored and contradicted this

accepted knowledge.  It was the policy of the Sangamon County Sheriff's Office to place persons

suffering from mental illness or in danger of suicide in solitary confinement for indefinite

periods.  That was precisely the policy the Sheriff's Office pursued with Tiffany, holding her in

solitary confinement for more than four months, from the day she arrived in December 2016 to

the day she strangled herself in March 2017.  Over the course of Tiffany's confinement, no effort

was made to provide her with any form of regular social interaction outside her cell, or otherwise ameliorate the conditions of her isolation.

40.     Over the multiple months of Tiffany's confinement, the Defendants provided no counseling or mental health treatment to her.  It was not ordered or sought by Dr. Abraham, Mr. Shmikler, or any other official in the jail.  The only interaction Tiffany had with any mental health professional was with Mr. Shmikler, who would occasionally interview her through a slot in the locked door of her cell.  These sessions with Mr. Shmikler were not therapeutic, however; they were intended simply to assess Tiffany's housing assignment.

41.     The Sheriff's Office had an agreement with an outside entity so that detainees whose mental health needs are beyond the services that can be provided at the jail could be transferred to an appropriate facility, but even though Tiffany was transferred to the jail *from* a state mental hospital, no effort was made by any of the Defendants, including Dr. Abraham and Mr. Shmikler, to determine whether Tiffany should be transferred to an outside mental health facility—instead, upon her admission Tiffany was simply put in solitary confinement, and was kept there.

42.     Despite their actual knowledge of Tiffany's need for intense mental health treatment, defendants Barr, Beck, Abraham, Shmikler, and/or Does 1-5 failed to provide any mental health treatment for Tiffany.  Instead, these defendants arranged for Tiffany to be placed in solitary confinement, where they knew she would be harmed instead of helped, from December 2016 through March 18, 2017.

43.     The placement of Tiffany in solitary confinement and the failure to provide her with mental health treatment or a referral to outside services was additionally the result of policies consciously chosen by Sangamon County, ACH, and the Sangamon County Sheriff:

(i)      Sangamon County's final decisionmakers repeatedly agreed to contracts with

         ACH that provided for minimal-to-no coverage by mental health professionals;

(ii)     ACH agreed to contracts in which its employees provided no mental health

         treatment whatsoever, including to detainees as seriously mentally ill as Tiffany,

         and pursuant to ACH's policies and practices its employees, including Defendants

         Abraham and Shmikler, indeed provided Tiffany with no mental healthcare;

(iii)    The Sangamon County Sheriff had no policies prohibiting placement of mentally

         ill prisoners in prolonged solitary confinement, had no policies mandating

         assessment for referrals to outside mental health facilities, and had no policies that

         actually mandated treatment and counseling of mentally ill prisoners.

**C.     Having increased Tiffany's risk of suicide, the defendants did not protect her.**

44.     By placing Tiffany in prolonged solitary confinement, the Defendants increased

the risk that she would commit suicide.  They then compounded this risk by failing adequately to

protect her from harming herself.

45.     Tiffany was not under observation, as required by all recognized suicide

prevention protocols.  Rather, her cell was placed in a hallway with no direct line of sight by jail

staff, meaning that the only time jail staff saw her was on 15-minute intervals during their tours

of the jail.

46.     At the same time Defendants Barr, Beck, and/or Does 1-5 compounded the risk

that Tiffany would harm herself by failing adequately to prevent Tiffany from accessing a

number of items that she used to harm herself.

47.     As a direct result of the actions and failures to act of defendants Barr, Beck,

and/or Does 1-5, Tiffany was able to engage in open and obvious self-harming and suicidal

behavior consistent with her diagnosis upon entering the Sangamon Jail.  For example:

(i)     On January 12, 2017, Tiffany swallowed a plastic spoon and was transferred from the Sangamon Jail to Memorial Medical Center in Springfield, Illinois, for treatment.

(ii)    On January 19, 2017, Tiffany tried to strangle herself with a strap from a protective medical boot worn on an injured foot.

(iii)   On January 29, 2017, Tiffany swallowed a toothbrush and was transferred from the Sangamon Jail to Memorial Medical Center in Springfield, Illinois, for treatment.

(iv)    On February 3, 2017, Tiffany tried to swallow a whole apple core.

(v)     On February 10 and 11, 2017, Tiffany was placed in restraints because she cut a wound in her hand and chewed on her hand until it bled.

(vi)    On February 12, 2017, Tiffany swallowed mattress stuffing.

(vii)   On February 24, 2017, Tiffany put toilet paper up her nose and said she could not breathe.

(viii)  On February 25, 2017, Tiffany was again placed in restraints because of self-harming behavior that caused her arm to bleed.

(ix)    On March 12, 2017, Tiffany was again placed in restraints for engaging in self-harm by scratching her arms on the underside of the concrete bunk in her cell until her arms bled.

(x)     On March 15, 2017, Tiffany swallowed a plastic bag.

48.    On March 18, 2017 Tiffany asked Defendants Meyer or Whitley to allow her to take a shower; the shower facilities were located down the hall from her cell.

49.     Meyer or Whitley asked the supervisor, Defendant Bouvet, who approved the shower without giving any special instruction, even though he knew that allowing Tiffany to shower unmonitored would present multiple opportunities for self-harm.

50.     Meyer and Whitley escorted Tiffany to the shower and allowed her to shower alone behind a closed door.

51.     At some point before, during or after her shower, Meyer, Whitley, or Defendant Ealey provided Tiffany with a bright orange towel and let her use it unsupervised, also behind a closed door.  On information and belief, when the defendants gave Tiffany the towel it was in good condition, with all its stitched edges intact.

52.     When Tiffany was down toweling off, Meyer, Whitely, and/or Ealey allowed to Tiffany to dress unsupervised into a suicide-proof "turtle suit."

53.     On information and belief, during the time that the officers left Tiffany unsupervised, she tore off a long strip of towel along one of its stitched edges, and hid the strip under her turtle suit so that she could use it to harm herself in her cell.

54.     Although Meyer, Whitely, and/or Ealey may not have personally observed Tiffany tear the towel, one or more of them would or should have noticed that the towel was now ripped, and that Tiffany left several strands of towel thread behind in the shower area.

55.     Photos taken by investigators in the shower area show that anyone who inspected the shower area after Tiffany dressed unsupervised would have seen the bright orange threads and realized that Tiffany tore the towel in some way while she was alone.

56.     Indeed, after Tiffany completed her shower, Defendant Ealey entered the shower room, saw the towel on the shower floor, and noted that it was ripped, but decided not to investigate further.  Had she done so, or had she simply inspected the shower room, Ealey would

have discovered multiple strands of ripped towel in the shower-room toilet, indicating that

Tiffany had ripped the towel:



57.     Instead of conducting any sort of sweep or inspection, however, Ealey simply

escorted Tiffany back to her cell.

58.     There was then a prolonged period, lasting approximately 15 minutes, during

which Tiffany was unsupervised.  None of the defendants responsible for monitoring Tiffany,

including Defendants Meyers or Whitley, checked on her.  She used this time to strangle herself

inside her cell.

59.     Despite the known risk that Tiffany would strangle herself and that jail inmates

who are at risk of suicide require special care, defendants Barr, Beck, and Bouvet failed to

develop policies and protocols to warn correctional officers of the specific risks of suicide and

establish protocols to prevent suicide.

60.     These same defendants also failed to establish protocols or policies that would prevent suicidal inmates from using towels to strangle themselves.  They failed to provide such inmates with only rip-proof towels; they failed to require that use of towels be supervised to ensure they would not be ripped; and they failed to require that towels be checked afterwards to ensure they had not been ripped.

61.     As a result, Tiffany was deprived of oxygen to her brain for a lengthy period of time sufficient to cause irreparable damage to her brain.  An autopsy later conducted by the Sangamon County Coroner noted that Tiffany "was found unresponsive in her cell, with a strip of hand towel wrapped tightly around her neck."

62.     On March 18, 2017, Tiffany was transferred from Sangamon Jail to St. John's Hospital in Springfield, Illinois and was placed on life support.

63.     On March 30, 2017, Tiffany died as a result of the injuries she had sustained while in Defendants' custody.  An autopsy conducted by the Sangamon County Coroner concluded that Tiffany's death was caused by self-inflicted and deliberate ligature strangulation.

## COUNT I:  Fourteenth Amendment
### Against: All Defendants

64.     Each paragraph of this complaint is incorporated as if fully restated here.

65.     Tiffany suffered from a serious condition that presented a substantial risk to her health or safety.

66.     In the manner described more fully above, each of the Defendants acted with deliberate indifference to Tiffany's condition and/or they acted in an objectively unreasonable manner in response to her condition.

67.     The misconduct described in this count caused harm to Tiffany, including severe emotional distress and physical injuries during the time she was confined to the jail, and ultimately her death.

16

## COUNT II:  Americans with Disabilities Act
**Against:** Campbell (official capacity)

68.     Each paragraph of this complaint is incorporated as if fully restated here.

69.     Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

70.     To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

71.     The Sangamon County Sheriff's Office is a public entity as defined in 42 U.S.C. § 12131(1).

72.     At all times relevant to this Complaint, in light of her severe mental illness, Tiffany was a qualified individual with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12131(2), and had a right not to be subjected to discrimination on the basis of her disability by Defendant.

73.     Due to her mental illnesses, Tiffany frequently contemplated and engaged in suicidal behavior and could not take adequate care of herself.

74.     As a detainee at the Sangamon Jail, Tiffany was wholly dependent upon the Sheriff of Sangamon County for basic daily needs and appropriate accommodations, including

mental health care and accommodation.  Individuals in the custody of defendant are also

dependent on the defendant for all of their basic daily needs, including food, exercise, and safety.

75.     Under the Title II of the ADA and 28 C.F.R. § 35.130(a), the Sangamon County

Sherriff's Office is responsible for ensuring that individuals in his custody with known

disabilities are provided with reasonable accommodations to prevent discrimination on the basis

of disability and are not, on the basis of disability, excluded from participation in or denied the

benefits of services, programs, or activities because of their disability.

76.     In the manner described more fully above, the Sangamon County Sherriff's Office

failed reasonably to accommodate Tiffany's known and obvious disability and discriminated

against her because of her disability.

77.     As a result of the wrongful conduct of the Sangamon County Sherriff's Office,

Tiffany's mental health condition was greatly exacerbated, and she was subjected to unnecessary

pain and suffering, and she died.

**COUNT III:  Rehabilitation Act**
**Against:**  Campbell (official capacity)

78.      Each paragraph of this complaint is incorporated as if fully restated here.

79.     The purpose of the Rehabilitation Act is to ensure that no "qualified individual

with a disability in the United States . . . shall, solely by reason of [ ] disability, be excluded from

the participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

80.     Tiffany was, at all times relevant to this complaint, a qualified individual with a

disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(2), and has a right not to

be subjected to discrimination on the basis of her disability. 29 U.S.C. § 794(a).

81.     The Sangamon County Sherriff's Office receives Federal financial assistance

within the meaning of 29 U.S.C. § 794(a).

82.     The Sangamon County Sheriff's Office constitutes "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(1)(A)-(B) and/or (b)(2)(B) and was required to comply with the Rehabilitation Act.

83.     In the manner described more fully above, the Sangamon County Sherriff's Office failed reasonably to accommodate Tiffany's known and obvious disability and discriminated against her because of her disability.

84.     As a result of the wrongful conduct of the Sangamon County Sheriff's Office, Tiffany's mental health condition was greatly exacerbated, and she was subjected to unnecessary pain, suffering, and death.

### COUNT IV: Wrongful Death (740 ILCS 180)
**Against:** All defendants

85.     Each paragraph of this complaint is incorporated as if fully restated here.

86.     Defendants had a duty to protect Tiffany from harm when such harm was reasonably foreseeable.

87.     Defendants breached that duty.

88.     As a result of defendants' breach of that duty, Tiffany died.

89.     Tiffany's next of kin have suffered damages from the loss of Tiffany, including grief, sorrow, mental suffering, and loss of society.

90.     As to the claims against Michael Shmikler, LCSW, and Arun Abraham, MD, the affidavit of one of Plaintiff's attorneys and written physician reports required by 735 ILCS 5/2-622 are attached as Exhibits 1-4 to this Complaint.

### COUNT V: Survival Act and Funeral Expenses
**Against:** All defendants

91.     Each paragraph of this complaint is incorporated as if fully restated here.

92.    Count VI is alleged against Defendants in their individual capacities and brought by Plaintiff as Tiffany's personal representative in her capacity as administrator of Tiffany's estate.

93.    This count is brought pursuant to the Survival Act, 755 ILCS 5/27-6, for the medical, funeral and burial expenses and the pain and suffering experienced by Tiffany prior to her death.

94.    As a result of one or more of the willful and wonton acts or omissions described in the previous paragraphs, Tiffany experienced suicidal thoughts, decline in mental health, agitation, mental abuse, punishment, pain and suffering, and other injuries including medical expenses prior to her death.

95.    As a direct and proximate result of the death of Tiffany, the estate incurred funeral and burial expenses.

96.    As to the claims against Michael Shmikler, LCSW, and Arun Abraham, MD, the affidavit of one of Plaintiff's attorneys and written physician reports required by 735 ILCS 5/2-622 are attached as Exhibits 1-4 to this Complaint.

**COUNT VI: *Respondeat Superior***
**Against:** Campbell

97.    Each paragraph of this complaint is incorporated as if fully restated here.

98.    The Sheriff of Sangamon County employed various Sangamon Jail personnel and staff who provided inadequate care to Tiffany and/or insufficiently monitored Tiffany while working in the course and scope of their employment.

99.    Sheriff Jack Campbell, by and through his employees, is liable for all Defendants' aforementioned unlawful acts that were the direct and proximate cause of Tiffany's injuries, and her death on March 30, 2017.

## COUNT VII: Indemnification
**Against:** Sangamon County

100.    Each paragraph of this complaint is incorporated as if fully restated here.

101.    Illinois law provides that public entities are directed to pay any tort judgments for compensatory damages for which employees are liable within the scope of their employment activities.

102.    Defendants Barr, Beck, and Does 1-5 were employees and agents of Defendants Sangamon County and/or the Sangamon County Sherriff's Office and acting within the scope of their employment in committing the misconduct described herein.

103.    Sangamon County is obligated by Illinois law to pay any judgment relating to the operation of the Sangamon Jail entered against the Sangamon County Sherriff's Office and its agents and employees.

## V.    RELIEF REQUESTED

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants, jointly and severally, for the following:

**A.**    An award of compensatory, punitive, and nominal damages;

**B.**    An award of full costs and attorneys' fees arising out of this litigation pursuant to 42 U.S.C. § 1988, the Americans with Disabilities Act, and the Rehabilitation Act, and;

**C.**    Any and other further relief this Court may deem just and appropriate.

## VI.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action of all issues so triable.


Dated: March 29, 2019                                        Respectfully submitted,

                                          _s/ Alan Mills_____

Stephen H. Weil – steve@weilchardon.com          Alan Mills - alan@uplcchicago.org
Alexis G. Chardon – ali@weilchardon.com          Elizabeth Mazur – liz@uplcchicago.org
Weil & Chardon LLC                               Nicole Schult - Nicole@uplcchicago.org
333 S. Wabash Ave., Suite 2700                   Uptown People's Law Center
Chicago, IL 60604                                4413 North Sheridan Rd.
312-585-7404                                     Chicago, Illinois 60640
                                                 Tel: (773) 769-1411
                                                 Fax: (773) 769-2224

                                                 *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

        I hereby certify that on March 29, 2019, a true and correct copy of the foregoing was
filed electronically.  Notice of this filing was sent by operation of the Court's ECF electronic
filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing
through the Court's electronic filing system.

                                    /s/ Alexis G. Chardon