IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| KELLI ANDREWS, as Administrator of the <br> Estate of Tiffany Ann Rusher, deceased, <br><br>     Plaintiff, <br><br> v. <br><br> SANGAMON COUNTY, ILLINOIS, WES BARR, <br> LARRY BECK JR., ADVANCED CORRECTIONAL <br> HEALTHCARE, INC. ARUN ABRAHAM, MICHAEL <br> SHMIKLER, KYLE MEYER, Z. WHITLEY, JENNFER <br> EALEY, GUY BOUVET III, AND DOES 1-5, <br><br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )    Case No. 18-cv-1100 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MOTION FOR SUMMARY JUDGMENT

NOW COME Defendants Arun Abraham, M.D., Advanced Correctional Healthcare, Inc. and Michael Shmikler (Special Representative Kevin McDermott), by their attorneys, QUINN JOHNSTON, and for their Motion for Summary Judgment, state as follows:

## I.  INTRODUCTION

Plaintiff Kelli Andrews brings this case on behalf of her daughter, Tiffany Rusher. Tiffany was an inmate at the Sangamon County Jail (SCJ) from December 15, 2016 to March 18, 2017. Ms. Andrews has asserted claims under the 14th Amendment and Illinois Wrongful Death and Survival Acts against Advanced Correctional Healthcare (ACH) and its employees, Dr. Arun Abraham and Michael (Mickey) Shmikler, LCSW (deceased).

Tiffany Rusher had a life-long and significant history of mental illness marked by frequent episodes of assaultive and self-harm behavior. Tiffany spent most of her adult life incarcerated (IDOC) before entering McFarland Mental Health Center for seven months of inpatient treatment. Tiffany arrived at Sangamon County Jail, on felony assault charges, after attacking a patient and

staff member at McFarland. Tiffany was seen frequently by ACH staff and treated for her mental illness. She was on precautions limiting the items in her cell and being checked every 15 minutes. Tiffany's behavior persisted and she self-strangulated with the seam of a towel that she obtained during a shower and secreted in her cell.

Plaintiff argues 1) that failing to provide adequate mental health care at Sangamon County Jail violated Tiffany's 14th Amendment rights, and 2) that the actions or inactions of our Defendants caused Tiffany's suicide. Plaintiff failed to raise any genuine issue of fact demonstrating objectively unreasonable medical care and / or that Defendants' care of Tiffany caused her suicide. Defendants are entitled to summary judgment on the 14th Amendment, Wrongful Death and Survival Claims.

## II.   EXHIBITS

1. Tiffany Rusher Sangamon County Jail Medical Records

2. Deposition Transcript of Tracy Hammitt, LPN

3. Deposition Transcript of Kate Daniels, RN

4. Deposition Transcript of Mary Dambacher, NP

5. Deposition Transcript of Arun Abraham, MD

6. Deposition Transcript of Billy Ernest, LPN

7. Deposition Transcript of Lydia Hicks, LCSW

8. Dr. Killian's Forensic Evaluation

9. Agreement for the Provision of Inmate Health Services and Amendments

10. Expert Report of Terry A. Kupers, MD, MSP

11. Expert Report of Tod Harrison, LCSW

### III.   UNDISPUTED MATERIAL FACTS

**A.   Medical Care at Sangamon County Jail**

**Tiffany's History at McFarland Mental Health Center**

1.  On May 3, 2016, Tiffany was discharged directly from Logan Correctional Center to McFarland Mental Health Center. *See,* Plaintiff's Third Amended Complaint, ¶24.

2.  Tiffany Rusher received treatment at McFarland Mental Health Center from May 3, 2016 to December 14, 2016. Sangamon County Jail received her Discharge Summary and included it in her medical record at the jail.  Dr. Ajay Jeetwani authored the Discharge Summary. *See* Sangamon County Jail Medical Records, attached hereto as Exhibit 1, Bates No. ACH 253-266.

3.  The McFarland Discharge Summary included the following history between October 2014 and April 2016 while Tiffany was an inmate at the Illinois Department of Corrections: 10 attempts to hang / strangle herself, 12 incidents of self-injury, 3 incidents of swallowing pens, 7 incidents of choking with toilet paper, and 5 incidents of blocking her airway with food. Exhibit 1, Bates No. ACH 254.

4.  The McFarland Discharge Summary included primary diagnoses of Antisocial Personality Disorder and Borderline Personality Traits. Exhibit 1, Bates No. ACH 254.

5.  The McFarland Discharge Summary included the following history: May 2016 swallowing ink pen, June 2016 self-strangulation, September 2016 swallowing ink pen, a ring, and two quarters, November and December 2016 swallowing forks and multiple acts of aggression including hitting, punching, kicking, biting, shoving and spitting on staff and peers. Exhibit 1, Bates No. ACH 261.

6.  The McFarland Discharge Summary detailed a November 2016 incident wherein Tiffany fell and sustained a spiral fracture of her tibia, removed her cast and re-fractured the same ankle in December 2016.  Exhibit 1, Bates No. ACH 261.

7.  The McFarland Discharge Summary listed current mental health medications Prazosin, Venlafaxine, Chlorpromazine, and Divalproex. Exhibit 1, Bates No. ACH 261.

8.  On December 8, 2016, Tiffany hit an elderly peer with her fists, pulled him out of his wheelchair and stomped on him with her casted leg. When staff attempted to intervene, Tiffany kicked them, bit them, and pulled their hair. This exchange lead to criminal charges and Tiffany's transfer to the Sangamon County Jail. Exhibit 1, Bates No. ACH 261-2.

**Medical History at Sangamon County Jail**

9. On December 15, 2016 Tiffany Rusher entered the Sangamon County Jail pursuant to felony charges for aggravated battery. Exhibit 1, Bates No. ACH 001.

10. On December 16, 2016, Nurse Tracy Hammitt, an ACH employee noted a call from a nurse at McFarland Mental Health Center, advising that Tiffany had a history of asphyxia and swallowing large food items and / or objects. Exhibit 1, Bates No. ACH 003, and *See* Deposition of Tracy Hammitt attached hereto as Exhibit 2, p.10:19-12:3.

11. On December 17, 2016, ACH medical staff documented re-wrapping Tiffany's splint and providing pain medications. Exhibit 1, Bates No. ACH 005.

12. On December 19, 2016, Dr. Abraham examined Tiffany, documented her left lower extremity fracture of the tibia, and sent her to the emergency room to have a new splint applied to her ankle fracture. Tiffany was ordered to follow up with Dr. Pineda, her treating orthopedic physician Exhibit 1, Bates No. ACH 006-7, 318-348.

13. On December 25, 2016, Nurse Hammitt documented re-wrapping Tiffany's leg and an upcoming appointment with Dr. Pineda. Exhibit 1, Bates No. ACH 009.

14. On December 28, 2016, Nurse Kate Daniels, an ACH employee, noted a call from Dr. Pineda's nurse requesting additional imaging for Tiffany's fracture. Nurse Practitioner Mary Dambacher, an ACH employee, ordered the x-ray the same day. Exhibit 1, Bates No. ACH 011-12, 172 and *See* Deposition of Kate Daniels, attached hereto as Exhibit 3, p. 33:1-6.

15. On December 29, 2016, Dr. Pineda (off-site orthopedic provider) ordered a walking boot for Tiffany's left ankle. Exhibit 1, Bates No. ACH 015-16, 296.

16. On December 31, 2016, Tiffany reported falling on her left foot and NP Dambacher ordered additional x-rays which confirmed her existing tibia fracture. Exhibit 1, Bates No. ACH 017, 173.

17. On January 1, 2017, Dr. Abraham sent Tiffany to Memorial Medical Center for complaints of nausea and vomiting and additional treatment of her left leg and Nurse Hammitt documented orders from the ER for an ultrasound to rule out deep vein thrombosis. Dr. Abraham approved the orders on January 4, 2017 and the ultrasound completed on January 10, 2017 with negative results. Exhibit 1, Bates No. ACH 018, 174, 350-386.

18. On January 4, 2017, Dr. Abraham examined Tiffany and noted diagnoses of lower left extremity fracture, bipolar and schizophrenia and Tiffany's denial of suicidal or homicidal ideation. Dr. Abraham continued all previous orders. Exhibit 1, Bates No. ACH 021 and *See* Deposition of Arun Abraham, MD, attached hereto as Exhibit 5, p. 144:15-148:24.

19. On January 10, 2017, NP Dambacher examined Tiffany for complaints of nausea and vomiting Exhibit 1, Bates No. ACH 022.

20. On January 12, 2017, NP Dambacher examined Tiffany after Tiffany reported swallowing a spoon. NP Dambacher ordered Tiffany be transported to the emergency room as soon as possible. The emergency room provider removed the spoon and Nurse Hammitt requested the records from her visit the following day. NP Dambacher approved the discharge order for Prilosec. Exhibit 1, Bates No. ACH 023-4, 388-417 and *See* Deposition of Mary Dambacher, attached hereto as Exhibit 4, p. 15:1-10.

21. On January 17, 2017, Dr. Abraham examined Tiffany for complaints of a fall resulting in a right- hand abrasion and discomfort to her left leg injury. Dr. Abraham noted schizo-affective and impulse-control diagnoses and Tiffany's denial of suicidal or homicidal ideation. Dr. Abraham ordered that Tiffany continue using her walking boot and Tiffany received a band-aid for her right hand. Exhibit 1, Bates No. ACH 025-26 and Exhibit 5, p.188:10-189:20.

22. On January 19, 2017, Nurse Billy Ernest, an ACH employee, evaluated Tiffany after Tiffany self-strangulated with the strap from her walking boot. Nurse Ernest examined Tiffany's neck, took her vitals, called NP Dambacher and reported the incident to Michael Shmikler, LCSW. Exhibit 1, Bates No. ACH 027, Exhibit 4, p. 82:16-83:13 and *See* Deposition of Billy Ernest, attached hereto as Exhibit 6, p. 41:17-42:21.

23. On January 20, 2017, Nurse Daniels called Dr. Pineda's office about issues with the walking boot and for further orders. Dr. Pineda discontinued use of the walking boot and ordered Tiffany to keep her leg non-weight bearing until her next appointment. Exhibit 1, Bates No. ACH 028-29.

24. On January 24, 2017, Dr. Abraham evaluated Tiffany pursuant to her high-risk status, examined her, noted her complaint of leg pain and ordered Tylenol, noted his schizophrenia diagnosis and continued previous orders. Exhibit 1, Bates No. ACH 030-1 and Exhibit 5, p. 186:6-187:7.

25. On January 29, 2017, Nurse Hammitt examined Tiffany after a correctional officer reported that Tiffany swallowed a toothbrush. NP Dambacher ordered that Tiffany be sent to the emergency room. Tiffany transferred to the ER and the toothbrush was removed. Nurse Hammitt requested the records from her visit the following day. Exhibit 1, Bates No. ACH 035-36, 419-460, Exhibit 2, p.27:11-28:23, and Exhibit 4, p. 19:19-21:1.

26. On January 30, 2017, Tiffany reported swallowing a pen and a toothbrush. NP Dambacher ordered a chest x-ray completed on the same day. No pen or toothbrush was identified. Exhibit 1, Bates No. ACH 037, 176-7.

27. On January 31, 2017, Tiffany reported swallowing an unknown object. NP Dambacher ordered a chest x-ray, completed the same day. No object was identified.NP Dambacher ordered continued monitoring. Exhibit 1, Bates No. ACH 037, 178-80.

28. On February 2, 2017, Dr. Abraham examined Tiffany for her complaint of swallowing a toothbrush, noting a negative x-ray and impulse control disorder. Exhibit 1, Bates No. ACH 041, Exhibit 3, p. 38:17-40:6 and Exhibit 5, p. 193:16-196:17.

29. On February 7, 2017, ACH medical staff documented examining Tiffany for complaints of liver pain and a fall on her left leg and ordered an additional left foot x-ray.  The x-ray confirmed the tibia fracture and swelling. The same day medical staff noted that Tiffany attempted to swallow an apple core and Dr. Abraham ordered no solid fruit. Exhibit 1, Bates No. ACH 042-45, 181.

30. On February 10, 2017, Dr. Abraham examined Tiffany and noted his assessment of impulse control disorder and foot pain.  Later the same evening ACH medical staff contacted Dr. Abraham to report that Tiffany complained of chest pain and reported saving her morning dose of Thorazine and taking it with other medications later in the day. Dr. Abraham ordered medical staff to monitor Tiffany's vitals. Exhibit 1, Bates No. ACH 046-47 and Exhibit 5, p. 197:7-199:23.

31. On February 12, 2017, medical staff documented Tiffany's report of eating mattress stuffing and Dr. Abraham ordered an abdominal x-ray, completed the same day and negative for bowel obstruction. No foreign objects were identified.  Exhibit 1, Bates No. ACH 048, 182.

32. On February 23, 2017, medical staff documented Tiffany's report of swallowing medical clips during her last visit to the hospital. The records reference her February 12, 2017 x-ray showing, "no clips present." Exhibit 1, Bates No. ACH 053.

33. On February 24, 2017, Nurse Billy Ernest examined Tiffany for a report she stuck toilet paper up her nose and could not breathe.  Nurse Ernest removed the toilet paper and checked Tiffany's vital signs. Exhibit 1, Bates No. ACH 054, Exhibit 5, p.200:18-201:7 and Exhibit 6, p. 19:1-13.

34. On February 25, 2017, Nurse Hammitt evaluated Tiffany in booking for self-inflicted abrasions to her left wrist. NP Dambacher ordered keeping the abrasion clean, monitoring for infection, encouraging the inmate to avoid self-harm, contacting mental health and providing a band-aid. Exhibit 1, Bates No. ACH 060.

35. On February 27, 2017, medical staff evaluated Tiffany for complaint of a toothache and follow-up of the wrist abrasion, noted no signs or symptoms of infection for the tooth or wrist abrasions and ordered Tylenol. Exhibit 1, Bates No. ACH 060.

36. On March 10, 2017, Nurse Hammitt documented Tiffany's current mental health medications (Depakote, Thorazine and Prazosin) and NP Dambacher ordered the medications continued for 90 days. Exhibit 1, Bates No. ACH 064 and Exhibit 4, p. 44:1-45:12.

37. On March 16, 2017, medical staff documented Tiffany reporting that she ate a bag, checked her vitals (normal), and called NP Dambacher. NP Dambacher ordered medical staff to take Tiffany's blood pressure every 8 hours for 24 hours. Exhibit 1, Bates No. ACH 063.

38. On March 17, 2017, Mickey completed a Placement / Review of Detainee in Observation. Mickey noted that Tiffany stood near the door of her cell to speak with him and was calm, cooperative, and smiling. Tiffany denied any self-harm intent or suicidal ideation. Mickey noted Tiffany's expected upcoming release (March 29) and congratulated Tiffany for her recent good behavior. Exhibit 1, Bates No. ACH 072, Exhibit 7, p. 86:1-17.

39. On March 18, 2017, Billy Ernest documented being called to the booking area because Tiffany had self-strangulated with the seam of a towel. Exhibit 1, Bates No. ACH 067 and Exhibit 6, p. 41:1-4, 62:4-63:5.

40. EMS transported Tiffany to St. John's Hospital, and she died there on March 30, 2017. Exhibit 1, Bates No. ACH 299-315.

41. From March 16 to March 18, 2017, Rusher was seen by nurses for medication pass three times each day and took her medications as prescribed. Exhibit 1, Bates No. ACH 112-129.

42. From March 16 to March 18, 2017, Tiffany was housed in high-risk observation cell, checked every 15 minutes, clothed in a suicide smock and restricted from having any items in her cell. Exhibit 3, p. 60:9-61:5 and Exhibit 5, p.78:18-79:6.

**Tiffany's Medications**

43. Dr. Abraham reviewed medication administration records (MAR) once a month to ensure Tiffany was taking medications as prescribed, and relied on medical staff, correctional officers, refusal forms and his own observations. Exhibit 2, p. 25:23-26:20, Exhibit 3, p. 24:7-17, Exhibit 4, p. 32:2-10, Exhibit 5, p. 60:5-18, 67:10-71:24, Exhibit 6, p. 15:1-8

44. Dr. Abraham and NP Dambacher prescribed Prazosin, Venlafaxine (Effexor), Chlorpromazine (Thorazine), and Divalproex (Depakote) to Tiffany based on her previous provider's judgment and their own clinical judgment. Exhibit 1, Bates No. ACH 112-129, Exhibit 4, p. 35:8-16, 37:4-17, 70:3-71:17 and Exhibit 5, p. 143:3-144:14.

45. A nurse and a correctional officer hand out medications to inmates at the Sangamon County Jail 2 or 3 times per day, each day, at 8:00 AM, 1:00 PM and 8:00 PM. Medical staff passed medication to Tiffany three times per day. Exhibit 1, Bates No. ACH 112-129, Exhibit 3, p. 104:1-13, Exhibit 6, p. 17:3-11.

**High-Risk Observation Cells**

46. High-risk observation cells are located at the booking area in the Sangamon County Jail. Tiffany was in a high-risk observation cell during most of her incarceration at the Sangamon County Jail. Exhibit 3, p. 60:9-61:5 and Exhibit 5, p.78:18-79:6.

47. High-risk observation cells are used for inmates who may try to harm themselves. The inmates are observed every 15 minutes, spoken to regularly by mental health staff, seen daily by nursing staff and seen weekly by the doctor or nurse practitioner. Exhibit 3, p. 34:5-13 and Exhibit 5, p. 84:15-23.

48. Dr. Abraham assessed suicidal or homicidal ideation with high-risk inmates during his weekly interactions. Exhibit 5, p. 128:15-22, 193:8-15.

49. The location of the high-risk observation cell allowed Tiffany to interact with others frequently each day through her cell door. Exhibit 3, p. 43:7-14 and Exhibit 6, p. 55:6-21.

**B.     Mental Health Care at Sangamon County Jail**

50. On December 16, 2016, Michael Shmikler, LCSW (Mickey) met with Tiffany pursuant to a psychological referral based on Tiffany's history of treatment at McFarland. Exhibit 1, Bates No. ACH 099 and 099-B.

51. Mickey provided mental health care at the Sangamon County Jail. Mickey worked at the Sangamon County Jail 28 hours per week (4 days a week, 7 hours per day). *See* Deposition of Lydia Hicks, attached hereto as Exhibit 7, p. 19:10-18, 54:15-55:1.

52. As part of his duties, Mickey met with all high-risk inmates including Tiffany Rusher each time he was at the jail. Mickey prepared a Mental Health Services – Referral Tracking form to indicate which inmates he would see and note his evaluation. Exhibit 7, p. 24:16-25:7, 27:6-28:2, 29:10-30:23, 31:12-33:19.

53. Mickey met with and evaluated Tiffany 48 times between December 19, 2016 and March 15, 2017. Exhibit 1, Bates No. ACH 099-C-107, Exhibit 3, p. 46:9-47:1, Exhibit 5, p. 173:7-174:21 and Exhibit 7, p. 93:18-94:5, 120:6-122:8.

54. For each of the 48 evaluations, Mickey documented a mental health rating and GAF (global assessment of functioning) score. Exhibit 1, Bates No. ACH 099-C-107 and Exhibit 7, pg. 27:6-28:2, 29:10-30:23, 31:12-33:19, 57:10-58:2.

55. On January 2, 2017, Mickey completed a Placement / Review of Detainee in Observation, noting Tiffany's battery charge, history of violent responses, thought process and content within normal limits and denial of self-harm intent, suicidal or homicidal ideation. Mickey met

with Tiffany through the locked door of her cell. In the Section marked, "to be completed in consultation with Security Supervisor," Mickey marked, "Continue Observation," and, "Close (15 Minute Checks)." Exhibit 1, Bates No. ACH 068.

56. On January 27, 2017, Mickey completed a Placement / Review of Detainee in Observation, noting Tiffany's January 19 hanging attempt with the strap of her medical boot, thought process and content within normal limits and denial of self-harm intent, suicidal or homicidal ideation. Mickey met with Tiffany through the locked door of her cell. In the Section marked, "to be completed in consultation with Security Supervisor," Mickey marked, "Continue Observation," and, "Close (15 Minute Checks)." Exhibit 1, Bates No. ACH 069.

57. On February 6, 2017, Mickey completed a Placement / Review of Detainee in Observation, noting Tiffany's January 29 incident of swallowing a toothbrush, thought process and content within normal limits and denial of self-harm intent, suicidal or homicidal ideation. Mickey met with Tiffany through the locked door of her cell. In the Section marked, "to be completed in consultation with Security Supervisor," Mickey marked, "Continue Observation," and, "Close (15 Minute Checks)." Exhibit 1, Bates No. ACH 070.

58. On February 20, 2017, Mickey completed a Placement / Review of Detainee in Observation, noting Tiffany's February 11 report of self-harming thoughts, thought process and content within normal limits and denial of self-harm intent, suicidal or homicidal ideation. Mickey met with Tiffany through the locked door of her cell. In the Section marked, "to be completed in consultation with Security Supervisor," Mickey marked, "Continue Observation," and, "Close (15 Minute Checks)." Exhibit 1, Bates No. ACH 071.

59. On March 17, 2017, Mickey completed a Placement / Review of Detainee in Observation, noting Tiffany's three incidents of Pica (swallowing non-food items) since her arrest, January 19 suicide attempt, February 11 thoughts of self-harm, thought process and content within normal limits and denial of self-harm intent, suicidal or homicidal ideation. Mickey met with Tiffany through the locked door of her cell. Tiffany reported an expected release of March 29, 2017. In the Section marked, "to be completed in consultation with Security Supervisor," Mickey marked, "Continue Observation," and, "Close (15 Minute Checks)." Exhibit 1, Bates No. ACH 072, Exhibit 7, p. 86:1-17.

60. Dr. Killian performed a psychiatric interview and examination on January 5, 2017 to determine Tiffany's fitness to stand trial. Dr. Killian issued a report on January 25, 2017 finding that Tiffany was fit to stand trial. *See* Dr. Killian's Forensic Evaluation, attached hereto as Exhibit 8.

61. Advanced Correctional Healthcare contracted with Sangamon County to provide a licensed clinical social worker at the jail 28 hours per week in December 2016, nursing staff on-site 24/7 and a physician on call 24/7. *See* Agreement for the Provision of Inmate Health Services

and Amendments, attached hereto as Exhibit 9, Bates No. Sangamon County Produced, 1736-1755.

62. Plaintiff has not identified any inpatient mental health facility that would have accepted Tiffany Rusher if such a transfer was sought.

# IV.     ARGUMENT

## COUNT I:     Fourteenth Amendment Claim

**A.     Applicable Law**

**1.     Summary Judgment Standard**

Summary judgment is required if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Court considers the entire evidentiary record in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). In § 1983 cases, "the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *Padula v. Leimbach* 656 F.3d 595, 600 (7th Cir. 2011) quoting *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

**2.     Fourteenth Amendment Standard**

As a pretrial detainee at the time a part of the relevant events took place, Plaintiff's rights arise under the Due Process Clause of the Fourteenth Amendment. *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015). Courts must analyze a pretrial detainee's medical-care claim under the objective reasonableness inquiry set forth in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015),

rather than the Eighth Amendment's deliberate indifference standard. *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).

Under the objective reasonableness standard, a plaintiff must show that: (1) the official "acted purposefully, knowingly, or perhaps even recklessly" when taking the actions at issue— negligence, or even gross negligence, will not suffice; and (2) that those actions were objectively unreasonable. *Id*. at 352-53. A §1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence. *Darnell v. Pineiro*, 849 F.3d 17 at 36 (2d Cir. 2017), *See Kingsley*, 135 S.Ct. at 2472 ("Liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). A detainee must prove that an official acted intentionally or recklessly, and not merely negligently. *Id*.

The latter inquiry "requires courts to focus on the totality of the facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively— without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann v. Ogle Cty*., Ill., 909 F.3d 881 at 888 (7th Cir. 2018); see also *Kingsley*, 135 S. Ct. at 2473 (the objective reasonableness inquiry is case-specific and must be made from the perspective of a reasonable official present at the time the relevant decisions were made, including what the official "knew at the time, not with the 20/20 vision of hindsight."). Reasonableness must be determined in light of the totality of the circumstances. *Pulera v. Sarzant*, 966 F.3d 540 at 550 (7th Cir. 2020).

**B.    Arun Abraham, MD did not violate Tiffany Rusher's constitutional rights.**

Plaintiff has failed to list specific actions on the part of Dr. Abraham that violated Tiffany Rusher's Fourteenth Amendment rights, but cites failure to provide mental health treatment, failure to transfer Tiffany to an outside mental health facility, and continued placement in a high-risk cell as general allegations in her Third Amended Complaint. ¶ 39-41. Plaintiff's retained expert opined

that Dr. Abraham, "should have involved a psychiatrist," in Tiffany's care to determine whether she required transfer to an off-site psychiatric treatment setting such as a hospital. *See* Expert Report of Terry A. Kupers, MD, MSP, attached hereto as Exhibit 10, p. 20-21.

**1.      Dr. Abraham provided objectively reasonable medical and mental health treatment to Tiffany.**

Dr. Abraham provided medical and mental health treatment to Tiffany Rusher. In accordance with Tiffany's McFarland provider (Dr. Jeetwani) and his own observations, Dr. Abraham monitored and continued Tiffany's prescribed medications. Dr. Abraham evaluated Tiffany on a regular basis and consulted with nursing staff and Mickey regarding any issues with Tiffany's health, mental or otherwise. Dr. Abraham noted his own impressions of Tiffany's diagnoses in the medical records. Dr. Abraham referred Tiffany to the emergency room when necessary, just as he would in family practice (Exhibit 5, p. 90:24-94:24). In the 14 weeks Tiffany remained at Sangamon County Jail, medical staff provided treatment at least 24 times.

Plaintiff failed to put forth any evidence that would create a triable issue of material fact that Dr. Abraham 1) acted knowingly or recklessly in his care of Tiffany Rusher, and that 2) his actions were objectively unreasonable. Tiffany Rusher was being treated at an inpatient mental health facility for over seven (7) months prior to entering the Sangamon County Jail. Plaintiff put forth no evidence that a change in Tiffany's medication was appropriate or that a psychiatric evaluation would have led to a change in medication or other treatment; Plaintiff's retained expert endorsed the care Tiffany received at McFarland including the medication she was prescribed. Dr. Abraham's decision to maintain the care prescribed by Tiffany's long-term mental health provider could hardly be described as reckless or intending to cause harm. As Dr. Abraham noted in his deposition, he continued her prescribed medications because they were selected by her long-term provider in that setting, who had an opportunity to assess Tiffany almost daily. Tiffany received

medication 3 times per day for 93 days at the Sangamon County Jail. The records indicate 24 refusals (86% compliance), with no record of consistent refusal to take medication.

Plaintiffs' expert opines that involving a psychiatrist may have led to an alternative treatment plan. This demonstrates a disagreement about which of many professionally acceptable treatment plans could have been implemented, which is insufficient to sustain a civil rights claim. *Collignon v. Milwaukee Cty*., 163 F.3d 982 at 990 (7th Cir. 1998). Such a dispute cannot make out a substantive due process claim. *Id*. citing *Youngberg*, 457 U.S. at 321, 102 S.Ct. 2452. Plaintiff disclosed no evidence that Dr. Abraham's actions were unreasonable. Dr. Abraham's care of Tiffany Rusher was objectively reasonable.

**2.    Dr. Abraham was unable to transfer Tiffany to a mental health facility.**

Dr. Abraham did not have the power to send Tiffany to an inpatient mental health facility, nor has Plaintiff identified any facility that would have accepted her. McFarland had her arrested and sent to Sangamon County. A person charged with a felony comes within the authority of the criminal justice system of the State. *People v. Zahn*, 71 Ill. App. 3d 585 at 589 (1st Dist. 1979). If such a person is subsequently found to be in need of mental health treatment, but fit to stand trial, a determination must be made as to whether that person shall remain under the authority of the criminal justice system or be transferred to the jurisdiction of the mental health system. *Id*. The legislature has specified that persons charged with a felony, although coming under the jurisdiction of the Department of Mental Health (DMH), will remain under the jurisdiction of the criminal justice system while awaiting trial. *Id*. and 405 ILCS 5/3-100. The *Zahn* opinion stated the rational basis for barring pre-trial felony defendants (found fit to stand trial) from a mental health facility:

> The defendants' right to a speedy trial and the short-term nature of pretrial detention would also make mental health treatment planning difficult. Effective planning would be thwarted where mental health patients awaiting trial are engaged in planning for their defenses and making pretrial appearances in court. Additionally, treatment planning

would be hindered by the fact that the DMH would be unable to predict with any accuracy when the defendant would actually come to trial. *Id*.

The circuit court governs the admission, transfer, and discharge procedures for patients in state mental health hospitals. *People v. Kenton*, 377 Ill. App. 3d 239 at 246 (4th Dist. 2007). With regards to mental health treatment the circuit court only has jurisdiction over persons **not charged with a felony**. 405 ILCS 5/3-100. Trial courts are procedurally limited from hearing a petition for involuntary admission where a person is charged with a felony. *In re Megan G*., 2015 IL App (2d) 140148 ¶ 24. There are limited exceptions including defendants who have been adjudicated unfit to stand trial, defendants acquitted of felonies by reason of insanity, and defendants adjudicated fit for trial receiving treatment while out on bond. *Kenton* at 247. Defendants charged with felonies in all other situations remain under the jurisdiction of the criminal court system. *Id*.

Tiffany Rusher was incarcerated in the Illinois Department of Corrections and then a patient at McFarland Mental Health Center before being charged with a felony and transferred to Sangamon County Jail. Tiffany was subsequently evaluated and found fit to stand trial. Tiffany remained under the jurisdiction of the criminal court system. The circuit court would not have jurisdiction to arrange for Tiffany's transfer back to McFarland while she awaited the resolution of her felony charge. No one, including Dr. Abraham, could arrange to transfer Tiffany to a mental health hospital pursuant to Illinois law.

**3.     Tiffany's placement in a high-risk observation cell was objectively reasonable.**

To be entitled to due process, a plaintiff must first show that he has a protected liberty interest. *Domka v. Portage County*, 523 F.3d 776 at 779–80 (7th Cir.2008); *Sandin v. Connor*, 515 U.S. 472 (1995). "A prisoner has no liberty interest in remaining in the general population." *Williams v. Ramos*, 71 F.3d 1246 at 1248 (7th Cir.1995). When an inmate is placed in conditions more restrictive than those in the general prison population, whether through protective

segregation like suicide watch or discretionary administrative segregation, her liberty is affected only if the more restrictive conditions are particularly harsh compared to ordinary prison life or if he remains subject to those conditions for a significantly long time. *Earl v. Racine County Jail*, 2013 WL 2302107, *2 (7th Cir.). Jail officials have an obligation to protect inmates from self-destructive behaviors up to and including suicide. *Miranda v. Cty. of Lake*, 900 F.3d 335 at 349 (7th Cir. 2018), citing *Rice*, 675 F.3d at 665 and *Cavalieri v. Shepard*, 321 F.3d 616 at 620–22 (7th Cir. 2003).

Plaintiff failed to put forth any evidence that would create a triable issue of material fact that Dr. Abraham 1) acted knowingly or recklessly by placing Tiffany in a high-risk observation cell, and that 2) his actions were objectively unreasonable. Medical and jail staff placed Tiffany in a high-risk observation cell to prevent her from harming herself or others. Plaintiff's Third Amended Complaint and the undisputed facts in this case make clear that Tiffany had a history of both self-harm and assaultive behaviors. Based on Tiffany's history and behavior at the jail, the high-risk observation cell was the safest place for Tiffany. Tiffany was not in, "solitary confinement."

Plaintiff mis-characterized the 7th Circuit's position on solitary confinement in her Third Amended Complaint (¶ 36). The *Scarver* opinion (confirming summary judgment for defendants) noted in dicta that it is a, "fair inference," that the plaintiff's conditions of confinement aggravated his mental illness but held that measures reasonably taken to protect inmates and staff would not violate the Constitution. *Scarver v. Litscher*, 434 F.3d 972 at 976 (7th Cir. 2006). Plaintiff's quote regarding, "scientific consensus," on the harms of solitary confinement is not the position of the court but rather a recitation of the arguments contained in plaintiff's amicus brief. *Wallace v.*

*Baldwin*, 895 F.3d 481at 484 (7th Cir. 2018). Plaintiff presented no legal authority limiting or barring the use of high-risk observation cells.

In *Rice*, the 7th Circuit discussed whether long-term administrative segregation (7 months) is a violation of Fourteenth Amendment rights. *Rice ex rel. Rice v. Corr. Med. Servs*., 675 F.3d 650 at 666 (2012). Similar to Dr. Kupers' analysis, plaintiff's expert opined that, "…it is a well established fact that individuals with psychiatric problems decompensate when they are in extreme isolation." *Id.* The Court affirmed summary judgment in favor of defendants on this issue, stating:

> It is not too much to expect the Estate's lawyers, when complaining about the debilitating effects of the jail's housing decisions, to identify feasible alternatives and to tender evidence supporting the contention that Rice likely would have fared better in one of those alternative placements. This they have not done. *Id*.

Plaintiff has failed to introduce a genuine issue of material fact over whether Tiffany's placement in a high-risk observation cell (not "extreme isolation") violated her constitutional rights, as Plaintiff failed to offer both a feasible alternative or any evidence that Tiffany would have fared better in any alternative placement.

Here, as in *Rice*, Plaintiff criticizes use of the high-risk observation cells at Sangamon County Jail, characterizing the conditions as, "solitary confinement." Tiffany interacted with a nurse and a corrections officer 3 times per day to receive medications. Nurse Hammitt would put books in the window of Tiffany's cell so that she could read. (Exhibit 2, p. 43:18-44:14. Nurse Daniels interacted with Tiffany, spoke with her 5-10 times in a day and wrote letters to Tiffany's mother for her. (Exhibit 3, p. 34:7-36:14). High-risk observation cells require 15-minute checks by corrections officers (96 observations per day), daily interaction with nursing staff, frequent evaluation by mental health staff (at least 48 times in 93 days) and weekly evaluation by a nurse practitioner or physician. Tiffany received medical intervention 24 times at the jail and at least 4 times at an outside provider over the course of three months. Tiffany's placement in the high-risk

observation cell was not just objectively reasonable based on the totality of the circumstances, but the best placement available at the Sangamon County Jail.

## C.   Michael Shmikler did not violate Tiffany Rusher's constitutional rights.

Plaintiff failed to list specific actions on the part of Michael Shmikler, LCSW (Mickey) that violated Tiffany Rusher's Fourteenth Amendment rights, but cites describing Tiffany as high-risk, "…due to the known danger that she presented to herself…", failing to provide mental health treatment, and failing to transfer Tiffany to a mental health facility as general allegations in her Third Amended Complaint. ¶ 32, 39-41. Plaintiff's retained expert opined that Mickey should have or failed to review the McFarland discharge summary, failed to provide treatment or therapy, failed to provide sufficient documentation, failed to obtain a psychiatric evaluation and / or transfer to a psychiatric hospital, and failed to appropriately assess Tiffany's level of functioning. *See* Expert Report of Tod Harrison, LCSW, attached hereto as Exhibit 11, p. 2-3.

It must be noted that Mickey was only one part of a care team that also included Dr. Abraham, several nurses, and outside medical providers who saw Tiffany during her incarceration. Mickey evaluated Tiffany 48 times during her incarceration at Sangamon County Jail and on 5 occasions created detailed summaries of her condition and progress. Plaintiff failed to put forth any evidence that would create a triable issue of material fact that Mickey 1) acted knowingly or recklessly in his care of Tiffany Rusher, and that 2) his actions were objectively unreasonable. Lydia Hicks, a former ACH employee and Mickey's supervisor, explained how an LCSW provides talk therapy in a jail setting:

> …we do talk lot and that's how we find out information about people, how they think, how they feel…our main focus in the Jail is solving and, you know, kind of resolving issues or problems that they want to resolve while they are there…Therapeutic services don't have to be formal sit down sessions, they don't have to last for long periods of time...you don't have to sit down one to one with a person to be able to provide them therapeutic services. Exhibit 7, p. 120:13-122:8.

A previous case identified a possible Fourteenth Amendment violation involving a social worker, where the social worker noted that a detainee suffered from major depressive disorder, hallucinations, acute anxiety, and feelings of hopelessness, but failed to report those findings to jail staff or to recommend suicide watch. *Belbachir v. Cty. of McHenry*, 726 F.3d 975 at 908-2 (7th Cir. 2013). Here, medical and jail staff were well informed of Tiffany's history and prior treatment and she remained on high-risk observation as a result.

Plaintiff has not cited any medical or legal authority requiring social workers to provide more than the talk therapy Ms. Hicks described that Mickey documented on his referral tracking and placement review forms, and that others observed him delivering to Tiffany. Mickey had no ability to transfer Tiffany to a mental health hospital.

Plaintiff failed to introduce a genuine issue of material fact over whether Mickey's care of Tiffany violated her constitutional rights. Plaintiff failed to put forth any evidence in the record supporting their expert's opinion that Mickey failed to provide Tiffany with therapy. The record shows that he did. Plaintiff has failed to put forth any evidence in the record supporting their expert's opinion that Mickey failed to review the McFarland record. Mickey first interacted with Tiffany on December 16, 2016, one day after she entered Sangamon County Jail. The referral form noted treatment at McFarland. On January 2, 2017, Mickey completed a placement review form noting Tiffany's battery charge and history of violent responses.

Plaintiff failed to put forth any evidence in the record supporting their expert's opinion that Mickey failed to provide sufficient documentation or that additional documentation would have prevented Tiffany's suicide. Mickey noted his evaluation of Tiffany after each interaction and consistently provided more detailed summaries to track her progress. He discussed her care with Dr. Abraham as needed. The record shows that Mickey met with and provided therapy to Tiffany.

Plaintiff failed to put forth any evidence in the record supporting their expert's opinion that Mickey failed to appropriately assess Tiffany's level of functioning. Tiffany remained under the highest possible level of observation while at the Sangamon County Jail. Regardless of Mickey's assessment, it never warranted a sustained change in her placement as a high-risk inmate housed in an observation cell.

Plaintiff failed to set forth a genuine issue of material fact over whether Mickey's care of Tiffany was objectively reasonable. Mickey evaluated Tiffany multiple times per week, offered talk therapy, documented her problems and progress, and communicated with medical and security staff. Mickey (and all Defendants) ensured that Tiffany remained under the highest level of observation while at the jail. Plaintiff failed to put forth any genuine issue of material fact showing that Mickey's care of Tiffany was reckless or intentionally harmful. Mickey's care of Tiffany was objectively reasonable.

### D.    ACH did not violate Tiffany Rusher's constitutional rights.

Plaintiff failed to even allege that there existed an unconstitutional custom, policy, procedure, or practice of Advanced Correctional Healthcare or that any such policy was the moving force behind a constitutional deprivation regarding Tiffany Rusher's healthcare. Private corporations who act under color of state law may be held liable for injuries resulting from their policies and practices. *Rice ex rel, Rice v. Correctional Medical Services*, 675 F.3rd 650 (7th Circ. 2012) citing *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 690-691 (1978). *See also Rodriguez v. Plymouth Ambulance Service*, 577 F. 3rd 816, 822 (7th Circ. 2009). (*Monell* liability applies to private corporation defendants under Section 1983).

It is not enough for the plaintiff to allege or show that an employee of the corporation violated her constitutional rights; she must also show that her injury was the result of the corporation's official policy or custom. *Rice ex rel*. at 675. *Monell* liability attaches where, and

only where, a deliberate choice to follow a course of action is made from among various alternatives by policy makers. *Rice ex rel.* at 675 citing *City of Canton, Ohio v. Harris*, 489 U.S. 378 at 389 (1989). An official policy or custom may be established by means of an express policy or wide spread practice which, although unwritten, is so entrenched and well known as to carry the force of policy, or through the actions of an individual who possess the authority to make final decisions on behalf of the corporation. *Id.* The plaintiff must also show a direct causal connection between the policy or practice and the claimed injury; in other words that the policy or custom was the moving force behind the constitutional violation. *Id.* citing *Harris* at 389.

Plaintiff failed to allege (a) that such a policy exists and (b) that there is a causal connection between that policy or custom and a constitutional violation. Plaintiff's sole allegation regarding ACH states:

> ACH agreed to contracts in which its employees provided no mental health treatment whatsoever, including to detainees as seriously mentally ill as Tiffany, and pursuant to ACH's policies and practices its employees, including Defendants Abraham and Shmikler, indeed provided Tiffany with no mental healthcare. *See* Plaintiff's Third Amended Complaint, ¶42(ii).

Plaintiff's bald assertion that ACH "provided no mental health treatment" is obviously false and contradicted by the evaluations and treatment provided by the ACH staff at Sangamon County. Plaintiff failed to raise any genuine issue of material fact demonstrating an ACH policy or custom causally connected to any violation of Tiffany Rusher's constitutional rights. As noted above, Dr. Abraham and Mickey Shmikler provided objectively reasonable care to Tiffany. ACH's contract with Sangamon County Jail provided for mental health care, requiring a Qualified Mental Health Professional (an LCSW such as Mickey) to be present in the jail 28 hours per week. Dr. Abraham treated Tiffany by continuing her mental health medications, monitoring her compliance with taking medications, evaluating her on (at least) a weekly basis, and noting his diagnoses. Mickey

treated Tiffany by conducting evaluations, documenting his interactions, and offering talk therapy. Plaintiff's own retained psychiatry expert admitted, "I have not conducted a comprehensive assessment of the adequacy of care provided by ACH at the Sangamon County Jail…" (Exhibit 10, p. 25). ACH is entitled to summary judgment on Plaintiff's Fourteenth Amendment claim.

## E.     Defendants are entitled to immunity.

Defendants are entitled to qualified immunity or good faith immunity. Defendants acknowledge that the 7th Circuit has foreclosed the qualified immunity defense for jail medical contractors. *Petties v. Carter*, 836 F.3d 722, 734 (7th Cir. 2016); *Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013). Defendant believes that the Supreme Court has not conclusively addressed this issue, and numerous prior cases allowed the Defense. See, e.g., *Filarsky v. Delia*, 132 S. Ct. 1657 (2012); *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008); *Williams v. O'Leary*, 55 F.3d 320, 323-324 (7th Cir. 1995); and *Young v. Murphy*, 90 F.3d 1225, 1234 (7th Cir. 1996).

In the absence of qualified immunity, Defendants are entitled to a good faith defense, comparable in scope to qualified immunity. See *Richardson v. McKnight*, 521 U.S. 399, 413-414 (7th Cir. 1997) (discussing whether the court might recognize a good faith defense for private actors if they were not entitled to qualified immunity). The Supreme Court held that its decision finding qualified immunity unavailable to private prison guards was limited to that specific question and that a "good faith" immunity might be available. The Court said that it "d[id] not foreclose the possibility that private defendants faced with § 1983 liability …could be entitled to an affirmative defense based on good faith… or that § 1983 suits against private, rather than governmental, parties could require plaintiffs to carry additional burdens." *Richardson v. McKnight*, 521 U.S. 399, 413 (1997) (quoting *Wyatt v. Cole*, 504 U.S. 158 (1992)). The Court expressly reserved the question of good faith immunity, and four justices issued a strong dissent

from the limitations on qualified immunity. *McKnight* at 414. Denying immunity to private contractors such as the ACH defendants creates a paradox where those defendants are subjected to liability under Section 1983 as "state actors" but denied the immunity available to government employees.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011) (citation omitted). "The purpose of the doctrine is "to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Catlin v. City of Wheaton*, 574 F.3d 361, 365 (7th Cir. 2009). Presumably, the "good faith" immunity envisioned by the Supreme Court in *Richardson* would have a similar purpose and scope as qualified immunity and immunize medical professionals from reasonable mistakes as to whether the care they provided complied with constitutional norms. The ACH defendants were responsive to every request made regarding Tiffany Rusher. They saw her regularly, counseled her, prescribed, and administered medications, and sent her out for emergency evaluation and treatment when they deemed it appropriate.

Given the medical and mental health issues that were confronted by the Defendants in the case at hand, there is no case law holding that failure to treat or respond differently constitutes deliberate indifference or objective unreasonableness. Most suicide cases involve the failure to identify a suicide risk and place an inmate or detainee on suicide precautions. Counsel has not found any cases comparable to this, where the suicide risk was known and significant precautions were taken, yet the providers were found to have violated the detainee's rights. There are certainly no cases holding that medical staff violated a detainee's constitutional rights by failing to put a

22

suicidal inmate in a less restrictive (i.e. less safe) environment, as Plaintiff's expert suggests. There are cases endorsing the use of high-risk observation cells ("This court concludes that the County could reasonably believe that its policy of placing potentially suicidal detainees in the special needs cell, along with its policy to require checks of these inmates every 15 minutes, was an effective way to prevent suicide by detainees." *Rapier v. Kankakee Cty., Ill*., 203 F. Supp. 2d 978 at 984 (C.D. Ill. 2002), granting summary judgment to defendants). There is no case law that would have put Defendants on notice that their conduct with respect to Ms. Rusher was a violation of her constitutional rights.

## COUNT IV:  Wrongful Death

### A. Applicable Law

While the issue of proximate cause is ordinarily a question of fact for the jury, the plaintiff must present affirmative evidence that the defendant's negligence was a proximate cause of the plaintiff's injuries to avoid summary judgment. *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289 at 292 (1st Dist. 2008). If the plaintiff fails to do so, summary judgment is proper as a matter of law. *Id*. at 293. Proximate cause must be established by expert testimony to a reasonable degree of medical certainty. *Id.* The causal connection between treatment, or a delay in treatment, and the claimed injury "must not be contingent, speculative, or merely possible." *Id*. An expert's opinion is only as valid as the reasons for the opinion. *Id*. While testimony grounded in "expert analysis of the known physical facts" is welcomed, conclusory opinions based on sheer, unsubstantiated speculation should be considered irrelevant. *Id*.

Illinois courts have found suicide to be an unforeseeable act that breaks the chain of causation required by proximate cause. *Dux v. United States*, 69 F. Supp. 3d 781 at 787 (N.D. Ill. 2014). A plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent event that the tortfeasor cannot be expected to foresee. *Id*. Illinois courts

recognize two exceptions to the general rule: 1) where suicide is foreseeable when the defendant's conduct caused an injury that made the decedent 'so bereft of reason' as to cause him to attempt suicide, or 2) an action asserting psychiatric malpractice and the failure to properly supervise. *Id.* at 787-8. The latter is different from a typical medical malpractice action because the negligence is not in the diagnosis or treatment, but rather, it is in the failure to carefully protect a patient from inflicting self-harm. *Id.* Where it is reasonably foreseeable that a patient by reason of his mental or emotional illness may attempt to injure himself, those in charge of his care owe a duty to safeguard him from his self-damaging potential. *Winger v. Franciscan Med. Ctr.*, 299 Ill. App. 3d 364 at 374 (3rd Dist. 1998). It is the plaintiff's burden to prove both that 1) the decedent would not have committed suicide had jail or medical staff acted responsibly, and 2) that the suicide was a foreseeable as well as actual consequence of the staff's negligence. *Jutzi-Johnson v. United States*, 263 F.3d 753 at 755 (7th Cir. 2001) (examining U.S. tort liability under the principles of Illinois tort law).

**B.     Plaintiff failed to disclose evidence that Defendants' actions caused Tiffany Rusher's suicide.**

Under Illinois law this case can proceed under two exceptions to the general rule that suicide is an independent event, breaking the chain of causation. One exception requires proof that Defendants' conduct caused an injury that made the decedent 'so bereft of reason' as to cause her to attempt suicide. Plaintiff put forth no evidence indicating that Defendants' conduct caused an injury leaving Tiffany 'bereft of reason.' The record demonstrates that Tiffany had a long history of self-harm behaviors, any of which could have resulted in her death. Nothing in the record demonstrates that Defendants' care of Tiffany worsened her condition; Plaintiff's experts repeatedly note Tiffany's self-harm history at both IDOC and McFarland.

The Plaintiff's sole option for relief under the Wrongful Death Act would be the second exception – an action asserting psychiatric malpractice and the failure to properly supervise. This is different from a typical medical malpractice action because the negligence is not in the diagnosis or treatment, but rather in the failure to carefully protect a patient from inflicting self-harm. For Plaintiff to survive summary judgment, she must demonstrate through expert opinion a causal connection between Defendants' alleged negligence (limited to the failure to properly supervise) and Tiffany's injury (obtaining and secreting a piece of towel which she used to commit suicide while unobserved). Plaintiff failed to meet this burden.

The ACH defendants could not transfer Tiffany out of the jail and Plaintiff cannot show that the ACH defendants could have reasonably taken any other actions or given any other orders which would have prevented Tiffany from committing her final act of self-harm. Defendants provided the highest level of observation available and restricted all items from Tiffany's cell. Their care was not a proximate cause of her suicide. To survive summary judgment, the plaintiff must present affirmative evidence that the defendant's negligence was a proximate cause of the plaintiff's injuries. The causal connection between the negligent act and the claimed injury "must not be contingent, speculative, or merely possible." Summary judgment is appropriate where the plaintiff's allegations cannot establish a concrete causal connection between defendant's actions and an inmate's suicide. ("The relevant causation inquiry is whether Rapier's suicide was a foreseeable consequence of the failure of the County to adequately deal with the problem of understaffing at the jail. *See Jutzi–Johnson*, 263 F.3d at 756. This court concludes that it would have to engage in speculation to determine that additional staff at the jail would have resulted in Rapier being checked more often when the undisputed evidence showed that he had been observed by Smith, at most, 20 minutes prior to the time he was found hanging in the special needs cell.")

*Rapier v. Kankakee Cty*., Ill., 203 F. Supp. 2d 978 at 985 (C.D. Ill. 2002).

The limited exception under which Plaintiff may proceed in this case only allow allegations of negligence for the failure to protect the patient from self-harm, not failures in diagnosis or treatment. Mr. Harrison's report fails to cite any failures on Mickey's part to protect Tiffany from self-harm and speak only to diagnosis and treatment. Dr. Kupers argues that the use of a high-risk observation cell was inappropriate, and that Tiffany should have had fewer restrictions and more ability to move about the jail and interact with others.

Undersigned counsel has been unable, after extensive research, to find any legal authority wherein liability for suicide is imposed on a provider for keeping an inmate on suicide watch and / or under the highest possible level of observation. Dr. Kupers suggests that Tiffany should have been removed from high-risk observation after each episode of self-harm and allowed more freedom to move about the jail and interact with other inmates. Dr. Kupers has offered the opinion that fewer restrictions would have kept Tiffany safer and prevented her suicide.  The record demonstrates that the opposite is true.

Tiffany's history of assaultive and self-harm behaviors is well-documented and repeated in Plaintiff's Third Amended Complaint and expert reports. As noted above, other cases have found that failures on the part of jailers and medical staff to implement anti-suicide measures have barred defendants from a grant of summary judgment (failure to implement the Quiet Room policy or some other reasonable suicide prevention measure, *White v. Watson*, 2018 WL 2047934, at *15 (S.D. Ill. May 2, 2018). Here, Plaintiff's evidence that Defendants' actions caused Tiffany's suicide is the expert opinion that Defendants should have removed Tiffany from the highest possible level of observation at the jail and allowed her unbridled access to inmates and instrumentalities of self-harm. The record from McFarland alone demonstrates that no reasonable

jury could conclude that decreased restrictions and observation would have prevented Tiffany's suicide. Defendants are entitled to summary judgment on Plaintiff's Wrongful Death claim.

## COUNT V – Survival Act

The Illinois Survival Act does not create a statutory cause of action but allows Plaintiff to bring an action that accrued prior to Tiffany's death, over which Tiffany would have been able to prosecute and recover damages for. *Saucedo v. City of Chicago*, 2015 WL 3643417, at *9 (N.D. Ill. June 11, 2015). Plaintiff brings an action for negligence under the Illinois Survival Act to recover damages to which Tiffany would have been entitled based on Defendants' conduct. *Id.* A negligence cause of action requires that there must be a legal duty to exercise care in favor of the person injured, a breach of such duty, and injury proximately caused by such breach. *Id.* At the summary judgment stage, Plaintiff must present affirmative evidence that there was reasonable certainty that Defendants' negligence proximately caused Tiffany's injuries. *Id.* In *Saucedo*, the court granted summary judgment to defendant for plaintiff's failure to establish proximate cause, noting that the decedent,

> …undoubtedly suffered from emotional and mental stress prior to his death that led him to decide to commit suicide, this suffering is reasonably understood as the result of being investigated and detained in relation to a murder, rather than caused by Defendant Detectives' failure to adequately monitor and protect Saucedo.

Plaintiff failed to put forth any evidence of Tiffany's alleged injuries of conscious pain and suffering, or that Defendants' actions proximately caused those injuries. Tiffany's mental health issues were long-term and well-documented. Nothing in the record could lead a reasonable jury to conclude that Tiffany's condition at the jail was any different than it had been in years past, or that Defendants' actions caused Tiffany's affliction. Defendants are entitled to summary judgment on Plaintiff's Survival Action claim.

## V.    CONCLUSION

Plaintiff failed to raise any genuine issue of fact demonstrating objectively unreasonable medical care and / or that Defendants' care of Tiffany caused her suicide. Defendants are entitled to summary judgment on the 14th Amendment, Wrongful Death and Survival Claims. Defendants care of Tiffany Rusher was objectively reasonable.

Arun Abraham, M.D., Advanced Correctional Healthcare, Inc. and Michael Shmikler, Defendants

By:    /s/ *Betsy A. Wirth*

Betsy A. Wirth
QUINN JOHNSTON

Matthew J. Maddox (Illinois Bar No. 6185870)
Betsy A. Wirth (Illinois Bar No. 6298163)
QUINN JOHNSTON
400 South Ninth Street, Suite 102
Springfield, IL 62701
Telephone:    (217) 753-1133
Facsimile:    (217) 753-1180
E-mail:    mmaddox@quinnjohnston.com
E-mail:    bwirth@quinnjohnston.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 25, 2020, I electronically filed the foregoing Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Stephen H. Weil
Jon Loevy
Arthur Loevy
Sarah Grady
Loevy & Loevy
311 N. Aberdeen Street
Third Floor
Chicago, IL 60607
weil@loevy.com
jon@loevy.com
arthur@loevy.com
sarah@loevy.com

Alan Mills
Nicole Schult
Bridget Geraghty
Uptown People's Law Center
4413 North Sheridan Road
Chicago, IL 60640
alan@uplcchicago.org
Nicole@uplcchicago.org
Bridget&uplcchicago.org

Teresa M. Powell
Brett Eric Siegel
Heyl Royster Voelker & Allen
3731 Wabash Avenue
PO Box 9678
Springfield, IL 62971
tpowell@heylroyster.com
secf@heylroyster.com
cskaggs@heylroyster.com

_s/Betsy A. Wirth_____
Matthew J. Maddox (Illinois Bar No. 6185870)
Betsy A. Wirth (Illinois Bar No. 6298163)
QUINN JOHNSTON
400 South Ninth Street, Suite 102
Springfield, IL 62701
Telephone:     (217) 753-1133
Facsimile:     (217) 753-1180
E-mail:     mmaddox@quinnjohnston.com
E-mail:     bwirth@quinnjohnston.com