**DEPOSITION OF KATE DANIELS**

**June 13, 2019**

Page 1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

KELLI ANDREWS, AS )
ADMINISTRATOR OF THE )
ESTATE OF TIFFANY ANN )
RUSHER, DECEASED, )
) No.
              Plaintiff, ) 1:18-cv-1100-SEM-TSH
)
    vs. )
)
SANGAMON COUNTY ILLINOIS,
WES BARR, LARRY BECK,
JR., ADVANCED
CORRECTIONAL HEALTHCARE,
INC., ARUN ABRAHAM,
MICHAEL SHMIKLER, KYLE
MEYER, Z. WHITLEY,
JENNIFER EALEY, GUY
BOUVET III, and DOES 1-5,

              Defendants.


              Deposition of KATE DANIELS, taken before

Cathy J. Craggs, CSR, RPR, at the instance of the

Plaintiff, on June 13, 2019, at the hour of 1:00 p.m.,

at QUINN, JOHNSTON, HENDERSON, PRETORIOUS & CERULO,

400 South 9th Street, Springfield, Illinois, Illinois,

pursuant to attached stipulation.

                    ASSOCIATED COURT REPORTERS
                        1-800-252-9915
                        P.O. Box 684
                  Taylorville, Illinois 62568

EXHIBIT
3

DEPOSITION OF KATE DANIELS                     June 13, 2019

Page 2

```
 1              S T I P U L A T I O N
 2              It is stipulated between the parties
 3    herein, through their attorneys, that the deposition
 4    of KATE DANIELS may hereby be taken upon oral
 5    interrogatories, on June 13, 2019, at the hour of 1:00
 6    p.m., at QUINN, JOHNSTON, HENDERSON, PRETORIOUS &
 7    CERULO, 400 South 9th Street, Springfield, Illinois,
 8    Illinois, before the instance of the Plaintiff, and
 9    before Cathy J. Craggs, CSR and RPR.
10              That the oral interrogatories and the
11    answers of the witness may be taken down in shorthand
12    by the Reporter and afterwards transcribed.
13              That the reading and signing of said
14    deposition is WAIVED.
15              That the deposition or any portions
16    thereof may be used by any of the parties hereto,
17    without foundation proof, for any purpose for which
18    depositions are competent.
19              That copies of the deposition may be
20    furnished to any of the parties at his or her own
21    expense.
22
23
24
```

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 3

1    APPEARANCES:    (June 13, 2019)

2

3       WEIL & CHARDON LLC
        By Ms. Alexis G. Chardon, Esq.
4       Attorney at Law
        333 South Wabash Avenue
5       Chicago, Illinois  60604
            Appeared on behalf of the Plaintiff;
6
        HEYL, ROYSTER, VOELKER & ALLEN
7       By Ms. Theresa M. Powell, Esq.
        Attorney at Law
8       3731 Wabash Avenue
        Springfield,Illinois  62791-9678
9           Appeared on behalf of the Defendants, Wes
    Barr, Larry Beck, Guy E. Bouvet, III, Jennifer Ealey,
10   Kyle Meyer. Sangamon County, Illinois and Zach Whitley

11

12      QUINN, JOHNSTON, HENDERSON, PRETORIUS & CERULO
        By Ms. Betsy A. Wirth, Esq.
        400 South Ninth Street
13      Suite 102
        Springfield, Illinois  62701

14
            Appeared on behalf of Arun Abraham, M.D.,
15   Advanced Correctional Healthcare, Inc., and Michael
     Shmikler.
16
                     ***      ***
17

18

19

20

21

22

23

24

**DEPOSITION OF KATE DANIELS**                    **June 13, 2019**

Page 4

1
                              I N D E X
2
      WITNESS          DIRECT      CROSS      REDIRECT   RECROSS
3     KATE DANIELS
                          5          100
4
5                        E X H I B I T S
6     EXHIBIT                                        PAGE
      Daniels Exhibit 1                                39
7     Daniels Exhibit 2                                48
      Daniels Exhibit 3                                52
8     Daniels Exhibit 4, 5                             53
9
10
11
12
13
14           ***EXHIBITS RETAINED BY MS. CHARDON***
15
16
17
18
19
20
21
22
23
24

Page 5

```
 1                    KATE DANIELS,
 2   called as a witness herein, at the instance of
 3   the Plaintiff, having been duly sworn on her oath,
 4   testified as follows:
 5                    DIRECT EXAMINATION
 6                    CONDUCTED BY MS. CHARDON:
 7        Q.  Good afternoon.
 8        A.  Good afternoon.
 9        Q.  My name is Ali Chardon I'm an attorney for
10   the Estate of the Plaintiff Tiffany Rusher.  Thank you
11   for being here today.
12        A.  Sure.
13        Q.  Can you state your full name for the record,
14   please?
15        A.  My full name is Erin Kathryn Daniels.
16        Q.  And you go by Kate?
17        A.  Correct.
18        Q.  So sometimes I see EK or EKD --
19        A.  Uh-huh.
20        Q.  -- that's you on the Medical records.
21                    Have you ever been deposed before?
22        A.  No.
23        Q.  Okay.
24        A.  Well, yes, I have I, but not in, like any
```

**DEPOSITION OF KATE DANIELS**                                   **June 13, 2019**

Page 6

1   Medical like for work, I guess I should say I've been

2   deposed in regards to like an accident that I came up

3   to.

4          Q.  Okay.  So you were a witness to a car

5   accident?

6          A.  Correct, correct.

7          Q.  And but you were, you sat for a deposition

8   in that?

9          A.  Yes.

10          Q.  And was that recently?

11          A.  No.

12          Q.  Okay.  Well, you probably, you know, you've

13   done it before and your lawyer has probably explained

14   it to you --

15          A.  Uh-huh.

16          Q.  -- but I will go over a little bit.

17              She's recording everything that we say,

18   so please answer with yes, no as opposed to uh-huh or

19   head nods.

20          A.  (Nod Affirmatively).

21          Q.  Does that make sense?

22          A.  Yes.

23          Q.  And we should try not to talk over each

24   other so that she can get a good record.  That means

1  that you should let me finish my question before you

2  answer, and I should make let you finish your

3  question.  If I've cut you off and you need to add

4  anything, excuse me, finish your answer.  Does that

5  make sense?

6      A.  Yes.

7      Q.  If you feel like you need to correct

8  anything later on in the deposition because you

9  thought of something new or additional or different

10  than you want to add feel free to do that so that we

11  can make sure that we have a full record.  This is my

12  only chance to kind of get information before we go to

13  trial in this case, so I want to make sure that

14  everything, you know, that you feel like you have the

15  opportunity to tell me everything that you need to,

16  does that make sense?

17      A.  Yes.

18      Q.  If you would like to take a break, please

19  feel free to do that, just answer any questions that I

20  have pending before you go out for your break, does

21  that sound fair?

22      A.  Yes.

23      Q.  So what is your job title?

24      A.  Health Systems Administrator.

DEPOSITION OF KATE DANIELS                          June 13, 2019

                                                              Page 8

1          Q.   And you're employed by ACH?

2          A.   Correct.

3          Q.   Correct?

4          A.   Yes.

5          Q.   You're Health Systems Administrator at

6    Sangamon County Jail?

7          A.   Correct.

8          Q.   How long have you held that job?

9          A.   Two and a half years, approximately.

10         Q.   Okay.  So when did you first become Health

11   System Administrator?

12         A.   I believe my hire date was October 10th of

13   2016 or 17, 16, 2016.

14         Q.   Where did you work before that?

15         A.   Memorial Medical Center.

16         Q.   And what's your professional licensure, are

17   you a Nurse?

18         A.   I'm a Registered Nurse.

19         Q.   Okay.

20         A.   Yeah, yes.

21         Q.   How long were you at Memorial Medical

22   Center?

23         A.   Since 2000.

24         Q.   Did you ever interact with Tiffany Rusher at

DEPOSITION OF KATE DANIELS                          June 13, 2019

Page 9

1   Memorial Medical Center?

2        A.  No.

3        Q.  Where, what did you do at Memorial Medical

4   Center?

5        A.  I was a Registered Nurse.

6        Q.  Were you in a particular floor or ward, did

7   you have a specific assignment?

8        A.  I was an Emergency Room Nurse.

9        Q.  Prior to working at Sangamon County Jail,

10  had you ever worked in the correctional setting

11  before?

12       A.  No.

13       Q.  Have you ever worked in the psychiatric

14  setting?  Specifically have you ever worked in a

15  Mental Health Institution?

16       A.  No.

17       Q.  Have you ever worked on a psych ward?

18       A.  No.

19       Q.  Prior to Memorial Medical Center, prior to

20  2000 what did you do?

21       A.  Went to college.

22       Q.  So that was your first job as a Nurse?

23       A.  Correct.

24       Q.  Okay.  And you, did you receive your RN

**DEPOSITION OF KATE DANIELS**                    **June 13, 2019**

Page 10

1   license shortly before or around the time of 2000?

2          A.  I graduated from Nursing school in 2002.

3          Q.  Okay.  And so prior to that what was your

4   job title at Memorial Medical Center?

5          A.  I was a tech, so like I was a CNA tech.

6          Q.  What are your, you're going to have to tell

7   me again because if I don't write it down it's gone.

8   What's your actual job title at ACH?

9          A.  HSA, Health Systems Administrator.

10         Q.  What are your duties as a Health System

11  Administrator?

12         A.  Oh, I guess I foresee that, the Medical

13  Unit, I do staffing, I do, I respond to

14  Administration, I do payroll, I do patient care, I do

15  sick call.  I mean I pretty much do everything and

16  anything of, in that unit.

17         Q.  You oversee the other healthcare

18  practitioners at the facility?

19         A.  I, yes.

20         Q.  And in what way, what does that entail?

21         A.  I deal with like I'm their Manager so I deal

22  with like staffing.  I deal with like patient specific

23  problems.  I deal with, they come to me in regards to

24  if they have questions about sick call stuff.  If they

**DEPOSITION OF KATE DANIELS**                    June 13, 2019

Page 11

1    were doing things right, I do their evaluations.

2    Sorry, let's see, I kind of like a managerial like in

3    regards to that.

4         Q.  Did you do evaluations for Arun Abraham?

5         A.  I don't do his evaluations, no, he's not

6    under me.

7         Q.  Okay.  Would everyone else all of the other

8    ACH employees at Sangamon County Jail be under you in

9    terms of reviews?

10        A.  In regards to nursing.

11        Q.  Well, who do you do evaluations for?

12        A.  The nursing staff.

13        Q.  And do you do evaluations for Nurse

14   Practitioners?

15        A.  No.

16        Q.  Okay.  So not Mary Dambacher?

17        A.  No.

18        Q.  She, who does her reviews or evaluations?

19        A.  I'm not aware of who does her reviews.

20        Q.  Okay.  And so you would not, do you do

21   reviews or evaluations, let me ask it differently.

22             Do you oversee Mental Healthcare

23   Professionals at the Jail?

24        A.  I'm strictly nursing, so I have nothing to

**DEPOSITION OF KATE DANIELS**                    **June 13, 2019**

1  do with Mental Health.

2      Q.  Okay.  When you provide patient care, do you

3  provide patient care regularly as a part of your job

4  duties or is it something like you, you fill in when

5  there's not coverage?

6      A.  In regards to like direct patient care is

7  that what you're saying?  Is that what's you're asking

8  or --

9      Q.  Well, you listed patient care and responding

10  to sick call as some of your job duties?

11      A.  Correct.

12      Q.  So can you describe the circumstances under

13  which you --

14      A.  Oh, sorry, go ahead.

15      Q.  Yeah.  Under which you provide patient care?

16      A.  So there isn't like a specific time when I

17  would do sick call, but like there would be like if

18  the Nurse was busy and the Inmate was brought in by

19  the Correctional Officer I would, you know, step in

20  and help her out.  Or I would, you know, assist the

21  Doctor if I was there when the Doctor came and I would

22  do sick call with him or not necessarily the, I never

23  do it with the Nurse Practitioners, but so just there

24  is just a different times where, you know, I'm very

**DEPOSITION OF KATE DANIELS**                    June 13, 2019

Page 13

1   active in my unit.  So I'm always sitting at the desk

2   in the unit when sick cal is going on it, the sick

3   call is being completed in our unit.  So I'm always

4   listening and if I overhear something, I will step in

5   and talk to the patient.  So I pretty much have, you

6   know, good patient contact with everybody, so I'm

7   involved all the time if that makes sense.

8        Q.  Yes.

9            Have you received training on Mental

10  Health or Meant Health Illness issues from ACH since

11  coming to work with ACH at Sangamon County Jail?

12       A.  Yes.

13       Q.  What training have you received?

14       A.  I don't know the exact name or title of what

15  the training was, but I believe we have gotten, I

16  think there's been two events that we've gone to where

17  they've, they've touched on Mental Health.

18            Then I believe there is also a training

19  in regards to when we're hired, but I couldn't be

20  specific on that, the exact name of it.

21       Q.  Okay.  Did you watch any videos as part of

22  you training?

23       A.  Yes.

24       Q.  So was there a video, did you have, you've

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 14

1   seen a video presented by Melissa Caldwell?

2        A.  Yes.

3        Q.  Okay.  And actually I should say Doctor

4   Caldwell, correct, she's a --

5        A.  Correct.

6        Q.  And did you watch an entire five part

7   series?

8        A.  I can't remember the exact number.

9        Q.  When did you watch that?

10       A.  Right when I got hired.

11       Q.  Okay.  And what topics were covered by that?

12       A.  I can't remember specific topics.

13       Q.  Did it discuss suicide risk, recognizing

14  suicide risk in Prisons or Jails?

15       A.  Yes.

16       Q.  Did it discuss risk factors for suicide?

17       A.  I don't remember specifics, so I can't

18  really answer that question.

19       Q.  Okay.  And you said was that when you said

20  that you've done two trainings since joining ACH was

21  that one of them or was that --

22       A.  That was on our own, that's, we were

23  provided with those videos to watch on our own when we

24  first were hired there.

**DEPOSITION OF KATE DANIELS**                    June 13, 2019

Page 15

1      Q.  Okay.  And you, was it voluntary or was it

2  mandatory?

3      A.  I don't remember, I can't remember, I know

4  they provided us with videos and asked us to watch

5  them.  I don't know if it was actually mandatory.  I

6  believe it was part of, we didn't have to sign

7  anything, I don't, in regards to that, so.

8      Q.  How much time did it take you to watch the

9  videos?

10     A.  A long time.  There is multiple videos not

11 just on Mental Health there is various different,

12 pregnancies, all kind of different videos.

13     Q.  Was there any videos presented by Norman

14 Johnson?

15     A.  Uh-huh.

16     Q.  Is that yes?

17     A.  Yes.

18     Q.  Do you remember what topics his videos

19 covered?

20     A.  No.

21     Q.  And then the other two trainings were those

22 PowerPoint's that you walked through on a computer,

23 were they live presentations?

24     A.  We have ongoing education there, I have been

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 16

1  to classes, I have to, I have to go to seminars, I

2  don't remember I think it's twice a year, I don't know

3  if that, all of those that we've had Mental Health I

4  can't be specific, but I probably have gone to 8

5  seminars, day long seminars in regards to ACH's, what

6  they're doing in the company and, you know, different

7  stuff, and I can't give you the specific details in

8  regards to that.

9      Q.  Does ACH have a suicide prevention policy?

10     A.  I can't answer that, I don't know.  I

11  believe so, yes but...

12     Q.  What is it?

13             What do you know about it?  Or what

14  protocol, suicide prevention protocol policy plan?

15     A.  We have Mental Health at the Jail, I know

16  what we do at the, I can tell you what we do at the

17  Jail.  As for a protocol I wouldn't say there is an

18  exact, I am not, I couldn't state that there was an

19  actual protocol.  But right now we do as ASQ

20  screening.  There is a Behavioral Mental Health Form

21  that the Officer whoever is involved with the patient

22  fills out and refers to Medical and Mental Health.

23  The patient is evaluated by Mental Health and placed

24  on High Risk observation status, suicide status based

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 17

1   off what statements were made.

2        Q.  Do you have anything to do with the decision

3   whether to put a patient on Mental High Risk status?

4        A.  Yes.

5        Q.  Okay.  What is your role?

6        A.  I can place somebody on Mental Health

7   suicide, so.

8        Q.  At what, can any Nurse at the facility do

9   that?

10       A.  I guess I'm not, maybe not understanding

11  what you're saying.

12              So if somebody tells an Officer or a

13  Nurse or someone that they're suicidal, can anybody

14  put them on High Risk status?

15       Q.  Well, to be clear you said you can, correct?

16       A.  Correct.

17       Q.  You can put them on?

18       A.  Uh-huh.

19       Q.  Could you make the decision to say move them

20  to a High Risk Observation Cell?

21       A.  Correct.

22       Q.  Okay.  Could other nurses, all the other

23  nurses at the facility make that determination?

24       A.  Yes.

**DEPOSITION OF KATE DANIELS**                           **June 13, 2019**

Page 18

1       Q.  Okay.  Yeah, so I, I was trying get at if it
2   was a special authority that you had as the Director?
3       A.  No.
4       Q.  No?
5       A.  No.
6       Q.  Okay.  Do you, have you been trained to by
7   ACH to recognize warnings signs of serious mental
8   illness?
9       A.  I couldn't answer that specifically, no.
10      Q.  Have you been trained to recognize risk
11  factors for suicide?
12      A.  Yes.
13      Q.  Okay.  What are the risk factors for suicide
14  that you have been taught to recognize?
15      A.  In regards to what ACH has taught me?
16      Q.  Yeah.
17      A.  I couldn't be specific on those, I mean I
18  couldn't tell you exactly her verbatim what they've
19  said no, I couldn't tell you that, I'm sorry.
20      Q.  Is it your understanding that prior suicide
21  attempts are, create a risk factor for future suicide?
22      A.  Yes.
23      Q.  Is it your understanding that prior
24  manipulative gestures of self harm can indicate a risk

DEPOSITION OF KATE DANIELS                June 13, 2019

Page 19

1   for future suicide?

2        A.  Yes.

3        Q.  Is it your understanding that all suicide

4   attempts whether or not they are motivated by a desire

5   to kill one's self need to be taken seriously?

6        A.  Yes.

7        Q.  Do you recall, did you ever treat Tiffany

8   Rusher --

9        A.  I --

10       Q.  -- when she was at the facility?

11       A.  I was present during her sick calls with

12   the, when she was down in High Risk.

13       Q.  Do you have any, do you ever do med pass or

14   like distribute medications?

15       A.  No.

16       Q.  Do you, do you review med pass records or

17   MAR's, Medication Administration Records --

18       A.  Yes.

19       Q.  -- as part of your job duty?

20       A.  Uh-huh.

21       Q.  And what, why do you review those?

22       A.  I review them based off of, I do various

23   different reasons.  I do a quality like a CQI at the

24   end of the month so I document percentage of

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 20

1   psychotropics and medications that, per month what the

2   percentage population is on what medication.

3               I review specific medications that

4   people are on just in compliance, I guess is the other

5   thing that we do like refusals.

6        Q.  Okay.  Did you have that duty back in 2017?

7        A.  Yes.

8        Q.  Okay.  So if, do you, when staff fills out

9   Medication Refusal Forms because an Inmate has refused

10  medication does that form come to you across your

11  desk?

12       A.  No.

13       Q.  No.  And so I'm going to show you, so I'm

14  going to, pointing to Exhibit 1 from Mr. Ernest's

15  deposition, that's what I was talking when I was

16  talking about a Medication Refusal Form.  Mr. Ernest

17  told me that he would provide that form to Doctor

18  Abraham when he filled it out, is that your

19  understanding of where that, that form would be

20  provided to the Medical Doctor on-site?

21       A.   It gets, either it goes into either Mary

22  Dambacher's box or Doctor Abraham's box, then it gets

23  filed into their chart, correct.

24       Q.  Okay.  And then at some point do you review

**DEPOSITION OF KATE DANIELS**                    June 13, 2019

Page 21

1   those Medication Refusal Forms?

2        A.   No, not necessarily I don't go through the

3   refusals, no, I look at the MAR, but then I don't like

4   actually do a chart review, I would have to look into

5   their chart and do an actual chart review in order to

6   look at those.

7        Q.   Okay.  Is, so when the MAR, I think I'm

8   going to show you Exhibit 5 from the last deposition,

9   from Ernest's deposition is that the MAR, Medication

10  Administration Record?

11       A.   Correct.

12       Q.   Do you review those for every Inmate?

13       A.   I go through every Inmate's MAR, yes.

14       Q.   And what are looking for when you go through

15  the MAR?

16       A.   Like I told you I determine if they are

17  psychotropic or medications that they take so I can

18  document my percentage of population is on

19  psychotropic versus medications.

20       Q.   And I think that you mentioned that you also

21  track compliance, right?

22       A.   Somewhat, yeah, if it's brought to my

23  attention, so then we can then talk to the Doctor.

24  It's not an ongoing thing in regards to every patient

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 22

1   we go through.  But if there is a chronic refusal of

2   medications across the board, then nursing usually

3   will bring it to the Doctor's attention, my attention,

4   whoever is going to see the Doctor next, so that the

5   then they can talk to them about that.

6       Q.  Okay.  Refusal of medications can create

7   risk for a patient, correct?

8       A.  I can't answer that appropriately.

9       Q.  Why not?

10      A.  In regards to what?

11      Q.  Is it dangerous for a patient who's been

12  prescribed medication to be skipping those

13  medications?

14      A.  Depends on what the medication is.

15      Q.  If a patient is taking medication, it's your

16  understanding that a Doctor has made a medical

17  judgment or a Doctor or a Nurse Practitioner that the

18  patient should take those medication, correct?

19      A.  Correct, yeah.

20      Q.  So if for example, a patient is skipping

21  psychotropic medications, correct?

22      A.  Uh-huh.

23      Q.  Could that present a mental health risk to

24  the patient?

DEPOSITION OF KATE DANIELS                June 13, 2019

Page 23

1      A.  I mean I can't, I couldn't effectively
2  answer that, I'm not, you know, I'm not a physician.
3      Q.  Okay.  You are a Nurse?
4      A.  Correct.
5      Q.  Correct.  And you're the Medical Director
6  the ACH --
7      A.  Correct.
8      Q.  -- at the Sangamon County Jail.  And you
9  don't know whether skipping psychotropic medication
10  could present a mental health care risk?
11      A.  I can't answer that in regards to her.  I
12  mean you're asking me about Tiffany Rusher, correct?
13      Q.  No, I'm actually asking as a general
14  question.
15      A.  Oh, okay.  I would say long term
16  noncompliance with medication would not be beneficial
17  for mental health, correct.
18      Q.  And is it something that ACH makes an
19  attempt to, would ACH want to be aware if there was
20  long term noncompliance with medication?
21           Let me make that different.  Would you
22  want to be aware if, that somebody was not being
23  compliant with psychotropic medication?
24      A.  Yes.

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 24

1        Q.  And is there a process in place to, to,

2   let's say, to inventory, to assess whether every, you

3   know, a particular, to excuse me, let me back up.

4                Is there a process in place to pick up

5   or flag when a patient is not, is consistently missing

6   medication?

7        A.  When our provider in regards to this

8   particular patient is provided with the MAR attached

9   to the sick call that when they see, when they saw her

10  on, the Mental Health, her MAR was attached to that.

11               So in regards to that they would be

12  notified via a circle of the medication, the name of

13  the medication, and that would be able to red flag if

14  she was compliant on her medications.

15               Also the fact that there is multiple

16  refusals that they sign and they're, can review in

17  their box.

18       Q.  Is that something that came, when Tiffany

19  Rusher was incarcerated at Sangamon County Jail, did

20  it come to your attention that she was refusing

21  medication?

22       A.  I don't remember, I don't recall that, no.

23       Q.  Was it something that you picked up when you

24  were doing your monitoring of the Medical

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 25

1    Administration Records that she was missing

2    medication?

3         A.  Not that I remember.

4         Q.  Was that within the scope of your duties to

5    monitor the medications that she was taking everyday

6    to determine whether she was consistently receiving

7    them or to yeah, or to determine whether she was

8    skipping them?

9         A.  Can you ask the question again?

10        Q.  Sure.

11             It was within the scope of your job

12   duties to be monitoring her Medication Administration

13   Record to check whether she was consistently getting

14   her medications?

15        A.  I wouldn't say it was my duty per se, I

16   think it's nursing as a whole pays attention to that.

17   I don't think it's any specific patient's duty or

18   nurse's duty.  Unfortunately, you know, we offer

19   medication everyday to, you know, if they are on

20   specific medication and they can take their medication

21   or they can deny their medication that is on them.  We

22   can't force medication on anybody.

23             So if they don't take their medications

24   for various different reasons and, you know, there

DEPOSITION OF KATE DANIELS                     June 13, 2019

Page 26

1   wasn't something in place.  I mean we were all in

2   great contact about Tiffany.  She was evaluated often

3   by the Medical Staff.  We all knew the situation in

4   regards to medication compliance.  I did know a little

5   bit about some of her behaviors and that kind of

6   stuff, but I can't review every single Inmate

7   medication compliance, but it's all brought to your

8   attention if there is like a consistent, inconsistency

9   with medications.

10      Q.  Okay.  So what I think I'm hearing you say

11  is that so you had mentioned that part of your job

12  duty in reviewing MAR's was to determine compliance,

13  but so I was trying to understand what you meant by

14  that.  It sounds to me, from what you just said it

15  sounds to me like the method, and you also, you stated

16  earlier that it can be a serious issue if somebody has

17  long term noncompliance with medicines, correct?

18      A.  Right, correct.

19      Q.  And specifically it can be a Mental Health

20  issue or even a suicide risk factor if somebody has

21  long term noncompliance with psychotropic medicine,

22  right?

23      A.  Yes.

24      Q.  But what I'm hearing you say, if I

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 27

1  understand correctly, is the method by which that kind

2  of noncompliance would be flagged is through

3  Practitioners reporting it among one another in the

4  facility, right?

5          A.  Correct.

6          Q.  But it was not the purpose of your reviewing

7  Medication Administration Records was not to pick up

8  or flag if somebody was missing too much medication?

9          A.  In going through the MAR's is that what

10  you're saying?

11          Q.  Yeah, yeah.

12          A.  That, that's one thing we would look at.  I

13  mean that's one thing that will catch our eye if we've

14  got constant circles across the board on somebody's

15  medication.  But that's also usually 90 percent of the

16  time that person is requested and is refusing their

17  medication and they've let Medical, they've let

18  everybody in Medical know they're done taking their

19  medication so it's an across the board refusal and we

20  know about it but we still have to offer the

21  medications.

22              So there is various different ways that

23  information is channeled down.

24              Going through the MAR I don't

DEPOSITION OF KATE DANIELS                         June 13, 2019

Page 28

1    specifically, you know, go through and look to see and

2    add up how many refusals each patient gets, no.

3         Q.   And is there any kind of, whether formal

4    like written or, or unwritten is there any test for

5    how much is too much when it comes to medication

6    referral, refusal?

7                   In other words, is there a, a minimum

8    number of medication refusals that at which point it

9    becomes classified as long term noncompliance?

10        A.   I don't think there is a specific number

11   before you mean before something happens or in regards

12   to what?

13        Q.   Well, I was using the term you earlier used,

14   you said that medication refusal can become a risk if

15   there is long term noncompliance.  And I'm trying to

16   determine what you mean by long term noncompliance.

17   And I think that's what you said, I'm not trying to

18   put words in your mouth on that, but I thought that

19   that was the phrase that you used?

20        A.   I guess this is more like an opinion but

21   when it comes to long term noncompliance with Mental

22   Health patients, you know, you see a decline in lots

23   of different things.  I can't be a specific in, in

24   this case how many, I mean do you have an exact number

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 29

1   of how many days she was not compliant on medications?

2                I mean we're talking a lot about

3   noncompliance and medications with her.

4          Q.  Actually I'm not, I'm talking in general I'm

5   not, I was showing you that form to make sure that we

6   were talking about the same kind of document.

7          A.  Oh, okay, but I know we are talking a lot

8   about noncompliance with her but I don't realize

9   that -- I know there was specific events of her issues

10  where she wouldn't take her meds because of behavior,

11  and she was mad at the world, but I didn't know it was

12  like her technically refusing meds because --

13         Q.  Well, that was actually going to be my next

14  question.  Do you know how many times she filled out

15  one of those --

16         A.  I don't.

17         Q.  -- Treatment Refusal Forms?

18         A.  I don't.

19         Q.  Was that anything that you, have you ever

20  been part of a discussion where anybody tried to make

21  that determination?

22         A.  No.

23         Q.  And it would not have been part of the, your

24  job duty to review and count the number of Medical

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 30

1   Refusal Forms that she had that had been written on,

2   you know, her behalf and or signed by her?

3        A.  No.

4        Q.  Whose job would it be to monitor whether or

5   not Tiffany was taking her psychotropic medication

6   regularly or whether she was skipping them?

7        A.  Well, I guess that would be the provider

8   that I would say Doctor Abraham or Mary Dambacher

9   whichever Doctor saw her would then review her

10  medications and talk to her about her medications.

11       Q.  Have you ever, would you agree that refusal

12  of medications can be an indication, the psychotropic

13  medication specifically can be an indication that a

14  patient isn't doing well?

15       A.  I think that's kind of a vague statement, I

16  couldn't answer that appropriately.  No, I mean

17  because I have seen people that do perfectly fine and

18  haven't taken psychotropics in, you know, five years.

19  I have seen people, I mean that's a vague statement, I

20  couldn't answer that.

21       Q.  Have you ever been taught or trained that

22  skipping medications can be an indication of mental

23  decompensation?

24       A.  Once again I think in the Medical, I mean

**DEPOSITION OF KATE DANIELS**                    June 13, 2019

Page 31

1   that is a whole, that's like a huge cloud of, I can't

2   really, I mean there is all kinds of different things

3   that go into that.  So I, I couldn't answer that

4   appropriately as a Nurse.  There is, I just, I

5   couldn't answer that appropriately, I'm sorry.

6        Q.  So are there any, I asked you earlier what

7   are, to your knowledge what or if you had been trained

8   on suicide risk factors --

9        A.  Correct.

10        Q.  -- correct.  And you, you were unable to

11   specifically identify any, is that correct?

12        A.  You asked me if ACH, what ACH specifically

13   taught me in regards to suicide risk factors, and to

14   tell me what ACH taught me and I couldn't tell you

15   exactly what ACH taught me.  So I wouldn't be telling

16   you the truth if I answered that question.

17              Of course I, you know, there is all

18   kinds of risk factors that I know as a Nurse and as a

19   medical professional about suicide.  There is all

20   kinds of different things that go into suicide and why

21   somebody does it, but I couldn't answer that question

22   in regards to what ACH exactly taught me.  So I

23   couldn't answer that that's what I said no, I

24   couldn't.

Page 32

1      Q.  Is prior attempts at self harm an indication

2   of a suicide risk, can it be a suicide risk factor?

3      A.  Can it be, yes.

4      Q.  Can prior self harm gestures which are

5   considered manipulative be a risk for suicide?

6      A.  Yes.

7      Q.  Can Mental Health, excuse me, can

8   situational events such as, you know, bad news about

9   Court be a suicide risk factor?

10      A.  Yes.

11      Q.  Can impending release from prison be a

12   suicide risk factor or indicator?

13      A.  I, if I would, usually people are excited

14   about getting out of Jail to be quite honest.

15      Q.  So in your opinion that's not one?

16      A.  No.

17      Q.  And can, is it your, at any point when

18   Tiffany, it's now talking specifically about Tiffany

19   Rusher, did it come to your, I think you mentioned it

20   did come to your attention while she was incarcerated

21   at Sangamon County Jail that she was refusing

22   medication at least from time to time, correct?

23      A.  Yes.

24      Q.  Okay.  And how did you become aware of that?

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 33

1        A.   I was, actually I would go through her chart

2   quite a bit in regards to her, I was the one that

3   scheduled her outside orthopedic appointments.  I was

4   the one that would review ER records like when she

5   came back to make sure that we were doing everything

6   right in regards to that.  So I would look through her

7   chart, you know, pretty much every chart at the

8   Sangamon County Jail has medication refusals in it for

9   various different reasons.  So I mean it's not an

10  uncommon thing.

11       Q.   Was there any, do you recall having any

12  conversations about that issue that, the issue in

13  Tiffany's medication compliance with anybody else?

14       A.   No.

15       Q.   At Sangamon County Jail?

16       A.   No.

17       Q.   If you were concerned that she was missing

18  too much psychotropic medication or other psychiatric

19  medication, who would you report that to?

20       A.   Doctor Abraham or Doctor or Mary Dambacher

21  or the yes, those two.

22       Q.   Okay.  And if you were concerned that she

23  was missing too much of it, would you have done that

24  in this case?

**DEPOSITION OF KATE DANIELS**                    June 13, 2019

1      A.  Yes.

2      Q.  Did you, do you have a specific recollection

3  of personally interacting with Tiffany?

4      A.  Lots.

5      Q.  What do you remember, do you remember

6  treating her for Medical complaints?

7      A.  I would go down and do the sick call with

8  Doctor Abraham when he did her High Risk assessment,

9  so I would be in the room, I would do her vitals.

10          I would talk to her quite a bit.  She

11  was always when you went down for Booking she was, you

12  talked to her every day that you worked and sometimes

13  5 to 10 times a day.

14      Q.  What do you remember about talking to her?

15      A.  In regards to like are you wanting me to

16  describe her as a person --

17      Q.  Yeah.

18      A.  -- or are you wanting me to describe as a

19  person that --

20      Q.  Just describe what you remember about her as

21  a person or a patient?

22      A.  Unpredictable, manipulative, attention

23  seeking.  Those would be the three best descriptive

24  factors of her.

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 35

1      Q.   Did she ever say anything inappropriate to
2  you?  Did she, yeah, did she ever say anything
3  inappropriate to you that you recollect?
4      A.   In regards to?
5      Q.   Just, I'm just asking if you have specific
6  recollections of --
7      A.   Specific incidents oh, I have all kinds of
8  recollections of her, I mean she, like I said she was,
9  we had tons and tons of interaction.  She would look
10  at you and say, call your name, and then put something
11  in her mouth and swallow it.  She would, you know,
12  talk to you about various different things.  Like I
13  wrote a letter to her mother for her because she
14  wasn't allowed with a pen.
15      Q.   Can you tell me about that what, you wrote a
16  letter for her --
17      A.   I did.
18      Q.   -- to her mother.
19      A.   Uh-huh.
20      Q.   What did the letter say?
21      A.   She was, begged her mother, she told her
22  mother that she missed her, she begged her mother to
23  come visit her.  She said she hasn't seen her mother
24  in years.  She told her mother that she was, I don't

**DEPOSITION OF KATE DANIELS**                    June 13, 2019

1   remember exact specifics, but I remember one thing

2   that she hadn't seen her mother in years.  That she

3   missed her, and she wanted her to come visit and that

4   she was sorry that she choose the life of sex

5   trafficking, I remember that to the T.

6         Q.  And you recorded for her or wrote for her?

7         A.  Yeah, because she was unable to be able to

8   be provided with pen, paper anything like that because

9   of her Pica, and so I wrote it down and, you know,

10  wrote and then I actually had her sign it.  I remember

11  having her sign it and I remember standing over her

12  scared that she was going to take that pen after I was

13  just doing something nice for her and swallow that

14  pen.  That's how unpredictable she was.

15        Q.  And you said she had Pica?

16        A.  Correct.

17        Q.  What is Pica?

18        A.  It's swallowing of objects, anything, dirt,

19  pens, spoons, mattress, anything that you can get your

20  hands on.

21        Q.  What, was Tiffany trying to kill herself

22  when she swallowed objects?

23        A.  I can't answer that.

24        Q.  At the time what did you think?  Did you

**DEPOSITION OF KATE DANIELS**          **June 13, 2019**

Page 37

1  think that she was trying to kill herself when she

2  swallowed objects like the ones you must mentioned?

3      A.  No.

4      Q.  Did you think that she was attention

5  seeking?

6      A.  She was attention seeking when she would

7  swallow objects.

8      Q.  And did you think she was being

9  manipulative?

10     A.  She would manipulate, yes, she was very

11  manipulative.  She would manipulate us by her behavior

12  if she didn't get what she wanted.  If she didn't get

13  the coffee that Lieutenant Strayer provided her with,

14  you know, it was, you know, you know, punching walls,

15  screaming, yelling, doing various different things,

16  you know, until she got what she wanted, or what she

17  thought she, you know, until we got her something that

18  would suffice her for the next 12 to 24 hours.

19     Q.  Do, when you're providing healthcare in the

20  incarcerated setting, do you need to take self harm,

21  take seriously self harm events that are attention

22  seeking or manipulative?

23     A.  You take every, that's yes because --

24     Q.  Some have you ever, because somebody could

**DEPOSITION OF KATE DANIELS**                    June 13, 2019

Page 38

1    actually succeed in one of those events, correct?

2         A.   Correct.

3         Q.   And they can, they can present real risk,

4    right?

5         A.   Correct.

6         Q.   And you in fact I think you treated Tiffany

7    at one point when she or you, you, yeah, you saw

8    Tiffany when she swallowed a, reported swallowing a

9    toothbrush, do you recall that?

10        A.   Do I recall treating her?

11        Q.   Or seeing her here?  Let me, let's, I will

12   give you a minute.

13        A.   She put a toothbrush in yeah, in her mouth

14   at one point.

15        Q.   Did she swallow it, if you remember?

16        A.   Yes, she stated she swallowed a toothbrush.

17        Q.   Okay.  So I'm going to hand you Plaintiff's

18   Production 10925 that's the Bates number, and this is

19   a Medical Progress Note dated February 2, 2017,

20   correct?

21                    MS. POWELL:  What number did

22   you mark that as?

23                    MS. CHARDON:  Daniels --

24        A.   Daniels 1.

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 39

1          MS. CHARDON:  Daniels 1, yeah.

2          (Daniels Exhibit 1 marked for

3          identification by the Court

4          Reporter.)

5     Q.  Is that your signature at the bottom?

6     A.  Correct.

7     Q.  But is that your handwriting on the chart?

8     A.  No.

9     Q.  Okay.  Do you remember this incident you can

10  take sometime to read it.  I think it says complaints

11  of swallowed toothbrush?

12    A.  Negative X-ray.

13    Q.  Negative X-ray, okay.

14          So do you recall this instance?

15    A.  This, yes, somewhat.  I don't believe this

16  is the exact event that she swallowed the toothbrush.

17  This is the High Risk Assessment when Doctor Abraham

18  goes down and sees the patient.

19    Q.  Okay.

20    A.  So this isn't the exact event of when she

21  swallowed the toothbrush.  I think she's, basically it

22  is saying that she was evaluated on High Risk, she

23  swallowed the toothbrush, she was, an X-ray was done

24  and evaluated on her in regards to that --

DEPOSITION OF KATE DANIELS                          June 13, 2019

Page 40

1        Q.   Okay.

2        A.   -- I believe.  I can't, it was an ongoing

3   issue with Tiffany.

4        Q.   And it's has, it says impulse control

5   disorder, correct?

6        A.   Correct.

7        Q.   Was that a diagnosis that you made?

8        A.   We just went over that, that is not my

9   documentation, none of it is my documentation except

10  the vitals and the signature.

11       Q.   So sometimes lawyers ask stu -- basic

12  questions --

13       A.   Okay.

14       Q.   -- and sometimes we don't, you know, we

15  don't know Medical records as well as you do --

16       A.   That's okay.

17       Q.   -- so, but also I'm also asking if you had

18  any part in making a diagnosis or assessment as a

19  result of this?

20       A.   I am not able to diagnose any patient,

21  anything, that's not my...

22       Q.   Okay.  So why were you present, why would

23  you go to the High Risk assessment meetings, I think

24  you said that you would take vitals?

**DEPOSITION OF KATE DANIELS**                    June 13, 2019

Page 41

1      A.  I would assist the Doctor in the High Risk

2   assessments, yes.

3      Q.  Okay.  And this is what, the record of what

4   a High Risk Assessment would look like through this

5   Medical progress note?

6      A.  Correct.

7      Q.  And would it always be Doctor Abraham who

8   conducted the High Risk assessment or would it, could

9   it be somebody else?

10      A.  It could be somebody else, it could be the

11   Nurse Practitioner also.

12                    MS. CHARDON:  We will go off

13   the record for the fire alarm.

14                    (Whereupon a recess was taken.)

15                    MS. CHARDON:  Back on the

16   record.

17      Q.  So before the fire alarm we were talking

18   about a couple of things.  One of the things we were

19   talking about was the time, your memories of

20   interacting with Tiffany and you talked about writing

21   a letter to her mother?

22      A.  Uh-huh, yes.

23      Q.  Did you mail the letter to her mother?

24      A.  Yes.

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 42

1        Q.  Did you write any other letters for her?

2        A.  No.

3        Q.  Do you remember any other specific

4   conversations with Tiffany?

5        A.  I talked to her before she was actually

6   getting ready to leave how she was excited about

7   getting out.  I can't remember the specifics of the

8   conversation.  I remember her saying something she

9   couldn't go live with her Mom because they lived too

10  close to a school because she was like a sex offender.

11  I might be generalizing stuff in regards to that.

12            But she was going to go live with

13  somebody, I can't remember who it was, and she had it

14  all planned out.  She was really excited about it.  I

15  don't remember specific parts of the conversation but

16  I remember the interactions with her was good.  She

17  was excited about getting out.

18            She, I believe that was the Friday

19  before, before all of this, it might have been

20  Thursday or Friday before I'm not really sure of

21  specific dates.  That was the last time.  I remember

22  various different conversations, I talked to her all

23  the time, all the time.

24        Q.  Anything else you remember?

Page 43

1              Did you document every time you

2    interacted with her?

3         A.  No, God no, I...

4         Q.  Why?

5         A.  You couldn't.

6         Q.  You couldn't?

7         A.  No, I mean when I say that I talked to her 5

8    to 10 times a day, I talked to her 5 to 10 times a

9    day.  I mean I would be in my room documenting all day

10   everyday.  They weren't specific interactions like

11   specific concrete, you know, it was just conversation

12   that you have between two people because she would

13   engage in conversation hey, Kate, what's going on.

14   She would talk to everybody that walked by her cell.

15        Q.  Anything else that you remember specifically

16   her telling you, talking about, I know it's, I know

17   you talked to her a lot, and I'm, but we can take

18   sometime because it's, you know, my only chance to get

19   to ask you all of the memories that you have of her.

20   Specific ones.

21        A.  I couldn't give you specific conversations I

22   mean...

23        Q.  Did she ever talk to you about any other

24   family members other than her mother?

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 44

1      A.  No.  And as for her mother that was the only

2   time I ever heard her talk about her mother was when

3   she asked me to write a letter to her.

4                I feel like she talked about an aunt

5   and that was in regards to what I was just talking

6   about who she was going to go live with, but I could

7   be wrong, but I will say to you that I know no one

8   ever, to my knowledge she never talked about anybody

9   ever coming and visiting her, calling anybody, she

10  never requested to reach out to anybody except for

11  that time.

12     Q.  And were you aware of who she was calling on

13  the telephone?

14     A.  No.

15     Q.  Do you know if she asked anybody else to

16  write letters on her behalf?

17     A.  No, I don't but I can guarantee you nobody

18  else would write her, write letters for her.

19     Q.  Why did you do it?

20     A.  I felt I built a relationship with her in

21  regards to like taking care of her, talking to her.

22  It was something she asked me to do.  I had the time.

23  I wanted to do something nice for her.  I just, you

24  know, she wasn't able to write a letter on her own

**DEPOSITION OF KATE DANIELS**                    **June 13, 2019**

Page 45

```
1   because of the whole issue with her swallowing items.

2   So it wasn't something she was going to be able to do

3   and she made that and it is something that I could

4   easily do.

5        Q.  Would she have been allowed a pen to sign a

6   Medication Refusal Form, if you know?

7        A.  I don't know.

8        Q.  Okay.  Do you remember when you wrote the

9   letter for her?

10       A.  No.

11       Q.  Did you document that --

12       A.  No.

13       Q.  -- that you were --

14       A.  No, I didn't.  Because it wasn't like it had

15   nothing to do with Medical so it was just kind of just

16   a nice gesture that I did.

17       Q.  Did you have any conversations with anybody

18   about whether Tiffany needed to see a psychiatrist?

19       A.  No.

20       Q.  Did you ever have any time when you, did you

21   ever talk to Mickey Shmikler about Tiffany?

22       A.  I don't remember specific instances but with

23   Mickey was in and out of our office everyday that he

24   was working and we talked a lot about, we have a, we
```

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 46

1    would have a good relationship about Mental Health.  I

2    don't remember specific conversations, he let, you

3    know, about Tiffany.

4         Q.  Do you, did you ever see, do you know what

5    kind of treatment Mickey Shmikler gave Tiffany?

6         A.  I can't answer that.

7         Q.  You don't know?

8         A.  No.

9         Q.  Did you ever see Mickey Shmikler giving her

10   therapy?

11        A.  Mickey was constantly at Tiffany Rusher's

12   door when he was there?

13        Q.  Was he at, did he have any other patients he

14   saw at the facility?

15        A.  Mickey was a Mental Health Case Worker for

16   the Sangamon County Jail so he saw lots of people.

17        Q.  But you said he's constantly at, I assume

18   that was a little bit of hyperbole he was often at

19   Tiffany's door when he was there?

20        A.  He was there, like I told you before well,

21   first of all, she was down in High Risk.  High Risk is

22   assessed by Mental Health every time that they're in

23   the facility.  So whenever you're in the facility, you

24   have to do Mental Health rounds on the High Risk

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 47

1   Inmates down in Booking.

2        Q.   Okay.  And what kind of records exist to

3   document those High Risk Mental Health rounds?

4        A.   In regards to what Mickey would be

5   documenting?

6        Q.   Yeah.

7        A.   That's going to be, I mean I am only

8   speaking, that's Mental Health.  So like I said

9   Nursing and Mental Health don't coincide in regards to

10  that.  Their Medical or their Mental Health notes go

11  into the, to the chart in regards to patient contacts

12  and notes in regards to that.

13       Q.   So is it not, do I understand correctly it's

14  not, it wasn't part of your job duty to, to review

15  Mickey Shmikler's notes?

16       A.   No, we went over that in the beginning

17  Mental Health and Medical are completely separate.

18       Q.   So you, when you do, I think you called it a

19  C, no Q --

20       A.   CQI.

21       Q.   CQI is that, any part of that reviewing the

22  documentation that Mental Health is doing?

23       A.   No, it's not reviewing documentation.  They

24  provide me with numbers in regards to contacts,

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 48

1   clinical contacts, observation contacts, basically CQI

2   I don't know if you know what a CQI is, but it is

3   basically, it's a snapshot of a monthly contact or

4   what ACH is providing the Jail with.  Like how many

5   medications they gave, how many patients the Doctors

6   see, how many, it's a snapshot of that month so then

7   you can do a trend of the year so based off of

8   medication, you know, medications, patient volume,

9   patient, what have you.

10         Q.  Okay.  And for that, with respect to Mental

11  Health you would just get basically numbers from them?

12         A.  He would send me monthly numbers.

13         Q.  I'm going to mark as Exhibit 2 ACH 550

14  through 5, yeah, sorry, it's not stapled correctly

15  through 558.

16                         (Daniels Exhibit 2 marked for

17                          identification by the Court

18                          Reporter.)

19         Q.  Is that a document that you're familiar

20  with?  I have a copy.

21                    MS. POWELL:  Is that Exhibit 2?

22                    MS. CHARDON:  Yes, it is

23  Exhibit 2.

24         Q.  I'm wondering if this is an example of your

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 49

1   CQI work product?

2          A.   This is my CQI, yes.

3          Q.   Okay.   So you prepared this?

4          A.   I prepared it?  Well, yeah, yes.

5          Q.   So where we see like under Mental Health for

6   example on the third page of this, which is ACH552 at

7   the bottom right there is a whole category for Mental

8   Health evals by psychiatry, single cell lockdown,

9   things like that, right?

10         A.   Okay.

11         Q.   And those, do I understand correctly that

12  you do not review the records to, to tease out these

13  numbers but instead Mental Health provides you with

14  the numbers?

15         A.   Yes.

16         Q.   Who in Mental Health, whose job is it to

17  give you those numbers?  Like who gives them to you

18  physically, is it Ember or is it a Manager?

19         A.   Ember wasn't working at the facility at that

20  time.  So it was Mickey, it's the Clinician who is

21  ever working at that, at that facility.  So if you're

22  talking in regards to November of 2018 Mickey would

23  have been the one that would have provided me with the

24  documentation if that's who was working there at that

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 50

1   time.  It's whoever the Clinician is that's working

2   that provides the, me with the information.

3        Q.  Okay.  And so you're aware that Mickey was

4   fired from by ACH after Tiffany's death, right?  Were

5   you aware?

6        A.  Well, he's no longer working for ACH, I

7   don't know the details surrounding it.

8        Q.  Okay.  Were you aware that there was a, so

9   were you, at any point were you aware that there was a

10  problem with his documentation of Mental Health

11  visits?

12       A.  Meant Health is not, I don't, I don't

13  license, I don't police Mental Health, they are not

14  under me.  So I was not aware of any of that, no.

15       Q.  Okay.  And so that is not something that you

16  were not involved in conversations about what Mickey

17  Shmikler had or had not documented at the facility?

18       A.  I was not aware of what he had or had not

19  documented, correct.

20       Q.  Okay.  And so earlier I asked you if you had

21  ever seen Mickey Shmikler do therapy with, with Miss

22  Rusher and you said that he was at her door, he was

23  often at her door, correct?

24       A.  Correct.

Page 51

1      Q.  Did you ever see her, him inside of her

2  cell?

3      A.  No.

4      Q.  And did you ever overhear what he was

5  talking about with her?

6      A.  No.

7      Q.  Okay.  Do you have, do you know whether he

8  was providing her therapy when he was at her door?

9      A.  No.

10      Q.  Was the CQI?

11      A.  You got it.

12      Q.  CQI, how long have you been doing CQI's for

13  ACH for, as part of your job duties?

14      A.  I would say I started probably in January so

15  after I started working there, so it wasn't

16  immediately when I started working there.  So it was

17  probably January I started taking over the CQI part.

18      Q.  Was there, do you know whether CQI's were

19  done prior to 2017?  I know you started in late 2016,

20  right, so, but do you know whether there were CQI's

21  prior to your time there?

22      A.  Yes, there were.

23      Q.  Okay.  So it was a process, ongoing process

24  that you just took over when you came in?

**June 13, 2019**

1     A.  Correct.

2     Q.  Okay.  Do you know how long they had been

3  doing CQI's?

4     A.  I can't answer that question.

5     Q.  I'm going to show you a document I'm marking

6  Daniels 3 which is Sangamon County 733 Bates label

7  through 734.

8                    MS. POWELL:  Wait a minute you

9  said Sangamon County --

10                    MS. CHARDON:  733 through 734,

11  it says Medical Timeline at the top.

12                    (Daniels Exhibit 3 marked for

13                     identification by the Court

14                     Reporter.)

15     Q.  I'm just wondering if you have ever seen

16  this document?

17     A.  Yes.

18     Q.  You have?

19     A.  Yes.

20     Q.  Okay.  Do you know who created it?

21     A.  I created this but this isn't, this wasn't

22  like I don't know how, this was just more in regards

23  of like times that she was seen.  This wasn't part of

24  her Medical like records.

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 53

1      Q.  Okay.

2      A.  This was created after the event.

3      Q.  Okay.  And so can you tell me the

4   circumstances surrounding your creation of this

5   document, why did you create it?

6      A.  I wanted to just provide and know in my head

7   like how often we provided her care.

8      Q.  Did anybody ask you to?

9      A.  No, I did it from, honestly for me.  Because

10  I wanted to make sure that, you know, that we did,

11  what, I just wanted to see how often she was evaluated

12  and seen on our end.

13     Q.  Do any of these entries reflect psychiatric

14  evaluations?

15     A.  This is a Medical timeline, so it's my

16  Medical timeline.

17     Q.  So this doesn't have to do with Mental

18  Health?

19     A.  No.

20     Q.  And I'm going to show you Daniels Exhibit 4

21  and 5.

22                  (Daniels Exhibit 4, 5 marked for

23                   identification by the Court

24                   Reporter.)

DEPOSITION OF KATE DANIELS                        June 13, 2019

Page 54

1        Q.  Which are, 4 is ACH 510 and 5 ACH 520.

2               These are e-mails from April of 2017,

3    that are either to, or that from you, correct?

4    Daniels 4 is an e-mail from you to Deborah Ash, right?

5        A.  Yeah.

6        Q.  And these are the, both of them have the

7    subject line Meeting with Administration, right?

8        A.  Correct.

9        Q.  So was there a meeting, it says

10   Administration would like to meet with someone about

11   Inmate Tiffany Rusher.  Superintendent Beck would like

12   whoever is coming down to evaluate the chart.  I sent

13   the chart to Jessica in legal last week, you see that?

14       A.  No.

15       Q.  Oh, that was on Daniels 5?

16       A.  Oh, that is this one (indicating)?

17       Q.  Yeah, yeah.

18               Was there a meeting, did you attend a

19   meeting about Tiffany Rusher in April of 2017?

20       A.  I can't, I don't remember.

21       Q.  Do you remember arranging the meeting with

22   Deborah Ash and the Superintendent and Nuri Marcelo.

23   Who is Nuri Marcelo who is cc'd on the e-mail Daniels

24   5?

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 55

1      A.  Nuri was my immediate supervisor so she was

2  called my, she was the Regional Nurse Manager.

3      Q.  Okay.  Is she still your supervisor?

4      A.  No.

5      Q.  Does she still work at ACH?

6      A.  No.

7      Q.  And Deborah Ash I think I see her job title

8  Vice-President of Compliance, correct?

9           Well, I see that on her signature line

10  which is on Daniel 4.

11      A.  She is, correct, at that time that's what

12  her position was.

13      Q.  Okay.  What's her position now?

14      A.  She's no longer working for ACH.

15      Q.  Okay.  Anyway you e-mail these people to

16  arrange a meeting regarding Tiffany Rusher, correct?

17      A.  Yes.

18      Q.  Did you go to the meeting?

19      A.  I don't remember, I don't, honestly I don't

20  even remember sending this e-mail.

21      Q.  My question was going to be did you prepare

22  the Medical timeline in conjunction with arranging

23  this meeting or attending the meeting do you know the

24  answer to that?

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 56

1          A.  I don't think it was in regards to this
2    meeting.  I don't, like I said I don't remember
3    anything in regards to this meeting, but I think this
4    was all prepared like right after this all happened in
5    regards to I wanted to put all the pieces of the
6    puzzle together, and in regards to what we had done
7    and provided how many times she was evaluated by
8    Medical honestly.  I don't remember specific events.
9          Q.  Did you prepare this, I --
10         A.  I do this often if that's what you're
11   asking, if this was a special occurrence, no.  I do
12   this often.  I do it often in regards to like how many
13   times we evaluate a patient in regards to basically
14   it's, to me I think it was in my head so that I could
15   say, you know, wow, okay, this is how many times we've
16   evaluated and saw her and did something for her.  And
17   in regards to in short period time that is how many
18   times we took our and documented not just in our
19   Medical lives of stopping and talking to her did
20   something for her and this is a lot.
21              So I think that's what I was trying to
22   like break it down because if you look at a full chart
23   it's kind of you got to go through lots of different
24   things so if I could specifically document what we did

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 57

1   what, you know, how we took care of it, just different

2   things so that we could have a bigger picture of the

3   chart.

4           Q.  Have you ever prepared one of these in a

5   situation where a prisoner has sued the, sued ACH or

6   the Jail?

7           A.  Sued the Jail, I don't really know about

8   people that are suing the Jail honestly usually the

9   people that are suing --

10          Q.  Sue ACH?

11          A.  I don't really know about the people are

12  suing ACH until like it's long down the people that

13  tell me that they are suing ACH or they're going to

14  sue me or threaten me that they're going to sue me

15  sometimes I'll do it in regards to like, you know,

16  they will say I don't necessarily do it for that

17  specific event.  A lot of times when I do this is so

18  that I can document and in my head show how often

19  we've seen them.  I do it sometimes when somebody

20  complains we're not evaluating them.  And then so I

21  will do kind of like a timeline that says okay we have

22  evaluating these people, you know, I, you know, I

23  counted, you know, 14 times in the, since admission

24  that Medical has seen them.  So it's kind of like so I

1    can then, you know, in my head know exactly what, you

2    know, we're providing, we've provided this amount of

3    care, so.

4         Q.  Have you ever had any other, since you've

5    come to ACH has anybody else successfully completed

6    suicide?

7         A.  No.

8         Q.  Any other prisoners?

9         A.  No.

10        Q.  So Tiffany is the only one?

11        A.  Correct.

12        Q.  Can you give me any other example of times

13   that you've created a medical timeline for a prisoner

14   besides when they've complained about not getting

15   enough care?

16        A.  Yeah.  They complain about payment, so they

17   don't want to pay Medical so I'll put, you know,

18   12/17/2017 seen and evaluated in sick call $10 charge.

19   I do it a lot to be quite honest.

20        Q.  Okay.  And who did, at some point you

21   provided this Medical timeline to somebody at, in the

22   Jail, is that correct?

23        A.  That's why I, when I saw that you had this,

24   I was surprised that you had this because this was in

**DEPOSITION OF KATE DANIELS**                    **June 13, 2019**

1  the front of the chart because this was mine.  I

2  didn't even know it was even part of the chart.  I

3  just put it in the front of the chart so that when I

4  opened the chart then that would be the first

5  documentation that I saw.  And in regards to it's not

6  necessarily part of her Medical chart I guess but no,

7  I don't remember providing it to anybody.

8      Q.  Do you remember when you prepared it?

9      A.  No, I believe it was after, obviously it was

10 after.

11     Q.  Did you talk about it with anybody?

12     A.  I don't remember that.

13     Q.  Okay.  Did you ever take a look, for

14 example, let's see, did you ever analyze this timeline

15 with an eye to whether any suicide risk factors were

16 documented on it?

17     A.  I am not really sure what you're trying to

18 ask.  Can you ask the question maybe a different way

19 that doesn't really medically --

20     Q.  So do you, it says on 1/12/2017 patient sent

21 to emergency department for swallowing spoon, correct?

22     A.  Correct.

23     Q.  Did you ever review Tiffany's Medical chart

24 to determine whether anybody in the Medical side

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 60

1    reported that incident to Mental Health?

2         A.  I can't, I, that wouldn't be something that

3    I would review but immediately following that she was

4    gone down to High Risk and High Risk Inmates are then

5    evaluated by Medical or Mental Health whenever they

6    are downstairs in Booking.  So that referral or that

7    incident would already, she would already be evaluated

8    by Mental Health.

9         Q.  Was Tiffany in High Risk prior to that spoon

10   swallowing incident?

11        A.  Yes.

12        Q.  So she was in High Risk the whole time that

13   she was there?

14        A.  No.

15        Q.  Do you remember at what point she was not in

16   High Risk?

17        A.  That day, the 12th.

18        Q.  One day only?

19        A.  One day only for one hour.

20        Q.  Okay.

21        A.  Because she swallowed a spoon.

22        Q.  And is there any, so other than that one day

23   for the entire time she was at Sangamon County Jail

24   she was in High Risk, correct?

**DEPOSITION OF KATE DANIELS**                    **June 13, 2019**

Page 61

1      A.  Correct, for her safety.

2      Q.  Is that an unusual amount of time for an

3  Inmate to be on High Risk status?

4      A.  With the way she presented and her behavior,

5  absolutely not.

6      Q.  What I meant are there other Inmates, are

7  you familiar with other instances where somebody

8  stayed on High Risk for three months at Sangamon

9  County Jail?

10     A.  Yes.

11     Q.  How many other instances?

12     A.  I can't answer that appropriately.  I mean

13  there is various different, there is various different

14  people that have been down in Booking and...

15     Q.  Would you think more than ten?

16     A.  In my, in the time that I've been down

17  there?

18     Q.  Uh-huh.

19     A.  I don't know, I mean...

20     Q.  Is there any period of time which is

21  considered too long to be on High Risk observation

22  status at Sangamon County Jail, to your knowledge?

23          Let me ask it a different way.  Is

24  there any policy regarding how long somebody can be on

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 62

1   High Risk observation status?

2           A.   In regards to Sangamon County policies?

3           Q.   Yes.

4           A.   I can't answer that.

5           Q.   Well, what about ACH policies?

6           A.   I think it's, I can't answer you, I can't

7   answer that.  I don't think there is any specific

8   policy in regards to a medical or like a time of

9   someone being down in High Risk.  I don't know of one.

10  I don't know of a policy that, regardless she would

11  not have fit that policy.

12          Q.   Was there, were you ever part of a

13  conversation with anybody about whether Tiffany needed

14  to be referred to an outside mental institution?

15          A.   She came to us from a mental institution.

16          Q.   Okay.  My question though was, were you

17  ever, did you ever talk with anybody about whether

18  Tiffany should or could go out to outside mental

19  institution?

20          A.   That's not my, that would not be something

21  that I would do I mean that's not my, I mean I guess I

22  couldn't say that's not something I do.  If I, no, I

23  have never had that discussion about her.

24          Q.   Okay.  Was, are you aware of that discussion

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 63

1   every taking, happening with other people?

2        A.  Absolutely.  You mean with other people

3   about her no, I can't answer that question.

4        Q.  Meaning you don't know the answer?

5        A.  Huh-uh.

6        Q.  You aren't unaware of any other --

7        A.  Huh-uh.

8        Q.  But you are aware of, has anybody else since

9   you've come to ACH has anybody, have, ever discussed

10  transferring any prisoner to inpatient mental

11  facility?

12       A.  Yes.

13       Q.  Okay.  How many, I'm not asking for specific

14  names but how many times has that happened?

15       A.  In regards to, that, you're, this is you're

16  incorporating like in regards to long term care,

17  mental health like McFarland or something like that?

18  We don't have anything to do with that.  We don't do

19  that.  We don't that's an unfit for trial that's a

20  Court based thing, that is an outside agency that does

21  that, the Court orders that.

22       Q.  Okay.

23       A.  So that has nothing do with Medical or

24  Mental Health.

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 64

1          Q.  Okay.  Have you ever, has there ever been a

2    time is, is ACH able to, if Medical providers at ACH

3    determined that somebody couldn't be cared for, needed

4    acute mental inpatient psychiatric treatment would ACH

5    be able to refer that person to out, outpatient,

6    excuse me, inpatient medical care at McFarland or

7    another institution like that?

8          A.  McFarland doesn't work like that.  If that's

9    what you're asking.  You can't just refer somebody to

10   McFarland.  It has it, it's a huge long process what

11   we can do is take them to the emergency room for an

12   involuntary psychiatric admission, and then and only

13   then can the Emergency Room Doctor and Psych Response

14   Team and SIU or whoever psychiatry is the one that

15   ultimately then admits the patient.

16         Q.  Okay.  So that's helpful.

17              So have you ever seen that happen since

18   you came to ACH?

19         A.  Yes.

20         Q.  To Sangamon County Jail?

21         A.  Yes.

22         Q.  How many times?

23         A.  I, I just did it last month.

24         Q.  Can you describe the circumstances where

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 65

1  that happened?

2          A.  I mean...

3          Q.  Yes.

4          A.  No, I can --

5                      MS. POWELL:  I don't think you

6  can tell her what she can and can't do.

7                      MS. WIRTH:  So repeat your

8  question what are you --

9                      MS. CHARDON:  Can you describe

10  the circumstances, I'm asking at this point one

11  example I will ask for more for when was the last time

12  that she took, is aware that somebody was referred

13  immediately to the ER for psychiatric reasons from the

14  Jail.

15                      MS. WIRTH:  Yeah, I think you

16  can recount the circumstances obviously without

17  identifying information and just say what the symptoms

18  were that would spur something like that.

19                      MS. CHARDON:  I'm not waiving

20  the right to, to obtain information.  I think we've

21  already been over this with the protective order so we

22  already have the mental health information of the

23  other person.

24                      MS. WIRTH:  But it doesn't

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 66

1  apply to people that aren't parties to the case that

2  are simply getting care in the Jail, so she can give

3  us an example like Miss Hicks did during her

4  deposition of this happened and we responded by doing

5  this, but she can't give you names of people.

6           MS. CHARDON:  I think, yeah, I

7  think what I'm trying to say I'm not going to force

8  her to give names today on the record, but I'm not

9  waiving the right to obtain that just like we got the

10  names of the others prisoners who are on Mental Health

11  referral tracking unredacted under Confidential Order

12  in the case.

13           MS. WIRTH:  That's fine.  We

14  can deal with that another day but...

15           MS. CHARDON:  But I do need

16  the, the example of the last time that you are aware

17  that somebody was brought from Sangamon County Jail to

18  the ER.

19      Q.  Can you describe this, the circumstances of

20  that?

21      A.  It was a young, first time, no history of

22  mental illness, bizarre behavior, catatonic state,

23  seven days into, pretty much seven days into his stay

24  at Sangamon County Jail, not eating, not drinking, not

**DEPOSITION OF KATE DANIELS**                    **June 13, 2019**

Page 67

1  taking medications and he then had a suicide attempt.

2      Q.  Okay.  So and after the suicide attempt, he

3  was brought to ER?

4      A.  Uh-huh.

5      Q.  And was he later checked into mental,

6  inpatient Mental Health?

7      A.  So the information I can give you on my

8  behalf that I know is that I went over to the Court

9  side and got an involuntary petition.  The involuntary

10  petition then was, he was given an OR which is own

11  recognizance bond so after he dropped out of, off at

12  the ER and did the handoff at the emergency room I do

13  not know what happened to him.  So it's not my, I

14  can't answer that question, but when we dropped him

15  off the information was provided to it, the emergency

16  room and in regards to specific events, what it was

17  going on with him, and then the care that it was, the

18  care was transferred.

19      Q.  Do you know whether he was still a ward of

20  Sangamon County Jail at that point?  Like was still

21  booked as an Inmate when he, when care was

22  transferred?

23      A.  He was given an OR so own recognizance bond

24  so then we took him to the, to the emergency room and

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 68

1   given, he was given the OR before we took him to the

2   emergency room so was he in Sangamon County custody?

3        Q.  She can't, I don't think --

4        A.  I don't know anything about that.

5                     MS. WIRTH:  If you don't

6   know --

7        A.  I don't know anything about that.  He was

8   given OR first before yeah, at the time that he was

9   transferred over.  I don't deal, I don't do that kind

10  of stuff, I have no idea.  But we did not sit on the

11  patient, how about that.  Our Sangamon County Officers

12  did not sit on the patient.

13       Q.  Yeah, yeah, that's helpful.

14                  And by that you mean they didn't

15  accompany the patient to the hospital?

16       A.  They did, they did, they took and dropped

17  him off at the hospital and transferred care to the

18  hospital, gave all the paperwork, they signed the

19  paperwork and then they leave.

20       Q.  Then they left?

21       A.  Then they take the patient directly to the

22  emergency room into a room and care is transferred.

23       Q.  What did you mean by they didn't sit on the

24  patient then?

Page 69

1          A.   Meaning that like they didn't stay with the

2     patient.

3          Q.   That's what, that's what I thought you

4     meant.

5          A.   Yeah.

6          Q.   Okay.  So are you, the, now thinking back

7     the other instances where you have seen that happen

8     where somebody's been brought to ER for psychiatric

9     reasons, can you think of any instance in which the

10    person was not, did not get an OR or own recognizance

11    prior to the --

12         A.   Well --

13         Q.   -- the transfer of care --

14                        MS. WIRTH:  Hold on for just

15    one second.

16                        (Off Record Discussion.)

17         Q.   So I think you told me there is at least

18    more than one instance in which you've seen somebody

19    get referred out from Sangamon County Jail to the ER

20    for psychiatric reasons?

21         A.   Correct.

22         Q.   And you just described one of them to me?

23         A.   Correct.

24         Q.   And in that instance the person had an OR

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 70

1  which meant that, an OR at the time that the care was

2  transferred, correct?

3       A.  Correct.

4       Q.  Are you familiar with any instances in

5  which, and in terms of the number of instances in

6  which you know that somebody's been brought from

7  Sangamon County Jail to the ER for psychiatric reasons

8  you said you don't know the exact number, right?

9       A.  For psychiatric reasons though that's like I

10  mean for, are you meaning like that we feel as though

11  we cannot provide them with the psychiatric care that

12  they need at the Sangamon County Jail and they need to

13  be inpatient admitted is that what you're asking?

14      Q.  Ummmm --

15      A.  Because they're all kinds of psychiatric

16  reasons.  I mean in regards to like say for example,

17  Tiffany she swallowed spoons, she stuffed, I mean

18  there is psychiatric reasons.  But that doesn't

19  mean --

20      Q.  Sure.

21      A.  -- so she was in our care and we took her to

22  the emergency room for psychiatric reasons.  Meaning

23  that as a result of her swallowing a spoon that would

24  be considered, you know, a Pica, which is a

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 71

1   psychiatric, encompasses a whole bunch of psychiatric

2   things, so care in regards to that so she was in our

3   custody and we sat on her in regards to that.

4        Q.  Yeah.  You took her to the ER when she

5   swallowed the spoon, right?

6        A.  Uh-huh.

7        Q.  When she needed treatment for her foot,

8   correct?

9        A.  Uh-huh.

10        Q.  Those --

11                    MS. POWELL:  You need to say

12   yes out loud.

13        A.  Yes.

14        Q.  And those are physical injuries, right?

15        A.  Correct.

16        Q.  Those is no instance where Tiffany was taken

17   to an outside facility for something involving non

18   physical harm, correct?

19        A.  That's not, well, she went to Doctor

20   Pineda's office in regards to, for ortho consult but

21   that wasn't --

22        Q.  Is that physical?

23        A.  But that was a consult in regards to the

24   unresolved fracture of her ankle.  She didn't like

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 72

1    currently hurt it at that time.  It was just a

2    follow-up, so I would say that was technically in

3    regards to like a follow-up.  It wasn't as a result of

4    an acute injury, it was an old injury.

5         Q.   Okay.  So I didn't, yeah, I'm not trying to

6    limit it to acute injury --

7         A.   Oh, okay.

8         Q.   -- no, I said a physical consequence.

9              I think that in general we're on the

10   same page I think we're potentially saying it

11   differently, I don't think that you would tell me that

12   Tiffany was brought to any outside facility or outside

13   of Sangamon County Jail for purely psychiatric reasons

14   without accompanying physical harm?

15        A.   No, she, meaning a psychiatry?  Was she seen

16   by a psychiatrist outside of the, outside of the

17   hospital?

18        Q.   Was she seen, was she left, did she leave

19   Sangamon County Jail for any reason not related to

20   physical injury?

21        A.   No.

22        Q.   Okay.  So earlier, so you were having

23   trouble with my question about referrals to the ER,

24   you, and you understood my question perfectly well

Page 73

1    when the example you provided of the gentleman wasn't

2    eating or drinking.  Obviously those are physical

3    reasons and then made a suicide attempt, right?  And

4    he was referred out to the emergency room?

5          A.  I mean you're, this is kind of a vague

6    thing.  I mean there is like, there is all kinds of

7    different things that go into it.  I mean I can't give

8    you like I can't give a specific thing about him.

9    There is all kinds of things that tunnel down in

10   regards to him going to the emergency room and having

11   an involuntary petition.

12         Q.  Okay.  So I'm going to stop you there

13   because there is, that's fine.  We can take your

14   deposition, your definition, your broad definition of

15   psychiatric issues?

16         A.  Okay, right.

17         Q.  And using that broad definition --

18         A.  Correct.

19         Q.  -- whether it is swallowing a spoon or, you

20   know, whatever it is, a suicide attempt would be one

21   example, but can you, in the other instance where you

22   have seen somebody go to the ER for that kind of

23   reason you said there is other instances other than

24   the one that you described to me, correct?

DEPOSITION OF KATE DANIELS                     June 13, 2019

Page 74

1        A.  Correct.

2        Q.  Okay.  How many other instances can you

3    think of?

4        A.  I can't give you exact numbers.  I mean I've

5    been there for three years.  I can't give you, I mean

6    there is all kinds of different things that has

7    happened.  It's happened probably I would say less

8    than ten times and it's --

9        Q.  Okay.

10       A.  -- I don't remember the last one just sticks

11   in my head just because of the simple fact that I

12   remember specific events of going over and getting an

13   involuntary petition in regards to that.  I think I've

14   done the involuntary petitions like maybe 3 or 4 other

15   times in regards to that.

16       Q.  An involuntary petition for -- okay and the

17   involuntary petition pertains to the involuntary?

18       A.  Psych admission.

19       Q.  Psych admission, that is what you said?

20       A.  Uh-huh.  But it doesn't mean they get a

21   psych admission.

22       Q.  Right.  And all the other times when you

23   have done those involuntary petitions and you thought

24   it was about 3 or 4 in any of those times did the

DEPOSITION OF KATE DANIELS                           June 13, 2019

Page 75

1   person not receive an OR, did the person remain under

2   the custody of Sangamon County Jail?

3         A.  I don't know specific instances.

4         Q.  Did any of them, did they receive an OR?

5         A.  I don't know, I don't deal, I don't, I'm not

6   the Court side I don't pay attention to that stuff.

7         Q.  Okay.  And are, what are the circumstances

8   of the other, were there suicide attempts in those

9   other 3 or 4 times?

10        A.  No.

11        Q.  What were the circumstances of each one?

12        A.  Decompensation of Medical and Mental Health

13  I guess would be the broad statement of it.

14        Q.  Okay.  Did you do that, any of these

15  involuntary commitment petitions prior to Tiffany's

16  death?

17        A.  I couldn't, I don't, I don't know how long I

18  was working here when Tiffany passed away, I don't

19  think I was working here for very long.

20        Q.  You said you didn't?

21        A.  I think I was only there for like I don't

22  know maybe, when did I start?

23        Q.  You said you started like in late fall

24  of 2016?

DEPOSITION OF KATE DANIELS                     June 13, 2019

                                                        Page 76

1        A.   October of, I was there for two months.

2        Q.   Before she came?

3        A.   Yeah.  So I wouldn't have done that, no.

4        Q.   So the answer is no?

5        A.   No.

6        Q.   And are you familiar with any other of those

7   referrals happening personally familiar before your

8   time?

9        A.   I know, I don't.

10       Q.   Okay.  And so was there any discussion that

11  you are aware coming back to the question that I asked

12  not in the, forgive me if you answered it, but I don't

13  know if I've got, you know, and how we've got that

14  framework.

15            Were you ever aware of a conversation

16  in which anybody talked about whether Tiffany was,

17  would need one of those ER transfers for psychiatric

18  reasons or because she presented a suicide risk?

19       A.   Here's, no, I wasn't aware of any

20  conversation or in regards to her being evaluated at

21  the emergency room for psychiatric because she was a

22  suicide risk.  But I do want to point out one thing is

23  that when going to the emergency room she's

24  transferred of care of an Emergency Room Doctor.

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 77

1    She's in the care of an Emergency Room Doctor and if

2    that Emergency Room Doctor felt the need for her to

3    have a psychiatric consult due to her behavior that

4    got her to the emergency room, he could be able to, he

5    could, he could pass that change and do it at SIU or

6    psych consult.  So it isn't necessarily by me

7    referring to get a psych consult or Mental Health

8    referring her to get a psych consult she had, there

9    was multiple opportunities for she could have gotten

10   evaluated by SIU when she went to the emergency room

11   for the various swallowing's, the various different

12   types of things.

13              I don't think that we did that at the

14   Sangamon County Jail because she came to us from

15   McFarland.  We had a pretty good history on her.  We

16   knew that this was her, her behavior.  This is what

17   she did prior to coming here.  This is what she did

18   prior to being at Logan.  We get this kind of behavior

19   often.

20              She was evaluated and asked if she was

21   suicidal.  I, she never told me she was suicidal, you

22   know.  I don't, as for anybody in our Department

23   referring her for a psych evaluation, for an

24   involuntary psych evaluation I don't think, you know,

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 78

1  based off of her, you know, mood and her conversation

2  with us it would have ever been something that we

3  would have done.

4          Q.  You didn't think she was suicidal?

5          A.  No.

6          Q.  Did any of your colleagues think she was

7  suicidal?

8          A.  No, I mean, no.  She would laugh and talk

9  and chat with you and the next minute you, you were

10  called down to Booking because she had a strap around

11  her neck.

12          Q.  You mentioned earlier that ER, the ER if

13  they had, if they had determined her to be at, in a

14  serious, have a serious mental health risk they could

15  have taken over care?

16          A.  Uh-huh.

17          Q.  Did you send her with her Medical chart

18  including her McFarland discharge summary when she

19  went to ER?

20          A.  No.

21          Q.  Did you send her with a note about her

22  psychiatric history?

23          A.  No.  What we do is we call and notify the

24  Charge Nurse of the specific event why we're sending

1  them there, and we kind of give them a little bit of a

2  tidbit of the history of, you know what, what sent

3  them there.  But as for, we don't provide them with,

4  we usually provided them with like their current

5  medication list.

6          Q.  ACH isn't relying on the outside ER

7  providers to provide the outside Mental Healthcare for

8  the prisoners, is it?

9          A.  No, but you're asking in regards to if we'd

10  ever sent anybody to the hospital in regards to or

11  like a psychiatric reasons or, you know, did she have

12  access to potentially getting outside psychiatric

13  care.  And so that would be one instance where, you

14  know, if, if, as a whole if you're thinking that ACH

15  didn't provide her with correct psychiatric care, she

16  had multiple occurrences where she could have

17  gathered, she could have gotten that care if she felt

18  as though she wasn't receiving that care at Sangamon

19  County Jail I guess is what I'm trying to say to you.

20              She had --

21          Q.  She could, you're saying she could have

22  gotten psychiatric care when she went to the ER?

23          A.  I wouldn't have said psychiatric care but

24  she could reached out to the provider and said, you

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 80

1    know, I'm suicidal, that's why I did this.  I wanted

2    to kill myself, or, you know.  And then that, that

3    would have, you know, put, been able to give them more

4    information and they could have, you know, done a

5    psych consult if they felt as though she was an

6    imminent danger to herself, you know, basically is

7    what I'm trying to say.

8         Q.  Is that something that you've talked about

9    within the context of ACH or your professional

10   training that the ER, outside ER providers might be

11   able to intervene and take over psychiatric care for

12   patients for prisoners?

13                   MS. WIRTH:  I'm going to object

14   to you mischaracterizing her answer.  I don't think

15   that is what she was saying at all.

16        Q.  Well, so I'm asking you what time it is and

17   you are telling me how to build a watch and that's the

18   problem.

19                   So the question that I had is was quite

20   simply you gave me a long answer but in the beginning

21   I think you said no.

22                   The question that I had was does ACH

23   rely on outside ER professionals to, for the Mental

24   Healthcare or Psychiatric care of the prisoners in

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 81

 1   it's --

 2        A.  Do we rely on it, no.

 3        Q.  And does ACH provide Mental Healthcare in,

 4   at Sangamon County Jail?

 5        A.  Yes.

 6        Q.  And is it ACH's responsibility to provide

 7   Mental Healthcare at Sangamon County Jail?

 8        A.  Yes.

 9        Q.  Are you familiar with ACH's contract with

10   Sangamon County Jail and --

11        A.  I don't do anything with contracts, no.

12        Q.  Do you ever review it to, to be aware of how

13   many Nurse hours are required under the contract at

14   the Jail?

15        A.  No.

16        Q.  Have you ever seen it before?

17        A.  No.

18        Q.  Okay.  Do you understand that, is there any,

19   if somebody at Sangamon County Jail who works for ACH,

20   a medical provider feels that somebody needs a

21   referral to psychiatry to an outside psychiatric

22   professional they could do so I think is your

23   testimony by sending them to the ER?

24        A.  No, we, could we, yeah, absolutely they

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 82

1   don't deny us, I mean if a provider feels the need

2   that for anybody to be seen for anything, we will, we

3   will make it happen, absolutely.

4        Q.  Other than the ER instances that we've

5   discussed, have you ever seen, have you ever seen a

6   patient at Sangamon County Jail be referred to a

7   psychiatrist?

8        A.  No.

9        Q.  Why not?  I mean have they been referred,

10  the is there a psychiatrist available to whom you

11  could refer patients?

12       A.  Absolutely, I mean SIU, Memorial Behavioral

13  Health, there is all kinds of places that we could

14  send people.

15       Q.  Okay.  Have you ever seen that happen?

16       A.  No.

17       Q.  Okay.  Have you ever contemplated sending

18  somebody to one of those places?

19       A.  No, that's not my, I don't refer people to

20  places.

21       Q.  Do you know who would be responsible for

22  paying for that if it happened?

23       A.  I don't know, the whole payment breakdown of

24  who I know that the bills are sent to ACH, I don't

Page 83

1   know who pays what, I don't deal with that.

2        Q.  Do you have any personal knowledge of what

3   Mickey Shmikler talked about with Tiffany when he was

4   at her cell door?

5        A.  Yeah, I think you asked me this question

6   already, I don't know.

7        Q.  Do you have any, are you able to, you said

8   he was constantly there --

9        A.  Yeah.

10       Q.  -- earlier.

11            Can you be more specific than

12  constantly how much time, so how long were his shifts?

13       A.  I don't know.

14       Q.  Okay.  How, what's the longest period of

15  time that you observed him outside her door, start to

16  finish?

17       A.  I know that when I would go down to Booking

18  to get our Intake sheets at sometimes she was always,

19  depends on when, what time period that we were there,

20  but like if she was the first cell on the right, you

21  know, you would always notice that somebody was

22  standing there talking to her.  I know, I knew, I know

23  that he would go there and talk to her every single

24  day that he worked.  We, he would, I would see, when I

DEPOSITION OF KATE DANIELS                           June 13, 2019

Page 84

1   worked he was always there.  I don't know 20, he was

2   very, he took a lot of time with each individual

3   person that he evaluated.  He was very, he always

4   talked to everybody for a long period of time.  I

5   don't know I couldn't give you a specific time.

6       Q.  A long period like 20 minutes?

7       A.  Yeah.

8       Q.  Okay.  And I think I asked if you've ever

9   talked to Shmikler about Tiffany and I think I asked

10  that and you said --

11      A.  I can't give you, I mean he was, like I

12  said, I think I said he was in our office often I

13  don't remember a specific conversation between Mickey

14  and I in regards to Tiffany Rusher.

15      Q.  Were you ever, you mentioned that staff was

16  in constant communication about Tiffany, I think

17  that's the word that you used, I don't mean to put

18  words in your mouth.  I think you said you talked

19  with, about Tiffany with other staff at the Jail?

20          This is not an intent to put words in

21  your mouth, let me ask the question again.

22      A.  Oh, I was like, I think that, I think that

23  there was lots going on with Tiffany in regards to are

24  you talking about Medical Staff, like us talking?

DEPOSITION OF KATE DANIELS                      June 13, 2019

Page 85

1        Q.  Sure.

2        A.  Yeah, we were all in, you know, what she

3    did, what she's doing, what her behavior is, what, you

4    know, what kind of event had happened for the day or

5    for the week or for, you know, it was always a

6    constant, it was always something, it was always

7    something in regards to her.

8        Q.  When you talk, when you were just about that

9    communication among Medical Staff was it oral, was it

10   through charts, how did you engage in that

11   communication about Tiffany?

12       A.  It was just conversation, report.

13       Q.  Have you and what about with Jail Staff so

14   Correctional Staff did you communicate with them about

15   Tiffany?

16       A.  I mean that was, I'm sure, I couldn't

17   remember, if, you're going, your next question is

18   going to be do you remember specifics no, I don't

19   remember specific instances of conversations that I

20   had.

21       Q.  Were there any documents that you would have

22   used to transmit information about Tiffany?  Like

23   documents that you would use to communicate about

24   prisoners with Jail Staff?

ASSSOCIATED COURT REPORTERS
1-800-252-9915

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 86

1        A.  Well, there is --

2        Q.  Forms?

3        A.  There is this, the menta, psychological the

4    referral form if that's what you're talking about,

5    yes.

6             Those are usually filled out by whoever

7    the event or the specific thing happened to and then

8    that would be sent up to -- I think they are called

9    Medical Psychological Referrals.

10            Medical Mental Health Psychological

11   Referrals, no, that's not it.

12       Q.  (Indicating).  Is that look familiar, this

13   document that I'm holding up, Hicks 2 it says Mental

14   Health Screening Interview on top?

15       A.  That is a Mental Health Form that Mental

16   Health fills out.  So that's not necessarily would be

17   documentation, that's her documentation to put in her

18   chart in regards to what she does.

19       Q.  Okay.  I'm going to show that, hand you

20   actually that document.  Let's see, which is marked as

21   Hicks Exhibit 2 and so the top is Mental Health

22   Screening Interview, have you seen that form before?

23       A.  Yes.

24       Q.  Okay.  So is that a form that's filled out

DEPOSITION OF KATE DANIELS                     June 13, 2019

Page 87

1   at Sangamon County Jail?

2          A.  It's a form that's filled out, yes, yeah.

3          Q.  Would it be filled out for all Inmates?

4          A.  No.

5          Q.  Okay.  Which Inmates would it be filled out

6   for?

7          A.  I can't answer that question, this is a

8   Mental Health Form.

9          Q.  Okay.  But you have seen it at the Sangamon

10  County Jail?

11         A.  Yes, but I can't answer specifics on who

12  gets it, what Inmate gets it, how, what is the

13  criteria for getting it.  I can't answer that.

14         Q.  Okay.  So if you just go to the third page

15  Andrews v Sangamon Plaintiff's Production 12588 Weekly

16  Mental Health Correspondence, have you seen that

17  document, that form before?

18         A.  No.

19         Q.  Okay.  The next page Medical and Mental

20  Health Rounds of Detainees in Segregation, have you

21  ever seen that form?

22         A.  Yes.

23         Q.  Is that a form that's used at Sangamon

24  County Jail?

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 88

1        A.  Yes.

2        Q.  Was that form used at the time of Tiffany's

3   death that same form?

4        A.  Yes.

5        Q.  Okay.  Or is possible that it was used in a

6   different -- okay.

7                 And would Medical Staff fill out, put,

8   fill out information into this form or just Mental

9   Health Staff?

10       A.  That's, can you ask the question again?  Did

11  we, do we fill these out?

12       Q.  Yeah.

13       A.  No.  Can we fill these out, yes.

14       Q.  Did you fill these out for Tiffany?

15       A.  No.

16       Q.  Why not?

17       A.  We fill out more, it's just not a, this is

18  like segregation rounds for like people that are, it's

19  just not a form that we would fill out.  It's more a

20  Mental Health could we fill out, yeah, but it's just

21  not something that we would do, that we do on a

22  routine basis.  We don't fill this form out ever,

23  really.

24       Q.  And then two pages next 12591 Placement

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 89

1    Review of Detainee and Observation?

2          A.  Where?

3          Q.  One more page.

4                    Have you seen that form before?

5          A.  Uh-huh.

6          Q.  Is that a form that you use at Sangamon

7    County Jail?

8          A.  Yes.

9          Q.  And would that be used with a patient like

10   Tiffany?

11         A.  It's a Mental Health form.

12         Q.  Should it be used for a patient like

13   Tiffany?

14         A.  These are Mental Health forms, I don't have

15   anything to do with Mental Health forms so it's not my

16   documentation.

17         Q.  Okay.

18         A.  So I can't answer that.

19         Q.  I can't remember you, would it go into her

20   Medical file or a different file?

21         A.  This (indicating)?

22         Q.  Uh-huh.

23         A.  Like I said I don't do Mental Health forms

24   like I don't do, I don't have anything to with Mental

**DEPOSITION OF KATE DANIELS**                    June 13, 2019

Page 90

1  Health forms, I literally don't have anything to with

2  Mental Health forms.

3      Q.  So if then if I understand correctly, it

4  wouldn't go the physical file that you review in

5  Medical, you sometimes look at files?

6      A.  Well, yeah, that's why when you said have

7  you seen this form used, yeah, I have seen the form,

8  but I have nothing to do with, like where they go if

9  anything is patient specific name it is going to go,

10 it's like an in depth detail report it's going to go,

11 it's going to go in their chart.

12     Q.  It goes in the same Medical chart and would

13 you read if it was part of the chart or would you skip

14 it because it's Mental Health?

15     A.  Would I read it?

16     Q.  Yeah, would you read it if you're reviewing

17 the chart?

18     A.  If I was reviewing the chart, yeah.

19     Q.  Is housing status including placement in

20 administrative segregation can that be a risk for

21 mental health decompensation or suicide?  Is it a risk

22 factor?

23     A.  Segregation in regards to mental health?

24     Q.  Uh-huh.

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 91

1       A.  Well, yes.

2       Q.  It's related to mental health?

3       A.  Sure, absolutely.

4       Q.  Did you ever have any conversation about

5   whether Tiffany was safe at Sangamon County Jail?

6       A.  Oh, my God, safe at Sangamon County Jail

7   like, okay, that's, I don't understand what you're

8   asking was, I don't understand what you're asking.

9   Was she safe at Sangamon County Jail?  Are you asking

10  me if I felt as though Tiffany Rusher was safe at

11  Sangamon County Jail?

12      Q.  No, I'm asking if you ever had conversations

13  with anybody about the issue of her safety at Sangamon

14  County Jail that we haven't talked about today prior

15  to her death?

16      A.  Her safety was talked about often because

17  the fact that she was, anything and everything that

18  she got her hands on would end up either swallowed or

19  used or, you know, there was, her safety was, yeah,

20  our number one concern there.  I think that's why --

21      Q.  You said earlier that you didn't think she

22  was suicidal?

23      A.  No, absolutely not.

24      Q.  And you still today would you characterize

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 92

1    her behavior during that time period as suicidal?

2         A.  No.

3         Q.  How would you characterize her behavior

4    during that time period?

5         A.  I think it was an attention seeking plea

6    that went really wrong.

7         Q.  You've testified earlier that you have seen

8    training videos that were from Melissa Caldwell,

9    right?

10        A.  Correct.

11        Q.  Do you know whether in any of those videos

12   Doctor Caldwell stated manipulation and true suicidal

13   impulses can coexist.  The presence of manipulation

14   does not rule out suicide risk?

15        A.  Uh-huh.

16        Q.  Is that something you were taught?

17        A.  Yeah.

18        Q.  Would you agree with that?

19        A.  Sure.

20        Q.  Would you, were you taught that overt

21   manipulation may actually be a risk factor for suicide

22   in the long term?

23        A.  Correct, with, I mean that's a huge broad

24   statement I mean...

DEPOSITION OF KATE DANIELS                    June 13, 2019

                                                      Page 93

1        Q.  Do you agree with the statement?

2        A.  Oh, absolutely.

3        Q.  Do you agree with the statement that

4    regardless of whether an action appears to be

5    manipulative, any indication of suicidal thinking or

6    self injury must be taken seriously?

7        A.  We took it very seriously with her.

8        Q.  You would agree with that statement?

9        A.  Yes.

10        Q.  Did you have any indication that Tiffany

11    was, had suicidal thinking?

12        A.  No.

13        Q.  In retrospect looking back --

14        A.  No.

15        Q.  -- do you think she had any suicidal

16    thinking?

17        A.  No.

18        Q.  None of the behaviors that you've charted on

19    that Medical timeline that we were looking at earlier

20    indicate to you that she was, had any suicidal

21    thinking?

22        A.  You're asking me as a personal, this is

23    personal or in regards to what I think as a Nurse?

24        Q.  As a Nurse, yeah.

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 94

1        A.  Yeah, no.

2        Q.  If you did think that those behaviors on

3   that timeline reflected suicidal thinking --

4        A.  Correct.

5        Q.  -- what would you have done?

6        A.  The same thing that, I mean we wouldn't have

7   done anything, I guess, differently is what -- we have

8   people that are suicidal everyday at the Jail.  We

9   have them talk to Mental Health.  We have them talk to

10  the Doctor, we see if there is things we can do for

11  them, medication changes, medication modification,

12  different things that we can do for them.  They talk

13  to Mental Health, you know.

14       Q.  Did Tiffany have a Mental Health Treatment

15  Plan?

16       A.  No.

17       Q.  Does anybody at Sangamon County Jail have

18  Mental a Health Treatment Plan?

19       A.  I am Medical, I'm not Mental Health, so I

20  don't have anything to do with Mental Health so I

21  can't answer those questions.

22       Q.  You look at Medical charts as part of the --

23       A.  Correct.

24       Q.  -- course of your duty?

DEPOSITION OF KATE DANIELS                          June 13, 2019

Page 95

1        A.   Right.

2        Q.   In any of the Medical records you've looked

3   at have you seen Mental Health Plan?

4        A.   Mental Health Treatment Plan I know but I

5   don't have anything to do with that, so I don't know

6   about Mental Health Treatment Plan.   I know there is

7   the screening interviews and stuff like that but like

8   I said I'm a Nurse, I'm not Mental Health.

9        Q.   Does Sangamon County Jail have a Suicide

10  Prevention Plan?

11       A.   Yes.

12       Q.   Okay.   Is that a general plan or is it an

13  individual thing that's authored for individual

14  Inmates?

15       A.   I think it's, we look at every individual

16  patient that comes into the Jail and basically I think

17  in regards to, in regards to what?   Oh, my God.

18                  MS. WIRTH:   Do you need to take

19  a break?

20       A.   Yeah, probably I mean how long, how much

21  longer is this going to be?

22       Q.   Ten minutes, we've got somebody else coming

23  in.

24       A.   Okay.   I will power through it.

June 13, 2019

1       Q.  But your own interpretation is there, you

2   said there is a Suicide Prevention Plan what is it is

3   my question?

4       A.  I can't, I don't know the logistics of it.

5   I mean there's policies set in place for every Inmate

6   that comes in the facility.  We've got different

7   things that we do for every individual Inmate.  I

8   can't, I'm to the point of this that I'm kind of

9   checked out so I don't, I'm not, I don't know.

10      Q.  Okay.  Are you still able to give me

11  truthful answers?

12      A.  Yeah, I just...

13      Q.  We're almost done.

14              There isn't a single document that sets

15  forth that plan that you can point me to?

16      A.  I know that the Jail has specific policies

17  and procedures that they all go through.  It's Jail

18  standards, I know they have different things, I can't

19  answer that question without being able to tell you

20  specific things I don't know that.

21      Q.  This is, was marked Bouvet Exhibit 19 have

22  you ever seen that memorandum before?

23      A.  I don't remember I mean...

24      Q.  Are you aware --

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 97

1        A.   Oh, yeah, this, I mean this is, this is

2   something that we do now, yes.

3        Q.   Okay.  So, and this was a new form or policy

4   Form 373 that went into existence after Tiffany's

5   death, right?

6        A.   Correct.

7        Q.   Was this a, was this a reaction to, in any

8   way to Tiffany death's?

9        A.   No, I mean, I think it, it was brought to,

10  you know, just so we could have some better

11  documentation from all kinds of different people so

12  that we could provide documentation of all the stuff

13  and services and people that see these Inmates every

14  single day versus just saying that, you know, I talked

15  to her multiple times a day.  I'm assuming so we could

16  have some documentation and all the steps are

17  appropriate.

18       Q.   I think you said earlier that you don't

19  recall participating in any meetings about Tiffany or

20  her death after her death?

21       A.   I don't remember.  I don't remember, you

22  asked me if I remember specifically meeting with Deb

23  Ash and Nuri, I don't remember that specific meeting.

24       Q.   Do you remember any, anything about meetings

1   that happened after her death?

2          A.   Meetings, no.   I remember getting stuff

3   together like being called by Illinois State Police in

4   regards to her and stuff like that, but I don't

5   remember a specific meeting where we talked about

6   Tiffany Rusher except for like -- no.

7          Q.   Okay.   And that's actually probably my last

8   question pertains to that.

9                   I think that you gathered records for,

10  did you gather Medical records for Illinois State

11  Police?

12         A.   I copied, yeah.

13         Q.   You copied.   And I am not going to mark it

14  it's just too big.

15                   Okay.   So, how do you, what did you do

16  to gather those records that were provided to Illinois

17  State Police?

18         A.   I copied the chart.

19         Q.   The whole chart?

20         A.   That I had in the Medical Unit.

21         Q.   Okay.   And was that, to your knowledge, all

22  of the Medical records that pertained to her?

23         A.   To my knowledge, yeah.

24         Q.   Is it possible that there were Medical

DEPOSITION OF KATE DANIELS                    June 13, 2019

1   records any other place?

2          A.   Medical records, no.

3          Q.   Mental Health records?

4          A.   Can't answer that.

5          Q.   Okay.  Why can't you answer that?

6          A.   Because I am, I was, you asked me at the

7   time that I copied the chart did I feel as though that

8   was all of her, yes, absolutely.

9          Q.   Okay.

10         A.   So I can't answer for Mental Health.

11         Q.   Okay.  So, and if I understand correctly the

12  Mental Health records should be in the chart, they may

13  or may not have been there, but Mental Health records

14  would live in the same place as medical chart in a

15  normal basis?

16         A.   Yeah, but there, you know, sometimes they're

17  some backlogging of charting like because they see so

18  many people as you can see their charting is extensive

19  so sometimes they are 2 to 3 weeks behind in regards

20  to charting.

21         Q.   But at the end of the day those charts go

22  into the same Medical file, when they are created?

23         A.   When they are completed.

24         Q.   Yeah.

ASSSOCIATED COURT REPORTERS
1-800-252-9915

**DEPOSITION OF KATE DANIELS**                    **June 13, 2019**

Page 100

1      A.  When they are completed.

2      Q.  So you intended to provide the full Medical

3  chart?

4      A.  Oh, yeah.

5      Q.  That existed on that day?

6                  MS. CHARDON:  Okay.  I don't

7  have anymore questions.

8                  MS. POWELL:  I just have a few

9  I won't be very many.

10                 CROSS EXAMINATION CONDUCTED

11                 BY MS. POWELL:

12     Q.  I think you said several times that you do

13  not participate in the Mental Healthcare, right?

14     A.  No, correct, no.

15     Q.  You wouldn't know how often a patient is

16  supposed to be subpoenaed by Mental Health?

17     A.  No.

18     Q.  And do you participate in the, in that

19  decisionmaking process as far as how often someone

20  should be seen?

21     A.  No.

22     Q.  Do you know who that person would be?

23     A.  In regards to like who was at our facility

24  would make sure that a patient like a High Risk

DEPOSITION OF KATE DANIELS                         June 13, 2019

Page 101

1    patient would be seen?

2         Q.  Yes.

3         A.  No, I don't know, well, I know that the

4    Mental Health probably has like a protocol that or a

5    guideline of how often a patient is seen, I know that

6    I know.

7         Q.  Let me ask you this.

8         A.  Okay.

9         Q.  The frequency of a visit is going to be

10   determined by someone in Mickey's capacity combined

11   with Doctor Abraham, is that fair?

12        A.  Yeah.

13        Q.  Was there anybody besides Doctor Abraham and

14   the Social Worker who would determine at the Sangamon

15   County Jail how often a patient there would be seen by

16   Mental Health?

17        A.  No.

18        Q.  Could you request that someone be seen by

19   Mental Health if you wanted?

20        A.  Yes.

21        Q.  Okay.  And that would be documented in the

22   chart as well, correct?

23        A.  Yes.

24        Q.  Now when the, a person like Mickey Shmikler

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 102

1   when he goes and sees the patient that he's going to

2   see does he see people outside of the Booking area as

3   well as those in High Risk cells?

4        A.  Yes.

5        Q.  Okay.  Do you know under what circumstances

6   he would see people who are not in High Risk?

7        A.  Referrals, patient requests, Medical

8   referrals, a lot, mostly they are patient referrals

9   like patients requesting to see Mickey.

10               They all, they would send in a, at the

11  time I believe we used like request for sick call or a

12  request for Mental Health or forms like that and they

13  were requesting to see him.

14       Q.  Would he see these people in the Medical

15  Unit or in the healthcare unit?

16       A.  You know I can't remember where, the

17  specific places that he saw them.  I know that he

18  would see them and I remember seeing them in his

19  office.  He had an office off the Second Floor, people

20  would come in there.

21               I can't, I don't know where he would

22  see them on the Third Floor.  So those were mainly the

23  Second Floor Inmates that he would see on the Second

24  Floor.  I can't answer for, I always where he saw the

June 13, 2019

Page 103

1  Third Floor Inmates I, the classroom he would, I know

2  there would be times where he would see some people in

3  the classroom but I don't know where he saw all of

4  them.

5      Q.  Okay.

6      A.  I don't know.

7      Q.  Then Doctor Abraham he did always see his

8  patients in the Healthcare Unit or would he come down

9  to High Risk to see them?

10     A.  He saw, he saw people in High Risk down in

11 the Medical Booking, Medical Exam Room down in

12 Booking.

13     Q.  Okay.  And the timeline that you did is that

14 related to sick call and times that Miss Rusher was

15 sent to an outside facility?

16     A.  I think it's just any time that basically we

17 did something significant in regards for, I can't

18 remember, I'd have to look, coincide it with the chart

19 like why I documented that specific day, but I think

20 it was specific like issues, Medical, where Medical

21 was seen and needed to see her.

22     Q.  Okay.  And this doesn't include a Medical, I

23 mean the medication pass, does it?

24     A.  No, no.

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 104

1      Q.  So in addition to all the times that she was

2  seen on Exhibit 3 she also would have been seen how

3  many times a day for Medical pass, for medication

4  pass?

5      A.  You know I don't how, I'm assuming she was a

6  BIB, no, sometimes there is TID's, so she was seen

7  three times a day for medications.

8      Q.  Okay.  So three times a day basically once a

9  shift the Nurse would pass medications?

10     A.  Yeah 8, 1 and 8.

11     Q.  Okay.  And that would have been every single

12  day that she was there, correct?

13     A.  Correct.

14     Q.  And I believe that you were testifying

15  previously about when Miss Rusher is sent to an

16  outside facility like an emergency room there is no

17  limitations placed on her as to what she can report to

18  them regarding what her problems are, right?

19     A.  Correct.

20     Q.  So she can tell them anything she wants to

21  about what caused her injuries or whether, what her

22  injuries are, correct?

23     A.  Right.

24     Q.  And if the Doctors at the hospital make a

DEPOSITION OF KATE DANIELS                          June 13, 2019

Page 105

1  recommendation for whether she needs to stay there or

2  been, be admitted he can do that if he wants to,

3  right?

4      A.  Correct.

5      Q.  And if the Doctor chooses to admit the

6  patient, the patient will stay there as long as that

7  Doctor feels that it's necessary?

8      A.  Correct.

9      Q.  But if the Doctor chooses to release the

10 patient and send her back to the Jail, he can do that,

11 too, right?

12     A.  Correct.

13     Q.  And you at the Jail don't tell the Doctors

14 at the hospital what they should or shouldn't do, do

15 you?

16     A.  Oh, no.

17     Q.  And you don't send over any documentation

18 that says she needs to be back by any certain time?

19     A.  No.

20              MS. POWELL:  Okay.  I believe

21 that's all I have, thank you very much.

22              MS. WIRTH:  I don't have

23 anything basically.

24

Page 106

1   STATE OF ILLINOIS      )
    COUNTY OF CHRISTIAN     )
2

3

                        CERTIFICATE
4

5       I, Cathy J. Craggs, CSR and RPR,

6   affiliated with Associated Court Reporters,

7   P.O. Box 684, Taylorville, Illinois, do hereby

8   certify that I reported in shorthand the

9   foregoing proceedings and the foregoing is a

10  true and correct transcript of my shorthand

11  notes.

12      I further certify that I am in no

13  way related to or associated with any of the

14  parties or attorneys involved herein, nor am I

15  financially interested in the action.

16

17

18

19  _____

20  CATHY J. CRAGGS CSR, RPR

21  CSR License No. 084-002703

22

23  Dated this 18th day of July, 2019.

24

DEPOSITION OF KATE DANIELS                          June 13, 2019

Page 107

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DEPOSITION OF KATE DANIELS
June 13, 2019

**A**

**able** 24:13 36:7 40:20 44:24 45:2 64:2,5 77:4 80:3,11 83:7 96:10,19
**Abraham** 1:11 3:14 11:4 20:18 30:8 33:20 34:8 39:17 41:7 101:11,13 103:7
**Abraham's** 20:22
**absolutely** 61:5 63:2 81:24 82:3,12 91:3 91:23 93:2 99:8
**access** 79:12
**accident** 6:2,5
**accompany** 68:15
**accompanying** 72:14
**ACH** 8:1 10:8 11:8 13:10,11 14:20 16:9 18:7,15 23:6 23:18,19 31:12 31:12,14,15,22 48:4,13 50:4,6 51:13 54:1,1 55:5,14 57:5 57:10,12,13 58:5 62:5 63:9 64:2,2,4,18 79:6,14 80:9 80:22 81:3,19 82:24
**ACH's** 16:5 81:6 81:9
**ACH552** 49:6
**action** 93:4

106:15
**active** 13:1
**actual** 10:8 16:19 21:5
**acute** 64:4 72:4 72:6
**add** 7:3,10 28:2
**addition** 104:1
**additional** 7:9
**Administration** 10:14 19:17 21:10 25:1,12 27:7 54:7,10
**administrative** 90:20
**Administrator** 1:5 7:24 8:5,11 10:9,11
**admission** 57:23 64:12 74:18,19 74:21
**admit** 105:5
**admits** 64:15
**admitted** 70:13 105:2
**Advanced** 1:10 3:15
**affiliated** 106:6
**Affirmatively** 6:20
**afternoon** 5:7,8
**agency** 63:20
**agree** 30:11 92:18 93:1,3,8
**ahead** 12:14
**alarm** 41:13,17
**Alexis** 3:3
**Ali** 5:9
**ALLEN** 3:6
**allowed** 35:14 45:5
**amount** 58:2 61:2
**analyze** 59:14
**Andrews** 1:5

87:15
**ankle** 71:24
**ANN** 1:6
**answer** 6:18 7:2 7:4,19 14:18 16:10 18:9 22:8 23:2,11 30:16,20 31:3 31:5,21,23 36:23 46:6 52:4 55:24 61:12 62:4,6,7 63:3,4 67:14 76:4 80:14,20 87:7,11,13 89:18 94:21 96:19 99:4,5 99:10 102:24
**answered** 31:16 76:12
**answers** 2:11 96:11
**anybody** 17:13 25:22 29:20 33:13 44:8,9 44:10,15 45:17 53:8 58:5 59:7 59:11,24 62:13 62:17 63:8,9 76:16 77:22 79:10 82:2 91:13 94:17 101:13
**anymore** 100:7
**Anyway** 55:15
**APPEARANC...** 3:1
**Appeared** 3:5,9 3:14
**appears** 93:4
**apply** 66:1
**appointments** 33:3
**appropriate** 97:17

**appropriately** 22:8 30:16 31:4,5 61:12
**approximately** 8:9
**April** 54:2,19
**area** 102:2
**arrange** 55:16
**arranging** 54:21 55:22
**Arun** 1:11 3:14 11:4
**Ash** 54:4,22 55:7 97:23
**asked** 15:4 31:6 31:12 44:3,15 44:22 50:20 76:11 77:20 83:5 84:8,9 97:22 99:6
**asking** 12:7 23:12,13 35:5 40:17 56:11 63:13 64:9 65:10 70:13 79:9 80:16 91:8,8,9,12 93:22
**ASQ** 16:19
**assess** 24:2
**assessed** 46:22
**assessment** 34:8 39:17 40:18,23 41:4,8
**assessments** 41:2
**assignment** 9:7
**assist** 12:20 41:1
**associated** 1:23 106:6,13
**assume** 46:17
**assuming** 97:15 104:5
**attached** 1:22 24:8,10

**attempt** 23:19 67:1,2 73:3,20
**attempts** 18:21 19:4 32:1 75:8
**attend** 54:18
**attending** 55:23
**attention** 21:23 22:3,3 24:20 25:16 26:8 32:20 34:22 37:4,6,21 75:6 92:5
**attorney** 3:4,7 5:9
**attorneys** 2:3 106:14
**aunt** 44:4
**authored** 95:13
**authority** 18:2
**available** 82:10
**Avenue** 3:4,8
**aware** 11:19 23:19,22 32:24 44:12 50:3,5,8 50:9,14,18 62:24 63:8 65:12 66:16 76:11,15,19 81:12 96:24

**B**

**B** 4:5
**back** 20:6 24:3 33:5 41:15 69:6 76:11 93:13 105:10 105:18
**backlogging** 99:17
**bad** 32:8
**Barr** 1:10 3:9
**based** 16:24 19:22 48:7 63:20 78:1
**basic** 40:11

DEPOSITION OF KATE DANIELS

June 13, 2019

Page 109

basically 39:21 48:1,3,11 56:13 80:6 95:16 103:16 104:8 105:23
basis 88:22 99:15
Bates 38:18 52:6
Beck 1:10 3:9 54:11
begged 35:21,22
beginning 47:16 80:20
behalf 3:5,9,14 30:2 44:16 67:8
behavior 29:10 37:11 61:4 66:22 77:3,16 77:18 85:3 92:1,3
Behavioral 16:20 82:12
behaviors 26:5 93:18 94:2
believe 8:12 13:15,18 15:6 16:11 39:15 40:2 42:18 59:9 102:11 104:14 105:20
beneficial 23:16
best 34:23
Betsy 3:12
better 97:10
BIB 104:6
big 98:14
bigger 57:2
bills 82:24
bit 6:16 26:5 33:2 34:10 46:18 79:1
bizarre 66:22
board 22:2 27:14,19

bond 67:11,23
booked 67:21
Booking 34:11 47:1 60:6 61:14 78:10 83:17 102:2 103:11,12
bottom 39:5 49:7
Bouvet 1:13 3:9 96:21
box 1:24 20:22 20:22 24:17 106:7
break 7:18,20 56:22 95:19
breakdown 82:23
bring 22:3
broad 73:14,17 75:13 92:23
brought 12:18 21:22 26:7 66:17 67:3 69:8 70:6 72:12 97:9
build 80:17
built 44:20
bunch 71:1
busy 12:18

C
C 47:19
cal 13:2
Caldwell 14:1,4 92:8,12
call 10:15,24 12:10,17,22 13:3 24:9 34:7 35:10 58:18 78:23 102:11 103:14
called 5:2 47:18 55:2 78:10 86:8 98:3

calling 44:9,12
calls 19:11
capacity 101:10
car 6:4
care 10:14 12:2 12:3,6,9,15 23:10 44:21 53:7 57:1 58:3 58:15 63:16 64:6 66:2 67:17,18,21 68:17,22 69:13 70:1,11,21 71:2 76:24 77:1 78:15 79:13,15,17,18 79:22,23 80:11 80:24
cared 64:3
case 7:13 28:24 33:24 46:15 66:1,12
catatonic 66:22
catch 27:13
category 49:7
Cathy 1:18 2:9 106:5,20
caused 104:21
cc'd 54:23
cell 17:20 43:14 49:8 51:2 83:4 83:20
cells 102:3
Center 8:15,22 9:1,4,19 10:4
CENTRAL 1:2
certain 105:18
CERTIFICATE 106:3
certify 106:8,12
CERULO 1:20 2:7 3:11
chance 7:12 43:18
change 77:5

changes 94:11
channeled 27:23
characterize 91:24 92:3
Chardon 3:3,3 4:14 5:6,9 38:23 39:1 41:12,15 48:22 52:10 65:9,19 66:6,15 100:6
charge 58:18 78:24
chart 20:23 21:4 21:5,5 33:1,7,7 39:7 47:11 54:12,13 56:22 57:3 59:1,2,3,4 59:6,23 78:17 86:18 90:11,12 90:13,17,18 98:18,19 99:7 99:12,14 100:3 101:22 103:18
charted 93:18
charting 99:17 99:18,20
charts 85:10 94:22 99:21
chat 78:9
check 25:13
checked 67:5 96:9
Chicago 3:5
choose 36:4
chooses 105:5,9
CHRISTIAN 106:1
chronic 22:1
circle 24:12
circles 27:14
circumstances 12:12 53:4 64:24 65:10,16 66:19 75:7,11 102:5

classes 16:1
classified 28:9
classroom 103:1 103:3
clear 17:15
clinical 48:1
Clinician 49:20 50:1
close 42:10
cloud 31:1
CNA 10:5
coexist 92:13
coffee 37:13
coincide 47:9 103:18
colleagues 78:6
college 9:21
combined 101:10
come 10:23 20:10 24:20 32:19,20 35:23 36:3 58:5 63:9 102:20 103:8
comes 28:5,21 95:16 96:6
coming 13:11 44:9 54:12 76:11 77:17 95:22
commitment 75:15
communicate 85:14,23
communication 84:16 85:9,11
company 16:6
competent 2:18
complain 58:16
complained 58:14
complains 57:20
complaints 34:6 39:10
completed 13:3

DEPOSITION OF KATE DANIELS

June 13, 2019

Page 110

58:5 99:23
100:1
**completely**
47:17
**compliance**
21:21 26:4,7
26:12 33:13
55:8
**compliance,I**
20:4
**compliant** 23:23
24:14 29:1
**computer** 15:22
**concern** 91:20
**concerned** 33:17
33:22
**concrete** 43:11
**conducted** 5:6
41:8 100:16
**Confidential**
66:11
**conjunction**
55:22
**consequence**
72:8
**considered** 32:5
61:21 70:24
**consistent** 26:8
**consistently** 24:5
25:6,13
**constant** 27:14
84:16 85:6
**constantly** 46:11
46:17 83:8,12
**consult** 71:20,23
77:3,6,7,8 80:5
**contact** 13:6
26:2 48:3
**contacts** 47:11
47:24 48:1,1
**contemplated**
82:17
**context** 80:9
**contract** 81:9,13
**contracts** 81:11

**control** 40:4
**conversation**
42:8,15 43:11
43:13 62:13
76:15,20 78:1
84:13 85:12
91:4
**conversations**
33:12 42:4,22
43:21 45:17
46:2 50:16
85:19 91:12
**copied** 98:12,13
98:18 99:7
**copies** 2:19
**copy** 48:20
**correct** 5:17 6:6
6:6 7:7 8:2,3,7
9:23 12:11
14:4,5 17:15
17:16,21 20:23
21:11 22:7,18
22:19,21 23:4
23:5,7,12,17
26:17,18 27:5
31:9,10,11
32:22 36:16
38:1,2,5,20
39:6 40:5,6
41:6 50:19,23
50:24 52:1
54:3,8 55:8,11
55:16 58:11,22
59:21,22 60:24
61:1 69:21,23
70:2,3 71:8,15
71:18 73:18,24
74:1 79:15
92:10,23 94:4
94:23 97:6
100:14 101:22
104:12,13,19
104:22 105:4,8
105:12 106:10
**correctional**

1:11 3:15 9:10
12:19 85:14
**correctly** 27:1
47:13 48:14
49:11 90:3
99:11
**Corresponden...**
87:16
**count** 29:24
**counted** 57:23
**County** 1:9 3:10
8:6 9:9 11:8
13:11 23:8
24:19 32:21
33:8,15 46:16
52:6,9 60:23
61:9,22 62:2
64:20 66:17,24
67:20 68:2,11
69:19 70:7,12
72:13,19 75:2
77:14 79:19
81:4,7,10,19
82:6 87:1,10
87:24 89:7
91:5,6,9,11,14
94:17 95:9
101:15 106:1
**couple** 41:18
**course** 31:17
94:24
**Court** 1:1,23
32:9 39:3
48:17 52:13
53:23 63:20,21
67:8 75:6
106:6
**coverage** 12:5
**covered** 14:11
15:19
**CQI** 19:23 47:20
47:21 48:1,2
49:1,2 51:10
51:12,17
**CQI's** 51:12,18

51:20 52:3
**Craggs** 1:18 2:9
106:5,20
**create** 18:21
22:6 53:5
**created** 52:20,21
53:2 58:13
99:22
**creation** 53:4
**criteria** 87:13
**CROSS** 4:2
100:10
**CSR** 1:18 2:9
106:5,20,21
**current** 79:4
**currently** 72:1
**custody** 68:2
71:3 75:2
**cut** 7:3

_____

**D**

**D** 4:1
**Dambacher**
11:16 30:8
33:20
**Dambacher's**
20:22
**danger** 80:6
**dangerous** 22:11
**Daniel** 55:10
**Daniels** 1:17 2:4
4:3,6,7,7,8 5:1
5:15 38:23,24
39:1,2 48:16
52:6,12 53:20
53:22 54:4,15
54:23
**date** 8:12
**dated** 38:19
106:23
**dates** 42:21
**day** 16:5 34:12
34:13 43:8,9,9
60:17,18,19,22
66:14 83:24

85:4 97:14,15
99:21 100:5
103:19 104:3,7
104:8,12
106:23
**days** 29:1 66:23
66:23
**deal** 10:21,21,22
10:23 66:14
68:9 75:5 83:1
**death** 50:4 75:16
88:3 91:15
97:5,20,20
98:1
**death's** 97:8
**Deb** 97:22
**Deborah** 54:4,22
55:7
**DECEASED** 1:6
**decision** 17:2,19
**decisionmaking**
100:19
**decline** 28:22
**decompensation**
30:23 75:12
90:21
**Defendants** 1:14
3:9
**definition** 73:14
73:14,17
**deny** 25:21 82:1
**department**
59:21 77:22
**depends** 22:14
83:19
**deposed** 5:21 6:2
**deposition** 1:17
2:3,14,15,19
6:7 7:8 20:15
21:8,9 66:4
73:14
**depositions** 2:18
**depth** 90:10
**describe** 12:12
34:16,18,20

ASSSOCIATED COURT REPORTERS
1-800-252-9915

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 111

64:24 65:9 66:19
**described** 69:22 73:24
**descriptive** 34:23
**desire** 19:4
**desk** 13:1 20:11
**detail** 90:10
**details** 16:7 50:7
**Detainee** 89:1
**Detainees** 87:20
**determination** 17:23 29:21
**determine** 21:16 25:6,7 26:12 28:16 59:24 101:14
**determined** 64:3 78:13 101:10
**diagnose** 40:20
**diagnosis** 40:7 40:18
**different** 7:9 12:24 15:11,12 16:9 19:23 23:21 25:24 27:22 28:23 31:2,20 33:9 35:12 37:15 42:22 56:23 57:1 59:18 61:13,13,23 73:7 74:6 77:11 88:6 89:20 94:12 96:6,18 97:11
**differently** 11:21 72:11 94:7
**direct** 4:2 5:5 12:6
**directly** 68:21
**Director** 18:2 23:5

**dirt** 36:18
**discharge** 78:18
**discuss** 14:13,16
**discussed** 63:9 82:5
**discussion** 29:20 62:23,24 69:16 76:10
**disorder** 40:5
**distribute** 19:14
**DISTRICT** 1:1 1:2
**Doctor** 12:21,21 14:3 20:17,20 20:22 21:23 22:4,16,17 30:8,9 33:20 33:20 34:8 39:17 41:1,7 64:13 71:19 76:24 77:1,2 92:12 94:10 101:11,13 103:7 105:5,7 105:9
**Doctor's** 22:3
**Doctors** 48:5 104:24 105:13
**document** 19:24 21:18 29:6 43:1 45:11 47:3 48:19 52:5,16 53:5 56:24 57:18 86:13,20 87:17 96:14
**documentation** 40:9,9 47:22 47:23 49:24 50:10 59:5 86:17,17 89:16 97:11,12,16 105:17
**documented** 50:17,19 56:18

59:16 101:21 103:19
**documenting** 43:9 47:5
**documents** 85:21,23
**doing** 11:1 16:6 24:24 30:14 33:5 36:13 37:15 47:22 51:12 52:3 66:4 85:3
**door** 46:12,19 50:22,23 51:8 83:4,15
**downstairs** 60:6
**drinking** 66:24 73:2
**dropped** 67:11 67:14 68:16
**due** 77:3
**duly** 5:3
**duties** 10:10 12:4,10 25:4 25:12 51:13
**duty** 19:19 20:6 25:15,17,18 26:12 29:24 47:14 94:24

---

**E**

**E** 3:9 4:1,5
**e-mail** 54:4,23 55:15,20
**e-mails** 54:2
**Ealey** 1:13 3:9
**earlier** 26:16 28:13 31:6 50:20 72:22 78:12 83:10 91:21 92:7 93:19 97:18
**easily** 45:4
**eating** 66:24 73:2

**education** 15:24
**effectively** 23:1
**either** 20:21,21 54:3 91:18
**EK** 5:18
**EKD** 5:18
**Ember** 49:18,19
**emergency** 9:8 59:21 64:11,13 67:12,15,24 68:2,22 70:22 73:4,10 76:21 76:23,24 77:1 77:2,4,10 104:16
**employed** 8:1
**employees** 11:8
**encompasses** 71:1
**engage** 43:13 85:10
**entail** 10:20
**entire** 14:6 60:23
**entries** 53:13
**ER** 33:4 65:13 66:18 67:3,12 69:8,19 70:7 71:4 72:23 73:22 76:17 78:12,12,19 79:6,22 80:10 80:10,23 81:23 82:4
**Erin** 5:15
**Ernest** 20:16
**Ernest's** 20:14 21:9
**Esq** 3:3,7,12
**Estate** 1:6 5:10
**evals** 49:8
**evaluate** 54:12 56:13
**evaluated** 16:23 26:2 39:22,24

53:11 56:7,16 58:18 60:5,7 76:20 77:10,20 84:3
**evaluating** 57:20 57:22
**evaluation** 77:23 77:24
**evaluations** 11:1 11:4,5,11,13 11:18,21 53:14
**event** 39:16,20 53:2 57:17 78:24 85:4 86:7
**events** 13:16 29:9 32:8 37:21 38:1 56:8 67:16 74:12
**everybody** 13:6 27:18 43:14 84:4
**everyday** 25:5 25:19 43:10 45:23 94:8
**exact** 13:14,20 14:8 16:18 28:24 36:1 39:16,20 70:8 74:4
**exactly** 18:18 31:15,22 58:1
**Exam** 103:11
**EXAMINATI...** 5:5 100:10
**example** 22:20 48:24 49:6 58:12 59:14 65:11 66:3,16 70:16 73:1,21
**excited** 32:13 42:6,14,17
**excuse** 7:4 24:3 32:7 64:6

DEPOSITION OF KATE DANIELS                    June 13, 2019

**Exhibit** 4:6,6,7,7
4:8 20:14 21:8
39:2 48:13,16
48:21,23 52:12
53:20,22 86:21
96:21 104:2
**EXHIBITS** 4:14
**exist** 47:2
**existed** 100:5
**existence** 97:4
**expense** 2:21
**explained** 6:13
**extensive** 99:18
**eye** 27:13 59:15

**F**

**facility** 10:18
17:8,23 19:10
27:4 46:14,23
46:23 49:19,21
50:17 63:11
71:17 72:12
96:6 100:23
103:15 104:16
**fact** 24:15 38:6
74:11 91:17
**factor** 18:21
26:20 32:2,9
32:12 90:22
92:21
**factors** 14:16
18:11,13 31:8
31:13,18 34:24
59:15
**fair** 7:21 101:11
**fall** 75:23
**familiar** 48:19
61:7 70:4 76:6
76:7 81:9
86:12
**family** 43:24
**far** 100:19
**February** 38:19
**feel** 7:7,10,14,19
44:4 70:10

99:7
**feels** 81:20 82:1
105:7
**felt** 44:20 77:2
79:17 80:5
91:10
**file** 89:20,20
90:4 99:22
**filed** 20:23
**files** 90:5
**fill** 12:4 88:7,8
88:11,13,14,17
88:19,20,22
**filled** 20:18
29:14 86:6,24
87:2,3,5
**fills** 16:22 20:8
86:16
**financially**
106:15
**fine** 30:17 66:13
73:13
**finish** 7:1,2,4
83:16
**fire** 41:13,17
**fired** 50:4
**first** 8:10 9:22
14:24 46:21
59:4 66:21
68:8 83:20
**fit** 62:11
**five** 14:6 30:18
**flag** 24:5,13 27:8
**flagged** 27:2
**floor** 9:6 102:19
102:22,23,24
103:1
**follow-up** 72:2,3
**following** 60:3
**follows** 5:4
**foot** 71:7
**force** 25:22 66:7
**foregoing** 106:9
106:9
**foresee** 10:12

**forgive** 76:12
**form** 16:20
20:10,16,17,19
29:5 45:6 86:4
86:15,22,24
87:2,8,17,21
87:23 88:2,3,8
88:19,22 89:4
89:6,11 90:7,7
97:3,4
**formal** 28:3
**forms** 20:9 21:1
29:17 30:1
86:2 89:14,15
89:23 90:1,2
102:12
**forth** 96:15
**foundation** 2:17
**fracture** 71:24
**framework**
76:14
**free** 7:10,19
**frequency** 101:9
**Friday** 42:18,20
**front** 59:1,3
**full** 5:13,15 7:11
56:22 100:2
**furnished** 2:20
**further** 106:12
**future** 18:21
19:1

**G**

**G** 3:3
**gather** 98:10,16
**gathered** 79:17
98:9
**general** 23:13
29:4 72:9
95:12
**generalizing**
42:11
**gentleman** 73:1
**gesture** 45:16
**gestures** 18:24

32:4
**getting** 25:13
32:14 42:6,7
42:17 58:14
66:2 74:12
79:12 87:13
98:2
**give** 16:7 38:12
43:21 49:17
58:12 66:2,5,8
67:7 73:7,8
74:4,5 79:1
80:3 84:5,11
96:10
**given** 67:10,23
68:1,1,8
**gives** 49:17
**giving** 46:9
**go** 5:16 6:16
7:12,20 12:14
16:1 21:2,13
21:14 22:1
28:1 31:3,20
33:1 34:7
40:23 41:12
42:9,12 44:6
47:10 55:18
56:23 62:18
73:7,22 83:17
83:23 87:14
89:19 90:4,8,9
90:10,11 96:17
99:21
**God** 43:3 91:6
95:17
**goes** 20:21 39:18
90:12 102:1
**going** 10:6 13:2
20:13,14 21:8
22:4 27:9,24
29:13 36:12
38:17 42:12
43:13 44:6
45:2 47:7
48:13 52:5

53:20 55:21
57:13,14 66:7
67:17 73:10,12
74:12 76:23
80:13 84:23
85:17,18 86:19
90:9,10,11
95:21 98:13
101:9 102:1
**good** 5:7,8 6:24
13:6 42:16
46:1 77:15
**gotten** 13:15
77:9 79:17,22
**graduated** 10:2
**great** 26:2
**guarantee** 44:17
**guess** 6:1 10:12
17:10 20:4
28:20 30:7
59:6 62:21
75:13 79:19
94:7
**guideline** 101:5
**Guy** 1:13 3:9

**H**

**H** 4:5
**half** 8:9
**hand** 38:17
86:19
**handoff** 67:12
**hands** 36:20
91:18
**handwriting**
39:7
**happen** 64:17
69:7 82:3,15
**happened** 56:4
63:14 65:1
66:4 67:13
74:7,7 82:22
85:4 86:7 98:1
**happening** 63:1
76:7

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 113

happens 28:11
harm 18:24 32:1
  32:4 37:20,21
  71:18 72:14
head 6:19 53:6
  56:14 57:18
  58:1 74:11
health 7:24 8:5
  8:10 9:15 10:9
  10:10 12:1
  13:10,10,17
  15:11 16:3,15
  16:20,22,23
  17:6 22:23
  23:10,17 24:10
  26:19 28:22
  32:7 46:1,15
  46:22,24 47:3
  47:8,9,10,17
  47:22 48:11
  49:5,8,13,16
  50:10,12,13
  53:18 60:1,5,8
  63:17,24 65:22
  66:10 67:6
  75:12 77:7
  78:14 82:13
  86:10,14,15,16
  86:21 87:8,16
  87:20 88:9,20
  89:11,14,15,23
  90:1,2,14,21
  90:23 91:2
  94:9,13,14,18
  94:19,20 95:3
  95:4,6,8 99:3
  99:10,12,13
  100:16 101:4
  101:16,19
  102:12
healthcare 1:11
  3:15 10:17
  11:22 37:19
  79:7 80:24
  81:3,7 100:13

102:15 103:8
heard 44:2
hearing 26:10
  26:24
held 8:8
help 12:20
helpful 64:16
  68:13
HENDERSON
  1:20 2:6 3:11
hereto 2:16
hey 43:13
HEYL 3:6
Hicks 66:3 86:13
  86:21
High 16:24 17:3
  17:14,20 19:12
  34:8 39:17,22
  40:23 41:1,4,8
  46:21,21,24
  47:3 60:4,4,9
  60:12,16,24
  61:3,8,21 62:1
  62:9 100:24
  102:3,6 103:9
  103:10
hire 8:12
hired 13:19
  14:10,24
history 66:21
  77:15 78:22
  79:2
Hold 69:14
holding 86:13
honest 32:14
  58:19
honestly 53:9
  55:19 56:8
  57:8
hospital 68:15
  68:17,18 72:17
  79:10 104:24
  105:14
hour 1:19 2:5
  60:19

hours 37:18
  81:13
housing 90:19
HSA 10:9
huge 31:1 64:10
  92:23
Huh-uh 63:5,7
hurt 72:1
hyperbole 46:18

I
idea 68:10
identification
  39:3 48:17
  52:13 53:23
identify 31:11
identifying
  65:17
III 1:13 3:9
Illinois 1:2,9,21
  1:21,24 2:7,8
  3:5,10,13 98:3
  98:10,16 106:1
  106:7
illness 13:10
  18:8 66:22
immediate 55:1
immediately
  51:16 60:3
  65:13
imminent 80:6
impending
  32:11
impulse 40:4
impulses 92:13
inappropriate
  35:1,3
incarcerated
  24:19 32:20
  37:20
incident 39:9
  60:1,7,10
incidents 35:7
include 103:22
including 78:18

90:19
inconsistency
  26:8
incorporating
  63:16
indicate 18:24
  93:20
indicating 54:16
  86:12 89:21
indication 30:12
  30:13,22 32:1
  93:5,10
indicator 32:12
individual 84:2
  95:13,13,15
  96:7
information
  7:12 27:23
  50:2 65:17,20
  65:22 67:7,15
  80:4 85:22
  88:8
injuries 71:14
  104:21,22
injury 72:4,4,6
  72:20 93:6
Inmate 12:18
  20:9 21:12
  26:6 54:11
  61:3 67:21
  87:12 96:5,7
Inmate's 21:13
Inmates 47:1
  60:4 61:6 87:3
  87:5 95:14
  97:13 102:23
  103:1
inpatient 63:10
  64:4,6 67:6
  70:13
inside 51:1
instance 1:18
  2:8 5:2 39:14
  69:9,18,24
  71:16 73:21

79:13
instances 45:22
  61:7,11 69:7
  70:4,5 73:23
  74:2 75:3 82:4
  85:19
institution 9:15
  62:14,15,19
  64:7
Intake 83:18
intended 100:2
intent 84:20
interact 8:24
interacted 43:2
interacting 34:3
  41:20
interaction 35:9
interactions
  42:16 43:10
interested
  106:15
interpretation
  96:1
interrogatories
  2:5,10
intervene 80:11
Interview 86:14
  86:22
interviews 95:7
inventory 24:2
involuntary
  64:12 67:9,9
  73:11 74:13,14
  74:16,17,17,23
  75:15 77:24
involved 13:7
  16:21 50:16
  106:14
involving 71:17
issue 26:16,20
  33:12,12 40:3
  45:1 91:13
issues 13:10 29:9
  73:15 103:20
items 45:1

DEPOSITION OF KATE DANIELS

June 13, 2019

## J

**J** 1:18 2:9 106:5 106:20
**Jail** 8:6 9:9 11:8 11:23 13:11 16:15,17 23:8 24:19 32:14,21 33:8,15 46:16 48:4 57:6,7,8 58:22 60:23 61:9,22 64:20 65:14 66:2,17 66:24 67:20 69:19 70:7,12 72:13,19 75:2 77:14 79:19 81:4,7,10,14 81:19 82:6 84:19 85:13,24 87:1,10,24 89:7 91:5,6,9 91:11,14 94:8 94:17 95:9,16 96:16,17 101:15 105:10 105:13
**Jails** 14:14
**January** 51:14 51:17
**Jennifer** 1:13 3:9
**Jessica** 54:13
**job** 7:23 8:8 9:22 10:4,8 12:3,10 19:19 25:11 26:11 29:24 30:4 47:14 49:16 51:13 55:7
**Johnson** 15:14
**JOHNSTON** 1:20 2:6 3:11
**joining** 14:20
**JR** 1:10
**judgment** 22:17

## K

**Kate** 1:17 2:4 4:3 5:1,16 43:13
**Kathryn** 5:15
**KELLI** 1:5
**kill** 19:5 36:21 37:1 80:2
**kind** 7:12 11:2 15:12 26:5 27:1 28:3 29:6 30:15 45:15 46:5 47:2 56:23 57:21,24 68:9 73:5,22 77:18 79:1 85:4 96:8
**kinds** 31:2,18,20 35:7 70:15 73:6,9 74:6 82:13 97:11
**knew** 26:3 77:16 83:22
**know** 6:12 7:14 12:19,20,24 13:6,14 15:3,5 16:2,6,10,13 16:15 23:2,9 24:3 25:18,19 25:24 26:4 27:18,20 28:1 28:22 29:7,9 29:11,14 30:2 30:18 31:17,18 32:8 33:7 35:11 36:9 37:14,14,14,16 37:17 40:14,15 43:11,16,16,18 44:7,15,24 45:6,7 46:3,4,7

## July 106:23
**June** 1:19 2:5 3:1

48:2,2,8 50:7
51:7,18,19,20
52:2,20,22
53:6,10 55:23
56:15 57:1,7
57:11,15,22,22
57:23 58:1,1,2
58:17 59:2
61:19 62:9,10
63:4 67:8,13
67:19 68:4,6,7
70:6,8,24
73:20 75:3,5
75:17,22 76:9
76:13,13 77:22
77:24 78:1
79:2,11,14
80:1,2,3,4,6
82:21,23,24
83:1,6,13,17
83:21,22,22
84:1,5 85:2,4,5
91:19 92:11
94:13 95:4,5,6
96:4,9,16,18
96:20 97:10,14
99:16 100:15
100:22 101:3,3
101:5,6 102:5
102:16,17,21
103:1,3,6
104:5
**knowledge** 31:7 44:8 61:22 83:2 98:21,23
**Kyle** 1:12 3:10

## L

**L** 2:1
**label** 52:6
**Larry** 1:10 3:9
**late** 51:19 75:23
**laugh** 78:8
**Law** 3:4,7
**lawyer** 6:13
**lawyers** 40:11
**leave** 42:6 68:19 72:18
**left** 68:20 72:18
**legal** 54:13
**let's** 11:2 24:2 38:11 59:14 86:20
**letter** 35:13,16 35:20 41:21,23 44:3,24 45:9
**letters** 42:1 44:16,18
**license** 10:1 50:13 106:21
**licensure** 8:16
**Lieutenant** 37:13
**life** 36:4
**limit** 72:6
**limitations** 104:17
**line** 54:7 55:9
**list** 79:5
**listed** 12:9
**listening** 13:4
**literally** 90:1
**little** 6:16 26:4 46:18 79:1
**live** 15:23 42:9 42:12 44:6 99:14
**lived** 42:9
**lives** 56:19
**LLC** 3:3
**lockdown** 49:8
**Logan** 77:18
**logistics** 96:4
**long** 8:8,21 15:10 16:5 23:15,20 26:17 26:21 28:9,15 28:16,21 51:12 52:2 57:12 61:21,24 63:16

64:10 75:17,19
80:20 83:12
84:4,6 92:22
95:20 105:6
**longer** 50:6
55:14 95:21
**longest** 83:14
**look** 21:3,4,6
27:12 28:1
33:6 35:9 41:4
56:22 59:13
86:12 90:5
94:22 95:15
103:18
**looked** 95:2
**looking** 21:14
93:13,19
**lot** 29:2,7 43:17
45:24 56:20
57:17 58:19
84:2 102:8
**lots** 28:22 34:4
46:16 56:23
84:23
**loud** 71:12

## M

**M** 3:7
**M.D** 3:14
**mad** 29:11
**mail** 41:23
**making** 40:18
**Manager** 10:21 49:18 55:2
**managerial** 11:2
**mandatory** 15:2 15:5
**manipulate** 37:10,11
**manipulation** 92:12,13,21
**manipulative** 18:24 32:5 34:22 37:9,11 37:22 93:5

DEPOSITION OF KATE DANIELS                  June 13, 2019

| | | | | |
|---|---|---|---|---|
| **MAR** 21:3,7,9 21:13,15 24:8 24:10 27:24 **MAR's** 19:17 26:12 27:9 **Marcelo** 54:22 54:23 **mark** 38:22 48:13 98:13 **marked** 39:2 48:16 52:12 53:22 86:20 96:21 **marking** 52:5 **Mary** 11:16 20:21 30:8 33:20 **mattress** 36:19 **McFarland** 63:17 64:6,8 64:10 77:15 78:18 **mean** 10:15 18:17 23:1,12 26:1 27:13 28:11,16,24 29:2 30:16,19 30:24 31:2 33:9 35:8 43:7 43:9,22 47:7 61:12,19 62:21 62:21 63:2 65:2 68:14,23 70:10,16,17,19 73:5,6,7 74:4,5 74:20 78:8 82:1,9,12 84:11,17 85:16 92:23,24 94:6 95:20 96:5,23 97:1,9 103:23 **meaning** 63:4 69:1 70:10,22 72:15 **means** 6:24 | **meant** 13:10 26:13 50:12 61:6 69:4 70:1 **med** 19:13,16 **medical** 5:20 6:1 8:15,21 9:1,3 9:19 10:4,12 16:22 20:20 22:16 23:5 24:24 26:3 27:17,18 29:24 30:24 31:19 34:6 38:19 40:15 41:5 45:15 47:10,17 52:11,24 53:15 53:16 55:22 56:8,19 57:24 58:13,17,21 59:6,23,24 60:5 62:8 63:23 64:2,6 75:12 78:17 81:20 84:24 85:9 86:9,10 87:19 88:7 89:20 90:5,12 93:19 94:19,22 95:2 98:10,20 98:22,24 99:2 99:14,22 100:2 102:7,14 103:11,11,20 103:20,22 104:3 **medically** 59:19 **medication** 19:17 20:2,9 20:10,16 21:1 21:9 22:12,14 22:15,18 23:9 23:16,20,23 24:6,12,13,21 25:2,12,19,20 25:20,21,22 | 26:4,7 27:7,8 27:15,17,19 28:5,8,14 30:5 30:13 32:22 33:8,13,18,19 45:6 48:8 79:5 94:11,11 103:23 104:3 **medications** 19:14 20:1,3 21:17,19 22:2 22:6,13,21 24:14 25:5,14 25:23 26:9 27:21 29:1,3 30:10,10,12,22 48:5,8 67:1 104:7,9 **medicine** 26:21 **medicines** 26:17 **meds** 29:10,12 **meet** 54:10 **meeting** 54:7,9 54:18,19,21 55:16,18,23,23 56:2,3 97:22 97:23 98:5 **meetings** 40:23 97:19,24 98:2 **Melissa** 14:1 92:8 **members** 43:24 **memorandum** 96:22 **Memorial** 8:15 8:21 9:1,3,19 10:4 82:12 **memories** 41:19 43:19 **menta** 86:3 **mental** 9:15 11:22 12:1 13:9,17 15:11 16:3,15,20,22 16:23 17:3,6 | 18:7 22:23 23:10,17 24:10 26:19 28:21 30:22 32:7 46:1,15,22,24 47:3,8,9,10,17 47:22 48:10 49:5,7,13,16 50:10,13 53:17 60:1,5,8 62:14 62:15,18 63:10 63:17,24 64:4 65:22 66:10,22 67:5,6 75:12 77:7 78:14 79:7 80:23 81:3,7 86:10 86:13,15,15,21 87:8,16,19 88:8,20 89:11 89:14,15,23,24 90:2,14,21,23 91:2 94:9,13 94:14,18,19,20 95:3,4,6,8 99:3 99:10,12,13 100:13,16 101:4,16,19 102:12 **mentioned** 21:20 26:11 32:19 37:2 78:12 84:15 **method** 26:15 27:1 **Meyer** 1:12 3:10 **Michael** 1:12 3:15 **Mickey** 45:21,23 46:5,9,11,15 47:4,15 49:20 49:22 50:3,16 50:21 83:3 84:13 101:24 102:9 | **Mickey's** 101:10 **mine** 59:1 **minimum** 28:7 **minute** 38:12 52:8 78:9 **minutes** 84:6 95:22 **mischaracteri...** 80:14 **missed** 35:22 36:3 **missing** 24:5 25:1 27:8 33:17,23 **modification** 94:11 **Mom** 42:9 **monitor** 25:5 30:4 **monitoring** 24:24 25:12 **month** 19:24 20:1 48:6 64:23 **monthly** 48:3,12 **months** 61:8 76:1 **mood** 78:1 **mother** 35:13,18 35:21,22,22,23 35:24 36:2 41:21,23 43:24 44:1,2 **motivated** 19:4 **mouth** 28:18 35:11 38:13 84:18,21 **move** 17:19 **multiple** 15:10 24:15 77:9 79:16 97:15 |
| | | | **N** | |
| | | | **N** 2:1 4:1 **name** 5:9,13,15 | |

DEPOSITION OF KATE DANIELS

June 13, 2019

Page 116

13:14,20 24:12
35:10 90:9
**names** 63:14
66:5,8,10
**necessarily**
12:22 21:2
57:16 59:6
77:6 86:16
**necessary** 105:7
**neck** 78:11
**need** 7:3,7,15
19:5 37:20
66:15 70:12,12
71:11 76:17
77:2 82:1
95:18
**needed** 45:18
62:13 64:3
71:7 103:21
**needs** 81:20
105:1,18
**Negative** 39:12
39:13
**never** 12:22 44:8
44:10 62:23
77:21
**new** 7:9 97:3
**news** 32:8
**nice** 36:13 44:23
45:16
**Ninth** 3:12
**Nod** 6:20
**nods** 6:19
**non** 71:17
**noncompliance**
23:16,20 26:17
26:21 27:2
28:9,15,16,21
29:3,8
**normal** 99:15
**Norman** 15:13
**note** 38:19 41:5
78:21
**notes** 47:10,12
47:15 106:11

**notice** 83:21
**notified** 24:12
**notify** 78:23
**November** 49:22
**number** 14:8
28:8,10,24
29:24 38:18,21
70:5,8 91:20
**numbers** 47:24
48:11,12 49:13
49:14,17 74:4
**Nuri** 54:22,23
55:1 97:23
**Nurse** 8:17,18
9:5,8,22 11:13
12:18,23 17:8
17:13 22:17
23:3 31:4,18
41:11 55:2
78:24 81:13
93:23,24 95:8
104:9
**nurse's** 25:18
**nurses** 17:22,23
**nursing** 10:2
11:10,12,24
22:2 25:16
47:9

---
**O**

**O** 2:1
**oath** 5:3
**object** 80:13
**objects** 36:18,22
37:2,7
**observation**
16:24 17:20
48:1 61:21
62:1 89:1
**observed** 83:15
**obtain** 65:20
66:9
**obviously** 59:9
65:16 73:2
**occurrence**

56:11
**occurrences**
79:16
**October** 8:12
76:1
**offender** 42:10
**offer** 25:18
27:20
**office** 45:23
71:20 84:12
102:19,19
**Officer** 12:19
16:21 17:12
**Officers** 68:11
**oh** 10:12 12:14
23:15 29:7
35:7 54:15,16
72:7 84:22
91:6 93:2
95:17 97:1
100:4 105:16
**okay** 5:23 6:4,12
8:10,19 9:24
10:3 11:7,16
11:20 12:2
13:21 14:3,11
14:19 15:1
17:5,22 18:1,6
18:13 20:6,8
20:24 21:7
22:6 23:3,15
26:10 29:7
32:24 33:22
38:17 39:9,13
39:19 40:1,13
40:16,22 41:3
45:8 47:2
48:10 49:3,10
50:3,8,15,20
51:7,23 52:2
52:20 53:1,3
55:3,13,15
56:15 57:21
58:20 59:13
60:20 62:16,24

63:13,22 64:1
64:16 67:2
69:6 72:5,7,22
73:12,16 74:2
74:9,16 75:7
75:14 76:10
81:18 82:15,17
83:14 84:8
86:19,24 87:5
87:9,14,19
88:5,6 89:17
91:7 95:12,24
96:10 97:3
98:7,15,21
99:5,9,11
100:6 101:8,21
102:5 103:5,13
103:22 104:8
104:11 105:20
**old** 72:4
**on-site** 20:20
**once** 30:24 104:8
**one's** 19:5
**ones** 37:5 43:20
**ongoing** 15:24
21:24 40:2
51:23
**opened** 59:4
**opinion** 28:20
32:15
**opportunities**
77:9
**opportunity**
7:15
**opposed** 6:18
**oral** 2:4,10 85:9
**order** 21:5 65:21
66:11
**orders** 63:21
**ortho** 71:20
**orthopedic** 33:3
**outpatient** 64:5
**outside** 33:3
62:14,18 63:20
71:17 72:12,12

72:16,16 79:6
79:7,12 80:10
80:23 81:21
83:15 102:2
103:15 104:16
**overhear** 13:4
51:4
**oversee** 10:17
11:22
**overt** 92:20

---
**P**

**P** 2:1
**p.m** 1:19 2:6
**P.O** 1:24 106:7
**page** 4:6 49:6
72:10 87:14,19
89:3
**pages** 88:24
**paper** 36:8
**paperwork**
68:18,19
**part** 12:3 13:21
14:6 15:6
19:19 26:11
29:20,23 40:18
47:14,21 51:13
51:17 52:23
59:2,6 62:12
90:13 94:22
**participate**
100:13,18
**participating**
97:19
**particular** 9:6
24:3,8
**parties** 2:2,16,20
66:1 106:14
**parts** 42:15
**pass** 19:13,16
77:5 103:23
104:3,4,9
**passed** 75:18
**patient** 10:14,22
12:2,3,6,9,15

ASSSOCIATED COURT REPORTERS
1-800-252-9915

DEPOSITION OF KATE DANIELS                    June 13, 2019

13:5,6 16:21
16:23 17:3
21:24 22:7,11
22:15,18,20,24
24:5,8 28:2
30:14 34:21
39:18 40:20
47:11 48:8,9
56:13 59:20
64:15 68:11,12
68:15,21,24
69:2 82:6 89:9
89:12 90:9
95:16 100:15
100:24 101:1,5
101:15 102:1,7
102:8 105:6,6
105:10
**patient's** 25:17
**patients** 28:22
46:13 48:5
80:12 82:11
102:9 103:8
**pay** 58:17 75:6
**paying** 82:22
**payment** 58:16
82:23
**payroll** 10:14
**pays** 25:16 83:1
**pen** 35:14 36:8
36:12,14 45:5
**pending** 7:20
**pens** 36:19
**people** 20:4
30:17,19 32:13
43:12 46:16
55:15 57:8,9
57:11,12,22
61:14 63:1,2
66:1,5 82:14
82:19 88:18
94:8 97:11,13
99:18 102:2,6
102:14,19
103:2,10

**percent** 27:15
**percentage**
19:24 20:2
21:18
**perfectly** 30:17
72:24
**period** 56:17
61:20 83:14,19
84:4,6 92:1,4
**person** 27:16
34:16,19,21
64:5 65:23
69:10,24 75:1
75:1 84:3
100:22 101:24
**personal** 83:2
93:22,23
**personally** 34:3
76:7
**pertained** 98:22
**pertains** 74:17
98:8
**petition** 67:9,10
73:11 74:13,16
74:17
**petitions** 74:14
74:23 75:15
**phrase** 28:19
**physical** 71:14
71:18,22 72:8
72:14,20 73:2
90:4
**physically** 49:18
**physician** 23:2
**Pica** 36:9,15,17
70:24
**pick** 24:4 27:7
**picked** 24:23
**picture** 57:2
**pieces** 56:5
**Pineda's** 71:20
**place** 17:6 24:1,4
26:1 96:5 99:1
99:14
**placed** 16:23

104:17
**placement** 88:24
90:19
**places** 82:13,18
82:20 102:17
**Plaintiff** 1:7,19
2:8 3:5 5:3,10
**Plaintiff's** 38:17
87:15
**plan** 16:14 94:15
94:18 95:3,4,6
95:10,12 96:2
96:15
**planned** 42:14
**plea** 92:5
**please** 5:14 6:18
7:18
**point** 20:24 28:8
32:17 38:7,14
50:9 58:20
60:15 65:10
67:20 76:22
96:8,15
**pointing** 20:14
**police** 50:13
98:3,11,17
**policies** 62:2,5
96:5,16
**policy** 16:9,14
61:24 62:8,10
62:11 97:3
**population** 20:2
21:18
**portions** 2:15
**position** 55:12
55:13
**possible** 88:5
98:24
**potentially**
72:10 79:12
**Powell** 3:7 38:21
48:21 52:8
65:5 71:11
100:8,11
105:20

**power** 95:24
**PowerPoint's**
15:22
**Practitioner**
22:17 41:11
**practitioners**
10:18 11:14
12:23 27:3
**pregnancies**
15:12
**prepare** 55:21
56:9
**prepared** 49:3,4
56:4 57:4 59:8
**prescribed**
22:12
**presence** 92:13
**present** 19:11
22:23 23:10
38:3 40:22
**presentations**
15:23
**presented** 14:1
15:13 61:4
76:18
**PRETORIOUS**
1:20 2:6
**PRETORIUS**
3:11
**pretty** 10:15
13:5 33:7
66:23 77:15
**prevention** 16:9
16:14 95:10
96:2
**previously**
104:15
**prior** 9:9,19,19
10:3 18:20,23
32:1,4 51:19
51:21 60:9
69:11 75:15
77:17,18 91:14
**prison** 32:11
**prisoner** 57:5

58:13 63:10
**prisoners** 58:8
66:10 79:8
80:12,24 85:24
**Prisons** 14:14
**probably** 6:12
6:13 16:4
51:14,17 74:7
95:20 98:7
101:4
**problem** 50:10
80:18
**problems** 10:23
104:18
**procedures**
96:17
**proceedings**
106:9
**process** 24:1,4
51:23,23 64:10
100:19
**product** 49:1
**Production**
38:18 87:15
**professional**
8:16 31:19
80:9 81:22
**professionals**
11:23 80:23
**progress** 38:19
41:5
**proof** 2:17
**protective** 65:21
**protocol** 16:14
16:14,17,19
101:4
**provide** 12:2,3
12:15 20:17
47:24 53:6
70:11 79:3,7
79:15 81:3,6
97:12 100:2
**provided** 14:23
15:4 20:20
24:8 36:8

DEPOSITION OF KATE DANIELS                    June 13, 2019

Page 118

37:13 49:23
53:7 56:7 58:2
58:21 67:15
73:1 79:4
98:16
**provider** 24:7
30:7 79:24
81:20 82:1
**providers** 64:2
79:7 80:10
**provides** 49:13
50:2
**providing** 37:19
48:4 51:8 58:2
59:7
**psych** 9:17 64:13
74:18,19,21
77:6,7,8,23,24
80:5
**psychiatric** 9:13
33:18 53:13
64:4,12 65:13
69:8,20 70:7,9
70:11,15,18,22
71:1,1 72:13
73:15 76:17,21
77:3 78:22
79:11,12,15,22
79:23 80:11,24
81:21
**psychiatrist**
45:18 72:16
82:7,10
**psychiatry** 49:8
64:14 72:15
81:21
**psychological**
86:3,9,10
**psychotropic**
21:17,19 22:21
23:9,23 26:21
30:5,12 33:18
**psychotropics**
20:1 30:18
**punching** 37:14

**purely** 72:13
**purpose** 2:17
27:6
**pursuant** 1:22
**put** 17:3,14,17
28:18 35:10
38:13 56:5
58:17 59:3
80:3 84:17,20
86:17 88:7
**puzzle** 56:6

**Q**

**quality** 19:23
**question** 7:1,3
14:18 23:14
25:9 29:14
31:16,21 52:4
55:21 59:18
62:16 63:3
65:8 67:14
72:23,24 76:11
80:19,22 83:5
84:21 85:17
87:7 88:10
96:3,19 98:8
**questions** 7:19
10:24 40:12
94:21 100:7
**QUINN** 1:20 2:6
3:11
**quite** 32:14 33:2
34:10 58:19
80:19

**R**

**reach** 44:10
**reached** 79:24
**reaction** 97:7
**read** 39:10 90:13
90:15,16
**reading** 2:13
**ready** 42:6
**real** 38:3
**realize** 29:8
**really** 14:18 31:2

42:14,20 57:7
57:11 59:17,19
88:23 92:6
**reason** 72:19
73:23
**reasons** 19:23
25:24 33:9
65:13 69:9,20
70:7,9,16,18
70:22 72:13
73:3 76:18
79:11
**recall** 19:7 24:22
33:11 38:9,10
39:14 97:19
**receive** 9:24
75:1,4
**received** 13:9,13
**receiving** 25:6
79:18
**recess** 41:14
**recognizance**
67:11,23 69:10
**recognize** 18:7
18:10,14
**recognizing**
14:13
**recollect** 35:3
**recollection** 34:2
**recollections**
35:6,8
**recommendati...**
105:1
**record** 5:13 6:24
7:11 21:10
25:13 41:3,13
41:16 66:8
69:16
**recorded** 36:6
**recording** 6:17
**records** 5:20
19:16,17 25:1
27:7 33:4
40:15 47:2
49:12 52:24

95:2 98:9,10
98:16,22 99:1
99:2,3,12,13
**recount** 65:16
**RECROSS** 4:2
**red** 24:13
**REDIRECT** 4:2
**refer** 64:5,9
82:11,19
**referral** 28:6
60:6 66:11
81:21 86:4
**referrals** 72:23
76:7 86:9,11
102:7,8,8
**referred** 62:14
65:12 69:19
73:4 82:6,9
**referring** 77:7,8
77:23
**refers** 16:22
**reflect** 53:13
**reflected** 94:3
**refusal** 20:9,16
21:1 22:1,6
27:19 28:6,14
29:17 30:1,11
45:6
**refusals** 20:5
21:3 24:16
28:2,8 33:8
**refused** 20:9
**refusing** 24:20
27:16 29:12
32:21
**regarding** 55:16
61:24 104:18
**regardless** 62:10
93:4
**regards** 6:2
10:23 11:3,10
12:6 13:19
15:7 16:5,8
18:15 21:24
22:10 23:11

24:7,11 26:4
28:11 31:13,22
33:2,6 34:15
35:4 39:24
42:11 44:5,21
47:4,9,11,12
47:24 49:22
52:22 56:1,3,5
56:6,12,13,17
57:15 59:5
62:2,8 63:15
63:16 67:16
70:16 71:2,3
71:20,23 72:3
73:10 74:13,15
76:20 79:9,10
84:14,23 85:7
86:18 90:23
93:23 95:17,17
98:4 99:19
100:23 103:17
**Regional** 55:2
**Registered** 8:18
9:5
**regularly** 12:3
30:6
**related** 72:19
91:2 103:14
106:13
**relationship**
44:20 46:1
**release** 32:11
105:9
**rely** 80:23 81:2
**relying** 79:6
**remain** 75:1
**remember** 14:8
14:12,17 15:3
15:3,18 16:2
24:22 25:3
34:5,5,14,20
36:1,1,5,10,11
38:15 39:9
42:3,7,8,13,15
42:16,21,24

DEPOSITION OF KATE DANIELS                    June 13, 2019

43:15 45:8,22
46:2 54:20,21
55:19,20 56:2
56:8 59:7,8,12
60:15 74:10,12
84:13 85:17,18
85:19 89:19
96:23 97:21,21
97:22,23,24
98:2,5 102:16
102:18 103:18
**repeat** 65:7
**report** 33:19
85:12 90:10
104:17
**reported** 38:8
60:1 106:8
**Reporter** 2:12
39:4 48:18
52:14 53:24
**Reporters** 1:23
106:6
**reporting** 27:3
**request** 101:18
102:11,12
**requested** 27:16
44:10
**requesting** 102:9
102:13
**requests** 102:7
**required** 81:13
**respect** 48:10
**respond** 10:13
**responded** 66:4
**responding** 12:9
**Response** 64:13
**responsibility**
81:6
**responsible**
82:21
**result** 40:19
70:23 72:3
**RETAINED**
4:14
**retrospect** 93:13

**review** 19:16,21
19:22 20:3,24
21:4,5,12
24:16 26:6
29:24 30:9
33:4 47:14
49:12 59:23
60:3 81:12
89:1 90:4
**reviewing** 26:12
27:6 47:21,23
90:16,18
**reviews** 11:9,18
11:19,21
**right** 11:1 14:10
16:19 21:21
26:18,22 27:4
33:6 38:4 49:7
49:9 50:4
51:20 54:4,7
56:4 65:20
66:9 70:8 71:5
71:14 73:3,16
74:22 83:20
92:9 95:1 97:5
100:13 104:18
104:23 105:3
105:11
**risk** 14:13,14,16
16:24 17:3,14
17:20 18:10,13
18:21,24 19:12
22:7,23 23:10
26:20 28:14
31:8,13,18
32:2,2,5,9,12
34:8 38:3
39:17,22 40:23
41:1,4,8 46:21
46:21,24 47:3
59:15 60:4,4,9
60:12,16,24
61:3,8,21 62:1
62:9 76:18,22
78:14 90:20,21

92:14,21
100:24 102:3,6
103:9,10
**RN** 9:24
**role** 17:5
**room** 9:8 34:9
43:9 64:11,13
67:12,16,24
68:2,22,22
70:22 73:4,10
76:21,23,24
77:1,2,4,10
103:11 104:16
**rounds** 46:24
47:3 87:20
88:18
**routine** 88:22
**ROYSTER** 3:6
**RPR** 1:18 2:9
106:5,20
**rule** 92:14
**Rusher** 1:6 5:10
8:24 19:8
23:12 24:19
32:19 50:22
54:11,19 55:16
84:14 91:10
98:6 103:14
104:15
**Rusher's** 46:11

---

**S**

**S** 2:1 4:5
**safe** 91:5,6,9,10
**safety** 61:1
91:13,16,19
**Sangamon** 1:9
3:10 8:6 9:9
11:8 13:11
23:8 24:19
32:21 33:8,15
46:16 52:6,9
60:23 61:8,22
62:2 64:20
66:17,24 67:20

68:2,11 69:19
70:7,12 72:13
72:19 75:2
77:14 79:18
81:4,7,10,19
82:6 87:1,9,15
87:23 89:6
91:5,6,9,11,13
94:17 95:9
101:14
**sat** 6:7 71:3
**saw** 24:9 30:9
38:7 46:14,16
56:16 58:23
59:5 102:17,24
103:3,10,10
**saying** 12:7
17:11 27:10
39:22 42:8
72:10 79:21
80:15 97:14
**says** 39:10 40:4
52:11 54:9
57:21 59:20
86:13 105:18
**scared** 36:12
**scheduled** 33:3
**school** 10:2
42:10
**scope** 25:4,11
**screaming** 37:15
**screening** 16:20
86:14,22 95:7
**se** 25:15
**second** 69:15
102:19,23,23
**see** 5:18 11:2
22:4 24:9 28:1
28:22 45:18
46:4,9 48:6
49:5 51:1
53:11 54:13
55:7,9 59:14
83:24 86:20
94:10 97:13

99:17,18 102:2
102:2,6,9,13
102:14,18,22
102:23 103:2,7
103:9,21
**seeing** 38:11
102:18
**seeking** 34:23
37:5,6,22 92:5
**seen** 14:1 30:17
30:19 35:23
36:2 50:21
52:15,23 53:12
57:19,24 58:18
64:17 69:7,18
72:15,18 73:22
81:16 82:2,5,5
82:15 86:22
87:9,16,21
89:4 90:7,7
92:7 95:3
96:22 100:20
101:1,5,15,18
103:21 104:2,2
104:6
**sees** 39:18 102:1
**segregation**
87:20 88:18
90:20,23
**self** 18:24 19:5
32:1,4 37:20
37:21 93:6
**seminars** 16:1,5
16:5
**send** 48:12 78:17
78:21 82:14
102:10 105:10
105:17
**sending** 55:20
78:24 81:23
82:17
**sense** 6:21 7:5,16
13:7
**sent** 54:12 59:20
79:2,10 82:24

DEPOSITION OF KATE DANIELS

June 13, 2019

86:8 103:15 104:15
**separate** 47:17
**series** 14:7
**serious** 18:7 26:16 78:14,14
**seriously** 19:5 37:21 93:6,7
**services** 97:13
**set** 96:5
**sets** 96:14
**setting** 9:10,14 37:20
**seven** 66:23,23
**sex** 36:4 42:10
**sheets** 83:18
**shift** 104:9
**shifts** 83:12
**Shmikler** 1:12 3:15 45:21 46:5,9 50:17 50:21 83:3 84:9 101:24
**Shmikler's** 47:15
**short** 56:17
**shorthand** 2:11 106:8,10
**shortly** 10:1
**show** 20:13 21:8 52:5 53:20 57:18 86:19
**showing** 29:5
**sick** 10:15,24 12:10,17,22 13:2,2 19:11 24:9 34:7 58:18 102:11 103:14
**side** 59:24 67:9 75:6
**sign** 15:6 24:16 36:10,11 45:5
**signature** 39:5 40:10 55:9

**signed** 30:2 68:18
**significant** 103:17
**signing** 2:13
**signs** 18:7
**simple** 74:11
**simply** 66:2 80:20
**single** 26:6 49:8 83:23 96:14 97:14 104:11
**sit** 68:10,12,23
**sitting** 13:1
**situation** 26:3 57:5
**situational** 32:8
**SIU** 64:14 77:5 77:10 82:12
**skip** 90:13
**skipping** 22:12 22:20 23:9 25:8 30:6,22
**snapshot** 48:3,6
**Social** 101:14
**somebody** 17:6 17:12 23:22 26:16,20 27:8 31:21 37:24 41:9,10 42:13 57:19 58:21 61:7,24 64:3,9 65:12 66:17 69:18 73:22 81:19,20 82:18 83:21 95:22
**somebody's** 27:14 69:8 70:6
**somewhat** 21:22 39:15
**sorry** 11:2 12:14 18:19 31:5 36:4 48:14
**sound** 7:21

**sounds** 26:14,15
**South** 1:21 2:7 3:4,12
**speaking** 47:8
**special** 18:2 56:11
**specific** 9:7 10:22 12:16 13:20 14:12 16:4,7 18:17 20:3 25:17,20 28:10,23 29:9 34:2 35:5,7 42:3,15,21 43:10,11,20,21 45:22 46:2 56:8 57:17 62:7 63:13 67:16 73:8 74:12 75:3 78:24 83:11 84:5,13 85:19 86:7 90:9 96:16,20 97:23 98:5 102:17 103:19,20
**specifically** 9:14 18:9 26:19 28:1 30:13 31:11,12 32:18 43:15 56:24 97:22
**specifics** 14:17 36:1 42:7 85:18 87:11
**spoon** 59:21 60:9,21 70:23 71:5 73:19
**spoons** 36:19 70:17
**Springfield** 1:21 2:7 3:13
**Springfield,Ill...** 3:8
**spur** 65:18

**staff** 11:12 20:8 26:3 84:15,19 84:24 85:9,13 85:14,24 88:7 88:9
**staffing** 10:13,22
**standards** 96:18
**standing** 36:11 83:22
**stapled** 48:14
**start** 75:22 83:15
**started** 51:14,15 51:16,17,19 75:23
**state** 5:13 16:18 66:22 98:3,10 98:17 106:1
**stated** 26:15 38:16 92:12
**statement** 30:15 30:19 75:13 92:24 93:1,3,8
**statements** 17:1
**STATES** 1:1
**status** 16:24,24 17:3,14 61:3 61:22 62:1 90:19
**stay** 66:23 69:1 105:1,6
**stayed** 61:8
**step** 12:19 13:4
**steps** 97:16
**sticks** 74:10
**stipulated** 2:2
**stipulation** 1:22
**stop** 73:12
**stopping** 56:19
**strap** 78:10
**Strayer** 37:13
**Street** 1:21 2:7 3:12
**strictly** 11:24
**stu** 40:11

**stuff** 10:24 16:7 26:6 42:11 68:10 75:6 95:7 97:12 98:2,4
**stuffed** 70:17
**subject** 54:7
**subpoenaed** 100:16
**succeed** 38:1
**successfully** 58:5
**sue** 57:10,14,14
**sued** 57:5,5,7
**suffice** 37:18
**suicidal** 17:13 77:21,21 78:4 78:7 80:1 91:22 92:1,12 93:5,11,15,20 94:3,8
**suicide** 14:13,14 14:16 16:9,14 16:24 17:7 18:11,13,20,21 19:1,3 26:20 31:8,13,19,20 32:2,2,5,9,12 58:6 59:15 67:1,2 73:3,20 75:8 76:18,22 90:21 92:14,21 95:9 96:2
**suing** 57:8,9,12 57:13
**Suite** 3:13
**summary** 78:18
**Superintendent** 54:11,22
**supervisor** 55:1 55:3
**supposed** 100:16
**sure** 5:12 7:11 7:13 25:10 29:5 33:5

DEPOSITION OF KATE DANIELS

June 13, 2019

Page 121

42:20 53:10
59:17 70:20
85:1,16 91:3
92:19 100:24
**surprised** 58:24
**surrounding**
50:7 53:4
**swallow** 35:11
36:13 37:7
38:15
**swallowed** 36:22
37:2 38:8,16
39:11,16,21,23
60:21 70:17
71:5 91:18
**swallowing**
36:18 38:8
45:1 59:21
60:10 70:23
73:19
**swallowing's**
77:11
**sworn** 5:3
**symptoms** 65:17
**System** 8:11
10:10
**Systems** 7:24 8:5
10:9

**T**

**T** 2:1,1 4:5 36:5
**take** 7:18 15:8
21:17 22:18
25:20,23 29:10
36:12 37:20,21
37:23 39:10
40:24 43:17
59:13 64:11
68:21 73:13
80:11 95:18
**taken** 1:17 2:4
2:11 19:5
30:18 41:14
71:16 78:15
93:6

**talk** 6:23 13:5
21:23 22:5
30:10 34:10
35:12 43:14,23
44:2 45:21
59:11 62:17
78:8 83:23
85:8 94:9,9,12
**talked** 34:12
41:20 42:5,22
43:7,8,17 44:4
44:8 45:24
76:16 80:8
83:3 84:4,9,18
91:14,16 97:14
98:5
**talking** 20:15,16
29:2,4,6,7
32:18 34:14
41:17,19 43:16
44:5,21 49:22
51:5 56:19
83:22 84:24,24
86:4
**taught** 18:14,15
30:21 31:13,14
31:15,22 92:16
92:20
**Taylorville** 1:24
106:7
**Team** 64:14
**tease** 49:12
**tech** 10:5,5
**technically**
29:12 72:2
**telephone** 44:13
**tell** 7:15 10:6
16:16 18:18,19
31:14,14 35:15
53:3 57:13
65:6 72:11
96:19 104:20
105:13
**telling** 31:15
43:16 80:17

**tells** 17:12
**ten** 61:15 74:8
95:22
**term** 23:15,20
26:17,21 28:9
28:13,15,16,21
63:16 92:22
**terms** 11:9 70:5
**test** 28:4
**testified** 5:4 92:7
**testifying** 104:14
**testimony** 81:23
**thank** 5:10
105:21
**therapy** 46:10
50:21 51:8
**thereof** 2:16
**Theresa** 3:7
**thing** 20:5 21:24
27:12,13 33:10
36:1 63:20
73:6,8 76:22
86:7 94:6
95:13
**things** 11:1
28:23 31:2,20
35:12 37:15
41:18,18 49:9
56:24 57:2
71:2 73:7,9
74:6 77:12
94:10,12 96:7
96:18,20
**think** 13:16 16:2
21:7,20 25:16
25:17 26:10
28:10,17 30:15
30:24 32:19
36:24 37:14,23
38:6 39:10,21
40:23 47:18
55:7 56:1,3,14
56:21 61:15
62:6,7 65:5,15
65:20 66:6,7

68:3 69:9,17
72:9,10,11
74:3,13 75:19
75:21 77:13,24
78:4,6 80:14
80:21 81:22
83:5 84:8,9,12
84:16,18,22,22
86:8 91:20,21
92:5 93:15,23
94:2 95:15,16
97:9,18 98:9
100:12 103:16
103:19
**thinking** 69:6
79:14 93:5,11
93:16,21 94:3
**third** 49:6 87:14
102:22 103:1
**thought** 7:9
28:18 37:17
69:3 74:23
**threaten** 57:14
**three** 34:23 61:8
74:5 104:7,8
**Thursday** 42:20
**TID's** 104:6
**tidbit** 79:2
**Tiffany** 1:6 5:10
8:24 19:7
23:12 24:18
26:2 30:5
32:18,18 34:3
36:21 38:6,8
40:3 41:20
42:4 45:18,21
46:3,5,11
54:11,19 55:16
58:10 60:9
62:13,18 70:17
71:16 72:12
75:18 76:16
83:3 84:9,14
84:16,19,23
85:11,15,22

88:14 89:10,13
91:5,10 93:10
94:14 97:8,19
98:6
**Tiffany's** 33:13
46:19 50:4
59:23 75:15
88:2 97:4
**time** 10:1 12:16
13:7 15:8,10
27:16 32:22,22
36:24 41:19
42:21,23,23
43:1 44:2,11
44:22 45:20
46:22 49:20
50:1 51:21
55:11 56:17
60:12,23 61:2
61:16,20 62:8
64:2 65:11
66:16,21 68:8
70:1 72:1 76:8
80:16 83:12,15
83:19 84:2,4,5
88:2 92:1,4
99:7 102:11
103:16 105:18
**timeline** 52:11
53:15,16 55:22
57:21 58:13,21
59:14 93:19
94:3 103:13
**times** 12:24
29:14 34:13
43:8,8 52:23
56:7,13,15,18
57:17,23 58:12
63:14 64:22
74:8,15,22,24
75:9 97:15
100:12 103:2
103:14 104:1,3
104:7,8
**title** 7:23 10:4,8

DEPOSITION OF KATE DANIELS                June 13, 2019

Page 122

| | | | | |
|---|---|---|---|---|
| 13:14 55:7 | **trend** 48:7 | 91:7,8 99:11 | 14:23 15:4,9 | **watch** 13:21 |
| **today** 5:11 66:8 | **trial** 7:13 63:19 | **understanding** | 15:10,12,13,18 | 14:6,9,23 15:4 |
| 91:14,24 | **tried** 29:20 | 17:10 18:20,23 | 92:8,11 | 15:8 80:17 |
| **told** 20:17 21:16 | **trouble** 72:23 | 19:3 20:19 | **visit** 35:23 36:3 | **way** 10:20 59:18 |
| 35:21,24 46:20 | **true** 92:12 | 22:16 | 101:9 | 61:4,23 97:8 |
| 69:17 77:21 | 106:10 | **understood** | **visiting** 44:9 | 106:13 |
| **tons** 35:9,9 | **truth** 31:16 | 72:24 | **visits** 50:11 | **ways** 27:22 |
| **toothbrush** 38:9 | **truthful** 96:11 | **unfit** 63:19 | **vitals** 34:9 40:10 | **we're** 13:19 29:2 |
| 38:13,16 39:11 | **try** 6:23 | **Unfortunately** | 40:24 | 57:20 58:2 |
| 39:16,21,23 | **trying** 18:1 | 25:18 | **VOELKER** 3:6 | 72:9,10 78:24 |
| **top** 52:11 86:14 | 26:13 28:15,17 | **unit** 10:13,16 | **volume** 48:8 | 96:13 |
| 86:21 | 36:21 37:1 | 13:1,2,3 98:20 | **voluntary** 15:1 | **we've** 13:16 16:3 |
| **topics** 14:11,12 | 56:21 59:17 | 102:15,15 | **vs** 1:8 | 27:13 56:15 |
| 15:18 | 66:7 72:5 | 103:8 | | 57:19 58:2 |
| **touched** 13:17 | 79:19 80:7 | **UNITED** 1:1 | **W** | 65:20 76:13 |
| **track** 21:21 | **tunnel** 73:9 | **unpredictable** | **Wabash** 3:4,8 | 82:4 95:22 |
| **tracking** 66:11 | **twice** 16:2 | 34:22 36:14 | **Wait** 52:8 | 96:6 |
| **trafficking** 36:5 | **two** 8:9 13:16 | **unredacted** | **WAIVED** 2:14 | **week** 54:13 85:5 |
| **trained** 18:6,10 | 14:20 15:21 | 66:11 | **waiving** 65:19 | **Weekly** 87:15 |
| 30:21 31:7 | 33:21 43:12 | **unresolved** | 66:9 | **weeks** 99:19 |
| **training** 13:9,13 | 76:1 88:24 | 71:24 | **walked** 15:22 | **WEIL** 3:3 |
| 13:15,18,22 | **types** 77:12 | **unusual** 61:2 | 43:14 | **went** 9:21 34:11 |
| 80:10 92:8 | **U** | **unwritten** 28:4 | **walls** 37:14 | 40:8 47:16 |
| **trainings** 14:20 | **U** 2:1 | **use** 85:23 89:6 | **want** 7:10,13 | 67:8 71:19 |
| 15:21 | **uh-huh** 5:19 | **usually** 22:2 | 23:19,22 58:17 | 77:10 78:19 |
| **transcribed** 2:12 | 6:15,18 15:15 | 27:15 32:13 | 76:22 | 79:22 92:6 |
| **transcript** | 17:18 19:20 | 57:8 79:4 86:6 | **wanted** 36:3 | 97:4 |
| 106:10 | 22:22 35:19 | | 37:12,16 44:23 | **weren't** 43:10 |
| **transfer** 69:13 | 41:22 61:18 | **V** | 53:6,10,11 | **Wes** 1:10 3:9 |
| **transferred** | 67:4 71:6,9 | **v** 87:15 | 56:5 80:1 | **whichever** 30:9 |
| 67:18,22 68:9 | 74:20 78:16 | **vague** 30:15,19 | 101:19 | **Whitley** 1:12 |
| 68:17,22 70:2 | 89:5,22 90:24 | 73:5 | **wanting** 34:15 | 3:10 |
| 76:24 | 92:15 | **various** 15:11 | 34:18 | **Wirth** 3:12 65:7 |
| **transferring** | **ultimately** 64:15 | 19:22 25:24 | **wants** 104:20 | 65:15,24 66:13 |
| 63:10 | **Ummmm** 70:14 | 27:22 33:9 | 105:2 | 68:5 69:14 |
| **transfers** 76:17 | **unable** 31:10 | 35:12 37:15 | **ward** 9:6,17 | 80:13 95:18 |
| **transmit** 85:22 | 36:7 | 42:22 61:13,13 | 67:19 | 105:22 |
| **treat** 19:7 | **unaware** 63:6 | 77:11,11 | **warnings** 18:7 | **witness** 2:11 4:2 |
| **treated** 38:6 | **uncommon** | **verbatim** 18:18 | **wasn't** 26:1 | 5:2 6:4 |
| **treating** 34:6 | 33:10 | **versus** 21:19 | 35:14 44:24 | **wondering** |
| 38:10 | **understand** | 97:14 | 45:2,14 47:14 | 48:24 52:15 |
| **treatment** 29:17 | 26:13 27:1 | **Vice-President** | 49:19 51:15 | **word** 84:17 |
| 46:5 64:4 71:7 | 47:13 49:11 | 55:8 | 52:21,23 71:21 | **words** 28:7,18 |
| 94:14,18 95:4 | 81:18 90:3 | **video** 13:24 14:1 | 72:3 73:1 | 84:18,20 |
| 95:6 | | **videos** 13:21 | 76:19 79:18 | **work** 6:1 8:14 |

DEPOSITION OF KATE DANIELS

June 13, 2019

Page 123

13:11 49:1
55:5 64:8
**worked** 9:10,13
 9:14,17 34:12
 83:24 84:1
**Worker** 46:15
 101:14
**working** 9:9
 45:24 49:19,21
 49:24 50:1,6
 51:15,16 55:14
 75:18,19
**works** 81:19
**world** 29:11
**wouldn't** 16:17
 25:15 29:10
 31:15 60:2
 76:3 79:23
 90:4 94:6
 100:15
**wow** 56:15
**write** 10:7 42:1
 44:3,16,18,18
 44:24
**writing** 41:20
**written** 28:4
 30:1
**wrong** 44:7 92:6
**wrote** 35:13,15
 36:6,9,10 45:8

### X

**X** 4:1,5
**X-ray** 39:12,13
 39:23

### Y

**yeah** 8:20 12:15
 18:1,16 21:22
 22:19 25:7
 27:11,11 34:17
 35:2 36:7 38:7
 38:13 39:1
 47:6 48:14
 49:4 54:5,17
 54:17 58:16

65:15 66:6
68:8,13,13
69:5 71:4 72:5
76:3 81:24
83:5,9 84:7
85:2 87:2
88:12,20 90:6
90:7,16,18
91:19 92:17
93:24 94:1
95:20 96:12
97:1 98:12,23
99:16,24 100:4
101:12 104:10
**year** 16:2 48:7
**years** 8:9 30:18
 35:24 36:2
 74:5
**yelling** 37:15
**young** 66:21

### Z

**Z** 1:12
**Zach** 3:10

### 0

**084-002703**
 106:21

### 1

**1** 4:6 20:14
 38:24 39:1,2
 104:10
**1-5** 1:13
**1-800-252-9915**
 1:23
**1/12/2017** 59:20
**1:00** 1:19 2:5
**1:18-cv-1100-...**
 1:7
**10** 34:13 43:8,8
 58:18
**100** 4:3
**102** 3:13
**10925** 38:18
**10th** 8:12

**12** 37:18
**12/17/2017**
 58:18
**12588** 87:15
**12591** 88:24
**12th** 60:17
**13** 1:19 2:5 3:1
**14** 57:23
**16** 8:13
**17** 8:13
**18th** 106:23
**19** 96:21

### 2

**2** 4:7 38:19
 48:13,16,21,23
 86:13,21 99:19
**20** 84:1,6
**2000** 8:23 9:20
 10:1
**2002** 10:2
**2016** 8:13,13
 51:19 75:24
**2017** 20:6 38:19
 51:19 54:2,19
**2018** 49:22
**2019** 1:19 2:5
 3:1 106:23
**24** 37:18

### 3

**3** 4:7 52:6,12
 74:14,24 75:9
 99:19 104:2
**333** 3:4
**373** 97:4
**3731** 3:8
**39** 4:6

### 4

**4** 4:8 53:20,22
 54:1,4 55:10
 74:14,24 75:9
**400** 1:21 2:7
 3:12
**48** 4:7

### 5

**5** 4:3,8 21:8
 34:13 43:7,8
 48:14 53:21,22
 54:1,15,24
**510** 54:1
**52** 4:7
**520** 54:1
**53** 4:8
**550** 48:13
**558** 48:15

### 6

**60604** 3:5
**62568** 1:24
**62701** 3:13
**62791-9678** 3:8
**684** 1:24 106:7

### 7

**733** 52:6,10
**734** 52:7,10

### 8

**8** 16:4 104:10,10

### 9

**90** 27:15
**9th** 1:21 2:7