E-FILED
Friday, 25 September, 2020  12:21:03 PM
Clerk, U.S. District Court, ILCD

**DEPOSITION OF MARY DAMBACHER**

Page 1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

KELLI ANDREWS, AS               )
ADMINISTRATOR OF THE            )
ESTATE OF TIFFANY ANN           )
RUSHER, DECEASED,               )
                                )  No.
                Plaintiff,      )  1:18-cv-1100-SEM-TSH
                                )
    vs.                         )
                                )
SANGAMON COUNTY ILLINOIS,
WES BARR, LARRY BECK,
JR., ADVANCED
CORRECTIONAL HEALTHCARE,
INC., ARUN ABRAHAM,
MICHAEL SHMIKLER, KYLE
MEYER, Z. WHITLEY,
JENNIFER EALEY, GUY
BOUVET III, and DOES 1-5,

                Defendants.

          Deposition of MARY DAMBACHER, taken

before Cathy J. Craggs, CSR, RPR, at the instance of

the Plaintiff, on June 13, 2019, at the hour of 5:30

p.m., at QUINN, JOHNSTON, HENDERSON, PRETORIOUS &

CERULO, 400 South 9th Street, Springfield, Illinois,

Illinois, pursuant to attached stipulation.

                ASSOCIATED COURT REPORTERS
                    1-800-252-9915
                     P.O. Box 684
              Taylorville, Illinois 62568

**EXHIBIT
4**

Page 2

1                    S T I P U L A T I O N

2               It is stipulated between the parties

3       herein, through their attorneys, that the deposition

4       of MARY DAMBACHER may hereby be taken upon oral

5       interrogatories, on June 13, 2019, at the hour of 5:30

6       p.m., at QUINN, JOHNSTON, HENDERSON, PRETORIOUS &

7       CERULO, 400 South 9th Street, Springfield, Illinois,

8       Illinois, before the instance of the Plaintiff, and

9       before Cathy J. Craggs, CSR and RPR.

10               That the oral interrogatories and the

11      answers of the witness may be taken down in shorthand

12      by the Reporter and afterwards transcribed.

13               That the reading and signing of said

14      deposition is WAIVED.

15               That the deposition or any portions

16      thereof may be used by any of the parties hereto,

17      without foundation proof, for any purpose for which

18      depositions are competent.

19               That copies of the deposition may be

20      furnished to any of the parties at his or her own

21      expense.

22

23

24

Page 3

1    APPEARANCES:    (June 13, 2019)

2

3        WEIL & CHARDON LLC
         By Ms. Alexis G. Chardon, Esq.
4        Attorney at Law
         333 South Wabash Avenue
5        Chicago, Illinois  60604
             Appeared on behalf of the Plaintiff;

6

7        HEYL, ROYSTER, VOELKER & ALLEN
         By Ms. Theresa M. Powell, Esq.
         Attorney at Law
8        3731 Wabash Avenue
         Springfield,Illinois  62791-9678
9            Appeared on behalf of the Defendants Wes Barr,
     Larry Beck, Guy E. Bouvet, III, Jennifer Ealey, Kyle
10   Meyer. Sangamon County, Illinois and Zach Whitley,

11

12       QUINN, JOHNSTON, HENDERSON, PRETORIUS & CERULO
         By Ms. Betsy A. Wirth, Esq.
13       400 South Ninth Street
         Suite 102
14       Springfield, Illinois  62701

15           Appeared on behalf of Arun Abraham, M.D.,
     Advanced Correctional Healthcare, Inc., and Michael
16   Shmikler

17                       ***        ***

18

19

20

21

22

23

24

**DEPOSITION OF MARY DAMBACHER**                    **June 13, 2019**

Page 4

1

                         I N D E X

2

WITNESS            DIRECT     CROSS      REDIRECT   RECROSS

3    MARY
     DAMBACHER

4                             5          58         80

5

                      E X H I B I T S

6

EXHIBIT                                        PAGE

7    Dambacher Exhibit 1                         18
     Dambacher Exhibit 2                         26

8    Dambacher Exhibit 3, 4                      42

9

10

11

12

13

14          ***EXHIBITS RETAINED BY MS. CHARDON***

15

16

17

18

19

20

21

22

23

24

**DEPOSITION OF MARY DAMBACHER**           **June 13, 2019**

1              MARY DAMBACHER,

2    called as a witness herein, at the instance of

3    the Plaintiff, having been duly sworn on her oath,

4    testified as follows:

5              DIRECT EXAMINATION

6              CONDUCTED BY MS. CHARDON:

7       Q.  Good evening, Miss Dambacher, thanks for

8    coming out here this evening.

9              My name is Alexis Chardon and I'm one

10   of the attorneys for the estate of the Plaintiff in

11   this lawsuit.  Have you ever been deposed before?

12      A.  No.

13      Q.  Okay.  So I am sure that Miss Wirth may have

14   explained it to you, but obviously we've got Cathy

15   here recording everything that we say, so we need to

16   try to make a clean record and not talk over one

17   another.

18              Please let me finish my question, I

19   will do my best to let you finish your answer as well,

20   does that sound fair?

21      A.  Yes.

22      Q.  And second thing you're already doing a

23   great job, please answer verbally yes or no as best as

24   possible versus a head shake because Cathy cannot take

Page 6

```
 1    that down.

 2                    Feel free to take a break but just

 3    please answer any question that I have pending before

 4    you do that.

 5                    If you need to go back and correct

 6    earlier testimony because you think of something that

 7    changed that you want to add to make a more complete

 8    or correct, please do so.  Because my goal is to make

 9    sure that I get all of the information out today

10    because this is my last chance to ask those questions

11    of you in person before trial.

12                    So can you tell me, I understand that

13    you're a Nurse Practitioners, is that right?

14         A.   Yes.

15         Q.   Okay.  What, how long have you been

16    certified as a Nurse Practitioner?

17         A.   Since 2013.

18         Q.   And were you a licensed nurse prior to that?

19         A.   Yes.

20         Q.   Do you have any kind of specialty within as

21    a Nurse Practitioner?

22         A.   Family Nurse Practitioner.

23         Q.   How long have you worked, do you still work

24    at Sangamon County Jail?
```

**DEPOSITION OF MARY DAMBACHER**                    **June 13, 2019**

Page 7

1        A.   I do.

2        Q.   Okay.  How long have you worked there?

3        A.   I have been there since I believe 2016.

4        Q.   And where did you work prior to 2016?

5        A.   I, ACH is my part-time job and then I work a

6    regular job for Memorial --

7        Q.   Oh, okay.

8        A.   -- as a Nurse Practitioner in the clinic.

9        Q.   When you say Clinic, is it like an

10   outpatient?

11       A.   It's a yeah, Internal Medicine.

12       Q.   So as a Nurse Practitioner in that Clinic do

13   you have regular patients that you see --

14       A.   Yes.

15       Q.   -- as a primary care provider?

16       A.   Yes.

17       Q.   And again I think you just answered me, it's

18   general --

19       A.   Internal medicine.

20       Q.   And family medicine.

21       A.   Adult.

22       Q.   Adult, okay.

23            How many hours a week do you work at

24   ACH?

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 8

1      A.   10 to 12 hours a week.

2      Q.   Does it depend on shifts or sort of need?

3      A.   Well, I have six sites that I work so it can

4   vary.

5      Q.   So let me I'm not sure how I phrased that

6   question and I want to make sure that I understand

7   correctly.

8              Did you say 10 to 12 hours at ACH sites

9   in total?

10     A.   Per week, yes.

11     Q.   Per week?

12     A.   Yes.

13     Q.   And so, and how many sites?

14     A.   Six.

15     Q.   Six different sites so Sangamon County Jail

16  is one of those sites?

17     A.   Yes.

18     Q.   At the time do you remember Tiffany Rusher?

19     A.   Vaguely, yes.

20     Q.   So that was, she died in early 2017 at that

21  time were you working in the same setup, and by that I

22  mean splitting 10 to 12 hours a week among six

23  different facilities?

24     A.   Yes.

Page 9

1      Q.  Okay.  And then how many hours a week do you

2  work at Memorial?

3      A.  40.

4      Q.  Okay.

5      A.  Yeah.

6      Q.  Thank you for finding time to be here today.

7           I will edit all those things I just

8  said about being tired.

9           So is there anyway that you can give me

10  an average amount of hours that you spend at Sangamon

11  County Jail per week?

12      A.  5 to 6.

13      Q.  Okay.  So almost half of your ACH time is

14  at, is at --

15      A.  Sangamon.

16      Q.  Sangamon.  Is Sangamon the biggest of the

17  Jails that you have visits for?

18      A.  Yes.

19      Q.  My understanding that as a Nurse

20  Practitioner you, you can prescribe medication,

21  correct?

22      A.  Yes.

23      Q.  When you prescribe medication, do you need

24  to be, have, are there any regulations pertaining to

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 10

1    your need for consultation or oversight from a Medical

2    Doctor?

3         A.  No, I'm independent.

4         Q.  Okay.  So when you prescribe medication as

5    Nurse Practitioner in Illinois, you don't need to

6    have, to consult with any Medical Doctor?

7         A.  I do have my resources at ACH and then

8    Doctor Lockwood or Lochhard works at Sangamon also.

9         Q.  Doctor Lochhard.  At the time of these

10   events was it Doctor Abraham who was in that role?

11        A.  Yes.

12        Q.  Is there any, do you have any, is there any

13   difference in your competency to prescribe psychiatric

14   medicine than say that of Doctor Lochhard or Doctor

15   Abraham?

16        A.  Well, just due to their training they would

17   have more training in the psychiatric area, yes.

18        Q.  Do you defer or do you consult with them

19   when you prescribe psychiatric medication?

20        A.  No.

21        Q.  Do you have any legal or professional

22   licensing restrictions on your ability to prescribe

23   psychiatric medication in any way?

24        A.  No.

Page 11

1      Q.   Is that true for any Nurse Practitioner in

2  Illinois?

3      A.   As far as I know, yes.

4      Q.   And is it, is there any standard of care

5  that would require you to or yeah, that would require

6  you to consult with a Medical Doctor before

7  prescribing psychiatric medication?

8      A.   Well, if I feel that, you know, I'm not

9  exactly sure, you know, that this would be the best

10 treatment I do.

11     Q.   Okay.  So at the time of, the event in this

12 lawsuit which is early 2017 what would you consider

13 your position to be within the structure of healthcare

14 services at Sangamon County Jail?

15     A.   I'm not sure what you mean.

16     Q.   What was your job title?

17     A.   Just as Nurse Practitioner.

18     Q.   What were your job duties?

19     A.   I would see sick call.  Anyone who put in a

20 sick request to be seen.  Anything emergent.  And then

21 I do chronic clinics, what they call chronic clinics.

22     Q.   Did you, were you different, were your

23 duties any different than those of Doctor Abraham?

24     A.   The only thing different that we did I see

Page 12

1    the patients on A Block or the male psychiatric area

2    and then he would do Booking.

3        Q.   And when you say see, you mean more chronic

4    clinic or for sick call?

5        A.   Weekly we do rounds on the male and female

6    units weekly of the psychiatric area where there are

7    more locked down.

8        Q.   Was Tiffany in the, did you just distinguish

9    the psychiatric area from Booking?

10       A.   The female psych, the psych area that's no,

11   I did not see her, I have not done that until

12   recently.

13       Q.   Okay.  So you did not round on Tiffany?

14       A.   No.

15       Q.   Do you have any recollection of with respect

16   to psychiatric treatment of patients are there, do you

17   have any lesser or different job responsibilities than

18   Doctor Abraham would have?

19       A.   No.

20       Q.   Did Doctor Abraham have a title like Medical

21   Director or anything like that at Sangamon County

22   Jail?

23       A.   I don't know for certain.

24       Q.   So of the two of you could you say whether

Page 13

1    one more than the other was responsible for Tiffany's

2    care at the time of her --

3          A.  No.

4          Q.  -- stay?

5          A.  No.

6          Q.  So you equally shared responsibilities for

7    her care?

8          A.  Uh-huh.

9          Q.  Did you, what, you were familiar with Mickey

10   Shmikler, correct?

11         A.  Yes.

12         Q.  And he was the Mental Healthcare provider at

13   Sangamon County Jail when Tiffany was there?

14         A.  Yes.

15         Q.  Did you have any duties for, of, to oversee

16   Mickey Shmikler?

17         A.  No.

18         Q.  Did you have any duties to, to review his

19   paperwork to determine whether he was filling it out

20   properly or correctly charting?

21         A.  No, no.

22         Q.  Did you have any ability, any

23   responsibilities for overseeing what kind of Mental

24   Healthcare treatment was provided to, he was providing

**DEPOSITION OF MARY DAMBACHER**                    **June 13, 2019**

Page 14

1    to patients or Inmates at the Jail?

2         A.  No.

3         Q.  Who would have been responsible for making

4    sure that Mickey Shmikler was turning in documentation

5    as required under ACH policies or procedures?

6         A.  I'm assuming it would be his Manager.

7         Q.  And do you know who his Manager was?

8         A.  No, I do not.

9         Q.  Anybody at Sangamon County Jail responsible

10   for reviewing or overseeing what kind of documentation

11   he was producing for within the facility?

12        A.  I don't know.

13        Q.  Was anybody at the Jail responsible for

14   overseeing what kind of treatment he was providing to?

15        A.  I have no knowledge of that.

16        Q.  Okay.  Was there any Peer Review System to

17   review Mickey Shmikler's charting that you are aware

18   of?

19        A.  Not that I'm aware of, no.

20        Q.  Do you have specific recollection of

21   treating Tiffany Rusher for any medical issues while

22   she was at the Jail?

23        A.  One time.

24        Q.  What do you recall?

Page 15

1      A.   She, they had brought her to Medical

2   emergently, she had swallowed a spoon at that time.

3   And after I assessed her, I determined she needed to

4   go to the emergency room, so they took her there.

5      Q.   Okay.  And why did you determine that she

6   needed to go to the emergency room?

7      A.   It was in her airway, you could hear it in

8   her airway.

9      Q.   So that presented an emergent situation?

10     A.   Yes.

11     Q.   Did you ever engage, did you ever discuss

12  with anybody at Sangamon County Jail whether Tiffany

13  was receiving an appropriate level of psychiatric or

14  Mental Healthcare treatment at the facility?

15     A.   No.

16     Q.   Did you ever have any concerns about whether

17  she was receiving an appropriate level of psychiatric

18  treatment at facility?

19     A.   I don't recall.

20     Q.   Did you consider Tiffany to be, did you

21  understand Tiffany was under a High Risk Observation

22  Status, correct?

23     A.   I did know she was down in the Booking area,

24  yes.

Page 16

1        Q.  Which is where women would go who were high,

2    any person?

3        A.  Any person, yes.

4        Q.  Okay.  But if I understand correctly, you

5    are saying there is another area where there would be

6    psychiatric, is there, when you were describing to me

7    that you and Doctor Abraham had different

8    responsibilities with respect to rounding on certain

9    patients?  My understanding was that he would round in

10   the Booking area which is where the patients were

11   under High Observation Status, correct?

12       A.  Yes.

13       Q.  And then was there another area which was

14   you, you described as --

15       A.  In like the, it's not a general population

16   but it's, you know, it's just a different area.

17       Q.  Okay.  And that's called psychiatric?

18       A.  It's called A Block.

19       Q.  A Block?

20       A.  Yes.  That's where the male individuals are

21   housed that have mainly schizophrenia.

22       Q.  Does, did you ever, you actually mentioned

23   so you just discussed that you specifically remember

24   the incident where she swallowed a spoon and you

Page 17

1    referred her out to the ER for treatment of the

2    obstruction to her airway, correct?

3           A.   Yes.

4           Q.   Do you have any other specific recollection

5    of, of --

6           A.   I do not.

7           Q.   -- treatment.

8                     And did you actually, was it

9    coincidence that that was what you remembered or had

10   you happened to have the opportunity to review the

11   record in front of you and that refreshed your

12   recollection?

13          A.   You don't forget somebody who swallows a

14   spoon like that.

15          Q.   Okay.  Yeah, you could see it in her throat,

16   you could hear it?

17          A.   I could hear her talking around it, yes.

18          Q.   Do you recall being called a time when

19   Tiffany strangled herself or attempted to strangle

20   herself with a boot from her, the strap from her

21   medical boot?

22          A.   I don't.

23          Q.   So you have no recollection of that?

24          A.   (Nod negatively.)  No.

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 18

1        Q.   Okay.   I'm going to show you, let's mark
2   this as Dambacher 1 and Dambacher 2.
3                        (Dambacher Exhibit 1 marked for
4                        identification by the Court
5                        Reporter.)
6        Q.   Dambacher 1 is Plaintiff's Production 11050
7   and it's a medical record I think from January 12th.
8   Is that your signature on the bottom right?
9        A.   It is.
10       Q.   Okay.   Whose signature is on the left, do
11  you know?
12       A.   I believe that may have been David Johnson
13  who was an LPN.
14       Q.   Okay.   And is David Johnson still employed
15  at ACH?
16       A.   Not that I know of.
17       Q.   Is this your handwriting?
18       A.   That is my handwriting, that is my charting,
19  patient was brought to Medical.
20       Q.   Okay.
21       A.   Yes.
22       Q.   And for this instance so this is also an
23  instance of swallowing a spoon, correct?
24       A.   Yes, two different dates.

ASSSOCIATED COURT REPORTERS
1-800-252-9915

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 19

1      Q.  Okay.  So this one was January 12th, right?

2      A.  This one, yeah, this one was dated January

3   12, 2017.

4      Q.  So did you recall that there were two

5   instances --

6      A.  No, I --

7      Q.  -- that she swallowed a spoon?

8      A.  I didn't know, I didn't know that.

9      Q.  Okay.

10     A.  Or I don't remember it, I mean I signed it

11  but I don't remember it.

12     Q.  You know what, that was a bad questioning

13  brought us down the briar path.

14          In Exhibit 2, I would like you to look

15  at Hammitt 2?

16     A.  Okay.

17     Q.  If we look a little closer I, forgive the

18  bad questioning.

19          This one says Inmate swallowed a

20  toothbrush?

21     A.  Yeah, Correctional Officer gave it.

22     Q.  And this pertains to swallowing a

23  toothbrush, right?

24     A.  Yes.

Page 20

```
 1        Q.  But that's your signature on the bottom
 2   right of Hammitt 2 as well, right?
 3        A.  Yes.
 4        Q.  Do you recall her swallowing a toothbrush?
 5        A.  I don't recall it.
 6        Q.  Okay.  Did you refer her out for, if you
 7   review Hammitt Exhibit 2 that's not your handwriting,
 8   correct?
 9        A.  No, this is Tracy's handwriting here.
10        Q.  Okay.  But you signed off, you signed the
11   record?
12        A.  Yes, I read it, signed it.
13        Q.  So why would you even read and sign a record
14   like that?
15        A.  Because I read a lot, I mean she called me
16   and asked me, you know, what my directions were, and I
17   told her to send her to the ER obviously.
18        Q.  Okay.  And so it was your --
19        A.  Order.
20        Q.  -- order to send her to the ER?
21        A.  Yes.
22        Q.  The reason why you sent her to the ER is
23   because the fact that she swallowed a toothbrush
24   presented an emergent medical issue, correct?
```

1      A.  Yes.

2      Q.  When you sent her to the ER did, were you

3  intending to refer her out for an emergent psychiatric

4  evaluation at the ER?

5      A.  I don't remember.

6      Q.  Is it written on that chart that you

7  referred her out for emergent psychiatric evaluation?

8      A.  On Hammitt 2?

9      Q.  Yeah.

10      A.  No, just the removal of the foreign body is

11  what it looks like.

12      Q.  I think you said earlier I mean had a lot of

13  depositions today so I'm not trying to put words in

14  your mouth, but I think you said that you didn't,

15  don't recall having any conversations about, with

16  anyone about whether Tiffany was receiving an

17  appropriate level of psychiatric treatment at facility

18  correct?

19      A.  I don't recall.

20      Q.  And you don't recall having any concerns

21  about that yourself?

22      A.  I honestly do not recall.

23      Q.  Okay.  So did you ever refer Tiffany out for

24  an emergent psychiatric evaluation anywhere outside of

Page 22

1  the facility?

2      A.  Unless there is something here in the

3  writing, I would not remember.

4      Q.  If you had done so, you would have written

5  it down?

6      A.  I would have written it down, yes.

7      Q.  Because Medical charting is an important way

8  for Practitioners to communicate with one other,

9  right?

10      A.  Yes.

11      Q.  And because I'm sure you're trained that

12  medical charting is important for other reasons like

13  legal reasons, right?

14      A.  Uh-huh, yes.

15      Q.  Have you ever heard the 3 C's of medical

16  charting, is that something you have ever heard,

17  clear, concise and contemporaneous?

18      A.  No.

19      Q.  Okay.  Have you ever heard the expression

20  that if it didn't, it's not in the Medical chart it

21  never happened?

22      A.  Yes.

23      Q.  Okay.  Other than the incident with the

24  spoon, do you have any specific recollection of

Page 23

1   treating Tiffany?

2        A.  No.

3        Q.  Does, do you have any recollection of

4   interacting with Tiffany?

5        A.  No.

6        Q.  Do you have any recollection of

7   conversations with Tiffany?

8        A.  No.

9        Q.  Okay.  What was your perception of what was

10  Tiffany like?

11       A.  I wasn't around her enough to, to make a

12  decision on that.

13              I mean the only thing I really remember

14  is yes, she swallowed the spoon.

15       Q.  Okay.  At the time that she was incarcerated

16  there, did you have any awareness of what kind of, you

17  were aware that she was under the care of Mickey

18  Shmikler, is that right?

19       A.  Yes.

20       Q.  Had you participated in sort of referring

21  her to Mr. Shmikler's care in any way?

22       A.  I don't recall.

23       Q.  Did you, and you knew she was on High Risk

24  status, right?

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 24

1       A.  Yes.

2       Q.  Did you understand, did you believe that she

3  was suicidal?

4       A.  There again I wasn't around her enough to

5  determine that.

6       Q.  Did you receive, have you ever received any

7  training from ACH, well, let me back up.

8               Does ACH have a suicide prevention

9  policy?

10      A.  We, we do receive some training for that,

11 yes.

12      Q.  And what training do you receive?

13      A.  It's, it's what they call CVL's.

14      Q.  What does that stand for?

15      A.  It's continuing education.

16      Q.  And have you, and what format is that?  Is

17 it like PowerPoint's you do --

18      A.  It is.

19      Q.  -- independently.

20               Have you ever watched any videos about

21 suicide prevention?

22      A.  At training?

23      Q.  Training videos for ACH?

24      A.  ACH, yes, I do believe.

Page 25

1      Q.   Okay.   And were those presented by Melissa
2  Caldwell?
3      A.   I believe so.
4      Q.   Okay.   When did you review those videos from
5  Melissa Caldwell?
6      A.   I couldn't give you an answer.
7      Q.   Okay, is did, was, did you have any ability
8  to refer Tiffany out for outside Mental Healthcare
9  treatment if you had, if you believed that she was not
10  receiving an adequate level of care at Sangamon County
11  Jail?
12      A.   Yes.
13      Q.   How would you have done that if you would
14  have felt that way?
15      A.   Refer her to the Emergency Department for
16  psychiatric evaluation.
17      Q.   Okay.   And have you ever done that for a
18  patient at Sangamon County Jail?
19      A.   I don't know.   I can't recall if I have or
20  not.
21      Q.   Have you done it for other incarcerated
22  people at other ACH facilities?
23      A.   Yes.
24      Q.   And when you have done that, has that ever

Page 26

1  resulted in the person becoming an involuntary commit

2  to a psychiatric hospital?

3        A.  Not that I can recall.

4        Q.  Okay.  Did the person then return to the

5  Jail after?

6        A.  Yes.

7        Q.  Okay.  Is, was there a Mental Healthcare

8  Plan for Tiffany when she was at Sangamon County Jail?

9        A.  I have no direct knowledge of that.

10       Q.  Okay.  Have you, is there such a thing as

11  Mental Healthcare Treatment Plan at Sangamon County

12  Jail?

13       A.  I have no knowledge of anything like that.

14       Q.  Okay.  Are you, let's see.

15                  (Dambacher Exhibit 2 marked for

16                   identification by the Court

17                   Reporter.)

18       Q.  I'm going to mark as Dambacher 2 a sort of a

19  still from a video, and I'm just going to ask, this is

20  Dambacher 2 does that look like a still from a, one of

21  the training videos that you reviewed?

22       A.  It looks like one of their videos, but I

23  don't know if I, that's one of them that I took part

24  in, I don't know.

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 27

1        Q.   Have you ever received training regarding,

2   from ACH, pertaining to risk factors for suicide?

3        A.   I do believe so.

4        Q.   Okay.  And what risk factors and it's, and

5   if you understand that person has risk factors,

6   suicide risk factors is, are there any actions that

7   you are required or should take, that you take?

8   Excuse me, that you are required to take in response

9   to that understanding?

10       A.   There are.  It would be placing them in High

11  Risk housing where they are monitored.

12       Q.   Is there any amount of time that, is there a

13  maximum amount of time for which a person can be in

14  the High Risk Housing Classification at Sangamon

15  County Jail?

16       A.   As long as they are a risk to themselves

17  they would, you know, have to stay.

18       Q.   Is there any time limit after which the

19  decision is made that the person needs to be referred

20  to a higher level of psychiatric care?

21       A.   I have no knowledge of that.

22       Q.   Okay.  And were you trained to take any

23  indication of suicidal thinking or self injury

24  seriously in, through your ACH Suicide Prevention

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 28

1    Training?

2         A.  Any, regardless of whether it's in or out in

3    the community any, anyone saying that they want to

4    hurt themselves or their actions themselves then yes,

5    you have to take them seriously.

6         Q.  And at times, would you agree at times

7    people engage in suicidal or risk, self harm behaviors

8    that may not be motivated by an actual intent to kill

9    themselves, correct?

10        A.  Can you --

11        Q.  Sure.

12        A.  I am not sure what you mean by that.

13        Q.  People may be motivated by different things

14   when, you know, engaging in self harm sometimes there

15   is a true desire to kill one's self, correct?

16        A.  True.

17        Q.  And sometimes it could be a cry for help,

18   correct?

19        A.  True.

20        Q.  And mentally ill patients sometimes engage

21   in manipulative behavior, correct?

22        A.  True.

23        Q.  And attention seeking behavior, correct?

24        A.  True.

Page 29

1        Q.   But manipulative and attention seeking

2   behavior, self harm behaviors can cause actual real

3   risks, correct?

4        A.   Yes.

5        Q.   And they need to be treated seriously,

6   correct?

7        A.   Uh-huh, yes.

8        Q.   And so the referral process, if you

9   determined that somebody was not, if you had

10  determined that Tiffany was not receiving an adequate

11  level of Mental Healthcare Treatment at Sangamon

12  County Jail, what would you have done?  I think you

13  said one thing you had the ability to do was to refer

14  to this ER for psychiatric evaluation, correct?

15       A.   Yes.

16       Q.   Is there anything else that you might do if

17  you determined that you might or could do if you

18  determined that Tiffany was not receiving an adequate

19  level of Mental Healthcare?

20       A.   Not that I can think of.

21       Q.   Okay.  Did you ever consult with Mickey

22  Shmikler about Tiffany's case?

23       A.   I don't recall.

24       Q.   Okay.  Do you know whether there is any

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 30

```
 1   association between segregated housing and suicide

 2   risk?

 3        A.  I'm not sure what you mean.

 4        Q.  Are Inmates in segregated housing a higher

 5   risk for suicide behaviors, suicidal behaviors?

 6        A.  Not necessarily.

 7        Q.  Can segregated housing lead to mental

 8   decompensation?

 9        A.  It can.

10        Q.  And is that a higher risk for people who

11   have preexisting mental illnesses?

12        A.  It could be.

13        Q.  Is it important to reevaluate someone if

14   there is existing signs that they are mentally

15   decompensating?

16        A.  What do you mean?

17        Q.  Is it important to evaluate a prisoner

18   regularly to determine whether their mental health is

19   getting worse?

20        A.  Yes.

21        Q.  And then that's true if they are in an, in a

22   segregated housing cell especially, correct?

23        A.  Yes.

24        Q.  What was done when Tiffany Rusher was at
```

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 31

1    Sangamon County Jail to evaluate whether or not her

2    mental healthcare status was getting worse?

3         A.   Mickey made his rounds.

4         Q.   Okay.  Did you have any responsibility in

5    monitoring Tiffany to make sure that she wasn't

6    mentally decompensating or getting worse?

7         A.   Not that I, no.

8         Q.   Were you prescribing medications to Tiffany?

9         A.   I don't remember.

10        Q.   Okay.  Is refusal of, were you aware that

11   Tiffany was refusing her psychiatric medications?

12        A.   I don't remember.

13        Q.   Is refusal of psychiatric medication a

14   potential, a risk factor that Medical providers should

15   be aware of?

16        A.   Yes.

17        Q.   And it's something that you need to keep an

18   eye on because it would indicate a person isn't

19   getting their prescribed psychiatric medication,

20   correct?

21        A.   Yes.

22        Q.   Who was responsible, if anyone, for making,

23   monitoring how often Tiffany was actually taking

24   versus refusing her psychiatric medications?

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 32

1        A.   I'm not sure, what do you mean?

2        Q.   Was anybody at Sangamon County Jail

3    responsible for keeping track of how often Tiffany was

4    refusing psychiatric medication?

5        A.   Well, the nurses would write down the, you

6    know, refusal on the MAR and that's how they kept

7    track of it.

8        Q.   And they would also fill out medications, a

9    Refusal of Treatment Form, correct?

10       A.   Yes.

11       Q.   Showing you Ernest Exhibit 1 which is

12   Sangamon County 201, are you familiar with that form?

13       A.   Yes.

14       Q.   And one of those should be filled out every

15   time a prisoner refuses medical treatment or medicine,

16   right?

17       A.   Should be.

18       Q.   And it should be the policy of ACH to have

19   that filled out every time?

20       A.   I'm assuming that it is.  If they, you know,

21   if they refuse their medicine.

22       Q.   Is it part, Mr. Ernest testified that

23   sometimes you would be present at the facility more

24   often than Doctor Abraham, is that consistent with

Page 33

1    your recollection?

2         A.  I did more hours than he did, yes.

3         Q.  Okay.  And did Doctor Abraham work at

4    multiple facilities at well?

5         A.  That I don't know.

6         Q.  And Mr. Ernest testified that he would

7    provide those Medical Refusal Forms to Doctor Abraham

8    but if he wasn't there that they would go to you, is

9    that consistent?

10        A.  Yes.

11        Q.  What would you do when you received those

12   Medical Refusal Forms?

13        A.  I would read them and, you know,

14   acknowledge, yes.

15        Q.  Were you ever asked to count how many

16   medical refusals a particular or excuse me, were you

17   ever asked to track medical refusals for a particular

18   patient?

19        A.  Not to my knowledge.

20        Q.  Is there any process like, formal process by

21   which medical refusals are tracked?

22        A.  I have no idea.

23        Q.  Okay.  Have you ever been asked to count how

24   many times Tiffany refused her medication?

Page 34

1      A.  No.

2      Q.  Is, can refusal of medications, whether

3  psychiatric or otherwise, be a symptom of mental

4  illness?

5      A.  Can be.

6      Q.  Can it be a sign of, if a person is, is

7  routinely refusing medication is it, can it be a sign

8  of mental decompensation?

9      A.  Can be.

10     Q.  Was anybody at Sangamon County Jail

11 reviewing Tiffany's medical refusal to determine

12 whether they were evidencing a risk that her Mental

13 Health was decompensating?

14     A.  I don't know.

15     Q.  Was, it wasn't your responsibility to do

16 that?

17     A.  No.

18     Q.  When you would receive a medication refusal

19 if you don't know what medicines were being refused

20 because you're not sure what's being prescribed to

21 that particular patient, would you review the Medical

22 Administration Record or, for Medical records to

23 determine, to find out what drugs were being refused?

24     A.  I could review the chart, yes.

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 35

1       Q.  Did you do that in Tiffany's case?

2       A.  I don't recall.

3       Q.  So I'm going to show you exhibit or Ernest

4   Exhibit 5 which is a Medication Administration Record

5   from Tiffany's stay.  And we're going to look at,

6   start by looking at this third page of the exhibit

7   which is SJT Medical records Tiffany Rusher 36.

8             I understand that that is a Medication

9   Administration Record from March of 2017, correct?

10      A.  Yes.

11      Q.  And because I do not have a copy in front of

12  me, I'm going to ask if you could read to me the

13  medications that Tiffany was prescribed at that time

14  period?

15      A.  She is on Stribild.  She's on Effexor,

16  Depakote, Thorazine, Thorazine again and aspirin.

17      Q.  Is that because she's on two doses of

18  Thorazine or why is Thorazine on there twice?

19      A.  Thorazine 200 milligrams 3 times daily, then

20  she had another hundred milligrams once daily.

21      Q.  And those are, Effexor is a psychiatric

22  medication, right?

23      A.  Antidepressant, yes.

24      Q.  And Depakote that was being provided for

Page 36

1  psychiatric purposes?

2       A.  I'm assuming it is but it is used for

3  seizures also.

4       Q.  Okay.  To your knowledge, did Tiffany have a

5  seizure disorder?

6       A.  Not that I can recall.

7       Q.  Okay.  But she did have a history of mental

8  illness, correct?

9       A.  Yes.

10       Q.  And then the next drug began with a P, what

11  was that one or --

12       A.  No, Stribild, I'd have to look it up, I have

13  no idea what it is.

14       Q.  Yeah.  But after Depakote what was the next

15  drug?

16       A.  That's Thorazine.

17       Q.  Oh, Thorazine and that's a psychotropic

18  medication, right?

19       A.  Yes.

20       Q.  And you prescribed the Effexor, the

21  Thorazine and the --

22       A.  The Stribild.

23       Q.  What about the, the Depakote, you prescribed

24  that as well, right?

Page 37

1         A.   Uh-huh.

2         Q.   That's a yes?

3         A.   Yes.

4         Q.   Did you ever undertake any kind of Mental

5    Health evaluation of Tiffany before prescribing those

6    medications?

7         A.   These would have been based on her outside

8    medications when they come in they are verified

9    through the pharmacy of what medications or if they

10   were in, say McFarland's.

11        Q.   And so you would prescribe psychiatric

12   medications that were already being prescribed to the

13   patient --

14        A.   Yes.

15        Q.   -- prior to?

16        A.   I would keep them on the same medications,

17   yes.

18        Q.   Would it be appropriate for you to, to

19   prescribe newer, change psychiatric medications for a

20   particular Inmate?

21        A.   I'm not sure what you mean.

22        Q.   If you were to, would it be appropriate for

23   you to prescribe new, in your capacity as the

24   Registered Nurse, excuse me, the Nurse Practitioner at

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 38

1  Sangamon County Jail would you be, would it be

2  appropriate for you to change or add new psychiatric

3  medications to a patient without undergoing a Mental

4  Health evaluation?

5       A.  That's depending on the patient.

6       Q.  It is, there are circumstances under which

7  it is okay to prescribe antipsychotic medication?

8       A.  Yes.

9       Q.  Without conducting a Mental Health

10 evaluation?

11      A.  Yes.

12      Q.  And what are those circumstances?

13      A.  Gosh, if you would have to pin that one I

14 don't know, I mean I don't know every situation is so

15 different, it's hard to, you know, give you an exact,

16 you know, this is how it is.

17      Q.  Okay.  There was no general rule that you

18 followed that would say that if you're going to be

19 prescribing antipsychotic medications, you need, as a

20 rule you need to consult with a psychiatrist?

21      A.  No.

22      Q.  And so you don't agree with me that a Nurse

23 Practitioner or a Family Medicine Doctor prescribing

24 antipsychotic medication at the Jail needs to consult

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 39

1   first with a psychiatrist?

2        A.  Well, in Tiffany's case we had her Mental

3   Health records.

4        Q.  Yes.  And I do want to come back to

5   Tiffany's case, but I'm actually asking as a general

6   premise.

7             You don't agree with me that as a

8   general premise a Family Practitioner or a Nurse

9   Practitioner in the incarceration setting should not

10  prescribe new antipsychotic medication without first

11  consulting with a psychiatrist?

12       A.  That depends.  There again that depends on

13  the patient.

14       Q.  Okay.  So, and so what I hear is that yeah,

15  you don't agree there is a general rule prescribing or

16  prohibiting that?

17       A.  No.

18       Q.  Okay.  And you mentioned that those drugs

19  were originally prescribed at McFarland or prior to

20  her incarceration you think?

21       A.  Yes, somewhere else, yes.

22       Q.  So you wrote a prescription continuing the

23  use of those drugs --

24       A.  Yes.

Page 40

1      Q.  -- right.

2              Did you undertake any kind of Mental

3      Health evaluation of Tiffany before writing the

4      prescription to continue those drugs?

5      A.  I don't remember.

6      Q.  If you did, would it have been documented in

7      the particular form?

8      A.  It would been documented.

9      Q.  What form would you have documented it?

10     A.  It would have been, it would have been on

11     the Medical progress note.

12     Q.  Okay.  And what, and what would your Mental

13     Health Evaluation entail?  What kind of things would

14     you be looking for in that evaluation?  Let me see if

15     I can find an example.

16              What do you mean, I said Mental Health

17     Evaluation that's the phrase I used when you said you

18     would do that if you were going to, I think you said

19     that you would engage in some kind of Mental Health

20     Evaluation before deciding to continue a prescription,

21     is that right?

22     A.  Well, it depends on the patient whether they

23     are coming directly from McFarland to our facility

24     because that happens frequently.  And we would

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 41

1   continue the medications that the psychiatrist had

2   ordered at that facility.

3        Q.  So at McFarland Tiffany was prescribed

4   assuming --

5        A.  Assuming that's where she came from.

6        Q.  That's assuming that the psychiatrist

7   prescribed Tiffany those medications prior to coming

8   to Sangamon.  Did you engage in any kind of evaluation

9   of whether Tiffany's mental status was whether or not

10  she had been decompensating or getting worse while on

11  those medications at the prison?

12       A.  That I don't recall.

13       Q.  If you had, it would be documented in the

14  note?

15       A.  On the Medical progress note.

16       Q.  On the Medical note?

17       A.  Uh-huh.

18       Q.  And at what point would, would continuous

19  acts of self harm be an indication that, that someone

20  might need a new psychiatric evaluation regarding what

21  psychotropic or other psychiatric medications were

22  being prescribed?

23       A.  I'm not sure are you meaning like a

24  medication review or?

DEPOSITION OF MARY DAMBACHER                        June 13, 2019

Page 42

1        Q.  Sure.

2               Is there such a thing as medication

3   review at Sangamon County Jail?

4        A.  I mean we would individually do it ourselves

5   I mean...

6        Q.  You were aware, you know, by here.

7               Let's see, so let's discuss this in

8   more concrete format.

9               Let me give you a page of Medical

10  records at least Plaintiff's 10862, 10863 about yeah,

11  that's what we're going to do.  They are printed

12  double sided so, sorry.

13              Okay.  So again the Medication

14  Administration Record that we're looking at was from

15  March, correct of 2017?

16       A.  I got 15, 16 but I don't know see the 3 it

17  is cut off.

18       Q.  Oh, at the bottom?

19       A.  There you go 3/1/17 charting form, yes.

20       Q.  So.  I'm going to show you Dambacher

21  Exhibit 3 which is 10862, Dambacher Exhibit 4 which is

22  Plaintiff's 10863?

23                      (Dambacher Exhibit 3, 4 marked for

24                       identification by the Court

Page 43

1                     Reporter.)

2          Q.   I'm wondering if those are records so in

3     10862 is Doctor Abraham's writing, correct, it's for

4     Tylenol?

5          A.   Yes, on 3/15 yes, it is.

6          Q.   On her Medication Administration Review you

7     see where he prescribed Tylenol, correct?

8          A.   Yes, that's his signature, yes.

9          Q.   And then here in exhibit, the other exhibit

10    we were looking at that's the MAR.  Oh, no, actually

11    that's --

12         A.   That is aspirin that would be a daily

13    medication anyway.

14         Q.   I was trying to see if that, that was like a

15    prescription that I could match up with that?

16         A.   No, they generally just write, just write it

17    in a blank spot if it's just for a short period of

18    time.

19         Q.   Okay.  Well, let's move to 10863 which is

20    Tracy Hammitt's handwriting, right?

21         A.   On 3/10/17, yes.

22         Q.   Okay.  And then your signature at the

23    bottom?

24         A.   Yes.

Page 44

1      Q.  And what, let's see, what that note says

2  3/10/17 on Stribild, Depakote and I'm skipping over

3  the dosage, so Thorazine 200 milligrams, Thorazine 100

4  milligrams later in the day, Prazosin RX to expire,

5  and then the plan said continue.  It says continue

6  meds times 90 days, is that, did I read that note

7  properly?

8      A.  Yes, this is typical.  We order them for so

9  many days because we don't know whether these patients

10  will be there, you know 30, 60, 90 days later.

11      Q.  Right, okay.

12            So this is an order, is this an order

13  to continue medication?

14      A.  Yes.

15      Q.  Is Tracy Hammitt -- so, the person who

16  prescribes the medication?

17      A.  It's typically whoever is on call, I was

18  probably on call that night getting ready to expire

19  and so we were going to continue those.

20      Q.  But my understanding is that Tracy Hammitt

21  can't prescribe medication?

22      A.  No, she's an LPN, no.

23      Q.  So basically you having signed that note,

24  this note is this in itself a prescription?

Page 45

1      A.  Yes.

2      Q.  Okay.  And how does, is this note sent to a

3  pharmacy?

4      A.  This note would be written on a pharmacy

5  sheet and faxed.

6      Q.  Okay.  So it would be you prescribing under

7  your own authority?

8      A.  Yes.

9      Q.  So this note reflects that you prescribed a

10 continuation of these medications on --

11     A.  That day, yes.

12     Q.  -- that day on March 10th, 2017, okay.

13          When, does this note reflect any kind

14 of, earlier we talked about, you know, there might be

15 instances where you would engage in some kind of

16 evaluation of whether a patient had been doing well or

17 decompensating on certain medications before

18 re-prescribing them, and you said that if you had done

19 that, it would be reflected in the Medical records,

20 correct?

21     A.  Yes.

22     Q.  And does this narrative progress note

23 indicate any reflection that you've engaged in any

24 kind of evaluation of Miss Rusher's current mental

Page 46

1    health status?

2         A.  No.

3         Q.  So safe to say that this reflects a

4    prescription but no Mental Health evaluation?

5         A.  Well, that's not entirely true.  If she was

6    in the High Risk, then she would have been evaluated

7    by Mickey and Doctor Abraham, so.

8         Q.  But they didn't prescribe the medications on

9    this date, correct?

10        A.  No.

11        Q.  It was you?

12        A.  Yes.

13        Q.  And what evaluation did you undertake before

14   prescribing those medications?

15        A.  Nothing.

16        Q.  Okay.  And is there any professional

17   standard of care that would require you to evaluate

18   her current Mental Health status before writing a

19   prescription to continue psychiatric medications?

20        A.  No.

21        Q.  Is there any professional standard that

22   would require you to, to prior to writing a

23   continuation for antipsychotic medication to determine

24   whether she was receiving an appropriate level of

**DEPOSITION OF MARY DAMBACHER**                    June 13, 2019

Page 47

1    Mental Healthcare treatment in the, at at the time

2    that you wrote the prescription?

3        A.  I'm not sure what you're asking.

4        Q.  Did you ever undertake an analysis about

5    whether she was receiving an appropriate level of

6    Mental Healthcare treatment?

7        A.  I did not because of where she was housed.

8        Q.  Because she was housed in High Observation,

9    correct?

10       A.  Yes.

11       Q.  And Mr. Shmikler was that, your

12   understanding was that he was treating her?

13       A.  He was seeing her and then Doctor Abraham

14   made his rounds there, yes.

15       Q.  Okay.  Did you communicate with Doctor

16   Abraham prior to writing this prescription?

17       A.  No.

18       Q.  Is there any standard of care that would

19   require you to communicate with the Doctor who was

20   making rounds on Tiffany prior to writing this

21   prescription to continue her psychotropic medication?

22       A.  No.

23       Q.  Is there any, did you consider how long

24   she'd been on High Risk Observation status prior to

**DEPOSITION OF MARY DAMBACHER**                    **June 13, 2019**

Page 48

1    writing this prescription for medication?

2          A.  I'm not sure what you mean.

3          Q.  When you wrote this prescription, did you

4    take into account how long Tiffany had been on, on

5    High Risk Observation?

6          A.  I'm not sure how to answer that because I

7    guess I'm, it's, I had very little interaction with

8    her because of where she was housed.  So no, I,

9    typically there is 400 Inmates or patients there for

10   me to keep track of, you know.

11         Q.  Is it appropriate for a Nurse Practitioner

12   to write prescriptions for Thorazine for a patient

13   with whom she has very little interaction?

14         A.  Continuation of medications that were

15   prescribed by a psychiatrist, yes.

16         Q.  Okay.  And although these were continued

17   medications that were prescribed by a psychiatrist,

18   was there any need for you to undertake any kind of

19   evaluation as to whether those medications were

20   continuing to be appropriate three months into her

21   stay at Sangamon County Jail?

22         A.  Again that would be Mickey and Doctor

23   Abraham when they made their rounds, yes.

24         Q.  And you did not talk about these

**DEPOSITION OF MARY DAMBACHER**                **June 13, 2019**

Page 49

1    prescriptions with Mickey or Doctor Abraham?

2         A.  No.

3         Q.  Okay.  Is there any policy at ACH regarding

4    when you are or are not authorized to continue

5    prescriptions of previously prescribed medications?

6         A.  No.

7         Q.  Do you know whether Tiffany, did you

8    consider Tiffany to be suicidal when she was at

9    Sangamon County Jail?

10        A.  There again I only had the, the one

11   interaction when she swallowed the spoon so I can't --

12        Q.  Did you, were you aware that she had also

13   reported swallowing other items?

14        A.  I don't remember.

15        Q.  Did you review her Medical chart to

16   determine how many times she had engaged in self

17   harming behavior before writing these prescriptions?

18        A.  No.

19        Q.  And were you, did you speak with any other,

20   do you have any conversations, do you recall any

21   conversations with anyone, any Medical Staff about

22   Tiffany Rusher?

23        A.  I don't recall.

24        Q.  Okay.  And then I've asked if you had any

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 50

1    recollections of interactions with Tiffany that you

2    haven't talked about today?

3          A.  No.

4          Q.  And I think you said no?

5          A.  No.

6          Q.  Okay.  I apologize I'm looking for a

7    document which I couldn't access.

8                          MS. CHARDON:  Let's take a

9    short break.

10                        (Whereupon a recess was taken.)

11                         MS. CHARDON:  Okay.  Back on

12   the record.

13         Q.  When you prescribed medication to Tiffany on

14   March 10, 2017, had you made any diagnosis of her

15   Mental Health condition?

16         A.  I did not.

17         Q.  Were you aware of whether she had a

18   diagnosis?

19         A.  We would have had records.

20         Q.  And did you evaluate that diagnosis prior to

21   continuing those medications --

22         A.  I did not.

23         Q.  -- viewing the medications are you able to

24   determine what the diagnosis was?

Page 51

1       A.  Not particularly, I mean no.

2       Q.  Do you treat, do you prescribe antipsychotic

3   medication in the course of your treatment of

4   individuals outside Jails at the Memorial --

5       A.  Yes.

6       Q.  -- Clinic?

7               And do you prescribe Depakote --

8       A.  Yes.

9       Q.  -- for psychiatric reasons?

10      A.  Yes.

11      Q.  Do you prescribe Thorazine?

12      A.  I don't remember if I have any patients on

13  that or not.

14      Q.  Okay.  Would you prescribe Thorazine if you

15  felt that it was appropriate for some of your

16  patients?

17      A.  If I felt it was appropriate, yes.

18      Q.  Would you refer patients to a psychiatrist

19  if you were prescribing them Depakote or Thorazine at

20  Memorial?

21      A.  At Memorial they typically have already been

22  evaluated by psychiatry.

23      Q.  If they haven't been evaluated by a

24  psychiatry, could you prescribe those medications

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 52

1    without sending them to psychiatry?

2         A.  Most likely not.

3         Q.  Why not?

4         A.  I would want a diagnosis --

5         Q.  Okay.

6         A.  -- before.

7         Q.  Because a diagnosis is important to have

8    when you're prescribing those kinds of psychiatric

9    medication?

10        A.  Yes.

11        Q.  And sitting here today do you know what

12   Tiffany's diagnosis was?

13        A.  I don't.

14        Q.  Did you know it at the time that you

15   prescribed these medications?

16        A.  I would have had the record in front of me.

17        Q.  Would you have prescribed them if it didn't

18   have a specific diagnosis in it?

19        A.  I'm not sure what you mean.

20        Q.  If you had a record which showed that she

21   was receiving these medications, but didn't have a

22   specific reference to a particular mental diagnosis,

23   would you feel comfortable continuing the

24   prescription?

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 53

1        A.   There again I'm not sure, I mean she had the

2    diagnosis, I mean, I mean she had the diagnosis so

3    and...

4        Q.   So again you didn't do any assessment to

5    determine whether this treatment, these drugs was

6    effective for the diagnosis that she had?

7        A.   I was relying on the psychiatrist.

8        Q.   Okay.  The psychiatrist at, who originally

9    prescribed these, correct?

10       A.   Yes.

11       Q.   And that was the only information that you

12   were relying on when you continued the prescription --

13       A.   No, yes.

14       Q.   -- correct?

15       A.   Yes.

16       Q.   What is your role with respect to suicide

17   prevention or crisis intervention at Sangamon County

18   Jail?

19       A.   I'm not sure what you mean.

20       Q.   Do you have any responsibilities or role

21   with respect to, is there, is there a program or

22   protocol or suicide prevention or crisis intervention

23   at Sangamon County Jail?

24       A.   It's everybody's job there to recognize the

Page 54

1    warning signs.

2         Q.  Okay.  And is that written down somewhere in

3    a particular place?

4         A.  I have no idea.

5         Q.  And when you say the warning signs what, how

6    do you know what you mean or by warning signs is there

7    a --

8         A.  A change in behavior, bad news from, you

9    know, call from home, bad from Court, bad news from

10   Court.

11        Q.  Prior acts of self harm is that a warning

12   sign?

13        A.  Depends on the behavior at that time I mean

14   because you try to commit suicide, you know, one time

15   doesn't mean that it would ever happen again.

16        Q.  Is it a, one of the risk factors that you

17   would take into account when evaluating suicide risk?

18        A.  It can be, yes.

19        Q.  So is that when you're talking about

20   recognizing the factors is that a potential factor

21   that you would take into account?

22        A.  If that information is available, yes.

23        Q.  Okay.  And so is there one single place

24   where there is a common understanding of what you mean

DEPOSITION OF MARY DAMBACHER                     June 13, 2019

Page 55

1   when you say risk, recognizing risk factors for

2   suicide?

3                  I asked you what the Suicide Prevention

4   Plan was at Sangamon County Jail, and I think your

5   answer is that everybody's job, correct?

6        A.   To recognize, yes, recognize and report,

7   yes.

8        Q.   Okay.  And is that written down in any

9   specific place so I can go looking for it to

10  understand what it is?

11       A.   I don't know of any place that it's written

12  down.

13       Q.   Okay.  And so do you have any different

14  roles or responsibilities within that plan that you're

15  talking about than other people or is the, you know

16  that that comes back to my question what is your role

17  with respect to Suicide Prevention Crisis Intervention

18  at Sangamon County Jail?

19       A.   Safety, their safety.

20       Q.   And as a Nurse Practitioner do you have any

21  responsibilities above and beyond other Medical Staff

22  at Sangamon County Jail with respect to that suicide

23  prevention and intervention?

24       A.   I'm not sure what you mean.

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

                                                        Page 56

1        Q.  Are your job responsibilities as a Nurse

2   Practitioner who can prescribe medication and make,

3   can you make diagnoses as a Nurse Practitioner?

4        A.  Yes.

5        Q.  Do you have anymore or greater

6   responsibilities with respect to suicide prevention

7   and crisis intervention than any other Medical Staff

8   at the facility?

9        A.  Not that I am aware of.

10       Q.  Okay.  Do you have any responsibilities to

11  undertake an evaluation of whether treatment being

12  received by a particular Inmate is appropriate for

13  their particular mental health crisis?

14       A.  Well, there again that depends like in

15  Tiffany's case, Tiffany was down in a different block

16  that I don't normally go and see patients at.

17       Q.  Is it against any policy or procedure at ACH

18  for you to write psychiatric prescriptions for a

19  patient whom you're not seeing regularly?

20       A.  There is no policy that I know of.

21       Q.  Okay.  And I think you have, did you state

22  that you have previously referred patients to the ER

23  for psychiatric reasons?

24       A.  I don't remember.

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 57

1        Q.   Okay.  Have you done it, so you don't know
2    if you've ever made a referral of a patient?
3        A.   At Sangamon, I don't remember.
4        Q.   You don't have any specific recollection of
5    that?
6        A.   No.
7        Q.   Did you say that you have a specific
8    recollection of doing that at other facilities?
9        A.   Yes.
10        Q.   Okay.  How many times?
11        A.   I couldn't put a number on it.
12        Q.   What lead you in those instances to make the
13    call that a person needed to be referred to the ER for
14    psychiatric evaluation?
15        A.   Change in their Mental Health status.
16        Q.   And what changes specifically?
17        A.   Just behaviors themselves.  There is a
18    difference between sites.  So Sangamon County does
19    have the Mental Health other sites do not, that's why
20    I had to refer them out.
21        Q.   Okay.  And again, your understanding is that
22    Tiffany was getting Mental Health treatment at
23    Sangamon County Jail, correct?
24        A.   Yes.

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 58

1          Q.  But you don't know, I'm wincing because I'm
2    not trying to invite an asked and answered objection.
3    I just, I apologize I'm, I just want to clarify your
4    answer on it.
5                    Do you know what kind of treatment she
6    was receiving from Mr. Shmikler?
7          A.  I do not.
8                    MS. CHARDON:  Okay.  I don't
9    have any other questions.
10                   MS. POWELL:  I just have a few,
11   can I have her exhibits, please.
12                   CROSS EXAMINATION CONDUCTED
13                   BY MS. POWELL:
14         Q.  Okay.  So in looking at Dambacher 2 you know
15   when you would have watched this PowerPoint?
16         A.  I do not.
17         Q.  Do you know if it was before or after
18   Tiffany died?
19         A.  I do not.
20                   MS. CHARDON:  I want to clarify
21   for the record that that was taken from, as a still
22   from a video not a PowerPoint.
23         Q.  Oh, I am sorry.
24                   Well, the video, did you watch this

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 59

 1    individual that is referenced in this Exhibit 2?

 2         A.   I don't remember.

 3         Q.   You don't know if you have or not?

 4         A.   I've watched a lot of videos, I don't

 5    remember that one in particular.

 6         Q.   Okay.  Do you know if anyone at the Sangamon

 7    County Jail who isn't employed about ACH has watched

 8    this.

 9         A.   I have no idea.

10         Q.   Okay.  And again you don't know what year

11    it's from?

12         A.   No.

13         Q.   You don't know when Doctor Caldwell started

14    with ACH?

15         A.   No.

16         Q.   Has Doctor Caldwell ever been at the

17    Sangamon County Jail while you were there?

18         A.   While I've been there, no.

19         Q.   Okay.  Exhibit 1 is the reference to Tiffany

20    says oh, swallowed a spoon, this is the one from

21    January 12 of 2017?

22         A.   Uh-huh, yes.

23         Q.   Now was that, do you know was that one of

24    the first times that you encountered her?

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 60

1      A.   It's the only time I ever remember.

2      Q.   Okay.  Do you think that may have been the

3  very first time you saw her?

4      A.   I couldn't say.

5      Q.   Do you know if you saw her -- do we have

6  another copy of that?

7                  MS. CHARDON:  Yeah, it's

8  Dambacher 1, I think so, just take me a moment.

9                  MS. POWELL:  I will give it

10  back to you, thanks.

11      Q.   Do you know if you saw her in the healthcare

12  unit or beside her cell?

13      A.   When she swallowed the spoon.

14      Q.   Well, when you wrote your name on this where

15  you actually with her?

16      A.   She would have been sent to the ER I was

17  there when she swallowed the spoon.

18      Q.   Okay.

19      A.   They brought her to me in the Medical Unit.

20      Q.   Okay.  So you were in the Medical Unit when

21  you filled this out probably?

22      A.   Yes.

23      Q.   Okay.  So you would have actually seen her

24  and you told you said David Johnson?

**DEPOSITION OF MARY DAMBACHER**                    **June 13, 2019**

Page 61

1      A.   Uh-huh.

2      Q.   He would have been there as well and most of

3  the writing you said I believe was Mr. Johnson's

4  writing?

5      A.   No, the majority of it is mine his is the

6  swallowed spoon at the top, subjective complaint.  The

7  rest of that is mine.

8      Q.   Okay.  And then when she went to the ER, you

9  wouldn't have followed her?

10      A.   No.

11      Q.   Now would you have spoken to the Doctors at

12  the hospital?

13      A.   No.

14      Q.   Would you have told the Doctors at the

15  hospital what to do?

16      A.   No.

17      Q.   And did you tell them to remove the spoon?

18      A.   No.

19      Q.   Did you tell them do anything?

20      A.   No.

21      Q.   Okay.  And you just expected them to

22  evaluate her and to determine what treatment she

23  needed, right?

24      A.   Yes.

Page 62

1      Q.   Would anybody from ACH have contacted the

2  Jail to find out what the recommendations were?

3      A.   No.

4      Q.   Would the hospital call someone at the Jail

5  to report her status?

6      A.   Yes.

7      Q.   Okay.  So someone did speak to the people at

8  the hospital?

9      A.   Yes, they typically call ahead and let the

10  ER know this patient is coming.  This is their issue,

11  and then they address it and then they send them back

12  they call with report.

13      Q.   Okay.  So someone at the hospital then will

14  call back to the Jail hey, we're sending this person

15  back or we're keeping this person or we have the

16  following recommendations?

17      A.   Yes, or either way I have seen them, the

18  Nursing staff also calls to do a health check

19  follow-up check and make sure what's going on.

20      Q.   Okay.

21      A.   Just depends.

22      Q.   Then where it says on here at the bottom

23  follow-up as needed, who wrote that?

24      A.   That would be me.

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 63

 1        Q.  Okay.  And where it says patient as

 2   needed --

 3        A.  Yes.

 4        Q.  -- that's you as well?

 5        A.  Yes.

 6        Q.  Okay.  So when it says follow-up as needed

 7   is that, as the patient says she needs it, or as the

 8   physicians at the ER say as needed who?

 9        A.  That can depend, too, that can be what they

10   recommend from the Emergency Department or when she

11   returns whatever procedure they've done with her.

12        Q.  Okay.

13        A.  It would be on an as needed basis.

14        Q.  Okay.  And then where it says

15   musculoskeletal, do you see what you wrote there?

16        A.  Air boot intact, able to self transport to

17   wheelchair to the table.

18        Q.  Do you know how long she had had that boot

19   on?

20        A.  No.

21        Q.  And at the time that you saw her did she,

22   were you aware of her having anybody problems with

23   that boot up until that time?

24        A.  I was more focused on her airway and if she

Page 64

1    was going to obstruct and that was my focus.

2         Q.  Okay.  Did she and do you know why she

3    swallowed the spoon?

4         A.  No.

5         Q.  And now at the time you encountered her, did

6    you know that she was someone who had a history of

7    Pica?

8         A.  At the time, no, they just brought her up

9    and said we had an emergency.

10        Q.  Okay.  So you don't really know why she

11   swallowed it?

12        A.  I have no idea why she swallowed it.

13        Q.  Do all people who suffer from Pica are they

14   always suicidal?

15        A.  No.

16        Q.  Does everyone who has Pica suffer from a

17   mental illness?

18        A.  That I can't tell you whether, with a

19   hundred percent certainty.

20        Q.  Okay.  And you recall encountering Miss

21   Rusher again personally other than on this particular

22   date referenced in Exhibit 1?

23        A.  That's the only time that I recall.

24        Q.  Okay.  Now you were asked some questions

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 65

1  about prescribing medications you recall that?

2       A.  Yes.

3       Q.  My guess is that you don't just go into the

4  Jail and grab random files off the shelf and just

5  start continuing medications, do you?

6       A.  No.

7       Q.  Okay.  So that's what's your testimony

8  sounded like it sounded like well, I'm just going to

9  continue these medications even though I didn't see

10  the patient?

11                 MS. CHARDON:  Objection, form.

12       Q.  So my question is that's not what happened,

13  is it?

14       A.  No.

15       Q.  Can you tell me the process as to how you

16  came to be continuing the medications for Miss Rusher?

17       A.  The Nurse when she's noticing that the

18  medication is running low, so we don't run out of the

19  medication.  Then they will, they will do the note on

20  the progress form and request that be continued.

21       Q.  Okay.  So the Nurse noticed that the

22  medication may be running out and you're coming to the

23  end of the month or whenever that prescription may run

24  out --

1        A.   Run out, yes --

2        Q.   -- and that it needs to be refilled and it

3   can only be refilled by a Physician or Nurse

4   Practitioner?

5        A.   Yes.

6        Q.   And that's either going to be you or Doctor

7   Abraham, correct?

8        A.   Yes.

9        Q.   Okay.  Are you aware of anyone other than

10  you or Doctor Abraham who can prescribe medications?

11       A.   No.

12       Q.   Now I believe you testified that when you

13  would renew the medication you would have the

14  patient's chart in front of you, right?

15       A.   Not necessarily, no.

16       Q.   You wouldn't see what the chart said you're

17  renewing?

18       A.   No, not necessarily.

19       Q.   How would you know what you were renewing?

20       A.   It was written down on the, from the EMAR

21  from the Nurse.

22       Q.   Okay.  So would there be a prior order that

23  indicated what the medication was for?

24       A.   I'm not sure what you mean, you mean from

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 67

1    the EMAR.

2         Q.   From anywhere?

3         A.   I'm not sure what you mean by that.

4         Q.   So if a patient had a prescription for

5    30 days for a medication you're not going to renew it

6    if it says it's supposed to end in 30 days, right?

7    What if it says, you know, what if the ER Doctor

8    writes a prescription for antibiotics for 30 days?

9         A.   Then if that was their instructions, then we

10   would continue that.

11        Q.   You're going to continue it forever?

12        A.   No, they said, you said for the 30 days.

13        Q.   Right.

14        A.   We would follow their recommendations.

15        Q.   And then it would end in the 30 days, right?

16        A.   Yes.

17        Q.   Okay.  So when you say you're going to

18   continue it, you are going to continue it for the

19   amount of time that the original person already wrote

20   it, right?

21        A.   No.

22        Q.   Well, explain it to me I don't understand

23   what you're saying.

24             If the ER Doctor writes a prescription

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 68

1   for 30 days, are you going to keep continuing that

2   medication?

3        A.  Well, psychiatric medication you can't just

4   stop, you know, they have to be weaned.  They have to,

5   you know, there are certain things that you can't just

6   stop.  That's why these medications, you know, when

7   they notice that there is, it's going to run out, we

8   renew it.

9        Q.  Okay.  So how is it determined which

10  medications need to be renewed and which medications

11  are ending?

12       A.  Well, it depends on the medication like for

13  her for the Thorazine, I mean that's one medication

14  and the Depakote also that you just, we do not just

15  stop that medication.

16       Q.  Now is Depakote something that has a half

17  life?

18       A.  Yes.

19       Q.  Okay.  So was that something that needs to

20  be given on a regular basis in order to make it

21  effective for a certain period of time?

22       A.  Yes.

23       Q.  Okay.  And you wouldn't just stop that

24  medication cold turkey for a person, would you?

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 69

1        A.   No.

2        Q.   Okay.  And there is significant side effects

3   in doing so, correct?

4        A.   There can be.

5        Q.   Okay.  Would the same be true for the

6   Thorazine?

7        A.   Yes.

8        Q.   Now if you want to stop the medication,

9   could you?

10       A.   I would wean it, I would not stop it.

11       Q.   Did you have any information to suggest that

12  these medications should not have been continued?

13       A.   I didn't have that information, no.

14       Q.   Okay.  Were you relying on the Nurse to

15  provide you with the appropriate information to rely

16  upon in order to continue those medication?

17       A.   In order to continue medications like this

18  they would, would request their records from wherever

19  it was that she was coming from, whether it was

20  McFarland or Chester or wherever she came from.

21       Q.   Okay.  And it's my understanding that the

22  McFarland records are, that there is notes in the

23  record from McFarland as to the prior prescriptions,

24  would ACH had been aware of the fact that she been on

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 70

1   these medications for sometime prior to coming to the

2   Jail?

3        A.  I'm not sure what you mean.  When the

4   patient comes from a facility such as McFarland they

5   will sometimes send the medications with them, a

6   certain amount, a certain supply of them or their

7   records.  I mean we, you know, we don't just order

8   these or stop these, you know, medications if they

9   have been recommended by the psychiatrist.

10       Q.  Will the records indicate to us how long the

11  original prescriptions were for?

12       A.  I have no idea.

13       Q.  Okay.  Do you know who would know that?

14       A.  It would be in the records.

15       Q.  And it's also my understanding that if

16  somebody at McFarland wrote a prescription, that

17  prescription is not going to be valid inside the Jail,

18  is it?

19       A.  That's why we order them.

20       Q.  Okay.  So if the psychiatrist at McFarland

21  wrote a prescription for all the medications that she

22  is taking right now in the Jail, in order for them to

23  be valid in the Jail as soon as she gets to the Jail

24  somebody has to rewrite all of those same

Page 71

1    prescriptions, correct?

2         A.  Yes.

3         Q.  Okay.  And would you agree that it's in

4    general that's what you're going to do is you're going

5    to immediately look at the prescriptions that the

6    patient is already on and as closely as possible

7    continue each of those medications or a similar

8    medication?

9         A.  Yes.

10        Q.  As long as it's in your formulary or

11   something that you can --

12        A.  Provide for them, yes.

13        Q.  Right.

14              And if they sent over medications, you

15   would continue to give the medications that they sent

16   with her, correct?

17        A.  Yes.

18        Q.  Okay.  Now at any time did you make any

19   recommendations to Jail Staff to move Miss Rusher from

20   High Risk to anywhere else?

21        A.  No.

22        Q.  Okay.  Do you recall ever seeing Miss Rusher

23   when she was housed with other people?

24        A.  No.

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 72

1        Q.   Do you know if, on January 12th of 2017 do
2   you know where she was housed?
3        A.   No.
4        Q.   Okay.  So on the date that she swallowed the
5   spoon, you don't know if she was around other people
6   or if she had been by herself for any period of time,
7   right?
8        A.   I don't know.
9        Q.   Okay.  Do you recall her saying anything
10  about why she swallowed the spoon?
11       A.   No.
12       Q.   Okay.  Do you think she swallowed the spoon
13  on purpose as opposed to being some sort of an
14  accident?
15       A.   It was a very large spoon, she had to try
16  very hard to get that down into her airway, yes.
17       Q.   Yes, you believe she did it on purpose?
18       A.   Yes.
19       Q.   Do you believe it would be reasonable to
20  restrain Miss Rusher 24/7 to keep her from doing these
21  types of things?
22       A.   No.
23       Q.   That wouldn't be reasonable, would it?
24       A.   No.

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 73

1      Q.   And why not?

2      A.   As far as you mean like a restraint chair?

3      Q.   As far as anything?

4      A.   I mean well you have to consider their

5  safety, I mean you can't, you know, let them go to

6  general housing if they're going to try and harm

7  themselves.

8      Q.   Well, what I'm asking though it's not

9  reasonable to tie her up 24/7, is it?

10     A.   To physically restrain her, no.

11     Q.   Yes?

12     A.   No.

13     Q.   And are you aware of her doing anything

14  other than swallowing items, you personally?

15     A.   No.

16     Q.   And what was your understanding as to what

17  the medications that she was on was supposed to do for

18  her?

19     A.   Would be stabilize her mood.

20     Q.   Now do you know whether she was doing better

21  while she was in the Jail or worse?

22                 MS. CHARDON:   Objection form,

23  foundation.

24     A.   I don't know.

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 74

1          MS. CHARDON:  Form, go ahead.

2      A.  No.

3          MS. POWELL:  What is wrong with

4  the form?

5          MS. CHARDON:  Better or worse,

6  vague, but I strike my objection as to foundation.

7      Q.  You can answer, if you know.

8      A.  I don't know.

9      Q.  Okay.  I believe you indicated that you

10  really didn't spend much time with her, did you?

11      A.  No.

12      Q.  And other than this one date, you can't

13  really say if you ever really saw her or spent time

14  with her other than on July, on January 12th, is that

15  fair?

16      A.  That's fair.

17      Q.  And do you remember having any conversations

18  with Jail Staff about Miss Rusher?

19      A.  No, I do not.

20      Q.  Okay.  Now if you thought she needed

21  something different, you could recommend that, right?

22      A.  Yes.

23      Q.  Okay.  And to your knowledge, did you ever

24  recommend any other medications other than the ones

Page 75

1    that she had been prescribed before she got there?

2         A.  Not that I can recall.

3         Q.  And you said that one of the reasons why you

4    didn't spend much time with her is because she was in

5    the High Risk area --

6         A.  Yes.

7         Q.  -- is that true.

8              So that means you mostly stayed in the

9    Medical Unit?

10        A.  I do stay in the Medical Unit.  They do

11   bring me people who are on sick call or chronic clinic

12   and then I go to the A Block to evaluate the A Block.

13        Q.  Okay.  You just don't go down to the High

14   Risk, you're just not assigned to working in High

15   Risk, is that fair?

16        A.  That's fair.

17        Q.  Okay.  So you wouldn't have the opportunity

18   to see who is there because you're not there to

19   observe them, correct?

20        A.  Correct.

21        Q.  And if there were problems or issues that

22   came up with people in High Risk, would it be fair to

23   say that those were more likely than not be brought up

24   to the people who worked down there rather than you?

Page 76

1      A.   No, they're not brought up to the Medical

2  Unit if they're in that, in that area.

3      Q.   I guess what I'm saying is if somebody down

4  in High Risk has a problem they're going, whoever is

5  working down there is going to bring that issue up to

6  the people who worked down there like Mickey when he

7  walks by or --

8      A.   Yeah.

9      Q.   -- or Doctor Abraham when he walks by,

10  correct?

11      A.   Yes.

12      Q.   You're just not going to be down there for

13  them to have communication or contact with you?

14      A.   Yes.

15      Q.   Okay.  And how many hours a week did you

16  work?

17      A.   Ten hours a week.  Well, in all together

18  with all of my sites.

19      Q.   Okay.  But I mean at the Sangamon County

20  Jail?

21      A.   It varies 5, 6 hours --

22      Q.   And did you --

23      A.   -- sometimes.

24      Q.   And did you do all of those in one day or

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 77

1   did you do it split up?

2          A.   Sangamon County I do Tuesday and Thursday

3   nights, the rest of my sites I am doing during the day

4   on Tuesday.

5          Q.   So at Sangamon County you would have been

6   there Tuesday and Thursday nights like three hours a

7   piece?

8          A.   Typically.

9          Q.   Okay.  So about, I think we did mention

10  before you were about six hours a week?

11         A.   Typically it varies but, yes.

12         Q.   And most of that time would all be in the

13  Healthcare Unit?

14         A.   Yes.

15         Q.   Except for when you went out to A Block?

16         A.   Yes.

17         Q.   Okay.  Now this is Dambacher 4 and it says

18  it's a narrative progress note where the medication

19  was continued is, do you also have an actual

20  medication order that you would fill out in addition

21  to this or would this be it?

22         A.   That's it.

23         Q.   Okay.  And Dambacher 3 that has Doctor

24  Abraham's signature on this, right, for the Tylenol?

**DEPOSITION OF MARY DAMBACHER**                    **June 13, 2019**

Page 78

1      A.   It looks like it, yes.

2      Q.   Okay.  Now for Hammitt 2 where it has

3  Practitioner's signature, did you have to sign off on

4  that before the patient was sent to the emergency room

5  or was the patient already sent out before you signed

6  it?

7      A.   She would have already been sent out.

8      Q.   Okay.  And it says right on here that you

9  signed it on January 31st of 2017?

10      A.   Uh-huh.

11      Q.   The patient went out on January 29th, what

12  was the purpose of you signing that?

13      A.   The purpose that I acknowledged that she was

14  sent out or that was my order that I gave that she was

15  to go to the Emergency Department.

16      Q.   Do you think that you were there on the 29th

17  or were you just reading about it later?

18      A.   It would have been that, the day that I

19  signed it I date it.  It's the date that, it's the

20  days that I'm there --

21      Q.   Okay.

22      A.   -- I sign all of my paperwork.

23      Q.   And then it said at the bottom it says TO,

24  that would be telephone order?

Page 79

```
 1        A.  Telephone order.

 2        Q.  Okay.  So you, they would have called you on

 3   the phone?

 4        A.  Yes.

 5        Q.  And you would have said go ahead and send

 6   her out?

 7        A.  Yes.

 8        Q.  Okay.  And you, again you didn't talk to the

 9   Medical providers at the Emergency Room on this day?

10        A.  No.

11        Q.  All right.  You didn't tell anybody at the

12   Emergency Room what to do or not to do?

13        A.  No, that's, they operate under their own

14   license.

15        Q.  Okay.  Nobody tells them what they are

16   allowed to do or whatnot to do, correct?

17        A.  That's correct.

18        Q.  And if they felt a certain course of care

19   needed to be done they could do it?

20        A.  Yes.

21        Q.  They could call and say hey, we need to

22   admit her, we need to do this procedure?

23        A.  Yes.

24        Q.  And they can make any recommendation they
```

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 80

1    like, correct?

2        A.  Correct.

3        Q.  Okay.  And if they did make those

4    recommendations, you, would you typically follow them?

5        A.  Yes.

6        Q.  Okay.  If a hospital requires or requests

7    that an Inmate be admitted, have you ever said no,

8    bring her back?

9        A.  I have never said that.

10       Q.  Are you aware of anybody doing that?

11       A.  Not that I know of.

12                     MS. POWELL:  Okay.  I don't

13   have any other questions.

14                     MS. WIRTH:  I don't have

15   anything.

16                     MS. CHARDON:  I just have a

17   couple more.

18                     REDIRECT EXAMINATION

19                     CONDUCTED BY MS. CHARDON:

20       Q.  You referred to EMAR, a type of record

21   called EMAR, can you tell me what that stands for?

22       A.  The, it's the Medical record.

23       Q.  Okay.

24       A.  It's medication record.

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 81

1    Q.  Did, what's the E stand for in EMAR?

2    A.  Oh, gosh, you're asking me hard questions.

3    Q.  It's also referred to as an MAR?

4    A.  MAR, yeah.

5    Q.  Okay.  When you, we were discussing

6    Exhibit 2 which reflects your referral to Tiffany to

7    the emergency room on January 29th, correct?  That's

8    what Exhibit 2 is, is that right?

9    A.  2, yes.

10   Q.  So do you know whether anybody told the

11   Emergency Room staff how long Tiffany had been housed

12   on High Observation Status?

13   A.  I would have no idea.

14   Q.  Do you know whether anybody told the

15   Emergency Room staff how long Tiffany had been housed

16   in by herself?

17   A.  I have no knowledge of that.

18   Q.  Okay.  And do you know whether anybody sent

19   over to the Emergency Room Tiffany's McFarland

20   discharge summary or other Mental Health records?

21   A.  No, they would not have sent any other

22   record of that nature.

23   Q.  Okay.  So that wouldn't be information that

24   the Emergency Room Physician had pertaining to Tiffany

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 82

1   when they --

2        A.  No, not unless it was in the electronic

3   records and they can look at that.

4        Q.  Okay.  But when you made the referral, you

5   had no reason to believe that they would have assess

6   to that information, correct?

7        A.  I don't know what would be in her regular

8   medical record at the hospital, I don't know.

9        Q.  Okay.  You told, I think you testified in

10  response to Miss Powell's questions that other than

11  the incidents of where Tiffany was swallowing items

12  like the spoon, you were not aware of any other times

13  when she tried to harm herself at the facility, is

14  that correct?

15       A.  I don't recall.

16       Q.  Okay.  Can you take a look at Ernest

17  Exhibit 2 which is Plaintiff's Production 1108, and

18  it's I think a medical record from January 19th, 2017.

19  Is that your signature at the bottom of that document?

20       A.  It is.

21       Q.  Okay.  And does that, is that a Medical

22  Triage Form reflecting that Tiffany had tried to

23  strangle herself with the strap of her medical boot?

24       A.  Yes.

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 83

1        Q.   Does that refresh your recollection as to

2   whether you were aware of any other instance where

3   Tiffany had tried to harm herself other than

4   swallowing?

5        A.   Obviously this, yes.

6        Q.   Okay.  And do you remember that incident

7   now?

8        A.   I don't, I mean, no, I don't remember it.

9        Q.   Is there a date by your signature?

10       A.   It would be 1/19/17.

11       Q.   Okay.  So you did review that record on

12   1/19/17?

13       A.   Yeah, that evening I would have.

14                  MS. CHARDON:  Okay.  I don't

15   have any other questions.

16                  MS. POWELL:  I don't either.

17                  MS. WIRTH:  I don't.

18

19

20

21

22

23

24

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 84

1   STATE OF ILLINOIS          )
    COUNTY OF CHRISTIAN        )
2

3

                              CERTIFICATE
4

5          I, Cathy J. Craggs, CSR and RPR,

6   affiliated with Associated Court Reporters,

7   P.O. Box 684, Taylorville, Illinois, do hereby

8   certify that I reported in shorthand the

9   foregoing proceedings and the foregoing is a

10  true and correct transcript of my shorthand

11  notes.

12         I further certify that I am in no

13  way related to or associated with any of the

14  parties or attorneys involved herein, nor am I

15  financially interested in the action.

16

17

18

19         _____

20                  CATHY J. CRAGGS CSR, RPR

21                  CSR License No. 084-002703

22

23  Dated this  24th day of July, 2019.

24

**DEPOSITION OF MARY DAMBACHER**                    **June 13, 2019**

Page 85

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DEPOSITION OF MARY DAMBACHER                June 13, 2019

---

**A**

**ability** 10:22 13:22 25:7 29:13
**able** 50:23 63:16
**Abraham** 1:11 3:15 10:10,15 11:23 12:18,20 16:7 32:24 33:3,7 46:7 47:13,16 48:23 49:1 66:7,10 76:9
**Abraham's** 43:3 77:24
**access** 50:7
**accident** 72:14
**account** 48:4 54:17,21
**ACH** 7:5,24 8:8 9:13 10:7 14:5 18:15 24:7,8 24:23,24 25:22 27:2,24 32:18 49:3 56:17 59:7,14 62:1 69:24
**acknowledge** 33:14
**acknowledged** 78:13
**action** 84:15
**actions** 27:6 28:4
**acts** 41:19 54:11
**actual** 28:8 29:2 77:19
**add** 6:7 38:2
**addition** 77:20
**address** 62:11
**adequate** 25:10 29:10,18
**Administration** 34:22 35:4,9 42:14 43:6

**ADMINISTR...** 1:5
**admit** 79:22
**admitted** 80:7
**Adult** 7:21,22
**Advanced** 1:10 3:15
**affiliated** 84:6
**agree** 28:6 38:22 39:7,15 71:3
**ahead** 62:9 74:1 79:5
**Air** 63:16
**airway** 15:7,8 17:2 63:24 72:16
**Alexis** 3:3 5:9
**ALLEN** 3:6
**allowed** 79:16
**amount** 9:10 27:12,13 67:19 70:6
**analysis** 47:4
**ANDREWS** 1:5
**ANN** 1:6
**answer** 5:19,23 6:3 25:6 48:6 55:5 58:4 74:7
**answered** 7:17 58:2
**answers** 2:11
**antibiotics** 67:8
**Antidepressant** 35:23
**antipsychotic** 38:7,19,24 39:10 46:23 51:2
**anybody** 14:9,13 15:12 32:2 34:10 62:1 63:22 79:11 80:10 81:10,14 81:18
**anymore** 56:5

**anyway** 9:9 43:13
**apologize** 50:6 58:3
**APPEARANC...** 3:1
**Appeared** 3:5,9 3:15
**appropriate** 15:13,17 21:17 37:18,22 38:2 46:24 47:5 48:11,20 51:15 51:17 56:12 69:15
**area** 10:17 12:1 12:6,9,10 15:23 16:5,10 16:13,16 75:5 76:2
**Arun** 1:11 3:15
**asked** 20:16 33:15,17,23 49:24 55:3 58:2 64:24
**asking** 39:5 47:3 73:8 81:2
**aspirin** 35:16 43:12
**assess** 82:5
**assessed** 15:3
**assessment** 53:4
**assigned** 75:14
**associated** 1:22 84:6,13
**association** 30:1
**assuming** 14:6 32:20 36:2 41:4,5,6
**attached** 1:21
**attempted** 17:19
**attention** 28:23 29:1
**Attorney** 3:4,7
**attorneys** 2:3

5:10 84:14
**authority** 45:7
**authorized** 49:4
**available** 54:22
**Avenue** 3:4,8
**average** 9:10
**aware** 14:17,19 23:17 31:10,15 42:6 49:12 50:17 56:9 63:22 66:9 69:24 73:13 80:10 82:12 83:2
**awareness** 23:16

**B**

**B** 4:5
**back** 6:5 24:7 39:4 50:11 55:16 60:10 62:11,14,15 80:8
**bad** 19:12,18 54:8,9,9
**Barr** 1:10 3:9
**based** 37:7
**basically** 44:23
**basis** 63:13 68:20
**Beck** 1:10 3:9
**becoming** 26:1
**began** 36:10
**behalf** 3:5,9,15
**behavior** 28:21 28:23 29:2 49:17 54:8,13
**behaviors** 28:7 29:2 30:5,5 57:17
**believe** 7:3 18:12 24:2,24 25:3 27:3 61:3 66:12 72:17,19 74:9 82:5

**believed** 25:9
**best** 5:19,23 11:9
**Betsy** 3:12
**better** 73:20 74:5
**beyond** 55:21
**biggest** 9:16
**blank** 43:17
**block** 12:1 16:18 16:19 56:15 75:12,12 77:15
**body** 21:10
**Booking** 12:2,9 15:23 16:10
**boot** 17:20,21 63:16,18,23 82:23
**bottom** 18:8 20:1 42:18 43:23 62:22 78:23 82:19
**Bouvet** 1:13 3:9
**Box** 1:23 84:7
**break** 6:2 50:9
**briar** 19:13
**bring** 75:11 76:5 80:8
**brought** 15:1 18:19 19:13 60:19 64:8 75:23 76:1

**C**

**C's** 22:15
**Caldwell** 25:2,5 59:13,16
**call** 11:19,21 12:4 24:13 44:17,18 54:9 57:13 62:4,9 62:12,14 75:11 79:21
**called** 5:2 16:17 16:18 17:18 20:15 79:2

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

80:21
**calls** 62:18
**capacity** 37:23
**care** 7:15 11:4
  13:2,7 23:17
  23:21 25:10
  27:20 46:17
  47:18 79:18
**case** 29:22 35:1
  39:2,5 56:15
**Cathy** 1:17 2:9
  5:14,24 84:5
  84:20
**cause** 29:2
**cell** 30:22 60:12
**CENTRAL** 1:2
**certain** 12:23
  16:8 45:17
  68:5,21 70:6,6
  79:18
**certainty** 64:19
**CERTIFICATE**
  84:3
**certified** 6:16
**certify** 84:8,12
**CERULO** 1:20
  2:7 3:12
**chair** 73:2
**chance** 6:10
**change** 37:19
  38:2 54:8
  57:15
**changed** 6:7
**changes** 57:16
**Chardon** 3:3,3
  4:14 5:6,9 50:8
  50:11 58:8,20
  60:7 65:11
  73:22 74:1,5
  80:16,19 83:14
**chart** 21:6 22:20
  34:24 49:15
  66:14,16
**charting** 13:20
  14:17 18:18

22:7,12,16
  42:19
**check** 62:18,19
**Chester** 69:20
**Chicago** 3:5
**CHRISTIAN**
  84:1
**chronic** 11:21,21
  12:3 75:11
**circumstances**
  38:6,12
**clarify** 58:3,20
**Classification**
  27:14
**clean** 5:16
**clear** 22:17
**clinic** 7:8,9,12
  12:4 51:6
  75:11
**clinics** 11:21,21
**closely** 71:6
**closer** 19:17
**coincidence** 17:9
**cold** 68:24
**come** 37:8 39:4
**comes** 55:16
  70:4
**comfortable**
  52:23
**coming** 5:8
  40:23 41:7
  62:10 65:22
  69:19 70:1
**commit** 26:1
  54:14
**common** 54:24
**communicate**
  22:8 47:15,19
**communication**
  76:13
**community** 28:3
**competency**
  10:13
**competent** 2:18
**complaint** 61:6

**complete** 6:7
**concerns** 15:16
  21:20
**concise** 22:17
**concrete** 42:8
**condition** 50:15
**CONDUCTED**
  5:6 58:12
  80:19
**conducting** 38:9
**consider** 11:12
  15:20 47:23
  49:8 73:4
**consistent** 32:24
  33:9
**consult** 10:6,18
  11:6 29:21
  38:20,24
**consultation**
  10:1
**consulting** 39:11
**contact** 76:13
**contacted** 62:1
**contemporane...**
  22:17
**continuation**
  45:10 46:23
  48:14
**continue** 40:4,20
  41:1 44:5,5,13
  44:19 46:19
  47:21 49:4
  65:9 67:10,11
  67:18,18 69:16
  69:17 71:7,15
**continued** 48:16
  53:12 65:20
  69:12 77:19
**continuing**
  24:15 39:22
  48:20 50:21
  52:23 65:5,16
  68:1
**continuous**
  41:18

**conversations**
  21:15 23:7
  49:20,21 74:17
**copies** 2:19
**copy** 35:11 60:6
**correct** 6:5,8
  9:21 13:10
  15:22 16:11
  17:2 18:23
  20:8,24 21:18
  28:9,15,18,21
  28:23 29:3,6
  29:14 30:22
  31:20 32:9
  35:9 36:8
  42:15 43:3,7
  45:20 46:9
  47:9 53:9,14
  55:5 57:23
  66:7 69:3 71:1
  71:16 75:19,20
  76:10 79:16,17
  80:1,2 81:7
  82:6,14 84:10
**Correctional**
  1:11 3:15
  19:21
**correctly** 8:7
  13:20 16:4
**count** 33:15,23
**County** 1:9 3:10
  6:24 8:15 9:11
  11:14 12:21
  13:13 14:9
  15:12 25:10,18
  26:8,11 27:15
  29:12 31:1
  32:2,12 34:10
  38:1 42:3
  48:21 49:9
  53:17,23 55:4
  55:18,22 57:18
  57:23 59:7,17
  76:19 77:2,5
  84:1

**couple** 80:17
**course** 51:3
  79:18
**Court** 1:1,22
  18:4 26:16
  42:24 54:9,10
  84:6
**Craggs** 1:17 2:9
  84:5,20
**crisis** 53:17,22
  55:17 56:7,13
**CROSS** 4:2
  58:12
**cry** 28:17
**CSR** 1:17 2:9
  84:5,20,21
**current** 45:24
  46:18
**cut** 42:17
**CVL's** 24:13

**D**

**D** 4:1
**daily** 35:19,20
  43:12
**Dambacher** 1:16
  2:4 4:3,7,7,8
  5:1,7 18:2,2,3
  18:6 26:15,18
  26:20 42:20,21
  42:23 58:14
  60:8 77:17,23
  72:4 74:12
  78:19,19 83:9
**dated** 19:2 84:23
**dates** 18:24
**David** 18:12,14
  60:24
**day** 44:4 45:11
  45:12 76:24
  77:3 78:18
  79:9 84:23
**days** 44:6,9,10
  67:5,6,8,12,15

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 88

68:1 78:20
**DECEASED** 1:6
**deciding** 40:20
**decision** 23:12
  27:19
**decompensating**
  30:15 31:6
  34:13 41:10
  45:17
**decompensation**
  30:8 34:8
**Defendants** 1:14
  3:9
**defer** 10:18
**Depakote** 35:16
  35:24 36:14,23
  44:2 51:7,19
  68:14,16
**Department**
  25:15 63:10
  78:15
**depend** 8:2 63:9
**depending** 38:5
**depends** 39:12
  39:12 40:22
  54:13 56:14
  62:21 68:12
**deposed** 5:14
**deposition** 1:16
  2:3,14,15,19
**depositions** 2:18
  21:13
**described** 16:14
**describing** 16:6
**desire** 28:15
**determine** 13:19
  15:5 24:5
  30:18 34:11,23
  46:23 49:16
  50:24 53:5
  61:22
**determined** 15:3
  29:9,10,17,18
  68:9
**diagnoses** 56:3

**diagnosis** 50:14
  50:18,20,24
  52:4,7,12,18
  52:22 53:2,2,6
**died** 8:20 58:18
**difference** 10:13
  57:18
**different** 8:15,23
  11:22,23,24
  12:17 16:7,16
  18:24 28:13
  38:15 55:13
  56:15 74:21
**direct** 4:2 5:5
  26:9
**directions** 20:16
**directly** 40:23
**Director** 12:21
**discharge** 81:20
**discuss** 15:11
  42:7
**discussed** 16:23
**discussing** 81:5
**disorder** 36:5
**distinguish** 12:8
**DISTRICT** 1:1
  1:2
**Doctor** 10:2,6,8
  10:9,10,14,14
  11:6,23 12:18
  12:20 16:7
  32:24 33:3,7
  38:23 43:3
  46:7 47:13,15
  47:19 48:22
  49:1 59:13,16
  66:6,10 67:7
  67:24 76:9
  77:23
**Doctors** 61:11
  61:14
**document** 50:7
  82:19
**documentation**
  14:4,10

**documented**
  40:6,8,9 41:13
**doing** 5:22 45:16
  57:8 69:3
  72:20 73:13,20
  77:3 80:10
**dosage** 44:3
**doses** 35:17
**double** 42:12
**drug** 36:10,15
**drugs** 34:23
  39:18,23 40:4
  53:5
**due** 10:16
**duly** 5:3
**duties** 11:18,23
  13:15,18

─────── **E** ───────
**E** 3:9 4:1,5 81:1
**Ealey** 1:13 3:9
**earlier** 6:6 21:12
  45:14
**early** 8:20 11:12
**edit** 9:7
**education** 24:15
**effective** 53:6
  68:21
**effects** 69:2
**Effexor** 35:15,21
  36:20
**either** 62:17
  66:6 83:16
**electronic** 82:2
**EMAR** 66:20
  67:1 80:20,21
  81:1
**emergency** 15:4
  15:6 25:15
  63:10 64:9
  78:4,15 79:9
  79:12 81:7,11
  81:15,19,24
**emergent** 11:20
  15:9 20:24

  21:3,7,24
**emergently** 15:2
**employed** 18:14
  59:7
**encountered**
  59:24 64:5
**encountering**
  64:20
**engage** 15:11
  28:7,20 40:19
  41:8 45:15
**engaged** 45:23
  49:16
**engaging** 28:14
**entail** 40:13
**entirely** 46:5
**equally** 13:6
**ER** 17:1 20:17
  20:20,22 21:2
  21:4 29:14
  56:22 57:13
  60:16 61:8
  62:10 63:8
  67:7,24
**Ernest** 32:11,22
  33:6 35:3
  82:16
**especially** 30:22
**Esq** 3:3,7,12
**estate** 1:6 5:10
**evaluate** 30:17
  31:1 46:17
  50:20 61:22
  75:12
**evaluated** 46:6
  51:22,23
**evaluating** 54:17
**evaluation** 21:4
  21:7,24 25:16
  29:14 37:5
  38:4,10 40:3
  40:13,14,17,20
  41:8,20 45:16
  45:24 46:4,13
  48:19 56:11

  57:14
**evening** 5:7,8
  83:13
**event** 11:11
**events** 10:10
**everybody's**
  53:24 55:5
**evidencing**
  34:12
**exact** 38:15
**exactly** 11:9
**EXAMINATI...**
  5:5 58:12
  80:18
**example** 40:15
**excuse** 27:8
  33:16 37:24
**exhibit** 4:6,7,7,8
  18:3 19:14
  20:7 26:15
  32:11 35:3,4,6
  42:21,21,23
  43:9,9 59:1,19
  64:22 81:6,8
  82:17
**exhibits** 4:14
  58:11
**existing** 30:14
**expected** 61:21
**expense** 2:21
**expire** 44:4,18
**explain** 67:22
**explained** 5:14
**expression** 22:19
**eye** 31:18

─────── **F** ───────
**facilities** 8:23
  25:22 33:4
  57:8
**facility** 14:11
  15:14,18 21:17
  22:1 32:23
  40:23 41:2
  56:8 70:4

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

82:13
fact 20:23 69:24
factor 31:14
  54:20
factors 27:2,4,5
  27:6 54:16,20
  55:1
fair 5:20 74:15
  74:16 75:15,16
  75:22
familiar 13:9
  32:12
family 6:22 7:20
  38:23 39:8
far 11:3 73:2,3
faxed 45:5
feel 6:2 11:8
  52:23
felt 25:14 51:15
  51:17 79:18
female 12:5,10
files 65:4
fill 32:8 77:20
filled 32:14,19
  60:21
filling 13:19
financially
  84:15
find 34:23 40:15
  62:2
finding 9:6
finish 5:18,19
  59:24 60:3
focus 64:1
focused 63:24
follow 67:14
  80:4
follow-up 62:19
  62:23 63:6
followed 38:18
  61:9
following 62:16
follows 5:4
foregoing 84:9,9

foreign 21:10
forever 67:11
forget 17:13
forgive 19:17
form 32:9,12
  40:7,9 42:19
  65:11,20 73:22
  74:1,4 82:22
formal 33:20
format 24:16
  42:8
Forms 33:7,12
formulary 71:10
foundation 2:17
  73:23 74:6
free 6:2
frequently 40:24
front 17:11
  35:11 52:16
  66:14
furnished 2:20
further 84:12

**G**

G 3:3
general 7:18
  16:15 38:17
  39:5,8,15 71:4
  73:6
generally 43:16
getting 30:19
  31:2,6,19
  41:10 44:18
  57:22
give 9:9 25:6
  38:15 42:9
  60:9 71:15
given 68:20
go 6:5 15:4,6
  16:1 33:8
  42:19 55:9
  56:16 65:3
  73:5 74:1
  75:12,13 78:15
  79:5

goal 6:8
going 18:1 26:18
  26:19 35:3,5
  35:12 38:18
  40:18 42:11,20
  44:19 62:19
  64:1 65:8 66:6
  67:5,11,17,18
  68:1,7 70:17
  71:4,4 73:6
  76:4,5,12
Good 5:7
gosh 38:13 81:2
grab 65:4
great 5:23
greater 56:5
guess 48:7 65:3
  76:3
Guy 1:13 3:9

**H**

H 4:5
half 9:13 68:16
Hammitt 19:15
  20:2,7 21:8
  44:15,20 78:2
Hammitt's
  43:20
handwriting
  18:17,18 20:7
  20:9 43:20
happen 54:15
happened 17:10
  22:21 65:12
happens 40:24
hard 38:15
  72:16 81:2
harm 28:7,14
  29:2 41:19
  54:11 73:6
  82:13 83:3
harming 49:17
head 5:24
health 30:18
  34:13 37:5

38:4,9 39:3
  40:3,13,16,19
  46:1,4,18
  50:15 56:13
  57:15,19,22
  62:18 81:20
healthcare 1:11
  3:15 11:13
  13:12,24 15:14
  25:8 26:7,11
  29:11,19 31:2
  47:1,6 60:11
  77:13
hear 15:7 17:16
  17:17 39:14
heard 22:15,16
  22:19
help 28:17
HENDERSON
  1:19 2:6 3:12
hereto 2:16
hey 62:14 79:21
HEYL 3:6
high 15:21 16:1
  16:11 23:23
  27:10,14 46:6
  47:8,24 48:5
  71:20 75:5,13
  75:14,22 76:4
  81:12
higher 27:20
  30:4,10
history 36:7
  64:6
home 54:9
honestly 21:22
hospital 26:2
  61:12,15 62:4
  62:8,13 80:6
  82:8
hour 1:18 2:5
hours 7:23 8:1,8
  8:22 9:1,10
  33:2 76:15,17
  76:21 77:6,10

housed 16:21
  47:7,8 48:8
  71:23 72:2
  81:11,15
housing 27:11
  27:14 30:1,4,7
  30:22 73:6
hundred 35:20
  64:19
hurt 28:4

**I**

idea 33:22 36:13
  54:4 59:9
  64:12 70:12
  81:13
identification
  18:4 26:16
  42:24
III 1:13 3:9
ill 28:20
Illinois 1:2,9,20
  1:21,24 2:7,8
  3:5,10,14 10:5
  11:2 84:1,7
illness 34:4 36:8
  64:17
illnesses 30:11
immediately
  71:5
important 22:7
  22:12 30:13,17
  52:7
incarcerated
  23:15 25:21
incarceration
  39:9,20
incident 16:24
  22:23 83:6
incidents 82:11
independent
  10:3
independently
  24:19
indicate 31:18

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 90

45:23 70:10
**indicated** 66:23
  74:9
**indication** 27:23
  41:19
**individual** 59:1
**individually**
  42:4
**individuals**
  16:20 51:4
**information** 6:9
  53:11 54:22
  69:11,13,15
  81:23 82:6
**injury** 27:23
**Inmate** 19:19
  37:20 56:12
  80:7
**Inmates** 14:1
  30:4 48:9
**inside** 70:17
**instance** 1:17
  2:8 5:2 18:22
  18:23 83:2
**instances** 19:5
  45:15 57:12
**instructions**
  67:9
**intact** 63:16
**intending** 21:3
**intent** 28:8
**interacting** 23:4
**interaction** 48:7
  48:13 49:11
**interactions**
  50:1
**interested** 84:15
**Internal** 7:11,19
**interrogatories**
  2:5,10
**intervention**
  53:17,22 55:17
  55:23 56:7
**invite** 58:2
**involuntary**

26:1
**involved** 84:14
**issue** 20:24
  62:10 76:5
**issues** 14:21
  75:21
**items** 49:13
  73:14 82:11

_____
**J**
_____

**J** 1:17 2:9 84:5
  84:20
**Jail** 6:24 8:15
  9:11 11:14
  12:22 13:13
  14:1,9,13,22
  15:12 25:11,18
  26:5,8,12
  27:15 29:12
  31:1 32:2
  34:10 38:1,24
  42:3 48:21
  49:9 53:18,23
  55:4,18,22
  57:23 59:7,17
  62:2,4,14 65:4
  70:2,17,22,23
  70:23 71:19
  73:21 74:18
  76:20
**Jails** 9:17 51:4
**January** 18:7
  19:1,2 59:21
  72:1 74:14
  78:9,11 81:7
  82:18
**Jennifer** 1:13
  3:9
**job** 5:23 7:5,6
  11:16,18 12:17
  53:24 55:5
  56:1
**Johnson** 18:12
  18:14 60:24
**Johnson's** 61:3

**JOHNSTON**
  1:19 2:6 3:12
**JR** 1:10
**July** 74:14 84:23
**June** 1:18 2:5
  3:1

_____
**K**
_____

**keep** 31:17
  37:16 48:10
  68:1 72:20
**keeping** 32:3
  62:15
**KELLI** 1:5
**kept** 32:6
**kill** 28:8,15
**kind** 6:20 13:23
  14:10,14 23:16
  37:4 40:2,13
  40:19 41:8
  45:13,15,24
  48:18 58:5
**kinds** 52:8
**knew** 23:23
**know** 11:3,8,9
  12:23 14:7,12
  15:23 16:16
  18:11,16 19:8
  19:8,12 20:16
  25:19 26:23,24
  27:17 28:14
  29:24 32:6,20
  33:5,13 34:14
  34:19 38:14,14
  38:15,16 42:6
  42:16 44:9,10
  45:14 48:10
  49:7 52:11,14
  54:6,9,14
  55:11,15 56:20
  57:1 58:1,5,14
  58:17 59:3,6
  59:10,13,23
  60:5,11 62:10
  63:18 64:2,6

64:10 66:19
  67:7 68:4,5,6
  70:7,8,13,13
  72:1,2,5,8 73:5
  73:20,24 74:7
  74:8 80:11
  81:10,14,18
  82:7,8
**knowledge**
  14:15 26:9,13
  27:21 33:19
  36:4 74:23
  81:17
**Kyle** 1:12 3:9

_____
**L**
_____

**L** 2:1
**large** 72:15
**Larry** 1:10 3:9
**Law** 3:4,7
**lawsuit** 5:11
  11:12
**lead** 30:7 57:12
**left** 18:10
**legal** 10:21
  22:13
**lesser** 12:17
**let's** 18:1 26:14
  42:7,7 43:19
  44:1 50:8
**level** 15:13,17
  21:17 25:10
  27:20 29:11,19
  46:24 47:5
**license** 79:14
  84:21
**licensed** 6:18
**licensing** 10:22
**life** 68:17
**limit** 27:18
**little** 19:17 48:7
  48:13
**LLC** 3:3
**Lochhard** 10:8,9
  10:14

**locked** 12:7
**Lockwood** 10:8
**long** 6:15,23 7:2
  27:16 47:23
  48:4 63:18
  70:10 71:10
  81:11,15
**look** 19:14,17
  26:20 35:5
  36:12 71:5
  82:3,16
**looking** 35:6
  40:14 42:14
  43:10 50:6
  55:9 58:14
**looks** 21:11
  26:22 78:1
**lot** 20:15 21:12
  59:4
**low** 65:18
**LPN** 18:13
  44:22

_____
**M**
_____

**M** 3:7
**M.D** 3:15
**majority** 61:5
**making** 14:3
  31:22 47:20
**male** 12:1,5
  16:20
**Manager** 14:6,7
**manipulative**
  28:21 29:1
**MAR** 32:6 43:10
  81:3,4
**March** 35:9
  42:15 45:12
  50:14
**mark** 18:1 26:18
**marked** 18:3
  26:15 42:23
**MARY** 1:16 2:4
  4:3 5:1
**match** 43:15

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

**maximum** 27:13
**McFarland**
  39:19 40:23
  41:3 69:20,22
  69:23 70:4,16
  70:20 81:19
**McFarland's**
  37:10
**mean** 8:22 11:15
  12:3 19:10
  20:15 21:12
  23:13 28:12
  30:3,16 32:1
  37:21 38:14
  40:16 42:4,5
  48:2 51:1
  52:19 53:1,2,2
  53:19 54:6,13
  54:15,24 55:24
  66:24,24 67:3
  68:13 70:3,7
  73:2,4,5 76:19
  83:8
**meaning** 41:23
**means** 75:8
**medical** 10:1,6
  11:6 12:20
  14:21 15:1
  17:21 18:7,19
  20:24 22:7,12
  22:15,20 31:14
  32:15 33:7,12
  33:16,17,21
  34:11,21,22
  35:7 40:11
  41:15,16 42:9
  45:19 49:15,21
  55:21 56:7
  60:19,20 75:9
  75:10 76:1
  79:9 80:22
  82:8,18,21,23
**medication** 9:20
  9:23 10:4,19
  10:23 11:7

31:13,19 32:4
33:24 34:7,18
35:4,8,22
36:18 38:7,24
39:10 41:24
42:2,13 43:6
43:13 44:13,16
44:21 46:23
47:21 48:1
50:13 51:3
52:9 56:2
65:18,19,22
66:13,23 67:5
68:2,3,12,13
68:15,24 69:8
69:16 71:8
77:18,20 80:24
**medications**
  31:8,11,24
  32:8 34:2
  35:13 37:6,8,9
  37:12,16,19
  38:3,19 41:1,7
  41:11,21 45:10
  45:17 46:8,14
  46:19 48:14,17
  48:19 49:5
  50:21,23 51:24
  52:15,21 65:1
  65:5,9,16
  66:10 68:6,10
  68:10 69:12,17
  70:1,5,8,21
  71:7,14,15
  73:17 74:24
**medicine** 7:11
  7:19,20 10:14
  32:15,21 38:23
**medicines** 34:19
**meds** 44:6
**Melissa** 25:1,5
**Memorial** 7:6
  9:2 51:4,20,21
**mental** 13:12,23
  15:14 25:8

26:7,11 29:11
29:19 30:7,11
30:18 31:2
34:3,8,12 36:7
37:4 38:3,9
39:2 40:2,12
40:16,19 41:9
45:24 46:4,18
47:1,6 50:15
52:22 56:13
57:15,19,22
64:17 81:20
**mentally** 28:20
  30:14 31:6
**mention** 77:9
**mentioned** 16:22
  39:18
**Meyer** 1:12 3:10
**Michael** 1:12
  3:15
**Mickey** 13:9,16
  14:4,17 23:17
  29:21 31:3
  46:7 48:22
  49:1 76:6
**milligrams**
  35:19,20 44:3
  44:4
**mine** 61:5,7
**moment** 60:8
**monitored** 27:11
**monitoring** 31:5
  31:23
**month** 65:23
**months** 48:20
**mood** 73:19
**motivated** 28:8
  28:13
**mouth** 21:14
**move** 43:19
  71:19
**multiple** 33:4
**musculoskeletal**
  63:15

|       | **N**       |
|-------|-------------|
| **N** 2:1 4:1 | |

**name** 5:9 60:14
**narrative** 45:22
  77:18
**nature** 81:22
**necessarily** 30:6
  66:15,18
**need** 5:15 6:5
  8:2 9:23 10:1,5
  29:5 31:17
  38:19,20 41:20
  48:18 68:10
  79:21,22
**needed** 15:3,6
  57:13 61:23
  62:23 63:2,6,8
  63:13 74:20
  79:19
**needs** 27:19
  38:24 63:7
  66:2 68:19
**negatively** 17:24
**never** 22:21 80:9
**new** 37:23 38:2
  39:10 41:20
**newer** 37:19
**news** 54:8,9
**night** 44:18
**nights** 77:3,6
**Ninth** 3:13
**Nod** 17:24
**normally** 56:16
**note** 40:11 41:14
  41:15,16 44:1
  44:6,23,24
  45:2,4,9,13,22
  65:19 77:18
**notes** 69:22
  84:11
**notice** 68:7
**noticed** 65:21
**noticing** 65:17
**number** 57:11
**nurse** 6:13,16,18

6:21,22 7:8,12
9:19 10:5 11:1
11:17 37:24,24
38:22 39:8
48:11 55:20
56:1,3 65:17
65:21 66:3,21
69:14
**nurses** 32:5
**Nursing** 62:18

|       | **O**       |
|-------|-------------|

**O** 2:1
**oath** 5:3
**objection** 58:2
  65:11 73:22
  74:6
**Observation**
  15:21 16:11
  47:8,24 48:5
  81:12
**observe** 75:19
**obstruct** 64:1
**obstruction** 17:2
**obviously** 5:14
  20:17 83:5
**Officer** 19:21
**oh** 7:7 36:17
  42:18 43:10
  58:23 59:20
  81:2
**okay** 5:13 6:15
  7:2,7,22 9:1,4
  9:13 10:4
  11:11 12:13
  14:16 15:5
  16:4,17 17:15
  18:1,10,14,20
  19:1,9,16 20:6
  20:10,18 21:23
  22:19,23 23:9
  23:15 25:1,4,7
  25:17 26:4,7
  26:10,14 27:4
  27:22 29:21,24

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 92

31:4,10 33:3
33:23 36:4,7
38:7,17 39:14
39:18 40:12
42:13 43:19,22
44:11 45:2,6
45:12 46:16
47:15 48:16
49:3,24 50:6
50:11 51:14
52:5 53:8 54:2
54:23 55:8,13
56:10,21 57:1
57:10,21 58:8
58:14 59:6,10
59:19 60:2,18
60:20,23 61:8
61:21 62:7,13
62:20 63:1,6
63:12,14 64:2
64:10,20,24
65:7,21 66:9
66:22 67:17
68:9,19,23
69:2,5,14,21
70:13,20 71:3
71:18,22 72:4
72:9,12 74:9
74:20,23 75:13
75:17 76:15,19
77:9,17,23
78:2,8,21 79:2
79:8,15 80:3,6
80:12,23 81:5
81:18,23 82:4
82:9,16,21
83:6,11,14
once 35:20
one's 28:15
ones 74:24
operate 79:13
opportunity
   17:10 75:17
opposed 72:13
oral 2:4,10

order 20:19,20
   44:8,12,12
   66:22 68:20
   69:16,17 70:7
   70:19,22 77:20
   78:14,24 79:1
ordered 41:2
original 67:19
   70:11
originally 39:19
   53:8
outpatient 7:10
outside 21:24
   25:8 37:7 51:4
oversee 13:15
overseeing 13:23
   14:10,14
oversight 10:1

—— P ——
P 2:1 36:10
p.m 1:19 2:6
P.O 1:23 84:7
page 4:6 35:6
   42:9
paperwork
   13:19 78:22
part 26:23 32:22
part-time 7:5
participated
   23:20
particular 33:16
   33:17 34:21
   37:20 40:7
   52:22 54:3
   56:12,13 59:5
   64:21
particularly
   51:1
parties 2:2,16,20
   84:14
path 19:13
patient 18:19
   25:18 33:18
   34:21 37:13

38:3,5 39:13
40:22 45:16
48:12 56:19
57:2 62:10
63:1,7 65:10
67:4 70:4 71:6
78:4,5,11
patient's 66:14
patients 7:13
   12:1,16 14:1
   16:9,10 28:20
   44:9 48:9
   51:12,16,18
   56:16,22
Peer 14:16
pending 6:3
people 25:22
   28:7,13 30:10
   55:15 62:7
   64:13 71:23
   72:5 75:11,22
   75:24 76:6
percent 64:19
perception 23:9
period 35:14
   43:17 68:21
   72:6
person 6:11 16:2
   16:3 26:1,4
   27:5,13,19
   31:18 34:6
   44:15 57:13
   62:14,15 67:19
   68:24
personally 64:21
   73:14
pertaining 9:24
   27:2 81:24
pertains 19:22
pharmacy 37:9
   45:3,4
phone 79:3
phrase 40:17
phrased 8:5
physically 73:10

Physician 66:3
   81:24
physicians 63:8
Pica 64:7,13,16
piece 77:7
pin 38:13
place 54:3,23
   55:9,11
placing 27:10
Plaintiff 1:7,18
   2:8 3:5 5:3,10
Plaintiff's 18:6
   42:10,22 82:17
plan 26:8,11
   44:5 55:4,14
please 5:18,23
   6:3,8 58:11
point 41:18
policies 14:5
policy 24:9
   32:18 49:3
   56:17,20
population
   16:15
portions 2:15
position 11:13
possible 5:24
   71:6
potential 31:14
   54:20
Powell 3:7 58:10
   58:13 60:9
   74:3 80:12
   83:16
Powell's 82:10
PowerPoint
   58:15,22
PowerPoint's
   24:17
Practitioner
   6:16,21,22 7:8
   7:12 9:20 10:5
   11:1,17 37:24
   38:23 39:8,9
   48:11 55:20

56:2,3 66:4
Practitioner's
   78:3
Practitioners
   6:13 22:8
Prazosin 44:4
preexisting
   30:11
premise 39:6,8
prescribe 9:20
   9:23 10:4,13
   10:19,22 37:11
   37:19,23 38:7
   39:10 44:21
   46:8 51:2,7,11
   51:14,24 56:2
   66:10
prescribed
   31:19 34:20
   35:13 36:20,23
   37:12 39:19
   41:3,7,22 43:7
   45:9 48:15,17
   49:5 50:13
   52:15,17 53:9
   75:1
prescribes 44:16
prescribing 11:7
   31:8 37:5
   38:19,23 39:15
   45:6 46:14
   51:19 52:8
   65:1
prescription
   39:22 40:4,20
   43:15 44:24
   46:4,19 47:2
   47:16,21 48:1
   48:3 52:24
   53:12 65:23
   67:4,8,24
   70:16,17,21
prescriptions
   48:12 49:1,5
   49:17 56:18

DEPOSITION OF MARY DAMBACHER                June 13, 2019

Page 93

69:23 70:11
71:1,5
**present** 32:23
**presented** 15:9
20:24 25:1
**PRETORIOUS**
1:19 2:6
**PRETORIUS**
3:12
**prevention** 24:8
24:21 27:24
53:17,22 55:3
55:17,23 56:6
**previously** 49:5
56:22
**primary** 7:15
**printed** 42:11
**prior** 6:18 7:4
37:15 39:19
41:7 46:22
47:16,20,24
50:20 54:11
66:22 69:23
70:1
**prison** 41:11
**prisoner** 30:17
32:15
**probably** 44:18
60:21
**problem** 76:4
**problems** 63:22
75:21
**procedure** 56:17
63:11 79:22
**procedures** 14:5
**proceedings**
84:9
**process** 29:8
33:20,20 65:15
**producing** 14:11
**Production** 18:6
82:17
**professional**
10:21 46:16,21
**program** 53:21

**progress** 40:11
41:15 45:22
65:20 77:18
**prohibiting**
39:16
**proof** 2:17
**properly** 13:20
44:7
**protocol** 53:22
**provide** 33:7
69:15 71:12
**provided** 13:24
35:24
**provider** 7:15
13:12
**providers** 31:14
79:9
**providing** 13:24
14:14
**psych** 12:10,10
**psychiatric**
10:13,17,19,23
11:7 12:1,6,9
12:16 15:13,17
16:6,17 21:3,7
21:17,24 25:16
26:2 27:20
29:14 31:11,13
31:19,24 32:4
34:3 35:21
36:1 37:11,19
38:2 41:20,21
46:19 51:9
52:8 56:18,23
57:14 68:3
**psychiatrist**
38:20 39:1,11
41:1,6 48:15
48:17 51:18
53:7,8 70:9,20
**psychiatry** 51:22
51:24 52:1
**psychotropic**
36:17 41:21
47:21

**purpose** 2:17
72:13,17 78:12
78:13
**purposes** 36:1
**pursuant** 1:21
**put** 11:19 21:13
57:11

---

### Q

**question** 5:18
6:3 8:6 55:16
65:12
**questioning**
19:12,18
**questions** 6:10
58:9 64:24
80:13 81:2
82:10 83:15
**QUINN** 1:19 2:6
3:12

---

### R

**random** 65:4
**re-prescribing**
45:18
**read** 20:12,13,15
33:13 35:12
44:6
**reading** 2:13
78:17
**ready** 44:18
**real** 29:2
**really** 23:13
64:10 74:10,13
74:13
**reason** 20:22
82:5
**reasonable**
72:19,23 73:9
**reasons** 22:12,13
51:9 56:23
75:3
**recall** 14:24
15:19 17:18
19:4 20:4,5
21:15,19,20,22

23:22 25:19
26:3 29:23
35:2 36:6
41:12 49:20,23
64:20,23 65:1
71:22 72:9
75:2 82:15
**receive** 24:6,10
24:12 34:18
**received** 24:6
27:1 33:11
56:12
**receiving** 15:13
15:17 21:16
25:10 29:10,18
46:24 47:5
52:21 58:6
**recess** 50:10
**recognize** 53:24
55:6,6
**recognizing**
54:20 55:1
**recollection**
12:15 14:20
17:4,12,23
22:24 23:3,6
33:1 57:4,8
83:1
**recollections**
50:1
**recommend**
63:10 74:21,24
**recommendati...**
79:24
**recommendati...**
62:2,16 67:14
71:19 80:4
**recommended**
70:9
**record** 5:16
17:11 18:7
20:11,13 34:22
35:4,9 42:14
50:12 52:16,20
58:21 69:23

80:20,22,24
81:22 82:8,18
83:11
**recording** 5:15
**records** 34:22
35:7 39:3
42:10 43:2
45:19 50:19
69:18,22 70:7
70:10,14 81:20
82:3
**RECROSS** 4:2
**REDIRECT** 4:2
80:18
**reevaluate** 30:13
**refer** 20:6 21:3
21:23 25:8,15
29:13 51:18
57:20
**reference** 52:22
59:19
**referenced** 59:1
64:22
**referral** 29:8
57:2 81:6 82:4
**referred** 17:1
21:7 27:19
56:22 57:13
80:20 81:3
**referring** 23:20
**refilled** 66:2,3
**reflect** 45:13
**reflected** 45:19
**reflecting** 82:22
**reflection** 45:23
**reflects** 45:9
46:3 81:6
**refresh** 83:1
**refreshed** 17:11
**refusal** 31:10,13
32:6,9 33:7,12
34:2,11,18
**refusals** 33:16
33:17,21
**refuse** 32:21

DEPOSITION OF MARY DAMBACHER                          June 13, 2019

Page 94

refused 33:24
  34:19,23
refuses 32:15
refusing 31:11
  31:24 32:4
  34:7
regarding 27:1
  41:20 49:3
regardless 28:2
Registered
  37:24
regular 7:6,13
  68:20 82:7
regularly 30:18
  56:19
regulations 9:24
related 84:13
rely 69:15
relying 53:7,12
  69:14
remember 8:18
  16:23 19:10,11
  21:5 22:3
  23:13 31:9,12
  40:5 49:14
  51:12 56:24
  57:3 59:2,5
  60:1 74:17
  83:6,8
remembered
  17:9
removal 21:10
remove 61:17
renew 66:13
  67:5 68:8
renewed 68:10
renewing 66:17
  66:19
report 55:6 62:5
  62:12
reported 49:13
  84:8
Reporter 2:12
  18:5 26:17
  43:1

Reporters 1:22
  84:6
request 11:20
  65:20 69:18
requests 80:6
require 11:5,5
  46:17,22 47:19
required 14:5
  27:7,8
requires 80:6
resources 10:7
respect 12:15
  16:8 53:16,21
  55:17,22 56:6
response 27:8
  82:10
responsibilities
  12:17 13:6,23
  16:8 53:20
  55:14,21 56:1
  56:6,10
responsibility
  31:4 34:15
responsible 13:1
  14:3,9,13
  31:22 32:3
rest 61:7 77:3
restrain 72:20
  73:10
restraint 73:2
restrictions
  10:22
resulted 26:1
RETAINED
  4:14
return 26:4
returns 63:11
review 13:18
  14:16,17 17:10
  20:7 25:4
  34:21,24 41:24
  42:3 43:6
  49:15 83:11
reviewed 26:21
reviewing 14:10

34:11
rewrite 70:24
right 6:13 18:8
  19:1,23 20:2,2
  22:9,13 23:18
  23:24 32:16
  35:22 36:18,24
  40:1,21 43:20
  44:11 61:23
  66:14 67:6,13
  67:15,20 70:22
  71:13 72:7
  74:21 77:24
  78:8 79:11
  81:8
risk 15:21 23:23
  27:2,4,5,6,11
  27:14,16 28:7
  30:2,5,10
  31:14 34:12
  46:6 47:24
  48:5 54:16,17
  55:1,1 71:20
  75:5,14,15,22
  76:4
risks 29:3
role 10:10 53:16
  53:20 55:16
roles 55:14
room 15:4,6
  78:4 79:9,12
  81:7,11,15,19
  81:24
round 12:13
  16:9
rounding 16:8
rounds 12:5
  31:3 47:14,20
  48:23
routinely 34:7
ROYSTER 3:6
RPR 1:17 2:9
  84:5,20
rule 38:17,20
  39:15

run 65:18,23
  66:1 68:7
running 65:18
  65:22
Rusher 1:6 8:18
  14:21 30:24
  35:7 49:22
  64:21 65:16
  71:19,22 72:20
  74:18
Rusher's 45:24
RX 44:4

─────── S ───────

S 2:1 4:5
safe 46:3
safety 55:19,19
  73:5
Sangamon 1:9
  3:10 6:24 8:15
  9:10,15,16,16
  10:8 11:14
  12:21 13:13
  14:9 15:12
  25:10,18 26:8
  26:11 27:14
  29:11 31:1
  32:2,12 34:10
  38:1 41:8 42:3
  48:21 49:9
  53:17,23 55:4
  55:18,22 57:3
  57:18,23 59:6
  59:17 76:19
  77:2,5
saw 60:3,5,11
  63:21 74:13
saying 16:5 28:3
  67:23 72:9
  76:3
says 19:19 44:1
  44:5 59:20
  62:22 63:1,6,7
  63:14 67:6,7
  77:17 78:8,23

schizophrenia
  16:21
second 5:22
see 7:13 11:19
  11:24 12:3,11
  17:15 26:14
  40:14 42:7,16
  43:7,14 44:1
  56:16 63:15
  65:9 66:16
  75:18
seeing 47:13
  56:19 71:22
seeking 28:23
  29:1
seen 11:20 60:23
  62:17
segregated 30:1
  30:4,7,22
seizure 36:5
seizures 36:3
self 27:23 28:7
  28:14,15 29:2
  41:19 49:16
  54:11 63:16
send 20:17,20
  62:11 70:5
  79:5
sending 52:1
  62:14
sent 20:22 21:2
  45:2 60:16
  71:14,15 78:4
  78:5,7,14
  81:18,21
seriously 27:24
  28:5 29:5
services 11:14
setting 39:9
setup 8:21
shake 5:24
shared 13:6
she'd 47:24
sheet 45:5
shelf 65:4

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

shifts 8:2
Shmikler 1:12
  3:16 13:10,16
  14:4 23:18
  29:22 47:11
  58:6
Shmikler's
  14:17 23:21
short 43:17 50:9
shorthand 2:11
  84:8,10
show 18:1 35:3
  42:20
showed 52:20
Showing 32:11
sick 11:19,20
  12:4 75:11
side 69:2
sided 42:12
sign 20:13 34:6
  34:7 54:12
  78:3,22
signature 18:8
  18:10 20:1
  43:8,22 77:24
  78:3 82:19
  83:9
signed 19:10
  20:10,10,12
  44:23 78:5,9
  78:19
significant 69:2
signing 2:13
  78:12
signs 30:14 54:1
  54:5,6
similar 71:7
single 54:23
sites 8:3,8,13,15
  8:16 57:18,19
  76:18 77:3
sitting 52:11
situation 15:9
  38:14
six 8:3,14,15,22

77:10
SJT 35:7
skipping 44:2
somebody 17:13
  29:9 70:16,24
  76:3
soon 70:23
sorry 42:12
  58:23
sort 8:2 23:20
  26:18 72:13
sound 5:20
sounded 65:8,8
South 1:20 2:7
  3:4,13
speak 49:19 62:7
specialty 6:20
specific 14:20
  17:4 22:24
  52:18,22 55:9
  57:4,7
specifically
  16:23 57:16
spend 9:10
  74:10 75:4
spent 74:13
split 77:1
splitting 8:22
spoken 61:11
spoon 15:2
  16:24 17:14
  18:23 19:7
  22:24 23:14
  49:11 59:20
  60:13,17 61:6
  61:17 64:3
  72:5,10,12,15
  82:12
spot 43:17
Springfield 1:20
  2:7 3:14
Springfield,Ill...
  3:8
stabilize 73:19
staff 49:21 55:21

56:7 62:18
  71:19 74:18
  81:11,15
stand 24:14 81:1
standard 11:4
  46:17,21 47:18
stands 80:21
start 35:6 65:5
started 59:13
state 56:21 84:1
STATES 1:1
status 15:22
  16:11 23:24
  31:2 41:9 46:1
  46:18 47:24
  57:15 62:5
  81:12
stay 13:4 27:17
  35:5 48:21
  75:10
stayed 75:8
stipulated 2:1
stipulation 1:21
stop 68:4,6,15
  68:23 69:8,10
  70:8
strangle 17:19
  82:23
strangled 17:19
strap 17:20
  82:23
Street 1:20 2:7
  3:13
Stribild 35:15
  36:12,22 44:2
strike 74:6
structure 11:13
subjective 61:6
suffer 64:13,16
suggest 69:11
suicidal 24:3
  27:23 28:7
  30:5 49:8
  64:14
suicide 24:8,21

27:2,6,24 30:1
  30:5 53:16,22
  54:14,17 55:2
  55:3,17,22
  56:6
Suite 3:13
summary 81:20
supply 70:6
supposed 67:6
  73:17
sure 5:13 6:9 8:5
  8:6 11:9,15
  14:4 22:11
  28:11,12 30:3
  31:5 32:1
  34:20 37:21
  41:23 42:1
  47:3 48:2,6
  52:19 53:1,19
  55:24 62:19
  66:24 67:3
  70:3
swallowed 15:2
  16:24 19:7,19
  20:23 23:14
  49:11 59:20
  60:13,17 61:6
  64:3,11,12
  72:4,10,12
swallowing
  18:23 19:22
  20:4 49:13
  73:14 82:11
  83:4
swallows 17:13
sworn 5:3
symptom 34:3
System 14:16

    T
T 2:1,1 4:5
table 63:17
take 5:24 6:2
  27:7,7,8,22
  28:5 48:4 50:8

54:17,21 60:8
  82:16
taken 1:16 2:4
  2:11 50:10
  58:21
talk 5:16 48:24
  79:8
talked 45:14
  50:2
talking 17:17
  54:19 55:15
Taylorville 1:24
  84:7
telephone 78:24
  79:1
tell 6:12 61:17
  61:19 64:18
  65:15 79:11
  80:21
tells 79:15
Ten 76:17
testified 5:4
  32:22 33:6
  66:12 82:9
testimony 6:6
  65:7
Thank 9:6
thanks 5:7 60:10
thereof 2:16
Theresa 3:7
thing 5:22 11:24
  23:13 26:10
  29:13 42:2
things 9:7 28:13
  40:13 68:5
  72:21
think 6:6 7:17
  18:7 21:12,14
  29:12,20 39:20
  40:18 50:4
  55:4 56:21
  60:2,8 72:12
  77:9 78:16
  82:9,18
thinking 27:23

DEPOSITION OF MARY DAMBACHER                    June 13, 2019

Page 96

third 35:6
Thorazine 35:16
  35:16,18,18,19
  36:16,17,21
  44:3,3 48:12
  51:11,14,19
  68:13 69:6
thought 74:20
three 48:20 77:6
throat 17:15
Thursday 77:2,6
tie 73:9
Tiffany 1:6 8:18
  12:8,13 13:13
  14:21 15:12,20
  15:21 17:19
  21:16,23 23:1
  23:4,7,10 25:8
  26:8 29:10,18
  30:24 31:5,8
  31:11,23 32:3
  33:24 35:7,13
  36:4 37:5 40:3
  41:3,7 47:20
  48:4 49:7,8,22
  50:1,13 56:15
  57:22 58:18
  59:19 81:6,11
  81:15,24 82:11
  82:22 83:3
Tiffany's 13:1
  29:22 34:11
  35:1,5 39:2,5
  41:9 52:12
  56:15 81:19
time 8:18,21 9:6
  9:13 10:9
  11:11 13:2
  14:23 15:2
  17:18 23:15
  27:12,13,18
  32:15,19 35:13
  43:18 47:1
  52:14 54:13,14
  60:1,3 63:21

63:23 64:5,8
64:23 67:19
68:21 71:18
72:6 74:10,13
75:4 77:12
times 28:6,6
  33:24 35:19
  44:6 49:16
  57:10 59:24
  82:12
tired 9:8
title 11:16 12:20
today 6:9 9:6
  21:13 50:2
  52:11
told 20:17 60:24
  61:14 81:10,14
  82:9
toothbrush
  19:20,23 20:4
  20:23
top 61:6
total 8:9
track 32:3,7
  33:17 48:10
tracked 33:21
Tracy 43:20
  44:15,20
Tracy's 20:9
trained 22:11
  27:22
training 10:16
  10:17 24:7,10
  24:12,22,23
  26:21 27:1
  28:1
transcribed 2:12
transcript 84:10
transport 63:16
treat 51:2
treated 29:5
treating 14:21
  23:1 47:12
treatment 11:10
  12:16 13:24

14:14 15:14,18
17:1,7 21:17
25:9 26:11
29:11 32:9,15
47:1,6 51:3
53:5 56:11
57:22 58:5
61:22
Triage 82:22
trial 6:11
tried 82:13,22
  83:3
true 11:1 28:15
  28:16,19,22,24
  30:21 46:5
  69:5 75:7
  84:10
try 5:16 54:14
  72:15 73:6
trying 21:13
  43:14 58:2
Tuesday 77:2,4
  77:6
turkey 68:24
turning 14:4
twice 35:18
two 12:24 18:24
  19:4 35:17
Tylenol 43:4,7
  77:24
type 80:20
types 72:21
typical 44:8
typically 44:17
  48:9 51:21
  62:9 77:8,11
  80:4

___ U ___

U 2:1
Uh-huh 13:8
  22:14 29:7
  37:1 41:17
  59:22 61:1
  78:10

undergoing 38:3
understand 6:12
  8:6 15:21 16:4
  24:2 27:5 35:8
  55:10 67:22
understanding
  9:19 16:9 27:9
  44:20 47:12
  54:24 57:21
  69:21 70:15
  73:16
undertake 37:4
  40:2 46:13
  47:4 48:18
  56:11
unit 60:12,19,20
  75:9,10 76:2
  77:13
UNITED 1:1
units 12:6
use 39:23

___ V ___

vague 74:6
Vaguely 8:19
valid 70:17,23
varies 76:21
  77:11
vary 8:4
verbally 5:23
verified 37:8
versus 5:24
  31:24
video 26:19
  58:22,24
videos 24:20,23
  25:4 26:21,22
  59:4
viewing 50:23
visits 9:17
VOELKER 3:6
vs 1:8

___ W ___

Wabash 3:4,8
WAIVED 2:14

walks 76:7,9
want 6:7 8:6
  28:3 39:4 52:4
  58:3,20 69:8
warning 54:1,5
  54:6,11
wasn't 23:11
  24:4 31:5 33:8
  34:15
watch 58:24
watched 24:20
  58:15 59:4,7
way 10:23 22:7
  23:21 25:14
  62:17 84:13
we're 35:5 42:11
  42:14 62:14,15
we've 5:14
wean 69:10
weaned 68:4
week 7:23 8:1,10
  8:11,22 9:1,11
  76:15,17 77:10
weekly 12:5,6
WEIL 3:3
went 61:8 77:15
  78:11
Wes 1:10 3:9
whatnot 79:16
wheelchair
  63:17
Whitley 1:12
  3:10
wincing 58:1
Wirth 3:12 5:13
  80:14 83:17
witness 2:11 4:2
  5:2
women 16:1
wondering 43:2
words 21:13
work 6:23 7:4,5
  7:23 8:3 9:2
  33:3 76:16
worked 6:23 7:2

DEPOSITION OF MARY DAMBACHER

June 13, 2019

75:24 76:6
**working** 8:21
  75:14 76:5
**works** 10:8
**worse** 30:19
  31:2,6 41:10
  73:21 74:5
**wouldn't** 61:9
  66:16 68:23
  72:23 75:17
  81:23
**write** 32:5 43:16
  43:16 48:12
  56:18
**writes** 67:8,24
**writing** 22:3
  40:3 43:3
  46:18,22 47:16
  47:20 48:1
  49:17 61:3,4
**written** 21:6
  22:4,6 45:4
  54:2 55:8,11
  66:20
**wrong** 74:3
**wrote** 39:22 47:2
  48:3 60:14
  62:23 63:15
  67:19 70:16,21

**X**

**X** 4:1,5

**Y**

**yeah** 7:11 9:5
  11:5 17:15
  19:2,21 21:9
  36:14 39:14
  42:10 60:7
  76:8 81:4
  83:13
**year** 59:10

**Z**

**Z** 1:12
**Zach** 3:10

**0**

**084-002703**
  84:21

**1**

**1** 4:7 18:2,3,6
  32:11 59:19
  60:8 64:22
**1-5** 1:13
**1-800-252-9915**
  1:23
**1/19/17** 83:10,12
**1:18-cv-1100-...**
  1:7
**10** 8:1,8,22
  50:14
**100** 44:3
**102** 3:13
**10862** 42:10,21
  43:3
**10863** 42:10,22
  43:19
**10th** 45:12
**11050** 18:6
**1108** 82:17
**12** 8:1,8,22 19:3
  59:21
**12th** 18:7 19:1
  72:1 74:14
**13** 1:18 2:5 3:1
**15** 42:16
**16** 42:16
**18** 4:7
**19th** 82:18

**2**

**2** 4:7 18:2 19:14
  19:15 20:2,7
  21:8 26:15,18
  26:20 58:14
  59:1 78:2 81:6
  81:8,9 82:17
**200** 35:19 44:3
**201** 32:12
**2013** 6:17

**2016** 7:3,4
**2017** 8:20 11:12
  19:3 35:9
  42:15 45:12
  50:14 59:21
  72:1 78:9
  82:18
**2019** 1:18 2:5
  3:1 84:23
**24/7** 72:20 73:9
**24th** 84:23
**26** 4:7
**29th** 78:11,16
  81:7

**3**

**3** 4:8 22:15
  35:19 42:16,21
  42:23 77:23
**3/1/17** 42:19
**3/10/17** 43:21
  44:2
**3/15** 43:5
**30** 44:10 67:5,6
  67:8,12,15
  68:1
**31st** 78:9
**333** 3:4
**36** 35:7
**3731** 3:8

**4**

**4** 4:8 42:21,23
  77:17
**40** 9:3
**400** 1:20 2:7
  3:13 48:9
**42** 4:8

**5**

**5** 4:4 9:12 35:4
  76:21
**5:30** 1:18 2:5
**58** 4:4

**6**

**6** 9:12 76:21
**60** 44:10
**60604** 3:5
**62568** 1:24
**62701** 3:14
**62791-9678** 3:8
**684** 1:23 84:7

**7**

**8**

**80** 4:4

**9**

**90** 44:6,10
**9th** 1:20 2:7