E-FILED
Friday, 25 September, 2020  12:21:03 PM
Clerk, U.S. District Court, ILCD

**DEPOSITION OF DOCTOR ARUN ABRAHAM**

Page 1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS


| | |
|---|---|
| KELLI ANDREWS, AS ADMINISTRATOR OF THE ESTATE OF TIFFANY ANN RUSHER, DECEASED, | ) ) ) ) |
| Plaintiff, | ) No. ) 1:18-cv-1100-SEM-TSH ) |
| vs. | ) ) |
| SANGAMON COUNTY ILLINOIS, WES BARR, LARRY BECK, JR., ADVANCED CORRECTIONAL HEALTHCARE, INC., ARUN ABRAHAM, MICHAEL SHMIKLER, KYLE MEYER, Z. WHITLEY, JENNIFER EALEY, GUY BOUVET III, and DOES 1-5, | ) |
| Defendants. | |

          Deposition of DOCTOR ARUN ABRAHAM, taken
before Cathy J. Craggs, CSR, RPR, at the instance of
the Plaintiff, on June 14, 2019, at the hour of 8:30
a.m., at QUINN, JOHNSTON, HENDERSON, PRETORIOUS &
CERULO, 400 South 9th Street, Springfield, Illinois,
Illinois, pursuant to attached stipulation.

ASSOCIATED COURT REPORTERS
1-800-252-9915
P.O. Box 684
Taylorville, Illinois 62568

EXHIBIT
5

Page 2

                    S T I P U L A T I O N

1                     It is stipulated between the parties

2       herein, through their attorneys, that the deposition

3       of DOCTOR ARUN ABRAHAM may hereby be taken upon oral

4       interrogatories, on June 14, 2019, at the hour of 8:30

5       a.m., at QUINN, JOHNSTON, HENDERSON, PRETORIOUS &

6       CERULO, 400 South 9th Street, Springfield, Illinois,

7       Illinois, before the instance of the Plaintiff, and

8       before Cathy J. Craggs, CSR and RPR.

9                     That the oral interrogatories and the

10      answers of the witness may be taken down in shorthand

11      by the Reporter and afterwards transcribed.

12                    That the reading and signing of said

13      deposition is NOT WAIVED.

14                    That the deposition or any portions

15      thereof may be used by any of the parties hereto,

16      without foundation proof, for any purpose for which

17      depositions are competent.

18                    That copies of the deposition may be

19      furnished to any of the parties at his or her own

20      expense.

DEPOSITION OF DOCTOR ARUN ABRAHAM                          June 14, 2019

Page 3

```
 1    APPEARANCES:     (June 14, 2019)

 2

 3       WEIL & CHARDON LLC
         By Ms. Alexis G. Chardon, Esq.
 4       Attorney at Law
         333 South Wabash Avenue
 5       Chicago, Illinois  60604
              Appeared on behalf of the Plaintiff;
 6
         HEYL, ROYSTER, VOELKER & ALLEN
 7       By Ms. Theresa M. Powell, Esq.
         Attorney at Law
 8       3731 Wabash Avenue
         Springfield,Illinois  62791-9678
 9            Appeared on behalf of the Defendants, Wes
      Barr, Larry Beck, Guy E. Bouvet, III, Jennifer Ealey,
10    Kyle Meyer. Sangamon County, Illinois and Zach Whitley

11

12       QUINN, JOHNSTON, HENDERSON, PRETORIUS & CERULO
         By Mr. Matthew J. Maddox, Esq.
13          Ms. Betsy A. Wirth, Esq.
         400 South Ninth Street
14       Suite 102
         Springfield, Illinois  62701
15
              Appeared on behalf of Arun Abraham, M.D.,
16    Advanced Correctional Healthcare, Inc., and Michael
      Shmikler.
17                     ***       ***
18

19

20

21

22

23

24
```

ASSSOCIATED COURT REPORTERS
1-800-252-9915

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 4

1
                              I N D E X
2
   WITNESS          DIRECT      CROSS      REDIRECT   RECROSS
3  DOCTOR ARUN
   ABRAHAM
4                       5         210         218

5
                         E X H I B I T S
6
   EXHIBIT                                    PAGE
7  Abraham Exhibit 1                            11
   Abraham Group Exhibit 2                     120
8  Abraham Exhibit 3                           125

9

10

11

12

13

14        ***EXHIBITS RETAINED BY MS. CHARDON***

15

16

17

18

19

20

21

22

23

24

Page 5

1              DOCTOR ARUN ABRAHAM,

2  called as a witness herein, at the instance of

3  the Plaintiff, having been duly sworn on his oath,

4  testified as follows:

5                    DIRECT EXAMINATION

6              CONDUCTED BY MS. CHARDON:

7      Q.  Good morning, Doctor Abraham.

8      A.  Good morning.

9      Q.  I am Ali Chardon and I'm a lawyer, one of

10  the lawyers for the Estate of the Plaintiff, Tiffany

11  Rusher, thank you for being here.

12             Have you ever been deposed before?

13     A.  I have.

14     Q.  Okay.  When was the last time that you were

15  deposed?  Let me ask is it this way first, how many

16  times have you been deposed?

17     A.  Once.

18     Q.  And when was it?

19     A.  I don't remember approximately 5 to 6 years

20  ago.

21     Q.  Okay.  What kind of, why were you deposed?

22     A.  I was a witness in a case involving an

23  Inmate.

24     Q.  Okay.  So you had, had you treated the

Page 6

1    Inmate?

2         A.   I had.

3         Q.   Okay.  So who knows Mr. Maddox may have been

4    your attorney then, too, but I'm sure he did a good

5    job explaining to you how this is going to work today,

6    and it probably wasn't necessary you've been through

7    it, but Cathy is here recording everything that we

8    say, so we should try not to speak over one another.

9              And so I will try to let you finish

10   your answer without cutting you off, and you should

11   try to let me finish my question so that we have a

12   nice record.

13             In addition, please continue to, to

14   answer verbally yes, no, and instead of nodding so she

15   can get the record down.

16             If you don't understand my question,

17   please ask me for clarification.  If you think of

18   something later on as we move on in the deposition

19   that would make your, you know, you would like to add

20   to a previous answer to clarify or correct or whatever

21   please feel free to do that even if it involves

22   skipping because this is the first time, this is the

23   only time I get to talk to you about this case before

24   we go to trial.

Page 7

 1                    And so I want to make sure we get all

 2       the information out that that we can today.

 3                    And then if you want to take a break

 4       that's fine, please just answer any question that I

 5       have pending before, before we take the break, just

 6       let us know, okay?

 7            A.   Sounds good.

 8            Q.   What did you, did you review any documents

 9       to prepare for the deposition today?

10            A.   I did.

11            Q.   Okay.  What did you review?

12            A.   The medical file.

13            Q.   Of Miss Rusher?

14            A.   Yeah.

15            Q.   Okay.  And about how long did you take

16       reviewing the file?

17            A.   5 to 6 hours.

18            Q.   Okay.  After receiving notice, between

19       receiving notice of this lawsuit and today had you

20       reviewed the medical file?

21            A.   Yes.

22            Q.   Okay.  So, and when did you first do that?

23            A.   When I was notified of the case and the file

24       was presented to me.

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 8

1      Q.  Okay.  And did you, following Tiffany's

2  death did you take any time to go back and review the

3  file?

4      A.  Yes.

5      Q.  Okay.  So where do you work today?

6      A.  At Springfield Clinic Urgent Care.

7      Q.  Okay.  And are you board certified?

8      A.  I am.

9      Q.  What's your certification?

10     A.  Family Medicine.

11     Q.  And of 2015 were you board certified, excuse

12  me, 2015, as of 2017 were you board certified in

13  Family Medicine?

14     A.  Yes.

15     Q.  When did you become board certified in

16  Family Medicine?

17     A.  Oh, sorry, I don't remember exactly the

18  date, it was within the last 2 to 3 years.

19     Q.  When did you receive your Medical Degree?

20     A.  So I have two medical degrees one is a MBBS

21  degree and one is an MD degree.

22     Q.  What's a MBBS degree?

23     A.  A Bachelor's in Medicine and a Bachelor's in

24  Surgery.

Page 9

1    Q.   Where did you receive those degrees?

2    A.   India.

3    Q.   Were you born in India?

4    A.   I was not, I was born in Africa.

5    Q.   Okay.  Now I'm being nosey but you sound

6    like you have American parents, your accent.

7              You were born in Africa and then you

8    went to Medical School in India?

9    A.   (Nod Affirmatively).

10   Q.   Okay.  You, at what point did you come to

11   the United States?

12   A.   2007.

13   Q.   And had you practiced as a Doctor in India?

14   A.   Yes.

15   Q.   How long did you practice in India as a

16   Doctor?

17   A.   One and a half years.

18   Q.   And in 2007 where did you come to in the

19   United States?

20   A.   New York.

21   Q.   And did you attend Medical School there?

22   A.   No.

23   Q.   Okay.  Let me, where did you get your MD

24   degree?

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 10

1        A.   SIU.

2        Q.   And when did you receive that?

3        A.   2011.

4        Q.   What year did you get your MBBS in India?

5        A.   2005.

6        Q.   Okay.  So you got on, did you have any kind

7   of specialization when you practiced for those, that

8   one and half years in India?

9        A.   No.

10        Q.   What kind of medicine did you practice?

11        A.   Family Medicine.

12        Q.   Did you spend about a year in New York

13   before coming to SIU?

14        A.   Yes.

15        Q.   And then you graduated from SIU with an MD

16   in 2011 and what did you do after that?

17        A.   I worked for Urgent Care.

18        Q.   In the, what in this area or where were you?

19        A.   Yes, here in Springfield.

20        Q.   And were you board certified?

21        A.   In?

22        Q.   At, in any profession?  In any, on any board

23   were you board certified at all?

24        A.   When?

Page 11

1      Q.   In 2011 when you began working for Urgent

2  Care?

3      A.   No.

4      Q.   Okay.  And at what point did you first

5  become board certified?

6      A.   That's what I don't remember exactly what

7  year that was.

8      Q.   I think you thought it was about 2 to

9  3 years ago, is that right?  That was your answer

10  before?

11      A.   Possibly, yeah.

12      Q.   So your first board certification was in

13  Family Medicine?

14      A.   Correct.

15      Q.   Do you have any other board certifications?

16      A.   I do not.

17      Q.   When did you, this isn't a memory test why

18  don't we make our lives easier, I'm going to hand you,

19  I'm going to mark what's been produced as your

20  employment file from the ACH as Abraham Exhibit 1 ACH

21  605 through 639.

22                    (Abraham Exhibit 1 marked for

23                     identification by the Court

24                     Reporter.)

Page 12

1      Q.   When did you first get hired at by ACH?

2           If you recall, you can recall, if you

3      want to look through your file that's fine I...

4      A.   I'm going to say --

5                MR. MADDOX:  Hang on a second,

6      off the record.

7                (Off Record Discussion.)

8      Q.   I see some, like if we turn to, how many

9      pages in here, it's three pages in, there is a

10     signature from January 2013 and the next if you flip

11     two pages at the bottom right hand we have, call those

12     Bates labels do you see the numbers that say ACH,

13     yeah, we see ACH 609 I think it's yeah to 610 I see

14     that that's titled -- well, it says position title

15     description and it's dated November 2012.

16           Does that refresh your recollection

17     about when you came to work at ACH?

18     A.   Yes, I think it does from memory and from

19     what's been provided I believe I only started in

20     January of 13 although I had met, interviewed and gone

21     through the process of deciding whether, initially

22     back November I was contacted by the Medical Director,

23     back in November of 12.

24     Q.   And when you were first hired or came to

Page 13

1    work in 2013 were you at Sangamon County Jail?

2         A.  I was.

3         Q.  And were you working at any other facilities

4    as well?

5         A.  I was not.

6         Q.  Okay.  Were you full time with ACH at that

7    point?

8         A.  I was not.

9         Q.  Were you working in any other capacity for

10   any other clinic or company?

11        A.  Urgent Care.

12        Q.  Was that the same Urgent Care that you had

13   worked for in Springfield?

14        A.  Not the same one I work currently for but it

15   was for Memorial.

16        Q.  And at any point were you full time with

17   ACH?

18        A.  No.

19        Q.  At any point did you work at any other

20   institutions, facilities other than Sangamon County

21   Jail?

22        A.  Yes.

23        Q.  And where did you work?

24        A.  I was called to fill in when other

Page 14

```
 1   physicians were out.  I don't remember all the
 2   facilities, Moultrie, Piatt, Logan, DeWitt,
 3   Petersburg.
 4         Q.  But it sounds like you never had a regular
 5   assignment to any of those facilities?
 6         A.  (Nod negatively.)
 7         Q.  Okay.  Throughout your time at and you
 8   stayed employed with ACH at Sangamon County Jail
 9   through August of 2017, is that right?
10         A.  Yes.
11         Q.  Throughout that time did you, did your
12   amount of hours per week change at all, was it always
13   the same about?
14         A.  It decreased.
15         Q.  It decreased.  So when you started how many
16   hours were you?
17         A.  I believe I was 3 or 4.
18         Q.  Okay.  And --
19         A.  Decreased to two.
20         Q.  Okay.  So when you finished in August
21   of 2017, you were two hours a week?
22         A.  Yes.
23         Q.  And that was two hours of being physically
24   present in the facility?
```

Page 15

1      A.   Correct.

2      Q.   And why did you leave?

3      A.   I was terminated.

4      Q.   And why were you terminated?

5      A.   I was terminated for concerns of

6   professionalism with my peers.

7      Q.   Okay.  And were there any issues about you,

8   them wanting you to do more on call days then you were

9   willing to do?

10      A.   Yes.

11      Q.   So can you tell me what happened with that?

12      A.   When my hours were reduced, they had hired

13   an Advanced Practitioner, so the Advanced Practitioner

14   was given more hours on-site, and I felt that it was

15   most fair that the site hours that were split

16   percentage wise should also be the same split for call

17   hours.

18      Q.   And when you began your job, were you on

19   call 7 hours, 7 days a week?

20      A.   When I was the exclusive provider, yes.

21      Q.   And at what point was the Advanced

22   Practitioners that's the Nurse Practitioner that you

23   were, the other person that was hired was that Mary

24   Dambacher?

1          A.   No.

2          Q.   Okay.  Who was that?

3          A.   Dan Williams.

4          Q.   And what was, and he's a Nurse Practitioner

5    as well, right?

6          A.   No.

7          Q.   Is he a Physician's Assistant?

8          A.   He is.

9          Q.   And at what point was he hired?

10         A.   Don't remember.

11         Q.   Did he work at the same time as Mary

12   Dambacher?

13         A.   Don't know.

14         Q.   Did, do you know when he left?

15         A.   I don't remember.

16         Q.   Okay.  So at any point was there both

17   Physician's Assistants and Nurse Practitioners working

18   with you at Sangamon County Jail?

19         A.   Not that I remember.

20         Q.   Okay.  Is Dan Williams still at Sangamon

21   County Jail?

22         A.   I don't know.

23         Q.   And --

24         A.   But I don't think so because he left before

Page 17

1    I left Sangamon County and he was replaced by Mary

2    Dambacher.

3         Q.  Oh he was, that's what I was trying to get

4    at, I must have been asking bad questions.

5         A.  Yeah, he was full time with ACH, so he had a

6    lot of facilities, and I don't know if he was, Mary

7    replaced him exclusively or if his, his

8    responsibilities continued with other facilities

9    within ACH.

10         Q.  Okay.  So you weren't terminated until 2017,

11    August, right?

12         A.  Correct.

13         Q.  Sounds like though Dan Williams had been

14    hired well before that.  And I guess I'm just

15    wondering did this issue with you not wanting to be on

16    the, on call after Dan Williams came on come up before

17    2017 or was that the first time --

18         A.  Could you repeat that?

19         Q.  -- you raised the issue.

20              So you said that there was an issue

21    about you, you know, we talked about you pushed back

22    on working seven, on call seven days a week?

23         A.  Yeah.

24         Q.  When did that conflict first arise?

Page 18

1          A.   It wasn't in August of 17, it was much

2     previous to that.

3          Q.   Okay.  How far previous?

4          A.   Probably a couple of years.

5          Q.   And had you received any written evaluation

6     mentioning that this was a problem that you were

7     pushing back on the seven days on call prior to being

8     terminated in August of 2017?

9          A.   I don't remember.

10          Q.   Do you remember having any, did any

11     Supervisors or Superiors address that issue with you?

12          A.   Yes.

13          Q.   When did they first address that with you?

14          A.   Again that, I don't know the specifics, but

15     I know that it was addressed and I also voiced my

16     rationale behind my stance.

17          Q.   And was that discussion, you know,

18     immediately prior to you being terminated?

19          A.   No, it was, it had this issue arose multiple

20     times over a few years, and I wasn't changing my

21     stance on what I believed to be fair.

22          Q.   Okay.  So it had been going on since at

23     least Dan Williams came?

24          A.   That I don't want to say.

1             Oh, yeah, yes, yes.

2        Q.   And you're not exactly sure when that was

3   but it was prior to Mary Dambacher coming?

4        A.   I believe so.

5        Q.   Okay.  And you also said that you were

6   terminated for acting impolite or in an unprofessional

7   manner, correct?

8        A.   Correct.

9        Q.   I think if we go, these are, I think that

10  the order of the Bates labels in that document is, is

11  contiguous so if you flip to ACH 633.  So that looks

12  like a, what's the, a problem review, a, it's a record

13  of a conference regarding a problem review, is that

14  correct?

15       A.   Yes.

16       Q.   And that's from March 2014, correct?

17       A.   Correct.

18       Q.   So that's three and a half years before you

19  were eventually fired, right?

20       A.   Correct.

21       Q.   Because is that the first time that this, a

22  complaint, anybody addressed a complaint of acting in

23  an impolite manner?

24       A.   Yes.

Page 20

1      Q.   What were the circumstances around this?

2    And you can tell me in your words.  What happened that

3    lead to this?

4      A.   So what happened was I had asked that when

5    somebody pages me, there are certain things, questions

6    that are asked before they page me.  Because this was

7    not my full time job.  I have a full time job doing

8    40 hours a week.  So when I was getting paged, I asked

9    that a certain protocol be asked, certain questions

10   duration, when they come with a complaint, duration,

11   onset, progress, episodes.  Those kind of questions

12   and I felt like I wasn't getting those and it was

13   taking three or four phone calls in certain

14   circumstances to get those answers.

15              So when I addressed that when I came

16   into the facility the nurses felt that I was being

17   harsh towards them, and so there was a complaint made

18   to Corporate and Corporate relayed that complaint to

19   me.

20      Q.   Did you feel that this was a fair criticism?

21      A.   No.

22      Q.   Did you feel that your requests to get the

23   information that you were asking for were reasonable,

24   reasonable requests given the standards of your

Page 21

1  profession?

2        A.  I did.

3        Q.  And after this reprimand that we -- oh, look

4  and we see a hire date on this form.  So that hire

5  date is January 7th, so consistent with your

6  recollection.

7              So this was in March of 2014 did you

8  receive any further written reprimand about this issue

9  after this one?

10       A.  No, not that I remember.

11       Q.  Did the, did you experience any conflict

12  over this issue, by this issue I guess keeping with

13  the issue of needing people to provide, requesting

14  that people provide information on the first phone

15  call, did you have any conflicts about that with

16  Medical Staff following this reprimand?

17       A.  When you say conflicts what do you mean?  So

18  conflict is a very, can be a strong word.  Are you

19  asking were there discussions or were there conflicts

20  because I guess, you know, discussions always, you

21  know, there is always a discussion.  Hey, thank you

22  for doing what I've asked or for calling me with those

23  things.  I wouldn't say conflict.

24       Q.  Okay.

Page 22

1      A.   Because I think if there was, it would have

2 been represented in documentation and immediate

3 termination.

4      Q.   Right, right.

5           Especially in the medical field

6 documentation is important, right?

7      A.   Of course.

8      Q.   And you got to put it in a record or else

9 it's hard to know what happened.

10           MR. MADDOX:   Well, I'm going to

11 object to the form and context of that question but...

12      Q.   Is it, do you agree?

13      A.   With?

14      Q.   That documentation is important in order to

15 keep track of what happened?

16      A.   Yes.

17      Q.   And did anybody accuse you of being impolite

18 or unprofessional towards coworkers after this time in

19 2013 or 2014?

20      A.   Not that I remember.

21      Q.   Did any Supervisor in an evaluation ever ask

22 you to more polite or more professional with coworkers

23 after this point?

24      A.   I'm not sure, I mean I don't, not that I

Page 23

1    remember.

2        Q.   And it says at the bottom if corrective

3    action is not taken, the next step will be

4    termination, correct?

5        A.   Correct.

6        Q.   And did you take any corrective action or

7    did you respond in any way to receiving this written

8    reprimand in 2014?

9        A.   Absolutely.

10       Q.   Okay.  And even though you felt it wasn't

11   necessarily a, I think fair criticism is the words we

12   used, what did you do in response to this reprimand?

13       A.   I rethought about my delivery methods.

14       Q.   And did you make some changes in the way you

15   were talking to people?

16       A.   Absolutely.

17       Q.   Did you continue to request that they

18   provide you with the certain, you know, information

19   that you were needing within, you know, the first or

20   second phone call upon paging?

21       A.   Occasionally but for the most part they were

22   very receptive to that constructive criticism and my

23   delivery changed.

24       Q.   Was there any kind of, was there any

Page 24

1   particular person who, you know, particular Nurse that

2   complained about your interactions leading up to this

3   complaint in 2014?

4        A.   I don't know.

5        Q.   And I'm just going to ask you some specific

6   names because there are some people I've met so.

7             Was, was Billy Ernest someone who had

8   complained about you?

9        A.   I, that was never privileged to me.

10        Q.   Okay.  And was it, did anybody ever tell you

11  that if Mary Dambacher had made complaints?

12        A.   (Nod Negatively.)

13        Q.   So you don't know?

14        A.   No.

15        Q.   Okay.  Then you were terminated three and a

16  half years later in August of 2017, correct?

17        A.   Yes.

18        Q.   And between this reprimand in August of 2017

19  you had not received any further criticism for being

20  impolite or unprofessional towards coworkers?

21        A.   Not that I remember.

22        Q.   So what are the circumstances of you getting

23  fired in August of 2017?  What's your recollection?

24  How did you learn that you were being terminated?

Page 25

 1        A.   How did I learn, honestly I don't remember

 2    if it was a phone call or if it was a letter, but I

 3    remember it was a, I don't remember.  I don't remember

 4    if somebody called me or if they sent me a letter or

 5    if somebody from the Jail called and said that my

 6    privileges to enter the facility, I really don't

 7    remember.

 8        Q.   And did they give a reason for why you were

 9    being fired?

10        A.   I don't remember the circumstances so I

11    don't remember if a letter said something or if

12    somebody called me.

13        Q.   I guess, yeah, and I guess --

14        A.   You know, what I --

15        Q.   Right, I, earlier I asked why were you fired

16    and you told me it was acting in an impolite manner?

17        A.   Because I remember this document.

18        Q.   Because you remember that document?

19        A.   Yes.

20        Q.   But you don't remember anybody communicating

21    that to you in August that something had come up or

22    that did anybody in August 2017 when you were fired

23    say look, we told you to be polite and you weren't

24    polite and you're being fired or --

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 26

1          A.   I don't remember that.

2          Q.   Do you remember if in August of 2017 anybody

3     said we're firing you because you are not willing to

4     be available seven days on call?

5          A.   I don't remember, I don't, I don't remember

6     if that was the reason or how that was communicated.

7          Q.   Cause earlier you, you said that you did

8     remember that those were two reasons?

9          A.   I said, what I said was that was a

10    circumstance, an issue because that was brought up

11    multiple times during my employment.

12         Q.   The issue of, okay.

13               So at any point did you, were you ever

14    suspicious that you were being fired because you had

15    treated a patient who had committed suicide?

16         A.   No.

17         Q.   And were you aware that Mickey Shmikler had

18    been terminated as well?

19         A.   I was.

20         Q.   And at any point did you question whether

21    you and Mickey Shmikler were both being terminated in

22    some relationship to Tiffany Rusher's suicide?

23         A.   Did I think that?

24         Q.   Yeah.

Page 27

1      A.  No.

2      Q.  Why do you think that you were terminated?

3                  MR. MADDOX:  Well, objection

4  lack of foundation but answer if he can.  I mean he

5  didn't make the decision, someone else did, so I don't

6  know how he can know that answer.

7                  MS. CHARDON:  Right, so that's

8  why I phrased it why do you think that you were

9  terminated.

10                  MR. MADDOX:  Well, that's, I

11  have the same objection.  He can offer a thought if he

12  wants, but he doesn't really have the foundation to

13  answer it.

14                  MS. CHARDON:  I think it's

15  relevant what he thinks about why he was terminated,

16  so you can go ahead and answer.

17      A.  I assume it's because of this and

18  availability that they had requested.

19      Q.  Okay.  So actually if we turn to ACH 631 so

20  sort of the, in the middle of this batch, and do you

21  see that?

22      A.  Yeah.

23      Q.  And so on the second page of that if you

24  flip one page to 632 at the bottom says Doctor Abraham

Page 28

1  was terminated via email by Doctor Mitcheff but this

2  paperwork was not completed at that time so he could

3  not sign it.

4              So does that refresh your recollection

5  as to how you learned you were terminated?

6       A.  No.

7       Q.  Okay.  But you think you got an email saying

8  you were fired?

9       A.  I don't remember.

10      Q.  Okay.  Do you have an ACH email address or

11  did you at that time?

12      A.  (Nod negatively.)

13      Q.  Were, would you have used a private email

14  address?

15      A.  (Nod Affirmatively).

16      Q.  So is that, you don't have to give me the

17  address right now but is it like a gmail, yahoo?

18      A.  It could be either, I have both.

19      Q.  Either, you have both.

20              And actually what are your email

21  addresses that you would have used to communicate?

22      A.  So I have Doctor Abraham, ███████████

23  ██████████

24      Q.  And that's one word?

Page 29

```
 1      A.  Yes.

 2      Q.  Okay.  And what's your other address?

 3      A.  The other one is ████████████████████

 4  ████████████

 5      Q.  And do you delete e-mails regularly on

 6  those, either one of those accounts?

 7      A.  I do.

 8      Q.  You, do, would you have e-mails from August

 9  of 2017?

10      A.  Possibly.

11      Q.  Okay.  Do you have any reason to think that

12  you would have deleted that email?

13      A.  Possibly because it was behind, that is no

14  longer a relevant thing to hold in my inbox and they

15  charge you.  As you accumulate e-mails, they charge

16  you for storage space, so.

17      Q.  Okay.  So I am going to ask that you don't

18  delete emails from those accounts until you have a

19  chance to look to see if that email still exists and

20  provide it to your Counsel?

21      A.  Okay.

22              MR. MADDOX:  Here's how I like

23  to handle that, if you have a request for a document

24  rather than kind of discuss it informally in a
```

Page 30

1    deposition, if you'd formalize it in a request to me.

2                    MS. CHARDON:  Oh, absolutely

3    and my request is that he doesn't delete it so that I

4    can deal with that.

5                    MR. MADDOX:  I get you, I just

6    wanted to make sure that we didn't walk out of here --

7                    MS. CHARDON:  Understood.  It's

8    not served yet, we will address it and any issues with

9    it.  Thank you, Matt.

10        Q.  So, and here we've got four under, on 631

11   summary eval he's not demonstrated, Doctor Abraham

12   refuses to take call more than two days per week

13   although the expectation is to take call seven days a

14   week.  And that you said was an issue that had been

15   ongoing for several years, correct?

16        A.  Correct.

17        Q.  Doctor Abraham refuses to be a collaborative

18   physician for the Nurse Practitioner at the facility.

19   Had you ever read that statement before today or heard

20   that criticism?

21        A.  Yes.

22        Q.  Okay.

23        A.  Yes.

24        Q.  The Nurse Practitioners was Mary Dambacher,

1  correct?

2        A.  Correct.

3        Q.  Did you have any conflict with Mary

4  Dambacher that you were aware of?

5        A.  No.

6        Q.  Did you get along professionally?

7        A.  Yeah.

8        Q.  So were you surprised then to hear that she

9  had reported that you were refusing to be a

10  collaborative physician with her?

11       A.  I don't think she reported that.

12       Q.  So who do you think reported that?

13       A.  I think that is, would be, from this

14  document it looks like this is coming from Advanced

15  Correctional.

16       Q.  So do you think, you're not aware of any

17  instance where Mary Dambacher had any conflict about

18  collaboration?

19       A.  I had no conflict with Mary.

20       Q.  How would ACH, you said you think that came

21  from ACH Corporate or the Medical Director Michael

22  Mitcheff, how would they know whether you had been

23  refusing to be a collaborative physician?

24       A.  Because the question comes from ACH not from

Page 32

1  Mary.

2       Q.  What request?

3       A.  If there is a request to be a collaborating

4  physician, the request, so Dan Williams was a PA.

5       Q.  Oh, okay.  So let's back up.

6                Is collaborative physician a term of

7  art that's used in your profession that means

8  something, that has a definition?  What does it mean

9  to you a collaborative physician?

10      A.  That the provider will call you or will use

11  you as a reference or will work almost under your

12  license in my opinion where you can now be held liable

13  for their actions if there was neglect or --

14      Q.  Okay.

15      A.  -- not due diligence.

16      Q.  Okay.  And so as a Nurse Practitioner.

17  Thank you.

18                So as a Nurse Practitioners Mary

19  Dambacher is she required to have a collaborative

20  physician with whom she can work as part of her

21  ability to diagnose and prescribe medications?

22      A.  I believe so but those laws have changed in

23  the last two years.

24      Q.  Okay.  At this time in 2017 was that, was it

Page 33

1    required for her to have a collaborative physician?

2         A.   I believe so, yes.

3         Q.   While she was at the facility, who was her

4    collaborative, sorry, in 2017 who was her

5    collaborative physician?

6         A.   I believe it was Doctor Mitcheff, I believe

7    but I don't know for sure.

8         Q.   Okay.  And what does it, what would it

9    entail to be a collaborative physician?

10         A.   That, it's a document that I think that you

11    sign with your, the Illinois Department of

12    Professional Regulation which states that hey, this

13    Advanced Practitioner is collaborating with this

14    physician in the care of their patients even though

15    they may be working independently outside of the

16    facility where the collaborating physician is.

17         Q.   And is it, are there duties attendant in

18    taking on the role of collaborative physicians?

19         A.   There are.

20         Q.   And yeah, I think you mentioned some of them

21    but explain to me exactly what that role would have

22    entailed, would entail for you?

23         A.   It would be overlooking charting, available

24    for questions, it would entail monitoring practicing

Page 34

1   habits.

2         Q.   And that is not something that you were

3   doing with Mary Dambacher?

4         A.   Correct.

5         Q.   Were you doing --

6         A.   I was not obligated to do.

7         Q.   Okay.  And were you doing, fulfilling that

8   role nonetheless from time to time?

9         A.   I was.

10        Q.   Okay.  With respect to Tiffany Rusher's care

11   were you fulfilling that role?

12        A.   Yes.

13        Q.   Okay.  And did Mary Dambacher and you ever

14   directly discuss that you, Tiffany Rusher's care?

15        A.   I don't, not that I remember.

16        Q.   Okay.  In your, if Mary Dambacher was

17   prescribing psychiatric medications to Tiffany Rusher

18   while she was at the hospital, at Sangamon County

19   Jail, would she have been required to collaborate with

20   you or another physician before prescribing those

21   medications?

22                    MR. MADDOX:  Can you explain

23   what you mean by collaborate?

24        Q.   Under the, I'm using the term from the

Page 35

1    document so if there is any form, you know, you can

2    define collaborate?

3         A.   So your question is just so I'm clear you're

4    asking if I collaborated with Mary Dambacher in the

5    care of Tiffany?

6         Q.   Uh-huh.

7         A.   Correct.

8         Q.   Yes?

9         A.   Yeah.

10        Q.   So that was the two questions ago.  Then the

11   last question was, was Mary Dambacher allowed to

12   prescribe psychiatric medications independently

13   without collaboration with any physician?

14        A.   They're always, so the word, you mean, I

15   think your question was prior to prescribing?

16        Q.   Yeah, the act of prescribing, yes, I'm not

17   sure, yeah, I'm not sure about your qualification.  My

18   question was --

19                    MR. MADDOX:  Okay.  We need

20   another question or the same question restated.

21                    MS. CHARDON:  Yeah, I'm going

22   to restate it.  Why don't you read, if you can flip

23   back and read my question, please.

24

Page 36

1              (Whereupon the Court Reporter read
2                   back the requested information.)
3      Q.  Is it true?
4      A.  No.
5      Q.  Okay.  And what was she required to do in
6  terms of collaboration with a physician?
7      A.  So as I mentioned previously, she is allowed
8  to order independently and practice independently with
9  a collaborating physician registered with the State.
10     Q.  Okay.  And that's what I'm trying to get at.
11  So the, so that means a collaborating physician would
12  be required to monitor her charts, be available for
13  questions, correct?
14     A.  (Nod Affirmatively).
15     Q.  Monitoring her practicing habits, correct?
16     A.  Yes.
17     Q.  Okay.  So is that collaborative physician
18  required to monitor, in other words, review every time
19  she prescribes psychiatric medication?
20              MR. MADDOX:  He's free to
21  answer that question.  I just do want to state an
22  objection though.  The duties of a collaborative
23  physician are in fact set forth in the Medical
24  Practice Act and the Nurse Practitioner Act.  Those

Page 37

1   duties are prescribed by law.  He may or may not be

2   aware of what the Act itself says, so I'm objecting on

3   foundation.

4                      MS. CHARDON:  Yes.

5                      MR. MADDOX:  He's certainly

6   free to answer the question the best of his ability.

7                      MS. CHARDON:  Understood.

8        A.  Okay.  So yes, I do review the documentation

9   that Mary puts into the chart.

10       Q.  Uh-huh.

11       A.  Because that's how we were communicating

12  occasionally.

13       Q.  Okay.

14       A.  When she did not make a phone call or if the

15  nurses did not call me on a patient, that's how I was

16  aware of what was being prescribed.

17       Q.  So it sounds like in practice you were

18  serving as a collaborative physician with Mary

19  Dambacher in 2017 at least with respect to some cases?

20       A.  So, collaborative physician is a very

21  definitive term and needs to be registered.  So

22  acting, there is no, you can't act as, you, either you

23  are or you are not.  And what, who you register with

24  at the State is who the collaborating physician is.

1          So whether I review a chart where I'm

2    working with a Nurse Practitioner or not, does not

3    make me a collaborating provider.

4          Q.   In other words, what I'm trying to get at is

5    we talked about the, what the duties of a

6    collaborating physician are, correct?  And we, you

7    gave me what includes monitoring, charting and

8    practicing habits, correct?

9          A.   Correct.

10         Q.   An actual as, not in term of a medical term

11   but a legal term but actual collaboration with the

12   person being able to answer questions?

13         A.   Being available.

14         Q.   Yes.

15         A.   Yes.

16         Q.   And those are all things, setting aside the

17   legal title, those are all things that you did at

18   least from time to time with Mary Dambacher, correct?

19         A.   Yes.

20         Q.   Those are things that you did at least from

21   time to time with respect to the care of Tiffany

22   Rusher, correct?

23         A.   Absolutely.

24         Q.   And so, but you nonetheless decided that you

Page 39

1    didn't want to be the legal collaborating physician

2    for Mary Dambacher?

3         A.   Correct.

4         Q.   And what are all the reasons why you refused

5    to be her collaborating physician?

6         A.   I didn't know Mary for me to legally put my

7    name on a formal document that says hey, I want to be

8    available and this is the person that I'm choosing.  I

9    want to also be comfortable and I didn't know Mary.  I

10   mean she wasn't hired by me.  She wasn't interviewed

11   by me.

12        Q.   And you felt that it would be taking on a

13   certain legal requirement to be, I think, I'm trying

14   to remember your words, but you earlier described that

15   you were basic, she would essentially be practicing

16   sort of under your auspices on some level if you were

17   the collaborating physician?

18        A.   So when I was doing training we were always

19   made aware that there has never been a case when an

20   Advanced Practitioner has been sued without a Doctor

21   being named in that case.  And so I was always

22   cautious to make sure that if I'm going to be

23   collaborating with somebody I want to be comfortable

24   in who that person is overall, and I want to be

Page 40

1    involved in that process before I legally put my name

2    beside somebody.

3        Q.  The next item on this list on 631 is Doctor

4    Abraham refuses to maintain a consistent schedule

5    which causes a hardship on the Medical Department and

6    negatively impacts operations of the Jail, our client.

7    Had you heard that criticism --

8        A.  I had.

9        Q.  -- before.

10            And what, what was the circumstances

11   surrounding your receipt of that criticism?

12       A.  So because I was only assigned two hours or

13   three hours at the Jail they, and when I work Urgent

14   Care, Urgent Care is shift work so you never know what

15   your shifts are going to be except for a month in

16   advance, so I don't know if I can be there every

17   Tuesday at 11 to 1, ,or I don't know if I can be there

18   every Thursday from 10 to 12.  But I can let you know

19   one to two weeks in advance depending on what my

20   schedule looks like.  I can be there every week, I

21   just may not be able to be on the exact time and date

22   every week.

23       Q.  And finally, and you had heard, you had

24   heard that criticism prior to --

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 41

1       A.   Yes.

2       Q.   -- to being fired?

3                 How, when was the first time that you

4   heard that?

5       A.   That was in conjunction, that was, these

6   were all part of those conversations that happened

7   with, why don't you want, why aren't you not seven

8   days a week on call and those kinds of things.

9       Q.   And were those memorialized, to your

10  knowledge, in any evaluations or written documents?

11      A.   No, not to my knowledge.

12      Q.   Who communicated those conversations to you,

13  that information to you?

14      A.   Doctor Rakestraw.

15      Q.   Who's Doctor Rakestraw?

16      A.   Doctor Rakestraw was the Corporate Medical

17  Director who hired me.

18      Q.   And was it over the phone or in person that

19  you talked about this?

20      A.   Over the phone.

21      Q.   How many times did you have conversations

22  with Doctor Rakestraw where he expressed criticism or

23  critical assessment of you?

24      A.   Maybe twice.

Page 42

1      Q.   And when was the first time?

2      A.   I don't know, I'm sorry.

3      Q.   Was this going on at the same time that you,

4  these issues regarding your schedule was that going on

5  at the same time, for example, that you received the

6  written reprimand about professionalism?

7      A.   Yes.

8      Q.   Okay.  So as far back as 2014?

9      A.   (Nod Affirmatively).

10     Q.   March 2014?

11     A.   Yes.

12     Q.   And then finally Doctor Abraham refuses to

13  fulfill his site visit responsibilities.  Have you

14  ever heard that criticism before?

15     A.   Never.

16     Q.   Okay.  So that before today had you heard

17  that criticism?

18     A.   Only from the document that was provided

19  within that, yeah.

20     Q.   Okay.  And is this a document that you

21  reviewed before today?  This, what you're looking at

22  in front of you?

23     A.   Yes.

24     Q.   Okay.  In preparation for today?

Page 43

1        A.   Yes.

2        Q.   Let's look at the, I'm, my next question is

3   going to be what were your site visit responsibilities

4   and so why don't I ask that.

5                  What were your site visit

6   responsibilities?

7        A.   To visit the facility every week for the

8   assigned amount of time and take care of the patients

9   that had sick call and were in High Risk.  As well as

10  taking call on a daily basis multiple times a day

11  after the nurses completed sick call and then provide

12  management suggestions.

13       Q.   Within the health, the structure of

14  healthcare provision at Sangamon County Jail, I think

15  you described that it was either you or another

16  Advanced Practitioner who would be on call at any one

17  time, is that correct?

18       A.   Yes.

19       Q.   And were there any differences in terms of

20  what kind of powers and duties you would each have

21  when you were on call as a result of your different

22  Medical licenses?

23       A.   Not to my knowledge.

24       Q.   When the Advanced Practitioner, the PA or

Page 44

1  the, the NP were on call, did they have, was there

2  like any kind of hierarchy where then they would call

3  up to you if they needed to advance?

4       A.  Yeah, if they had questions, concerns.

5       Q.  Okay.

6       A.  Yeah.

7       Q.  Were you available to be, even if it wasn't

8  your on call time?

9       A.  Yeah.

10      Q.  Was that formal or is that just your, your

11 practice?

12      A.  I mean I assumed that was one of, you know,

13 if somebody is calling you about a patient or about a

14 concern whether I'm working or not I'm, that's just,

15 nobody told me, yeah, nobody told me not to, you know.

16      Q.  Okay.  At the end of the day, I mean you

17 have different abilities as, do you have different

18 abilities as a result of your medical training and

19 licensure in terms of treating patients?

20      A.  Yes.

21      Q.  And what are those different, what are the

22 differences?

23      A.  I don't need a collaborating physician.  I

24 can practice completely independently.

Page 45

1      Q.  Any other differences?

2      A.  Licensing differences and requirements, CME

3  standards and requirements.

4      Q.  Training differences?

5      A.  Absolutely.

6      Q.  Okay.  I am reviewing ACH 609 which is the

7  Site Physician description that's in this, in this

8  document.  And so that was, your position title was

9  Site Physician, correct?

10     A.  Yeah.

11     Q.  And you report to the Corporate Medical

12  Director, correct?

13     A.  Yes.

14     Q.  And was that Doctor Rakestraw?

15     A.  Yeah.

16     Q.  Did it ever become Michael Mitcheff?

17     A.  It did.

18     Q.  Okay.  Do you know at what point that

19  changed?

20     A.  I don't, it might have been 15 or 16, but I

21  don't remember exactly.

22     Q.  So at different times you reported back to

23  Doctor Rakestraw and Doctor Mitcheff?

24     A.  Yes.

Page 46

1    Q.   And where do they physically, where are they

2    physically located?

3    A.   Peoria.

4    Q.   So did you meet with them in person at

5    times?

6    A.   Yeah.

7    Q.   And are they responsible for a certain

8    territory or are they responsible for all ACH --

9    A.   I --

10   Q.   -- if you know?

11   A.   My assumption is that they were Corporate so

12   the whole company.

13   Q.   And you are aware, does the company practice

14   in other states as well?

15   A.   Yeah.

16   Q.   Okay.  Okay.  So under description of the

17   essential functions, triage telephone calls in a

18   timely and appropriate manner, did you understand that

19   to be one of your job functions?

20   A.   Yes.

21   Q.   Reports to assigned facility at designated

22   hour to examine referred patients, that was a job

23   responsibility?

24   A.   Yes.

Page 47

1    Q.  Assumes role of Primary Care Physician with

2  the coordination of on and off-site care needs.

3            Do you agree that was your role as, at

4  Sangamon County Jail?

5    A.  Yes.

6    Q.  And so was it your role to coordinate on and

7  off care needs for all patients in the, all prisoners

8  in the facility?

9    A.  All, yeah, all patients, yeah.

10   Q.  Did you share that role of Primary Care

11 Physician with anybody else while you were there?

12   A.  No.

13   Q.  It was just you, okay.

14            Supervises the clinical services

15 provided by professional and paraprofessional staff

16 when requested?

17   A.  Yes.

18   Q.  Did anybody ever request you to supervise

19 the clinical services provided by professional and

20 paraprofessional staff?

21   A.  Yes.

22   Q.  And that's something that you did?

23   A.  Yes.

24   Q.  Sir, I'm skipping one, serves as the

Page 48

1    discussion leader in selected inservice training

2    classes is that a role that you ever fulfilled?

3         A.   Inservice, not that I remember.

4         Q.   Did you ever represent the healthcare

5    program in discussions when requested?

6         A.   I guess my question would be what is the

7    healthcare program?

8         Q.   And what is discussion, yeah, that's fair if

9    it meant something to you.

10                   Attends Corporate Physician Advisory

11   Board Meeting as requested?

12        A.   Yep.

13        Q.   So you did attend Corporate Physician

14   Advisory Board Meeting?

15        A.   Uh-huh.

16                   MR. MADDOX:   Is that a yes?

17        A.   Yes, sorry.

18        Q.   And how many times did you do that?

19        A.   Oh, that I don't remember but there was

20   corporate meetings at least three times a year,

21   sometimes even four.

22        Q.   And was training offered for Physicians at

23   those meetings?

24        A.   Yes.

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

                                                              Page 49

1          Q.   Monitors referral to outside healthcare

2    facilities for appropriateness, quality and continuity

3    of care was that part of your role?

4          A.   Yes.

5          Q.   And is that something that you did actively

6    while you were there?

7          A.   Yes.

8          Q.   Did you ever monitor referrals to outside

9    healthcare facilities that were psychiatric referrals?

10              In other words, psychiatric inpatient

11   commitments?

12         A.   Did I, did I do referrals to outside, yes.

13         Q.   How many times did you monitor, so there

14   were times that you, which you are aware, where people

15   were referred from Sangamon County Jail to outpatient?

16         A.   Or attempts, yes.

17         Q.   Attempts to refer?

18         A.   Yes.

19         Q.   And well, let's talk about actual referrals

20   to a person where someone becomes committed to an

21   inpatient facility after?

22         A.   I have to refer to the documents that I

23   don't remember exactly how many times.

24         Q.   Do you remember a specific time where a

Page 50

1    person was referred from Sangamon County Jail to an

2    inpatient re, inpatient medical, excuse, inpatient

3    psychiatric facility?  Can you think?  Did that

4    happen?  Do you know whether that happened?

5         A.   Like I said, I remember requesting to look

6    for psychiatric services or inpatient services that

7    would accept patients.  I don't know if that, I don't

8    remember if that referral went through or not or was

9    accepted by the outside facility.

10        Q.   And so do you have any recollection of any

11   time when a person was, simultaneously had been

12   referred out to an inpatient psychiatric facility but

13   was still under the custody of Sangamon County Jail

14   and your care?

15        A.   I refer to my previous answer it's the same

16   answer I don't remember if that actually went through.

17   I do remember talking about cases and wanting a

18   referral or see if an outside facility whether that be

19   McFarland or Lincoln, you know, would accept a

20   patient.

21        Q.   And those circumstances, first, where did

22   you refer them to?  Was there a specific place that

23   you or Doctor you referred them to?

24        A.   No, that was up to the RN or the Lead Nurse

Page 51

1    who would try multiple facilities.

2         Q.  Did you ever refer people to the Emergency

3    Room for psychiatric reasons?

4         A.  We can't refer for a reason, we refer for

5    evaluation.

6         Q.  Sure.

7              And did you, were you ever motivated,

8    did you ever send someone to the ER for psychiatric

9    reasons and your motivation?  I'm asking medically did

10   you make the decision for, as a result of psychiatric

11   symptoms someone should go to an ER?

12        A.  Yes.

13        Q.  Okay.  And what was that circumstance?

14        A.  There was a gentleman that I remember

15   specific case from New York and he was having a

16   breakdown that he was now going to be a harm to

17   himself or he was a harm to others, I don't remember

18   the exact, but I remember this gentleman we found it

19   after the fact he was from New York and whatnot.  But

20   he was actively having issues and so we were worried

21   about his safety as well as safety of others.

22        Q.  And did you feel that he might need

23   psychiatric diagnosis?

24        A.  Yeah.

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 52

1      Q.  And psychiatric prescriptions?

2      A.  Yeah.

3      Q.  Did he come into your facility when you were

4   present when he presented to you were you aware

5   whether he had been prescribed psychiatric medication

6   previously or do you have any medical history for him?

7      A.  What was it, I don't remember his Intake

8   form.

9      Q.  The, and at that point you sent him to an

10  Emergency Room?

11     A.  (Nod Affirmatively).  Yes.

12     Q.  What happened did he return to the Jail

13  subsequently?

14     A.  I don't remember if he returned immediately

15  but he did eventually return, I remember seeing him

16  again.  But I don't remember if it was immediately or

17  if there was an inpatient at Memorial, or if he was, I

18  don't remember when or why, you know, but I do

19  remember him coming back.

20     Q.  And was that in 2017 when that happened?  Do

21  you know when that happened?

22     A.  I don't, I'm sorry.

23     Q.  Okay.  Was it before or after Tiffany

24  Rusher's suicide?

1     A.  I think it was, I think it was before.

2     Q.  And when you also mentioned that you also

3  could, was there a reason why on that date you

4  referred to the ER because we were talking about

5  before how you could also have a Nurse look for

6  inpatient beds at psych wards?

7     A.  Uh-huh.

8     Q.  Was there a reason why you sent that patient

9  to the ER versus looking for a psych bed?

10     A.  Yeah, he wasn't eating or drinking.

11     Q.  He was not eating or drinking?  And had he

12  been and now you've sparked a memory of a conversation

13  that I had with another colleague yesterday.  Was he,

14  also, had he been in the facility for about a week or

15  so by the time when he was referred out?

16     A.  I don't remember how long.

17     Q.  And but when he stopped eating and drinking,

18  you referred him out to the ER, is that correct?

19     A.  Yes.

20     Q.  How long had he been not eating or drinking?

21     A.  I don't remember.

22     Q.  And then he was, was he treated by a

23  psychiatrist and returned to the facility?

24     A.  I don't know.

Page 54

1          Q.   When he returned to the facility, was he

2     prescribed psychotropic medication?

3          A.   I assume so, but I don't remember the

4     specifics.

5          Q.   And then with respect to the folks for whom

6     you made requests to look for inpatient beds at psych

7     wards, were those people who had been determined not

8     fit to stand trial?

9          A.   Say that again?

10         Q.   Were you aware of whether those people, had

11    anybody made a determination that they were not fit to

12    stand trial?

13         A.   I do not know.

14         Q.   What prompted you in those cases to request

15    for an inpatient, a bed at an inpatient ward?

16         A.   I felt that they were having symptoms that I

17    was not able to effectively control.

18         Q.   What symptoms?

19         A.   I don't remember, like I said I don't

20    remember the specific patients.  I don't remember the

21    specific circumstances and I don't, yeah, that would

22    have to be pulled from the medical records.

23         Q.   What sitting, what would be a symptom that

24    you felt couldn't be controlled?

Page 55

1          MR. MADDOX:  Object to the form

2    of that question, answer if you can.

3          A.   Throwing feces at other Inmates or Staff or

4    trying to eat their own feces.

5          Q.   And in retrospect does that, is that one of

6    the symptoms that you recollect somebody --

7          A.   From that gentleman.

8          Q.   Who was not eating or drinking?

9          A.   (Nod Affirmatively).

10          Q.   Okay.  And --

11          MR. MADDOX:  Other than his own

12    feces.

13          A.   Yeah, I mean...

14          Q.   And what about the people who you sent, you

15    referred, you, first of all, how many times did you

16    have to ask a Nurse to call for a referral to an

17    inpatient site?

18          A.   Like I said before, I don't remember.

19          Q.   Was it more than five?

20          A.   I don't remember.

21          Q.   Was it more than one?

22          A.   I don't exactly know because I remember him

23    very vividly but I don't remember from 2013.

24          Q.   So you have a specific recollection of this

Page 56

1  gentleman who went to the ER but you have no other

2  specific recollection of anybody being referred to an

3  inpatient psych ward?

4       A.  I don't remember.

5       Q.  Okay.  Is there anything about referring

6  anybody to an inpatient psych ward when you worked at

7  Sangamon County Jail that you do remember?

8       A.  Specifics, no.

9       Q.  Okay.  Did you ever, well, you keep saying

10 specifics --

11      A.  Yeah.

12      Q.  Do you, but you don't know if it was more

13 than one time?

14      A.  I believe it was but I don't, I don't want

15 to say yes because I don't know for sure.

16      Q.  Okay.  Are you for sure it happened once?

17      A.  Yes.

18      Q.  Okay.  But you, and why are you sure that --

19      A.  Because I remember a conversation.  I

20 remember having a conversation with the RN or the Lead

21 Nurse, the Site Nurse.

22      Q.  And who was that person?

23      A.  Who was it before Kate, Kate Daniels oh,

24 tall guy Dan, I don't remember his last name.  Dan is

Page 57

1    his first name.

2           Q.  It wasn't Dan Williams?

3           A.  No, Dan Williams was the PA, I believe.

4           Q.  And so it was before Kate Daniels and do you

5    remember anything about the prisoner, the patient?

6           A.  I don't.

7           Q.  And do you know whether that prisoner or

8    patient had been, whether a determination had been

9    made about whether they could stand trial?

10          A.  I don't.

11          Q.  Okay.  So you, going back to the document we

12   were looking at.  I think we were talking about

13   monitors, referrals to outside healthcare facilities

14   for appropriateness, quality and continuity of care.

15               I think what we just came around to is

16   you don't have any specific recollection of doing that

17   in the context of the psychiatric outpatient referral?

18          A.  I don't.

19          Q.  Or inpatient --

20          A.  Coordination.

21          Q.  -- in and out of the facility, right.

22               Monitors mediation utilization at an

23   assigned facility and facilities, could that, do you

24   think that might be supposed to mean medication?

Page 58

1          A.  I would assume so.

2          Q.  Okay.  Did you monitor medication

3     utilization at assigned facilities?

4          A.  Yes.

5          Q.  And how did you do that?

6          A.  We were given reports on, sometimes even a

7     monthly basis.

8          Q.  Was that a CQI report?  What kind of --

9          A.  Sorry, I don't know what a C, sorry.

10         Q.  What did the report look like?

11         A.  It was a table of medications.  It included

12    which medications were heavily being used or most

13    prescribed, least prescribed, yeah, and then, yeah.

14         Q.  Who prepared the table?

15         A.  Doctor Rakestraw.

16         Q.  Okay.  And did it have a breakdown, did your

17    monitoring of medication utilization involve

18    monitoring of specific patients medication

19    utilization?

20         A.  Did his report?

21         Q.  Yeah, I guess.

22         A.  Yeah, it told you which patient was on

23    medication and, yeah.

24         Q.  Okay.  And so you could look and did it tell

Page 59

1    you, did you monitor whether or not patients were

2    refusing their medications --

3         A.  Yes.

4         Q.  -- as part of that?

5         A.  Yes.

6         Q.  So with, yesterday with Mr. Ernest I looked

7    at a document and I will show you Ernest 1 it is

8    Sangamon County Produced 201.  I understand that's a

9    Medication Refusal Form?

10        A.  Uh-huh.

11                      MR. MADDOX:  Yes?

12        A.  Yes, sorry, yes.

13        Q.  And that's, do you review, do you receive

14   those medication referrals, did you receive those

15   Medication Refusal Forms in the course of your duties

16   at Sangamon County Jail?

17        A.  No.

18        Q.  No.  Okay.  Did you ever review them?

19        A.  No.

20        Q.  Do you know whether they were passed along,

21   were they put in your mailbox?

22        A.  No.

23        Q.  Okay.  So if Mr. Ernest testified that he

24   did put those in your mailbox or if not yours Miss

Page 60

1    Dambacher's?

2         A.  No.

3         Q.  Okay.

4         A.  Not that I remember.

5         Q.  Was anybody keeping track of how often

6    Tiffany Rusher was refusing her medications?

7         A.  Yes.

8         Q.  Who?

9         A.  Whichever Nurse was administering the

10   medications as well as the provider.  The Site

11   Clinician when they came in to review the, what was

12   called the MAR, the medication, there was a form that

13   you could see when patients were refusing medications

14   and how often.  And it was also because you had

15   clinical staff there on a daily basis they would

16   verbally notify you if there was a concern of multiple

17   days being refused, and who those patients were, and

18   why they were being refused.

19        Q.  Okay.  So let's break that down.

20             Who's the Site Clinician?

21        A.  Myself and the Advanced Practitioner.

22        Q.  Okay.  So you said it wasn't but you had

23   just said it was, all right.

24             At times you did review then as a Site

Page 61

1   Clinician --

2        A.  Not these.

3        Q.  Not those but you reviewed -- --

4        A.  Yeah, yes.

5        Q.  -- Ernest Exhibit 5 which is the Medication

6   Administration Record.  I'm going to show that to you.

7            So you did review the Medication

8   Administration Record?

9        A.  Yes.

10        Q.  And was there any protocol to, did you, to

11   make sure that, going, backing up my question was, was

12   anybody tracking whether or not she was taking her

13   medication right and you said yes, correct?

14        A.  Yeah.

15        Q.  And I understand that somebody was, it would

16   always be recorded, right, if she missed her

17   medication, correct?

18        A.  Yes.

19        Q.  And that would be recorded in the Medication

20   Administration Record?

21        A.  Yes.

22        Q.  And it was, would be recorded in the

23   Medication Refusal of Treatment Form that you looked

24   at, right?

1      A.  I --

2      Q.  I'm sorry, it was a terrible question.

3              You didn't look at it at the time,

4  right?

5      A.  Yeah.

6      Q.  You didn't review that at the time but it

7  would go in her chart.  Do you know whether the

8  Medication Administration Refusal would go into her

9  Medical record?

10     A.  Yes.

11             MR. MADDOX:  Hold on a second

12  when you're say Medication Administration Refusal are

13  you referring to the MAR or to this other form?

14             MS. CHARDON:  Yeah, let's start

15  over.

16     A.  Sorry.

17     Q.  And when I said you looked at it, I meant

18  you looked at it today, so let's start fresh.

19             The Refusal of Treatment Form you

20  didn't review contemporaneously?

21     A.  You mean continuously --

22     Q.  Yeah.

23     A.  -- is that what contemporaneous --

24             MR. MADDOX:  I mean at the time

Page 63

1   it occurred.

2          Q.  At the time it occurred?

3          A.  Oh, no.

4          Q.  It would go into the chart, correct?

5          A.  Yes.

6          Q.  Okay.  If the Medication Administration

7   Record or MAR you did review contemporaneously with

8   treating the patient?

9          A.  Yes.

10          Q.  And did you review her at, on what occasion

11   did you review specifically Tiffany's Medication

12   Administration Record?

13          A.  Usually when I go into the facility is,

14   specifically I can't tell you but I, specific dates I

15   would have to go to the records, but it was when I

16   went into the site or if a concern was brought to my

17   attention.

18          Q.  Okay.  So when you arrived, when you,

19   whenever you went to the site would you review every

20   patients Medication Administration Record?

21          A.  No.

22          Q.  Whose patients Medication Administration

23   Record would you review?

24          A.  So Corporate had asked us to review them at

Page 64

1    least once a month unless it was brought to our

2    attention that there was another concern.  Because

3    every month they change, like the sheet changes every

4    month.  And so it goes off, you know, you don't see it

5    in that, that file anymore, in that binder.  It's not

6    there any more after that month.

7                    So they wanted you to review it, every,

8    once a month at least unless there was a concern that

9    was brought up by...

10       Q.  And if there was a concern brought up, would

11   it be documented in the medical record?

12       A.  Not that I remember, no, I don't think so.

13       Q.  I'm not talking about specifically Tiffany's

14   case but in general how would that concern be

15   communicated?

16       A.  Verbally.

17       Q.  Verbally.  And would it be important to

18   document that concern in a record?

19       A.  It's documented here in the MAR.

20       Q.  So what's documented in the MAR is whether

21   or not they are taking the medication, correct?

22       A.  Yeah.

23       Q.  And at what point does it become a concern

24   if, that somebody is missing medication?

Page 65

1            MR. MADDOX:  I just want to
2    object to the form of the question as vague and not
3    having any factual context to allow a reasonable
4    answer but answer if you can.
5            MS. CHARDON:  I would object to
6    the speaking nature of the objection as instructing
7    the witness, but you, I'm trying to use your words.
8    You said that, that concerns would be documented?
9        A.  Yeah.
10           No, I didn't say documented, notified,
11   right, yeah.
12       Q.  Yeah, well, that's right I think you did say
13   documented and that's what I was trying to probe.
14           Concerns would be notified to you,
15   correct?
16       A.  Yes.
17       Q.  Concerns wouldn't necessarily be written
18   down on paper, is that what you're saying?
19       A.  Correct.
20       Q.  Okay.  And at what point does skipping
21   psychotropic medication become a concern?
22           MR. MADDOX:  Same objection as
23   before.
24       A.  That would be the clinical judgment of where

Page 66

1  we're having episodes and failure to, you know,

2  control symptoms.

3       Q.  Okay.  And is there any system in place or

4  was there any system in place at the time that you

5  were treating Tiffany to flag formally to keep track

6  of, or, I'm sorry, to pick up on whether or not she

7  was skipping too much medication?

8       A.  Was there a formal method?

9       Q.  Yes.

10      A.  Other than the MAR?

11      Q.  Correct.

12            So one method, no, one method you

13 explained to me that you would review the MAR --

14      A.  Yeah.

15      Q.  -- upon coming in.  It was your practice to

16 review the MAR upon treating Tiffany, is that what you

17 said?

18      A.  No, I said that the I, it was my practice to

19 review the MAR once a month before it got, was filed

20 into another part of the chart.  And that MAR that's

21 in the folder there, in the, right there on top of the

22 meds is where you would go through.

23      Q.  Okay.  And so at the end of the month you

24 would, would you always review the MAR before filing

Page 67

1   it?

2        A.  I would say majority of the time I can't say

3   always because I don't know specifics.

4        Q.  Were you required in the, by any sort of the

5   written practice or protocol to review the MAR at

6   least once a month?

7        A.  Not that I know of.

8        Q.  So why did you do it?

9        A.  My practice, standards or say habits.

10       Q.  Okay.  So you were reviewing the MAR as part

11   of your practice once a month.  Is there any other,

12   was there any other formal or informal procedure

13   within ACH that you knew about which was instituted in

14   order to track whether or not a person was skipping

15   too many medications?

16       A.  Too many medications, not that I know of.

17       Q.  And you don't, you didn't chart it when you

18   reviewed the MAR, did you chart and document that I

19   have reviewed the MAR for the month?

20       A.  No.

21       Q.  And so, and if there were concerns, say a

22   person missed seven days in a row of medication in the

23   beginning of a month?

24       A.  Okay.

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 68

1          Q.   Okay.   Days 1 through 7 of a month?

2          A.   Yeah.

3          Q.   What procedures were in place to notify you

4     of that, of that?  How would you become aware of that,

5     if at all?

6          A.   They would either during one of the phone

7     calls or when I came on-site.  If it wasn't something

8     that was emergent causing an acute situation, then I

9     would be notified usually on-site.  They wouldn't

10    utilize, they wouldn't utilize that phone call.

11         Q.   How would they know, I mean the people who

12    are reviewing, the nurses are, don't have your same

13    medical licensure, correct?  They don't have your same

14    level of training, the Nurses?

15         A.   Are you asking me if an RN and MD have the

16    same level of training and certification?

17         Q.   Yes.

18         A.   No.

19         Q.   No, no.

20              So how did they know, one of the

21    questions that I asked a lot yesterday, how do you

22    know, how much is too much, right?  I'm trying to find

23    out at what point, you know, is there any, any rules

24    that you give them to follow at what point is it time

Page 69

1    to flag to Doctor Abraham that she's missed too many

2    medications?

3         A.  That would be a subjective clinical

4    assessment of their interaction.

5         Q.  Okay.  And what would that, yeah, what do

6    you mean by that?  What would it be based on, the

7    subjective clinical --

8         A.  That you would have to ask the person who

9    was observing that patient and interacting with that

10   patient.

11        Q.  Well, what would you want a Nurse to, what

12   kind of factors would they need to be reporting on

13   that were relevant to their decision?

14        A.  You're asking me to answer what they feel

15   would be clinically relevant?

16        Q.  I'm asking you what you, you were depending

17   on them to be your eyes and ears as to whether she was

18   taking her medication --

19        A.  Yeah.

20        Q.  -- right.

21             And so you have to rely on them in

22   order to let you know if she was missing seven days in

23   a row from days 1 through 7, right?

24        A.  Yeah.

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 70

1      Q.   You were relying on them to, to report that

2  up?

3      A.   If there was a concern that she missed 1

4  through 7 and she's exhibiting symptoms that are

5  concerning to the person who's visiting her, or if the

6  CO is letting them know.  Because the CO's are

7  checking on them every 15 minutes.  If there's,

8  they're concerned they let, they are very good

9  reporting to Medical Staff, and Medical Staff is there

10  at one point was there almost 24 hours a day staffed,

11  you know.

12      Q.   And so you're trusting them to report those

13  things to you, correct?

14      A.   Yeah.

15      Q.   Because otherwise you don't know about them,

16  correct?

17      A.   Right.

18      Q.   The end of the day you're the Doctor?

19      A.   Yes.

20      Q.   -- with the most training, correct?

21      A.   Well, with training I don't know what you

22  classify as most because some people, I mean Nurse

23  Practitioners go through how many years of training,

24  right.  Nurses go through how many years of training,

Page 71

1   RN's might have, are you asking, training is, I've

2   done 13 years of training to get to where I am.

3          Q.  At the end of day the buck stops with you in

4   terms of --

5          A.  No.

6          Q.  -- writing the prescription?

7          A.  No.

8          Q.  In terms of reviewing the Medical

9   Administration Record you told me you're the one

10  that's checking to make sure that at the end of the

11  month that that's the processes that you check to see

12  how many medications --

13         A.  My process.

14         Q.  Your process.

15              And in addition part of your process is

16  relying on Nurses and CO's that are interacting with

17  her regularly to notify you if she's missing

18  medication and there is a concern, right?

19         A.  Yes.  As well as my interaction with those

20  during in High Risk when I come to the site.

21         Q.  Okay.  And what I'm asking you is what, what

22  things are relevant to your assessment when you come

23  to the site?

24         A.  Yeah.

Page 72

1      Q.  But --

2      A.  I guess eating feces.

3      Q.  Okay.  And what, is that eating feces

4  that's, I would classify that as a behavior, correct?

5      A.  Yes.

6      Q.  What else is relevant in your assessment?

7      A.  What else is relevant?

8                     MR. MADDOX:  In his assessment

9  of the patient?

10                     MS. CHARDON:  Of the patient.

11      Q.  Of the patient whether there is a concern

12  about that patient's mental health or the fact that

13  they're, their medication?

14      A.  The symptoms they exhibit.

15      Q.  And is skipping medication a symptom of

16  mental decompensation?

17      A.  It can be.

18      Q.  Is self harm a symptom of mental

19  decompensation?

20      A.  It can be.

21      Q.  Is erratic behavior a symptom of mental

22  decompensation?

23      A.  It can be.

24      Q.  When you're relying on Medical Staff and

Page 73

1  CO's, Nurses and CO's to be reporting concerns, are

2  you relying that they would recognize those things we

3  just mentioned as symptoms of decompensation?

4       A.  If it's a change from baseline.

5       Q.  And if it's not a change from baseline would

6  you be relying on them to report to you self harm

7  events?

8       A.  Yes.

9       Q.  And if it's not a change in baseline would

10 you be relying on them to report to you behaviors like

11 eating feces?

12      A.  Yes.

13      Q.  So you are, when you said that you don't

14 know, you know, what is, subjectively what's a concern

15 to them earlier, you do have a certain level of

16 professional competence in terms of recognizing mental

17 health symptoms, symptoms of mental illness that you

18 are assuming they are going to recognize, right?

19      A.  Yes.

20      Q.  And so when you're, so if I understand

21 correctly the two ways that you're making sure that

22 specific, the ways you are making sure that, excuse

23 me, the ways in which it might come to your attention

24 that a patient is skipping medication or number one

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 74

1   you would catch it at the end of the month in your

2   MAR, correct?

3        A.   That doesn't tell me if there is a symptom,

4   that simply tells me if they are taking medication or

5   not.

6        Q.   Right, yeah, and I did sort of my question

7   was to determine whether they are skipping medication

8   is to review the MAR at the end of the month, correct?

9        A.   Yes.

10       Q.   And then the second way is if somebody

11  reports to you a concern that they're skipping

12  medication, right?

13       A.   Correct.

14       Q.   And if I understand correct, and at what

15  point is it appropriate, is there any standard for, my

16  question for when it becomes a concern, right?  We

17  were talking about at what point does it become a

18  concern, correct?

19       A.   Uh-huh.

20       Q.   And you said that it was when they're

21  skipping medication in conjunction with other symptoms

22  that they recognize?

23       A.   Well, I said that because your question

24  asked me does skipping medication become a concern and

Page 75

1    I said that's in conjunction with symptoms being

2    exhibited.

3         Q.  Okay.  And at that point you would expect

4    that the Nurse, the Nurses or other Medical Staff to

5    let you know?

6         A.  Including the Behavioral Therapist, the

7    Clinical --

8         Q.  Yeah.

9         A.  -- the Mental Health Team.

10        Q.  Okay.  Were you prescribing medication,

11   psychiatric medications to Tiffany?

12        A.  Yes.

13        Q.  Okay.  In the --

14                 MR. MADDOX:  Would this be a

15   good time for a break?

16                 MS. CHARDON:  Sure.

17                 MR. MADDOX:  Okay, thanks.

18                 (Whereupon a recess was taken.)

19                 MS. CHARDON:  So back on

20   record.

21        Q.  So we were talking about how you rely on

22   other caregivers and Correctional Officers to, to

23   report symptoms of mental decompensation up to you,

24   correct?

1      A.  Yes.

2      Q.  Would swallowing a plastic bag be something

3  that you would want reported up to you?

4      A.  Yes.

5      Q.  That would be a symptom indicating, it could

6  be a symptom of mental decompensation, correct?

7      A.  Yes.

8      Q.  What about swallowing a plastic spoon?

9      A.  Yes.

10      Q.  Swallowing medical clips?

11      A.  Yes.

12      Q.  Those are things that you'd want your eyes

13  and ears to relate up to you, correct?

14      A.  Yes.

15      Q.  What about attention seeking self harm

16  behaviors are those, can those be signs and symptoms

17  of mental decompensation?

18      A.  Such as swallowing a spoon, yes.

19      Q.  Even if somebody determines that it is

20  attention seeking as opposed to a genuine suicidal

21  gesture?

22      A.  Yes.

23      Q.  Okay, yes.

24              Is extended solitary confinement a risk

1  factor for mental decompensation?

2       A.  Is extended solitary confinement a risk

3  factor, I think it can be.

4       Q.  And are there any, can solitary confinement

5  have a detrimental effect on mental health?

6       A.  I'm sure there is studies out there that say

7  yes.

8       Q.  Are you, you're aware of that?

9       A.  Yes.

10       Q.  Is that something that you've learned in

11  your professional training as a Doctor?

12       A.  No.

13       Q.  Is it something, have you received Mental

14  Health training at ACH?

15       A.  Yes.

16       Q.  And is it something that you learned in the

17  context of that training?

18       A.  I don't remember if it was in the context of

19  that training or my own reading.

20       Q.  Okay.  It's something you understand to be

21  true?

22       A.  It can be true, yes.

23       Q.  And is it also true that solitary

24  confinement is likely, it can have an, a magnified

DEPOSITION OF DOCTOR ARUN ABRAHAM                         June 14, 2019

Page 78

1    effect on people with preexisting mental health

2    conditions?

3          A.   I don't know if it exacerbates or magnifies,

4    but I do believe that it can, from what I've read that

5    it can have an effect.

6          Q.   That in other words, the people with

7    preexisting mental illness can be even more sensitive

8    to the effects of solitary confinement?

9          A.   Like I said, I don't know if I've read that

10   study but I have read studies that say, I don't know

11   if it is synergistic versus --

12         Q.   Okay.  But in general what you said before

13   you agree that it there can be compounded or

14   accelerate or synergetic effect with preexisting

15   mental illness?

16         A.   Well, yeah, I've read that and I'm aware of

17   that.

18         Q.   Okay.  And Tiffany Rusher was on High Risk

19   Status while she was in prison, right?

20         A.   Yes.

21         Q.   And so she was located down by Booking,

22   correct?

23         A.   Yes.

24         Q.   Okay.  How long was she on High Risk Status

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 79

1    while she was there?

2        A.  I would say the majority of her time.

3        Q.  Are you, is there any limit in your mind as

4    to how long a person can remain on High Risk

5    Observation Status?

6        A.  Not to my knowledge.

7        Q.  Is there any limit as to how long a person

8    can remain in solitary, in a solitary cell on High

9    Risk?

10       A.  Not to my knowledge.

11       Q.  What kind of mental health, are you aware of

12   whether, or what kind of mental health training other

13   Practitioners, other mental healthcare, backing up,

14   not mental health care.

15            Are you aware of what kind of Mental

16   Health training other healthcare providers at Sangamon

17   County Jail receive?

18                     MR. MADDOX:  When you say

19   other, I mean do you want to be, can you be more

20   specific as to the role?

21                     MS. CHARDON:  Sure.

22       Q.  Let's talk about nurses.  Do you know what

23   kind of Mental Healthcare training they receive at

24   ACH?

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 80

1          A.   They have conferences.

2          Q.   Do you know whether they are trained to

3     recognize signs and symptoms of mental decompensation?

4          A.   I believe they are.

5          Q.   And what leads you to believe that?

6          A.   The conferences and topics that have been

7     told, you know, when Nurses tell me what they learned

8     and things like that.

9               And I also know that there is site

10    visits where they have, I don't remember what the

11    official titles maybe Regional Supervisor or site, you

12    know, they come around and say hey, these are things,

13    or if there is concerns that are voiced and, yeah.

14         Q.   Do the nurses, do you understand that the,

15    whether or not the nurses, excuse me.

16              Okay.   We're going to go back to the

17    evaluation that we were looking at before.  The second

18    page utilizes, we're on page ACH 610 of your

19    Exhibit 1.  Second bullet point, utilizes available

20    inhouse resource personnel for treatment or resolution

21    of identified problems before off-site referral, you

22    see that?

23         A.   Yeah.

24         Q.   Did you identify Tiffany Rusher as having

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 81

1   any Mental Health problems?

2          A.  Yes.

3          Q.  Okay.  And did you refer her to anybody for

4   treatment of those problems?

5          A.  Yes.

6          Q.  Who did you refer her to?

7          A.  ER.

8          Q.  When did you refer Tiffany Rusher to ER for

9   treatment of psychiatric problems?

10         A.  I referred her for treatment of symptoms she

11  exhibited.

12         Q.  Okay.  And did you refer her, was there any

13  Mental Health person you referred her to inhouse?

14         A.  Yeah.

15         Q.  Okay.

16         A.  Well, I didn't, I don't need to refer

17  inhouse.  They, if somebody is in Mental Health, we

18  have Mental Health personnel that meet with them.

19         Q.  And who was meeting with her?

20         A.  Mickey.

21         Q.  And did you --

22         A.  I don't remember if Lydia ever did or not.

23         Q.  Okay.  And did you see any record that she

24  met with her when you reviewed Tiffany's records?

Page 82

1      A.   No, I didn't.

2      Q.   Would she meet with patients, Lydia?

3      A.   Yeah.

4      Q.   Okay.  And you saw her meeting with patients

5  at Sangamon County Jail?

6      A.   Yeah.

7      Q.   Did she provide therapy for patients?

8      A.   When you say therapy, are you talking about

9  what kind of therapy?

10     Q.   Psychotherapy.

11     A.   I don't know because I wasn't there for

12  those visits.

13     Q.   Okay.  Is psychotherapy provided to patients

14  at Sangamon County Jail?

15     A.   I assume, yeah.

16     Q.   Why do you assume?

17     A.   Because I would get reports of how their

18  interactions and interviews went with those patients.

19     Q.   So you referred, okay, so you didn't, you

20  wouldn't consider yourself to having, as having

21  referred Tiffany for treatment with Mickey Shmikler,

22  is that right?

23     A.   No, I think Mickey was involved right from

24  the get go because she came from a Mental Health

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 83

1   facility, so there was a standing diagnosis.

2                   I would refer Mickey or refer Mental

3   Health for evaluation if there wasn't a standing

4   diagnosis that was previously diagnosed and so Mickey

5   would then initiate care at that time.

6        Q.  And what was Tiffany's diagnosis?

7                   MR. MADDOX:  Can he refer to

8   the chart?

9        Q.  Yes, you know what, I'll come back to the

10  question.  Can you answer that, after having reviewed

11  your charts can you answer that, do you know?  It

12  isn't a memory, do you know what her diagnoses were?

13       A.  From what I recollect schizophrenia,

14  bipolar, and mood disorder.

15       Q.  Okay.  And we'll go back to that.

16                  Why don't let me back up and sort of

17  just speak generally about what I want to ask about

18  how this process works that you were just describing

19  on a more general level.

20                  Do you know whether Sangamon County

21  Jail is under any special accreditation standards?  Is

22  it accredited by National NCC, National Commission on

23  Correctional Healthcare?

24       A.  I don't know.

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 84

1        Q.  Okay.  So was there any standard of

2   accreditation that you felt that you were operating

3   under when you were at Sangamon County Jail?

4        A.  Not, I don't know.

5        Q.  Is there a Suicide Prevention and Crisis

6   Intervention Program at Sangamon County Jail?

7        A.  Suicide Prevention and Crisis?

8        Q.  Let's break it up.

9        A.  I'm sorry.

10       Q.  Sure.

11            Is there a Suicide Prevention Program

12   at Sangamon County Jail?

13       A.  Yeah.

14       Q.  And what is it?

15       A.  So if somebody is identified as trying to

16   harm themselves, then they are put in what's called

17   High Risk Status, and they're observed every

18   15 minutes.  And then they're observed, then they're

19   spoken to regularly by Mental Health staff.

20            They're observed by the Nursing staff

21   daily.  They're observed by the Site Clinician myself

22   or Mary or sorry, I should say the NP or PA as well at

23   least on a weekly basis.

24       Q.  And are they observed by the Nursing Staff

Page 85

1    on any routine or scheduled basis as part of that

2    Suicide Prevention Plan or is it more on call or sick

3    call?

4          A.   I believe they are observed during

5    medication distribution sometimes once and sometimes

6    multiple times a day.

7          Q.   Okay.  And have you ever known a person

8    who's on suicide in that within that Suicide

9    Prevention Observation Status to not be taking, to not

10   be receiving medication --

11         A.   I don't know.

12         Q.   -- at all?

13         A.   I don't remember, I'm sure, yeah.

14         Q.   What is your role in terms of the Suicide

15   Prevention Program that you just discussed?  You

16   mentioned you see patients once a week at least?

17         A.   (Nod Affirmatively).

18         Q.   Do you have any other role in the program?

19         A.   Reviewing their medications, reviewing their

20   clinical status and --

21         Q.   What you do mean by clinical status?

22         A.   Well, if I'm going, I'm going to observe

23   them.  I'm reviewing, I'm documenting my clinical

24   observation, talking to the patient as well as

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 86

1    visiting, observing the patient.

2         Q.   Okay.  And do you review their records from

3    the Mental Health provider?

4         A.   If they are brought to my attention.

5         Q.   If they are just in the, what would make

6    them be brought to your attention?  What do you mean

7    by that?

8         A.   They are put in my mailbox or they are

9    brought to me by the Mental Health provider.

10        Q.   So if they just get filed in the chart, that

11   would not count as being brought to your attention?

12        A.   No.

13        Q.   Does anybody write a Mental Health

14   Evaluation of a patient being put in this Suicide

15   Prevention Program?

16        A.   Yeah, the Mental Health Staff.

17        Q.   And what does that look like, is there a

18   specific form that's used?

19        A.   They have a documentation form that they do

20   use.

21        Q.   Okay.  And then does that require them to

22   record a diagnosis?

23        A.   I don't think they put, I don't remember if

24   he had a diagnosis on there or not or what his

Page 87

1    thoughts were.  He might say acts as Axis 1 or but,

2    not that I remember specific diagnosis but he might

3    say what he thinks is going on.

4         Q.  Okay.  And he's an LCSW, right?

5         A.  (Nod Affirmatively).

6         Q.  Is that correct?

7         A.  I assume.

8         Q.  Sorry, you nodded.

9         A.  Yeah.

10                   MR. MADDOX:  We have to clarify

11   you're talking about Mickey here now?

12                   MS. CHARDON:  Yeah, thank you,

13   I am talking about Mickey.

14        Q.  He was --

15        A.  Michael.

16        Q.  Are you aware?

17        A.  Michael, everybody calls him Mickey.

18        Q.  Did you call him Michael or Mickey?

19        A.  Mickey.

20        Q.  All right.  Did you understand that he was a

21   LCSW in terms of his licensure?

22        A.  Yes.

23        Q.  Okay.  As an LCSW was he, could he make

24   Mental Health diagnosis?

Page 88

1       A.  I'm not sure.

2       Q.  Okay.  Could he make psychiatric diagnosis?

3                       MR. MADDOX:  Is there a

4   difference?

5       A.  I'm not sure.

6                       MS. CHARDON:  I'm asking the

7   Doctor so I --

8       A.  I'm not sure yeah, I mean...

9       Q.  You don't know, okay.

10      A.  Yeah.

11      Q.  Was there a Treatment Plan incorporated in

12  the Mental Health Evaluation that he would fill out?

13      A.  Suggestions, yes.

14      Q.  Okay.  And what kind, what do you mean by

15  suggestion?

16      A.  Well, no, there wasn't a treatment, there

17  wasn't a management plan.

18      Q.  Okay.

19      A.  No, there wasn't a Management Plan.  He

20  wouldn't tell you what meds to put on or, you know,

21  yeah.

22      Q.  Is Management Plan something that you're

23  familiar with your, in the context of your work

24  outside of Sangamon County Jail, do you use Management

Page 89

1    Plans in your full time practice?

2         A.  Yes.

3         Q.  And do those involve when you have a

4    Management Plan for a, pertaining to a Mental Health

5    condition or psychiatric condition would it involve

6    recommendations as to treatment like psychotherapy

7    type of treatment?

8         A.  In my private practice?

9         Q.  Yeah, in your private practice?

10        A.  No.

11        Q.  Okay.  Would it involve, you mention

12   medication recommendations?

13        A.  (Nod Affirmatively).

14        Q.  Yes?

15        A.  Yes.

16        Q.  And do you, who writes that Management Plan?

17        A.  Who writes the, I do.

18        Q.  Okay.  Have, and do you, have you referred

19   as part of your Management Plan does it include a

20   referral to psychotherapy?

21        A.  No.

22        Q.  No, okay.

23             Have you ever referred patients for

24   psychotherapy as part of your private practice?

Page 90

1      A.  No.

2      Q.  Never?

3      A.  We refer to psychiatrists, they are the ones

4  who determine what the Management Plan is for mental,

5  yeah.

6      Q.  So in your Management Plan for a mental

7  health condition in your private practice, does it

8  include referral to psychiatry?

9      A.  No.

10     Q.  Okay.

11     A.  Because Urgent Care does not deal with acute

12  psychiatric episodes.

13     Q.  Okay.  So Urgent Care is not the place where

14  you're equipped to handle acute psychiatric episodes?

15     A.  No, that would be under my family, yeah.

16  Family Medicine I would refer to psychiatry.

17     Q.  Okay.  And so the Management Plans we were

18  discussing those were something that you use in your

19  practice as Urgent Care, is that right?

20     A.  Of medications?

21     Q.  Yeah.

22     A.  Yeah, because you asked me two different

23  things.

24     Q.  Oh, yeah, I know I actually think you're

Page 91

1    trying to explain this to me I just, I'm trying to

2    follow it.

3         A.  You know, if a patient comes in with acute

4    psychiatric concern into Urgent Care --

5         Q.  Yeah.

6         A.  -- they are referred to the ER.

7         Q.  Okay.

8         A.  Okay.  If you have somebody in an acute

9    psychiatric concern in family practice, they are also

10   referred to the ER.

11        Q.  Okay.

12        A.  If you have somebody who needs medical

13   management of a diagnosis that is not an acute

14   flare-up then you refer, and it's beyond your scope of

15   practice, then you refer to psychiatry.  If you

16   cannot.  If you feel that it's beyond the scope of

17   practice.

18        Q.  And what constitutes an acute psychiatric?

19        A.  Clinical evaluation.

20        Q.  Yeah.

21        A.  Clinical evaluation, yeah.

22        Q.  So what are, what's an example of an acute

23   psychiatric condition that would require referral to

24   the ER?

Page 92

1        A.  Eating feces.

2        Q.  Okay.  And you would refer that person for

3    an acute psychiatric evaluation?

4        A.  I would refer that person for their

5    safety --

6        Q.  Yeah.

7        A.  -- and their health concerns.  Whether they

8    get a psychiatric evaluation or not is no longer under

9    my jurisdiction.

10               When a patient is referred to the ER,

11   the ER physician makes their evaluation.  If I say I'm

12   worried about a patient having a stroke and the

13   patient shows up to the ER, I don't get to choose

14   whether that patient gets an evaluation for a stroke.

15       Q.  Your duty is just to, as the, it's, a

16   Primary Care Physician is basically like the

17   quarterback as I think of it, right?  So you're

18   coordinating this care, right?

19       A.  (Nod Affirmatively).

20       Q.  Is that correct?

21       A.  Yeah.

22       Q.  Okay.  And you, if you're going to make a

23   referral, if you have a concern about a patient, say a

24   stroke concern, right, your job is to refer that

Page 93

1  person to the appropriate place to address the concern

2  for stroke?

3      A.  If it's an acute stroke, yes.

4      Q.  Okay.  And you, you would need to

5  communicate that concern to the Doctor to whom you're

6  referring it, right?

7      A.  No, you would communicate it to that office.

8      Q.  Correct.

9          You'd say, you would communicate a

10  referral for concerns of an acute stroke or, correct?

11     A.  Yes.

12     Q.  Psychiatric, psychiatry you would

13  communicate a referral for concerns of an acute

14  psychiatric symptoms?

15     A.  Yes, if it was beyond my scope of practice.

16     Q.  Right.  And it would be important that in

17  the context of that communication you'd make clear you

18  weren't referring them for constipation, correct?  You

19  were referring them for psychiatric treatment for

20  psychiatric concerns?

21     A.  If I'm referring somebody for psychiatric

22  concerns to an outpatient department?

23     Q.  Yeah.

24     A.  Yeah.

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 94

1        Q.   You would say psychiatric concerns?

2        A.   Well, I would say here's the incident that

3   occurred, I need them evaluated by you.

4        Q.   Yes.

5        A.   Right.

6        Q.   Okay.  And then at that point it's once you

7   have channeled them to the appropriate --

8        A.   Because you may not have a diagnosis when

9   you refer, right.  If a patient comes in with a

10  swelling of the leg, and you've done your scope of

11  practice and you don't know why you have a

12  differential, so I'm going to refer that patient to a

13  vascular surgeon, but I am not going to tell the

14  vascular surgeon what the diagnosis is.  I'm going to

15  tell the vascular surgeon I still got swelling of the

16  leg, I don't know why.  Here's a patient with swelling

17  of the leg or their symptoms.

18       Q.   Okay.  And did you, so in your Urgent Care

19  when somebody comes in, you, I think what you just

20  explained to me is that in your private practice

21  whether in Family Medicine or Urgent Care if somebody

22  presents with acute psychiatric symptoms, you refer

23  them to the ER?

24       A.   Yes.

1       Q.  Okay.  And so in, at least one of those

2   contexts we were talking about the document you called

3   it a Management Plan, right?

4       A.  Yeah.

5       Q.  What's a Management Plan?

6       A.  A, it's, it's the plan of what you would

7   like to do with that patient and manage those

8   symptoms.

9       Q.  Okay.  And is there an equivalent to

10  Management Plan that you use at, you used at Sangamon

11  County Jail?

12      A.  Yes, it's a SOAP note.

13      Q.  A SOAP note?

14      A.  Yes.

15      Q.  Subjective Objective Assessment Plan?

16      A.  Yeah.

17      Q.  Okay.  And you have SOAP notes in your

18  Medical records progress, under progress notes

19  essentially, correct?

20      A.  (Nod Affirmatively).

21                  MR. MADDOX:  Is that a yes?

22      A.  Yes.

23      Q.  And would there be, other than your SOAP

24  notes, is there any kind of written Treatment Plan for

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 96

1   psychiatric conditions that would exist at Sangamon

2   County Jail?

3        A.   From the Advanced Practitioner.

4        Q.   Oh, an Advanced Practitioner could make

5   notes as well?

6        A.   Yes.

7        Q.   Okay.  And would there be, I think we were

8   talking before we kind of got sidetracked into your

9   private practice about the, you are familiar what you

10  know of the -- well, you know what rather than trying

11  to restate it and I may have a faulty memory I'm just

12  going to reask.

13             So would there be any kind of Treatment

14  Plan authored or created by Mental Healthcare workers

15  at Sangamon County Jail?

16       A.   That they, no, they wouldn't execute the

17  plan, no.

18       Q.   Would they create it to just make sure I am

19  clear?  Would they write one, is there any kind of

20  plan?  You know all I'm asking, if --

21       A.   No, I think it was more, I believe it was

22  more observations, that they would report their

23  observations and their suggestions but not a plan, no.

24       Q.   Okay.  And so is there any sort of

1    documented plan, when we're talking about a patient

2    who presents with signs of, who you would determine to

3    be mentally ill that -- okay -- no.

4                    If we talk about a patient who's

5    involved in crisis intervention or suicide prevention

6    program at Sangamon County Jail, okay --

7         A.   Okay.

8         Q.   -- is there any written plan governing

9    housing of that person?

10        A.   From myself?

11        Q.   From yourself or anyone else you're aware

12   of?

13        A.   You mean who determines the housing

14   situation?

15        Q.   Yes, who determines the housing situation?

16        A.   So who puts them in High Risk?

17        Q.   Yes.  Question one, who puts them in High

18   Risk?

19        A.   All right.

20        Q.   Who puts them in High Risk?

21        A.   Me.

22        Q.   You do?

23        A.   Or the Advanced Practitioner.

24        Q.   And is there any --

June 14, 2019

Page 98

1        A.   And the Nursing Staff can also.

2        Q.   Okay.

3        A.   Yeah.

4        Q.   Is there any point of authored with respect

5   to, to the housing if they're in High Risk?

6        A.   That is?

7        Q.   Any document?

8        A.   I'm sorry?

9        Q.   There is probably a document putting them

10  in, notifying --

11       A.   Placing patients in High Risk, yes.

12       Q.   And then is there any plan for the future

13  going forward of how long that person is going to stay

14  in High Risk or --

15       A.   That's based on the clinical evaluation,

16  observations made during their stay.

17       Q.   And so there is no document, if I'm going to

18  lock for documents, there is no documents I should

19  look for that would be the housing plan for as part of

20  crisis intervention or whatever?

21       A.   No, because it's individualized according to

22  their symptoms and they're, yeah.

23       Q.   Is there any, at what point when you're

24  dealing with a patient who has been placed on High

Page 99

1  Risk Status, at what point would you have the ability

2  to call at Sangamon County Jail to call a psychiatrist

3  if you felt they needed referral to a higher level of

4  care?

5          A.   Yeah.

6          Q.   How would you do that?

7          A.   You would ask for a referral to be made to a

8  psychiatrist, and there is also psychiatrist there was

9  1 or 2 that I remember that had been involved in cases

10 or been consulted.

11         Q.   Okay.  At Sangamon County Jail?

12         A.   I believe so, yeah.

13         Q.   Did they consult with the patient the

14 prisoner directly or telephonically?

15         A.   I'm not sure.

16         Q.   Okay.  But, and who, what, specifically what

17 were your resources as of 2017 if you wanted to call a

18 psychiatrist about Tiffany?

19         A.   Uh-huh.

20         Q.   Who, where, who would you call?  How would

21 that work?

22         A.   I would ask my Nurse Supervisor that hey,

23 I'm making a referral to psychiatry or I need a

24 psychiatrist evaluation.  And a psychiatrist would

Page 100

1    then be called and that process is started.

2                    That psychiatrist also to accept the

3    referral, you know, we can't force somebody, a

4    specialist to take a patient.

5        Q.  Are there any psychiatrists with whom you've

6    worked with and who you've referred patients to from

7    Sangamon County Jail, any specific ones?

8        A.  I believe so, there was some referrals about

9    fit for trial kind of stuff.

10       Q.  Okay.  Do you have any involvement in those

11   kind of referrals?

12       A.  I don't believe so.  I believe that's

13   something that the --

14       Q.  Yeah.

15                   Do you review when determinations are

16   made in, or reports authored as to whether somebody is

17   fit for trial is that something that you have access

18   to?

19       A.  I don't believe I do.  I think I'm actually

20   notified, you know, through some method I was notified

21   of one or two cases.

22       Q.  Do you think that you ever saw one for I, I

23   recently obtain a copy of one for Tiffany, we all did,

24   I'm just wondering if you have ever seen that or you

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 101

1  think that you've ever seen one?

2       A.  I don't think that I have, I mean...

3       Q.  Okay.  You have no recollection of receiving

4  that --

5       A.  No.

6       Q.  -- during the time.

7              And so you recall she was referred I

8  can tell she is referred to Killian and Associates for

9  psychiatric evaluation?

10      A.  Doctor Killian.

11      Q.  Does that name sound familiar?

12      A.  Yeah.

13      Q.  Have you ever referred anybody to Doctor

14  Killian for outside the context of a fitness to stand

15  trial evaluation?

16      A.  I don't think so.

17      Q.  Have you ever referred a patient from

18  Sangamon County Jail to a psychiatrist outside the

19  facility?

20      A.  I don't remember, I don't remember.

21      Q.  Okay.  So you're not, you can't recollect a

22  single, a specific instance of doing that?

23              MR. MADDOX:  He just said he

24  doesn't remember.

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 102

1              MS. CHARDON:  I'm making sure,

2   yeah.

3              MR. MADDOX:  Well, how many

4   answers do you need?  He doesn't remember.

5       A.  Yeah, sorry I --

6       Q.  You don't remember?

7       A.  No.

8       Q.  Okay.  You can't think of an example, okay.

9              And other than Doctor Killian are there

10  any psychiatrists that you know who have a referral

11  relationship with Sangamon County Jail?

12      A.  The only reason I remember that the, you

13  mentioned the name it triggered a memory that...

14      Q.  Okay.

15      A.  -- I thought there was another name, but I,

16  until I hear it, I wouldn't, you know.

17      Q.  Have you ever determined well, we talked

18  about a couple acute, well, one specific example of a

19  gentleman who had an acute psychiatric need and went

20  to the ER.  The gentleman who was not eating and

21  drinking.

22              Have you ever made a determination

23  setting aside him and the category of people with

24  acute needs that need to go to ER?

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 103

1      A.  Yeah.

2      Q.  Have you ever made the determination that

3  somebody or, excuse me, have you ever had concerns

4  that someone wasn't receiving a level of psychiatric

5  care that they needed at Sangamon County Jail?

6                    MS. POWELL:  Objection,

7  foundation.

8                    MR. MADDOX:  Yeah, object to

9  the form of the question as well because the question

10  is, has he ever had a concern that they're not

11  receiving adequate psychiatric care?

12                    MS. CHARDON:  Yes.

13                    MR. MADDOX:  Okay.

14      Q.  Let me ask you this way.

15                    Do you, have you ever had a concern

16  that anybody at Sangamon County Jail a patient is not,

17  needs psychiatric care that they are not getting?

18      A.  No, because if there is an acute episode, we

19  send them to the ER.  I mean that's kind of my, I

20  remember that we had tried sending a patient to a

21  Mental Health Facility for, as a referral and it

22  didn't happen because the facility refused, 2 or 3

23  facilities refused them.  I think we've even went as

24  far as like, because you start close, you just get

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 104

1   keep kind of going out is how the nurses did it.  And

2   I remember that hey, listen this patient da, da, da

3   and then they had an acute episode, I was like, okay

4   ER.

5                   And that patient then got evaluated at

6   the ER and I believe that patient, Memorial has an

7   inpatient facility as well, but that was the way we

8   would handle if we couldn't get somebody into a

9   facility because facilities refuse.

10                  When an acute episode occurred, that

11  patient would get referred to the ER, and then we

12  would hope that the ER physician they have like a team

13  there at the ER called the PRT, the Psych Response

14  Team, they actually come down there and evaluate

15  and...

16      Q.  Okay.  So I think you did answer my question

17  in other words --

18      A.  Sorry.

19      Q.  -- yeah for that person, well, first of all

20  would that person that you were just discussing where

21  they were looking for beds was that person determined

22  not to fit to stand trial?

23      A.  I don't remember.  I don't even remember who

24  it was.  I just remember one of the lead nurses

Page 105

1    telling me that we've even gone two, three hours away

2    and we can't find a facility that will take them.

3               And then, you know, but the patient was

4    stable, but then the patient had an acute episode and

5    they went to the ER.  I guess ER can't release them,

6    you know what I mean, they have their own protocols on

7    what they can and cannot do with mental health.

8        Q.  So that person was exhibiting psychiatric

9    symptoms that, that you determined were, would

10   require, would warrant inpatient--

11       A.  And an ER visit, yeah.

12       Q.  Well, prior to that when you are looking for

13   the bed they warranted inpatient hospitalization?

14       A.  Well, I felt that person could yeah, might

15   be better served.

16       Q.  So for that person that wasn't an example of

17   a time when you did feel that somebody needed more

18   psychiatric care then they were getting at Sangamon

19   County Jail?

20       A.  Yeah, okay.

21       Q.  And you were unable to place that person,

22   correct?

23       A.  (Nod Affirmatively).

24       Q.  And eventually that lead to the person had

June 14, 2019

Page 106

1    an acute, an acute psychiatric symptom that, that

2    warranted transfer to the ER, correct?

3        A.  Yes.

4                      MR. MADDOX:  And I just want

5    you to concentrate on not just nodding your head.

6        A.  Sorry.

7                      MR. MADDOX:  Okay.  So if she

8    asks a question and you go like this (indicating) it's

9    hard for Cathy --

10       A.  Sorry.

11                     MR. MADDOX:  -- and hard on us

12   later to know exactly what you said.

13       A.  Sorry.

14                     MR. MADDOX:  Okay, thank you.

15       Q.  And is that best practices in an ideal world

16   which is, is it best to wait until somebody has an

17   acute psychiatric episode and has to go to the ER or

18   is it better to treat that psychiatric symptoms?

19                     MR. MADDOX:  I --

20       Q.  -- prior?

21                     MR. MADDOX:  Object to form of

22   the question.

23       A.  Yeah, I, is it better for the person to go

24   to inpatient?  Well, yeah, that's why I'm asking for

Page 107

1   the referral.

2        Q.  Well, lawyers sometimes ask very basic

3   questions.

4        A.  Sorry.

5        Q.  And I know as a Doctor it's, you know,

6   you're used to but, so.

7              So you would rather not have to wait

8   until somebody has an acute psychiatric symptom and

9   has to go to the ER, correct?

10       A.  In that specific instance that was probably

11  my clinical judgment.

12       Q.  Yeah.  In general is that something that,

13  that the way you practice medicine it's better to

14  treat a disease to avoid hospitalization?

15              MR. MADDOX:  Object to the form

16  of the question, answer if you can.

17       A.  Better to treat a disease in avoid then --

18       Q.  In order to avoid having acute consequences?

19       A.  Yes.

20       Q.  Preventative medicine?

21       A.  Is always better than, yes.

22       Q.  And so you attempt, so in that context the

23  preventative medicine would have been getting that

24  person into psychiatry sooner?

Page 108

1      A.   Yes.

2      Q.   And there were no beds available?

3      A.   Correct.

4                MR. MADDOX:  Well, that's not

5   what he said.

6      A.   I said that they didn't take them.

7      Q.   They didn't take them.

8      A.   And I don't know if it's due to beds, I

9   don't know if they had prior experience with that

10   facility.  I don't know if that patient was removed

11   from that facility prior and I don't know, I know that

12   the referral was...

13      Q.   And okay, when did that happen, that

14   patient?

15      A.   I don't remember, I don't even remember

16   which Nurse it was with, whether it was Dan or Kate

17   or, you know.

18      Q.   Was it a male or female patient?

19      A.   I don't remember.

20      Q.   Did you treat the patient?

21      A.   Yes, they were in my facility.

22      Q.   Did you have anything to do with the

23   determination to start looking for a psych ward for

24   them, a psych facility?

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 109

1      A.  Yes.

2      Q.  Okay.  And what was your role in that

3  determination?

4      A.  I don't remember.  I do, I mean if you're

5  asking a general question my concern would be that

6  they're having maybe too many acute episodes in a

7  brief period of time, psychotic breaks or, you know,

8  acute episodes on their chronic illness in a brief

9  amount of time that hey, this is beyond what we can

10  manage safely.

11      Q.  Okay.  Did you ever have that concern with

12  Tiffany that she was having too many acute episodes in

13  a brief period of time?

14      A.  Not that I remember.

15      Q.  Would you consider swallowing a spoon and

16  having it obstruct your airway an acute episode?

17      A.  Yes.

18      Q.  Would you consider strangulation with a

19  Velcro boot strap an acute episode?

20      A.  Yes.

21      Q.  Would you consider swallowing medical clips

22  at an outside clinic an acute episode?

23      A.  At an outside clinic?

24      Q.  Wherever swallowing medical clip?

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 110

1      A.   In my facility?

2      Q.   Any facility, yeah.

3      A.   Yeah.

4      Q.   Just the act of swallowing medical clips to

5  be an acute episode?

6      A.   Yes.

7      Q.   And would you consider swallowing a plastic

8  bag to be an acute episode?

9      A.   Yes.

10     Q.   Swallowing a toothbrush?

11     A.   Yes.

12     Q.   Acute episode?

13     A.   Yes.

14     Q.   And you are aware that those are all things

15  that Tiffany did while she was at Sangamon County

16  Jail?

17                MR. MADDOX:  Object, misstates

18  the evidence but go ahead.

19                MS. POWELL:  I will object to

20  the form of the question as well.

21                MR. MADDOX:  Yeah.

22     A.   I don't know if all of them I don't

23  recollect if all of them, but I do recollect majority

24  of them.

Page 111

1      Q.   Okay.  So the, which ones do you recollect?

2      A.   The toothbrush, the strap, the clip, I don't

3  remember the bag.

4      Q.   Okay.  At any point and you were aware of

5  those contemporaneously with them occurring?

6                     MR. MADDOX:  Can you define

7  contemporaneously.

8                     MS. CHARDON:  Sure.

9                     MR. MADDOX:  Cause that means,

10  that suggests that he is there watching it happen.  If

11  you can rephrase the question.

12                     MS. CHARDON:  That's a fair

13  question, yeah.

14      Q.   You know what I'm going to, we're going to

15  look at records because I don't want to, it's just not

16  going to, it's not helpful until we do.  We got the

17  records and we will look at those in a minute.  But at

18  any point did you have a concern that Tiffany was

19  having too many acute psychiatric episodes and needed

20  more or different psychiatric treatment?

21      A.   Not that I recollect.

22      Q.   If you had made that determination, what

23  resources did you have available to you?

24      A.   I would have asked for a referral to

Page 112

1  psychiatry or a referral to inpatient facility or

2  referral to, you know, be beyond what Mental Health.

3       Q.  That's something that you could have done?

4       A.  Yes.

5       Q.  Okay.  Is, Tiffany was on High Risk

6  Observation, correct?

7       A.  High --

8       Q.  High Risk Status?

9       A.  Yes.

10      Q.  And she was located in Booking, right?

11           The area near Booking?

12      A.  I, yes, but I also believe at some point she

13  was, I don't want to misspeak, but I believe at one

14  point she was actually up in, we have High Risk

15  upstairs as well.

16      Q.  Okay.  Is that called like Medical is their

17  a name for the High Risk upstairs how would you

18  describe that location?

19      A.  Well, the idea of High Risk upstairs that

20  are, Nursing Staff has direct eyes because it's

21  directly across from the Medical Staff like it's a

22  glass and you can see that hallway consistently.

23      Q.  Okay.

24      A.  And so I think at one point she was up their

Page 113

1   from what I remember, I don't...

2        Q.  Are there any Medical cells where, is there

3   a Medical Unit, too?  I haven't toured the Jail my

4   colleagues have so, excuse me.

5        A.  When you say a Medical Unit?

6        Q.  Uh-huh.  Is there a Medical Unit?

7        A.  Yeah, I mean the, I don't know if we have a

8   specific Medical Unit, but Medical when you say

9   Medical, I don't know if you mean physical or mental

10  health that's all Medical.  Mental Health can be

11  housed in A, from what I remember now, I don't

12  remember all the blocks, but I believe A Block, High

13  Risk, Booking, High Risk up on the second floor, these

14  are all areas that people can be housed.

15       Q.  And in the A Block are there any cells that

16  have cameras --

17       A.  I don't know.

18       Q.  -- that have a, okay.  And what about

19  Booking, not Booking, at the High Risk up on the

20  Second Floor are there any cells with camera

21  surveillance?

22       A.  I think so.

23       Q.  And do you know who views, who can view that

24  camera surveillance?

Page 114

1      A.  It's in, I assume, I know that there was

2   cameras in Medical in, sorry, the Medical Office.

3      Q.  Okay.

4      A.  But I don't know how the CO's or Jail Staff,

5   Sangamon County Jail Staff were observing that.

6      Q.  So or --

7      A.  Or what their cameras, I wasn't privy to

8   that section of Security.

9      Q.  When you say there were cameras in the

10  Medical Office, this would be the office where the

11  nurses the, the Doctors, the prisoners would come to

12  receive medical care --

13     A.  Yes.

14     Q.  -- not where they lived?

15     A.  Correct.

16     Q.  But there were cameras, to your knowledge,

17  in any of the cells on the, near the Medical Unit?

18     A.  Oh, gosh, I don't know.

19     Q.  Okay.  What training have you received from

20  ACH relating to Mental Health issues?

21     A.  CME conferences.

22     Q.  Okay.  Continuing Medical Education

23  conferences?

24     A.  Uh-huh.

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 115

```
 1                    MR. MADDOX:  Yes?
 2       A.  Yes, sorry.
 3       Q.  Are these offered by ACH?
 4       A.  Yes.
 5       Q.  And were there, did you watch a
 6  presentation, presentations or how was information
 7  presented about mental health at those conferences?
 8       A.  Presentations, Q and A, clinical case
 9  reviews.
10       Q.  And were those, how often did you attend
11  those CME's?
12       A.  Almost every quarter.
13       Q.  Where were they located?
14       A.  Peoria.
15       Q.  And would, are you familiar with Doctor
16  Melissa Caldwell?
17       A.  Yeah, yes, sorry.
18       Q.  And she's the Director of Mental Health at
19  ACH, right?
20       A.  Yes.
21       Q.  Or something equivalent to that if I don't
22  have the exact correct job title.
23            Did you see presentations from her
24  regarding Mental Health issues?
```

Page 116

1      A.  Yes.

2      Q.  Okay.  Do you ever watch videos regarding

3 Mental Health issues?

4      A.  Yes.

5      Q.  But, that were created by her, that were her

6 presenting?

7      A.  I don't remember if it was her presenting, I

8 know I was at conferences where they showed actors

9 portraying trying clinical scenarios and...

10     Q.  Okay.  Do you know whether other Medical or

11 well, employees of ACH with different licenses so non

12 physicians received the same training as you in terms

13 of these Mental Health issues or?

14     A.  They had the opportunity to attend the same.

15     Q.  Okay.

16     A.  Yes, there were people with different

17 licenses at the same presentations.

18     Q.  Okay.  So nurses could come to those CME

19 conferences?

20     A.  Yes.

21     Q.  Were they required to go to the CME

22 conferences?

23     A.  That I don't know.

24     Q.  Were you required to go?

Page 117

1       A.  You were required to go to as many as

2  possible.  I don't know if there was a cutoff number.

3  I know I was there probably 75 percent of the time, I

4  might have missed one a year kind of thing.

5       Q.  So physicians did have a requirement to

6  attend some amount of these?

7       A.  I don't know.

8                    MR. MADDOX:  I just want to

9  clarify.  When you say requirement, I mean the State

10  of Illinois requires a minimum CME.  You mean by the

11  State or ACH?

12                    MS. CHARDON:  Thanks, that's a

13  good clarification.

14       Q.  I'm asking if ACH required you to go to

15  these conferences?

16       A.  They highly recommended it.  If you were, I

17  remember saying no, I wasn't available due to

18  scheduling and I would get a call from Doctor

19  Rakestraw hey, how come you can't make it, what's

20  going on, you know.  They wanted to know why you

21  couldn't make it.

22       Q.  And then they would provide the kind of

23  accreditation that you'd need to report to the, would

24  you use, did they get credits that you could report to

1  the State Board as continuing medical education

2  credits?

3      A.  Yes, yes.

4      Q.  And do you know whether nurses employed at

5  Sangamon County Jail had the same expectations from

6  ACH in terms of attending those conferences?

7      A.  I don't know if they, no, we didn't, I guess

8  nobody discussed if they got the phone calls that I

9  had received.

10     Q.  Okay.  So I think I've asked, I have asked a

11 bunch of questions make sure I've got it.  You don't

12 have anyway of knowing what training Mental Health

13 nurses were receiving at Sangamon County Jail?

14             MR. MADDOX:  Excuse me, I just

15 want to, would you, can you reword that to say what

16 Mental Health training nurses received, you said

17 Mental Health nurses I don't think there was a Mental

18 Health Nurse.

19             MS. CHARDON:  Thanks, you're

20 fixing my record for me.

21             MR. MADDOX:  Well, I wanted to

22 make sure.

23             MS. CHARDON:  No, I appreciate

24 it, yeah.

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 119

1      Q.  Am I correct that you have no way of knowing
2  exactly what training in Mental Health issues was
3  received by nurses --
4      A.  Correct.
5      Q.  -- at Sangamon County Jail?
6      A.  I wasn't made aware.
7      Q.  Okay.  What topics were covered in, you
8  meant, it sounds like you were at ACH, you were at
9  Sangamon County Jail for, from at least, you know,
10 2013 to 2017, and you attended several CME's during
11 that time period, correct?
12     A.  Yes.
13     Q.  And there was, so what topics with respect
14 to Mental Health were covered in the context of the
15 course of the training that you received?
16     A.  I don't remember the specifics.
17     Q.  Was it training on recognizing signs and
18 symptoms of suicide risk?
19     A.  I don't, I can't clarify if it was received
20 from ACH versus my CME requirements by the State
21 versus my full time job requiring me to do certain, I
22 don't know where or what the specific topics were for
23 those conferences that I attended.
24     Q.  Okay.  Let's mark Abraham, are we on 2,

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 120

1    Abraham 2.  This is a Group Exhibit, it's a collection

2    of Medical records, it's not contiguous, I will give

3    copies to you.

4                          (Abraham Group Exhibit 2 marked for

5                           identification by the Court

6                           Reporter.)

7                          MS. POWELL:  What was Abraham

8    1?

9                          MS. CHARDON:  Abraham 1 is his

10   contract.

11                         MS. POWELL:  Oh, the contract.

12                         MR. MADDOX:  No, it's not,

13   Abraham 1 is the personnel file.

14                         MS. CHARDON:  Okay, thank you

15   his personnel file.

16       Q.  And Abraham 2 again is not contiguous

17   numbering.  The first page of it is 11056 and the last

18   Plaintiff's Production 11056 and the last page is

19   Plaintiff's Production 10861.

20                 Is this, this is a medical progress

21   note, correct?

22       A.  Yes.

23       Q.  And it's dated well, is this your

24   handwriting?

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

                                                        Page 121

1                    MR. MADDOX:  Just for
2    clarification you are looking at the first page of
3    this, correct?
4                    MS. CHARDON:  Yeah, thank you.
5        Q.  I'm looking at the first Page 11056.
6              Is that your handwriting?
7        A.  It is my handwriting, not all of it is my
8    handwriting.
9        Q.  Okay.  And I, yes, you want to describe
10   which part is not your handwriting?
11       A.  The vitals is not my handwriting, the
12   filling out of the top portion with date, patient name
13   and Inmate ID and subjective, the first subjective
14   complaint that says HR is not my handwriting.
15       Q.  Okay.  What is HR stand for?
16       A.  High Risk.
17       Q.  Okay.  And under date, it first says
18   12/26/16, correct?  And then that, it looks like
19   that's crossed out, do you see that?
20       A.  I do.
21       Q.  Above it is 1/4/17, right?
22       A.  Yes.
23       Q.  And then you, do you know why that date, why
24   that date was originally written 12/26/16?

Page 122

1      A.  I don't.

2                      MS. POWELL:  I just am going to

3  object to the form of the question --

4      A.  Sorry.

5                      MS. POWELL:  -- because this is

6  scratched out I can't tell if it's a one or 12/20 or

7  12/30.

8      Q.  Okay.  So you do you have any knowledge of

9  the circumstances of why that date is crossed out

10 there?

11     A.  I don't.

12     Q.  Okay.  You, is that your signature at the

13 bottom?

14     A.  It is.

15     Q.  Okay.  So it's, you signed your name with

16 like two letters basically, that short signature under

17 well, it's under Practitioner's signature, correct?

18     A.  Yes.

19     Q.  And that indicates that this was no note was

20 taken on January 4th, 2017, correct?

21     A.  Correct.

22     Q.  Was this the first time that you examined

23 Tiffany Rusher?

24     A.  I'm not sure.

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

                                                    Page 123

1       Q.  Okay.  If you had examined her prior to this

2   time, would it have been in the Medical records like

3   would you have documented it?

4       A.  If I had examined her?

5       Q.  Yes.

6       A.  Yes.

7       Q.  Okay.  And so where are my notes, excuse me.

8            So if I didn't find Medical records

9   assuming it's correct that there are no Medical

10  records with your name on them prior to this time,

11  would that indicate to you that you hadn't examined

12  her prior?

13      A.  My documentation is when I visited --

14              MR. MADDOX:  Counsel, I'm

15  looking at one right now.

16              MS. CHARDON:  Yeah, I'm not

17  trying to create --

18              MR. MADDOX:  Okay, yeah, there

19  is one before then.

20              MS. CHARDON:  Okay.  And what's

21  the date?

22              MR. MADDOX:  12/19/16.

23              MS. CHARDON:  Okay.  What's the

24  Bates label of the one you're looking at?

Page 124

```
 1                    MR. MADDOX:  Well, it's Bates
 2   by my own internal and I can tell you but it wouldn't
 3   mean anything to you but...
 4                    MS. CHARDON:  Okay.
 5                    MR. MADDOX:  My internal is
 6   ACH006.
 7                    MS. POWELL:  But that's not the
 8   ACH that we received?
 9                    MR. MADDOX:  It is not.
10                    MS. POWELL:  Okay.
11        Q.  When you were, you said you reviewed, you
12   spent quite a bit of time reviewing the Medical charts
13   in advance of this deposition, right?
14        A.  Yes.
15        Q.  Do you, in the course of that did you note
16   when you first saw her?
17        A.  No.
18        Q.  Okay.  Do you have a memory of when you
19   first saw her?
20        A.  I would refer to the documents of the
21   Medical chart.
22        Q.  Okay.  Do you have notes on that or can you,
23   can I look at it, that document?
24                    MR. MADDOX:  Yeah.
```

Page 125

1           MS. CHARDON:  Thank you.  Do

2    you have a problem with me marking this?

3           MR. MADDOX:   Let me have copies

4    made.

5           MS. CHARDON:  Yeah, sure.  Do

6    you won't to go off the record for a minute?

7           MR. MADDOX:  Yeah.

8           (Whereupon a recess was taken.)

9           (Abraham Exhibit 3 marked for

10          identification by the Court

11          Reporter.)

12    Q.  So I'm handing you Abraham 3 which states at

13    the bottom ACH 006 organized, and that is a Medical

14    progress note from December 19th, 2016, correct?

15    A.  Correct.

16    Q.  Is that your handwriting, is your

17    handwriting anywhere on this?

18    A.  Yes.

19    Q.  Okay.  And again is the, is the date and the

20    patient name and the date of birth your handwriting?

21    A.  No.

22    Q.  Okay.  Below that under subjective complaint

23    is that your handwriting?

24    A.  Yes.

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 126

1      Q.  Are the vitals your handwriting?

2      A.  No.

3      Q.  Okay.  So does it indicate to you that you

4  examined Tiffany Rusher on December 19, 2016?

5      A.  Yes.

6      Q.  Okay.  What is the subjective complaint

7  that's recorded here?

8      A.  Fracture of tibia and ankle.

9      Q.  Okay.  And then underneath does it say

10  denies numbness?

11      A.  It does.

12      Q.  Under lungs, chest it, what does that say?

13      A.  CTAB.

14      Q.  And what does that mean?

15      A.  Clear to Auscultation Bilaterally.

16      Q.  Okay.  Heart?

17      A.  Regular RR S1 S2.

18      Q.  That's your handwriting?

19      A.  It is.

20      Q.  Okay.  Musculoskeletal?

21      A.  LLE-N with a circle sensation.

22      Q.  Okay.  Practitioner assessment what's, you

23  write, what do you write there?

24      A.  CONTHR-NNO.

DEPOSITION OF DOCTOR ARUN ABRAHAM                    June 14, 2019

Page 127

1            MR. MADDOX:  No, above that.

2        A.  Oh, assessment LLE fracture.

3        Q.  What's LLE stand for?

4        A.  Left lower extremity.

5        Q.  Okay.  And what is, there is something in a

6   circle before that, what does that mean?

7        A.  One.

8        Q.  Okay.  Does that refer to, what does the one

9   refer to?

10       A.  The assessment of the first problem or one

11  of the problems.

12       Q.  Okay.  And under plan it says, I think you

13  read that it, under plan you write one continue --

14       A.  HR.

15       Q.  Okay.  What's HR?

16       A.  High Risk.

17       Q.  Okay.  And what does NNO stand for?

18       A.  No new orders.

19       Q.  Okay.  And number two, what does that say?

20       A.  Check on something, control.

21            MR. MADDOX:  Pain?

22       Q.  Pain?

23       A.  Pain control, you guys can read it better

24  than me.

Page 128

1              MR. MADDOX:  Years of practice,

2   Doctor, years of practice.

3        Q.  Patient education, fracture is that what it

4   says?

5        A.  Uh-huh.

6        Q.  Yes?

7        A.  Yes.

8        Q.  Okay.  So what did you examine Tiffany,

9   what, what did you do in examining Tiffany Rusher on

10  December 19th, 2016?

11       A.  I examined her heart, her lungs, asked her

12  to, about her lower extremity injury, and that is what

13  the record shows here.

14       Q.  Okay.

15       A.  I, with anybody in High Risk I always ask

16  suicidal and homicidal ideations.

17       Q.  Okay.  And what does that, what do you do,

18  ask that about?

19       A.  I, any thoughts of hurting yourself, anybody

20  else, any plans if they do have thoughts and then

21  yeah, I mean what their frame of mind is during that

22  evaluation.

23       Q.  Do you ever document that when you ask those

24  questions?

DEPOSITION OF DOCTOR ARUN ABRAHAM                     June 14, 2019

Page 129

1       A.  I do.

2       Q.  Okay.  And you didn't on this day?

3       A.  Correct.

4       Q.  Okay.  Do you, you make it your practice to

5   try to document as clearly as --

6       A.  I do.

7       Q.  -- contemporaneously as possible, correct?

8       A.  Yes.

9       Q.  You heard the expression if it's not on a

10  Medical record it's, it didn't happen?

11      A.  I have.

12      Q.  And it is important to document completely

13  your Medical, what you do clinically, correct?

14                      MR. MADDOX:  I object to the

15  form of the question.

16      Q.  It is important to document what you do

17  clinically with a patient?

18      A.  Yes.

19      Q.  Okay.  That's one of, that's the way you

20  can, one way you can communicate with other, other

21  Practitioners about the patient, correct?

22      A.  Yes.

23      Q.  Why did you put continue High Risk here?

24      A.  Because she was, when was she, she must have

Page 130

1   just come in, I assume.

2         Q.  I can tell she came in on December 15th.

3         A.  Yes, she just came in.  And so she, from

4   what I'm seeing she came in four days prior to this

5   visit.

6         Q.  Uh-huh.

7         A.  I must have been told or I don't know if

8   Mental Health had evaluated her, but we hadn't had

9   enough time to observe her to make a determination to

10  discontinue from High Risk.  She had come in from a

11  Mental Health facility and it was, I believe, I don't

12  remember if she attacked somebody or how she entered,

13  but for some reason that comes to mind.

14              And I believe that I was made aware

15  that she had previous Mental Health acute episodes.

16  And so when you're coming from a Mental Health

17  Facility, we need to observe a patient especially when

18  they are saying they have been discharged from a

19  Mental Health Facility because they don't feel that

20  they can stay there any longer.

21        Q.  Had you, are you, you reviewed her Medical

22  record in preparation for today, correct?

23        A.  Yeah.

24        Q.  Okay.  And you are aware that there was like