# Expert Report of Terry A. Kupers, M.D., M.S.P.

**Re:** *Andrews v. Sangamon County et al*, No. 18 cv 1100 (C.D. Ill.)

## I. Background and Qualifications

I am a board-certified psychiatrist, Institute Professor at the Wright Institute, Distinguished Life Fellow of the American Psychiatric Association, and an expert on correctional mental health issues. I have testified more than thirty times in state and federal courts about the psychiatric effects of jail and prison conditions, the quality of correctional management and mental health treatment, and prison sexual assaults. I have served as a consultant to the U.S. Department of Justice, Human Rights Watch and Disability Rights. I am the author of <u>Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It</u> (Jossey-Bass/Wiley, 1998) and <u>Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It</u> (University of California Press, 2017), co-editor of <u>Prison Masculinities</u> (Temple University Press, 2001), and a Contributing Editor of <u>Correctional Mental Health Report</u>. I have authored and co-authored dozens of professional articles and book chapters, including "A Community Mental Health Model in Corrections" in <u>Stanford Law & Policy Review</u>, 26, 119-158, Spring, 2015; and "The Asylum, The Prison and the Future of Community Mental Health," a chapter in *Community Mental Health: Challenges for the 21st Century*, Editors Jessica Rosenberg and Samuel J. Rosenberg, New York & London: Taylor & Francis/Routledge, 2017.

I served as consultant to the Connections Program in San Francisco, California, a collaboration between San Francisco Court Case Managers, San Francisco Jail Mental Health Services and Community Mental Health agencies designed to provide alternatives to jail for mentally ill and substance-abusing

EXHIBIT
10

offenders. I have served as an expert witness in multiple class action lawsuits concerning the conditions of confinement in solitary confinement units, including Jones 'El v. Litscher, Dockery v. Hall and Ashker v. Governor of California (see *curriculum vitae*, Exhibit A). I served as monitor of the *Presley v. Epps* consent decree (federal court) in Mississippi, involving prisoners with mental illness in isolated confinement at Mississippi State Penitentiary.[1] I was the recipient of the Exemplary Psychiatrist Award presented by the National Alliance on Mental Illness (NAMI) at the 2005 annual meeting of the American Psychiatric Association, and the William Rossiter Award for "global contributions made to the field of forensic mental health" at the 2009 Annual Meeting of the Forensic Mental Health Association of California.

I have been asked by counsel to review records and provide opinions about the management and mental health treatment of Ms. Tiffany Rusher at Sangamon County Jail, and about her eventual suicide. My fee is $325 per hour. My c.v., which includes a list of publications in the past ten years, and a list of cases where I have testified in the last four years are attached to this report as Exhibits A & B.

## II. Preparation for My Testimony

I have reviewed the following documents: The First Amended Complaint in Andrews v. Sangamon County Jail; Illinois Department of Corrections Medical and Mental Health records (Andrews 1-4848); The Petition for Involuntary/Judicial Admission, April 18, 2016 and related reports of psychological examinations (Wexford Bates 2214-2233); Medical Records from

[1] No. 4:05CV148-JAD (N.D. Mississippi, 2005 & 2007).

McFarland Mental Health Center (Andrews 4849-5286); Medical Records from Logan Correctional Center; Medical Records from Sangamon County Jail (Andrews 10858-11244), including records of LCSW Shmikler's contacts with Ms. Rusher on 12/16/2016, 1/27/2017, 2/7/2017, 2/20/2017 (Sangamon 885-89) and 3/17/2017 (Tiffany Rusher 33); Records from the Memorial Medical Center, Springfield Clinic in Springfield (Andrews 5418-5881), Records from Lincoln Memorial Hospital (Andrews 6041-6094) and Records from St. John's Hospital in Springfield (where she died). I have also reviewed depositions in this matter, plus exhibits (including policies at Sangamon County Jail), of Ajay Jeetwani, Arun Abraham, Betty Glenn, Lydia Hicks, Kate Daniels, Billy Ernest, Melissa Caldwell, Kathleen Treanor, Kelli Andrews, Richard Lechner, Mary Dambacher, Richard Rusher, Tracy Hamitt, Zachary Rusher and several friends and family members. I reviewed transcripts of Ms. Rusher's phone conversations while at the jail.

## III. Summary of Events

Ms. Tiffany Rusher's history includes a very dysfunctional early family life, her father being a drug addict who physically abused her, and she was homeless since age 17. She was admitted to the Illinois Department of Corrections in 2013 and began over three years of incarceration at Logan Correctional Center. Upon admission to the Illinois Department of Correction (I.D.O.C.) she had a history of mental illness including attempted suicides on several occasions as an adolescent. While at Logan Correctional Center she spent time in solitary confinement. She became dangerously suicidal. During her tenure in the I.D.O.C. she was involved in 37 incidents of attempted suicide and self-harm. She received mental health treatment at Logan Correctional Center.

In May, 2016 , she completed her prison sentence. The document "Involuntary/Judicial Admission, April 18, 2016," reflects that Ms. Rusher suffered from a serious mental illness (Bipolar Disorder[2], Borderline Personality Disorder, Posttraumatic Stress Disorder, and Cocaine Use Disorder) and was a serious threat to herself such that she required involuntary admission to the state hospital and urgent inpatient level of psychiatric treatment subsequent to her release from the I.D.O.C. Ms. Rusher was transferred from I.D.O.C. (Logan Correctional Center) to McFarland Mental Health Center in May, 2016. Subsequently, in the state hospital, there were quite a few incidents of self-harm, but between incidents her condition improved and she was rewarded with a higher level of freedom including congregate activities with peers at the hospital. She was restrained on multiple occasions, but not secluded. For days at a time, she functioned well in congregate hospital ward programs and group therapy, and seemed to be benefitting from individual psychotherapy. But then she would evidence behavioral dyscontrol and became self-harming or assaultive. This cycle re-occurred quite a few times. A progress note of July 5, 2016, states: "Reports doing well, had two good days, no aggression and was not agitated by others... apologized for her behavior while on Jefferson Hall." Then she would become agitated again, would self-harm, swallow a toothbrush

---

[2] Bipolar Disorder is a mood disorder, typically characterized by swings from manic to depressed mood. Other relevant diagnoses are Bipolar Disorder with Psychotic Features, and Schizoaffective Disorder. At various points Ms. Rusher was diagnosed with each of these disorders by different clinicians. That is consistent with the course of her very serious mental illness, i.e. at certain times the mood swings stand out and the diagnosis Bipolar Disorder is applied, at other times psychosis, a thought disorder in contrast to a mood disorder, is more prominent and the clinician diagnoses Bipolar Disorder with Psychotic Features or Schizoaffective Disorder. On other occasions, other clinicians decide she is not psychotic nor Bipolar, and diagnose Borderline Character Disorder or Antisocial Personality Disorder. The bottom line is that Ms. Rusher, suffered from a very serious mental illness that involved a disorder of mood as well as psychotic episodes.

5

or get into an altercation with a peer, and be placed back on one-on-one watch. Dr. Jeetwani, the psychiatrist who treated her at McFarland, reports in his deposition that she would make a suicide attempt, be placed on one-on-one observation and restrictions, and the next day she would be out on the floor interacting with others (deposition, pp. 173-174). Her clinical chart from McFarland Mental Health Center contains many notes about self-harm, assaultiveness and agitation, and repeatedly she calms down and participates in ward activities. Notice that, between suicidal crises and angry outbursts immediately after which she required one-on-one constant observation, she would not be placed in seclusion or any other kind of solitary confinement after being released from observation, rather she would be returned to congregate activities and therapeutic activities. This is an acceptable treatment plan, i.e. acute incidents were handled by staff keeping her safe, and then when the crisis waned she would be returned to a non-isolative setting and encouraged to take part in congregate activities and treatment. She would eventually be transferred from the state hospital to Sangamon County Detention Facility on December 15,2016 as a pre-trial detainee facing battery charges related to an alleged December 8 assault on a peer during her inpatient stay at McFarland Mental Health Center.

In Jan, 2017, a non-psychiatrist physician at the jail diagnosed Bipolar Disorder and Schizoaffective Disorder. She was designated "high risk" and was confined for much of her time in the jail in a "high risk" cell by herself in the jail's booking area. She had no regular clothes but wore "suicide attire," no radio or television, and very little property, if any. She was not actually on official or effective suicide watch all of the three months she spent in the observation cell, in fact she was permitted to cover the window to her cell part of the time. But

KUPERS 5

there is documentation noting she was suicidal and she was placed on fifteen minute checks in her cell. She was seen at least five times by Michael Shmikler, a licensed clinical social worker, who noted she was "high risk" of self-harm (12/16/2016, 1/27/2017, 2/6/2017, 2/20/2017 and 3/17/2017). On January 12, 2017, she swallowed a plastic spoon and was transferred from the Sangamon Jail to Memorial Medical Center in Springfield, Illinois, for medical treatment. On January 19, 2017, she tried to strangle herself with the strap of a protective medical boot. On January 29, 2017, she swallowed a toothbrush and was transferred again to Memorial Medical Center in Springfield, Illinois, for medical treatment. On February 3, 2017, she tried to swallow an apple core. On February 12, 2017, she swallowed mattress stuffing. On February 24, 2017, she stuffed toilet paper up her nose and could not breathe. On March 15, 2017, she swallowed a plastic bag (The date may have been March 16, see ACH 706). Then, on March 18, 2017 she strangled herself by wrapping a towel around her neck in her cell and died March 30, 2017.

## IV. The Management and Treatment of Suicide Crises in Jail

Suicide is a very big problem in jails and prisons. The rate of suicide behind bars is much greater than in the community. Long-term consignment to solitary confinement is a major factor in the high suicide rate among prisoners.[3] Recent research confirms that of all successful suicides that occur in a correctional system, approximately fifty percent involve the three to eight

---

[3] See Daniel P Mears & Jamie Watson, Towards a Fair and Balanced Assessment of Supermax Prisons, 23 JUST. Q. 232 (2006); see also Patterson, R.F. & Hughes, K. (2008). Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004, *Psychiatric Services,* 59(6), 676-682; Bruce Way et al., Factors Related to Suicide in New York State Prisons, 28 INT'L J.L. & PSYCHIATRY 207 (2005).

percent of prisoners who are in some form of isolated confinement at any given time.[4]

Correctional crisis intervention and suicide prevention must include a number of components. The standards of the National Commission on Correctional Health Care[5] provide this list: Training of mental health and custody staff on recognition and intervention regarding prisoners at risk; identification (i.e., screening at admission to the prison or the segregation unit as well as ongoing suicide risk assessment as clinically appropriate); referral (to the appropriate mental health practitioners and programs, including especially transfer to an inpatient psychiatric facility within or outside the correctional facility, as indicated); evaluation (comprehensive mental health examination including past suicidal and self-harm crises and incidents as well as current stressors); housing (for example, transfer to an observation cell, or after a brief period of observation, to a psychiatric inpatient unit or to a location where the patient will be safe and appropriately monitored); monitoring (this means not only intensive observation during the immediate crisis, but also ongoing monitoring at incrementally less frequent intervals as the prisoner demonstrates diminishing risk of self-harm); communication (between custody and mental health staff and also between the various mental health and medical providers); intervention (including but not limited to observation and monitoring since

---

[4] Patterson & Hughes, supra note 3; Rusty Reeves & Anthony Tamburello, Single Cells, Segregated Housing, and Suicide in the New Jersey Department of Corrections, 42 AM. ACAD. PSYCHIATRY & L. 484-88 (2014).

[5] See NAT'L COMM'N ON CORR. HEALTH CARE, supra note 35. While accreditation by the National Commission on Correctional Health Care (NCCHC) is not required, the standards of the NCCHC do reflect a national consensus on what the standard of care in the community requires as adapted to the correctional environment.

meaningful talking psychotherapy must occur if the staff are to get to the issues driving the prisoner to despair and contemplate or attempt suicide); notification (of family members, and so forth); reporting (in the electronic medical record according to widely accepted standards in the medical and mental health fields); review (peer review, quality assurance, etc., with the assumption that where programmatic deficiencies or lapses in staff interventions are discovered they will be corrected); and critical incident debriefing (which are essential if flaws in the mental health program are to be addressed).

An adequate crisis intervention and suicide prevention plan would not in most cases permit merely sending a prisoner back to a segregation cell after she is discharged from observation, but would require a detailed treatment plan that includes recommendations on housing, the frequency of monitoring and the kind of ongoing mental health treatment she will receive. This might include medications and must include some talking psychotherapy so the mental health staff can assess ongoing suicide risk and the prisoner can be helped to become more functional.[6]

Isolation in a cell, even with staff checking on the prisoner's status *vis a vis* suicide risk, must be time-limited. If the prisoner does not resolve the suicidal crisis and/or does not become psychiatrically stable in a relatively short time period (24 hours, 48 hours, or in some situations 72 hours), the treatment staff need to assess the patient for a higher level of care, in most cases

---

[6] Ibid. at 6-1 to 7-23.

inpatient care. And if this assesment had been done for Tiffany, it would have been obvious she needed a higher level of care on an urgent basis.

The standard of care in the community is very clear about this.[7] The "crisis unit" or "hospital within a hospital" is the model from which this standard of care is derived. Large psychiatric hospitals in the community typically have a crisis unit where individuals in acute suicidal crises or acute psychotic decompensation are transferred to receive time-limited, intensive urgent care. The clinical staff in the crisis unit utilize crisis or brief psychotherapy plus relevant psychotropic medications in an attempt to attain stability and end the suicidal crisis. If they are unsuccessful in doing so, for instance if the patient continues to aver suicidal or self-harm proclivities at the end of the 24-hour or 48-hour limit to the crisis intervention, the patient must then be admitted to the psychiatric ward in the hospital for ongoing treatment. If the clinical team in the crisis unit is successful in achieving remission and the patient is considered safe to go home, the patient can be discharged from the crisis unit to return home and come in later for a mental health clinic appointment. The controlling rule is that no patient can remain in the crisis intervention unit longer than the designated 24 or 48 or 72 hour period because the fact that they have not stabilized with intensive treatment in that period indicates they

---

[7] The word community in "the standard of care in the community" refers to the broader community outside of jail and prison. There is consensus about the meaning of the phrase, physicians and psychiatrists are in agreement that certain practices are required by "the standard of care in the community," for example when a patient is suicidal he or she must be watched and talked to. And there are certain practices that are prohibited by the standard of care in the community. The patient who is suicidal must not be isolated, and if acutely suicidal, must be watched constantly. In other words, the standard of care in the community refers to a consensus among physicians and psychiatrists about the wat treatment must be conducted.

require inpatient admission with ongoing suicide observation and clinical treatment. The Observation cells in jails and prisons should be, if properly run, equivalent to the crisis unit at a hospital with a psychiatric ward. The prisoner in a suicidal crisis, according to the standard of care in the community, must remain in the Observation cell only for a brief period (24 or 48 or 72 hours, as designated by policy, but no longer), and then, if the prisoner has not returned to stability or remains a significant risk of suicide or self-harm, he or she must be transferred to a higher level of mental health care, meaning a residential treatment center or inpatient unit within the correctional system or in the community. This is why there is a requirement, for example in the standards of N.C.C.H.C.,[8] that a jail or prison must have available an inpatient psychiatric unit for prisoners who remain suicidal or decompensated longer than the day or the few days that they are permitted to remain in an Observation cell.[9] Prisoners must not be retained in an Observation cell for longer time-periods.

The question is often raised whether the standards on isolation and solitary confinement can be by-passed in cases where particular prisoners are deemed assaultive toward others. Corrections officials who make this argument ignore the purpose of the standards. The cases where a prisoner is a danger to others is one of the very situations for which the standards were written. It is not

---

[8]Standard for Health Services in Jails, National Commission on Correctional Health Care, 2003. In Sect. J-G-05, Suicide Prevention Program, the paragraph about Housing contains this statement: "Unless constant supervision is maintained, a suicidal inmate is not isolated. Rather, he or she is housed in the general population, mental health unit, or medical infirmary, and located in close proximity to staff. All cells or rooms housing suicidal inmates are as suicide-resistant as possible...."

[9] The Illinois Administrative Code contains such a requirement. In Section 701.90, Medical and Mental Health Care, All jails shall provide a competent medical authority to ensure that the following documented medical and mental health services are available:... arrangements for hospitalization," Illinois Administrative Code, Title 20.

permissible to torture people because they commit bad acts, the prevention of harmful treatment and abuse is what the standards were written for.  Among the prisoners kept in solitary for a long time are quite a few who are assaultive. They need help with their proclivity for anger and assault.  If they are merely left in solitary confinement for a long time, by the time they get out they will be even more prone to violence, on average, because of the psychologically harmful effects of the solitary confinement. The help they need requires programming, not isolation.  They should be separated from the people they tend to fight with -- for example, enemies -- but they must be provided effective programs in that separate place, not isolation.  In fact, there are very accepted correctional and mental health practices and treatments for difficult and assaultive prisoners that do not involve solitary confinement.  Hans Toch and I have written about those methods, and the Colorado Department of Corrections and clinicians at New York's Rikers Island have evolved the techniques.[10]

Sometimes self-harm involves suicidal intent; sometimes it does not. Both kinds are urgent problems in a correctional setting. Non-suicidal self-harm, especially cutting of some part of the body and less often the swallowing of foreign objects, is very commonplace in prison segregation units, and in my

---

[10] "Violence in Prisons, Revisited," Hans Toch & Terry Kupers, Journal of Offender Rehabilitation, 45,3/4, 49-54, 2007.  See also Toch, Hans, and Kenneth Adams. (2002). Acting Out: Maladaptive Behavior in Confinement. Washington, DC: American Psychological Association; Raemisch, Rick, and Kellie Wasko. 2016. "Open the Door: Segregation Reforms in Colorado." Corrections.com, January 4. www.corrections.com/news/article/42045; and Sarah Glowa-Kollisch, Sarah, Fatos Kaba, Anthony Waters, Y. Jude Leung, Elizabeth Ford and Homer Venters (2016) "From Punishment to Treatment: "The Clinical Alternative to Punitive Segregation: (CAPS) Program in New York City Jails," Int. J. Environ. Res. Public Health 2016, 13, 182. doi:10.3390/ijerph13020182

experience the worse the conditions of confinement and the less the officers attend to prisoners' urgent needs, the more often prisoners cut themselves for non-suicidal reasons or swallow foreign bodies.

Often correctional mental health staff, viewing non-suicidal self-harm as manipulative, pay little or no attention to the prisoners' despair, anxiety, and needs that are expressed in the self-harm. That is a deadly mistake. Non-suicidal self-harm can be as dangerous as self-harm with suicidal intent. Non-suicidal self-harm, a well-studied psychiatric phenomenon, is usually related to a high degree of anxiety, often secondary to past or current traumas and exacerbated by isolation and idleness, and it can result in unintended fatalities. Many prisoners I have interviewed subsequent to a serious episode of self-harm in a segregation setting report that they despair of ever being released from their unbearable segregation cell. That despair, along with the isolation itself, drives many acts of self-harm. When a prisoner decides out of despair to take his own life, the situation can be dire, and much clinical energy and competence need to be expended on providing crisis intervention.

There is a big difference between "assessment" and "treatment," including assessment and treatment for suicide risk. There are many contexts in a jail where mental health staff briefly visit prisoners for the purpose of assessment. This includes suicide risk assessments at the time of admission to the jail, "rounds" in segregation units where the mental health clinician goes from cell to cell to check on the gross mental health of each prisoner in segregation, and so forth. These assessments do not constitute treatment. The assessment might last for a few minutes and occur anywhere in the jail, whereas treatment involves longer periods of contact with the prisoner (typically between 25 and

50 minutes) in a private and confidential setting such as an office, and is ongoing for a substantial amount of time. Of course there is a certain amount of overlap between assessment and treatment. Thus, a trained and ethical mental health clinician considers every contact with prisoner/patients to be "therapeutic," in the sense that the clinician must always try to help and to "do no harm"; and even in therapy sessions the mental health clinician is constantly conducting ongoing assessment. But still, the practice of assessment is quite distinct from the practice of treatment. The rounds that mental health staff conduct in segregation units and in the area where there are Observation cells, including contact of a minute or a few minutes with prisoners in segregation or in an Observation cell, does not constitute treatment. Typically, if, after a clinical assessment at cell-front, the prisoner is moved to an office where a private and confidential treatment session can occur.

## V. Review of Clinical Notes

A review of the five progress notes ("Placement/Review of Detainee in Observation") by Michael Shmikler, LCSW, provides a picture of Ms. Rusher's experience at the Sagamon County Jail. On 12/16/2016, in a "Report of Prisoner Medical/Psychological Referral," he merely notes he met with Ms. Rusher 8 days after her admission to the jail, and there is no clinical data nor case discussion. (Produced #889). On 1/2/2017 Mr. Shmikler reports that she was admitted after being arrested for battery at McFarland Mental Health Center, she has a history of violence, serious mental illness, self-harm and pica (eating foreign bodies). She was placed on observation/high risk status, given suicide attire to wear, and placed in a high risk cell (presumably in the admitting area, Cell I-15) (#888). He spoke with her across the closed door to her cell, found her to be calm and cooperative, she denied self-harm intent, and he

found nothing remarkable on mental status examination. He ordered, with advice from administration, that she remain on high risk/suicide status with 15 minute checks.

On 1/27/2017, Mr. Shmikler reports that on 1/19/2017 Ms. Rusher made a suicide attempt while on Observation/high risk status. He ordered Observation/high risk status in the booking area be continued. He met with her by talking through her cell door. Again he reports she was calm and cooperative, and a bit dysphoric (depressed). She denied being suicidal and he felt there were no other mental status concerns (#887).

On 2/6/2017, Mr. Shmikler again met with Ms. Rusher by talking through the solid metal door of her observation/high risk cell in the admitting area (#886). He reports that on 1/29/2017 she swallowed a tooth brush. She remains on suicide/high risk status in the admitting area. He reports her smiling and being euthymic, denying suicidal thoughts, and she engaged in normal conversation. On 2/20/2017, Mr. Shmikler reports she remains on Observation/high risk in suicide attire in the booking area. He spoke to her through the locked door of her cell, she was at first sleeping on the floor, she was "mildly irritable," but denied suicidal ideas and there were no other mental status concerns.

A "Narrative Progress Note" on 3/10/2017 reflects she was receiving Depacote 500 mg. twice a day, plus Thorazine 200 mg. three times a day and an additional 100 mg. per day. (Plaintiff's Production 010863). A 1/30/2017 note from the Memorial Health System in Springfield reflects she is prescribed Zolpidem, Venlafaxine, Tramadol, Thorazine and Divalproex, among other medications. From these notes and several others it is clear that at various

times she was prescribed anti-psychotic medications (Thorazine), medications for mood stabilization in Bipolar or Schizoaffective Disorder (Depacote/Divalproex), and antidepressants (Venlafaxine), along with a number of medications for medical conditions.

On 2/25/2017 she was seen for a wrist injury from slamming a wall, the hand was not broken but she was placed in a restraint chair per a custody Sergeant's order.  There was no mental health consultation. (Plaintiff's Production 010877).  There is an "Abnormal Involuntary Movement Scale" completed on 2/20/2017 (Plaintiff's Production 010890, this is an assessment of involuntary movements caused by certain anti-psychotic medications).  And there are multiple forms indicating refusal of medications.

Ms. Rusher was found to have a plastic bag in her stomach at autopsy. According to a progress note dated March 16, 2017, she reported swallowing a plastic bag to medical staff, but there is no documentation of an officer being informed, nor that she was referred to mental health.

There are notes from her medical treatment at Memorial Health System, covering medical treatment with no mental health treatment.  The physician in the emergency department could have requested a psychiatric consultation but, knowing that she was transferred from and would be returning to a jail with both medical and mental health services, probably thought that medical staff at the jail would pursue mental health assessment.  What is remarkable, and not acceptable practice, is that the medical and mental health staff at the jail, who had transferred her to the hospital emergency room on account of her swallowing foreign objects (pica), did not provide urgent mental health

assessment and treatment at the jail upon her return from the emergency department, to assess her risk of self-harm.

## VI. Opinions

1. One can only conclude from reviewing the documents produced in this matter from Sangamon County Jail, the IDOC, McFarland Mental Health Center, and medical facilities in the community, that Ms. Rusher was at very high risk of suicide and self-harm before her transfer to Sangamon County Jail, and the entire time she was in the jail.  For almost her entire stay at the jail she was confined in an observation/high risk cell in the admitting area or in a "lockdown" solitary confinement cell, and when in the high risk cell she had no clothes except "suicide apparel" (usually a gown made of indestructible material), and just about no possessions and no activities.  Presumably she was in that cell 24 hours per day, so it was a virtual solitary confinement cell, and there is no notation indicating she was permitted in the dayroom area nor in the recreation area.  Thus, she was in virtual solitary confinement for almost all, or all, of the 14 weeks she spent at the jail, and she killed herself by strangulation with a towel in her solitary confinement.  She was seen five times in the 14 weeks (Dec. 8, 2016 – March 18, 2017) she was at the jail by Michael Shmikler, LCSW. When on official observation or watch, she was observed through the window of her cell door by staff every 15 minutes or at some other interval.  She was seen by a clinician (there is no documentation that she was seen by a psychiatrist, so it seems that a nurse practitioner prescribed for her) who prescribed psychotropic medications. She was also seen by general medical and nursing staff for medical problems including broken bones in her hand and foot, the ingestion of foreign bodies, and

hanging.  And she was transferred to an outside health clinic and hospital as needed for the medical problems and after the hanging.  From documents, it appears that was all of the medical and mental health attention she received.  According to all standards of care, Mr. Shmikler and the medical clinician prescribing psychotropic medications would have known that Ms. Rusher, because of a history of serious mental illness with repeated pica and self-injury, in combination with current pica and self-injury, was at an extremely high risk of repeated self-harm or suicide; that the plan to retain her in a "high risk/Observation" cell for more than a few days resulted in no improvement in her condition nor any reduction of her risk of self-harm (actually, the fact that the cell she was consigned to was essentially a solitary confinement cell and she had little or no out-of-cell activity likely increased her proclivity to harm herself), and should have ordered emergency transfer to a higher level of mental health treatment (e.g., admission to a psychiatric inpatient facility).  If she had been transferred to a higher level of mental health care, she probably would not have taken her life.

2. Ms. Rusher was an extremely troubled individual known to suffer from serious mental illness (diagnosed by different clinicians in the Illinois Department of Corrections, McFarland Mental Health Center and the Sangamon County Jail as Bipolar Disorder, Schizoaffective Disorder, Major Depressive Disorder, Schizophrenia, Posttraumatic Stress Disorder, Borderline Character Disorder and Antisocial Personality Disorder).  She had attempted suicide and self-harm a large number of times in the I.D.O.C. and at McFarland Mental Health Center, and this history was known to staff at Sangamon County Jail at the time of her admission.  A past

history of suicide attempts and self-harm is a very strong risk factor for
future suicide, as is a diagnosis of serious mental illness, so staff knew she
was very high risk and required extraordinary measures to insure her
safety.   She was housed in a "high risk cell" in the admitting area
(presumably because officers are always present in that area and were
expected to keep an eye on her) or a solitary confinement "lockdown" cell
for just about the entire time she spent at the jail.  She was observed
when she was noted to be suicidal, but not all of the time she spent in the
jail, usually that meant every 15 minutes, and presumably jail staff
considered the cell she was in at least somewhat "suicide-proof," though it
proved not to be in her case.  From photographs of the cell where Ms.
Rusher was confined at the time of her death, it is clear there was a
window that looked directly into her cell from the booking area where
officers were always stationed.  Thus it would have been possible for her
to be on "constant watch," and had she been it is likely her suicide could
have been prevented.  But, as Ms. Lydia Hicks testified in her deposition,
"constant watch" was not utilized at the jail even though the architecture
permitted it, and in fact the shade on the window through which officers in
the booking area could see into her cell was pulled down at the time of her
demise.  Had an effective constant watch been in place, Ms. Rusher would
not have been able to commit suicide.

3. Regarding mental health care aimed at treating Ms. Rusher's serious
   mental illness and preventing her suicide, the care she received at
   Sangamon County Jail was quite inadequate and substandard.  The only
   significant contact she had with a mental health professional was five
   meetings with Michael Shmikler, L.C.S.W., plus some brief contact with the

prescribing clinician (from documents, it appears a psychiatrist was not the prescriber, rather Nurse Practitioner Mary Dambacher prescribed medications for Ms. Rusher). Mr. Shmikler's first meeting with Ms. Rusher occurred eight days after she was admitted to the jail, and his note about that visit contains very little clinical material and no reflection of her mental status. This is far too long a delay in arranging for Ms. Rusher to be seen by a mental health professional, given her history of serious mental illness and multiple very serious suicide attempts. Mr. Shmikler's meetings with Ms. Rusher were too few and too superficial, given the severity of her psychiatric symptoms and the high level of suicide risk. If the meetings were clinical or therapeutic, it would be an LCSW's practice to make notes, and there are none other than the notes about the 5 meetings. And non-therapeutic, occasional conversations through a steel door are unlikely to mitigate the impact of solitary. Additionally, Mr. Shmikler's meetings with Ms. Rusher did not occur close to the time when she actually attempted suicide or self-harm. For example, on 1/19/2017 Ms. Rusher made a suicide attempt by trying to hang herself with straps from a medical boot, but was not seen by a mental health professional until Mr. Shmikler saw her on 1/27/2017. Again, on 1/29/2017 Ms. Rusher swallowed a tooth brush (an act of self-harm that might have constituted an attempted suicide, and in a prisoner with a record like Ms. Rusher's, certainly a psychiatric emergency), but Mr. Shmikler did not see her until 2/6/2017. Five brief meetings with a mental health professional in fourteen weeks is simply too few for a prisoner/patient with problems as acute and serious as were Ms. Rusher's.

When asked at deposition if there is a "Suicide Prevention Program" at Sangamon County Jail, Dr. Arun Abraham, the physician providing medical care at the jail, said: "So if somebody is identified as trying to harm themselves, then they are put in what's called High Risk Status, and they're observed every 15 minutes.  And then they're observed, then they're spoken to regularly by Mental Health staff.  They're observed by the nursing staff daily. They're observed by the Site Clinician myself or Mary or sorry, I should say the NP or PA as well at least on a weekly basis" (Abraham deposition, p. 84).  We know that Mr. Shmikler was the only mental health clinician, besides the nurse practitioner who prescribed his medications, who saw her and he only documented seeing her five times during her tenure in the jail, and those were brief conversations across her solid cell door.  The 2015 Sangamon County Jail Policy (Bates 2740-2745, 12-004 Policy. – OCR) requires, when a prisoner "exhibits behavior indicating self-harm," that medical staff place the prisoner on a list to see the psychiatrist, and (Section D.,b.): "6. The psychiatrist will determine what, if any, medications are needed and make recommendation for permanent housing assignment; 7. Follow-up visits by the psychiatrist may be necessary for additional evaluation and recommendations."  There is no documentation of an evaluation by a psychiatrist during the entire time Ms. Rusher was at the jail.  I should note that it is acceptable for a general medical practitioner to prescribe psychiatric medications, but the psychiatrist's job is far more extensive than the prescribing of medications.  The psychiatrist's evaluation is important in generating a treatment plan, the psychiatrist is the most highly trained clinician in terms of managing suicidal crises, and typically it is the psychiatrist who determines that a prisoner in jail requires transfer to an off-site psychiatric

treatment setting such as a hospital. Dr. Abraham is not a psychiatrist, and he did not perform these functions. But as a primary care practitioner and the ranking medical practitioner at the jail, Dr. Abraham is expected to know when specialty services, including psychiatry, are needed, and make appropriate referrals for those services. Ms. Rusher obviously had very significant mental health issues and Dr. Abraham should have involved a psychiatrist in her care. In summary, the treatment Ms. Rusher received at Sangamon County Jail is far from an adequate Suicide Prevention Program, according to all standards.

4. It seems staff at various times viewed Ms. Rusher as "manipulative" or "attention-seeking." It is very dangerous to dismiss a prisoner as manipulative or attention-seeking, especially a prisoner like Ms. Rusher with many suicide attempts and incidents of self-harm in her history.[11] Too often, conducting reviews of suicides, I find dismissive notes in the chart prior to the suicide that the prisoner is "manipulating." Some prisoners who are consigned to a solitary cell and do not receive adequate mental health treatment will try to manipulate staff to have their needs met. This is very often not so much a characteristic of the prisoner as it is a sign that the prisoner's needs are not being adequately addressed. It tends to be the case that the less staff tend to the needs of prisoners in solitary settings, the more the prisoners are forced to try to manipulate to get their needs met. Similarly, when a prisoner's needs are ignored by staff or insufficiently addressed, the prisoner, appropriately enough, demands more attention. Again, this kind of attention-seeking is not so much a

---

[11] See my discussion of manipulation and suicide prevention in Section IV., above.

characteristic of the prisoner as it is an extreme action the prisoner believes he or she must perform in order to have needs addressed. But more important, the prisoner's appearance of being manipulative is entirely independent of the question whether there is serious mental illness or serious risk of suicide. Some of the most psychotic and suicidal patients I have seen during my psychiatric career were also noted by staff to be manipulative. Being manipulative can co-exist with serious mental illness and suicide risk, it does not rule out psychosis or a suicidal crisis. And to dismiss a prisoner as "manipulative" or "attention-seeking" leads to extremely dangerous ignoring of the prisoner's needs, as evidenced by the fact that Ms. Rusher eventually committed suicide at the jail.

5. Mr. Shmikler met with Ms. Rusher while she was locked in an observation/high risk cell and he stood outside the locked cell door. This kind of meeting provides neither confidentiality nor privacy – there are custody staff and other prisoners in the vicinity who could overhear the conversations. While it is acceptable for staff to conduct 15-minute observations through the window of the cell door (still, it is preferable that they actually talk to the prisoner), it is not acceptable to conduct a mental health interview in such a setting. Rather, the prisoner being examined or treated must be moved to a private office for the interview, where confidentiality and privacy are possible, as well as a modicum of comfort that would be conducive to frank conversation. In general, the effect of conducting a mental health interview by standing outside a locked cell door while the patient is locked in the cell results in her feeling it is unsafe to disclose anything significant (there is stigma and possible reprisals toward prisoners known to suffer from mental illness or be

suicidal), so she will likely go silent and merely wish that the clinician will go away. Mr. Shmikler's notes about his meetings with Ms. Rusher are very brief and contain little clinical data. In a note documenting a visit with Ms. Rusher on March 17, 2017, Mr. Shmikler notes that he spoke to Ms. Rusher "through the locked door of cell I-16." Mr Shmikler reports that Ms. Rusher "was smiling today. Her mood was euthymic with a congruent affect." But we do not really know for certain what was going on in Ms. Rusher's mind that day, although one strong possibility is that she had decided to commit suicide and was merely giving Mr. Shmikler the appearance of calm and cooperation so he would pass by and leave her alone. (Many prisoners tell me that this is what they usually do when staff come to their locked solid cell door and want to talk to them). In any case, the situation where he was talking to her across a locked solid cell door certainly interfered with his ability to make the clinical distinction between someone who was truly cheerful vs. someone who was merely acting cheerful to get him to leave her alone while she planned her imminent demise. The only way to adequately and effectively treat a suicidal patient and prevent suicide is to establish a trusting therapeutic relationship within which the individual feels free to discuss the despair and desperation driving the suicidal and self-harm behaviors. This is very unlikely to be accomplished talking across a locked cell door in a public space like the admitting area of a jail.

6. Ms. Rusher was not seen by a psychiatrist at Sangamon County Jail, rather her medications were prescribed by a nurse practitioner. This is not acceptable treatment for a person as seriously disturbed as Ms. Rusher was, or as actively self-harming and suicidal. Consider the issue of

medication adherence.  There are notes scattered through the chart about Ms. Rusher not taking prescribed medications.  Non-adherence of this kind is a major problem in mental health treatment, especially within institutions.  Individuals suffering from serious mental illness often refuse to adhere to their prescribed medications.  On one hand, this can be viewed as a matter of the patient having some choice *vis a vis* taking pills; but on the other hand there are many cases where the patient's refusal to adhere to a medication regimen will predictably lead to harm to self or others.  Keeping that possible scenario in mind, the physician who prescribes for a psychiatric patient must monitor for whether that patient takes the pills, and if he or she does not, a treatment plan must be created to ameliorate the non-adherence.  If the patient cannot be persuaded to voluntarily comply with prescriptions for medications that help avoid decompensation, and this patient's decompensation is likely to involve danger to self and others, then the psychiatrist must pursue the legal mechanism for ordering involuntary medications.  The point for this discussion is that a psychiatrist is involved in making the decision whether a certain patient is dangerous enough to self and others to require seclusion in a high risk cell or involuntary medications.  In Ms. Rusher's case, a prescribing psychiatrist should have reviewed the log documenting the dispensing of medications, caught the fact that Ms. Rusher was non-adhering at times (or written an order for the nurse to notify the psychiatrist if there is non-adherence), and instituted a treatment plan to address that problem.  The psychiatrist plays an important role on a jail mental health treatment team.  He or she is not simply the prescriber.  The psychiatrist is generally recognized as the senior clinician on the team, and as such, the psychiatrist weighs in on issues such as placing a patient

on observation status, releasing a patient from isolation, ordering involuntary medications, and transferring a patient who is not responding sufficiently to a higher level of mental health treatment, usually a psychiatric hospital.  The fact that no psychiatrist was involved in Ms. Rusher's treatment at the jail probably played a part in her erratic medication consumption going unnoticed and uncorrected, in her consignment for such a long period of time to a cell where she was isolated and not involved in meaningful activities, and in her quite dangerous suicide risk being minimized or insufficiently attended to.

I have not conducted a comprehensive assessment of the adequacy of care provided by ACH at the Sangamon County Jail, but my review of documents related to Ms. Rusher as well as deposition transcripts for Dr. Abraham, L.C.S.W. Hicks and Dr. Caldwell, suggests that, were there to be a thorough investigation of mental health care at Sangamon County Jail, the findings (as reflected in this matter) would include unacceptably substandard care in the following regards: a. There does not seem to be anyone in a position of authority to oversee mental health services in the jail; b. Treatment Plans are absent, or entirely inadequate; c. no psychiatrist saw Ms. Rusher during her tenure at the jail; d. There seems to be no arrangement for referral of very disturbed or suicidal prisoners to a more intensive mental health treatment setting (this usually involves transfer to an off-site psychiatric hospital or crisis unit); e. High Risk Cells are over-utilized and prisoners with serious mental illness are retained in this kind of solitary confinement cell for too long periods, in other words prisoners with mental illness are consigned to solitary confinement instead of receiving adequate mental health treatment; f. Constant

Observation is almost never utilized at the jail (see Deposition testimony of LCSW Hicks, pp.64-65). These issues are clearly covered by standards, including the N.C.C.H.C. standards and, in less detail, the Illinois Administrative Code.

A note is called for here about why, in my opinion, A.C.H., a private contractor for medical, dental and mental health services at Sangamon County Jail, might provide inadequate care. I believe that the problem of inadequate staffing in jail mental health services is that the private company scrimps on staffing and does not lay out sufficient funds to staff the jail adequately, for example with a part-time psychiatrist. I mentioned the absence of a psychiatrist, I could as well have mentioned the lack of constant observation or the sparseness of Mr. Shmikler's interventions with Ms. Rusher. There needs to be richer staffing in the mental health department at the jail. There needs to be a protocol for sending prisoners in acute crisis to another facility such as a psychiatric hospital where they can undergo the intensive care their condition requires. There needs to be a treatment plan that includes the exclusion of the patient from solitary confinement and the tracking of her adherence to his medication regimen. All of these practices cost money.

I have had an opportunity to review materials from the Grant County Jail in Kentucky,[12] another county where jail mental health services are provided by Advanced Correctional Healthcare (ACH). The U.S.

---

[12] See October 1, 2014 Letter to Joe Taylor from Christopher Cheng from D.O.J.; January 9, 2015 Memo from Mike Coffey to Deborah Ash and others, Exhibit to Dr. Caldwell's deposition.

Department of Justice found constitutionally inadequate medical and mental health care at Grant County Jail, and found that "the County has made little progress in addressing these deficiencies since our last inspection...." The D.O.J. inspection team found inadequate mental health staffing, inadequate treatment plans, over-utilization of solitary confinement for prisoners with serious mental illness, and a lack of access to the care of a psychiatrist – all of these problems are apparent in the A.C.H.-administered mental health program at Sangamon County Jail.

7. In effect, Ms. Rusher was consigned to solitary confinement for the entire time she was in the jail. An observation/high risk cell is not officially designated solitary confinement, but Ms. Rusher was in that cell 24 hours per day with few if any possessions, she was fed in her cell, she did not talk to anyone aside from "checks" at 15 minute or other intervals and routine medical contacts, the four sessions with Mr. Shmikler and the brief contact she had with the physician. She was not even released from her cell to participate in recreation or to spend time with others in the dayroom. Various staff members claim that Ms. Rusher talked informally and intermittently to various staff through the solid door of her cell. There is no documentation of this kind of contact with staff. But even if staff did occasionally converse with Ms. Rusher through her solid cell door, this does not at all constitute meaningful social contact, and it certainly is not effective clinical intervention. Often correctional administrators and staff claim there is no solitary confinement in their jail facility because officers go to cells to pass food trays or transport prisoners to appointments. But I have witnessed this kind of contact with staff in quite a few jail facilities, and in my considered opinion the kinds of words that

are exchanged do not constitute meaningful human communication.  If the fact that officers slide food trays through the slot in a solid door were to be considered meaningful social contact, then there would be no such thing as "solitary confinement" in jails and prisons.  But the very brief conversations that sometimes accompany the passing of food trays through a solid metal cell door and the transport of prisoners to appointments does not constitute adequate social interaction.  The logs documenting the fifteen minute checks of Ms. Rusher's cell very often consist words like "lying on the floor."  This is simply not meaningful human communication.  Mr. Shmikler described in one of his four clinical progress notes that he found her sleeping on the floor, presumably on a mattress placed on a concrete slab on the floor (see photo of her cell in the First Amended Complaint).

8. We garner a glimpse of Ms. Rusher's experience while confined to a jail cell from recordings of phone calls she participated in while at the jail.  Thus, on 12/31/2016 a relative asked her to write a letter, and she responded, "I can't, I'm on watch! They got me on fucking watch....  I can't do nothing, I have a mattress, a blanket and a smock. But next week I should be off this watch."  Later, she responded to a question about how she slept the previous night, "Do you know what time I went to sleep last night? Oh my god. I took my afternoon meds because I didn't take 'em the day before, and I fell asleep after lunch probably until breakfast." And in a 1/15/2017 call Ms. Rusher reported that she had no television, and that "I've been sleeping....  I went to bed around noon Friday, woke up at breakfast time the next day. I stayed up 'til lunch, went to bed at noon and got up at 2:45 in the morning and then off and on until 5:30 A.M. and

now I've been up since 5:30... When I take [medicine] that's when I'll take a nap. That shit knocks me the fuck out."

Under these extreme conditions, psychiatric symptoms begin to emerge in previously healthy prisoners. In less healthy ones, there is psychosis, mania, compulsive acts of self-abuse or suicide, and in all too many cases bizarre acts of self-harm such as cutting, hanging, swallowing foreign bodies, and so forth. If many prisoners who have no history of serious mental illness and who are not especially prone to psychiatric decompensation (breakdown) develop such a high degree of symptomatology and disability, the experience of prisoners who do have a history of serious mental illness or suicide potential is far worse.  This was Ms. Rusher's situation.  Indeed, it has been my experience, from tours and clinical interviews in solitary confinement units and equivalent forms of near-24-hour cell confinement (including the kind of observation/high risk cell where Ms. Rusher was confined at the Sangamon County Jail) in many states, that the conditions that cause psychiatric symptoms such as anxiety and aggression in relatively healthy prisoners cause psychotic breakdowns, severe affective disorders and suicide crises in prisoners who have histories of serious mental illness and previous suicide attempts. Prisoners with PTSD are very prone to suffer psychiatric crises when in segregation housing for any length of time. Many report to me that the experience of isolated confinement serves as a re-enactment of earlier traumas or re-traumatization.

9. Solitary confinement, even *de facto* solitary confinement that is tagged "high risk" or "observation," is the wrong place to house a prisoner who is

suicidal or self-harming. Suicide in jail is much more prevalent than it is in the population in the community. Clinical research shows that a hugely disproportionate number of jail and prison suicides occur in solitary confinement. This disturbing trend is so strong that most manuals on and standards about preventing suicide in jail stress that staff should make certain that the individual is not left alone in a cell. Fifteen minute checks, or less frequent checks, do not ameliorate the damaging effects of solitary confinement on a suicidal prisoner like Ms. Rusher. Lindsay Hayes, a national expert on suicide in jails, includes this caution in his recommendations on housing suicidal prisoners:

> When determining the most appropriate housing location for a suicidal inmate, correctional facility officials (with concurrence from medical and/or mental health staff) often tend to physically isolate (or segregate) and sometimes restrain the individual. Although these responses may be convenient for facility staff, they are detrimental to the inmate because isolation escalates a sense of alienation and further removes the individual from proper staff supervision. Whenever possible, suicidal inmates should be housed in the general population unit, mental health unit, or medical infirmary, and should be located close to facility staff. Further, removal of an inmate's clothing (excluding belts and shoelaces) and the use of physical restraints (e.g. restraint chairs or boards, leather straps, handcuffs, and straitjackets) should be avoided whenever possible; these measures should only be used as a last resort when the inmate is physically engaging in self-harming behavior. Housing assignments should be based on the ability to maximize staff interaction with the inmate, not on decisions that

heighten depersonalizing aspects of
confinement.[13]

10. Sangamon County Jail was clearly unable to provide the mental health
treatment Ms. Rusher's condition required, nor were they set up to keep
her safe from suicide.  Mr. Shmikler was only able to see her five times in
14 weeks because of his hours of employment or heavy caseload, and she
was consigned to a cell in admitting because, absent an infirmary or
mental health unit, there was nowhere else in the facility where staff felt
she would be safer.  But the care and arrangements for safety she
received were nevertheless substandard.  Some types of meeting between
suicidal prisoner and mental health staff can take place while the prisoner
is in a locked cell and the clinician stands outside the door, for example
when the mental health professional is conducting "rounds" and merely
wants to accomplish a quick assessment of the prisoner's general level of
functioning; but for a substantial interview to take place, where the
clinician can discuss with the prisoner the reasons for her suicidal despair,
the interview needs to occur in an office or room where there is privacy
and confidentiality.  And generally, in the field of correctional mental
health care, it is considered acceptable to place a prisoner at high risk of
suicide in some kind of observation cell – the standard is to place them in
an observation cell in the Infirmary or mental health unit where nursing
staff are present to oversee the observation – but only for a few days at
the longest.  After that, if the suicidal crisis has not resolved (which is in

[13] Hayes, Lindsay (2010). National Study of Jail Suicides: Fifty Years Later, National
Center on Institutions and Alternatives, p.50.

itself a reflection of the seriousness of suicide risk), the prisoner must be transferred to a site of higher level mental health treatment, and that means a psychiatric hospital or inpatient ward.  Nothing like that was even contemplated, as reflected in the documents I reviewed.

11. According to all standards for correctional mental health treatment, there must be a treatment plan documented in each patient's chart at all points in time.  A treatment plan is required so that clinical staff who come into contact with a particular patient can know what treatment is planned and thus can effectively collaborate in or at least not disrupt the treatment. Treatment plans are usually discussed among staff from different disciplines (e.g. the psychiatrist, nurse, social worker and so forth) and revised as time goes on.  A treatment plan is a statement about the housing, precautions, clinical interventions, expected outcomes, time-lines and contingency plans for each prisoner on the mental health caseload. Typically, a treatment plan lists a diagnosis or describes an emotional problem that will be the focus of treatment; identifies the treatment modalities that are to occur (group therapy, psychotropic medications, etc.); designates a place where the treatment will occur (in jail, a housing assignment, or transfer into or out of Observation), the steps to be taken to insure the patient's safety (e.g. constant observation or 15 minute checks), the kinds of outcomes that are to be monitored (e.g. the patient will no longer be suicidal, or no longer hallucinating), the time-frame for the phase of treatment being planned (we will keep the patient in Observation with 15 minute checks for 48 hours, and if no improvement is noted we will transfer him or her to a location where more intensive mental health treatment will occur); and there must be a plan for the

future stages of treatment (for example, after two days in Observation, if there is no improvement she will be transferred to the psychiatric hospital, or if she calms down and is no longer overtly suicidal, she can be reduced to checks every thirty minutes, and later can be seen daily by mental health staff, etc.)  The treatment plan can be documented in the progress notes written by clinicians, or it can be covered in a separate form designated a treatment plan.  Many jails, by policy, require a treatment plan form be filled out with a date of initiation and a date when it is no longer applicable or needs to be reviewed.  I did not find any thorough treatment plan in Ms. Rusher's medical and mental health chart at the jail. There are notes that would constitute a part of a treatment plan.  For example, Mr. Shmikler writes in a progress note that Ms. Rusher is at high risk of self-harm and must be maintained on "high risk" status.  This is the beginning of a treatment plan, but is certainly incomplete and inadequate as a treatment plan.  There is no mention of the expected outcome of placing Ms. Rusher on "high risk" status, no delineation of the treatment she is to undergo, and no assignment of a time limit after which, if she remains a high risk of self-harm, she will be transferred to a more intensive mental health program.  Dr. Abraham, the medical practitioner at Sangamon County Jail, testifies in his deposition that he would write treatment plans in the form of a S-O-A-P (Subjective-Objective-Assessment-Plan) note in the progress notes.  But his are medical plans, not mental health.  He responds to a question whether there is any comparable plan by mental health staff at the jail, "That they, no, wouldn't execute the plan, no…. it was more, I believe it was more observations, that they would report their observations, and their suggestions, but not a plan, no" (Abraham Deposition, p. 96).  Again, a required component of an

adequate treatment plan for someone as repeatedly self-harming as Ms. Rusher is the steps for de-intensifying monitoring as she responds to treatment and becomes less at risk.  When there is no adequate treatment plan in place, there is real danger that a patient like Ms. Rusher will be removed from Observation status with no incrementally lessened but structured monitoring, and she will simply kill herself in a less restrictive and unmonitored setting.  The fact is that Ms. Rusher was either on Observation (inadequate observation, she should have been on constant observation when acutely suicidal, not every 15 minute observation) and then removed from Observation with a treatment plan indicating incrementally diminishing levels of Observation, as befit her clinical condition and immediate risk of suicide or self-harm.  Lindsay Hayes includes this statement in his comprehensive recommendations on jail suicides:

> Finally, because of the strong correlation between prior suicidal behavior and suicide, and to safeguard the continuity of care for suicidal inmates, all inmates who are discharged from suicide precautions should remain on mental health caseloads and receive regularly scheduled follow-up assessments by mental health personnel until they are released from custody. Although there is no nationally accepted schedule for follow-up, a suggested assessment schedule following discharge from suicide precautions might be: daily for 5 days, once a week for 2 weeks, and then once a month until release.[14]

---

[14] Hayes, Lindsay (2010). National Study of Jail Suicides: Fifty Years Later, National Center on Institutions and Alternatives,  p.51

But there really was no adequate treatment plan for Ms. Rusher at the jail, none of the mental health clinicians looked at her entire clinical course and created an adequate treatment plan. That plan, for example, would have stated that if she continues to repeatedly pose a very high risk of self-harm, after a few attempts to treat her in Observation and prevent further episodes of suicide crisis, she needs to be transferred to a psychiatric hospital. That plan should have called for a consultation by a psychiatrist, something that was very indicated but never happened at the jail. The plan could include an item stating that, after the first use of Observation, if the patient is acutely suicidal again a psychiatrist needs to be brought in to do a thorough assessment or she needs to be admitted to a psychiatric hospital. Again, Ms. Rusher spent almost all of her time at the jail, either on Observation with 15 minute checks or in a lockdown or solitary confinement cell, with no psychiatrist or psychologist involved in her assessment or treatment. After Observation was deemed no longer necessary, she should absolutely not have been returned to solitary confinement because solitary confinement is well-known to exacerbate suicidal behavior.

12. In an inpatient setting such as a psychiatric hospital, the suicidal patient is not permitted to spend much time alone in her cell or room. Participation in congregate activities including informal interactions in a dayroom and formal participation in group therapy are encouraged strenuously by staff, who will go into a room where a patient is isolating herself and insist the patient come out of her room and participate in the ward group activities. Dr. Ajay Jeetwani, the psychiatrist at MacFarland Mental Health Center, discusses in his deposition this aspect of hospital treatment. For example, at pp. 66-67, Dr. Jeetwani says, "And then they

would be called for meals, lunch, dinner, snack, breakfast. Uh, there would
be groups on the unit in the morning and afternoon for the clients and
they would be invited to attend.  There is engagement staff for clients
who are reclusive or not doing so well to talk to them, to engage them, to
encourage them to, say, go on the patio, as long as they are safe to
themselves or to, you know, play word games, crosswords, something to
keep them busy."  Nothing like that occurred in the Sangamon County Jail,
and meanwhile Ms. Rusher remained in her cell, mostly naked and inactive,
for many weeks before finally taking her own life. This is tragic, and could
have been prevented had the jail staff simply declared after several days
of suicide observation that Ms. Rusher remained a very high suicide risk
and needed to be transferred to a higher level of care, i.e. a psychiatric
hospital.

13. Contrasting treatment for Ms. Rusher at McFarland Mental Health Center
and at the Sangamon County Jail, it is quite clear that the treatment she
received at McFarland was adequate and the treatment she received at
Sangamon County Jail was quite inadequate.  According to Dr. Jeetwani, at
McFarland Ms. Rusher did exhibit recurrent self-harm and assaultiveness.
Each time she seemed imminently self-harming or assaultive she would be
restricted to her room and placed on one-to-one observation, but then,
when she returned to a calm state, she would immediately be released
from the high level of restrictions and encouraged to participate in
congregate activities within the ward's treatment milieu.  Contrast this
with her isolation status at the Sangamon County Jail, the minimal contact
she had with treatment staff, the lack of contact with a psychiatrist and
the very occasional brief interactions she had with Mr. Shmikler through a

locked cell door. Yes, Ms. Rusher was a difficult, or "high profile" patient and prisoner. But there are minimum standards for the treatment of difficult patients when they are at high risk of suicide, and those standards were met at McFarland Mental Health Center while the treatment she received at Sangamon County Jail was essentially limited to unacceptably lengthy solitary confinement in a "high risk" cell and sporadic visits at cell-front with a mental health clinician. It is a grave mistake to assume that the treatment she received at McFarland failed because she would subsequently attempt self-harm or assault again. At McFarland, every effort was made to avoid "seclusion," and when she did require seclusion as an "extreme measure," she would be constantly observed while in brief seclusion and very soon released to join congregate ward activities as soon as possible. This kind of hospital psychiatric treatment is effective in preventing suicide, while isolation in a jail is correlated with a very high rate of suicide. In other words, no matter how difficult the patient is to manage, consistent therapeutic interventions like those she received at McFarland are the required mental health intervention with the greatest chance of eventual success at reducing self-harming and assaultive behavior, while prolonged solitary confinement of the kind she underwent at Sangamon County Jail, with less than adequate mental health treatment, is known to greatly increase risk of jail suicide. Dr. Jeetwani testified in no uncertain terms at deposition that McFarland Mental Health Center would have re-admitted Ms. Rusher (Jeetwani deposition, p. 217 and 222); and Dr. Kathleen Treanor, the physician responsible for medical care at McFarland, testified at deposition that McFarland is a facility equipped to deal with people at high risk of suicide (Treanor deposition, pp. 36-37).

14. Ms. Rusher presented a very difficult situation for custody and correctional mental health staff. She was known to present a very serious risk of suicide. She had repeatedly tried to harm herself or take her own life while incarcerated in the I.D.O.C. And even during a civil commitment at the McFarland Mental Health Center, she attempted self-harm or suicide and assaulted others. So I am not saying that it would be easy to treat Ms. Rusher and prevent her suicide. She presented an extremely difficult and dangerous clinical situation, and staff at the jail did not make sufficient attempts to keep her safe. It is entirely obvious that jails today need to be prepared to manage and treat difficult individuals like Ms. Rusher. The unmistakable reality is that there are more people with serious mental illness in our jails and prisons than there are in our psychiatric hospitals. Suicide is an especially high-risk development with so many people suffering from serious mental illness finding their way into jails. All standards in the field of correctional mental health require that there be provisions for the transfer of individuals in acute psychiatric crisis (involving suicide, psychosis or mania, for example) from jail to a psychiatric hospital or a crisis center where the psychiatric emergency can be properly treated. An individual who was as obviously disturbed as Ms. Rusher and as much of a known suicide risk, after a very few days of trying to retain her in the jail on observation/high risk status (with more robust mental health treatment than she received at Sangamon County Jail), should have been transferred to the highest level of care available, i.e. a mental health ward or hospital, because treatment in that more intensive treatment setting would be most likely to achieve treatment aims and prevent suicide.

39

Respectfully submitted,

Terry A. Kupers, M.D., M.S.P.

# Curriculum Vitae

## Terry Allen Kupers, M.D., M.S.P.

Office Address:
*484 Lake Park Ave, #338, Oakland, California 94610*
phone: 510-654-8333      email: kupers@igc.org

Institute Professor, Emeritus, Graduate School of Psychology,
   The Wright Institute
      2728 Durant Avenue, Berkeley, California 94704

Born: ███████ 1943, Philadelphia, Pennsylvania

Education:
B.A., With Distinction, Psychology Major, Stanford University, 1964
M.D., U.C.L.A. School of Medicine, 1968
M.S.P. (Masters in Social Psychiatry), U.C.L.A., 1974

Training:
Intern (Mixed Medicine/ Pediatrics/ Surgery), Kings County Hospital/Downstate Medical
      Center, Brooklyn, New York, 1968-1969.
Resident in Psychiatry, U.C.L.A. Neuropsychiatric Institute, Los Angeles, 1969-
      1972
Registrar in Psychiatry, Tavistock Institute, London (Elective Year of U.C.L.A.
      Residency) 1971-1972
Fellow in Social and Community Psychiatry, U.C.L.A. Neuropsychiatric Institute, 1972-
      1974

License: California, Physicians & Surgeons, #A23440, 1968-

Certification: American Board of Psychiatry and Neurology (Psychiatry, #13387), 1974-

Honors:
Alpha Omega Alpha, U.C.L.A. School of Medicine,1968.
Distinguished Life Fellow, American Psychiatric Association
Listed: Who's Who Among Human Services  Professionals (1995-); Who's Who in
      California (1995-);  Who's Who in The United States  (1997-);  Who's Who in
      America (1998-); International Who's Who in  Medicine (1995-);  Who's Who in
      Medicine and Healthcare (1997-);  The National Registry of Who's Who (2000-);
      Strathmore's Millenial Edition, Who's Who; American Biographical Institute's
      International Directory of Distinguished Leadership; Marquis' Who's Who in the
      World (2004-); Marquis' Who's Who in Science and Engineering, (2006-); Who's
      Who Among American Teachers & Educators (2007-); The Global Directory of
      Who's Who (2012-); International Association of Healthcare Professionals' The
      Leading Physicians (2012-).

Helen Margulies Mehr Award, Division of Public Interest (VII), California Psychological
    Association, Affiliate of American Psychological Association, March 30, 2001.
Stephen Donaldson Award, Stop Prisoner Rape (Just Detention, Int'l), 2002.
Exemplary Psychiatrist Award, National Alliance for the Mentally Ill, 2005
William Rossiter Award for "global contributions made to the field of forensic mental
    health," Annual Meeting, Forensic Mental Health Association of California,
    March 18,2009, Monterey, California
Albert Nelson Marquis Lifetime Achievement Award, Marquis Who's Who, 2018-

Clinical Practice:
Los Angeles County, SouthEast Mental Health Center, Staff Psychiatrist,  1972-1974
Martin Luther King, Jr. Hospital, Department of Psychiatry, Los Angeles; Staff
    Psychiatrist and Co-Director, Outpatient Department, 1974-1977.
Contra Costa County, Richmond Community Mental Health Center, Staff Psychiatrist
    and Co-Director, Partial Hospital, 1977-1981
Private Practice of Psychiatry, Los Angeles and Oakland, 1972 to present

Teaching:
Assistant Professor, Department of Psychiatry and Human Behavior, Charles Drew
    Postgraduate Medical School, Los Angeles,  and Assistant Director, Psychiatry
    Residency Education, 1974-1977.
Institute Professor, Graduate School of Psychology, The Wright Institute, Berkeley,
    1981 to present
Courses Taught at: U.C.L.A. Social Science Extension, California School of
    Professional Psychology (Los Angeles), Goddard Graduate School (Los
    Angeles), Antioch-West (Los Angeles), New College Graduate School of
    Psychology (San Francisco).

Professional Organizations:
American Psychiatric Association (Distinguished Life Fellow); Northern California
    Psychiatric Society; East Bay Psychiatric Association (President, 1998-1999);
    American Orthopsychiatric Association (Fellow); American Association of
    Community Psychiatrists; Physicians for Social Responsibility; American
    Academy of Psychiatry and the Law.

Committees and Offices:
Task Force on the Study of Violence, Southern  California Psychiatric Society, 1974-
    1975
Task Force on Psychosurgery, American Orthopsychiatric Association, 1975-1976
California Department of Health Task Force to write "Health Standards for Local
    Detention Facilities," 1976-77
Prison/ Forensic Committee, Northern California Psychiatric Society,  1976-1981;
    1994-
Psychiatry Credentials Committee, Alta Bates Medical Center, Berkeley, 1989-1994
    (Chair, Subcommittee to Credential Licensed Clinical Social Workers)
President, East Bay Chapter of Northern California Psychiatric Society, 1998-1999

Co-Chair, Committee on Persons with Mental Illness Behind Bars of the American
     Association of Community Psychiatrists, 1998-2003

Consultant/Staff Trainer:
Contra Costa County Mental Health Services; Contra Costa County Merrithew
     Memorial Hospital Nursing Service; Bay Area Community Services, Oakland;
     Progress Foundation, San Francisco; Operation Concern, San Francisco; Marin
     County Mental Health Services; Berkeley Psychotherapy Institute; Berkeley
     Mental Health Clinic; Oregon Department of Mental Health; Kaiser Permanente
     Departments of Psychiatry in Oakland, San Rafael, Martinez and Walnut Creek;
     Human Rights Watch, San Francisco Connections collaboration (Jail Psychiatric
     Services, Court Pre-Trial Diversion, CJCJ and Progress Foundation); Contra
     County Sheriff's Department Jail Mental Health Program.

     Consultant to Protection & Advocacy, Inc. (Disability Rights), re Review of State
     Hospital Suicides
     National Advisory Panel, The Equitas Project, Denver, CO

Forensic Psychiatry (partial list):
Testimony in Madrigal v. Quilligan, U.S. District Court, Los Angeles, regarding
     informed consent for surgical sterilization, 1977
Testimony in Rutherford v. Pitchess, Los Angeles Superior Court, regarding conditions
     and mental health services in Los Angeles County Jail, 1977
Testimony in Hudler v. Duffy, San Diego County Superior Court, regarding conditions
     and mental health services in San Diego County Jail, 1979
Testimony in Branson v. Winter, Santa Clara County Superior Court, regarding
     conditions and mental health services in Santa Clara County Jail, 1981
Testimony in Youngblood v. Gates, Los Angeles Superior Court, regarding conditions
     and mental health services in Los Angeles Police Department Jail, 1982
Testimony in Miller v. Howenstein, Marin County Superior Court, regarding conditions
     and mental health services in Marin County Jail, 1982
Testimony in Fischer v. Geary, Santa Clara County Superior Court, regarding
     conditions and mental health services in Santa Clara County Women's
     Detention Facility, 1982
Testimony in Wilson v. Deukmejian, Marin County Sup Court, regarding conditions and
     mental health services at San Quentin Prison, 1983
Testimony in Toussaint/Wright/Thompson v. Enomoto, Federal District Court in San
     Francisco, regarding conditions and double-celling in California State Prison
     security housing units, 1983
Consultant, United States Department of Justice, Civil Rights Division, regarding
     conditions and mental health services in Michigan State Prisons, 1983-4
Testimony in Arreguin vs. Gates, Federal District Court, Orange County, regarding
     "Rubber Rooms" in Orange County Jail, 1988
Testimony in Gates v Deukmejian, in Federal Court in Sacramento, regarding
     conditions, quality of mental health services and segregation of inmates with
     HIV positivity or AIDS at California Medical Facility at Vacaville, 1989

Testimony in Coleman v. Wilson, Federal Court in Sacramento, regarding the quality of mental health services in the California Department of Corrections' statewide prison system, 1993

Testimony in Cain v. Michigan Department of Corrections, Michigan Court of Claims, regarding the effects on prisoners of a proposed policy regarding possessions, uniforms and classification, 1998

Testimony in Bazetta v. McGinnis, Federal Court in Detroit, regarding visiting policy and restriction of visits for substance abuse infractions, 2000

Testimony in Everson v. Michigan Department of Corrections, Federal Court in Detroit, regarding cross-gender staffing in prison housing units, 2001

Testimony in Jones 'El v. Litscher, Federal Court in Madison, Wisconsin, regarding confinement of prisoners suffering from severe  mental  illness in supermax, 2002

Testimony in Russell v. Johnson, Federal Court in Oxford, Mississippi, regarding conditions of confinement and treatment prisoners with mental illness on Death Row at Parchman, 2003

Testimony in Austin v. Wilkinson, Federal Court in Cleveland, Ohio, regarding proposed transfer of Death Row into Ohio State Penitentiary (supermax), August, 2005

Testimony in Roderick Johnson v. Richard Watham, Federal Court in Wichita Falls, Texas, regarding staff responsibility in case of prison rape, September, 2005

Testimony in Presley v. Epps, No. 4:05CV148-JAD, N.D., Oxford, Mississippi, 2005 & 2007, involving consitions in Supermax Unit 32 at Mississippi State Penitentiary and Treatment of Prisoners with Serious Mental Illness.

Testimony in DAI, Inc. v. NYOMH, Federal Court, So. Dist. NY, April 3, 2006,  regarding mental health care in NY Dept. of Correctional Services

Testimony in Neal v. Michigan DOC, State of Michigan, Circuit Court for the County of Washtenaw, January 30, 2008, File No. 96-6986-CZ, regarding custodial misconduct & sexual abuse of women prisoners

Testimony in Hadix v. Caruso, No. 4:92-cv-110, USDistCt, WDistMichiganTestimony, USDistCt, WDistMichigan, Grand Rapids, Michigan, regarding mental health care in prison, April 29, 2008

Testimony in John Doe v. Michigan D.O.C., Detroit, 2014.

Testimony in A.B. v. WA State Dept Soc'l & Health Services, USDistCtWDistWA, No. 14-cv-011 78-MJP, Seattle, March 17, 2015, regarding Competency Evaluations and Competency Restoration Treatment

Testimony (deposition) in Ashker v. Governor of California, USDistCtNoDistCA, Oakland, No. C 09-05796 CW, 2015, regarding confinement in excess of 10 years in Security Housing Unit at Pelican Bay State Prison.

Testimony in Dockery v. Hall, USDistCtSoDistMississippi, Jackson, No. 3:13CV326WHB-JCG, March 14-15, 2018, regarding psychiatric effects of conditions in solitary confinement Unit at Eastern Mississippi Correctional Facility.

Testimony (deposition) in John Doe et al. v. Michigan DOC, et al., Washtenaw County (MI) Circuit Court, Case Nos. 13-1196-CZ and 15-1006-CZ, August 7 & 8, 2019, Oakland, CA.

Journal Editorial Positions:
Men and Masculinities, Editorial Advisory Panel (in the past)
Juvenile Correctional Mental Health Report, Editorial Board (in the past)
Correctional Mental Health Report, Contributing Editor (current)

Presentations and Lectures (partial list):
"Expert Testimony on Jail and Prison Conditions." American Orthopsychiatric
    Association Annual Meeting, San Francisco, March 30, 1988, Panel 137: "How
    Expert are the Clinical Experts?
"The Termination of Psychotherapy." Psychiatry Department Grand Rounds,
    Mills/Peninsula Hospitals, Burlingame, February 24, 1989.
"Big Ideas, and Little Ones." American Psychiatric Association Annual Meeting, San
    Francisco, April, 1989.
"Men in Psychotherapy." Psychiatry Department Grand Rounds, Mills/Peninsula
    Hospitals, Burlingame, September 29, 1989.
"Psychodynamic Principles and Residency Training in Psychiatry." The Hilton Head
    Conference, Hilton Head Island, South Carolina, March 15, 1991.
Panelist: "The Mentally Ill in Jails and Prisons," California Bar Association Annual
    Meeting, Annaheim, 1991.
"The State of the Sexes: One Man's Viewpoint." The Commonwealth Club of California,
    San Mateo, March 25, 1992.
Keynote Address: "Feminism and the Family." 17th National Conference on Men and
    Masculinity, Chicago, July 10, 1992.
Panel Chair and Contributor: "Burnout in Public Mental Health Workers." Annual
    Meeting of the American Orthopsychiatric Association, San Francisco, May 22,
    1993.
Panel Chair and Contributor: "Socioeconomic Class and Mental Illness." Annual
    Meeting of the American Psychiatric Association, San Francisco, May 26, 1993.
"Public Mental Health." National Council of Community Mental Health Centers Training
    Conference, San Francisco, June 12, 1993.
Psychiatry Department Grand Rounds: "Men's Issues in Psychotherapy." California
    Pacific Medical Center, San Francisco, February 24, 1993.
"The Effect of the Therapist's Gender on Male Clients in Couples and Family
    Therapy." Lecture at Center for Psychological Studies, Albany, California, April
    15, 1994.
"Pathological Arrhythmicity and Other Male Foibles." Psychiatry Department Grand
    Rounds, Alta Bates Medical Center, June 7, 1993.
Roger Owens Memorial Lecture. "Prisons and Mental Illness." Department
    of          Psychiatry, Alta Bates Medical Center, March 6, 1995.
Keynote Address: "Understanding Our Audience: How People Identify with
    Movements and Organizations." Annual Conference of the Western Labor
    Communications Association, San Francisco, April 24, 1998.
"Men in Groups and Other Intimacies." 44th Annual Group Therapy Symposium,
    University of California at San Francisco, November 6, 1998.
"Men in Prison." Keynote, 24th Annual Conference on Men and Masculinity, Pasadena,

July 10, 1999.

"Trauma and Posttraumatic Stress Disorder in Prisoners" and "Prospects for Mental Health Treatment in Punitive Segregation." Staff Training Sessions at New York State Department of Mental Health, Corrections Division, at Albany, August 23, 1999, and at Central New York Psychiatric Institution at Utica, August 24.

"The Mental Health Crisis Behind Bars." Keynote, Missouri Association for Social Welfare Annual Conference, Columbia, Missouri, September 24, 1999.

"The Mental Health Crisis Behind Bars." Keynote, Annual Conference of the Association of Community Living Agencies in Mental Health of New York State, Bolton Landing, NY, November 4, 1999.

"Racial and Cultural Differences in Perception Regarding the Criminal Justic Population." Statewide Cultural Competence and Mental Health Summit VII, Oakland, CA, December 1, 1999.

"The Criminalization of the Mentally Ill," 19th Annual Edward V. Sparer Symposium, University of Pennsylvania Law School, Philadelphia, April 7, 2000.

"Mentally Ill Prisoners." Keynote, California Criminal Justice Consortium Annual Symposium, San Francisco, June 3, 2000.

"Prison Madness/Prison Masculinities," address at the Michigan Prisoner Art Exhibit, Ann Arbor, February 16, 2001.

"The Mental Health Crisis Behind Bars," Keynote Address, Forensic Mental Health Association of California, Asilomar, March 21, 2001.

"Madness & The Forensic Hospital," grand rounds, Napa State Hospital, 11/30/01.

Commencement Address, The Wright Institute Graduate School of Psychology, June 2, 2002.

"Mental Illness & Prisons: A Toxic Combination," Keynote Address, Wisconsin Promising Practices Conference, Milwaukee, 1/16/02.

"The Buck Stops Here: Why & How to Provide Adequate Services to Clients Active in the Criminal Justice System," Annual Conference of the California Association of Social Rehabilitation Agencies, Walnut Creek, California, 5/2/02.

Keynote Address, "Mental Illness in Prison," International Association of Forensic Psychotherapists, Dublin, Ireland, May 20, 2005

Invited Testimony (written) at the Vera Institute of Justice, Commission on Safety and Abuse in America's Prisons, Newark, NJ, July 19, 2005

Invited Testimony at the National Prison Rape Elimination Commission hearing in San Francisco, August 19, 2005

Lecture, Prisoners with Serious Mental Illness: Their Plight, Treatment and Prognosis," American Psychiatric Association Institute on Psychiatric Services, San Diego, October 7, 2005

Grand Rounds, "The Disturbed/Disruptive Patient in the State Psychiatric Hospital," Napa State Hospital, June 26, 2007

Lecture, "Our Drug Laws Have Failed, Especially for Dually Diagnosed Individuals," 19 Annual Conference, California Psychiatric Association, Huntington Beach, CA, October 6, 2007

Panel: "Mental Health Care and Classification," Prison Litigation Conference, George Washington University Law School, Washington, D.C., March 28, 2008.

Keynote Address: "Winning at Rehabilitation," Annual Meeting of the Forensic Mental

Health Association of California, Monterey, California, March 18, 2009

Panel: "Construction of Masculinity and Male Sexuality in Prison," UCLA Women's Law Journal Symposium, Los Angeles, April 10, 2009

Panel: "Solitary Confinement in America's Prisons," Shaking the Foundations Conference, Stanford Law School, October 17, 2009.

Commencement Address, San Francisco Behavioral Health Court Graduation Ceremony, October 21, 2009.

Panel: "Negotiating Settlements of Systemic Prison Suits," Training & Advocacy Support Center, Protection & Advocacy Annual Conference, Los Angeles, June 8, 2010.

Grand Rounds, "Recidivism or Rehabilitation in Prison?," Alta Bates Summit Medical Center, November 1, 2010

Keynote Address: "Prison Culture & Mental Illness: a Bad Mix," University of Maryland Department of Psychiatry Cultural Diversity Day, Baltimore, Maryland, March 24, 2011.

Grand Rounds, "The Role of Misogyny & Homophobia in Prison Sexual Abuse," Alta Bates Summit Medical Center, October 17, 2011

Special Guest, "Offering Hope and Fostering Respect in Jail and Prison," 2011 ZIA Partners UnConvention, Asilomar Conference Center, October 24, 2011.

Invited Lecture, "Suicide Behind Bars: The Forgotten Epidemic," 2011 Institute on Psychiatric Services, American Psychiatric Association, San Francisco, October 28, 2011.

Lecture: "How Can We Help Persons with Mental Illness in the Criminal Justice System?," Solano County Re-entry Council, Fairfield, CA, January 15, 2012.

Lecture:  "The Prison System in the U.S.A.: Recent History and Development, Structure, Special Issues," Conference of the American Bar Association Rule of Law Initiative, Cross-National Collaboration: Protecting prisoners in the US and Russia, Moscow, Russia, January 20, 2012.

Continuing Medical Education (CME) Presentation: "Correctional Psychiatry Overview," The Center for Public Service Psychiatry of Western Psychiatric Institute and Clinic (co-sponsored by the American Association of Community Psychiatrists), national videoconference originating in Pittsburg, PA, February 2, 2012.

Grand Rounds, "Mental Health Implications of the Occupy Movement," Alta Bates Summit Medical Center, October 8, 2012

Invited Speaker: "Solitary Confinement: Medical and Psychiatric Consequences," Session: Multi-Year Solitary Confinement in California and the Prisoner Hunger Strikes of 2011-2012, American Public Health Association Annual Meeting, Moscone Convention Center, San Francisco, October 29, 2012.

Keynote Address:  "Solitary Confinement and Mental Health," Conference of the Midwest Coalition for Human Rights, Northeastern Illinois University, Chicago, November 9, 2012.

Symposium Presentation: "The Experience of Individuals with Mental Illness in the Criminal Justice System," American Psychiatric Association Annual Meeting, Moscone Center, San Francisco, May 20, 2013.

Presentation:  Incarceration and Racial Inequality in the U.S., Roundtable on the Role of Race and Ethnicity Among Persons Who Were Formerly Incarcerated,

California Institute for Mental Health, Sacramento, California, February 28, 2014.

Testimony at Nevada Advisory Commission on the Administration of Justice on Isolated Confinement, Las Vegas, Nevada, March 5, 2014.

Lecture, "The Death Penalty and Mental Health," General Assembly of the World Coalition Against the Death Penalty, San Juan, Puerto Rico, June 21, 2014.

Staff Training: "Ethical Care in Managing and Treating the Disturbed/Disruptive Patient," Napa State Hospital, October 2, 2014.

Lecture: "The Multiple Traumas of Youth in Detention," American Psychiatric Association Institute on Psychiatric Services, San Francisco, November 1, 2014.

Guest Expert: Community Psychiatry Forum: "The Social, Economic and Political Impact of Incarceration."; The Center for Public Service Psychiatry at the University of Pittsburg, and the American Association of Community Psychiatrists, video-conference from Pittsburg, March 12, 2015.

Lecture: "The Struggles of People with Mental Illness in Jails," The Mental Health Board of San Francisco, San Francisco Department of Public Health, September 16, 2015.

Lecture: "A Psychoanalytic Response to the Effects of Forced Isolation in the Age of Mass Incarceration," Northern California Society for Psychoanalytic Psychology, Scientific Meeting, San Francisco, April 2, 2016.

Panel: "Mental Health, Neuroscience and the Physical Environment," Academy of Neuroscience for Architecture Conference, September 23, 2016, Salk Institute, University of California at San Diego.

Paper presentation: "Gender and Domination in Prison," Law Review Symposium on Gender and Incarceration, Western New England School of Law, Springfield, MA, October 14, 2016.

Presentation, " Working with Experts: An Expert and Lawyer Conversation," with Rachel Higgins, New Mexico Criminal Defense Lawyers' Association, Solitary Confinement & Prisoner Civil Rights, Albuquerque, New Mexico, May 5, 2017.

Keynote Address: "Corrections, Solitary Confinement and Prisoner Mental Health," Conference on Supporting Prisoner Mental Health, Vancouver, British Columbia, June 2, 2017.

Webinar, "The Humane Imperative: Ending Solitary Confinement. SAMHSA & NAMI, July 27,2017.

Lecture, "Masculinity Behind Bars: Violence on the Yards, Terror in Isolation," Center for the Study of Men and Masculinities, SUNY Stony Brook, delivered at Fordham University, Manhattan, October 24, 2017.

Lecture and Panel, "Solitary Confinement," Georgetown University, January 16, 2018

Participant, "National Summit on Mental Health & Criminal Justice Law & Policy," sponsored by the Equitas Project at Georgetown University, Washington, D.C., Jan. 17-18, 2018.

Featured Speaker, "Mental Illness and the Criminal Justice System," NAMI (National Alliance on Mental Illness), Contra Costa County, Feb 21, 2018

Presentation, "The Harm of Solitary Confinement," Washington State House Of Representatives, Public Safety Committee (by video), March 5, 2019.

Panel: "Solitary Confinement," University of California Human Rights Law Student Association and National Lawyers' Guild, University of California School of Law,

Boalt Hall, Berkeley, March 5, 2019.

Panel: "Knowledge and Power: Contending with Science in Psychiatry," annual
meeting of the American Psychiatric Association, San Francisco, May 19, 2019.

Panel: "Psychologists and Mass Incarceration," Healing Justice: Ending Mass
Incarceration Conference, The Wright Institute, Berkeley, November 2, 2019.

Books Published:

Public Therapy: The Practice of Psychotherapy in the Public Mental Health Clinic. New
York: Free Press/ MacMillan, 1981. Re-published as e-Book, 2015, at
<http://www.freepsychotherapybooks.org/product/208-public-therapy-the-
practice-of-psychotherapy-in-the-public-mental-health-clinic/category_pathway-
14>

Ending Therapy: The Meaning of Termination. New York: New York University Press,
1988. Re-published as e-Book, 2014, at
<http://freepsychotherapybooks.org/product/118-ending-therapy-the-meaning-
of-termination>

(Editor): Using Psychodynamic Principles in Public Mental Health. New Directions
for Mental Health Services, vol. 46. San Francisco: Jossey-Bass, 1990.

La Conclusione della Terapia: Problemi, metodi, conseguenze. Rome: Casa Editrice
Astrolabio, 1992. (trans. of Ending Therapy.)

Revisioning Men's Lives: Gender, Intimacy and Power. New York: Guilford
Publications, 1993. (trans. into Chinese, 2000; re-published as e-Book, 2014, at
<http://www.freepsychotherapybooks.org/product/117-revisioning-men-s-lives-
gender-intimacy-and-power/category_pathway-14)>

Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About
It. San Francisco: Jossey-Bass/Wiley, 1999.

(Co-Editor & contributor): Prison Masculinities. Philadelphia: Temple University Press,
2001.

Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It. Berkeley,
CA: University of California Press, 2017.

Other Publications:

"The Depression of Tuberculin Delayed Hypersensitivity by Live Attenuated Mumps
Virus," Journal of Pediatrics, 1970, 76, 716-721.

Editor and Contributor, An Ecological Approach to Resident Education in Psychiatry,
the product of an NIMH Grant to the Department of Psychiatry and Human
Behavior, Drew Medical School, 1973.

"Contact Between the Bars - A Rationale for Consultation in Prisons," Urban Health,
Vol. 5, No. 1, February, 1976.

"Schizophrenia and History," Free Associations, No. 5, 1986, 79-89.

"The Dual Potential of Brief Psychotherapy," Free Associations, No. 6, 1986, pp. 80-99.

"Big Ideas, and Little Ones," Guest Editorial in Community Mental Health Journal,
1990, 26:3, 217-220.

"Feminist Men," Tikkun, July/August, 1990.

"Pathological Arrhythmicity in Men," Tikkun, March/April, 1991.

"The Public Therapist's Burnout and Its Effect on the Chronic Mental Patient." The Psychiatric Times, 9,2, February, 1992.

"The State of the Sexes: One Man's Viewpoint," The Commonwealth, 86,16, April, 1992.

"Schoolyard Fights." In Franklin Abbott, Ed., Boyhood. Freedom, California: Crossing Press, 1993; Univeristy of Wisconsin Press, 1998.

"Menfriends." Tikkun, March/April, 1993

"Psychotherapy, Neutrality and the Role of Activism." Community Mental Health Journal,1993.

"Review: Treating the Poor by Mathew Dumont." Community Mental Health Journal, 30(3),1994, 309-310.

"The Gender of the Therapist and the Male Client's Capacity to Fill Emotional Space." Voices, 30(3), 1994, 57-62.

"Soft Males and Mama's Boys: A Critique of Bly."  In Michael Kimmel, Ed., The Politics of Manhood: Profeminist Men Respond to the Mythopoetic Men's Movement (And Mythopoetic Leaders Respond).  Philadelphia: Temple University Press, 1995.

"Gender Bias, Countertransference and Couples Therapy." Journal of Couples Therapy, 1995.

"Jail and Prison Rape." TIE-Lines, February, 1995.

"The Politics of Psychiatry: Gender and Sexual Preference in DSM-IV." masculinities, 3,2, 1995, reprinted in Mary Roth Walsh, ed., Women, Men and Gender,  Yale University Press, 1997.

"What Do Men Want?, review of M. Kimmel's Manhood in America." Readings, 10, 4, 1995.

Guest Editor, issue on Men's Issues in Treatment, Psychiatric Annals,2,1, 1996.

"Men at Work and Out of Work," Psychiatric Annals, 2,1, 1996.

"Trauma and its Sequelae in Male Prisoners."  American Journal of  Orthopsychiatry, 66, 2, 1996, 189-196.

"Consultation to Residential Psychosocial Rehabilitation Agencies." Community Psychiatric Practice Section, Community Mental Health Journal, 3, July, 1996.

"Shame and Punishment: Review of James Gilligan's Violence: Our Deadly Epidemic and its Causes," Readings, Sept., 1996.

"Community Mental Health: A Window of Opportunity for Interracial Therapy," Fort/Da, 2,2,1996.

"Men, Prison, and the American Dream," Tikkun, Jan-Feb., 1997.

"Dependency and Counter-Dependency in Couples," Journal of Couples Therapy, 7,1, 1997, 39-47.  Published simultaneously in When One  Partner is Willing and the Other is Not,  ed. Barbara Jo Brothers, The Haworth Press, 1997, pp. 39-47.

"Shall We Overcome: Review of Jewelle Taylor Gibbs' Race and Justice," Readings, December, 1997.

"The SHU Syndrome and Community Mental Health," The Community Psychiatrist, Summer, 1998.

"Review of Jerome Miller's Search and Destroy," Men and Masculinities, 1, 1, July, 1998.

"Will Building More Prisons Take a Bite Out of Crime?," Insight, Vol. 15, No. 21, June 7, 1999.

"The Mental Health Crisis Behind Bars," Harvard Mental Health Letter, July, 2000.

"Mental Health Police?," Readings, June, 2000.

"The Men's Movement in the U.S.A.," in Nouvelles Approches des Hommes et du Masculine, ed. Daniel Weizer-Lang, Les Presses Universitaires du Mirail, Toulouse, France, 2000.

"Symptoms, Meanings and Social Progress," Voices, 36, 4, 2000.

"Psychotherapy with Men in Prison," in A New Handbook of Counseling & Psychotherapy Approaches for Men, eds. Gary Brooks and Glenn Good, Jossey-Bass, 2001.

"A Very Wise Decision by the Montana Supreme Court," Correctional Mental Health Report, 5,3, 35-36, Sept./Oct, 2003.

"Review of William Roller's The Dead are Dancing," Psychiatric Services, 54,11,1660-1661, 2003.

"The Future of Correctional Mental Health," Correctional Mental Health Report, 6,1, May/June, 2004.

"Foreword," David Jones (ed.): Working with Dangerous People: The Psychotherapy of Violence, Oxon, UK: Radcliffe Medical Press Ltd., 2004.

"Malingering in Correctional Settings," Correctional Mental Health Report, 5, 6, 81-, March/April, 2004.

"Prisons," in Michael Kimmel & Amy Aronson (eds.), Men & Masculinities: A Social, Cultural, and Historical Encyclopedia, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 630-633, 2004.

"Mental Illness," in Michael Kimmel & Amy Aronson (eds.), Men & Masculinities: A Social, Cultural, and Historical Encyclopedia, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 537-539, 2004.

"Toxic Masculinity as a Barrier to Mental Health Treatment in Prison," Journal of Clinical Psychology, 61,6,1-2, 2005.

"Posttraumatic Stress Disorder (PTSD) in Prisoners," in Managing Special Populations in Jails and Prisons, ed. Stan Stojkovic,Kingston, NJ: Civic Research Institute, 2005.

"Schizophrenia, its Treatment and Prison Adjustment," in Managing Special Populations in Jails and Prisons, ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005.

"The Prison Heat Issue," Correctional Mental Health Report, 7,2, July/August, 2005.

"How to Create Madness in Prison," in Humane Prisons, Ed. David Jones, Oxford: Radcliffe Publishing, 2006.

"Conditions on death row,Terrell Unit,Texas," in M. Mulvey-Roberts (Ed.), Writing for their lives: Death Row USA (pp. 69-77), Carbondale: University of Illinois Press, pp. 69-77, 2006.

"Prison madness in Mississippi," in M. Mulvey-Roberts (Ed.), Writing for their lives: Death Row USA, Carbondale: University of Illinois Press, pp. 281-287, 2006.

"Working with Men in Prison," In International Encyclopedia of Men and Masculinities, 1 vol., eds. M. Flood, J.K. Gardiner, B. Pease, and K. Pringle, London & New York: Routledge, 2007.

"Post-Incarceration Civil Commitments and Public Mental Health: An Essay," Correctional Mental Health Report, 9,4, 2007.

"Violence in Prisons, Revisited," Hans Toch & Terry Kupers, Journal of Offender Rehabilitation, 45,3/4, 49-54, 2007.

"Posttraumatic Stress Disorder in Prisoners," Correctional Health Care Report, Vol. 9, Nos. 2 & 3, January/February, 2008

"Prison and the Decimation of Pro-Social Life Skills," in The Trauma of Psychological Torture, Editor Almerindo E. Ojeda, Vol 5 of Disaster and Trauma Psychology Series, Series Editor Gilbert Reyes, Westport, Connecticut: Praeger, 2008

"What To Do With the Survivors?: Coping With the Long-Term Effects of Isolated Confinement." Criminal Justice and Behavior, Vol. 35 No. 8, August 2008, pp. 1005-1016

"Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs," T.A. Kupers, T. Dronet, M. Winter, et al., Criminal Justice and Behavior, October, 2009.

"Mutual Respect and Effective Prison Management," in Transforming Corrections: Humanistic Approaches to Corrections and Offender Treatment, Editors David Polizzi & Michael Braswell, Durham: Carolina Academic Press, pp. 121-134, 2009.

"Preparing an Expert's Report," Correctional Mental Health Report, 12,1, 2010

"Treating Those Excluded from the SHU," Correctional Mental Health Report, 12,4, 2010.

"The Role of Misogyny and Homophobia in Prison Sexual Abuse," UCLA Women's Law Journal, 18,1, 2010.

Stuart Grassian & Terry Kupers, "The Colorado Study vs. the Reality of Supermax Confinement," Correctional Mental Health Report, Vol. 13, No. 1, May/June, 2011

"Preparing an Expert's Report," in Practical Guide to Correctional Mental Health and the Law, by Fred Cohen (with Terry Kupers,) Kingston, NJ: Civic Research Institute, 2011

"The Role of Psychiatry in Correctional Settings: A Community Mental Health Model," Correctional Mental Health Report, Vol. 13, No. 3, September/October, 2011

"Testimony of Terry Kupers, M.D., at August 23, 2011 Hearing of California Assembly Public Safety Committee Regarding Conditions at Pelican Bay State Prison Security Housing Units," Correctional Law Reporter, Vol XXIII, No. 4, December/January 2012

"A Community Mental Health Model for Corrections," Correctional Mental Health Report, Vol. 13, No. 5, January/February, 2012

"Programming Cells are Neither the Problem nor the Solution," Correctional Mental Health Report, 2012

"Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?," The Routledge Handbook of International Crime and Justice Studies, Eds. Bruce Arrigo & Heather Bersot, Oxford: Routledge, 2013, pp. 213-232.

"The Psychiatrist's Obligation to Report Patient Abuse: A Dialogue with Fred Cohen,"

Correctional Mental Health Report, Vol 15, No. 5, Jan/Feb 2014

"Safety, Yes; Near Total Isolation and Idleness, No," Correctional Law Reporter, XXVI, No. 1, June/July 2014.

"A Community Mental Health Model in Corrections," Stanford Law & Policy Review, 26, 119-158, Spring, 2015.

Co-signatory, Brief of Amici Curiae, *Alfredo Prieto v. Harold C. Clarke,* Supreme Court of the U.S.A., No. 15-31, 2015.

Committee Member, Group for the Advancement of Psychiatry (GAP), *People With Mental Illness in the Criminal Justice System: A Cry for Help,* Washington, D.C.: American Psychiatric Association Press, 2016.

"How to Create Madness in Prison," in Hell is a Very Small Place, Editors Jean Casella, James Ridgeway & Sarah Shourd, New Press, 2016, pp. 163-178.

"The SHU Post-Release Syndrome," Correctional Mental Health Report, 17, 6, March/April, 2016.

"Alternatives to Long-Term Solitary Confinement," *Correctional Law Reporter*, Vol. XXVIII, No. 3, Oct. – Nov., 2016.

"Gender and Domination in Prison." *Western New England Law Review*, 39, 2017.

"The Asylum, The Prison and the Future of Community Mental Health," chapter in *Community Mental Health: Challenges for the 21st Century*, Editors  Jessica Rosenberg and Samuel J. Rosenberg, New York & London: Taylor & Francis/Routledge, 2017.

"Waiting Alone to Die,' In *Living on Death Row: The Psychology of Waiting to Die*, edited by Hans Toch, James Acker and V.M. Bonventre.  American Psychological Association Press, 2018.

"Posttraumatic Stress Disorder in Incarcerated Offenders, Treatment of," in the *Sage Encyclopedia of Criminal Psychology*, Sage Publications, 2019.

"Imprisonment and Stress," in the *Sage Encyclopedia of Criminal Psychology*, Sage Publications, 2019.

"Prospects for Correctional Mental Health Litigation," *Correctional Mental Health Report*, 21,4, November/December, 2019.

# Depositions and Court Testimony in Past Four Years by Terry A. Kupers, M.D.

Deposition in Ashker v. Brown, 4:09-cv-05796-CW (N.D. Cal., 2015), San Francisco, CA, 2015, case involving long-term solitary confinement at Pelican Bay State Prison.

Deposition & Trial Testimony in Trueblood v. Washington State Dept. of Social and Health Services, Case No. C14-1178-MJP, Seattle, WA, (Trial testimony March17, 2015), regarding length of wait for transfer to state hospital for individuals deemed incompetent by the court.

Deposition in James Kluppelberg **v. Burge**, No. 13 CV 3963 (N.D.Ill.), Civil case re wrongful conviction, 9/8/2015, in San Francisco

Testimony at trial in State of Ariz. v. Dennis Michael Levis, No. S-0700-CR-2013002559 (Ariz. Super. Ct. Maricopa Cty., 2016), sentencing phase of death penalty trial.

Deposition in Frank O.Connell v. J.D. Smith, Los Angeles County. Central Valley Court, 2:13-cv-01905, 3/20/17, in Emeryville, CA, re exoneration following false conviction

Testimony about Jason Peterson, San Mateo Sup Ct, Redwood City, June 29, 2017, regarding re-sentencing.

Testimony about Walter Cruz, San Francisco Immigration Court, December 18, 2017

Testimony in Dockery v. Hall, USDistCtSoDistMississippi, Jackson, No. 3:13CV326WHB-JCG, March 14-15, 2018, regarding psychiatric effects of conditions in solitary confinement Unit at Eastern Mississippi Correctional Facility.

Testimony in State v. Travis Smoot, Bakersfield Superior Court, Case No. BF164146A, March 20, 2019, criminal trial about murder of prisoner's cellmate.

Deposition in Jay Vermillion v. Mark Levenhagen, 1:15-cv-605-RLY-TAB, U.S.Dist.Ct,So.Dist.Indiana, in San Francisco, May 30, 20 about effects of Solitary Confinement at Westville Corr. Facil.

Deposition in William Richards v. County of San Bernadino et al, Case No. 5:17-cv-00497-SJO-SP, USDistCtCentralDistCA, in Oakland, July 19, 2019, re exoneration following false conviction.

Deposition in John Doe et al. v. Michigan DOC, et al., Washtenaw County (MI) Circuit Court, Case Nos. 13-1196-CZ and 15-1006-CZ, August 7 & 8, 2019, Oakland, CA.  Class action regarding effects on juveniles of incarceration in adult prison facilities.

Deposition in Luong v. Alameda County, USDistCtNoDistCA No: 3:17-cv-06675-EMC, September 5, 2019, Oakland, CA, re death in custody at Santa Rita Jail Facility.

Deposition in Finley v. Huss et al, USDISTCtWestDistMichigan, North Division, No. 2-18-cv-100, October 15, 2019, Oakland, CA, re self-harm in solitary confinement.