**IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| KELLI ANDREWS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cv-1100 |
| | ) | |
| COUNTY OF SANGAMON, et al., | ) | Hon. Sue E. Myerscough |
| | ) | |
| Defendants. | ) | Hon. Tom Schanzle-Haskins |

**PLAINTIFF'S STATEMENTS OF FACT AND
RESPONSE TO DEFENDANTS' STATEMENTS OF FACT**

Pursuant to Federal Rule of Civil Procedure 56 and local Rule 7.1, Plaintiff hereby submits the follow statements of fact and response to Defendants' statements of fact (Dkt. 177 at 3-10; Dkt. 180 at 3-29).

**PLAINTIFF'S STATEMENTS OF FACT**

Pursuant to Local Rule 7.1(D)(2)(b)(5), Plaintiff submits the following statement of material facts ("PSOF").

**The Defendants Were Informed that Tiffany Rusher
was Suicidal and Seriously Mentally Ill**

PSOF 1.        Tiffany Rusher was a patient at the McFarland Mental Health Center, in Springfield, IL from May to December 2016. On December 15, 2016, Tiffany Rusher was arrested on charges of assaulting another McFarland patient and was booked into the Sangamon County Jail.

PSOF 2.        Upon Ms. Rusher's arrest, McFarland mental health staff forwarded a discharge summary of Ms. Rusher's mental health history to the Jail.  (Exhibit 1.)

PSOF 3.      The McFarland discharge summary explained that Ms. Rusher was seriously mentally ill and a serious danger to herself.  The discharge summary detailed Ms. Rusher's mental health history and her prior incarceration by the Illinois Department of Corrections ("IDOC").

PSOF 4.      The McFarland discharge summary detailed Ms. Rusher's vulnerability to self-harm, including incidents from her incarceration at IDOC. The discharge summary stated that Ms. Rusher:

> has an extensive history of self-harming behaviors and suicide attempts prior to and throughout her incarceration.  Between 10-19-2014 to 04-14-2016 she made 10 attempts to hang herself/strangle herself and 12 incidents of self-injury (cutting, biting self, head banging), 3 incidents of swallowing ink pens or segregation pens, 7 incidents of choking herself on toilet paper, 5 incidents of blocking her airway with celery, and carrot sticks. On 04-06-2016, she swallowed a spork which was lodged so tight y in her throat that it had to be removed by endoscopy in Memorial Hospital in Springfield. She fought with rescue workers trying to save her life and reports indicate that if she did not have a partial airway she very well could have died. About 3 weeks prior to admission she swallowed a toothbrush. She was on constant watch in Logan since 09-11-2015. She was placed on a healthcare unit there, to be closer to nursing to allow for a more timely response to her frequent suicide attempts.

(Exhibit 1 at 895.)  The discharge summary also noted  that medical staff had assessed Ms. Rusher to have an "underdeveloped sense of self" and that "[s]he was noted to go from happy and cheerful to making a suicide attempt" after experiencing even a "trivial frustration[]." (Exhibit 1 at 895.)  Notably, the discharge summary indicated that Ms. Rusher had far fewer incidents of self-harm while at McFarland than at IDOC facilities.  (Exhibit 1 at 902.)

PSOF 5.      Ms. Rusher's discharge summary noted multiple mental health diagnoses. Her two primary diagnoses were Antisocial Personality Disorder and Other Specified Personality Disorder (Borderline Personality Traits), as well as an Unspecified Depressive Disorder and Post-traumatic Stress Disorder. (Exhibit 1 at 895.)

PSOF 6.     The McFarland discharge summary explained that Ms. Rusher was prescribed multiple medications during her time at McFarland, and that those medications had been adjusted frequently during her stay.  (Exhibit 1 at 901-902.)

PSOF 7.     The McFarland discharge summary indicated that the reason for Ms. Rusher's release was not clinical (e.g., that she "no longer met the criteria for inpatient hospitalization"); rather, that the sole reason for her discharge from McFarland was her arrest by law enforcement on battery charges.  (Exhibit 1 at 903.)

PSOF 8.     Neither Mr. Shmikler nor Dr. Abraham, Ms. Rusher's primary treatment providers at Sangamon Jail, appear to have read the discharge summary, been aware of its contents, nor made an effort to determine whether such a summary existed.  Indeed, nobody at the Jail appears to have read the discharge summary.  *See* PSOF ¶¶ 83-86 *infra.*  In addition, on the day after Ms. Rusher's admission to the Sangamon Jail, Jail personnel received a phone call from a nurse at McFarland, who explained that Tiffany had been provided one-to-one care at McFarland, that she had "pica and asphyxia for sexual satisfaction," and that she had made false sexual harassment allegations against male staff.  The nurse's note from the call does not reflect Ms. Rusher's mental illness diagnoses or her history of suicide attempts.  (Exhibit 2.)

## The Standard of Care for Managing Seriously Mentally Ill and Suicidal Inmates in Correctional Facilities

PSOF 9.     Plaintiff's psychiatric expert, Dr. Terry Kupers, is an expert on correctional mental health issues.  (Exhibit 3 at 1.)  Dr. Kupers explains that suicide is a very big problem in prisons and jails, and that consignment of prisoners to long-term isolation is a major driver of the suicide rate in those facilities.  (Exhibit 3 at 6.)

PSOF 10.    As Dr. Kupers explains, a disproportionate percentage of persons who commit suicide in jails or prisons are in some form of isolated confinement.  (Exhibit 3 at 6-7.)

PSOF 11.     Caring for a mentally ill inmate and preventing their suicide requires

multiple components, described at length in the expert reports of Dr. Kupers and Philip Stanley,

two of Plaintiff's experts.  (Exhibit 3 at 7-8; Exhibit 4 *passim*.)

**Isolation of Mentally Ill Inmates and the Necessary Limitations of Isolation**

PSOF 12.     Dr. Kupers has opined:

Isolation in a cell, even with staff checking on the prisoner's status vis a vis
suicide risk, must be time-limited. If the prisoner does not resolve the suicidal
crisis and/or does not become psychiatrically stable in a relatively short time
period (24 hours, 48 hours, or in some situations 72 hours), the treatment staff
need to assess the patient for a higher level of care, in most cases inpatient care.

(Exhibit 3 at 8-9.)

PSOF 13.     Dr. Kupers asserts that the standard of care for use of isolated observation

cells for suicidal inmates in correctional facilities is derived from the "crisis unit" and "hospital

within a hospital" models in the community.  (Exhibit 3 at 9.)  Additionally, Dr. Kupers explains

that hospitals have crisis units for patients "to receive time limited-intensive urgent care."  (*Id.*)

However, time in such units is short:

controlling rule is that no patient can remain in the crisis intervention unit longer
than the designated 24 or 48 or 72 hour period because the fact that they have not
stabilized with intensive treatment in that period indicates they require inpatient
admission with ongoing suicide observation and clinical treatment.

(Exhibit 3 at 9-10.)

PSOF 14.     Dr. Kupers further illustrates that

Observation cells in jails and prisons should be, if properly run, equivalent to the
crisis unit at a hospital with a psychiatric ward. The prisoner in a suicidal crisis,
according to the standard of care in the community, must remain in the
observation cell only for a brief period (24 or 48 or 72 hours, as designated by
policy, but no longer), and then, if the prisoner has not returned to stability or
remains a significant risk of suicide or self-harm, he or she must be transferred to
a higher level of mental health care, meaning a residential treatment center or
inpatient unit within the correctional system or in the community.

(Exhibit 3 at 10.)

PSOF 15.    Dr. Kupers offers the opinion that in all events, a person who is suicidal or

mentally decompensated "must not be retained in an observation cell for longer" than a "day or a

few days."  (Exhibit 3 at 10.)

PSOF 16.    Dr. Kupers clarifies that if mentally ill patients are not removed from

confinement within a short period:

> there is psychosis, mania, compulsive acts of self-abuse or suicide, and in all too
> many cases bizarre acts of self-harm such as cutting, hanging, swallowing foreign
> bodies, and so forth.

(Exhibit 3 at 29.)

PSOF 17.    Dr. Ajay Jeetwani, the lead psychiatrist who treated Ms. Rusher at

McFarland Mental Health Center, offered an essentially identical opinion about placing a

mentally ill, suicidal patient like Ms. Rusher in isolation:

> Q. [Y]ou know Ms. Rusher swallowed a
> lot of stuff in self-harming behavior and sometimes
> would try to strangle herself with items with self-harming
> behavior, correct?
> A. In general, yes.
> Q. Wouldn't it have been easier just to put her
> in a locked room with nothing in it and prevent her
> from committing suicide or harming herself that way?
> A. Easier for whom? Staff? Yeah. We're not
> doing what is easier.
> Q. Why not?
> A. The best interest of the patients probably.
> Q. And why wouldn't it be in the patient's best
> interest just to lock someone away in their room and
> keep them there and prevent them from committing
> suicide that way?
> A. We discussed the effects of solitary
> confinement already.
> Q. And by that, I think you're saying that it
> would be damaging to the person's mind to keep them in
> solitary confinement in that manner?
> A. Yes.

Q. And if I understand you correctly, that
would worsen their risk of suicide and self-harming
behavior in the future, is that right?
A. Yes.

(Exhibit 5 at 170:10-171:11.)

PSOF 18.     Mr. Stanley, another of Plaintiff's experts who is a former regional

administrator of the Washington State correctional system where he oversaw multiple prisons

accounting for approximately one-third of the prison population of Washington State, offers a

similar opinion.  (Exhibit 4 at 1.)

PSOF 19.     Mr. Stanley maintained that "placement in an isolation cell or suicide

prevention cell is done so for a very short period of time, no more than a few days at a time."

(Exhibit 4 at 6.)

PSOF 20.     Mr. Stanley further opines that if the mental crisis causing an inmate to be

placed in an isolation cell

can't [be] resol[ved] within a few days, then the jail administration must ask
themselves whether the inmate should remain in the jail or be sent to another
facility, such as a psychiatric hospital for more intensive treatment. . . .  It is
inconceivable to me that any corrections professional can believe [isolation for
"months at a time"] is a healthy practice, much less defensible, given the obvious
deprivation and lack of socialization that occurs, in an isolation cell, over an
extended period of time,

(Exhibit 4 at 6-7), such as the time Ms. Rusher spent in the Jail's isolation cells.  (*Id.*)

PSOF 21.     Dr. Kupers explains that to the extent a mentally ill inmate might have

conflicts with others, the practice should be to separate the inmate from those with whom the

inmate has conflicts, not isolate them in a cell alone.  (Exhibit 3 at 11-12.)

PSOF 22.     Indeed, as Dr. Kupers explains, the practice at McFarland, where patients

were encouraged to engage in congregate activities, socialize, play board games, and go outside

while supervised by staff to prevent self-harm, even immediately after engaging in an act of self-

harm, was the appropriate and reasonable clinical response. (Exhibit 3 at 35-36.) Locking the inmate in a cell, by contrast, simply ensured that the inmate would deteriorate and continue to harm themselves. (Exhibit 3 at 36-37.) Such practices, Dr. Kupers notes, are reasonable but they cost money. (Exhibit 3 at 26.)

PSOF 23.    Mr. Stanley offers the opinion that

> It is well known by corrections professionals that it is unconstitutional to keep an inmate confined for 24 hours per day, day after day. It is part of basic corrections treatment, that even the most disruptive, poorly behaved inmates, are afforded one hour out of their cells per day. The Disciplinary Segregation (09-002) policy for Sangamon County states "Each inmate will receive a minimum of one hour per day of exercise, outside their cell, unless safety or security concerns dictate otherwise."

(Exhibit 4 at 5.)

PSOF 24.    Mr. Stanley further notes that classification decisions, like the decision to house Ms. Rusher in extended isolation, should not be confined to medical staff alone. He notes that

> The National Commission on Correctional Health Care standard on Communication on Patient's Mental Health Needs (MH-A-08) states "Communication occurs between appropriate nonclinical staff and treating mental health professionals regarding inmates significant mental health needs that must be considered in classification decisions in order to preserve the health and safety of that inmate, other inmates, or staff."

(Exhibit 4 at 12-13.)

**The Defendants Subjected Ms. Rusher to Extended Isolation**

PSOF 25.    Ms. Rusher was held in an isolation cell, almost continuously, for three months.

PSOF 26.    The policy of the Sangamon County Sheriff's Office is to confine inmates who are deemed a threat to themselves in "isolation cells" located on the Jail's first floor.

(Exhibit 6.)  The jail's written policies have no time limits for such detention, (*see id.*), meaning

that under those policies indefinite detention in isolation cells is not prohibited.

PSOF 27.　　　These "isolation cells" are located in or near the Jail's "booking" area.

The booking area is the area outlined by the red marker on the below floorplan:



(Exhibit 7, 31:8-33:18; Exhibit 8.)  In this diagram, Cell I-16, where Ms. Rusher strangled

herself, is highlighted in yellow and is indicated with a black arrow.  The shower room in which

Ms. Rusher ripped the towel strip that she used to strangle herself on March 18, 2017 is also

highlighted in yellow and marked with a red X, and is indicated with a black arrow as well.  (*See*

Exhibit 7 at 162:11-24.)

PSOF 28.     The booking area has a central "bullpen", which is marked with a blue "X" in the diagram above.  (Exhibit 7 at 33:11-22.)  The bullpen is always occupied by an officer.  (Exhibit 7 at 108:3-7.)  The octagonal partition surrounding the bullpen is a low wall, which allows officers inside the bullpen to see out into the booking area.

PSOF 29.     The primary function of the booking area is to serve as a location where the Jail receives and "books" incoming jail detainees.  (Exhibit 7 at 34:4-13.) Those incoming inmates—*i.e.*, inmates of all types who have just been arrested and are being processed into the jail, are housed in "intake" cells, which are marked with a "T" in the diagram above. These "intake" cells  are directly across from the booking bullpen and within the line of sight of the officers in the booking bullpen.  (Exhibit 7 at 46:3-24.)

PSOF 30.     Portions of the booking area have been repurposed as a "[m]ental housing area" for "those considered a threat to themselves" (*see* Exhibit 6.)  The cells for these inmates are marked with an "o" in the diagram above.  (Exhibit 7 at 34:14-36:10.)  Some of these mental health cells are within the line of sight of officers in the bullpen, as indicated above.

PSOF 31.     There are a total of five, high-risk mental health isolation cells:  Cells I-02, I-03, I-04, I-15, and I-16.  (Exhibit 7 at 35.)  Additionally, Cells I-13 and I-14 can serve as overflow cells if they are available and there are too many high-risk detainees.  (Exhibit 7 at 35.) And Cell I-12 is a cell for people who are uncooperative, intoxicated, or acutely suicidal, thus occasionally serving as a "mental health" cell but occasionally used for other purposes.  (Exhibit 7 at 37.)

PSOF 32.     Ms. Rusher was housed among several of these "isolation cells," but spent much of her time, including the last month of her imprisonment, in Cell I-16.  (*See* Exhibit 9.)

PSOF 33.      These isolation cells, and the booking area generally, are not located near the Jail's medical staff, who are located on an upper floor in the jail.  (Exhibit 10 at 112:10-22.)

PSOF 34.      Additionally, not all of the Jail's mental health isolation cells were located within the booking area.  Two of the cells, I-12 and I-16, for example, are behind the bullpen and open onto a back corridor that is effectively outside of the booking area that is visible to officers in the bullpen.

PSOF 35.      The isolation cells had windows, both in the cell doors themselves and on the side of the cell.  However, at the time of Ms. Rusher's strangulation, cloth covers were installed over these windows in a manner that dramatically reduced the view between the cell and the outside.  Indeed, at the time of Ms. Rusher's strangulation, the Jail's standard procedure was that "Curtains in Booking are to remain half way down unless the I/Ms in any given cell are being disruptive.  Then they can be covered."  [*See* Exhibit 11 at 5223.]

PSOF 36.      These curtains were installed "as a rule at th[e] time" of Ms. Rusher's strangulation, which was justified as "privacy for the individual" detainee.  (Exhibit 12 at 33:15-34:3.)  While an officer could look over the half-closed curtain and into the cell when doing 15-minute cell checks, (*id.* at 33:22-24), the person in the cell would otherwise be hidden from view to passersby, such that "if for whatever reason the individual isn't dressed or the individual could be masturbating there is a, there is privacy for that individual."  (*Id.* 33:23-34:3.)

PSOF 37.      These cell coverings, which were in place on cells both in the bullpen area of booking and in the cells lining the hallway behind booking, appear to have covered both the side windows and the cell door windows of the mental health cells:



(Exhibit 13.)



(Exhibit 14.)

PSOF 38. On the day that Ms. Rusher strangled herself, the side window of Cell I-16 was covered entirely, while the smaller cell door window was not. (*See* Exhibit 13.) However

the cloth curtains were placed over all cell windows "as a rule," (Exhibit 12 at 33:7-34:3), and those curtains were applied to isolation cells "halfway up the glass" that would have been placed on I-16 as well. (Exhibit 12 at 34:18-35:4.)

PSOF 39. Cell I-16 did not open onto the actual booking and bullpen area where personnel would interact with new admissions. Instead, as the Jail's floorplan above indicates, Cell I-16 opened onto a back hallway. Cell I-16, furthermore, was on the dead-end side of the hall that had no natural communication with other parts of the Jail. (*See* Exhibit 8.) The only door opening near Cell I-16 that communicated to any other part of the facility was an exit stairway, which had so little traffic that a trash can had been placed in front of it:



(Exhibit 15.) Thus, only persons taking the long way in or out of booking to other parts of the Jail would pass by Cell I-16.

PSOF 40.    The interior of I-16 had a window that allowed the cell  to be monitored directly from the bullpen in the booking area, as indicated by the arrow in this picture:



(Exhibit 16.)  However, blinds were installed on the window from the bullpen side, making it impossible to see between the booking area and the interior of the cell:



(Exhibit 17.)  Indeed at the time Plaintiff inspected the Jail, a trash can had been placed in front of this monitoring window on the bullpen side:



(Exhibit 18.)

PSOF 41.     Ms. Rusher had limited interactions with human beings during her placement in the isolation cells.

PSOF 42.     She was subject to 15-minute checks by an officer, whose job it was to "rove" around the Jail and complete checks of numerous detainees every 15 minutes.  (Exhibit 19 at 103-104.)

PSOF 43.     Because she was on psychotropic medications, nurses would pass pills to her on three different pill runs per day.

PSOF 44.     She may have been observed briefly by Mr. Shmikler on the four days per week that he was at the Jail, however, Mr. Shmikler's rounds do not appear to have been for the

purpose of engaging in extended interaction; on multiple occasions Mr. Shmikler's notes state that Ms. Rusher was sleeping or "ok". (*See, e.g.*, Exhibits 20, 21, 22, 23.)

PSOF 45.     Mr. Shmikler also recorded four assessments of Ms. Rusher when she was at the Jail, which recorded that she should remain on high risk status. (Exhibit 24.)

PSOF 46.     Nurse Kate Daniels claims that she had multiple conversations with Ms. Rusher every day, but these were in the nature of Ms. Rusher trying to initiate conversations such as "hey Kate what's going on" as Ms. Daniels or other employees walked by her cell. (Exhibit 25 at 43:6-14.) According to Ms. Daniels, Ms. Rusher tried to initiate conversations with anyone who walked by her cell. (*Id.*)

PSOF 47.      There are no records of these interactions, no indication of how long they lasted, and no indication that they occurred when Ms. Rusher was housed in the I-16 cell that opened onto the back hallway behind booking.

PSOF 48.     Dr. Kupers notes that because of the recognized harmfulness of solitary confinement, "[o]ften correctional administrators and staff claim there is no solitary confinement in their jail facility because officers" have brief interactions with the inmate like the ones described in the preceding paragraphs. (Exhibit 3 at 27.) Dr. Kupers offers the opinion, however, that such interactions are not meaningful human contact that ameliorates the psychological damage caused by solitary confinement on mentally ill persons. (Exhibit 3 at 27-28.)

PSOF 49.     Prisoners who are isolated will often engage in behavior that is perceived as manipulative in order to have their basic needs met, and that is what Dr. Kupers believes happened in this case. (Exhibit 3 at 21.)

PSOF 50.    Ms. Rusher was confined to her isolation cell for 24 hours per day with no scheduled time out of her cell, other than showers and medical appointments. (Exhibit 12 at 80.)

PSOF 51.    Plaintiff's expert Mr. Stanley offers the opinion that "[i]t is well known by corrections professionals that it is unconstitutional to keep an inmate confined for 24 hours per day, day after day," and that "[i]t is part of basic corrections treatment, that even the most disruptive, poorly behaved inmates, are afforded one hour out of their cells per day."  (Exhibit 4 at 5.)

PSOF 52.    The Jail's written policies for detainees in *disciplinary* segregation were to "receive a minimum of one hour per day of exercise, outside their cell," provided that they did not pose a safety threat.  (Exhibit 26; Exhibit 4 at 5-6.)  Indeed this is a standard practice in the corrections industry, whose standards provide that even segregated inmates must have regular access to out of cell activities, including outdoors.  (Exhibit 4 at 5-6.)

PSOF 53.    There was no such policy for inmates confined to the mental health isolation cells in booking.  (Exhibit 4 at 6.)  Mr. Stanley offers the opinion that

> It is inconceivable to me that any corrections professional can believe this is a healthy practice, much less defensible, given the obvious deprivation and lack of socialization that occurs, in an isolation cell, over an extended period of time, as was the case with Ms. Rusher. I view the use of High-Risk cells, at the Sangamon County Jail, such as practiced with Ms. Rusher, to be punishment, without cause. When a jail treats inmates, who have not violated jail rules (Ms. Rusher), worse than those inmates who have violated jail rules, something is seriously amiss with decision making, leadership, and the standard of care being practiced.

(Exhibit 4 at 6-7.)

PSOF 54.    Mr. Stanley also offers the opinion that the failure of non-clinical staff to involve themselves in communications and decisions about the extended solitary confinement of a severely mentally ill inmate departed dramatically from standard correctional practice.  Noting that the standard is for non-clinical professionals to be involved in such decisions (Exhibit 4 at

12), Mr. Stanley observes that "[i]n the depositions of jail officers, there is no indication that this type of communication occurred regarding Ms. Rusher." (Exhibit 4 at 13.)

PSOF 55.    Indeed, Mr. Stanley offers the opinion that given the failure to resolve Ms. Rusher's suicidality after an extended confinement in the observation cells,

> I would expect that there would be meetings between jail administration and mental health providers to accelerate treatment for Ms. Rusher. But, at the Sangamon County Jail, I can see no evidence in the depositions or in the written record that there was any alarm that Tiffany Rusher was being made to live in this very restrictive environment, day after day with no plan for removal.

(Exhibit 4 at 16.)

PSOF 56.    Mr. Stanley explains that as a corrections administrator, he would have expected regular meetings between ACH and Jail administration to discuss the performance of mental health staff and the delivery of mental health care, yet he saw none of this. (Exhibit 4 at 16.)

PSOF 57.    Mr. Stanley notes that given Ms. Rusher's extended solitary confinement and her numerous incidents of self-harm, he would have expected Mr. Beck, as the superintendent of a facility the size of the Jail, to have a "heightened awareness of" Ms. Rusher's condition…There should have been, at the minimum, weekly meetings with his security staff, medical and mental health staff regarding the plan for dealing with Ms. Rusher." (Exhibit 4 at 17.) Yet Mr. Beck testified that he had almost no awareness of Ms. Rusher or what happened to her during her incarceration, and that he never discussed Ms. Rusher's condition with Mr. Shmikler, and he responded that he had not. (*Id.*) Mr. Stanley was particularly critical of Mr. Beck for making no effort to understand the national standards that set out the impacts of extended solitary confinement on the mentally ill. (Exhibit 4 at 18.) These failures, Mr. Stanely opines, led to Ms. Rusher's extended confinement and ultimately her death. (*Id.* at 19.)

PSOF 58.      Virtually all the times that Ms. Rusher was permitted to leave her isolation cell were (1) short, *ad hoc* trips to the shower on the Jail's midnight shift, where she would periodically be permitted to shower and to attempt payphone calls in the middle of the night; and (2) instances in which she engaged in self-harm so serious that she required medical attention. These showers did not occur every day.  Furthermore, Ms. Rusher indicated in phone calls that the showers were not even offered to her on a daily basis.  Rather, "high risk shower's Monday, Wednesday and Friday at midnight."  (Exhibit 54 at 24.)  Ms. Rusher also reported that sometimes she was not offered a shower at all: "at night when they do showers, they don't ... they don't fucking do it right. They don't even ask me if I wanna take a shower." (*Id.* at 26.)  Mr. Shmikler's Location Verification Form notes corroborate this, noting in places that "tonight is shower night."  (Exhibit 61.)  Ms. Rusher was only permitted to change her suicide smock every third day.  (Exhibit 54 at 17.)

PSOF 59.      Ms. Rusher was finally let out of her isolation cell after Mr. Shmikler, on January 11, 2017, cleared her to be transferred from her isolation cell to the Jail's general population. (Exhibit 27.)

PSOF 60.      Ms. Rusher was transferred to the Jail's general population on January 12, but she was removed from the general population and placed back in isolation a few hours later, after she swallowed a spoon. (Exhibit 28.)  She had to be sent to the local hospital so that it could be removed.

PSOF 61.      During Ms. Rusher's entire incarceration at the Jail, there is no record of her threatening, assaulting, or harming any person, or otherwise engaging in acts that threatened others.

PSOF 62.     Even if Ms. Rusher were to have had some conflicts with others, Dr.

Kupers offers the opinion that that cannot bar removal from solitary confinement:

> The cases where a prisoner is a danger to others is one of the very situations for which the standards [prohibiting extended solitary confinement for suicide "observation" beyond 72 hours] were written.  It is not permissible to torture people because they commit bad acts, the prevention of harmful treatment and abuse is what the standards were written for. Among the prisoners kept in solitary for a long time are quite a few who are assaultive. They need help with their proclivity for anger and assault. If they are merely left in solitary confinement for a long time, by the time they get out they will be even more prone to violence, on average, because of the psychologically harmful effects of the solitary confinement. The help they need requires programming, not isolation.

(Exhibit 3 at 10-11.)

PSOF 63.     Dr. Kupers offers the opinion that the isolation Ms. Rusher experienced

likely contributed to her extreme self-harm that ended in her death.  Dr. Kupers states that:

> [I]t has been my experience, from tours and clinical interviews in solitary confinement units and equivalent forms of near-24-hour cell confinement (including the kind of observation/high risk cell where Ms. Rusher was confined at the Sangamon County Jail) in many states, that the conditions that cause psychiatric symptoms such as anxiety and aggression in relatively healthy prisoners cause psychotic breakdowns, severe affective disorders and suicide crises in prisoners who have histories of serious mental illness and previous suicide attempts.

(Exhibit 3 at 29.)  Dr. Kupers offers the further opinion that "prolonged solitary confinement of

the kind [Ms. Rusher] underwent at Sangamon County Jail, with less than adequate mental health

treatment, is known to greatly increase risk of jail suicide."  (Exhibit 3 at 37.)

PSOF 64.     Mr. Stanley also offers the opinion that the prolonged isolation of Ms.

Rusher indicated by the record, likely contributed to her self-strangulation and her death.

(Exhibit 4 at 3.)

### The Provision of Mental Health Care to Seriously Mentally Jail Ill Inmates

PSOF 65.     The Sangamon County Jail's written policies endorse comprehensive

mental health treatment.  They provide that

19

All inmates will be provided access to a comprehensive mental health program increasing their probability of functioning within normal limits of socially acceptable behavior. This program will be designed to provide inmates with a means of treatment through mental health services.

(Exhibit 29.)

## Jail Inmates Must Be Provided with Adequate Mental Health Care

PSOF 66.    Dr. Kupers illustrates that suicidal, mentally ill detainees like Ms. Rusher require mental health treatment, and in particular a treatment plan.  (*See, e.g.*, Exhibit 3 at 10, 20.)  Appropriate mental healthcare treatment, Dr. Kupers opines, is important for preventing suicide.  (*See, e.g.*, Exhibit 3 at 23.)

PSOF 67.    Dr. Kupers explains that "[a] treatment plan is a statement about the housing, precautions, clinical interventions, expected outcomes, time-lines and contingency plans for each prisoner on the mental health caseload."  (Exhibit 3 at 32.)

PSOF 68.    Dr. Kupers asserts that

a treatment plan lists a diagnosis or describes an emotional problem that will be the focus of treatment; identifies the treatment modalities that are to occur (group therapy, psychotropic medications, etc.) . . . the steps to be taken to ensure the patient's safety . . . the kinds of outcomes that are to be monitored . . . the time-phase for the treatment being planned . . . [and] a plan for future stages of treatment.

(Exhibit 3 at 32.)

PSOF 69.    According to Dr. Kupers, treatment plans are important for improving a detainee's mental health and preventing them from committing suicide. (Exhibit 3 at 8.)

PSOF 70.    Additionally, a treatment plan should be developed in consultation with a psychiatrist, particularly for patients being administered psychotropic medication. (*Id.* at 32-33.)

PSOF 71.     Dr. Kupers also shows that it is important for patients to be seen by psychiatrists to have their medication assessed and adjusted as necessary, in particular so that the medication can best be adjusted to prevent self-harm incidents. (Exhibit 3 at 24-25.)

PSOF 72.     Dr. Kupers asserts that the treatment plans he reviewed from McFarland were an example of appropriate treatment for someone like Ms. Rusher.  (Exhibit 3 at 36-37.)

PSOF 73.     The therapy Ms. Rusher was offered at McFarland Mental Health Center included congregate activities, group therapy, and intensive one-on-one cognitive therapy and counseling as well.  (Exhibit 3 at 35-36; Exhibit 5 at 142:9-143:4; 144:2-145:11; 166:24-168:16.)

PSOF 74.     A treatment plan should further "include[] the exclusion of the patient from solitary confinement and the tracking of her adherence to his medication regimen." (Exhibit 3 at 26.)

PSOF 75.     Mr. Stanley concurs that the failure of Jail staff to oversee ACH's administration of these services was a critical failure.  (Exhibit 4 at 15.)

PSOF 76.     He states that "there was no apparent oversight of the mental health services or personnel by the jail administrators." (Exhibit 4 at 16.) He would expect a jail of Sangamon's size to conduct weekly meetings about Ms. Rusher. (*Id*.)

PSOF 77.     In the depositions of jail officers, there is no indication that this type of communication occurred regarding Ms. Rusher.

PSOF 78.     In the days after Ms. Rusher's suicide, Lydia Hicks was at the Sangamon County Jail and noted that documentation regarding the treatment of Ms. Rusher was missing. (Exhibit 37 at 102.)

PSOF 79.     During Mr. Shmikler's time working at the jail, Ms. Hicks' supervision of his work had been limited to weekly check ins via email or short phone calls. (Exhibit 37 at 18.)

PSOF 80.     After further review of his work in the aftermath of Ms. Rusher's death and consultation with Dr. Caldwell and an HR representative, Ms. Hicks made the decision to fire Mr. Shmikler. (Exhibit 37 at 99-100.)

**The Defendants Failed to Provide Ms. Rusher Adequate Mental Healthcare**

PSOF 81.     Dr. Kupers offers the opinion that, to be effective, the individual counseling modality of group therapy alone involves long periods of contact with the prisoner (typically between 25 and 50 minutes) in a private and confidential setting such as an office, and is ongoing for a substantial amount of time.  (Exhibit 3 at 12-13.) Talking to Ms. Rusher through a steel door would be "non-therapeutic." (Exhibit 3 at 19, 22.)

PSOF 82.     Mr. Shmikler performed a brief suicide risk assessment of Ms. Rusher on December 15, but makes no mention of reviewing any chart or documentation that might have described her mental illness or condition.  (Exhibit 31; Exhibit 32 at 184:22-185:10.)

PSOF 83.     Dr. Abraham, meanwhile, first assessed Ms. Rusher on December 19 for a leg injury.  (Exhibit 33.)  On that day, he ordered that Ms. Rusher be returned to her high-risk isolation cell.  (*Id.*; Exhibit 10 at 127:12-14.) Dr. Abraham testified that he made this order because he knew Ms. Rusher had been discharged to the Jail from a mental health facility. (Exhibit 10 at 130:2-20.) But, he said, he would not have reviewed the McFarland discharge summary prior to the December 19 appointment. (Exhibit 10 at 131:5-11; 132:2-5.)

PSOF 84.      Dr. Abraham did not remember when or whether he would have reviewed the discharge summary at all. (Exhibit 10 at 132:6-8.)  He testified that he would not know whether a mental health discharge summary was important until he had read it (Exhibit 10 at 133:3-9), but he would not have reviewed the discharge summary unless "it was brought to my attention and put in my mailbox."  (Exhibit 10 at 133:16-19.)  Dr. Abraham testified that "I

wanted as much information [about Ms. Rusher's psychiatric history] as is provided to me," but he would not have looked in Ms. Rusher's medical records when he was treating Ms. Rusher for her psychiatric illness to determine whether a psychiatric history existed. (Exhibit 10 at 134:23-137:1.)

PSOF 85.     Dr. Abraham said it was the duty of the Jail's "medical staff" to review records like the McFarland discharge summary (Exhibit 10 at 137:9-11), but while he described this staff as "a team," he had no way of knowing whether anybody on the medical team actually ever reviewed the McFarland discharge summary.  (Exhibit 10 at 139:15-140.)  Among other things, Dr. Abraham testified that no specific person on the medical staff was assigned to read such mental health discharges (Exhibit 10 at 142:7-16), and there was no record created or notation made on any medical records that could confirm whether anybody had actually read the discharge summary.  (Exhibit 10 at 139:23-140:16.)

PSOF 86.     Notably, Dr. Abraham, whose certification is in family medicine (Exhibit 10 at 8:9-10), later diagnosed Ms. Rusher with bipolar disorder and schizophrenia (Exhibit 34), even though the McFarland discharge summary does not contain either diagnosis.  (Exhibit 35.) Dr. Abraham testified that he made this diagnosis based on "my conversations" with Ms. Rusher. (Exhibit 10 at 146:2-147:13.) At the same time, Dr. Abraham continued the psychotropic medications that Ms. Rusher had been prescribed at McFarland, because "I was told that is what the inpatient psychiatric evaluation physician believed was in her best interests as the specialist," (Exhibit 10 at  143:12-144:6), even though the McFarland doctors had prescribed those medications to address entirely different diagnosed conditions.  .

PSOF 87.     Dr. Abraham also testified that he never participated in developing a treatment plan (Exhibit 10 at 169:23-170:3), but did continue to prescribe medication. And while

Dr. Abraham knew Mr. Shmikler talked with Ms. Rusher, he did not know whether Mr. Shmikler was providing any therapy to her. (Exhibit 10 at 173:23-174:8; 176:5-11.) Although he claims to have talked to Mr. Shmikler about Ms. Rusher, he could not recall any specifics and made no notes recording their conversation. (Exhibit 10 at 172.)

PSOF 88.      When Ms. Rusher was admitted to the Jail on December 15, 2016, she was referred to Mr. Shmikler who wrote down a note that she should be committed to an isolation cell. (Exhibit 31.)

PSOF 89.      ACH did provide a form called a "Mental Health Service Clinical Contact" form, which contains a section marked "treatment plan." (Exhibit 36.) The "treatment plan" provided for in this form did not resemble a formal treatment plan like the treatment plans created at McFarland. (Exhibit 37 at 63:11-13.)    Furthermore, Lydia Hicks, the ACH employee who supervised Mr. Shmikler and took over for him at the jail after Ms. Rusher died, testified that this form would be used for someone who was *not* in the high-risk isolation housing. (Exhibit at 62.) For persons in the Jail's isolation cells, the only form that would be used was the "Observation Form" periodically filled out by Mr. Shmikler. (Exhibit at 63.) And these Observation Forms are primarily used for housing assignment and observation level, not treatment. (Exhibit at 64.)

PSOF 90.      Indeed Ms. Hicks testified that she has never done a treatment plan for any patient placed in the Jail's high-risk isolation cells. (Exhibit at 63.)

PSOF 91.      Dr. Amy Trivette, one of the Defendants' expert witnesses in this case retained to testify about the standard of care governing the mental healthcare provided to Ms. Rusher, testified that she had reviewed Ms. Rusher's records and did not see any treatment plans contained in them. (Exhibit 38 at 66:1-4.)

PSOF 92.     Dr. Kupers reviewed each of the assessment forms that Mr. Shmikler completed and concluded that none of them consisted of a treatment plan. (Exhibit 3 at 33.)

PSOF 93.     There is no evidence in the record that any staff at the jail consulted a psychiatrist about Ms. Rusher's mental health during her incarceration.  Thus, no psychiatrist could have been involved in the development of a treatment plan.

PSOF 94.     There is no indication that Dr. Abraham was involved in the development of a treatment plan, or that he reviewed any information about Ms. Rusher's mental health status. Indeed, Mr. Shmikler was fired after Ms. Rusher's death because it was discovered that he had failed to keep proper documentation. (Exhibit 37 at 99-100.)  During Ms. Rusher's incarceration, however, Dr. Abraham never noted the absence of these notes. (Exhibit 10 at 172-173.)

PSOF 95.     When Mr. Shmikler spoke with Ms. Rusher, he did so exclusively through the steel door of her cell.  There is no indication in the record that Mr. Shmikler ever consulted with Ms. Rusher in any private location, and indeed jail staff testified that he only spoke with her through the cell door. (Exhibit 25 at 51, Exhibit 12 at 82.)

PSOF 96.     No group therapies were provided to Ms. Rusher.  (Exhibit 37 at 30:19-31:2; 122:13-24.)

PSOF 97.     There is no indication in the record that Mr. Shmikler's conversations with Ms. Rusher were anything other than short conversations for purposes of making the periodic assessments he recorded, or short conversations in which he assessed her immediate needs, such as a shower. (*see, e.g.,* Exhibit 39 at 23-24.)

PSOF 98.     Indeed, one of the Defendants' experts, social worker Michelle James, offered the opinion that given Mr. Shmikler's mental health caseload at the Jail, he would only

have had time to make short assessments of Ms. Rusher, and could not have provided therapy.

(Exhibit 39 at 21:3-23:1.)

PSOF 99.    Dr. Kupers offers the same assessment:

Mr. Shmikler was only able to see her five times in 14 weeks because of his hours of employment or heavy caseload, and she was consigned to a cell in admitting because, absent an infirmary or mental health unit, there was nowhere else in the facility where staff felt she would be safer.

(Exhibit 3 at 31.)

PSOF 100.    The Defendants' own expert, Dr. Fowlkes, offered the same opinion, conceding that therapies such as cognitive behavioral therapy, which is standard therapy for borderline patients but was not offered to Ms. Rusher, would likely have made it less likely that Ms. Rusher would have harmed herself.  (Exhibit 40 at 185.)

PSOF 101.    Dr. Kupers offers the opinion that the failure to provide Ms. Rusher with mental health treatment made it more likely that she would harm herself and eventually commit suicide.  He explains that

An individual who was as obviously disturbed as Ms. Rusher and as much of a known suicide risk, after a very few days of trying to retain her in the jail on observation/high risk status (with more robust mental health treatment than she received at Sangamon County Jail), should have been transferred to the highest level of care available, i.e. a mental health ward or hospital, because treatment in that more intensive treatment setting would be most likely to achieve treatment aims and prevent suicide.

(Exhibit 3 at 38.)

PSOF 102.    Mr. Stanley also states that the failure to provide mental health treatment for Ms. Rusher, combined with her prolonged isolation, made it more likely that she would commit suicide.  (Exhibit 3 at 12-15.)

**The Defendants' Policies and Practices Provided
for Inadequate Mental Healthcare at the Jail**

PSOF 103.     The Sangamon County Sheriff's Office had long known that despite its

written policies providing for mental healthcare, there was little actual mental health care

provided at the Jail.  The Sheriff's Office had notice, for example, of the following:  A local

newspaper, the *Illinois Times*, reported in 2013 that a severely mentally ill man named Alonso

Travis was found dead in his jail cell.  (Exhibit 41.)  The story reported that he had been found

unfit to stand trial, but was housed in the Jail without ever seeing a psychiatrist.  The paper

reports Mr. Travis's lack of mental healthcare in the jail this way:

> After nearly a month in jail, Travis started acting up in a serious way. Prosecutors
> charged him with a felony after he spat on a guard in early August. [Sangamon County
> Sheriff Jack] Campbell says that he bit another guard, who needed seven stitches, and
> threw a tray at another, who suffered a concussion. He also plugged his toilet to flood his
> cell and threw garbage around a common area.
>
> "Starting in August, we begin to have this series of infractions," Campbell says. "He hurt
> several of our people."
>
> A judge ordered a psychiatric evaluation in mid-August, but Travis did not otherwise see
> a psychiatrist while in the jail, Campbell says. While Travis got the best care the jail
> could provide, Campbell says, that doesn't mean that he was in the right place. "We are
> not set up to handle these people," Campbell says.  "It causes us a lot of issues. They
> fight with our staff. They injure themselves, and now we have to take them to the hospital
> for treatment. It's a vicious cycle. There's really nothing you can do with them."

(Exhibit 41 at 012546.)

PSOF 104.     ACH meanwhile, had been warned by the Civil Rights Division of the

U.S. Department of Justice that its healthcare practices were unconstitutional.

PSOF 105.     In 2012 ACH gained a contract to provide medical and mental healthcare

to the jail in Grant County, Kentucky.  (Exhibit 32 at 224:8-13.)

PSOF 106.     After ACH took over mental healthcare at the Grant County Jail, the DOJ

toured the Jail in 2012 and on February 6, 2013, it wrote a letter to the Jail's administrators

following up on its inspection of the healthcare that was provided there. (Exhibit 42.) The letter

reviewed care that had been provided at the Jail both before and after ACH arrived. (*Id.*) It was

sharply critical of an April 2010 case involving a mentally ill jail inmate. (*Id.* at 13477.)

> [N]o one developed a treatment plan for more comprehensive care [for the
> inmate]. The prisoner killed himself. In September 2010, a new prisoner arrived
> and told staff that he was going to kill himself. The Jail's course of intervention
> essentially consisted of putting the prisoner in a segregation cell. The Jail staff
> left the prisoner with a sheet, and the prisoner hung himself. . . . [Such prisoners]
> cannot be treated safely just through occasional encounters with low level medical
> or mental health staff. They require an actual treatment plan, overseen by a
> physician, who can help guide staff at all levels in managing the prisoner's care.

(Exhibit 42 at 013477.)

PSOF 107.    The DOJ letter also criticized Grant County because:

Medical and mental health records did not include any formal, written, treatment plans.

> Prisoners with chronic conditions, including mental illness, require a plan of care
> that includes a clear description of the treatment program, proper monitoring, and
> follow-up.

(Exhibit 42 at 013479.)

PSOF 108.    The Department of Justice followed up its 2013 letter with a letter on

October 14. 2014. (Exhibit 62 at 013419.) Referring to the deficiencies identified in its 2013

letter, the Department reported that the Grant County Jail "has made little progress in addressing

these deficiencies since our last inspection." (*Id.* at 013419.)

PSOF 109.    The Department's concerns regarding the mental health care being

provided by ACH included the following:

> a.    Given his caseload, the qualified mental health professional was not on-site
>
> enough hours per week to "actually provide much documented testing,
>
> counseling, or individualized treatment planning that he might otherwise be
>
> qualified to provide." (*Id.* at 013428.)

b.  Suicidal inmates often required "more complex clinical supervision than can be provided" by a masters-level qualified mental health professional, transfer of an inmate to a mental hospital.  (*Id.* at 013428-29.)  "The Jail's mental health professional cannot handle these types of treatment matters entirely on his own."  (*Id.* at 013429.)  The Department observed that while the Jail's primary care physician "[t]echnically" could perform these duties, but as a matter of practice, "The physician does not regularly refer even complex cases for outside specialty review by a psychiatrist. Most notably, the Jail physician has no meaningful role in much of the suicide assessment and monitoring process."  (*Id.*)

PSOF 110.     The Department's letter to Grant County was forwarded to ACH's senior management, including its president.  (Exhibit 32 at 233:24-235-21; 243:14-17.)

PSOF 111.     Melissa Caldwell, who set mental health policy for ACH (Exhibit 32 at 19:10-20:5), dismissed the concerns expressed by the Department of Justice regarding the mental health care that ACH provided in Grant County as amounting to an "idiosyncratic" concern about having a psychiatrist on staff. (Exhibit 32 at 229:13-231:10.) She did concede, however, that if a mental health professional did not have enough time on site, they could not complete treatment plans.  (Exhibit 32 at 55:3-24; 239:9-241:5.)

PSOF 112.     Caldwell also confirmed that she, at ACH, sets out the number of hours that a mental health professional will be on site in each one of ACH's contracts with jails, including Sangamon County.  (Exhibit 32 at 51:1-22; 53:4-54:10.)

**Referral of Mentally Ill Detainees for Offsite Care**

PSOF 113.      Dr. Kupers states that in a correctional facility, referral to an appropriate psychiatric facility is an essential component for any crisis intervention and suicide prevention program.  (Exhibit 3 at 7.)

PSOF 114.      Dr. Kupers details that because acutely mentally ill people must be provided appropriate mental healthcare if they cannot be stabilized quickly, jails or prisons must have available an inpatient psychiatric unit for prisoners who remain suicidal or decompensated. (Exhibit 3 at 31.)

PSOF 115.      According to Dr. Kupers, if a suicidal crisis has not resolved within a few days of observation, which is itself a sign of serious suicidal risk, the inmate "must be transferred to a higher level of mental health care, meaning a residential treatment center or inpatient unit within the correctional system or in the community."  (Exhibit 3 at 10 and 31.)

PSOF 116.      Mr. Stanley similarly states that if an inmate is experiencing a mental health crisis that cannot be resolved "within a few days, then the jail administration must ask themselves whether the inmate should remain in the jail or be sent to another facility, such as a psychiatric hospital for more intensive treatment."  (Exhibit 4 at 6.)

PSOF 117.      Mr. Stanley also explains that jails must make "'[h]ospitalization and specialty care . . . available to patients in need of these services,'" which is "how a jail would interact with a local hospital to deal with severe medical and/or mental health needs of inmates." (Exhibit 4 at 14.)

PSOF 118.      The Sangamon County Jail's written policies are consistent with these provisions.  Under "Mental Health Transfers," they provide that "Any inmate whose conditions

are beyond the range of services available in this facility will be transferred to a non-correctional facility or as specifically designated by the court system." (Exhibit 29.)

PSOF 119.    IDHS mental health hospital admissions may be voluntary as well as involuntary. (Exhibit 5 at 10-11; 13.) Dr. Jeetwani further testified that Ms. Rusher's removal from McFarland occurred because she was arrested, and was not clinically indicated by the progress of her mental illness. (Exhibit 5 at 202-03; 208-09.) And Dr. Jeetwani testified that in addition to a civil commitment from a court, McFarland would accept Ms. Rusher on a referral from a doctor. (Exhibit 5 at 217-22.)

PSOF 120.    Multiple ACH employees have testified that Ms. Rusher could have been admitted to a hospital psychiatric ward upon evaluation by a psychiatrist in a hospital. P-SOF ¶¶ 125-28. Dr. Kupers explained that Ms. Rusher's admission to a psychiatric ward was clinically indicated. (Exhibit 3 at 38.) There is no law in Illinois prohibiting the voluntary admission to psychiatric wards of persons with pending felony convictions.

### The Defendants Failed to Refer Ms. Rusher to An Appropriate Level of Care Despite Her Prolonged Mental Health Crisis

PSOF 121.    Larry Beck, the Jail's Superintendent when Ms. Rusher was incarcerated, was not familiar with the ACH contract at all, nor could he recall a single instance in which a detainee was transferred out of the jail because of their mental condition, (Exhibit 43 at 57:18-58:3), and he did not know whether the Jail's policies were provided to ACH at all. (Exhibit 43 at 45:8-11.)

PSOF 122.    Mr. Beck testified that Terry Durr, the Assistant Superintendent at Sangamon County Jail during Ms. Rusher's incarceration, was principally responsible for interfacing with ACH. (Exhibit 43 at 45:16-20.)

PSOF 123.     Mr. Durr stated that the person responsible for determining whether someone's condition was beyond the range of services available at the jail was the ACH employee in charge of mental health.  (Exhibit 44 at 30-31.)

PSOF 124.     Mr. Durr, however, did not know whether ACH employees working at the jail were expected to know the Jail's mental health transfer policies.  (Exhibit 44 at. 35.)  Durr also believed that ACH might have its own mental health protocols, but did not know what they were.  (Exhibit 44 at 35.)

PSOF 125.     Dr. Abraham testified that he would have been responsible for referring inmates out to receive a higher level of care, which he said would be done by making a referral to a psychiatrist.  (Exhibit 10 at 98:23-100:4.)  However, he did not remember referring any patient from the jail to a psychiatrist. (Exhibit 10 at 101:17-20.)  A mental health provider like Mr. Shmikler could make transfers as well.  (Exhibit 37 106-07.)

PSOF 126.     Dr. Abraham additionally testified that he could make a psychiatric referral for "an acute episode," the medical staff could refer the inmate to the emergency room, after which the hospital's psychiatry team would evaluate the inmate for a psychiatric commitment.  (Exhibit 10 at 103:15-104:15.)

PSOF 127.     Nurse Daniels was responsible for reviewing Ms. Rusher's records when she was sent out of the jail to the emergency room after she harmed herself on several occasions during her incarceration.  (Exhibit 25 at 33:1-6.)  While Ms. Daniels took the position that the ER staff could theoretically conduct a psychological assessment of Ms. Rusher, she admitted that the Jail's medical staff never sent along to the ER Ms. Rusher's McFarland discharge summary or any other notes about Ms. Rusher's psychiatric history. (Exhibit 25 at 78:12-79:5.)

PSOF 128.    Ms. Daniels further conceded that ACH was not relying on local emergency room doctors to provide outside mental healthcare for the patients under its care. (Daniels Dep. 79:6-19), though she claimed at her deposition that Ms. Rusher's trips to the emergency room were "occurrences where . . . [Ms. Rusher] could have gotten that [mental health] care if she felt as though she wasn't receiving that care at Sangamon County Jail" (Exhibit 25 at 79:16-19.)

PSOF 129.    Dr. Abraham agreed that the following events qualified as acute episodes: "swallowing a spoon and having it obstruct your airway," "strangulation with a Velcro boot strap," "swallowing a medical clip," "swallowing a plastic bag," and "swallowing a toothbrush" were all acute episodes of the type that would call for psychiatric referral, (Exhibit 10 at 109:15-110:13), and even though he specifically recalled "[t]he toothbrush, the strap, the clip," (Exhibit 10 at 111:2-3), he did not recall ever having a concern that Ms. Rusher was having too many acute episodes that might call for a psychiatric referral.  (Exhibit 10 at 109:11-14.)

PSOF 130. Dr. Kupers offers the opinion that:

> An individual who was as obviously disturbed as Ms. Rusher and as much of a known suicide risk, after a very few days of trying to retain her in the jail on observation/high risk status (with more robust mental health treatment than she received at Sangamon County Jail), should have been transferred to the highest level of care available, i.e. a mental health ward or hospital, because treatment in that more intensive treatment setting would be most likely to achieve treatment aims and prevent suicide.

(Exhibit 3 at 38.)

PSOF 131.    There are no documents in the record indicating that any person at the Jail conducted a written assessment to determine whether Ms. Rusher should be referred out of the Jail for psychiatric admission.

PSOF 132.    Mr. Stanley criticizes the lack of oversight by Sheriff's staff of the Jail's private medical contractor. He explains that it is well known to correctional administrators that correctional services are a key component of a well-run jail. "The bulk of jail inmates have some degree of mental health issues. It is well understood by corrections professionals, that attention needs to be paid to mental health issues within a jail." (Exhibit 4 at 15.)  He explains that

> Either Mr. Durr or Mr. Beck should have been keenly aware of the ACH contract provisions and one of their activities should have been regularly scheduled meetings to confirm that ACH met the contract provisions. As a former jail administrator, I would have expected the ACH supervisor and the mental health professional to come forward with a solid plan for the treatment of Tiffany Rusher. I would expect that there would be meetings between jail administration and mental health providers to accelerate treatment for Ms. Rusher.

(Exhibit 4 at 16.)  Mr. Stanley observes that Durr and Beck failed to do this, indicating that the Jail's leadership had adopted an indifferent, hands-off approach even where detainees like Ms. Rusher were obviously in desperate straits. (Exhibit 4 at 16.)

### Prevention of Suicide and Self-Harm

PSOF 133.    In addition to reducing the likelihood that an inmate will harm themselves through appropriate housing, mental health treatment, and off-site referrals, Plaintiff's experts offer the opinion that jails must also have in place robust policies dedicated to suicide prevention.  (*See, e.g.*, Exhibit 3 at 10; Exhibit 4 at 19.)

PSOF 134.    Mr. Stanley offers the opinion that in order to prevent against suicide, jails must have separate, stand-alone suicide prevention policies and training that can be relied upon by both mental health and security personnel.  (Exhibit 4 at 19.)

PSOF 135.    Mr. Stanley explains that such a policy should include a dedicated policy for dealing with detainees deemed high-risk, such as those persons detained alongside Ms. Rusher in the mental health cells on the booking area.  (Exhibit 4 at 20.)

PSOF 136.    Mr. Stanley also offers the opinion that communication among clinical and non-clinical staff is critical for preventing suicides, including communication about the psychological condition and risks of a potentially suicidal inmate.  (Exhibit 3 at 12-13.)  Dr. Kupers opines that such communication is critical for suicide prevention as well.  (Exhibit 3 at 7-8, 15.)

PSOF 137.    Additionally, Dr. Kupers offers the opinion that incidents of self-harm should be taken seriously by staff, and that aggressive mental health intervention is required after any suicide or self-harm attempt.  (Exhibit 3 at 8.)

### The Defendants Failed to Implement Harm Prevention Policies

PSOF 138.    At the Jail, Ms. Rusher was placed in isolation but was not placed on constant observation; rather she was only afforded 15-minute checks, as provided for in Mr. Shmikler's mental health observation forms.  (Exhibit 24.)

PSOF 139.    Among other things, Plaintiff's experts offer the opinion that a suicidal inmate must not be isolated unless constant supervision of the inmate is maintained.  (Exhibit 3 at 10; Exhibit 4 at 20.)  This is to be distinguished from 15-minute checks of at-risk inmates, which are insufficient.  (Exhibit 4 at 20.)

PSOF 140.    These forms had an option for 15-minute checks, but no place for constant watch.

PSOF 141.    ACH previously had used a form that provided for "1:1" constant watch. (Exhibit 32 at 192 and Exhibit 45)  ACH used this form across the jails that it serviced.  (Exhibit 32 at 193:21-194:3.)  However, the ACH form used by Mr. Shmikler in the Jail only had options for 15-minute checks.  (Exhibit 24.)  One of ACH's witnesses, Melissa Caldwell, explained that

the observation forms were adjusted to match the policies of different facilities. (Exhibit 32 at 193:21-194:3.)

PSOF 142.    Additionally, even though the window between the booking bullpen and Cell I-16 meant that the Jail's architecture had been designed to facilitate constant watch, that practice had been abandoned, with blinds put in over the windows and a trash can placed in front. (Exhibit 3 at 18.) Dr. Kupers offers the opinion that if effective constant watches were in place, Ms. Rusher would not have been able to kill herself. (Exhibit 3 at 18.)

PSOF 143.    Lydia Hicks, a senior QMHP at the Jail and Mr. Shmikler's supervisor, could not recall ordering constant watch for anyone in the Jail's isolation cells. (Exhibit 37 at 64-65.)

PSOF 144.    Mr. Stanley offers the opinion that given Ms. Rusher's history and the Jail's confinement of Ms. Rusher in isolation; she should have been placed on constant watch. (Exhibit 4 at 7-8.)

PSOF 145.    Having assessed the Jail's policies, Mr. Stanley offers the opinion that the Jail does not have a stand-alone suicide prevention policy. There is no policy establishing procedures for communication of information between medical or mental health staff. Nor is there a policy in place regarding coordination among staff for protecting suicidal detainees. (Exhibit 4 at 19-20.)

PSOF 146.    There are no records indicating that the information in the McFarland discharge summary was communicated to security staff at the Jail.

PSOF 147.    Upon Ms. Rusher's arrival at the Jail in December 2016, a from was completed instructing that she be restricted from various items:

**SPECIAL DIET ORDER**

Inmate/Patient Name _Rusher, Tiffany_    Housing Location: _Book'N_

Problem: _Pica_

Diet Ordered: _finger foods_

Start Date: _12·15·16_   Ending Date: _Discharge_

- [ ] ALLERGIES: _____
- [ ] RELIGIOUS RESTRICTIONS: _____
- [ ] FOODS CAUSING DISTRESS: _____
- [x] OTHER: _No plastic eating utensils, No pins, No clips, No paper, No plastic_

Additional Comments: _chip bags - Any Kool-aid or milk Drinks must be supervised Cup return imdtly. No brush, No comb, No toothbrush, No TP more than 8 squares. Must have finger foods_

Ordered By: _M.D. (O) FNP-3_   Date: _12-15-16_, 20 _16_

NOTE: Full liquid diets will be discontinued after three (3) days unless a provider (Physician) specifically ordered otherwise. This must be noted on the special diet.

SCSO #197   White: Medical Records    Yellow – Food Service Manager    Pink: Administrative File
7-02

(Exhibit 46.)

PSOF 148. However, this form was placed in Ms. Rusher's "diet" file and was filed in her medical file along with her other medical documents. (Exhibit 47 at 43-46.) It would only be consulted when "a patient needed a special diet ordered," (Exhibit 47 at 43:1-12) or when personnel had a concern related to the inmate's diet (Exhibit 47 at 64:2-21), and to be alerted to these restrictions, an employee would have to pull the detainee's medical chart and search for the order. (Exhibit 47 at 44:19-45:14.)

PSOF 149. On multiple occasions Ms. Rusher was permitted to access items prohibited by her diet order:

> a. The diet order stated that Ms. Rusher should not be given access to plastic eating utensils—but she was placed in the general population and gained access to a spoon, which she swallowed. (Exhibit 48)
>
> b. The diet order stated that Ms. Rusher should not be given access to a toothbrush, but she was given a toothbrush and swallowed it. (Exhibit 49.) After this

incident staff issued a prohibition on providing Ms. Rusher with a toothbrush, even though such an order had already been issued. (*Id.*)

c. The diet order provided that Ms. Rusher be given only limited access to toilet paper. But she was given unfettered access and used it to block her airways. (Exhibit 40.) After this incident staff limited her access to toilet paper, even though such an order had already been issued.

d. The diet order provided that Ms. Rusher should not have access to bags, but on or about March 15 she gained access to a bag and swallowed it, which she reported to a nurse on March 16, but the information was never passed on, even to the next shift. (Exhibit 47 18:3-23 and Exhibit 46.)

e. Ms. Rusher's autopsy found a plastic bag in her stomach. (Exhibit 51 at 3/Exhibit 52.)

PSOF 150.    On the day after Ms. Rusher told a nurse she had swallowed a bag, Mr. Shmikler's recorded observation congratulates Ms. Rusher for displaying good behavior recently. (Exhibit 53.) There are no documents or information indicating that the report of Ms. Rusher claiming on March 16 that she swallowed a bag was relayed to Mr. Shmikler or to the Jail's security staff.

PSOF 151.    Mr. Sean Stewart, the Defendants' corrections practices expert, offered the opinion that it would be important for security staff to know about self-harm incidents like Ms. Rusher swallowing a bag. He explained that reports of such incidents should be documented in a manner that gave staff the ability to go back and read about the incidents or have access to incident reports that alerted them to the incident. Mr. Stewart, moreover, offered the opinion that

it was important not only that such incidents be documented, but that a procedure be in place to ensure that they were communicated to security staff.  (Exhibit 54 at 185:13-189:22.)

PSOF 152.     Mr. Beck thought that medical staff would "probably" communicate such information, but he was not aware of any formal process to ensure that such information was communicated.  (Exhibit 43 at 150; 155-56.)  He was also unaware of any clearly delineated procedural guidelines for communication of risk factors or for suicide prevention generally. (Exhibit 43 at 151-52.)

## The Officer Defendants (Meyer, Ealey, Whitney, And Bouvet)<br>Failed to Take Reasonable Steps to Protect Ms. Rusher

PSOF 153.     On March 18, 2017, Ms. Rusher had been housed in a high-risk isolation cell, there was a warning posted at her door, and officers were briefed on her high-risk status daily at the beginning of each shift. (Exhibit 19 at 81.)

PSOF 154.     Whitley, Ealey, Meyer, and Bouvet were aware that Ms. Rusher was at high risk of suicide and other self-harm behaviors. (Exhibit 55 at 27; Exhibit 7 at 179; Exhibit 19 at 87; Exhibit 12 at 30.)

PSOF 155.     Sergeant Bouvet knew Tiffany was not allowed access to books, mail, or the bible in her cell because of pica restrictions. (Exhibit 12 at 102-103) Those items were not in any of the listed restrictions created by the medical team.

PSOF 156.     Meyer knew Ms. Rusher had tried to strangle herself a month earlier and was aware that suicide smocks were worn by people who were high risk, and they could not be ripped. (Exhibit 19 at 134-136.)

PSOF 157.     Though Ealey was not assigned to the first floor on March 18, 2018, she regularly worked in the booking area of the jail, was familiar with guidelines for mental health

inmates housed in that area, had interacted with Ms. Rusher, and knew about restrictions placed

on Ms. Rusher and her risks for self-harm. (Exhibit 7 at 72, 73, 75, 159, 179.)

PSOF 158.    Plaintiff's expert, Mr. Stanley, offers the opinion that

The primary reason that suicide smocks are provided to suicidal inmates is due to the universal understanding, in jails, that suicidal inmates can use articles of clothing, bedsheets and any other item that can be tied around a person's neck to attempt suicide. Standard practice for corrections officers is to examine any items given to a suicide risk inmate, for short term use, such as a towel or toothbrush, and then examine those same items when they are returned to the officer. This is not only common-sense correctional practice, but essential to the inmate's well-being, and the security of the jail.

(Exhibit 4 at 11.)

PSOF 159.    Superintendent Beck expected his officers to know that towels can be torn,

and that someone on high risk status should not have access to a towel.  (Exhibit 43 at 146-147.)

PSOF 160.    Sgt. John Kirby, who supervised the Jail's night shift in booking when

high risk detainees normally took showers, testified that it would have been normal to check

showers after high risk detainees used them. (Exhibit 56 at 58) He testified that for safety

reasons, he also would have expected his officers to conduct searches to make sure that nothing

had been tampered with after a high-risk inmate had conducted a shower.  (*Id*.)

PSOF 161.    Dr. Jeetwani offered essentially the same testimony about the manner in

which showers are supervised for potentially suicidal patients at McFarland.  He explained that

while Ms. Rusher was sometimes allowed to use a towel alone during a brief shower, it would

"be important" for staff to " check the towel . . . afterwards to make sure she hadn't ripped it," in

order to "make sure she was not, you know, trying to accumulate objects to hang herself or to

hurt herself with." (Exhibit 5 at 120.)

PSOF 162.     Ms. Rusher's shower was at the beginning of the afternoon shift.  Bouvet, Meyer, and Whitley had just started their afternoon shifts when Ms. Rusher requested a shower. (Exhibit 12 at 69; Exhibit 19 at 102; Exhibit 55 at 18.)

PSOF 163.     Bouvet cleared Ms. Rusher for taking a shower without requesting that a female officer be involved in the process from start to finish, without asking Meyer or Whitley whether they had any experience overseeing showers by high-risk detainees, and without cautioning Meyer or Whitley to inspect items given to Ms. Rusher before and after Ms. Rusher had taken a shower.  Bouvet (Exhibit 12 at 71.).  Bouvet was unaware that Ms. Rusher had told a nurse that she'd swallowed a bag. (Exhibit 12 at 123-124.)

PSOF 164.     Meyer and Whitley provided Ms. Rusher a towel without checking its condition beforehand. (Exhibit 55 at 47-48, Exhibit 19 at 122.)

PSOF 165.     During Ms. Rusher's shower, the door to the shower area was completely closed. (Exhibit 55 at 49-50.)  The shower lasted 5-10 minutes. (Exhibit 19 at 119.)

PSOF 166.     After the shower, neither Meyer, nor Whitley, nor Ealey checked the towel to determine whether it had been ripped or looked different than it had when the towel was given to Ms. Rusher. (Exhibit 19 at 122, Exhibit 7 at 174.)

PSOF 167.     When she saw the towel on the shower floor, Ms. Ealey noticed that it had tattered ends. (Exhibit 7 at 175.) The portion of the towel with tattered ends was a long strip along its end, with long strings coming off it:



(Exhibit 57.)

PSOF 168.     Upon noticing that the towel was tattered, Ealey made no further inquiry to determine whether Ms. Rusher had ripped a portion of the towel.  She did not inspect the towel further, did not inspect Ms. Rusher, did not inspect the shower area, and did not inquire with Mr. Meyer or Mr. Whitley about the original condition of the towel. (Exhibit 7 at 175.)

PSOF 169.     Mr. Meyer and Mr. Whitley also did not inspect the towel after the shower was completed. (Exhibit 19 at 122-23, 133; Exhibit 55 at 47.)

PSOF 170.     Had they done so, it would have been apparent that the towel had been ripped.

PSOF 171.     Before Ms. Rusher ripped the towel, it had intact edges and was in good condition.  Compare towel image *supra* with portion of towel that Ms. Rusher ripped:



(Exhibit 58)

PSOF 172.     Had Mr. Meyer or Mr. Whitley checked the towel before and after Ms.

Rusher used it, the fact that it had been ripped would have been obvious.  *See* towel images

*supra*.

PSOF 173.     Neither Meyer, nor Whitley, nor Ealey claims to have checked the shower

area after Tiffany was returned to her cell.

PSOF 174.     In the process of ripping the towel, Ms. Rusher had left strands of the

towel in the shower area:



(Exhibit 59)

PSOF 175.     Had Mr. Meyer, Mr. Whitley, or Ms. Ealey inspected the shower area after

Ms. Rusher used it, the ripped portion of towel would have been apparent. Ultimately Ms.

Rusher used that ripped portion to strangle herself.

PSOF 176.     Mr. Stanley offers the opinion that the officers' failure to protect Ms.

Rusher is inexplicable. (Exhibit 4 at 10.)

PSOF 177.     Mr. Stanley states that it was entirely appropriate to provide Ms. Rusher

with a shower.  Mr. Stanley observes:

> The primary reason that suicide smocks are provided to suicidal inmates is due to
> the universal understanding, in jails, that suicidal inmates can use articles of
> clothing, bedsheets and any other item that can be tied around a person's neck to
> attempt suicide. Standard practice for corrections officers is to examine any items
> given to a suicide risk inmate, for short term use, such as a towel or toothbrush,
> and then examine those same items when they are returned to the officer. This is
> not only common sense correctional practice, but essential to the inmate's well-
> being, and the security of the jail.

(Exhibit 4 at 11.)

PSOF 178.     Mr. Stanley is of the opinion that the responses by Whitley, Ealey, and

Meyer are "an example of the failed security practices provided to Ms. Rusher," and he offers the

opinion that

> Professional corrections officers in the position of Whitley, Ealey, and Meyer
> would know that a towel could be used as a potentially deadly tool for self harm,
> just as a torn piece of clothing or a torn bed sheet, may be used, because it is
> tearable.

(Exhibit 4 at 12.)

**ACH Video Summary**

PSOF 179.     Norman Johnson, ACH's president, has taken the position in training

videos that a jail "is not a health spa, and you don't have to make them better than they were

when they came in . . . ."  (Exhibit 63 at 7:09-7:27.)  Mr. Johnson takes the position that a jail

has no responsibility to make detainees better than when they came in because "[j]ails are short term. That's why the standard [of care] is so different in a jail." (*Id.* 7:45-50.)

PSOF 180.    Dr. Johnson also takes the position that general practice physicians, like board certified internists, can provide care not only for conventional illnesses like hypertension and diabetes; they "can also take care of mental health problems . . . . because [internists] are licensed to prescribe psychotropic drugs, as all primary care doctors are."

PSOF 181.    Dr. Kupers offers the opinion that even though Ms. Rusher engaged in acts of self-harm at McFarland, providing her with psychiatric care was her best chance of survival. "It is a grave mistake to assume that the treatment she received at McFarland failed because she would subsequently attempt self-harm or assault again." (Ex. 3 at 37.)  Rather, the psychiatric care at McFarland "is effective in preventing suicide, while isolation in a jail is correlated with a very high rate of suicide. In other words, no matter how difficult the patient is to manage, consistent therapeutic interventions like those she received at McFarland are the required mental health intervention with the greatest chance of eventual success at reducing self-harming and assaultive behavior, while prolonged solitary confinement of the kind she underwent at Sangamon County Jail, with less than adequate mental health treatment, is known to greatly increase risk of jail suicide." (Ex. 3 at 37.)

**PLAINTIFF'S RESPONSE TO THE DEFENSE STATEMENTS OF FACTS**

Pursuant to Local Rule 7.1(D)(2)(b)(1)-(4), Plaintiff responds to the statements of facts submitted by the Defendants. Plaintiff will refer to the Statements of Fact submitted by the ACH Defendants as "ADSOF" and the Statements of Fact submitted by the Sangamon Defendants as "SDSOF."

## A.    Disputed Material Facts

**AD-SOF 8.** On December 8, 2016, Tiffany hit an elderly peer with her fists, pulled him out of his wheelchair and stomped on him with her casted leg. When staff attempted to intervene, Tiffany kicked them, bit them, and pulled their hair. This exchange lead to criminal charges and Tiffany's transfer to the Sangamon County Jail. Exhibit 1, Bates No. ACH 261-2.

> **Undisputed that these allegations were made against Ms. Rusher, and undisputed that Ms. Rusher was charged with assault based on these allegations. Disputed that Ms. Rusher was "transferred" from McFarland Medical Center to the Jail. She was arrested at McFarland. Assertion is unsupported by document cited. Ms. Rusher was removed from McFarland because she was arrested.**

**AD-SOF 44.** Dr. Abraham and NP Dambacher prescribed Prazosin, Venlafaxine (Effexor), Chlorpromazine (Thorazine), and Divalproex (Depakote) to Tiffany based on her previous provider's judgment and their own clinical judgment. Exhibit 1, Bates No. ACH 112-129, Exhibit 4, p. 35:8-16, 37:4-17, 70:3-71:17 and Exhibit 5, p. 143:3-144:14.

> **Undisputed that Dr. Abraham and NP Dambacher prescribed Prazosin, Venlafaxine (Effexor), Chlorpromazine (Thorazine), and Divalproex (Depakote) to Ms. Rusher, and undisputed that these prescriptions reflected the clinical judgment of Ms. Rusher's providers at McFarland. Disputed that continuing these prescriptions reflected NP Dambacher's clinical judgment, as she lacks the licensing necessary. Dispute that prescrptions reflected Dr. Abraham's clinical judgment, as he did not review discharge summary.** *See* **PSOF ¶ 86-87.**

**AD-SOF 46.** High-risk observation cells are located at the booking area in the Sangamon County Jail. Tiffany was in a high-risk observation cell during most of her incarceration at the Sangamon County Jail. Exhibit 3, p. 60:9-61:5 and Exhibit 5, p.78:18-79:6.

> **Disputed. While some high risk cells are in the booking area within the line of sight of officers in the bullpen, other high risk cells open onto the hallway behind the booking bullpen, and are not within the line of sight of any person in the booking area.**

**AD-SOF 47.** High-risk observation cells are used for inmates who may try to harm themselves. The inmates are observed every 15 minutes, spoken to regularly by mental health staff, seen daily by nursing staff and seen weekly by the doctor or nurse practitioner. Exhibit 3, p. 34:5-13 and Exhibit 5, p. 84:15-23.

> **Disputed.** *See* **P-SOF ¶¶ 25-58**

**AD-SOF 49.** The location of the high-risk observation cell allowed Tiffany to interact with others frequently each day through her cell door. Exhibit 3, p. 43:7-14 and Exhibit 6, p. 55:6-21.

> **Disputed.** *See* **P-SOF ¶¶ 25-58.**

**AD-SOF 50.** On December 16, 2016, Michael Shmikler, LCSW (Mickey) met with Tiffany pursuant to a psychological referral based on Tiffany's history of treatment at McFarland. Exhibit 1, Bates No. ACH 099 and 099-B.

> **Disputed. ACH 099 reflects that the referral was made because Ms. Rusher was "arrested at McFarland."**

**AD-SOF 51.** Mickey provided mental health care at the Sangamon County Jail. Mickey worked at the Sangamon County Jail 28 hours per week (4 days a week, 7 hours per day.) See Deposition of Lydia Hicks, attached hereto as Exhibit 7, p. 19:10-18, 54:15-55:1.

> **Disputed that Mr. Shmikler provided mental health care beyond assessments and housing assignments.** *See* **P-SOF ¶¶ 98-100.**

**SD-SOF 11.** At all relevant times, the Jail had in place a protocol for correctional officers to complete a mental health referral form to notify mental health professionals of the need to evaluate mentally unstable detainees. (See Deposition of Larry Beck, attached as Group Exhibit 7, pp. 149-150; see also Ex. 5.)

> **Disputed. Beck testifies that the Jail had mental health referral forms that should be used for this purpose. Beck did not know whether or how the form was sent or whether it was sent to mental health professionals at all. (Exhibit 53 at 148:5-13)**

**SD-SOF 13.** Jail administrators defer to the judgment of mental health professionals concerning whether a detainee should be on 15-minute checks, or come off of 15-minute checks. (Ex. 6, pp. 55-56; Ex. 7, p. 80; see Deposition of William Strayer, attached as Group Exhibit 8, pp. 28-29.)

> **Undisputed that the Sangamon County Jail's administrators did defer to the judgment of ACH employees about whether the Sangamon County Jail's detainees should be on 15-minute checks, except that the Sangamon County Jail's policies did not permit for constant or 1:1 watch for an inmate who might need it. (See, e.g. Exhibit 61.)**
>
> **Plaintiff objects to this SOF as a legal assertion to which no response is required, to the extent the SOF purports to make a normative statement, *i.e.* that jail administrators *should* or *may* defer to the judgment of mental health professionals in the areas cited. Plaintiff would dispute such an assertion. (*See* P-SOF ¶ 57..) Furthermore, such a claim contradicts the law. *See, e.g.*, *Martinez v. Garcia*, 2012 WL 266352, at \*5 (N.D.Ill. Jan. 30, 2012) ("There can be no reasonable reliance on the judgment of a medical staff where it is obvious that the staff is failing to exercise its medical judgment.".)**

**SD-SOF 17.** Mental health professionals determine if a detainee should be referred to a psychiatrist while confined at the Jail. [d/e #177-11, pp. 98-99].

> **Undisputed that at the time of Ms. Rusher's incarceration at the Sangamon County Jail, the Sangamon County Jail's administrators made no attempt to determine whether or not a detainee should be referred to a psychiatrist while confined at the Jail, and left that decision entirely to ACH employees. Plaintiff objects to this SOF as a legal assertion to which no response is required, to the extent the SOF purports to make a normative statement, *i.e.* that only mental health professionals *should* or *may* determine if a detainee should be referred to a psychiatrist while confined to a jail. (*See* P-SOF ¶ 57..) Furthermore, such an assertion contradicts the law. *See, e.g.*, *Martinez***

**v. Garcia**, 2012 WL 266352, at *5 (N.D.Ill. Jan. 30, 2012) ("There can be no reasonable reliance on the judgment of a medical staff where it is obvious that the staff is failing to exercise its medical judgment.".)

**SD-SOF 18.** Jail administrators rely upon mental health professionals to determine if psychiatric referrals are necessary. (Ex. 6, pp. 45-46.)

> **Undisputed that at the time of Ms. Rusher's incarceration at the Sangamon County Jail, the Sangamon County Jail's administrators made no attempt to determine whether psychiatric referrals for detainees were necessary, and left that decision entirely to ACH employees.**
> **Plaintiff objects to this SOF as a legal assertion to which no response is required, to the extent the SOF purports to make a normative statement, *i.e.* that jail administrators *should* or *may* rely on mental health providers to determine if psychiatric referrals are necessary, without exception. (*See* P-SOF ¶ 57..) Furthermore, such an assertion contradicts the law. *See, e.g.*, *Martinez v. Garcia*, 2012 WL 266352, at *5 (N.D.Ill. Jan. 30, 2012) ("There can be no reasonable reliance on the judgment of a medical staff where it is obvious that the staff is failing to exercise its medical judgment.".)**

**SD-SOF 19.** Jail administration relied on mental health professionals to determine whether a detainee's mental health condition was beyond the range of services available at the Jail. (Ex. 6, pp. 30-31.)

> **Undisputed that at the time of Ms. Rusher's incarceration at the Sangamon County Jail, the Sangamon County Jail's administrators made no attempt to determine for themselves whether detainees' mental health condition was beyond the range or services available at the Jail, and instead relied entirely upon ACH employees.**
>
> **Disputed that the Sangamon County Jail's administrators actually believed or had reason to believe that the Sangamon County Jail offered adequate services to detainees who were seriously mentally ill. (P-SOF ¶ 103) Plaintiff objects to this SOF as a legal assertion to which no response is required, to the extent the SOF purports to make a normative statement, *i.e.* that jail administrators *should* or *may* rely entirely on mental health professionals to determine whether a detainee's mental health condition was beyond the range of services available at the Jail. (*See* P-SOF ¶ 57..) Furthermore, such an assertion contradicts the law. *See, e.g.*, *Martinez v. Garcia*, 2012 WL 266352, at *5 (N.D.Ill. Jan. 30, 2012) ("There can be no reasonable reliance on the judgment of a medical staff where it is obvious that the staff is failing to exercise its medical judgment.".)**

**SD-SOF 20.** Jail administrators conduct quality improvement meetings with ACH to address any issues concerning medical or mental health needs at the Jail. (Ex. 7, pp. 69-70.)

> **Disputed. The cited evidence does not support the proposition that Jail administrators conduct quality improvement meetings with ACH to address any issues concerning medical or mental health needs at the Jail. The witness testified that CQI consisted of "using our numbers" about how many people were seen, and that she knew little else about the CQI process. Ex. 7 at 51.**

**SD-SOF 21.** At all relevant times, Jail administrators had no information to suggest that they should question the recommendations of ACH mental health professionals working at the Jail. (Ex. 7, pp. 72-73.)

> **Disputed. *See* P-SOF ¶¶ 20, 23-24, 50-57.**

**SD-SOF 22.** Jail administrators believed that mental health professionals working at the Jail would conduct a clinical evaluation of a mentally unstable detainee, determine if treatment was necessary and, if so, develop a treatment plan. (Ex. 7, p. 77.)

> **Disputed. The cited evidence does not support the proposition that Jail administrators believed that mental health professionals working at the Jail would conduct a clinical evaluation of a mentally unstable detainee, determine if treatment was necessary and, if so, develop a treatment plan. The cited evidence is a statement by Mr. Beck about what he thought, and stated he believed that "I would think" that mental health staff "probably" performed the tasks in the statement. Circumstantial evidence, though, suggests Mr. Beck was on notice otherwise. *See* P-SOF ¶¶ 20, 23-24, 50-57.**

**SD-SOF 27.** High-risk cells I-15 and I-16 have windows on multiple sides. (Ex. 6, pp. 59-61.)

> **Undisputed to the extent windows exist; at the time of Ms. Rusher's incarceration, however, nearly all of these windows were covered. PSOF ¶¶ 35-41.**

**SD-SOF 28.** High-risk cells I-15 and I-16 are located in a high traffic area of the Sangamon County Jail. (See Deposition of Matthew Ward, attached as Group Exhibit 12, pp. 26-29.) These cells are located in a hallway used by officers and jail trustees to move about the first floor of the facility. (Ex. 12, pp. 26-29.)

**Undisputed that Cell I-15 is located within the booking area of the jail. Undisputed that the booking area surrounding the bullpen received intake in the jail, which involved persons coming in and out of booking. Object to the extent that "high traffic" is vague and a "weasel word" that implies, but does not establish, an unspecified level of traffic that is never quantified.**

**Disputed that Cell I-16 is in a "high traffic" area of the Jail in that it is not in booking. PSOF ¶¶ 25-50.**

**Undisputed that the hallway in front of Cell I-16 may sometimes be used by officers or jail trustees. Disputed that the hallway in front of Cell I-16 is frequently used by officers or jail trustees to move about the first floor of the facility. PSOF ¶¶ 25-50.**

**SD-SOF 29.** A detainee located in a high-risk cell can look through large windows into the hallway to see what is going on in the corridor. (Ex. 12, p. 28.) A detainee in a high-risk cell can also communicate through the large windows and it was typical for detainees in high-risk cells to talk to people as they walked by. (Ex. 12, pp. 28-29.)

**Disputed in that a detainee located in a high-risk cell can look through large windows into the hallway to see what is going on in the corridor, since the windows of the high risk cells are frequently covered. PSOF ¶¶ 25-50. Disputed in that there is typically anything "going on" in the corridor outside the back hallway facing certain high risk isolation cells. PSOF ¶¶ 25-50. Disputed in that "typical" is a vague word that does not establish a quantified level of activity. Disputed to the extent that this SOF implies that isolated detainees were successful in engaging persons walking by in conversation. PSOF ¶¶ 25-50.**

**SD-SOF 31.** At the start of every shift, a Jail supervisor was responsible for briefing all officers on that shift by reading aloud the Daily Activity Report ("DAR".) (Ex. 13, pp. 18-19.) The DAR would advise all correctional officers on that shift of any noteworthy things that happened during the prior shift and any security or high-risk issues concerning detainees. (Ex. 13, pp 19-21.)

**Undisputed that the DAR was read as part of briefing. Disputed that the DAR captured noteworthy things that had happened on the prior shift, as the defendants did not have policies in place designed to ensure that all noteworthy information would be communicated to the person preparing the DAR. PSOF ¶¶ 150.**

**SD-SOF 36.** The DAR identified any items that were to be restricted from use by a detainee. (Ex. 13, p. 52.)

**Disputed. The Jail lacked policies for ensuring that correctional staff preparing the DAR knew about restricted items.**

**SD-SOF 38.** If a high-risk detainee was ordered restricted access to a particular item, a mental health professional would need to be consulted prior to returning the item for use in the cell. (Ex. 13, p. 53.)

> **Disputed. The Jail lacked a system for ensuring that all restrictions were communicated to the person preparing the DAR. PSOF ¶¶ 148-49. For example, Ms. Rusher was restricted access to multiple items that she was nonetheless provided with or given access to by staff.** *Id.*

**SD-SOF 55.** The County Defendants incorporate by reference the recitation of Rusher's history at McFarland Mental Health Center from May 3, 2016, to December 14, 2016, as set forth in the Motion for Summary Judgment filed by Advanced Correctional Healthcare [d/e #177, ¶¶1-8 ("ACH Facts".)]

> **Plaintiff incorporates her responses to the referenced statements of fact.**

**SD-SOF 56.** The County Defendants incorporate by reference the recitation those portions of Rusher's medical history provided by ACH at the Sangamon County Jail as set forth in the Motion for Summary Judgment filed by ACH. [d/e #177, ¶¶10-42.]

> **Plaintiff incorporates her responses to the referenced statements of fact.**

**SD-SOF 57.** The County Defendants incorporate by reference the recitation of Rusher's mental health care at the Sangamon County Jail as set forth in the Motion for Summary Judgment filed by ACH. [d/e #177, ¶¶50-62.]

> **Plaintiff incorporates her responses to the referenced statements of fact.**

**SD-SOF 100.** On January 19, 2017, Rusher removed a black strap from her medical boot and wrapped it around her neck. (Ex. 21, SCP 1005-1006.) CO Pfeiffer observed this behavior,

entered cell I-14, cut the strap off of Rusher's neck and contacted medical. (Ex. 21, SCP 1005-1006.)

> **Disputed in that the cited evidence cited in this SOF does not support the proposition that Mr. Pfeiffer observed Ms. Rusher in the act of wrapping the strap around her neck. Otherwise undisputed.**

**SD-SOF 121.** On February 6, 2017, QMHP Shmikler met with Rusher and completed a Placement/Review of Detainee in Observation, noting Rusher's January 29 incident of swallowing a toothbrush, thought process and content within normal limits and denial of self-harm intent, suicidal or homicidal ideation. (ACH Facts, ¶57.)

> **Undisputed that Mr. Shmikler completed a Placement/Review of Detainee in Observation. Disputed that Mr. Shmikler "met with" Ms. Rusher; the evidence cited does not support a "meeting." There is no evidence in the record indicating that Mr. Shmikler met with Ms. Rusher face-to-face as opposed to through her steel cell door.**

**SD-SOF 146.** Jail Superintendent Larry Beck did not personally take part in any decision concerning Rusher's housing arrangements or restrictions. (Ex. 7, pp. 24-25.)

> **Object that "personally" and "decision" are vague in this context. Disputed. Beck personally oversaw the Jail's operations, including the delivery of mental healthcare to seriously mentally ill detainees, many of whom were confined to the Jail's isolation cells as a substitute for provision of adequate mental healthcare. *See* PSFO ¶¶ 57, 121-22, 132, 152.**

**SD-SOF 155.** On March 16, 2017, ACH medical staff documented Rusher reporting that she ate a bag, checked her vitals (normal), and called NP Dambacher. NP Dambacher ordered medical staff to take Rusher's blood pressure every 8 hours for 24 hours. (ACH Facts, ¶37.)

> **Plaintiff refers to her response to ACH Facts ¶ 37.**

**SD-SOF 192.** The towel looked like a used towel. (Ex. 11, p. 175.)

> **Disputed. The towel looked like a relatively new towel with a dramatic, new rip on one side. *See* PSOF ¶ 167.**

**SD-SOF 194.** CO Ealey did not observe the towel to be torn. (Ex. 11, p. 174.)

**Disputed.** She observed a fresh tear on the edge of the towel. PSOF ¶¶ 167-68.

**B.** **Undisputed Material Facts**

**AD-SOF 3.** The McFarland Discharge Summary included the following history between October 2014 and April 2016 while Tiffany was an inmate at the Illinois Department of Corrections: 10 attempts to hang / strangle herself, 12 incidents of self-injury, 3 incidents of swallowing pens, 7 incidents of choking with toilet paper, and 5 incidents of blocking her airway with food. Exhibit 1, Bates No. ACH 254.

     **Plaintiff's response:  Undisputed.**

**AD-SOF 4.** The McFarland Discharge Summary included primary diagnoses of Antisocial Personality Disorder and Borderline Personality Traits. Exhibit 1, Bates No. ACH 254.

     **Plaintiff's response:  Undisputed.**

**AD-SOF 5.** The McFarland Discharge Summary included the following history: May 2016 swallowing ink pen, June 2016 self-strangulation, September 2016 swallowing ink pen, a ring, and two quarters, November and December 2016 swallowing forks and multiple acts of aggression including hitting, punching, kicking, biting, shoving and spitting on staff and peers. Exhibit 1, Bates No. ACH 261.

     **Plaintiff's response:  Undisputed.**

**AD-SOF 7.** The McFarland Discharge Summary listed current mental health medications Prazosin, Venlafaxine, Chlorpromazine, and Divalproex. Exhibit 1, Bates No. ACH 261.

     **Undisputed.**

**AD-SOF 10.** On December 16, 2016, Nurse Tracy Hammitt, an ACH employee noted a call from a nurse at McFarland Mental Health Center, advising that Tiffany had a history of asphyxia and swallowing large food items and / or objects. Exhibit 1, Bates No. ACH 003, and See Deposition of Tracy Hammitt attached hereto as Exhibit 2, p.10:19-12:3.

**Undisputed.**

**AD-SOF 16.** On December 31, 2016, Tiffany reported falling on her left foot and NP Dambacher ordered additional x-rays which confirmed her existing tibia fracture. Exhibit 1, Bates No. ACH 017, 173.

**Undisputed.**

**AD-SOF 17.** On January 1, 2017, Dr. Abraham sent Tiffany to Memorial Medical Center for complaints of nausea and vomiting and additional treatment of her left leg and Nurse Hammitt documented orders from the ER for an ultrasound to rule out deep vein thrombosis. Dr. Abraham approved the orders on January 4, 2017 and the ultrasound completed on January 10, 2017 with negative results. Exhibit 1, Bates No. ACH 018, 174, 350-386.

**Undisputed.**

**AD-SOF 18.** On January 4, 2017, Dr. Abraham examined Tiffany and noted diagnoses of lower left extremity fracture, bipolar and schizophrenia and Tiffany's denial of suicidal or homicidal ideation. Dr. Abraham continued all previous orders. Exhibit 1, Bates No. ACH 021 and See Deposition of Arun Abraham, MD, attached hereto as Exhibit 5, p. 144:15-148:24.

**Undisputed.**

**AD-SOF 19.** On January 10, 2017, NP Dambacher examined Tiffany for complaints of nausea and vomiting Exhibit 1, Bates No. ACH 022.

**Undisputed.**

**AD-SOF 20.** On January 12, 2017, NP Dambacher examined Tiffany after Tiffany reported swallowing a spoon. NP Dambacher ordered Tiffany be transported to the emergency room as soon as possible. The emergency room provider removed the spoon and Nurse Hammitt requested the records from her visit the following day. NP Dambacher approved the discharge

order for Prilosec. Exhibit 1, Bates No. ACH 023-4, 388-417 and See Deposition of Mary

Dambacher, attached hereto as Exhibit 4, p. 15:1-10.

**Undisputed.**

**AD-SOF 21.** On January 17, 2017, Dr. Abraham examined Tiffany for complaints of a fall

resulting in a right- hand abrasion and discomfort to her left leg injury. Dr. Abraham noted

schizo-affective and impulse-control diagnoses and Tiffany's denial of suicidal or homicidal

ideation. Dr. Abraham ordered that Tiffany continue using her walking boot and Tiffany

received a band-aid for her right hand. Exhibit 1, Bates No. ACH 025-26 and Exhibit 5,

p.188:10-189:20.

**Undisputed.**

**AD-SOF 22.** On January 19, 2017, Nurse Billy Ernest, an ACH employee, evaluated Tiffany

after Tiffany self-strangulated with the strap from her walking boot. Nurse Ernest examined

Tiffany's neck, took her vitals, called NP Dambacher and reported the incident to Michael

Shmikler, LCSW. Exhibit 1, Bates No. ACH 027, Exhibit 4, p. 82:16-83:13 and See Deposition

of Billy Ernest, attached hereto as Exhibit 6, p. 41:17-42:21.

**Undisputed.**

**AD-SOF 23.** On January 20, 2017, Nurse Daniels called Dr. Pineda's office about issues with

the walking boot and for further orders. Dr. Pineda discontinued use of the walking boot and

ordered Tiffany to keep her leg non-weight bearing until her next appointment. Exhibit 1, Bates

No. ACH 028-29.

**Undisputed.**

**AD-SOF 24.** On January 24, 2017, Dr. Abraham evaluated Tiffany pursuant to her high-risk

status, examined her, noted her complaint of leg pain and ordered Tylenol, noted his

schizophrenia diagnosis and continued previous orders. Exhibit 1, Bates No. ACH 030-1 and Exhibit 5, p. 186:6-187:7.

**Undisputed.**

**AD-SOF 25.** On January 29, 2017, Nurse Hammitt examined Tiffany after a correctional officer reported that Tiffany swallowed a toothbrush. NP Dambacher ordered that Tiffany be sent to the emergency room. Tiffany transferred to the ER and the toothbrush was removed. Nurse Hammitt requested the records from her visit the following day. Exhibit 1, Bates No. ACH 035-36, 419-460, Exhibit 2, p.27:11-28:23, and Exhibit 4, p. 19:19-21:1.

**Undisputed.**

**AD-SOF 26.** On January 30, 2017, Tiffany reported swallowing a pen and a toothbrush. NP Dambacher ordered a chest x-ray completed on the same day. No pen or toothbrush was identified. Exhibit 1, Bates No. ACH 037, 176-7.

**Undisputed.**

**AD-SOF 27.** On January 31, 2017, Tiffany reported swallowing an unknown object. NP Dambacher ordered a chest x-ray, completed the same day. No object was identified.NP Dambacher ordered continued monitoring. Exhibit 1, Bates No. ACH 037, 178-80.

**Undisputed.**

**AD-SOF 28.** On February 2, 2017, Dr. Abraham examined Tiffany for her complaint of swallowing a toothbrush, noting a negative x-ray and impulse control disorder. Exhibit 1, Bates No. ACH 041, Exhibit 3, p. 38:17-40:6 and Exhibit 5, p. 193:16-196:17.

**Undisputed.**

**AD-SOF 29.** On February 7, 2017, ACH medical staff documented examining Tiffany for complaints of liver pain and a fall on her left leg and ordered an additional left foot x-ray. The x-

ray confirmed the tibia fracture and swelling. The same day medical staff noted that Tiffany

attempted to swallow an apple core and Dr. Abraham ordered no solid fruit. Exhibit 1, Bates No.

ACH 042-45, 181.

> **Undisputed.**

**AD-SOF 30.** On February 10, 2017, Dr. Abraham examined Tiffany and noted his assessment of

impulse control disorder and foot pain. Later the same evening ACH medical staff contacted Dr.

Abraham to report that Tiffany complained of chest pain and reported saving her morning dose

of Thorazine and taking it with other medications later in the day. Dr. Abraham ordered medical

staff to monitor Tiffany's vitals. Exhibit 1, Bates No. ACH 046-47 and Exhibit 5, p. 197:7-

199:23.

> **Undisputed.**

**AD-SOF 31.** On February 12, 2017, medical staff documented Tiffany's report of eating

mattress stuffing and Dr. Abraham ordered an abdominal x-ray, completed the same day and

negative for bowel obstruction. No foreign objects were identified. Exhibit 1, Bates No. ACH

048, 182.

> **Undisputed.**

**AD-SOF 32.** On February 23, 2017, medical staff documented Tiffany's report of swallowing

medical clips during her last visit to the hospital. The records reference her February 12, 2017 x-

ray showing, "no clips present." Exhibit 1, Bates No. ACH 053.

> **Undisputed.**

**AD-SOF 33.** On February 24, 2017, Nurse Billy Ernest examined Tiffany for a report she stuck

toilet paper up her nose and could not breathe. Nurse Ernest removed the toilet paper and

checked Tiffany's vital signs. Exhibit 1, Bates No. ACH 054, Exhibit 5, p.200:18-201:7 and Exhibit 6, p. 19:1-13.

       **Undisputed.**

**AD-SOF 34.** On February 25, 2017, Nurse Hammitt evaluated Tiffany in booking for self-inflicted abrasions to her left wrist. NP Dambacher ordered keeping the abrasion clean, monitoring for infection, encouraging the inmate to avoid self-harm, contacting mental health and providing a band-aid. Exhibit 1, Bates No. ACH 060.

       **Undisputed.**

**AD-SOF 35.** On February 27, 2017, medical staff evaluated Tiffany for complaint of a toothache and follow-up of the wrist abrasion, noted no signs or symptoms of infection for the tooth or wrist abrasions and ordered Tylenol. Exhibit 1, Bates No. ACH 060.

       **Undisputed.**

**AD-SOF 36.** On March 10, 2017, Nurse Hammitt documented Tiffany's current mental health medications (Depakote, Thorazine and Prazosin) and NP Dambacher ordered the medications continued for 90 days. Exhibit 1, Bates No. ACH 064 and Exhibit 4, p. 44:1-45:12.

       **Undisputed.**

**AD-SOF 37.** On March 16, 2017, medical staff documented Tiffany reporting that she ate a bag, checked her vitals (normal), and called NP Dambacher. NP Dambacher ordered medical staff to take Tiffany's blood pressure every 8 hours for 24 hours. Exhibit 1, Bates No. ACH 063.

       **Undisputed.**

**AD-SOF 38.** On March 17, 2017, Mickey completed a Placement / Review of Detainee in Observation. Mickey noted that Tiffany stood near the door of her cell to speak with him and was calm, cooperative, and smiling. Tiffany denied any self-harm intent or suicidal ideation.

Mickey noted Tiffany's expected upcoming release (March 29) and congratulated Tiffany for her recent good behavior. Exhibit 1, Bates No. ACH 072, Exhibit 7, p. 86:1-17.

> **Undisputed to the extent this SOF goes to what Mr. Shmikler recorded, not what Ms. Rusher said to him.**

**AD-SOF 39.** On March 18, 2017, Billy Ernest documented being called to the booking area because Tiffany had self-strangulated with the seam of a towel. Exhibit 1, Bates No. ACH 067 and Exhibit 6, p. 41:1-4, 62:4-63:5.

> **Undisputed.**

**AD-SOF 40.** EMS transported Tiffany to St. John's Hospital, and she died there on March 30, 2017. Exhibit 1, Bates No. ACH 299-315.

> **Undisputed.**

**AD-SOF 55.** On January 2, 2017, Mickey completed a Placement / Review of Detainee in Observation, noting Tiffany's battery charge, history of violent responses, thought process and content within normal limits and denial of self-harm intent, suicidal or homicidal ideation. Mickey met with Tiffany through the locked door of her cell. In the Section marked, "to be completed in consultation with Security Supervisor," Mickey marked, "Continue Observation," and, "Close (15 Minute Checks.)" Exhibit 1, Bates No. ACH 068.

> **Undisputed.**

**AD-SOF 56.** On January 27, 2017, Mickey completed a Placement / Review of Detainee in Observation, noting Tiffany's January 19 hanging attempt with the strap of her medical boot, thought process and content within normal limits and denial of self-harm intent, suicidal or homicidal ideation. Mickey met with Tiffany through the locked door of her cell. In the Section marked, "to be completed in consultation with Security Supervisor," Mickey marked, "Continue Observation," and, "Close (15 Minute Checks.)" Exhibit 1, Bates No. ACH 069.

**Undisputed.**

**AD-SOF 57.** On February 6, 2017, Mickey completed a Placement / Review of Detainee in Observation, noting Tiffany's January 29 incident of swallowing a toothbrush, thought process and content within normal limits and denial of self-harm intent, suicidal or homicidal ideation. Mickey met with Tiffany through the locked door of her cell. In the Section marked, "to be completed in consultation with Security Supervisor," Mickey marked, "Continue Observation," and, "Close (15 Minute Checks.)" Exhibit 1, Bates No. ACH 070.

**Undisputed.**

**AD-SOF 58.** On February 20, 2017, Mickey completed a Placement / Review of Detainee in Observation, noting Tiffany's February 11 report of self-harming thoughts, thought process and content within normal limits and denial of self-harm intent, suicidal or homicidal ideation. Mickey met with Tiffany through the locked door of her cell. In the Section marked, "to be completed in consultation with Security Supervisor," Mickey marked, "Continue Observation," and, "Close (15 Minute Checks.)" Exhibit 1, Bates No. ACH 071.

**Undisputed.**

**AD-SOF 59.** On March 17, 2017, Mickey completed a Placement / Review of Detainee in Observation, noting Tiffany's three incidents of Pica (swallowing non-food items) since her arrest, January 19 suicide attempt, February 11 thoughts of self-harm, thought process and content within normal limits and denial of self-harm intent, suicidal or homicidal ideation. Mickey met with Tiffany through the locked door of her cell. Tiffany reported an expected release of March 29, 2017. In the Section marked, "to be completed in consultation with Security Supervisor," Mickey marked, "Continue Observation," and, "Close (15 Minute Checks.)" Exhibit 1, Bates No. ACH 072, Exhibit 7, p. 86:1-17.

> **Undisputed.**

**AD-SOF 61.** Advanced Correctional Healthcare contracted with Sangamon County to provide a licensed clinical social worker at the jail 28 hours per week in December 2016, nursing staff on-site 24/7 and a physician on call 24/7. See Agreement for the Provision of Inmate Health Services and Amendments, attached hereto as Exhibit 9, Bates No. Sangamon County Produced, 1736-1755.

> **Undisputed.**

**SD-SOF 3.** Rusher was arrested on December 15, 2016, and taken into custody by police officers at approximately 11:58 am. (See Sangamon County Jail booking records, at Sangamon County Produced (hereinafter referred to as "SCP") 1641-1646, attached as Group Exhibit 2.)

> **Undisputed.**

**SD-SOF 5.** Rusher made four phone calls on December 15, 2016. (See IC Solutions Call Records, SCP 719-731, attached as Group Exhibit 4.)

> **Undisputed.**

**SD-SOF 6.** On December 16, 2016, a nurse at McFarland Mental Health Center ("McFarland") called Tracy Hammitt ("Hammitt"), an Advanced Correctional Healthcare ("ACH") nurse at the Sangamon County Jail, and provided Hammitt with information regarding Rusher's history at McFarland. [Advanced Correctional Healthcare organized records ("ACH __"), d/e #177-1; ACH 003].

> **Undisputed.**

**SD-SOF 9.** Medical and mental health staff are not Jail employees. The Jail does not directly employ medical staff. These services are provided through an independent contractor. (See Deposition of Terry Durr, attached as Group Exhibit 6, pp. 31-32.)

**Undisputed.**

**SD-SOF 10.** At the time Rusher was confined at the Jail, Sangamon County contracted with ACH to provide a licensed clinical social worker at the Jail 28 hours per week, nursing staff on-site 24/7 and a physician on call 24/7. [Agreement for the Provision of Inmate Health Services and Amendments, d/e #177-16].

**Undisputed.**

**SD-SOF 12.** Mental health professionals at the Jail determine if a detainee should be assigned and/or remain in high-risk status at the Jail for mental health reasons. [Deposition of Dr. Arun Abraham, d/e #177-11, pp. 97-98].

**Undisputed.**

**SD-SOF 14.** Persons housed in high-risk were monitored on 15-minute checks unless other orders were provided. (Ex., 8, p. 63; Ex. 7, pp. 120-121.)

**Undisputed.**

**SD-SOF 15.** Rusher was checked every 15 minutes pursuant to her placement on high risk and confirmed by orders from mental health. (See Placement/Review of Detainee in Observation forms, SCP 885-888, attached as Group Exhibit 9.)

**Undisputed.**

**SD-SOF 23.** Mental health professionals working at the Jail were permitted to meet with high-risk detainees by speaking through their cell door, or by entering the high-risk cell to provide evaluation or treatment when they deemed it appropriate. [Deposition of Lydia Hicks, d/e #177-14, pp. 42-43].

**Undisputed.**

**SD-SOF 25.** Cells I-02, I-03, I-04, I-15 and I-16 on the first floor of the Jail are designated as mental health cells. (See Deposition of Jennifer Ealey, attached as Group Exhibit 11, pp. 34-35.)

      **Undisputed.**

**SD-SOF 37.** High-risk detainees were to have the same items in their cell as other Jail detainees, unless there is a specific order by mental health professionals or Jail administration to be restricted based on conduct occurring at the Jail. (Ex. 13, p. 55.)

      **Undisputed.**

**SD-SOF 46.** The Jail does not offer rehabilitative programs to any detainee, regardless of security classification. (Ex. 7, p. 177.)

      **Undisputed.**

**SD-SOF 52.** From approximately October 19, 2014, to April 14, 2016, Rusher was confined at the Logan Correctional Center (an IDOC facility) on a felony conviction for aggravated criminal sexual abuse. (See McFarland Discharge Summary, attached as Group Exhibit 16, SCP 890-911 at 895; see also d/e 143, ¶24.) Rusher had a documented history of engaging in acts of self-harm while in the custody of the Department of Corrections. (Ex. 16.)

      **Undisputed.**

**SD-SOF 53.** Prior to her release from Logan Correctional Center, IDOC psychologists petitioned pursuant to the Illinois Mental Health Code, 405 ILCS 3-700, for Rusher to be involuntarily committed to a mental health facility in Cause No. 16-MH-1. (See Petition and Order in 16-MH-1, attached as Group Exhibit 17.)

      **Undisputed.**

**SD-SOF 54.** On May 3, 2016, following her release from Logan Correctional Center, Rusher was involuntarily committed to the McFarland Mental Health Center pursuant to an Order of the Logan County Circuit Court. (Ex. 17.)

      **Undisputed.**

**SD-SOF 60.** On December 14, 2016, Rusher was charged with one count of felony aggravated battery and two counts of misdemeanor battery in Cause No. 2016-CF-1287, filed in Sangamon County Circuit Court. (Ex. 1.)

      **Undisputed.**

**SD-SOF 62.** On December 15, 2016, officers arrested Rusher on a warrant for felony battery. (Ex 2, State Warrant, showing date of service, SCP 1644.)

      **Undisputed.**

**SD-SOF 63.** On December 15, 2016, upon her arrival for booking in the Sangamon County Jail Rusher was referred by a Sangamon County booking officer to ACH mental health professionals for a medical/psychological evaluation. (Ex. 5, SCP 889.)

      **Undisputed.**

**SD-SOF 65.** On December 15, 2016, an ACH nurse entered a Special Diet Order for Rusher, beginning on that date, until her date of discharge. (See Special Diet Orders, attached as Group Exhibit 20, SCP 182, 521-522; Ex. 7, pp. 153-154.) The Special Diet Order stated that Rusher should be given "no plastic eating utensils, no pens, no caps, no paper, no potato chip bags . . . drinks must be supervised . . . cup remove immediately. No brush. No comb. No toothbrush. No TP more than 8 squares. Must have finger foods." (Ex. 20, SCP 182, 521-522; Ex. 7, pp. 153-154.)

      **Undisputed.**

**SD-SOF 71.** On December 19, 2016, at approximately 10:45 p.m., Rusher was observed havin

removed the hard cast from her leg and foot, which had been applied prior to her time at the Jail.

She was transported to the hospital for treatment. (See Jail Incident Reports, attached as Group

Exhibit 21, SCP 988-1020, at 1009-1010.)

    **Undisputed.**

**SD-SOF 72.** On December 19, 2016, Dr. Abraham examined Rusher, documented her left lower

extremity fracture of the tibia, and sent her to the emergency room to have a new splint applied

to her ankle fracture. (ACH Facts, ¶12; ACH 006.)

    **Undisputed.**

**SD-SOF 73.** On December 20, 2016, Rusher was seen at Memorial Medical Center in the ER by

Dr. Christopher Miedema who ordered an X-ray of her left leg and ankle after Rusher reported

that she cut her cast off that evening. (See Memorial Medical Center records, attached as Group

Exhibit 22, at MMC 226.) Rusher was ordered to have a splint reapplied at the ER, with specific

orders that the splint was not to be removed until confirmed by her orthopedist. (Ex. 22, p. 216.)

    **Undisputed.**

**SD-SOF 74.** Rusher is documented to have been in the hospital on December 20, 2016, at 12:03

a.m. and discharged at 7:22 a.m. later that same morning. (Ex. 22, pp. 246-247.)

    **Undisputed.**

**SD-SOF 75.** On December 20, 2016, Rusher was returned from the hospital and at

approximately 8:25 a.m. was housed in single-occupancy in cell I-15. (Ex. 3, SCP 2746; Ex. 19,

SCP 1596.)

    **Undisputed.**

**SD-SOF 76.** On December 25, 2016, ACH Nurse Hammitt documented re-wrapping Rusher's leg after she removed her brace. (ACH Facts, ¶13; ACH 009.)

    **Undisputed.**

**SD-SOF 77.** On December 27, 2016, Rusher was transported out of the Jail to a doctor's appointment at the Springfield Clinic with off-site orthopedic provider, Dr. Steven Pineda. (Daily Shift Activity Reports ("DAR"), 12/15/16 thru 03/26/17, attached as Group Exhibit 23, SCP 4975-5275 at 004988; see also Ex. 22, p. 223.)

    **Undisputed.**

**SD-SOF 78.** On December 29, 2016, Rusher was sent for x-rays, per an order of Dr. Pineda. (ACH 015.)

    **Undisputed.**

**SD-SOF 79.** On December 29, 2016, Dr. Pineda ordered a walking boot for Rusher's left ankle. (ACH Facts, ¶15; ACH 015.)

    **Undisputed.**

**SD-SOF 80.** On December 31, 2016, Rusher met with ACH NP Dambacher complaining of pain in her leg. (ACH 017.) At approximately 11:15 p.m., Jail staff took Rusher to the hospital for concerns regarding a possible blood clot in her leg. (Ex. 23, SCP 4975; Ex. 22, p. 203.)

    **Undisputed.**

**SD-SOF 81.** Rusher was assessed by MMC medical staff, including Dr. Della Cruz, and it was documented that Rusher was still wearing the prescribed medical boot. (Ex. 22, p. 143.) Rusher was discharged at 2:52 a.m. on January 1, 2017, with vital signs within normal limits. (Ex. 22, pp. 133, 202-203.)

    **Undisputed.**

**SD-SOF 83.** On January 2, 2017, QMHP Shmikler met with Rusher and completed a

Placement/Review of Detainee in Observation, noting Rusher's battery charge, history of violent

responses, thought process and content within normal limits and denial of self-harm intent,

suicidal or homicidal ideation. (ACH Facts, ¶55; see also Ex. 9, SCP 888.)

> **Undisputed.**

**SD-SOF 84.** Shmikler designated Rusher on "observation/high risk" classification and placed her

on "close" observation, to be visually observed by corrections staff on 15-minute intervals. (Ex.

9, SCP 888.) Shmikler's placement review indicated that Rusher should be allowed only "suicide

attire" in her cell. (Ex. 9, SCP 888.)

> **Undisputed.**

**SD-SOF 86.** On January 4, 2017, Dr. Abraham noted diagnoses of lower left extremity fracture,

bipolar and schizophrenia and Rusher's denial of suicidal or homicidal ideation. Dr. Abraham

continued all previous orders. (ACH 021.)

> **Undisputed.**

**SD-SOF 88.** During subsequent assessments of January 27, February 6, February 20, QMHP

Shmikler reaffirmed that Rusher should remain on "observation/high risk" classification and

placed on "close" observation, to be visually observed by corrections staff on 15-minute

intervals. (Ex. 9, SCP 885-888.)

> **Undisputed.**

**SD-SOF 89.** Each placement review indicated that Rusher should be allowed "suicide attire."

(Ex. 9, SCP 885-888.) At each placement review, QMHP Shmikler determined that "[t]he

patient's safety can be best [assured or maintained] by her remaining in high risk status in the

booking area." (Ex. 9, SCP 885-888.) Detainees designated as high-risk by mental health are provided with an anti-suicide "smock" that cannot be torn apart. (Ex. 11, p. 165.)

> **Undisputed.**

**SD-SOF 91.** On January 10, 2017, NP Dambacher examined Rusher for complaints of nausea and vomiting. (ACH Facts, ¶19; ACH 022.)

> **Undisputed.**

**SD-SOF 92.** On January 11, 2017, QMHP Shmikler cleared Rusher from high-risk for mental health reasons. (See Inmate Clearing form, attached as Exhibit 24, SCP 9027.)

> **Undisputed.**

**SD-SOF 93.** On January 12, 2017, at approximately 1:34 p.m., Rusher was moved to a female housing unit on the second floor, cell FeC-01. (Ex. 23, SCP 5080.)

> **Undisputed.**

**SD-SOF 94.** On January 12, 2017, at approximately 6:00 p.m., Rusher attempted to swallow a spoon, which became lodged in her throat. (Ex. 21, SCP 1007-1008.) Rusher was transported to the hospital for treatment. (Ex. 21, SCP 1007-1008.)

> **Undisputed.**

**SD-SOF 95.** NP Dambacher examined Rusher after Rusher reported swallowing a spoon. NP Dambacher ordered Rusher be transported to the emergency room as soon as possible. (ACH Facts, ¶20.)

> **Undisputed.**

**SD-SOF 96.** Rusher was assessed by ER hospital medical staff, including Dr. Anna McCormick, and ordered for a CT scan. (Ex. 22, p. 95.) Hospital medical staff noted that Rusher vomited up the spoon while at the hospital. (Ex. 22, p. 82.)

**Undisputed.**

**SD-SOF 97.** Rusher was discharged from the hospital at approximately 10:54 p.m. with all vital signs within normal limits. (Ex. 22, p. 68.)

**Undisputed.**

**SD-SOF 98.** On January 13, 2017, at approximately 12:11 a.m., Rusher was returned to the Jail, and housed in single-occupancy in high-risk cell I-14. (Ex. 3, SCP 2746; Ex. 19, SCP 1572.)

**Undisputed.**

**SD-SOF 99.** On January 17, 2017, at approximately 9:35 a.m., Rusher met with Nurse Hammitt complaining of fall the night before and a hand abrasion. (ACH 025.) Dr. Abraham examined Rusher the same day at approximately 1:40 p.m. for complaints of a fall resulting in a right-hand abrasion and discomfort to her left leg injury. (ACH Facts, ¶21; ACH 026.)

**SD-SOF 101.** On January 19, 2017, ACH Nurse Ernest, an ACH employee, examined Rusher's neck after the incident with the medical boot strap, took her vitals, called NP Dambacher and reported the incident to QMHP Shmikler (ACH Facts, ¶22.)

**Undisputed.**

**SD-SOF 102.** On January 20, 2017, ACH Nurse Daniels called Dr. Pineda's office about issues with the walking boot and for further orders. Dr. Pineda discontinued use of the walking boot and ordered Rusher to keep her leg non-weight bearing until her next appointment. (ACH Facts, ¶22; ACH 029.)

**Undisputed.**

**SD-SOF 103.** On January 24, 2017, Dr. Abraham evaluated Rusher pursuant to her high-risk status, examined her, noted her complaint of leg pain, ordered Tylenol, and continued previous orders. (ACH Facts, ¶24.)

**Undisputed.**

**SD-SOF 104.** On January 25, 2017, an ACH nurse met with Rusher, who had complained that she fell, but was observed laughing when the nurse arrived and stood up with little help. (ACH 032.)

**Undisputed.**

**SD-SOF 105.** On January 27, 2017, QMHP Shmikler met with Rusher and completed a Placement/Review of Detainee in Observation, noting Rusher's January 19 act of self-harm with the strap of her medical boot, thought process and content within normal limits and denial of self-harm intent, suicidal or homicidal ideation. (ACH Facts, ¶56.)

**Undisputed.**

**SD-SOF 110.** On January 29, 2017, Childress provided Rusher with a toothbrush for use in her cell while under observation and Rusher appeared to try to swallow the toothbrush. (Ex. 25, pp. 11-12; Ex. 21, SCP 1003-1004.) Officers intervened, contacted medical and Rusher was transported to the hospital for evaluation at approximately 1:10 p.m. (Ex. 25, pp. 11-12; Ex. 21, SCP 1003-1004; Ex. 23, SCP 5029.)

**Undisputed.**

**SD-SOF 111.** Nurse Hammitt examined Rusher after a correctional officer reported that Rusher swallowed a toothbrush. NP Dambacher ordered that Rusher be sent to the emergency room. (ACH Facts, ¶25; ACH 035.)

**Undisputed.**

**SD-SOF 112.** Rusher was evaluated at Memorial Medical Center by emergency room staff for a complaint of swallowing a toothbrush. ER staff Carol Lantz RN and John Jessen MD document

that Rusher presented as a recurrent swallower of foreign bodies and that she has been seen multiple times for swallowing food utensils. (Ex. 22, p. 27.)

    **Undisputed.**

**SD-SOF 113.** A CT scan showed no evidence of the toothbrush in Rusher's body. (Ex. 22, p. 29) Hospital staff discharged Rusher back to the jail at approximately 4:44 p.m. (Ex. 22, p. 19.)

    **Undisputed.**

**SD-SOF 115.** On January 29, 2017, medical ordered Rusher placed on a clear liquid diet for 48 hours. (Ex. 20, SCP 521; ACH 036.) Jail staff was instructed that Rusher was no longer allowed the use of a toothbrush, even on a monitored basis, and they were to place the toothpaste on her finger. (Ex. 23, SCP 5028.)

    **Undisputed.**

**SD-SOF 116.** On January 30, 2017, Rusher reported swallowing a pen and a toothbrush. NP Dambacher ordered a chest x-ray completed on the same day. No pen or toothbrush was identified. (ACH Facts, ¶26.)

    **Undisputed.**

**SD-SOF 117.** On January 31, 2017, Rusher reported swallowing an unknown object.  NP Dambacher ordered a chest x-ray, completed the same day. No object was identified. NP Dambacher ordered continued monitoring. (ACH Facts, ¶27.)

    **Undisputed.**

**SD-SOF 119** On February 2, 2017, Dr. Abraham examined Tiffany for her complaint of swallowing a toothbrush, noting a negative X-ray and impulse control disorder. (ACH Facts, ¶28.)

    **Undisputed.**

**SD-SOF 120** On February 6, 2017, Rusher was transported out of the Jail for a doctor's appointment. (Ex. 23, SCP 5182.)

   **Undisputed.**

**SD-SOF 124.** On February 7, 2017, Rusher attempted to swallow an apple core whole. (Ex. 26, pp. 25-28; Ex. 23, SCP 5178.) Corrections staff observed this behavior, Sgt. Brown responded in less than a minute, and quickly removed the apple core. (Ex. 26, pp. 26-27.) Medical staff and the kitchen were advised of the incident. (Ex. 26, pp. 27-28.)

   **Undisputed.**

**SD-SOF 125.** On February 7, 2017, ACH medical staff documented examining Rusher for complaints of liver pain and a fall on her left leg and ordered an additional left foot X-ray. The same day medical staff noted that Rusher attempted to swallow an apple core and Dr. Abraham ordered Rusher to have no solid fruit. (ACH Facts, ¶29; Ex. 20, SCP 182; ACH 044.)

   **Undisputed.**

**SD-SOF 127.** On February 10, 2017, at approximately 8:37 p.m., Rusher informed jail staff that she was having thoughts of self-harm. Medical was notified of the incident. (Ex. 21, SCP 999-1000.)

   **Undisputed.**

**SD-SOF 129.** On February 10, 2017, Dr. Abraham examined Rusher and noted his assessment of impulse control disorder and foot pain. (ACH Facts, ¶30.)

   **Undisputed.**

**SD-SOF 131.** On February 11, 2017, at approximately 7:15 p.m., Rusher informed jail staff that she was having thoughts of self-harm. (Ex. 21, SCP 998-999.) Medical was notified of the incident. (Ex. 21, SCP 998-999.)

> **Undisputed.**

**SD-SOF 134.** On February 12, 2017, Rusher was discovered swallowing her mattress stuffing and was placed on "No Mat" status. (Ex. 23, SCP 5162.)

> **Undisputed.**

**SD-SOF 135.** Medical staff documented Rusher's report of eating mattress stuffing and Dr. Abraham ordered an abdominal x-ray, completed the same day and negative for bowel obstruction. No foreign objects were identified. (ACH Facts, ¶31.)

> **Undisputed.**

**SD-SOF 137.** On February 20, 2017, QMHP Shmikler met with Rusher and completed a Placement/Review of Detainee in Observation, noting Rusher's February 11 report of self-harming thoughts, thought process and content within normal limits and denial of self-harm intent, suicidal or homicidal ideation. (ACH Facts, ¶58.)

> **Undisputed.**

**SD-SOF 138.** On February 24, 2017, ACH Nurse Billy Ernest examined Rusher for a report she stuck toilet paper up her nose and could not breathe. Nurse Ernest removed the toilet paper and checked Rusher's vital signs. (ACH Facts, ¶33; ACH 054.)

> **Undisputed.**

**SD-SOF 139.** On February 25, 2017, ACH Nurse Hammitt evaluated Rusher for self-inflicted abrasions to her left wrist. NP Dambacher ordered keeping the abrasion clean, monitoring for infection, encouraging the inmate to avoid self-harm, contacting mental health and providing a Band-Aid. (ACH Facts, ¶34; ACH 060.)

> **Undisputed.**

**SD-SOF 140.** On February 27, 2017, medical staff evaluated Rusher for complaint of a toothache and follow-up of the wrist abrasion, noted no signs or symptoms of infection for the tooth or wrist abrasions and ordered Tylenol. (ACH Facts, ¶35.)

> **Undisputed.**

**SD-SOF 143.** Sergeant John Kirby was a correctional officer assigned to midnight shift at the Jail during the time that Rusher was housed there. (Ex. 13, pp. 6-7.)

**SD-SOF 147.** Beck was aware of Rusher's location in the Jail and would say hi when he passed by her cell. (Ex. 7, pp. 15-16.)

> **Undisputed.**

**SD-SOF 157.** On March 17, 2017, QMHP Shmikler completed a Placement/Review of Detainee in Observation. QMHP Shmikler noted that Rusher stood near the door of her cell to speak with him and was calm, cooperative and smiling. Rusher denied any self-harm intent or suicidal ideation. QMHP Shmikler noted Rusher's expected upcoming release (March 29) and congratulated Rusher for her recent good behavior. (ACH Facts, ¶38; ACH 072.)

> **Undisputed.**

**SD-SOF 158.** On March 18, 2017, Guy Bouvet, III was employed as a Sergeant with the Sangamon County Sheriff's Office, Division of Corrections. (See Deposition of Guy Bouvet, attached as Group Exhibit 28, p. 6.) On that date, Sgt. Bouvet was the evening (second) shift supervisor at the Sangamon County jail. (Ex. 28, p. 6.)

> **Undisputed.**

**SD-SOF 160.** First shift for corrections officers at the Jail ran from approximately 7:15 a.m. to 4:15 p.m. (Ex. 11, p. 64.) Second shift ran from approximately 2:30 p.m. to 11:30 p.m. (Ex. 11, p. 64.) Third shift ran from approximately 10:45 p.m. to 7:45 a.m. (Ex. 11, p. 65.)

**Undisputed.**

**SD-SOF 161.** On March 18, 2019, at approximately 2:30 p.m., Sgt. Bouvet provided officers with a shift briefing, the DAR, notifying them of Rusher's "high risk" status and her placement in mental health cell I-16. (Ex. 28, pp. 29-30, 42; Ex. 23, SCP 5223-5224.)

**Undisputed.**

**SD-SOF 163.** On March 18, 2017, Officer Kyle Meyer was employed as a Corrections Officer with the Sangamon County Sheriff's Office. (Ex. 14, p. 5.) On that date, he was working second shift. (Ex. 14, p. 28.)

**Undisputed.**

**SD-SOF 164.** On March 18, 2017, CO Meyer was assigned to serve as the first floor "rove" responsible, in part, for 15-minute checks on detainees in the mental health cells. (Ex. 14, pp. 47-48, 102-103.)

**Undisputed.**

**SD-SOF 165.** The records for Rusher's cell I-16 confirm that her cell was checked consistently throughout the day on March 18, 2017, including checks at 3:02 p.m., 3:16 p.m., and 3:30 p.m. (See Cell Detail form, attached as Exhibit 29, SCP 1967.)

**Undisputed.**

**SD-SOF 166.** During the 3:00 p.m. cell check, Rusher contacted CO Meyer and requested to use the shower, because she stated that she had soiled herself. (Ex. 14, pp. 108, 111.)

**Undisputed.**

**SD-SOF 167.** CO Meyer then spoke with Sgt. Bouvet and conveyed Rusher's request for special shower access, because she had soiled herself. (Ex. 28, p. 67.)

**Undisputed.**

**SD-SOF Sg168. t.** Bouvet inquired about Rusher's behavior and upon learning that she was not showing any signs of difficulty or agitation approved the request. (Ex. 28, pp. 67-68; Ex. 14, p 111.)

 **Undisputed.**

**SD-SOF 169.** Sgt. Bouvet anticipated that Rusher would be provided a towel to dry herself and was not aware of any administrative directives or medical limitations placed on Rusher's use of a bath towel. (Ex. 28, pp. 70-71.)

 **Undisputed.**

**SD-SOF 171.** On March 18, 2017, Zach Whitley was a Corrections Officer with the Sangamon County Sheriff's Office. (See Deposition of Zach Whitley, attached as Group Exhibit 30, p. 8.)

 **Undisputed.**

**SD-SOF 172.** On March 18, 2017, CO Whitley was assigned to the booking area of the Sangamon County jail. (Ex. 30, p. 9.)

 **Undisputed.**

**SD-SOF 173.** After receiving approval from Sgt. Bouvet, CO Meyer located CO Whitley, and the two officers escorted Rusher out of her cell and into a nearby linen storage area to obtain a bath towel and new smock for Rusher to change into. (Ex. 14, p. 117.)

 **Undisputed.**

**SD-SOF 174.** After retrieving the towel and a fresh smock, CO Meyer and CO Whitley escorted Rusher to the shower. (Ex. 14, p. 118; Ex. 30, p. 47.)

 **Undisputed.**

**SD-SOF 176.** CO Meyer and CO Whitley did not enter the shower area with Rusher, because she was a female detainee, but maintained verbal contact with her through the door to the shower during her 5 to 10 minute shower. (Ex. 14, p. 119; Ex. 30, pp. 53-54.)

      **Undisputed.**

**SD-SOF 178.** Upon learning that Rusher's fresh smock did not fit, CO Meyer retrieved a new smock and also contacted CO Ealey, a female corrections officer who happened to be near the booking area, to assist Rusher with the smock. (Ex. 14, pp. 121-123.)

      **Undisputed.**

**SD-SOF 179.** On March 18, 2017, Jennifer Ealey was a Corrections Officer with the Sangamon County Sheriff's Office. (Ex. 11, p. 8.) CO Ealey was working first shift. (Ex. 11, p.159.)

      **Undisputed.**

**SD-SOF 181.** At the end of her shift on the third floor, CO Ealey took her scanner down to the computer system on the first floor to be downloaded. (Ex. 11, p. 159.)

      **Undisputed.**

**SD-SOF 182.** While she was there to download her scanner, Meyer asked Ealey to assist him with walking a female back to her cell. (Ex. 11, p. 161.)

      **Undisputed.**

**SD-SOF 183.** CO Ealey opened the doorway to the shower and assisted Rusher with the new smock, while CO Meyer and CO Whitley remained in the hallway outside the shower. (Ex. 14, p. 125; Ex. 11, p. 163.)

      **Undisputed.**

**SD-SOF 184.** When CO Ealey arrived at the doorway to the shower, Rusher had completed her shower and was done drying herself off. (Ex. 11, p. 173.)

**Undisputed.**

**SD-SOF 186.** CO Ealey observed a bath towel on the floor of the shower room. (Ex. 11, p. 173.)

       **Undisputed.**

**SD-SOF 189.** Ealey would not leave the shower door open when taking a male inmate for a shower. Officers would generally stand outside the door of opposite sex inmates when showering. (Ex. 11, pp. 171-172.)

       **Undisputed.**

**SD-SOF 190.** Ealey saw that Rusher had left her towel on the floor in the shower room. (Ex. 11, p. 173.)

       **Undisputed.**

**SD-SOF 198.** CO Ealey did not ask CO Meyer or CO Whitley about the condition of the towel. (Ex. 11, p. 182.)

       **Undisputed.**

**SD-SOF 199.** CO Ealey was asked to walk Rusher back to her cell only. (Ex. 11, pp. 184, 186.)

       **Undisputed.**

**SD-SOF 200.** CO Ealey did not know what the other officers had done prior to assisting Rusher on March 18, 2017. (Ex. 11, p. 185.)

       **Undisputed.**

**SD-SOF 201.** After Rusher left the shower area, CO Meyer picked up the dirty smock, the poor fitting smock and the bath towel and took these linens to the laundry. (Ex. 14, pp. 127-128.)

       **Undisputed.**

**SD-SOF 205.** At approximately 3:30 p.m., CO Meyer conducted another 15-minute cell check, finding that Rusher had committed an act of self-harm by tying an item around her neck, and called for assistance. (Ex. 30, p. 71.)

    **Undisputed.**

**C.    Disputed Immaterial Facts**

**AD-SOF 8.** On December 8, 2016, Tiffany hit an elderly peer with her fists, pulled him out of

his wheelchair and stomped on him with her casted leg. When staff attempted to intervene,

Tiffany kicked them, bit them, and pulled their hair. This exchange lead to criminal charges and

Tiffany's transfer to the Sangamon County Jail. Exhibit 1, Bates No. ACH 261-2.

> **Undisputed that these allegations were made against Ms. Rusher, and undisputed
> that Ms. Rusher was charged with assault based on these allegations.  Disputed that
> Ms. Rusher was "transferred" from McFarland Medical Center to the Jail.  She was
> arrested at McFarland.  Assertion is unsupported by document cited.  Ms. Rusher
> was removed from McFarland because she was arrested.**

**AD-SOF 49.** The location of the high-risk observation cell allowed Tiffany to interact with

others frequently each day through her cell door. Exhibit 3, p. 43:7-14 and Exhibit 6, p. 55:6-21.

> **Disputed.  *See* P-SOF ¶¶ 25-58.**

**AD-SOF 50.** On December 16, 2016, Michael Shmikler, LCSW (Mickey) met with Tiffany

pursuant to a psychological referral based on Tiffany's history of treatment at McFarland.

Exhibit 1, Bates No. ACH 099 and 099-B.

> **Disputed.  ACH 099 reflects that the referral was made because Ms. Rusher was
> "arrested at McFarland."**

**AD-SOF 52.** As part of his duties, Mickey met with all high-risk inmates including Tiffany

Rusher each time he was at the jail. Mickey prepared a Mental Health Services – Referral

Tracking form to indicate which inmates he would see and note his evaluation. Exhibit 7, p.

24:16-25:7, 27:6-28:2, 29:10-30:23, 31:12-33:19.

> **Disputed that the referenced form reflects any evaluation beyond the recording of a
> GAF score.**

**AD-SOF 53.** Mickey met with and evaluated Tiffany 48 times between December 19, 2016 and March 15, 2017. Exhibit 1, Bates No. ACH 099-C-107, Exhibit 3, p. 46:9-47:1, Exhibit 5, p. 173:7-174:21 and Exhibit 7, p. 93:18-94:5, 120:6-122:8.

> **Disputed that Mr. Shmikler ever met with Ms. Rusher as all interactions occurred through a closed steel door. Disputed that most meetings constituted "evaluations." The Prisoner Location Verification forms typically reflect entries of "OK" indicating that no actual evaluation occurred. *See* ACH Ex. 3 at ACH 206-52. Disputed that the referenced form reflects any evaluation beyond the recording of a GAF score.**

**AD-SOF 54.** For each of the 48 evaluations, Mickey documented a mental health rating and GAF (global assessment of functioning) score. Exhibit 1, Bates No. ACH 099-C-107 and Exhibit 7, pg. 27:6-28:2, 29:10-30:23, 31:12-33:19, 57:10-58:2.

> **Disputed that the referenced form reflects any evaluation beyond the recording of a GAF score.**

**AD-SOF 62.** Plaintiff has not identified any inpatient mental health facility that would have accepted Tiffany Rusher if such a transfer was sought.

> **Plaintiff objects that this statement of fact is confusing as worded. To the extent Defendants failed to develop relationships with facilities to accept inmates in need of inpatient care, in contradiction to the Sheriff's own policies and IDOC regulations, identifying a location for Ms. Rusher would likely be made more difficult. Subject to this objection, Disputed. ACH's own employees and agents testified that they could gain admission to inpatient facilities via psychiatric or emergency room referrals. And Dr. Jeetwani testified that McFarland would accept Ms. Rusher on a voluntary basis through a clinical referral. *See* PSOF ¶ 116-20; 125-28.**

**SD-SOF 7.** Based upon information provided by McFarland and documented through the booking process, Rusher was referred immediately to mental health for assessment and recommendations. (See Medical/Psychological Referral form, SCP 889, attached as Exhibit 5.)

> **Disputed. SCP 889 indicates the referral was made because Ms. Rusher was transferred from McFarland, not because of any information in the documentation sent with her.**

**SD-SOF 16.** Detainees housed in high-risk cells were aware that they would need to be cleared by mental health professionals prior to being moved to a less secure environment. (See Deposition of Vicki Thompson, attached as Group Exhibit 10, p. 18.)

> **Disputed as unsupported by the evidence cited. Ms. Thompson does not know what detainees were aware of.**

**SD-SOF 24.** Mental health professionals working at the Jail would engage with the detainee in any type of therapy that the detainee was open to. [d/e #177-14, pp. 120-121].

> **Disputed. There was insufficient mental health staffing at the Sangamon County Jail to provide therapy to the Jail's detainees. PSOF ¶¶ 98-100. Despite written policies stating that group therapy was to be provided to detainees who needed it, no such group therapy was provided at the jail. PSOF ¶¶ 96. Mental health treatment plans, which would guide therapy, were never created for detainees in the high risk cells. PSOF ¶ 90-91.**

**SD-SOF 26.** These mental health cells are not used for disciplinary segregation or for solitary confinement. (Ex. 11, p. 38.) The Jail has different cells located on the third floor used for disciplinary segregation. (Ex. 11, p. 38.)

> **Disputed that the cells are not used for solitary confinement. *See* P-SOF ¶¶ 20, 23-24, 50-57. Otherwise undisputed.**

**SD-SOF 35.** At each 15-minute check, correctional officers are expected to make sure the detainee is okay and answer any questions they have. (Ex. 13, p. 32.) If the inmate is awake and so chooses, there is an opportunity for communication with the correctional officer four times every hour. (Ex. 13, p. 46.)

> **Undisputed that correctional officers are expected to make sure the detainee is okay on the 15-minute checks. Disputed that guards can make themselves available for conversation when a detainee desires, as the guards must keep on schedule to complete 15-minute checks of other cells on time. Unable to identify record cited in support of this proposition within the Defendants' filings.**

**SD-SOF 38.** If a high-risk detainee was ordered restricted access to a particular item, a mental health professional would need to be consulted prior to returning the item for use in the cell. (Ex. 13, p. 53.)

> **Disputed. The Jail lacked a system for ensuring that all restrictions were communicated to the person preparing the DAR. PSOF ¶¶ 148-49. For example, Ms. Rusher was restricted access to multiple items that she was nonetheless provided with or given access to by staff.** *Id.*

**SD-SOF 39.** When certain items were restricted by orders of mental health professionals, that item, such as a cup or toothbrush, would not generally be denied entirely, but given to the detainee on a limited basis under observation. (Ex. 7, pp. 179-180.)

> **Disputed. The diet order barred toothbrushes entirely but Ms. Rusher was given one anyway. Ms. Rusher was also given access to a spoon and bag which were both prohibited by the diet order. PSOF ¶¶ 148-49.**

**SD-SOF 41.** All high-risk detainees were offered a daily shower on midnight shift between 11 p.m. and 1 a.m., and were given about a half an hour to shower. (Ex. 13, pp. 23-24, 27.)

> **Disputed that Ms. Rusher was allowed a daily shower.** *See* **PSOF ¶ 59**

**SD-SOF 42.** High risk detainees would be escorted to the shower, given a cup of soap or shampoo and given a clean uniform. (Ex. 13, p. 25.)

> **Disputed. Ms. Rusher was only permitted to change her suicide smock every third day. See PSOF 59.**

**SD-SOF 43.** During daily showers on midnight shift, detainees were provided with a towel for use in the shower area. (Ex. 13, p. 27.)

> **Undisputed, except as to the characterization of showers as "daily." See Plaintiff's response to SD-SOF 41.**

**SD-SOF 44.** On midnight shift, high-risk detainees were permitted to use a phone, which was located near the booking desk. (Ex. 13, p. 48.) High-risk detainees could use the phone during

their shower time, or request to use the phone at another time at the discretion of the officers on duty. (Ex. 13, pp. 47-49.)

**Undisputed that detainees were sometimes permitted to use a phone; disputed that permission to use the phone outside of the midnight shower time was routinely granted. The fact that the established slot for calls was the Jail's midnight shift, when anyone the detainee was likely to call was likely to be asleep and unable to answer, suggests that detainees were not often permitted to make calls at more convenient times, because few detainees would choose to make calls to family and friends who were likely to be asleep and less likely to answer.**

**SD-SOF 48.** Sheriff Barr understood that Illinois law requires the County jail to keep custody of charged felons, absent an order from the court. (Ex. 15, pp. 68-69.)

**Disputed. The Sheriff's own policies and IDOC regulations governing jails provided otherwise and it is reasonable to infer that a sheriff would be aware of such policies. PSOF ¶ 25.**

**SD-SOF 49.** Jail administrators understood that under Illinois law, the Jail cannot refer a criminally charged detainee to a mental health facility, but instead mental health professionals may make recommendations to the courts for appropriate placement by court order. (Ex. 8, pp. 36-39; 50-51.)

**Disputed. Cited evidence concerns only a single employee's claimed knowledge or state of mind. The Sheriff's own policies provide for mental health transfers in those cases where the jail cannot provide for a detainee's mental healthcare needs, and does not limit only to those who would be placed _involuntarily_ by court order. PSOF ¶ 25. Illinois statutes and the IDOC's regulations provide otherwise. _See_ 730 ILCS 5/3-7-7; 20 Ill. Admin. Code § 701.70(b)(6.) Medical employees at the Jail testified that mental health transfers could be accomplished by referrals to psychiatrists or hospital emergency room. PSOF ¶ 127-28.**

**SD-SOF 58.** On December 8, 2016, Rusher was involved in an incident at McFarland Mental Health Center, in which she kicked a McFarland nurse, pulled an elderly patient from his wheelchair, repeatedly kicked him while he was on the ground, and then assaulted multiple nurses who attempted to intervene. (See Deposition Testimony of Brenda Booth, attached as

Group Exhibit 18, pp. 41-45; see also Ex. 16, SCP 911.) McFarland staff documented Rusher's

history of similar prior incidents of assaultive conduct while she was there. (Ex. 18, pp. 29-34;

see also Ex. 16, SCP 902.) Rusher was attacking other patients every day she was at the

McFarland facility. (Ex. 18, pp. 30, 61.)

> **Undisputed that on December 8, 2016, Rusher was involved in an incident at McFarland Mental Health Center, in which she kicked a McFarland nurse, pulled an elderly patient from his wheelchair, repeatedly kicked him while he was on the ground, and then assaulted multiple nurses who attempted to intervene.**
> **Disputed that Ms. Rusher had a "history of similar prior incidents of assaultive conduct while she was there." The documents cited do not establish that other conduct Ms. Rusher engaged in was similar to the December 8 incident.**
> **Disputed that Ms. Rusher attacked other patients every day she was at the McFarland facility. The witness cited appears to be engaged in hyperbole. The witness stated that Ms. Rusher did not attack people early in her time at the facility. (Ex. 18 p. 80.) Tiffany was often housed in a different building than where the witness worked. (*Id.* at 30-31.) The witness went on leave while Ms. Rusher was at McFarland, but could not remember for how long. (*Id.* at 28.) Moreover, the McFarland discharge summary sent to the Jail notes only a handful of assaults during her time at McFarland.**

**SD-SOF 59.** McFarland records reflect that Rusher was fitted with a cast on her leg and ankle at

the time of alleged assault incident. (Ex. 16, SCP 902.) Rusher used the cast to assault

McFarland staff. (Ex. 16, SCP 902.)

> **Undisputed that Ms. Rusher was accused of acts asserted in this SOF. The information relied upon for this SOF is insufficient to establish that those acts actually occurred.**

**SD-SOF 61.** On December 14, 2016, Rusher was discharged from McFarland by Dr. Ajay

Jeetwani, who documented that her aggressive behavior was premeditated and consistent with an

antisocial personality disorder. (Ex. 16, SCP 902.)

> **Disputed; object that the term "discharge" is vague. Ms. Rusher was removed from McFarland medical center because she was arrested there after being charged with a crime. (*See* SD-SOF ¶ 62.)**

**SD-SOF 64.** On December 15, 2016, Rusher was housed with two other female detainees in cell

I-15. (See Daily Admin. Disciplinary Reports, attached as Group Exhibit 19, SCP 1509-1601 at

1601.)

> **Undisputed that at some time on December 15, 2016, Ms. Rusher was so housed. Disputed to the extent this SOF is understood to mean that Ms. Rusher was so housed for all of December 15, 2016. The document cited in support of this SOF supports neither of those propositions. *See also* SD-SOF ¶ 68.**

**SD-SOF 69.** On December 16, 2016, Rusher was evaluated by ACH social worker Michael

Shmikler, LCSW ("Shmikler"), a qualified mental health professional ("QMHP".) (Ex. 5., SCP

889; d/e #177-14, pp. 17-19.)

> **Disputed that Mr. Shmikler evaluated Ms. Rusher. The document cited states merely that Mr. Shmikler met with Ms. Rusher, and offers no evaluation of her mental or psychological condition.**

**SD-SOF 107.** Childress had daily interactions with Rusher and was on a first-name basis with

her. (Ex. 25, pp. 11, 21.)

> **Undisputed that Ms. Rusher and Ms. Childress knew each other's first names. Disputed that Ms. Rusher and Ms. Childress had daily interactions with each other. The evidence cited supports the proposition only that Ms. Childress and Ms. Rusher interacted when Ms. Childress was assigned to 15-minute checks; when Ms. Childress delivered food; and certain times when Ms. Rusher was housed in a cell that Ms. Childress passed on the way to booking. (Ex. 25 at 25.)**

**SD-SOF 108.** Childress would regularly answer Rusher's questions and discuss with her

anything that would come to Rusher's mind. (Ex. 25, p. 21.)

> **Disputed. The document cited supports the proposition only that Ms. Rusher tried to initiate conversations with Ms. Childress on a variety of topics (such as "what time is it"); Ms. Childress would engage in a "discuss[ion]" in response. (Ex. 25 at 21.) In three months of daily interaction with Ms. Rusher, the only "personal" conversation that Ms. Childress had with Ms. Rusher, which was about Ms. Rusher's family, occurred after Ms. Rusher swallowed a toothbrush and Ms. Childress accompanied her to the hospital. (Ex. 25 at 21-23.) Ms. Childress could not recall any other personal conversation with Ms. Rusher. (*Id.* at 23.)**

**SD-SOF 109.** Based on their discussions, Childress was aware that Rusher's mother had kicked her out of the house and that her dad was a drug addict. (Ex. 25, pp. 21-22.)

> **Disputed that this knowledge occurred as the result of conversations at Ms. Rusher's cell door. The only time Ms. Rusher had an opportunity to engage in a personal conversation with Ms. Childress was after Ms. Rusher engaged in an act of self-harm and Ms. Childress accompanied her to the hospital. (Ex 25 at 22-23.)**

**SD-SOF 123.** Sgt. Brown would interact with Rusher 3-4 times per shift. (Ex. 26, p. 14.)

> **Undisputed there was interaction on occasions when Sgt. Brown would pass by Ms. Rusher's cell. Sgt. Brown's testimony indicates that on such occasions Ms. Rusher would attempt to engage Sgt. Brown in conversation but Sgt. Brown would limit the interaction to a few words, and Sgt. Brown would then move on. (Ex. 26 at 14.)**

**SD-SOF 126.** On February 9-10, 2017, Rusher was housed with another female detainee in cell I-03. (Ex. 23, SCP, 6169-5171; Ex. 19, SCP 1544-1545.)

> **Disputed that Ms. Rusher was "housed" with another detainee in Cell I-03. (*See* PSOF 5 Ex. 7 Ealey Dep at 50-51 (distinguishing between long-term "housing" and short term "placement".) The cited document (Ex. 19, SCP 1544-1545) indicates that on these dates the high-risk cells were overcrowded with detainees. Compare with PSOF ¶ 27 (indicating five high-risk cells.)**

**SD-SOF 128.** On February 10, 2017, from approximately 8:37 p.m. to 10:30 p.m., Rusher was located in single-occupancy in cell I-02 for her safety. (Ex. 23, SCP 5168-5169.)

> **Undisputed that Ms. Rusher was housed in Cell I-02. The cited document does not support the proposition that Ms. Rusher was moved from Cell I-03 to I-02 for her safety, since both cells are rated as high risk and feature 15-minute checks.**

**SD-SOF 130.** On February 10-11, 2017, Rusher was returned to be housed with another female detainee in cell I-03. (Ex. 19, SCP 1543-1544.)

> **Disputed that Ms. Rusher was "housed" with another detainee in Cell I-03. (*See* PSOF ¶ 27 Ealey Dep at 50-51 (distinguishing between long-term "housing" and short term "placement".) The cited document (Ex. 19, SCP 1544-1545) indicates that on these dates the high-risk cells were overcrowded with detainees. Compare with PSOF ¶ 27 (indicating five high-risk cells.)**

**SD-SOF 133.** On February 12, 2017, Rusher moved to cell I-16 and housed with another female

detainee. (Ex. 23, SCP 5162; Ex. 19, SCP 1542.)

> **Disputed.** *See* **response to SD-SOF ¶ 130.**

**SD-SOF 145.** Rusher was generally given access to coffee from the commissary when it was

deemed safe by jail supervisors. (Ex. 25, pp. 23-24.)

> **Disputed. The cited document does not support the assertion. On page 10 of his**
> **deposition Sgt. Kirby states that he would "occasionally" give Ms. Rusher coffee**
> **(Ex. 25 at 10.)**

**SD-SOF 149.** Rusher was visited by a mental health professional employed by ACH on

approximately 48 occasions between December 19, 2016 and March 17, 2017. [d/e #177, ¶53].

> **Undisputed that Mr. Shmiker's schedule theoretically allowed for this many**
> **passages by Ms. Rusher's cell. Dispute to the extent that "visit" implies an**
> **appointment or visit for the purpose of providing mental health treatment, or that**
> **the "visit" involved in-person interaction, as opposed to observation through a steel**
> **door. The records cited do not support either such proposition.**

**SD-SOF 152.** Rusher made no requests to participate in rehabilitative programs during her time

at the Sangamon County Jail. (Ex. 7, p. 184.)

> **Disputed. The cited evidence does not support the proposition for which it is**
> **offered. Mr. Beck did not state that Ms. Rusher had not requested to participate in**
> **certain programs; he said he was not aware of whether Ms. Rusher asked to**
> **participate in certain programs. Mr. Beck later reiterated "I can [only] speak for**
> **myself and I don't know if she ever asked anybody else" for opportunities to leave**
> **her isolation cell. (Ex. 7, p. 186.)**

**SD-SOF 187.** CO Ealey did not observe any small pieces of towel on the shower room floor.

(Ex. 11, p. 213.)

> **Disputed, to the extent that the record indicates that Ms. Ealey observed that the**
> **towel had a tattered edge. PSOF ¶ 167-68. The "ragged" edge of the towel had**
> **numerous long strings that were coming off the towel. PSOF ¶ 167.**

**SD-SOF 191.** Ealey did not examine the condition of the towel, because it was normal for a

towel to be left on the floor of the shower area. (Ex. 11, p. 174.)

**Undisputed that Ealey claimed that she did not examine the condition of the towel. because it was normal for a towel to be left on the floor of the shower area.**

**SD-SOF 202.** CO Meyer did not observe, recall or document anything unusual about the towel he picked up after Rusher's shower. (Ex. 14, p. 131.)

**Undisputed; except disputed to the extent the SOF implies that Mr. Meyer inspected the towel in any manner, as there is no evidence that he did so. PSOF ¶ 169.**

**D.**     **Undisputed Immaterial Facts**

**AD-SOF 1.** On May 3, 2016, Tiffany was discharged directly from Logan Correctional Center to McFarland Mental Health Center. See, Plaintiff's Third Amended Complaint, ¶24.

> **Undisputed.**

**AD-SOF 2.** Tiffany Rusher received treatment at McFarland Mental Health Center from May 3, 2016 to December 14, 2016. Sangamon County Jail received her Discharge Summary and included it in her medical record at the jail. Dr. Ajay Jeetwani authored the Discharge Summary. See Sangamon County Jail Medical Records, attached hereto as Exhibit 1, Bates No. ACH 253-266.

> **Undisputed.**

**AD-SOF 6.** The McFarland Discharge Summary detailed a November 2016 incident wherein Tiffany fell and sustained a spiral fracture of her tibia, removed her cast and re-fractured the same ankle in December 2016. Exhibit 1, Bates No. ACH 261.

> **Undisputed.**

**AD-SOF 6.** The McFarland Discharge Summary detailed a November 2016 incident wherein Tiffany fell and sustained a spiral fracture of her tibia, removed her cast and re-fractured the same ankle in December 2016. Exhibit 1, Bates No. ACH 261.

> **Undisputed.**

**AD-SOF 9.** On December 15, 2016 Tiffany Rusher entered the Sangamon County Jail pursuant to felony charges for aggravated battery. Exhibit 1, Bates No. ACH 001.

> **Undisputed.**

**AD-SOF 11.** On December 17, 2016, ACH medical staff documented re-wrapping Tiffany's splint and providing pain medications. Exhibit 1, Bates No. ACH 005.

**Undisputed.**

**AD-SOF 12.** On December 19, 2016, Dr. Abraham examined Tiffany, documented her left lower extremity fracture of the tibia, and sent her to the emergency room to have a new splint applied to her ankle fracture. Tiffany was ordered to follow up with Dr. Pineda, her treating orthopedic physician Exhibit 1, Bates No. ACH 006-7, 318-348.

**Undisputed.**

**AD-SOF 13.** On December 25, 2016, Nurse Hammitt documented re-wrapping Tiffany's leg and an upcoming appointment with Dr. Pineda. Exhibit 1, Bates No. ACH 009.

**Undisputed.**

**AD-SOF 14.** On December 28, 2016, Nurse Kate Daniels, an ACH employee, noted a call from Dr. Pineda's nurse requesting additional imaging for Tiffany's fracture. Nurse Practitioner Mary Dambacher, an ACH employee, ordered the x-ray the same day. Exhibit 1, Bates No. ACH 011-12, 172 and See Deposition of Kate Daniels, attached hereto as Exhibit 3, p. 33:1-6.

**Undisputed.**

**AD-SOF 15.** On December 29, 2016, Dr. Pineda (off-site orthopedic provider) ordered a walking boot for Tiffany's left ankle. Exhibit 1, Bates No. ACH 015-16, 296.

**Undisputed.**

**AD-SOF 41.** From March 16 to March 18, 2017, Rusher was seen by nurses for medication pass three times each day and took her medications as prescribed. Exhibit 1, Bates No. ACH 112-129.

**Undisputed.**

**AD-SOF 42.** From March 16 to March 18, 2017, Tiffany was housed in high-risk observation cell, checked every 15 minutes, clothed in a suicide smock and restricted from having any items in her cell. Exhibit 3, p. 60:9-61:5 and Exhibit 5, p.78:18-79:6

**Undisputed.**

**AD-SOF 43.** Dr. Abraham reviewed medication administration records (MAR) once a month to ensure Tiffany was taking medications as prescribed, and relied on medical staff, correctional officers, refusal forms and his own observations. Exhibit 2, p. 25:23-26:20, Exhibit 3, p. 24:7-17, Exhibit 4, p. 32:2-10, Exhibit 5, p. 60:5-18, 67:10-71:24, Exhibit 6, p. 15:1-8.

**Undisputed.**

**AD-SOF 45.** A nurse and a correctional officer hand out medications to inmates at the Sangamon County Jail 2 or 3 times per day, each day, at 8:00 AM, 1:00 PM and 8:00 PM. Medical staff passed medication to Tiffany three times per day. Exhibit 1, Bates No. ACH 112-129, Exhibit 3, p. 104:1-13, Exhibit 6, p. 17:3-11.

**Undisputed.**

**AD-SOF 48.** Dr. Abraham assessed suicidal or homicidal ideation with high-risk inmates during his weekly interactions. Exhibit 5, p. 128:15-22, 193:8-15.

**Undisputed.**

**AD-SOF 60.** Dr. Killian performed a psychiatric interview and examination on January 5, 2017 to determine Tiffany's fitness to stand trial. Dr. Killian issued a report on January 25, 2017 finding that Tiffany was fit to stand trial. See Dr. Killian's Forensic Evaluation, attached hereto as Exhibit 8.

**Undisputed.**

**SD-SOF 1.**   The Sangamon County Jail (the "Jail") is a County detention facility located in Springfield, Illinois.

**Undisputed.**

**SD-SOF 2.** On December 14, 2016, an arrest warrant was issued for felony charges against Rusher. (See Case Information Sheet for State v. Rusher, 2016-CR-1287, attached as Group Exhibit 1.)

       **Undisputed.**

**SD-SOF 4.** Rusher was brought to the Sangamon County Jail on December 15, 2016, at approximately 12:34p.m. and placed in Booking Cell I-15. (See Inmate Housing History Report, SCP 2746, attached as Exhibit 3.)

       **Undisputed.**

**SD-SOF 8.** Rusher presented in person before Judge Perrin on December 16, 2016, for her first appearance on the felony charges. (Ex. 1.)

       **Undisputed.**

**SD-SOF 30.** The high risk cells at the Jail permit a detainee to both see and hear through the door, such that the detainee can have a conversation with the correctional officer, or other person walking past. (See Deposition of John Kirby, attached as Group Exhibit 13, p. 46.)

       **Undisputed.**

**SD-SOF 32.** The DAR identified which detainees were on high-risk status and required 15-minute checks or other safety restrictions. (Ex. 13, pp. 21-23.)

       **Undisputed.**

**SD-SOF 33.** The Sangamon County Jail has assigned for each shift one correctional officer who works as a first floor "rove" responsible for 15-minute checks on detainees in the high-risk cells, as well as providing meals to the detainees. (See Deposition of Kyle Meyer, attached as Group Exhibit 14, pp. 47-48, 102-103.)

       **Undisputed.**

**SD-SOF 34.** Officers are required to press an electronic indicator at each cell to register that the cell check has been performed on the correct time increments. (Ex. 14, p. 49.)

 **Undisputed.**

**SD-SOF 40.** All inmates at the Jail were allowed to use towels while in the shower, including those on high-risk status, unless there was an order from mental health to the contrary. (Ex. 7, pp. 178-179.) As with restricted use of a cup or toothbrush, a towel would be provided for limited use, then taken back by the correctional officer prior to returning the detainee to the high-risk cell. (Ex. 7, pp. 178-179.)

 **Undisputed.**

**SD-SOF 45.** High-risk detainees were served meals in their cell three (3) times a day, with the meal delivered by a correctional officer or Jail trustee. (Ex. 13, p. 49.)

 **Undisputed.**

**SD-SOF 47.** Wes Barr served as Sheriff of Sangamon County from 2014-2018. (See Deposition of Wes Barr, attached as Group Exhibit 15, p. 8.)

 **Undisputed.**

**SD-SOF 50.** Rusher was the only suicide in the jail during Sheriff Barr's tenure. (Ex. 15, p. 39.)

 **Undisputed.**

**SD-SOF 51.** Rusher was the only suicide in the jail during Superintendent Beck's tenure. (Ex. 7, p. 72.)

 **Undisputed.**

**SD-SOF 66.** There were no orders from medical staff restricting Rusher from having a towel associated with a shower. (Ex. 20, SCP 182, 521-522; Ex. 7, pp. 153-154.)

 **Undisputed.**

**SD-SOF 67.** On December 16, 2016, Rusher appeared in court in Cause No. 2016-CF-1287, her bond was set at $75,000 and she was remanded to the custody of the Sangamon County Sheriff pending trial for felony assault. (Ex. 1.)

    **Undisputed.**

**SD-SOF 68.** On December 16, 2016, at approximately 12:34 p.m. Rusher was housed in single-occupancy in high-risk cell I-15. (Ex. 3, SCP 2746; Ex. 19, SCP 1600.)

    **Undisputed.**

**SD-SOF 70.** On December 17, 2016, ACH medical staff documented re-wrapping Rusher's splint and providing pain medications. (ACH Facts, ¶11; ACH 005.)

    **Undisputed.**

**SD-SOF 82.** On January 1, 2017, at approximately 3:06 a.m., Rusher was returned to the Jail and housed in single-occupancy in high-risk cell I-15. (Ex. 3, SCP 2746; Ex. 19, SCP 1584.)

    **Undisputed.**

**SD-SOF 85.** On January 3, 2017, Rusher was moved from high-risk cell I-15 to single-occupancy in high-risk cell I-14. (Ex. 23, SCP 5106; Ex. 19, SCP 1582.)

    **Undisputed.**

**SD-SOF 87.** On January 5, 2017, Dr. Killian performed a psychiatric interview and examination to determine Rusher's fitness to stand trial. Dr. Killian issued a report on January 25, 2017, finding that Rusher was fit to stand trial. (ACH Facts, ¶60.)

    **Undisputed.**

**SD-SOF 90.** No placement review by QMHP Shmikler indicated that Rusher should be prohibited from temporary use of a bath towel during a shower. (Ex. 11, p. 165.)

    **Undisputed.**

**SD-SOF 106.** Officer Melissa Childress ("Childress") was a day shift correctional officer at the Sangamon County Jail during the time that Rusher was housed there. (See Deposition of Melissa Childress, attached as Group Exhibit 25, p. 6.)

      **Undisputed.**

**SD-SOF 114.** On January 29, 2017, at approximately 5:00 p.m., Rusher was returned to single occupancy housing in high-risk cell I-14. (Ex. 23, SCP 5028; Ex. 19, SCP 1556.)

      **Undisputed.**

**SD-SOF 118.** On January 31, 2017, Rusher was moved from cell I-14 to single-occupancy in cell I-03. (Ex. 3, SCP 2746; Ex. 19, SCP 1554.)

      **Undisputed.**

**SD-SOF 122.** Sergeant Vivian Brown was a correctional officer assigned to second shift at the Jail during the period that Rusher was housed there. (Deposition of Vivian Brown, attached as Group Exhibit 26, pp. 8, 11.)

      **Undisputed.**

**SD-SOF 132.** On February 11, 2017, from approximately 7:26 p.m. to 10:08 p.m., Rusher was again temporarily located in single-occupancy cell I-12 for her safety. (Ex. 23, SCP 5166.)

      **Undisputed.**

**SD-SOF 136.** On February 14, 2017, Rusher was housed in single-occupancy in cell I-16. (Ex. 3, SCP 2746; Ex. 19, SCP 1539.)

      **Undisputed.**

**SD-SOF 141.** Sgt. Thompson was a Court Liaison Officer located at the Sangamon County Jail during the time Rusher was housed there. (Ex. 10, pp. 14-15.) Her office was located across from high-risk cells I-15 and I-16. (Ex. 10, pp. 14-15.)

      **Undisputed.**

**SD-SOF 142.** Sgt. Thompson interacted with Rusher on multiple occasions and was on a first-name basis with her. (Ex. 10, pp. 11-12.)

> **Undisputed.**

**SD-SOF 144.** Sgt. Kirby would occasionally interact with Rusher on midnight shift. (Ex. 13, pp. 9- 10.) Kirby would occasionally give Rusher a cup of coffee or a snack. (Ex. 13, p. 10.)

> **Undisputed.**

**SD-SOF 148.** When he walked by her cell, Beck observed that Rusher was always talking to someone. (Ex. 7, pp. 17-18.)

> **Undisputed.**

**SD-SOF 150.** During the period she was confined at the Jail from December 15, 2016, to March 17, 2017, Rusher accessed the jail phone system on 406 occasions. (Ex. 4, SCP 719-731.) The Jail call log reflects that Rusher successfully completed calls on approximately 108 of those occasions. (Ex. 4, SCP 719-731, column 9.)

> **Object that "access" is vague; undisputed that Ms. Rusher attempted to place 406 phone calls, nearly all of which occurred at the midnight hour. Undisputed that on 108 occasions the call connected with another telephone.**

**SD-SOF 151.** During the period she was confined at the Jail from December 16, 2016, to March 18, 2017, Rusher was observed every 15 minutes at all times she was housed in the booking area. (Ex. 9, SCP 885-888.)

> **Undisputed.**

**SD-SOF 153.** On January 15, February 16, February 23, March 2, March 13, and March 15, 2017, Rusher was transported out of the Jail and to court on her criminal case. (Ex. 1.)

> **Undisputed.**

**SD-SOF 154.** On March 15, 2017, Rusher appeared in court on her criminal case No. 2016-CF-1287. (Ex. 1.) By agreement of the parties, her criminal case was set for a plea hearing and Rusher was to remain in the Sangamon County Sheriff's custody until such hearing could be held. (Ex. 1.)

    **Undisputed.**

**SD-SOF 156.** From March 16 to March 18, 2017, Rusher was seen by nurses for medication pass three times each day and took her medications as prescribed. (ACH Facts, ¶41.)

    **Plaintiff refers to her response to ACH Facts ¶ 44.**

**SD-SOF 158.** On the morning of March 18, 2017, Rusher spoke to Correctional Officer Chris Unthank and indicated that she was leaving the jail in a couple of days. (See Deposition of Chris Unthank, attached as Group Exhibit 27, pp. 17-18.)

    **Undisputed.**

**SD-SOF 162.** Sgt. Bouvet did not personally have any interaction with Rusher on March 18, 2019. (Ex. 28, pp. 73-74.)

    **Undisputed.**

**SD-SOF 170.** Sgt. Bouvet instructed CO Meyer to take an additional officer for the safety of Rusher and the officers. (Ex. 28, p. 70; Ex. 14, p. 112.)

    **Undisputed with clarification that Bouvet issued the instruction pursuant to a protocol that all jail detainees should be accompanied by two officers when moving in the Jail. (Ex. 28 at 70.)**

**SD-SOF 175.** CO Whitley checked the shower area for any materials that Rusher might try to swallow, finding none. (Ex. 30, pp. 47, 58.)

    **Undisputed.**

**SD-SOF 177.** After Rusher turned the water off, she indicated to CO Meyer and CO Whitley that the fresh anti-suicide smock did not fit properly. (Ex. 14, p. 119; Ex. 30, 55.)

      **Undisputed.**

**SD-SOF 180.** On March 18, 2017, CO Ealey was not assigned to the first floor of the Jail, but had a shift on the third floor. (Ex. 11, p. 14.)

      **Undisputed.**

**SD-SOF 185.** CO Ealey observed Rusher changing into a new smock. (Ex. 11, p. 204.)

      **Undisputed.**

**SD-SOF 188.** Inmates were typically provided a towel when given a shower. (Ex. 11, pp. 168-169.)

      **Undisputed.**

**SD-SOF 193.** CO Ealey did not see the towel in a laid out, full length as was shown in Deposition Exhibit 11 to her deposition. (Ex. 11, pp. 174-176.)

      **Undisputed.**

**SD-SOF 195.** CO Ealey escorted Rusher back to her cell. (Ex. 14, p. 126; Ex. 11, p. 182.)

      **Undisputed.**

**SD-SOF 196.** CO Ealey did not observe anything on Rusher's body that looked like part of a towel was concealed underneath her smock. (Ex. 11, p. 213.)

      **Undisputed.**

**SD-SOF 197.** CO Ealey did not observe Rusher to walk in an abnormal manner, suggesting she had concealed anything underneath her smock. (Ex. 11, p. 213.)

      **Undisputed.**

**SD-SOF 203.** CO Meyer was not aware of any orders or instructions relating to the handling of towels either before, during or after a detainee shower. (Ex. 14, p. 166.)

      **Undisputed.**

**SD-SOF 204.** CO Meyer conducted a 15-minute check of Rusher at 3:16 p.m. (Ex. 29, SCP 1967.)

      **Undisputed.**

**SD-SOF 206.** CO Meyer opened the cell door immediately and began to perform chest compressions. (Ex. 14, p. 152.)

      **Undisputed.**

**SD-SOF 207.** CO Meyer, CO Whitley and other officers attempted to administer aid to Rusher until medical arrived. (Ex. 14, p. 152; Ex. 30, p. 73.)

**Undisputed.**

<br>

Dated: November 6, 2020                Respectfully submitted,

                                        /s/ Stephen H. Weil

Alan Mills - alan@uplcchicago.org        Stephen H. Weil
Nicole Schult - Nicole@uplcchicago.org     Arthur Loevy
Bridget Geraghty - bridget@uplcchicago.org  Sarah Grady
Uptown People's Law Center            Loevy & Loevy
4413 North Sheridan Rd.               311 N. Aberdeen Street
Chicago, Illinois 60640                Third Floor
Tel: (773) 769-1411                   Chicago, IL 60607
Fax: (773) 769-2224                 312-243-5900
                                       weil@loevy.com

                                       *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I Stephen H. Weil, an attorney, certify that on November 6, 2020, I filed the foregoing on the Court's CM/ECF system, which distributes copies of this filing to all counsel of record.

/s/ Stephen H. Weil
Stephen H. Weil