IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS

KELLI ANDREWS,                        )
                                      )
          Plaintiff,                  )
                                      )
     v.                               )      No. 18-cv-1100
                                      )
COUNTY OF SANGAMON, et al.,           )      Hon. Sue E. Myerscough
                                      )
          Defendants.                 )      Hon. Tom Schnazle-Haskins, Magistrate

# EXHIBIT 10

1

1    IN THE UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF ILLINOIS

3

4

5    KELLI ANDREWS, AS              )
     ADMINISTRATOR OF THE           )
6    ESTATE OF TIFFANY ANN          )
     RUSHER, DECEASED,              )
7                                   )   No.
                  Plaintiff,        )   1:18-cv-1100-SEM-TSH
8                                   )
          vs.                       )
9                                   )
     SANGAMON COUNTY ILLINOIS,      )
10   WES BARR, LARRY BECK,
     JR., ADVANCED
11   CORRECTIONAL HEALTHCARE,
     INC., ARUN ABRAHAM,
12   MICHAEL SHMIKLER, KYLE
     MEYER, Z. WHITLEY,
13   JENNIFER EALEY, GUY
     BOUVET III, and DOES 1-5,
14
                  Defendants.
15

16

17          Deposition of DOCTOR ARUN ABRAHAM, taken

18   before Cathy J. Craggs, CSR, RPR, at the instance of

19   the Plaintiff, on June 14, 2019, at the hour of 8:30

20   a.m., at QUINN, JOHNSTON, HENDERSON, PRETORIOUS &

21   CERULO, 400 South 9th Street, Springfield, Illinois,

22   Illinois, pursuant to attached stipulation.

23              ASSOCIATED COURT REPORTERS
                   1-800-252-9915
24                   P.O. Box 684
              Taylorville, Illinois 62568

2

S T I P U L A T I O N

1

2  It is stipulated between the parties

3  herein, through their attorneys, that the deposition

4  of DOCTOR ARUN ABRAHAM may hereby be taken upon oral

5  interrogatories, on June 14, 2019, at the hour of 8:30

6  a.m., at QUINN, JOHNSTON, HENDERSON, PRETORIOUS &

7  CERULO, 400 South 9th Street, Springfield, Illinois,

8  Illinois, before the instance of the Plaintiff, and

9  before Cathy J. Craggs, CSR and RPR.

10  That the oral interrogatories and the

11  answers of the witness may be taken down in shorthand

12  by the Reporter and afterwards transcribed.

13  That the reading and signing of said

14  deposition is NOT WAIVED.

15  That the deposition or any portions

16  thereof may be used by any of the parties hereto,

17  without foundation proof, for any purpose for which

18  depositions are competent.

19  That copies of the deposition may be

20  furnished to any of the parties at his or her own

21  expense.

22

23

24

3

1  APPEARANCES:   (June 14, 2019)

2

3     WEIL & CHARDON LLC
      By Ms. Alexis G. Chardon, Esq.
4     Attorney at Law
      333 South Wabash Avenue
5     Chicago, Illinois  60604
           Appeared on behalf of the Plaintiff;
6
      HEYL, ROYSTER, VOELKER & ALLEN
7     By Ms. Theresa M. Powell, Esq.
      Attorney at Law
8     3731 Wabash Avenue
      Springfield,Illinois  62791-9678
9          Appeared on behalf of the Defendants, Wes
   Barr, Larry Beck, Guy E. Bouvet, III, Jennifer Ealey,
10 Kyle Meyer. Sangamon County, Illinois and Zach Whitley

11

12    QUINN, JOHNSTON, HENDERSON, PRETORIUS & CERULO
      By Mr. Matthew J. Maddox, Esq.
13       Ms. Betsy A. Wirth, Esq.
      400 South Ninth Street
14    Suite 102
      Springfield, Illinois  62701
15
           Appeared on behalf of Arun Abraham, M.D.,
16 Advanced Correctional Healthcare, Inc., and Michael
   Shmikler.
17                    ***      ***

18

19

20

21

22

23

24

4

1

2

## I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| **DOCTOR ARUN ABRAHAM** | 5 | 210 | 218 | |

## E X H I B I T S

| EXHIBIT | PAGE |
|---------|------|
| Abraham Exhibit 1 | 11 |
| Abraham Group Exhibit 2 | 120 |
| Abraham Exhibit 3 | 125 |

***EXHIBITS RETAINED BY MS. CHARDON***

5

1           **DOCTOR ARUN ABRAHAM,**

2      called as a witness herein, at the instance of

3      the Plaintiff, having been duly sworn on his oath,

4      testified as follows:

5                     DIRECT EXAMINATION

6                     CONDUCTED BY MS. CHARDON:

7           **Q.  Good morning, Doctor Abraham.**

8           A.  Good morning.

9           **Q.  I am Ali Chardon and I'm a lawyer, one of**

10     **the lawyers for the Estate of the Plaintiff, Tiffany**

11     **Rusher, thank you for being here.**

12                     **Have you ever been deposed before?**

13          A.  I have.

14          **Q.  Okay.  When was the last time that you were**

15     **deposed?  Let me ask is it this way first, how many**

16     **times have you been deposed?**

17          A.  Once.

18          **Q.  And when was it?**

19          A.  I don't remember approximately 5 to 6 years

20     ago.

21          **Q.  Okay.  What kind of, why were you deposed?**

22          A.  I was a witness in a case involving an

23     Inmate.

24          **Q.  Okay.  So you had, had you treated the**

6

1    Inmate?

2         A.  I had.

3         Q.  Okay.  So who knows Mr. Maddox may have been

4    your attorney then, too, but I'm sure he did a good

5    job explaining to you how this is going to work today,

6    and it probably wasn't necessary you've been through

7    it, but Cathy is here recording everything that we

8    say, so we should try not to speak over one another.

9              And so I will try to let you finish

10   your answer without cutting you off, and you should

11   try to let me finish my question so that we have a

12   nice record.

13             In addition, please continue to, to

14   answer verbally yes, no, and instead of nodding so she

15   can get the record down.

16             If you don't understand my question,

17   please ask me for clarification.  If you think of

18   something later on as we move on in the deposition

19   that would make your, you know, you would like to add

20   to a previous answer to clarify or correct or whatever

21   please feel free to do that even if it involves

22   skipping because this is the first time, this is the

23   only time I get to talk to you about this case before

24   we go to trial.

7

1            And so I want to make sure we get all

2  the information out that that we can today.

3            And then if you want to take a break

4  that's fine, please just answer any question that I

5  have pending before, before we take the break, just

6  let us know, okay?

7       A.  Sounds good.

8       Q.  What did you, did you review any documents

9  to prepare for the deposition today?

10      A.  I did.

11      Q.  Okay.  What did you review?

12      A.  The medical file.

13      Q.  Of Miss Rusher?

14      A.  Yeah.

15      Q.  Okay.  And about how long did you take

16  reviewing the file?

17      A.  5 to 6 hours.

18      Q.  Okay.  After receiving notice, between

19  receiving notice of this lawsuit and today had you

20  reviewed the medical file?

21      A.  Yes.

22      Q.  Okay.  So, and when did you first do that?

23      A.  When I was notified of the case and the file

24  was presented to me.

8

1     Q.  Okay.  And did you, following Tiffany's

2  death did you take any time to go back and review the

3  file?

4     A.  Yes.

5     Q.  Okay.  So where do you work today?

6     A.  At Springfield Clinic Urgent Care.

7     Q.  Okay.  And are you board certified?

8     A.  I am.

9     Q.  What's your certification?

10     A.  Family Medicine.

11     Q.  And of 2015 were you board certified, excuse

12  me, 2015, as of 2017 were you board certified in

13  Family Medicine?

14     A.  Yes.

15     Q.  When did you become board certified in

16  Family Medicine?

17     A.  Oh, sorry, I don't remember exactly the

18  date, it was within the last 2 to 3 years.

19     Q.  When did you receive your Medical Degree?

20     A.  So I have two medical degrees one is a MBBS

21  degree and one is an MD degree.

22     Q.  What's a MBBS degree?

23     A.  A Bachelor's in Medicine and a Bachelor's in

24  Surgery.

9

1     Q.  Where did you receive those degrees?

2     A.  India.

3     Q.  Were you born in India?

4     A.  I was not, I was born in Africa.

5     Q.  Okay.  Now I'm being nosey but you sound

6  like you have American parents, your accent.

7              You were born in Africa and then you

8  went to Medical School in India?

9     A.  (Nod Affirmatively).

10    Q.  Okay.  You, at what point did you come to

11  the United States?

12    A.  2007.

13    Q.  And had you practiced as a Doctor in India?

14    A.  Yes.

15    Q.  How long did you practice in India as a

16  Doctor?

17    A.  One and a half years.

18    Q.  And in 2007 where did you come to in the

19  United States?

20    A.  New York.

21    Q.  And did you attend Medical School there?

22    A.  No.

23    Q.  Okay.  Let me, where did you get your MD

24  degree?

10

1    A. SIU.

2    Q. And when did you receive that?

3    A. 2011.

4    Q. What year did you get your MBBS in India?

5    A. 2005.

6    Q. Okay.  So you got on, did you have any kind

7    of specialization when you practiced for those, that

8    one and half years in India?

9    A. No.

10   Q. What kind of medicine did you practice?

11   A. Family Medicine.

12   Q. Did you spend about a year in New York

13   before coming to SIU?

14   A. Yes.

15   Q. And then you graduated from SIU with an MD

16   in 2011 and what did you do after that?

17   A. I worked for Urgent Care.

18   Q. In the, what in this area or where were you?

19   A. Yes, here in Springfield.

20   Q. And were you board certified?

21   A. In?

22   Q. At, in any profession?  In any, on any board

23   were you board certified at all?

24   A. When?

11

1    Q.  In 2011 when you began working for Urgent

2  Care?

3    A.  No.

4    Q.  Okay.  And at what point did you first

5  become board certified?

6    A.  That's what I don't remember exactly what

7  year that was.

8    Q.  I think you thought it was about 2 to

9  3 years ago, is that right?  That was your answer

10  before?

11    A.  Possibly, yeah.

12    Q.  So your first board certification was in

13  Family Medicine?

14    A.  Correct.

15    Q.  Do you have any other board certifications?

16    A.  I do not.

17    Q.  When did you, this isn't a memory test why

18  don't we make our lives easier, I'm going to hand you,

19  I'm going to mark what's been produced as your

20  employment file from the ACH as Abraham Exhibit 1 ACH

21  605 through 639.

22                    (Abraham Exhibit 1 marked for

23                     identification by the Court

24                     Reporter.)

12

1       **Q.  When did you first get hired at by ACH?**

2                **If you recall, you can recall, if you**

3       **want to look through your file that's fine I...**

4       A.  I'm going to say --

5                MR. MADDOX:  Hang on a second,

6       off the record.

7                (Off Record Discussion.)

8       **Q.  I see some, like if we turn to, how many**

9       **pages in here, it's three pages in, there is a**

10      **signature from January 2013 and the next if you flip**

11      **two pages at the bottom right hand we have, call those**

12      **Bates labels do you see the numbers that say ACH,**

13      **yeah, we see ACH 609 I think it's yeah to 610 I see**

14      **that that's titled -- well, it says position title**

15      **description and it's dated November 2012.**

16                **Does that refresh your recollection**

17      **about when you came to work at ACH?**

18      A.  Yes, I think it does from memory and from

19      what's been provided I believe I only started in

20      January of 13 although I had met, interviewed and gone

21      through the process of deciding whether, initially

22      back November I was contacted by the Medical Director,

23      back in November of 12.

24       **Q.  And when you were first hired or came to**

13

1    work in 2013 were you at Sangamon County Jail?

2        A.  I was.

3        Q.  And were you working at any other facilities

4    as well?

5        A.  I was not.

6        Q.  Okay.  Were you full time with ACH at that

7    point?

8        A.  I was not.

9        Q.  Were you working in any other capacity for

10   any other clinic or company?

11       A.  Urgent Care.

12       Q.  Was that the same Urgent Care that you had

13   worked for in Springfield?

14       A.  Not the same one I work currently for but it

15   was for Memorial.

16       Q.  And at any point were you full time with

17   ACH?

18       A.  No.

19       Q.  At any point did you work at any other

20   institutions, facilities other than Sangamon County

21   Jail?

22       A.  Yes.

23       Q.  And where did you work?

24       A.  I was called to fill in when other

14

1    physicians were out.  I don't remember all the

2    facilities, Moultrie, Piatt, Logan, DeWitt,

3    Petersburg.

4         Q.  But it sounds like you never had a regular

5    assignment to any of those facilities?

6         A.  (Nod negatively.)

7         Q.  Okay.  Throughout your time at and you

8    stayed employed with ACH at Sangamon County Jail

9    through August of 2017, is that right?

10        A.  Yes.

11        Q.  Throughout that time did you, did your

12   amount of hours per week change at all, was it always

13   the same about?

14        A.  It decreased.

15        Q.  It decreased.  So when you started how many

16   hours were you?

17        A.  I believe I was 3 or 4.

18        Q.  Okay.  And --

19        A.  Decreased to two.

20        Q.  Okay.  So when you finished in August

21   of 2017, you were two hours a week?

22        A.  Yes.

23        Q.  And that was two hours of being physically

24   present in the facility?

15

1      A.  Correct.

2      Q.  And why did you leave?

3      A.  I was terminated.

4      Q.  And why were you terminated?

5      A.  I was terminated for concerns of

6  professionalism with my peers.

7      Q.  Okay.  And were there any issues about you,

8  them wanting you to do more on call days then you were

9  willing to do?

10      A.  Yes.

11      Q.  So can you tell me what happened with that?

12      A.  When my hours were reduced, they had hired

13  an Advanced Practitioner, so the Advanced Practitioner

14  was given more hours on-site, and I felt that it was

15  most fair that the site hours that were split

16  percentage wise should also be the same split for call

17  hours.

18      Q.  And when you began your job, were you on

19  call 7 hours, 7 days a week?

20      A.  When I was the exclusive provider, yes.

21      Q.  And at what point was the Advanced

22  Practitioners that's the Nurse Practitioner that you

23  were, the other person that was hired was that Mary

24  Dambacher?

16

1      A. No.

2      Q. Okay.  Who was that?

3      A. Dan Williams.

4      Q. And what was, and he's a Nurse Practitioner

5   as well, right?

6      A. No.

7      Q. Is he a Physician's Assistant?

8      A. He is.

9      Q. And at what point was he hired?

10     A. Don't remember.

11     Q. Did he work at the same time as Mary

12  Dambacher?

13     A. Don't know.

14     Q. Did, do you know when he left?

15     A. I don't remember.

16     Q. Okay.  So at any point was there both

17  Physician's Assistants and Nurse Practitioners working

18  with you at Sangamon County Jail?

19     A. Not that I remember.

20     Q. Okay.  Is Dan Williams still at Sangamon

21  County Jail?

22     A. I don't know.

23     Q. And --

24     A. But I don't think so because he left before

17

1    I left Sangamon County and he was replaced by Mary

2    Dambacher.

3        Q.  Oh he was, that's what I was trying to get

4    at, I must have been asking bad questions.

5        A.  Yeah, he was full time with ACH, so he had a

6    lot of facilities, and I don't know if he was, Mary

7    replaced him exclusively or if his, his

8    responsibilities continued with other facilities

9    within ACH.

10       Q.  Okay.  So you weren't terminated until 2017,

11   August, right?

12       A.  Correct.

13       Q.  Sounds like though Dan Williams had been

14   hired well before that.  And I guess I'm just

15   wondering did this issue with you not wanting to be on

16   the, on call after Dan Williams came on come up before

17   2017 or was that the first time --

18       A.  Could you repeat that?

19       Q.  -- you raised the issue.

20            So you said that there was an issue

21   about you, you know, we talked about you pushed back

22   on working seven, on call seven days a week?

23       A.  Yeah.

24       Q.  When did that conflict first arise?

18

1    A.  It wasn't in August of 17, it was much

2    previous to that.

3        Q.  Okay.  How far previous?

4        A.  Probably a couple of years.

5        Q.  And had you received any written evaluation

6    mentioning that this was a problem that you were

7    pushing back on the seven days on call prior to being

8    terminated in August of 2017?

9        A.  I don't remember.

10       Q.  Do you remember having any, did any

11   Supervisors or Superiors address that issue with you?

12       A.  Yes.

13       Q.  When did they first address that with you?

14       A.  Again that, I don't know the specifics, but

15   I know that it was addressed and I also voiced my

16   rationale behind my stance.

17       Q.  And was that discussion, you know,

18   immediately prior to you being terminated?

19       A.  No, it was, it had this issue arose multiple

20   times over a few years, and I wasn't changing my

21   stance on what I believed to be fair.

22       Q.  Okay.  So it had been going on since at

23   least Dan Williams came?

24       A.  That I don't want to say.

19

1              Oh, yeah, yes, yes.

2       Q.  And you're not exactly sure when that was

3  but it was prior to Mary Dambacher coming?

4       A.  I believe so.

5       Q.  Okay.  And you also said that you were

6  terminated for acting impolite or in an unprofessional

7  manner, correct?

8       A.  Correct.

9       Q.  I think if we go, these are, I think that

10  the order of the Bates labels in that document is, is

11  contiguous so if you flip to ACH 633.  So that looks

12  like a, what's the, a problem review, a, it's a record

13  of a conference regarding a problem review, is that

14  correct?

15       A.  Yes.

16       Q.  And that's from March 2014, correct?

17       A.  Correct.

18       Q.  So that's three and a half years before you

19  were eventually fired, right?

20       A.  Correct.

21       Q.  Because is that the first time that this, a

22  complaint, anybody addressed a complaint of acting in

23  an impolite manner?

24       A.  Yes.

20

1    Q.  What were the circumstances around this?

2    And you can tell me in your words.  What happened that

3    lead to this?

4        A.  So what happened was I had asked that when

5    somebody pages me, there are certain things, questions

6    that are asked before they page me.  Because this was

7    not my full time job.  I have a full time job doing

8    40 hours a week.  So when I was getting paged, I asked

9    that a certain protocol be asked, certain questions

10   duration, when they come with a complaint, duration,

11   onset, progress, episodes.  Those kind of questions

12   and I felt like I wasn't getting those and it was

13   taking three or four phone calls in certain

14   circumstances to get those answers.

15            So when I addressed that when I came

16   into the facility the nurses felt that I was being

17   harsh towards them, and so there was a complaint made

18   to Corporate and Corporate relayed that complaint to

19   me.

20   Q.  Did you feel that this was a fair criticism?

21   A.  No.

22   Q.  Did you feel that your requests to get the

23   information that you were asking for were reasonable,

24   reasonable requests given the standards of your

21

1    profession?

2         A.  I did.

3         Q.  And after this reprimand that we -- oh, look

4    and we see a hire date on this form.  So that hire

5    date is January 7th, so consistent with your

6    recollection.

7              So this was in March of 2014 did you

8    receive any further written reprimand about this issue

9    after this one?

10         A.  No, not that I remember.

11        Q.  Did the, did you experience any conflict

12   over this issue, by this issue I guess keeping with

13   the issue of needing people to provide, requesting

14   that people provide information on the first phone

15   call, did you have any conflicts about that with

16   Medical Staff following this reprimand?

17        A.  When you say conflicts what do you mean?  So

18   conflict is a very, can be a strong word.  Are you

19   asking were there discussions or were there conflicts

20   because I guess, you know, discussions always, you

21   know, there is always a discussion.  Hey, thank you

22   for doing what I've asked or for calling me with those

23   things.  I wouldn't say conflict.

24        Q.  Okay.

22

1        A.  Because I think if there was, it would have

2    been represented in documentation and immediate

3    termination.

4        **Q.  Right, right.**

5                **Especially in the medical field**

6    **documentation is important, right?**

7        A.  Of course.

8        **Q.  And you got to put it in a record or else**

9    **it's hard to know what happened.**

10               MR. MADDOX:  Well, I'm going to

11   object to the form and context of that question but...

12       **Q.  Is it, do you agree?**

13       A.  With?

14       **Q.  That documentation is important in order to**

15   **keep track of what happened?**

16       A.  Yes.

17       **Q.  And did anybody accuse you of being impolite**

18   **or unprofessional towards coworkers after this time in**

19   **2013 or 2014?**

20       A.  Not that I remember.

21       **Q.  Did any Supervisor in an evaluation ever ask**

22   **you to more polite or more professional with coworkers**

23   **after this point?**

24       A.  I'm not sure, I mean I don't, not that I

23

1    remember.

2        Q.  And it says at the bottom if corrective

3    action is not taken, the next step will be

4    termination, correct?

5        A.  Correct.

6        Q.  And did you take any corrective action or

7    did you respond in any way to receiving this written

8    reprimand in 2014?

9        A.  Absolutely.

10       Q.  Okay.  And even though you felt it wasn't

11   necessarily a, I think fair criticism is the words we

12   used, what did you do in response to this reprimand?

13       A.  I rethought about my delivery methods.

14       Q.  And did you make some changes in the way you

15   were talking to people?

16       A.  Absolutely.

17       Q.  Did you continue to request that they

18   provide you with the certain, you know, information

19   that you were needing within, you know, the first or

20   second phone call upon paging?

21       A.  Occasionally but for the most part they were

22   very receptive to that constructive criticism and my

23   delivery changed.

24       Q.  Was there any kind of, was there any

24

1    particular person who, you know, particular Nurse that

2    complained about your interactions leading up to this

3    complaint in 2014?

4         A.  I don't know.

5         Q.  And I'm just going to ask you some specific

6    names because there are some people I've met so.

7              Was, was Billy Ernest someone who had

8    complained about you?

9         A.  I, that was never privileged to me.

10        Q.  Okay.  And was it, did anybody ever tell you

11   that if Mary Dambacher had made complaints?

12        A.  (Nod Negatively.)

13        Q.  So you don't know?

14        A.  No.

15        Q.  Okay.  Then you were terminated three and a

16   half years later in August of 2017, correct?

17        A.  Yes.

18        Q.  And between this reprimand in August of 2017

19   you had not received any further criticism for being

20   impolite or unprofessional towards coworkers?

21        A.  Not that I remember.

22        Q.  So what are the circumstances of you getting

23   fired in August of 2017?  What's your recollection?

24   How did you learn that you were being terminated?

25

1      A.  How did I learn, honestly I don't remember

2   if it was a phone call or if it was a letter, but I

3   remember it was a, I don't remember.  I don't remember

4   if somebody called me or if they sent me a letter or

5   if somebody from the Jail called and said that my

6   privileges to enter the facility, I really don't

7   remember.

8      **Q.  And did they give a reason for why you were**

9   **being fired?**

10     A.  I don't remember the circumstances so I

11  don't remember if a letter said something or if

12  somebody called me.

13     **Q.  I guess, yeah, and I guess --**

14     A.  You know, what I --

15     **Q.  Right, I, earlier I asked why were you fired**

16  **and you told me it was acting in an impolite manner?**

17     A.  Because I remember this document.

18     **Q.  Because you remember that document?**

19     A.  Yes.

20     **Q.  But you don't remember anybody communicating**

21  **that to you in August that something had come up or**

22  **that did anybody in August 2017 when you were fired**

23  **say look, we told you to be polite and you weren't**

24  **polite and you're being fired or --**

26

1       A.  I don't remember that.

2       Q.  Do you remember if in August of 2017 anybody

3   said we're firing you because you are not willing to

4   be available seven days on call?

5       A.  I don't remember, I don't, I don't remember

6   if that was the reason or how that was communicated.

7       Q.  Cause earlier you, you said that you did

8   remember that those were two reasons?

9       A.  I said, what I said was that was a

10  circumstance, an issue because that was brought up

11  multiple times during my employment.

12      Q.  The issue of, okay.

13              So at any point did you, were you ever

14  suspicious that you were being fired because you had

15  treated a patient who had committed suicide?

16      A.  No.

17      Q.  And were you aware that Mickey Shmikler had

18  been terminated as well?

19      A.  I was.

20      Q.  And at any point did you question whether

21  you and Mickey Shmikler were both being terminated in

22  some relationship to Tiffany Rusher's suicide?

23      A.  Did I think that?

24      Q.  Yeah.

27

1    A. No.

2    Q. Why do you think that you were terminated?

3              MR. MADDOX:  Well, objection

4    lack of foundation but answer if he can.  I mean he

5    didn't make the decision, someone else did, so I don't

6    know how he can know that answer.

7              MS. CHARDON:  Right, so that's

8    why I phrased it why do you think that you were

9    terminated.

10             MR. MADDOX:  Well, that's, I

11   have the same objection.  He can offer a thought if he

12   wants, but he doesn't really have the foundation to

13   answer it.

14             MS. CHARDON:  I think it's

15   relevant what he thinks about why he was terminated,

16   so you can go ahead and answer.

17   A. I assume it's because of this and

18   availability that they had requested.

19   Q. Okay.  So actually if we turn to ACH 631 so

20   sort of the, in the middle of this batch, and do you

21   see that?

22   A. Yeah.

23   Q. And so on the second page of that if you

24   flip one page to 632 at the bottom says Doctor Abraham

28

1   was terminated via email by Doctor Mitcheff but this

2   paperwork was not completed at that time so he could

3   not sign it.

4            So does that refresh your recollection

5   as to how you learned you were terminated?

6        A.  No.

7        Q.  Okay.  But you think you got an email saying

8   you were fired?

9        A.  I don't remember.

10       Q.  Okay.  Do you have an ACH email address or

11  did you at that time?

12       A.  (Nod negatively.)

13       Q.  Were, would you have used a private email

14  address?

15       A.  (Nod Affirmatively).

16       Q.  So is that, you don't have to give me the

17  address right now but is it like a gmail, yahoo?

18       A.  It could be either, I have both.

19       Q.  Either, you have both.

20            And actually what are your email

21  addresses that you would have used to communicate?

22       A.  So I have Doctor Abraham, Doctor A Abraham

23  at gmail.com.

24       Q.  And that's one word?

29

1      A.  Yes.

2      Q.  Okay.  And what's your other address?

3      A.  The other one is Doctor A Abraham at

4  yahoo.com.

5      Q.  And do you delete e-mails regularly on

6  those, either one of those accounts?

7      A.  I do.

8      Q.  You, do, would you have e-mails from August

9  of 2017?

10      A.  Possibly.

11      Q.  Okay.  Do you have any reason to think that

12  you would have deleted that email?

13      A.  Possibly because it was behind, that is no

14  longer a relevant thing to hold in my inbox and they

15  charge you.  As you accumulate e-mails, they charge

16  you for storage space, so.

17      Q.  Okay.  So I am going to ask that you don't

18  delete emails from those accounts until you have a

19  chance to look to see if that email still exists and

20  provide it to your Counsel?

21      A.  Okay.

22              MR. MADDOX:  Here's how I like

23  to handle that, if you have a request for a document

24  rather than kind of discuss it informally in a

30

1 deposition, if you'd formalize it in a request to me.

2       MS. CHARDON:  Oh, absolutely

3 and my request is that he doesn't delete it so that I

4 can deal with that.

5       MR. MADDOX:  I get you, I just

6 wanted to make sure that we didn't walk out of here --

7       MS. CHARDON:  Understood.  It's

8 not served yet, we will address it and any issues with

9 it.  Thank you, Matt.

10   Q.  So, and here we've got four under, on 631

11 summary eval he's not demonstrated, Doctor Abraham

12 refuses to take call more than two days per week

13 although the expectation is to take call seven days a

14 week.  And that you said was an issue that had been

15 ongoing for several years, correct?

16   A.  Correct.

17   Q.  Doctor Abraham refuses to be a collaborative

18 physician for the Nurse Practitioner at the facility.

19 Had you ever read that statement before today or heard

20 that criticism?

21   A.  Yes.

22   Q.  Okay.

23   A.  Yes.

24   Q.  The Nurse Practitioners was Mary Dambacher,

31

1    correct?

2         A.  Correct.

3         Q.  Did you have any conflict with Mary

4    Dambacher that you were aware of?

5         A.  No.

6         Q.  Did you get along professionally?

7         A.  Yeah.

8         Q.  So were you surprised then to hear that she

9    had reported that you were refusing to be a

10   collaborative physician with her?

11        A.  I don't think she reported that.

12        Q.  So who do you think reported that?

13        A.  I think that is, would be, from this

14   document it looks like this is coming from Advanced

15   Correctional.

16        Q.  So do you think, you're not aware of any

17   instance where Mary Dambacher had any conflict about

18   collaboration?

19        A.  I had no conflict with Mary.

20        Q.  How would ACH, you said you think that came

21   from ACH Corporate or the Medical Director Michael

22   Mitcheff, how would they know whether you had been

23   refusing to be a collaborative physician?

24        A.  Because the question comes from ACH not from

32

1    Mary.

2         Q.  What request?

3         A.  If there is a request to be a collaborating

4    physician, the request, so Dan Williams was a PA.

5         Q.  Oh, okay.  So let's back up.

6              Is collaborative physician a term of

7    art that's used in your profession that means

8    something, that has a definition?  What does it mean

9    to you a collaborative physician?

10        A.  That the provider will call you or will use

11   you as a reference or will work almost under your

12   license in my opinion where you can now be held liable

13   for their actions if there was neglect or --

14        Q.  Okay.

15        A.  -- not due diligence.

16        Q.  Okay.  And so as a Nurse Practitioner.

17   Thank you.

18              So as a Nurse Practitioners Mary

19   Dambacher is she required to have a collaborative

20   physician with whom she can work as part of her

21   ability to diagnose and prescribe medications?

22        A.  I believe so but those laws have changed in

23   the last two years.

24        Q.  Okay.  At this time in 2017 was that, was it

33

1   required for her to have a collaborative physician?

2        A.  I believe so, yes.

3        Q.  While she was at the facility, who was her

4   collaborative, sorry, in 2017 who was her

5   collaborative physician?

6        A.  I believe it was Doctor Mitcheff, I believe

7   but I don't know for sure.

8        Q.  Okay.  And what does it, what would it

9   entail to be a collaborative physician?

10       A.  That, it's a document that I think that you

11  sign with your, the Illinois Department of

12  Professional Regulation which states that hey, this

13  Advanced Practitioner is collaborating with this

14  physician in the care of their patients even though

15  they may be working independently outside of the

16  facility where the collaborating physician is.

17       Q.  And is it, are there duties attendant in

18  taking on the role of collaborative physicians?

19       A.  There are.

20       Q.  And yeah, I think you mentioned some of them

21  but explain to me exactly what that role would have

22  entailed, would entail for you?

23       A.  It would be overlooking charting, available

24  for questions, it would entail monitoring practicing

34

 1   habits.

 2        Q.  And that is not something that you were

 3   doing with Mary Dambacher?

 4        A.  Correct.

 5        Q.  Were you doing --

 6        A.  I was not obligated to do.

 7        Q.  Okay.  And were you doing, fulfilling that

 8   role nonetheless from time to time?

 9        A.  I was.

10        Q.  Okay.  With respect to Tiffany Rusher's care

11   were you fulfilling that role?

12        A.  Yes.

13        Q.  Okay.  And did Mary Dambacher and you ever

14   directly discuss that you, Tiffany Rusher's care?

15        A.  I don't, not that I remember.

16        Q.  Okay.  In your, if Mary Dambacher was

17   prescribing psychiatric medications to Tiffany Rusher

18   while she was at the hospital, at Sangamon County

19   Jail, would she have been required to collaborate with

20   you or another physician before prescribing those

21   medications?

22                    MR. MADDOX:  Can you explain

23   what you mean by collaborate?

24        Q.  Under the, I'm using the term from the

35

1   **document so if there is any form, you know, you can**

2   **define collaborate?**

3        A.  So your question is just so I'm clear you're

4   asking if I collaborated with Mary Dambacher in the

5   care of Tiffany?

6        **Q.  Uh-huh.**

7        A.  Correct.

8        **Q.  Yes?**

9        A.  Yeah.

10       **Q.  So that was the two questions ago.  Then the**

11  **last question was, was Mary Dambacher allowed to**

12  **prescribe psychiatric medications independently**

13  **without collaboration with any physician?**

14       A.  They're always, so the word, you mean, I

15  think your question was prior to prescribing?

16       **Q.  Yeah, the act of prescribing, yes, I'm not**

17  **sure, yeah, I'm not sure about your qualification.  My**

18  **question was --**

19                    MR. MADDOX:  Okay.  We need

20  another question or the same question restated.

21                    MS. CHARDON:  Yeah, I'm going

22  to restate it.  Why don't you read, if you can flip

23  back and read my question, please.

24

36

1          (Whereupon the Court Reporter read

2              back the requested information.)

3     **Q.  Is it true?**

4     A.  No.

5     **Q.  Okay.  And what was she required to do in**

6  **terms of collaboration with a physician?**

7     A.  So as I mentioned previously, she is allowed

8  to order independently and practice independently with

9  a collaborating physician registered with the State.

10     **Q.  Okay.  And that's what I'm trying to get at.**

11  **So the, so that means a collaborating physician would**

12  **be required to monitor her charts, be available for**

13  **questions, correct?**

14     A.  (Nod Affirmatively).

15     **Q.  Monitoring her practicing habits, correct?**

16     A.  Yes.

17     **Q.  Okay.  So is that collaborative physician**

18  **required to monitor, in other words, review every time**

19  **she prescribes psychiatric medication?**

20              MR. MADDOX:  He's free to

21  answer that question.  I just do want to state an

22  objection though.  The duties of a collaborative

23  physician are in fact set forth in the Medical

24  Practice Act and the Nurse Practitioner Act.  Those

37

1   duties are prescribed by law.  He may or may not be

2   aware of what the Act itself says, so I'm objecting on

3   foundation.

4               MS. CHARDON:  Yes.

5               MR. MADDOX:  He's certainly

6   free to answer the question the best of his ability.

7               MS. CHARDON:  Understood.

8        A.  Okay.  So yes, I do review the documentation

9   that Mary puts into the chart.

10       **Q.  Uh-huh.**

11       A.  Because that's how we were communicating

12  occasionally.

13       **Q.  Okay.**

14       A.  When she did not make a phone call or if the

15  nurses did not call me on a patient, that's how I was

16  aware of what was being prescribed.

17       **Q.  So it sounds like in practice you were**

18  **serving as a collaborative physician with Mary**

19  **Dambacher in 2017 at least with respect to some cases?**

20       A.  So, collaborative physician is a very

21  definitive term and needs to be registered.  So

22  acting, there is no, you can't act as, you, either you

23  are or you are not.  And what, who you register with

24  at the State is who the collaborating physician is.

38

1            So whether I review a chart where I'm

2     working with a Nurse Practitioner or not, does not

3     make me a collaborating provider.

4            Q.  In other words, what I'm trying to get at is

5     we talked about the, what the duties of a

6     collaborating physician are, correct?  And we, you

7     gave me what includes monitoring, charting and

8     practicing habits, correct?

9            A.  Correct.

10           Q.  An actual as, not in term of a medical term

11    but a legal term but actual collaboration with the

12    person being able to answer questions?

13           A.  Being available.

14           Q.  Yes.

15           A.  Yes.

16           Q.  And those are all things, setting aside the

17    legal title, those are all things that you did at

18    least from time to time with Mary Dambacher, correct?

19           A.  Yes.

20           Q.  Those are things that you did at least from

21    time to time with respect to the care of Tiffany

22    Rusher, correct?

23           A.  Absolutely.

24           Q.  And so, but you nonetheless decided that you

39

1    didn't want to be the legal collaborating physician

2    for Mary Dambacher?

3           A.  Correct.

4           Q.  And what are all the reasons why you refused

5    to be her collaborating physician?

6           A.  I didn't know Mary for me to legally put my

7    name on a formal document that says hey, I want to be

8    available and this is the person that I'm choosing.  I

9    want to also be comfortable and I didn't know Mary.  I

10   mean she wasn't hired by me.  She wasn't interviewed

11   by me.

12          Q.  And you felt that it would be taking on a

13   certain legal requirement to be, I think, I'm trying

14   to remember your words, but you earlier described that

15   you were basic, she would essentially be practicing

16   sort of under your auspices on some level if you were

17   the collaborating physician?

18          A.  So when I was doing training we were always

19   made aware that there has never been a case when an

20   Advanced Practitioner has been sued without a Doctor

21   being named in that case.  And so I was always

22   cautious to make sure that if I'm going to be

23   collaborating with somebody I want to be comfortable

24   in who that person is overall, and I want to be

40

1   involved in that process before I legally put my name

2   beside somebody.

3          Q.  **The next item on this list on 631 is Doctor**

4   **Abraham refuses to maintain a consistent schedule**

5   **which causes a hardship on the Medical Department and**

6   **negatively impacts operations of the Jail, our client.**

7   **Had you heard that criticism --**

8          A.  I had.

9          Q.  **-- before.**

10              **And what, what was the circumstances**

11  **surrounding your receipt of that criticism?**

12         A.  So because I was only assigned two hours or

13  three hours at the Jail they, and when I work Urgent

14  Care, Urgent Care is shift work so you never know what

15  your shifts are going to be except for a month in

16  advance, so I don't know if I can be there every

17  Tuesday at 11 to 1, ,or I don't know if I can be there

18  every Thursday from 10 to 12.  But I can let you know

19  one to two weeks in advance depending on what my

20  schedule looks like.  I can be there every week, I

21  just may not be able to be on the exact time and date

22  every week.

23         Q.  **And finally, and you had heard, you had**

24  **heard that criticism prior to --**

41

1        A.  Yes.

2        Q.  -- to being fired?

3            How, when was the first time that you

4   heard that?

5        A.  That was in conjunction, that was, these

6   were all part of those conversations that happened

7   with, why don't you want, why aren't you not seven

8   days a week on call and those kinds of things.

9        Q.  And were those memorialized, to your

10   knowledge, in any evaluations or written documents?

11        A.  No, not to my knowledge.

12        Q.  Who communicated those conversations to you,

13   that information to you?

14        A.  Doctor Rakestraw.

15        Q.  Who's Doctor Rakestraw?

16        A.  Doctor Rakestraw was the Corporate Medical

17   Director who hired me.

18        Q.  And was it over the phone or in person that

19   you talked about this?

20        A.  Over the phone.

21        Q.  How many times did you have conversations

22   with Doctor Rakestraw where he expressed criticism or

23   critical assessment of you?

24        A.  Maybe twice.

42

1    Q.  And when was the first time?

2    A.  I don't know, I'm sorry.

3    Q.  Was this going on at the same time that you,

4  these issues regarding your schedule was that going on

5  at the same time, for example, that you received the

6  written reprimand about professionalism?

7    A.  Yes.

8    Q.  Okay.  So as far back as 2014?

9    A.  (Nod Affirmatively).

10    Q.  March 2014?

11    A.  Yes.

12    Q.  And then finally Doctor Abraham refuses to

13  fulfill his site visit responsibilities.  Have you

14  ever heard that criticism before?

15    A.  Never.

16    Q.  Okay.  So that before today had you heard

17  that criticism?

18    A.  Only from the document that was provided

19  within that, yeah.

20    Q.  Okay.  And is this a document that you

21  reviewed before today?  This, what you're looking at

22  in front of you?

23    A.  Yes.

24    Q.  Okay.  In preparation for today?

43

1    A.  Yes.

2    Q.  Let's look at the, I'm, my next question is

3    going to be what were your site visit responsibilities

4    and so why don't I ask that.

5                        What were your site visit

6    responsibilities?

7    A.  To visit the facility every week for the

8    assigned amount of time and take care of the patients

9    that had sick call and were in High Risk.  As well as

10   taking call on a daily basis multiple times a day

11   after the nurses completed sick call and then provide

12   management suggestions.

13   Q.  Within the health, the structure of

14   healthcare provision at Sangamon County Jail, I think

15   you described that it was either you or another

16   Advanced Practitioner who would be on call at any one

17   time, is that correct?

18   A.  Yes.

19   Q.  And were there any differences in terms of

20   what kind of powers and duties you would each have

21   when you were on call as a result of your different

22   Medical licenses?

23   A.  Not to my knowledge.

24   Q.  When the Advanced Practitioner, the PA or

44

1    the, the NP were on call, did they have, was there

2    like any kind of hierarchy where then they would call

3    up to you if they needed to advance?

4         A.  Yeah, if they had questions, concerns.

5         Q.  Okay.

6         A.  Yeah.

7         Q.  Were you available to be, even if it wasn't

8    your on call time?

9         A.  Yeah.

10        Q.  Was that formal or is that just your, your

11   practice?

12        A.  I mean I assumed that was one of, you know,

13   if somebody is calling you about a patient or about a

14   concern whether I'm working or not I'm, that's just,

15   nobody told me, yeah, nobody told me not to, you know.

16        Q.  Okay.  At the end of the day, I mean you

17   have different abilities as, do you have different

18   abilities as a result of your medical training and

19   licensure in terms of treating patients?

20        A.  Yes.

21        Q.  And what are those different, what are the

22   differences?

23        A.  I don't need a collaborating physician.  I

24   can practice completely independently.

45

1      Q.  Any other differences?

2      A.  Licensing differences and requirements, CME

3   standards and requirements.

4      Q.  Training differences?

5      A.  Absolutely.

6      Q.  Okay.  I am reviewing ACH 609 which is the

7   Site Physician description that's in this, in this

8   document.  And so that was, your position title was

9   Site Physician, correct?

10     A.  Yeah.

11     Q.  And you report to the Corporate Medical

12  Director, correct?

13     A.  Yes.

14     Q.  And was that Doctor Rakestraw?

15     A.  Yeah.

16     Q.  Did it ever become Michael Mitcheff?

17     A.  It did.

18     Q.  Okay.  Do you know at what point that

19  changed?

20     A.  I don't, it might have been 15 or 16, but I

21  don't remember exactly.

22     Q.  So at different times you reported back to

23  Doctor Rakestraw and Doctor Mitcheff?

24     A.  Yes.

46

1      Q.  And where do they physically, where are they
2   physically located?
3      A.  Peoria.
4      Q.  So did you meet with them in person at
5   times?
6      A.  Yeah.
7      Q.  And are they responsible for a certain
8   territory or are they responsible for all ACH --
9      A.  I --
10      Q.  -- if you know?
11      A.  My assumption is that they were Corporate so
12   the whole company.
13      Q.  And you are aware, does the company practice
14   in other states as well?
15      A.  Yeah.
16      Q.  Okay.  Okay.  So under description of the
17   essential functions, triage telephone calls in a
18   timely and appropriate manner, did you understand that
19   to be one of your job functions?
20      A.  Yes.
21      Q.  Reports to assigned facility at designated
22   hour to examine referred patients, that was a job
23   responsibility?
24      A.  Yes.

47

1      Q.  Assumes role of Primary Care Physician with
2   the coordination of on and off-site care needs.
3           Do you agree that was your role as, at
4   Sangamon County Jail?
5      A.  Yes.
6      Q.  And so was it your role to coordinate on and
7   off care needs for all patients in the, all prisoners
8   in the facility?
9      A.  All, yeah, all patients, yeah.
10     Q.  Did you share that role of Primary Care
11   Physician with anybody else while you were there?
12     A.  No.
13     Q.  It was just you, okay.
14           Supervises the clinical services
15   provided by professional and paraprofessional staff
16   when requested?
17     A.  Yes.
18     Q.  Did anybody ever request you to supervise
19   the clinical services provided by professional and
20   paraprofessional staff?
21     A.  Yes.
22     Q.  And that's something that you did?
23     A.  Yes.
24     Q.  Sir, I'm skipping one, serves as the

48

1    discussion leader in selected inservice training

2    classes is that a role that you ever fulfilled?

3         A.  Inservice, not that I remember.

4         Q.  Did you ever represent the healthcare

5    program in discussions when requested?

6         A.  I guess my question would be what is the

7    healthcare program?

8         Q.  And what is discussion, yeah, that's fair if

9    it meant something to you.

10                   Attends Corporate Physician Advisory

11   Board Meeting as requested?

12        A.  Yep.

13        Q.  So you did attend Corporate Physician

14   Advisory Board Meeting?

15        A.  Uh-huh.

16                   MR. MADDOX:  Is that a yes?

17        A.  Yes, sorry.

18        Q.  And how many times did you do that?

19        A.  Oh, that I don't remember but there was

20   corporate meetings at least three times a year,

21   sometimes even four.

22        Q.  And was training offered for Physicians at

23   those meetings?

24        A.  Yes.

49

1      Q.  Monitors referral to outside healthcare

2  facilities for appropriateness, quality and continuity

3  of care was that part of your role?

4      A.  Yes.

5      Q.  And is that something that you did actively

6  while you were there?

7      A.  Yes.

8      Q.  Did you ever monitor referrals to outside

9  healthcare facilities that were psychiatric referrals?

10          In other words, psychiatric inpatient

11 commitments?

12     A.  Did I, did I do referrals to outside, yes.

13     Q.  How many times did you monitor, so there

14 were times that you, which you are aware, where people

15 were referred from Sangamon County Jail to outpatient?

16     A.  Or attempts, yes.

17     Q.  Attempts to refer?

18     A.  Yes.

19     Q.  And well, let's talk about actual referrals

20 to a person where someone becomes committed to an

21 inpatient facility after?

22     A.  I have to refer to the documents that I

23 don't remember exactly how many times.

24     Q.  Do you remember a specific time where a

50

1 **person was referred from Sangamon County Jail to an**

2 **inpatient re, inpatient medical, excuse, inpatient**

3 **psychiatric facility?  Can you think?  Did that**

4 **happen?  Do you know whether that happened?**

5   A.  Like I said, I remember requesting to look

6 for psychiatric services or inpatient services that

7 would accept patients.  I don't know if that, I don't

8 remember if that referral went through or not or was

9 accepted by the outside facility.

10   **Q.  And so do you have any recollection of any**

11 **time when a person was, simultaneously had been**

12 **referred out to an inpatient psychiatric facility but**

13 **was still under the custody of Sangamon County Jail**

14 **and your care?**

15   A.  I refer to my previous answer it's the same

16 answer I don't remember if that actually went through.

17 I do remember talking about cases and wanting a

18 referral or see if an outside facility whether that be

19 McFarland or Lincoln, you know, would accept a

20 patient.

21   **Q.  And those circumstances, first, where did**

22 **you refer them to?  Was there a specific place that**

23 **you or Doctor you referred them to?**

24   A.  No, that was up to the RN or the Lead Nurse

51

1    who would try multiple facilities.

2         Q.  Did you ever refer people to the Emergency

3    Room for psychiatric reasons?

4         A.  We can't refer for a reason, we refer for

5    evaluation.

6         Q.  Sure.

7              And did you, were you ever motivated,

8    did you ever send someone to the ER for psychiatric

9    reasons and your motivation?  I'm asking medically did

10   you make the decision for, as a result of psychiatric

11   symptoms someone should go to an ER?

12        A.  Yes.

13        Q.  Okay.  And what was that circumstance?

14        A.  There was a gentleman that I remember

15   specific case from New York and he was having a

16   breakdown that he was now going to be a harm to

17   himself or he was a harm to others, I don't remember

18   the exact, but I remember this gentleman we found it

19   after the fact he was from New York and whatnot.  But

20   he was actively having issues and so we were worried

21   about his safety as well as safety of others.

22        Q.  And did you feel that he might need

23   psychiatric diagnosis?

24        A.  Yeah.

52

1    Q.  And psychiatric prescriptions?

2    A.  Yeah.

3    Q.  Did he come into your facility when you were

4  present when he presented to you were you aware

5  whether he had been prescribed psychiatric medication

6  previously or do you have any medical history for him?

7    A.  What was it, I don't remember his Intake

8  form.

9    Q.  The, and at that point you sent him to an

10  Emergency Room?

11    A.  (Nod Affirmatively).  Yes.

12    Q.  What happened did he return to the Jail

13  subsequently?

14    A.  I don't remember if he returned immediately

15  but he did eventually return, I remember seeing him

16  again.  But I don't remember if it was immediately or

17  if there was an inpatient at Memorial, or if he was, I

18  don't remember when or why, you know, but I do

19  remember him coming back.

20    Q.  And was that in 2017 when that happened?  Do

21  you know when that happened?

22    A.  I don't, I'm sorry.

23    Q.  Okay.  Was it before or after Tiffany

24  Rusher's suicide?

53

1      A.  I think it was, I think it was before.

2      Q.  And when you also mentioned that you also

3  could, was there a reason why on that date you

4  referred to the ER because we were talking about

5  before how you could also have a Nurse look for

6  inpatient beds at psych wards?

7      A.  Uh-huh.

8      Q.  Was there a reason why you sent that patient

9  to the ER versus looking for a psych bed?

10     A.  Yeah, he wasn't eating or drinking.

11     Q.  He was not eating or drinking?  And had he

12 been and now you've sparked a memory of a conversation

13 that I had with another colleague yesterday.  Was he,

14 also, had he been in the facility for about a week or

15 so by the time when he was referred out?

16     A.  I don't remember how long.

17     Q.  And but when he stopped eating and drinking,

18 you referred him out to the ER, is that correct?

19     A.  Yes.

20     Q.  How long had he been not eating or drinking?

21     A.  I don't remember.

22     Q.  And then he was, was he treated by a

23 psychiatrist and returned to the facility?

24     A.  I don't know.

54

1    Q.  When he returned to the facility, was he

2   prescribed psychotropic medication?

3    A.  I assume so, but I don't remember the

4   specifics.

5    Q.  And then with respect to the folks for whom

6   you made requests to look for inpatient beds at psych

7   wards, were those people who had been determined not

8   fit to stand trial?

9    A.  Say that again?

10    Q.  Were you aware of whether those people, had

11   anybody made a determination that they were not fit to

12   stand trial?

13    A.  I do not know.

14    Q.  What prompted you in those cases to request

15   for an inpatient, a bed at an inpatient ward?

16    A.  I felt that they were having symptoms that I

17   was not able to effectively control.

18    Q.  What symptoms?

19    A.  I don't remember, like I said I don't

20   remember the specific patients.  I don't remember the

21   specific circumstances and I don't, yeah, that would

22   have to be pulled from the medical records.

23    Q.  What sitting, what would be a symptom that

24   you felt couldn't be controlled?

55

1        MR. MADDOX:  Object to the form

2   of that question, answer if you can.

3        A.  Throwing feces at other Inmates or Staff or

4   trying to eat their own feces.

5        **Q.  And in retrospect does that, is that one of**

6   **the symptoms that you recollect somebody --**

7        A.  From that gentleman.

8        **Q.  Who was not eating or drinking?**

9        A.  (Nod Affirmatively).

10       **Q.  Okay.  And --**

11       MR. MADDOX:  Other than his own

12   feces.

13       A.  Yeah, I mean...

14       **Q.  And what about the people who you sent, you**

15   **referred, you, first of all, how many times did you**

16   **have to ask a Nurse to call for a referral to an**

17   **inpatient site?**

18       A.  Like I said before, I don't remember.

19       **Q.  Was it more than five?**

20       A.  I don't remember.

21       **Q.  Was it more than one?**

22       A.  I don't exactly know because I remember him

23   very vividly but I don't remember from 2013.

24       **Q.  So you have a specific recollection of this**

56

1    gentleman who went to the ER but you have no other

2    specific recollection of anybody being referred to an

3    inpatient psych ward?

4        A.  I don't remember.

5        Q.  Okay.  Is there anything about referring

6    anybody to an inpatient psych ward when you worked at

7    Sangamon County Jail that you do remember?

8        A.  Specifics, no.

9        Q.  Okay.  Did you ever, well, you keep saying

10   specifics --

11       A.  Yeah.

12       Q.  Do you, but you don't know if it was more

13   than one time?

14       A.  I believe it was but I don't, I don't want

15   to say yes because I don't know for sure.

16       Q.  Okay.  Are you for sure it happened once?

17       A.  Yes.

18       Q.  Okay.  But you, and why are you sure that --

19       A.  Because I remember a conversation.  I

20   remember having a conversation with the RN or the Lead

21   Nurse, the Site Nurse.

22       Q.  And who was that person?

23       A.  Who was it before Kate, Kate Daniels oh,

24   tall guy Dan, I don't remember his last name.  Dan is

57

1   his first name.

2          Q.  It wasn't Dan Williams?

3          A.  No, Dan Williams was the PA, I believe.

4          Q.  And so it was before Kate Daniels and do you

5   remember anything about the prisoner, the patient?

6          A.  I don't.

7          Q.  And do you know whether that prisoner or

8   patient had been, whether a determination had been

9   made about whether they could stand trial?

10         A.  I don't.

11         Q.  Okay.  So you, going back to the document we

12  were looking at.  I think we were talking about

13  monitors, referrals to outside healthcare facilities

14  for appropriateness, quality and continuity of care.

15              I think what we just came around to is

16  you don't have any specific recollection of doing that

17  in the context of the psychiatric outpatient referral?

18         A.  I don't.

19         Q.  Or inpatient --

20         A.  Coordination.

21         Q.  -- in and out of the facility, right.

22              Monitors mediation utilization at an

23  assigned facility and facilities, could that, do you

24  think that might be supposed to mean medication?

58

1    A.  I would assume so.

2    Q.  Okay.  Did you monitor medication

3  utilization at assigned facilities?

4    A.  Yes.

5    Q.  And how did you do that?

6    A.  We were given reports on, sometimes even a

7  monthly basis.

8    Q.  Was that a CQI report?  What kind of --

9    A.  Sorry, I don't know what a C, sorry.

10    Q.  What did the report look like?

11    A.  It was a table of medications.  It included

12  which medications were heavily being used or most

13  prescribed, least prescribed, yeah, and then, yeah.

14    Q.  Who prepared the table?

15    A.  Doctor Rakestraw.

16    Q.  Okay.  And did it have a breakdown, did your

17  monitoring of medication utilization involve

18  monitoring of specific patients medication

19  utilization?

20    A.  Did his report?

21    Q.  Yeah, I guess.

22    A.  Yeah, it told you which patient was on

23  medication and, yeah.

24    Q.  Okay.  And so you could look and did it tell

59

1    you, did you monitor whether or not patients were

2    refusing their medications --

3         A.  Yes.

4         Q.  -- as part of that?

5         A.  Yes.

6         Q.  So with, yesterday with Mr. Ernest I looked

7    at a document and I will show you Ernest 1 it is

8    Sangamon County Produced 201.  I understand that's a

9    Medication Refusal Form?

10        A.  Uh-huh.

11                MR. MADDOX:  Yes?

12        A.  Yes, sorry, yes.

13        Q.  And that's, do you review, do you receive

14    those medication referrals, did you receive those

15    Medication Refusal Forms in the course of your duties

16    at Sangamon County Jail?

17        A.  No.

18        Q.  No.  Okay.  Did you ever review them?

19        A.  No.

20        Q.  Do you know whether they were passed along,

21    were they put in your mailbox?

22        A.  No.

23        Q.  Okay.  So if Mr. Ernest testified that he

24    did put those in your mailbox or if not yours Miss

60

1   Darmbacher's?

2        A.  No.

3        Q.  Okay.

4        A.  Not that I remember.

5        Q.  Was anybody keeping track of how often

6   Tiffany Rusher was refusing her medications?

7        A.  Yes.

8        Q.  Who?

9        A.  Whichever Nurse was administering the

10  medications as well as the provider.  The Site

11  Clinician when they came in to review the, what was

12  called the MAR, the medication, there was a form that

13  you could see when patients were refusing medications

14  and how often.  And it was also because you had

15  clinical staff there on a daily basis they would

16  verbally notify you if there was a concern of multiple

17  days being refused, and who those patients were, and

18  why they were being refused.

19       Q.  Okay.  So let's break that down.

20            Who's the Site Clinician?

21       A.  Myself and the Advanced Practitioner.

22       Q.  Okay.  So you said it wasn't but you had

23  just said it was, all right.

24            At times you did review then as a Site

61

1    Clinician --

2         A.  Not these.

3         Q.  Not those but you reviewed -- --

4         A.  Yeah, yes.

5         Q.  -- Ernest Exhibit 5 which is the Medication

6    Administration Record.  I'm going to show that to you.

7              So you did review the Medication

8    Administration Record?

9         A.  Yes.

10        Q.  And was there any protocol to, did you, to

11   make sure that, going, backing up my question was, was

12   anybody tracking whether or not she was taking her

13   medication right and you said yes, correct?

14        A.  Yeah.

15        Q.  And I understand that somebody was, it would

16   always be recorded, right, if she missed her

17   medication, correct?

18        A.  Yes.

19        Q.  And that would be recorded in the Medication

20   Administration Record?

21        A.  Yes.

22        Q.  And it was, would be recorded in the

23   Medication Refusal of Treatment Form that you looked

24   at, right?

62

1      A.  I --

2      Q.  I'm sorry, it was a terrible question.

3              You didn't look at it at the time,

4  right?

5      A.  Yeah.

6      Q.  You didn't review that at the time but it

7  would go in her chart.  Do you know whether the

8  Medication Administration Refusal would go into her

9  Medical record?

10     A.  Yes.

11                  MR. MADDOX:  Hold on a second

12  when you're say Medication Administration Refusal are

13  you referring to the MAR or to this other form?

14                  MS. CHARDON:  Yeah, let's start

15  over.

16     A.  Sorry.

17     Q.  And when I said you looked at it, I meant

18  you looked at it today, so let's start fresh.

19              The Refusal of Treatment Form you

20  didn't review contemporaneously?

21     A.  You mean continuously --

22     Q.  Yeah.

23     A.  -- is that what contemporaneous --

24                  MR. MADDOX:  I mean at the time

63

1    it occurred.

2          Q.  At the time it occurred?

3          A.  Oh, no.

4          Q.  It would go into the chart, correct?

5          A.  Yes.

6          Q.  Okay.  If the Medication Administration

7    Record or MAR you did review contemporaneously with

8    treating the patient?

9          A.  Yes.

10         Q.  And did you review her at, on what occasion

11   did you review specifically Tiffany's Medication

12   Administration Record?

13         A.  Usually when I go into the facility is,

14   specifically I can't tell you but I, specific dates I

15   would have to go to the records, but it was when I

16   went into the site or if a concern was brought to my

17   attention.

18         Q.  Okay.  So when you arrived, when you,

19   whenever you went to the site would you review every

20   patients Medication Administration Record?

21         A.  No.

22         Q.  Whose patients Medication Administration

23   Record would you review?

24         A.  So Corporate had asked us to review them at

64

1   least once a month unless it was brought to our

2   attention that there was another concern.  Because

3   every month they change, like the sheet changes every

4   month.  And so it goes off, you know, you don't see it

5   in that, that file anymore, in that binder.  It's not

6   there any more after that month.

7                   So they wanted you to review it, every,

8   once a month at least unless there was a concern that

9   was brought up by...

10      Q.  And if there was a concern brought up, would

11  it be documented in the medical record?

12      A.  Not that I remember, no, I don't think so.

13      Q.  I'm not talking about specifically Tiffany's

14  case but in general how would that concern be

15  communicated?

16      A.  Verbally.

17      Q.  Verbally.  And would it be important to

18  document that concern in a record?

19      A.  It's documented here in the MAR.

20      Q.  So what's documented in the MAR is whether

21  or not they are taking the medication, correct?

22      A.  Yeah.

23      Q.  And at what point does it become a concern

24  if, that somebody is missing medication?

65

1          MR. MADDOX:  I just want to

2    object to the form of the question as vague and not

3    having any factual context to allow a reasonable

4    answer but answer if you can.

5          MS. CHARDON:  I would object to

6    the speaking nature of the objection as instructing

7    the witness, but you, I'm trying to use your words.

8    You said that, that concerns would be documented?

9        A.  Yeah.

10          No, I didn't say documented, notified,

11   right, yeah.

12       **Q.  Yeah, well, that's right I think you did say**

13   **documented and that's what I was trying to probe.**

14          **Concerns would be notified to you,**

15   **correct?**

16       A.  Yes.

17       **Q.  Concerns wouldn't necessarily be written**

18   **down on paper, is that what you're saying?**

19       A.  Correct.

20       **Q.  Okay.  And at what point does skipping**

21   **psychotropic medication become a concern?**

22          MR. MADDOX:  Same objection as

23   before.

24       A.  That would be the clinical judgment of where

66

1   we're having episodes and failure to, you know,

2   control symptoms.

3       Q.  Okay.  And is there any system in place or

4   was there any system in place at the time that you

5   were treating Tiffany to flag formally to keep track

6   of, or, I'm sorry, to pick up on whether or not she

7   was skipping too much medication?

8       A.  Was there a formal method?

9       Q.  Yes.

10      A.  Other than the MAR?

11      Q.  Correct.

12          So one method, no, one method you

13  explained to me that you would review the MAR --

14      A.  Yeah.

15      Q.  -- upon coming in.  It was your practice to

16  review the MAR upon treating Tiffany, is that what you

17  said?

18      A.  No, I said that the I, it was my practice to

19  review the MAR once a month before it got, was filed

20  into another part of the chart.  And that MAR that's

21  in the folder there, in the, right there on top of the

22  meds is where you would go through.

23      Q.  Okay.  And so at the end of the month you

24  would, would you always review the MAR before filing

67

1    it?

2          A.  I would say majority of the time I can't say

3    always because I don't know specifics.

4          **Q.  Were you required in the, by any sort of the**

5    **written practice or protocol to review the MAR at**

6    **least once a month?**

7          A.  Not that I know of.

8          **Q.  So why did you do it?**

9          A.  My practice, standards or say habits.

10         **Q.  Okay.  So you were reviewing the MAR as part**

11   **of your practice once a month.  Is there any other,**

12   **was there any other formal or informal procedure**

13   **within ACH that you knew about which was instituted in**

14   **order to track whether or not a person was skipping**

15   **too many medications?**

16         A.  Too many medications, not that I know of.

17         **Q.  And you don't, you didn't chart it when you**

18   **reviewed the MAR, did you chart and document that I**

19   **have reviewed the MAR for the month?**

20         A.  No.

21         **Q.  And so, and if there were concerns, say a**

22   **person missed seven days in a row of medication in the**

23   **beginning of a month?**

24         A.  Okay.

68

1     Q.  Okay.  Days 1 through 7 of a month?

2     A.  Yeah.

3     Q.  What procedures were in place to notify you

4  of that, of that?  How would you become aware of that,

5  if at all?

6     A.  They would either during one of the phone

7  calls or when I came on-site.  If it wasn't something

8  that was emergent causing an acute situation, then I

9  would be notified usually on-site.  They wouldn't

10  utilize, they wouldn't utilize that phone call.

11     Q.  How would they know, I mean the people who

12  are reviewing, the nurses are, don't have your same

13  medical licensure, correct?  They don't have your same

14  level of training, the Nurses?

15     A.  Are you asking me if an RN and MD have the

16  same level of training and certification?

17     Q.  Yes.

18     A.  No.

19     Q.  No, no.

20          So how did they know, one of the

21  questions that I asked a lot yesterday, how do you

22  know, how much is too much, right?  I'm trying to find

23  out at what point, you know, is there any, any rules

24  that you give them to follow at what point is it time

69

1      to flag to Doctor Abraham that she's missed too many

2      medications?

3          A.  That would be a subjective clinical

4      assessment of their interaction.

5          Q.  Okay.  And what would that, yeah, what do

6      you mean by that?  What would it be based on, the

7      subjective clinical --

8          A.  That you would have to ask the person who

9      was observing that patient and interacting with that

10     patient.

11         Q.  Well, what would you want a Nurse to, what

12     kind of factors would they need to be reporting on

13     that were relevant to their decision?

14         A.  You're asking me to answer what they feel

15     would be clinically relevant?

16         Q.  I'm asking you what you, you were depending

17     on them to be your eyes and ears as to whether she was

18     taking her medication --

19         A.  Yeah.

20         Q.  -- right.

21              And so you have to rely on them in

22     order to let you know if she was missing seven days in

23     a row from days 1 through 7, right?

24         A.  Yeah.

70

Q.  You were relying on them to, to report that up?

A.  If there was a concern that she missed 1 through 7 and she's exhibiting symptoms that are concerning to the person who's visiting her, or if the CO is letting them know.  Because the CO's are checking on them every 15 minutes.  If there's, they're concerned they let, they are very good reporting to Medical Staff, and Medical Staff is there at one point was there almost 24 hours a day staffed, you know.

Q.  And so you're trusting them to report those things to you, correct?

A.  Yeah.

Q.  Because otherwise you don't know about them, correct?

A.  Right.

Q.  The end of the day you're the Doctor?

A.  Yes.

Q.  -- with the most training, correct?

A.  Well, with training I don't know what you classify as most because some people, I mean Nurse Practitioners go through how many years of training, right.  Nurses go through how many years of training,

71

1    RN's might have, are you asking, training is, I've

2    done 13 years of training to get to where I am.

3         Q.  At the end of day the buck stops with you in

4    terms of --

5         A.  No.

6         Q.  -- writing the prescription?

7         A.  No.

8         Q.  In terms of reviewing the Medical

9    Administration Record you told me you're the one

10   that's checking to make sure that at the end of the

11   month that that's the processes that you check to see

12   how many medications --

13        A.  My process.

14        Q.  Your process.

15             And in addition part of your process is

16   relying on Nurses and CO's that are interacting with

17   her regularly to notify you if she's missing

18   medication and there is a concern, right?

19        A.  Yes.  As well as my interaction with those

20   during in High Risk when I come to the site.

21        Q.  Okay.  And what I'm asking you is what, what

22   things are relevant to your assessment when you come

23   to the site?

24        A.  Yeah.

72

1      Q.  But --

2      A.  I guess eating feces.

3      Q.  Okay.  And what, is that eating feces

4   that's, I would classify that as a behavior, correct?

5      A.  Yes.

6      Q.  What else is relevant in your assessment?

7      A.  What else is relevant?

8                      MR. MADDOX:  In his assessment

9   of the patient?

10                     MS. CHARDON:  Of the patient.

11     Q.  Of the patient whether there is a concern

12  about that patient's mental health or the fact that

13  they're, their medication?

14     A.  The symptoms they exhibit.

15     Q.  And is skipping medication a symptom of

16  mental decompensation?

17     A.  It can be.

18     Q.  Is self harm a symptom of mental

19  decompensation?

20     A.  It can be.

21     Q.  Is erratic behavior a symptom of mental

22  decompensation?

23     A.  It can be.

24     Q.  When you're relying on Medical Staff and

73

1    CO's, Nurses and CO's to be reporting concerns, are

2    you relying that they would recognize those things we

3    just mentioned as symptoms of decompensation?

4         A.  If it's a change from baseline.

5         Q.  And if it's not a change from baseline would

6    you be relying on them to report to you self harm

7    events?

8         A.  Yes.

9         Q.  And if it's not a change in baseline would

10   you be relying on them to report to you behaviors like

11   eating feces?

12        A.  Yes.

13        Q.  So you are, when you said that you don't

14   know, you know, what is, subjectively what's a concern

15   to them earlier, you do have a certain level of

16   professional competence in terms of recognizing mental

17   health symptoms, symptoms of mental illness that you

18   are assuming they are going to recognize, right?

19        A.  Yes.

20        Q.  And so when you're, so if I understand

21   correctly the two ways that you're making sure that

22   specific, the ways you are making sure that, excuse

23   me, the ways in which it might come to your attention

24   that a patient is skipping medication or number one

74

1    you would catch it at the end of the month in your

2    MAR, correct?

3        A.  That doesn't tell me if there is a symptom,

4    that simply tells me if they are taking medication or

5    not.

6        Q.  Right, yeah, and I did sort of my question

7    was to determine whether they are skipping medication

8    is to review the MAR at the end of the month, correct?

9        A.  Yes.

10       Q.  And then the second way is if somebody

11   reports to you a concern that they're skipping

12   medication, right?

13       A.  Correct.

14       Q.  And if I understand correct, and at what

15   point is it appropriate, is there any standard for, my

16   question for when it becomes a concern, right?  We

17   were talking about at what point does it become a

18   concern, correct?

19       A.  Uh-huh.

20       Q.  And you said that it was when they're

21   skipping medication in conjunction with other symptoms

22   that they recognize?

23       A.  Well, I said that because your question

24   asked me does skipping medication become a concern and

75

1     I said that's in conjunction with symptoms being

2     exhibited.

3          **Q.  Okay.  And at that point you would expect**

4     **that the Nurse, the Nurses or other Medical Staff to**

5     **let you know?**

6          A.  Including the Behavioral Therapist, the

7     Clinical —

8          **Q.  Yeah.**

9          A.  — the Mental Health Team.

10         **Q.  Okay.  Were you prescribing medication,**

11    **psychiatric medications to Tiffany?**

12         A.  Yes.

13         **Q.  Okay.  In the --**

14                   MR. MADDOX:  Would this be a

15    good time for a break?

16                   MS. CHARDON:  Sure.

17                   MR. MADDOX:  Okay, thanks.

18                (Whereupon a recess was taken.)

19                   MS. CHARDON:  So back on

20    record.

21         **Q.  So we were talking about how you rely on**

22    **other caregivers and Correctional Officers to, to**

23    **report symptoms of mental decompensation up to you,**

24    **correct?**

76

1      A.  Yes.

2          Q.  Would swallowing a plastic bag be something

3   that you would want reported up to you?

4      A.  Yes.

5          Q.  That would be a symptom indicating, it could

6   be a symptom of mental decompensation, correct?

7      A.  Yes.

8          Q.  What about swallowing a plastic spoon?

9      A.  Yes.

10         Q.  Swallowing medical clips?

11     A.  Yes.

12         Q.  Those are things that you'd want your eyes

13  and ears to relate up to you, correct?

14     A.  Yes.

15         Q.  What about attention seeking self harm

16  behaviors are those, can those be signs and symptoms

17  of mental decompensation?

18     A.  Such as swallowing a spoon, yes.

19         Q.  Even if somebody determines that it is

20  attention seeking as opposed to a genuine suicidal

21  gesture?

22     A.  Yes.

23         Q.  Okay, yes.

24              Is extended solitary confinement a risk

77

1   factor for mental decompensation?

2       A.  Is extended solitary confinement a risk

3   factor, I think it can be.

4       Q.  And are there any, can solitary confinement

5   have a detrimental effect on mental health?

6       A.  I'm sure there is studies out there that say

7   yes.

8       Q.  Are you, you're aware of that?

9       A.  Yes.

10      Q.  Is that something that you've learned in

11  your professional training as a Doctor?

12      A.  No.

13      Q.  Is it something, have you received Mental

14  Health training at ACH?

15      A.  Yes.

16      Q.  And is it something that you learned in the

17  context of that training?

18      A.  I don't remember if it was in the context of

19  that training or my own reading.

20      Q.  Okay.  It's something you understand to be

21  true?

22      A.  It can be true, yes.

23      Q.  And is it also true that solitary

24  confinement is likely, it can have an, a magnified

78

1  effect on people with preexisting mental health

2  conditions?

3      A.  I don't know if it exacerbates or magnifies,

4  but I do believe that it can, from what I've read that

5  it can have an effect.

6      Q.  That in other words, the people with

7  preexisting mental illness can be even more sensitive

8  to the effects of solitary confinement?

9      A.  Like I said, I don't know if I've read that

10  study but I have read studies that say, I don't know

11  if it is synergistic versus --

12      Q.  Okay.  But in general what you said before

13  you agree that it there can be compounded or

14  accelerate or synergetic effect with preexisting

15  mental illness?

16      A.  Well, yeah, I've read that and I'm aware of

17  that.

18      Q.  Okay.  And Tiffany Rusher was on High Risk

19  Status while she was in prison, right?

20      A.  Yes.

21      Q.  And so she was located down by Booking,

22  correct?

23      A.  Yes.

24      Q.  Okay.  How long was she on High Risk Status

79

1  while she was there?

2      A.  I would say the majority of her time.

3      Q.  Are you, is there any limit in your mind as

4  to how long a person can remain on High Risk

5  Observation Status?

6      A.  Not to my knowledge.

7      Q.  Is there any limit as to how long a person

8  can remain in solitary, in a solitary cell on High

9  Risk?

10     A.  Not to my knowledge.

11     Q.  What kind of mental health, are you aware of

12 whether, or what kind of mental health training other

13 Practitioners, other mental healthcare, backing up,

14 not mental health care.

15          Are you aware of what kind of Mental

16 Health training other healthcare providers at Sangamon

17 County Jail receive?

18              MR. MADDOX:  When you say

19 other, I mean do you want to be, can you be more

20 specific as to the role?

21              MS. CHARDON:  Sure.

22     Q.  Let's talk about nurses.  Do you know what

23 kind of Mental Healthcare training they receive at

24 ACH?

80

1      A.  They have conferences.

2      Q.  Do you know whether they are trained to

3  recognize signs and symptoms of mental decompensation?

4      A.  I believe they are.

5      Q.  And what leads you to believe that?

6      A.  The conferences and topics that have been

7  told, you know, when Nurses tell me what they learned

8  and things like that.

9           And I also know that there is site

10  visits where they have, I don't remember what the

11  official titles maybe Regional Supervisor or site, you

12  know, they come around and say hey, these are things,

13  or if there is concerns that are voiced and, yeah.

14      Q.  Do the nurses, do you understand that the,

15  whether or not the nurses, excuse me.

16           Okay.  We're going to go back to the

17  evaluation that we were looking at before.  The second

18  page utilizes, we're on page ACH 610 of your

19  Exhibit 1.  Second bullet point, utilizes available

20  inhouse resource personnel for treatment or resolution

21  of identified problems before off-site referral, you

22  see that?

23      A.  Yeah.

24      Q.  Did you identify Tiffany Rusher as having

81

1  any Mental Health problems?

2       A.  Yes.

3       Q.  Okay.  And did you refer her to anybody for

4  treatment of those problems?

5       A.  Yes.

6       Q.  Who did you refer her to?

7       A.  ER.

8       Q.  When did you refer Tiffany Rusher to ER for

9  treatment of psychiatric problems?

10       A.  I referred her for treatment of symptoms she

11  exhibited.

12       Q.  Okay.  And did you refer her, was there any

13  Mental Health person you referred her to inhouse?

14       A.  Yeah.

15       Q.  Okay.

16       A.  Well, I didn't, I don't need to refer

17  inhouse.  They, if somebody is in Mental Health, we

18  have Mental Health personnel that meet with them.

19       Q.  And who was meeting with her?

20       A.  Mickey.

21       Q.  And did you --

22       A.  I don't remember if Lydia ever did or not.

23       Q.  Okay.  And did you see any record that she

24  met with her when you reviewed Tiffany's records?

82

1     A.  No, I didn't.

2     **Q.  Would she meet with patients, Lydia?**

3     A.  Yeah.

4     **Q.  Okay.  And you saw her meeting with patients**

5  **at Sangamon County Jail?**

6     A.  Yeah.

7     **Q.  Did she provide therapy for patients?**

8     A.  When you say therapy, are you talking about

9  what kind of therapy?

10    **Q.  Psychotherapy.**

11    A.  I don't know because I wasn't there for

12  those visits.

13    **Q.  Okay.  Is psychotherapy provided to patients**

14  **at Sangamon County Jail?**

15    A.  I assume, yeah.

16    **Q.  Why do you assume?**

17    A.  Because I would get reports of how their

18  interactions and interviews went with those patients.

19    **Q.  So you referred, okay, so you didn't, you**

20  **wouldn't consider yourself to having, as having**

21  **referred Tiffany for treatment with Mickey Shmikler,**

22  **is that right?**

23    A.  No, I think Mickey was involved right from

24  the get go because she came from a Mental Health

83

1   facility, so there was a standing diagnosis.

2            I would refer Mickey or refer Mental

3   Health for evaluation if there wasn't a standing

4   diagnosis that was previously diagnosed and so Mickey

5   would then initiate care at that time.

6        **Q. And what was Tiffany's diagnosis?**

7            MR. MADDOX:  Can he refer to

8   the chart?

9        **Q. Yes, you know what, I'll come back to the**

10  **question.  Can you answer that, after having reviewed**

11  **your charts can you answer that, do you know?  It**

12  **isn't a memory, do you know what her diagnoses were?**

13       A.  From what I recollect schizophrenia,

14  bipolar, and mood disorder.

15       **Q. Okay.  And we'll go back to that.**

16           **Why don't let me back up and sort of**

17  **just speak generally about what I want to ask about**

18  **how this process works that you were just describing**

19  **on a more general level.**

20           **Do you know whether Sangamon County**

21  **Jail is under any special accreditation standards?  Is**

22  **it accredited by National NCC, National Commission on**

23  **Correctional Healthcare?**

24       A.  I don't know.

84

1      Q.  Okay.  So was there any standard of

2  accreditation that you felt that you were operating

3  under when you were at Sangamon County Jail?

4      A.  Not, I don't know.

5      Q.  Is there a Suicide Prevention and Crisis

6  Intervention Program at Sangamon County Jail?

7      A.  Suicide Prevention and Crisis?

8      Q.  Let's break it up.

9      A.  I'm sorry.

10     Q.  Sure.

11          Is there a Suicide Prevention Program

12  at Sangamon County Jail?

13     A.  Yeah.

14     Q.  And what is it?

15     A.  So if somebody is identified as trying to

16  harm themselves, then they are put in what's called

17  High Risk Status, and they're observed every

18  15 minutes.  And then they're observed, then they're

19  spoken to regularly by Mental Health staff.

20          They're observed by the Nursing staff

21  daily.  They're observed by the Site Clinician myself

22  or Mary or sorry, I should say the NP or PA as well at

23  least on a weekly basis.

24     Q.  And are they observed by the Nursing Staff

1    on any routine or scheduled basis as part of that

2    Suicide Prevention Plan or is it more on call or sick

3    call?

4            A.  I believe they are observed during

5    medication distribution sometimes once and sometimes

6    multiple times a day.

7            Q.  Okay.  And have you ever known a person

8    who's on suicide in that within that Suicide

9    Prevention Observation Status to not be taking, to not

10   be receiving medication --

11           A.  I don't know.

12           Q.  -- at all?

13           A.  I don't remember, I'm sure, yeah.

14           Q.  What is your role in terms of the Suicide

15   Prevention Program that you just discussed?  You

16   mentioned you see patients once a week at least?

17           A.  (Nod Affirmatively).

18           Q.  Do you have any other role in the program?

19           A.  Reviewing their medications, reviewing their

20   clinical status and --

21           Q.  What you do mean by clinical status?

22           A.  Well, if I'm going, I'm going to observe

23   them.  I'm reviewing, I'm documenting my clinical

24   observation, talking to the patient as well as

86

1    visiting, observing the patient.

2        Q.  Okay.  And do you review their records from

3    the Mental Health provider?

4        A.  If they are brought to my attention.

5        Q.  If they are just in the, what would make

6    them be brought to your attention?  What do you mean

7    by that?

8        A.  They are put in my mailbox or they are

9    brought to me by the Mental Health provider.

10       Q.  So if they just get filed in the chart, that

11   would not count as being brought to your attention?

12       A.  No.

13       Q.  Does anybody write a Mental Health

14   Evaluation of a patient being put in this Suicide

15   Prevention Program?

16       A.  Yeah, the Mental Health Staff.

17       Q.  And what does that look like, is there a

18   specific form that's used?

19       A.  They have a documentation form that they do

20   use.

21       Q.  Okay.  And then does that require them to

22   record a diagnosis?

23       A.  I don't think they put, I don't remember if

24   he had a diagnosis on there or not or what his

87

1     thoughts were.  He might say acts as Axis 1 or but,

2     not that I remember specific diagnosis but he might

3     say what he thinks is going on.

4          Q.  Okay.  And he's an LCSW, right?

5          A.  (Nod Affirmatively).

6          Q.  Is that correct?

7          A.  I assume.

8          Q.  Sorry, you nodded.

9          A.  Yeah.

10               MR. MADDOX:  We have to clarify

11    you're talking about Mickey here now?

12               MS. CHARDON:  Yeah, thank you,

13    I am talking about Mickey.

14         Q.  He was --

15         A.  Michael.

16         Q.  Are you aware?

17         A.  Michael, everybody calls him Mickey.

18         Q.  Did you call him Michael or Mickey?

19         A.  Mickey.

20         Q.  All right.  Did you understand that he was a

21    LCSW in terms of his licensure?

22         A.  Yes.

23         Q.  Okay.  As an LCSW was he, could he make

24    Mental Health diagnosis?

88

1     A.  I'm not sure.

2     **Q.  Okay.  Could he make psychiatric diagnosis?**

3                 MR. MADDOX:  Is there a

4  difference?

5     A.  I'm not sure.

6                 MS. CHARDON:  I'm asking the

7  Doctor so I --

8     A.  I'm not sure yeah, I mean...

9     **Q.  You don't know, okay.**

10     A.  Yeah.

11     **Q.  Was there a Treatment Plan incorporated in**

12  **the Mental Health Evaluation that he would fill out?**

13     A.  Suggestions, yes.

14     **Q.  Okay.  And what kind, what do you mean by**

15  **suggestion?**

16     A.  Well, no, there wasn't a treatment, there

17  wasn't a management plan.

18     **Q.  Okay.**

19     A.  No, there wasn't a Management Plan.  He

20  wouldn't tell you what meds to put on or, you know,

21  yeah.

22     **Q.  Is Management Plan something that you're**

23  **familiar with your, in the context of your work**

24  **outside of Sangamon County Jail, do you use Management**

89

1    Plans in your full time practice?

2         A.  Yes.

3         Q.  And do those involve when you have a

4    Management Plan for a, pertaining to a Mental Health

5    condition or psychiatric condition would it involve

6    recommendations as to treatment like psychotherapy

7    type of treatment?

8         A.  In my private practice?

9         Q.  Yeah, in your private practice?

10        A.  No.

11        Q.  Okay.  Would it involve, you mention

12   medication recommendations?

13        A.  (Nod Affirmatively).

14        Q.  Yes?

15        A.  Yes.

16        Q.  And do you, who writes that Management Plan?

17        A.  Who writes the, I do.

18        Q.  Okay.  Have, and do you, have you referred

19   as part of your Management Plan does it include a

20   referral to psychotherapy?

21        A.  No.

22        Q.  No, okay.

23             Have you ever referred patients for

24   psychotherapy as part of your private practice?

90

1    A. No.

2    Q. **Never?**

3    A. We refer to psychiatrists, they are the ones

4    who determine what the Management Plan is for mental,

5    yeah.

6    Q. **So in your Management Plan for a mental**

7    **health condition in your private practice, does it**

8    **include referral to psychiatry?**

9    A. No.

10   Q. **Okay.**

11   A. Because Urgent Care does not deal with acute

12   psychiatric episodes.

13   Q. **Okay.  So Urgent Care is not the place where**

14   **you're equipped to handle acute psychiatric episodes?**

15   A. No, that would be under my family, yeah.

16   Family Medicine I would refer to psychiatry.

17   Q. **Okay.  And so the Management Plans we were**

18   **discussing those were something that you use in your**

19   **practice as Urgent Care, is that right?**

20   A. Of medications?

21   Q. **Yeah.**

22   A. Yeah, because you asked me two different

23   things.

24   Q. **Oh, yeah, I know I actually think you're**

91

1  **trying to explain this to me I just, I'm trying to**

2  **follow it.**

3      A.  You know, if a patient comes in with acute

4  psychiatric concern into Urgent Care --

5      **Q.  Yeah.**

6      A.  -- they are referred to the ER.

7      **Q.  Okay.**

8      A.  Okay.  If you have somebody in an acute

9  psychiatric concern in family practice, they are also

10  referred to the ER.

11      **Q.  Okay.**

12      A.  If you have somebody who needs medical

13  management of a diagnosis that is not an acute

14  flare-up then you refer, and it's beyond your scope of

15  practice, then you refer to psychiatry.  If you

16  cannot.  If you feel that it's beyond the scope of

17  practice.

18      **Q.  And what constitutes an acute psychiatric?**

19      A.  Clinical evaluation.

20      **Q.  Yeah.**

21      A.  Clinical evaluation, yeah.

22      **Q.  So what are, what's an example of an acute**

23  **psychiatric condition that would require referral to**

24  **the ER?**

92

1     A.  Eating feces.

2     Q.  Okay.  And you would refer that person for

3  an acute psychiatric evaluation?

4     A.  I would refer that person for their

5  safety --

6     Q.  Yeah.

7     A.  -- and their health concerns.  Whether they

8  get a psychiatric evaluation or not is no longer under

9  my jurisdiction.

10          When a patient is referred to the ER,

11  the ER physician makes their evaluation.  If I say I'm

12  worried about a patient having a stroke and the

13  patient shows up to the ER, I don't get to choose

14  whether that patient gets an evaluation for a stroke.

15     Q.  Your duty is just to, as the, it's, a

16  Primary Care Physician is basically like the

17  quarterback as I think of it, right?  So you're

18  coordinating this care, right?

19     A.  (Nod Affirmatively).

20     Q.  Is that correct?

21     A.  Yeah.

22     Q.  Okay.  And you, if you're going to make a

23  referral, if you have a concern about a patient, say a

24  stroke concern, right, your job is to refer that

93

1    person to the appropriate place to address the concern
2    for stroke?
3         A.  If it's an acute stroke, yes.
4         Q.  Okay.  And you, you would need to
5    communicate that concern to the Doctor to whom you're
6    referring it, right?
7         A.  No, you would communicate it to that office.
8         Q.  Correct.
9              You'd say, you would communicate a
10   referral for concerns of an acute stroke or, correct?
11        A.  Yes.
12        Q.  Psychiatric, psychiatry you would
13   communicate a referral for concerns of an acute
14   psychiatric symptoms?
15        A.  Yes, if it was beyond my scope of practice.
16        Q.  Right.  And it would be important that in
17   the context of that communication you'd make clear you
18   weren't referring them for constipation, correct?  You
19   were referring them for psychiatric treatment for
20   psychiatric concerns?
21        A.  If I'm referring somebody for psychiatric
22   concerns to an outpatient department?
23        Q.  Yeah.
24        A.  Yeah.

94

1      Q.  You would say psychiatric concerns?

2      A.  Well, I would say here's the incident that

3   occurred, I need them evaluated by you.

4      Q.  Yes.

5      A.  Right.

6      Q.  Okay.  And then at that point it's once you

7   have channeled them to the appropriate --

8      A.  Because you may not have a diagnosis when

9   you refer, right.  If a patient comes in with a

10  swelling of the leg, and you've done your scope of

11  practice and you don't know why you have a

12  differential, so I'm going to refer that patient to a

13  vascular surgeon, but I am not going to tell the

14  vascular surgeon what the diagnosis is.  I'm going to

15  tell the vascular surgeon I still got swelling of the

16  leg, I don't know why.  Here's a patient with swelling

17  of the leg or their symptoms.

18     Q.  Okay.  And did you, so in your Urgent Care

19  when somebody comes in, you, I think what you just

20  explained to me is that in your private practice

21  whether in Family Medicine or Urgent Care if somebody

22  presents with acute psychiatric symptoms, you refer

23  them to the ER?

24     A.  Yes.

1    Q.  Okay.  And so in, at least one of those

2    contexts we were talking about the document you called

3    it a Management Plan, right?

4    A.  Yeah.

5    Q.  What's a Management Plan?

6    A.  A, it's, it's the plan of what you would

7    like to do with that patient and manage those

8    symptoms.

9    Q.  Okay.  And is there an equivalent to

10   Management Plan that you use at, you used at Sangamon

11   County Jail?

12   A.  Yes, it's a SOAP note.

13   Q.  A SOAP note?

14   A.  Yes.

15   Q.  Subjective Objective Assessment Plan?

16   A.  Yeah.

17   Q.  Okay.  And you have SOAP notes in your

18   Medical records progress, under progress notes

19   essentially, correct?

20   A.  (Nod Affirmatively).

21              MR. MADDOX:  Is that a yes?

22   A.  Yes.

23   Q.  And would there be, other than your SOAP

24   notes, is there any kind of written Treatment Plan for

96

1    psychiatric conditions that would exist at Sangamon

2    County Jail?

3         A.  From the Advanced Practitioner.

4         Q.  Oh, an Advanced Practitioner could make

5    notes as well?

6         A.  Yes.

7         Q.  Okay.  And would there be, I think we were

8    talking before we kind of got sidetracked into your

9    private practice about the, you are familiar what you

10   know of the -- well, you know what rather than trying

11   to restate it and I may have a faulty memory I'm just

12   going to reask.

13             So would there be any kind of Treatment

14   Plan authored or created by Mental Healthcare workers

15   at Sangamon County Jail?

16        A.  That they, no, they wouldn't execute the

17   plan, no.

18        Q.  Would they create it to just make sure I am

19   clear?  Would they write one, is there any kind of

20   plan?  You know all I'm asking, if --

21        A.  No, I think it was more, I believe it was

22   more observations, that they would report their

23   observations and their suggestions but not a plan, no.

24        Q.  Okay.  And so is there any sort of

97

1  documented plan, when we're talking about a patient

2  who presents with signs of, who you would determine to

3  be mentally ill that -- okay -- no.

4                    If we talk about a patient who's

5  involved in crisis intervention or suicide prevention

6  program at Sangamon County Jail, okay --

7       A.  Okay.

8       Q.  -- is there any written plan governing

9  housing of that person?

10      A.  From myself?

11      Q.  From yourself or anyone else you're aware

12  of?

13      A.  You mean who determines the housing

14  situation?

15      Q.  Yes, who determines the housing situation?

16      A.  So who puts them in High Risk?

17      Q.  Yes.  Question one, who puts them in High

18  Risk?

19      A.  All right.

20      Q.  Who puts them in High Risk?

21      A.  Me.

22      Q.  You do?

23      A.  Or the Advanced Practitioner.

24      Q.  And is there any --

98

1      A.  And the Nursing Staff can also.

2      Q.  Okay.

3      A.  Yeah.

4      Q.  Is there any point of authored with respect

5   to, to the housing if they're in High Risk?

6      A.  That is?

7      Q.  Any document?

8      A.  I'm sorry?

9      Q.  There is probably a document putting them

10   in, notifying --

11      A.  Placing patients in High Risk, yes.

12      Q.  And then is there any plan for the future

13   going forward of how long that person is going to stay

14   in High Risk or --

15      A.  That's based on the clinical evaluation,

16   observations made during their stay.

17      Q.  And so there is no document, if I'm going to

18   lock for documents, there is no documents I should

19   look for that would be the housing plan for as part of

20   crisis intervention or whatever?

21      A.  No, because it's individualized according to

22   their symptoms and they're, yeah.

23      Q.  Is there any, at what point when you're

24   dealing with a patient who has been placed on High

99

1    Risk Status, at what point would you have the ability

2    to call at Sangamon County Jail to call a psychiatrist

3    if you felt they needed referral to a higher level of

4    care?

5         A.  Yeah.

6         Q.  How would you do that?

7         A.  You would ask for a referral to be made to a

8    psychiatrist, and there is also psychiatrist there was

9    1 or 2 that I remember that had been involved in cases

10   or been consulted.

11        Q.  Okay.  At Sangamon County Jail?

12        A.  I believe so, yeah.

13        Q.  Did they consult with the patient the

14   prisoner directly or telephonically?

15        A.  I'm not sure.

16        Q.  Okay.  But, and who, what, specifically what

17   were your resources as of 2017 if you wanted to call a

18   psychiatrist about Tiffany?

19        A.  Uh-huh.

20        Q.  Who, where, who would you call?  How would

21   that work?

22        A.  I would ask my Nurse Supervisor that hey,

23   I'm making a referral to psychiatry or I need a

24   psychiatrist evaluation.  And a psychiatrist would

100

1   then be called and that process is started.

2              That psychiatrist also to accept the

3   referral, you know, we can't force somebody, a

4   specialist to take a patient.

5        Q.  Are there any psychiatrists with whom you've

6   worked with and who you've referred patients to from

7   Sangamon County Jail, any specific ones?

8        A.  I believe so, there was some referrals about

9   fit for trial kind of stuff.

10       Q.  Okay.  Do you have any involvement in those

11  kind of referrals?

12       A.  I don't believe so.  I believe that's

13  something that the --

14       Q.  Yeah.

15             Do you review when determinations are

16  made in, or reports authored as to whether somebody is

17  fit for trial is that something that you have access

18  to?

19       A.  I don't believe I do.  I think I'm actually

20  notified, you know, through some method I was notified

21  of one or two cases.

22       Q.  Do you think that you ever saw one for I, I

23  recently obtain a copy of one for Tiffany, we all did,

24  I'm just wondering if you have ever seen that or you

101

1    think that you've ever seen one?

2         A.  I don't think that I have, I mean...

3         Q.  Okay.  You have no recollection of receiving

4    that --

5         A.  No.

6         Q.  -- during the time.

7              And so you recall she was referred I

8    can tell she is referred to Killian and Associates for

9    psychiatric evaluation?

10        A.  Doctor Killian.

11        Q.  Does that name sound familiar?

12        A.  Yeah.

13        Q.  Have you ever referred anybody to Doctor

14   Killian for outside the context of a fitness to stand

15   trial evaluation?

16        A.  I don't think so.

17        Q.  Have you ever referred a patient from

18   Sangamon County Jail to a psychiatrist outside the

19   facility?

20        A.  I don't remember, I don't remember.

21        Q.  Okay.  So you're not, you can't recollect a

22   single, a specific instance of doing that?

23                   MR. MADDOX:  He just said he

24   doesn't remember.

102

1              MS. CHARDON:  I'm making sure,

2   yeah.

3              MR. MADDOX:  Well, how many

4   answers do you need?  He doesn't remember.

5       A.  Yeah, sorry I --

6       **Q.  You don't remember?**

7       A.  No.

8       **Q.  Okay.  You can't think of an example, okay.**

9              **And other than Doctor Killian are there**

10  **any psychiatrists that you know who have a referral**

11  **relationship with Sangamon County Jail?**

12      A.  The only reason I remember that the, you

13  mentioned the name it triggered a memory that...

14      **Q.  Okay.**

15      A.  -- I thought there was another name, but I,

16  until I hear it, I wouldn't, you know.

17      **Q.  Have you ever determined well, we talked**

18  **about a couple acute, well, one specific example of a**

19  **gentleman who had an acute psychiatric need and went**

20  **to the ER.  The gentleman who was not eating and**

21  **drinking.**

22             **Have you ever made a determination**

23  **setting aside him and the category of people with**

24  **acute needs that need to go to ER?**

103

1    A.  Yeah.

2    Q.  **Have you ever made the determination that**

3    **somebody or, excuse me, have you ever had concerns**

4    **that someone wasn't receiving a level of psychiatric**

5    **care that they needed at Sangamon County Jail?**

6                    MS. POWELL:  Objection,

7    foundation.

8                    MR. MADDOX:  Yeah, object to

9    the form of the question as well because the question

10   is, has he ever had a concern that they're not

11   receiving adequate psychiatric care?

12                   MS. CHARDON:  Yes.

13                   MR. MADDOX:  Okay.

14   Q.  **Let me ask you this way.**

15           **Do you, have you ever had a concern**

16   **that anybody at Sangamon County Jail a patient is not,**

17   **needs psychiatric care that they are not getting?**

18   A.  No, because if there is an acute episode, we

19   send them to the ER.  I mean that's kind of my, I

20   remember that we had tried sending a patient to a

21   Mental Health Facility for, as a referral and it

22   didn't happen because the facility refused, 2 or 3

23   facilities refused them.  I think we've even went as

24   far as like, because you start close, you just get

104

1    keep kind of going out is how the nurses did it.  And

2    I remember that hey, listen this patient da, da, da

3    and then they had an acute episode, I was like, okay

4    ER.

5                    And that patient then got evaluated at

6    the ER and I believe that patient, Memorial has an

7    inpatient facility as well, but that was the way we

8    would handle if we couldn't get somebody into a

9    facility because facilities refuse.

10                   When an acute episode occurred, that

11   patient would get referred to the ER, and then we

12   would hope that the ER physician they have like a team

13   there at the ER called the PRT, the Psych Response

14   Team, they actually come down there and evaluate

15   and...

16        **Q.  Okay.  So I think you did answer my question**

17   **in other words --**

18        A.  Sorry.

19        **Q.  -- yeah for that person, well, first of all**

20   **would that person that you were just discussing where**

21   **they were looking for beds was that person determined**

22   **not to fit to stand trial?**

23        A.  I don't remember.  I don't even remember who

24   it was.  I just remember one of the lead nurses

105

1    telling me that we've even gone two, three hours away

2    and we can't find a facility that will take them.

3                    And then, you know, but the patient was

4    stable, but then the patient had an acute episode and

5    they went to the ER.  I guess ER can't release them,

6    you know what I mean, they have their own protocols on

7    what they can and cannot do with mental health.

8        **Q.  So that person was exhibiting psychiatric**

9    **symptoms that, that you determined were, would**

10   **require, would warrant inpatient--**

11       A.  And an ER visit, yeah.

12       **Q.  Well, prior to that when you are looking for**

13   **the bed they warranted inpatient hospitalization?**

14       A.  Well, I felt that person could yeah, might

15   be better served.

16       **Q.  So for that person that wasn't an example of**

17   **a time when you did feel that somebody needed more**

18   **psychiatric care then they were getting at Sangamon**

19   **County Jail?**

20       A.  Yeah, okay.

21       **Q.  And you were unable to place that person,**

22   **correct?**

23       A.  (Nod Affirmatively).

24       **Q.  And eventually that lead to the person had**

106

1    an acute, an acute psychiatric symptom that, that

2    warranted transfer to the ER, correct?

3         A.  Yes.

4                    MR. MADDOX:  And I just want

5    you to concentrate on not just nodding your head.

6         A.  Sorry.

7                    MR. MADDOX:  Okay.  So if she

8    asks a question and you go like this (indicating) it's

9    hard for Cathy --

10        A.  Sorry.

11                   MR. MADDOX:  -- and hard on us

12   later to know exactly what you said.

13        A.  Sorry.

14                   MR. MADDOX:  Okay, thank you.

15        Q.  And is that best practices in an ideal world

16   which is, is it best to wait until somebody has an

17   acute psychiatric episode and has to go to the ER or

18   is it better to treat that psychiatric symptoms?

19                   MR. MADDOX:  I --

20        Q.  -- prior?

21                   MR. MADDOX:  Object to form of

22   the question.

23        A.  Yeah, I, is it better for the person to go

24   to inpatient?  Well, yeah, that's why I'm asking for

107

1    the referral.

2         Q.  **Well, lawyers sometimes ask very basic**

3    **questions.**

4         A.  Sorry.

5         Q.  **And I know as a Doctor it's, you know,**

6    **you're used to but, so.**

7                   **So you would rather not have to wait**

8    **until somebody has an acute psychiatric symptom and**

9    **has to go to the ER, correct?**

10        A.  In that specific instance that was probably

11   my clinical judgment.

12        Q.  **Yeah.  In general is that something that,**

13   **that the way you practice medicine it's better to**

14   **treat a disease to avoid hospitalization?**

15                   MR. MADDOX:  Object to the form

16   of the question, answer if you can.

17        A.  Better to treat a disease in avoid then --

18        Q.  **In order to avoid having acute consequences?**

19        A.  Yes.

20        Q.  **Preventative medicine?**

21        A.  Is always better than, yes.

22        Q.  **And so you attempt, so in that context the**

23   **preventative medicine would have been getting that**

24   **person into psychiatry sooner?**

108

1    A.  Yes.

2    **Q.  And there were no beds available?**

3    A.  Correct.

4                    MR. MADDOX:  Well, that's not

5    what he said.

6    A.  I said that they didn't take them.

7    **Q.  They didn't take them.**

8    A.  And I don't know if it's due to beds, I

9    don't know if they had prior experience with that

10   facility.  I don't know if that patient was removed

11   from that facility prior and I don't know, I know that

12   the referral was...

13   **Q.  And okay, when did that happen, that**

14   **patient?**

15   A.  I don't remember, I don't even remember

16   which Nurse it was with, whether it was Dan or Kate

17   or, you know.

18   **Q.  Was it a male or female patient?**

19   A.  I don't remember.

20   **Q.  Did you treat the patient?**

21   A.  Yes, they were in my facility.

22   **Q.  Did you have anything to do with the**

23   **determination to start looking for a psych ward for**

24   **them, a psych facility?**

109

1        A.  Yes.

2        Q.  Okay.  And what was your role in that

3   determination?

4        A.  I don't remember.  I do, I mean if you're

5   asking a general question my concern would be that

6   they're having maybe too many acute episodes in a

7   brief period of time, psychotic breaks or, you know,

8   acute episodes on their chronic illness in a brief

9   amount of time that hey, this is beyond what we can

10  manage safely.

11       Q.  Okay.  Did you ever have that concern with

12  Tiffany that she was having too many acute episodes in

13  a brief period of time?

14       A.  Not that I remember.

15       Q.  Would you consider swallowing a spoon and

16  having it obstruct your airway an acute episode?

17       A.  Yes.

18       Q.  Would you consider strangulation with a

19  Velcro boot strap an acute episode?

20       A.  Yes.

21       Q.  Would you consider swallowing medical clips

22  at an outside clinic an acute episode?

23       A.  At an outside clinic?

24       Q.  Wherever swallowing medical clip?

110

1      A.  In my facility?

2      **Q.  Any facility, yeah.**

3      A.  Yeah.

4      **Q.  Just the act of swallowing medical clips to**

5   **be an acute episode?**

6      A.  Yes.

7      **Q.  And would you consider swallowing a plastic**

8   **bag to be an acute episode?**

9      A.  Yes.

10     **Q.  Swallowing a toothbrush?**

11     A.  Yes.

12     **Q.  Acute episode?**

13     A.  Yes.

14     **Q.  And you are aware that those are all things**

15  **that Tiffany did while she was at Sangamon County**

16  **Jail?**

17                    MR. MADDOX:  Object, misstates

18  the evidence but go ahead.

19                    MS. POWELL:  I will object to

20  the form of the question as well.

21                    MR. MADDOX:  Yeah.

22     A.  I don't know if all of them I don't

23  recollect if all of them, but I do recollect majority

24  of them.

1    Q.  Okay.  So the, which ones do you recollect?

2    A.  The toothbrush, the strap, the clip, I don't

3    remember the bag.

4    Q.  Okay.  At any point and you were aware of

5    those contemporaneously with them occurring?

6                    MR. MADDOX:  Can you define

7    contemporaneously.

8                    MS. CHARDON:  Sure.

9                    MR. MADDOX:  Cause that means,

10   that suggests that he is there watching it happen.  If

11   you can rephrase the question.

12                    MS. CHARDON:  That's a fair

13   question, yeah.

14   Q.  You know what I'm going to, we're going to

15   look at records because I don't want to, it's just not

16   going to, it's not helpful until we do.  We got the

17   records and we will look at those in a minute.  But at

18   any point did you have a concern that Tiffany was

19   having too many acute psychiatric episodes and needed

20   more or different psychiatric treatment?

21   A.  Not that I recollect.

22   Q.  If you had made that determination, what

23   resources did you have available to you?

24   A.  I would have asked for a referral to

112

1    psychiatry or a referral to inpatient facility or

2    referral to, you know, be beyond what Mental Health.

3         Q.  That's something that you could have done?

4         A.  Yes.

5         Q.  Okay.  Is, Tiffany was on High Risk

6    Observation, correct?

7         A.  High —

8         Q.  High Risk Status?

9         A.  Yes.

10        Q.  And she was located in Booking, right?

11             The area near Booking?

12        A.  I, yes, but I also believe at some point she

13   was, I don't want to misspeak, but I believe at one

14   point she was actually up in, we have High Risk

15   upstairs as well.

16        Q.  Okay.  Is that called like Medical is their

17   a name for the High Risk upstairs how would you

18   describe that location?

19        A.  Well, the idea of High Risk upstairs that

20   are, Nursing Staff has direct eyes because it's

21   directly across from the Medical Staff like it's a

22   glass and you can see that hallway consistently.

23        Q.  Okay.

24        A.  And so I think at one point she was up their

113

1    from what I remember, I don't...

2        **Q.  Are there any Medical cells where, is there**

3    **a Medical Unit, too?  I haven't toured the Jail my**

4    **colleagues have so, excuse me.**

5        A.  When you say a Medical Unit?

6        **Q.  Uh-huh.  Is there a Medical Unit?**

7        A.  Yeah, I mean the, I don't know if we have a

8    specific Medical Unit, but Medical when you say

9    Medical, I don't know if you mean physical or mental

10   health that's all Medical.  Mental Health can be

11   housed in A, from what I remember now, I don't

12   remember all the blocks, but I believe A Block, High

13   Risk, Booking, High Risk up on the second floor, these

14   are all areas that people can be housed.

15       **Q.  And in the A Block are there any cells that**

16   **have cameras --**

17       A.  I don't know.

18       **Q.  -- that have a, okay.  And what about**

19   **Booking, not Booking, at the High Risk up on the**

20   **Second Floor are there any cells with camera**

21   **surveillance?**

22       A.  I think so.

23       **Q.  And do you know who views, who can view that**

24   **camera surveillance?**

114

1      A.  It's in, I assume, I know that there was

2  cameras in Medical in, sorry, the Medical Office.

3      Q.  Okay.

4      A.  But I don't know how the CO's or Jail Staff,

5  Sangamon County Jail Staff were observing that.

6      Q.  So or --

7      A.  Or what their cameras, I wasn't privy to

8  that section of Security.

9      **Q.  When you say there were cameras in the**

10  **Medical Office, this would be the office where the**

11  **nurses the, the Doctors, the prisoners would come to**

12  **receive medical care --**

13      A.  Yes.

14      **Q.  -- not where they lived?**

15      A.  Correct.

16      **Q.  But there were cameras, to your knowledge,**

17  **in any of the cells on the, near the Medical Unit?**

18      A.  Oh, gosh, I don't know.

19      **Q.  Okay.  What training have you received from**

20  **ACH relating to Mental Health issues?**

21      A.  CME conferences.

22      **Q.  Okay.  Continuing Medical Education**

23  **conferences?**

24      A.  Uh-huh.

115

1                MR. MADDOX:  Yes?

2        A.  Yes, sorry.

3        Q.  Are these offered by ACH?

4        A.  Yes.

5        Q.  And were there, did you watch a

6   presentation, presentations or how was information

7   presented about mental health at those conferences?

8        A.  Presentations, Q and A, clinical case

9   reviews.

10       Q.  And were those, how often did you attend

11  those CME's?

12       A.  Almost every quarter.

13       Q.  Where were they located?

14       A.  Peoria.

15       Q.  And would, are you familiar with Doctor

16  Melissa Caldwell?

17       A.  Yeah, yes, sorry.

18       Q.  And she's the Director of Mental Health at

19  ACH, right?

20       A.  Yes.

21       Q.  Or something equivalent to that if I don't

22  have the exact correct job title.

23            Did you see presentations from her

24  regarding Mental Health issues?

116

1      A.  Yes.

2      Q.  Okay.  Do you ever watch videos regarding

3   Mental Health issues?

4      A.  Yes.

5      Q.  But, that were created by her, that were her

6   presenting?

7      A.  I don't remember if it was her presenting, I

8   know I was at conferences where they showed actors

9   portraying trying clinical scenarios and...

10      Q.  Okay.  Do you know whether other Medical or

11   well, employees of ACH with different licenses so non

12   physicians received the same training as you in terms

13   of these Mental Health issues or?

14      A.  They had the opportunity to attend the same.

15      Q.  Okay.

16      A.  Yes, there were people with different

17   licenses at the same presentations.

18      Q.  Okay.  So nurses could come to those CME

19   conferences?

20      A.  Yes.

21      Q.  Were they required to go to the CME

22   conferences?

23      A.  That I don't know.

24      Q.  Were you required to go?

117

1      A.  You were required to go to as many as

2   possible.  I don't know if there was a cutoff number.

3   I know I was there probably 75 percent of the time, I

4   might have missed one a year kind of thing.

5      Q.  So physicians did have a requirement to

6   attend some amount of these?

7      A.  I don't know.

8                    MR. MADDOX:  I just want to

9   clarify.  When you say requirement, I mean the State

10  of Illinois requires a minimum CME.  You mean by the

11  State or ACH?

12                   MS. CHARDON:  Thanks, that's a

13  good clarification.

14     Q.  I'm asking if ACH required you to go to

15  these conferences?

16     A.  They highly recommended it.  If you were, I

17  remember saying no, I wasn't available due to

18  scheduling and I would get a call from Doctor

19  Rakestraw hey, how come you can't make it, what's

20  going on, you know.  They wanted to know why you

21  couldn't make it.

22     Q.  And then they would provide the kind of

23  accreditation that you'd need to report to the, would

24  you use, did they get credits that you could report to

118

1  the State Board as continuing medical education

2  credits?

3         A.  Yes, yes.

4         Q.  And do you know whether nurses employed at

5  Sangamon County Jail had the same expectations from

6  ACH in terms of attending those conferences?

7         A.  I don't know if they, no, we didn't, I guess

8  nobody discussed if they got the phone calls that I

9  had received.

10         Q.  Okay.  So I think I've asked, I have asked a

11  bunch of questions make sure I've got it.  You don't

12  have anyway of knowing what training Mental Health

13  nurses were receiving at Sangamon County Jail?

14                   MR. MADDOX:  Excuse me, I just

15  want to, would you, can you reword that to say what

16  Mental Health training nurses received, you said

17  Mental Health nurses I don't think there was a Mental

18  Health Nurse.

19                   MS. CHARDON:  Thanks, you're

20  fixing my record for me.

21                   MR. MADDOX:  Well, I wanted to

22  make sure.

23                   MS. CHARDON:  No, I appreciate

24  it, yeah.

119

1      Q.  Am I correct that you have no way of knowing

2   exactly what training in Mental Health issues was

3   received by nurses --

4      A.  Correct.

5      Q.  -- at Sangamon County Jail?

6      A.  I wasn't made aware.

7      Q.  Okay.  What topics were covered in, you

8   meant, it sounds like you were at ACH, you were at

9   Sangamon County Jail for, from at least, you know,

10  2013 to 2017, and you attended several CME's during

11  that time period, correct?

12     A.  Yes.

13     Q.  And there was, so what topics with respect

14  to Mental Health were covered in the context of the

15  course of the training that you received?

16     A.  I don't remember the specifics.

17     Q.  Was it training on recognizing signs and

18  symptoms of suicide risk?

19     A.  I don't, I can't clarify if it was received

20  from ACH versus my CME requirements by the State

21  versus my full time job requiring me to do certain, I

22  don't know where or what the specific topics were for

23  those conferences that I attended.

24     Q.  Okay.  Let's mark Abraham, are we on 2,

120

1   **Abraham 2.  This is a Group Exhibit, it's a collection**

2   **of Medical records, it's not contiguous, I will give**

3   **copies to you.**

4                   (Abraham Group Exhibit 2 marked for

5                   identification by the Court

6                   Reporter.)

7                       MS. POWELL:  What was Abraham

8   1?

9                       MS. CHARDON:  Abraham 1 is his

10  contract.

11                      MS. POWELL:  Oh, the contract.

12                      MR. MADDOX:  No, it's not,

13  Abraham 1 is the personnel file.

14                      MS. CHARDON:  Okay, thank you

15  his personnel file.

16       **Q.  And Abraham 2 again is not contiguous**

17  **numbering.  The first page of it is 11056 and the last**

18  **Plaintiff's Production 11056 and the last page is**

19  **Plaintiff's Production 10861.**

20           **Is this, this is a medical progress**

21  **note, correct?**

22       A.  Yes.

23       **Q.  And it's dated well, is this your**

24  **handwriting?**

121

1            MR. MADDOX:  Just for

2    clarification you are looking at the first page of

3    this, correct?

4            MS. CHARDON:  Yeah, thank you.

5       Q.  I'm looking at the first Page 11056.

6            Is that your handwriting?

7       A.  It is my handwriting, not all of it is my

8    handwriting.

9       Q.  Okay.  And I, yes, you want to describe

10   which part is not your handwriting?

11      A.  The vitals is not my handwriting, the

12   filling out of the top portion with date, patient name

13   and Inmate ID and subjective, the first subjective

14   complaint that says HR is not my handwriting.

15      Q.  Okay.  What is HR stand for?

16      A.  High Risk.

17      Q.  Okay.  And under date, it first says

18   12/26/16, correct?  And then that, it looks like

19   that's crossed out, do you see that?

20      A.  I do.

21      Q.  Above it is 1/4/17, right?

22      A.  Yes.

23      Q.  And then you, do you know why that date, why

24   that date was originally written 12/26/16?

122

1        A.  I don't.

2                        MS. POWELL:  I just am going to

3    object to the form of the question --

4        A.  Sorry.

5                        MS. POWELL:  -- because this is

6    scratched out I can't tell if it's a one or 12/20 or

7    12/30.

8        Q.  Okay.  So you do you have any knowledge of

9    the circumstances of why that date is crossed out

10   there?

11       A.  I don't.

12       Q.  Okay.  You, is that your signature at the

13   bottom?

14       A.  It is.

15       Q.  Okay.  So it's, you signed your name with

16   like two letters basically, that short signature under

17   well, it's under Practitioner's signature, correct?

18       A.  Yes.

19       Q.  And that indicates that this was no note was

20   taken on January 4th, 2017, correct?

21       A.  Correct.

22       Q.  Was this the first time that you examined

23   Tiffany Rusher?

24       A.  I'm not sure.

123

1        Q.  Okay.  If you had examined her prior to this

2   time, would it have been in the Medical records like

3   would you have documented it?

4        A.  If I had examined her?

5        Q.  Yes.

6        A.  Yes.

7        Q.  Okay.  And so where are my notes, excuse me.

8             So if I didn't find Medical records

9   assuming it's correct that there are no Medical

10  records with your name on them prior to this time,

11  would that indicate to you that you hadn't examined

12  her prior?

13       A.  My documentation is when I visited --

14                  MR. MADDOX:  Counsel, I'm

15  looking at one right now.

16                  MS. CHARDON:  Yeah, I'm not

17  trying to create --

18                  MR. MADDOX:  Okay, yeah, there

19  is one before then.

20                  MS. CHARDON:  Okay.  And what's

21  the date?

22                  MR. MADDOX:  12/19/16.

23                  MS. CHARDON:  Okay.  What's the

24  Bates label of the one you're looking at?

124

1          MR. MADDOX:  Well, it's Bates

2    by my own internal and I can tell you but it wouldn't

3    mean anything to you but...

4          MS. CHARDON:  Okay.

5          MR. MADDOX:  My internal is

6    ACH006.

7          MS. POWELL:  But that's not the

8    ACH that we received?

9          MR. MADDOX:  It is not.

10         MS. POWELL:  Okay.

11    **Q.  When you were, you said you reviewed, you**

12    **spent quite a bit of time reviewing the Medical charts**

13    **in advance of this deposition, right?**

14    A.  Yes.

15    **Q.  Do you, in the course of that did you note**

16    **when you first saw her?**

17    A.  No.

18    **Q.  Okay.  Do you have a memory of when you**

19    **first saw her?**

20    A.  I would refer to the documents of the

21    Medical chart.

22    **Q.  Okay.  Do you have notes on that or can you,**

23    **can I look at it, that document?**

24         MR. MADDOX:  Yeah.

125

1            MS. CHARDON:  Thank you.  Do

2   you have a problem with me marking this?

3            MR. MADDOX:  Let me have copies

4   made.

5            MS. CHARDON:  Yeah, sure.  Do

6   you won't to go off the record for a minute?

7            MR. MADDOX:  Yeah.

8            (Whereupon a recess was taken.)

9            (Abraham Exhibit 3 marked for

10             identification by the Court

11             Reporter.)

12        Q.  So I'm handing you Abraham 3 which states at

13   the bottom ACH 006 organized, and that is a Medical

14   progress note from December 19th, 2016, correct?

15        A.  Correct.

16        Q.  Is that your handwriting, is your

17   handwriting anywhere on this?

18        A.  Yes.

19        Q.  Okay.  And again is the, is the date and the

20   patient name and the date of birth your handwriting?

21        A.  No.

22        Q.  Okay.  Below that under subjective complaint

23   is that your handwriting?

24        A.  Yes.

126

1      Q.  Are the vitals your handwriting?

2      A.  No.

3      Q.  Okay.  So does it indicate to you that you

4  examined Tiffany Rusher on December 19, 2016?

5      A.  Yes.

6      Q.  Okay.  What is the subjective complaint

7  that's recorded here?

8      A.  Fracture of tibia and ankle.

9      Q.  Okay.  And then underneath does it say

10  denies numbness?

11      A.  It does.

12      Q.  Under lungs, chest it, what does that say?

13      A.  CTAB.

14      Q.  And what does that mean?

15      A.  Clear to Auscultation Bilaterally.

16      Q.  Okay.  Heart?

17      A.  Regular RR S1 S2.

18      Q.  That's your handwriting?

19      A.  It is.

20      Q.  Okay.  Musculoskeletal?

21      A.  LLE-N with a circle sensation.

22      Q.  Okay.  Practitioner assessment what's, you

23  write, what do you write there?

24      A.  CONTHR-NNO.

127

1               MR. MADDOX:  No, above that.

2        A.  Oh, assessment LLE fracture.

3        Q.  **What's LLE stand for?**

4        A.  Left lower extremity.

5        Q.  **Okay.  And what is, there is something in a**

6   **circle before that, what does that mean?**

7        A.  One.

8        Q.  **Okay.  Does that refer to, what does the one**

9   **refer to?**

10       A.  The assessment of the first problem or one

11   of the problems.

12       Q.  **Okay.  And under plan it says, I think you**

13   **read that it, under plan you write one continue --**

14       A.  HR.

15       Q.  **Okay.  What's HR?**

16       A.  High Risk.

17       Q.  **Okay.  And what does NNO stand for?**

18       A.  No new orders.

19       Q.  **Okay.  And number two, what does that say?**

20       A.  Check on something, control.

21               MR. MADDOX:  Pain?

22       Q.  **Pain?**

23       A.  Pain control, you guys can read it better

24   than me.

128

1          MR. MADDOX:  Years of practice,

2  Doctor, years of practice.

3      **Q.  Patient education, fracture is that what it**

4  **says?**

5      A.  Uh-huh.

6      **Q.  Yes?**

7      A.  Yes.

8      **Q.  Okay.  So what did you examine Tiffany,**

9  **what, what did you do in examining Tiffany Rusher on**

10 **December 19th, 2016?**

11     A.  I examined her heart, her lungs, asked her

12 to, about her lower extremity injury, and that is what

13 the record shows here.

14     **Q.  Okay.**

15     A.  I, with anybody in High Risk I always ask

16 suicidal and homicidal ideations.

17     **Q.  Okay.  And what does that, what do you do,**

18 **ask that about?**

19     A.  I, any thoughts of hurting yourself, anybody

20 else, any plans if they do have thoughts and then

21 yeah, I mean what their frame of mind is during that

22 evaluation.

23     **Q.  Do you ever document that when you ask those**

24 **questions?**

129

1          A.  I do.

2          Q.  Okay.  And you didn't on this day?

3          A.  Correct.

4          Q.  Okay.  Do you, you make it your practice to

5     try to document as clearly as --

6          A.  I do.

7          Q.  -- contemporaneously as possible, correct?

8          A.  Yes.

9          Q.  You heard the expression if it's not on a

10    Medical record it's, it didn't happen?

11         A.  I have.

12         Q.  And it is important to document completely

13    your Medical, what you do clinically, correct?

14                        MR. MADDOX:  I object to the

15    form of the question.

16         Q.  It is important to document what you do

17    clinically with a patient?

18         A.  Yes.

19         Q.  Okay.  That's one of, that's the way you

20    can, one way you can communicate with other, other

21    Practitioners about the patient, correct?

22         A.  Yes.

23         Q.  Why did you put continue High Risk here?

24         A.  Because she was, when was she, she must have

130

1    just come in, I assume.

2         Q.  I can tell she came in on December 15th.

3         A.  Yes, she just came in.  And so she, from

4    what I'm seeing she came in four days prior to this

5    visit.

6         Q.  Uh-huh.

7         A.  I must have been told or I don't know if

8    Mental Health had evaluated her, but we hadn't had

9    enough time to observe her to make a determination to

10   discontinue from High Risk.  She had come in from a

11   Mental Health facility and it was, I believe, I don't

12   remember if she attacked somebody or how she entered,

13   but for some reason that comes to mind.

14              And I believe that I was made aware

15   that she had previous Mental Health acute episodes.

16   And so when you're coming from a Mental Health

17   Facility, we need to observe a patient especially when

18   they are saying they have been discharged from a

19   Mental Health Facility because they don't feel that

20   they can stay there any longer.

21        Q.  Had you, are you, you reviewed her Medical

22   record in preparation for today, correct?

23        A.  Yeah.

24        Q.  Okay.  And you are aware that there was like

131

1    a discharge summary from McFarland, was there a

2    discharge summary from McFarland Mental Health Center

3    in the record that you reviewed?

4         A.  Yes.

5         Q.  Okay.  Did you, would you have reviewed

6    that, did you review that back in December of 2016?

7         A.  No.

8         Q.  No.  When was the first time that you

9    reviewed that?

10        A.  I don't remember when but it would have been

11   yeah, it wasn't prior to my visiting with her.

12        Q.  Okay.  Was it prior to her death?

13        A.  I believe so.

14        Q.  Okay.  Was it, so she --

15        A.  And but I don't want to say that, I would

16   have to see the discharge.

17        Q.  Record to know?

18        A.  Yeah.

19        Q.  Okay.  And you, but you did review, you

20   spent 5 or 6 hours in preparation, you're saying if

21   you could look at Medical, the McFarland discharge

22   record it might remind you if you reviewed it at that

23   time?

24        A.  It might.  At the time of when?  Prior to

132

1    her death or at the time prior to this, this visit?

2        **Q.  Well, I think we got an answer for that.  I**

3    **think you don't, you do not believe you reviewed it**

4    **prior to this visit?**

5        A.  No.

6        **Q.  And then yeah, my question is then when you**

7    **first reviewed it?**

8        A.  And I said, I don't remember.

9        **Q.  Okay.  And if you looked at the record, it**

10   **might refresh your memory?**

11       A.  It might.

12       **Q.  Okay.  When you reviewed the record in**

13   **preparation for the deposition, did you read the**

14   **McFarland discharge summary?**

15       A.  I did.

16       **Q.  And did it refresh your recollection at that**

17   **time as to whether you had known about it during the**

18   **course of your treatment with Tiffany while she was**

19   **alive?**

20       A.  That was almost three weeks ago, so I don't

21   want to say, I mean I know we discussed it, but I

22   don't --

23                    MR. MADDOX:  You've answered

24   the question.

133

1        Q.  Yeah.  Okay.  Well, we can maybe take a

2    break and I can pull it up.

3                Would it have been important to you, to

4    if you knew that that discharge summary was in the,

5    her Medical record is that something that you think

6    would be important to read?

7        A.  If I see, if, I don't know until I see it

8    and you don't know if something is important until you

9    see it.

10       Q.  You have seen it now though?

11       A.  Uh-huh.

12       Q.  Correct?

13       A.  Uh-huh.

14       Q.  And you would have, you need to read it?

15       A.  I would have liked, to, yeah.

16       Q.  So if it was part of her chart, is it

17   something you would have read?

18       A.  If it was brought to my attention and put in

19   my mailbox.

20       Q.  Okay.  So that's how you would have read it?

21       A.  Correct.

22       Q.  Do you know whether anybody brought it to

23   your attention and put it in your mailbox?

24       A.  Not that I remember.

134

1    Q.  And when you, you were reviewing the Medical

2    record did you see any note that the discharge summary

3    was brought to your attention and put in your mailbox?

4        A.  I did not.

5        Q.  Do you know whether Mickey Shmikler read the

6    McFarland discharge summary?

7        A.  I do not.

8        Q.  Okay.  Did you know that somebody from

9    McFarland made a phone call to Sangamon County Jail

10   the Medical on the day that Tiffany was admitted or

11   booked at the prison --

12       A.  I don't know.

13       Q.  -- or around there.  Okay.

14           Did you see in your review of the

15   record a note regarding a phone call from McFarland,

16   recording a phone call from a practitioner at

17   McFarland regarding Tiffany?

18       A.  I don't remember seeing that, no.

19       Q.  And so you, is that something you would have

20   read if it had been called to your attention when you

21   were treating Tiffany?

22       A.  Probably.

23       Q.  Would you have wanted to know about her

24   psychiatric history?

135

1      A.  I wanted as much information as is provided

2  to me.  As any information somebody gives me is

3  helpful in the care of a patient.

4      **Q.  Is putting information like that in the**

5  **Medical records is that a way of providing it to you?**

6      A.  No.

7      **Q.  Okay.  And how does this, I think you**

8  **mentioned if it's put in your mailbox that's the way**

9  **of providing it to you?**

10      A.  Correct.

11      **Q.  Or if it's, is there any other way of**

12  **providing it to you?**

13      A.  Yeah, they give it to me when I walk into

14  the facility or yeah, it's, there is the back table

15  and my mailbox.

16          The back table is where all

17  documentation they need me to review is for that day

18  because something is urgent or emergent and then

19  mailbox is routine review of documents.

20      **Q.  Okay.  So sitting here today you don't know**

21  **well, you have no recollection of ever reviewing a**

22  **note about a phone call from McFarland regarding**

23  **Tiffany?**

24      A.  No.

136

1      Q.  And sitting here today you don't know when

2   you first reviewed Tiffany McFarland's discharge

3   summary, correct?

4      A.  Correct.

5      Q.  And you don't know whether you reviewed it

6   before she engaged in the strangulation that lead to

7   her death on March 17th?

8      A.  I don't, no.

9      Q.  You read it now though, correct?

10     A.  Yes, I had reviewed it.

11     Q.  Okay.  Is that something that knowing now

12  what you, what's in it is that something that would

13  have been important to you to know it existed when you

14  were treating Tiffany back in 2017?

15     A.  Like I said any piece of medical information

16  is important and relevant to any patient care as all

17  care is individualized and there is no standards.

18  It's individualized care so the more information you

19  have about a patient.

20     Q.  If you had known it was in, did you go

21  looking in the record for it when you were treating

22  her for her history?

23     A.  No, because that would entail me going

24  through 400 patients every single week.  It's not

137

1    something that is routinely, you know.

2          **Q. Whose job, if anybody, whose job was it to,**

3    **to review Tiffany's medical history or psychiatric**

4    **history in her file at Sangamon County Jail?**

5          A. The --

6                      MR. MADDOX:  I just want to

7    object to the form of the question but you can answer.

8          A. The Medical Staff.

9          **Q. So specifically with respect to the**

10   **McFarland discharge summary?**

11         A. The Medical Staff.

12         **Q. Who's the Medical Staff specifically, are**

13   **you Medical Staff?**

14         A. Yes.

15         **Q. Okay.**

16         A. There are a total of there is Nurses, Mental

17   Health Staff, Physicians and Clinicians.

18         **Q. And so, but you didn't review it?**

19                      MR. MADDOX:  You know, Counsel,

20   let's stop, okay.  Unfortunately there is no time

21   limit on depositions in Federal Court, but I can

22   certainly object to asked and answered which I think

23   is about the fifth time now, okay.

24                      MS. CHARDON:  Okay.

1          MR. MADDOX:  So can we move on

2    to questions that haven't been asked.

3          MS. POWELL:  There is a seven

4    hour time limit.

5          MR. MADDOX:  Okay, well, good,

6    thanks for that.

7          MS. CHARDON:  There is no, I'm,

8    actually I sympathize with your objection but I am

9    actually trying to get information that I don't

10   understand his answer.  And so I will try to rephrase

11   but I'm not, I don't think it's asked and answered if

12   you don't understand it.

13        **Q.  You don't know whether you reviewed the**

14   **McFarland discharge summary, correct?**

15        A.  Correct.

16        **Q.  And you would not have reviewed it, you said**

17   **that you, you personally would not have reviewed it**

18   **unless it came, was put in your, to your, in your**

19   **inbox?**

20        A.  Unless it was brought to my attention, I

21   would not have reviewed it, correct.

22        **Q.  Correct.**

23            **And assuming it was in her file while**

24   **she was there at Sangamon County Jail, assume that for**

139

1    me okay, I asked you whether anybody's, it was

2    anybody's job to go and read her file to find it?

3        A.  To find it?

4        Q.  To find it?

5        A.  It has to get filed.

6        Q.  Has to get filed.

7        A.  So somebody received it.

8        Q.  Did somebody, did somebody --

9                    MR. MADDOX:  You asked earlier

10   whose job it was and he said the Medical Staff.  Now

11   do we have to ask this again I mean...

12                   MS. CHARDON:  Well, then he

13   said he's on the medical staff.

14                   MR. MADDOX:  Right.

15       Q.  Is it anybody's job to review Tiffany's

16   Medical history?

17       A.  Yes, the Medical Staff.  There is a team, it

18   is not one responsible person, there is a team

19   involved and that team collaborates.  Some of the team

20   is there everyday, some of that team is there once a

21   week, some of that team is, reviews charts once a

22   month.

23       Q.  And how do you know whether somebody

24   reviewed that McFarland discharge summary?

140

1      A.  How do I know?

2      **Q.  Correct.**

3      A.  I don't know because I don't know when it

4  was received.  I don't know who received it, I don't

5  know when it was filed, I don't know any of those

6  details.

7      **Q.  So you have, is there anyway that you can**

8  **find out for sure if anybody read Tiffany's McFarland**

9  **discharge summary?**

10     A.  Is there anyway I can go and find out?  I

11  could ask the Medical Staff or I could review the

12  record.

13     **Q.  And would it be in the record if somebody**

14  **had read it?  A notation I read the McFarland**

15  **discharge summary?**

16     A.  No, that would not be said.

17     **Q.  And your answer was that in terms, I'm**

18  **asking if it was everybody's job to read it?**

19                    MR. MADDOX:  No, that's not

20  what he said.  Let's take a break, okay.  Why don't we

21  not restructure, come on, you know, Counsel --

22                    MS. CHARDON:  Matt --

23                    MR. MADDOX:  -- he never said

24  it was everybody's job to read it.  Why do you state

141

1    that then, I don't understand that frankly.

2                    MS. CHARDON:  Okay, could, take

3    it down a notch, I'm not trying to be aggressive.  I'm

4    trying to understand his answer.

5                    MR. MADDOX:  Well, don't

6    restate his answers incorrectly then, please.  Let's

7    take a break.

8                    MS. CHARDON:  We have a

9    question pending though.

10                    MR. MADDOX:  Oh, okay.

11                    MS. CHARDON:  I'm not trying

12   to, you know, I don't think it's appropriate for you

13   to take -- I am not trying to be -- I'm trying to

14   understand his answer by Medical Staff.

15                    MR. MADDOX:  All right.  All

16   right.  Your question just now was so you're telling

17   me it was everybody's job to read it, is that the

18   question?

19                    MS. CHARDON:  I'm happy to

20   rephrase that, too, you're telling me it was, it was

21   the Medical Staff's job.

22                    MR. MADDOX:  Thank you now

23   that's a better question which he's already said four

24   times but go ahead.

142

1      A.  So what's the question?

2                          MS. CHARDON:  Are we back on

3      the record now?  Were we off the record?

4                          COURT REPORTER:  No, I am sorry

5      no one told me to go off the record.

6                          MS. CHARDON:  That's okay.

7      **Q.  The question is you told me it was the**

8      **Medical Staff's job to read the McFarland Discharge**

9      **Summary?**

10     A.  I said there is a Medical Team that

11     collaborates in reviewing these records.

12     **Q.  Okay.  And now I'm asking if it was any**

13     **specific person's assignment to read the McFarland**

14     **Discharge Summary?**

15     A.  Anybody's specific, no, it wasn't a specific

16     assignment.

17     **Q.  Okay.  And I think I asked if there was**

18     **anyway of knowing for sure if somebody read it?**

19     A.  That would be to ask the staff and to see

20     who, where, when, where, whom received.

21     **Q.  And at that time you were treating Tiffany,**

22     **did you ever ask that question of the staff?**

23     A.  What question?

24     **Q.  Have they reviewed Tiffany's medical history**

143

1    in the file?

2         A.  I don't remember.

3         Q.  Okay.  Would that be incumbent on you to do

4    as her treater to find out whether anybody on your

5    team was familiar with her Medical history in the

6    file?

7         A.  I think it's incumbent of the Medical Staff,

8    the whole team.

9         Q.  And is it incumbent on you?

10        A.  As part of that Medical Staff as well to ask

11   if we've received it, yeah.

12        Q.  And you prescribed psychotropic medications

13   for her, correct?

14        A.  Yes.

15        Q.  You prescribed Depakote?

16        A.  Yes.

17        Q.  You prescribed Thorazine?

18        A.  Correct.

19        Q.  You prescribed Effexor XL?

20        A.  Yes.

21        Q.  Did you prescribe any psychiatric

22   medication --

23        A.  Not that I remember.

24        Q.  -- to your knowledge.

144

Okay.  Was it incumbent on you to get the full medical history available to you before prescribing those medications?

A.  I believe I was told that is what the inpatient psychiatric evaluation physician believed was in her best interests as the specialist.

Q.  Okay.  And you relied on that specialist's judgment?

A.  I relied on it as one of the determining factors.

Q.  What other factors?

A.  As I continue to visit with the patient, I reevaluate and make decisions upon my clinical judgment.

Q.  Did you ever make a diagnosis of Tiffany's mental health --

A.  Yes.

Q.  -- conditions?

A.  Yes.

Q.  And what did you diagnose?

MR. MADDOX:  Can he refer to the chart?

Q.  You may.  And it maybe, I attempted to excerpt your notes so it could be helpful.  Why don't

145

1   we turn to, for example, the first page of Abraham 2

2   that's a Medical note from, we started talking about

3   it's 11056, right, at the bottom?

4        A.  Yes.

5        Q.  It's January 4, 2017, note, under

6   Practitioner's assessment do you see any diagnosis

7   there?

8        A.  I do.

9        Q.  Okay.  What's the diagnosis you see?

10       A.  LLE fracture, bipolar, schizophrenia.

11       Q.  Okay.  Did you reach those diagnoses of

12  Tiffany?

13       A.  Yes.

14       Q.  Okay.  Those were your diagnoses?

15       A.  Yes.

16       Q.  Okay.  What did you consider in reaching

17  though diagnoses?

18       A.  My conversation with her.

19       Q.  And did you document that conversation

20  anywhere?

21       A.  Yes, in the subjective.

22       Q.  Okay.  And what does the subjective say?

23       A.  It says denies suicidal ideation or

24  homicidal ideations requesting discontinuation of

146

1    Thorazine.

2         Q.  Okay.  And is that what you relied on in

3    reaching her diagnosis in concluding, excuse me, in

4    diagnosing her bipolar and schizophrenia?

5         A.  I'm sorry.  You asked me what did I refer

6    to, I answered your question now you're asking me the

7    same question again.

8         Q.  Making sure I understand.

9         A.  Well, I mean I've answered your question,

10   you asked me the question, I answered your question.

11   Then you asked me the same question again reiterating

12   what I just said.  You said what did you use and I

13   said the subjective.  You asked me to read the

14   subjective, I read the subjective, and then you asked

15   me did you use your subjective to make your

16   assessment.

17        Q.  Did you have any conversations with Tiffany

18   other than, that aren't recorded in your subjective

19   complaints?

20        A.  Did I have conversations with Tiffany?

21        Q.  On that day?

22        A.  Yes.

23        Q.  Okay.

24        A.  Yes.

147

1      Q.  And did you rely on, I believe that your

2  answer, I asked once again what you relied on in

3  reaching the diagnosis of bipolar and schizophrenia,

4  correct?

5      A.  Yes.

6      Q.  And I think your answer it was her

7  subjective, was your subjective assessment?

8      A.  It was my conversation with her, yes, and it

9  might have also been, and I don't know because I don't

10  have that, and maybe it's here somewhere, but I don't

11  know if Mental Health had brought it to my attention

12  her record or their evaluation of their interaction as

13  well.

14      Q.  Okay.  So you record, you recorded the basis

15  for your diagnosis up in subjective complaint,

16  correct?

17      A.  Part of it, yes.

18      Q.  Okay.  And part of it was at, at what about

19  denies suicidal ideation or what is AD?

20      A.  No, homicide, HS homicide.

21      Q.  HS, okay.  Or requests to discontinue

22  Thorazine how was, how did that relate to your

23  diagnosis of bipolar and schizophrenia?

24      A.  So it must have been brought, I'm assuming I

148

1    don't know this because I can't tell you exactly where

2    my frame of mind was two and half years ago when I

3    don't remember that exact conversation that I had with

4    her.  But I assume that I saw that my conversation

5    with her lead me to believe that there was components

6    of depression or mania or unusual behavior in thinking

7    that lead to those.

8         **Q.  So this was a diagnosis that you made**

9    **independently as a result of your clinical evaluation**

10   **of Tiffany, correct?**

11        A.  As well as conversation I may have had with

12   nurses that told me what they were cause they get a

13   report from either, I don't know the report comes from

14   Booking or from, it comes from the other facility

15   because it's a transfer almost.  And so they reach out

16   to the facilities and they say hey, this is the

17   medication because otherwise how do we know what

18   medication we're continuing and things like that.

19             And so I was given report by nurses as

20   well telling me what was going on, what her situation

21   was, her behaviors in the past and maybe even, I don't

22   know, if she's ever been to this facility before, but

23   sometimes when that happens Nurses even remember

24   patients from previous interactions.

149

1      Q.  That reminds me, does the name Brittany

2  Bandy sound familiar, she's a Nurse at or was a Nurse

3  at some point?

4      A.  It doesn't, it doesn't, sorry.

5              I remember Brittany, I don't know

6  Bandy, but I don't think she was there very long.

7  From what I remember I think she, because the nurses

8  that I remember for my, the majority of the time are

9  the Nurses that you mentioned.

10     Q.  Did you ever speak to anybody on staff at

11 Sangamon County Jail that had actually worked or

12 interacted with Tiffany at Logan Prison?

13     A.  Not that I remember.

14     Q.  Okay.  So I'm asking, I was asking what you

15 based your diagnosis of bipolar and schizophrenia on

16 and you mentioned your subjective assessment which you

17 record under your --

18     A.  My conversation and interview.

19     Q.  -- your conversation which you recorded

20 under subjective complaints, you say, correct?

21     A.  (Nod Affirmatively).

22     Q.  You also mentioned that you may have relied

23 on information that you received from nurses or other

24 treaters of Tiffany, correct?

150

1      A.  From other staff, yes.

2      Q.  From other staff, okay.

3          And did you document that anywhere what

4  information that you had received from other staff?

5      A.  No, I don't know, I would review, yeah, I

6  would refer to the Medical review if it's not, if I

7  didn't write it, then there is no documentation.

8      Q.  Okay.  And you have no specific memory of it

9  now sitting here today?

10     A.  Of having conversation, any patient that

11 comes in from an outside Medical facility, we always

12 want to know what medication they came on, and the

13 staff receives that, and then they call you because

14 you're not there 90 percent of the time when these

15 patients come in.  So they're getting that information

16 from an outside resource.  So that information is

17 relayed to me.

18          So I assume that there should have been

19 a phone call.  When you tell me she arrived on the

20 14th is what I believe or did you say 15th?

21     Q.  Yeah, something --

22     A.  Something in there but there should have

23 been a phone call at that point to one of the

24 Practitioners after she was admitted saying hey, these

151

1   are the medications we've been notified that she's on,

2   what would you like to continue, what would you like

3   to discontinue, and until we have the opportunity for

4   her to be evaluated in person.

5          **Q.  Okay.  And that's with respect to medication**

6   **and I'm trying to, to talk about with respect to**

7   **diagnosis specifically these diagnoses of bipolar and**

8   **schizophrenia?**

9          A.  So I should rephrase then.

10                 In regards to the patient because that

11  patient is coming, if they're coming from an outside

12  facility, there is communication whether that be

13  verbally through fax, through email, I don't know, but

14  that, that communication is occurring between that

15  outside facility and this facility, and then that

16  information is relayed.

17         **Q.  Okay.  And so is, are you telling me that**

18  **another element of what you relied on would have been**

19  **well, you don't, again you don't remember specifically**

20  **but it may have been information that in terms of her**

21  **diagnosis itself were you aware that another**

22  **Psychiatrist or Practitioner had diagnosed Tiffany**

23  **with bipolar or schizophrenia?**

24         A.  I'm not sure at this point but if --

152

1       Q.  Sorry.

2       Q.  My question was bad, I don't mean to cut you

3  off but is that okay?

4               That if you had been aware of that,

5  would that have been something you relied on in making

6  this diagnosis here?

7       A.  Yes.

8       Q.  Okay.  Nonetheless it is an independent

9  diagnosis you reach on your own when you were reported

10  this on January 4th?

11       A.  I didn't know because I don't know if I

12  relied, like you said I'm not sure and aware and

13  that's exactly what I'm telling you, I don't remember

14  the specifics of the detail that were provided to me

15  for me to conclude this, that was a component, yes, my

16  interview was a component.  But if it, like I used my

17  example earlier, if I have an ultrasound, if I have a

18  leg swelling, a patient with a leg swelling, and

19  they've been diagnosed with something, I'm not going

20  to go back and perform diagnostic testing to confirm a

21  diagnosis that's already been confirmed.

22               So if a specialists tells me hey, this

23  person does have this diagnosis, I would utilize that

24  diagnosis by a specialist as well moving forward.

153

1      Q.  Okay.

2      A.  If that, I would utilize that information as

3   relevant.

4      Q.  Okay.  That's helpful and so, but when you

5   record your, you know, as a Doctor when you record

6   under assessment bipolar and schizophrenia that is

7   your diagnosis and your clinical judgment?

8      A.  Yes.

9      Q.  Okay.  And it may be based on relying on

10   information from other medical providers?

11      A.  Yes, it's my overall assessment with all the

12   information that I have at hand.

13      Q.  So that's your, all right.

14           Quickly on Abraham 3 the single page

15   that we marked previously, is there a Mental Health or

16   Psychiatric diagnosis on that chart?

17      A.  There is not.

18      Q.  Okay.  Are you familiar with the DSM-V?

19      A.  Yes.

20      Q.  Okay.  And was your diagnosis, what's the

21   criteria for bipolar disease under, you know, the

22   DSM-V criteria that you --

23      A.  So the DSM-V is only, is not a criteria that

24   is followed internationally.  It is not a criteria

154

1   that is accepted internationally.  It does have

2   certain elements including depression, insomnia, you

3   know, loss of, there is about --

4         Q.  Can I stop you just for a moment.

5         A.  Yes.

6         Q.  Are you talking about it as a whole or with

7   respect to bipolar?

8         A.  I'm talking about it as a whole.  The

9   international community believes that if we were to

10   follow DSM-V there would be a challenge with it being

11   accepted, and 50 percent of Americans fall under the

12   DSM-V to be put on medications.

13         Q.  Okay.  So do you consider it to set forth

14   the standard of care?

15         A.  I consider it a resource.

16         Q.  Okay.  Do you rely on it as a resource?

17         A.  I utilize it as a resource.

18         Q.  Okay.  Does that mean something different

19   than rely to you?

20         A.  It is used in my overall it's, I use it as

21   part of my overall, yes.

22         Q.  Okay.  But it's not determinative to you?

23                  MR. MADDOX:  Object to form of

24   the question.

155

1      Q.  Is it determinative to you?

2                     MR. MADDOX:  I still object to

3      the form of the question.

4      Q.  I'm trying to interpret what you were

5      telling me about the international community not

6      recognizing it, do you --

7      A.  So --

8                     MR. MADDOX:  The question still

9      remains is it determinative to him.  I still object to

10     the form the question.

11     A.  What's determinative?

12                    MR. MADDOX:  Yeah, it's --

13     Q.  Does it, is it, does it articulate -- well,

14     I think I asked you and I'm not intending to, to

15     prompt an asked and answered here, but I think, if I

16     understand correctly, I asked you does it articulate

17     the standard of care for diagnosing psychiatric

18     illnesses in your practice?

19     A.  Yes, I use that as my guiding resource.

20     Q.  Okay.  And with respect to the criteria for

21     bipolar that are in DSM-V do you recognize those

22     criteria to be present in Tiffany?

23     A.  Yes, yes.

24     Q.  Okay.  Which ones?

156

1      A.  I don't remember right now because I

2  haven't, I don't remember that exact conversation.

3                     MR. MADDOX:  You know what I do

4  need to take a break because I need to make a phone

5  call.

6                     MS. CHARDON:  Okay.

7                     (Whereupon a recess was taken.)

8                     MS. CHARDON:  Let's go back on

9  record.

10     **Q.  Did you rely on DSM-V criteria in reaching**

11 **the diagnosis of bipolar for Tiffany on January 4,**

12 **2017?**

13     A.  I utilized it as one of my —

14     **Q.  Okay.  And what criteria were present for**

15 **bipolar for Tiffany?**

16                     MR. MADDOX:  Didn't you ask

17 this question already but he can answer it again.

18     A.  Yeah, I would, like I said I don't remember

19 exactly my conversation with her back in 2014 —

20                     MR. MADDOX:  17.

21     A.  Sorry 17.  But from what, I mean from what I

22 remember of Tiffany in general from my interaction

23 with her, you know, there was disorganized speech.

24 She, you know she was, she had talked about people

157

1    talking to her like, you know, voices occasionally.

2    She had mentioned you know, she would randomly talk,

3    you know, she would randomly talk about different

4    things, you know, delusions, hallucinations or

5    disorganized speech or, you know, yeah, I don't

6    remember exactly now what specific symptoms she had to

7    fulfill that criteria.

8         Q.  Okay.  But those all, could the things you

9    just mentioned could all be, are all criteria for

10   bipolar under the DSM-V?

11        A.  Schizophrenia.

12        Q.  For schizophrenia.

13             What are the other criteria can be, in

14   this, in the DSM-V?

15        A.  I would refer to the DSM-V.

16        Q.  Are you familiar with any others, and I'm

17   not asking for ones that were present with Tiffany

18   just in general?

19        A.  In general not right now I don't practice

20   that anymore.  It's not relevant in my practice.

21        Q.  Okay.  What about for bipolar what is the

22   DSM-V criteria for bipolar?

23        A.  I don't utilize the DSM-V currently in my

24   practice to, to require --

158

1          Q.  Were you familiar with at, in 2017?

2          A.  Yes.

3          Q.  And in 2017 you were also practicing as a

4     family care doctor at the clinic, correct?

5          A.  No.

6          Q.  You were Urgent Care?

7          A.  Correct.

8          Q.  Do you practice as Family Medicine

9     currently?

10         A.  No.

11         Q.  So, and you're current, what are your

12    current roles you have, you do the Urgent Care?

13         A.  Correct.

14         Q.  And what else?

15         A.  That's it.

16         Q.  That's it, okay.

17              Did you, at any point, practice Family

18    Medicine?

19         A.  2008 to 2011.

20         Q.  Okay.  And that was in India?

21         A.  No, that was at --

22         Q.  No, okay, that is right, okay.

23              When you practiced from 2008 to 2011

24    did you treat patients for bipolar disorder or

159

1    schizophrenia?

2         A.  Yes.

3         Q.  Did you diagnose patients with bipolar and

4    schizophrenia?

5         A.  Yes.

6         Q.  Is that typical for, is it within the realm

7    of Family Practice Medicine to diagnose bipolar and

8    schizophrenia?

9         A.  Yes.

10        Q.  And in your role as an Urgent Care Physician

11   do you diagnose bipolar or schizophrenia?

12        A.  No.

13        Q.  What treatment, what were the elements, when

14   you have treated bipolar or schizophrenia have you, so

15   in your role as a Family Practitioner from 2008 to

16   2011 you treated patients with bipolar and

17   schizophrenia, do I understand that correctly?

18        A.  Yes.

19        Q.  Is that the only time that you treated

20   patients with bipolar and schizophrenia outside the

21   incarceral setting?

22        A.  That's correctional setting.

23        Q.  Correctional setting?

24        A.  Yes.

160

Q.  Okay.  And what did your treatment involve
of those patients when you treated them when you were
a Family Practitioner between 2008 and 11?

A.  What did that involve?  It involved --

Q.  Correct.

A.  -- medication, possibly referral to
psychiatry if medication weren't working.  It
involved, yeah, those were the two methods.

Q.  Okay.  Do you, did you prescribe
psychotherapy or refer for psychotherapy?

A.  No, I referred to psychiatry and psychiatry
made that decision.

Q.  Okay.  So did you refer to psychiatry prior
to prescribing medications for those patients?

A.  I may have but not that I remember.  Usually
you try medications and then if not controlled outside
your, you know, scope of practice or not working then
you may or may not refer to depending on what the
situation of the patient is and the circumstances
surrounding.

Q.  Okay.  And is it ever necessary, is it ever
in any circumstances necessary to prescribe treatment,
psychotherapy in addition to psychiatric medicine for
conditions like bipolar or schizophrenia?

161

1      A.  Whom are you asking that question to the

2   Family Medicine or the Psychiatrist because Family

3   Medicine does not refer or to psychotherapy?

4   Psychotherapy falls under the realm of, you know, CBT,

5   cognitive.

6                I don't know when you say psychotherapy

7   I guess I'm not sure what you're asking.  There is

8   many different types of psychotherapy.  What type of

9   psychotherapy are you talking about?

10     **Q.  I am talking about the overarching one, the**

11  **one with many different types underneath?**

12     A.  Yes, there are situations where that is

13  necessary or --

14     **Q.  Okay.  But you, if I understand correctly,**

15  **as a Family Practitioner you never were the one that**

16  **referred for therapy, you would instead refer to a**

17  **psychiatrist first?**

18     A.  Do medications fall under your definition of

19  psychotherapy?

20     **Q.  No.**

21     A.  Okay.  Then I would not be the one

22  prescribing or administering behavioral therapy.

23     **Q.  Okay.  I asked for referring for it,**

24  **prescribing, okay, prescribing is fine, prescribing or**

162

1    referring it would not be you?

2                        MR. MADDOX:  Object to the form

3    of the question.

4                        MS. CHARDON:  Okay.

5                        MR. MADDOX:  Prescribing or

6    referring to, he's already said he prescribes

7    medication.

8                        MS. CHARDON:  Right for

9    psychotherapy.  I'm trying to get at his role with

10   respect to whether you ever, have you ever in any

11   context recommended or referred a patient for

12   psychotherapy?

13                       MS. POWELL:  I object to the

14   form of the question to the extent you're using the

15   term psychotherapy in a way that is inconsistent with

16   what a Mental Health person or how a Mental Health

17   person would diagnose it.

18                       MR. MADDOX:  Yeah, and I join

19   because psychotherapy involves many different things.

20   And I think he's tried to make that clear to you.

21       Q.  Right.  Psychotherapy has many different

22   categories, right?  Many different types?

23       A.  Right,, what are you talking about?

24       Q.  I want you to define psychotherapy for me.

163

1    **I'm telling you it doesn't involve, I'm setting aside**

2    **medication prescriptions, what does psychotherapy**

3    **mean?**

4                        MS. POWELL:  And I object to

5    the extent again to the form of the question in that

6    you're asking a person to define a term without using

7    all of the appropriate definitions of that term

8    according to your own personal definition.

9                        MS. CHARDON:  Okay, that's

10   fine, I hear you.

11        **Q.  What is psychotherapy, give me a definition**

12   **of psychotherapy, please?**

13        A.  What is psychotherapy, that's what I asked

14   you and yeah, I mean...

15                        MR. MADDOX:  I mean I object to

16   the form of the question.  I don't know if it can be

17   answered or not.

18        A.  Yeah, I asked you what you're referring to

19   in psychotherapy.  If you're referring to Cognitive

20   Behavioral Therapy?  If you're referring to

21   counseling?  If you are referring to, you know, who

22   was administering the psychotherapy?  I get, I don't

23   know what your definition of psychotherapy is.  If you

24   take the two words psych and therapy it doesn't --

164

1      Q.  Have you heard the phrase talk therapy?

2      A.  Talk therapy?

3      Q.  Yeah.

4      A.  No.

5      Q.  Not a Medical term.

6      A.  No.

7      Q.  Okay.  So CBT behavioral therapy an

8  counseling, correct those are two type of

9  psychotherapy, right?

10     A.  Yes.

11     Q.  Are there other types of psychotherapy that

12  you're familiar with as a medical practitioner that

13  involves talking?

14     A.  Not that I am aware of.

15     Q.  Okay.  So what else does psychotherapy mean

16  to you in addition to, you said there is many things,

17  what else does psychotherapy mean to you in addition

18  to cognitive behavior therapy and counseling?

19     A.  That's what I refer to as or that's what I

20  understand.

21     Q.  Okay, great.

22          So you don't understand that the

23  general principle that psychotherapy refers to

24  prescribing medication?

165

1       A.  Well, you told me no, you told me it doesn't

2  include it.

3       Q.  **As a Medical Doctor is that the working**

4  **definition, does your definition what I, as a Medical**

5  **Doctor do you define psychotherapy to include**

6  **psychiatric medicine?**

7       A.  I do.

8       Q.  **You do?**

9       A.  Yeah, because I believe anything that falls

10  under psychiatric medicine is a form of therapy for a

11  patient.

12       Q.  **Okay.  Okay.  So in addition, so you would**

13  **also identify prescription medication as within that,**

14  **within that heading of psychotherapy, is there**

15  **anything else?  We got prescription medication,**

16  **cognitive behavioral therapy and counseling, what**

17  **else?  Let me ask it a different answer, okay.**

18            **So are those all treatments from mental**

19  **health illness type of treatment for mental illness?**

20       A.  Yes.

21       Q.  **Okay.  What other types of treatment, if**

22  **any, can be appropriate for schizophrenia or maniac,**

23  **excuse me, bipolar, if any?**

24       A.  ECT.

166

1      Q.  What's ECT?

2      A.  Electroconvulsive therapy.

3      Q.  Okay.  And is that, what is that used for

4   it is for both bipolar and schizophrenia or just one

5   or the other?

6      A.  Usually bipolar it can be used depending on

7   the type of bipolar.

8      Q.  Okay.  So those are all potential treatments

9   for mental for bipolar or schizophrenia?

10     A.  Okay, yes.

11     Q.  Okay.  Are there any other type of

12  treatments that might be appropriate?

13     A.  Not within my realm of practice.

14     Q.  Okay.  So when I talk about psychotherapy,

15  what I am talking about is cognitive behavioral

16  therapy and counseling, okay, or, and do you ever

17  refer, have you ever referred patients for cognitive

18  behavioral therapy or counseling in the course of your

19  practice whether inside or outside of Jail?

20     A.  Counseling, yes.

21     Q.  Okay.

22     A.  But not I have never referred a patient for

23  CBT, no.

24     Q.  Okay.  And in what context did you refer a

1    patient for counseling?

2         A.  Depression, usually depression is usually

3    what or a form of depression being a component of

4    other diagnoses.

5         Q.  Okay.  And were you practicing when you did

6    that?

7         A.  In Southern, here in Springfield.

8         Q.  Okay.  Were you practicing as a Family

9    Medicine Doctor?

10        A.  Yes.

11        Q.  Okay.  So this was between 2008 and 2011?

12        A.  Yes.

13        Q.  Okay.  Have you ever referred somebody for

14   therapy counseling at, in the Jail setting?

15        A.  No.

16        Q.  Okay.  Is therapy provided to any patients

17   at Sangamon County Jail?

18        A.  Yes.

19        Q.  Okay.

20        A.  And but I want to rephrase that previous

21   answer because I believe I've asked Mickey to go in

22   and assess, his observations.

23        Q.  Okay.  Have you ever asked Mickey to provide

24   therapy?

168

1      A. No.

2      Q. Okay.  And again is it, do you see a

3  difference between assessment of observations and

4  therapy is there a difference in that, those two

5  categories of --

6      A. Yes, because I believe one is assessment and

7  one is a plan.

8      Q. Okay.  And did you ask Mickey to provide his

9  assessment of Tiffany at any point?

10     A. I think, yes.

11     Q. Okay.

12     A. Yes.

13     Q. And what, do you remember talking to Mickey

14  about Tiffany?

15     A. Yes, I do remember talking to him about

16  Tiffany.

17     Q. Okay.  And you distinguished earlier you

18  said that, you know, assess, treatment is more of a

19  plan, correct?  I think you said there is assessment,

20  there is therapy, there is counseling and assessment,

21  correct?  We were distinguishing the two?

22     A. Okay.

23     Q. And you, I asked you to describe the

24  difference and you said counseling is more of a plan,

169

1    correct?

2         A.  More of, yes.

3         Q.  **Have you ever been involved in developing a**

4    **Counseling Treatment Plan for a patient at Sangamon**

5    **County Jail?**

6         A.  No.

7         Q.  **Have you ever been involved in developing a**

8    **Counseling Treatment Plan for a patient outside the**

9    **Jail in private practice?**

10        A.  When you say Counseling Treatment Plan,

11   you're not asking me, if, are you asking me if I've

12   ever referred a patient for that because I want to

13   differentiate the two?

14        Q.  **That's fine.**

15        A.  If you're asking have I ever referred a

16   patient for counseling, yes, in terms of having Mickey

17   assess and evaluate.

18        Q.  **Uh-huh.**

19        A.  If you're asking me if I've ever been

20   involved in the treatment and how that counseling

21   occurred, the answer is no.

22        Q.  **Okay.  Yes, and thank you.**

23             **The question was the latter whether**

24   **you, and were you, and I think the next question I**

170

1    think you've answered is were you involved in

2    developing a Treatment Plan?

3         A. No.

4         Q. Whether or not you administered --

5         A. No, I was not involved.  I was not involved

6    in the Treatment Plan of the counseling portion of the

7    that treatment.

8         Q. Is there any single plan for treatment of

9    Mental Health issue at the Sangamon County Jail that

10   involved both, the components both psychiatric and

11   counseling in one place such as a single document or

12   something like that?

13        A. Say that again, I'm sorry.

14        Q. Okay.

15        A. Yeah, I'm sorry.

16        Q. Sure.

17             Was there, for any, were you familiar

18   with any patients at Sangamon County Jail who had a

19   Mental Health Treatment Plan that involved both

20   psychiatry and, excuse me, medicine and counseling?

21        A. Yes.

22        Q. Okay.  And was that written down in the same

23   place?  Same note?  Same document?

24        A. I think so, I don't know for sure but I

171

1    would refer to Mickey's notes because he would be the

2    one doing that counseling, and he would note, he may

3    or may not note in his documentation who that patient

4    and what medications that patient is on.

5         **Q.  Okay.  And did Mickey make decisions about**

6    **medications?**

7                        MR. MADDOX:  Object to the form

8    of the question.

9         **Q.  Can, could Mickey prescribe medication?**

10        A.  No.

11        **Q.  Okay.  Did Mickey participate in the**

12   **determination of what medications were appropriate for**

13   **Tiffany?**

14        A.  Participate in the determination, yes,

15   because his evaluation was used to determine whether

16   medications, why, which medications or how to derive

17   to which medications should be utilized.

18        **Q.  Okay.  And in what way were those**

19   **evaluations used, did you read them?**

20        A.  Yes.

21        **Q.  Okay.**

22        A.  Or he may have verbally communicated,

23   written document is one form of communication, verbal

24   documentation is another form of communication,

172

1    physical observation is another form of communication.

2         Q.  Okay.  You mentioned a moment ago that you

3    and Mickey well, did you and Mickey ever talk about

4    Tiffany's treatment?

5         A.  Yes.

6         Q.  All right.  What did you talk about, what do

7    you remember?

8         A.  I don't, I don't remember I know that

9    Tiffany I, I know that after instances or during I

10   know that Mickey and I talked about, you know, I think

11   one time she put something in her boot like she put

12   like some sort of utensil in her boot.  And I know

13   that she had used a strap and, you know, those kinds

14   of, any time an incident like that has occurred Mickey

15   and I communicate or, you know.

16        Q.  And so do you have specific recollection

17   about talking to Mickey about those things?

18        A.  I don't have specific recollection.

19        Q.  Okay.  Do you have specific recollection of

20   reviewing Mickey's records during the time that he was

21   treating Tiffany?

22        A.  Not specifics, no.

23        Q.  Did you ever notice that Mickey, did you

24   ever have concerns that Mickey wasn't properly

173

1    documenting his meeting with Tiffany?

2        A.  Not that I remember, no.

3        Q.  Did you, was it, did you consider your

4    responsibility to review Mickey's documentation to

5    determine whether it was sufficient?

6        A.  No, Mickey did not report to me directly.

7        Q.  Did you ever do anything to, to, were you

8    aware of what, whether Mickey was giving, providing

9    Tiffany with therapy?

10       A.  Yeah, because he told me he talked to her.

11       Q.  Okay.

12       A.  Yeah.

13       Q.  What did he tell you specifically?

14       A.  I don't know what did he tell me?  I know

15   Mickey, and I don't remember specifics, I know Mickey

16   and I thought she was a very nice woman.  She seemed

17   to be cooperative with us when we talked to her.

18   There were certain people that she would gel with and

19   certain people she wouldn't.  And when you were one of

20   those people she gelled with, a lot of times those

21   interactions went really well, you know, but yeah, I

22   don't remember the specifics.

23       Q.  Do you know whether, what kind of therapy

24   then Mickey was providing with, to her?

174

1          MR. MADDOX:  Object to the form

2   of the question.

3          A.  I don't know, yeah, I don't know what.

4          **Q.  You said he told you he talked to her,**

5   **correct?**

6          A.  Correct.

7          **Q.  Do you know whether that was therapy?**

8          A.  I don't know.

9          **Q.  Was it your, was it your responsibility to**

10   **make sure that Tiffany was getting therapy?**

11          MR. MADDOX:  Object to the form

12   of the question.

13          A.  Was it my responsibility that Mickey, is it

14   my responsibility to know that Mickey is giving her

15   therapy?

16          **Q.  Yes.**

17          A.  I mean he was talking to her.  So like I

18   said I don't know what kind of therapy, but I know

19   he's talking to her.  So I assume that he's also

20   making his assessments, and he did raise concerns when

21   incidents, that were occurring but yeah, I mean...

22          **Q.  Did you review Mickey's records as part of**

23   **your review of Tiffany's medical file?**

24          MR. MADDOX:  At what point?

175

1      Q.  Yeah, in preparation, well, that's a good
2   question.
3              While Tiffany, I'm going to give you
4   Bouvet Exhibit 17, which is Sangamon County Produced
5   855 through 889.  Then I will give you Hicks 4 which
6   is ACH 073 Organized or ACH 27.
7              Do you understand these to be records
8   that were created by Mickey Shmikler?  Do you have any
9   knowledge of him, who made these exhibits I just
10  showed you?
11     A.  Prior to today you're asking me?
12     Q.  Prior to me just saying --
13     A.  That yeah, no.
14     Q.  -- do you know whose records those are?
15     A.  I mean I see Mickey's signature at the
16  bottom so I am assuming that those are his.
17     Q.  Okay.  When, did you review these while
18  Tiffany was incarcerated?
19     A.  These records, no.
20     Q.  Yeah.  Okay.  Do these --
21     A.  These are not provided to me.
22     Q.  Okay.  Do they go in, do they go in, and by
23  that do you mean that they are not put in your
24  mailbox?

176

1      A.  Correct.

2      Q.  Okay.  Do they go into Tiffany's medical

3   record?

4      A.  I would assume so, yes.

5      Q.  Okay.  If you read the first page of Bouvet

6   17 which is 885, are you able to determine from this

7   whether Mickey provided, just from this document

8   alone, are you able to determine whether Mickey

9   provided therapy to Tiffany?

10     A.  I am not able to know if he provided therapy

11  versus an assessment or his assessment.

12     Q.  Okay.  And okay.  And I'm showing you what's

13  been marked as Hicks Exhibit 3, it's a document that

14  says Prisoner Location Verification on the top, you

15  see that?

16     A.  Yeah.

17     Q.  Is that a form that you're familiar with?

18          Type of document that you're familiar

19  with?

20     A.  I have seen this but I, it's not something

21  that I normally review or, you know, I have seen this

22  type of documentation but I have never --

23     Q.  Does this type, does this document, this

24  type of document or this form, the Prisoner Location

177

1    **Verification, go into a medical record?**

2         A.  I'm not sure.

3         **Q.  Is it a medical record?**

4         A.  In my opinion I can't read what that says at

5    the top here.

6              I'm sorry, I can't read the handwriting

7    portion.  If we're not including the handwriting

8    portion it could be, if she was, if this is part of

9    her, if this is where she is in, if she's in a Medical

10   Unit then it might be part of a medical record, but I

11   don't see anything here that, you know, I don't know,

12   I just see Medical.  I don't know what it says

13   there --

14        **Q.  Okay.**

15        A.  -- in the writing are you --

16        **Q.  And --**

17             MR. MADDOX:  I think the

18   question is is this part of, is this a medical record?

19             MS. CHARDON:  Yeah.

20             MR. MADDOX:  You have an

21   opinion on that or not?

22        A.  My opinion is no --

23        **Q.  Okay.**

24        A.  -- but I don't, yeah.

178

1    Q.  And you have never relied on this kind of

2  document in forming your professional opinions in the

3  past?

4    A.  No.

5    Q.  And it, so it's not the type of document

6  that you would rely on in your professional --

7    A.  This document, no.

8    Q.  Okay.  And in general I think this isn't

9  something that was familiar to you before today?

10    A.  No.

11    Q.  Okay, that's my question.

12        When you prescribed psychiatric

13  medication to Tiffany while she was incarcerated, was

14  it your understanding that she was simultaneously

15  receiving treatment, excuse me, that she was

16  simultaneously receiving counseling?

17    A.  At Sangamon County?

18    Q.  Yeah.

19    A.  I know Mickey was, I believed that Mickey

20  was meeting with her regularly.

21    Q.  Okay.  Did you believe that he was giving

22  her counseling?

23    A.  Yeah, by him talking, I mean I, I don't

24  know.

179

1          Q.  Okay.

2          A.  Because I don't know what those exact

3     interactions were unless he brought a concern to me

4     and then he would bring me, he had a form that he

5     would handwrite, you know, and it was his whole thing.

6     And then he would go back later and type it, like so I

7     don't know if these are -- yes.

8          Q.  Okay.  That's, I'm pointing to 889 Sangamon

9     Produced it's the last page of that exhibit.

10              Is that the form that you were talking

11    about?

12         A.  Yes, so, yes.

13         Q.  Okay.  So what's this form?

14         A.  This is something that Mickey would

15    sometimes fill out and leave for me or bring to my

16    attention.  I don't remember how often Mickey worked,

17    but he was there more frequently than I was.

18         Q.  Okay.

19         A.  And no, I don't remember this, I think it

20    was a, I don't remember something in the middle.

21         Q.  Okay.

22         A.  It was where he wrote a lot more, it was his

23    interactions, he would write exactly what they talked

24    about, he would talk about family, he would talk

180

1    about, like he had a lot more writing his, like this

2    is very brief and this is not -- from what I

3    understand this is not Mickey's writing from what I

4    remember.  This is script down here, that's Mickey

5    writing.

6            Q.  Okay.

7            A.  But he would write, Mickey was very, he

8    would write a lot, but from understanding he had to go

9    type those later but he would bring me the writing.

10           Q.  Okay.  And would you put the writing in

11   here, in the person's medical file or would it go in

12   the personal --

13           A.  No, Mickey would take that back with him.

14   He would bring it to my attention or he would leave it

15   for me to review on that back table I was telling you

16   about.

17           Q.  Okay.

18           A.  Yeah.

19           Q.  So he would doc -- he would write down what

20   went on during his therapy?

21           A.  He would write about his conversation.

22           Q.  Okay, right and you, thank you.

23               And so, and you haven't been, hadn't

24   seen that, those descriptions, those kind of documents

181

1   with respect to Tiffany when you were looking through

2   her medical file?

3          A.  Recently?

4          **Q.  Recently.**

5          A.  So I, yeah, no, I hadn't because I wasn't

6   going through and looking for all of Mickey's –– I

7   wanted to make sure I knew what I wrote.  I wasn't

8   trying to go through, because I didn't want to skew my

9   memory of then and now.

10         **Q.  Okay.  And yeah, and so you answered**

11   **previously that you don't know what he was talking**

12   **about when he was talking to Tiffany, right?**

13         A.  Yeah, unless he brought it to my attention.

14   Like I said we had conversations he told me about, you

15   know.

16         **Q.  Yeah.**

17         A.  Yeah.

18         **Q.  And you, and at that time unless he, you**

19   **know, brought it to your attention through a note like**

20   **that you wouldn't know?**

21         A.  Right, or if Dan or Kate had brought it to

22   my, hey, Mickey told us about this, he's not here

23   today, he wanted you to look at this, you know.

24         **Q.  Okay.  And I'm just trying to make sure that**

182

1     I can understand what you knew at the time.

2                    So at the time sitting here today you

3     don't know whether you knew back in February of 2017

4     what Mickey was talking about with Tiffany?

5          A.  The specific details, I don't recollect the

6     specific details.  I know he was having conversations

7     with her.  That she was very nice.  He got along with

8     her well from what my memory serves me.

9          Q.  Okay.

10         A.  And she was very, she seemed to like to talk

11    to Mickey.

12         Q.  Okay.

13         A.  I remember her liking to talk to Kate.

14                    I remember her, when she talked to me

15    she was very nice to me.  She, like what I would hear

16    from other staff, I wasn't seeing all of that

17    aggressive, you know.  If she took a liking to you,

18    she kind of, just was great with you, you know, wanted

19    to talk and wanted to, you know what I mean.

20         Q.  Uh-huh.

21                    Did you ever observe Mickey talking

22    with Tiffany?

23         A.  Yes.

24         Q.  Okay.  And did you hear them talking?

183

1    A.  Yes.

2    Q.  Okay.  Did you see them talking?

3            Lawyers ask basic questions.

4    A.  Yes.

5                MR. MADDOX:  Observe and see

6    even in lawyers speak that's the same word.

7    Q.  Well, no, yeah, but you both, so you could

8    see Mickey and where was he standing?

9    A.  He was standing in the hallway.

10   Q.  Okay.  And what did you hear when you

11   overheard?

12   A.  I just heard conversation, I didn't hear

13   specific details of the conversation because I would

14   be moving to my other patients to see them and I

15   observed Mickey, you know.

16   Q.  Do you know how much time he spent with her?

17   A.  I don't.

18   Q.  Okay.

19   A.  It was longer than when I was, because, you

20   know, he would be there as I approached Booking and he

21   might still be there when I'm leaving.

22   Q.  And was Tiffany's cell door open when he was

23   standing there?

24   A.  No.

184

1      Q.  So were they, how would they be talking was

2    there a chuckhole or how did it --

3      A.  There is a chuckhole and he was, yeah.

4      Q.  Okay.  Did you ever see Tiffany come out of

5    her cell for meetings with Mickey in any other place?

6      A.  I did not observe that.

7      Q.  Do you know whether that happened?

8      A.  I don't know.

9      Q.  Did that happen with other prisoners, did

10   other prisoners ever come out of their cell for

11   therapy with Mickey --

12     A.  I don't know.

13     Q.  -- or, excuse me, with conversations with

14   Mickey?

15     A.  I don't --

16               MR. MADDOX:  Just excuse me,

17   you mean in the High Risk?

18               MS. CHARDON:  No, I mean

19   anywhere.

20     A.  I don't know.

21     Q.  Okay.  So do you know whether there was --

22     A.  No, I don't know, yeah, I was trying to

23   think because I remember there was, I don't remember

24   if Mickey went in that block or yeah, I don't

185

1   remember, I don't want to misspeak.

2        Q.  Okay.  So was there, I'm asking if there was

3   a specific location you're aware of that was the

4   therapy room where Mickey could, Mickey gave --

5        A.  Mickey had his own office.

6        Q.  Mickey had an office?

7        A.  Yeah.  Like as soon as you get off the

8   elevators, that's where Mickey and Lydia and that's

9   how they, as soon you get off the elevators, they see

10  you.  So if there is a concern, they are coming out to

11  follow you to the Medical, because the Medical is

12  right around the corner from them in a different, I

13  guess, unit I would call it, but it's a security door

14  so they would follow you to come, yeah.

15       Q.  Okay.  Did they ever have prisoners in their

16  office that you observed?

17       A.  I had, I don't remember, but I thought for

18  some reason my memory seems to say I remember a CO

19  with a prisoner there.  But I don't remember yeah, I

20  don't want to say a hundred percent.  I don't know if

21  my memory is playing games with me on that, but I

22  don't want to say yes or no.

23       Q.  Okay.  Going back to Exhibit 2 from your

24  deposition which is the larger group of medical

186

1    records.

2         A.  Yeah.

3         Q.  I want to turn to the fourth page of the

4    exhibit which is 10990 at the bottom?

5         A.  Yes.

6         Q.  And is that a medical progress note from

7    January 24th?

8         A.  Yes.

9         Q.  Okay.  And was this, what you, when you

10   rounded on a patient was this the kind of document

11   that you would fill out?

12        A.  Yes.

13        Q.  Okay.  And did you round on Tiffany while

14   she was there?

15        A.  Yes.

16        Q.  So this is a note of your rounding?

17        A.  Yes.

18        Q.  Okay.  And under, what to see, so subjective

19   complaint HR that's stands for High Risk, right?

20        A.  Yes.

21        Q.  And then was does that says denies?

22        A.  Nausea, vomiting, diarrhea, complaining of

23   left lower extremity pain.

24        Q.  Okay.  And then you have some notes on her

187

1    lungs, heart, chest, skin, correct?

2           A.  Correct.

3           Q.  And then your assessment is, under 1, what

4    is 1?

5           A.  LLE fracture.

6           Q.  Okay.  And then number two?

7           A.  Schizophrenia.

8           Q.  Okay.  And then under plan remind me what

9    NNO means?

10          A.  No new orders.

11          Q.  No knew orders, okay.

12                  Now you didn't write bipolar on this

13   document, right?

14          A.  Correct.

15          Q.  So, but you had written it on the note that

16   we looked at from January 17th, right?

17          A.  Correct.

18          Q.  So did you, you're actually what did I do,

19   no, the note we looked at from January 4th, excuse me,

20   I skipped January 17th, we have to go back.

21                  Did your diagnosis change?

22          A.  No, schizophrenia is still there.

23          Q.  Then was, did you still diagnose her, did

24   she still have bipolar according to your diagnosis?

188

1      A.  Yeah, yes.

2      Q.  Okay.  Is there a reason why you wrote

3   schizophrenia down on this one and not bipolar?

4      A.  No, I mean, no, I mean yeah, no, it didn't

5   change and I didn't change her orders.

6      Q.  Okay.  And I actually want to flip back, I

7   apologize there was a, one the second page of this

8   Exhibit 11043.

9      A.  Yes.

10      Q.  That's a progress note from 1/17/17 which is

11   7 days prior so you're rounding the week before,

12   right?

13      A.  Yes.

14      Q.  Okay.  And can you read the subjective

15   complaints here?

16      A.  Left lower extremity pain but no signs of

17   incarceration, denies vomiting, diarrhea but...

18      Q.  I want to stop you, no signs of

19   incarceration did you mean to say that?

20      A.  So no signs of, basically where there is

21   swelling in the leg that there is now constriction

22   causing neurovascular compromise.

23      Q.  Okay, you did.

24      A.  Okay.

189

1      Q.  Denies vomiting, diarrhea?

2      A.  Right, right, something mouth but I'm not

3  sure.

4      Q.  Something mouth?

5      A.  Yeah.

6           Denies suicidal or homicidal ideations.

7  And then her vitals, her examination assessment and

8  plan.

9      Q.  Okay.  So here you wrote assessment

10  schizoaffective or schizo?

11     A.  Yes.

12     Q.  Okay.  Impulse control is that a diagnosis?

13     A.  It's a disorder.

14     Q.  It's a disorder, okay.  So you were

15  diagnosing her with Impulse Control Disorder?

16     A.  (Nod Affirmatively).

17     Q.  Okay.  Why did you diagnose her with Impulse

18  Control Disorder?

19     A.  It must have been something that occurred

20  prior to that visit that I was notified of by staff.

21     Q.  Okay.  And you didn't record on this note,

22  did you record on this note the basis for your

23  conclusion she had Impulse Control Disorder?

24     A.  No.

1      Q.  Okay.  Is, what is the appropriate treatment

2   for Impulse Control Disorder?

3      A.  Impulse control it, you can use medications

4   as well as behavior therapy.

5      Q.  Okay.  Did you prescribe any new medications

6   for the Impulse Control Disorder?

7      A.  No.

8      Q.  Did you prescribe behavioral therapy for the

9   Impulse Control Disorder?

10      A.  No, but the previous medications she was on

11   are not inappropriate for Impulse Control Disorder.

12      Q.  Were they working to control her Impulse

13   Control Disorder?

14      A.  So Impulse Control Disorder, schizophrenia,

15   mood disorders are all chronic illnesses with acute

16   flare-ups.  Schizophrenia and bipolar are illnesses

17   that will follow you or diagnoses that can follow you

18   for a lifetime, and you're going to have acute

19   episodes or breakthrough episodes.  Unfortunately, in

20   the incarceration setting you try to control symptoms

21   but you will have breakouts.  You will have acute

22   episodes and you're never going to be able to

23   completely cure a patient although you can treat a

24   patient.

191

1    Q.  And in Tiffany's case you were continuing

2  medication treatment that had been prescribed by the

3  Practitioner before she arrived at the Jail, correct,

4  in terms of --

5        A.  If that's what the records shows.

6        Q.  At any point was it necessary for you to

7  perform an assessment as to whether those treatments

8  you were prescribing were effective?

9        A.  I believe that's what I was doing when I met

10  with her.

11        Q.  Okay.  And at any point did you have

12  concerns that she was having too many acute flare-ups?

13        A.  No.

14        Q.  Okay.  Why not?

15        A.  My opinion.

16        Q.  Okay.  And what was your opinion based on?

17        A.  Well, I'm going off the record, but if I

18  felt she was having too many acute flare-ups in a

19  short period of time, I would have possibly referred

20  out or looked for further change in medication or

21  looked at change of plan, Management Plan.

22        Q.  And would you have talked to Mickey about

23  it?

24        A.  About, I would have talk to Mickey about his

192

1    observations and time with her.

2         Q.  Okay.  And I think did we, have we, I want

3    to make sure that I understand all of your

4    recollections, if you have any, about what you talked

5    about with Mickey specifically.

6              I think I asked, is there anything that

7    you remember about conversations about Tiffany with

8    Mickey that we haven't talked about today?

9         A.  No, just that he thought she was very, he

10   got along with her.  And he thought that she was very

11   sweet and that he wasn't having difficulty

12   communicating with her.

13        Q.  Okay.  Did Mickey report to you ever that

14   she had manipulative behaviors that you recollect?

15        A.  I don't know if it was Mickey but somebody

16   told me that they felt that it might have been Mickey.

17        Q.  Okay.  Did anybody tell you that they felt

18   she was attention seeking?

19        A.  Possibly, yes.

20        Q.  Okay.  Is attention seeking harm or

21   manipulative, self harm that's committed for

22   manipulative intentions purposes, is that still

23   something you need to take seriously?

24        A.  Absolutely.

1      Q.  Okay.  And is that something that ACH, you

2   learned about in your ACH training even for mental

3   health?

4      A.  I don't know if it's ACH training, but I do

5   know that it's something that I take very seriously.

6      Q.  Okay.  Okay.  Did you think that Tiffany was

7   suicidal?

8      A.  I do believe that she had suicidal ideations

9   because it was brought to my attention whether that be

10   through verbal or written from the previous facility

11   I'm not sure, but I do know in my mind that there was,

12   that she had suicidal tendencies, hence why I always

13   asked about them during those visits.  And it's one of

14   those standard questions that I have for patients who

15   are in High Risk.

16      Q.  Okay.  If you could flip a couple pages to

17   10925.  So I'm skipping over now the 1/24 progress

18   note because actually we talked about that and now

19   we're at 2/2/17 progress note, that's your

20   handwriting, right?

21      A.  It is.

22      Q.  Okay.  And so is this a record of rounding

23   on Tiffany?

24      A.  Yes.

194

1     Q.  Okay.  And your subjective complaint you

2   note High Risk and complaints of swallowed a

3   toothbrush, negative X-ray, correct?

4     A.  (Nod Affirmatively).

5     Q.  Does that mean --

6     A.  Yes.

7     Q.  Okay.  Thank you.

8        And what does negative X-ray mean?

9     A.  From what I remember it means she was sent

10   to the ER or she had an X-ray done and the foreign

11   body wasn't visualized.

12     Q.  Okay.  And would you consider this to

13   reflect, to use your terms, an acute flare-up of

14   Tiffany's mental illness symptoms?

15     A.  No, because there was no foreign body

16   visualized that to me is possible attention seeking.

17     Q.  Okay.  If she had swallowed a toothbrush or

18   a spoon, would it be considered an acute flare-up?

19     A.  Yes.

20     Q.  Okay.  And your diagnosis or assessment on

21   this is Impulse Control Disorder, correct?

22     A.  Correct.

23     Q.  Did you do anything to evaluate at this

24   point whether the treatment that was being provided to

195

1  Tiffany was effective?

2      A.  Yes.

3      Q.  Okay.

4      A.  I spoke to her.

5      Q.  Okay.  What did she tell you?

6      A.  I don't remember.

7      Q.  Okay.  So how do you know that you spoke to

8  her?

9      A.  Because I visited with her.

10      Q.  Okay.  And can you tell me anything about

11  what, what from that conversation lead you to -- well,

12  what did you conclude whether, you know, I asked if

13  you did, you assessed whether the treatment being

14  prescribed to her was effective, and you said yes, you

15  assessed it, what was your conclusion?

16                  MR. MADDOX:  On you mean

17  February 2, 2017?

18                  MS. CHARDON:  Sure, at this

19  time.

20      A.  On February 2, 2017, what was my conclusion

21  in regards to my assessment with her or my discussion

22  with her?

23      Q.  No, as to whether the treatment that she was

24  receiving for mental health issues was effective?

1      A.  I didn't change the orders, so I assumed, so

2   from what I have to assume now is that it was

3   effective.

4      **Q.  Okay.  But you don't, and just to make sure**

5   **I understand.  There is no, nothing you can, you've**

6   **got no memory to be able to explain to me how you**

7   **reached that conclusion or what you based it on?**

8      A.  I, no, but I do remember being told what she

9   came in, what was prescribed by a Mental Health

10   inpatient facility where she resided for some time.

11   And they, I believe, were evaluating her on a daily

12   basis, and from what I remember they felt that that

13   was the appropriate treatment.  And so I continued

14   that treatment until I said if there was a change in

15   acute frequency of acute flare-ups which would raise

16   my concern to change medications.  Or if Mickey had

17   brought it to my attention or if staff, yeah.

18      **Q.  Did you have any concerns at this point or**

19   **at any point during Tiffany's incarceration at**

20   **Sangamon County Jail that she had been on High Risk**

21   **Status too long?**

22      A.  No.

23      **Q.  Okay.  Did you have any concerns that she**

24   **had been, she had been housed in isolation by herself**

197

1    for too long?

2         A.  Not that I remember.

3         Q.  Okay.  Did you have any concerns that the

4    fact that she was alone in her cell might be worsening

5    her mental condition?

6         A.  No, not that I remember.

7         Q.  All right.  The next page is a note from

8    2/10/17, so I'm looking at 10906?

9         A.  Yes.

10         Q.  And it looks like High Risk under subjective

11    complaint and denies complaints, correct?

12         A.  Correct.

13         Q.  And you note Impulse Control Disorder under

14    your assessment and foot pain, correct?

15         A.  Correct.

16         Q.  You, like again you don't put

17    schizoaffective or bipolar on this one, correct?

18         A.  Correct.

19         Q.  Did you change your diagnosis?

20         A.  I did not.

21         Q.  Okay.  So why did you write Impulse Control

22    Disorder here and not those other diagnoses?

23         A.  I hadn't changed and that wasn't a change in

24    her medication, I'm not sure why I didn't add those to

198

1    the list, but it hadn't changed my observation,

2    interview or clinical plan with her.

3          Q.  The next note is also from, so this one,

4    excuse me, was 2/10 was a rounding note, is there a

5    time on this showing what time, no, there is no time,

6    correct?  Sorry, the one before?

7          A.  No.

8          Q.  Okay.  What time of day did you round on

9    patients, if you know?

10         A.  It varied.

11         Q.  Okay.  Depending on when you were in?

12         A.  (Nod Affirmatively).

13         Q.  Okay and your other schedule, there wasn't a

14   regular time?

15         A.  Correct.

16         Q.  Okay.  There is --

17         A.  Usually, yeah.

18         Q.  Go ahead.

19         A.  Usually it would be in the mornings.

20         Q.  Okay.  So then the next page of this exhibit

21   is 109--893 and that, is that your handwriting on this

22   note?

23         A.  No.

24         Q.  Okay.  Do you recognize Billy Ernest's

199

1    signature or do you know, let me ask you, do you Billy

2    Ernest?

3            A.  Yes.

4            Q.  You recognize his signature?

5            A.  Yes.

6            Q.  Okay.  So do you think this was a note made

7    by Billy Ernest?

8            A.  Yes.

9            Q.  Okay.

10                        MS. POWELL:  Which page are you

11   looking at?

12                        MS. CHARDON:  This is 10983.

13                        MR. MADDOX:  No, it's 10893.

14                        MS. POWELL:  10893, okay, I

15   didn't understand that.

16           Q.  It says Inmate stated she saved her

17   Thorazine from this morning and took it with her noon

18   meds after the Doctor well, seen her.

19                   Okay.  So what does this note reflects

20   as a Medical like when you review this is the

21   information being conveyed here?

22           A.  That the patient mouthed her medication and

23   took it at a later time.

24           Q.  Okay.  And basically Billy Ernest brought

200

1    that to your attention through this note, correct?

2    Well, your signature is at the bottom, right?

3        A.  Correct.

4        Q.  Oh, and you signed it on February 15th?

5        A.  Correct.

6        Q.  So that would be the next time that you were

7    in the prison?

8        A.  Correct.

9        Q.  Okay.  So it looks like the note was made at

10   5:50 in the p.m.?

11       A.  P.M., yes.

12       Q.  Okay.  So would you guess this happened

13   after you visited as reflected in the note?

14       A.  Yes.

15       Q.  Okay.  And then you reviewed that when you

16   came the next week, correct?

17       A.  (Nod Affirmatively).

18       Q.  Okay.  The next page is that's another Billy

19   Ernest note, right?

20       A.  It appears that yeah, that's, I think, I

21   believe that's Billy's writing and signature.

22       Q.  And you reviewed this February 27th, right?

23       A.  Correct.

24       Q.  Okay.  And this is a note from

201

1    February 24th?

2         A.  Correct.

3         Q.  And it, in my paraphrasing you can feel free

4    to correct me, but it pertains to a report that

5    Tiffany had stuffed a bunch of tissue paper up her

6    nose, correct, toilet paper?

7         A.  Correct.

8         Q.  Do you remember that incident?

9         A.  I don't.

10        Q.  Okay.  At any point when Tiffany was

11   incarcerated at Sangamon County Jail between December

12   of 2016 and March of 2017 did you alter your diagnosis

13   of bipolar and schizophrenic?

14        A.  No.

15        Q.  Okay.  At any point did you reevaluate, did

16   you change the medications being prescribed to

17   Tiffany?

18        A.  I did.

19        Q.  Okay.  And what did you change?

20        A.  I believe I added —

21        Q.  You can look at —

22        A.  — an SSR.

23             Well, maybe Wellbutrin or

24   antidepressants, I believe I —

1    Q.  Effexor?  There is an exhibit I think in

2    front of you, the Medication Administration Record.  I

3    believe I want to ask a couple of questions about

4    that.

5                Did you add the Effexor?

6    A.  I'm not sure, I don't remember, I remember

7    her medication being changed, I don't remember if I

8    did it or not.

9    Q.  Okay.  On several of those pages like I will

10   give you an example, I'm looking at Page 36 the third

11   page of the exhibit, is there a record that goes, that

12   the prescriptions does it record who prescribed the

13   medication?

14   A.  It does.

15   Q.  And it says Mary Dambacher for most of the

16   medications, correct?

17   A.  Correct.

18   Q.  Does that indicate that Mary Dambacher wrote

19   the prescription or what does that reflect?

20               MR. MADDOX:  When you say write

21   the prescription, I'm not sure that is a correct term

22   of art in this setting.

23               MS. CHARDON:  Yeah, sure.

24   Q.  Ordered the prescription or prescribed the

203

1    medicine?

2                        MR. MADDOX:  Ordered the

3    medicine I think is the best way to state it.

4         Q.  Ordered the medicine?

5         A.  Yes.

6         Q.  Okay.  Did you prescribe the medicine or did

7    she prescribe the medicine?

8         A.  Here she prescribed it.

9         Q.  Okay.  So you had prescribed it, could it be

10   written on the Medication Administration Record?

11        A.  Yes, yes.

12        Q.  Okay.

13        A.  Sorry, just making sure.

14        Q.  There are certain entries which are

15   handwritten on the Medication Administration Record,

16   do you see that --

17        A.  I do.

18        Q.  -- on 241, you know, I'm going to see if I

19   can find one with a date on it because I think that

20   the date is cut off of 241.  So here's 291 is dated

21   12/15/16.

22        A.  Yes.

23        Q.  Okay.  And is there an indication on that

24   handwritten Medication Administration Record of who

204

1  prescribed the medicine?

2      A.  Yes.

3      Q.  All right.  And how do you know where is it?

4      A.  I think that's what that is.

5      Q.  All right.  And is that MD?

6      A.  Mary Dambacher.

7      Q.  Yes, is that Mary Dambacher?

8      A.  Yes.

9      Q.  Okay.  So that indicates that Mary Dambacher

10  prescribed the medication?

11      A.  Yes.

12      Q.  Did you review that prescription to

13  determine whether you agreed whether it was

14  appropriate?

15      A.  Yes.

16      Q.  You did, when did you do that?

17      A.  I did that at every visit with her.

18      Q.  Okay.

19                  MR. MADDOX:  With Tiffany you

20  mean?

21      A.  Yes, sorry, yeah, with Tiffany.

22      Q.  Okay.  And during those visits you

23  determined that the, the treatment, the medication

24  that was being prescribed was, was effective, was

205

1    **appropriate?**

2         A.  Yes.

3         **Q.  Okay.  And did you during those visits make**

4    **any determinations about whether she needed anything**

5    **other than medicine to treat her mental illness?**

6         A.  I believe by having Mickey talking to her

7    she was receiving a different form of therapy other

8    than medications.

9         **Q.  Okay.  And did you ever assess whether that**

10   **was adequate or appropriate for the symptoms that she**

11   **was displaying?**

12                    MR. MADDOX:  Which do you want

13   him to answer?

14        A.  Which symptoms are you --

15        **Q.  Did you ever assess whether the treatment**

16   **that Mickey Shmikler was providing was adequate for**

17   **the, the mental health symptoms that Tiffany was**

18   **displaying?**

19        A.  Did I assess whether Mickey's therapy was

20   appropriate, no.

21        **Q.  Okay.  Was it your responsibility to make**

22   **that assessment?**

23                    MR. MADDOX:  Object to the form

24   of the question.

1        A.  I feel by me assessing Tiffany that was how

2   I made an assessment of how effective her treatment

3   was.

4        **Q.  So I think I am not understanding your**

5   **answer based on your last, my last question.**

6              **My last question was did you ever make**

7   **an assessment of whether Mickey's treatment was**

8   **adequate for Tiffany's condition and your answer was**

9   **no?**

10       A.  Sorry, I should have say yes because I

11  assessed it through my observations and interactions

12  with Tiffany.

13       **Q.  Okay.  And you determined that through, what**

14  **did you determine about Mickey's treatment through**

15  **your assessment and observations of Tiffany?**

16       A.  I assessed that the treatment that Tiffany

17  was receiving was appropriate with my interactions

18  with Tiffany.

19       **Q.  Okay.  Why?  What about those interactions**

20  **lead you to conclude that?**

21       A.  Like I said when her and I spoke she was

22  very receptive, had great conversation with me, was,

23  if you talked to the Staff including, when I say Staff

24  I mean both Medical and Jail Staff, Tiffany and I

207

1    seemed to have a very good rapport.  She would always

2    want to interact or talk to me or be like if she saw

3    me going by her cell, hey, Doctor Abraham come talk,

4    you know, and we would talk.  You know, she was very

5    appropriate and receptive to conversation.  She wasn't

6    pushing off any sort of conversation or didn't seem to

7    have any reason not to enjoy that time.

8         Q.  Okay.  In terms of mental health conditions

9    or mental health, yeah, mental health conditions while

10   Tiffany was at Sangamon County Jail you were treating

11   her for bipolar, correct?

12        A.  Correct.

13        Q.  Schizoaffective Disorder, correct?

14        A.  Yes.

15        Q.  Impulse Control Disorder, correct?

16        A.  Yes.

17        Q.  Anything else that you are aware of?

18        A.  Mood Disorders.

19        Q.  Mood Disorders, okay, would that, was that

20   different from the bipolar that we just mentioned or

21   is that separate?

22        A.  So mental, it --

23        Q.  Difficult to answer?

24        A.  You know, a lot of these symptoms are found

208

1    in multiple diagnoses, right.  And so bipolar, can I

2    say that I wasn't treating depression no, because

3    depression is a component of bipolar.  Schizotypal,

4    schizoaffective, you know, they have similarities but

5    they have differences as well.

6                      Was I treating impulse control or did I

7    observe impulse control issues and disorder, yes.  Did

8    I observe schizophrenic disorder or disease, yes.  You

9    know obsessive compulsive disorder, you, know I don't

10   remember if she had any of OCD tendencies from what I

11   remember, I don't think she did but, yeah.

12        **Q.  Did you ever talk about Tiffany with**

13   **Correctional Staff?**

14        A.  Yeah, yes.

15        **Q.  What did you talk about?**

16        A.  Whatever they would let me know when I came

17   in.  If somebody was concerned, the Staff, the

18   Correctional Staff were very forthcoming in letting me

19   know hey, Doc, this happened, you got to be aware, or

20   hey, this is our interaction with this patient, please

21   be aware that this is what our Staff is observing.

22        **Q.  Do you have any specific memories of such**

23   **conversations?**

24        A.  In regards to Tiffany?

209

1     Q.  Yeah.

2     A.  I don't.

3     Q.  Okay.  Do you have any specific memories of

4  conversations with Tiffany that we haven't talked

5  about today?

6     A.  Yes.

7     Q.  Okay.  What?

8     A.  I remember talking to Kate and Kate saying

9  Kate was always like she's so nice, she's this, she's,

10  you know.  Kate had said that she had mentioned that

11  her family had left her alone and never, you know,

12  wanted anything to do with her.  And that, you know,

13  Kate felt very empathetic towards Tiffany and her, I

14  guess, life situation.

15     Q.  Have you talked to anyone else that was, any

16  other ACH employees about Tiffany since this lawsuit

17  was filed?

18     A.  Not once.

19     Q.  Okay.  Have you talked, and so preparing for

20  the deposition today, did you talk to anybody that you

21  had worked with?

22     A.  I have not talked to anybody at ACH until

23  my, since my termination.

24     Q.  Okay.  And do you remember any conversations

210

1    that you had with Tiffany about her family?

2         A.  No.

3         Q.  Okay.  Do you have any memories of

4    conversations with Tiffany that you had that we

5    haven't talked about today?

6         A.  No, just like I said I don't remember

7    specifics, I just remember her demeanor with me.  I

8    remember that we just got along.

9         Q.  Okay.

10        A.  Oh, I do remember her saying cause she was

11   on finger foods or soft I can't remember but she was

12   like can you remove that for me, you know.

13        Q.  Okay.  What did you tell her?

14        A.  I said if you can, I think it was, if you

15   can go a month or two or something without incidents

16   we can consider it but, yeah.

17                 MS. CHARDON:  Okay.  I don't

18   have anymore questions.

19                 MS. POWELL:  Doctor, I just

20   have a few questions for you.

21                 CROSS EXAMINATION CONDUCTED

22                 BY MS. POWELL:

23        Q.  Would it be fair to say, that you

24   recommended all the medical care and treatment that

211

1   you thought was necessary for Tiffany when you saw

2   her?

3        A.  Yes.

4        Q.  Okay.  And that would be the same for if you

5   believed that she needed additional Mental Health

6   Treatment you recommended all the Mental Health

7   Treatment that you thought was necessary, right?

8        A.  Yes.

9        Q.  Okay.  And if you thought she needed

10   something else, you were able to do so, correct?

11        A.  Yes.

12        Q.  And did you ever suggest to any of the Staff

13   at the Sangamon County Jail that the Mental Health

14   Treatment that was being provided by ACH agents was

15   inappropriate?

16        A.  No.

17        Q.  Did you ever suggest that to the Sangamon

18   County Jail Staff that Tiffany needed any care whether

19   it was Medical or Mental Health-wise that ACH was

20   unable to provide other than the times that she was

21   sent to the hospital?

22        A.  No.

23        Q.  And would you agree that Mental, that the

24   Sangamon County Jail Staff never interfered with your

212

1    ability to prescribe medications or to refer Tiffany

2    to someone else?

3         A.  No.  So your question --

4         Q.  My question is you would agree they never

5    interfered?

6         A.  Correct.

7         Q.  Okay.  And was it your understanding that

8    for the most part when you interacted with Tiffany she

9    was always in High Risk?

10        A.  Yes.

11        Q.  Now would you also agree that based on the

12   testimony that you've given here today that you

13   indicated that you have treated patients both who are

14   incarcerated and who aren't incarcerated with Mental

15   Health problems?

16        A.  Yes.

17        Q.  Okay.  And you apply the same standard of

18   care to both types of patients?

19        A.  They're the same patient.  I mean they are

20   patients that's all, there is no same, there is no

21   type, you know.

22        Q.  Okay.  So if a person who was not

23   incarcerated came to you in the Prompt Care setting

24   who had eaten a spoon or eaten a toothbrush, would you

213

1   send them to the Emergency Room?

2        A.  Straight to the ER.

3        Q.  Okay.  And you would rely on Emergency Room

4   Staff to determine what appropriate treatment would be

5   necessary for that person?

6        A.  Yes.

7        Q.  Okay.  And is that what you did as a

8   physician in the Sangamon County Jail?

9        A.  Yes.

10       Q.  And did you follow the recommendation that

11  were made by the Emergency Room physician to the

12  extent any were made?

13       A.  From what I can remember, I can't speak to

14  specifics because yeah, I can't speak to specifics

15  because I don't remember if there was, you know, but

16  from any time a suggestion comes in from an outside

17  facility who is treating one of our patients we're

18  definitively going to utilize those considerations.

19       Q.  Have you ever treated people or dealt with

20  people who suffer from Pica outside of the Jail

21  setting?

22       A.  Yes.

23       Q.  Okay.  Are all people who suffer from Pica

24  referred for involuntary commitment to a Mental Health

214

1    Facility?

2        A.  No.

3        Q.  Would you agree many of those people live in

4    the outside world?

5        A.  Yes.

6        Q.  Okay.  Would you agree that dealing with a

7    person who suffers from PICA is difficult to treat?

8                    MS. CHARDON:  Objection, form.

9        A.  Would you repeat the question.

10       Q.  Yes.  Would you agree dealing with people

11   who suffer from Pica is difficult for a, for a

12   physician to address or treat?

13       A.  Yes.

14       Q.  Okay.

15       A.  It's a challenge, yes.

16       Q.  Okay.  Is Pica something that can be dealt

17   with medication?

18       A.  Yes, can be, symptoms can be, can, flare-ups

19   can try to be controlled.

20       Q.  And is it your opinion that some of the

21   medications that Tiffany was on were given to her in

22   an effort to minimize her Pica?

23       A.  I believe so.

24       Q.  But you would also agree there is no magic

1   pill or cure for Pica, is there?

2          A.  No.

3          Q.  And are there a variety of factors that

4   would trigger a person to eat objects that are not

5   food?

6          A.  Yes.

7          Q.  Have you also had experience with persons

8   who engage in self harm actions such as putting things

9   around their neck outside of the Jail setting?

10          A.  Around their necks I don't know if I had

11   specific instance but self harm, yes.

12          Q.  Okay.  And are all persons who engage in

13   self harm behaviors involuntarily committed to a

14   Mental Health Facility?

15          A.  No, no.

16          Q.  Okay.  Would you agree that in the Sangamon

17   County Jail an Inmate has the legal right to refuse

18   medications?

19          A.  Yes.

20          Q.  And are you legally able to enforce

21   medications the first time a patient refuses the

22   medication?

23          A.  We are not.  It has been made very clear to

24   us.

216

1      Q.  Have you ever been involved in a process of

2  enforcing a medication at the Jail?

3      A.  No.

4      Q.  So you wouldn't know how long it takes to do

5  that or what type of information you would have to

6  present to the Court in order to obtain an order to do

7  so?

8      A.  Oh my gosh, I don't remember, but I, there,

9  I believe you have to get a Court order saying that

10  they're not fit for trial, or there has to be a Mental

11  Health evaluation done by an outside and independent

12  provider, and that is how that's administered.  But I

13  don't remember in any situation forcing a medication

14  on a patient.

15      Q.  Do you know if ACH has an Enforcement of

16  Medication Policy separate from Illinois law?

17      A.  I don't, I know that we had a situation

18  where a patient was refusing medication, and we could

19  see deterioration in their mental health and physical

20  status and we consulted with the attorneys at ACH they

21  said you do not have the ability to force this

22  medication on this patient.  And the patient then went

23  into an acute episode and we then transferred that

24  patient to the ER.

217

1       Q.  Have you ever personally been involved in

2    legally discharging a person from custody of the

3    Sangamon County Jail?

4       A.  Can you say that again?

5       Q.  Yeah.

6            Have you ever personally been involved

7    in discharging a person from the custody of the

8    Sangamon County Jail for either Medical or Mental

9    Health reasons?  Do you know what I'm saying, I'm

10   asking --

11      A.  No, I'm sorry.

12      Q.  Okay.  So when a person is in the Sangamon

13   County Jail, they are in the custody of the Jail?

14      A.  Correct.

15      Q.  Okay.  When a person is transferred from the

16   Jail to the hospital for a medical reason, would you

17   agree that under most circumstances the person remains

18   in the custody of the Jail and Officers go with that

19   person?

20      A.  Yes.

21      Q.  To the Jail?

22      A.  Yes, well, to the hospital.

23      Q.  I'm sorry, yes, to the hospital, correct?

24      A.  Yes.

218

Q.  Okay.  Have you ever taken any actions or
personally filed any documents with the Court in an
effort to have an Inmate in the Sangamon County Jail
discharged from the custody of the --

A.  I have not.

Q.  -- of the Jail for either medical or
reasons?

A.  No, not that I remember.

Q.  Okay.  Would it be fair to say, that you're
not familiar with the legal process of doing so?

A.  That would be fair to say.

MS. POWELL:  Okay.  I believe
that's all I have.  Thank you very much.

MS. CHARDON:  Just a few more?

MR. MADDOX:  Any follow-up?

MS. CHARDON:  Yeah, a few
follow-up.

REDIRECT EXAMINATION

CONDUCTED BY MS. CHARDON:

Q.  Did you ever have a conversation with
anybody at ACH about what it would cost to refer
someone to an out, a psychiatrist?

A.  No.

Q.  Do you know what it could cost?

219

1     A.  No idea.

2     **Q.  Did you diagnose Tiffany with having Pica?**

3     A.  I think I did.

4     **Q.  Did you, let me ask it a different way.  Did**

5  **you think that she had Pica?**

6                          MS. POWELL:  I'm going to

7  object to the form of the question having Pica is, the

8  way it's said I'm not --

9                          MR. MADDOX:  Answer the

10  question, if you can.

11     A.  Yes.

12     **Q.  Okay.  You thought she had Pica?**

13     A.  Yeah, I think she was eating nonfood items

14  that weren't food.

15     **Q.  What is Pica?**

16     A.  Pica is eating objects that are not food and

17  you can't control it.

18     **Q.  Are you aware other than Tiffany of**

19  **instances of people with Pica swallowing larger**

20  **objects like spoons?**

21     A.  Not usually.

22     **Q.  Yeah.  Are you aware of any specific**

23  **examples?**

24     A.  No, yeah.

220

Q.  And Pica is often related to a nutritional
deficiency, right?

A.  Correct.

Q.  People eat paint chips, sometimes dirt --

A.  Yeah.

Q.  -- correct?

A.  Correct.

Q.  Okay.  You also said that you, I asked if
you thought Tiffany was suicidal and you said, I think
your answer was she had suicidal, I'm not trying to
put words in your mouth and I don't have the record in
front of me.  So do you think that Tiffany was
suicidal?

MR. MADDOX:  That is asked and
answered and but he can say it again.

Q.  It's fine, I just don't, I think you
answered that she --

A.  From my observations whether that would be
from previous facilities, whether that that was given
to me verbally, I know she had ideations in the past.

Q.  Okay.  And did you think she was having
suicidal ideations while she was at --

A.  No, she denied it.

Q.  Okay.  And did she make suicide, did she

221

1   make suicide attempts while she was at Sangamon County

2   Jail?

3        A.  Yes.

4        Q.  Okay.  And I'm not even, I am not speaking

5   of the one, the successful one on March 17th but prior

6   to that did she make suicide attempts?

7                      MR. MADDOX:  He's free to

8   answer the question, I do want to object because I

9   think that, that he doesn't have the foundation to

10  answer that question because always is, requires

11  getting inside of the head of the person who does the

12  attempt.

13       A.  I don't know if those actions were suicidal

14  attempts or those instances and circumstances.

15       Q.  Did you consider her to be at risk for

16  suicide while she was at Sangamon County Jail?

17       A.  Yes.

18       Q.  Okay.  And she presented suicide risk

19  factors, correct?

20       A.  Her history.

21       Q.  Her history.  And she presented with, she

22  engaged in self harm while she was at the Sangamon

23  County Jail at times, correct?

24       A.  Self harm does not mean suicide.

222

1    Q.  And can self harm be a suicide risk factors?

2    A.  Yes.

3    Q.  Yes.  And she engaged self harm, right?

4    A.  Yes.

5    Q.  And that was one of her suicide risk

6    factors?  Would you consider that to have been a

7    suicide risk factor with respect to Tiffany?

8    A.  I don't know because I would want to read

9    the circumstances because the spoon the, you know, the

10   sticking toilet paper in her nose saying you can't

11   breathe, you can still breathe through your mouth, you

12   know what I -- I don't know if I would consider those

13   suicidal attempts.

14             And so I, the one that I'm questioning

15   is the boot strap, and so I don't know until I read

16   that.

17   Q.  Were those symptoms of Tiffany's mental

18   health illness those things that you just listed?

19   A.  Yes.

20   Q.  Okay.  And when I say that they were

21   symptoms of the diagnoses that you recorded which

22   included bipolar, schizoaffective and Impulse Control

23   Disorder, correct?

24   A.  Yes.

223

1    Q.  So swallowing the spoon was a symptom of

2  bipolar, schizoaffective and Impulse Control Disorder

3  one of the above, correct?

4    A.  Yes.

5    Q.  Okay.  And so when she swallowed the or

6  reported swallowing when she swallowed a spoon for

7  example at some point you became aware that she had

8  swallowed a spoon, correct?

9    A.  Yes.

10   Q.  And did you conclude that that was a symptom

11 of her, the mental illness that you had diagnosed

12 bipolar, schizoaffective, Impulse Control Disorder?

13   A.  One of them, yes.

14   Q.  Did you conclude at that point that it was a

15 symptom of Pica?

16   A.  I did not.

17   Q.  Okay.  You didn't put in your record that it

18 was a symptom of Pica, correct?

19   A.  I did not.

20   Q.  In your medical judgment did Tiffany have

21 Pica?

22   A.  No.

23              MS. CHARDON:  Okay.  I don't

24 have any other questions.

224

1           MR. MADDOX:  I might, just one

2    moment with my client Arun, come out here, please.

3                (Whereupon a recess was taken.)

4           MR. MADDOX:  I don't any

5    questions.

6           Arun, Cathy is going to prepare a

7    transcript, which will be very lengthy, and you have a

8    right to review that transcript to make sure she took

9    everything down correctly or you can waive that right

10   and assume she took it down correctly.  You can't

11   change your answers you can only correct errors.  I

12   recommend that you waive.

13        A.  You recommend I waive?

14          MR. MADDOX:  It's up to you,

15   it's up to you.  He hesitated, so we reserve.

16

17

18

19

20

21

22

23

24

225

STATE OF ILLINOIS       )
COUNTY OF CHRISTIAN      )


                    CERTIFICATE


        I, Cathy J. Craggs, CSR and RPR,

affiliated with Associated Court Reporters,

P.O. Box 684, Taylorville, Illinois, do hereby

certify that I reported in shorthand the

foregoing proceedings and the foregoing is a

true and correct transcript of my shorthand

notes.

        I further certify that I am in no

way related to or associated with any of the

parties or attorneys involved herein, nor am I

financially interested in the action.




                    _____
                    CATHY J. CRAGGS CSR, RPR

                    CSR License No. 084-002703


Dated this 27th day of July, 2019.

226

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

227

SIGNATURE AND ERRATA SHEET

I, DOCTOR ARUN ABRAHAM, have read the foregoing testimony, given by me, taken on June 14, 2019, at 400 South Ninth Street, Springfield, Illinois, in the case of KELLI ANDREWS, AS ADMINISTRATOR OF THE ESTATE OF TIFFANY ANN RUSHER, DECEASED vs. SANGAMON COUNTY ILLINOIS, WES BARR, LARRY BECK, JR., ADVANCED CORRECTIONAL HEALTHCARE, INC., ARUN ABRAHAM, MICHAEL SHMIKLER, KYLE MEYER, Z. WHITLEY, JENNIFER EALEY, GUY BOUVET III, and DOES 1-5 Case Number 1:18-cv-1100-SEM-TSH, and have made any and all necessary corrections below:

Page No.                Line No.    Reason for Change:

228

1

2                                          _____
                                           Signature of Witness

3       SUBSCRIBED AND SWORN TO BEFORE ME
        THIS_____DAY OF_____, 2019.
4

5       _____
            Notary Public
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

229

Cathy J. Craggs, CSR
Associated Court Reporters
P.O. Box 684
Taylorville, Illinois 62568
27th day of July, 2019

Dear Matt,,

Enclosed herewith please find the transcript of the deposition testimony of Doctor Arun Abraham taken on June 14, 2019 at the Law Offices of Quinn,Johnston, Springfield, Illinois.

As indicated at the conclusion of the deposition, your client reserved his right to read the transcript. Please have your client read the enclosed transcript and sign the sheet at the end entitled Errata Sheet. Please mark on that sheet only. Please read and sign the transcript within the next thirty days and return a copy of the Errata Sheet to me,

If you have any questions in this regard, please do not hesitate to call on me.

Thank you for your time.

Sincerely,

Cathy J. Craggs, CSR

# 0

**006** [1] - 125:13
**073** [1] - 175:6
**084-002703** [1] -
225:21

# 1

**1** [16] - 4:7, 11:20,
11:22, 40:17, 59:7,
68:1, 69:23, 70:3,
80:19, 87:1, 99:9,
120:8, 120:9,
120:13, 187:3, 187:4
**1-5** [2] - 1:13, 227:6
**1-800-252-9915** [1] -
1:23
**1/17/17** [1] - 188:10
**1/24** [1] - 193:17
**1/4/17** [1] - 121:21
**10** [1] - 40:18
**102** [1] - 3:14
**10861** [1] - 120:19
**10893** [2] - 199:13,
199:14
**109** [1] - 198:21
**10906** [1] - 197:8
**10925** [1] - 193:17
**10983** [1] - 199:12
**10990** [1] - 186:4
**11** [3] - 4:7, 40:17,
160:3
**11043** [1] - 188:8
**11056** [4] - 120:17,
120:18, 121:5, 145:3
**12** [2] - 12:23, 40:18
**12/15/16** [1] - 203:21
**12/19/16** [1] - 123:22
**12/20** [1] - 122:6
**12/26/16** [2] - 121:18,
121:24
**12/30** [1] - 122:7
**120** [1] - 4:7
**125** [1] - 4:8
**13** [2] - 12:20, 71:2
**14** [5] - 1:19, 2:5, 3:1,
227:3, 229:7
**14th** [1] - 150:20
**15** [3] - 45:20, 70:7,
84:18
**15th** [3] - 130:2,
150:20, 200:4
**16** [1] - 45:20
**17** [5] - 18:1, 156:20,
156:21, 175:4, 176:6
**17th** [4] - 136:7,
187:16, 187:20,

221:5
**19** [1] - 126:4
**19th** [2] - 125:14,
128:10
**1:18-cv-1100-SEM-
TSH** [2] - 1:7, 227:6

# 2

**2** [13] - 4:7, 8:18, 11:8,
99:9, 103:22,
119:24, 120:1,
120:4, 120:16,
145:1, 185:23,
195:17, 195:20
**2/10** [1] - 198:4
**2/10/17** [1] - 197:8
**2/2/17** [1] - 193:19
**2005** [1] - 10:5
**2007** [2] - 9:12, 9:18
**2008** [5] - 158:19,
158:23, 159:15,
160:3, 167:11
**201** [1] - 59:8
**2011** [7] - 10:3, 10:16,
11:1, 158:19,
158:23, 159:16,
167:11
**2012** [1] - 12:15
**2013** [5] - 12:10, 13:1,
22:19, 55:23, 119:10
**2014** [8] - 19:16, 21:7,
22:19, 23:8, 24:3,
42:8, 42:10, 156:19
**2015** [2] - 8:11, 8:12
**2016** [5] - 125:14,
126:4, 128:10,
131:6, 201:12
**2017** [28] - 8:12, 14:9,
14:21, 17:10, 17:17,
18:8, 24:16, 24:18,
24:23, 25:22, 26:2,
29:9, 32:24, 33:4,
37:19, 52:20, 99:17,
119:10, 122:20,
136:14, 145:5,
156:12, 158:1,
158:3, 182:3,
195:17, 195:20,
201:12
**2019** [7] - 1:19, 2:5,
3:1, 227:3, 228:3,
229:3, 229:7
**210** [1] - 4:4
**218** [1] - 4:4
**24** [1] - 70:10
**241** [2] - 203:18,
203:20
**24th** [2] - 186:7, 201:1

**27** [1] - 175:6
**27th** [2] - 200:22,
229:3
**291** [1] - 203:20

# 3

**3** [9] - 4:8, 8:18, 11:9,
14:17, 103:22,
125:9, 125:12,
153:14, 176:13
**333** [1] - 3:4
**36** [1] - 202:10
**3731** [1] - 3:8

# 4

**4** [4] - 14:17, 145:5,
156:11, 175:5
**40** [1] - 20:8
**400** [5] - 1:21, 2:7,
3:13, 136:24, 227:3
**4th** [2] - 122:20,
152:10, 187:19

# 5

**5** [5] - 4:4, 5:19, 7:17,
61:5, 131:20
**50** [1] - 154:11
**5:50** [1] - 200:10

# 6

**6** [3] - 5:19, 7:17,
131:20
**605** [1] - 11:21
**60604** [1] - 3:5
**609** [2] - 12:13, 45:6
**610** [2] - 12:13, 80:18
**62568** [2] - 1:24, 229:2
**62701** [1] - 3:14
**62791-9678** [1] - 3:8
**631** [3] - 27:19, 30:10,
40:3
**632** [1] - 27:24
**633** [1] - 19:11
**639** [1] - 11:21
**684** [3] - 1:24, 225:7,
229:2

# 7

**7** [6] - 15:19, 68:1,
69:23, 70:4, 188:11
**75** [1] - 117:3

**7th** [1] - 21:5

# 8

**855** [1] - 175:5
**885** [1] - 176:6
**889** [2] - 175:5, 179:8
**893** [1] - 198:21
**8:30** [2] - 1:19, 2:5

# 9

**90** [1] - 150:14
**9th** [2] - 1:21, 2:7

# A

**a.m** [2] - 1:20, 2:6
**abilities** [2] - 44:17,
44:18
**ability** [5] - 32:21,
37:6, 99:1, 212:1,
216:21
**able** [10] - 38:12,
40:21, 54:17, 176:6,
176:8, 176:10,
190:22, 196:6,
211:10, 215:20
**Abraham** [29] - 3:15,
4:7, 4:7, 4:8, 5:7,
11:20, 11:22, 27:24,
28:22, 29:3, 30:11,
30:17, 40:4, 42:12,
69:1, 119:24, 120:1,
120:4, 120:7, 120:9,
120:13, 120:16,
125:9, 125:12,
145:1, 153:14,
207:3, 229:7
**ABRAHAM** [7] - 1:11,
1:17, 2:4, 4:3, 5:1,
227:2, 227:5
**absolutely** [2] - 23:9,
30:2, 38:23
**Absolutely** [3] - 23:16,
45:5, 192:24
**accelerate** [1] - 78:14
**accent** [1] - 9:6
**accept** [3] - 50:7,
50:19, 100:2
**accepted** [3] - 50:9,
154:1, 154:11
**access** [1] - 100:17
**according** [3] - 98:21,
163:8, 187:24
**accounts** [2] - 29:6,
29:18
**accreditation** [3] -

83:21, 84:2, 117:23
**accredited** [1] - 83:22
**accumulate** [1] -
29:15
**accuse** [1] - 22:17
**ACH** [46] - 11:20, 12:1,
12:12, 12:13, 12:17,
13:6, 13:17, 14:8,
17:5, 17:9, 19:11,
27:19, 28:10, 31:20,
31:21, 31:24, 45:6,
46:8, 67:13, 77:14,
79:24, 80:18,
114:20, 115:3,
115:19, 116:11,
117:11, 117:14,
118:6, 119:8,
119:20, 124:8,
125:13, 175:6,
193:1, 193:2, 193:4,
209:16, 209:22,
211:14, 211:19,
216:15, 216:20,
218:21
**ACH006** [1] - 124:6
**Act** [3] - 36:24, 37:2,
110:4
**act** [3] - 35:16, 37:22,
110:4
**acting** [4] - 19:6,
19:22, 25:16, 37:22
**action** [3] - 23:3, 23:6,
225:15
**actions** [4] - 32:13,
215:8, 218:1, 221:13
**actively** [2] - 49:5,
51:20
**actors** [1] - 116:8
**acts** [1] - 87:1
**actual** [3] - 38:10,
38:11, 49:19
**acute** [46] - 68:8,
90:11, 90:14, 91:3,
91:8, 91:13, 91:18,
91:22, 92:3, 93:3,
93:10, 93:13, 94:22,
102:18, 102:19,
102:24, 103:18,
104:3, 104:10,
105:4, 106:1,
106:17, 107:8,
107:18, 109:6,
109:8, 109:12,
109:16, 109:19,
109:22, 110:5,
110:8, 110:12,
111:19, 130:15,
190:15, 190:18,
190:21, 191:12,
191:18, 194:13,
194:18, 196:15,

216:23
**AD** [1] - 147:19
**add** [3] - 6:19, 197:24, 202:5
**added** [1] - 201:20
**addition** [6] - 6:13, 71:15, 160:23, 164:16, 164:17, 165:12
**additional** [1] - 211:5
**address** [9] - 18:11, 18:13, 28:10, 28:14, 28:17, 29:2, 30:8, 93:1, 214:12
**addressed** [3] - 18:15, 19:22, 20:15
**addresses** [1] - 28:21
**adequate** [4] - 103:11, 205:10, 205:16, 206:8
**administered** [2] - 170:4, 216:12
**administering** [3] - 60:9, 161:22, 163:22
**Administration** [14] - 61:6, 61:8, 61:20, 62:8, 62:12, 63:6, 63:12, 63:20, 63:22, 71:9, 202:2, 203:10, 203:15, 203:24
**ADMINISTRATOR** [2] - 1:5, 227:4
**admitted** [2] - 134:10, 150:24
**advance** [4] - 40:16, 40:19, 44:3, 124:13
**ADVANCED** [2] - 1:10, 227:5
**Advanced** [13] - 3:16, 15:13, 15:21, 31:14, 33:13, 39:20, 43:16, 43:24, 60:21, 96:3, 96:4, 97:23
**Advisory** [2] - 48:10, 48:14
**affiliated** [1] - 225:6
**Affirmatively)** [17] - 9:9, 28:15, 36:14, 42:9, 52:11, 55:9, 85:17, 87:5, 89:13, 92:19, 95:20, 105:23, 149:21, 189:16, 194:4, 198:12, 200:17
**Africa** [2] - 9:4, 9:7
**afterwards** [1] - 2:12
**agents** [1] - 211:14
**aggressive** [2] - 141:3, 182:17
**ago** [6] - 5:20, 11:9,

35:10, 132:20, 148:2, 172:2
**agree** [12] - 22:12, 47:3, 78:13, 211:23, 212:4, 212:11, 214:3, 214:6, 214:10, 214:24, 215:16, 217:17
**agreed** [1] - 204:13
**ahead** [4] - 27:16, 110:18, 141:24, 198:18
**airway** [1] - 109:16
**Alexis** [1] - 3:3
**Ali** [1] - 5:9
**alive** [1] - 132:19
**ALLEN** [1] - 3:6
**allow** [1] - 65:3
**allowed** [2] - 35:11, 36:7
**almost** [5] - 32:11, 70:10, 115:12, 132:20, 148:15
**alone** [3] - 176:8, 197:4, 209:11
**alter** [1] - 201:12
**American** [1] - 9:6
**Americans** [1] - 154:11
**amount** [4] - 14:12, 43:8, 109:9, 117:6
**AND** [2] - 227:1, 228:3
**and..** [2] - 104:15, 116:9
**ANDREWS** [2] - 1:5, 227:3
**ankle** [1] - 126:8
**ANN** [2] - 1:6, 227:4
**answer** [42] - 6:10, 6:14, 6:20, 7:4, 11:9, 27:4, 27:6, 27:13, 27:16, 36:21, 37:6, 38:12, 50:15, 50:16, 55:2, 65:4, 69:14, 83:10, 83:11, 104:16, 107:16, 132:2, 137:7, 138:10, 140:17, 141:4, 141:14, 147:2, 147:6, 156:17, 165:17, 167:21, 169:21, 205:13, 206:5, 206:8, 207:23, 219:9, 220:10, 221:8, 221:10
**answered** [12] - 132:23, 137:22, 138:11, 146:6, 146:9, 146:10,

155:15, 163:17, 170:1, 181:10, 220:15, 220:17
**answers** [5] - 2:11, 20:14, 102:4, 141:6, 224:11
**antidepressants** [1] - 201:24
**anyway** [4] - 118:12, 140:7, 140:10, 142:18
**apologize** [1] - 188:7
**APPEARANCES** [1] - 3:1
**Appeared** [3] - 3:5, 3:9, 3:15
**apply** [1] - 212:17
**appreciate** [1] - 118:23
**approached** [1] - 183:20
**appropriate** [18] - 46:18, 74:15, 93:1, 94:7, 141:12, 163:7, 165:22, 166:12, 171:12, 190:1, 196:13, 204:14, 205:1, 205:10, 205:20, 206:17, 207:5, 213:4
**appropriateness** [2] - 49:2, 57:14
**area** [2] - 10:18, 112:11
**areas** [1] - 113:14
**arise** [1] - 17:24
**arose** [1] - 18:19
**arrived** [3] - 63:18, 150:19, 191:3
**art** [2] - 32:7, 202:22
**articulate** [2] - 155:13, 155:16
**Arun** [4] - 3:15, 224:2, 224:6, 229:6
**ARUN** [7] - 1:11, 1:17, 2:4, 4:3, 5:1, 227:2, 227:5
**AS** [2] - 1:5, 227:3
**aside** [3] - 38:16, 102:23, 163:1
**assess** [6] - 167:22, 168:18, 169:17, 205:9, 205:15, 205:19
**assessed** [4] - 195:13, 195:15, 206:11, 206:16
**assessing** [1] - 206:1
**Assessment** [1] - 95:15

**assessment** [32] - 41:23, 69:4, 71:22, 72:6, 72:8, 126:22, 127:2, 127:10, 145:6, 146:16, 147:7, 149:16, 153:6, 153:11, 168:3, 168:6, 168:9, 168:19, 168:20, 176:11, 187:3, 189:7, 189:9, 191:7, 194:20, 195:21, 197:14, 205:22, 206:2, 206:7, 206:15
**assessments** [1] - 174:20
**assigned** [5] - 40:12, 43:8, 46:21, 57:23, 58:3
**assignment** [3] - 14:5, 142:13, 142:16
**Assistant** [1] - 16:7
**Assistants** [1] - 16:17
**Associated** [2] - 225:6, 229:1
**ASSOCIATED** [1] - 1:23
**associated** [1] - 225:13
**Associates** [1] - 101:8
**assume** [15] - 27:17, 54:3, 58:1, 82:15, 82:16, 87:7, 114:1, 130:1, 138:24, 148:4, 150:18, 174:19, 176:4, 196:2, 224:10
**assumed** [2] - 44:12, 196:1
**assumes** [1] - 47:1
**assuming** [5] - 73:18, 123:9, 138:23, 147:24, 175:16
**assumption** [1] - 46:11
**attached** [1] - 1:22
**attacked** [1] - 130:12
**attempt** [2] - 107:22, 221:12
**attempted** [1] - 144:23
**attempts** [6] - 49:16, 49:17, 221:1, 221:6, 221:14, 222:13
**attend** [5] - 9:21, 48:13, 115:10, 116:14, 117:6
**attendant** [1] - 33:17
**attended** [2] - 119:10, 119:23
**attending** [1] - 118:6

**attends** [1] - 48:10
**attention** [24] - 63:17, 64:2, 73:23, 76:15, 76:20, 86:4, 86:6, 86:11, 133:18, 133:23, 134:3, 134:20, 138:20, 147:11, 179:16, 180:14, 181:13, 181:19, 192:18, 192:20, 193:9, 194:16, 196:17, 200:1
**attorney** [1] - 6:4
**Attorney** [2] - 3:4, 3:7
**attorneys** [2] - 2:3, 216:20, 225:14
**August** [12] - 14:9, 14:20, 17:11, 18:1, 18:8, 24:16, 24:18, 24:23, 25:21, 25:22, 26:2, 29:8
**Auscultation** [1] - 126:15
**auspices** [1] - 39:16
**authored** [4] - 96:14, 98:4, 100:16
**availability** [1] - 27:18
**available** [11] - 26:4, 33:23, 36:12, 38:13, 39:8, 44:7, 80:19, 108:2, 111:23, 117:17, 144:2
**Avenue** [2] - 3:4, 3:8
**avoid** [3] - 107:14, 107:17, 107:18
**aware** [34] - 26:17, 31:4, 31:16, 37:2, 37:16, 39:19, 46:13, 49:14, 52:4, 54:10, 68:4, 77:8, 78:16, 79:11, 79:15, 87:16, 97:11, 110:14, 111:4, 119:6, 130:14, 130:24, 151:21, 152:4, 152:12, 164:14, 173:8, 185:3, 207:17, 208:19, 208:21, 219:18, 219:22, 223:7
**Axis** [1] - 87:1

**B**

**Bachelor's** [2] - 8:23
**backing** [2] - 61:11, 79:13
**bad** [2] - 17:4, 152:2

**bag** [3] - 76:2, 110:8, 111:3
**Bandy** [2] - 149:2, 149:6
**BARR** [2] - 1:10, 227:4
**Barr** [1] - 3:9
**based** [8] - 69:6, 98:15, 149:15, 153:9, 191:16, 196:7, 206:5, 212:11
**baseline** [3] - 73:4, 73:5, 73:9
**basic** [3] - 39:15, 107:2, 183:3
**basis** [8] - 43:10, 58:7, 60:15, 84:23, 85:1, 147:14, 189:22, 196:12
**batch** [1] - 27:20
**Bates** [4] - 12:12, 19:10, 123:24, 124:1
**became** [1] - 223:7
**Beck** [1] - 3:9
**BECK** [2] - 1:10, 227:5
**become** [8] - 8:15, 11:5, 45:16, 64:23, 65:21, 68:4, 74:17, 74:24
**becomes** [2] - 49:20, 74:16
**bed** [3] - 53:9, 54:15, 105:13
**beds** [5] - 53:6, 54:6, 104:21, 108:2, 108:8
**BEFORE** [1] - 228:3
**began** [2] - 11:1, 15:18
**beginning** [1] - 67:23
**behalf** [3] - 3:5, 3:9, 3:15
**behavior** [5] - 72:4, 72:21, 148:6, 164:18, 190:4
**behavioral** [6] - 161:22, 164:7, 165:16, 166:15, 166:18, 190:8
**Behavioral** [2] - 75:6, 163:20
**behaviors** [5] - 73:10, 76:16, 148:21, 192:14, 215:13
**behind** [2] - 18:16, 29:13
**believes** [1] - 154:9
**below** [2] - 125:22, 227:7
**beside** [1] - 40:2
**best** [5] - 37:6, 106:15, 106:16, 144:6, 203:3

**Betsy** [1] - 3:13
**better** [8] - 105:15, 106:18, 106:23, 107:13, 107:17, 107:21, 127:23, 141:23
**between** [8] - 2:2, 7:18, 24:18, 151:14, 160:3, 167:11, 168:3, 201:11
**beyond** [5] - 91:14, 91:16, 93:15, 109:9, 112:2
**Bilaterally** [1] - 126:15
**Billy** [6] - 24:7, 198:24, 199:1, 199:7, 199:24, 200:18
**Billy's** [1] - 200:21
**binder** [1] - 64:5
**bipolar** [43] - 83:14, 145:10, 146:4, 147:3, 147:23, 149:15, 151:7, 151:23, 153:6, 153:21, 154:7, 155:21, 156:11, 156:15, 157:10, 157:21, 157:22, 158:24, 159:3, 159:7, 159:11, 159:14, 159:16, 159:20, 160:24, 165:23, 166:4, 166:6, 166:7, 166:9, 187:12, 187:24, 188:3, 190:16, 197:17, 201:13, 207:11, 207:20, 208:1, 208:3, 222:22, 223:2, 223:12
**birth** [1] - 125:20
**bit** [1] - 124:12
**Block** [2] - 113:12, 113:15
**block** [1] - 184:24
**blocks** [1] - 113:12
**Board** [3] - 48:11, 48:14, 118:1
**board** [10] - 8:7, 8:11, 8:12, 8:15, 10:20, 10:22, 10:23, 11:5, 11:12, 11:15
**body** [2] - 194:11, 194:15
**booked** [1] - 134:11
**Booking** [8] - 78:21, 112:10, 112:11, 113:13, 113:19,

148:14, 183:20
**boot** [4] - 109:19, 172:11, 172:12, 222:15
**born** [3] - 9:3, 9:4, 9:7
**bottom** [9] - 12:11, 23:2, 27:24, 122:13, 125:13, 145:3, 175:16, 186:4, 200:2
**Bouvet** [3] - 3:9, 175:4, 176:5
**BOUVET** [2] - 1:13, 227:6
**Box** [3] - 1:24, 225:7, 229:2
**break** [9] - 7:3, 7:5, 60:19, 75:15, 84:8, 133:2, 140:20, 141:7, 156:4
**breakdown** [2] - 51:16, 58:16
**breakouts** [1] - 190:21
**breaks** [1] - 109:7
**breakthrough** [1] - 190:19
**breathe** [2] - 222:11
**brief** [4] - 109:7, 109:8, 109:13, 180:2
**bring** [4] - 179:4, 179:15, 180:9, 180:14
**Brittany** [2] - 149:1, 149:5
**brought** [22] - 26:10, 63:16, 64:1, 64:9, 64:10, 86:4, 86:6, 86:9, 86:11, 133:18, 133:22, 134:3, 138:20, 147:11, 147:24, 179:3, 181:13, 181:19, 181:21, 193:9, 196:17, 199:24
**buck** [1] - 71:3
**bullet** [1] - 80:19
**bunch** [2] - 118:11, 201:5
**but..** [2] - 22:11, 124:3, 188:17
**BY** [4] - 4:14, 5:6, 210:22, 218:19
**by..** [1] - 64:9

## C

**Caldwell** [1] - 115:16
**camera** [2] - 113:20, 113:24
**cameras** [5] - 113:16,

114:2, 114:7, 114:9, 114:16
**cannot** [2] - 91:16, 105:7
**capacity** [1] - 13:9
**Care** [20] - 8:6, 10:17, 11:2, 13:11, 13:12, 40:14, 47:1, 47:10, 90:11, 90:13, 90:19, 91:4, 92:16, 94:18, 94:21, 158:6, 158:12, 159:10, 212:23
**care** [30] - 33:14, 34:10, 34:14, 35:5, 38:21, 43:8, 47:2, 47:7, 49:3, 50:14, 57:14, 79:14, 83:5, 92:18, 99:4, 103:5, 103:11, 103:17, 105:18, 114:12, 135:3, 136:16, 136:17, 136:18, 154:14, 155:17, 158:4, 210:24, 211:18, 212:18
**caregivers** [1] - 75:22
**case** [10] - 5:22, 6:23, 7:23, 39:19, 39:21, 51:15, 64:14, 115:8, 191:1, 227:3
**Case** [1] - 227:6
**cases** [5] - 37:19, 50:17, 54:14, 99:9, 100:21
**catch** [1] - 74:1
**categories** [2] - 162:22, 168:5
**category** [1] - 102:23
**CATHY** [1] - 225:20
**Cathy** [8] - 1:18, 2:9, 6:7, 106:9, 224:6, 225:5, 229:1, 229:18
**causes** [1] - 40:5
**causing** [2] - 68:8, 188:22
**cautious** [1] - 39:22
**CBT** [3] - 161:4, 164:7, 166:23
**cell** [6] - 79:8, 183:22, 184:5, 184:10, 197:4, 207:3
**cells** [4] - 113:2, 113:15, 113:20, 114:17
**Center** [1] - 131:2
**CENTRAL** [1] - 1:2
**certain** [13] - 20:5, 20:9, 20:13, 23:18, 39:13, 46:7, 73:15,

119:21, 154:2, 173:18, 173:19, 203:14
**certainly** [2] - 37:5, 137:22
**CERTIFICATE** [1] - 225:3
**certification** [3] - 8:9, 11:12, 68:16
**certifications** [1] - 11:15
**certified** [7] - 8:7, 8:11, 8:12, 8:15, 10:20, 10:23, 11:5
**certify** [2] - 225:8, 225:12
**CERULO** [3] - 1:21, 2:7, 3:12
**challenge** [2] - 154:10, 214:15
**chance** [1] - 29:19
**change** [18] - 14:12, 64:3, 73:4, 73:5, 73:9, 187:21, 188:5, 191:20, 191:21, 196:1, 196:14, 196:16, 197:19, 197:23, 201:16, 201:19, 224:11
**Change** [1] - 227:8
**changed** [6] - 23:23, 32:22, 45:19, 197:23, 198:1, 202:7
**changes** [2] - 23:14, 64:3
**changing** [1] - 18:20
**channeled** [1] - 94:7
**CHARDON** [60] - 3:3, 4:14, 5:6, 27:7, 27:14, 30:2, 30:7, 35:21, 37:4, 37:7, 62:14, 65:5, 72:10, 75:16, 75:19, 79:21, 87:12, 88:6, 102:1, 103:12, 111:8, 111:12, 117:12, 118:19, 118:23, 120:9, 120:14, 121:4, 123:16, 123:20, 123:23, 124:4, 125:1, 125:5, 137:24, 138:7, 139:12, 140:22, 141:2, 141:8, 141:11, 141:19, 142:2, 142:6, 156:6, 156:8, 162:4, 162:8, 163:9, 177:19, 184:18, 195:18, 199:12, 202:23,

210:17, 214:8,
218:14, 218:16,
218:19, 223:23
**Chardon** [2] - 3:3, 5:9
**charge** [2] - 29:15
**chart** [13] - 37:9, 38:1,
62:7, 63:4, 66:20,
67:17, 67:18, 83:8,
86:10, 124:21,
133:16, 144:22,
153:16
**charting** [2] - 33:23,
38:7
**charts** [4] - 36:12,
83:11, 124:12,
139:21
**check** [2] - 71:11,
127:20
**checking** [2] - 70:7,
71:10
**chest** [2] - 126:12,
187:1
**Chicago** [1] - 3:5
**chips** [1] - 220:4
**choose** [1] - 92:13
**choosing** [1] - 39:8
**CHRISTIAN** [1] - 225:1
**chronic** [2] - 109:8,
190:15
**chuckhole** [2] - 184:2,
184:3
**circle** [2] - 126:21,
127:6
**circumstance** [2] -
26:10, 51:13
**circumstances** [13] -
20:1, 20:14, 24:22,
25:10, 40:10, 50:21,
54:21, 122:9,
160:19, 160:22,
217:17, 221:14,
222:9
**clarification** [3] - 6:17,
117:13, 121:2
**clarify** [4] - 6:20,
87:10, 117:9, 119:19
**classes** [1] - 48:2
**classify** [2] - 70:22,
72:4
**clear** [6] - 35:3, 93:17,
96:19, 126:15,
162:20, 215:23
**clearly** [1] - 129:5
**client** [4] - 40:6, 224:2,
229:9, 229:10
**clinic** [4] - 13:10,
109:22, 109:23,
158:4
**Clinic** [1] - 8:6
**Clinical** [1] - 75:7

**clinical** [19] - 47:14,
47:19, 60:15, 65:24,
69:3, 69:7, 85:20,
85:21, 85:23, 91:19,
91:21, 98:15,
107:11, 115:8,
116:9, 144:13,
148:9, 153:7, 198:2
**clinically** [3] - 69:15,
129:13, 129:17
**Clinician** [4] - 60:11,
60:20, 61:1, 84:21
**Clinicians** [1] - 137:17
**clip** [2] - 109:24, 111:2
**clips** [3] - 76:10,
109:21, 110:4
**close** [1] - 103:24
**CME** [6] - 45:2,
114:21, 116:18,
116:21, 117:10,
119:20
**CME's** [2] - 115:11,
119:10
**CO** [2] - 70:6, 185:18
**CO's** [5] - 70:6, 71:16,
73:1, 114:4
**cognitive** [5] - 161:5,
164:18, 165:16,
166:15, 166:17
**Cognitive** [1] - 163:19
**collaborate** [3] -
34:19, 34:23, 35:2
**collaborated** [1] - 35:4
**collaborates** [2] -
139:19, 142:11
**collaborating** [13] -
32:3, 33:13, 33:16,
36:9, 36:11, 37:24,
38:3, 38:6, 39:1,
39:5, 39:17, 39:23,
44:23
**collaboration** [4] -
31:18, 35:13, 36:6,
38:11
**collaborative** [15] -
30:17, 31:10, 31:23,
32:6, 32:9, 32:19,
33:1, 33:4, 33:5,
33:9, 33:18, 36:17,
36:22, 37:18, 37:20
**colleague** [1] - 53:13
**colleagues** [1] - 113:4
**collection** [1] - 120:1
**comfortable** [2] -
39:9, 39:23
**coming** [9] - 10:13,
19:3, 31:14, 52:19,
66:15, 130:16,
151:11, 185:10
**Commission** [1] -

83:22
**commitment** [1] -
213:24
**commitments** [1] -
49:11
**committed** [4] - 26:15,
49:20, 192:21,
215:13
**communicate** [7] -
28:21, 93:5, 93:7,
93:9, 93:13, 129:20,
172:15
**communicated** [4] -
26:6, 41:12, 64:15,
171:22
**communicating** [3] -
25:20, 37:11, 192:12
**communication** [6] -
93:17, 151:12,
151:14, 171:23,
171:24, 172:1
**community** [2] -
154:9, 155:5
**company** [3] - 13:10,
46:12, 46:13
**competence** [1] -
73:16
**competent** [1] - 2:18
**complained** [2] - 24:2,
24:8
**complaining** [1] -
186:22
**complaint** [13] - 19:22,
20:10, 20:17, 20:18,
24:3, 121:14,
125:22, 126:6,
147:15, 186:19,
194:1, 197:11
**complaints** [6] -
24:11, 146:19,
149:20, 188:15,
194:2, 197:11
**completed** [2] - 28:2,
43:11
**completely** [3] -
44:24, 129:12,
190:23
**component** [4] -
152:15, 152:16,
167:3, 208:3
**components** [2] -
148:5, 170:10
**compounded** [1] -
78:13
**compromise** [1] -
188:22
**compulsive** [1] -
208:9
**concentrate** [1] -
106:5

**concern** [32] - 44:14,
60:16, 63:16, 64:2,
64:8, 64:10, 64:14,
64:18, 64:23, 65:21,
70:3, 71:18, 72:11,
73:14, 74:11, 74:16,
74:18, 74:24, 91:4,
91:9, 92:23, 92:24,
93:1, 93:5, 103:10,
103:15, 109:5,
109:11, 111:18,
179:3, 185:10,
196:16
**concerned** [2] - 70:8,
208:17
**concerning** [1] - 70:5
**concerns** [21] - 15:5,
44:4, 65:8, 65:14,
65:17, 67:21, 73:1,
80:13, 92:7, 93:10,
93:13, 93:20, 93:22,
94:1, 103:3, 172:24,
174:20, 191:12,
196:18, 196:23,
197:3
**conclude** [5] - 152:15,
195:12, 206:20,
223:10, 223:14
**concluding** [1] - 146:3
**conclusion** [5] -
189:23, 195:15,
195:20, 196:7, 229:9
**condition** [6] - 89:5,
90:7, 91:23, 197:5,
206:8
**conditions** [6] - 78:2,
96:1, 144:18,
160:24, 207:8, 207:9
**CONDUCTED** [3] -
5:6, 210:21, 218:19
**conference** [1] - 19:13
**conferences** [11] -
80:1, 80:6, 114:21,
114:23, 115:7,
116:8, 116:19,
116:22, 117:15,
118:6, 119:23
**confinement** [5] -
76:24, 77:2, 77:4,
77:24, 78:8
**confirm** [1] - 152:20
**confirmed** [1] - 152:21
**conflict** [7] - 17:24,
21:11, 21:18, 21:23,
31:3, 31:17, 31:19
**conflicts** [3] - 21:15,
21:17, 21:19
**conjunction** [3] - 41:5,
74:21, 75:1
**consequences** [1] -

107:18
**consider** [14] - 82:20,
109:15, 109:18,
109:21, 110:7,
145:16, 154:13,
154:15, 173:3,
194:12, 210:16,
221:15, 222:6,
222:12
**considerations** [1] -
213:18
**considered** [1] -
194:18
**consistent** [2] - 21:5,
40:4
**consistently** [1] -
112:22
**constipation** [1] -
93:18
**constitutes** [1] - 91:18
**constriction** [1] -
188:21
**constructive** [1] -
23:22
**consult** [1] - 99:13
**consulted** [2] - 99:10,
216:20
**contacted** [1] - 12:22
**contemporaneous** [1]
- 62:23
**contemporaneously**
[5] - 62:20, 63:7,
111:5, 111:7, 129:7
**context** [12] - 22:11,
57:17, 65:3, 77:17,
77:18, 88:23, 93:17,
101:14, 107:22,
119:14, 162:11,
166:24
**contexts** [1] - 95:2
**CONTHR** [1] - 126:24
**CONTHR-NNO** [1] -
126:24
**contiguous** [3] -
19:11, 120:2, 120:16
**continue** [6] - 6:13,
23:17, 127:13,
129:23, 144:12,
151:2
**continued** [2] - 17:8,
196:13
**continuing** [4] -
114:22, 118:1,
148:18, 191:1
**continuity** [2] - 49:2,
57:14
**continuously** [1] -
62:21
**contract** [2] - 120:10,
120:11

**control** [11] - 54:17, 66:2, 127:20, 127:23, 189:12, 190:3, 190:12, 190:20, 208:6, 208:7, 219:17
**Control** [16] - 189:15, 189:18, 189:23, 190:2, 190:6, 190:9, 190:11, 190:13, 190:14, 194:21, 197:13, 197:21, 207:15, 222:22, 223:2, 223:12
**controlled** [3] - 54:24, 160:16, 214:19
**conversation** [22] - 53:12, 56:19, 56:20, 145:18, 145:19, 147:8, 148:3, 148:4, 148:11, 149:18, 149:19, 150:10, 156:2, 156:19, 180:21, 183:12, 183:13, 195:11, 206:22, 207:5, 207:6, 218:20
**conversations** [13] - 41:6, 41:12, 41:21, 146:17, 146:20, 181:14, 182:6, 184:13, 192:7, 208:23, 209:4, 209:24, 210:4
**conveyed** [1] - 199:21
**cooperative** [1] - 173:17
**coordinate** [1] - 47:6
**coordinating** [1] - 92:18
**coordination** [2] - 47:2, 57:20
**copies** [2] - 2:19, 120:3, 125:3
**copy** [2] - 100:23, 229:12
**corner** [1] - 185:12
**Corporate** [9] - 20:18, 31:21, 41:16, 45:11, 46:11, 48:10, 48:13, 63:24
**corporate** [1] - 48:20
**correct** [145] - 6:20, 15:1, 17:12, 19:7, 19:14, 19:16, 19:17, 23:4, 23:5, 24:16, 30:15, 30:16, 31:1, 31:2, 34:4, 35:7, 36:13, 36:15, 38:6, 38:8, 38:9, 38:18,

38:22, 43:17, 45:9, 45:12, 53:18, 61:13, 61:17, 63:4, 64:21, 65:15, 65:19, 66:11, 68:13, 70:13, 70:16, 70:20, 72:4, 74:2, 74:8, 74:14, 74:18, 75:24, 76:6, 76:13, 78:22, 87:6, 92:20, 93:8, 93:10, 93:18, 95:19, 105:22, 106:2, 107:9, 112:6, 115:22, 119:1, 119:4, 119:11, 120:21, 121:3, 121:18, 122:17, 122:20, 122:21, 123:9, 125:14, 125:15, 129:3, 129:7, 129:13, 129:21, 130:22, 133:12, 133:21, 136:3, 136:4, 136:9, 138:14, 138:15, 138:21, 138:22, 140:2, 143:13, 143:18, 147:4, 147:16, 148:10, 149:20, 149:24, 158:4, 160:5, 164:8, 168:19, 168:21, 169:1, 174:5, 174:6, 187:1, 187:14, 191:3, 194:3, 194:21, 194:22, 197:11, 197:12, 197:14, 197:15, 197:17, 197:18, 198:6, 198:15, 200:1, 200:5, 200:8, 200:16, 200:23, 201:2, 201:4, 201:6, 201:7, 202:16, 202:17, 202:21, 207:11, 207:12, 207:13, 207:15, 211:10, 212:6, 217:14, 217:23, 220:3, 220:6, 220:7, 221:19, 221:23, 222:23, 223:3, 223:8, 223:18, 224:11, 225:10
**Correct** [14] - 11:14, 19:8, 19:20, 39:3, 74:13, 108:3, 114:15, 135:10, 158:7, 158:13, 176:1, 187:2, 187:17, 200:3
**Correctional** [6] -

3:16, 31:15, 75:22, 83:23, 208:13, 208:18
**correctional** [2] - 159:22, 159:23
**CORRECTIONAL** [2] - 1:11, 227:5
**corrections** [1] - 227:7
**corrective** [2] - 23:2, 23:6
**correctly** [6] - 73:21, 155:16, 159:17, 161:14, 224:9, 224:10
**cost** [2] - 218:21, 218:24
**Counsel** [4] - 29:20, 123:14, 137:19, 140:21
**counseling** [19] - 163:21, 164:8, 164:18, 165:16, 166:16, 166:18, 166:20, 167:1, 167:14, 168:20, 168:24, 169:16, 169:20, 170:6, 170:11, 170:20, 171:2, 178:16, 178:22
**Counseling** [3] - 169:4, 169:8, 169:10
**count** [1] - 86:11
**COUNTY** [3] - 1:9, 225:1, 227:4
**County** [67] - 3:10, 13:1, 13:20, 14:8, 16:18, 16:21, 17:1, 34:18, 43:14, 47:4, 49:15, 50:1, 50:13, 56:7, 59:8, 59:16, 79:17, 82:5, 82:14, 83:20, 84:3, 84:6, 84:12, 88:24, 95:11, 96:2, 96:15, 97:6, 99:2, 99:11, 100:7, 101:18, 102:11, 103:5, 103:16, 105:19, 110:15, 114:5, 118:5, 118:13, 119:5, 119:9, 134:9, 137:4, 138:24, 149:11, 167:17, 169:5, 170:9, 170:18, 175:4, 178:17, 196:20, 201:11, 207:10, 211:13, 211:18, 211:24, 213:8, 215:17,

217:3, 217:8, 217:13, 218:3, 221:1, 221:16, 221:23
**couple** [4] - 18:4, 102:18, 193:16, 202:3
**course** [6] - 22:7, 59:15, 119:15, 124:15, 132:18, 166:18
**Court** [10] - 11:23, 36:1, 120:5, 125:10, 137:21, 216:6, 216:9, 218:2, 225:6, 229:1
**COURT** [3] - 1:1, 1:23, 142:4
**covered** [2] - 119:7, 119:14
**coworkers** [3] - 22:18, 22:22, 24:20
**CQI** [1] - 58:8
**CRAGGS** [1] - 225:20
**Craggs** [5] - 1:18, 2:9, 225:5, 229:1, 229:18
**create** [2] - 96:18, 123:17
**created** [3] - 96:14, 116:5, 175:8
**credits** [2] - 117:24, 118:2
**Crisis** [2] - 84:5, 84:7
**crisis** [2] - 97:5, 98:20
**criteria** [12] - 153:21, 153:22, 153:23, 153:24, 155:20, 155:22, 156:10, 156:14, 157:7, 157:9, 157:13, 157:22
**critical** [1] - 41:23
**criticism** [11] - 20:20, 23:11, 23:22, 24:19, 30:20, 40:7, 40:11, 40:24, 41:22, 42:14, 42:17
**CROSS** [2] - 4:2, 210:21
**crossed** [2] - 121:19, 122:9
**CSR** [7] - 1:18, 2:9, 225:5, 225:20, 225:21, 229:1, 229:18
**CTAB** [1] - 126:13
**cure** [2] - 190:23, 215:1
**current** [2] - 158:11, 158:12

**custody** [6] - 50:13, 217:2, 217:7, 217:13, 217:18, 218:4
**cut** [2] - 152:2, 203:20
**cutoff** [1] - 117:2
**cutting** [1] - 6:10

## D

**daily** [4] - 43:10, 60:15, 84:21, 196:11
**Dambacher** [22] - 15:24, 16:12, 17:2, 19:3, 24:11, 30:24, 31:4, 31:17, 32:19, 34:3, 34:13, 34:16, 35:4, 35:11, 37:19, 38:18, 39:2, 202:15, 202:18, 204:6, 204:7, 204:9
**Dambacher's** [1] - 60:1
**Dan** [12] - 16:3, 16:20, 17:13, 17:16, 18:23, 32:4, 56:24, 57:2, 57:3, 108:16, 181:21
**Daniels** [2] - 56:23, 57:4
**date** [15] - 8:18, 21:4, 21:5, 40:21, 53:3, 121:12, 121:17, 121:23, 121:24, 122:9, 123:21, 125:19, 125:20, 203:19, 203:20
**Dated** [1] - 225:23
**dated** [3] - 12:15, 120:23, 203:20
**dates** [1] - 63:14
**days** [16] - 15:8, 15:19, 17:22, 18:7, 26:4, 30:12, 30:13, 41:8, 60:17, 67:22, 68:1, 69:22, 69:23, 130:4, 188:11, 229:12
**deal** [2] - 30:4, 90:11
**dealing** [3] - 98:24, 214:6, 214:10
**dealt** [2] - 213:19, 214:16
**Dear** [1] - 229:5
**death** [4] - 8:2, 131:12, 132:1, 136:7
**DECEASED** [2] - 1:6, 227:4
**December** [6] - 125:14, 126:4,

128:10, 130:2,
131:6, 201:11
**decided** [1] - 38:24
**deciding** [1] - 12:21
**decision** [4] - 27:5,
51:10, 69:13, 160:12
**decisions** [2] -
144:13, 171:5
**decompensation** [9] -
72:16, 72:19, 72:22,
73:3, 75:23, 76:6,
76:17, 77:1, 80:3
**decreased** [3] - 14:14,
14:15, 14:19
**Defendants** [2] - 1:14,
3:9
**deficiency** [1] - 220:2
**define** [5] - 35:2,
111:6, 162:24,
163:6, 165:5
**definition** [7] - 32:8,
161:18, 163:8,
163:11, 163:23,
165:4
**definitions** [1] - 163:7
**definitive** [1] - 37:21
**definitively** [1] -
213:18
**Degree** [1] - 8:19
**degree** [4] - 8:21,
8:22, 9:24
**degrees** [2] - 8:20, 9:1
**delete** [3] - 29:5,
29:18, 30:3
**deleted** [1] - 29:12
**delivery** [2] - 23:13,
23:23
**delusions** [1] - 157:4
**demeanor** [1] - 210:7
**demonstrated** [1] -
30:11
**denied** [1] - 220:23
**denies** [8] - 126:10,
145:23, 147:19,
186:21, 188:17,
189:1, 189:6, 197:11
**Depakote** [1] - 143:15
**Department** [2] -
33:11, 40:5
**department** [1] - 93:22
**deposed** [4] - 5:12,
5:15, 5:16, 5:21
**deposition** [14] - 1:17,
2:3, 2:14, 2:15, 2:19,
6:18, 7:9, 30:1,
124:13, 132:13,
185:24, 209:20,
229:6, 229:9
**depositions** [2] - 2:18,
137:21

**depression** [7] -
148:6, 154:2, 167:2,
167:3, 208:2, 208:3
**derive** [1] - 171:16
**describe** [3] - 112:18,
121:9, 168:23
**described** [2] - 39:14,
43:15
**describing** [1] - 83:18
**description** [3] -
12:15, 45:7, 46:16
**descriptions** [1] -
180:24
**designated** [1] - 46:21
**detail** [1] - 152:14
**details** [4] - 140:6,
182:5, 182:6, 183:13
**deterioration** [1] -
216:19
**determination** [10] -
54:11, 57:8, 102:22,
103:2, 108:23,
109:3, 111:22,
130:9, 171:12,
171:14
**determinations** [2] -
100:15, 205:4
**determinative** [4] -
154:22, 155:1,
155:9, 155:11
**determine** [10] - 74:7,
90:4, 97:2, 171:15,
173:5, 176:6, 176:8,
204:13, 206:14,
213:4
**determined** [6] - 54:7,
102:17, 104:21,
105:9, 204:23,
206:13
**determines** [3] -
76:19, 97:13, 97:15
**determining** [1] -
144:9
**detrimental** [1] - 77:5
**developing** [3] -
169:3, 169:7, 170:2
**DeWitt** [1] - 14:2
**diagnose** [9] - 32:21,
144:20, 159:3,
159:7, 159:11,
162:17, 187:23,
189:17, 219:2
**diagnosed** [4] - 83:4,
151:22, 152:19,
223:11
**diagnoses** [10] -
83:12, 145:11,
145:14, 145:17,
151:7, 167:4,
190:17, 197:22,

208:1, 222:21
**diagnosing** [3] -
146:4, 155:17,
189:15
**diagnosis** [38] - 51:23,
83:1, 83:4, 83:6,
86:22, 86:24, 87:2,
87:24, 88:2, 91:13,
94:8, 94:14, 144:15,
145:6, 145:9, 146:3,
147:3, 147:15,
147:23, 148:8,
149:15, 151:7,
151:21, 152:6,
152:9, 152:21,
152:23, 152:24,
153:7, 153:16,
153:20, 156:11,
187:21, 187:24,
189:12, 194:20,
197:19, 201:12
**diagnostic** [1] -
152:20
**diarrhea** [3] - 186:22,
188:17, 189:1
**difference** [4] - 88:4,
168:3, 168:4, 168:24
**differences** [6] -
43:19, 44:22, 45:1,
45:2, 45:4, 208:5
**different** [21] - 43:21,
44:17, 44:21, 45:22,
90:22, 111:20,
116:11, 116:16,
154:18, 157:3,
161:8, 161:11,
162:19, 162:21,
162:22, 165:17,
185:12, 205:7,
207:20, 219:4
**differential** [1] - 94:12
**differentiate** [1] -
169:13
**difficult** [3] - 207:23,
214:7, 214:11
**difficulty** [1] - 192:11
**diligence** [1] - 32:15
**DIRECT** [2] - 4:2, 5:5
**direct** [1] - 112:20
**directly** [4] - 34:14,
99:14, 112:21, 173:6
**Director** [5] - 12:22,
31:21, 41:17, 45:12,
115:18
**dirt** [1] - 220:4
**discharge** [14] - 131:1,
131:2, 131:16,
131:21, 132:14,
133:4, 134:2, 134:6,
136:2, 137:10,

138:14, 139:24,
140:9, 140:15
**Discharge** [2] - 142:8,
142:14
**discharged** [2] -
130:18, 218:4
**discharging** [2] -
217:2, 217:7
**discontinuation** [1] -
145:24
**discontinue** [3] -
130:10, 147:21,
151:3
**discuss** [2] - 29:24,
34:14
**discussed** [3] - 85:15,
118:8, 132:21
**discussing** [2] -
90:18, 104:20
**discussion** [5] -
18:17, 21:21, 48:1,
48:8, 195:21
**Discussion** [1] - 12:7
**discussions** [3] -
21:19, 21:20, 48:5
**disease** [4] - 107:14,
107:17, 153:21,
208:8
**disorder** [7] - 83:14,
158:24, 189:13,
189:14, 208:7,
208:8, 208:9
**Disorder** [17] - 189:15,
189:18, 189:23,
190:2, 190:6, 190:9,
190:11, 190:13,
190:14, 194:21,
197:13, 197:22,
207:13, 207:15,
222:23, 223:2,
223:12
**Disorders** [2] -
207:18, 207:19
**disorders** [1] - 190:15
**disorganized** [2] -
156:23, 157:5
**displaying** [2] -
205:11, 205:18
**distinguished** [1] -
168:17
**distinguishing** [1] -
168:21
**distribution** [1] - 85:5
**DISTRICT** [2] - 1:1, 1:2
**doc** [1] - 180:19
**Doc** [1] - 208:19
**doctor** [1] - 158:4
**DOCTOR** [5] - 1:17,
2:4, 4:3, 5:1, 227:2
**Doctor** [43] - 5:7, 9:13,

9:16, 27:24, 28:1,
28:22, 29:3, 30:11,
30:17, 33:6, 39:20,
40:3, 41:14, 41:15,
41:16, 41:22, 42:12,
45:14, 45:23, 50:23,
58:15, 69:1, 70:18,
77:11, 88:7, 93:5,
101:10, 101:13,
102:9, 107:5,
115:15, 117:18,
128:2, 153:5, 165:3,
165:5, 167:9,
199:18, 207:3,
210:19, 229:6
**Doctors** [1] - 114:11
**document** [39] -
19:10, 25:17, 25:18,
29:23, 31:14, 33:10,
35:1, 39:7, 42:18,
42:20, 45:8, 57:11,
59:7, 64:18, 67:18,
95:2, 98:7, 98:9,
98:17, 124:23,
128:23, 129:5,
129:12, 129:16,
145:19, 150:3,
170:11, 170:23,
171:23, 176:7,
176:13, 176:18,
176:23, 176:24,
178:2, 178:5, 178:7,
186:10, 187:13
**documentation** [12] -
22:2, 22:6, 22:14,
37:8, 86:19, 123:13,
135:17, 150:7,
171:3, 171:24,
173:4, 176:22
**documented** [8] -
64:11, 64:19, 64:20,
65:8, 65:10, 65:13,
97:1, 123:3
**documenting** [2] -
85:23, 173:1
**documents** [9] - 7:8,
41:10, 49:22, 98:18,
124:20, 135:19,
180:24, 218:2
**DOES** [2] - 1:13, 227:6
**don't...** [1] - 113:1
**done** [5] - 71:2, 94:10,
112:3, 194:10,
216:11
**door** [2] - 183:22,
185:13
**down** [13] - 2:11, 6:15,
60:19, 65:18, 78:21,
104:14, 141:3,
170:22, 180:4,

180:19, 188:3,
224:9, 224:10
**drinking** [6] - 53:10,
53:11, 53:17, 53:20,
55:8, 102:21
**DSM** [12] - 153:18,
153:22, 153:23,
154:10, 154:12,
155:21, 156:10,
157:10, 157:14,
157:15, 157:22,
157:23
**DSM-V** [12] - 153:18,
153:22, 153:23,
154:10, 154:12,
155:21, 156:10,
157:10, 157:14,
157:15, 157:22,
157:23
**due** [3] - 32:15, 108:8,
117:17
**duly** [1] - 5:3
**duration** [2] - 20:10
**during** [16] - 26:11,
68:6, 71:20, 85:4,
98:16, 101:6,
119:10, 128:21,
132:17, 172:9,
172:20, 180:20,
193:13, 196:19,
204:22, 205:3
**duties** [6] - 33:17,
36:22, 37:1, 38:5,
43:20, 59:15
**duty** [1] - 92:15

**E**

**e-mails** [3] - 29:5,
29:8, 29:15
**EALEY** [2] - 1:13,
227:6
**Ealey** [1] - 3:9
**ears** [2] - 69:17, 76:13
**easier** [1] - 11:18
**eat** [3] - 55:4, 215:4,
220:4
**eaten** [2] - 212:24
**eating** [12] - 53:10,
53:11, 53:17, 53:20,
55:8, 72:2, 72:3,
73:11, 92:1, 102:20,
219:13, 219:16
**ECT** [2] - 165:24,
166:1
**education** [2] - 118:1,
128:3
**Education** [1] - 114:22
**effect** [4] - 77:5, 78:1,

78:5, 78:14
**effective** [7] - 191:8,
195:1, 195:14,
195:24, 196:3,
204:24, 206:2
**effectively** [1] - 54:17
**effects** [1] - 78:8
**Effexor** [3] - 143:19,
202:1, 202:5
**effort** [2] - 214:22,
218:3
**either** [8] - 28:18,
29:6, 37:22, 43:15,
68:6, 148:13, 217:8,
218:6
**Either** [1] - 28:19
**electroconvulsive** [1]
- 166:2
**element** [1] - 151:18
**elements** [2] - 154:2,
159:13
**elevators** [2] - 185:8,
185:9
**email** [8] - 28:1, 28:7,
28:10, 28:13, 28:20,
29:12, 29:19, 151:13
**emails** [1] - 29:18
**Emergency** [5] - 51:2,
52:10, 213:1, 213:3,
213:11
**emergent** [2] - 68:8,
135:18
**empathetic** [1] -
209:13
**employed** [2] - 14:8,
118:4
**employees** [2] -
116:11, 209:16
**employment** [2] -
11:20, 26:11
**Enclosed** [1] - 229:6
**enclosed** [1] - 229:10
**end** [8] - 44:16, 66:23,
70:18, 71:3, 71:10,
74:1, 74:8, 229:10
**enforce** [1] - 215:20
**Enforcement** [1] -
216:15
**enforcing** [1] - 216:2
**engage** [2] - 215:8,
215:12
**engaged** [3] - 136:6,
221:22, 222:3
**enjoy** [1] - 207:7
**entail** [4] - 33:9, 33:22,
33:24, 136:23
**entailed** [1] - 33:22
**enter** [1] - 25:6
**entered** [1] - 130:12
**entitled** [1] - 229:11

**entries** [1] - 203:14
**episode** [12] - 103:18,
104:3, 104:10,
105:4, 106:17,
109:16, 109:19,
109:22, 110:5,
110:8, 110:12,
216:23
**episodes** [12] - 20:11,
66:1, 90:12, 90:14,
109:6, 109:8,
109:12, 111:19,
130:15, 190:19,
190:22
**equipped** [1] - 90:14
**equivalent** [2] - 95:9,
115:21
**ER** [32] - 51:8, 51:11,
53:4, 53:9, 53:18,
56:1, 81:7, 81:8,
91:6, 91:10, 91:24,
92:10, 92:11, 92:13,
94:23, 102:20,
102:24, 103:19,
104:4, 104:6,
104:11, 104:12,
104:13, 105:5,
105:11, 106:2,
106:17, 107:9,
194:10, 213:2,
216:24
**Ernest** [9] - 24:7, 59:6,
59:7, 59:23, 61:5,
199:2, 199:7,
199:24, 200:19
**Ernest's** [1] - 198:24
**Errata** [2] - 229:11,
229:12
**ERRATA** [1] - 227:1
**erratic** [1] - 72:21
**errors** [1] - 224:11
**especially** [2] - 22:5,
130:17
**Esq** [4] - 3:3, 3:7,
3:12, 3:13
**essential** [1] - 46:17
**essentially** [2] - 39:15,
95:19
**Estate** [1] - 5:10
**ESTATE** [2] - 1:6,
227:4
**eval** [1] - 30:11
**evaluate** [3] - 104:14,
169:17, 194:23
**evaluated** [4] - 94:3,
104:5, 130:8, 151:4
**evaluating** [1] -
196:11
**Evaluation** [2] - 86:14,
88:12

**evaluation** [21] - 18:5,
22:21, 51:5, 80:17,
83:3, 91:19, 91:21,
92:3, 92:8, 92:11,
92:14, 98:15, 99:24,
101:9, 101:15,
128:22, 144:5,
147:12, 148:9,
171:15, 216:11
**evaluations** [2] -
41:10, 171:19
**events** [1] - 73:7
**eventually** [3] - 19:19,
52:15, 105:24
**everyday** [1] - 139:20
**evidence** [1] - 110:18
**exacerbates** [1] - 78:3
**exact** [6] - 40:21,
51:18, 115:22,
148:3, 156:2, 179:2
**exactly** [14] - 8:17,
11:6, 19:2, 33:21,
45:21, 49:23, 55:22,
106:12, 119:2,
148:1, 152:13,
156:19, 157:6,
179:23
**examination** [1] -
189:7
**EXAMINATION** [3] -
5:5, 210:21, 218:18
**examine** [2] - 46:22,
128:8
**examined** [6] -
122:22, 123:1,
123:4, 123:11,
126:4, 128:11
**examining** [1] - 128:9
**example** [9] - 42:5,
91:22, 102:8,
102:18, 105:16,
145:1, 152:17,
202:10, 223:7
**examples** [1] - 219:23
**except** [1] - 40:15
**excerpt** [1] - 144:24
**exclusive** [1] - 15:20
**exclusively** [1] - 17:7
**excuse** [16] - 8:11,
50:2, 73:22, 80:15,
103:3, 113:4,
118:14, 123:7,
146:3, 165:23,
170:20, 178:15,
184:13, 184:16,
187:19, 198:4
**execute** [1] - 96:16
**EXHIBIT** [1] - 4:6
**exhibit** [6] - 72:14,
179:9, 186:4,

198:20, 202:1,
202:11
**Exhibit** [14] - 4:7, 4:7,
4:8, 11:20, 11:22,
61:5, 80:19, 120:1,
120:4, 125:9, 175:4,
176:13, 185:23,
188:8
**exhibited** [2] - 75:2,
81:11
**exhibiting** [2] - 70:4,
105:8
**exhibits** [1] - 175:9
**EXHIBITS** [1] - 4:14
**exist** [1] - 96:1
**existed** [1] - 136:13
**exists** [1] - 29:19
**expect** [1] - 75:3
**expectation** [1] -
30:13
**expectations** [1] -
118:5
**expense** [1] - 2:21
**experience** [3] -
21:11, 108:9, 215:7
**explain** [4] - 33:21,
34:22, 91:1, 196:6
**explained** [2] - 66:13,
94:20
**explaining** [1] - 6:5
**expressed** [1] - 41:22
**expression** [1] - 129:9
**extended** [2] - 76:24,
77:2
**extent** [3] - 162:14,
163:5, 213:12
**extremity** [4] - 127:4,
128:12, 186:23,
188:16
**eyes** [3] - 69:17,
76:12, 112:20

**F**

**facilities** [16] - 13:3,
13:20, 14:2, 14:5,
17:6, 17:8, 49:2,
49:9, 51:1, 57:13,
57:23, 58:3, 103:23,
104:9, 148:16,
220:19
**Facility** [5] - 103:21,
130:17, 130:19,
214:1, 215:14
**facility** [45] - 14:24,
20:16, 25:6, 30:18,
33:3, 33:16, 43:7,
46:21, 47:8, 49:21,
50:3, 50:9, 50:12,

50:18, 52:3, 53:14, 53:23, 54:1, 57:21, 57:23, 63:13, 83:1, 101:19, 103:22, 104:7, 104:9, 105:2, 108:10, 108:11, 108:21, 108:24, 110:1, 110:2, 112:1, 130:11, 135:14, 148:14, 148:22, 150:11, 151:12, 151:15, 193:10, 196:10, 213:17
**fact** [4] - 36:23, 51:19, 72:12, 197:4
**factor** [3] - 77:1, 77:3, 222:7
**factors** [7] - 69:12, 144:10, 144:11, 215:3, 221:19, 222:1, 222:6
**factual** [1] - 65:3
**failure** [1] - 66:1
**fair** [9] - 15:15, 18:21, 20:20, 23:11, 48:8, 111:12, 210:23, 218:9, 218:11
**fall** [2] - 154:11, 161:18
**falls** [2] - 161:4, 165:9
**familiar** [15] - 88:23, 96:9, 101:11, 115:15, 143:5, 149:2, 153:18, 157:16, 158:1, 164:12, 170:17, 176:17, 176:18, 178:9, 218:10
**Family** [16] - 8:10, 8:13, 8:16, 10:11, 11:13, 90:16, 94:21, 158:8, 158:17, 159:7, 159:15, 160:3, 161:2, 161:15, 167:8
**family** [6] - 90:15, 91:9, 158:4, 179:24, 209:11, 210:1
**far** [3] - 18:3, 42:8, 103:24
**faulty** [1] - 96:11
**fax** [1] - 151:13
**February** [6] - 182:3, 195:17, 195:20, 200:4, 200:22, 201:1
**feces** [7] - 55:3, 55:4, 55:12, 72:2, 72:3, 73:11, 92:1
**Federal** [1] - 137:21
**felt** [15] - 15:14, 20:12,

20:16, 23:10, 39:12, 54:16, 54:24, 84:2, 99:3, 105:14, 191:18, 192:16, 192:17, 196:12, 209:13
**female** [1] - 108:18
**few** [4] - 18:20, 210:20, 218:14, 218:16
**field** [1] - 22:5
**fifth** [1] - 137:23
**file** [7] - 7:12, 7:16, 7:20, 7:23, 8:3, 11:20, 12:3, 64:5, 120:13, 120:15, 137:4, 138:23, 139:2, 143:1, 143:6, 174:23, 180:11, 181:2
**filed** [7] - 66:19, 86:10, 139:5, 139:6, 140:5, 209:17, 218:2
**filing** [1] - 66:24
**fill** [4] - 13:24, 88:12, 179:15, 186:11
**filling** [1] - 121:12
**finally** [2] - 40:23, 42:12
**financially** [1] - 225:15
**fine** [6] - 7:4, 12:3, 161:24, 163:10, 169:14, 220:16
**finger** [1] - 210:11
**finish** [2] - 6:9, 6:11
**finished** [1] - 14:20
**fired** [9] - 19:19, 24:23, 25:9, 25:15, 25:22, 25:24, 26:14, 28:8, 41:2
**firing** [1] - 26:3
**first** [35] - 5:15, 6:22, 7:22, 11:4, 11:12, 12:1, 12:24, 17:17, 17:24, 18:13, 19:21, 21:14, 23:19, 41:3, 42:1, 50:21, 55:15, 57:1, 104:19, 120:17, 121:2, 121:5, 121:13, 121:17, 122:22, 124:16, 124:19, 127:10, 131:8, 132:7, 136:2, 145:1, 161:17, 176:5, 215:21
**fit** [6] - 54:8, 54:11, 100:9, 100:17, 104:22, 216:10
**fitness** [1] - 101:14

**five** [1] - 55:19
**fixing** [1] - 118:20
**flag** [2] - 66:5, 69:1
**flare** [8] - 91:14, 190:16, 191:12, 191:18, 194:13, 194:18, 196:15, 214:18
**flare-up** [3] - 91:14, 194:13, 194:18
**flare-ups** [5] - 190:16, 191:12, 191:18, 196:15, 214:18
**flip** [6] - 12:10, 19:11, 17:24, 35:22, 188:6, 193:16
**floor** [1] - 113:13
**Floor** [1] - 113:20
**folder** [1] - 66:21
**folks** [1] - 54:5
**follow** [10] - 68:24, 91:2, 154:10, 185:11, 185:14, 190:17, 213:10, 218:15, 218:17
**follow-up** [2] - 218:15, 218:17
**followed** [1] - 153:24
**following** [2] - 8:1, 21:16
**follows** [1] - 5:4
**food** [3] - 215:5, 219:14, 219:16
**foods** [1] - 210:11
**foot** [1] - 197:14
**force** [2] - 100:3, 216:21
**forcing** [1] - 216:13
**foregoing** [3] - 225:9, 227:2
**foreign** [2] - 194:10, 194:15
**form** [41] - 21:4, 22:11, 35:1, 52:8, 55:1, 60:12, 62:13, 65:2, 86:18, 86:19, 103:9, 106:21, 107:15, 110:20, 122:3, 129:15, 137:7, 154:23, 155:3, 155:10, 162:2, 162:14, 163:5, 163:16, 165:10, 167:3, 171:7, 171:21, 171:24, 172:1, 174:1, 174:11, 176:17, 176:24, 179:4, 179:10, 179:13, 205:7, 205:23,

214:8, 219:7
**Form** [3] - 59:9, 61:23, 62:19
**formal** [4] - 39:7, 44:10, 66:8, 67:12
**formalize** [1] - 30:1
**formally** [1] - 66:5
**forming** [1] - 178:2
**Forms** [1] - 59:15
**forth** [2] - 36:23, 154:13
**forthcoming** [1] - 208:18
**forward** [2] - 98:13, 152:24
**foundation** [6] - 2:17, 27:4, 27:12, 37:3, 103:7, 221:9
**four** [5] - 20:13, 30:10, 48:21, 130:4, 141:23
**fourth** [1] - 186:3
**fracture** [5] - 126:8, 127:2, 128:3, 145:10, 187:5
**frame** [2] - 128:21, 148:2
**frankly** [1] - 141:1
**free** [5] - 6:21, 36:20, 37:6, 201:3, 221:7
**frequency** [1] - 196:15
**frequently** [1] - 179:17
**fresh** [1] - 62:18
**front** [3] - 42:22, 202:2, 220:12
**fulfill** [2] - 42:13, 157:7
**fulfilled** [1] - 48:2
**fulfilling** [2] - 34:7, 34:11
**full** [8] - 13:6, 13:16, 17:5, 20:7, 89:1, 119:21, 144:2
**functions** [2] - 46:17, 46:19
**furnished** [1] - 2:20
**future** [1] - 98:12

## G

**games** [1] - 185:21
**gel** [1] - 173:18
**gelled** [1] - 173:20
**general** [10] - 64:14, 78:12, 83:19, 107:12, 109:5, 156:22, 157:18, 157:19, 164:23, 178:8
**generally** [1] - 83:17

**gentleman** [6] - 51:14, 51:18, 55:7, 56:1, 102:19, 102:20
**genuine** [1] - 76:20
**gesture** [1] - 76:21
**given** [8] - 15:14, 20:24, 58:6, 148:19, 212:12, 214:21, 220:19, 227:2
**glass** [1] - 112:22
**gmail** [1] - 28:17
**gmail.com** [1] - 28:23
**gosh** [2] - 114:18, 216:8
**governing** [1] - 97:8
**graduated** [1] - 10:15
**great** [3] - 164:21, 182:18, 206:22
**group** [1] - 185:24
**Group** [3] - 4:7, 120:1, 120:4
**guess** [14] - 17:14, 21:12, 21:20, 25:13, 48:6, 58:21, 72:2, 105:5, 118:7, 161:7, 185:13, 200:12, 209:14
**guiding** [1] - 155:19
**guy** [1] - 56:24
**Guy** [1] - 3:9
**GUY** [2] - 1:13, 227:6
**guys** [1] - 127:23

## H

**habits** [4] - 34:1, 36:15, 38:8, 67:9
**half** [5] - 9:17, 10:8, 19:18, 24:16, 148:2
**hallucinations** [1] - 157:4
**hallway** [2] - 112:22, 183:9
**hand** [3] - 11:18, 12:11, 153:12
**handing** [1] - 125:12
**handle** [3] - 29:23, 90:14, 104:8
**handwrite** [1] - 179:5
**handwriting** [17] - 120:24, 121:6, 121:7, 121:8, 121:10, 121:11, 121:14, 125:16, 125:17, 125:20, 125:23, 126:1, 126:18, 177:6, 177:7, 193:20, 198:21

handwritten [2] - 203:15, 203:24
Hang [1] - 12:5
happy [1] - 141:19
hard [3] - 22:9, 106:9, 106:11
hardship [1] - 40:5
harm [15] - 51:16, 51:17, 72:18, 73:6, 76:15, 84:16, 192:20, 192:21, 215:8, 215:11, 215:13, 221:22, 221:24, 222:1, 222:3
harsh [1] - 20:17
head [2] - 106:5, 221:11
heading [1] - 165:14
health [23] - 43:13, 72:12, 73:17, 77:5, 78:1, 79:11, 79:12, 79:14, 90:7, 92:7, 105:7, 113:10, 115:7, 144:16, 165:19, 193:3, 195:24, 205:17, 207:8, 207:9, 216:19, 222:18
Health [54] - 75:9, 77:14, 79:16, 81:1, 81:13, 81:17, 81:18, 82:24, 83:3, 84:19, 86:3, 86:9, 86:13, 86:16, 87:24, 88:12, 89:4, 103:21, 112:2, 113:10, 114:20, 115:18, 115:24, 116:3, 116:13, 118:12, 118:16, 118:17, 118:18, 119:2, 119:14, 130:8, 130:11, 130:15, 130:16, 130:19, 131:2, 137:17, 147:11, 153:15, 162:16, 170:9, 170:19, 196:9, 211:5, 211:6, 211:13, 211:19, 212:15, 213:24, 215:14, 216:11, 217:9
Health-wise [1] - 211:19
HEALTHCARE [2] - 1:11, 227:5
healthcare [8] - 43:14, 48:4, 48:7, 49:1, 49:9, 57:13, 79:13, 79:16

Healthcare [4] - 3:16, 79:23, 83:23, 96:14
hear [7] - 31:8, 102:16, 163:10, 182:15, 182:24, 183:10, 183:12
heard [10] - 30:19, 40:7, 40:23, 40:24, 41:4, 42:14, 42:16, 129:9, 164:1, 183:12
heart [3] - 126:16, 128:11, 187:1
heavily [1] - 58:12
held [1] - 32:12
helpful [4] - 111:16, 135:3, 144:24, 153:4
hence [1] - 193:12
HENDERSON [3] - 1:20, 2:6, 3:12
hereby [2] - 2:4, 225:7
herein [3] - 2:3, 5:2, 225:14
hereto [1] - 2:16
herewith [1] - 229:6
herself [1] - 196:24
hesitate [1] - 229:14
hesitated [1] - 224:15
HEYL [1] - 3:6
Hicks [2] - 175:5, 176:13
hierarchy [1] - 44:2
high [1] - 112:7
High [34] - 43:9, 71:20, 78:18, 78:24, 79:4, 79:8, 84:17, 97:16, 97:17, 97:20, 98:5, 98:11, 98:14, 98:24, 112:5, 112:8, 112:14, 112:17, 112:19, 113:12, 113:13, 113:19, 121:16, 127:16, 128:15, 129:23, 130:10, 184:17, 186:19, 193:15, 194:2, 196:20, 197:10, 212:9
higher [1] - 99:3
highly [1] - 117:16
himself [1] - 51:17
hire [2] - 21:4
hired [8] - 12:1, 12:24, 15:12, 15:23, 16:9, 17:14, 39:10, 41:17
history [11] - 52:6, 134:24, 136:22, 137:3, 137:4, 139:16, 142:24, 143:5, 144:2, 221:20, 221:21

hold [2] - 29:14, 62:11
homicidal [3] - 128:16, 145:24, 189:6
homicide [1] - 147:20
honestly [1] - 25:1
hope [1] - 104:12
hospital [5] - 34:18, 211:21, 217:16, 217:22, 217:23
hospitalization [2] - 105:13, 107:14
hour [1] - 1:19, 2:5, 46:22, 138:4
hours [16] - 7:17, 14:12, 14:16, 14:21, 14:23, 15:12, 15:14, 15:15, 15:17, 15:19, 20:8, 40:12, 40:13, 70:10, 105:1, 131:20
housed [1] - 113:11, 113:14, 196:24
housing [5] - 97:9, 97:13, 97:15, 98:5, 98:19
HR [5] - 121:14, 121:15, 127:14, 127:15, 186:19
HS [2] - 147:20, 147:21
hundred [1] - 185:20
hurting [1] - 128:19

**I**

I.. [1] - 12:3
ID [1] - 121:13
idea [2] - 112:19, 219:1
ideal [1] - 106:15
ideation [2] - 145:23, 147:19
ideations [6] - 128:16, 145:24, 189:6, 193:8, 220:20, 220:22
identification [3] - 11:23, 120:5, 125:10
identified [2] - 80:21, 84:15
identify [2] - 80:24, 165:13
Ill [3] - 1:13, 3:9, 227:6
ill [1] - 97:3
Illinois [15] - 1:21, 1:22, 1:24, 2:7, 2:8, 3:5, 3:10, 3:14, 33:11, 117:10, 216:16, 225:7,

227:3, 229:2, 229:7
ILLINOIS [4] - 1:2, 1:9, 225:1, 227:4
illness [10] - 73:17, 78:7, 78:15, 109:8, 165:19, 194:14, 205:5, 222:18, 223:11
illnesses [3] - 155:18, 190:15, 190:16
immediate [1] - 22:2
immediately [3] - 18:18, 52:14, 52:16
impacts [1] - 40:6
impolite [5] - 19:6, 19:23, 22:17, 24:20, 25:16
important [2] - 22:6, 22:14, 64:17, 93:16, 129:12, 129:16, 133:3, 133:6, 133:8, 136:13, 136:16
impulse [5] - 189:12, 190:3, 207:15, 208:6, 208:7
Impulse [15] - 189:15, 189:17, 189:23, 190:2, 190:6, 190:9, 190:11, 190:12, 190:14, 194:21, 197:13, 197:21, 222:22, 223:2, 223:12
IN [1] - 1:1
inappropriate [2] - 190:11, 211:15
inbox [2] - 29:14, 138:19
Inc [1] - 3:16
INC [2] - 1:11, 227:5
incarceral [1] - 159:21
incarcerated [6] - 175:18, 178:13, 201:11, 212:14, 212:23
incarceration [4] - 188:17, 188:19, 190:20, 196:19
incident [3] - 94:2, 172:14, 201:8
incidents [2] - 174:21, 210:15
include [4] - 89:19, 90:8, 165:2, 165:5
included [2] - 58:11, 222:22
includes [1] - 38:7
including [4] - 75:6, 154:2, 177:7, 206:23
inconsistent [1] -

162:15
incorporated [1] - 88:11
incorrectly [1] - 141:6
incumbent [4] - 143:3, 143:7, 143:9, 144:1
independent [2] - 152:8, 216:11
independently [6] - 33:15, 35:12, 36:8, 44:24, 148:9
India [8] - 9:2, 9:3, 9:8, 9:13, 9:15, 10:4, 10:8, 158:20
indicate [3] - 123:11, 126:3, 202:18
indicated [2] - 212:13, 229:9
indicates [2] - 122:19, 204:9
indicating [2] - 76:5, 106:8
indication [1] - 203:23
individualized [2] - 98:21, 136:17, 136:18
informal [1] - 67:12
informally [1] - 29:24
information [24] - 7:2, 20:23, 21:14, 23:18, 36:2, 41:13, 115:6, 135:1, 135:2, 135:4, 136:15, 136:18, 138:9, 149:23, 150:4, 150:15, 150:16, 151:16, 151:20, 153:2, 153:10, 153:12, 199:21, 216:5
inhouse [3] - 80:20, 81:13, 81:17
initiate [1] - 83:5
injury [1] - 128:12
Inmate [6] - 5:23, 6:1, 121:13, 199:16, 215:17, 218:3
Inmates [1] - 55:3
inpatient [23] - 49:10, 49:21, 50:2, 50:6, 50:12, 52:17, 53:6, 54:6, 54:15, 55:17, 56:3, 56:6, 57:19, 104:7, 105:10, 105:13, 106:24, 112:1, 144:5, 196:10
inservice [2] - 48:1, 48:3
inside [2] - 166:19, 221:11
insomnia [1] - 154:2

**instance** [7] - 1:18, 2:8, 5:2, 31:17, 101:22, 107:10, 215:11
**instances** [3] - 172:9, 219:19, 221:14
**instead** [2] - 6:14, 161:16
**instituted** [1] - 67:13
**institutions** [1] - 13:20
**instructing** [1] - 65:6
**Intake** [1] - 52:7
**intending** [1] - 155:14
**intentions** [1] - 192:22
**interact** [1] - 207:2
**interacted** [2] - 149:12, 212:8
**interacting** [2] - 69:9, 71:16
**interaction** [5] - 69:4, 71:19, 147:12, 156:22, 208:20
**interactions** [9] - 24:2, 82:18, 148:24, 173:21, 179:3, 179:23, 206:11, 206:17, 206:19
**interested** [1] - 225:15
**interests** [1] - 144:6
**interfered** [2] - 211:24, 212:5
**internal** [2] - 124:2, 124:5
**international** [2] - 154:9, 155:5
**internationally** [2] - 153:24, 154:1
**interpret** [1] - 155:4
**interrogatories** [2] - 2:5, 2:10
**Intervention** [1] - 84:6
**intervention** [2] - 97:5, 98:20
**interview** [3] - 149:18, 152:16, 198:2
**interviewed** [2] - 12:20, 39:10
**interviews** [1] - 82:18
**involuntarily** [1] - 215:13
**involuntary** [1] - 213:24
**involve** [7] - 58:17, 89:3, 89:5, 89:11, 160:1, 160:4, 163:1
**involved** [19] - 40:1, 82:23, 97:5, 99:9, 139:19, 160:4, 160:8, 169:3, 169:7, 169:20, 170:1,

170:5, 170:10, 170:19, 216:1, 217:1, 217:6, 225:14
**involvement** [1] - 100:10
**involves** [3] - 6:21, 162:19, 164:13
**involving** [1] - 5:22
**isolation** [1] - 196:24
**issue** [13] - 17:15, 17:19, 17:20, 18:11, 18:19, 21:8, 21:12, 21:13, 26:10, 26:12, 30:14, 170:9
**issues** [11] - 15:7, 30:8, 42:4, 51:20, 114:20, 115:24, 116:3, 116:13, 119:2, 195:24, 208:7
**item** [1] - 40:3
**items** [1] - 219:13
**itself** [2] - 37:2, 151:21

## J

**Jail** [81] - 13:1, 13:21, 14:8, 16:18, 16:21, 25:5, 34:19, 40:6, 40:13, 43:14, 47:4, 49:15, 50:1, 50:13, 52:12, 56:7, 59:16, 79:17, 82:5, 82:14, 83:21, 84:3, 84:6, 84:12, 88:24, 95:11, 96:2, 96:15, 97:6, 99:2, 99:11, 100:7, 101:18, 102:11, 103:5, 103:16, 105:19, 110:16, 113:3, 114:4, 114:5, 118:5, 118:13, 119:5, 119:9, 134:9, 137:4, 138:24, 149:11, 166:19, 167:14, 167:17, 169:5, 169:9, 170:9, 170:18, 191:3, 196:20, 201:11, 206:24, 207:10, 211:13, 211:18, 211:24, 213:8, 213:20, 215:9, 215:17, 216:2, 217:3, 217:8, 217:13, 217:16, 217:18, 217:21, 218:3, 218:6, 221:2, 221:16, 221:23
**January** [11] - 12:10, 12:20, 21:5, 122:20,

145:5, 152:10, 156:11, 186:7, 187:16, 187:19, 187:20
**Jennifer** [1] - 3:9
**JENNIFER** [2] - 1:13, 227:6
**job** [19] - 6:5, 15:18, 20:7, 46:19, 46:22, 92:24, 115:22, 119:21, 137:2, 139:2, 139:10, 139:15, 140:18, 140:24, 141:17, 141:21, 142:8
**JOHNSTON** [3] - 1:20, 2:6, 3:12
**join** [1] - 162:18
**JR** [2] - 1:10, 227:5
**judgment** [6] - 65:24, 107:11, 144:8, 144:14, 153:7, 223:20
**July** [1] - 229:3
**June** [5] - 1:19, 2:5, 3:1, 227:3, 229:7
**jurisdiction** [1] - 92:9

## K

**Kate** [11] - 56:23, 57:4, 108:16, 181:21, 182:13, 209:8, 209:9, 209:10, 209:13
**keep** [4] - 22:15, 56:9, 66:5, 104:1
**keeping** [2] - 21:12, 60:5
**KELLI** [2] - 1:5, 227:3
**Killian** [4] - 101:8, 101:10, 101:14, 102:9
**kind** [32] - 5:21, 10:6, 10:10, 20:11, 23:24, 29:24, 43:20, 44:2, 58:8, 69:12, 79:11, 79:12, 79:15, 79:23, 82:9, 88:14, 95:24, 96:8, 96:13, 96:19, 100:9, 100:11, 103:19, 104:1, 117:4, 117:22, 173:23, 174:18, 178:1, 180:24, 182:18, 186:10
**kinds** [2] - 41:8, 172:13
**knowing** [4] - 118:12,

119:1, 136:11, 142:18
**knowledge** [9] - 41:10, 41:11, 43:23, 79:6, 79:10, 114:16, 122:8, 143:24, 175:9
**known** [3] - 85:7, 132:17, 136:20
**knows** [1] - 6:3
**KYLE** [2] - 1:12, 227:5
**Kyle** [1] - 3:10

## L

**label** [1] - 123:24
**labels** [2] - 12:12, 19:10
**lack** [1] - 27:4
**larger** [2] - 185:24, 219:19
**Larry** [1] - 3:9
**LARRY** [2] - 1:10, 227:4
**last** [11] - 5:14, 8:18, 32:23, 35:11, 56:24, 120:17, 120:18, 179:9, 206:5, 206:6
**latter** [1] - 169:23
**law** [2] - 37:1, 216:16
**Law** [3] - 3:4, 3:7, 229:7
**laws** [1] - 32:22
**lawsuit** [2] - 7:19, 209:16
**lawyer** [1] - 5:9
**lawyers** [4] - 5:10, 107:2, 183:3, 183:6
**LCSW** [3] - 87:4, 87:21, 87:23
**Lead** [2] - 50:24, 56:20
**lead** [8] - 20:3, 104:24, 105:24, 136:6, 148:5, 148:7, 195:11, 206:20
**leader** [1] - 48:1
**leading** [1] - 24:2
**leads** [1] - 80:5
**learn** [2] - 24:24, 25:1
**learned** [5] - 28:5, 77:10, 77:16, 80:7, 193:2
**least** [13] - 18:23, 37:19, 38:18, 38:20, 48:20, 58:13, 64:1, 64:8, 67:6, 84:23, 85:16, 95:1, 119:9
**leave** [2] - 15:2, 179:15, 180:14
**leaving** [1] - 183:21

**left** [7] - 16:14, 16:24, 17:1, 127:4, 186:23, 188:16, 209:11
**leg** [6] - 94:10, 94:16, 94:17, 152:18, 188:21
**legal** [6] - 38:11, 38:17, 39:1, 39:13, 215:17, 218:10
**legally** [4] - 39:6, 40:1, 215:20, 217:2
**lengthy** [1] - 224:7
**letter** [3] - 25:2, 25:4, 25:11
**letters** [1] - 122:16
**letting** [2] - 70:6, 208:18
**level** [7] - 39:16, 68:14, 68:16, 73:15, 83:19, 99:3, 103:4
**liable** [1] - 32:12
**License** [1] - 225:21
**license** [1] - 32:12
**licenses** [3] - 43:22, 116:11, 116:17
**licensing** [1] - 45:2
**licensure** [3] - 44:19, 68:13, 87:21
**life** [1] - 209:14
**lifetime** [1] - 190:18
**likely** [1] - 77:24
**limit** [4] - 79:3, 79:7, 137:21, 138:4
**Lincoln** [1] - 50:19
**Line** [1] - 227:8
**list** [2] - 40:3, 198:1
**listed** [1] - 222:18
**listen** [1] - 104:2
**live** [1] - 214:3
**lived** [1] - 114:14
**lives** [1] - 11:18
**LLC** [1] - 3:3
**LLE** [5] - 126:21, 127:2, 127:3, 145:10, 187:5
**LLE-N** [1] - 126:21
**located** [4] - 46:2, 78:21, 112:10, 115:13
**location** [2] - 112:18, 185:3
**Location** [2] - 176:14, 176:24
**lock** [1] - 98:18
**Logan** [2] - 14:2, 149:12
**look** [19] - 12:3, 21:3, 25:23, 29:19, 43:2, 50:5, 53:5, 54:6, 58:10, 58:24, 62:3,

86:17, 98:19,
111:15, 111:17,
124:23, 131:21,
181:23, 201:21
**looked** [9] - 59:6,
61:23, 62:17, 62:18,
132:9, 187:16,
187:19, 191:20,
191:21
**looking** [17] - 42:21,
53:9, 57:12, 80:17,
104:21, 105:12,
108:23, 121:2,
121:5, 123:15,
123:24, 136:21,
181:1, 181:6, 197:8,
199:11, 202:10
**looks** [6] - 19:11,
31:14, 40:20,
121:18, 197:10,
200:9
**loss** [1] - 154:3
**lower** [4] - 127:4,
128:12, 186:23,
188:16
**lungs** [3] - 126:12,
128:11, 187:1
**Lydia** [3] - 81:22, 82:2,
185:8

## M

**M.D** [1] - 3:15
**MADDOX** [108] - 12:5,
22:10, 27:3, 27:10,
29:22, 30:5, 34:22,
35:19, 36:20, 37:5,
48:16, 55:1, 55:11,
59:11, 62:11, 62:24,
65:1, 65:22, 72:8,
75:14, 75:17, 79:18,
83:7, 87:10, 88:3,
95:21, 101:23,
102:3, 103:8,
103:13, 106:4,
106:7, 106:11,
106:14, 106:19,
106:21, 107:15,
108:4, 110:17,
110:21, 111:6,
111:9, 115:1, 117:8,
118:14, 118:21,
120:12, 121:1,
123:14, 123:18,
123:22, 124:1,
124:5, 124:9,
124:24, 125:3,
125:7, 127:1,
127:21, 128:1,
129:14, 132:23,

137:6, 137:19,
138:1, 138:5, 139:9,
139:14, 140:19,
140:23, 141:5,
141:10, 141:15,
141:22, 144:21,
154:23, 155:2,
155:8, 155:12,
156:3, 156:16,
156:20, 162:2,
162:5, 162:18,
163:15, 171:7,
174:1, 174:11,
174:24, 177:17,
177:20, 183:5,
184:16, 195:16,
199:13, 202:20,
203:2, 204:19,
205:12, 205:23,
218:15, 219:9,
220:14, 221:7,
224:1, 224:4, 224:14
**Maddox** [2] - 3:12, 6:3
**magic** [1] - 214:24
**magnified** [1] - 77:24
**magnifies** [1] - 78:3
**mailbox** [10] - 59:21,
59:24, 86:8, 133:19,
133:23, 134:3,
135:8, 135:15,
135:19, 175:24
**mails** [3] - 29:5, 29:8,
29:15
**maintain** [1] - 40:4
**majority** [4] - 67:2,
79:2, 110:23, 149:8
**male** [1] - 108:18
**manage** [2] - 95:7,
109:10
**Management** [13] -
88:19, 88:22, 88:24,
89:4, 89:16, 89:19,
90:4, 90:6, 90:17,
95:3, 95:5, 95:10,
191:21
**management** [3] -
43:12, 88:17, 91:13
**mania** [1] - 148:6
**maniac** [1] - 165:22
**manipulative** [3] -
192:14, 192:21,
192:22
**manner** [4] - 19:7,
19:23, 25:16, 46:18
**MAR** [17] - 60:12,
62:13, 63:7, 64:19,
64:20, 66:10, 66:13,
66:16, 66:19, 66:20,
66:24, 67:5, 67:10,
67:18, 67:19, 74:2,

74:8
**March** [6] - 19:16,
21:7, 42:10, 136:7,
201:12, 221:5
**mark** [3] - 11:19,
119:24, 229:11
**marked** [5] - 11:22,
120:4, 125:9,
153:15, 176:13
**marking** [1] - 125:2
**Mary** [29] - 15:23,
16:11, 17:1, 17:6,
19:3, 24:11, 30:24,
31:3, 31:17, 31:19,
32:1, 32:18, 34:3,
34:13, 34:16, 35:4,
35:11, 37:9, 37:18,
38:18, 39:2, 39:6,
39:9, 84:22, 202:15,
202:18, 204:6,
204:7, 204:9
**Matt** [3] - 30:9, 140:22,
229:5
**Matthew** [1] - 3:12
**MBBS** [3] - 8:20, 8:22,
10:4
**McFarland** [17] -
50:19, 131:1, 131:2,
131:21, 132:14,
134:6, 134:9,
134:15, 134:17,
135:22, 137:10,
138:14, 139:24,
140:8, 140:14,
142:8, 142:13
**McFarland's** [1] -
136:2
**MD** [5] - 8:21, 9:23,
10:15, 68:15, 204:5
**ME** [1] - 228:3
**mean** [57] - 21:17,
22:24, 27:4, 32:8,
34:23, 35:14, 39:10,
44:12, 44:16, 57:24,
62:21, 62:24, 68:11,
69:6, 70:22, 79:19,
85:21, 86:6, 88:14,
97:13, 103:19,
105:6, 109:4, 113:7,
113:9, 117:9,
117:10, 124:3,
126:14, 127:6,
128:21, 132:21,
146:9, 152:2,
154:18, 156:21,
163:3, 163:15,
164:15, 164:17,
174:17, 175:15,
175:23, 178:23,
182:19, 184:17,

184:18, 188:4,
188:19, 194:5,
194:8, 195:16,
204:20, 206:24,
212:19, 221:24
**mean..** [6] - 55:13,
88:8, 101:2, 139:11,
163:14, 174:21
**means** [5] - 32:7,
36:11, 111:9, 187:9,
194:9
**meant** [3] - 48:9,
62:17, 119:8
**mediation** [1] - 57:22
**medical** [40] - 7:12,
7:20, 8:20, 22:5,
38:10, 44:18, 50:2,
52:6, 54:22, 64:11,
68:13, 76:10, 91:12,
109:21, 109:24,
110:4, 114:12,
118:1, 120:20,
136:15, 137:3,
139:13, 142:24,
144:2, 153:10,
164:12, 174:23,
176:2, 177:1, 177:3,
177:10, 177:18,
180:11, 181:2,
185:24, 186:6,
210:24, 217:16,
218:6, 223:20
**Medical** [78] - 8:19,
9:8, 9:21, 12:22,
21:16, 31:21, 36:23,
40:5, 41:16, 43:22,
45:11, 62:9, 70:9,
71:8, 72:24, 75:4,
95:18, 112:16,
112:21, 113:2,
113:3, 113:5, 113:6,
113:8, 113:9,
113:10, 114:2,
114:10, 114:17,
114:22, 116:10,
120:2, 123:2, 123:8,
123:9, 124:12,
124:21, 125:13,
129:10, 129:13,
130:21, 131:21,
133:5, 134:1,
134:10, 135:5,
137:8, 137:11,
137:12, 137:13,
139:10, 139:16,
139:17, 140:11,
141:14, 141:21,
142:8, 142:10,
143:5, 143:7,
143:10, 145:2,

150:6, 150:11,
164:5, 165:3, 165:4,
177:9, 177:12,
185:11, 199:20,
206:24, 211:19,
217:8
**medically** [1] - 51:9
**Medication** [17] - 59:9,
59:15, 61:5, 61:7,
61:19, 61:23, 62:8,
62:12, 63:6, 63:11,
63:20, 63:22, 202:2,
203:10, 203:15,
203:24, 216:16
**medication** [59] -
36:19, 52:5, 54:2,
57:24, 58:2, 58:17,
58:18, 58:23, 59:14,
60:12, 61:13, 61:17,
64:21, 64:24, 65:21,
66:7, 67:22, 69:18,
71:18, 72:13, 72:15,
73:24, 74:4, 74:7,
74:12, 74:21, 74:24,
75:10, 85:5, 85:10,
89:12, 143:22,
148:17, 148:18,
150:12, 151:5,
160:6, 160:7, 162:7,
163:2, 164:24,
165:13, 165:15,
171:9, 178:13,
191:2, 191:20,
197:24, 199:22,
202:7, 202:13,
204:10, 204:23,
214:17, 215:22,
216:2, 216:13,
216:18, 216:22
**medications** [41] -
32:21, 34:17, 34:21,
35:12, 58:11, 58:12,
59:2, 60:6, 60:10,
60:13, 67:15, 67:16,
69:2, 71:12, 75:11,
85:19, 90:20,
143:12, 144:3,
151:1, 154:12,
160:14, 160:16,
161:18, 171:4,
171:6, 171:12,
171:16, 171:17,
190:3, 190:5,
190:10, 196:16,
201:16, 202:16,
205:8, 212:1,
214:21, 215:18,
215:21
**medicine** [15] - 10:10,
107:13, 107:20,

107:23, 160:23,
165:6, 165:10,
170:20, 203:1,
203:3, 203:4, 203:6,
203:7, 204:1, 205:5
**Medicine** [4] - 8:10,
8:13, 8:16, 8:23,
10:11, 11:13, 90:16,
94:21, 158:8,
158:18, 159:7,
161:2, 161:3, 167:9
**meds** [3] - 66:22,
88:20, 199:18
**meet** [3] - 46:4, 81:18,
82:2
**meeting** [4] - 81:19,
82:4, 173:1, 178:20
**Meeting** [2] - 48:11,
48:14
**meetings** [3] - 48:20,
48:23, 184:5
**Melissa** [1] - 115:16
**Memorial** [3] - 13:15,
52:17, 104:6
**memorialized** [1] -
41:9
**memories** [3] -
208:22, 209:3, 210:3
**memory** [14] - 11:17,
12:18, 53:12, 83:12,
96:11, 102:13,
124:18, 132:10,
150:8, 181:9, 182:8,
185:18, 185:21,
196:6
**mental** [41] - 72:12,
72:16, 72:18, 72:21,
73:16, 73:17, 75:23,
76:6, 76:17, 77:1,
77:5, 78:1, 78:7,
78:15, 79:11, 79:12,
79:13, 79:14, 80:3,
90:4, 90:6, 105:7,
113:9, 115:7,
144:16, 165:18,
165:19, 166:9,
193:2, 194:14,
195:24, 197:5,
205:5, 205:17,
207:8, 207:9,
207:22, 216:19,
222:17, 223:11
**Mental** [57] - 75:9,
77:13, 79:15, 79:23,
81:1, 81:13, 81:17,
81:18, 82:24, 83:2,
84:19, 86:3, 86:9,
86:13, 86:16, 87:24,
88:12, 89:4, 96:14,
103:21, 112:2,

113:10, 114:20,
115:18, 115:24,
116:3, 116:13,
118:12, 118:16,
118:17, 119:2,
119:14, 130:8,
130:11, 130:15,
130:16, 130:19,
131:2, 137:16,
147:11, 153:15,
162:16, 170:9,
170:19, 196:9,
211:5, 211:6,
211:13, 211:19,
211:23, 212:14,
213:24, 215:14,
216:10, 217:8
**mentally** [1] - 97:3
**mention** [1] - 89:11
**mentioned** [15] -
33:20, 36:7, 53:2,
73:3, 85:16, 102:13,
135:8, 149:9,
149:16, 149:22,
157:2, 157:9, 172:2,
207:20, 209:10
**mentioning** [1] - 18:6
**met** [4] - 12:20, 24:6,
81:24, 191:9
**method** [4] - 66:8,
66:12, 100:20
**methods** [2] - 23:13,
160:8
**MEYER** [2] - 1:12,
227:5
**Meyer** [1] - 3:10
**MICHAEL** [2] - 1:12,
227:5
**Michael** [6] - 3:16,
31:21, 45:16, 87:15,
87:17, 87:18
**Mickey** [70] - 26:17,
26:21, 81:20, 82:21,
82:23, 83:2, 83:4,
87:11, 87:13, 87:17,
87:18, 87:19, 134:5,
167:21, 167:23,
168:8, 168:13,
169:16, 171:5,
171:9, 171:11,
172:3, 172:10,
172:14, 172:17,
172:23, 172:24,
173:6, 173:8,
173:15, 173:24,
174:13, 174:14,
175:8, 176:7, 176:8,
178:19, 179:14,
179:16, 180:4,
180:7, 180:13,

181:22, 182:4,
182:11, 182:21,
183:8, 183:15,
184:5, 184:11,
184:14, 184:24,
185:4, 185:5, 185:6,
185:8, 191:22,
191:24, 192:5,
192:8, 192:13,
192:15, 192:16,
196:16, 205:6,
205:16
**Mickey's** [10] - 171:1,
172:20, 173:4,
174:22, 175:15,
180:3, 181:6,
205:19, 206:7,
206:14
**middle** [2] - 27:20,
179:20
**might** [20] - 45:20,
51:22, 57:24, 71:1,
73:23, 87:1, 87:2,
105:14, 117:4,
131:22, 131:24,
132:10, 132:11,
147:9, 166:12,
177:10, 183:21,
192:16, 197:4, 224:1
**mind** [5] - 79:3,
128:21, 130:13,
148:2, 193:11
**minimize** [1] - 214:22
**minimum** [1] - 117:10
**minute** [2] - 111:17,
125:6
**minutes** [2] - 70:7,
84:18
**Miss** [2] - 7:13, 59:24
**missed** [5] - 61:16,
67:22, 69:1, 70:3,
117:4
**missing** [3] - 64:24,
69:22, 71:17
**misspeak** [2] - 112:13,
185:1
**misstates** [1] - 110:17
**Mitcheff** [5] - 28:1,
31:22, 33:6, 45:16,
45:23
**moment** [3] - 154:4,
172:2, 224:2
**monitor** [6] - 36:12,
36:18, 49:8, 49:13,
58:2, 59:1
**monitoring** [5] -
33:24, 36:15, 38:7,
58:17, 58:18
**monitors** [3] - 49:1,
57:13, 57:22

**month** [18] - 40:15,
64:1, 64:3, 64:4,
64:6, 64:8, 66:19,
66:23, 67:6, 67:11,
67:19, 67:23, 68:1,
71:11, 74:1, 74:8,
139:22, 210:15
**monthly** [1] - 58:7
**mood** [4] - 83:14,
190:15, 207:18,
207:19
**morning** [3] - 5:7, 5:8,
199:17
**mornings** [1] - 198:19
**most** [8] - 15:15,
23:21, 58:12, 70:20,
70:22, 202:15,
212:8, 217:17
**motivated** [1] - 51:7
**motivation** [1] - 51:9
**Moultrie** [1] - 14:2
**mouth** [4] - 189:2,
189:4, 220:11,
222:11
**mouthed** [1] - 199:22
**move** [2] - 6:18, 138:1
**moving** [2] - 152:24,
183:14
**MR** [108] - 12:5, 22:10,
27:3, 27:10, 29:22,
30:5, 34:22, 35:19,
36:20, 37:5, 48:16,
55:1, 55:11, 59:11,
62:11, 62:24, 65:1,
65:22, 72:8, 75:14,
75:17, 79:18, 83:7,
87:10, 88:3, 95:21,
101:23, 102:3,
103:8, 103:13,
106:4, 106:7,
106:11, 106:14,
106:19, 106:21,
107:15, 108:4,
110:17, 110:21,
111:6, 111:9, 115:1,
117:8, 118:14,
118:21, 120:12,
121:1, 123:14,
123:18, 123:22,
124:1, 124:5, 124:9,
124:24, 125:3,
125:7, 127:1,
127:21, 128:1,
129:14, 132:23,
137:6, 137:19,
138:1, 138:5, 139:9,
139:14, 140:19,
140:23, 141:5,
141:10, 141:15,
141:22, 144:21,

154:23, 155:2,
155:8, 155:12,
156:3, 156:16,
156:20, 162:2,
162:5, 162:18,
163:15, 171:7,
174:1, 174:11,
174:24, 177:17,
177:20, 183:5,
184:16, 195:16,
199:13, 202:20,
203:2, 204:19,
205:12, 205:23,
218:15, 219:9,
220:14, 221:7,
224:1, 224:4, 224:14
**MS** [76] - 4:14, 5:6,
27:7, 27:14, 30:2,
30:7, 35:21, 37:4,
37:7, 62:14, 65:5,
72:10, 75:16, 75:19,
79:21, 87:12, 88:6,
102:1, 103:6,
103:12, 110:19,
111:8, 111:12,
117:12, 118:19,
118:23, 120:7,
120:9, 120:11,
120:14, 121:4,
122:2, 122:5,
123:16, 123:20,
123:23, 124:4,
124:7, 124:10,
125:1, 125:5,
137:24, 138:3,
138:7, 139:12,
140:22, 141:2,
141:8, 141:11,
141:19, 142:2,
142:6, 156:6, 156:8,
162:4, 162:8,
162:13, 163:4,
163:9, 177:19,
184:18, 195:18,
199:10, 199:12,
199:14, 202:23,
210:17, 210:19,
210:22, 214:8,
218:12, 218:14,
218:16, 218:19,
219:6, 223:23
**multiple** [7] - 18:19,
26:11, 43:10, 51:1,
60:16, 85:6, 208:1
**musculoskeletal** [1] -
126:20
**must** [5] - 17:4,
129:24, 130:7,
147:24, 189:19

# N

**name** [13] - 39:7, 40:1, 56:24, 57:1, 101:11, 102:13, 102:15, 112:17, 121:12, 122:15, 123:10, 125:20, 149:1
**named** [1] - 39:21
**names** [1] - 24:6
**National** [2] - 83:22
**nature** [1] - 65:6
**nausea** [1] - 186:22
**NCC** [1] - 83:22
**near** [2] - 112:11, 114:17
**necessarily** [2] - 23:11, 65:17
**necessary** [9] - 6:6, 160:21, 160:22, 161:13, 191:6, 211:1, 211:7, 213:5, 227:7
**neck** [1] - 215:9
**necks** [1] - 215:10
**need** [18] - 35:19, 44:23, 51:22, 69:12, 81:16, 93:4, 94:3, 99:23, 102:4, 102:19, 102:24, 117:23, 130:17, 133:14, 135:17, 156:4, 192:23
**needed** [9] - 44:3, 99:3, 103:5, 105:17, 111:19, 205:4, 211:5, 211:9, 211:18
**needing** [2] - 21:13, 23:19
**needs** [6] - 37:21, 47:2, 47:7, 91:12, 102:24, 103:17
**negative** [2] - 194:3, 194:8
**negatively** [3] - 14:6, 28:12, 40:6
**Negatively** [1] - 24:12
**neglect** [1] - 32:13
**neurovascular** [1] - 188:22
**never** [15] - 14:4, 24:9, 39:19, 40:14, 42:15, 90:2, 140:23, 161:15, 166:22, 176:22, 178:1, 190:22, 209:11, 211:24, 212:4
**new** [3] - 127:18, 187:10, 190:5

**New** [4] - 9:20, 10:12, 51:15, 51:19
**next** [12] - 12:10, 23:3, 40:3, 43:2, 169:24, 197:7, 198:3, 198:20, 200:6, 200:16, 200:18, 229:11
**nice** [5] - 6:12, 173:16, 182:7, 182:15, 209:9
**Ninth** [2] - 3:13, 227:3
**NNO** [2] - 126:24, 127:17, 187:9
**nobody** [3] - 44:15, 118:8
**non** [1] - 116:11
**nonetheless** [3] - 34:8, 38:24, 152:8
**nonfood** [1] - 219:13
**noon** [1] - 199:17
**normally** [1] - 176:21
**nose** [2] - 201:6, 222:10
**nosey** [1] - 9:5
**NOT** [1] - 2:14
**notary** [1] - 228:5
**notation** [1] - 140:14
**notch** [1] - 141:3
**note** [37] - 95:12, 95:13, 120:21, 122:19, 124:15, 125:14, 134:2, 134:15, 135:22, 145:2, 145:5, 170:23, 171:2, 171:3, 181:19, 186:6, 186:16, 187:15, 187:19, 188:10, 189:21, 189:22, 193:18, 193:19, 194:2, 197:7, 197:13, 198:3, 198:4, 198:22, 199:6, 199:19, 200:1, 200:9, 200:13, 200:19, 200:24
**notes** [10] - 95:17, 95:18, 95:24, 96:5, 123:7, 124:22, 144:24, 171:1, 186:24, 225:11
**nothing** [1] - 196:5
**notice** [3] - 7:18, 7:19, 172:23
**notified** [8] - 7:23, 65:10, 65:14, 68:9, 100:20, 151:1, 189:20
**notify** [3] - 60:16,

68:3, 71:17
**notifying** [1] - 98:10
**November** [3] - 12:15, 12:22, 12:23
**NP** [2] - 44:1, 84:22
**Number** [1] - 227:6
**number** [4] - 73:24, 117:2, 127:19, 187:6
**numbering** [1] - 120:17
**numbers** [1] - 12:12
**numbness** [1] - 126:10
**Nurse** [24] - 15:22, 16:4, 16:17, 24:1, 30:18, 30:24, 32:16, 32:18, 36:24, 38:2, 50:24, 53:5, 55:16, 56:21, 60:9, 69:11, 70:22, 75:4, 99:22, 108:16, 118:18, 149:2
**nurses** [20] - 20:16, 37:15, 43:11, 68:12, 79:22, 80:14, 80:15, 104:1, 104:24, 114:11, 116:18, 118:4, 118:13, 118:16, 118:17, 119:3, 148:12, 148:19, 149:7, 149:23
**Nurses** [9] - 68:14, 70:24, 71:16, 73:1, 75:4, 80:7, 137:16, 148:23, 149:9
**Nursing** [4] - 84:20, 84:24, 98:1, 112:20
**nutritional** [1] - 220:1

# O

**oath** [1] - 5:3
**object** [26] - 22:11, 55:1, 65:2, 65:5, 103:8, 106:21, 107:15, 110:17, 110:19, 122:3, 129:14, 137:7, 137:22, 154:23, 155:2, 155:9, 162:2, 162:13, 163:4, 163:15, 171:7, 174:1, 174:11, 205:23, 219:7, 221:8
**objecting** [1] - 37:2
**objection** [8] - 27:3, 27:11, 36:22, 65:6, 65:22, 103:6, 138:8,

214:8
**Objective** [1] - 95:15
**objects** [3] - 215:4, 219:16, 219:20
**obligated** [1] - 34:6
**Observation** [3] - 79:5, 85:9, 112:6
**observation** [3] - 85:24, 172:1, 198:1
**observations** [9] - 96:22, 96:23, 98:16, 167:22, 168:3, 192:1, 206:11, 206:15, 220:18
**observe** [8] - 85:22, 130:9, 130:17, 182:21, 183:5, 184:6, 208:7, 208:8
**observed** [8] - 84:17, 84:18, 84:20, 84:21, 84:24, 85:4, 183:15, 185:16
**observing** [4] - 69:9, 86:1, 114:5, 208:21
**obsessive** [1] - 208:9
**obstruct** [1] - 109:16
**obtain** [2] - 100:23, 216:6
**occasion** [1] - 63:10
**occasionally** [3] - 23:21, 37:12, 157:1
**occurred** [7] - 63:1, 63:2, 94:3, 104:10, 169:21, 172:14, 189:19
**occurring** [3] - 111:5, 151:14, 174:21
**OCD** [1] - 208:10
**OF** [8] - 1:2, 1:5, 1:6, 225:1, 225:1, 227:4, 228:3
**off-site** [2] - 47:2, 80:21
**offer** [1] - 27:11
**offered** [2] - 48:22, 115:3
**Office** [2] - 114:2, 114:10
**office** [5] - 93:7, 114:10, 185:5, 185:6, 185:16
**Officers** [2] - 75:22, 217:18
**Offices** [1] - 229:7
**official** [1] - 80:11
**often** [5] - 60:5, 60:14, 115:10, 179:16, 220:1
**on-site** [3] - 15:14, 68:7, 68:9

214:8
**once** [14] - 5:17, 56:16, 64:1, 64:8, 66:19, 67:6, 67:11, 85:5, 85:16, 94:6, 139:20, 139:21, 147:2, 209:18
**one** [81] - 5:9, 6:8, 8:20, 8:21, 9:17, 10:8, 13:14, 21:9, 27:24, 28:24, 29:3, 29:6, 40:19, 43:16, 44:12, 46:19, 47:24, 55:5, 55:21, 56:13, 66:12, 68:6, 68:20, 70:10, 71:9, 73:24, 95:1, 96:19, 97:17, 100:21, 100:22, 100:23, 101:1, 102:18, 104:24, 112:13, 112:24, 117:4, 122:6, 123:15, 123:19, 123:24, 127:7, 127:8, 127:10, 127:13, 129:19, 129:20, 139:18, 142:5, 144:9, 150:23, 156:13, 161:10, 161:11, 161:15, 161:21, 166:4, 168:6, 168:7, 170:11, 171:2, 171:23, 172:11, 173:19, 188:3, 188:7, 193:13, 197:17, 198:3, 198:6, 203:19, 213:17, 221:5, 222:5, 222:14, 223:3, 223:13, 224:1
**ones** [5] - 90:3, 100:7, 111:1, 155:24, 157:17
**ongoing** [1] - 30:15
**onset** [1] - 20:11
**open** [1] - 183:22
**operating** [1] - 84:2
**operations** [1] - 40:6
**opinion** [7] - 32:12, 177:4, 177:21, 177:22, 191:15, 191:16, 214:20
**opinions** [1] - 178:2
**opportunity** [2] - 116:14, 151:3
**opposed** [1] - 76:20
**oral** [2] - 2:4, 2:10
**order** [9] - 19:10, 22:14, 36:8, 67:14, 69:22, 107:18,

216:6, 216:9
**ordered** [3] - 202:24, 203:2, 203:4
**orders** [5] - 127:18, 187:10, 187:11, 188:5, 196:1
**organized** [1] - 125:13
**Organized** [1] - 175:6
**originally** [1] - 121:24
**otherwise** [2] - 70:15, 148:17
**outpatient** [3] - 49:15, 57:17, 93:22
**outside** [25] - 33:15, 49:1, 49:8, 49:12, 50:9, 50:18, 57:13, 88:24, 101:14, 101:18, 109:22, 109:23, 150:11, 150:16, 151:11, 151:15, 159:20, 160:16, 166:19, 169:8, 213:16, 213:20, 214:4, 215:9, 216:11
**overall** [4] - 39:24, 153:11, 154:20, 154:21
**overarching** [1] - 161:10
**overheard** [1] - 183:11
**overlooking** [1] - 33:23
**own** [9] - 2:20, 55:4, 55:11, 77:19, 105:6, 124:2, 152:9, 163:8, 185:5

**P**

**p.m** [1] - 200:10
**P.M** [1] - 200:11
**P.O** [3] - 1:24, 225:7, 229:2
**PA** [4] - 32:4, 43:24, 57:3, 84:22
**page** [19] - 20:6, 27:23, 27:24, 80:18, 120:17, 120:18, 121:2, 145:1, 153:14, 176:5, 179:9, 186:3, 188:7, 197:7, 198:20, 199:10, 200:18, 202:11
**PAGE** [1] - 4:6
**Page** [3] - 121:5, 202:10, 227:8
**paged** [1] - 20:8

**pages** [6] - 12:9, 12:11, 20:5, 193:16, 202:9
**paging** [1] - 23:20
**pain** [6] - 127:21, 127:22, 127:23, 186:23, 188:16, 197:14
**paint** [1] - 220:4
**paper** [4] - 65:18, 201:5, 201:6, 222:10
**paperwork** [1] - 28:2
**paraphrasing** [1] - 201:3
**paraprofessional** [2] - 47:15, 47:20
**parents** [1] - 9:6
**part** [23] - 23:21, 32:20, 41:6, 49:3, 59:4, 66:20, 67:10, 71:15, 85:1, 89:19, 89:24, 98:19, 121:10, 133:16, 143:10, 147:17, 147:18, 154:21, 174:22, 177:8, 177:10, 177:18, 212:8
**participate** [2] - 171:11, 171:14
**particular** [2] - 24:1
**parties** [4] - 2:2, 2:16, 2:20, 225:14
**passed** [1] - 59:20
**past** [3] - 148:21, 178:3, 220:20
**patient** [83] - 26:15, 37:15, 44:13, 50:20, 53:8, 57:5, 57:8, 58:22, 63:8, 69:9, 69:10, 72:9, 72:10, 72:11, 73:24, 85:24, 86:1, 86:14, 91:3, 92:10, 92:12, 92:13, 92:14, 92:23, 94:9, 94:12, 94:16, 95:7, 97:1, 97:4, 98:24, 99:13, 100:4, 101:17, 103:16, 103:20, 104:2, 104:5, 104:6, 104:11, 105:3, 105:4, 108:10, 108:14, 108:18, 108:20, 121:12, 125:20, 128:3, 129:17, 129:21, 130:17, 135:3, 136:16, 136:19, 144:12, 150:10,

151:10, 151:11, 152:18, 160:19, 162:11, 165:11, 166:22, 167:1, 169:4, 169:8, 169:12, 169:16, 171:3, 171:4, 186:10, 190:23, 190:24, 199:22, 208:20, 212:19, 215:21, 216:14, 216:18, 216:22, 216:24
**patient's** [1] - 72:12
**patients** [42] - 33:14, 43:8, 44:19, 46:22, 47:7, 47:9, 50:7, 54:20, 58:18, 59:1, 60:13, 60:17, 63:20, 63:22, 82:2, 82:4, 82:7, 82:13, 82:18, 85:16, 89:23, 98:11, 100:6, 136:24, 148:24, 150:15, 158:24, 159:3, 159:16, 159:20, 160:2, 160:14, 166:17, 167:16, 170:18, 183:14, 193:14, 198:9, 212:13, 212:18, 212:20, 213:17
**peers** [1] - 15:6
**pending** [2] - 7:5, 141:9
**people** [27] - 21:13, 21:14, 23:15, 24:6, 49:14, 51:2, 54:7, 54:10, 55:14, 68:11, 70:22, 78:1, 78:6, 102:23, 113:14, 116:16, 156:24, 173:18, 173:19, 173:20, 213:19, 213:20, 213:23, 214:3, 214:10, 219:19, 220:4
**Peoria** [2] - 46:3, 115:14
**per** [2] - 14:12, 30:12
**percent** [4] - 117:3, 150:14, 154:11, 185:20
**percentage** [1] - 15:16
**perform** [2] - 152:20, 191:7
**period** [4] - 109:7, 109:13, 119:11, 191:19
**person** [51] - 15:23,

24:1, 38:12, 39:8, 39:24, 41:18, 46:4, 49:20, 50:1, 50:11, 56:22, 67:14, 67:22, 69:8, 70:5, 79:4, 79:7, 81:13, 85:7, 92:2, 92:4, 93:1, 97:9, 98:13, 104:19, 104:20, 104:21, 105:8, 105:14, 105:16, 105:21, 105:24, 106:23, 107:24, 139:18, 151:4, 152:23, 162:16, 162:17, 163:6, 212:22, 213:5, 214:7, 215:4, 217:2, 217:7, 217:12, 217:15, 217:17, 217:19, 221:11
**person's** [2] - 142:13, 180:11
**personal** [2] - 163:8, 180:12
**personally** [4] - 138:17, 217:1, 217:6, 218:2
**personnel** [4] - 80:20, 81:18, 120:13, 120:15
**persons** [2] - 215:7, 215:12
**pertaining** [1] - 89:4
**pertains** [1] - 201:4
**Petersburg** [1] - 14:3
**phone** [17] - 20:13, 21:14, 23:20, 25:2, 37:14, 41:18, 41:20, 68:6, 68:10, 118:8, 134:9, 134:15, 134:16, 135:22, 150:19, 150:23, 156:4
**phrase** [1] - 164:1
**phrased** [1] - 27:8
**physical** [3] - 113:9, 172:1, 216:19
**physically** [3] - 14:23, 46:1, 46:2
**physician** [33] - 30:18, 31:10, 31:23, 32:4, 32:6, 32:9, 32:20, 33:1, 33:5, 33:9, 33:14, 33:16, 34:20, 35:13, 36:6, 36:9, 36:11, 36:17, 36:23, 37:18, 37:20, 37:24, 38:6, 39:1, 39:5, 39:17, 44:23, 92:11,

104:12, 144:5, 213:8, 213:11, 214:12
**Physician** [8] - 45:7, 45:9, 47:1, 47:11, 48:10, 48:13, 92:16, 159:10
**Physician's** [2] - 16:7, 16:17
**physicians** [4] - 14:1, 33:18, 116:12, 117:5
**Physicians** [2] - 48:22, 137:17
**Piatt** [1] - 14:2
**Pica** [17] - 213:20, 213:23, 214:11, 214:16, 214:22, 215:1, 219:2, 219:5, 219:7, 219:12, 219:15, 219:16, 219:19, 220:1, 223:15, 223:18, 223:21
**PICA** [1] - 214:7
**pick** [1] - 66:6
**piece** [1] - 136:15
**pill** [1] - 215:1
**place** [10] - 50:22, 66:3, 66:4, 68:3, 90:13, 93:1, 105:21, 170:11, 170:23, 184:5
**placed** [1] - 98:24
**placing** [1] - 98:11
**Plaintiff** [6] - 1:7, 1:19, 2:8, 3:5, 5:3, 5:10
**Plaintiff's** [2] - 120:18, 120:19
**Plan** [22] - 85:2, 88:11, 88:19, 88:22, 89:4, 89:16, 89:19, 90:4, 90:6, 95:3, 95:5, 95:10, 95:15, 95:24, 96:14, 169:4, 169:8, 169:10, 170:2, 170:6, 170:19, 191:21
**plan** [19] - 88:17, 95:6, 96:17, 96:20, 96:23, 97:1, 97:8, 98:12, 98:19, 127:12, 127:13, 168:7, 168:19, 168:24, 170:8, 187:8, 189:8, 191:21, 198:2
**plans** [1] - 128:20
**Plans** [2] - 89:1, 90:17
**plastic** [3] - 76:2, 76:8, 110:7
**playing** [1] - 185:21

15

**point** [46] - 9:10, 11:4, 13:7, 13:16, 13:19, 15:21, 16:9, 16:16, 22:23, 26:13, 26:20, 45:18, 52:9, 64:23, 65:20, 68:23, 68:24, 70:10, 74:15, 74:17, 75:3, 80:19, 94:6, 98:4, 98:23, 99:1, 111:4, 111:18, 112:12, 112:14, 112:24, 149:3, 150:23, 151:24, 158:17, 168:9, 174:24, 191:6, 191:11, 194:24, 196:18, 196:19, 201:10, 201:15, 223:7, 223:14
**pointing** [1] - 179:8
**Policy** [1] - 216:16
**polite** [3] - 22:22, 25:23, 25:24
**portion** [4] - 121:12, 170:6, 177:7, 177:8
**portions** [1] - 2:15
**portraying** [1] - 116:9
**position** [2] - 12:14, 45:8
**possible** [3] - 117:2, 129:7, 194:16
**possibly** [6] - 11:11, 29:10, 29:13, 160:6, 191:19, 192:19
**potential** [1] - 166:8
**POWELL** [17] - 103:6, 110:19, 120:7, 120:11, 122:2, 122:5, 124:7, 124:10, 138:3, 162:13, 163:4, 199:10, 199:14, 210:19, 210:22, 218:12, 219:6
**Powell** [1] - 3:7
**powers** [1] - 43:20
**Practice** [2] - 36:24, 159:7
**practice** [39] - 9:15, 10:10, 36:8, 37:17, 44:11, 44:24, 46:13, 66:15, 66:18, 67:5, 67:9, 67:11, 89:1, 89:8, 89:9, 89:24, 90:7, 90:19, 91:9, 91:15, 91:17, 93:15, 94:11, 94:20, 96:9, 107:13, 128:1, 128:2, 129:4, 155:18, 157:19,

157:20, 157:24, 158:8, 158:17, 160:17, 166:13, 166:19, 169:9
**practiced** [3] - 9:13, 10:7, 158:23
**practices** [1] - 106:15
**practicing** [7] - 33:24, 36:15, 38:8, 39:15, 158:3, 167:5, 167:8
**Practitioner** [21] - 15:13, 15:22, 16:4, 30:18, 32:16, 33:13, 36:24, 38:2, 39:20, 43:16, 43:24, 60:21, 96:3, 96:4, 97:23, 151:22, 159:15, 160:3, 161:15, 191:3
**practitioner** [3] - 126:22, 134:16, 164:12
**Practitioner's** [2] - 122:17, 145:6
**Practitioners** [8] - 15:22, 16:17, 30:24, 32:18, 70:23, 79:13, 129:21, 150:24
**preexisting** [3] - 78:1, 78:7, 78:14
**preparation** [5] - 42:24, 130:22, 131:20, 132:13, 175:1
**prepare** [2] - 7:9, 224:6
**prepared** [1] - 58:14
**preparing** [1] - 209:19
**prescribe** [7] - 32:21, 35:12, 143:21, 160:9, 160:22, 171:9, 190:5, 190:8, 203:6, 203:7, 212:1
**prescribed** [22] - 37:1, 37:16, 52:5, 54:2, 58:13, 143:12, 143:15, 143:17, 143:19, 178:12, 191:2, 195:14, 196:9, 201:16, 202:12, 202:24, 203:8, 203:9, 204:1, 204:10, 204:24
**prescribes** [2] - 36:19, 162:6
**prescribing** [14] - 34:17, 34:20, 35:15, 35:16, 75:10, 144:3, 160:14, 161:22, 161:24, 162:5, 164:24, 191:8

**prescription** [7] - 71:6, 165:13, 165:15, 202:19, 202:21, 202:24, 204:12
**prescriptions** [3] - 52:1, 163:2, 202:12
**present** [6] - 14:24, 52:4, 155:22, 156:14, 157:17, 216:6
**presentation** [1] - 115:6
**presentations** [4] - 115:6, 115:8, 115:23, 116:17
**presented** [5] - 7:24, 52:4, 115:7, 221:18, 221:21
**presenting** [2] - 116:6, 116:7
**presents** [2] - 94:22, 97:2
**PRETORIOUS** [2] - 1:20, 2:6
**PRETORIUS** [1] - 3:12
**preventative** [2] - 107:20, 107:23
**Prevention** [7] - 84:5, 84:7, 84:11, 85:2, 85:9, 85:15, 86:15
**prevention** [1] - 97:5
**previous** [10] - 6:20, 18:2, 18:3, 50:15, 130:15, 148:24, 167:20, 190:10, 193:10, 220:19
**previously** [5] - 36:7, 52:6, 83:4, 153:15, 181:11
**Primary** [3] - 47:1, 47:10, 92:16
**principle** [1] - 164:23
**prison** [3] - 78:19, 134:11, 200:7
**Prison** [1] - 149:12
**prisoner** [4] - 57:5, 57:7, 99:14, 185:19
**Prisoner** [2] - 176:14, 176:24
**prisoners** [5] - 47:7, 114:11, 184:9, 184:10, 185:15
**private** [8] - 28:13, 89:8, 89:9, 89:24, 90:7, 94:20, 96:9, 169:9
**privileged** [1] - 24:9
**privileges** [1] - 25:6
**privy** [1] - 114:7

**probe** [1] - 65:13
**problem** [5] - 18:6, 19:12, 19:13, 125:2, 127:10
**problems** [6] - 80:21, 81:1, 81:4, 81:9, 127:11, 212:15
**procedure** [1] - 67:12
**procedures** [1] - 68:3
**proceedings** [1] - 225:9
**process** [9] - 12:21, 40:1, 71:13, 71:14, 71:15, 83:18, 100:1, 216:1, 218:10
**processes** [1] - 71:11
**Produced** [3] - 59:8, 175:4, 179:9
**produced** [1] - 11:19
**Production** [2] - 120:18, 120:19
**profession** [3] - 10:22, 21:1, 32:7
**Professional** [1] - 33:12
**professional** [7] - 22:22, 47:15, 47:19, 73:16, 77:11, 178:2, 178:6
**professionalism** [2] - 15:6, 42:6
**professionally** [1] - 31:6
**program** [4] - 48:5, 48:7, 85:18, 97:6
**Program** [4] - 84:6, 84:11, 85:15, 86:15
**progress** [9] - 20:11, 95:18, 120:20, 125:14, 186:6, 188:10, 193:17, 193:19
**prompt** [1] - 155:15
**Prompt** [1] - 212:23
**prompted** [1] - 54:14
**proof** [1] - 2:17
**properly** [1] - 172:24
**protocol** [3] - 20:9, 61:10, 67:5
**protocols** [1] - 105:6
**provide** [10] - 21:13, 21:14, 23:18, 29:20, 43:11, 82:7, 117:22, 167:23, 168:8, 211:20
**provided** [14] - 12:19, 42:18, 47:15, 47:19, 82:13, 135:1, 152:14, 167:16, 175:21, 176:7,

176:9, 176:10, 194:24, 211:14
**provider** [7] - 15:20, 32:10, 38:3, 60:10, 86:3, 86:9, 216:12
**providers** [2] - 79:16, 153:10
**providing** [6] - 135:5, 135:9, 135:12, 173:8, 173:24, 205:16
**provision** [1] - 43:14
**PRT** [1] - 104:13
**psych** [8] - 53:6, 53:9, 54:6, 56:3, 56:6, 108:23, 108:24, 163:24
**Psych** [1] - 104:13
**Psychiatric** [1] - 153:16
**psychiatric** [58] - 34:17, 35:12, 36:19, 49:9, 49:10, 50:3, 50:6, 50:12, 51:3, 51:8, 51:10, 51:23, 52:1, 52:5, 57:17, 75:11, 81:9, 88:2, 89:5, 90:12, 90:14, 91:4, 91:9, 91:18, 91:23, 92:3, 92:8, 93:12, 93:14, 93:19, 93:20, 93:21, 94:1, 94:22, 96:1, 101:9, 102:19, 103:4, 103:11, 103:17, 105:8, 105:18, 106:1, 106:17, 106:18, 107:8, 111:19, 111:20, 134:24, 137:3, 143:21, 144:5, 155:17, 160:23, 165:6, 165:10, 170:10, 178:12
**Psychiatrist** [2] - 151:22, 161:2
**psychiatrist** [11] - 53:23, 99:2, 99:8, 99:18, 99:24, 100:2, 101:18, 161:17, 218:22
**psychiatrists** [3] - 90:3, 100:5, 102:10
**psychiatry** [12] - 90:8, 90:16, 91:15, 93:12, 99:23, 107:24, 112:1, 160:7, 160:11, 160:13, 170:20
**psychotherapy** [35] -

82:10, 82:13, 89:6, 89:20, 89:24, 160:10, 160:23, 161:3, 161:4, 161:6, 161:8, 161:9, 161:19, 162:9, 162:12, 162:15, 162:19, 162:21, 162:24, 163:2, 163:11, 163:12, 163:13, 163:19, 163:22, 163:23, 164:9, 164:11, 164:15, 164:17, 164:23, 165:5, 165:14, 166:14
**psychotic** [1] - 109:7
**psychotropic** [3] - 54:2, 65:21, 143:12
**Public** [1] - 228:5
**pull** [1] - 133:2
**pulled** [1] - 54:22
**purpose** [1] - 2:17
**purposes** [1] - 192:22
**pursuant** [1] - 1:22
**pushed** [1] - 17:21
**pushing** [2] - 18:7, 207:6
**put** [24] - 22:8, 39:6, 40:1, 59:21, 59:24, 84:16, 86:8, 86:14, 86:23, 88:20, 129:23, 133:18, 133:23, 134:3, 135:8, 138:18, 154:12, 172:11, 175:23, 180:10, 197:16, 220:11, 223:17
**puts** [4] - 37:9, 97:16, 97:17, 97:20
**putting** [3] - 98:9, 135:4, 215:8

**Q**

**qualification** [1] - 35:17
**quality** [2] - 49:2, 57:14
**quarter** [1] - 115:12
**quarterback** [1] - 92:17
**questioning** [1] - 222:14
**questions** [22] - 17:4, 20:5, 20:9, 20:11, 33:24, 35:10, 36:13, 38:12, 44:4, 68:21,

107:3, 118:11, 128:24, 138:2, 183:3, 193:14, 202:3, 210:18, 210:20, 223:24, 224:5, 229:13
**quickly** [1] - 153:14
**QUINN** [3] - 1:20, 2:6, 3:12
**Quinn,Johnston** [1] - 229:7
**quite** [1] - 124:12

**R**

**raise** [2] - 174:20, 196:15
**raised** [1] - 17:19
**Rakestraw** [8] - 41:14, 41:15, 41:16, 41:22, 45:14, 45:23, 58:15, 117:19
**randomly** [2] - 157:2, 157:3
**rapport** [1] - 207:1
**rather** [3] - 29:24, 96:10, 107:7
**rationale** [1] - 18:16
**ray** [3] - 194:3, 194:8, 194:10
**re** [1] - 50:2
**reach** [3] - 145:11, 148:15, 152:9
**reached** [1] - 196:7
**reaching** [4] - 145:16, 146:3, 147:3, 156:10
**read** [41] - 30:19, 35:22, 35:23, 36:1, 78:4, 78:9, 78:10, 78:16, 127:13, 127:23, 132:13, 133:6, 133:14, 133:17, 133:20, 134:5, 134:20, 136:9, 139:2, 140:8, 140:14, 140:18, 140:24, 141:17, 142:8, 142:13, 142:18, 146:13, 146:14, 171:19, 176:5, 177:4, 177:6, 188:14, 222:8, 222:15, 227:2, 229:9, 229:10, 229:11
**reading** [2] - 2:13, 77:19
**really** [3] - 25:6, 27:12, 173:21

**realm** [3] - 159:6, 161:4, 166:13
**reask** [1] - 96:12
**Reason** [1] - 227:8
**reason** [12] - 25:8, 26:6, 29:11, 51:4, 53:3, 53:8, 102:12, 130:13, 185:18, 188:2, 207:7, 217:16
**reasonable** [3] - 20:23, 20:24, 65:3
**reasons** [6] - 26:8, 39:4, 51:3, 51:9, 217:9, 218:7
**receipt** [1] - 40:11
**receive** [9] - 8:19, 9:1, 10:2, 21:8, 59:13, 59:14, 79:17, 79:23, 114:12
**received** [19] - 18:5, 24:19, 42:5, 77:13, 114:19, 116:12, 118:9, 118:16, 119:3, 119:15, 119:19, 124:8, 139:7, 140:4, 142:20, 143:11, 149:23, 150:4
**receives** [1] - 150:13
**receiving** [13] - 7:18, 7:19, 23:7, 85:10, 101:3, 103:4, 103:11, 118:13, 178:15, 178:16, 195:24, 205:7, 206:17
**recently** [3] - 100:23, 181:3, 181:4
**receptive** [3] - 23:22, 206:22, 207:5
**recess** [4] - 75:18, 125:8, 156:7, 224:3
**recognize** [7] - 73:2, 73:18, 74:22, 80:3, 155:21, 198:24, 199:4
**recognizing** [3] - 73:16, 119:17, 155:6
**recollect** [9] - 55:6, 83:13, 101:21, 110:23, 111:1, 111:21, 182:5, 192:14
**recollection** [14] - 12:16, 21:6, 24:23, 28:4, 50:10, 55:24, 56:2, 57:16, 101:3, 132:16, 135:21, 172:16, 172:18, 172:19

**recollections** [1] - 192:4
**recommend** [2] - 224:12, 224:13
**recommendation** [1] - 213:10
**recommendations** [2] - 89:6, 89:12
**recommended** [4] - 117:16, 162:11, 210:24, 211:6
**Record** [13] - 12:7, 61:6, 61:8, 61:20, 63:7, 63:12, 63:20, 63:23, 71:9, 202:2, 203:10, 203:15, 203:24
**record** [49] - 6:12, 6:15, 12:6, 19:12, 22:8, 62:9, 64:11, 64:18, 75:20, 81:23, 86:22, 118:20, 125:6, 128:13, 129:10, 130:22, 131:3, 131:17, 131:22, 132:9, 132:12, 133:5, 134:2, 134:15, 136:21, 140:12, 140:13, 142:3, 142:5, 147:12, 147:14, 149:17, 153:5, 156:9, 176:3, 177:1, 177:3, 177:10, 177:18, 189:21, 189:22, 191:17, 193:22, 202:11, 202:12, 220:11, 223:17
**recorded** [8] - 61:6, 61:19, 61:22, 126:7, 146:18, 147:14, 149:19, 222:21
**recording** [2] - 6:7, 134:16
**records** [20] - 54:22, 63:15, 81:24, 86:2, 95:18, 111:15, 111:17, 120:2, 123:2, 123:8, 123:10, 135:5, 142:11, 172:20, 174:22, 175:7, 175:14, 175:19, 186:1, 191:5
**RECROSS** [1] - 4:2
**REDIRECT** [2] - 4:2, 218:18
**reduced** [1] - 15:12
**reevaluate** [2] -

144:13, 201:15
**refer** [43] - 49:17, 49:22, 50:15, 50:22, 51:2, 51:4, 81:3, 81:6, 81:8, 81:12, 81:16, 83:2, 83:7, 90:3, 90:16, 91:14, 91:15, 92:2, 92:4, 92:24, 94:9, 94:12, 94:22, 124:20, 127:8, 127:9, 144:21, 146:5, 150:6, 157:15, 160:10, 160:13, 160:18, 161:3, 161:16, 164:19, 166:17, 166:24, 171:1, 212:1, 218:21
**reference** [1] - 32:11
**referral** [24] - 49:1, 50:8, 50:18, 55:16, 57:17, 80:21, 89:20, 90:8, 91:23, 92:23, 93:10, 93:13, 99:3, 99:7, 99:23, 100:3, 102:10, 103:21, 107:1, 108:12, 111:24, 112:1, 112:2, 160:6
**referrals** [8] - 49:8, 49:9, 49:12, 49:19, 57:13, 59:14, 100:8, 100:11
**referred** [35] - 46:22, 49:15, 50:1, 50:12, 50:23, 53:4, 53:15, 53:18, 55:15, 56:2, 81:10, 81:13, 82:19, 82:21, 89:18, 89:23, 91:6, 91:10, 92:10, 100:6, 101:7, 101:8, 101:13, 101:17, 104:11, 160:11, 161:16, 162:11, 166:17, 166:22, 167:13, 169:12, 169:15, 191:19, 213:24
**referring** [13] - 56:5, 62:13, 93:6, 93:18, 93:19, 93:21, 161:23, 162:1, 162:6, 163:18, 163:19, 163:20, 163:21
**refers** [1] - 164:23
**reflect** [2] - 194:13, 202:19
**reflected** [1] - 200:13
**reflects** [1] - 199:19

**refresh** [4] - 12:16, 28:4, 132:10, 132:16
**Refusal** [6] - 59:9, 59:15, 61:23, 62:8, 62:12, 62:19
**refuse** [2] - 104:9, 215:17
**refused** [5] - 39:4, 60:17, 60:18, 103:22, 103:23
**refuses** [5] - 30:12, 30:17, 40:4, 42:12, 215:21
**refusing** [6] - 31:9, 31:23, 59:2, 60:6, 60:13, 216:18
**regard** [1] - 229:14
**regarding** [7] - 19:13, 42:4, 115:24, 116:2, 134:15, 134:17, 135:22
**regards** [3] - 151:10, 195:21, 208:24
**Regional** [1] - 80:11
**register** [1] - 37:23
**registered** [2] - 36:9, 37:21
**regular** [3] - 14:4, 126:17, 198:14
**regularly** [4] - 29:5, 71:17, 84:19, 178:20
**Regulation** [1] - 33:12
**reiterating** [1] - 146:11
**relate** [2] - 76:13, 147:22
**related** [2] - 220:1, 225:13
**relating** [1] - 114:20
**relationship** [2] - 26:22, 102:11
**relayed** [3] - 20:18, 150:17, 151:16
**release** [1] - 105:5
**relevant** [10] - 27:15, 29:14, 69:13, 69:15, 71:22, 72:6, 72:7, 136:16, 153:3, 157:20
**relied** [9] - 144:7, 144:9, 146:2, 147:2, 149:22, 151:18, 152:5, 152:12, 178:1
**rely** [8] - 69:21, 75:21, 147:1, 154:16, 154:19, 156:10, 178:6, 213:3
**relying** [7] - 70:1, 71:16, 72:24, 73:2, 73:6, 73:10, 153:9
**remain** [2] - 79:4, 79:8

**remains** [2] - 155:9, 217:17
**remember** [162] - 5:19, 8:17, 11:6, 14:1, 16:10, 16:15, 16:19, 18:9, 18:10, 21:10, 22:20, 23:1, 24:21, 25:1, 25:3, 25:7, 25:10, 25:11, 25:17, 25:18, 25:20, 26:1, 26:2, 26:5, 26:8, 28:9, 34:15, 39:14, 45:21, 48:3, 48:19, 49:23, 49:24, 50:5, 50:8, 50:16, 50:17, 51:14, 51:17, 51:18, 52:7, 52:14, 52:15, 52:16, 52:18, 52:19, 53:16, 53:21, 54:3, 54:19, 54:20, 55:18, 55:20, 55:22, 55:23, 56:4, 56:7, 56:19, 56:20, 56:24, 57:5, 60:4, 64:12, 77:18, 80:10, 81:22, 85:13, 86:23, 87:2, 99:9, 101:20, 101:24, 102:4, 102:6, 102:12, 103:20, 104:2, 104:23, 104:24, 108:15, 108:19, 109:4, 109:14, 111:3, 113:1, 113:11, 113:12, 116:7, 117:17, 119:16, 130:12, 131:10, 132:8, 133:24, 134:18, 143:2, 143:23, 148:3, 148:23, 149:5, 149:7, 149:8, 149:13, 151:19, 152:13, 156:1, 156:2, 156:18, 156:22, 157:6, 160:15, 168:13, 168:15, 172:7, 172:8, 173:2, 173:15, 173:22, 179:16, 179:19, 179:20, 180:4, 182:13, 182:14, 184:23, 185:1, 185:17, 185:18, 185:19, 192:7, 194:9, 195:6, 196:8, 196:12, 197:2, 197:6, 201:8, 202:6, 202:7, 208:10, 208:11, 209:8,
209:24, 210:6, 210:7, 210:8, 210:10, 210:11, 213:13, 213:15, 216:8, 216:13, 218:8
**remind** [2] - 131:22, 187:8
**reminds** [1] - 149:1
**remove** [1] - 210:12
**removed** [1] - 108:10
**repeat** [2] - 17:18, 214:9
**rephrase** [5] - 111:11, 138:10, 141:20, 151:9, 167:20
**replaced** [2] - 17:1, 17:7
**report** [18] - 45:11, 58:8, 58:10, 58:20, 70:1, 70:12, 73:6, 73:10, 75:23, 96:22, 117:23, 117:24, 148:13, 148:19, 173:6, 192:13, 201:4
**reported** [8] - 31:9, 31:11, 31:12, 45:22, 76:3, 152:9, 223:6, 225:8
**REPORTER** [1] - 142:4
**Reporter** [5] - 2:12, 11:24, 36:1, 120:6, 125:11
**Reporters** [2] - 225:6, 229:1
**REPORTERS** [1] - 1:23
**reporting** [3] - 69:12, 70:9, 73:1
**reports** [5] - 46:21, 58:6, 74:11, 82:17, 100:16
**represent** [1] - 48:4
**represented** [1] - 22:2
**reprimand** [7] - 21:3, 21:8, 21:16, 23:8, 23:12, 24:18, 42:6
**request** [9] - 23:17, 29:23, 30:1, 30:3, 32:2, 32:3, 32:4, 47:18, 54:14
**requested** [5] - 27:18, 36:2, 47:16, 48:5, 48:11
**requesting** [3] - 21:13, 50:5, 145:24
**requests** [4] - 20:22, 20:24, 54:6, 147:21
**require** [4] - 86:21, 91:23, 105:10,

157:24
**required** [11] - 32:19, 33:1, 34:19, 36:5, 36:12, 36:18, 67:4, 116:21, 116:24, 117:1, 117:14
**requirement** [3] - 39:13, 117:5, 117:9
**requirements** [3] - 45:2, 45:3, 119:20
**requires** [2] - 117:10, 221:10
**requiring** [1] - 119:21
**reserve** [1] - 224:15
**reserved** [1] - 229:9
**resided** [1] - 196:10
**resolution** [1] - 80:20
**resource** [6] - 80:20, 150:16, 154:15, 154:16, 154:17, 155:19
**resources** [2] - 99:17, 111:23
**respect** [14] - 34:10, 37:19, 38:21, 54:5, 98:4, 119:13, 137:9, 151:5, 151:6, 154:7, 155:20, 162:10, 181:1, 222:7
**respond** [1] - 23:7
**Response** [1] - 104:13
**response** [2] - 23:12
**responsibilities** [4] - 17:8, 42:13, 43:3, 43:6
**responsibility** [6] - 46:23, 173:4, 174:9, 174:13, 174:14, 205:21
**responsible** [3] - 46:7, 46:8, 139:18
**restate** [3] - 35:22, 96:11, 141:6
**restated** [1] - 35:20
**restructure** [1] - 140:21
**result** [4] - 43:21, 44:18, 51:10, 148:9
**RETAINED** [1] - 4:14
**rethought** [1] - 23:13
**retrospect** [1] - 55:5
**return** [3] - 52:12, 52:15, 229:12
**returned** [3] - 52:14, 53:23, 54:1
**review** [50] - 7:8, 7:11, 8:2, 19:12, 19:13, 36:18, 37:8, 38:1, 59:13, 59:18, 60:11, 60:24, 61:7, 62:6,

62:20, 63:7, 63:10, 63:11, 63:19, 63:23, 63:24, 64:7, 66:13, 66:16, 66:19, 66:24, 67:5, 74:8, 86:2, 100:15, 131:6, 131:19, 134:14, 135:17, 135:19, 137:3, 137:18, 139:15, 140:11, 150:5, 150:6, 173:4, 174:22, 174:23, 175:17, 176:21, 180:15, 199:20, 204:12, 224:8
**reviewed** [27] - 7:20, 42:21, 61:3, 67:18, 67:19, 81:24, 83:10, 124:11, 130:21, 131:3, 131:5, 131:9, 131:22, 132:3, 132:7, 132:12, 136:2, 136:5, 136:10, 138:13, 138:16, 138:17, 138:21, 139:24, 142:24, 200:15, 200:22
**reviewing** [13] - 7:16, 45:6, 67:10, 68:12, 71:8, 85:19, 85:23, 124:12, 134:1, 135:21, 142:11, 172:20
**reviews** [2] - 115:9, 139:21
**reword** [1] - 118:15
**Risk** [34] - 43:9, 71:20, 78:18, 78:24, 79:4, 79:9, 84:17, 97:16, 97:18, 97:20, 98:5, 98:11, 98:14, 99:1, 112:5, 112:8, 112:14, 112:17, 112:19, 113:13, 113:19, 121:16, 127:16, 128:15, 129:23, 130:10, 184:17, 186:19, 193:15, 194:2, 196:20, 197:10, 212:9
**risk** [8] - 76:24, 77:2, 119:18, 221:15, 221:18, 222:1, 222:5, 222:7
**RN** [3] - 50:24, 56:20, 68:15
**RN's** [1] - 71:1
**role** [17] - 33:18,

33:21, 34:8, 34:11, 47:1, 47:3, 47:6, 47:10, 48:2, 49:3, 79:20, 85:14, 85:18, 109:2, 159:10, 159:15, 162:9
**roles** [1] - 158:12
**room** [1] - 185:4
**Room** [5] - 51:3, 52:10, 213:1, 213:3, 213:11
**round** [2] - 186:13, 198:8
**rounded** [1] - 186:10
**rounding** [4] - 186:16, 188:11, 193:22, 198:4
**routine** [2] - 85:1, 135:19
**routinely** [1] - 137:1
**row** [2] - 67:22, 69:23
**ROYSTER** [1] - 3:6
**RPR** [4] - 1:18, 2:9, 225:5, 225:20
**RR** [1] - 126:17
**rules** [1] - 68:23
**Rusher** [11] - 5:11, 7:13, 34:17, 38:22, 60:6, 78:18, 80:24, 81:8, 122:23, 126:4, 128:9
**RUSHER** [2] - 1:6, 227:4
**Rusher's** [4] - 26:22, 34:10, 34:14, 52:24

## S

**S1** [1] - 126:17
**S2** [1] - 126:17
**safely** [1] - 109:10
**safety** [3] - 51:21, 92:5
**Sangamon** [68] - 3:10, 13:1, 13:20, 14:8, 16:18, 16:20, 17:1, 34:18, 43:14, 47:4, 49:15, 50:1, 50:13, 56:7, 59:8, 59:16, 79:16, 82:5, 82:14, 83:20, 84:3, 84:6, 84:12, 88:24, 95:10, 96:1, 96:15, 97:6, 99:2, 99:11, 100:7, 101:18, 102:11, 103:5, 103:16, 105:18, 110:15, 114:5, 118:5, 118:13, 119:5, 119:9, 134:9, 137:4,

138:24, 149:11, 167:17, 169:4, 170:9, 170:18, 175:4, 178:17, 179:8, 196:20, 201:11, 207:10, 211:13, 211:17, 211:24, 213:8, 215:16, 217:3, 217:8, 217:12, 218:3, 221:1, 221:16, 221:22
**SANGAMON** [2] - 1:9, 227:4
**saved** [1] - 199:16
**saw** [7] - 82:4, 100:22, 124:16, 124:19, 148:4, 207:2, 211:1
**scenarios** [1] - 116:9
**schedule** [4] - 40:4, 40:20, 42:4, 198:13
**scheduled** [1] - 85:1
**scheduling** [1] - 117:18
**schizo** [1] - 189:10
**schizoaffective** [7] - 189:10, 197:17, 207:13, 208:4, 222:22, 223:2, 223:12
**schizophrenia** [27] - 83:13, 145:10, 146:4, 147:3, 147:23, 149:15, 151:8, 151:23, 153:6, 157:11, 157:12, 159:1, 159:4, 159:8, 159:11, 159:14, 159:17, 159:20, 160:24, 165:22, 166:4, 166:9, 187:7, 187:22, 188:3, 190:14, 190:16
**schizophrenic** [2] - 201:13, 208:8
**schizotypal** [1] - 208:3
**School** [2] - 9:8, 9:21
**scope** [5] - 91:14, 91:16, 93:15, 94:10, 160:17
**scratched** [1] - 122:6
**script** [1] - 180:4
**second** [9] - 12:5, 23:20, 27:23, 62:11, 74:10, 80:17, 80:19, 113:13, 188:7
**Second** [1] - 113:20
**section** [1] - 114:8
**security** [1] - 185:13

**Security** [1] - 114:8
**see** [41] - 12:8, 12:12, 12:13, 21:4, 27:21, 29:19, 50:18, 60:13, 64:4, 71:11, 80:22, 81:23, 85:16, 112:22, 115:23, 121:19, 131:16, 133:7, 133:9, 134:2, 134:14, 142:19, 145:6, 145:9, 168:2, 175:15, 176:15, 177:11, 177:12, 183:2, 183:5, 183:8, 183:14, 184:4, 185:9, 186:18, 203:16, 203:18, 216:19
**seeing** [4] - 52:15, 130:4, 134:18, 182:16
**seeking** [5] - 76:15, 76:20, 192:18, 192:20, 194:16
**seem** [1] - 207:6
**selected** [1] - 48:1
**self** [11] - 72:18, 73:6, 76:15, 192:21, 215:8, 215:11, 215:13, 221:22, 221:24, 222:1, 222:3
**send** [3] - 51:8, 103:19, 213:1
**sending** [1] - 103:20
**sensation** [1] - 126:21
**sensitive** [1] - 78:7
**sent** [6] - 25:4, 52:9, 53:8, 55:14, 194:9, 211:21
**separate** [2] - 207:21, 216:16
**seriously** [2] - 192:23, 193:5
**served** [2] - 30:8, 105:15
**serves** [2] - 47:24, 182:8
**services** [4] - 47:14, 47:19, 50:6
**serving** [1] - 37:18
**set** [2] - 36:23, 154:13
**setting** [12] - 38:16, 102:23, 159:21, 159:22, 159:23, 163:1, 167:14, 190:20, 202:22, 212:23, 213:21, 215:9
**seven** [9] - 17:22, 18:7, 26:4, 30:13,

41:7, 67:22, 69:22, 138:3
**several** [3] - 30:15, 119:10, 202:9
**share** [1] - 47:10
**SHEET** [1] - 227:1
**Sheet** [2] - 229:11, 229:12
**sheet** [3] - 64:3, 229:10, 229:11
**shift** [1] - 40:14
**shifts** [1] - 40:15
**Shmikler** [7] - 3:16, 26:17, 26:21, 82:21, 134:5, 175:8, 205:16
**SHMIKLER** [2] - 1:12, 227:5
**short** [2] - 122:16, 191:19
**shorthand** [3] - 2:11, 225:8, 225:10
**show** [2] - 59:7, 61:6
**showed** [2] - 116:8, 175:10
**showing** [2] - 176:12, 198:5
**shows** [3] - 92:13, 128:13, 191:5
**sick** [3] - 43:9, 43:11, 85:2
**sidetracked** [1] - 96:8
**sign** [4] - 28:3, 33:11, 229:10, 229:11
**signature** [10] - 12:10, 122:12, 122:16, 122:17, 175:15, 199:1, 199:4, 200:2, 200:21, 228:2
**SIGNATURE** [1] - 227:1
**signed** [2] - 122:15, 200:4
**signing** [1] - 2:13
**signs** [7] - 76:16, 80:3, 97:2, 119:17, 188:16, 188:18, 188:20
**similarities** [1] - 208:4
**simply** [1] - 74:4
**simultaneously** [3] - 50:11, 178:14, 178:16
**Sincerely** [1] - 229:16
**single** [5] - 101:22, 136:24, 153:14, 170:8, 170:11
**Site** [7] - 45:7, 45:9, 56:21, 60:10, 60:20, 60:24, 84:21
**site** [16] - 15:14,

15:15, 42:13, 43:3, 43:5, 47:2, 55:17, 63:16, 63:19, 68:7, 68:9, 71:20, 71:23, 80:9, 80:11, 80:21
**sitting** [5] - 54:23, 135:20, 136:1, 150:9, 182:2
**situation** [8] - 68:8, 97:14, 97:15, 148:20, 160:19, 209:14, 216:13, 216:17
**situations** [1] - 161:12
**SIU** [3] - 10:1, 10:13, 10:15
**skew** [1] - 181:8
**skin** [1] - 187:1
**skipped** [1] - 187:20
**skipping** [12] - 6:22, 47:24, 65:20, 66:7, 67:14, 72:15, 73:24, 74:7, 74:11, 74:21, 74:24, 193:17
**SOAP** [4] - 95:12, 95:13, 95:17, 95:23
**soft** [1] - 210:11
**solitary** [7] - 76:24, 77:2, 77:4, 77:23, 78:8, 79:8
**someone** [8] - 24:7, 27:5, 49:20, 51:8, 51:11, 103:4, 212:2, 218:22
**sometimes** [8] - 48:21, 58:6, 85:5, 107:2, 148:23, 179:15, 220:4
**somewhere** [1] - 147:10
**soon** [2] - 185:7, 185:9
**sooner** [1] - 107:24
**sorry** [39] - 8:17, 33:4, 42:2, 48:17, 52:22, 58:9, 59:12, 62:2, 62:16, 66:6, 84:9, 84:22, 87:8, 98:8, 102:5, 104:18, 106:6, 106:10, 106:13, 107:4, 114:2, 115:2, 115:17, 122:4, 142:4, 146:5, 149:4, 152:1, 156:21, 170:13, 170:15, 177:6, 198:6, 203:13, 204:21, 206:10, 217:11, 217:23

**sort** [8] - 27:20, 39:16, 67:4, 74:6, 83:16, 96:24, 172:12, 207:6
**sound** [3] - 9:5, 101:11, 149:2
**sounds** [5] - 7:7, 14:4, 17:13, 37:17, 119:8
**South** [5] - 1:21, 2:7, 3:4, 3:13, 227:3
**Southern** [1] - 167:7
**space** [1] - 29:16
**sparked** [1] - 53:12
**speaking** [2] - 65:6, 221:4
**special** [1] - 83:21
**specialist** [3] - 100:4, 144:6, 152:24
**specialist's** [1] - 144:7
**specialists** [1] - 152:22
**specialization** [1] - 10:7
**specific** [37] - 24:5, 49:24, 50:22, 51:15, 54:20, 54:21, 55:24, 56:2, 57:16, 58:18, 63:14, 73:22, 79:20, 86:18, 87:2, 100:7, 101:22, 102:18, 107:10, 113:8, 119:22, 142:13, 142:15, 150:8, 157:6, 172:16, 172:18, 172:19, 182:5, 182:6, 183:13, 185:3, 208:22, 209:3, 215:11, 219:22
**specifically** [10] - 63:11, 63:14, 64:13, 99:16, 137:9, 137:12, 151:7, 151:19, 173:13, 192:5
**specifics** [13] - 18:14, 54:4, 56:8, 56:10, 67:3, 119:16, 152:14, 172:22, 173:15, 173:22, 210:7, 213:14
**speech** [2] - 156:23, 157:5
**spend** [1] - 10:12
**spent** [3] - 124:12, 131:20, 183:16
**split** [2] - 15:15, 15:16
**spoken** [1] - 84:19
**spoon** [9] - 76:8, 76:18, 109:15, 194:18, 212:24,

222:9, 223:1, 223:6, 223:8
**spoons** [1] - 219:20
**Springfield** [9] - 1:21, 2:7, 3:14, 8:6, 10:19, 13:13, 167:7, 227:3, 229:7
**Springfield,Illinois** [1] - 3:8
**SSR** [1] - 201:22
**stable** [1] - 105:4
**staff** [16] - 47:15, 47:20, 60:15, 84:19, 84:20, 139:13, 142:19, 142:22, 149:10, 150:1, 150:2, 150:4, 150:13, 182:16, 189:20, 196:17
**Staff** [35] - 21:16, 55:3, 70:9, 72:24, 75:4, 84:24, 86:16, 98:1, 112:20, 112:21, 114:4, 114:5, 137:8, 137:11, 137:12, 137:13, 137:17, 139:10, 139:17, 140:11, 141:14, 143:7, 143:10, 206:23, 206:24, 208:13, 208:17, 208:18, 208:21, 211:12, 211:18, 211:24, 213:4
**Staff's** [2] - 141:21, 142:8
**staffed** [1] - 70:10
**stance** [2] - 18:16, 18:21
**stand** [8] - 54:8, 54:12, 57:9, 101:14, 104:22, 121:15, 127:3, 127:17
**standard** [6] - 74:15, 84:1, 154:14, 155:17, 193:14, 212:17
**standards** [5] - 20:24, 45:3, 67:9, 83:21, 136:17
**standing** [5] - 83:1, 83:3, 183:8, 183:9, 183:23
**stands** [1] - 186:19
**start** [4] - 62:14, 62:18, 103:24, 108:23
**started** [4] - 12:19, 14:15, 100:1, 145:2
**STATE** [1] - 225:1

**State** [6] - 36:9, 37:24, 117:9, 117:11, 118:1, 119:20
**state** [3] - 36:21, 140:24, 203:3
**statement** [1] - 30:19
**STATES** [1] - 1:1
**states** [3] - 33:12, 46:14, 125:12
**States** [2] - 9:11, 9:19
**status** [3] - 85:20, 85:21, 216:20
**Status** [8] - 78:19, 78:24, 79:5, 84:17, 85:9, 99:1, 112:8, 196:21
**stay** [3] - 98:13, 98:16, 130:20
**stayed** [1] - 14:8
**step** [1] - 23:3
**sticking** [1] - 222:10
**still** [13] - 16:20, 29:19, 50:13, 94:15, 155:2, 155:8, 155:9, 183:21, 187:22, 187:23, 187:24, 192:22, 222:11
**stipulated** [1] - 2:2
**stipulation** [1] - 1:22
**stop** [3] - 137:20, 154:4, 188:18
**stopped** [1] - 53:17
**stops** [1] - 71:3
**storage** [1] - 29:16
**straight** [1] - 213:2
**strangulation** [2] - 109:18, 136:6
**strap** [4] - 109:19, 111:2, 172:13, 222:15
**Street** [4] - 1:21, 2:7, 3:13, 227:3
**stroke** [6] - 92:12, 92:14, 92:24, 93:2, 93:3, 93:10
**strong** [1] - 21:18
**structure** [1] - 43:13
**studies** [2] - 77:6, 78:10
**study** [1] - 78:10
**stuff** [1] - 100:9
**stuffed** [1] - 201:5
**subjective** [23] - 69:3, 69:7, 95:15, 121:13, 125:22, 126:6, 145:21, 145:22, 146:13, 146:14, 146:15, 146:18, 147:7, 147:15, 149:16, 149:20,

186:18, 188:14, 194:1, 197:10
**subjectively** [1] - 73:14
**SUBSCRIBED** [1] - 228:3
**subsequently** [1] - 52:13
**successful** [1] - 221:5
**sued** [1] - 39:20
**suffer** [3] - 213:20, 213:23, 214:11
**suffers** [1] - 214:7
**sufficient** [1] - 173:5
**suggest** [2] - 211:12, 211:17
**suggestion** [2] - 88:15, 213:16
**suggestions** [3] - 43:12, 88:13, 96:23
**suggests** [1] - 111:10
**suicidal** [14] - 76:20, 128:16, 145:23, 147:19, 189:6, 193:7, 193:8, 193:12, 220:9, 220:10, 220:13, 220:22, 221:13, 222:13
**Suicide** [6] - 84:5, 84:11, 85:2, 85:8, 85:14, 86:14
**suicide** [16] - 26:15, 26:22, 52:24, 84:7, 85:8, 97:5, 119:18, 220:24, 221:1, 221:6, 221:16, 221:18, 221:24, 222:1, 222:5, 222:7
**Suite** [1] - 3:14
**summary** [13] - 30:11, 131:1, 131:2, 132:14, 133:4, 134:2, 134:6, 136:3, 137:10, 138:14, 139:24, 140:9, 140:15
**Summary** [2] - 142:9, 142:14
**Superiors** [1] - 18:11
**supervise** [1] - 47:18
**Supervises** [1] - 47:14
**Supervisor** [3] - 22:21, 80:11, 99:22
**Supervisors** [1] - 18:11
**supposed** [1] - 57:24
**surgeon** [3] - 94:13, 94:14, 94:15
**Surgery** [1] - 8:24

**surprised** [1] - 31:8
**surrounding** [2] - 40:11, 160:20
**surveillance** [2] - 113:21, 113:24
**suspicious** [1] - 26:14
**swallowed** [5] - 194:2, 194:17, 223:5, 223:6, 223:8
**swallowing** [13] - 76:2, 76:8, 76:10, 76:18, 109:15, 109:21, 109:24, 110:4, 110:7, 110:10, 219:19, 223:1, 223:6
**sweet** [1] - 192:11
**swelling** [6] - 94:10, 94:15, 94:16, 152:18, 188:21
**sworn** [1] - 5:3
**SWORN** [1] - 228:3
**sympathize** [1] - 138:8
**symptom** [13] - 54:23, 72:15, 72:18, 72:21, 74:3, 76:5, 76:6, 106:1, 107:8, 223:1, 223:10, 223:15, 223:18
**symptoms** [34] - 51:11, 54:16, 54:18, 55:6, 66:2, 70:4, 72:14, 73:3, 73:17, 74:21, 75:1, 75:23, 76:16, 80:3, 81:10, 93:14, 94:17, 94:22, 95:8, 98:22, 105:9, 106:18, 119:18, 157:6, 190:20, 194:14, 205:10, 205:14, 205:17, 207:24, 214:18, 222:17, 222:21
**synergetic** [1] - 78:14
**synergistic** [1] - 78:11
**system** [2] - 66:3, 66:4

## T

**table** [5] - 58:11, 58:14, 135:14, 135:16, 180:15
**tall** [1] - 56:24
**Taylorville** [3] - 1:24, 225:7, 229:2
**Team** [3] - 75:9, 104:14, 142:10
**team** [9] - 104:12, 139:17, 139:18,

139:19, 139:20, 139:21, 143:5, 143:8
**telephone** [1] - 46:17
**telephonically** [1] - 99:14
**tendencies** [2] - 193:12, 208:10
**term** [11] - 32:6, 34:24, 37:21, 38:10, 38:11, 162:15, 163:6, 163:7, 164:5, 202:21
**terminated** [16] - 15:3, 15:4, 15:5, 17:10, 18:8, 18:18, 19:6, 24:15, 24:24, 26:18, 26:21, 27:2, 27:9, 27:15, 28:1, 28:5
**termination** [3] - 22:3, 23:4, 209:23
**terms** [16] - 36:6, 43:19, 44:19, 71:4, 71:8, 73:16, 85:14, 87:21, 116:12, 118:6, 140:17, 151:20, 169:16, 191:4, 194:13, 207:8
**terrible** [1] - 62:2
**territory** [1] - 46:8
**test** [1] - 11:17
**testified** [2] - 5:4, 59:23
**testimony** [3] - 212:12, 227:2, 229:6
**testing** [1] - 152:20
**that..** [1] - 102:13
**THE** [3] - 1:1, 1:5, 227:4
**themselves** [1] - 84:16
**Therapist** [1] - 75:6
**Therapy** [1] - 163:20
**therapy** [35] - 82:7, 82:8, 82:9, 161:16, 161:22, 163:24, 164:1, 164:2, 164:7, 164:18, 165:10, 165:16, 166:2, 166:16, 166:18, 167:14, 167:16, 167:24, 168:4, 168:20, 173:9, 173:23, 174:7, 174:10, 174:15, 174:18, 176:9, 176:10, 180:20, 184:11, 185:4, 190:4, 190:8, 205:7, 205:19
**thereof** [1] - 2:16
**Theresa** [1] - 3:7
**they've** [1] - 152:19

**thinking** [1] - 148:6
**thinks** [2] - 27:15, 87:3
**third** [1] - 202:10
**thirty** [1] - 229:12
**THIS_____DAY** [1] - 228:3
**Thorazine** [4] - 143:17, 146:1, 147:22, 199:17
**thoughts** [3] - 87:1, 128:19, 128:20
**three** [8] - 12:9, 19:18, 20:13, 24:15, 40:13, 48:20, 105:1, 132:20
**throughout** [2] - 14:7, 14:11
**throwing** [1] - 55:3
**Thursday** [1] - 40:18
**tibia** [1] - 126:8
**TIFFANY** [2] - 1:6, 227:4
**Tiffany** [100] - 5:10, 26:22, 34:10, 34:14, 34:17, 35:5, 38:21, 52:23, 60:6, 66:5, 66:16, 75:11, 78:18, 80:24, 81:8, 82:21, 99:18, 100:23, 109:12, 110:15, 111:18, 112:5, 122:23, 126:4, 128:8, 128:9, 132:18, 134:10, 134:17, 134:21, 135:23, 136:2, 136:14, 142:21, 145:12, 146:17, 146:20, 148:10, 149:12, 149:24, 151:22, 155:22, 156:11, 156:15, 156:22, 157:17, 168:9, 168:14, 168:16, 171:13, 172:9, 172:21, 173:1, 173:9, 174:10, 175:3, 175:18, 176:9, 178:13, 181:1, 181:12, 182:4, 182:22, 184:4, 186:13, 192:7, 193:6, 193:23, 195:1, 201:5, 201:10, 201:17, 204:19, 204:21, 205:17, 206:1, 206:12, 206:15, 206:16, 206:18,

206:24, 207:10, 208:12, 208:24, 209:4, 209:13, 209:16, 210:1, 210:4, 211:1, 211:18, 212:1, 212:8, 214:21, 219:2, 219:18, 220:9, 220:12, 222:7, 223:20
**Tiffany's** [19] - 8:1, 63:11, 64:13, 81:24, 83:6, 137:3, 139:15, 140:8, 142:24, 144:15, 172:4, 174:23, 176:2, 183:22, 191:1, 194:14, 196:19, 206:8, 222:17
**timely** [1] - 46:18
**tissue** [1] - 201:5
**title** [4] - 12:14, 38:17, 45:8, 115:22
**titled** [1] - 12:14
**titles** [1] - 80:11
**TO** [1] - 228:3
**today** [23] - 6:5, 7:2, 7:9, 7:19, 8:5, 30:19, 42:16, 42:21, 42:24, 62:18, 130:22, 135:20, 136:1, 150:9, 175:11, 178:9, 181:23, 182:2, 192:8, 209:5, 209:20, 210:5, 212:12
**toilet** [2] - 201:6, 222:10
**took** [5] - 182:17, 199:17, 199:23, 224:8, 224:10
**toothbrush** [5] - 110:10, 111:2, 194:3, 194:17, 212:24
**top** [4] - 66:21, 121:12, 176:14, 177:5
**topics** [4] - 80:6, 119:7, 119:13, 119:22
**total** [1] - 137:16
**toured** [1] - 113:3
**towards** [4] - 20:17, 22:18, 24:20, 209:13
**track** [4] - 22:15, 60:5, 66:5, 67:14
**tracking** [1] - 61:12
**trained** [1] - 80:2
**training** [29] - 39:18,

44:18, 45:4, 48:1, 48:22, 68:14, 68:16, 70:20, 70:21, 70:23, 70:24, 71:1, 71:2, 77:11, 77:14, 77:17, 77:19, 79:12, 79:16, 79:23, 114:19, 116:12, 118:12, 118:16, 119:2, 119:15, 119:17, 193:2, 193:4
**transcribed** [1] - 2:12
**transcript** [7] - 224:7, 224:8, 225:10, 229:6, 229:10, 229:10, 229:11
**transfer** [2] - 106:2, 148:15
**transferred** [2] - 216:23, 217:15
**treat** [9] - 106:18, 107:14, 107:17, 108:20, 158:24, 190:23, 205:5, 214:7, 214:12
**treated** [9] - 5:24, 26:15, 53:22, 159:14, 159:16, 159:19, 160:2, 212:13, 213:19
**treater** [1] - 143:4
**treaters** [1] - 149:24
**treating** [13] - 44:19, 63:8, 66:5, 66:16, 134:21, 136:14, 136:21, 142:21, 172:21, 207:10, 208:2, 208:6, 213:17
**Treatment** [14] - 61:23, 62:19, 88:11, 95:24, 96:13, 169:4, 169:8, 169:10, 170:2, 170:6, 170:19, 211:6, 211:7, 211:14
**treatment** [37] - 80:20, 81:4, 81:9, 81:10, 82:21, 88:16, 89:6, 89:7, 93:19, 111:20, 132:18, 159:13, 160:1, 160:22, 165:19, 165:21, 168:18, 169:20, 170:7, 170:8, 172:4, 178:15, 190:1, 191:2, 194:24, 195:13, 195:23, 196:13, 196:14, 204:23, 205:15, 206:2, 206:7,

206:14, 206:16, 210:24, 213:4
**treatments** [4] - 165:18, 166:8, 166:12, 191:7
**triage** [1] - 46:17
**trial** [9] - 6:24, 54:8, 54:12, 57:9, 100:9, 100:17, 101:15, 104:22, 216:10
**tried** [2] - 103:20, 162:20
**trigger** [1] - 215:4
**triggered** [1] - 102:13
**true** [5] - 36:3, 77:21, 77:22, 77:23, 225:10
**trusting** [1] - 70:12
**try** [9] - 6:8, 6:9, 6:11, 51:1, 129:5, 138:10, 160:16, 190:20, 214:19
**trying** [27] - 17:3, 36:10, 38:4, 39:13, 55:4, 65:7, 65:13, 68:22, 84:15, 91:1, 96:10, 116:9, 123:17, 138:9, 141:3, 141:4, 141:11, 141:13, 151:6, 155:4, 162:9, 181:8, 181:24, 184:22, 220:10
**Tuesday** [1] - 40:17
**turn** [4] - 12:8, 27:19, 145:1, 186:3
**twice** [1] - 41:24
**two** [26] - 8:20, 12:11, 14:19, 14:21, 14:23, 26:8, 30:12, 32:23, 35:10, 40:12, 40:19, 73:21, 90:22, 100:21, 105:1, 122:16, 127:19, 148:2, 160:8, 163:24, 164:8, 168:4, 168:21, 169:13, 187:6, 210:15
**type** [15] - 89:7, 161:8, 164:8, 165:19, 166:7, 166:11, 176:18, 176:22, 176:23, 176:24, 178:5, 179:6, 180:9, 212:21, 216:5
**types** [6] - 161:8, 161:11, 162:22, 164:11, 165:21, 212:18
**typical** [1] - 159:6

## U

ultrasound [1] - 152:17
unable [2] - 105:21, 211:20
under [34] - 30:10, 32:11, 34:24, 39:16, 46:16, 50:13, 83:21, 84:3, 90:15, 92:8, 95:18, 121:17, 122:16, 122:17, 125:22, 126:12, 127:12, 127:13, 145:5, 149:17, 149:20, 153:6, 153:21, 154:11, 157:10, 161:4, 161:18, 165:10, 186:18, 187:3, 187:8, 197:10, 197:13, 217:17
underneath [2] - 126:9, 161:11
understood [2] - 30:7, 37:7
unfortunately [2] - 137:20, 190:19
unit [1] - 185:13
Unit [6] - 113:3, 113:5, 113:6, 113:8, 114:17, 177:10
United [2] - 9:11, 9:19
UNITED [1] - 1:1
unless [7] - 64:1, 64:8, 138:18, 138:20, 179:3, 181:13, 181:18
unprofessional [3] - 19:6, 22:18, 24:20
unusual [1] - 148:6
up [33] - 17:16, 24:2, 25:21, 26:10, 32:5, 44:3, 50:24, 61:11, 64:9, 64:10, 66:6, 70:2, 75:23, 76:3, 76:13, 79:13, 83:16, 84:8, 91:14, 92:13, 112:14, 112:24, 113:13, 113:19, 133:2, 147:15, 194:13, 194:18, 201:5, 218:15, 218:17, 224:14, 224:15
ups [5] - 190:16, 191:12, 191:18, 196:15, 214:18
upstairs [3] - 112:15,

112:17, 112:19
urgent [1] - 135:18
Urgent [16] - 8:6, 10:17, 11:1, 13:11, 13:12, 40:13, 40:14, 90:11, 90:13, 90:19, 91:4, 94:18, 94:21, 158:6, 158:12, 159:10
utensil [1] - 172:12
utilization [4] - 57:22, 58:3, 58:17, 58:19
utilize [7] - 68:10, 152:23, 153:2, 154:17, 157:23, 213:18
utilized [2] - 156:13, 171:17
utilizes [2] - 80:18, 80:19

## V

vague [1] - 65:2
varied [1] - 198:10
variety [1] - 215:3
vascular [3] - 94:13, 94:14, 94:15
Velcro [1] - 109:19
verbal [2] - 171:23, 193:10
verbally [7] - 6:14, 60:16, 64:16, 64:17, 151:13, 171:22, 220:20
Verification [2] - 176:14, 177:1
versus [5] - 53:9, 78:11, 119:20, 119:21, 176:11
via [1] - 28:1
videos [1] - 116:2
view [1] - 113:23
views [1] - 113:23
visit [11] - 42:13, 43:3, 43:5, 43:7, 105:11, 130:5, 132:1, 132:4, 144:12, 189:20, 204:17
visited [3] - 123:13, 195:9, 200:13
visiting [3] - 70:5, 86:1, 131:11
visits [5] - 80:10, 82:12, 193:13, 204:22, 205:3
visualized [2] - 194:11, 194:16
vitals [3] - 121:11,

126:1, 189:7
vividly [1] - 55:23
VOELKER [1] - 3:6
voiced [2] - 18:15, 80:13
voices [1] - 157:1
vomiting [3] - 186:22, 188:17, 189:1
vs [2] - 1:8, 227:4

## W

Wabash [2] - 3:4, 3:8
wait [2] - 106:16, 107:7
waive [3] - 224:9, 224:12, 224:13
WAIVED [1] - 2:14
walk [2] - 30:6, 135:13
wants [1] - 27:12
ward [4] - 54:15, 56:3, 56:6, 108:23
wards [2] - 53:6, 54:7
warrant [1] - 105:10
warranted [2] - 105:13, 106:2
was.. [1] - 108:12
watch [2] - 115:5, 116:2
watching [1] - 111:10
ways [3] - 73:21, 73:22, 73:23
week [17] - 14:12, 14:21, 15:19, 17:22, 20:8, 30:12, 30:14, 40:20, 40:22, 41:8, 43:7, 53:14, 85:16, 136:24, 139:21, 188:11, 200:16
weekly [1] - 84:23
weeks [2] - 40:19, 132:20
WEIL [1] - 3:3
Wellbutrin [1] - 201:23
WES [2] - 1:10, 227:4
Wes [1] - 3:9
whatnot [1] - 51:19
whichever [1] - 60:9
WHITLEY [2] - 1:12, 227:6
Whitley [1] - 3:10
whole [5] - 46:12, 143:8, 154:6, 154:8, 179:5
Williams [8] - 16:3, 16:20, 17:13, 17:16, 18:23, 32:4, 57:2, 57:3

willing [2] - 15:9, 26:3
Wirth [1] - 3:13
wise [2] - 15:16, 211:19
WITNESS [1] - 4:2
witness [4] - 2:11, 5:2, 5:22, 65:7
Witness [1] - 228:2
woman [1] - 173:16
wondering [2] - 17:15, 100:24
word [4] - 21:18, 28:24, 35:14, 183:6
words [11] - 20:2, 23:11, 36:18, 38:4, 39:14, 49:10, 65:7, 78:6, 104:17, 163:24, 220:11
workers [1] - 96:14
works [1] - 83:18
world [2] - 106:15, 214:4
worried [2] - 51:20, 92:12
worsening [1] - 197:4
write [14] - 86:13, 96:19, 126:23, 127:13, 150:7, 179:23, 180:7, 180:8, 180:19, 180:21, 187:12, 197:21, 202:20
writes [2] - 89:16, 89:17
writing [8] - 71:6, 177:15, 180:1, 180:3, 180:5, 180:9, 180:10, 200:21
written [15] - 18:5, 21:8, 23:7, 41:10, 42:6, 65:17, 67:5, 95:24, 97:8, 121:24, 170:22, 171:23, 187:15, 193:10, 203:10
wrote [5] - 179:22, 181:7, 188:2, 189:9, 202:18

## X

X-ray [3] - 194:3, 194:8, 194:10
XL [1] - 143:19

## Y

yahoo [1] - 28:17
yahoo.com [1] - 29:4

year [5] - 10:4, 10:12, 11:7, 48:20, 117:4
years [17] - 5:19, 8:18, 9:17, 10:8, 11:9, 18:4, 18:20, 19:18, 24:16, 30:15, 32:23, 70:23, 70:24, 71:2, 128:1, 128:2, 148:2
yesterday [3] - 53:13, 59:6, 68:21
York [4] - 9:20, 10:12, 51:15, 51:19
yourself [3] - 82:20, 97:11, 128:19

## Z

Zach [1] - 3:10