## IN THE UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| KELLI ANDREWS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cv-1100 |
| | ) | |
| COUNTY OF SANGAMON, et al., | ) | Hon. Sue E. Myerscough |
| | ) | |
| Defendants. | ) | Hon. Tom Schanzle-Haskins |

### PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO THE
### DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and local Rule 7.1, Plaintiff here responds to summary judgment motions filed by the defendants in this case. *See* Dkt 177; Dkt. 180; Dkt. 181. Plaintiff is separately filing her statements of fact, and her responses to the Defendants' statements of fact simultaneous with this response.

### INTRODUCTION

When Tiffany Rusher was brought to the Sangamon County Jail after being arrested at a state mental hospital, the Defendants in this case understood that she was seriously mentally ill, and because of that serious mental illness, she was a danger to herself. As such, what Ms. Rusher needed was treatment for her mental illness.

The level of mental health treatment Ms. Rusher needed was not available at the Sangamon County Jail, however. Although the Jail's written policies provided that "[a]ll inmates will be provided access to a comprehensive mental health program[,]" PSOF ¶ 66, the Jail's mental healthcare vendor, ACH, had a different attitude: jails had no obligation to "make you better than when you came in." PSOF ¶ 182. Indeed, the Defendants scrimped on mental healthcare at the Jail; the contract with ACH provided for such a low level of mental health

staffing that the Defendants' own expert in this case, LCSW Michelle James, testified would only permit the single mental healthcare provider, LCSW and mental health specialist Michael Shmikler, time to monitor mentally ill patients, not provide them with actual mental health treatment.

Instead of mental health treatment, the Defendants adopted an easier and far cheaper option: solitary confinement. The Defendants repurposed five single-occupancy cells in the Jail's booking area, converting them to high-risk "isolation" cells for severely mentally ill detainees, and then did nothing more than monitor the mentally ill detainees in these isolation cells until they were discharged from the Jail—and no longer the Defendants' financial responsibility. Indeed, rudimentary mental health treatment forms were available at the Jail, but only "monitoring" forms were used for those detainees confined to isolation cells. In other words, the most acutely mentally ill detainees in the Jail were provided even *less* mental health treatment than other detainees in the facility. That was true for Ms. Rusher. The Defendants made virtually no effort to determine what mental illnesses actually afflicted her, and certainly made no effort to address her mental illness through treatment. Instead, Defendants simply "monitored" her from outside her isolation cell.

Meanwhile, the Defendants' suicide prevention practices were slipshod. The medical staff developed a prohibited items list for Ms. Rusher when she entered the Jail, but then put it into a file for food preparation rather than incorporated into the restrictions imposed by security staff. Over the next several months, Ms. Rusher gained access to a number of the items on the list, and injured herself with them. There was no established system for the medical staff to report self-injury events to the security staff who oversaw Ms. Rusher on a daily basis. And there was not even a system to report Ms. Rusher's self harm to the Jail's mental health staff—the

individuals responsible for addressing her mental health needs. Thus, on March 16, 2017, when Ms. Rusher told a nurse that she had swallowed a bag—a serious self-harm event—the nurse merely filed that information away in Ms. Rusher's medical file, and neither Mr. Shmikler nor security staff were aware of the bag incident in the following days. Over the next two days, correctional officers failed to take the simple steps to keep her safe. Even though it was standard practice for guards on the Jail's night shift to check high-risk detainees' shower items before and after they were used, the guards on the day shift failed to take that commonsense measure. Ms. Rusher had ripped off a strip of the towel and used it to strangle herself minutes later.

*     *     *

In their summary judgment motions, the Defendants quibble with some of these facts. They claim that they did not really place Ms. Rusher in isolation, because people occasionally passed by her cell. But Plaintiff's experts have offered well-grounded opinions that such incidental, insubstantial contacts would not mitigate the damage inflicted on Ms. Rusher by the isolation of solitary confinement. A jury is entitled to believe Plaintiff's experts and find that Ms. Rusher's solitary confinement was objectively unreasonable and thus unconstitutional.

The Defendants claim that they really *did* provide mental health treatment to Ms. Rusher. But once again, Plaintiff's experts—and the Defendants' own expert—offer the opinion that no actual mental health care was ever provided to her. That too is a factual dispute, and a jury is entitled to credit Plaintiff's evidence that the lack of mental health care at the Jail was objectively unreasonable.

The Defendants further claim that they were prohibited by an Illinois statute from referring Ms. Rusher to a psychiatric facility outside the Jail to receive the level of mental health care she required. They are wrong, as Plaintiff explains herein. But what if they were right? The Illinois Court of Appeals decision that they cite, *People v. Zahn,* 71 Ill. App. 3d 585 (1st Dist.

1979), has been on the books since 1979—nearly 40 years before Ms. Rusher was brought to the Jail. Yet with those decades of lead time, the Defendants took no action to provide the mental healthcare at the Jail that detainees like Ms. Rusher need. Instead, they built high-risk isolation cells to confine detainees with serious mental illness rather than treat them. A reasonable jury could easily conclude that this intentional policy choice disregarded the high-level needs of seriously mentally ill detainees like Ms. Rusher.

At bottom, however, the Defendants' argument is that they should be allowed to treat detainees the very way that Defendants treated Ms. Rusher: by putting them into a box and offering no mental health care whatsoever. They claim that they were within their rights to place Ms. Rusher in an isolation cell for three months, even if it was solitary confinement (a form of incarceration that experts universally agree wreaks permanent damage on incarcerated individuals). The Defendants are free to make this argument to a jury, but this Court must not allow them to escape accountability through summary judgment. The Court should deny the Defendants' motions.

## STATEMENT OF FACTS

Plaintiff incorporates by reference the Plaintiff's Statements of Fact and Response to Defendants' Statements of Fact that she is filing separately and simultaneously with this response. Plaintiff refers to her statements of fact as "PSOF," to the statements of fact from the ACH Defendants as "AD-SOF," and to the statements of fact from the Sangamon Defendants as "SD-SOF."

## LEGAL STANDARD

As the movants, Defendants must establish that the case presents no genuine issues of material fact which require a trial to resolve. *Ponsett v. GE Pension Plan*, 614 F.3d 684, 691 (7th

Cir. 2010). Defendants can satisfy this burden(a) by "negating an essential element of [the plaintiff's] claim with affirmative evidence" or (b) by "demonstrating that [the plaintiff's] claim lacks supporting evidence." *Tapley v. Chambers*, 840 F.3d 370, 376 (7th Cir. 2016).

When deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to Plaintiff, resolving all evidentiary conflicts in her favor. *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015); *Williams v. City of Chicago*, 733 F.3d 749, 752 (7th Cir. 2013) (credibility issues must be given to a jury to decide). Plaintiff is entitled to every reasonable inference. *Hansen v. Fincantieri Marine Grp.*, LLC, 763 F.3d 832, 836 (7th Cir. 2014); *see also Miller v. Gonzalez,* 761 F.3d 822, 828 (7th Cir. 2014) ("Deciding which inference to draw from [a] conversation is the task of a fact finder."). Furthermore, circumstantial evidence is entitled to equal weight, especially in cases that "turn on circumstantial evidence, often originating in a doctor's failure to conform to basic standards of care." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

## ARGUMENT

## I.   The Individual Defendants Were Objectively Unreasonable in Their Treatment of Tiffany Rusher.

Plaintiff's case centers on the misconduct of Sangamon County and ACH, and their employees, while Ms. Rusher was detained pending trial at the Sangamon County Jail. Because Ms. Rusher was a pretrial detainee, Plaintiff's constitutional claims related to her confinement arise under the Fourteenth Amendment. *Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015) ("[A] pretrial detainee is entitled to be free from conditions that amount to "punishment," while a convicted prisoner is entitled to be free from conditions that constitute "cruel and unusual

punishment." (cleaned up)); *see also Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018)

("[C]ourts must pay careful attention to the different status of pretrial detainees.").

As Defendants acknowledge, Plaintiff's Fourteenth Amendment claim is governed by an

objective reasonableness standard. To succeed on such a claim, Plaintiff must first show that

Defendants' actions were taken intentionally, knowingly, or perhaps recklessly. *Kingsley v.*

*Hendrickson*, 576 U.S. 389, 395 (2015); *Pittman by & through Hamilton v. Cnty. of Madison*,

970 F.3d 823, 827-28 (7th Cir. 2020) (this inquiry "encompasses all states of mind except for

negligence and gross negligence"). Plaintiff must also show that the defendant's conduct was

objectively unreasonable. *Id.* That is the limit of the showing required: "the plaintiff needed only

to show that the defendant's conduct was objectively unreasonable." *Miranda*, 900 F.3d at 351.

Objective reasonableness "requires courts to focus on the totality of facts and circumstances

faced by the individual alleged" to have committed a constitutional deprivation "and to gauge

objectively—without regard to any subjective belief held by the individual—whether the

response was reasonable." *McCann v. Ogle Cnty.*, 909 F.3d 881, 886 (7th Cir. 2018); *see also*

*Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020).

### A.    Defendants Abraham and Shmikler Were Objectively Unreasonable in Denying Ms. Rusher Adequate Mental Health Care.

 Plaintiff has put forward facts showing that from the outset, Ms. Rusher received

virtually no mental health care at the Sangamon County Jail. There is ample evidence in this case

from which a reasonable jury could conclude that the care provided by the Defendants was

objectively unreasonable.

Dr. Terry Kupers, Plaintiff's medical expert, explains that in order to prevent suicide,

mentally ill, suicidal detainees like Ms. Rusher require mental health treatment, and in particular

a treatment plan. PSOF ¶¶ 67-71. Dr. Kupers explains that

> a treatment plan lists a diagnosis or describes an emotional problem that will be the focus of treatment; identifies the treatment modalities that are to occur (group therapy, psychotropic medications, etc.) . . . the steps to be taken to ensure the patient's safety . . . the kinds of outcomes that are to be monitored . . . the time-phase for the treatment being planned . . . [and] a plan for future stages of treatment.

PSOF ¶ 69. Treatment plans frame the provision of mental healthcare and give clinicians a means of identifying situations where a patient's mental state deteriorates. *Id*; *see also Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 380 (7th Cir. 2017) (en banc) (discussing the need for a treatment plan in the correctional setting).

The evidence shows that the Defendants made no attempt to develop a treatment plan or monitor Ms. Rusher's progress as she repeatedly hurt herself at the Jail. Ms. Rusher was arrested at McFarland Mental Health Center, and to ensure that she would not be harmed by her transfer to the Jail, the doctors at McFarland prepared a detailed discharge summary that discussed her mental health history, diagnoses, and course of treatment. PSOF ¶¶ 2-7. It does not appear, however, that Dr. Abraham, Ms. Rusher's doctor at the Jail, ever read that summary. At his deposition, Dr. Abraham could not say when he saw the summary, and could not say that he had seen it before Ms. Rusher's death. PSOF ¶ 8. Dr. Abraham said that someone on the medical "team" would have read it, but he did not know who that person would be, and admitted that there was no process in place to determine who might have read such an intake document, or whether it was read at all. PSOF ¶¶ 8, 84, 85. Dr. Abraham said that even though Ms. Rusher had been brought to the Jail from a state psychiatric hospital and the discharge summary was easily accessible in Ms. Rusher's medical file, he would have made no effort to review the discharge summary had been provided, because then he would have to look in the medical files of all the patients he saw. PSOF ¶ 84, 85.

In January 2017 Dr. Abraham "diagnosed" Ms. Rusher with bipolar and schizophrenia disorders. PSOF ¶ 86. He claims to have arrived at this diagnosis through a conversation with her, during which he took virtually no notes. PSOF ¶ 86. Notably, Dr. Abraham—whose certification is in family medicine—diagnosed entirely different disorders than the ones the doctors at McFarland had recorded in the discharge summary without any explanation whatsoever. Dr. Abraham continued the same medication regimen that the McFarland doctors had prescribed, but again provided no justification for why Ms. Rusher's diagnoses had changed but no change to her medication was required. PSOF ¶¶ 86, 87. Even as Ms. Rusher began engaging in multiple and repeated acts of self-harm, Dr. Abraham never attempted to develop a treatment plan to address her current mental health needs or psychiatric state. PSOF ¶ 87. Dr. Abraham claims to have talked occasionally about Ms. Rusher with Mr. Shmikler, PSOF ¶ 87, but there are no notes of these conversations, and there were no alterations to Ms. Rusher's "care" even as she engaged in repeated self-harm events.

Mr. Shmikler also failed to develop a treatment plan, either on his own or with Dr. Abraham. Mr. Shmikler's written entries regarding Ms. Rusher consist principally of "Observation Forms," which are administrative documents used to periodically determine whether a detainee should remain in the Jail's high-risk cells and what restrictions should be imposed on them. PSOF ¶ 89. Dr. Kupers explains that these entries are not treatment plans, and indeed do not identify or plan out any mental health treatment to be provided at all. PSOF ¶ 68. Dr. Amy Trivette, the Defendant's expert, agrees; she testified that she saw no treatment plans in Ms. Rusher's records. PSOF ¶ 91. Notably, the Jail *does* use a rudimentary treatment plan document for addressing mental illness. PSOF ¶ 89. But as another ACH mental health employee testified, those forms are *not* used for detainees in the high-risk isolation cells. PSOF ¶ 89. That

employee, Lydia Hicks, testified that she had never developed a treatment plan for detainees in high-risk isolation cells. PSOF ¶ 90.

A jury could reasonably conclude that no treatment plan was developed for Ms. Rusher because no mental health treatment was being provided to her. Dr. Kupers explains that given Ms. Rusher's serious mental health condition, any treatment plan should have included, at minimum, a method to track Ms. Rusher's psychotropic medication and their effects; lengthy, in-person psychotherapy sessions, typically between 25 and 50 minutes in a private and confidential setting; exclusion from isolation; and congregate activities as well as group therapy. PSOF ¶¶ 75, 81. None of that occurred. Mr. Shmikler was not a full-time employee at the Jail and only worked there four days a week for a total of just 28 hours. PSOF ¶ 45. Mr. Shmikler claims that he checked on Ms. Rusher while he was at the Jail, but the only record of these interactions are terse notes on the Jail's Inmate Location Verification form, with entries such as "OK" or "sleeping". PSOF ¶ 45. There is no indication in these notes that Mr. Shmikler ever provided treatment to Ms. Rusher or made any efforts to ensure she received mental health care. *Id.*

The Defendants argue that brief interactions like these conversations amounted to "therapy" for Ms. Rusher. Dkt. 177 at 17-18. But as Dr. Kupers explains in his report, such conversations, all of which occurred through a steel door, do not resemble the therapy that would meaningfully address Ms. Rusher's diagnosed conditions and make her less likely to harm herself. PSOF ¶ 81. The Defendants' own expert, Dr. Thomas Fowlkes, agreed; he testified that therapies such as cognitive behavioral therapy, which is a standard therapy for borderline personality disorder, were not offered to Ms. Rusher while she was at the Jail, and that such therapist would have made it less likely that Ms. Rusher would harm herself. PSOF ¶ 100. Furthermore, the Defendants' own expert social-worker witness, Michelle James, agreed that

9

given Mr. Shmiklers's mental health caseload, he would have been confined to monitoring and would have been unable to provide therapy to the detainees at the Jail, including Ms. Rusher. PSOF ¶ 98.

This evidence is more than sufficient to permit a reasonable jury to conclude that Defendants Abraham and Shmikler were objectively unreasonable in failing to create a treatment plan for Ms. Rusher or provide her with therapy or other mental health treatment. The Seventh Circuit has squarely held that a state actor's "failure to protect an inmate from self-harm" is sufficient to establish the more onerous standard of deliberate indifference, which applies to convicted prisoners. *Miranda*, 900 F.3d at 349. Such an obligation "covers self-destructive behaviors up to an including suicide." *Id.* Unlike the defendant in *McCann*, which the evidence showed "attended diligently and conscientiously to [the plaintiff's] medical needs from the moment he arrived at the [jail,]" the evidence in this case demonstrates that Dr. Abraham and Mr. Shmikler disregarded Ms. Rusher's clear need for intensive mental health care and unreasonably failed to create a treatment plan to ensure that such care was provided.

Defendants Abraham and Shmikler contend that Plaintiff's constitutional claim against them is actually just a disagreement about "which of many professionally acceptable treatment plans" should have been implemented. Dkt. 177 at 13. Notably, Defendants' argument relies on a case that imposed the more onerous deliberate indifference standard, which the Seventh Circuit held in *Miranda* was inapplicable to pretrial detainees. *Compare Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1988) ("In the context of a claim for inadequate medical care, the professional judgment standard requires essentially the same analysis as the Eighth Amendment standard."), *with Miranda*, 900 F.3d at 350-51 ("[C]ourts must pay careful attention to the different status of pretrial detainees."). But more importantly, Defendants' argument wholly

10

mischaracterizes Plaintiff's claim. Plaintiff's claim is not a disagreement about how many days per week Ms. Rusher received cognitive behavioral therapy, or whether Ms. Rusher should have received a brand name psychotropic medication rather than a generic version; Plaintiff's claim is instead about whether Defendants provided her any meaningful mental health treatment whatsoever. *Miranda*, 900 F.3d at 354. Plaintiff's evidence, which must be believed at this juncture, demonstrates that Defendants' conduct was not simply an alternative choice of treatment—it was no meaningful treatment at all.

> **B.    Defendants' Decision to Put Ms. Rusher in Prolonged Solitary Confinement was Objectively Unreasonable.**

Instead of providing mental health care to address Ms. Rusher's serious mental illness, the Defendants chose to address it by placing Ms. Rusher in an isolation cell. Ms. Rusher was confined to a "high risk" isolation cell for virtually her entire incarceration at the Jail. PSOF ¶ 33.[1] Although the Jail permitted even detainees in disciplinary segregation at least an hour outside their cells each day, PSOF ¶ 53, detainees in the high risk isolation cells were not. PSOF ¶ 54. Instead, these detainees were allowed to leave their cells at midnight a few times per week. During these short breaks, detainees in isolation cells would be permitted to take a shower and to try to call their loved ones. SD-SOF ¶ 44. (Not surprisingly, given the hour, most people were asleep and the calls were unsuccessful.) *See* SD-SOF ¶ 44 (reflecting that Ms. Rusher placed virtually all of her calls around midnight and was only able to complete approximately a quarter of them). Otherwise, the detainees were confined in their small cells alone, 24 hours a day with no meaningful interactions—a situation that Ms. Rusher endured for three months.

---

[1] Ms. Rusher was housed in the general population for a matter of hours on January 12. PSOF ¶ 60. Plaintiff discusses that housing in greater detail below.

Dr. Kupers explains that confining mentally ill and suicidal detainees in this manner departs dramatically from the standard of care, and is catastrophic for their mental well-being, substantially increasing the risk that they will attempt suicide.  PSOF ¶ 64.  Dr. Kupers's opinion regarding the confinement of suicidal persons, which is consonant with the literature on the subject for correctional facilities, is that a suicidal prisoner should be housed in an observation cell for no more than 72 hours; if their suicidality is not resolved, they should be brought out of the cell and provided with a higher level of inpatient, psychiatric care. PSOF ¶¶ 12, 13. Dr. Ajay Jeetwani, Ms. Rusher's psychiatrist at McFarland, offered the exact same assessment, explaining that he would never subject a mentally ill person—particularly a suicidal one—to any period of extended confinement, because doing so would be psychologically damaging and would increase the probability that they would kill themselves. PSOF ¶ 17. In other words, the unanimous consensus of correctional mental health experts and literature is that the proper response to an acutely suicidal prisoner is, at most, extremely brief confinement in an observation cell, followed by the provision of intensive *treatment*.

The evidence demonstrates that Defendants took the diametrically opposite approach: they denied Ms. Rusher any meaningful mental health treatment, and instead relied exclusively on solitary confinement to keep her from suicide. PSOF ¶¶ 25-50. The inevitable consequence was the swift deterioration of Ms. Rusher's mental health and her eventual successful suicide. PSOF ¶¶ 63, 64.

The Defendants attempt to negate Plaintiff's evidence with several arguments. First, they argue that Ms. Rusher's extended confinement in the isolation cells was not solitary confinement at all. It is undisputed that for all but a few hours on January 12 (*see* PSOF ¶ 61), Ms. Rusher was confined to an isolation cell for more than 23 hours per day. PSOF ¶ 50. The Defendants

12

nevertheless insist that this was not solitary confinement, because there were 15-minute checks, daily delivery of food and medications, and *ad hoc* interactions with persons walking by her cell. *See* Dkt. 177 at 15-16; Dkt. 180 at 31, 33-34, 38.

There are multiple problems with this position. As an initial matter, it rests on a factual premise that Defendants have not established and that Plaintiff disputes.[2] As Plaintiff has pointed out, the Defendants' claim that Ms. Rusher had "frequent" interactions is belied by the record. The Defendants generally assert that the booking area was "high traffic," but they never quantify what that means and do not deny that curtains were placed on all or most of the windows in the booking cells, making the quantity of any so-called "traffic" unknown and irrelevant for Ms. Rusher. PSOF ¶¶ 36- 39. Additionally, nearly all the "conversations" that the Defendants call attention to appear to have been perfunctory, non-meaningful interactions, in which Ms. Rusher would attempt to engage a guard in any way she could think of (*e.g.*, "Hey what time is it?") and the guard responding with a few words and then quickly move on. SD-SOF ¶ 107, 108. For example, the Defendants highlight that Ms. Rusher talked about her family background with a guard named Childress, *see* SD-SOF ¶ 107, but they omit that this conversation only occurred after Ms. Rusher engaged in an act of self-harm and Childress was escorting her to the hospital. SD-SOF ¶ 107-108. Tellingly, while Childress claimed to have daily interactions with Ms. Rusher, she conceded that this was the only personal, substantive conversation they ever had. SD-SOF ¶ 108. In the other interactions Childress identified, Ms. Rusher would try to engage in

---

[2] Sangamon also emphasizes that on two very short occasions, which lasted a day, Ms. Rusher was housed with other detainees. Dkt. 180 at 36, 37. The reason for this appears to have been overcrowding. *See* PSOF ¶ 27; SD-SOF ¶ 126. The Defendants make much of the fact that on one of these occasions she engaged in self-harm, *see* Dkt. 180 at 37, but such self-harm is consistent with Dr. Kupers's opinion that solitary confinement for mentally ill individuals leads to acute psychosis, which would have led her to engage in harmful acts. PSOF ¶ 16. It is therefore unsurprising that after prolonged periods of solitary confinement, Ms. Rusher engaged in self-harm during the brief periods she was released from solitary without any corresponding treatment for her acute mental health needs.

conversation and would be brushed off with at most a few words from the guard. Recollections from other employees are similar. *See* SD-SOF ¶ 123; PSOF ¶ 46.

Additionally, as Dr. Kupers explains, the Defendants are essentially engaged in semantics that are meaningless to the clinical impact of isolation on the mentally ill. Dr. Kupers notes that because the use of solitary confinement has been exposed as inhumane, correctional administrators will go to lengths to preserve the practice under other names, and to claim, in particular, that incidental cell-side interactions like the ones the Defendants highlight here convert solitary confinement into something else. PSOF ¶ 48. Dr. Kupers has opined, however, that it is well established that such interactions do not alter the isolating and damaging nature of the confinement, or meaningfully mitigate the devastating impact that it has on mentally ill individuals. PSOF ¶ 48.

Dr. Kupers maintains instead that mentally ill detainees like Ms. Rusher will commonly resort to acts of self-harm and "manipulation" in an attempt to get relief from the agony caused by solitary confinement. PSOF ¶¶ 48, 49. As Dr. Kupers notes, that is what happened in this case. PSOF ¶ 49. The Sangamon Defendants' own statement of facts, *see* SD-SOF ¶¶ 1-207, make clear that Ms. Rusher repeatedly inflicted serious injuries on herself (or claimed serious injury or illness) so that she could have human contact with the guards and nurses who were forced to respond. *Id.*

Defendants also make several arguments relating to the operation of Due Process Clause in this case that have no relevance to the issues in this case. First, Defendants argue that summary judgment on Plaintiff's Fourteenth Amendment claim regarding Ms. Rusher's solitary confinement is appropriate because Ms. Rusher had no right to process before she was placed in solitary. Dkt. 177 at 14-15. That argument confuses both Plaintiff's claim and binding

14

precedents. The Supreme Court in *Sandin v. Conner*, 515 U.S. 472 (1995), addressed the *process* that is due to an incarcerated individual before he is moved from one custodial setting to another. The Court in *Sandin* held that there is no process whatsoever required to be provided to that individual unless the new custodial setting "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484.

Plaintiff's claim does not challenge the *process* provided or denied to Ms. Rusher before she was placed in solitary. Instead, it alleges that Ms. Rusher's solitary confinement was itself objectively unreasonable in light of the particular circumstances of this case, including the abject denial of mental health treatment. *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019) (recognizing that the Fourteenth Amendment requires jails to provide detainees with reasonably adequate shelter, among other things); *see also James v. Hale*, 959 F.3d 307, 316-17 (7th Cir. 2020) (objective reasonableness inquiry is "a context-sensitive, fact-bound inquiry into the intentionality of the defendant's conduct *and* the totality of the circumstances").

Consider this illustration: instead of being placed in solitary confinement, Ms. Rusher is assigned a top bunk in her cell. She could hardly claim a due process liberty interest in avoiding a top bunk, even if it were less desirable than a lower one. But if Ms. Rusher had a condition like epilepsy that made assignment to the top bunk dangerous, a Fourteenth Amendment claim would prevail if she was unreasonably assigned to the bunk and was injured as a result. *Cf. Bolling v. Carter*, 819 F.3d 1035 (7th Cir. 2016) (recognizing Fourteenth Amendment violation where a jail detainee was wrongfully assigned to a top bunk despite his medical condition, and was injured as a result). Plaintiff makes the same claim here. In other words, Plaintiff's Fourteenth Amendment claim would be no different if the Defendants had provided Ms. Rusher a full trial before placing her in solitary. The claim instead challenges the decision to place Ms. Rusher in solitary

15

confinement with its attendant conditions *itself* based on the circumstances of the case, including Ms. Rusher's serious mental illness and Defendants' refusal to provide her treatment.

The Sangamon Defendants argue that Ms. Rusher's solitary confinement was not objectively unreasonable because it did not deprive her of the "minimal civilized measure of life's necessities," Dkt. 180 at 39 (quoting *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). This misunderstands *Giles*. In *Giles*, the Seventh Circuit affirmed summary judgment against a *pro se* prisoner who alleged that solitary confinement was harmful to persons with mental illness. The Court agreed with that proposition as a general matter, 914 F.3d at 1051-52, but found that the plaintiff had not made the required showing that the conditions "creat[ed] an excessive risk to the inmate's health and safety." *Id.* at 1051. Instead, the only evidence in the record demonstrated that the plaintiff was regularly evaluated by the defendants and removed from segregation as soon as the evidence indicated a decline in his mental health. *Id.* at 1052.

Unlike in *Giles*, Plaintiff here has offered ample evidence, including expert testimony, that solitary confinement *did* create an excessive risk to Ms. Rusher's health and safety; that solitary confinement was particularly harmful to Ms. Rusher given the Defendants' refusal to provide mental health care; that Defendants failed to take any action when Ms. Rusher demonstrated through acts of self-harm the debilitating effect solitary was having on her mental health; and that solitary confinement, among other misconduct by Defendants, eventually caused Ms. Rusher to take her own life. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666-67 (7th Cir. 2012) (recognizing that prolonged confinement in isolation may constitute a violation of the Eighth Amendment depending the duration and nature of the segregation); *Walker v. Shansky*, 28 F.3d 666, 673 (7th Cir. 1994) (same). PSOF ¶¶ 63, 64. The facts in this case, in other words, bear little resemblance to the record available to the Court in *Giles*, and the Seventh

Circuit's holding in *Giles* accordingly does not support Defendants' request for summary judgment.

Defendants next claim that summary judgment is required because even if solitary confinement was harmful to her, Plaintiff has not proposed any feasible alternatives. *See, e.g.*, Dkt. 177 at 16-17. As explained above, the record contradicts Defendants' assertion—Plaintiff has explained in detail the necessary and feasible alternatives to relegating Ms. Rusher to solitary confinement rather than treating her. Rather than being permanently assigned to solitary confinement, Dr. Kupers explained that Ms. Rusher should have received actual mental health treatment, e.g., "longer periods of clinical contact with the prisoner (typically between 25 and 50 minutes) in a private and confidential setting such as an office, and is ongoing for a substantial amount of time." PSOF ¶ 81. The Defendants have offered no explanation as to why these proposals would be unreasonable or infeasible. And any such argument would necessarily require a jury to resolve and thus improper at summary judgment.

The record further demonstrates that Ms. Rusher easily could have been housed in the non-solitary confinement areas in the Jail. There is nothing in the record to suggest that Ms. Rusher was a danger to others while she was at the Jail, and Defendants themselves moved other individuals into her isolation cell when the Jail became overcrowded. PSOF ¶ 60; SD-SOF ¶ 126. Additionally, on January 11, 2017, Mr. Shmikler cleared her to enter the Jail's general population. PSOF ¶ 59. She was isolated again after she harmed *herself*, but there is no suggestion that the Jail housed her alone because she was a threat to others.[3] The record also demonstrates that Defendants had the ability to allow Ms. Rusher to make supervised trips out of her cell without issue. This case is thus a far cry from *Scarver v. Litscher*, 434 F.3d 972 (7th Cir.

---

[3] While Ms. Rusher was brought to the Jail on an assault charge, such simple charges constitute much of the Jail's general population to begin with.

2006), the "feasible alternatives" case Defendants rely on, *see* Dkt. 177 at 16, in which the prisoner had been placed in solitary confinement as a protective measure because he was an "extremely dangerous" schizophrenic individual who had murdered multiple people while in prison. 434 F.3d at 973-74.

As such, there is nothing to suggest it would have been infeasible for Ms. Rusher to be brought out of her cell to meet with a mental health provider for extended, private therapy sessions. Nor is there anything to suggest it would have been infeasible to allow her out of her cell for recreation or relief from her isolation. Given Mr. Shmikler's existing caseload, however, those alternatives would require more staff time for a mental health professional or security staff, which would have cost money.

### C.    Defendants Were Objectively Unreasonable in Failing to Enable Ms. Rusher to Receive Psychiatric Care.

Both Dr. Kupers and Mr. Stanley have opined that Ms. Rusher required inpatient intensive psychiatric care. The record is undisputed that the Jail had no inpatient psychiatric unit or facility, and thus the Defendants were required to take Ms. Rusher to an appropriate facility where she could receive the care she needed. PSOF ¶¶ 101, 115. Despite acknowledging their ability and responsibility to arrange for Ms. Rusher to receive offsite psychiatric care given her severe mental illness, Defendants Abraham and Shmikler intentionally chose the less expensive, but objectively unreasonable, option: to deny her any mental health treatment and instead house her in solitary confinement.

The Defendants do not argue that it would have been unreasonable to bring Ms. Rusher to an inpatient psychiatric facility, whether through transfer or single-day accompanied furloughs that jails routinely use to take detainees offsite for necessary medical care. Defendants instead argue that state law prohibited them from transferring Ms. Rusher to an inpatient psychiatric

facility. Dkt. 177 at 13-14 (405 ILCS 5/3-100); Dkt. 180 at 48 (same). But Defendants' argument is both an incorrect understanding of state law, and irrelevant. 405 ILCS 5/3-100 prohibits circuit *courts* of the ability to order individuals with pending felony charges to be *involuntarily* committed at a psychiatric institution, the state law says nothing about voluntary commitments or a *jailer's* ability to bring a detainee to a psychiatric institution for treatment. In other words, jails in Illinois are free to seek transfers for detainees awaiting trial for a felony to a psychiatric institution with the patient's consent. 405 ILCS 5/3-100. And jails in Illinois remain free to take any detainee in their custody out of the Jail to a medical or mental health facility for a medical appointment. Indeed, correctional facilities across the State take prisoners in their care to various offsite medical facilities on a regular basis. *See Petties*, 836 F.3d at 729 (discussing line of cases that address care of prisoners by offsite specialists).

A request by Defendants Abraham or Shmikler to voluntarily transfer Ms. Rusher to an inpatient psychiatric facility would have been permissible under state law, objectively reasonable, and would have saved Ms. Rusher's life. Moreover, the law permitted the Defendants to ensure that Ms. Rusher would not evade custody by leaving the facility upon transfer; She would have been permitted to leave the facility only upon signing a 5-day release request, which would permit their re-confinement at the jail if they sought to end their voluntary commitment to the facility. *See* 405 ILCS 5/3-400(b)(3).

The Illinois Department of Corrections' regulations governing county jails require county jails to attempt such commitments. The IDOC has been tasked by the Illinois Legislature with adopting "standards and procedures for the provision of mental health . . . services to persons with mental illness . . . confined in a county jail," 730 ILCS 5/3-15-2, and to "establish rules governing the provision of mental health services" which "shall provide . . . that a committed

person who is diagnosed as suffering from a mental illness . . . shall have access to treatment as deemed necessary" by a mental health professional. 730 ILCS 5/3-7-7.

Pursuant to this mandate, the IDOC's regulations of jails regarding "classification and separation" require that "[a]ction shall be taken to transfer [jail] detainees who have been determined by mental health professionals to be severely mentally ill, developmentally disabled or emotionally disturbed to an appropriate facility." 20 Ill. Admin. Code § 701.70(b)(6). The IDOC's regulations further require that "[a]ll jails shall provide a competent medical authority to ensure that the following . . . mental health services are available: Arrangements for hospitalization." 20 Ill. Admin. Code § 701.90. Section 701.90 is consistent with the Jail's own policies (which Defendants Abraham and Shmikler were required to follow), which require transfer to an appropriate facility if the mental health services offered at the Jail are insufficient for meeting their needs. PSOF ¶ 118.

Notably, Defendants themselves, and other ACH staff, believed such transfers are possible. Dr. Abraham testified that he had the responsibility to refer detainees to another facility to receive a higher level of care, which he said would be done by making a referral to a psychiatrist. PSOF ¶¶ 125, 126. Dr. Abraham further testified that to make a psychiatric referral for "an acute episode," the medical staff could refer the detainee to the emergency room, after which the hospital's psychiatry team would evaluate the detainee for a psychiatric commitment. PSOF ¶ 126. Mr. Shmikler was likewise empowered to refer detainees for offsite psychiatric care. PSOF ¶ 125. And another ACH employee, Nurse Kate Daniels, also testified that patients in need of inpatient psychiatric care could receive it via a psychiatric evaluation at the emergency room. PSOF ¶ 127. Had Defendants referred Ms. Rusher, Dr. Jeetwani testified that she would have been re-admitted at McFarland (as distinguished from a civil commitment by a

court). PSOF ¶ 119. Contrary to the Defendants' arguments, Ms. Rusher's referral to a psychiatrist for inpatient admission was not simply indicated—it was required by the regulation governing the Jail, and it was well known to the medical staff at the Jail that such transfers were possible.[4] Defendants' contention that it was barred by statute appears to be an erroneous post-hoc rationalization for their misconduct, rather than any true understanding of the law at the time Ms. Rusher was in their care.

Even if the Defendants' post-hoc reading of Illinois statute is correct, there is absolutely nothing that barred them from ordering that Ms. Rusher be taken offsite for psychiatric care. To the contrary, Defendants routinely order detainees at the Jail be referred for evaluation and treatment by specialists offsite. And certainly, if the Defendants had no ability to transfer Ms. Rusher to an inpatient psychiatric facility, it was objectively unreasonable for them to simply throw up their hands and do nothing. To the contrary, if they truly believed that state law required Ms. Rusher to remain onsite at the Jail, it would have been incumbent upon Defendants to take dramatically greater action to provide Ms. Rusher mental health treatment. Yet the evidence shows that they did not such thing, and instead relegated Ms. Rusher (and other detainees with serious mental illness) to an isolation cell—conduct that was far more profitable for their employer. A reasonable jury could conclude that Defendants' decision not to refer Ms. Rusher for psychiatric treatment by mental health specialists was objectively unreasonable, especially in light of their refusal to undertake the mental health Ms. Rusher needed themselves.

---

[4] The ACH Defendants also assert that Plaintiffs cannot identify a mental health facility that would have admitted Ms. Rusher. AD-SOF ¶ 62. But Dr. Jeetwani testified that McFarland would have admitted Ms. Rusher either via involuntary civil commitment or via voluntary referral from a physician. PSOF ¶ 119. And ACH's own employees, Nurse Daniels and Dr. Abraham, both testified that they could secure such psychiatric care for Ms. Rusher by referring her to a psychiatrist, directly or through the emergency room. PSOF ¶¶ 125-127.

### D. The Correctional Officer Defendants Were Objectively Unreasonable in Failing to Take Simple, Obvious Actions to Prevent Ms. Rusher's Suicide.

The ACH Defendants were objectively unreasonable in failing to provide Ms. Rusher with constitutionally adequate mental health. But the Sangamon County Defendants also acted objectively unreasonable in their care of Ms. Rusher. Defendants Meyer, Whitley, and Ealey—correctional officers at the Jail who escorted Ms. Rusher to and from her shower—failed to take basic, commonsense steps that would have kept Ms. Rusher safe and alive.

The facts are straightforward: on March 18, Ms. Rusher was housed in "high risk" isolation cell, and was considered by the Jail's mental health personnel to be at such an acute risk of suicide that her cell had been stripped of essentially all objects—for fear that she could use any of them to harm herself. PSOF ¶ 155, 156. She had also been stripped of all her clothing and given a suicide smock instead—once again, for the fear that she could rip any article of clothing and use it to strangle herself. PSOF ¶ 156. The Officer Defendants also knew that Ms. Rusher had succeeding in committing multiple acts of self-harm, including attempted strangulation. PSOF ¶ 155, 156, 157. She was, in short, an extreme danger to herself, and her confinement had been designed to prevent her from obtaining objects—including, specifically, cloth that could be torn—that she could use to strangle herself with. The Officer Defendants accordingly knew that Ms. Rusher suffered from self-destructive tendencies and knew that medical staff had determined that Ms. Rusher faced a risk of self-harm from access to items that could be used for strangulation. *Rice*, 675 F.3d at 665.

On March 18, Sergeant Bouvet ordered Ms. Rusher to be escorted for a shower but permitted two male officers to escort Ms. Rusher to the shower without directing that a female, who could enter the shower, accompany her as well. PSOF ¶ 163. Officers Meyer and Whitley then gave Ms. Rusher a towel without inspecting it beforehand. PSOF ¶ 164. Meyer and Whitley

permitted Ms. Rusher to seclude herself in a room with the towel and the shower running for five to ten minutes. PSOF ¶ 165. When Ms. Rusher finished the shower, neither Meyer nor Whitley inspected the towel that she left behind. PSOF ¶ 166. And neither Meyer nor Whitley inspected the shower to look for evidence that Ms. Rusher had manipulated an object with which she could harm herself. PSOF ¶ 165-174. Had either one done so, they would have noted the freshly-torn towel strands that Ms. Rusher had left in the toilet. PSOF ¶ 175. And neither one asked Ealey, whom they had recruited to help with the shower, whether she had checked the towel either. PSOF ¶ 166.

Officer Ealey was brought in to help after the shower had begun, and thus did not have an opportunity to inspect the towel beforehand, but she testified that after she entered the shower to assist Ms. Rusher, she saw the towel on the floor and noted that it was tattered. PSOF ¶ 167. Photographs show that besides the ripped edge, the towel was in good condition, and is not otherwise "tattered." PSOF ¶ 171. This tattered edge, however, had every appearance of being freshly torn. PSOF ¶ 171-172. Yet Ealey, upon seeing this, did nothing further. PSOF ¶ 168. Besides not inspecting the towel, she also did not inspect the shower area, which would have revealed the torn towel strands that Ms. Rusher had dumped in the toilet. PSOF ¶ 168. Ealey also did not alert Meyer or Whitley that the towel appeared ripped, alert them that she had not inspected it, alert them that she had not inspected the shower room, or ask them what condition the towel had been in when they gave it to Ms. Rusher. PSOF ¶ 168. Instead, the officers allowed Ms. Rusher to secret the towel back to her cell, where, isolated and out of sight from any watchful eye, she strangled herself with it. PSOF ¶ 175.

These facts are largely undisputed. To elide them, the Defendants advance a variety of meritless arguments. First, they argue that Sgt. Bouvet cannot held liable under the stringent

23

standard of supervisory liability. Dkt. 181 at 11. But Bouvet is not being sued for supervising others; he is being sued directly for failing to order a female officer to assist with the shower. That failure was objectively unreasonable because it ensured that Ms. Rusher would necessarily be in shower without any supervision for her safety, which Sgt. Bouvet knew posed an extreme risk of self-harm. The Defendants also argue that when Sgt. Bouvet issued his instructions there was an "absence of any signs of imminent danger." *Id.* at 12. But Ms. Rusher's suicide smock, and her continued status on suicide watch in a high-risk cell, were glaring signs of imminent danger. Sgt. Bouvet's decision not to ensure monitoring for Ms. Rusher during her shower was thus objectively unreasonable

Next, the Defendants contend that medical staff had issued no specific order prohibiting Ms. Rusher from taking a shower or using a bath towel. Dkt. 181 at 12. This is a red herring. Plaintiff has no quarrel with the decision to permit Ms. Rusher to take a shower or to use a towel. Providing Ms. Rusher with both those things was entirely appropriate. It is the failure to take basic *precautions* when permitting her to do these things, and thus allowing her to harm herself, that is objectively unreasonable.

Next, the Defendants accuse Plaintiff of essentially inventing merely "concievab[le]" counterfactuals of what the officers might have done with the benefit of hindsight, which does not rise to the level of culpability necessary to make out a due process claim. Dkt. 181 at 15. But Plaintiff's claim does not rely on mere Monday morning quarterbacking. Instead, it is about the objectively unreasonable nature of Defendants' intentional actions in light of Ms. Rusher's suicidal status. *Rice*, 675 F.3d 650 ("prison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies"); *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 928 (7th Cir. 2004) (staff's inaction despite knowledge that the plaintiff was suicidal

was deliberate indifference); *Boncher ex rel. Boncher v. Brown Cnty.*, 272 F.3d 484, 486 (7th Cir. 2001) ("Jail managers who decided to take no precautions against the possibility of inmate suicide . . . would be guilty of deliberate indifference in the relevant sense").

A jury in this case could reasonably conclude that the Officer Defendants' conduct violated the Fourteenth Amendment.[5] There is no dispute that the Defendants knew Ms. Rusher was suicidal. And they knew (or, at minimum, were reckless) that Ms. Rusher was in a high-risk cell and in a suicide smock precisely because it was understood that if she had access to tearable cloth—like her clothes—she could tear such cloth and harm herself. *Pittman*, 970 F.3d at 827-28 (Fourteenth Amendment inquiry "encompasses all states of mind except for negligence and gross negligence"). Indeed, that is the principal purpose of a suicide smock, as Mr. Stanley explains. PSOF ¶ 177. As Mr. Stanley notes, it would be "common sense" to check a towel—a large piece of tearable cloth—before and after giving it to a person like Ms. Rusher, in order to prevent her from ripping the cloth and harming herself. Any professional corrections officer would know that a towel, like clothing, could be used torn and used to attempt suicide. PSOF ¶¶ 177-178.  Sgt. Kirby, the officer who oversaw the night shift's administration of showers at the Jail, testified that it was standard practice to check each towel in advance of giving it to the Jail's "high risk" detainees. The risks of failing to check Ms. Rusher's towel were obvious, and a reasonable jury could infer that the guards' failure to check the towel in the face of that risk was unreasonable. *James*, 959 F.3d at 316-17 (objective reasonableness inquiry is fact-bound and requires assessment of all relevant circumstances).The Defendants lastly argue that Officer Ealy had no duty to check Ms. Rusher's towel because the event did not occur on her shift, and she was not

---

[5] Indeed, the guard defendants' conduct could go to a jury on the deliberate indifference standard as well: "If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties*, 836 F.3d at 729.

formally assigned to assist with Ms. Rusher's shower. In support of their argument, Defendants cite *Burks v. Raemisch*, 555 F.3d 592 (7th Cir. 2009), a case in which the Seventh Circuit affirmed summary judgment for a grievance officer (among other prison administrators) because it found that she had no responsibility under the Eighth Amendment to investigate and correct every issue raised by prisoners through the grievance process. 555 F.3d at 595. Notably, *Burks* relied heavily on the fact that the grievance officer's job was to process grievances, and observed that it would have been a different matter had the defendant been "a physician or nurse". *Id.* District courts have rejected attempts by other prison employees to invoke *Burks* to evade their constitutional obligation not to ignore serious risks to prisoners. *E.g., Rice v. Walker*, No. 06-cv-3214, 2010 WL 1050227, at *7 (C.D. Ill. Mar. 16, 2010).

In this case, Officer Ealey's specific, articulable connection to Ms. Rusher's safety is plain: she was recruited specifically to help ensure that Ms. Rusher completed her shower safely and was safely returned to her cell. Her involvement in the safe completion of Ms. Rusher's shower bears no resemblance to the entirely disconnected, clerical role at issue in *Burks*. Officer Ealey accordingly had a constitutional responsibility to act objectively reasonable, and not to ignore the gravely dangerous situation that was presented to her in the shower room.

### E. Defendants Forfeited Any Argument that Defendant Larry Beck Did Not Violate Ms. Rusher's Constitutional Rights.

The Defendants address their arguments regarding Superintendent Larry Beck on two pages. Dkt. 181 at 20-21. They raise only perfunctory arguments regarding the claims against him and have forfeited any additional arguments. Defendants contend that Superintendent Beck should be dismissed because he was not personally responsible for Ms. Rusher's cell assignment or safety protocol. Dkt. 181 at 20-21. But Plaintiff's claims against Superintendent Beck are not based on his interactions with Ms. Rusher individually. Rather, they are predicated on his

26

oversight of the delivery of medical and mental health services at the Jail. Dkt. 142 ¶ 11; *see also*

*Childress v. Walker*, 787 F.3d 433, 439-40 (7th Cir. 2015) (correctional administrators

"responsible for setting policy" may be held liable "from the institution of a policy that, when

enforced, causes a constitutional deprivation"). Superintendent Beck testified about his

responsibilities regarding the delivery of medical and mental health services at the Jail, and

Plaintiff's experts have testified about how he unreasonably failed in his responsibilities. *See*

PSFO ¶¶ 57, 121-22, 132, 152. The Defendants do not address these various charges anywhere

and offer no evidence or arguments to the contrary. Specifically, Plaintiff provided substantial

evidence, particularly through the expert report of Philip Stanley (a correctional administrator

like Superintendent Beck), about how Superintendent Beck abdicated his role as supervisor and

overseer of the Jail's delivery of mental healthcare, which led to Ms. Rusher's denial of mental

health care. If Defendants believe the detailed evidence that Plaintiff has amassed was not

sufficient to establish the elements of supervisory liability set out in *Matthews* and other

decisions, their motion for summary judgment was the place to make those arguments. Their

failure to do so has forfeited any such argument. *See Yuhe Diamba Wembi v. Metro Air Serv.*,

195 F. Supp. 3d 957, 968-69 (N.D. Ill. 2016) (defendant who moves for summary judgment on

"all claims" but whose brief only addressed some claims forfeits motion on claims not

addressed).

## II.    The Defendants Are Not Protected from Liability by Qualified (or Good-Faith) Immunity.

### A.    Qualified (or Good-Faith) Immunity Is Unavailable to Private Contractors Like the ACH Defendants.

The ACH Defendants acknowledge that because they are private contractors, whose role

as state actors was voluntarily undertaken in order to profit, qualified immunity is not available

in this Circuit. *Petties*, 836 F.3d at 734 ("[Q]ualified immunity does not apply to private medical personnel in prisons."). The ACH Defendants cite to Seventh Circuit precedents that they contend permitted privately employed correctional staff to invoke qualified immunity, but the precedents cited by the ACH Defendants all predate the Seventh Circuit's en banc *Petties* decision. Dkt. 177 at 21. And the Seventh Circuit has expressly rejected Defendants' suggestion that the Supreme Court's decision in *Filarsky v. Delia*, 566 U.S. 377 (2012), supports their invocation of qualified immunity. *Estate of Clark v. Walker*, 865 F.3d 544, 550-51 (7th Cir. 2017) (citing *Richardson v. McKnight*, 521 U.S. 399, 401 (1997)).

The ACH Defendants next contend that this Court should permit them to excuse their unconstitutional conduct based on a defense of good faith, "comparable in scope to qualified immunity." Dkt. 177 at 21. Notably, the ACH Defendants contend that such an immunity should be considered by this Court as equal in scope to the qualified immunity defense that the Supreme Court in *Richardson* and the Seventh Circuit in *Petties* found was unavailable to ACH or its employees. And their contention that such a "good-faith" defense is necessary to protect Defendants "when they perform their duties reasonably," *id.* at 22, would render the defense meaningless since the objectively reasonable performance of their duties would necessarily negate the merits of Plaintiff's constitutional claims. In any event, neither the Seventh Circuit nor any district court within it has ever recognized the hypothetical "good faith" defense requested by the ACH Defendants in this case, and Defendants have offered no compelling reason why this Court should be the first to create and apply it. This Court should accordingly reject the ACH Defendants' request for immunity.

**B.     The Officer Defendants Are Not Entitled to Qualified Immunity Because They Violated Clearly Established Law.**

The Officer Defendants—Bouvet, Ealey, Meyer, and Whitley—claim they are entitled to qualified immunity.[6] Dkt. 181 at 22. In reviewing Defendants' request for qualified immunity, this Court must determine whether Plaintiff has asserted violation of a constitutional right, and whether that right was "clearly established at the time the alleged violation occurred." *Delaney v. DeTella*, 256 F.3d 679, 682 (7th Cir. 2001). Where a plaintiff has established a constitutional violation, and the right at issue was "clearly established at the time of the violation such that a reasonable official would understand what he is doing violates that right," qualified immunity is unavailable. *Orlowski v. Milwaukee Cnty.*, 872 F.3d 417, 421 (7th Cir. 2017) (cleaned up).

Defendants concede that the right to be free from deliberate indifference to a risk of suicide while in custody was clearly established when Ms. Rusher arrived at the Jail in 2017. Dkt. 181 at 22 (citing *Estate of Clark*, 865 F.3d at 551). Defendants argue, however, that it was not clearly established that Defendants were prohibited from permitting Ms. Rusher to take a shower or use a towel. But as described above, that is not Plaintiff's complaint against the Officer Defendants whatsoever. Instead, it was the abject failure to take basic precautions—including checking the towel and monitoring her while she showered—that form the basis of their misconduct. *See supra* pg. 24. And although the Seventh Circuit had not yet extended *Kingsley*'s objective reasonableness standard to claims like those brought by Plaintiff here when Ms. Rusher was at the Jail, it was clearly established since at least 1986 that security officers were not permitted to act with deliberate indifference to Ms. Rusher's known risk of suicide by failing to take reasonable actions to protect Ms. Rusher from self-harm. *See, e.g., Hall v. Ryan*,

---

[6] Defendant Beck has not sought qualified immunity and therefore has forfeited that defense for purposes of summary judgment. *Henry v. Hulett*, 969 F.3d 769, 785-86 (7th Cir. 2020) (defendant forfeited qualified immunity on appeal by not raising it at summary judgment).

957 F.2d 402, 404-05 (7th Cir. 1992) ("It was clearly established in 1986 that police officers could not be deliberately indifferent to a detainee who is . . . a substantial suicide risk."); *see also, e.g., Cavalieri v. Shepard*, 321 F.3d 616, 623-24 (7th Cir. 2003) (clearly establishing that detainees have a right to be free from deliberately indifferent action by officers in response to a known suicide risk); *Rice*, 675 F.3d at 665 ("prison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies"). The Seventh Circuit has made clear that, especially in the deliberate indifference context, Plaintiff is not required to point to a prior case on all fours with the case at issue. *Estate of Clark*, 872 F.3d at 422 (rejecting a reading of the "clearly established" requirement to be "narrow to the point of meaninglessness").

Construing the evidence and all reasonable inferences therefrom in Plaintiff's favor (an especially appropriate exercise in determining whether Defendants are protected from trial on the basis of an affirmative defense), Plaintiff's evidence establishes that the Officer Defendants were deliberately indifferent to Ms. Rusher's known risk of suicide and qualified immunity is thus unavailable to Defendants. Ms. Rusher's risk of suicide from her serious medical condition could hardly have been more obvious—and the evidence demonstrates that Defendants in fact were aware she was suicidal. Ms. Rusher had been placed in a "high risk" cell that had been stripped of anything that she could strangle herself with, and her clothes had been removed and replaced with a rip-proof smock, precisely so that she could not rip such cloth and injure herself with it. PSOF ¶¶ 153. All the Officer Defendants knew this. PSOF ¶¶ 154-157. Nevertheless, Sgt. Bouvet took no special safety precautions in approving the shower, PSOF ¶ 163, and the other officers left Ms. Rusher alone with a towel—a large cloth that could be torn into strips—without checking it, or the shower, to see whether she might have ripped it.

Simply put, the Officer Defendants knew Ms. Rusher faced a serious risk of suicide, and they knew that her suicidal nature required extra precaution because she would attempt suicide with any item to which she could gain access. Despite this fact, Defendants permitted Ms. Rusher to shower without any monitoring or action to ensure that she did not alter the towel to fashion a tool for strangulation. Such inaction was deliberate indifference, and such deliberate indifference was clearly established at the time of Ms. Rusher's detention at the Jail.

### III.    A Jury Could Reasonably Find ACH and the County Liable for Violating Ms. Rusher's Fourteenth Amendment Rights.

Under current precedent,[7] municipalities and private corporations like ACH can be held liable for the violation of a prisoner's constitutional rights if there is evidence that a "policy or custom [that] gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson*, 849 F.3d at 379. Plaintiff may establish entity liability in a number of different ways. First, she may show that Ms. Rusher was harmed as a result of an official policy or regulation, or the failure to implement or create a policy. *Id.* at 382; *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016) ("An unconstitutional policy can include both implicit policies as well as a gap in expressed policies."). Second, she may demonstrate that Ms. Rusher's death was caused by widespread, although unwritten, custom or practice. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010); *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 927 (7th Cir. 2004). Third, Plaintiff may show that the constitutional violation was committed by a person with final policymaking authority. *Monell v. Dep't of Soc. Servs. of City*

---

[7] The Seventh Circuit recently questioned whether private corporations should be subject to respondeat superior liability for section 1983 claims. *Shields v. Ill. Dep't of Corrs.*, 746 F.3d 782, 789 (7th Cir. 2014). To preserve liability on these grounds, Plaintiff additionally asserts liability against ACH on these grounds.

*of New York*, 436 U.S. 658, 690-91 (1978); *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675-76 (7th Cir. 2009).

In this case, Plaintiff's evidence demonstrates that ACH and Sangamon County violated Ms. Rusher's constitutional rights by expressly adopting a policy that provided an objectively unreasonable level of mental health care at the Jail. ACH further violated Ms. Rusher's constitutional rights through its widespread practice of denying mental health care, placing seriously ill detainees in solitary confinement instead, and eliminating the use of constant watch for suicidal detainees. And Plaintiff's evidence demonstrates that Sangamon County also violated Ms. Rusher's constitutional rights because the Office of the Sheriff abdicated its role in preventing seriously mentally ill detainees from being confined to solitary confinement for extended periods, and failed to establish reasonable safety measures, like communication among medical and security staff, that would prevent seriously mentally ill detainees from harming themselves.

A.    **ACH's and the Sheriff's Contract Expressly Adopted a Policy that Provided an Objectively Unreasonable Level of Mental Health Care at the Jail.**

ACH and Sangamon County entered into a contract pursuant to which ACH agreed to provide mental healthcare at the Jail. AD-SOF ¶ 61. The Sheriff's Office accordingly delegated to ACH final policymaking authority over the provision of mental health care to detainees at the Jail. *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) ("[T]he private company's policy becomes that of the County if the County delegates final decision-making authority to it."); *Treadwell v. McHenry Cnty.*, 193 F. Supp. 3d 900, 910 (N.D. Ill. 2016) (company's policy "is deemed by law to be the policy of the County"). The contract itself provided that ACH would supply the Jail with a licensed clinical social worker at the jail 28 hours per week SD-SOF ¶ 61. The staffing policies were thus an express policy attributable to both ACH and the Sheriff's

32

Office. *King*, 680 F.3d at 1021 (describing contractual provisions as "express policies"); *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020) (en banc) (express policies include those "embodied, for example, in a policy statement, regulation, or decision officially adopted by municipal decisionmakers). The staffing policies were created by Dr. Caldwell, ACH's policymaker with respect to its mental healthcare contracts. PSOF ¶ 112.

The evidence in this case demonstrates that the express staffing policy on its face was unconstitutional. Dr. Kupers and the Defendants' own expert Michelle James, have both opined that in light of the Jail's mental health caseload, the staffing policy did not provide enough staff hours to provide for actual mental health treatment to detainees. PSOF ¶¶ 98, 99. The assessment of the Defendants' expert, Ms. James, was straightforward:

> [I]t's my understanding of Mr. Shmikler's position, he was working 28 hours a week as the only mental health professional at the jail and he was tasked with meeting each day with any detainees who came in presenting or who were being housed presenting with psychiatric symptoms.
> Looking at the documentation, it did appear that that number would vary each day depending on the jail census and who he was tasked to see.
> Based on that, I don't believe that he would have had the opportunity to do more than just meet with people and provide the assessment.

PSOF ¶ 98. A reasonable jury could accordingly find that the staffing policy of the Sheriff's Office and ACH was objectively unreasonable in that it was not sufficient to provide actual mental health treatment to the detainees in the Jail.

The evidence likewise permits a reasonable jury to conclude that this lack of staffing was why Mr. Shmikler visited the jail only four days per week, PSOF ¶ 44, and provided her only with short observation "checks" that allowed Mr. Shmikler to do little more than lay eyes on Ms. Rusher and see that she was not dead. *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005)

(under express policy claim, "one application of the offensive policy resulting in a constitutional violation is sufficient to establish municipal liability."); *see also City of Okla. City v. Tuttle*, 471 U.S. 808, 822 (1985) (same).

There can be little doubt that the staffing policy was adopted intentionally. *J.K.J.*, 960 F.3d at 378 ("Deliberate conduct is easily inferred from the intentional adoption of the offending policy."). And there is no requirement under *Monell* to demonstrate that ACH or the County were deliberately indifferent to the risk that their express staffing policy was likely to cause violations of detainees' constitutional right to mental health care. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404-05 (1997) (when municipal action itself is challenged, "the plaintiff must establish [only] the state of mind required to prove the underlying violation"); *Awalt v. Marketti*, 74 F. Supp. 3d 909, 940-41 (N.D. Ill. 2014) (rejecting county's argument that evidence of notice was required to establish liability when it delegated final policymaking authority to corporation to provide medical care in a county jail).

Nevertheless, the record demonstrates significant evidence that ACH knew its staffing policy was constitutionally inadequate and likely to lead to the violation of the constitutional rights of detainees under its care. In 2013 and 2014, the Department of Justice (DOJ) alerted ACH that its mental health care contract at another jail, in Grant County, Kentucky, and ACH's practices pursuant to that contract, were causing serious violations of the detainees' constitutional rights at the jail. The DOJ specifically noted that given the size of the jail, ACH's staffing policies prohibited the mental health professional from having sufficient time to develop treatment plans or provide mental health treatment to the detainees who needed it. PSOF ¶ 109(a). The Defendants' own expert, Michelle James, has offered the same conclusion here. PSOF ¶ 98.

The DOJ further notified ACH that suicidal detainees in jail required more complex clinical supervision than a masters-level clinician can provide, and advised that such detainees needed to be transferred to a local hospital. PSOF ¶ 109(b). And the DOJ noted that while the primary care physician "technically" could perform many of these duties, "[t]he physician does not regularly refer even complex cases for outside specialty review by a psychiatrist. Most notably, the Jail physician has no meaningful role in much of the suicide assessment and monitoring process." *Id*.

Dr. Caldwell confirmed at her deposition that ACH's senior management, including Caldwell herself, had received these important notifications from the DOJ. PSOF ¶ 112. Yet ACH dismissed these warnings as amounting to an "idiosyncratic" desire by the DOJ to put a psychiatrist on the Jail's staff. PSOF ¶ 111. And the evidence demonstrates that ACH took no action in response to this notice from the DOJ to change any of its policies or practices in order to ensure that detainees received constitutionally adequate mental health care in other facilities, like Sangamon. To the contrary, by the end of 2016 when Ms. Rusher arrived at the Jail, ACH had not changed—the DOJ's Grant County letters could easily have been written about ACH's practices at the Sangamon County Jail and its care of Ms. Rusher in particular.

Finally, a reasonable jury could easily conclude that the County's and ACH's staffing policy was the "moving force" behind the violation of Ms. Rusher's constitutional rights. *Bryan Cnty.*, 520 U.S. at 404 (plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights"). The Court's and ACH's staffing policy was objectively unreasonable precisely because it prohibited ACH employees from having sufficient time at the Jail to provide mental health care. That the constitutional violation ultimately visited on Ms. Rusher is the denial of her constitutional right to mental health care is precisely the kind

35

of close nexus that the Supreme Court and Seventh Circuit have repeatedly recognized is sufficient to permit a finding that the municipality is the moving force behind the violation. *See, e.g., Bryan Cnty.*, 520 U.S. at 404 (An express policy that "itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains."); *Glisson*, 849 F.3d at 385 (same); *Daniel v. Cook Cnty.*, 833 F.3d 728, 736 (7th Cir. 2016) (causation may be satisfied by showing a "clear link" between the municipal action and plaintiff's injury). There is little inference required for a reasonable jury to conclude that the County's and ACH's staffing policy that provides for an objectively unreasonable amount of time for ACH employees to provide mental health treatment at the Jail was the moving force behind Ms. Rusher's denial of mental health care at the Jail, which permitted her mental illness to overcome her, leading to her suicide. *J.K.J.*, 960 F.3d at 384 ("causation is not a mechanical exercise . . . but instead requires jurors to view evidence in its totality, draw on their life experiences and common sense, and then reach reasonable conclusions about the effects of particular action"). And to the extent that Defendants contend that some other act or individual was responsible for the denial of Ms. Rusher's right to mental health care at the Jail, such an argument is properly presented to a jury. *Id.* (noting that juries are entitled to consider the question of causation in light of "their life experiences and common sense"); *Ortiz v. City of Chicago*, 656 F.3d 523, 534-35 (7th Cir. 2011) (causation is quintessential fact question that should be normally decided by a jury); *see also Whitlock v. Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012) (injuries resulting from constitutional violations can—and frequently do—have multiple sufficient causes).

**B.    ACH's and the Sheriff's Other Policies Violated Ms. Rusher's Constitutional Rights.**

In addition to its staffing policy, other policies at the Jail violated Ms. Rusher's constitutional rights. ACH's "observation forms," which it directed staff to complete in order to determine the level of observation necessary for a mentally ill detainee, permitted staff to order at most 15-minute checks, and prohibited any option of one-on-one constant watch for mentally ill detainees at the Jail. PSOF ¶ 141. ACH deliberately deleted "1:1" constant watch from the observation forms that were used at the Jail, PSOF ¶ 141, and although the Jail's architecture had been designed in order to facilitate constant watch of Ms. Rusher's cell, the Defendants had blocked off that window and placed a trash can in front. PSOF ¶ 142. Such a prohibition of constant watch is dangerous; it is the industry standard that a suicidal detainee must not be isolated unless constant supervision of the detainee is maintained. PSOF ¶ 139. Fifteen-minute checks are insufficient to protect such individuals and are not a substitute for constant watch. PSOF ¶ 139.

Additionally, both Mr. Shmikler and Lydia Hicks testified that about the widespread practice in place at the Jail of using only "observation" forms—and not "treatment" forms—for detainees in the "high risk" isolation cells. "Treatment" forms, by contrast, were available only for detainees who, ironically, had less acute mental healthcare needs. PSOF ¶ 89. And it was a widespread practice at the Jail not to develop treatment plans for detainees in the high risk isolation cells: not only did Mr. Shmikler never develop one for Ms. Rusher, despite the obvious need to do so; Ms. Hicks, his supervisor, testified that she had never created a treatment plan for high risk detainees. PSOF ¶ 90.

The Sheriff and ACH further chose to have no policy in place to ensure communications between medical, mental health, and security staff in the facility. PSOF ¶ 145. Without this

37

policy, restrictions that medical staff had placed on Ms. Rusher were not enforced, and the Jail's

staff allowed her access to a number of prohibited items that she used to hurt herself. PSOF ¶

149. For example, medical staff filled out "diet restrictions" for Ms. Rusher when she arrived at

the Jail, but these restrictions were placed in a detainee's diet folder, and would only be reviewed

when there was a concern about the detainee's food. PSOF ¶ 148. That is inappropriate; the

restrictions contained safety instructions—no bag, no toothbrush, no utensils, only finger

foods—and in Ms. Rusher's case, this lack of communication led to staff permitting Ms. Rusher

to have restricted items that she then used to injure herself over the following three months.

PSOF ¶ 149. Communication failures like this made it more likely that staff would let their guard

down and allow Ms. Rusher to kill herself.

    The risks of these widespread practices were obvious. *J.K.J.*, 960 F.3d at 380; *Glisson*,

849 F.3d at 382-83; *Woodward*, 368 F.3d at 927-28. One does not need to be an expert in mental

health care to know that adequate mental health care treatment for mentally ill individuals

includes a "plan" for treatment, and cases in this Circuit routinely recognize the obvious need for

constant watch for suicidal detainees. *See, e.g., Lapre v. City of Chicago*, 911 F.3d 424, 431 (7th

Cir. 2018) (holding that officials who "have no suicide-watch option[ ]would be guilty of

deliberate indifference in the relevant sense; they would be ignoring a known and serious risk of

death of persons under their control for whose safety they are responsible"). And even if they

were not obvious, Plaintiff has adduced evidence, including through testimony of her mental

health and correctional experts, demonstrating that the Office of the Sheriff and ACH would

have known about their dangers. PSOF ¶¶ 24, 55, 76, 132. *Farmer v. Brennan*, 511 U.S. 825,

841 (1997) (constructive notice to municipalities of risks posed by their policies sufficient to

impose *Monell* liability).

Additionally, Plaintiff has provided evidence that ACH and the Sheriff received *actual* notice of the risks of the mental health practices in place at the Jail. The DOJ specifically notified ACH, in its letter regarding Grant County Jail, that seriously mentally ill detainees needed actual treatment plans, but ACH was failing to prepare them. PSOF ¶¶ 106, 107. And news media reports further showed the risks of harm posed by these practices. For example, after a severely mentally ill man died in his cell at the Sangamon County Jail, a story in the *Illinois Times* reported that he had been found unfit to stand trial but had nevertheless been detained at the Jail without access to a psychiatrist. PSOF ¶ 103. The newspaper reported that Jack Campbell, the Sangamon County Sheriff at the time, told reporters in 2013 that "[w]hile Travis got the best care the jail could provide . . . that doesn't mean that he was in the right place. We are not set up to handle these people . . . There's really nothing you can do with them." PSOF ¶ 103. *See King*, 680 F.3d at 1021 (newspaper stories about jail health care vendor's improper practices put county on notice to the problem). ACH has been the mental healthcare vendor at the Sangamon County Jail since at least 2011 and was accordingly on similar notice. AD-SOF ¶ 61 Ex. 9. The *Illinois Times* story alerted the Sheriff's Office and ACH that the mental healthcare practices at the Jail were putting detainees' lives at risk. Rather than act, the Sheriff's Office and ACH chose to do nothing. This was objectively unreasonable. As the Court of Appeals put it in *King¸* "If the County is faced with actual or constructive knowledge that its agents will probably violate constitutional rights, [it] may not adopt a policy of inaction." 680 F.3d at 1021 (quotation omitted).

The Sheriff's Office argues that Plaintiff cannot assert *Monell* claims against it because by contracting with ACH, it was entitled to rely on ACH and its employees to fulfill its obligation to provide detainees with constitutionally adequate mental health care. But this

argument has been squarely rejected by the Seventh Circuit. "The County cannot shield itself from § 1983 liability by contract out its duty to provide medical services." *Id.* at 1020. "[T]he private company's policy becomes that of the County if the County delegates final decision-making authority to it." *Id.*; *see also Awalt*, 74 F. Supp. 3d at 935; *Treadwell*, 193 F. Supp. 3d at 910. The contract between ACH and the County[8] clearly indicates that ACH had broad discretion to provide mental health care to detainees at the Jail, and to enact any policies (including changes to policies) that were necessary to provide such care without any review by the Sheriff. *Treadwell*, 193 F. Supp. 3d at 910; *see also Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011) (whether an entity of individual is a final policymaker requires review of, among other things, whether the entity's actions on the issue in question "is subject to meaningful review"). ACH acted as the final policymaker for the Sheriff on the issue of mental health care, and ACH's policies are thus the Sheriff's policies for purposes of Plaintiff's *Monell* claims. *Awalt*, 74 F. Supp. 3d at 935.

It is additionally worth noting that even if the Sheriff could theoretically hide behind its contract with ACH to avoid liability—it can't—it certainly could not do so in the face of the actual and constructive notice described above about the inadequate mental health care policies ACH had instituted at the Jail. *King*, 680 F.3d at 1018 ("[N]onmedical officers may be found deliberately indifferent if "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner."). That notice required the Sheriff to do *something* to ensure that it was fulfilling its constitutional responsibility to provide

---

[8] The fact that Sangamon County and not the Officer of the Sheriff is one of the signatories to the contract is irrelevant. *Treadwell*, 193 F. Supp. 3d at 910. As the district court in *Treadwell* explained, such a fact is really more form over substance (attributable to the structure of municipal finances), and the language in the contract indicates that it is binding on the Sheriff as the County's agent at his acquiescence. *Id.*

seriously mentally ill detainees like Ms. Rusher with mental health care. The Sheriff instead "chose the one unavailable option—doing nothing." *J.K.J.*, 960 F.3d at 383. A reasonably jury could conclude that even if notice to the Sheriff was required for *Monell* liability to attach, it was given that notice.

The Sheriff's Office lastly argues that it cannot be held liable under *Monell* because this is its first suicide, at least during the tenure of its current administrators. Dkt. 180 at 45-46. But the Seventh Circuit has squarely rejected that argument as well. As the Seventh Circuit said in *Woodward*, jails "do[] not get a 'one free suicide' pass." 368 F.3d at 929. Rather, "evidence of a single violation of federal rights can trigger municipal liability if the violation was a highly predictable consequence of the municipality's failure to act." *Id.* (quotation omitted). Where there is a "direct link" between the municipality's policies and the suicide, that criteria is satisfied. *Id.*

That is the case here. Plaintiff has presented evidence that would permit a reasonable jury to infer that the Defendants in this case chose to provide a cheap form of mental "healthcare" that was really no such thing, instead substituting real mental healthcare with solitary confinement that would simply incapacitate the ill person. And Plaintiff's experts have explained that a highly predictable consequence of this practice was that mentally ill persons would be driven into mania and were much more likely to kill themselves if given the chance. That is sufficient to make out a claim that the Sheriff's inaction led to Ms. Rusher's death.

## IV. A Reasonable Jury Could Find that the Sangamon County Sheriff's Office Violated the Americans with Disabilities Act and the Rehabilitation Act.

Plaintiff has brought a claim against the Sangamon County Sheriff's Office for failing to provide reasonable accommodations for Ms. Rusher's disability and discriminating against her because of her disability. *See* Dkt. 143 ¶¶ 67-83. To establish discrimination under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"), Plaintiff must show

that (1) she suffered from a disability, (2) she was "otherwise qualified" to participate in the

program or service in question, and (3) she was denied participation, by reason of his disability.

*Jaros v. Ill. Dep't of Corrs.*, 684 F.3d 667, 672 (7th Cir. 2012). The RA additionally requires

federal funding, which the Defendants do not challenge. The Sheriff makes multiple arguments

against Plaintiff's ADA and RA claims, but they all fail.

The Sheriff argues generally that Ms. Rusher was not denied the benefits of any services,

programs, or activities at the Jail. Dkt. 180 at 54-56. The Sheriff's principal contention is that the

ADA and RA do not create a cause of action for inadequate medical care, and thus "Plaintiff

cannot create an ADA or RA claim for an alleged failure to treat." *Id.* at 55 (citing *Bryant v.*

*Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)).

This Court addressed essentially identical arguments in *Andrews v. Rauner*, No. 3:18-

CV-1101, 2018 WL 3748401 (C.D. Ill. Aug. 6, 2018), which concerned Ms. Rusher's

imprisonment in the IDOC, and which the Sheriff conspicuously omits from his collected

authorities. *Rauner* rejected the defendants' "medical" arguments there, explaining that Plaintiff

stated an ADA claim where she alleged that the defendants "discriminated against Rusher by

denying her access to hospitalization outside of the prison but allowed prisoners with physical

injuries or illnesses to receive outside hospitalization." 2018 WL 3748401, at *5. There is

evidence to support the same claim here; one need look no further than Ms. Rusher's own

experience, in which she was repeatedly sent to outside hospitals when her physical injuries

could not be addressed by the Jail's medical services, but was never relocated to receive care,

that the Jail was unable to provide, to address her serious mental illness. PSOF ¶¶ 60, 116.

Plaintiff has also offered evidence from which a jury could conclude that the Sheriff,

having placed Ms. Rusher in an isolation cell, chose to deprive seriously mentally ill detainees

like Ms. Rusher of treatment for their mental health conditions, while nevertheless providing treatment at the Jail for detainees' physical injuries. Both Dr. Kupers and the Defendants' own expert, Michelle James, offer the opinion that the Defendants did little more than monitor the mental illnesses of seriously mentally ill detainees in high-risk isolation cells. PSOF ¶¶ 81, 98. Again, Ms. Rusher's case is illustrative: while confined to the isolation cell, she was repeatedly provided medical treatment inside the Jail for physical injuries, but denied any treatment for her serious mental illness. AD-SOF ¶¶ 12, 17, 20, 25. Plaintiff disputes that Mr. Shmikler provided mental health treatment. But even crediting Defendants' assertions, the only "care" they point to amounted to occasional, short conversations through a steel door. There is no evidence of any therapeutic clinical care provided by the Sheriff that might have benefitted Ms. Rusher and actually addressed her mental illness.

That the Jail provides care for physical injuries or conditions, but does not provide clinical care for serious mental health conditions, is sufficient evidence to prove a charge of *discrimination* in the provision of medical services states a claim under the ADA, even if the underlying claim otherwise concerns the *adequacy* of the medical care that was provided. As the court explained in *Estate of Crandall v. Godinez*, No. 14-cv-1401, 2015 WL 1539017 (C.D. Ill. Mar. 31, 2015), while a plaintiff cannot base an ADA claim on the provision of inadequate medical services in general, "a plausible claim under the ADA if [the plaintiff] plead[s] that Defendants deprived [the disabled prisoner] of access to medical services *that were available to other inmates*." 2015 WL 1539017, at *6 (emphasis added).

Plaintiff, in other words, has offered evidence both of denial of access to care and of discrimination in the provision of care. Those are both ADA and RA claims. The Sheriff

43

predictably disputes that it failed to provide Ms. Rusher with mental health treatment, but that is a factual dispute that must be resolved by a jury and is not appropriate for summary judgment.

Aside from medical services, the Sheriff argues that Plaintiff was not denied access to any other services or programs, vaguely referencing exercise and claiming that the condition of a detainee's cell is not a service under the ADA. Dkt. 180 at 55-56. This argument is confusing and meritless. It is well established that exercise and similar activities are programs and services covered by Title II of the ADA. *See, e.g.*, *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (recreation and education). Detainees at the jail, even those on disciplinary segregation, were allowed out of their cells for exercise. PSOF ¶ 52. Mentally ill detainees in the high-risk isolation cells, however, were not. PSOF ¶ 53.

Virtually the entire panoply of programs and services that jails offer their detainees are made available outside the detainees' cells. That includes something as basic as human interaction, and meaningful social contact with other people, of which Ms. Rusher was deprived. Human interaction is a recognized program or service under the ADA. In *Reaves v. Dep't of Corrs.*, 195 F. Supp. 3d 383 (D. Mass. 2016), a quadriplegic prisoner who had been confined to his cell argued that prison officials "violated the ADA by not allowing him to socialize with his peers in the prisons' common areas." 195 F. Supp. 3d at 421. The district court in *Reaves* granted a preliminary injunction ordering the defendants to offer opportunities for such contact, holding that the prisoner was "likely to prevail on his claim that the DOC Defendants have violated Title II of the ADA by failing to provide him opportunities to socialize with other inmates." *Id.* at 423.

In reaching this conclusion, the court in *Reaves* noted that allowing disabled persons to interact with others is at the core of the rights secured by the ADA: "When enacting the ADA, Congress explained that although 'physical or mental disabilities in no way diminish a person's

right to fully participate in all aspects of society, . . . society has tended to isolate and segregate individuals with disabilities,'" *Id.* at 422 (quoting 42 U.S.C. § 12101(1)-(3)). As such, "[i]ntegration is fundamental to the purposes of the [ADA]." *Id.* at 422-23 (citing 28 C.F.R. § Pt. 35, App. B). In turn, "[a]n integrated setting is one that 'enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible.'" *Id.* at 423 (quoting 28 C.F.R. § Pt. 35, App. B). And in *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 597 (1999), the Supreme Court held that under the ADA, "[u]njustified isolation . . . is properly regarded as discrimination based on disability." The isolation to which Defendants subjected Ms. Rusher, depriving her of the established activity of access to human interaction, violated these foundational principles of the ADA. As *Reaves* explains, access to human interaction is an established program or activity under the statute.

The Office of the Sheriff refers to security concerns that it contends justify Ms. Rusher's exclusion from the Jail's programming and activities but provides no explanation as to what those concerns were. Dkt. 180 at 57. As Plaintiff has noted, the Jail regularly brought Ms. Rusher out of her cell for short midnight shower sessions. PSOF ¶ 58. This demonstrates that out-of-cell time was practicable for Ms. Rusher and that the Sheriff's decision not to do more of it was a choice rather than a force course of conduct based on security concerns. Certainly, conflict with other detainees was theoretically possible. But as Dr. Kupers explains, any such concerns called for effective programs to separate Ms. Rusher from such detainees—not isolate her entirely. PSOF ¶ 21. As Mr. Stanley notes, it is standard practice for jails to permit even segregated prisoners—who are typically segregated precisely because they present discipline or security concerns—to have regular exercise and recreation, including outdoors. PSOF ¶ 22.

The Sheriff may argue in reply that Mr. Shmikler's January 11 order to move Ms. Rusher to the general population, her self-harm event the next day, and the Defendants' decision to place her back in isolation are evidence that the Sheriff tried, but failed, to provide her with opportunities to interact with others. Such a line of argument betrays a binary policy on the Sheriff's part: a detainee would either be placed in the general population, or, if they posed any danger to themselves, complete isolation. That is not a reasonable approach. Dr. Kupers contrasts the Jail's binary approach with the one at McFarland, where patients were encouraged to come out of their rooms and congregate with others, even if they had engaged in self harm or assault in the past. PSOF ¶ 22. To prevent injuries, congregate activities would be supervised by staff. *Id.* Such accommodations are reasonable, Dr. Kupers notes, but they require adequate staffing and cost money. *Id.* Yet they represent the standard of care in the correctional industry, which provides that severely mentally ill detainees should not be isolated for more than a few days, and thereafter provided with a higher level of psychiatric care. PSOF ¶ 14. That form of accommodation was something that the Sheriff's Office has chosen to substitute with isolation cells instead. Isolating Ms. Rusher in this manner violated her rights under the ADA and RA. Summary judgment must accordingly be denied.

## V.     Defendants Are Not Entitled to Summary Judgment on Plaintiff's State-Law Claims.

### A.     Plaintiff's Claims Against the Officer Defendants Are Timely.

Defendants Meyer, Whitley, Ealey and Bouvet claim that Plaintiff's state-law claims against them are barred by the statute of limitations, which they allege ran March 18, 2018. This claim fails under the applicable law governing amendments to civil actions. Defendants admit the suit was properly filed within the statute of limitations on March 12, 2018. In the complaint, Plaintiff named "Does 1-5" noting that "their true names are unknown to Plaintiffs. Plaintiffs

46

will seek leave to amend this complaint to allege the true names and capacities of these

Defendants when their identities have been ascertained." Plaintiff then diligently pursued that

information, naming Meyer, Whitley, Ealey and Bouvet in her first amended complaint filed

December 6, 2018. Dkt. 34.

Because the first and subsequent amended complaints related back to the original

complaint under the rules, this Court should not grant summary judgment as to Counts IV and V

for Meyer, Whitley, Ealey and Bouvet. Federal Rule 15 governs amendments to complaints and

their relation back to previous complaints. The equivalent state law is 735 ILCS 5/2-616.

"Illinois' relation-back doctrine is, in all material respects, identical to the federal rule." *In re*

*Safeco Ins. Co. of Am.*, 585 F.3d 326, 331 (7th Cir. 2009). Under Rule 15, when an amended

complaint names additional defendants, the only question "is whether [additional defendant]

knew or should have known that, absent some mistake, the action would have been brought

against him." *Krupski v. Costa Crociere S.P.A.*, 560 U.S. 538, 549 (2010).

In this case, Plaintiff named Does 1-5 in her Complaint. The initial complaint concerned

the conditions of her confinement at Sangamon County Jail and the incidents around her final act

of self-harm there on March 18, 2017, and alleged a failure to protect her from suicide. A

reasonable guard at the jail involved in those incidents—especially one who helped provide Ms.

Rusher the means by which she was able to commit suicide—knew or should have known that he

or she was one of the "Does 1-5." Because the amended complaints relate back to the properly

filed initial complaint, this Court should deny Defendants' request to grant summary judgment

for them on Counts IV and V.

### B.    The Officer Defendants Are Not Protected by the Tort Immunity Act.

#### 1.    The Officer Defendants Are Not Entitled to Absolute Immunity from Suit Under Section 4-103 of the Tort Immunity Act.

County Defendants Whitley, Meyer, Ealey, Bouvet, and Beck argue that they are entitled to immunity under 745 ILCS 10/4-103. Under that statute, "[n]either a local public entity nor a public employee is liable for failure to provide a jail, detention or correctional facility, or if such facility is provided, for failure to provide sufficient equipment, personnel, supervision or facilities therein. Nothing in this Section requires the periodic inspection of prisoners."

Section 4-103, however, provides protection only to the extent that the plaintiff's tort claim is based upon an alleged failure to provide sufficient personnel or supervision, not an allegation of other willful and wanton conduct. *Thomas ex rel. Smith v. Cook Cty. Sheriff*, 401 F. Supp. 2d 867 (N.D. Ill. 2005) makes this clear enough. There a person who died in jail alleged that the defendants were liable for his death because they had ignored his serious medical condition, refused to allow him to make requests for medical aid, and "otherwise acting willfully and wantonly towards the decedent" in "disregard of his medical needs." *Id.* at 876. The defendant officers invoked Section 4-103, but the court rejected that defense, explaining that "[t]hese allegations of wrongful death are not premised on any negligent failure to supervise or provide sufficient personnel, equipment, or facilities. Instead, these claims allege that the defendants had actual knowledge of Smith's medical needs and wilfully denied him medical treatment." *Id.* Section 4-103 therefore provided them with no protection.

In this case Plaintiff's claims against the individual defendants are that they ignored a serious medical need, and wilfully so: they had knowledge of Ms. Rusher's serious medical condition and the danger it posed, yet they did not provide the care she needed. *Cf. Egebergh v. Sheahan*, 955 F.Supp. 965, 968 (N.D.Ill.1997) (finding that Section 4–103 "provides no aid to

[d]efendants" where they were on notice of the plaintiff's need for immediate medical attention.). Plaintiff thus asserts willful conduct that does not concern provision of equipment and the like. Section 4-103 does not provide protection to the defendants.

### 2. The Officer Defendants Are Not Entitled to Immunity Under Section 2-202 of the Tort Immunity Act.

Defendants next argue that they are immune from suit under Section 2-202 of the Tort Immunity Act, which provides "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. The "willful and wanton" standard and the "deliberate indifference" standard are "remarkably similar" *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1042 n.13 (7th Cir. 1998) such that courts treat them as functionally identical, such that their analysis is the same. *Williams v. Wisconsin Lock & Load Prisoner Transports, LLC*, No. 15 C 8090, 2016 WL 4124292, at *4 (N.D. Ill. Aug. 3, 2016) ("Because plaintiff has alleged facts to plausibly show deliberate indifference, plaintiff also alleged sufficient facts to support a claim for willful and wanton conduct.")

Here, as explained above, Plaintiff has explained in detail why she has offered sufficient facts for a jury to infer that the Individual Defendants were deliberately indifferent to Ms. Rusher's serious risk of suicide. In sum, they all knew that she was at a severe risk for suicide, but did not take obvious, simple steps to prevent her from killing herself. Just as those facts are sufficient to prove a claim of deliberate indifference, they are sufficient to prove a willful and wanton claim as well. Section 2-202 does not bar Plaintiff's state-law claims.

### 3.    The Officer Defendants Are Not Entitled to Immunity Under Section 4-105 of the Tort Immunity Act.

The Officer Defendants also claim immunity under a different Section of the Tort Immunity Act, 745 ILCS 10/4-105. Dkt. 181 at 30. Section 4-105 protects public employees for a failure to furnish medical care, unless that failure was willful and wanton. The Individual Defendants argue that they are shielded by Section 4-105 because once they discovered that Ms. Rusher had strangled herself, they quickly summoned help and tried to save her. Dkt. 181 at 31. But Plaintiff has never claimed that these defendants acted irresponsibly *after* she was discovered with the towel around her neck. The defendants' invocation of their actions *after* Ms. Rusher was discovered strangled are accordingly irrelevant to Plaintiff's claims.

Rather, Plaintiff's claims concern the Defendants' failure to protect Ms. Rusher before she strangled herself, when she was able to abscond with the strop of towel due to their indifference. Section 4-105 offers no immunity for willful and wanton conduct, when a defendant acts "with a conscious disregard or indifference for the consequences when the known safety of other persons was involved." *Murray v. Chicago Youth Center*, 864 N.E.2d 176, 190-191 (Ill. 2007). And as Plaintiff has explained, she has offered ample evidence to satisfy the willful and wanton threshold at this stage.

### C.    Plaintiff Can Prove a Claim of Wrongful Death.

Both sets of defendants assert that Plaintiff had not offered proof of a wrongful death claim. *See* Dkt. 177 at 23-27; Dkt. 181 at 31. Their arguments, however, boil down to claims that (1) Ms. Rusher's suicide was not a foreseeable result of their conduct, and (2) there was nothing reasonable that they could have done to prevent it. Those contentions, however, are factual disputes. Plaintiff has put forward evidence that Ms. Rusher's suicide was indeed a foreseeable

result of the Defendants' conduct, and Plaintiff has offered well-qualified experts who have

offered detailed, reasoned opinions explaining what else could be done.

Under the Illinois Wrongful Death Act, 740 ILCS 180/1, a plaintiff must establish that

the: (1) defendant owed a duty to decedent; (2) defendant breached that duty; (3) the breach of

duty proximately caused decedent's death; and pecuniary damages arising therefrom to persons

designated under the Act. *Leavitt v. Farwell Tower Ltd. P'ship*, 625 N.E.2d 48, 52 (Ill. Ct. App.

1993). The Defendants do not mention the first two elements, and appear to concede them.

Indeed they did owe Ms. Rusher a duty, and Plaintiff has offered ample evidence that in

substituting solitary confinement for mental health care, or in failing to take basic steps to protect

Ms. Rusher when they gave her secluded access to a long strip of cloth.

Instead, the Defendants fall back on the Wrongful Death Act's causation criteria for cases

of suicide. Specifically, suicide is considered an intervening event that breaks the causal chain

between a tortious act and the injury unless (1) the defendant's conduct caused an injury, most

often to the head, that made the decedent 'so bereft of reason' as to cause him to attempt suicide,

or (2) where a patient has committed suicide under the custody or control of a psychiatric

caregiver who failed to properly supervise the decedent. *See Saucedo v. City of Chicago*, No. 11

C 5868, 2015 WL 3643417, at *8 (N.D. Ill. June 11, 2015).

The Defendants argue that these exceptions do not apply, but their arguments do not hold

water. The County Defendants argue that they could not have caused her an injury that left her

"bereft of reason." Dkt. 177 at 24; Dkt. 181 at 31. The ACH Defendants simply declare this to be

so, and assert that Plaintiff has brought forward no evidence to the contrary. (ECF 177 at 24.)

But Plaintiff has offered two expert witnesses who offer the opinion that failing to provide Ms.

Rusher any treatment, and locking her in solitary confinement instead, was more likely to drive

her to madness and make her kill herself. Dr. Jeetwani offers the precise same opinion. PSOF

¶ 17. ACH claims that she would have killed herself anyway, Dkt. 177 at 24, but simply offers

that argument as an assertion. The fact is, Dr. Kupers considered her mental health history and

explained that actual mental health treatment would indeed have made it less likely for her to

commit suicide. PSOF ¶ 181. This, therefore, is a disagreement for a jury.

The County Defendants, meanwhile, simply deny that Ms. Rusher was "bereft of reason,"

because she had recently been found competent to stand trial and because Mr. Shmikler had

reported her happy and rational the day before. Dkt. 181 at 31. This argument is somewhat

risible on its face; the Defendants were so concerned that Ms. Rusher was so suicidal and

unreasonable that they would not allow her to wear clothes. But in all events, this amounts to a

fact dispute—Dr. Kupers has offered the opinion that solitary confinement like that Ms. Rusher

experienced is one for a jury.

What Plaintiff alleges is that the Defendants had a duty to treat Ms. Rusher, but instead

drove her mad by putting her in a small room for months, which drove her to psychosis and

caused her to kill herself. It can hardly be disputed that the Defendants knew she was suicidal;

they simply chose, for expediency, not to provide her with the care she needed.

The ACH defendants additionally argue that they cannot be held liable under the

psychiatrist exception, essentially because there is nothing more they could have done. Dkt. 177

at 24-25. But the ACH defendants are simply wrong that they could not have referred Ms.

Rusher out—Dr. Abraham *said* he could do it, and in any event the only barrier was to

involuntary admissions. ACH argues that it would have been impossible, for example to provide

Ms. Rusher any out of cell time for therapy and the like. *Id.* at 26. But Ms. Rusher was let out of

her cell on many midnights to shower, without incident.

The Defendants' objections to Plaintiffs' wrongful death claim are wrong on the facts, but they emphatically concern disputed issues of fact—not matters that can be resolved at this stage.

### D.    Plaintiff Can Prove a Survival Act Claim.

The Survival Act does not create a statutory cause of action, but merely allows the estate to maintain those statutory or common law actions which already accrued to the decedent before she died. *Readel v. Vital Signs, Inc.*, No. 97 C 3495, 2002 WL 1359417, at *2 (N.D. Ill. June 21, 2002). A negligence cause of action requires that there must be a legal duty to exercise care in favor of the person injured, a breach of such duty, and injury proximately caused by such breach. *Advincula v. United Blood Servs.*, 176 Ill.2d 1, 12 (1996).

Once again, the Defendants claim that no action can be brought on these grounds. The Defendants argue that Plaintiff has put forward no evidence that Ms. Rusher endured pain and suffering when she strangled herself. Dkt. 177 at 26. But a layperson does not need an expert witness to explain the pain and horror of strangulation. And Dr. Kupers has provided ample evidence on the devastating effects of solitary confinement. *See, e.g.,* PSOF ¶ 181. The Defendants' bottom-line argument is that "[n]othing in the record could lead a reasonable jury to conclude that Tiffany's condition at the jail was any different than it had been in years past . . . ." Dkt. 177 at 27. Plaintiff can show, however, that placing this mentally ill woman in solitary confinement for moths did indeed harm her. The motion should be denied.

### CONCLUSION

For the reasons discussed above, the Defendants' motions for summary judgment should be denied.

Dated: November 6, 2020

Respectfully submitted,

/s/ Stephen H. Weil

Alan Mills - alan@uplcchicago.org
Nicole Schult - nicole@uplcchicago.org
Bridget Geraghty - bridget@uplcchicago.org
Uptown People's Law Center
4413 North Sheridan Rd.
Chicago, Illinois 60640
Tel: (773) 769-1411
Fax: (773) 769-2224

Stephen H. Weil
Arthur Loevy
Sarah Grady
Loevy & Loevy
311 N. Aberdeen Street
Third Floor
Chicago, IL 60607
312-243-5900
weil@loevy.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I Stephen H. Weil, an attorney, certify that on November 6, 2020, I filed the foregoing on the Court's CM/ECF system, which distributes copies of this filing to all counsel of record.

<u>/s/ Stephen H. Weil</u><br>
Stephen H. Weil