IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS

KELLI ANDREWS,     )
          )
  Plaintiff,     )
          )
  v.        )  No. 18-cv-1100
          )
COUNTY OF SANGAMON, et al.,  )  Hon. Sue E. Myerscough
          )
  Defendants.    )  Hon. Tom Schnazle-Haskins, Magistrate

# EXHIBIT 32

1          IN THE UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF ILLINOIS
2
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
3
KELLI ANDREWS, as Administrator of the
4  Estate of Tiffany Ann Rusher, deceased,

5                    Plaintiff,

6     -v-                          CASE NO. 18-CV-1100

7  SANGAMON COUNTY, et al.,

8                    Defendants.

9  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10

11          The deposition of MELISSA CALDWELL, MD, in the

12  above entitled action otherwise than as a witness upon

13  the trial was taken at the instance of the plaintiff

14  pursuant to Section 804.05 of the Wisconsin Statutes

15  and acts amendatory thereof and supplementary thereto

16  on notice and subpoena at Burlington Public Library,

17  166 E. Jefferson Street, Burlington, Wisconsin, on

18  October 21, 2019 commencing at 10:00 o'clock in the

19  morning before SUSAN K. TAYLOR, a Court Reporter and

20  Notary Public in and for the State of Wisconsin.

21

22

23

24

25
                                                        1



1  | APPEARANCES:

2  | LOEVY & LOEVY, by Stephen H. Weil, 311 N. Aberdeen
   | Street, 3rd Floor, Chicago, IL 60607 appeared on
3  | behalf of the Plaintiff.

4  | HEYL, ROYSTER, VOELKER & ALLEN, P.C., by Theresa M.
   | Powell, 3731 Wabash Avenue, Springfield, IL 62791
5  |  appeared telephonically on behalf of Defendants
   | Larry Beck, Guy E. Bouvet, III, Jack Campbell, Jennifer
6  | Ealey, Kyle Meyer, Sangamon County, IL, Zach Whitley.

7  | QUINN JOHNSTON, HENDERSON, PRETORIUS, CERULO, by
   | Matthew J. Maddox, 400 S. 9th Street, Suite 102,
8  | Springfield, IL 62701 appeared on behalf of Defendants
   |  Advanced Correctional Healthcare, Inc., Michael
9  | Shmikler, Dr. Arun Abraham.

10 |

11 |

12 |

13 |             E X A M I N A T I O N   I N D E X

14 |

15 | by Mr. Weil                                Page 4

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |



MELISSA CALDWELL, M.D.                           October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          3

1

2

3

4               E X H I B I T   I N D E X

5

6   EXHIBIT NO.                            PAGE IDENTIFIED

7       1     Dr. Caldwell's LinkedIn profile       9

8       2          program overview                27

9       3   NCCHC Standards for Mental Health
             Services at Correctional Facilities   74
10
        4     position statement on solitary
11                     confinement                 144

12      5    Standards for Mental Health Services
                 in Correctional Facilities        184
13
      6 - 8          photographs                    215
14      9         training document                217
       10            GAF scale                      219
15     11      January, 2015, e-mail                222
       12    Grant County Detention Center
16                   inspection                     222

17

18

19

20

21

22

23

24

25



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                      MELISSA CALDWELL, MD, having been first
 2         duly sworn on oath to tell the truth, the whole truth,
 3          and nothing but the truth testified as follows:
 4                      MR. WEIL: Good morning.  My
 5          name is Steve Weil.  We just met, Dr. Caldwell.
 6         EXAMINATION BY MR. WEIL:
 7    Q.   Would you just state and spell your name for the record?
 8    A.   Dr. Melissa -- M-e-l-i-s-s-a -- Caldwell.
 9         C-a-l-d-w-e-l-l.
10    Q.   Have you ever been deposed before, Doctor?
11    A.   Yes.
12    Q.   How many time?
13    A.   Three.  Excuse me.  Five total.
14    Q.   Have you testified in court at all during any of those
15         circumstances?
16    A.   I have testified in court, yes.
17    Q.   How many times have you testified in court?
18    A.   I think once or twice.
19    Q.   Were the testimony deposition and court testimony just
20         referred to, was that in relation to your work at ACH or
21         some other testimony?
22    A.   The testimony was not in relation to my work with ACH.
23         The depositions, two of them were in relation to ACH.
24    Q.   I imagine --  How long ago were those depositions?
25    A.   I had one fairly recently, but that is in relation to
```

1      my private practice.

2  Q.   Is that the third deposition you were talking about?

3  A.   The fifth.  This will be the sixth.

4                   MR. WEIL: I will just go over

5      the ground rules really quickly.  I think there is a

6      couple -- some people go over a long list, but for one,

7      I try to make the conversation at deposition as normal

8      as possible, but we have a court reporter who can only

9      take down exactly what we say, so two things are

10     important.

11                  One, nods of heads, shakes of heads, uh-huh,

12     ugh-ugh, is hard to understand for a court reporter and

13     hard to record, so I'd ask you to give clear answers in

14     that sense.  Is that understood?

15                  THE WITNESS: Yes.

16                  MR. WEIL: The second is we

17     don't try to talk over each other because that's very

18     hard for the court reporter to take down.  So I think in

19     normal conversation, it's often very common to start

20     talking because you anticipate where the person is

21     going, but in these circumstances, we don't want to do

22     that.  I break the rule probably every deposition I

23     take.  You probably will.  We will just try to slow down

24     when we do that and get the record right.  Make sense?

25                  THE WITNESS:  Yes.



```
1                    MR. WEIL: Your lawyer may

2      object from time to time.  That's normal.  It is part of

3       preserving the legal issue.  Unless your lawyer

4      instructs you not to answer a question, you should still

5      answer the question that is being asked.  Is that

6      understood?

7                    THE WITNESS: Yes.

8                    MR. WEIL: If you want to take a

9      break at any time, let me know.  I only ask you not to

10     take a break when a question a pending.  Does that make

11     sense?

12                   THE WITNESS:  Yes.

13                   MR. WEIL: If I ask a question

14     that you don't understand what I am asking, please don't

15     hesitate to ask me to rephrase it or explain myself.

16     Just explain what I am getting at.  If I ask a question

17     and you answer it, I am going to assume that you under-

18     stand the question I have asked.  Does that make sense?

19                   THE WITNESS: Yes.

20     BY MR. WEIL:

21 Q.  Can you give me a bit of your background, Dr. Caldwell,

22     your educational background?  We'll start there.

23 A.  I earned my bachelors with majors in psychology and

24     criminal justice from UW-Madison in 1998, my master's

25     with a minor in human development and law from the
```



MELISSA CALDWELL, M.D.                                October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                    7

1    University of Illinois at Urbana-Champaign in 2001, and,
2     then, my Ph.D. with minors in human development
3    in law in 2003.  My master's and my doctorate are in
4    clinical and community psychology.
5 Q.  Clinical and community psychology.  You said you had
6    minors in a Ph.D.?
7 A.  Yes.
8 Q.  What is that?
9 A.  Areas of specialization during my education in those
10    programs.
11 Q.  So you have a Ph.D. thesis, I am assuming.  Is that
12    right?
13 A.  Yes.
14 Q.  And, then, did that Ph.D. thesis incorporate those minor
15    areas, or were those just courses you took along the
16    way?
17 A.  The way that the program at University of Illinois was
18    set up, much like at UW-Madison; I had a major, which
19    was clinical and community psychology, but I was able
20    to specialize, in kind, of adjunct areas, so I took a
21    number of courses in human development.  My dissertation
22    was related to that.  It had to do with children.  Then
23    I took a number of law classes and my internships were
24    legally involved; thus, my minor there.
25 Q.  You said you got that degree -- the Ph.D. in 2003?



| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | 2003.  What did you do after you got your Ph.D.?  I will |
| 3 | | tell you I have your -- as you can tell, I have your |
| 4 | | LinkedIn profile here, which I will give to you in a |
| 5 | | second, but just to understand, can you give me your |
| 6 | | employment history after getting your Ph.D.? |
| 7 | A. | I had satisfied my pre-doctoral requirements prior to |
| 8 | | leaving Urbana-Champaign, which is a little bit unusual, |
| 9 | | so when I went to Ethan Allen School, an APA-accredited |
| 10 | | correctional facility for juveniles, that served as my |
| 11 | | post-doc internship.  From there, I accepted a position |
| 12 | | with the Wisconsin Department of Corrections working as |
| 13 | | part of the Racine correctional team. |
| 14 | Q. | Let me stop you.  Could you put some dates to these |
| 15 | | things? |
| 16 | A. | Sure.  I -- |
| 17 | Q. | Let me back up.  I should have asked you that to start |
| 18 | | with, so go ahead.  You started -- |
| 19 | A. | 2003 to 2004, I went to Ethan Allen School.  2004, I |
| 20 | | accepted the position with Racine Correctional to head, |
| 21 | | sort of, the in-transitional facility in Sturtevant, |
| 22 | | Wisconsin.  I was there until 2008.  Kind of over- |
| 23 | | lapping in 2005, I accepted a position in my private |
| 24 | | practice at Kenosha County Sheriff's Department |
| 25 | | providing mental health services for their two |



1          facilities.

2    Q.    Do you mean jails?

3    A.    Yes.  In 2008, I left my state work and took the

4          director of Mental Health Services position with

5          Advanced Correctional Healthcare.  I have been there

6          since 2008, was promoted to vice president exec for the

7          company and I am still heading Mental Health Services

8          for the company as of January.

9    Q.    That helps.  Just looking at your -- the profile here,

10         which I will give to you in a second, if I take what you

11         are saying -- what you just told me in summary, were

12         you, essentially, a practicing psychologist between 2003

13         and 2008 when you began working at ACH?

14   A.    In 2004, I was licensed as a psychologist.

15   Q.    So from 2004 to 2008, you were practicing as a psycholo-

16         gist.  Is that right?

17   A.    Yes.

18                  (A document was marked as Exhibit 1)

19         BY MR. WEIL:

20   Q.    Dr. Caldwell, I have handed you what the court reporter

21         has marked as Caldwell Exhibit 1 and that is just a

22         printout of your LinkedIn profile which is on the Web.

23         If you page through quickly, tell me if that looks

24         familiar to you.

25   A.    It does.



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      10

1   Q.  One lingering question I have here.  You are practicing

2       as a psychologist between 2004 and 2008 before you

3       accept a position at ACH.  Correct?

4   A.  Yes.

5   Q.  In that practice, it sounds like the entire practice was

6       in a correctional setting, either a juvenile facility or

7       jail.  Is that right?

8   A.  2003 to 2004, I was in a juvenile facility.  Also, in a

9       female facility in a community setting.  Then from 2004

10      to 2008, I was in a male adult correctional facility;

11      prison.

12  Q.  It says here at the bottom of Page 2, I see,

13              "Clinical-Forensic Psychologist; Founder

14               Caldwell Psychological Associates."

15  A.  Yes.

16  Q.  That is 2005 to present.  Do you see that?

17  A.  Yes.

18  Q.  Can you describe what that is?

19  A.  That is my small, private practice.

20  Q.  Tell me what you do in that practice.

21  A.  Part of that from 2005 to 2013 -- early 2013, I helped

22      coordinate and provide services for the Kenosha County

23      Sheriff's Department, which is the jail, and I also do

24      clinical forensic work, expert witness work, for

25      example.



1    Q.   It says, "to present", so that practice has been ongoing

2         since you accepted a position at ACH?

3    A.   Yes.

4    Q.   Since you accepted a position at ACH in 2008, what has

5         that practice consisted of?

6    A.   From 2008 to 2013, I was working at the Kenosha County

7         Sheriff's Department and since then, I have accepted a

8         number of consulting and expert witness work.

9    Q.   The work at the Kenosha County Sheriff's Department,

10        I am assuming you are not, sort of, a full-time staff

11        psychologist.  Right?

12   A.   No.  I was part-time then and I am no longer employed

13        with them.

14   Q.   But just going to 2013, you said -- it was what time --

15   A.   2005.

16   Q.   2005 to 2013.  In that time, were you a staff psycholo-

17        gist or more of a consultant about programming, or how

18        did that work?

19   A.   I was an independent contractor.  I provided mental

20        health services and also, helped supervise a number

21        of doctoral students that were there.

22   Q.   Okay.  And was that through some sort of contract akin

23        to ACH or was that just a direct contract between you

24        and the jail?

25   A.   It started off with a contract with me and the sheriff's



1          department and, then, it became under Kenosha Visiting

2          Nurse Association.

3    Q.    That would be a private type contract?

4    A.    It is not affiliated with ACH, no.

5    Q.    Understood.  I wasn't trying to draw any affiliation

6          to ACH.  It's just a similar type of private entity that

7          contracted out services.  Is that fair?

8    A.    Yes.

9    Q.    Then you said since 2013, you no longer have that agree-

10         ment with the sheriff's department in Kenosha, but you

11         still are -- you said you practice as an expert witness

12         occasionally.  Is that right?

13   A.    Yes.

14   Q.    What else beyond that?

15   A.    I have done, like, one FOID evaluation, things of that

16         sort.

17   Q.    That is a firearms evaluation?

18   A.    Yes, for the State of Illinois.

19   Q.    And that's whether someone is psychologically equipped

20         to carry a firearm?

21   A.    Yes.

22   Q.    You said you did one of those.  Right?

23   A.    Yes.

24   Q.    Then you served as an expert witness several times.

25         Is that right?



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      13

```
 1    A.   I would have to look at my list, but five times.
 2    Q.   And beyond that, you haven't been providing, I guess
 3         what I'd describe as just care that a psychologist would
 4         provide.  You have been doing more assessments.  Is that
 5         right?
 6    A.   Yes.  Not in that capacity.
 7    Q.   Why don't you describe your --  You get hired as a
 8         director of Mental Health Services in August of 2008 for
 9         ACH.  Is that right?
10    A.   Yes.
11    Q.   Describe what that role is, if you could just summarize
12         what it is.
13    A.   Part of my responsibility was to be affiliated and draw
14         from the National Commission For Correctional Healthcare
15         standards to create a mental health program.
16    Q.   Create a mental health program for ACH?
17    A.   Correct.
18    Q.   What does that mental health program do?  What is the
19         purpose of that program?
20    A.   To customize individual programs for given sheriffs
21         departments or for jailers.  So, depending on the jail
22         that is interested in our services, to look at what
23         their resources are and to provide staffing recommenda-
24         tions as to what would be needed to meet the clinical
25         needs of that site.
```



```
 1    Q.   You referred to --  You are developing programs for --
 2         To back up quickly, ACH is a contractor -- a medical
 3         contractor that contracts with a variety of jails around
 4         the country.  Is that right?
 5    A.   A number of states, yes.
 6    Q.   A number of states.  A number of states.  Fair enough.
 7         Those jails may be of different sizes.  Right?
 8    A.   Yes.
 9    Q.   And therefore, maybe even different physical setups and
10         whatnot.  Right?
11    A.   Yes.
12    Q.   So your job as director of Mental Health Services would
13         be to, if I am understanding you correctly, you'd --
14         a contract would be developed or having gotten or been
15         in the practice of -- ACH has been in the practice of
16         providing services for that particular jail.  Your job
17         was to look at the jail itself and the setup and all
18         those factors at the jail and develop a mental health
19         program for that jail.  Is that right?
20    A.   For --
21    Q.   Is that a fair description?
22    A.   Yes.  I think you, kind of, highlight existing clients.
23         Yes, some existing clients and some clients who are
24         brand-new to our relationship and are exploring a
25         partnership.
```



MELISSA CALDWELL, M.D.                                October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                  15

1   Q.   And the description I provided is, more or less,

2        accurate.  Is that fair?  I mean, would you add or

3        subtract anything from that?

4   A.   I think it's fair, yes.

5   Q.   How would you go about developing -- I will just call it

6        a mental health program, for lack of a better word.  How

7        do you go about developing a mental health program for

8        the various jails that you work with?

9   A.   Really, it's case by case, but I am looking at that

10       particular client, having conversations with the sheriff

11       and the jail administration, looking at what systems or

12       services are available, what are not available, and

13       giving recommendations as to what kind of staffing or

14       professional or services are needed to either support

15       or supplement what they already have or provide a

16       comprehensive program.

17  Q.   What would you be referring to in making an assessment?

18       I understand on the one hand, they are, sort of, what

19       the sheriff has, how they are set up and the other, you

20       are applying -- you are bringing a professional judgment

21       into that.  What are you referring to in your profes-

22       sional judgment when you do that?

23  A.   Well --

24  Q.   What standards are you referring to, what protocols are

25       you using to help the sheriff out in coming up with a



```
 1        program?

 2   A.   It really varies, but depending on the state, what

 3        is their state jail standards, what are the NCCHC

 4        guidelines, do they have accreditation, do they not have

 5        accreditation?  There is a lot of factors that I am

 6        looking at.

 7   Q.   And when you are talking about something like the

 8        NCCHC guidelines, that is a book.  Right?

 9   A.   Yes.

10   Q.   A book that you are looking at and saying --

11   A.   A number of books.

12   Q.   A number of books and other literature that they have

13        and you are looking at the jail situation and, among

14        other resources, you are looking at NCCHC and seeing

15        what guidelines they provide in trying to marry those

16        guidelines up with what the jail does.  Is that fair?

17   A.   Yes.  There is certainly other resources.  Every jail is

18        a little different.  If I have, for example, immigration

19        inmates, ICE inmates, that are housed there, there is

20        things you may need to do somewhat differently, but yes,

21        you are referencing these resources to provide recom-

22        mendations.

23   Q.   And if you would turn to Page 3 of Exhibit 1, I was

24        interested in "Licenses and Certifications."  Do you see

25        that section?
```



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                        17

```
 1   A.   Yes.
 2   Q.   The first one says, "Certified Correctional Health
 3        Professional."  Do you see that?
 4   A.   Yes.
 5   Q.   That is for the NCCHC.  Right?
 6   A.   Yes.
 7   Q.   What was that?  What was that certification about?
 8        What did it do and how did you get it?
 9   A.   I don't know, off the top of my head, how many years
10        of experience you have to have to be considered.  You
11        apply, you have to take an examination, you have to pass
12        that examination and you have to maintain it through
13        continuing education and be in good standing with your
14        state licensure.  It is a certification that NCCHC
15        says is a standard of excellence to show that, as a
16        correctional healthcare professional, you have the
17        skills and experience to be considered.
18   Q.   And the exam is, sort of, just to show --  Again, I have
19        looked at some NCCHC standards, but it would be to show
20        a mastery of those standards that NCCHC puts out for any
21        variety of subjects?
22   A.   Mastery of the standards as well as clinical knowledge,
23        yes.
24   Q.   So you accomplished that in 2016.  Right?
25   A.   Correct.
```



 1   Q.   Had you been certified before 2016 -- October of 2016 by

 2        the NCCHC?

 3   A.   That was the first time that I considered doing it.  I

 4        had not thought about doing it prior.

 5   Q.   Was there somebody else at ACH who was certified by the

 6        NCCHC before October of 2016?

 7                    MR. MADDOX:  If you don't mind my

 8        asking for clarification, Steve.  I see on Exhibit 1,

 9        that there are two types of certifications.  Can you

10        specify which one you mean?

11        BY MR. WEIL:

12   Q.   I am talking about the lower one, the first one we've

13        been talking about, the "Certified Correctional Health

14        Professional."

15   A.   The general one, the first --

16   Q.   It is more general than the mental health one?

17   A.   Yes.

18   Q.   Just start with that first one, the October of 2016.

19        Had there been somebody at ACH certified as a certified

20        correctional health professional before October of 2016?

21   A.   Can I clarify first?

22   Q.   Yes.

23   A.   This is not something that is required.  This is not

24        something that is required.  However, it is something I

25        considered in 2016.  Your answer to if there were other



| | |
|---|---|
| 1 | people, my understanding is there's other people in the |
| 2 | company that also were, what we call "CCHP" certified. |
| 3 | Q. Let me back up and ask you about your roles here.  You |
| 4 | have described director of Mental Health Services and, |
| 5 | then, going -- in January of this year --  To back up, |
| 6 | can you give me, in a very brief sketch, just, sort of, |
| 7 | where you fell within the corporate structure of ACH as |
| 8 | director of Mental Health Services? |
| 9 | A. In terms of the -- |
| 10 | Q. What was your role in the company?  I am assuming there |
| 11 | is a president and there is people underneath them.  Are |
| 12 | you in a management role?  Are you in a -- sort of, just |
| 13 | a random employee role?  Like, where do you fall?  If |
| 14 | you are the director of Mental Health Services for a |
| 15 | company that provides mental health services, I would |
| 16 | infer that you are -- you have some sort of role in |
| 17 | deciding how the company provides mental health |
| 18 | services.  Is that fair? |
| 19 | A. I headed mental health in that capacity. |
| 20 | Q. You headed up mental health. |
| 21 | A. Yes. |
| 22 | Q. What do you mean by that? |
| 23 | A. Meaning that if there was a professional that was |
| 24 | responsible for the specialty of mental health in terms |
| 25 | of recommendations and things that we have described |



1          earlier, that would have been me.

2    Q.    So you'd be, sort of, in a role of guiding how ACH

3          approached providing mental health for its various

4          clients.  Is that right?

5    A.    Yes.

6    Q.    Then describe to me this promotion to vice president of

7          Mental Health Services.

8    A.    My role with mental health really has not changed.

9          What has changed is I am now part of the executive team.

10         So there was an executive branch.  I was more in the med

11         ops healthcare delivery branch, if you can separate

12         that.

13   Q.    Let me -- my stupid way of understanding corporate

14         structure.   So I'm assuming there is a president at the

15         top.  Right?  Then, there is a bunch of vice presidents

16          that handle different substantive areas at ACH?

17   A.    Yes.

18   Q.    Before as director of Mental Health Services, you might

19         have been underneath one of those vice presidents?

20   A.    The titles have changed over the years.  Who I speak

21         to has pretty much stayed the same.  I respond to our

22          president and to our vice president or now, our

23         corporate medical director.

24   Q.    So there wasn't -- it sounds -- if I understand you

25         right, there wasn't a vice president of Mental Health



1        Services before you took that job.  It was, sort of,

2        your title changed.  Is that fair?

3   A.   Yes.

4   Q.   Just returning to Page 3 and trying to understand the

5        certified correctional health professional -- or these

6        NCCHC certifications, I understand that you're saying --

7        I wasn't trying to get at what was required or obli-

8        gated, but initially, you said that your understanding

9        was that there were other people who were certified

10       correctional health professionals at ACH before October

11       of 2016.  Right?

12  A.   Yes.  It is an achievement and there were others that

13       had already achieved that.

14  Q.   Do you know who any of those people were?

15  A.   I can think of one person, and she is no longer alive.

16       She just passed away.

17  Q.   Who was that?

18  A.   Ms. Karen Stocke.

19  Q.   Karen Stocke?

20  A.   Yes.  There is quite a number of us who are CCHP.

21       I just don't know exactly when they achieved it.

22  Q.   Turning to the other certification, it is another

23       NCCHC certification.  "Certified Correctional Health

24       Professional - Mental Health."  Do you see that?

25  A.   Yes.



1  Q.  You achieved that certification in October of 2017.

2      Is that right?

3  A.  Yes.

4  Q.  And you said, as to the certified correctional health

5      professional, the general one below, you had to display

6      a mastery of NCCHC standards.  What's the specialized

7      certification up above, the mental health certification?

8  A.  There are specialized mental health standards, so that

9      is the next step.  It replaces the -- the general.

10 Q.  Okay.  So, again, I understand NCCHC and a bunch of

11     books, so there's maybe a general medical book that

12     might touch on mental health, but, then, they've got a

13     big, thick mental health book and they have other stuff,

14     too, I'm sure.  Right?

15 A.  Yes.

16 Q.  So you are mastering that mental health book.

17 A.  Yes.  You have to be at least -- certified at least one

18     year before you could go for the next.

19 Q.  So you had to be certified as a correctional health

20     professional before you could even apply for this more

21     specialized certification.  Is that right?

22 A.  Correct.

23 Q.  Did this require an exam, too?

24 A.  Yes.

25 Q.  You said as to the other one --  And that exam, I am



 1     assuming, covered that -- again, my understanding --

 2     the book.  Right?  Along with other standards that get

 3     put out?

 4  A.  Other clinical mish mash, yes.

 5  Q.  So that is the exam.  Then, you said as to the first

 6     certification, that it required clinical proficiency.

 7     I'm putting words in your mouth.  What was the clinical

 8     portion of that?

 9  A.  There were random clinical questions in terms of health-

10     care delivery that weren't necessarily in the book.

11  Q.  So you had to, sort of, know how to care for people as

12     well just in general terms.  Is that right?

13  A.  Yes.

14  Q.  If you turn to Page 5 of your LinkedIn profile.  I am

15     going by the little numbers in the bottom right-hand

16     corner.  Do you see "5/6"?

17  A.  Yes.

18  Q.  It sounds like you, essentially, do the same things at

19     ACH.  Again, I am not trying to put words in your mouth,

20     but you got hired as director of Mental Health Services

21     and you've done that role and now, you are vice presi-

22     dent, but during that time, you are, essentially --

23     Well, you have testified about that.  Your role has not

24     changed.  I am trying to understand this,

25              "Learn the Skills Melissa S. Has."



MELISSA CALDWELL, M.D.                            October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          24

```
 1          Do you see that?  It says,
 2                  "Advanced Persuasive Selling.  Persuading
 3                  Different Personality Types."
 4          Do you see that?
 5   A.   I don't know what any of that is.  That is something
 6        that LinkedIn does.
 7   Q.   They just throw that in.
 8   A.   It is interesting, but I don't know what it is.
 9   Q.   So you don't have some sort of certification in
10        "Advanced persuasive selling"?
11   A.   No.
12   Q.   You do have a sales role, though -- right -- at ACH
13        or -- or a promotional role.  Is that fair to say?
14   A.   I wouldn't say I am a good salesperson.  If I have a
15        sales role, it is to convey what we do clinically and
16        if that is of merit, then, I guess, there is a sales
17        piece.
18   Q.   So you are going out and providing --  In the legal
19        world, we have continuing legal education; CLEs.  I
20        think NCCHC, I think there are conferences to educate
21        jailers about how to operate healthcare in a jail.
22        Right?  You are going out and you are speaking at those
23        types of things.  Is that right?
24   A.   Well --
25   Q.   Let me back up and ask you a different question.
```



1    You said that you provide education about what ACH does.

2    Right?

3  A.   Yes.

4  Q.   Maybe people are interested in that and maybe they are

5       not.  Describe what that is, providing that education.

6  A.   To clarify, I don't think I necessarily provide directly

7       what ACH does.  I speak to correctional healthcare --

8       correctional mental healthcare, and I do that on the

9       national and state level.  The fact I am affiliated with

10       ACH, but other than, I am not saying, "ACH does this,

11       buy our product."

12  Q.   Understood.  So you are out there as an expert in

13       correctional mental healthcare providing education to

14       folks.  It is probably not a mystery of who you work

15       for, but that's -- if you had a sales role, that would

16       be it.  You don't have to --

17  A.   My hope is if I do my job well, then, that is something

18       that has value.

19  Q.   To clean up this messy question, essentially, you are

20       out there providing expertise at various presentations?

21       You are giving talks about various --

22  A.   Local, state and national --

23                  MR. MADDOX: Let him finish his

24       question.

25                  MR. WEIL:  A perfect example of



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          26

```
 1        us talking over each other.
 2                    THE WITNESS: I'm sorry.
 3                    MR. WEIL: That's a fairly
 4        normal response.
 5        BY MR. WEIL:
 6   Q.   So you are out providing --  There are seminars that are
 7        put on for jailers around the country.  Right?
 8   A.   Yes.
 9   Q.   You speak at some of those on various topics of mental
10        healthcare, I am assuming.  Is that right?
11   A.   Yes.
12   Q.   You referred to the NCCHC standards.  Why was it worth
13        getting a certification to you?
14                    MR. MADDOX:  Her individual
15        certification?
16        BY MR. WEIL:
17   Q.   The certification, the mental --  Well, both of these
18        certifications that you have, what was the purpose in
19        getting those certifications and why was that -- why was
20        that important?  It is on your profile, so I am assuming
21        it is important.  Just explain why it is important as a
22        professional.
23   A.   I am proud of them.  I am proud because if you look at
24        our industry, meaning correctional healthcare, there is
25        really only two main bodies that provide standards.  One
```



 1        is the ACA, American Correctional Association, and the

 2        other is the National Commission on Correctional Health-

 3        care.  ACA only touches on healthcare versus NCCHC

 4        really focuses on healthcare delivery.  I have been

 5        involved with them since I started with the company in

 6        2008.  I have been honored to be a presenter for them

 7        at least annually, if not more than once per year.

 8        Our industry looks to them as the premiere experts.

 9        The experts inform their board, help with the writing of

10        their literature, so when you --  I am sure there is

11        similar things in law.  You look to those bodies that

12        are well-respected to help guide your practice and to be

13        recognized, in their words, as someone who has achieved

14        excellence, and I am proud to have that certification.

15   Q.   That is helpful.  I am assuming it is not just guiding a

16        practice, but I have read some of the NCCHC.  It is,

17        sort of, this is how a jail should be run or this is how

18        a mental health program should be run.

19   A.   That's practice.

20                (A document was marked as Exhibit 2)

21        BY MR. WEIL:

22   Q.   Dr. Caldwell, this is a document that was produced to us

23        by the county -- I am not sure who produced this, but it

24        does not matter.  I am going to ask you something -- a

25        general question about --



| | |
|---|---|
| 1 | MR. MADDOX:  Would you identify |
| 2 | this on the record? |
| 3 | BY MR. WEIL: |
| 4 | Q.   I don't expect you to recognize the cover page, but |
| 5 | do you recognize what this document is, in general? |
| 6 | A.   In general? |
| 7 | Q.   Yes.  Can you describe what this is? |
| 8 | A.   I believe we call this a program overview. |
| 9 | Q.   What is that? |
| 10 | A.   It is what our salespeople, our program consultants, |
| 11 | will provide a client to help them have, like, a quick |
| 12 | rough snapshot of what services or what staffing and |
| 13 | what monies they'd be contracting for. |
| 14 | Q.   If I understand you correctly, these -- this is a rough, |
| 15 | sort of, sales description of the services that ACH |
| 16 | provides.  Is that right? |
| 17 | A.   Yes. |
| 18 | Q.   I want to refer you first to the second page, which is |
| 19 | Andrews v. Sangamon Plaintiff's Production 011364.  Do |
| 20 | you see that? |
| 21 | A.   No. |
| 22 | Q.   Do you know why -- |
| 23 | MR. WEIL:  You have my document |
| 24 | and I have what should be yours.  We will get the -- |
| 25 | It is the same document without the highlighting. |



| | |
|---|---|
| 1 | MR. MADDOX:  I just want to state |
| 2 | for the record this was attached to a cover letter from |
| 3 | ACH to Terry Durr dated February 8, 2013. |
| 4 | MR. WEIL:  Thank you. |
| 5 | BY MR. WEIL: |
| 6 | Q.   The part that I highlighted and that you have now in a |
| 7 | clean copy, looking at "Risk Management Program", do you |
| 8 | see that on the second page? |
| 9 | A.   Yes. |
| 10 | Q.   It says -- I am in the first column.  It says, |
| 11 | "Risk Management Program." |
| 12 | Let's see.  What is that first column? |
| 13 | "ACH provided services." |
| 14 | Do you see that on the first page? |
| 15 | A.   Yes. |
| 16 | Q.   The first column refers to services that ACH provides. |
| 17 | Is that fair? |
| 18 | A.   Yes. |
| 19 | Q.   So going down to the second page where it starts, |
| 20 | "Risk Management Program."  Do you see that? |
| 21 | A.   Yes. |
| 22 | Q.   It says, |
| 23 | "Risk Management Program Compliance with |
| 24 | NCCHC, ACA, DOJ, Illinois & HIPAA standards." |
| 25 | Do you see that? |



1   A.   Yes.

2   Q.   Can you describe what is being described in this box?

3   A.   I could interpret it, but I can't tell you with direct

4        knowledge what is being described in this box.

5   Q.   Given your experience at ACH, I just want you to inter-

6        pret this as best you can, what is being described here.

7   A.   I have not ever seen that particular thing.  I would

8        interpret it as saying that we intend to comply with

9        these standards and laws.

10  Q.   Let me back you up.  Maybe I'll take this piece by

11       piece.  Do you know what a risk management program --

12       risk management program compliance is?  Is that a term

13       that means anything to you?

14  A.   This would not have been under my umbrella.  Again,

15       I'd be interpreting it.  I am not comfortable doing

16       that.  Whoever was responsible for that contribution

17       would have to interpret that to be accurate.

18  Q.   Whose umbrella would this be under?

19  A.   Previously, that would have been under Ms. Deborah Ash

20       as our director and vice president of compliance.

21  Q.   Who would it be now?

22  A.   It would be a number of different people, but I would

23       say that we'd have to ask the corporate heads and find

24       out.  I am not sure, as this is a legal piece.

25  Q.   It says "compliance with NCCHC."  Do you see that?



MELISSA CALDWELL, M.D.                                October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                              31

```
 1   A.   Uh-huh.
 2   Q.   "Compliance with NCCHC", would that be something --
 3        to the extent it fell under mental health, would that
 4        be something you would be involved with?
 5   A.   My role would have been across the board to try to
 6        have compliance with NCCHC.  For those sites that are
 7        accredited, there is a different or varying level of
 8        compliance that is necessary.  If I can explain.
 9        In that book, certain standards or guidelines are
10        considered to be essential, some are considered to be
11        important.  So you have some wiggle room.  Not every-
12        thing is black and white, you must do this or you don't
13        do this.  We definitely want to provide a program that
14        is as defensible as possible, knowing it is not just you
15        that is responsible for that.  You may be working in
16        systems where an important thing is -- is met, but an
17        essential thing -- an essential thing is met, but an
18        important thing may not be met, if that makes sense to
19        you.
20   Q.   I think you were describing what you do earlier.  You
21        come in as a specialist and try to help jails figure
22        out how to, among other things, comply with the NCCHC.
23        Right?
24   A.   I do the best I can.
25   Q.   Would this description, "compliance with the NCCHC",
```



1        that would be, at least partially, described in the

2        service that you are involved with in compliance with --

3        to the extent it relates to mental health.  Is that

4        right?

5    A.  I would say everybody who works in mental health is

6        responsible to a different piece.  We all have different

7        pieces.  I had a piece.

8    Q.  Your piece would be the mental health piece.

9    A.  Yes.

10   Q.  It goes to ACA, and that is the American Correctional

11       Association, I assume?

12   A.  Yes.

13   Q.  I think you said a moment ago, that is a little bit less

14       concerned with healthcare and more with other matters.

15       Is that right?

16   A.  We may be educating a client about how to best decon-

17       taminate a mattress, but ultimately, that would be more

18       of a security function, just to give you an example.

19   Q.  Going back real quickly to the work you did in helping

20       someone comply with the NCCHC, what would that consist

21       of in terms of the work product that you would provide

22       or deliverable that you would give a jail or whatnot?

23       Would you be sitting down and having a meeting?  Would

24       it be a written memo saying, "here's the things you need

25       to do.  I have done an assessment"?  Describe what it



1       would be, in general.

2   A.  Can you --

3   Q.  You tell me.  You have told me that you are involved --

4       Again, I am just referring to the mental health and your

5       specific job.  You said that ACH has various clients all

6       over the country.  You are involved in figuring out how

7       to help each of those clients or a lot of those clients

8       comply with, among other things, the NCCHC for mental

9       health.  Right?

10  A.  Yes.

11  Q.  I am trying to understand, what does that involve?  What

12      do you do?  What deliverables do you provide the jail to

13      do that, or a particular jail?

14  A.  I think a lot of that is not tangible.  It is sitting

15      with a client saying, "first of all, tell me who

16      provides your mental health services currently", and

17      they tell you it is one sole provider in the community

18      who maybe comes in once a month.  "What does that person

19      do?  Do you want them to continue to do that?  What

20      about the hospitals?  What are their roles in this

21      particular community?"  So looking at the pieces that

22      are already being satisfied in terms of the clinical

23      activity, what needs to be supplemented in order to make

24      this a more defensible program?  Who does suicide watch

25      risk assessments?  Who monitors people who are not

1        functioning well in general population?  Who sees inmate
2        requests or staff referrals?
3   Q.   I am going to break my rule and interrupt you.  Substan-
4        tively, what you are saying makes utter sense.  You are
5        going through various --  What does the work product
6        look like?  Is it a sit-down meeting?  Do you end up
7        writing a lot of memos to jails?  Do you talk on the
8        phone?  Just -- I am not asking you to describe every
9        single one.  In a lot of ways, I am asking, what is your
10       job like?
11  A.   It is a lot of talking on the phone and, then, going
12       back and helping the parties and company to draft a
13       bid or a contract that outlines those activities.
14  Q.   Do you end up writing a lot of memos to a jail like,
15       "Here is what you should do to comply with the NCCHC"?
16  A.   I don't.
17  Q.   Does anybody else at ACH do that in this setup process
18       that you are involved with?
19  A.   I can't speak to what other people do.  I know that I
20       don't.
21  Q.   To the extent that you are involved in setting up this
22       process, if somebody else were writing a memo about
23       mental healthcare, you'd probably know about that, I'd
24       assume?
25  A.   Yes.



| | |
|---|---|
| 1 | Q. Does anybody do that, that you are aware of it, at ACH? |
| 2 | A. No.  We have written letters to clients who, once we |
| 3 | have had a qualified mental health professional in |
| 4 | place, they have been trained to deliver the services |
| 5 | that are needed.  If there was something that was |
| 6 | barring compliance in an area, we'd be having conversa- |
| 7 | tions with that client and that has, over the years, |
| 8 | resulted in a written product, a letter to the client |
| 9 | informing them of the concern.  It's been very rare, so |
| 10 | I can't tell you which ones I have done that for.  Maybe |
| 11 | twice. |
| 12 | Q. So it is once or twice in your experience, you have |
| 13 | written letters saying, "you are not complying with the |
| 14 | NCCHC here." |
| 15 | A. Correct. |
| 16 | Q. How many jails would you say you have consulted with |
| 17 | over the years?  This is not a memory test, just a |
| 18 | ballpark. |
| 19 | A. I have been with the company since August of 2008, it |
| 20 | will be 11 years now.  We provide services to over 300 |
| 21 | jails.  I have about 120 current mental health clients. |
| 22 | I have consulted minimally with them and more so.  So |
| 23 | somewhere between 400 and 120. |
| 24 | Q. Thank you.  Going through this --  Again, I am referring |
| 25 | to the "Risk Management Program" box in Exhibit 2.  It |



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      36

 1    says,
 2              "Compliance with NCCHC, ACA, DOJ."
 3    Does that have any meaning to you?
 4  A.  Department of Justice.
 5  Q.  Agreed.  What would that mean?  What does that mean in
 6    terms of DOJ?  DOJ compliance?  What does DOJ compliance
 7    refer to?
 8  A.  DOJ generally references the National Commission For
 9    Correctional Healthcare.  However, they are, in some
10    ways, the enforcer when there is deficiencies in certain
11    jails.  So they may have orders that are in place and
12    some jails that have had problems in the past saying,
13    "You must provide X, Y and Z."  Again, this would
14    require me to interpret, so I worry about the accuracy
15    of that, but that makes me think, you know, if they have
16    a DOJ understanding in place, that we would need to be
17    part of that to help them continue to comply with those
18    directives.
19  Q.  An example of that, you are familiar with the Grant
20    County jail?
21  A.  Yes.
22  Q.  They had a -- the DOJ was involved in that administra-
23    tion.  Is that right?
24  A.  Yes.
25  Q.  And you are saying the DOJ refers typically --  Again,



1    I am dealing with mental health, your subspecialty.  The

2    DOJ reference to the NCCHC standards as the standard

3    that should be met for -- under constitutional law?

4  A.  At least the two colleagues I work very closely with

5    over the years did exactly that, yes.

6  Q.  Two colleagues at DOJ?

7  A.  Yes.

8  Q.  Who were those?

9  A.  Now I can't remember his name because he's been retired

10    for several years.

11  Q.  Chang (phonetic)?  I know he was involved in --

12  A.  No.  That was in Wisconsin.

13  Q.  Understood.  So there was a jail in Wisconsin that had

14    two DOJ folks involved?

15  A.  No.  Just over the years, you get partnerships with

16    various people.  I have worked with a couple of people

17    over the years who now, I am very bad with names.

18                    MR. WEIL:  It's not a memory

19    test.

20                    THE WITNESS:  Thank you.

21  BY MR. WEIL:

22  Q.  What that refers to, essentially, is compliance with

23    DOJ directives if the DOJ is involved?

24                    MR. MADDOX:  Steve, I just want

25    to interpose an objection.  She is going to be free to

1    answer, but I think she has repeatedly said she is

2    really not sure about this language and who wrote it and

3    what it means, so subject to that objection, ask away.

4                    MR. WEIL:  Understood.

5    BY MR. WEIL:

6    Q.  I don't expect you've ever seen this document before,

7        but just in your experience as a mental health person

8        who is involved in this consultation, it sounds like you

9        are involved in consulting about compliance with DOJ

10       directives.  Is that right?  Or letters?

11   A.  I have.

12   Q.  Would Illinois be, sort of, the same thing, or would

13       that be, sort of, Illinois prison regulations and jail

14       regulations?

15   A.  We have Illinois jail standards in Illinois and, of

16       course, they can be held to the same thing that you are

17       referring to for Grant.

18   Q.  Again, you'd be the person that people would look to --

19       For mental health, you'd be the person that -- someone

20       selling ACH services here, when it comes to mental

21       health, you are the person that would be providing those

22       services.

23   A.  I would be one of the people.

24   Q.  Who would be the other people providing the services as

25       to mental health?



MELISSA CALDWELL, M.D.                                     October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                        39

```
1   A.   Physician Services.
2   Q.   I meant these consulting services at the outset, the
3        risk management program compliance.
4   A.   We don't have a decapitated system, so there is not
5        mental health services over here and medical services
6        over there.  Our physicians are trained and they are
7        treating head to toe.  So they have a mental health
8        component.  Our non-medical mental health people,
9        which is more of a specialty, like our QMHPs, qualified
10       mental health professionals, they are working in
11       coordination with medical services.  The point is,
12       there is different personnel that are responsible for
13       mental health services, not simply under my direct
14       supervision.
15  Q.   Understood.  So the answer you just gave was referring
16       to people actually on the ground in the jail.  Right?
17  A.   And overseeing them, yes.
18  Q.   Do you oversee the people responsible for providing
19       mental health services in the jails that ACH services?
20  A.   For a certain number of people based on geography, yes.
21  Q.   What is the geography where you are responsible for
22       overseeing?
23  A.   Since we have grown as a company, it went from me over-
24       seeing all of them to me overseeing mostly directly the
25       ones that are in the north.  So, for example, in my home
```



```
 1         State of Wisconsin.
 2    Q.   How about in Illinois?
 3    A.   No.  I have a regional mental health manager.  I am
 4         second in line there.
 5    Q.   When was that regional mental health manager --
 6         You know this case involves Sangamon jail.  Right?
 7    A.   Yes.
 8    Q.   Was that -- did you ever see the jail at the time
 9         that Ms. Rusher was incarcerated there?
10    A.   No, not when the time when Ms. Rusher was there.
11    Q.   Who was overseeing the jail at ACH at the time that
12         Ms. Rusher was there?
13    A.   Lidia Hicks (phonetic).
14    Q.   She reported to you?
15    A.   Correct.
16    Q.   So you were, sort of, a second level of supervision
17         above Lidia Hicks?
18    A.   Yes.
19    Q.   What would that second level of supervision involve
20         as distinguished from the first level?
21    A.   If I am understanding your question --
22    Q.   What was your job -- as it relates to supervision, what
23         was your job?
24    A.   With relation to Lidia Hicks, I had at least weekly
25         contact with her.  We consulted on the workers that
```



1    she was overseeing, any questions in terms of their

2    professional delivery, any issues in terms of specific

3    patient issues that needed consult.

4  Q.  Was Lidia -- I don't remember what her professional

5    degree is.  Do you know what it is?

6  A.  She is a master's level social worker licensed as a

7    clinical social worker.

8  Q.  Thank you.  Turning you again to Exhibit 2, look at the

9    first page, Bates 363.  I am sorry.  The second page,

10   the first page of the grid.  I'm at the -- I'm going

11   down to the box that says "Mental Health Services."

12   Do you see that?

13 A.  Yes.

14 Q.  In the second column --  Well, do you understand what

15   these two columns are?  There is "ACH Provided Services"

16   in the first column and there is two columns after that.

17   Do you understand what those two columns refer to?

18 A.  I'd have to look closely to tease it apart, but I

19   immediately see differences in LPN, staffing.  They are

20   generally options, usually varied by staffing.

21 Q.  So this would be, essentially, two different types of --

22   or two different amounts of services that the jail could

23   provide, for lack of a better word?

24 A.  Two options.

25 Q.  I am looking at the top line there, "Annual Cost of



MELISSA CALDWELL, M.D.                              October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                              42

 1       Services."  One is $649,000.  The other is $662,000.
 2       Do you see that?
 3   A.  Yes.
 4   Q.  I am inferring, as you went over -- you could buy this
 5       amount of services or slightly more and it would cost
 6       you slightly more.  Fair?
 7   A.  Yes.
 8   Q.  So looking down to the row that says "Mental Health
 9       Services", it looks like the two different cost options,
10       at least here, they are exactly the same.  You have a
11       QMHP at 28 hours a week.  Right?
12   A.  Uh-huh.
13   Q.  For both options and, then, the -- the description of
14       services, as far as I can tell, is identical.  Fair?
15   A.  On this, yes.
16   Q.  Can I have you walk through these services?  I don't
17       expect you have seen this document before, but given
18       your role at ACH, what your understanding of these
19       different services are.  So we can start at screening
20       and work our way through.  So let's say screening to
21       start.
22   A.  I would like to give a caveat.  These are supposed to
23       be brief, rough lay descriptions from a non-healthcare
24       person, a salesperson, to a non-healthcare person, which
25       is the jail administration.



1  Q.  The box is about an inch-and-a-half square, so I don't

2      expect a whole lot more.  Obviously, this is a summary.

3      If you could walk through what these are.  So just

4      starting with screening.

5  A.  Screening is done at a number of different levels.  For

6      me, screening would be not just the screening that is

7      done by a nurse, for example, a 14-day assessment or the

8      screening that is done during a -- a physician's call,

9      but also, screening that is done for various purposes by

10     a qualified mental health professional, which is one of

11     the options here.

12 Q.  Turning to "Medication Management", what is that?

13 A.  Medication management is done by the physician.  That

14     can be a specialist, like, a psychiatrist or the jail

15      physician who is caring for head-to-toe issues.

16 Q.  Obviously, that would be psychotropic medication.

17     Is that right?

18 A.  Yes.

19 Q.  In this context?

20 A.  And that wouldn't be by the QMHP.  That is not within

21     their scope.

22 Q.  Unless the QMHP is a psychiatrist.  Right?

23 A.  We generally don't call our psychiatrist QMHPs, but

24     yes, technically, even a physician is a QMHP.

25 Q.  Understood.  And,



1               "Coordination of services and referral for
2               off-site care."
3     That sounds like one -- one thing given, the "and."
4     What is that referring to?
5  A.  I wouldn't interpret it as one thing.
6  Q.  Give me your interpretation.
7  A.  Coordination of services both is, you know, intra-
8     agency, so within the facility between custody, medical,
9     mental health working together to manage a patient or
10    with outside agencies insofar as sharing of information,
11    if other agencies are involved.  Referral for off-site
12    care, you know, we generally want the client to know
13    that because, in some cases, some sites, they have to
14    make sure that they're accounting for off-sites as well.
15    So if needed and we can't management a patient, we may,
16    for example, refer somebody to be treated off site for
17    whatever their ailment is, head to toe.
18 Q.  You said if you can't manage a patient -- I am referring
19    to this referral for off-site care.  If you can't manage
20    a patient, what do you mean by that?
21 A.  If a patient is found not fit for confinement, we may
22    refer to off-site services.  If, for example, they have
23    a dental issue that is too significant to be managed in-
24    house, they'd be linked with an outside provider.  Every
25    system --  You know, a pregnant female who has issues



 1          that can't be managed in-house may go off site.

 2   Q.   The examples you just gave me don't involve mental --

 3   A.   The same thing for mental health if there is something

 4          we can't safely manage in-house.

 5                         MR. WEIL:  You anticipated my

 6          question, which is what often happens here.

 7          BY MR. WEIL:

 8   Q.   If you couldn't manage a mental health condition at the

 9          facility, what this type of literature is saying is,

10          "We offer a service, a referral off site."  Right?  Is

11          that correct?

12   A.   Yes.

13   Q.   So that would be -- the medical judgment of the ACH

14          personnel would say, "well, we can't manage this person

15          on site, we have to refer them elsewhere for care."

16          Right?

17   A.   We can refer them, we can't always send them.

18   Q.   Understood.  But the medical -- what this literature --

19          I am trying to look at this as a jailer who receives

20          this literature and says "okay, these are the services

21          that" --  In very basic summary, the inch-and-a-half

22          square they have here, in very basic summary, one of the

23          services that they are going to offer is if they can't

24          manage a mental health condition, given what is avail-

25          able at the jail, they will refer that person out.



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          46

```
 1        Right?
 2   A.   Yes, but that should not be interpreted as gatekeeping
 3        nor do I believe our clients believe that that is gate-
 4        keeping.
 5   Q.   What do you mean by "gatekeeping"?
 6   A.   They can send patients off site independently of any
 7        medical directive, and they do.
 8   Q.   Help me.  I don't understand what you mean.
 9   A.   For example, if someone is on the floor having a medical
10        emergency of whatever sort, they don't need to call a
11         physician and say, "can we send them off site?"
12   Q.   You didn't need Mickey Shmikler or Arun Abraham to say,
13        "You know what?  That person is better off site."
14   A.   Right.
15   Q.   That is understood.
16   A.   And "fit for confinement" may be interpreted differently
17        from one professional's standpoint than from another.
18        I have had patients where I can reasonably put things in
19        place to keep them safe; eating, drinking, maintaining
20        basic health, but the jail doesn't want them in the
21        facility and I, by all means, support that and vice-
22        versa, where they think somebody can stay in a jail and
23        I don't think so.  So there can be different opinions.
24   Q.   Give me an example where you wouldn't think so, where
25        someone shouldn't be in a jail, regardless of what the
```



1          jail thinks.  You expect your employees to make an

2          independent medical judgment about whether the person

3          should -- can stay in a jail.  Is that right?

4     A.   I had a recent example.  Do you want me to describe it?

5     Q.   Yes.

6     A.   It resulted in a nice, collaborative conversation with

7          the sheriff, the chief deputy, the jail administrator,

8          with community mental health.  What had happened is our

9          physician had expressed concern that a patient had come

10         from the state hospital, that he was having drug inter-

11         actions and as a result, literally had some sort of

12         neurological effect where he is forgetting to eat and

13         drink.  He was becoming very dehydrated, had fallen, had

14         injured his face, had been sent to the emergency room.

15         There were signs that his kidneys were impacted from the

16         drugs from the psychiatric facility, but because he was

17         fit for confinement as well as treated for competency,

18         there was concern about changing those meds and causing

19         legal effects.  However, to continue like this, it was

20         a concern by the physician that he would become more

21         malnourished, more dehydrated, maybe even have serious

22         renal effect, like, renal failure.  We told the jail.

23         The jail was very supportive.  We told community mental

24         health, who he was under their legal orders, that he was

25         not doing well, he was deteriorating, we were concerned

1     he was going to have a serious health effect.  We

2     partnered to send him back to the psychiatric facility

3     to have his meds managed.

4  Q. By "health effect", you are referring to physical health

5     effect?

6  A. It was both.  Mental, as he was at risk of being

7     assaulted because he was so sedated, so mentally

8     compromised and he was falling and hurting himself.

9                    MR. WEIL:  I am going to now --

10    This is the one document that I don't have copies of.

11     I can give you my copy.  This is a contract for

12    professional services between ACH and Sangamon County.

13    The Bates is ACH 501.  My last page, which is Page 10 of

14    12, is 510, so it is missing the last page, but I am not

15    going to ask you about that.   I will give it to you and

16    I have highlighted a section.  The section I have high-

17    lighted is in ACH 504.  Section 1.2, "Management

18    Services."

19                    MR. MADDOX:  For the record, this is

20    the agreement for provision of inmate health services at

21    the Sangamon County jail.  On Page ACH 508, there is a

22    recitation of the term of agreement and it's handwritten

23    "February 14, 2011."

24    BY MR. WEIL:

25 Q. Turn to 504.  It says,



MELISSA CALDWELL, M.D.                              October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                              49

```
 1                    "ACH shall provide management services to
 2                    include:"
 3          Do you see that?
 4     A.   Yes.
 5     Q.   It goes through a list of different services that are
 6          being provided.  Down at the -- one of the last items
 7          is -- do you see "NCCHC compliance" there?
 8     A.   "Compliance programs."
 9     Q.   Yes.  Compliance programs specific to the jail's medical
10          operations.  Do you see that?
11     A.   Yes.
12     Q.   In rough form, is that the compliance program that you
13          are involved with as it relates to mental healthcare
14          that you have been describing?
15     A.   This would fall in the same category as that little
16          one-inch box in terms   of not necessarily something I
17          directly was responsible for.  I did not have a role in
18          writing this.  However, I do have compliance pieces
19          within my role.
20     Q.   And part of your role, as we have discussed, is
21          compliance for NCCHC as it relates to the provision of
22          mental healthcare.  Is that correct?
23     A.   Correct, yes.
24     Q.   Do you recall providing that type of service -- that
25          consulting service to Sangamon County jail?
```



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                       50

1   A.   My role with Sangamon County jail would be, for example,

2        to take a bid -- and I can't remember what process we

3        came by the services -- and to look at staffing and to

4        consider staffing that would meet the needs in terms of

5        the clinical activities that I described previously.

6   Q.   Do you actually recall doing that for Sangamon County?

7        Do you have a recollection of that?

8   A.   Not a direct recollection.  This is many, many years ago

9        at this point.

10  Q.   Given your role at ACH, would you expect that you would

11       be one of the people involved in the NCCHC compliance

12       consulting -- or management services at Sangamon County

13       jail, again, as it relates to the mental health piece

14       that we have described where you go around to different

15       jails and try to help them come into compliance?

16                     MR. MADDOX:  Do you understand the

17       question?

18                     THE WITNESS:  I am really not

19       understanding.

20       BY MR. WEIL:

21  Q.   We talked about the services offered here on Exhibit 1,

22       the sales literature involved in NCCHC consulting for

23       mental health as it relates to you.  You told me you are

24       involved in that.  Correct?

25  A.   Yes.



| | |
|---|---|
| 1 | Q.  Sangamon County jail was -- is one of ACH's clients. |
| 2 | Right? |
| 3 | A.  Yes. |
| 4 | Q.  What I am asking you is just describe your role, |
| 5 | generally.  I am asking if you performed that role at |
| 6 | Sangamon County. |
| 7 | A.  I think the word "compliance" has so many different |
| 8 | activities.  I think I have said that I do have a role |
| 9 | in that.  My focus primarily is on hiring professionals, |
| 10 | what is the level of staffing, and what clinical |
| 11 | activities will that job entail. |
| 12 | Q.  Understood.  Whatever that role is, we talked about |
| 13 | earlier, did you perform that role for Sangamon County? |
| 14 | A.  Yes. |
| 15 | Q.  Do you recall doing that? |
| 16 | A.  That is pretty much what I do when I set up staffing. |
| 17 | MR. MADDOX:  Do you recall doing |
| 18 | it?  I think that's been asked and answered, but the |
| 19 | question is, do you recall performing those functions |
| 20 | when the contract was set up in Sangamon County jail? |
| 21 | A.  Setting up staffing based on the size of the facility, |
| 22 | yes. |
| 23 | Q.  Anything else at Sangamon County jail?  Any other |
| 24 | services you performed?  Again, I am referring to the |
| 25 | NCCHC compliance piece that we talked about earlier. |



 1  A.  That is a large part of the NCCHC compliance; staffing

 2      and clinical delivery.

 3  Q.  So do you recall doing that with Sangamon County jail?

 4  A.  In terms of setting up a staffing?

 5  Q.  In terms of NCCHC compliance, whatever that was for you.

 6  A.  I am the only one in the company that sets up staffing

 7      for mental health services.

 8  Q.  Understood.  Um --

 9  A.  So do I remember particularly that day and what day,

10      what I was thinking?

11  Q.  I am not asking for a day, not asking for anything like

12      that, but just, do you recall doing it for Sangamon

13      County jail?

14  A.  I know that I did it.  Do I remember I did it that day?

15      No.

16  Q.  Perfectly fair.  That was my next question.  If you

17      don't recall, given your role, you would have expected

18      to have been the one to have done it.

19  A.  Yes.

20  Q.  We talked earlier about, you know, do you provide a

21      written memo, do you get on the phone, and I think you

22      said generally, you are not providing whole lot of

23      written product to the client.  It is a lot of telephone

24      consultation, that kind of thing.  Do you remember that?

25  A.  Uh-huh.



MELISSA CALDWELL, M.D.                                October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                  53

```
 1                    MR. MADDOX: Yes?
 2    A.   Yes.
 3         BY MR. WEIL:
 4    Q.   Thank you.  Internally, do you have a written product
 5         or a memo that you make to yourself or anything you
 6         write down about, "here is what the jail has, here is
 7         what the NCCHC standards are"?  I am doing some sort
 8         of written assessment, a memo to myself, an e-mail to
 9         myself, anything where you say, "well, this looks like
10         where they are in compliance, this looks where they are
11         not."  In general.  I am not referring specifically to
12         Sangamon County.  Do you have a practice like that or
13         is there a practice at ACH to conduct that internal
14         assessment, whatever your eventual consultation with a
15         client is?
16    A.   No.
17    Q.   So how do you keep in your head, sort of, what the --
18         how do you marry up NCCHC standards with what the jail
19         is?  My thinking is it's a thick book.  How do you marry
20         those two things up and keep it all in your head so you
21         can consult effectively with a client?
22    A.   Well, a lot of it is written in how large the facility
23         and how many hours based on the number of patients to
24         know whether it'll have adequate staffing.  That is my
25         first thinking process.  Looking at a 300-bed jail and
```



1      thinking about, on average, how many patients in a jail

2      may present with certain issues.  There is certain

3      industry thoughts on this and you set up staffing based

4      on that.  Sometimes, you are right and sometimes, you

5      have jails where it is more resources than you need and

6      some jails, it is less.  You make adjustments as part of

7      that partnership to ask for increases and so sort.  So a

8      lot of what I am doing is based on the typical jail of

9      this size, how many hours would we need to be able to

10     see patients on a certain time frame.

11  Q.  And that is an NCCHC compliance function that you are

12      performing.

13  A.  Yes.

14  Q.  NCCHC is a lot more than staffing.  I mean, it would be

15      three pages long if it was just staffing.  There is a

16      lot of other stuff that goes into it.  What about that

17      other assessment?

18              MR. MADDOX:  Object to the form of

19      the question.  You are asking her about "a lot of other

20      stuff."

21  BY MR. WEIL:

22  Q.  NCCHC has more than just staffing.  Right?  There is

23      a lot of different standards.  Right?

24  A.  Yes.

25  Q.  All sorts of things about how mental health should be



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                        55

1          operated in a jail.  Correct?

2  A.   Yes.

3  Q.   So as to setting aside staffing, which we have just

4       talked about, what about all those other criteria that

5       NCCHC sets out?  How do you match those up with the

6       jail's operations to try to get to NCCHC compliance?

7  A.   Staffing really is central and core.  You have a

8       qualified person to do it.  What is their licensure?

9       These are the activities you want to achieve and

10      generally, here are some of the time frames in terms of

11      it is recommended for various things.  So how many hours

12      is needed to provide that?  Within that, there may be

13      things like how to deal with an allegation of sexual

14      assault.  These are rolled into how you train your

15      professional, some of the orientations they go through,

16      the oversight we have with them weekly minimally.  So

17      certainly --  Maybe I am making it overly simplistic,

18      but a lot of standards are met once you have that

19      qualified person and you are working with them within

20      the hours that they are at the facilities.

21  Q.   Again, we talked about staffing.  You want to make sure

22      you have enough hours basically, enough hours of a

23      person there.  Right?

24  A.   Yes.

25  Q.   And the right person.  Right?



1  A.   Yes.

2  Q.   So that is one thing you do to get compliance.  Another

3       thing you do is training.  You are referring to training

4       who?  The ACH contractor or employee?

5  A.   They were employees, but yes, our qualified mental

6       health professionals.

7  Q.   The ACH employee.  Are you training the MD, too, in that

8       circumstance?

9  A.   Our company does, yes, and I do have a role three times

10      a year in training our MDs.

11 Q.   You make sure have enough staff -- given the size of the

12      facility, you want to make sure you have enough staff.

13      That is one thing you do to comply with NCCHC.  You

14      train your staff -- you train that staff in --

15 A.   In correctional and mental healthcare.

16 Q.   NCCHC standards -- referring to NCCHC standards.  I am

17      trying to get at NCCHC compliance, talking about NCCHC

18      compliance in Exhibit 2.  It is in the contract there.

19      It is talking about it, so I am just trying to under-

20      stand what that is and what ACH does.  So one thing you

21      talk about is sufficient staffing.  Another is --

22 A.   Providing relevant trainings.

23 Q.   Training to your staff.

24 A.   Yes.

25 Q.   What else do you do?



```
 1   A.   What level of oversight or consultation, who is your
 2        mental health authority, so setting up systems.
 3   Q.   How do you -- what do you mean by that?  Describe what
 4        you mean by "oversight."  You said --  Go ahead.
 5   A.   So working with the site -- every site is different --
 6        as to who is the responsible person.  Am I working with
 7        the jail administrator?  Am I working with the sheriff?
 8        You know, is our physician working in the capacity of
 9        the mental health authority?  Every jail is a little
10        different.
11   Q.   So every jail needs a mental health authority?  Is that
12        right?
13   A.   Usually, jail administration.
14   Q.   So you want to make sure you are setting up a mental
15        health authority at the jail.  Right?
16   A.   Yes.
17   Q.   You are trying to set up a mental health authority and
18        identify that person.
19   A.   Yes.
20              MR. WEIL:  I am sorry to make
21        this pedantic, but I just want to get through what else
22        you do.  You do this day in and day out.  You have done
23        it for hundreds of sites.  I am trying to understand.
24   Q.   So staffing, training.  You are identifying the mental
25        health authority.  Is that right?
```



1   A.   It is usually already identified.

2   Q.   It is usually already identified.  What else?

3   A.   We discuss with our professionals that they are working

4        under the jail's policies and procedures.  What are

5        those jail's policies and procedures?

6   Q.   Let me stop you there.  So you are identifying the

7        jail's policies and procedures?

8   A.   Some jails don't have real good policies and procedures.

9        What are those policies and procedures and how do they

10        pertain to our delivery of services?

11   Q.   So you take a look at the policies and procedures the

12        jail has, maybe phone them up and say, "show me your

13        policies and procedures.  I want to understand what they

14        are."  Is that right?

15   A.   Our compliance professionals have, yes.

16   Q.   And what do you do with those policies and procedures?

17   A.   If they are reasonable, defensible and in line with

18         Illinois jail standards, we operate under them.

19   Q.   In terms of NCCHC compliance, what are you doing to,

20        sort of, figure out --  Again, I am just talking about

21        what is in this literature.  What are you doing to

22        marry those policies and procedures up with NCCHC?

23   A.   We educate our clients based on areas that maybe are

24        not in compliance.  For example, if they have blanket

25        policies, if they have things that would act as barriers



1      to healthcare, if there is things like that that would

2      be concerning.  Those are not in compliance with NCCHC.

3      By the way, again, if you read the NCCHC standards --

4      I am not trying to be difficult, but they are not

5      specific.  They are subject to interpretation.  They are

6      pretty open and they reference the state law.  You can

7      go to another resource, which is the Illinois jail

8      standards, and those are pretty vague as well.

9  Q.  Okay.  I'm going to go through the list.  You make sure

10     the staffing is sufficient, you make sure the staffing

11      you have is trained, you identify mental health

12     authorities, you look at the policies and procedures

13     that the jail has and if you see something that looks

14     deficient, you let the jail know.  Is that right?

15 A.  Yes.

16 Q.  Anything else that you are doing?

17 A.  I am sure there is other things.  I just can't recall

18     off the top of my head.  That's pretty core to what I

19     do.

20 Q.  That is what?

21 A.  That is pretty core to what I do.

22 Q.  And in terms of identifying the mental health authority,

23     how does that help out?  What does that accomplish from

24     the perspective of complying with the NCCHC?

25 A.  It's coordination, communication of care.  There needs



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          60

```
 1        to be someone who is taking a lead or a directive, but
 2        often, that is many different people.  It can be the
 3        medical director, it could be me to an extent, it could
 4        be Lidia, it could be the QMHP, it could be the jail
 5        administration.  We are all, kind of, working in that
 6        capacity.
 7   Q.   So do you write down anywhere, do you try to make a note
 8        for each of the hundreds of jails that you run who the
 9        mental health authority is for that jail?
10   A.   No.  This is not an NCCHC-accredited site.  If it was,
11        there would be a different process.
12                       MR. MADDOX:  You mean Sangamon
13        County jail?
14                       THE WITNESS:  Correct.
15   BY MR. WEIL:
16   Q.   It is not an NCCHC-accredited site.  Is part of --
17        I mean, that was true in when this contract was signed,
18         the contract we have been referring to.  Right?
19   A.   Yes.
20   Q.   What is the point of putting NCCHC compliance into a
21        contract with a jail that's not accredited?
22   A.   We want them to understand that that is the standard of
23        care that we want to ascribe to, that we want to try to
24        achieve that to make it the most defensible program they
25        have.
```



```
 1   Q.   Understood.  So given that, what we are talking about,

 2        these are things you do even for a site that is not

 3        accredited to push them in that direction.  Is that

 4        fair?

 5   A.   Yes.

 6   Q.   Why -- if you are trying to identify a mental health

 7        authority and that is important -- it sounds like it

 8        does -- why wouldn't ACH want to know who the mental

 9        health authority is at a place like Sangamon that might

10        not be accredited by the NCCHC?

11   A.   Could you, please, explain that again?

12                    MR. MADDOX:  You are assuming they

13        don't want to know.

14        BY MR. WEIL:

15   Q.   Why wouldn't it be written down somewhere?  Why wouldn't

16        you want to have a note of that somewhere?

17   A.   I think just because you don't give someone a title

18        doesn't mean that they don't have a role.

19                    MR. WEIL:  Completely agree.

20        I don't mean to interrupt you, but I completely agree.

21                    MR. MADDOX:  Were you done with

22        your answer?

23        BY MR. WEIL:

24   Q.   It seems like it would be important for ACH to know who

25        is in charge of Sangamon County jail for coordinating
```



MELISSA CALDWELL, M.D.                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          62

 1      care and who is that mental healthcare authority.
 2      Right?
 3  A.  Yes.
 4  Q.  You'd want to be able to look at a list, pick up a phone
 5      and not have to figure out for a week who that person
 6      is.  Right?
 7  A.  Yes.
 8  Q.  Is that something you'd write down somewhere, who that
 9      mental health authority is?
10              MR. MADDOX:  I just want to be
11      careful here.  "You" is a word that can be used in terms
12      of ACH or for Dr. Caldwell.  I just want some definition
13      on that.
14              MR. WEIL:  Both.
15  BY MR. WEIL:
16  Q.  It sounds like you are involved in the setup person-
17      ally.  I am asking about your practice.  If that is
18      something that somebody else at ACH does, I'd want to
19      know that, too.
20  A.  Almost, without exception, our mental health authorities
21      are our medical directors on site.  They serve in that
22      capacity, head-to-toe care.  They are working in
23      coordination with if there is a QMHP or with a community
24      mental health provider.  I am trying to make this clear,
25      but we are talking about 300 jails that have had very



1      customized approaches, by necessity, based on what they

2      have and what they don't have, so I can't say that this

3      is the cookie cutter approach that we are doing at every

4      single jail.  It would be much easier for me right now

5      if I could do that for you, but I'd say it is not good

6      practice to do that.  I have to look at the jail and we

7      have to say this is a jail that doesn't have a QMHP, it

8      has a community mental health provider.  Who is going to

9      be playing that, kind of, lead role?  And it's almost,

10     without exception, been our -- our medical directors on

11     site, our physicians.

12 Q.  Going down to the next thing we talked about, we talked

13     about identifying mental health authority.  We said that

14     you assess the policies and procedures the jail has and,

15     then, you try to educate the client.  Right?

16 A.  I have a role, but I am not solely responsible for that.

17 Q.  Who else is solely responsible for that?

18 A.  Previously, it was our vice president of compliance,

19     Ms. Deb Ash.

20 Q.  You talked about her earlier.

21 A.  Yes.

22 Q.  Is it Dr. Ash?  Ms. Ash?

23 A.  Ms. Ash.

24 Q.  What is Ms. Ash's role and what is your role in that

25     education of the client?



1   A.   She is no longer with our company, but her role at that

2        point -- and I may be oversimplifying it --

3   Q.   Let me get some specifics.  I am concerned with the time

4        which Tiffany Rusher was incarcerated and, then, before

5        then, too, to the extent, you know, if something --

6        if one of these things happened in 2011, sort of, was

7        put on cruise control from there on out, you know, set

8        up and it goes, then, I'd be interested in that, but --

9        So if Ms. Ash left after --  When did she leave ACH?

10  A.   The first half of this year.

11                   MR. WEIL:  She is still there

12       for my purposes, if that makes sense.  I am concerned up

13       to --

14                   THE WITNESS: Her role may have

15       been different at that time.  That is where my hesitancy

16       in talking comes from.

17  Q.   I'll clean it up.  You can describe -- I want you to

18       describe to me in general --  You said there is --

19       ACH looks at policies and procedures -- again, I am

20       referring to mental health, your specialty -- and, then,

21       tries to educate the client about, among other things,

22       compliance with the NCCHC.  So I want to understand what

23       you do and if there is anybody else involved, what they

24       do, to the extent you know.

25                   MR. MADDOX:  Is that a question?



1       I am not sure if you are describing your approach here

2       or that is a specific question.

3       BY MR. WEIL:

4   Q.  It is requesting you to describe that.

5   A.  If I can maybe explain a little bit, this is based on my

6       knowledge and my little piece of the puzzle.  It may not

7       be complete.  For example, when we start a program,

8       some of our jails are small, maybe they do not have the

9       most -- what we would say thorough policies and proce-

10      dures, which is a jail administrator's responsibility.

11      So one thing that we do on start-up, we will provide

12      NCCHC template policies.  They are not our policies.

13      These are reference materials for you to -- the jail

14      administration or the sheriff -- to look at and see how

15      they compare to yours, see if there is tweaks you need

16      to make in your policy.  Sometimes, we've had jails go,

17      "Oh, yes.  I want to use these."  They are not our

18      policies; they are NCCHC templates.  A lot of people in

19      our industry have them.  If they have their own and they

20      feel like yes, they are fitting the bill, they are doing

21      what needs to be done here, they may not change their

22      policies.

23  Q.  Let me stop you to focus your -- I am asking what you

24      guys do.  It sounds like you are saying you hand them

25      NCCHC template policies.



MELISSA CALDWELL, M.D.                              October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                               66

```
 1   A.   We have worked -- when I say "we", meaning our company
 2        or people that work for the company -- have coordinated
 3        with jail administration or the sheriff's department to
 4        look at their templates, their drafts, to make sure that
 5        they are not doing things that would be problematic for
 6        our patients.  Then, there was a signature that was
 7        provided on those final policies.  That would be,
 8        generally, the sheriff and the site medical director,
 9        the physician saying who that medical and mental health
10        authority is.  And we operate under those policies.
11   Q.   So you say "coordinate."  What do you mean?  You said
12        they coordinate with the jail to look at the policies.
13        What do you mean?
14   A.   Here is my draft.  I hand it to you.  You hand it back
15        to me.  We are reading it together.  We are evaluating
16        it for our given purposes.  I say, "this is a concern.
17        You are talking about not giving patients referral forms
18        so they can access care.  I'd say that is something or a
19        practice that you need to reconsider.  This one sounds,
20        like, a blanket policy where you are saying 'nobody gets
21        this.  We won't operate like this.'"  Working together,
22        educating and, then, working under that jail policy.
23   Q.   You are describing -- what you just described, is that
24        a memorandum identifying particular things, is that
25        sitting down at a table and talking about the various
```



1      policies that might be problematic?  How does that work?

2  A.  I can't speak to how, for example, Deb Ash did it.  I

3      can just say how I have done it in the past, it was

4      usually me e-mailing saying, "I have read this.  Thank

5      you.  Here is some areas I think we need to work on",

6      and going back and forth.  It doesn't often happen.

7      They often have existing policies that are in place and

8      we review them and we co-sign on them.  There is some

9      jails that don't have good policies.  We work with them.

10 Q.  I think you said earlier, in your recollection, that it

11     happened once or twice where you actually wrote them and

12     said, "you have a problem."  Is that right?

13 A.  That wasn't in relation to a policy, but I had, for

14     example, a site that was using unqualified people to do

15     mental health suicide risk assessments.  I said, "you

16     can't do that."  Another one, I said to the jail

17     administrator, "why are you releasing people off of

18     suicide watch?  I wouldn't recommend you do that.  You

19     are assuming a lot of responsibility if something bad

20     happens."

21 Q.  And you communicate those in an e-mail typically?

22 A.  E-mail or a letter, yes.

23 Q.  That is one category where you are writing them.  How

24     often do you do that would you say?

25 A.  In my role, rarely.  It's usually not been my focus.



 1        My focus is more hiring and staffing.

 2   Q.   And in terms of this --  I understood the hiring, the

 3        training.  In terms of this policy -- I am focused on

 4        the policies and procedures and educating the client.

 5        Do you --  We talked about coordinating, but I am trying

 6        to understand what you actually do.  Are you e-mailing

 7        them a copy of the NCCHC standards saying, "look, they

 8        should really comply with this", or are you -- are there

 9        model policies that the NCCHC provides and you are

10        saying --  Literally, I want to understand how this

11        actually works.

12   A.   When you say "me", you said "you."  That is not my role.

13   Q.   You don't have a role in educating about policies and

14        procedures to the jail?

15   A.   Unless something comes up in practice in general or our

16        compliance person would say, "hey, there is this issue",

17        that is not my front-line role.

18   Q.   That person would be Deb Ash?

19   A.   That was Deb Ash.

20   Q.   That was Deb Ash.  Okay.  Do you know, in terms of the

21        materials that actually get sent to a jail, whether it

22        be a letter from you or somebody else or you hand them

23        over NCCHC policies or another model policy, does NCCHC

24        make a record of the materials that they provided?

25   A.   Say that again.



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      69

1   Q.   Does NCCHC --  Sorry, wrong acronym.  Does ACH make a
2        record of the materials that they provide, the educa-
3        tional policies for policies and procedures?
4   A.   I don't handle --  You said "you" again.
5   Q.   I am asking --
6   A.   I don't hand them policies and procedures.  I'd presume
7        yes, as start of our start-up.  I'd be guessing.
8                        MR. MADDOX:  I want you to testify
9        about things you know.
10  A.   I would say I am not the best person to speak to that
11       process.
12  Q.   Deb Ash would be?
13  A.   She would have been part of that, yes.
14                   (Discussion off the record)
15  BY MR. WEIL:
16  Q.   Dr. Caldwell, turning back to your LinkedIn profile
17       quickly, in the mental health certification that you
18       have from NCCHC that we have been talking about, who
19       else at ACH has a certification?
20  A.   It is growing.  Almost all of us now have it.
21  Q.   Did Deborah Ash have it?
22  A.   Yes.
23  Q.   I am a little confused about --  Maybe you can help me
24       understand your role in this NCCHC certification or
25       encouragement.  It sounds like what you are doing is,



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                           70

1      essentially, just the staffing.  Right?  You are setting

2      up staffing?

3  A.  It's the bulk of what I do, yes.

4  Q.  If you are the head of mental health, why wouldn't you

5      be involved in, sort of, substantively telling the jail

6      whether their policies --  Why wouldn't you want to have

7      oversight into that, what the jail is substantively

8      doing in terms of their policies?

9  A.  I am not sure why you assume I don't.  I have a role in

10     it, but is that my responsibility entirely?  No.  I am

11     primarily responsible for the hiring and staffing of

12     qualified mental health professionals.

13 Q.  What is your role in it?

14                   MR. MADDOX:  In what?

15 BY MR. WEIL:

16 Q.  In the jail's substantive mental health policies.  To

17     back up, you talked about Deb Ash.  This is, sort of,

18     her bucket, for lack -- her side of this NCCHC com-

19     pliance.  Her side of it is the substantive policies

20     that the jail might have?

21 A.  And to be clear, I don't know if that is what she was

22     doing at that time.  I am just saying that was her more

23     recent role.  But yes, that was her focus, but I would

24     partner with her if there was a mental health concern

25     issue.  Policies and procedures are a lot of different



1     things, not just medical or mental health.  We work as

2     an inter-disciplinary team in terms of inputting the

3     pieces that fall under our areas of expertise.  So if

4     there was concerns about how a client is operating in

5     relation to these standards, I educate them, I partner

6     them and they make changes and if they don't, then, I

7     have sent my rare letter.

8  Q.  Why wouldn't you, as a practice, be writing out memos

9     to a jail?  I am just thinking of jails.  In terms of,

10    "Here is where you are in compliance, here is where the

11    NCCHC says you can do something you are not", because my

12    experience is it is just a massive bureaucracy.  I mean,

13    something goes in, maybe it is this person over here who

14    would actually be responsible for --  Wouldn't it be

15    helpful for them to have something in writing to say,

16    "Here is where it's missing something, here is what is

17    good"?

18                  MR. MADDOX:  Please answer.  Every

19    time I object, please answer.  I want to object to the

20    form of the question.  That rambled on quite a bit.

21    BY MR. WEIL:

22  Q.  Do you understand my question?

23  A.  I guess my -- my reaction is to assume that a memo is

24    that process.  We have continuous quality improvement

25    processes.  So there are meetings with various jail



1    representatives about how many people are being seen,

2    something as general as that, what things are working,

3    what are not, there is action items, there is strategic

4    planning.  Those things are in place.

5  Q.  I was talking about the outset.  You talked about doing

6    this initial outset thing where you are looking at a

7    potential client, trying to figure out what you need,

8    "I need this much staffing, I have to figure out who the

9    mental health authority is, I have to make sure my staff

10   is trained", all of that.

11 A.  There was a lot, but yes.

12 Q.  I am just going through the list.  I don't want to march

13   through it every time.  There is this bit about taking a

14   look at what their policies and procedures are.  Right?

15 A.  Which my colleague, that would be her primary focus and,

16   then, she'd inform me if there is, for example, a

17   suicide prevention policy that is odd.  A lot of them

18   are very typical; 15-minute staggered checks.  I have

19   had jails that have five minutes or ten minutes.  So

20   knowing if there is something different going on here

21   than the norm.

22             MR. WEIL:  Were you done?  I

23   don't want to interrupt you.

24 A.  I am involved as far as that is my piece of the puzzle.

25 Q.  You were serving as the director of mental health at



1          ACH.

2    A.    Yes.

3    Q.    I am just trying to understand why -- as a practice, why

4          wouldn't you just provide a written summary to the jail,

5          you know, we are looking at hiring -- "you are looking

6          at hiring us.  We have looked at your policies.  We are

7          trying to educate you about NCCHC.  Here are the areas

8          where I think there is a problem.  Here is where you are

9          doing well", something in writing like that.

10                    MR. MADDOX:  I think it's been

11         asked and answered.  But go ahead.

12   A.    I think for me, there is an assumption that one form

13         of communication is better than another.  If I am

14         communicating with a client and the message is being

15         conveyed and I say, "I recommend that you have 20 hours

16         based on this size" or later on, "I think you need to go

17         up to 28", there are written work products that our

18         company provides that I participate in that go to that

19         client.  If there was a deficiency, that would be

20         communicated to them and I would be aware of that.

21   Q.    That would be communicated how?

22   A.    Via, for example, our vice president of compliance,

23         communicating that "I talked with Dr. Caldwell.  We have

24         a concern that your policy says this."  Usually, since

25         we start up a program, the policies are pretty



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      74

1       defensible.  They are pretty general.  They are not
2       rules, they are guidelines.
3    Q.  But I meant, it would be communicated how?  In writing
4       or orally?
5    A.  I wouldn't be able to speak to Ms. Ash.  I would say it
6        is probably a combination of what she had done.
7    Q.  But you are Deb Ash's boss.  Right?  You were.
8    A.  I am not Deb Ash's boss, no.
9    Q.  But you were in charge of what sort of mental health
10      education -- ultimately, you were in charge of the
11      mental health education that was provided to potential
12      clients?
13   A.  I have a responsibility of our mental health education,
14      but I am not the only one.
15              (A document was marked as Exhibit 3)
16   BY MR. WEIL:
17   Q.  Dr. Caldwell, I am handing you what's been marked as
18      Exhibit 3 and I will represent to you that is a copy
19      of the "NCCHC Standards for Mental Health Services at
20      Correctional Facilities" dated 2015.  Do you have that
21      in front of you and do you recognize this document?
22   A.  Yes.
23   Q.  Yes, you recognize the document.  Right?
24   A.  Yes.
25   Q.  Have these standards been updated since 2015?



 1  A.   No.

 2  Q.   And so these would have been operational through

 3       Ms. Rusher's incarceration at Sangamon County jail.

 4       Right?

 5  A.   Yes.

 6  Q.   These are the standards --  When we have been talking

 7       about NCCHC compliance in terms of mental health, these

 8       are the standards that you are trying to get a jail to

 9       comply with.  Is that right?

10  A.   As much as possible, yes.

11  Q.   You do that at the outset through staffing, training,

12       oversight and client education we have been talking

13       about.  Is that right?

14  A.   Yes.

15  Q.   I refer you to the various sections that are set out.

16       I am sure you are much more familiar with it that I am,

17       but turn first to MH-A-02.

18  A.   Where is that?

19  Q.   MH-A-02.  "Responsible Mental Health Authority."

20                   MR. MADDOX:  What page is that?

21                   MR. WEIL:  14830.

22       BY MR. WEIL:

23  Q.   It says here under 1., "Compliance Indicators."  It

24       says,

25                   "The facility has a designated mental health



1              authority responsible for mental health care
2              services."
3      Do you see that?
4  A.   Yes.
5  Q.   In the case of Sangamon County, do you know who that
6      person was?
7  A.   That would have been --
8                  MR. MADDOX:  Hang on one second.
9              (Discussion off the record)
10     BY MR. WEIL:
11 Q.   I am referring you to the standard at the top of
12     MH-A-02.
13             "The facility has a designated mental health
14             authority responsible for mental health care
15             services."
16     Do you see that?
17 A.   Yes.
18 Q.   Do you know who that person was at Sangamon County
19     during Ms. Rush's incarceration there?
20 A.   It would have been stipulated in their policy.
21 Q.   And if the policy did not identify a person who was the
22     designated mental health authority, is that something
23     you'd expect that Deb Ash or somebody at ACH had a flag
24     for them?
25 A.   It may not have been flagged.  They are not NCCHC



 1      accredited.  It would not have been in non-compliance

 2      with Illinois jail standards necessarily.

 3  Q.  If something like a designated mental health authority

 4      didn't exist --  I understood you saying that you try to

 5      push a client in the direction of compliance with the

 6      NCCHC.  Right?

 7  A.  Yes.

 8  Q.  So if a jail didn't have a designated mental health

 9      authority in their policies, that is something that

10      you'd want to educate the client about in order to get

11      them to comply with the NCCHC.  Is that right?

12  A.  It is a question of whether somebody had a title versus

13      if there is somebody operating in practice.  I think, if

14      you look at Compliance Indicator No. 4, it talks about

15      all the various entities or persons that can serve in

16      this capacity and it doesn't have to be a singular

17      person.  So it can very well be the jail administration,

18      it can be, in some jails, a community mental health

19      agency.  Mr. Shmikler, the qualified mental health

20      professional, had a role in this, the nurse manager may

21      have had a role in this.  They are all pieces of the

22      puzzle working together.

23  Q.  In Paragraph 6 of "Compliance Indicators, "it says,

24              "All aspects of this standard are addressed

25              by written policy and defined procedures."



1         Do you see that?

2    A.   If they are meaning --

3    Q.   Do you see that?

4    A.   Yes, sir.

5    Q.   So if that wasn't identified by a written policy, if the

6         designated mental health authority responsible for

7         mental healthcare services was not identified in the

8         written policy, that is something that you would expect

9         ACH to have tried to educate the client about.  Is that

10        right?

11   A.   I can't speak to what level of non-compliance was

12        allowed for a non-accredited site, but it may have been

13        if it impacted delivery of care.  I would have to look

14        at their policy at that time to know whether that is

15        non-compliance.  I can't recall.

16   Q.   If --  This standard is "essential."  Do you see that in

17        the upper left corner?

18   A.   Yes.

19   Q.   What does "essential" mean?

20   A.   For accreditation, you need to be able to show this.

21   Q.   I am referring you to Bates 14973.  It is Appendix --

22        Going forward, I am just going to refer to the last

23        three letters.  So 973.  You see where the phrase --

24         the section called "Compliance With Standards"?

25   A.   Yes.



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                        79

1  Q.   It says,

2              "Each standard is classified as either

3              'Essential' or 'important.'"

4       Do you see that?

5  A.   Yes.

6  Q.   I am going to skip down.  It says,

7              "Generally, essential standards are more

8              directly related to the health, safety, and

9              welfare of patients and the critical

10             components of a mental health care system."

11      Do you see that?

12 A.   Yes.

13 Q.   That doesn't sound like it is just -- it is just a

14      matter of accreditation or not.  It is describing some-

15      thing that is directly related to the health, safety and

16      welfare of patients.  Correct?

17 A.   I think it is saying generally, these are more directly

18      related to health safety, yes.  They are ones that you

19      want to emphasize and focus on.

20 Q.   So regardless of whether a facility is accredited or

21      not, an essential standard you are going to expect is

22      going to be directly related to health, safety and

23      welfare of patients.  Is that right?

24 A.   Yes.

25 Q.   So if you are trying to get a jail to come into



1    compliance with the NCCHC, you'd expect somebody to say,

2    "Do you know what" -- I will get you back to MH-A-02.

3    If a jail doesn't have a designated mental health

4    authority in its written policies, if it doesn't

5    designate a mental health authority, you'd expect that

6    would be something that ACH would want to let the jail

7    know about in terms of its consultant role of NCCHC

8    compliance?

9                    MR. MADDOX:  I just want to

10   interpose an objection.  Do you mean the Sangamon County

11   jail?

12                   MR. WEIL:  I am asking about a

13   jail generally.

14                   MR. MADDOX:  Well, there seemed to

15    be two categories, so I object to the question.

16   BY MR. WEIL:

17   Q.   Do you understand the question?  Do you want me to ask

18        it again?

19   A.   (No response)

20   Q.   I will ask it again to clear it up.  If you encounter

21        a jail -- or ACH encounters a jail -- again, given your

22        knowledge as the mental health director for ACH, if ACH

23        encounters a jail under a contract like Sangamon's where

24        there's a consulting role for NCCHC compliance and a

25        designated mental health authority responsible for



MELISSA CALDWELL, M.D.                                October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                  81

 1     mental healthcare services is not identified in any

 2     written policy, is that something you'd expect ACH to

 3     want to let the jail know about?

 4                    MR. MADDOX:  Object to form.

 5                    MR. WEIL:  You can answer.

 6  A.  It is hard to answer that question because mental health

 7     and medical authority tend to fall under the same

 8     umbrella and again, I'd be more comfortable speaking to

 9     what is going on at Sangamon with their particular

10     policies because my recollection is that would have been

11     probably our medical director.  The on-site medical

12     director is identified as that authority.

13  Q.  Do you think it was?

14  A.  I would need to look at the policy.

15  Q.  It wasn't a question that I asked.  I am just asking,

16     if a mental health authority isn't identified in a

17     jail's written policies, is that something you'd expect

18     ACH to want to let a jail know about in that education

19     component that we talked about, about jail policies and

20     procedures?

21                    MR. MADDOX:  Object to the form.

22                    Go ahead.

23  A.  As it wasn't my role, I don't want to speak to what I

24     think could have, would have, should have happened.

25     i think you need to talk to the professional who that is



```
 1              their job.
 2   Q.   Dr. Caldwell, you are director of mental health at ACH.
 3        Right?
 4   A.   I am the vice president of mental health.
 5   Q.   Well, at the time that we are particularly concerned
 6        about, you were the director of mental health.  Would
 7        you want your clients to be educated about the NCCHC
 8        requirements?
 9   A.   If they are impacting the health and safety of a
10        patient, if there is a mental health authority in
11        practice, I will be honest.  I am less concerned as to
12        whether they have a title as long as there is one in
13        action.
14   Q.   So essentially, if there was no actual mental health
15        authority identified in a written policy, that wouldn't
16        be a concern to you?
17                   MR. MADDOX:  That is not what she
18        said, but go ahead.
19   A.   I think I always have a concern about meeting, as
20        closely as possible, these guidelines.  However, my
21        primary focus is to make sure that a site is achieving
22        as closely as possible.
23   Q.   Of course.  You don't control the Sangamon County jail.
24        I am just talking about ACH's role in trying to educate
25        the jail as far as NCCHC standards.  Would it be a
```



| | | |
|---|---|---|
| 1 | | concern to you if ACH didn't try to educate the jail |
| 2 | | about designating a mental health authority in writing |
| 3 | | in its written policies? |
| 4 | A. | If they did not have one? |
| 5 | | MR. MADDOX:  Objection.  Asked and |
| 6 | | answered. |
| 7 | A. | Yes.  If they didn't have an acting mental health |
| 8 | | authority, somebody who is acting in the capacity, then, |
| 9 | | yes, I'd be concerned. |
| 10 | Q. | It wouldn't matter to you whether that authority was |
| 11 | | identified anywhere in the jail's policies? |
| 12 | A. | Again, I believe it was, but I'd want to reference |
| 13 | | materials. |
| 14 | Q. | I am asking you in general.  I am not referring to |
| 15 | | Sangamon in particular. |
| 16 | A. | That they have that particular title with those words? |
| 17 | Q. | No.  That a mental health authority is identified, |
| 18 | | somebody responsible for mental health in a jail's |
| 19 | | policies. |
| 20 | A. | I believe they had. |
| 21 | Q. | Dr. Caldwell -- |
| 22 | A. | They need to have a mental health person -- |
| 23 | Q. | Dr. Caldwell, I am asking you about general -- I am not |
| 24 | | asking about Sangamon County.  You do this with hundreds |
| 25 | | of jails.  I am just asking you a general question about |



MELISSA CALDWELL, M.D.                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                    84

1       jails.  This is an essential policy in the NCCHC and I
2       am just asking you, hypothetically, if you saw that a
3       jail's policies -- if ACH sees that a jail's written
4       policies don't identify a mental health authority
5       responsible for mental health, is that something that
6       ACH would want to educate the jail about?
7   A.  You are asking me to speak for the company versus my
8       personal opinion?
9   Q.  I am asking you to speak as the medical director for
10      mental health at ACH.
11  A.  I'm the mental health director at that point.  I think
12      we described what I do.  When I am talking with a
13      client, when I am setting up a program, when I am asking
14      them who is providing their mental health services, is
15      it community mental health, this is part of what I am
16      going through, part of what I am educating about who is
17      going to be meeting their mental health needs.  So I am
18      telling them that they need to have somebody responsible
19      for this action.
20  Q.  Thank you.  So that would be you or that would be Deb
21      Ash telling them that they need someone responsible for
22      that action?
23  A.  I think there is multiple persons that are involved
24      in identifying who is the mental health and medical
25      authority.



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                       85

1  Q.  My question is just about whether a written policy

2      identifies a mental health authority.  And if it

3      doesn't -- It is a simple question.

4  A.  The templates that we give a client at the very first --

5      I'll describe that process.  When we have a brand-new

6      client, whether they have policies and procedures

7      already in hand, part of what we do is we hand them

8      this, the template of policies and procedures based on

9      NCCHC standards that actually even have those numbers,

10     the same reference points, and they outline how to do

11     this.  So we are providing the resources to comply with

12     this standard.

13 Q.  You just provide them a big document and hope that they

14     figure it out, or what do you do?

15 A.  I think I described earlier that we work back and forth

16     with them to either say, "I don't need this because my

17     existing policies and procedures already comply with

18     this", or, "yes, let's customize these to my jail based

19     on my physical plans and processes in place", and we

20     will work with them in making those policies theirs and,

21     then, their designee, the sheriff, generally speaking,

22      or the jailer, and our mental health or medical

23     authority, which is generally the physician, signs off

24     on those procedures.

25 Q.  Let me turn you to MH-A-06.  That's on Page 839.



MELISSA CALDWELL, M.D.                               October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                              86

1          "Continuous Quality Improvement Program."  Do you see

2          that?

3    A.    Yes.

4    Q.    Can you describe what that is?

5    A.    What it looks like in execution, sir?

6    Q.    Yes.

7    A.    What it looks like is a meeting with a work product

8          document, usually fielded by the site health service

9          administrator and the regional nurse manager with input

10         from the physician, the QMHP, with the jail administra-

11         tion or custody.  Pretty much anybody who is involved

12         in health services is invited to be part of this

13         process.  They have meetings where they discuss statis-

14         tics and unusual circumstances or processes or policies

15         that need to be looked at.  It is a work group meeting

16         to improve of quality of healthcare in the jail.

17   Q.    This is also an essential criteria for the NCCHC.

18         Right?

19   A.    Yes.

20   Q.    If ACH has a client who does not set up or engage in

21         these CQI meetings, what does ACH do?  Again, I am

22         speaking in general.

23   A.    Observing it from afar, I have seen my colleagues

24         repeatedly educate, repeatedly try to set up these

25         meetings.  I believe that there probably is a written



1         work document that says "okay, jail administrator, I
2         understand that you have decided to waive CQIs.  It is
3         fairly rare, but there are some clients that either
4         don't want to do it or they don't want to do it on the
5         frequency that we recommend.
6    Q.   How do you make that recommendation, the frequency --
7         You said you recommend that these things be done at a
8         certain frequency?
9    A.   It's varied over the years.  However, that is not
10        something that I am involved in.  That is, usually, a
11        regional nurse manager activity.
12   Q.   Does ACH have a general policy about whether to push for
13        these CQI meetings?
14   A.   We strongly recommend them.
15   Q.   Do you have any mechanism for learning from your
16        regional nurse managers whether the meetings are
17        occurring or not?
18   A.   Yes.  They track those attendance.
19   Q.   Do they track them in writing?
20   A.   Yes.
21   Q.   Again, going to mental health, going to what you under-
22        stand --  I guess, CQIs would involve more than just
23        mental health, obviously.  Right?
24   A.   Yes.
25   Q.   So when ACH has a client, for lack of a better word,



1          ACH corporate, the central body, is there some

2          coordinating feature of saying -- identifying clients

3          who are not actually engaged in this CQI process?

4     A.   Yes.

5     Q.   So ACH corporate central learns about whether different

6          clients are engaged in CQIs.  Is that right?

7     A.   Yes.

8     Q.   How does ACH learn about that?

9     A.   I'm aware that there is a tracking process.  I have seen

10         lists of, "this one is coming due.  This one has not

11         been done and why."

12    Q.   Who would be storing a document like that, or what is

13         that document comprised of?

14    A.   I have only seen it in passing in a meeting, so I can't

15         speak to who is currently or then responsible for that.

16         I just know it exists.

17    Q.   Do you know, then, how ACH actually -- the mechanism

18         that ACH corporate, the central office, actually learns

19         about whether these things are occurring or not?

20    A.   Regional nurse managers turning in their completed CQI

21         documents is my understanding.

22    Q.   Do you know who would be involved in receiving documents

23         like that?  I think you said you don't, but I am trying

24         to make sure I understand.  Is there an office that

25         would be involved, a person at central --



 1   A.   There have been several people that have done it

 2        clerically, and I'd be guessing right now who would be

 3        responsible for that.

 4   Q.   What department would it be?

 5   A.   It was under compliance.  And the departments have

 6        changed over time and even recently.

 7   Q.   If the compliance department at ACH learns that

 8        CQIs are not being conducted by a particular client,

 9        do you know what happens?  What does -- what does ACH

10        corporate do?

11   A.   I don't have a direct role in that.  Again, my answer

12        to that question would be based on overhearing of a

13        conversation.

14                   MR. MADDOX:  In fairness, he is

15        not asking if it is your direct role; he is asking about

16        your knowledge.  So if you have knowledge, you should

17        share it.  If you don't have knowledge, then, say you

18        don't know.  But saying it is not your role is not quite

19        answering his question.

20   A.   Can you ask the question again?

21   Q.   I am asking what you know about what -- I will get a --

22        what does ACH corporate do when it learns that a client

23        is not engaging in CQIs, to the extent you know?

24   A.   There is communication with the regional nurse manager

25        who has a more direct responsibility in that respect.



1          "This client is now three months overdue.  Why are they

2          not wanting it?"  I have heard coaching or direction to

3          the regional nurse managers of things they can do to

4          educate the client about the importance of this.  I am

5          not aware of what happens if a client says, "no, I am

6          not going to do that", but I imagine there is some, sort

7          of, education or communication with them about it.

8     Q.   Does anything written go to the client, any e-mail or

9          something saying, "you are not doing this and you really

10         should be?"

11    A.   I imagine so, but I'd be guessing.

12    Q.   Would it surprise you to learn that between 2011 and

13         Ms. Rusher's death, there were no CQI meetings at

14         Sangamon County jail?

15    A.   Would it surprise me?

16    Q.   Yes.

17    A.   I think I referenced there are some clients, for

18         whatever reason, either don't want them or don't do

19         them.

20    Q.   Has ACH had clients that it thinks they are just running

21         the jail so badly and maybe are so thick headed, they

22         are not changing the way they are doing things, that

23         ACH says, "we have to walk away from this contract"?

24    A.   Yes, we have.

25    Q.   Give me some examples.



1   A.   Like, names?

2   Q.   Yes.

3   A.   I am not comfortable doing that.

4                    MR. WEIL:  I am asking the

5        question.   Unless you are directed not to answer --

6                    THE WITNESS:  Do I answer?

7                    MR. MADDOX:  He wants you to

8         identify a particular jail.  I think that is --

9   A.   Wood, Wisconsin, is a current client.  My recollection

10       is clear because it is recent to now.  They will not --

11       or has not accepted recommendations about needed

12       staffing levels to be able to effectively do our job.

13       We have sent them a take-it-or-leave-it.  Basically,

14       "In-house, this is the staffing if you want to continue.

15       Otherwise, we are not going to continue the contract."

16   Q.   Anybody else?

17   A.   Over the years?

18   Q.   Yes.

19   A.   I would say medically, that happens.  I think I

20       explained that we have quite a bit fewer mental health

21       programs than we do medical programs.  That is the first

22       mental health program that I have had that happen.

23       I think Grant, Kentucky, was pretty close because we

24       weren't afforded the staffing that we needed to be able

25       to even comply with DOJ.  And the response from the



1    jailer was, "well, unless they say something to us, this
2    is what we are going to do."
3  Q.  Outside of staffing concerns, are there any other
4    circumstances you can recall where ACH has said,
5    "Because you are non-compliant with some other feature
6    or requirement or best practice, we just can't keep
7    providing care here"?
8  A.  I am sure there have been.  We have left contracts for a
9    variety of reasons, but these are the ones I can speak
10   to directly that are directly related to patient care.
11 Q.  Are CQI meetings important, in your view?
12 A.  Yes.  I think meetings to discuss what is being done and
13   actions for what needs to be done to improve it are
14   important.  Whether you call it a CQI meeting or not,
15   you have to do something that resembles that.
16 Q.  What are the risks of not conducting CQI meetings?
17               MR. MADDOX:  Object to the form
18   of the question.  Vague, a hypothetical.
19 A.  I think that would be --
20 Q.  Let me back up.  I am asking from a mental health
21   perspective.  In your profession, your understanding,
22   what are the risks for a mental health program of a jail
23   of not conducting CQI meetings?
24               MR. MADDOX:  Same objection.
25               Go ahead and answer.



```
 1   A.   The hypothetical risks or the real risks for a
 2        particular program?  I guess I just want to be really
 3        clear.
 4   Q.   The real risks.
 5   A.   I'd have more hypothetical risks that have to do with
 6        communication breakdowns.
 7   Q.   What do you mean by that?
 8   A.   The CQI meeting is, I think, more about improving
 9        communication.
10   Q.   Between whom?
11   A.   All parties.  All responsible parties involved in
12        healthcare.  That is healthcare professionals and also,
13        administrative pieces or jail pieces.  So for them to
14        know what is working, what is not working, it helps us
15        to identify where there is concerns.
16   Q.   Why is that important for inmate safety?
17   A.   Communication is important for inmate care, for patient
18        care.  If you miss pieces of the puzzle, you may not
19        have an accurate assessment, for example.  This is a
20        larger process, however.  This is not day-to-day stuff.
21        This is CQI -- I want to make it really clear.  It
22        doesn't happen on the frequency that would take care
23        of day-to-day issues.  These are looking at more larger
24        systemic problems.
25   Q.   And larger systemic problems can create real risks for
```



MELISSA CALDWELL, M.D.                           October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                              94

1          inmates.  Right?
2   A.   It can.
3   Q.   Turn to MH-A-08, Page 846.  You don't have to turn
4        back, Dr. Caldwell, but referring you to CQIs --
5        Strike that.  "Communication on Patient's Mental Health
6        Needs."  I think, actually, that this is one of the
7        issues you referred to in CQI, make sure communication
8        is -- is effective.  Is that right?
9   A.   Yes.
10  Q.   And this is an essential standard, too.  Right?
11  A.   Yes.
12  Q.   All right.  It says,
13                  "Communication occurs between appropriate
14                  nonclinical staff and treating mental health
15                  professionals regarding inmates' significant
16                  mental health needs that must be considered
17                  in classification decisions in order to
18                  preserve the health and safety of that
19                  inmate, other inmates, or staff."
20       Do you see that?
21  A.   Yes.
22  Q.   What sort of communication is involved here between
23       non-clinical staff and staff?  Substantially, what is
24       important to talk about?
25  A.   Recommendations for staying on suicide watches, for



1    example.

2  Q.  Explain how that would work.  Explain --  Back up.

3      Explain what you mean by "recommendations for staying on

4      suicide watches."  Who would be making that recommenda-

5      tion, or should be?

6  A.  The on-site qualified mental health professional, which

7      can include, for example, the physician if he or she is

8      working in that capacity.  Assessing the patient and

9      reporting back to custody partners who are generally

10     responsible for things, like, housing and property as to

11     whether the patient needs some accommodations in those

12     areas because of medical or mental health needs.

13 Q.  What do you expect the mental health professionals, the

14     QMHP or the mental health authority, whoever that is,

15     what is their input into, say, a suicidal inmate?  What

16     communication do you expect them to provide to the

17     non-clinical staff at a jail?

18 A.  It varies, but minimally, if somebody is on a special

19     observation or suicide watch, whether that should be, by

20     healthcare's opinion, a continued process, we recommend

21     that only qualified professionals -- healthcare profes-

22     sionals be the ones who make decisions to remove someone

23     off a watch.  Anyone can place someone on a watch.  So

24     if there is a question about whether somebody can be

25     taken off of a 15-minute suicide watch or a medical

1     observation, there should be healthcare professional

2     input.

3  Q.  Go to the bottom of 846.  I have an ellipsis here, but

4     it says,

5          "Because mental health problems affect housing

6          decisions",

7     and it goes through a bunch of other issues.  It says,

8          "Communication between security, classifica-

9          tion/program staff, health services, and

10         mental health staff ensures the mentally ill

11         inmate's activities of daily living are

12         restored or maintained to the greatest extent

13         possible."

14    Do you see that?

15 A.  Yes.

16 Q.  Is that a clinical goal, that a mentally ill inmate's

17    activities of daily living are restored to the greatest

18    extent possible?

19 A.  I have never articulated it quite like that, but I would

20    agree with that.

21 Q.  What does that mean, "activities of daily living are

22    restored or maintained at the greatest extent possible"?

23 A.  Activities of daily living is, kind of, a category of

24    life functions described healthcare-wise.  It is things

25    like eating, drinking, grooming, social interaction, so



1      the basic human functions.

2   Q.  By "social interaction", what do you mean?

3   A.  How I generally look at that is I think my colleagues

4      would look at that as primarily, safety for self and

5      others.  Not whether or not they are making friends

6      necessarily, but are we able to have them in a situation

7      where they are safe for themselves and others?

8   Q.  What does that have to do with social interaction?

9   A.  I think that is, kind of, core to social interactions.

10     If you are hurting yourself or hurting others, that is

11     a pretty deteriorated level of social interaction.

12  Q.  So back up and tell me what social interaction is.

13     Setting aside what a particular person might be limited

14     and being able to do that, what does social interaction

15     mean?

16  A.  To me versus a Webster --

17  Q.  To you as a mental health professional.

18  A.  It is a very large description of all the things.  Me

19     talking to you, you know, can I be in your proximity and

20     for you to be safe?

21  Q.  I think I am asking a bad question.  Let me ask some-

22     thing else.  I think for lack --  In summary, social

23     interaction, it is interacting with other people in some

24     fashion.  Is that right?

25  A.  It is the interchanges we have as people.  It could be



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      98

```
 1       as simple as the interchange between the officer and the
 2       patient when they hand over the food tray and getting
 3       acknowledgement that they need toilet paper.  It can be
 4       pretty basic all the way up to real complex interactions
 5       like maybe with you and your spouse or with your
 6       children or with your friends.  I don't think we are
 7       necessarily defining it to that upper level.  We want
 8       people to be able to interact in a safe way for them-
 9       selves and others.
10   Q.  So in terms of restoring social interaction to the
11       greatest extent possible, talking about here, what would
12       "The greatest extent possible" mean in that context of
13       social interaction?
14   A.  In a jail environment, optimally, I'd want someone, if
15       possible, to be able to be in general population, housed
16       with others, living with a cellmate, all the way up to
17       being prepped to be back in our community as a safe
18       citizen.
19   Q.  Is that beneficial, that high level of interaction that
20       you just talked about?
21   A.  It is beneficial, but not always possible.
22   Q.  Understood that it is not always possible, but you agree
23       it is beneficial.
24   A.  Yes.
25   Q.  As that social interaction gets cut down farther and
```



1        farther, that is less beneficial to an inmate.  Is that

2        right?

3   A.   I wouldn't agree with that, necessarily.

4   Q.   Why would NCCHC want social interaction be to the

5        greatest extent possible?

6   A.   We also have to have safe, social interaction.

7   Q.   I understand that.  I am asking -- I understand that

8        "Possible" is a word in that phrase, but I want to

9        understand why it would be to the greatest extent

10       possible.

11  A.   Can I explain what may be the greatest extent for some

12       people versus others, sir?

13  Q.   Just answer my question, please.

14  A.   I can't in the way that you framed it.

15  Q.   You can't explain why the NCCHC would encourage

16       social interaction to the greatest extent possible?

17  A.   I think it is a human goal.

18  Q.   Why is that?

19  A.   We want to get along with people.  I would say most

20       people, unless there is, for example, autism, take

21       comfort and enjoyment from positive, healthy human

22       interactions.  There is some, however, that find it

23       uncomfortable and that is not going to be achieved to

24       the same level as for you or I.  There is others where,

25       because they chronically are in situations that hurt



1       themselves or hurt others, that you have to prioritize

2       safety and you may have to limit their proximity to

3       others.

4   Q.  It says here, "a consistent reliable method" -- I'm

5       sorry.  I am on 847 now at the top.  This is just after

6       that phrase we are talking about, "to the greatest

7       extent possible."

8               "A consistent reliable method of communication

9               of essential information, without compromising

10              confidentiality, among staff regarding the

11              special mental health needs of inmates is the

12              linchpin to successful compliance with this

13              standard."

14      Do you see that?

15  A.  Yes.

16  Q.  What mechanisms for consistent, reliable communication

17      do you encourage when you are looking at a jail's

18      policy?

19  A.  This is more of a procedural issue or process issue, in

20      my opinion.

21  Q.  Right.  It goes to mental health safety.  Right?

22  A.  It can.

23  Q.  It is an essential standard by the NCCHC.  Right?

24              MR. MADDOX:  You said "mental

25      health."  Did you mean "safety" or "needs"?  Because it

1    refers to mental health "needs."  I don't know if there

2    is a difference.  I'm just wondering if you quoted --

3    BY MR. WEIL:

4  Q.  We can talk about "needs."  Let's talk about mental

5    health "needs."  I understood mental health essential

6    standards to go to health, safety and welfare of

7    patients and we reviewed that earlier.  Right?  Correct?

8  A.  I think you even read something in the back in terms of

9    the compliance or the audits and these are standards

10   that, generally speaking, if they are essential, may

11   have an impact on health and safety.

12  Q.  So turning again to 847, why would consistent and

13   reliable communication among staff be important for

14   inmate health and safety or inmates with mental health

15   issues?

16  A.  It is part of coordination of care.

17  Q.  Okay.  But why would it be important?

18  A.  Without communication, you may have breakdowns in

19   coordination of care.

20  Q.  That would be communication from non-clinical staff to

21   clinical staff.  Right?

22  A.  That is one piece of the puzzle, yes.

23  Q.  It would also be communication from clinical staff to

24   non-clinical staff.  Right?

25  A.  And clinical staff to clinical staff, a triangulation.



1    Q.    Understood.  What are you looking for in terms of

2          written policies to set that up -- set up that kind of

3          communication?

4    A.    I am looking for processes and practices.  That is

5          something else that is discussed in here, not just

6          policy, but practices.  So this would be, for example,

7          a mental health worker talking with an officer about

8          what their observations have been about a patient and

9          debriefing appropriate information to that officer so

10         that that officer or administration or custody or what-

11         ever level can make custody decisions about housing and

12         property.

13   Q.    This is another standard -- I am looking at 846.  It

14         says,

15                   "All aspects of the standard are addressed by

16                   written policy and defined procedures."

17         Do you see that?

18   A.    That is in all of them, yes.

19   Q.    I would imagine that you would really want to see a

20         written policy saying, "this is how things are communi-

21         cated."  Right?

22   A.    If my site was NCCHC accredited, it is important for

23         them to maintain their accreditation.

24   Q.    Well, regardless of accreditation, these essential

25         standards are important to inmate safety whether the



1       site is accredited or not.  Right?

2   A.  I want the processes in place, yes.  If they are not

3       accredited, we may have some ability to be a little bit

4       looser in terms of how it is defined, but these things

5       are generally defined in the policies and procedures.

6       These are guidelines, they are not rules.  They don't

7       represent every single scenario, so they can't outline

8       everything that you do.

9   Q.  I understand, but you would want something written down

10      to say, "look, we have to make sure that this triangular

11      communication you talked about happens in a structured

12      way."  Right?

13                  MR. MADDOX: Objection.  I think

14      that's been asked and answered, but go ahead.  You can

15      answer the question.

16  A.  My answer to the question would be that the policies

17      and procedures that I have seen reflect a component of

18      talking about security talking to healthcare staff,

19       particularly in the area of suicide prevention.

20  Q.  So when you start out a contract with a jail, you'd

21      be looking for written policies that talk about this

22      communication.  Right?

23  A.  Particularly under suicide prevention, which would be my

24      area.

25  Q.  If a jail didn't have written policies setting up that



1       communication, structuring it, that is something that

2       you'd want to talk to the jail about in terms of NCCHC

3       compliance and just best practices in general?

4   A.  Myself or my colleagues, yes.  We need those policies to

5       know, for example, are they on 15-minute watches and

6       what are they allowed to have on a basic watch?  Those

7       are things that help guide our practice as well.

8   Q.  Let's turn to the next page, 848, MH-A-09, which is the

9       next page.  This is "Privacy of Care."

10                  "Discussion of patient information and

11                  clinical encounters are conducted in private

12                  and carried out in a manner designed to

13                  encourage the patient's subsequent use of

14                  mental health services."

15      Do you see that?

16  A.  Yes.

17  Q.  What is the clinical encounter that you encourage?  I am

18      looking Indicator No. 2; "occur in private, without

19       being observed or overheard."  Do you see that?

20  A.  Yes.

21  Q.  What is the clinical encounter that you encourage to

22      comply with this standard?

23  A.  If you look at the final paragraph on this, the factor

24      considered here is safety.  Safety for the clinician

25      who is seeing that patient, safety for the patient and



1   safety for surrounding staff members.  If I can see that
2   patient in a less secure situation, sitting across a
3   table like you and I, sir, that is optimal for me.  In
4   other cases, so that the patient doesn't incur further
5   charges or end up assaulted because they have to be
6   taken down by officers because they are being assaul-
7   tive, I will talk with patients at the door front
8   through the crack.  Because my focus is on safety, there
9   is some flexibility in terms of what is considered
10  confidential versus not.
11  Q.  Your priority is safety.  The confidentiality of
12      encounters is a secondary concern.  Is that right?
13  A.  I would say that I don't sit there and give it a,
14      "This one is more important than others", but I can't
15      talk to my patient and assess them if they are not safe
16      and if I am not safe.
17  Q.  I am going to turn you now to 870.  This has to do with
18      "Training for Mental Health Staff."  Do you see that?
19  A.  Yes, sir.
20  Q.  I think we talked about the NCCHC compliance that you
21      are involved with earlier.  One of the things you
22      mentioned was training.  Right?
23  A.  Yes.
24  Q.  What sort of training do you provide to ACH employees --
25      Well, in this case, we have a QMHP who is Mickey



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      106

1        Shmikler and there is an MD who is Arun Abraham.

2        Correct?

3   A.   Yes.

4   Q.   And those are the two ACH staff on site involved in

5        mental healthcare.  Is that right?

6   A.   Nurses have a role within their scope of practice,

7        security has a role within their scope of practice,

8        but QMHPs, yes, those would be the primary.  There was

9        also a psychiatrist at some point.

10  Q.   It says in MH-C-03, "All qualified mental health

11       professionals", and it goes on from there.  Correct?

12  A.   Yes.

13  Q.   That would be Mickey Shmikler.  Correct?

14  A.   Primarily, yes.

15  Q.   Then as a secondary role, it would be Arun Abraham and

16       maybe folks in the nursing department?

17  A.   The physician and Mickey would have been the qualified

18       mental health professionals.

19  Q.   Can you describe the training that ACH provides?

20       Again, I will refer you specifically to Sangamon here.

21       Knowing ACH's policies, I, obviously, don't expect you

22       to know exactly what was done for each of those gentle-

23       men, can you describe the training that is provided by

24       ACH?

25                    MR. MADDOX:  To, like, a social



1    worker and doctor?

2    BY MR. WEIL:

3  Q.  I am referring, in general, to people in Mickey

4      Shmikler's and Arun Abraham's roles.

5  A.  For example, Mickey Shmikler would have received

6      training upon hire and/orientation minimally to start

7      talking about what "kind of clinical documentation you

8      use, what are your responsibilities", talking about the

9      correctional environment.  We expected our workers to

10     stay in weekly contact with us.  Part of that was

11     support, but also, for oversight and training.  Mickey

12     was an independently licensed clinical professional,

13     could have had a private practice.  It didn't require

14     it by law, but that was part of our role.

15 Q.  I'm sorry.  I hate to interrupt you.  You talked about

16     clinical documentation.  What else?

17 A.  Clinical activities, so things directly, kind of, off

18     of the specialized job description.  So what would he

19     actually be doing at Sangamon in particular?

20 Q.  Generally, you'd key that off of the job descriptions

21     for the hire?

22 A.  The job description is pretty general and it has to be

23     modified per site, but yes, that would have been off of

24     the job description.

25 Q.  What else?



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      108

```
 1    A.   Mickey also attended our annual mental health workshop

 2         and medical conference.  We generally held that in

 3         December.  So he had 16-plus hours of focus on

 4         correctional healthcare training during those two days.

 5    Q.   What else?

 6    A.   We also had what we considered annual trainings, more

 7         updates and reminders of various things, so I don't know

 8         what was in place during Mickey, but, for example, since

 9         PREA, Prison Rape Elimination Act, is largely en force,

10         we train on PREA responsibilities.

11    Q.   Let me make sure.  You said annual -- annual mental

12         health workshops and, then, annual updates?

13    A.   Yes, updates and acknowledgements.

14    Q.   What are "acknowledgements"?

15    A.   I can't speak to what happened in 2016.  These things

16         are fluid.  They change.  But this year, for example,

17         discussing OSHA, safety in the workplace stuff.  Talking

18         about correctional healthcare boundaries and the

19         principles of working in a correctional environment.

20         Prison Rape Elimination Act.  There is quite a number of

21         them.

22    Q.   I understand.  Anything else?

23    A.   I could be missing something, but it seems like on-site

24         training when they first -- well, start-up training,

25         the annual acknowledgements, the workshop, the medical
```



1          conference and our weekly contacts.

2    Q.    The weekly contacts are training contacts?

3    A.    There is always a training component.  SO when you are

4          talking with a worker about a particular case or a

5          systems issue, you may be educating them about processes

6          or giving recommendations or helping them problem solve.

7    Q.    Just to go through these, clinical documentation, that

8           is how somebody should fill out -- record their

9          activities, essentially --

10   A.    Yes.

11   Q.    -- for lack of a better word.  That doesn't have to do

12         with how care should be provided, just more "here is how

13         you fill out this form, here is what that form means,

14         here's what that form means."  Is that right?

15   A.    I think somehow, there is this misnomer that we are

16         training people how to be a clinical social worker. We

17         are not doing that.  We are making sure that they under-

18          stand how to do certain skills and fine tuning.

19                          MR. WEIL:  That's fine.  You can

20         get there, just answer my question.

21         BY MR. WEIL:

22   Q.    So clinical documentation is how to fill out the forms.

23         Right?

24   A.    How to fill out the forms from a correctional healthcare

25         standpoint, yes.



 1   Q.   Clinical activities, what sort of training is that?
 2        That's the training for the activities in the job
 3        description.  Right?
 4   A.   It is tailored to that environment.  Let's say Sangamon
 5        had a status called "high risk."  Some jails don't have
 6        that status.  I'm just throwing that out there.  What
 7        does that mean in terms of where those people live, how
 8        do you see them, what things are you maybe looking for
 9        asking, is there going to be an officer with you?  It is
10        execution.
11   Q.   That training, where does that occur?
12   A.   Some of that can realistically happen distally and a
13        lot of that can be on-the-job training.
14   Q.   Who would provide on-the-job training?
15   A.   It can vary.  It could be the regional mental health
16        manager, it could be me, it could be the nurse showing
17        them where the files go and "this is the room you use to
18        see your patients."  So there is lots of people who have
19        different pieces of that puzzle.
20   Q.   So there is not, like, a structured course that you're
21        talking about saying, "welcome to corrections.  Here is
22        what you should know" type of thing?
23   A.   There is a semi-structured course.  It's during our
24        orientation training, so there are HR pieces that are in
25        there and, then, I think in this case, Lidia covered



1        "Here are the forms that we use.  This one, we use for

2        this purpose."  Yes, there is a structured component to

3        it.

4    Q.  In this structured component, you are talking about the

5        forms you use, I think you said execution stuff, like,

6        here is a high risk area, here is what that means?

7    A.  There is an orientation checklist.

8    Q.  An orientation checklist.  Okay.  The checklist, when

9        you are checking stuff off, that consists of training

10       on, sort of, how to execute the job.  I am using your

11       words.  "High risk is here, you have to go to the guard

12       for this, that, and the other."  Right?

13   A.  It is part of how we deliver training.  Once Mickey

14       started on site, there would have been pieces there for

15       him to know how to get around, what things to bring in,

16       not to bring in.

17   Q.  There is an annual mental health workshop.  Right?

18   A.  Yes.

19   Q.  That is 16 hours of focus correctional training.  Is

20       that right?

21   A.  Well, at that point, and still currently, it is eight

22       hours on Friday of just mental health and, then, on

23       Saturday, we bring in, like, our -- our physicians.  Our

24       physicians also, you know, may train on Friday in their

25       own workshop.  We put all of our disciplines together in



```
 1        one room on Saturday.
 2   Q.   Is that done via PowerPoint or anything written, or how
 3        does it work?
 4   A.   It is formalized.  We get CE credits.  There are Power-
 5        Points.  There is other materials.
 6   Q.   You talked about annual updates for things like PREA and
 7        whatnot and acknowledgements for programs like OSHA.  Is
 8        that right?
 9   A.   Those are our annual acknowledgements.
10   Q.   What sort of training, if any, is there in the NCCHC
11        in these standards that we have been talking about?
12   A.   That is peppered throughout all of our topics.  I'd
13        say that most of our topics are discussed in NCCHC to
14        some extent.
15   Q.   Which topics is it peppered in?  In clinical documen-
16         tation?  In, sort of, the execution of the job?
17   A.   I may talk about, like, our workshop and our Saturday
18        conferences when we do our CE credits.
19   Q.   So you would have training conferences saying, "to the
20        maximum extent possible, folks are to have social
21        interaction", that kind of thing.  That is part of the
22        training?
23   A.   I don't think I have ever said that, but we talk about
24        ADLs and, generally speaking, that's core to our
25        training.  Physicians and other healthcare people
```



1          understand what ADLs are, activities of daily living.

2   Q.    I know that was an example, but you are saying that

3          generally, you are trying to teach to the NCCHC in

4          training folks?

5   A.    Yes.

6   Q.    It sounds like, just going through that, the bulk of

7          that would occur at the annual -- that 16 hours of focus

8          training?

9   A.    Yes.

10  Q.    Let me refer you to actually 870, the compliance

11         indicators they have there.  There is an orientation,

12         which I think you described just now.  Right?

13  A.    Yes.

14  Q.    That is No. 1.  No. 2, an initial, basic orientation,

15         relevant security, mental health services, medical

16         services, response to a facility, emergencies.  That,

17         kind of, sounds like the -- the second area that you

18         just discussed, the execution stuff.  Is that fair?

19  A.    Yes.

20  Q.    The in-depth orientation, where does that occur?  No. 3.

21  A.    Those are combined.  They don't have to be separate.

22  Q.    Medical policies and procedures are going to be

23         captured, typical mental health, the inmate population

24         is going to be captured in execution stuff?

25  A.    Yes.



MELISSA CALDWELL, M.D.                                October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                  114

1   Q.   Is any of that training going to be -- No. 3, is any of

2        this training going to be written down somewhere?  Is

3        there written materials provided?

4   A.   I would say that they may not be listed in this way, but

5        they are covered in the orientation checklist.  Then

6        there are trainings that we do at new hire; for example,

7        OSHA that cover infection control, things of that sort,

8        bloodborne pathogens.

9   Q.   No. 5, would be, roughly speaking, that annual training

10       you referred to?

11  A.   That workshop and the Saturday conference, yes.  If I

12       can add, our workers are also required by license to

13       have continuing education; CEs, CMEs, CLEs.  So that

14       also covers the stuff they need to do.  It is part of

15       their licensure.  So what we do as a company exceeds

16       that.

17  Q.   Do you try to record who gets trained and what they get

18       trained in?  Does ACH record that for mental health

19       needs?

20  A.   When they attend our workshops and our orientations,

21       absolutely, and we do license verifications to make sure

22       they are satisfying their state-specific CE require-

23       ments.  For example, I need 20 per year for my psycho-

24       logist's license.

25  Q.   That is important to know for the ACH as a corporation



1      to know that its employees -- you know, to stay on top

2      administratively to make sure its employees are properly

3      trained.  Right?

4  A.  We won't let them work if they don't have a license.

5  Q.  I understand, but --

6  A.  If they are not trained, then, they don't have a

7      license.  They can't meet their CE requirements.

8  Q.  The training described here goes beyond the license.

9      Right?  By "here", I am referring to Page 870.

10 A.  It actually doesn't.  It means that because we hire

11     independently licensed clinical professionals, they are

12     going to need that standard because our state that we

13     operate in require them to have over 12 hours of CE

14     credits.  Additionally, Mickey Shmikler, Mike Shmikler,

15     our QMHP for Sangamon, was invited to our annual

16      conference, so he received CEs for his Saturday

17     attendance and informal CEs for his Friday attendance,

18     16 hours.

19 Q.  Do you know that personally or is that something you're

20     saying you'd expect to have happened?

21 A.  I saw him physically, so I know it happened.  And we

22     give them their certificates of completion, so we do

23     track that.

24 Q.  Turn to Page 880.  This is a "Mental Health Staffing"

25     standard, MH-C-07.  Do you see that?



1   A.   Yes.

2   Q.   Just a question about this.  You talked about deter-

3        mining how to decide the level of necessary staffing.

4        What goes into that for you?

5   A.   What goes into it?

6   Q.   Uh-huh.

7   A.   It is one part art, one part science.  When I am looking

8        at a jail, let's say a hundred-bed jail, you can go

9        based on the literature talking about how many people

10       have mental health problems, how many people have

11       substance abuse issues.  Then, breaking it down in

12       terms of serious diagnoses or suicidality.  Generally

13       speaking, a jail may have 60 percent or greater patients

14       with problems, but they may have about ten percent that

15       present with serious issues.  When I look at a jail that

16       is looking at, for example, an acute care program, I

17       would want to make sure they have adequate staffing to

18       meet that serious issue and, again, I referenced before,

19       sometimes, it is pretty accurate.  Sometimes, we have an

20       excess of resources and sometimes, we have to ask for

21       more resources; the staffing estimate wasn't quite on.

22       So, in this case, if I have a hundred-bed facility,

23       about ten of my patients are going to be floating on

24       suicide watches or need closer monitoring or care

25       because they present with pretty significant or serious



1      mental health issues.

2  Q.  How do you make sure that a clinician has enough time

3      to fulfill both their clinical and administrative

4      responsibilities?

5  A.  Well, it starts off with this estimate, which you hope

6      is right, and it's followed with that weekly communica-

7      tion with the professional where you are checking in

8      with them, asking how are they doing.  You are looking

9      at their peer reviews, seeing how they are documenting,

10      how they are articulating their clinical decisionmaking,

11      but it is communication and partnership with your

12      professional.

13  Q.  Does anybody check their charting?

14  A.  Yes.

15  Q.  I think Lidia Hicks, in her deposition, described a

16      several-foot-high pile of records that Mickey Shmikler

17      hadn't completed at the time he was fired.  Does that

18      sound about right to you?

19  A.  Yes.  I don't know how big the pile was.  It was

20      significant.

21  Q.  If his charting was being checked, do you have any idea

22      how that pile could have grown so high?

23  A.  Yes.

24  Q.  How?

25  A.  It is a guess.  When we do peer reviews and we are



1          looking at somebody's documentation, part of the process

2          is asking for, let's say, ten random notes in this

3          period.  If the worker was allowed, because they were

4          allowed to pick their own notes, they may be in a

5          position to pick the completed ones and not uncompleted

6          ones.

7     Q.   Would you allow a worker to pick their own notes to try

8          to get a random sample?

9     A.   I will tell you I have been with the company for 11

10         years.  I may have been a bit naive in the beginning in

11         thinking that people would do what you asked them to.

12         Over the years, we have asked nurse managers to pick

13         those notes.  We have taken some greater care to make

14         sure people can't cherry pick their notes, but I think

15         you trust or hope that you are working with people who

16         will be honest with you that they are doing their notes.

17    Q.   The point of a random sample, though, would be to

18         confirm that.  Right?

19    A.   It is random insofar as you are looking for a tracking

20         list of people that have been seen, you know, in a time

21         period and going, "I will take that one, I will take

22         that one, I will take that one."  It is not random as

23         far as you just pull a chart and the person may or may

24         not have been seen --

25    Q.   I guess I meant it is not random in the sense that if



1    you allow the person you are evaluating to pick the

2    documents that they are being evaluated on, they might

3    not give you a random sample.  Right?

4  A.  Historically, my expectation of "random" is not to say,

5    "I am going to pick the one patient who I know that I

6    have had the greatest hand on.  I want you to pick a

7    challenging case."  As we move forward, my expectation

8    is it's random even so far as the professional who picks

9    it is not the one that wrote the document.

10  Q.  Turn to Page 893.  This is "Inpatient Psychiatric Care."

11    Do you see that?

12  A.  Yes.

13  Q.  It says,

14          "Inpatient psychiatric hospitalization and

15          specialty care are provided to patients in

16          need of these services."

17    Do you see that?

18  A.  Yes.

19  Q.  Does "inpatient psychiatric hospitalization" have a

20    meaning to you?

21  A.  Yes.

22  Q.  What is it?

23  A.  It can be --  Well, when I worked in prisons, it was a

24    unit within our prisons.  As I worked in jails, more

25    often, that means a community setting hospital of some



1    sort, specialized mental health.  But it could also be

2    an emergency room.

3  Q.  Did Sangamon County jail in its walls have an inpatient

4    psychiatric hospital facility?

5  A.  No, although you wouldn't have guessed it.  No, not

6    strictly speaking, they didn't have --

7  Q.  What do you mean by that, "you wouldn't have guessed

8    it"?

9  A.  Jails treat a lot of psychiatric patients.  They don't

10    look unlike what you see in a hospital.

11  Q.  Do you think the facility at Sangamon County jail

12    offered looked like a hospital?

13  A.  It didn't look all that different from the forensic

14    psychiatric unit I once worked on.  It is correctional

15    based, but based on the level of psychiatric need, it

16    is not uncommon.

17  Q.  Did Sangamon County jail --  Strike that.  I'm looking

18    at "Compliance Indicators."

19           "Evidence demonstrates there's appropriate

20           access to inpatient psychiatric hospitali-

21           zation and specialist care when necessary."

22    Do you see that?

23  A.  Where is that?

24  Q.  Compliance Indicator No. 1.  That would include, where

25    necessary, a referral outside of the jail.  Is that



1        right?

2    A.   If needed and appropriate, yes.

3    Q.   You would expect that to be written into policy.  Is

4        that right?  Transfer out of the jail, if necessary,

5        to an inpatient psychiatric hospital?

6    A.   For an NCCHC accredited facility, yes.

7    Q.   This is an essential standard.  Right?

8    A.   Yes.

9    Q.   That would apply to any facility, regardless of their

10       accreditation, in order to preserve the health and

11       safety of inmates with mental health needs.  I am going

12       back to that referral to what "essential" means under

13       the NCCHC.  Is that right?

14               MS. POWELL:  I object to your

15       characterization of what it meant.  It is not what she

16       said.  I object to the foundation.

17               MR. WEIL:  I am just going --

18       I will refer back to the NCCHC, Page 973.  It says,

19               "Generally essential standards are more

20               directly related to the health, safety, and

21               welfare of patients and the critical

22               components of a mental health care system."

23       That is Page 973.

24               MS. POWELL:  I understand what you

25       are saying.



1            MR. WEIL:  Theresa, keep yourself

2  to a form objection, please.

3            MS. POWELL:  You are the one that

4  just read this as a statement.  I am commenting on your

5  statement.  I object to you giving meaning to statements

6  in the NCCHC document that you are attributing this

7  meaning something more than what it means, so I object

8  to you making that statement.

9            MR. WEIL:  Theresa, please

10  confine yourself to form objections.  Okay?  If you are

11  not going to confine yourself to a form objection, I am

12  going to ask the witness to leave the room.  You can

13  speak out your speaking objection and, then, we will

14  call the witness back in.  That time will be docked

15  against you.  I'm asking you to confine yourself to form

16  objections and that is it.

17            MR. MADDOX: Let's just get a new

18  question.

19            MR. WEIL:  But going forward, I

20  don't want to have a bunch of speaking objections where

21  you are coaching the witness.  If you are going to make

22  one, just -- we will excuse Dr. Caldwell and we will

23  call her back when we are done.

24            MR. MADDOX:  First off,

25  Dr. Caldwell is not leaving the room when we are on the



```
 1     record.  Let's get a new question, Steve, and see what

 2     happens.

 3                    MR. WEIL:  No, she will leave

 4     the room.  If we are going to have a bunch of speaking

 5     objections, they're going to be struck.  It is going to

 6     be one or the other.

 7                    MR. MADDOX: Steve, if you want to

 8     leave the room, you want to stop the deposition, you can

 9     at any time.  I'm telling you my client is not leaving

10     the room.  Let's move on, ask a question and see where

11     we go.

12                    MR. WEIL:  Speaking objections

13     are improper.  We aren't going to have a witness getting

14     coached here.

15                    MR. MADDOX:  Steve, can you ask a

16     question and we will move on.

17     BY MR. WEIL:

18  Q.  Inpatient psychiatric care is essential for the health,

19     safety, and welfare of patients in a jail.  Right?

20                    MS. POWELL:  Objection to the form

21     of the question.

22                    MR. MADDOX:  I join.

23                    Answer if you can, Doctor.

24  A.  According to the guidelines set forth by the National

25     Commission for Correctional Healthcare, which may or may
```



1    not be referenced or applied to a jail.  If it is not

2    accredited, it won't necessarily be utilized in these

3    recommendations as set forth exactly.

4  Q.  What you are saying is that an essential standard

5    would -- when it is saying, "essential standards are

6    directly related to health, safety, and welfare of

7    patients", that matters for NCCHC accreditation, but

8    not the actual health, safety, and welfare of patients?

9             MR. MADDOX:  Object.  Form of the

10    question.  Argumentative.  Misstates her testimony.

11             Go ahead and answer.

12  A.  The example I'd give is I can practice as a psychologist

13    and I don't require it to be CCHP certified.  I am, and

14    jails can operate without being NCCHC accredited.  They

15    need to abide by the law, which is Illinois jail

16    standards, generally speaking.  They may or may not

17    utilize the recommendations and guidelines that are in

18    NCCHC if it's a higher level.

19  Q.  Do you agree that essential standards like MH-D-05 are

20    directly related to the health, safety and welfare of

21    patients in the critical components of a mental health-

22    care system and a jail?

23  A.  I agree as far as I even shared an example of a time

24    where I got a patient inpatient psychiatric hospitaliza-

25    tion.  These are things that we do in practice.  Now,



1    whether or not it is stipulated precisely in a written

2    policy, again, it is not required of a jail to do that

3    unless they are NCCHC certified and want to maintain

4    that level of --

5 Q.  Dr. Caldwell, that's not my question at all.  I'm not

6    talking about their accreditation.  I am just talking

7    about do you agree that inpatient -- providing inpatient

8    psychiatric hospitalization specialty care is an

9    essential standard that is more directly related to the

10   health, safety and welfare of patients in the critical

11   components of a mental healthcare system and a jail?

12 A.  You should provide it, if needed.

13 Q.  What do you mean by "if needed"?

14 A.  If it is determined that the patient is in need of that

15   level of service.

16 Q.  So that's --

17 A.  It is a clinical decision.

18 Q.  Of course, it's a clinical decision.  So what I am

19   saying is the availability of inpatient psychiatric

20   hospitalization, though, for a patient who needs it,

21   is critical to that patient's welfare.  Is that right?

22 A.  The reality, sir, is I have some counties and some jails

23   where there are not hospitals.

24 Q.  I am asking you to answer my question, not different

25   circumstances that you have.



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      126

1   A.   I'm saying it should be provided and referred to if

2        needed based on a patient's presentation.

3   Q.   If a prisoner in a county jail is determined clinically

4        to require inpatient psychiatric hospitalization, it is

5        important to that patient's welfare that they receive

6        it.  Is that right?

7   A.   We will provide off-site services if needed.

8   Q.   Dr. Caldwell, please just answer my question.  I am not

9        asking about what you provide.  I am just asking whether

10       something is important to a patient's welfare.  This is

11       not a hard question.

12  A.   It can be.  You are wanting me --  I'm sorry, sir.

13       You're wanting me to answer a question as if it is black

14        and white, and there is grey.  It can affect --

15                  MR. WEIL:  Let's stop.

16                  MR. MADDOX:  Let her finish.  She

17       is trying to explain her answer, Steve.  She will let

18       you finish your question and if you think she said

19       something she shouldn't have --

20                  MR. WEIL:  I am striking the

21       question.  I am striking the question.

22                  MR. MADDOX:  Fine.  And it would

23       be appreciated if I can finish what I am saying, too.

24       I will allow you the same courtesy.  Thank you.  It is

25       not asking for much.



```
 1       BY MR. WEIL:

 2  Q.   Is the availability of inpatient psychiatric hospitali-

 3       zation as a policy matter directly related to the

 4       health, safety, and welfare of patients and is that a

 5       critical component of the mental healthcare system and

 6       jail?

 7                   MR. MADDOX:  Objection.  Asked and

 8       answered.  I think she's answered it.

 9                   Go ahead if you can.

10  A.   I can't answer based on the way that you formulated that

11       question.

12  Q.   Why not?

13                   MR. MADDOX:  Would you let her

14       finish what she is saying?  Please, Steve.  She was

15       explaining that.

16  A.   You are stating it as an absolute.

17  Q.   I am asking a question.

18  A.   I am saying, if I can rephrase it, having access to

19       specialty services, having access to inpatient hospital-

20       ization is important for the given case based on what

21       that patient needs.  If I had a patient who needs to be

22       sent off because they are not fit for confinement and I

23       can't treat them in my facility, I am going to be

24       referring and vocal and documenting that the patient

25       can't be treated at this facility.  That is my role.
```



1    Aside from doing a jail break, I can't get that person

2    someplace.  There is larger systems that are involved

3    in determining if something is accessible.  I have some

4    communities that have -- that have a jail with maybe

5    eight inmates.  I still get them inpatient psychiatric

6    hospitalization or specialty care if needed.  We do it

7    in a variety of different ways.

8  Q.  What ways do you do it in?

9  A.  Telemental health, for example.

10 Q.  And that is the equivalent of inpatient psychiatric

11   hospitalization?

12 A.  Specialty care, sir.

13 Q.  What about inpatient psychiatric hospitalization?

14 A.  I have had patients driven four hours to the closest

15   psychiatric facility.  If somebody needs it, they are

16   going to get it, but we have larger processes that are

17   in place and we can be vetoed.  If somebody is not safe

18   for the community, then, the jail may be dealing with a

19   patient that must be cared for in a different way.  I

20   just can't state it as an absolute.

21 Q.  I think that is helpful, actually.  So you are saying

22   that you may have a recommendation as -- again, I am not

23   referring to you because you are not actually working at

24   a jail, but an ACH employee, a mental health provider

25   may have a recommendation that a patient receive



1      psychiatric hospitalization, but, for whatever reason,

2      the jail might not carry that out.  Is that what you are

3      saying?

4  A.  I don't think that I can give you an example of my jails

5      serving as barriers to care, sir.  I am also telling

6      you -- we used a specific case -- we had a patient who

7      came from a psychiatric facility and she is now in our

8      facility.  Can we meet her ADLs to the maximum

9      possibility for her?  That was what we were doing.

10 Q.  Is that the equivalent, in your mind, to inpatient

11     psychiatric hospitalization?

12 A.  I will say that I said somewhat tongue in cheek about

13     you wouldn't have guessed that jails are not psychiatric

14     facilities, but the reality is that they are.  The

15     largest psychiatric facilities in our country are jails.

16     We are treating the highest concentration of seriously

17     mentally ill and behaviorally ill persons and I have had

18     hospitals who won't take our patients because they say

19     they are safer in our facilities.  Some of them have

20     been through that system and they won't take them again.

21     Unlike the community setting where they can say, "I

22     don't want this patient ever again, send them somewhere

23     else", we don't have the liberty to say, "I don't want

24     this patient, this inmate."  If they are with us and we

25     can keep them alive, that is what we are trying to do,

1        and sometimes, it is very difficult.

2   Q.   Let me refer you to the bottom of Page 893.  "It is

3        recommended to obtain."  Do you see where I am?

4   A.   Yes.

5   Q.          "It is recommended to obtain a written

6                agreement with each community hospital or

7                off-site specialty service used regularly for

8                mental health care that outlines the terms of

9                care to be provided."

10       Do you see that?

11  A.   Yes.

12  Q.   So this seems to anticipate that, on occasion, inmates

13       would be getting referred out of the jail to some sort

14        of specialty provider outside for mental health

15       services.  Right?

16  A.   Yes.

17  Q.   That would occur when the jail was incapable of

18       providing inpatient psychiatric hospitalization or

19       the specialty care that the particular inmate required.

20       Right?

21  A.   If we are unable to meet psychiatric needs, correct.

22        It is a recommendation within a recommendation.

23  Q.   What do you mean, "a recommendation"?

24  A.   It says, "it is recommended."  So it is a recommendation

25       within a book of guidelines.



1  Q.  I am assuming it would be recommended for those jails

2      that are not able to provide inpatient psychiatric

3      hospitalization on their own.  Right?

4  A.  I would presume so.  It is also not a compliance

5      indicator for meeting this essential standard.

6  Q.  One of the compliance indicators is,

7              "Off-site facilities or mental health profes-

8              sionals provide a summary of the treatment

9              given and any follow-up instructions,

10             including specific instructions about the

11             signs, symptoms, or conditions that require

12             return to the hospital.  This information

13             accompanies the inmate on return to the

14             facility."

15     It does anticipate that some inmates would be sent off

16     site if the jail can't provide the proper care.  Is that

17     right?

18 A.  It means that for continuity of care, that we should

19     have a basic understanding of what the patient was

20     treated with or at when they were off site.  We should

21     have some kind of record.

22 Q.  Do you have an understanding of the care that was

23      provided at Sangamon County jail to Ms. Rusher?

24 A.  I have reviewed some of the records to have an under-

25     standing as to what was provided.



| | |
|---|---|
| 1 | MR. MADDOX:  Steve, would this be |
| 2 | a good time for a break? |
| 3 | MR. WEIL:  Sure. |
| 4 | (Discussion off the record) |
| 5 | BY MR. WEIL: |
| 6 | Q. Turn to MH-D-05 and I am just going to refer you to the |
| 7 | top.  It is Page 893.  Again, referring to the top |
| 8 | standard, |
| 9 | "Inpatient psychiatric hospitalizations and |
| 10 | specialty care are provided to patients in |
| 11 | need of these services." |
| 12 | Do you see that? |
| 13 | A. Yes. |
| 14 | Q. And I think we have agreed that in certain -- when it |
| 15 | is required for a particular patient, that includes |
| 16 | referral to outside mental health hospitals.  Correct? |
| 17 | A. Yes. |
| 18 | Q. And that wouldn't depend on, sort of, the legal status |
| 19 | on the inmate.  By that, I mean whether they have |
| 20 | been -- whether they have been adjudicated, not guilty |
| 21 | by insanity or whether they are determined to have been |
| 22 | unfit to stand trial or not.  It would just be -- it |
| 23 | would turn on the inmate's medical needs.  Is that |
| 24 | right? |
| 25 | A. Yes. |



1              MS. POWELL:  Objection to the form

2        of the question, foundation as it relates to a legal

3        standard.

4        BY MR. WEIL:

5   Q.   You wouldn't expect the legal standard --  Well, an

6        inmate who needed it, if your medical professional

7        there on the ground, the mental health professional,

8        determined that an inmate needed hospitalization outside

9        of the jail, they would seek it, regardless of whether

10       that inmate had been determined not guilty by reason of

11       insanity.  Right?

12  A.   Correct.

13  Q.   And the same goes, they --  If an ACH employee or, under

14       this standard, I should say, if an employee -- if a

15       mental health provider determines that an inmate -- an

16       inpatient needs inpatient psychiatric treatment at a

17       hospital, they would seek that referral regardless of

18       whether the person had been deemed unfit to stand trial.

19       Is that correct?

20  A.   Yes.

21  Q.   That is encapsulated here in the phrase under

22       "Discussion", the first paragraph.

23              "Clinical need dictates the time required to

24          receive the ordered service."

25       Right?  As opposed to some other legal status of the



1          inmate.  Correct?

2   A.   To meet this standard?

3   Q.   To determine when they need inpatient psychiatric

4        hospitalization.

5   A.   The meet the standard, that is what it is saying, that

6        there shouldn't be other practical considerations, that

7        if the patient needs it, they get it.  But it has a

8        caveat in terms of waiting times in community practice.

9   Q.   So if -- it should not exceed the waiting times of

10       community practice.  Right?  That is the caveat?

11  A.   Which can be six weeks or months, depending.

12  Q.   Right, but it should not exceed them.  Is that right?

13  A.   Yes.

14  Q.   That is the significance of the caveat.  That is what

15       the caveat says.  Correct?

16  A.   It is recognizing that there can be a significant delay

17       that's because of community system issues, yes.  I have

18       patients in jails who are not fit for trial that won't

19       be sent to the state hospital.  They are second on the

20       list, but that could be three more months.

21  Q.   I think this is --  If I can paraphrase, what this is

22       saying is they wouldn't get bumped down -- they wouldn't

23       be disfavored in a list like that because they're in a

24       jail.  Is that right?

25                     MR. MADDOX:  By who?



1              MR. WEIL:  Whatever the time is.

2        Well, we should read it, because we haven't.

3                  MR. MADDOX:  You can paraphrase

4        it.

5        BY MR. WEIL:

6    Q.          "Clinical need dictates the time required to

7                 receive the ordered service; the general

8                 waiting time should not exceed average waiting

9                 times in community service and community

10                practice."

11       Right?

12   A.   I think that is, kind of, a vague line.

13   Q.   It says what it says.  Right?

14   A.   So I'm not reading anything to say because of their

15       inmate status, that they would be bumped up or bumped

16       down.  It recognized that there may be delays that are

17       typical in community practice.

18   Q.   Turn to Page 911, MH-E-07.  It says,

19                "The mental health of segregated inmates is

20                monitored regularly."

21       Do you see that?

22   A.   Yes.

23   Q.          "On notification that an inmate is placed

24                in segregation, mental health staff reviews

25                the inmate's mental health record to determine



1             whether existing mental health needs contra-

2             indicate the placement or require accommoda-

3             tion."

4     Do you see that?

5  A.  Yes.

6  Q.  That review should be documented somewhere in the

7     clinical record.  Right?  I am looking at the next line.

8  A.  If you were to meet the essential standard and have

9     accreditation, yes.

10 Q.  Is that an important standard to meet for anybody,

11    whether they are accredited or not?

12 A.  I think the essence of this is that people who are

13    isolated are monitored and it is documented.

14 Q.  By a mental health professional?

15 A.  By a healthcare professional, a designated person, yes.

16 Q.  Presumably, that mental healthcare professional is going

17    to have clinical knowledge about what mental health

18    conditions are going to be contraindicated by solitary

19    confinement.  Is that right?

20 A.  Yes.

21             MR. MADDOX:  Just a second.  What

22    paragraph were you referring to?

23             MR. WEIL:  I was just asking a

24    question, but --

25             MR. MADDOX:  Does it say "solitary



800.211.DEPO (3376)
EsquireSolutions.com

1      confinement" here?  Are those words in this section?

2                      MR. WEIL:  Does it matter to

3      this question?

4                      THE WITNESS:  It's not.

5                      MR. MADDOX:  You are looking at

6      the document --

7                      MR. WEIL:  You can ask questions

8      at the end if you want.

9                      MR. MADDOX:  I just didn't know

10     if you were referring to this standard or not.  That's

11     all.  It just surprises me that --

12                     MR. WEIL:  Please.  You are

13     coaching the witness.

14                     MR. MADDOX:  Actually, I'm

15      expressing some aggravation here, but go ahead.

16     BY MR. WEIL:

17   Q.  I am looking down at No. 7 in this list of compliance

18       indicators.

19              "Mental health staff inform custody officials

20              of the latest scientific information

21              concerning any health effects of segregation."

22       Do you see that?

23   A.  Yes.

24   Q.  Is that something that ACH tries to do for the jail it

25       serves?



1   A.   Yes.

2   Q.   How does it do that?

3   A.   By communicating when we assess a patient who is on that

4        status if there are mental status concerns or signs of

5        injury or whatnot.

6   Q.   How do you communicate the latest scientific informa-

7        tion --  Well, let me back up for a second.  How does

8         ACH ensure that its staff know about the latest

9        scientific information concerning the health effects of

10       segregation?

11  A.   Well, it would be one of those training topics if there

12       was something new or latest, but in my understanding,

13       there is not, like, something from yesterday.

14  Q.   Would there be training at the outset when an ACH

15       employee is hired about the latest scientific informa-

16       tion concerning health effects of segregation for ACH

17       staff?

18  A.   Yes.

19  Q.   That training would be reflected where?  In the orienta-

20       tion or where?

21  A.   In the orientation checklist describing why we do rounds

22       on people who are in segregated status.

23  Q.   What is the substance of that information that is

24       provided?

25  A.   It is pretty short and simple.  That we monitor people



```
 1        who are single celled because, one, you get a concentra-
 2        tion of people with mental health issues on that status,
 3        so we want to have an understanding as to how they are
 4        functioning, whether mental health issues are contribut-
 5        ing to the reasons why they are segregated, and to
 6        monitor for any signs of deterioration.
 7   Q.   Understanding that inmates should be monitored for the
 8        signs of deterioration, does ACH train its employees in
 9        the mental health effects of segregation itself?
10   A.   Very few inmates are extremely isolated as described by
11        this particular standard, sir.
12                        MR. WEIL:  Just answer my
13        question.
14   A.   About the health effects of segregation, whether we
15        train on that?
16   Q.   Yes, about the mental health effects of segregation.
17   A.   I can't tell you if we have done one recently.
18   Q.   So as a matter of policy, ACH doesn't train its
19        employees in the mental health effects of segregation?
20   A.   We train our staff as to why they should be monitoring
21        people who are segregated.  I'd say that is training on
22        the importance of monitoring that population.
23   Q.   I understand about monitoring, but I am talking about
24        the health effects of segregation.  Does ACH train its
25        employees on that?
```



MELISSA CALDWELL, M.D.                           October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                           140

```
 1   A.   I have not trained on that.  I can't speak to anybody
 2        else.
 3   Q.   Would you expect, given that you are the director of
 4        mental health for ACH, that you would know whether
 5        that type of training has been provided?
 6   A.   I want to clarify.  I think I have said that when we
 7        orientate our workers and we go through what their job
 8        description is and what the activities are, we touch on
 9        why we are monitoring people who are segregated.
10   Q.   Why is that?  Why do you tell them to monitor people who
11        are segregated?
12   A.   Do you want me to repeat what I said, sir?
13   Q.   Yes.
14   A.   Recite exactly?
15   Q.   No, just go and ahead explain.  I understand that you
16        are telling people that they have to be monitored --
17        that people in segregation have to be monitored.  I want
18        to understand whether you are training your staff as to
19        why.
20   A.   I'd say my clinical mental health professionals have a
21        general understanding that when you are alone, that may
22        not be good for your health.  However, they also under-
23        stand that most of the patients in jail are not like in
24        prison settings.  They are not truly isolated, meaning
25        they are having minimal to no contact with staff.  They
```



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                             141

```
 1        are having repeated interactions throughout the day with
 2        staff, they are in settings with lots of activities,
 3        usually booking areas, but we tell our workers that we
 4        are doing this activity because you get a concentration
 5        of people with mental health issues in segregation
 6        because they don't conduct themselves well in general
 7        population, so we want to have a good handle of what
 8        those mental health issues are and what needs may
 9        present themselves that need to be met and to monitor
10        for any signs of deterioration because when people are
11        alone, it can impact them and it varies from person to
12        person.  I have patients who seek out segregation
13        because they function well there.  I don't like them
14        there, but they like to be there.  I have others where
15        that is where they need to be for the safety to them-
16        selves or others.
17   Q.   That was my question.  I understand you train people to
18        monitor.  Do you --
19   A.   I haven't done a PowerPoint on this topic, sir.
20   Q.   Let me ask my question first.  I am asking whether you
21        train on the mental health effects of segregation.
22   A.   The answer is yes.
23   Q.   You do.  What is the substance of that training?
24   A.   I just provided that.
25   Q.   You talked a lot about instructing people to make sure
```



1    they are monitored, but do you train people to say --

2    do you train people that segregation is harmful for the

3    mental health of inmates?

4  A.  It can be.

5  Q.  Is that the training you provide?

6  A.  We need to be providing mental status examinations on

7    people who are in segregated settings and why.  Some of

8    them may be suicidal, so assess for suicidality as well.

9              MR. WEIL:  I am trying to get a

10    clean response to this question.

11              MR. MADDOX:  There may not be one,

12    so I object to the qualification.

13  A.  The answer is yes, we do train.

14  Q.  And I want to understand what is the substance of that

15    training is.  I understand you train about monitoring

16    folks in segregation and that it is important to monitor

17    them.  I want to understand what training you provide

18    about the health effects, the mental health of being on

19    segregation, to your employees.

20  A.  Forgive me if I am not being clear.  I think I have

21    touched on that which is, one, that you could have

22    deterioration -- monitor for deterioration.

23  Q.  So you train that --

24  A.  Monitor for suicidality as well.

25  Q.  Is this the scientific information that you expect --



1    how do you --  Turning to No. 7.

2                "Mental health staff inform custody officials

3                of the latest scientific information

4                concerning any health effects of segregation."

5    Is that the information that you expect your mental

6     health staff to pass on to jail administrators?

7    A.    No.

8    Q.    Do you expect them to pass on any information to jail

9          administrators about the mental health effects of

10         segregation?

11   A.    If there was some new data on segregation effects that

12         were pertinent to the jail environment, we'd pass that

13         kind of information on to our facility.

14   Q.    How do you do that?

15   A.    We have state summits, we train jail administrators, we

16         write blogs that go to all of our clients talking about

17         new educational topics, areas of concern, things to be

18         aware of.  The reality is, there isn't anything new and

19         we don't have to be overly academic to help a worker to

20         function and do what they are supposed to do.  They

21         know.  These are masters and doctoral level profes-

22         sionals who understand that if somebody is extremely

23         isolated, which again, most of our jail inmates are

24         not, that you need to look for signs of physical or

25         psychological deterioration.

1   Q.   Again, I want to direct you to the question I am asking,

2        which is what information do you pass on to custody

3        officials?  You listed a few.  Is there anything else?

4   A.   We tell them if there is any signs of physical or

5        psychological deterioration.

6                    (A document was marked as Exhibit 4)

7                         MR. WEIL:  This is Bates

8        beginning Plaintiff's Production 14703 to 14708.

9                         MR. MADDOX:  Can you restate the

10       title?

11                        MR. WEIL: Sure.  It's called

12       "Position Statement on Solitary Confinement."

13                        MR. MADDOX: From NCCHC?

14                        MR. WEILL:  This is from the

15       NCCHC.

16       BY MR. WEIL:

17  Q.   This document will say it is dated, if you look on

18       Page 2, it is adopted April of 2016.  Do you see that?

19  A.   Yes.

20  Q.   Is this something that ACH would have received or that

21       you would have received?

22  A.   Not unless I seek it out.

23  Q.   Is this the type of information you'd seek out from

24       NCCHC?

25  A.   It is much of the kind of thing I seek out from NCCHC,

1    yes.

2  Q.  Is this a document that you would try to pass on to your

3      clients to let them know about the position statement of

4      the NCCHC on solitary confinement?

5  A.  Not necessarily, no.

6  Q.  Turn to Page --  Do you recall ever passing this out to

7      a new client?

8  A.  No.

9  Q.  Do you recognize this document at all?

10  A.  I have not read this, no.

11  Q.  Why don't you turn to Page 706.  It says -- it has a

12      bunch of bullets there.  The first bullet says,

13              "Prolonged (greater than 15 consecutive days)

14              solitary confinement is cruel, inhumane, and

15              degrading treatment, and harmful to an

16              individual's health."

17      Do you see that?

18  A.  Yes.

19  Q.  Do you agree with that statement?

20  A.  Yes.  It can be.

21  Q.  Do you agree with the statement as it is written here?

22  A.  Not as an absolute.

23  Q.  It would depend on whether it was cruel, inhumane or

24      degrading?

25  A.  Yes.



 1   Q.   What would it depend on?

 2   A.   It depends on the patient's response and adjustment to

 3        it and the rationale behind the isolation.  I also

 4        would have questions about the definition of "solitary

 5        confinement."

 6   Q.   Would that affect your assessment whether it was cruel,

 7        inhumane or degrading given the -- depending on the

 8        reasons that the individual is placed in solitary

 9        confinement?

10   A.   And the patient's adjustment and the patient's request,

11        in some cases, for that kind of housing.

12   Q.   So if somebody didn't ask for solitary confinement,

13        would that be a factor for you?

14   A.   You'd want to look at that, yes.

15   Q.   Turn to the first page of this exhibit.  It says --

16        it provides a definition of "solitary confinement."

17        It says,

18                 "Solitary confinement is the housing of an

19                 adult or juvenile with minimal or rare

20                 meaningful contact with other individuals."

21        Do you see that?

22   A.   Yes.

23   Q.   You can go on reading there.  It says,

24                 "Those in solitary confinement often

25                 experience sensory deprivation and they are



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          147

1                        offered few or no educational, vocational or
2                        rehabilitative programs."
3          Do you see that?
4    A.    Yes.
5    Q.    It goes through a bunch of alternatives, names that are
6          given to "solitary confinement."  At the end, it says,
7                        "Regardless of the term used, an individual
8                        who is deprived of meaningful contact with
9                        others is considered to be in solitary
10                       confinement."
11         Do you see that?
12   A.    Yes.
13   Q.    Are you familiar with the conditions of Ms. Rusher's
14         solitary confinement?
15                       MR. MADDOX:  Object to the form.
16         BY MR. WEIL:
17   Q.    Her confinement at the Sangamon County jail?
18   A.    She was on observation status, which is not listed in
19         these terms.  She was on a suicide watch.
20   Q.    I understand, but are you familiar with the conditions
21         for confinement?
22   A.    I have some understanding based on the record.
23   Q.    What is your understanding?
24   A.    That she was housed, I believe, in the booking area on
25         a high risk status due to risk to self and others.



1   Q.   Do you understand that she was housed alone?

2   A.   She was single celled.  Correct.

3   Q.   Do you understand that she was -- how regularly she was

4        let out of the cell and for how long?

5   A.   I am not familiar with that, no.

6   Q.   It says you noted that -- what did you call it?  She was

7        on suicide watch?

8   A.   Yes.

9   Q.   It says,

10                "Different jurisdictions refer to solitary

11                confinement by a variety of terms",

12       and it lists a bunch of examples.  Could suicide watch

13       also be a form of solitary confinement?

14  A.   It can.

15  Q.   If it met these criteria, the definition described?

16  A.   It likely wouldn't meet the criterion because of the

17       intensity of contact that this patient is having with

18       custody who are monitoring them on at least 15-minute

19       staggered watch as well as the contact with medical

20       and other healthcare providers.  So it doesn't meet the

21       definition because of the "minimal to rare meaningful

22       contact."

23  Q.   So you consider the 15-minute contacts with security

24       staff to be meaningful?

25                      MR. MADDOX:  Objection.  She



1        just listed several different things.

2                            MR. WEIL:  I --

3                            MR. MADDOX:  Do you know what?

4        I will withdraw my objection.  Go ahead.

5   A.   I would say it is one piece of the interaction.

6        Additionally, she is not housed --

7   Q.   Let me ask the questions.  I understood you based a lot

8        into your answer, so I'm just trying to understand.

9        Do you consider that to be meaningful?  Yes or no or you

10       can explain.

11                           MR. MADDOX:  And she was trying to

12       explain when you interrupted.  Go ahead.

13       BY MR. WEIL:

14  Q.   Let me ask the question so we have a clear record.  Do

15       you consider the 15-minute cell checks with security

16       guards to be meaningful contact?

17  A.   They are meaningful.

18  Q.   What else is meaningful contact?

19  A.   What else is meaningful contact?

20  Q.   Yes.

21  A.   Anything that helps us to establish whether she is safe

22       to be with others, including other healthcare contacts.

23  Q.   Turning you to Page 706 again.  I am sorry to back up.

24       I think you said 15-minute contacts and, then, there

25       were some other contacts that you described.  What were

MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      150

1        those?

2   A.   Contacts with the qualified mental health professional,

3        any contacts with medical staff.  I mean, these are all

4        using the word "meaningful."  They are purposeful and

5        they are interactions that they are having with the

6        patient.  She is not sensory deprived.

7   Q.   You are describing the contacts with medical staff in

8        the context of Mr. Shmikler?

9   A.   Yes.  That may not be exhaustive.

10  Q.   Were there any other mental health staff at the jail?

11  A.   Mental health staff, by definition, is also nursing

12       staff by NCCHC definitions.

13  Q.   Do you know that nursing staff were coming by and

14       checking on her at the cell?

15  A.   They have had contacts with her.

16  Q.   Elsewhere or at the cell?

17  A.   I can't speak to that, sir.

18  Q.   What contacts are you aware of?

19  A.   I understand from the chart -- which is pretty exten-

20       sive -- that there was contacts with nursing staff.

21       There may be med passes, there may have been evaluations

22       during periods of time that she had self harmed, there

23       had been medical contacts.

24  Q.   Outside of the charting that you saw, are you aware of

25       any other contacts?



1  A.  No.

2  Q.  And you are aware of those contacts from the charting.

3      Right?

4  A.  Yes.

5  Q.  So No. 2, it says,

6              "Juveniles, mentally ill individuals, and

7              pregnant women should be excluded from

8              solitary confinement of any duration."

9      Do you see that?

10 A.  What page are we on?

11 Q.  706, No. 2.

12 A.  Yes.

13 Q.  You are saying this wouldn't apply to Ms. Rusher because

14     she wasn't in solitary confinement as you define it?

15 A.  I would say that is one reason why I think it doesn't

16     include Ms. Rusher, but again, this is -- these are

17     recommendations within the recommendations, these are

18     not rules, and there is exceptions to them.

19              MR. WEIL:  I agree completely.

20 A.  It is not an absolute.

21 Q.  Right.  What the NCCHC is saying here is that mentally

22     ill individuals should be excluded from solitary con-

23     finement of any duration.  Right?

24 A.  That is what they are saying in the position statement.

25 Q.  Do you agree with that?



 1  A.   I don't.  I think there is exceptions where, for the

 2       safety of that patient and the safety of others, we have

 3       no other recourse.  But we are talking about solitary

 4       confinement and that is not, generally speaking, what I

 5       see in jails.  I've seen it in prisons where I work in

 6       the past.  There is concerns about that kind of solitary

 7       confinement.  I wouldn't say that what we are describing

 8       here applies to what happened with Ms. Rusher or largely

 9       in my jail settings.  They are not locked away with a

10       TV -- or no TV for seven years with nobody passing but

11       the food.  That is not what is happening here.

12  Q.   How about three months?  Is that a duration that you

13       wouldn't be comfortable for solitary confinement?

14  A.   If it was to keep her safe and others safe, then, I am

15       comfortable with it.  It is not optimal, but it is

16       necessary for safety.

17  Q.   Look at No. 7 and see whether you agree with it or not.

18                  "Isolation for clinical or therapeutic

19                  purposes should be allowed only upon the order

20                  of a health care professional and for the

21                  shortest duration and under the least

22                  restrictive conditions possible, and should

23                  take place in a clinically designated and

24                  supervised area."

25       Do you see that?



MELISSA CALDWELL, M.D.                              October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                              153

1   A.   Yes.

2   Q.   There is a lot of components, but in general, do you

3        agree with Item 7?

4   A.   Yes.

5   Q.   Do you understand Ms. Rusher's isolation to have been

6        for clinical or therapeutic purposes?

7                       MR. MADDOX:  Has she identified

8        "Isolation"?  I object to the form of the question.

9        BY MR. WEIL:

10  Q.   She was in a cell for -- she was housed in the way she

11       was.  You said you read her records.

12  A.   I would agree that she was single celled on observation

13       status, that in terms of duration, there was never a

14       "You will stay on this for" --  It was from evaluation

15       to evaluation.

16  Q.   So do you understand --  Again, I'm just referring to

17       No. 7.  Do you understand Ms. Rusher's isolation was

18       done on the order of the healthcare professional?

19                       MR. MADDOX:  Object to the form

20       of the question.  It hasn't been established whether

21       there was isolation.

22       BY MR. WEIL:

23  Q.   Do you understand that that was ordered by a healthcare

24       professional?

25  A.   The housing placement that happened is a security



1   function.  The recommendation to be on a suicide watch,

2   on special observation and monitor as such, that is a

3   healthcare recommendation.

4   Q.   It says, "under the shortest duration."  So do you

5        understand that Ms. Rusher's --  How does one go about

6        ensuring that the housing is for the shortest duration

7        possible?

8   A.   When you have a QMHP that works four days a week, our

9        recommendation is that they see them pretty much every

10       single day that they are on site, so that each evalua-

11       tion is an opportunity to make adjustments as need be.

12       This was not a situation where we see the patient once

13       every month and keep them on the status regardless of

14       their presentation.  We see them frequently.

15  Q.   Would you expect those evaluations to be recorded?

16  A.   Yes.

17  Q.   And specifically, the recording of whether it was

18       appropriate to continue to keep that person in -- I will

19       say isolation.  I understand there is an objection to

20       it, but in the celling situation that Ms. Rusher was in?

21  A.   Yes.

22  Q.   And in terms of "least restrictive conditions possible",

23       what options were there for Ms. Rusher in terms of her

24       celling conditions and ensuring they were the least

25       restrictive possible?



1              MS. POWELL:  Objection.

2        Foundation.

3              MR. WEIL:  Go ahead.  You can

4        answer.

5   A.   Least restrictive, for example, would be if I see a

6        patient and I think that they could be housed with

7        somebody else, I can give that recommendation.

8        Certainly, there may be security rationales that would

9        trump that.  That is their expertise.  Housing and

10       property is their function.  If I can, for example, say

11       the patient will have a smock versus be naked.  I've,

12       sadly, had to recommend a patient not have clothing

13       because they tried to hurt themselves with clothing.  A

14       paper gown versus a suicide Ferguson suit versus outer

15       clothing with no underclothing, with underclothing.

16       These are things -- steps-downs that we can work with

17       security to recommend.  In terms of least restrictive

18       conditions, again, with cell mate, without cell mate,

19       in a housing unit.  These are all things that are

20       considered.

21  Q.   Turn to Page 911 of the NCCHC standards again, 3a.

22       Do you see where I am looking?  "Inmates under extreme

23       isolation"?

24  A.   Yes, "with little or no contact with other individuals."

25  Q.            "Inmates under extreme isolation with little



1                       or no contact to other individuals are

2                       monitored daily by medical staff and at least

3                       once a week by qualified mental health

4                       professionals."

5         Do you see that?

6    A.   Yes.

7    Q.   An individual can be under extreme isolation and also

8         monitored daily by medical health staff.  Right?

9    A.   If they are in extreme isolation.

10   Q.   Right.  So the fact that somebody is being --  I am

11        reading this and it seems like the fact that somebody

12        is being monitored daily by mental health staff doesn't

13        mean they are not under extreme isolation.  Right?  I

14        mean, this definition seems to assume that you can be

15        under extreme isolation and also be monitored by medical

16        health staff every day.  Right?

17                       MS. POWELL:  I object to the form

18        of your question in that it conflicts specifically with

19        the definition given on the pages that you are showing

20        her.

21                       MR. WEIL: You can answer.

22                       THE WITNESS:  I'm confused.  Could

23        you restate that, sir?

24   Q.   Okay.  Go to Page 912.  It says,

25                       "Extreme isolation refers to situations in



1                    which inmates encounter staff or other inmates

2                    fewer than three times per day."

3      Do you see that?

4  A.  Like, for example, bringing the food tray.  Yes.

5  Q.  I think you --  Do you think Ms. Rusher was under

6      extreme isolation during her incarceration at the

7      Sangamon County jail?

8  A.  No.

9  Q.  I think the reasons for that, you gave -- I am putting

10     words in your mouth, so correct me if I'm wrong --

11     is she received checks from correctional staff.  Right?

12 A.  Yes.

13 Q.  She was visited by Mr. Shmikler.  Right?

14 A.  Yes.

15 Q.  And then, I think, there was a third category of contact

16     with medical staff that you inferred from her charting.

17     Is that right?

18 A.  For various episodes, yes, as well as there is others

19     that I said was not exhaustive.  So giving her food,

20     responding to whatever, you know, if she needs toilet

21     paper.  There is all the other things that are not

22     documented or quantified in terms of her care.  But

23     given the fact she had access to toilet paper, she

24     had -- she asked staff --

25 Q.  If an inmate has access to toilet paper --  So given



MELISSA CALDWELL, M.D.                           October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          158

1        those interactions that you have just described, you
2        take the position Ms. Rusher was not under extreme
3        isolation.  Is that right?
4   A.   By the definition, she was not under extreme isolation.
5        She was also housed in an area where there is a lot of
6        traffic and a lot of sensory stimulation going on.
7   Q.   What makes you say that?
8   A.   Booking areas, you -- you see people who are coming in
9        for arrests, there is a lot of staff traffic.  It is the
10       nature of that particular setting in a jail.  We have
11       issues sometimes with people being -- well, doing things
12       because they want to be in booking because it is a high
13       action area.  There is entertainment value in the
14       facility.  So she was not in an extreme isolation
15       setting.
16  Q.   Do you have any idea how much traffic came by because of
17       booking by Ms. Rusher's cell?
18  A.   It still exceeds what you'd expect of a segregation unit
19       where the person only has somebody go through the food
20       trap three times a day.
21  Q.   Do you have any idea how much traffic Ms. Rusher saw
22       because of booking in front of her cell?
23  A.   I have seen that unit.  I can't quantify it exactly.
24       I can tell you it doesn't meet the definition, sir.
25       She was seeing officers every 15 minutes.



1   Q.   If somebody is receiving 15-minute checks, that

2        indicates to you that -- that is a strong indication

3        they are not under extreme isolation?

4   A.   Not by the definition per this standard, sir.

5   Q.   Turn to 928.  I am sorry, Doctor.  Let me -- let me ask

6        you a follow-up question.  I am going to -- I apologize

7        for making you jump back.  On 911, looking to 3b, would

8        Ms. Rusher qualify as a segregated inmate?  You can look

9        at the definition on top of 912.  "Segregated Inmates."

10       I am at the top of 912.

11                 "Segregated inmates are those isolated from

12                 the general population and who receive

13                 services and activities apart from other

14                 inmates."

15       Do you see that?

16  A.   Uh-huh.

17  Q.   Would Ms. Rusher qualify as a segregated inmate?

18  A.   She may have after she was released from observation

19       status.  But while she is on observation status, there

20       is a reason for her to be separated from population.

21  Q.   I am not talking about the reason that she's in whatever

22       status she's in.  I just am asking whether Ms. Rusher

23       would qualify as a segregated inmate.

24  A.   I wouldn't say that is her status, no.

25  Q.   So Ms. Rusher, during her incarceration at Sangamon



1    County jail, she is not under extreme isolation.  Right?

2                   MR. MADDOX:  Objection.  Asked and

3    answered.

4    BY MR. WEIL:

5 Q.  I'm just --

6 A.  She encountered staff and inmates more than three times

7    per day.

8 Q.  So she is not under extreme isolation.  You testified to

9    that.  Right?

10 A.  Yes.

11 Q.  You are saying also, given the definition of "segregated

12   inmates" up here, you'd say that Ms. Rusher was not a

13   segregated inmate, either.  Is that right?

14 A.  She was on an observation status.  There is a

15   different --

16 Q.  I'm asking --

17 A.  No, I wouldn't say she meets the definition.

18 Q.  She doesn't meet the definition of --

19 A.  She may have housing placement or celling placement,

20   meaning by herself, that would be similar to somebody

21   who is segregated.  However, the function of her

22   separation is -- is different.  There is a healthcare

23   reason for it.

24 Q.  It says here,

25              "For the purposes of this standard, the living



```
 1              and confinement conditions define the

 2              segregated status, not the reason an inmate

 3              was placed in segregation."

 4    You are talking about her being on observation.  What

 5    this is saying is that is irrelevant.  It is talking

 6    about the conditions.  So given the conditions that

 7    Ms. Rusher was experiencing during her incarceration at

 8    Sangamon County jail, was she -- would she be a segre-

 9    gated inmate under this definition?

10 A. She still has much more than the limited contact you

11    would see for someone who is on protective custody,

12    disciplinary status, or supermax.  She has much more

13    meaningful contacts with healthcare staff.  When

14    somebody is on these status, maybe there is a brief,

15    couple-minute interaction at a door once per week with

16    the healthcare staff.  She had much more than that.

17 Q. Is your answer yes or no?

18 A. She was not in the same category as inmates described

19    under this area, this paragraph.

20 Q. This definition -- it says here,

21              "Inmates who are segregated have limited

22              contact with staff or other inmates."

23    It seems to be that is part of what they are talking

24    about when they are describing "segregation."  Is that

25    fair?
```

MELISSA CALDWELL, M.D.                              October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          162

1   A.   Say it again, sir.

2   Q.   It says,

3                "Inmates who are segregated have limited

4                contact with staff or other inmates."

5        In terms of the description, it seems to account for the

6        idea that inmates who are segregated may have limited

7        contact with staff or other inmates.   Right?

8   A.   Inmates who are segregated may have limited contact.

9        However, she had contact with staff every 15 minutes.

10  Q.   Because of that and the contacts with Mr. Shmikler

11       and the contacts with the medical staff you described

12       earlier, it is your assessment that she was not a

13       segregated inmate as the NCCHC defines that?

14  A.   We --

15                MR. MADDOX:  She's already said

16       that.  It's been asked and answered, so I object.

17                MR. WEIL:  Go ahead and answer,

18       Doctor.

19  A.   We even have a specific form used for our patients, our

20       detainees who are segregated.  That form did not apply

21       to her.  She was using -- they were using observation

22       status.  She was on a suicide watch.

23                MR. WEIL: I want to just --

24       again, it is your witness who can't answer --

25                MR. MADDOX:  That is not true,



1          Steve.  You have asked is she on the segregation status

2          three or four times now.  Dr. Caldwell has said no.

3          Do you want her to say it again?

4                         MR. WEIL:  No, you are right.

5          BY MR. WEIL:

6     Q.   Now we can go to 928, Doctor.  This is "Basic Mental

7          Health Services."  Do you see that?

8     A.   Yes.

9     Q.         "A range of mental health services are

10                available for all inmates who require them."

11         Do you see that?

12    A.   Yes.

13    Q.   And on No. 3, it says,

14                "When commitment or transfer to an

15                inpatient psychiatric setting is clinically

16                indicated, required procedures are followed

17                and the transfer occurs in a timely manner."

18         Do you see that?

19    A.   Yes.

20    Q.   We covered this and discussed a different standard

21         earlier, but do you agree with that statement, that

22         is an essential component of a jail's mental health

23         program?

24    A.   Yes.

25    Q.   Was it clinically indicated for Ms. Rusher?

1   A.   I wasn't part of the clinical process and my under-

2        standing is it was not.

3   Q.   What is that understanding based on?

4   A.   Based on the documentation that's in the chart.

5   Q.   That would be Mr. Shmikler's documentation?

6   A.   And the physicians.

7   Q.   And would that include the documentation that came

8        with Ms. Rusher from McFarland Medical Center?

9   A.   I saw that as well.

10  Q.   And you are including that in your assessment?

11  A.   Well, I am focusing on the more recent evaluation,

12       particularly the one that was done the day before.

13  Q.   The day before she strangled herself?

14  A.   Passed away, yes.

15  Q.   When Ms. Rusher arrived from McFarland, what would be

16       the information used to assess her clinical need for

17       inpatient psychiatric care?

18  A.   What was used?

19  Q.   What would you be using?  You said you would look at the

20       immediate assessment immediately before her strangula-

21       tion, but I am asking, when she came in, what would you

22       be looking at?

23  A.   What was available in the chart.

24  Q.   Would you also want to know what her assessment was,

25       her -- her outpatient communication from McFarland?



MELISSA CALDWELL, M.D.                                October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                  165

| | | |
|---|---|---|
| 1 | A. | It is helpful.  It is determinant of what we do. |
| 2 | Q. | Go again to the compliance indicators. |
| 3 | | "Regardless of the facility's type or size, |
| 4 | | basic on-site outpatient services include at a |
| 5 | | minimum:" |
| 6 | | Then it lists a bunch of services.  I want to under- |
| 7 | | stand. |
| 8 | | "Individual and group counseling as clinically |
| 9 | | indicated." |
| 10 | | Do you see that? |
| 11 | A. | Yes. |
| 12 | Q. | What does that mean? |
| 13 | A. | Do you want me to break it down? |
| 14 | Q. | Yes.  Do individual and, then, group counseling. |
| 15 | A. | Based on the patient's clinical needs, do we have |
| 16 | | individual services that are available, group services |
| 17 | | that are available?  Again, it is based on the clinical |
| 18 | | needs.  We have to be able to meet them in one or both |
| 19 | | ways. |
| 20 | Q. | Were there any group services available at Sangamon |
| 21 | | County jail? |
| 22 | A. | Not provided by my team, no. |
| 23 | Q. | Well, your team was in charge of mental healthcare. |
| 24 | | Right? |
| 25 | A. | There is other counseling.  Do you want me to describe |



1       the counseling and explain why I am answering the way I

2       am?

3   Q.  Yes.

4   A.  Counseling is a pretty large umbrella.  It can include

5       psychotherapy as provided by a mental health profes-

6       sional to deal with mental health issues.  It could

7       also be things like AODA services.  Some jails have

8       parenting groups and lots of jails have no groups.  They

9       have individual services only.

10  Q.  So Sangamon was one of the jails which have individual

11      services only?

12  A.  From our team only.  I can't speak to whether they have

13      other group services.

14  Q.  And the individual services that were provided to

15      Ms. Rusher regarding mental health -- I understand she

16      received some medical care, but the individual services

17      provided to Ms. Rusher for mental health were her

18      counseling with Mr. Shmikler.  Is that right?

19  A.  The risk assessments and the education counseling

20      provided by, among others, Mr. Shmikler, yes.

21  Q.  Sorry.  The risk assessments, and what was the second

22      one?

23  A.  Risk assessments.

24  Q.  What was the second one?

25  A.  Psychoeducation and any counseling or psychotherapy that



1          could be done, given her situation.

2    Q.    Education.   Psychotherapy?

3    A.    She wouldn't have been a good candidate for group

4          counseling, not in her current status.

5    Q.    I understand.   I think you said, as far as you knew,

6          there wasn't group counseling at Sangamon County jail.

7          So the risk assessment, I think, I understand.   The

8          education, what is that?

9    A.    Every one of my contacts with a patient has an educa-

10         tional component.   It could be talking about coping

11         skills, little nuggets of things that they can do to

12         improve their emotional response or behavioral response.

13         It could be, you know, encouraging them to be compliant

14         with medications or not eat things that are inedible or

15         not put things that would harm you in your nose or down

16         your throat.   There is always -- it builds into our

17         interactions, an educational component.

18   Q.    The counseling, what is that?

19   A.    Counseling is usually --

20   Q.    Let me stop you first.   I am referring to Sangamon

21         specifically now.   Again, given that you have read

22         Ms. Rusher's medical records and whatnot, what

23         counseling do you understand was provided to her?

24   A.    Provided to her?

25   Q.    Yes.



MELISSA CALDWELL, M.D.                                October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                  168

1   A.   I am not sure how much was able to be provided to her in

2        the fact that we were at an active risk assessment and

3        risk management point with her.  You have to have a

4        patient who is safe for self or others to really be

5        amenable to a lot of other therapeutic interventions.

6   Q.   If the patient isn't safe for others, are there any

7        steps that can be taken to provide counseling outside

8        of talking through a cell door?

9   A.   Excuse me?

10  Q.   Earlier, you said that there was counseling provided to

11       Ms. Rusher through, sort of, talking through the cell

12       door by Mr. Shmikler?

13  A.   That is my understanding.

14  Q.   Obviously, I think you agree that that is not an ideal

15       method of providing counseling.  Right?

16  A.   It is not ideal, no.

17  Q.   So are there any methods or protocols that are available

18       to, notwithstanding the risk somebody imposes, get them

19       counseling in a more clinically appropriate setting?

20  A.   If I have patient who is a known assault risk, it could

21       be very, very challenging to get them into a less inten-

22       sive situation.  Getting her out would involve having

23       her restrained and exposing also officers and herself to

24       potential assault.

25  Q.   That is your security assessment, or what is that based



```
 1          on?

 2   A.    That is based on me reviewing the chart and under-

 3          standing the behaviors that may have led them to make

 4          the decisions to see her at door front only.

 5   Q.    What behaviors are you referring to?

 6   A.    Documented assaults on -- on staff members.

 7   Q.    At the Sangamon County jail?

 8   A.    Other facilities.  Documented assaults on vulnerable

 9          inmates or patients at other settings.  Times when she

10          was allowed to have more mobility or freedom in which

11          she, then, used it as an opportunity to harm herself.

12          I can go through the list of different ways that she's

13          harmed herself with basic materials.  So lots and lots

14          of examples or rich datasets, so to speak, of times that

15          she's hurt herself or hurt others.

16   Q.    She was extremely mentally ill.  Wouldn't you agree?

17   A.    She had a very, very serious personality disorder.

18   Q.    Do you think that would be exacerbated by the conditions

19          of her confinement, whatever we call them?

20   A.    Well, it's one of those examples where you are damned

21          if you do and you are damned if you don't.  Excuse me,

22          sir, for saying it like that.  We have to keep her safe

23          and we have to keep others safe and at the same time,

24          that means that we have to utilize what is available to

25          us and what is available to us means keeping her
```



1    separated and lessening her access to things to harm

2    herself.  That is all there is in the industry, period.

3    That is not optimal.

4  Q.  Was outside psychiatric hospitalization available to

5    you?

6  A.  Could we have referred her?  Is that what you are

7    saying?

8  Q.  Yes.

9  A.  I think we could have referred her, but the benefit of

10    that, I think, is highly in question considering she

11    came from one and she hurt staff, she hurt herself and

12    she hurt other patients.

13  Q.  So given that she did those things in a clinical

14    setting, you are saying that she wouldn't have

15    benefitted from a psychiatric -- I'm sorry.  Because

16    of her history at McFarland, are you saying that she

17    wouldn't have benefitted from inpatient psychiatric

18    hospitalization?

19  A.  I think it's the professionals' task to determine, at

20    any given assessment, whether her status has changed,

21    her behavior has changed.  I think, at the time of her

22    strangulation, the decision, from my understanding, is

23    she was not safe for herself or others and the benefit

24    of transferring her someplace else when we had the means

25    to provide her with medication and with the status to

| 1 | | keep her safe, to the best of our ability, there wasn't |
|---|---|---|
| 2 | | a benefit in doing that. |
| 3 | Q. | So I think you said earlier, that the conditions of |
| 4 | | her confinement, whatever we call them, would have a |
| 5 | | negative impact on her psychological condition.  I don't |
| 6 | | want to put words in your mouth, but is that correct? |
| 7 | A. | I wouldn't say that that is correct, sir. |
| 8 | Q. | You don't think that the conditions of her confinement |
| 9 | | at Sangamon County jail -- I'll say, the isolation she |
| 10 | | experienced -- and we can disagree about the level that |
| 11 | | is, but you agree that it wasn't a normal inmate out |
| 12 | | there in population.  Right? |
| 13 | A. | She was not a general population inmate, no. |
| 14 | Q. | She was more isolated than most general inmate popula- |
| 15 | | tions are going to be.  Right? |
| 16 | A. | She was separated to a greater extent.  Yes. |
| 17 | Q. | And is that isolation -- would you think that isolation |
| 18 | | would have a negative psychological impact on Ms. Rusher |
| 19 | | given her condition? |
| 20 | A. | Having not assessed her, I can't say yes to that.  I |
| 21 | | have seen patients who the typical response that you |
| 22 | | are suggesting was not their response.  They gravitated |
| 23 | | toward a separated status.  They functioned better with- |
| 24 | | out the level of stimulation or interaction.  So having |
| 25 | | not seen her or assessed her or reading anything in |



1   support of that, I cannot say yes, sir.  In fact, I

2   would say her behavior seemed pretty consistent,

3   consistent from what I have heard her conduct was at

4   Logan, with IDOC, consistent with how she was at

5   McFarland.  The difference, I think, is we were actually

6   able to minimize the number of self harm or assault

7   incidents, but unfortunately, it only takes one.

8   Q.  You are saying that her behavior was better at Sangamon?

9   A.  I don't think so.  That is not what I am saying.

10  Q.  Her behavior was more consistent?

11  A.  I am saying that she was just as unstable in all of

12      those three settings as she was even in our facility

13      where we are concerned about the level of separation.

14      The level of separation was able to minimize the number

15      of instances in which she harmed herself or harmed

16      others.  That is what I was saying.

17                  MR. MADDOX:  Steve, we've been at

18      it for four hours.  Do you have any estimate, just so I

19      can give a shout out to my home front?

20                  MR. WEIL:  I think another hour.

21  BY MR. WEIL:

22  Q.  Let's turn to MH-G-03.  MH-G-02, I am sorry.  So this

23      happens to do with,

24              "Mental health programs or residential units

25               meet the serious mental health needs of



1                           patients."  Do you see that?

2   A.   MH-G-03?

3   Q.   Two.  It says,

4                    "When offered on-site, mental health programs

5                    or residential units meet the serious mental

6                    health needs of patients."

7        Do you see that?

8   A.   Yes.

9   Q.   I am looking to Compliance Indicator, No. 2.  It says,

10                   "Acute mental health residential units, when

11                   provided on-site, are consistent with their

12                   defined scope of care to provide for patients

13                   who are psychotic, clinically unstable, or

14                   acutely suicidal, or at imminent risk of

15                   self-harm and have, at a minimum:"

16        And then it lists some items.  Do you see that?

17  A.   Yes.

18  Q.   So we can go through a bunch, but did Sangamon County

19       jail have continuous coverage by mental health staff?

20       I am looking at "a."

21  A.   First of all, I have to say that this is generally a

22       prison-applicable thing.  Okay?  This is the standard.

23       But when it comes to,

24                   "Continuous (24 hours per day, 7 days per

25                   week) coverage by mental health staff assigned



MELISSA CALDWELL, M.D.                                October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                  174

```
 1                        to the unit",
 2         mental health staff can include officers that have been
 3         trained in mental health issues.  There was access 24/7
 4         to physicians.
 5    Q.   What do you mean, "access"?
 6    A.   They could call the physician, 24 hours a day.  There
 7         was also physician back-ups.
 8    Q.   So there wasn't a physician on site.  Right?  You are
 9         talking about a physician could be called?
10    A.   Yes.  Again, this is an accreditation standard.  This
11         is also, when you talk about residential units, that is
12         usually terminology applied to prisons.  Like, for
13         example, Wisconsin Resource Center is an example of a
14         residential unit within Department of Corrections.
15         They are staffed differently.  They are staffed as
16         psychiatric units.
17    Q.   Let's go to Page 818 real quickly.  Keep your hand on
18         that standard, but I just want to understand something.
19         It is right at the beginning.  It's the preface.  Look
20         at the third paragraph, "these standards."  It says,
21                    "These standards are intended for prisons and
22                    jails of any size."
23         Do you see that?
24    A.   Yes.
25    Q.   Is that accurate?
```



1  A.   That is NCCHC's intention, yes.  It doesn't mean it is

2       achievable for every jail of every size, but that is --

3       I am saying that you are talking about a standard that

4       is talking about a specialized residential unit.  That

5       is not a requirement for jails.

6  Q.   It is an essential standard.  Right?

7  A.   For accreditation.

8  Q.   NCCHC considers MH-G-O2 to be an essential standard.

9       Right?

10 A.   Yes.

11 Q.   We went through "a",

12            "Continuous coverage by mental health staff

13            assigned to the unit."

14      Right?

15 A.   As met by the trained officers or by nursing staff.

16 Q.   Do you know whether any officers at Sangamon County jail

17      were trained and who were assigned to the unit in mental

18      health?

19 A.   They have their annual required training for mental

20      health.

21 Q.   Do you think that that satisfies that standard?

22 A.   That is how it is satisfied during audits.  It is how

23      the auditors meet that standard.  You have to show that

24      the officers have mental health training.

25 Q.   If they have one of these units.  Correct?



1    A.    Or mental health programs.  If you look at the training

2          section, there is a training standard that talks about

3          annual training --

4    Q.    This is an acute mental health residential unit.  I am

5          trying to figure out whether Sangamon County jail

6          actually had one or not.

7    A.    They didn't have a residential unit, no.

8    Q.    They didn't have what is being described here.  Right?

9          In "2"?

10   A.    I have no jails that have a residential unit.

11   Q.    If what is needed here can't be provided, if a patient

12         needs acute on-site psychiatric care, that would be

13         a situation where they should get referred out to a

14         inpatient psychiatric hospital.  Right?

15   A.    Yes.

16   Q.          "Nonacute mental health residential units,

17              when provided on-site, have, at a minimum:

18              a. A defined scope of care.

19              f. A clean, safe, therapeutic environment

20                 and milieu, including facilities for

21                 maintaining good personal hygiene with

22                 guidance in the activities of daily living,

23                 if needed."

24         Do you see that?

25   A.    Yes.



1   Q.   Is that something that Sangamon jail provided?  I mean
2        specifically to Ms. Rusher.
3   A.   Specifically to Ms. Rusher?
4   Q.   Uh-huh.
5   A.   She wasn't non acute.
6   Q.   So she was acute?
7   A.   She was on suicide watch.
8   Q.   Okay.  So if she is on suicide watch for an extended
9        period of time, would you expect the services to be
10       provided under 2, "Acute Mental Health Residential
11       Units", on Page 929 to be provided and available to her?
12                 MS. POWELL:  I object to the form
13       of the question in that it's asking her to identify and
14       discuss standards for a jail that is not accredited
15       under these provisions.
16       BY MR. WEIL:
17   Q.   Can you answer the question, please?
18   A.   This is talking about residential units.  This is not
19       something that was applicable to Sangamon County jail.
20       They didn't have a mental health unit.  They had cells
21       and other things designated for people who were in a
22       stabilized state.
23   Q.   Turning to 928 under "Discussion", it says,
24                 "The intent of this standard is that a range
25                 of mental health services are available to



1                          inmates with mental health problems so that

2                          they are able to maintain their best level of

3                          functioning."

4       Do you see that?

5   A.  Yes.

6   Q.  That would be regardless of the prognosis for the

7       inmate.  I mean, if, say, Ms. Rusher had a guarded

8       prognosis where people weren't optimistic about her

9       recovering from her mental health, this is something

10      you'd still want to provide to any inmate who came in.

11      Right?

12  A.  And each one of those were provided to Ms. Rusher, yes.

13  Q.  When you say "each one of those", what do you mean?

14  A.  Each one of those would have been available to her or

15      were, in fact, provided to her in that time that she was

16      with us.

17  Q.  Those what?

18  A.  "Identification and referral", that's screening and

19      assessment stuff.  "Crisis intervention services", that

20      is the focus of where she was at because of her safety

21      concerns.  She was provided with psychotropic medication

22      management in terms of "individual and group counseling

23      as clinically indicated."  So hers was more individual

24      in nature and more crisis focused because of where she

25      was at.  "Psychosocial/psychoeducational programs."



1        Those are covered by "d."  It's "treatment documentation

2        and follow-up."  That is each one of the available docu-

3        ments.

4   Q.   You are saying -- you are referring, just for clarity,

5        to Compliance Indicators Paragraph 2 and those sub-

6        paragraphs.  Right?

7   A.   Yes.

8   Q.   When you say "treatment documentation and follow-up",

9        when you are saying that was provided to Ms. Rusher,

10       you were referring to the documentation that you read in

11       her chart?

12  A.   Yes, the day before her incident.

13  Q.   Why don't we go to 932?   This is mental health --

14       this says "Treatment Plans."  It says,

15                 "Mental health services are provided according

16                 to individual treatment plans."

17       Do you see that?

18  A.   Yes.

19  Q.   So you have read Ms. Rusher's charts.  Did she have an

20       individual treatment plan?

21  A.   Yes.

22  Q.   Where did you find that?  It's not a memory test, just

23       where would that be?

24  A.   For example, on the clinical note that was documented

25       the day before her strangulation, there is a section on



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          180

```
 1        there.  It is more designed to be able to communicate
 2        also to security, but it talks about what level of
 3        observation is recommended, the decision, and why that
 4        decision was made.
 5   Q.   What decision?
 6   A.   To continue her on suicide precautions.
 7   Q.   Let me back you up quickly.  When would a treatment plan
 8        get created?
 9                    MR. WEIL:  Do you need a minute
10        with your phone?
11                    THE WITNESS:  Yes.
12                    MR. WEIL:  Let's take a break.
13             (Discussion off the record)
14        BY MR. WEIL:
15   Q.   We are back on 932, Dr. Caldwell.  We talked about
16        the standard right at the beginning.  Going down to
17        "Discussion", it says,
18                    "The intent of this standard is that mental
19                    health patients receive care tailored to their
20                    individual needs",
21        and it goes on from there.  Do you see that?
22   A.   Yes.
23   Q.   You are saying that that was provided to Ms. Rusher in
24        the documents you reviewed.
25   A.   Can I expound on it?
```



1   Q.   Sure.

2   A.   The mental health treatment plan, because of the nature

3        of the contact Ms. Rusher was having, suicide risk

4        assessment, safety planning, you know, the components

5        are tailored for that function.  But yes, she had an

6        individualized treatment plan.  The treatment plan is --

7        considers her history, her current behavior, you know,

8        what things have predicted her safety in the past, what

9        she needs to be on right now by the clinical decision-

10       making of that professional.

11  Q.   It says -- I am going on the "Compliance Indicators."

12       I am looking at 5.

13                "Mental health treatment plans include, at a

14                minimum:"

15       It lists a bunch of things.  I am interested in "e."

16                "Documentation of treatment goals and

17                objectives, interventions necessary to

18                achieve those goals, and notation of clinical

19                progress."

20       So what treatment goal did you see for Ms. Rusher?

21       Let me back up.  Are the treatment plans that you are

22       talking about -- when you say these were developed for

23       Ms. Rusher, are those Mr. Shmikler's notes?  What are

24       those?

25                     THE WITNESS:  Since you have his



1      notes, can I see his notes?

2                    MR. WEIL:  No.  This is a blank

3      piece of paper.  I don't have them.

4  A.  When we were talking about a suicide watch review, the

5      observation status, first off, if you look at the form,

6      it was designed to be shared with custody staff.  As

7      such, the kind of information that is being shared is

8      being mindful of that and trying to maintain patient

9      confidentiality when you can.  For example, unlike other

10     forms, there may not be a diagnosis on there.  We don't

11     want officers knowing that she is antisocial or has

12     borderline personality disorder.  It may not be good for

13     her.  But we need to have enough communication of how

14     does she look right now and my understanding is that

15     last contact, she looked pretty stable.  She had not

16     been stable behaviorally, but she looked pretty stable.

17     And the decision, largely because of her -- her propen-

18     sity toward self harm, even when she denied suicidality,

19     was to keep her on a suicide watch.  So there's two

20      areas; one talking about the recommendation for

21     monitoring -- you know, continued monitoring, and a --

22     a statement as to why that is.

23  Q.  Let me, just for purposes of clarity --

24  A.  So the short-term goal was safety.

25  Q.  This is just for the record.  It is Bates 12678.  I am



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          183

1      going to produce this document to you in a minute, but

2      is that the type of document you are referring to when

3      you are talking about the treatment plan?

4  A.  For our purpose, the treatment plan would have been

5      encapsulated here.

6  Q.  I am talking about for Ms. Rusher in general, the

7      charting you reviewed, this is the document you are

8      referring to?

9  A.  The most recent contact, that would have been the treat-

10     ment plan component; her continued observation status.

11 Q.  And you are referring -- you just pointed to a page and

12     it's Page 12678.  Right?

13 A.  Yes.

14 Q.  It says here, going back to the NCCHC Page 932, when it

15     says, "documentation of treatment goals and objectives."

16     Do you see that?

17 A.  Yes.

18 Q.  What treatment goals do you recall being documented

19     on those -- the document that I just showed you?

20 A.  The treatment goal is very much based on the nature of

21     the contact.  The treatment goal is safety for self and

22     others.  It is implied based on the function of the

23     clinical activity.  That is our focus a hundred percent.

24     I mean, if her hygiene is not good, we'd like to work on

25     that, as an example, but honestly, the fire that we are



 1     trying to put out right now is her hurting herself or

 2     hurting others.  We have other long-term treatment goals

 3     for a patient, but you have to deal with what is the

 4     most critically immediate.  That is a suicide watch.

 5                    (A document was marked as Exhibit 5)

 6     BY MR. WEIL:

 7  Q.  The court reporter has handed you what's being marked

 8     Exhibit 5, Dr. Caldwell.  It's 678.  That is the one we

 9     were looking at just now?

10  A.  Yes.

11  Q.  You are saying this is where you saw Ms. Rusher's

12     treatment plan memorialized.  Obviously, not in this

13     document, but this type of form.  Is that right?

14  A.  A treatment plan is a lot of things; short-term and

15     long-term goals.  If I am seeing a stable patient, my

16     treatment plan is going to be pretty extensive, talking

17     about historical things and did she have trauma and --

18  Q.  Dr. Caldwell, I am just asking you a simple question.

19     Is this where you saw --

20  A.  Most recent.  Yes, right here would be --

21  Q.  So --

22  A.  -- Michael Shmikler's current treatment plan based on a

23     suicide risk assessment.

24  Q.  I'm looking at 932, again, the NCCHC.  3 says,

25                    "Individual treatment planning is initiated



1            when the individual enters into treatment with

2            a qualified mental health professional."

3      That would be when Ms. Rusher showed up.  Right?  At

4      Sangamon County jail?

5   A.  Not necessarily.  But whenever she was referred to see

6      the mental health professional.

7   Q.  And she was referred, essentially, immediately.  Right?

8   A.  But she was referred for a suicide risk assessment which

9      is quite qualitatively different than seeing somebody

10      for therapy.

11  Q.  If somebody is suicidal, is it recommended that there be

12      a therapy goal?

13  A.  The therapy goal is safety for self and others.

14  Q.  Ms. Rusher was known to be mentally ill when she entered

15      the Sangamon County jail.  Right?

16  A.  She had a mental health diagnosis, correct.

17  Q.  Just looking at MH-G-03, you'd expect that an individual

18      treatment plan would have been initiated when she

19      entered into Sangamon County jail when she showed up

20      there.  Right?  Or soon thereafter.

21  A.  In a jail situation, that would be when she is referred

22      to a healthcare provider.  There is treatment goals on

23      them.  And jail is, generally, short-term.

24  Q.  I am referring you to 678.  There are multiple versions

25      of this document throughout Ms. Rusher's charting.



1       Right?

2   A.  Yes.

3   Q.  So are you saying that in that form, that is where

4       Ms. Rusher's treatment plan was recorded?

5   A.  For her particular clinical indication, yes.  Her

6       treatment plan from Mickey Shmikler is on this form.

7   Q.  In those multiple versions of this form.  Correct?

8   A.  Yes.

9                   MR. WEIL: And again, just for

10      the record, we are referring to 678 -- 12678.

11  Q.  Going back to "d", it says,

12              "Documentation of treatment goals and

13              objectives",

14      and you are saying that you saw her treatment goals and

15      objectives as reflected here.  Right?

16  A.  In relation to her suicide risk assessment, yes.

17  Q.  And I think you said Mr. Shmikler, because this

18      document, 678, is going to be shared the correctional

19      staff, that you'd expect Ms. Rusher to try to preserve

20      her confidentiality at some rate?

21  A.  Yes.

22  Q.  And not provide a full clinical assessment there?

23  A.  There is an evaluation, but in terms of placing labels,

24      things like that, we try to avoid that.

25  Q.  Why not just develop a separate document for mental



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      187

1        health staff where that more full record could be

2        developed?

3   A.   They are able to use another form to do that if they

4        desire.  It is a clinical professional's decision

5        whether they want to supplementally document.

6   Q.   Did you see that other form anywhere in Ms. Rusher's

7        charting records?

8   A.   Not that I recall.

9   Q.   You are saying this treatment goal was provided and the

10       treatment goal was what, that you saw for Ms. Rusher?

11  A.   It is based on her referral reason.  It is safety.  It

12       is stabilizing her for safety for self and others.

13  Q.   Okay.  Was there any other treatment provided -- any

14       other treatment goals achieved in terms of --  Besides

15       protecting her from killing herself, she had a diagnosis

16       of mental illness.  Was there any effort to treat that

17       mental illness beyond protecting her from killing her-

18       self?

19  A.   In order to treat her, she has to be stabilized.  If we

20       are going to work on other issues --  I mean, that is

21       what the literature tells us, as well, sir.  If you have

22       somebody who has borderline personality disorder, we

23       have to stabilize them for self as well as for others

24       in terms of safety before we can start to work on their

25       distorted thinking and so forth in any deliberate,



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          188

| | |
|---|---|
| 1 | concerted fashion.  I don't know what Mickey did in |
| 2 | terms of any adjunct short-term interventions, whatever |
| 3 | is documented, but his focus was on suicide risk assess- |
| 4 | ment.  So his treatment planning was based on a clinical |
| 5 | referral of suicidality or assaultiveness. |
| 6 | Q.  So you are saying -- How long did it take to stabilize |
| 7 | Ms. Rusher, looking at the record? |
| 8 | A.  She never stabilized. |
| 9 | Q.  She never stabilized.  So there was never any treatment |
| 10 | for her beyond attempting to prevent her in killing |
| 11 | herself.  Is that right? |
| 12 | A.  Not in that time frame, no.  Not that I am aware of. |
| 13 | Sorry.  Can I go back?  She was provided medical treat- |
| 14 | ment.  I'm focusing on Mickey Shmikler. |
| 15 | Q.  And you are focusing on her mental health treatment that |
| 16 | you were looking for.  Right? |
| 17 | A.  She had psychotropic medications as part of mental |
| 18 | health treatment as well. |
| 19 | Q.  Was there any treatment plan --  You said stabilizing |
| 20 | and she had psychotropic medication.   Right? |
| 21 | A.  That I see documented. |
| 22 | Q.  Okay.  Would you consider her treatment plan to be |
| 23 | therapeutic? |
| 24 | A.  Yes, I would. |
| 25 | Q.  Why? |



MELISSA CALDWELL, M.D.                                October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                   189

```
 1   A.   Because what is more important than being safe?  If I
 2        am going to work on all of these other life issues, I
 3        have to have a patient who isn't hurting themselves or
 4        hurting others.  That is my first focus.
 5   Q.   It sounds like what you are saying is in the three
 6        months Ms. Rusher was housed at Sangamon County jail,
 7        the staff there was incapable of stabilizing her and
 8        pursuing mental health treatment that was therapeutic.
 9        Is that right?
10   A.   We were stabilizing her based on her housing and her
11        property, which is what you do.  Her condition was
12        chronic and multi-facility.  I don't know exactly how
13        many years, but my understanding is chronic since
14        childhood and unless Ms. Rusher was in a place, a mind-
15        set of wanting to do something different, unfortunately,
16        that is all we had available; to educate her and help
17        keep her safe from herself, and that is challenging.
18   Q.   That is what you mean when you say that she was not
19        stable, that she was consistently mentally ill over time
20        and therefore, you weren't able to offer therapeutic
21        services beyond preventing her from hurting herself.
22        Is that --
23   A.   She was personality disorder.  Her way of viewing her-
24        self and the world was maladaptive and she showed a lack
25        of motivation and willingness to do something different.
```



1  The hope was that she would come down the road and that

2  maybe dialectical behavioral therapy or other interven-

3  tions for people with borderline could have been

4  utilized, but you can't do that with somebody who is not

5  amenable.  You focus on keeping them safe, healing the

6  physical wounds, encouraging them to do something

7  different and hoping they get to that point where they

8  want to do something different.

9  Q.  I think I understand her physical wounds were healed,

10      but in terms of encouraging her to do something

11  different, that would have been Mr. Shmikler talking

12      with her through the cell door.  Is that right?

13  A.  At least four times a week, generally speaking, yes.

14  Q.  Let me ask you a question about that document you have

15  in front of you, 678.

16                    MR. MADDOX:  Just so we are clear,

17  can you say an exhibit number?

18                    MR. WEIL:  Exhibit 5, I am

19  sorry.  I am looking to Bates 678.

20  BY MR. WEIL:

21  Q.  Is this a document that is familiar to you?

22  A.  Yes.

23  Q.  This is an ACH document.  Right?

24  A.  It is not a proprietary document of ACH, no.

25  Q.  Is it one that ACH employs?



MELISSA CALDWELL, M.D.                              October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                           191

1   A.   It is one that we employ, yes.

2   Q.   So you would bring this into a jail.  When you get hired

3        at the jail, ACH would say, "this is one of the docu-

4        ments we want to bring to chart and attend to the mental

5        health needs of a patient."

6   A.   It is one of the documents that can be used to chart,

7        yes.

8   Q.   This is going to sound like a really basic question, but

9        when you have this at ACH corporate or whatever, is it a

10       Word document?  Is it a PDF?  What kind of form is this

11       in?

12  A.   Either one.  Can it be changed?

13  Q.   Yes.  Can you edit it?

14  A.   Yes.  I originally gotten it from the Wisconsin

15       Department of Correction and it was adapted from the

16       NCCHC standards.

17  Q.   This was produced from, I believe, Advanced Correctional

18       Healthcare.  But regardless, does this look like the

19       form that ACH keeps the document in?

20  A.   Our forms have gone through some changes.  My only

21       concern is it says 2013.  My forms are reviewed every

22       year, so this was not the form that was in place,

23       necessarily.  It may have been without change, but it

24       should have said 2016 or 2017 if it was truly the form.

25  Q.   Ms. Rusher was kept in the condition she was in because



1       she was acutely suicidal.  Right?

2   A.   She was acutely at risk of harming herself.  I think

3       there is a distinction.

4   Q.   What is the distinction?

5   A.   It doesn't matter in practice whether you intend to

6       kill yourself or not if you are engaging in dangerous

7       behaviors, but she regularly denied that she was

8       suicidal and, then, would go and do things to harm

9       herself.  That was documented in multiple settings.

10  Q.   Referring to 678 real quick, "Mental Health Placements -

11      Level of Observation."  Do you see that box in the lower

12      left-hand (sic) side?

13  A.   Yes.

14  Q.   It has three options; "Constant", "Close", and

15      "Intermediate"?

16  A.   Yes.

17  Q.   Constant watch is one-to-one observation.  Right?

18  A.   Yes.

19  Q.   That is what it says.  It is constant.  You are not

20      walking --

21  A.   Usually, it is an officer sitting with you while you

22      are pending transfer to a hospital.

23  Q.   When you gave these forms to clients, would they suggest

24      edits in the way they wanted the care to be provided?

25  A.   I have had clients request that we use a different form



1       or modify it in some way.

2   Q.  Do you recall Sangamon ever making that request?

3   A.  No.

4   Q.  I am curious because on Sangamon's form, there is no

5       option for constant observation.

6   A.  That may have been the version.  This is 2013.

7   Q.  Understood.  But ACH would always want to have an option

8       of constant observation for -- if somebody was acutely

9       suicidal.  Right?

10  A.  Not necessarily.  If you have a -- the concern --

11      This was intended for a small jail four hours away from

12      a hospital who does not possess a restraint chair or a

13      padded cell or special housing for somebody who is

14      suicidal.  In those cases where they don't have physical

15      resources to keep somebody safe, standing with them

16      until they can get them to someplace that had those

17      things.

18  Q.  And how do you know who this was provided for?  You said

19      this was for a small jail?

20  A.  I'm saying when this version was in place --

21  Q.  Grant County jail.  Right?  I believe these were

22      produced for the Grant County --

23  A.  It was whatever year had this.  This form was in place

24      in 2013 across the board.  Now, there's also been a

25      modification where it says "per your policies."  So



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          194

1    we have tried to reflect that.  Some jails may have

2    different things.  Some jails won't have 30-minute

3    checks.

4  Q.  Let me ask, then, if you go to MH-G-04 in the NCCHC

5    standards, "Suicide Prevention Program", it says,

6         "Acutely suicidal inmates are placed on

7         constant observation."

8    Do you see that?

9  A.  (No response)

10  Q.  It's 1c.

11  A.  Yes.

12  Q.  At least the NCCHC standard, that would be something

13    that should happen.  Right?

14  A.  That could be defined by policies of the facility as

15    having camera cells.  There is ways that that is defined

16    in different places.  And also, in terms of "acutely

17    suicidal", that also has been defined by some as meaning

18    that they are actively harming themselves right now;

19    biting at their wrists, scratching at themselves.

20  Q.  Constant observation could be substituted with cameras?

21  A.  I have seen that, yes.

22  Q.  Is that something that is acceptable to the NCCHC or --

23  A.  It depends on the auditor.  I have seen them meet that

24    function.   And the "non-acutely" is usually defined

25    as someone who isn't actively harming themselves.



1              MR. WEIL:  Go to 936.  It is the

2    next page under seven.

3  A.    So when they talk about, like, an isolation cell,

4        "Isolation" meaning not having lines of sight, again,

5        constant observation usually defined as a camera.

6  Q.    Go to seven on 936.  "Monitoring."  It says, in the last

7        sentence,

8                  "Other supervision aids (closed circuit tele-

9                  vision, inmate companions or watchers) can be

10                 used as a supplement to, but never as a

11                 substitute for, staff monitoring."

12       Do you see that?

13 A.    You can't just turn on the camera and walk away.

14 Q.    So you could have -- I guess you could abandon one-to-

15       one observation as long as you had a closed circuit TV?

16 A.    You don't have to sit there, like, in their space.

17 Q.    Then it says,

18                 "Nonacutely suicidal inmates are monitored on

19                 an unpredictable schedule with no more than 15

20                 minutes between checks."

21       Do you see that?

22 A.    Yes.

23 Q.             "If, however the nonacutely suicidal inmate

24                 is placed in an isolation cell, constant

25                 observation is required."



1          Do you see that?

2     A.   Meaning not having lines of sight, yes.

3     Q.   Lines of sight to what?

4     A.   Again, this is just my experience with how people

5          interpret it.  Isolation, meaning that they are not in a

6          camera cell, it is not a cell in an area where officers

7          can see into the cell readily.  They are in a unit some-

8          where across the building.

9     Q.   Across the building?

10    A.   I have had some jails that their -- their mental health

11         cells are not where officers are.  So they are not in

12         direct supervision of those cells.

13    Q.   You said "light of sight."  Line of sight to what?  Just

14         someone who might walk by?

15    A.   Or sitting at a control station in a booking area.

16    Q.   So if they are not those things where someone is, sort

17         of, in their eyesight where a staff person is sitting,

18         you'd want to be -- the NCCHC recommends that the non-

19         acutely suicidal inmate is placed in an isolation cell

20         to be under constant observation.  Right?

21    A.   Yes.  And if you want to get accredited, you'd have to

22         show you are meeting that --

23    Q.   NCCHC would insist on this standard because it is an

24         essential standard for accreditation.  Right?

25    A.   Yes.



 1   Q.   That is because it is important for the health, safety
 2        and welfare of patients, and critical to the components
 3        of a mental healthcare program.  Right?
 4   A.   Generally speaking.
 5   Q.   Are inmates in specialized single-cell housing at an
 6        increased risk of suicide?
 7   A.   Yes.
 8   Q.   So would that include this housing that Tiffany Rusher
 9        was placed in?
10   A.   Possibly.
11   Q.   Given what you have seen of her record, would you think
12        that Ms. Rusher was at increased risk of suicide because
13        of her single-cell housing?
14   A.   No.
15   Q.   Why not?
16   A.   Not because of.  I think because of her personality
17        issues.
18   Q.   Would the single-cell housing unit she was placed in
19        exacerbate her risk of suicide, as you understand that
20         placement, given the records you have reviewed?
21   A.   I think it mitigated her risk of harming herself more
22        so than allowing her free rein and access to things.
23        So it is a weighing out of risk.
24   Q.   So the fact that she was isolated increased her risk,
25        but maybe the lack of access to things she could kill



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          198

1        herself or hurt herself with decreased her risk.  Is

2        that what you are saying?

3                     MR. MADDOX:  I want to object to

4        the form of the question; use of the word "isolated."

5                     MS. POWELL:  I object as well.

6                     THE WITNESS: Can you, please,

7        restate your question?

8        BY MR. WEIL:

9    Q.  You agreed that inmates -- a moment ago, that inmates in

10       single-cell housing are at an increased risk of suicide.

11       Right?

12   A.  Do you want me to explain the mechanism?

13   Q.  You said a moment ago -- I am asking you a yes-or-no

14       question.  I think you said --  Well, set that aside.

15       I think what you said was there was a balancing out.

16       On the one hand, Ms. Rusher was in single-cell housing.

17       On another, I believe what you were saying was she had

18       less access to things she could hurt herself with.  Is

19       that the balance you were referring to?

20   A.  That is the intention of separating her; to give her

21       less access to things and others that she could harm.

22   Q.  What balance were you referring to?

23   A.  I think the industry recognizes that if a person is not

24       a risk to themselves or others, placing them with others

25       would be optimal.  However, if someone is a known and

| | | |
|---|---|---|
| 1 | | recent assault risk, a known and recent self harm risk, |
| 2 | | then, you may have no other recourse than to separate |
| 3 | | them.  However, it takes very little time, and you can |
| 4 | | use lots of different things to strangle yourself with. |
| 5 | | The reality is even if you were able to give her no |
| 6 | | clothing, absolutely no sort of bedding, no toilet |
| 7 | | paper, I have had patients somehow manage to harm them- |
| 8 | | selves with toilet paper; strangulation. |
| 9 | Q. | Ms. Rusher did. |
| 10 | A. | Yes. |
| 11 | Q. | I guess I'm just -- |
| 12 | A. | They could still harm themselves. |
| 13 | Q. | You are giving a very long speech to a simple question. |
| 14 | | I understand there is a lot of risks with placing |
| 15 | | somebody who is suicidal among other people where she |
| 16 | | has access to things she could harm herself with. |
| 17 | | You refer to a balance and so I was trying to -- |
| 18 | A. | I was trying to explain that balance, so I'm sorry it |
| 19 | | was a long answer. |
| 20 | Q. | It was a long answer.  I understand.  Placing somebody |
| 21 | | where -- |
| 22 | A. | If there was a perfect way to keep someone safe, we'd do |
| 23 | | it.  That same piece -- |
| 24 | Q. | Ma'am, that wasn't my question.  Okay?  You referred to |
| 25 | | a balance.  I understand there are -- |



1  A.  Not a balance; more like a weighing out.

2  Q.  "Inmates" --  It is 935.

3              "Inmates and specialized single-cell house

4              are also at increased risk of suicide."

5  That is in the "Discussion" section.

6  A.  Not disputed.

7  Q.  I think, if I understand the science correctly, what

8  that is saying is that isolation can increase your

9  desire or propensity to kill yourself, setting aside

10  your access to the items with which you might do it.  Is

11  that fair?

12  A.  That may be one mechanism.  The other mechanism is they

13  have time to do it.  Recognize that it takes three

14  minutes for brain damage, death within five minutes.

15  Q.  Fair enough.  So if I understood the balancing you were

16  referring to, the balance would be it would be nice to

17  let this person get out and socialize among others

18  because that is important, but doing that gives them

19  access to things with which they may harm themselves.

20  Is that fair?

21  A.  Yes.

22  Q.  Under the compliance indicators on 934, it says --

23  I'm looking No. 5.

24              "The mental health authority approves the

25              facility's suicide prevention plan, training



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      201

1              curriculum for staff, including development of

2              intake screening for suicide potential and

3              referral protocols, and training for staff

4              conducting the suicide screening intake."

5       Did Mr. Shmikler or Dr. Abraham approve Sangamon's

6       suicide treatment plan?

7   A.  I think I explained that the mental health authority

8       was very well met by various professionals, including

9       jail administration.

10  Q.  So they were a mental health authority, the jail

11      administration?

12  A.  In terms of directing things like training for staff,

13      they helped coordinate those pieces, yes.

14  Q.  Do you know what sort of training the jail administra-

15      tion had in preventing suicide?

16  A.  Not offhand, sir.

17  Q.  Would that be important to know in deciding whether the

18      mental health authority -- whether this standard would

19      have been met?

20  A.  If they are accredited, yes, but that's not a

21      required -- that's not a rule.

22  Q.  I am not asking about accreditation, I am just asking

23      whether this occurred.

24  A.  I can't speak to it.

25  Q.  Under 935, at the bottom under "Discussion", 3,



1    "Referral",

2              "There are procedures for referring

3              potentially suicidal inmates and those who

4              have attempted suicide to mental health

5              providers or facilities."

6    Do you see that?

7    A.   Yes.

8    Q.   That refers to referring somebody outside of the jail,

9         if necessary.  Is that right?

10   A.   Not necessarily.  It could have been to Mickey Shmikler

11        or Dr. Abraham.

12   Q.   Okay.  So in the context of Sangamon, what would this

13        mean?

14              MR. MADDOX:  Under what circumstances?

15   BY MR. WEIL:

16   Q.   Under Ms. Rusher's circumstances.

17   A.   To the qualified mental health professional on site, to

18        the jail physician, and if there were any referrals off

19        site.  This referral was met based on who saw her.

20   Q.   Were there any procedures that were -- or any considera-

21        tion given to referring Ms. Rusher off site that you are

22        aware of that you can see in her charting?

23   A.   No.

24   Q.   Do you think there should have been?

25   A.   No.



1    Q.   No you said?

2    A.   Based on my understanding of her presentation, no.

3    Q.   Why not?

4    A.   I think I have discussed it.  Do you want me to expound

5         on it again, sir?

6                   MR. MADDOX:   This was covered.

7    A.   I think that it is clinical decisionmaking of the

8         providers on site whether she was fit for confinement,

9         whether we had the capacity to keep her safe, whether we

10        could keep others safe from her and whether she would

11        derive any benefit from a referral off site.

12   Q.   I am going to 936, Paragraph 6.  "Housing."  Do you see

13        that?

14   A.   Yes.

15   Q.        "Unless constant supervision maintained, a

16             suicidal inmate is not isolated but is housed

17             in the general population, mental health unit,

18             or medical infirmary, and located in close

19             proximity to staff."

20        Do you see that?

21   A.   Yes.

22   Q.   So this would indicate that suicidal inmates should be

23        housed in general population unless there is constant

24        observation.  Right?

25   A.   Or in a suicide-resistant cell designated in booking.



```
 1        That can also meet the standards, sir.

 2   Q.   If the person is isolated in such a cell, they should be

 3        under constant observation.  Right?

 4   A.   Say it again.

 5   Q.   If the person is isolated in a such a cell, they should

 6        be under constant observation.  Is that right?

 7   A.   Booking cells are, generally, not isolated.  But, yes.

 8        If she was isolated, it suggests, by the standard or

 9        suggestions here, that she have a higher level of

10        monitoring, even with cameras.

11   Q.   You'd expect --  Let's go to 948.  "Clinical Record

12        Format and Contents."

13                  "The method of recording entries and the

14                   format of the clinical record are approved by

15                   the mental health authority."

16        Do you see that?

17   A.   Yes.

18   Q.   Those records are going to include the form that we went

19        over, Page 12678.  Right?

20   A.   Yes.

21                  MR. MADDOX:  I just want to object

22        because I think she's pointed out that form has a dis-

23        crepancy or a difference from what was used.

24                  MR. WEIL:  Your objection is

25        well taken.
```



1      BY MR. WEIL:

2  Q.   It is a version of this form.  Right?

3  A.   Yes.  And record is not just a singular form.

4  Q.   Were ACH staff trained to record their clinical inter-

5       actions with patients?

6  A.   Yes.

7  Q.   So you'd expect Mr. Shmikler to know that you had to

8       document his contacts with Ms. Rusher.  Right?

9  A.   Yes.

10 Q.   So we can assume that if Mr. Shmikler had clinical

11      contacts with Ms. Rusher, they'd be documented.  Right?

12 A.   Yes.

13 Q.   Turn to 958 in the NCCHC standards.  This is NH-I-01.

14      This is "Restraint and Seclusion."  It says,

15              "Mental health staff order clinical restraints

16              and clinical seclusion only for patients

17              exhibiting dangerous behavior to self or

18              others as a result of mental illness."

19      Do you see that?

20 A.   Yes.

21 Q.   So is this the type of seclusion that Ms. Rusher was

22      under, as best you understand it?

23 A.   No.

24 Q.   She wasn't under clinical seclusion?  I am setting

25      aside restraints, just to be clear.



1  A.   It depends on how you define "clinical exclusion."  So

2       if we want to refer --

3                    MR. WEIL:  Seclusion.  Go ahead.

4                    MR. MADDOX:  You said "exclusion."

5       The hour is late.

6                    THE WITNESS: Sorry.  Seclusion.

7       And I have had no food.

8  A.   An example is I may monitor a patient referred by

9       security who has been placed on restraints.  However,

10      there is a difference between me helping to monitor and

11      make sure there is no contraindications to being in the

12      restraints than to say, "I ordered the restraints."

13      The same thing with the person being on an observation

14      status that had separation as a component.

15                   MR. WEIL:  I'll say, for the

16      purposes of my questions, I am setting aside restraints,

17      if that becomes an issue, but we will do that.

18                   THE WITNESS:  I just wanted to use

19      that as an example.

20                   MR. WEIL:  Understood.

21      BY MR. WEIL:

22  Q.  The clinical seclusion is supposed to occur pursuant

23      to a treatment plan.  Is that right?

24  A.  Yes, I think we discussed that earlier in terms of

25      suicide risk assessment.



1  Q.  And that is the treatment plan that you are saying

2      Mr. Shmikler developed in the form that is similar to

3      Page 678.  Is that right?

4  A.  He noted to continue observation, he noted what level

5      per the policy.

6  Q.  Turn to Page 959.  It says,

7              "When clinical restraint or seclusion is used,

8              it is employed for the shortest time possible

9              in keeping with current community practice."

10     Do you see that?

11 A.  Yes.

12 Q.  Going down, the next paragraph talks about restraint and

13     it says,

14             "Facilities that do not employ clinical

15             restraints or clinical seclusion generally

16             transfer patients who need such treatment

17             immediately to a local emergency room or

18             another correctional facility equipped to

19             offer such interventions."

20     Right?  Would Sangamon County jail have facilities for

21     clinical inclusion?  Would that be --  Sorry.  Clinical

22     seclusion?

23 A.  This is the example that I gave earlier of that reason

24     for a one-to-one, for sites who don't have a designated

25     cell for suicide watches, who don't have a restraint



1      chair or other restraints.  That's what I was talking

2      about.  This does not reflect Sangamon County.

3  Q.  So did Sangamon County, as you understand it, have --

4      was it set up for clinical seclusion or was it not?

5  A.  They have the ability to separate at-risk persons who

6      are suicidal or assaultive.

7  Q.  And that would be in a cell like Ms. Rusher's?

8  A.  Yes.  I believe they called it "high risk."

9  Q.  The confinement that you understand Ms. Rusher was

10     subject to would be -- that would be a clinical seclu-

11     sion as it is defined here.  Is that right?

12 A.  Clinical seclusion includes lots of different reasons.

13     I have never ordered therapeutic seclusion for somebody

14     who was not on a suicide watch.  There may be times

15     where a therapist wants to separate someone.  I used to

16     work with sex offenders.  Maybe I had some patients who

17     were inappropriate.  I might have recommended thera-

18      peutic separation because of that inappropriate

19     behavior.  I wouldn't say that this is characterizing

20     the care for Ms. Rusher.

21 Q.  So Ms. Rusher's confinement was not clinical seclusion,

22     just given what you've seen?

23 A.  It was a suicide watch, an observation status based

24     on risk to self or others that had separation as a

25     component by policy, by the jail.



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      209

1   Q.   How is that different than clinical seclusion?

2   A.   I gave you an example.  You can use clinical seclusion

3        for a lot of different reasons.  I may want somebody

4        single celled because they don't live well with others.

5   Q.   Here, it is saying --  Set aside restraints.  It says,

6                "Mental health staff order clinical seclusion

7                only for patients exhibiting behavior

8                dangerous to self or others as a result of

9                mental illness."

10       Right?

11  A.   An example is my person who sexually offends and has

12       deviancy and does things that are not safe for others.

13  Q.   How about one who is dangerous to themselves?

14  A.   Yes.

15  Q.   So in that circumstance, that would be Ms. Rusher.

16       Right?  You are ordering clinical seclusion for someone

17       who is a danger to themselves and Ms. Rusher is also --

18  A.   We are ordering continued observation per the policy

19       for someone who is deemed to be at risk for hurting

20       themselves or hurting others.  We are not saying that

21       they need to be isolated.  I think, however, the

22       discussion with the team is she hurts herself and she

23       hurts others, so --

24  Q.   So she is subject to clinical seclusion?

25  A.   Per the policy, yes.  It is a difference between me



1      monitoring somebody who is on restraints versus ordering

2      the restraints.  Does that make sense?

3   Q.  Well, you talked about a treatment plan for Ms. Rusher

4      that Mr. Shmikler entered into and I think basically,

5      the treatment was to keep her in a segregated cell.

6      Right?  Keep her in that cell.

7   A.  Until the next observation, until we could get more data

8      to see what we needed to do.

9   Q.  That is his medical recommendation.  Correct?

10  A.  That is his mental health recommendation.

11  Q.  Fair enough.  That sounds like clinical seclusion.

12      It sounds like what this is.  Are you distinguishing

13      between what Mr. Shmikler did and clinical seclusion?

14  A.  I don't see that he ever documented that she needs to

15      be in isolation.  I think, however, the policy and the

16      general practice is if you hurt yourself or hurt others,

17      seclusion is part of that management procedure.  So I am

18      just trying to distinguish the fact Mr. Shmikler never

19      specifically ordered that.  He ordered that she be on a

20      watch that had that as part of the -- the clinical

21      management plan.

22  Q.  But it was important that she be --  I mean, Sangamon

23      called them "isolation cells", so it was important that

24      she be in an isolation cell.  Right?

25  A.  If they called her that, I am saying that I don't



1        recognize that as isolation per the way things are

2        defined in these standards.  So we are, kind of, getting

3        into semantics.  I am trying to be really clear.

4                       MR. WEIL:  Why don't you turn to

5        959?  I am looking at the third paragraph.

6                       MS. POWELL:  When you say "959",

7        you have some documents that were 14 something and some

8        that were 12.  It gets confusing.

9                       MR. WEIL:  It's the NCCHC

10       standards, it is Page 14959.

11                      MR. MADDOX:  14959.

12       BY MR. WEIL:

13   Q.  It says,

14                  "Generally an order for clinical" --

15       Again, I am excising "restraint" because that wasn't --

16                  "Generally, an order for clinical seclusion is

17                  not to exceed 12 hours."

18       Right?  Do you see that?

19   A.  I am trying.  Yes.

20   Q.  Why would Ms. Rusher be subject to clinical -- or to

21       seclusion for months on end if this standard is talking

22       about 12 hours?

23   A.  Because we are not talking about seclusion as a

24       therapeutic intervention.  We are talking about a

25       suicide risk assessment.  That is a whole different



```
 1        beast, sir.  The length of time for that is dependent on
 2        her evaluation and her presentation and the risk factors
 3        and warning signs, the protective factors that are
 4        deemed from the evaluation.  So we are talking about two
 5        different things.  This is me giving someone a time-out
 6        versus --
 7   Q.   This is because they are a danger to themselves or
 8        others.  Right?  As a result of mental illness?  Doesn't
 9        that describe Ms. Rusher?
10   A.   I am just telling you that if you look, there is,
11        depending on the semantics of it, there is not always
12        pure a hundred percent consistency.  These are guide-
13        lines, they are not rules and they are not always
14        talking about the things that I think you are thinking
15        about.  When I see that, as a correctional health
16        professional -- I've worked 26 years in corrections in
17        some way, shape or form -- I am thinking about how I
18        operate when it comes to clinical restraint and about
19        the times where I may have come close to saying that
20        this person needs to be put in a single cell and it is
21        not a suicide risk assessment.  The separation is --
22        can be part of how you manage somebody who is at risk
23        for themselves or others, but this is a little
24        different.  In fact, the literature tells you that
25        people on suicide watch --  There were things even on
```

1 the news about Financier Epstein about how being on

2 suicide watch for six days may not have been enough.

3 So clearly, this is not to suggest that you only put

4 somebody on a suicide watch for 12 hours or if somebody

5 is a risk to hurting others, that you only separate

6 themselves for 12 hours so that half a day later, they

7 can hurt someone.

8 Q. In your estimation, after 12 hours, it is not that they

9 should be removed from seclusion, but that if they are

10 still suicidal, they should just remain in that clinical

11 seclusion type setting?

12 A. It means that the team, including custody staff, are

13 having input as to whether the person is stable enough

14 to be taken out and honestly, the recommendation now

15 after the last conference that I just attended last

16 week, is for people to be on watch at least for 24

17 hours.

18 Q. Not for three months?

19 A. If they need to be on for three months, they are on

20 for three months.  I even wrote on this recently.  It

21 depends on the patient's presentation.  You keep them

22 on watch for however long you can justify keeping them

23 safe.  If they are not safe, you don't remove them from

24 a watch just because there is some arbitrary time frame.

25 Q. It says here -- I am sorry.  Compliance Indicators.



1                          MR. MADDOX:  What page are you on?

2                          MR. WEIL:  I'm on 1e.

3          BY MR. WEIL:

4     Q.   It says,

5                    "The same types of restraints or seclusion

6                    room."

7          Again, I am going to excise "restraints."

8                    "The same types of seclusion room that would

9                     be appropriate for individuals treated in the

10                    community are used in the institution."

11         Do you see that?

12    A.   Yes.

13    Q.   So that would be the I-16 cell that Ms. Rusher was

14         housed in.  Is that right?

15    A.   If you are applying this, then, yes.

16    Q.   Well, should this be applied?

17    A.   They are not an accredited site.  These are guidelines,

18         they are not rules.

19    Q.   Well, the NCCHC recommends somebody who is being placed

20         in seclusion would be placed in a room that would be

21         appropriate for individuals treated in the community.

22         Right?  It is a recommendation.  Right?

23    A.   I will just say that it depends on what community

24         standard you are applying it to.  I have seen some

25         facilities that weren't equipped to keep people safe,



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      215

```
 1       either.
 2  Q.   Have you seen photos or visited the room where
 3       Ms. Rusher was housed?
 4  A.   I have not.
 5                   MR. WEIL:  I will show you a couple.
 6            (Photos were marked as Exhibits 6, 7, 8)
 7       BY MR. WEIL:
 8  Q.   I am handing you what's been marked as Exhibits 6, 7,
 9       and 8.  Do you have those in front of you?
10  A.   Yes.
11  Q.   So I'll represent to you that these were photos of
12       Ms. Rusher's cell that were taken by the Illinois State
13       Police after she was found strangled in that cell.  Is
14       that -- does that strike you as a clinically appropriate
15       setting that you would find out in the community as a
16       seclusion cell -- or seclusion room?
17  A.   This is a suicide-resistant cell.
18                   MR. WEIL:  That wasn't my
19       question.  Please answer my question.
20  A.   Yes.
21  Q.   You'd expect to see a bare concrete cell like that?
22  A.   I have seen cells just like this in state psychiatric
23       forensic units.
24  Q.   And they'd be locked?
25  A.   Yes.
```



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      216

 1  Q.  And the patient would not be allowed out of that cell
 2      for virtually an entire day.  Is that right?
 3  A.  That can be the case, yes.
 4  Q.  That is in state psychiatric facilities you said?
 5  A.  Yes.
 6  Q.  Is that common in state psychiatric facilities?
 7  A.  In my experience.  This is almost a classic textbook
 8      suicide-resistant correctional cell almost down to the
 9      T.
10  Q.  I am not asking about a correctional cell; I am asking
11      about a cell in the community.  Does that look like a
12      room in the community --
13  A.  She was not a patient in the community.
14              MR. WEIL:  Ma'am, please let me
15      finish my question.
16  Q.  Does this look like a room that we use in the community
17      for someone in clinical seclusion?
18  A.  I don't work in the community.
19  Q.  You seem to have knowledge about state hospitals.
20      Right?  Is this a room that you'd expect to see in a
21      state hospital?
22  A.  Yes.  I would not be surprised to see it.
23  Q.  And you'd expect that room to be locked at all times.
24      Is that right?
25  A.  If they are a danger to themselves or others, yes.



```
 1   Q.   You'd expect the person in the state hospital not to be

 2        allowed out of that room for most of the day.  Is that

 3        right?

 4   A.   That is possible.

 5   Q.   Is it probable?  Anything is possible.

 6   A.   Yes, it is probable.

 7                     MR. MADDOX:  We are at five hours

 8        now, Steve.  What are we doing?

 9                     MR. WEIL:  I think I can get the

10        rest of this done pretty quickly.

11             (A document was marked as Exhibit 9)

12        BY MR. WEIL:

13   Q.   I am handing you what's been marked as Exhibit 9.  This

14        is a document that we have printed off of ACH's Facebook

15        page.  Do you recognize this, for lack of a better word,

16        document?

17   A.   Yes.

18   Q.   Was this a training that ACH provided?

19   A.   This is a national presentation, yes.

20   Q.   Is Jessica Young the current president of ACH?

21   A.   Yes.

22   Q.   Who is Erin Staley?

23   A.   She is my regional mental health manager.

24   Q.   It says,

25             "Mental healthcare in jails:  Why it's
```



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      218

1              leagally (sic) required."
2       Do you see that?
3  A.   Yes.  There is a typo, but yes.
4  Q.   What is that referring to?
5  A.   It is a talk discussing the legal precedent and founda-
6       tion for why mental health services must be provided in
7       jails.
8  Q.   That is treatment.  Right?
9  A.   Everything we do, including suicide risk assessments
10      and management of patients, I guess, could fall under
11      "Treatment", but that is a title.  It's got a larger --
12 Q.   If somebody is mentally ill and they are in jail, you
13      are required not just to incapacitate them, but to treat
14      them.  Right?
15 A.   There is standards for what we do in jails, yes.
16 Q.   I don't know what that answer means.
17              MR. MADDOX:  I don't know what the
18      question was.  Required by who?
19              MR. WEIL:  By the law.
20              MR. MADDOX:  Then I object for
21      foundation.
22      BY MR. WEIL:
23 Q.   Were you involved in giving this presentation?
24 A.   I attended it.
25 Q.   Was it a PowerPoint?



MELISSA CALDWELL, M.D.                        October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                        219

1    A.   It had a PowerPoint, yes.

2    Q.   Who spoke at it?  These two people?

3    A.   Yes.

4    Q.   They explained that treating people in mental health is

5         legally required in jails?

6    A.   Yes.

7    Q.   Simply incapacitating somebody with mental health is not

8         sufficient.

9                    MR. MADDOX:  I object to the form

10        of the question.  Lack of definition.

11        BY MR. WEIL:

12   Q.   Do you understand what incapacitating someone means?

13   A.   Yes.

14   Q.   And that is not treatment.  Right?

15   A.   Correct.

16   Q.   So you have to do more than incapacitate.  You actually

17        have to provide mental healthcare for someone who needs

18        it.  Correct?

19   A.   Yes.

20             (A document was marked as Exhibit 10)

21                    MR. WEIL:  Exhibit 10 is ACH 774.

22                    MR. MADDOX: 744.

23                    MR. WEIL:  Thank you.

24        BY MR. WEIL:

25   Q.   744.  It is a GAF scale.  Right?



1  A.  Yes.

2  Q.  I am assuming you recognize this document or this form.

3      Is that right?

4  A.  Yes.

5  Q.  In your opinion, where would Ms. Rusher fall in this GAF

6      score table?

7  A.  This is a snapshot in time, so it depends on any of the

8      evaluations.  I think sometimes, she may have been in

9      the 51 to 60.  Other times, she may have been down in

10     the ten.

11 Q.  How often -- based on your review of the charting that

12     you saw, how often was Ms. Rusher in the 51 to 60 range?

13 A.  I can't speak to that.

14 Q.  Why would you say that, then?

15 A.  Because I have read the document and the reason.  She

16     may have had one day where she is kind of, stable.  You

17     know, her mood looks pretty stable.  She is generally

18     cooperative.  She denies she is suicidal.  However,

19     there is other times.  That is part and parcel for her

20     diagnosis to be very labile and unpredictable.

21 Q.  So when she is labile and unpredictable and she is at a

22     high peak of that, would that bring her up to 51 to 60?

23 A.  This is a subjective scale.  This is just one tool of

24     many that clinical professionals will use to try to get

25     an idea of how the person is doing.



1  Q.  Right.  And it is a tool you would use.  Right?

2  A.  I have used, yes.

3  Q.  Okay.  And so you are saying that she was sometimes --

4      based on your review of the records, she was sometimes a

5      51 or 60?

6  A.  I think I have seen that, yes.

7  Q.  That is based on --

8  A.  Moderate symptoms.  You know, you look at both.  You

9      look at not only these areas of function, but you look

10     at the symptom profile.  So her symptoms may not have

11     been particularly bad during that evaluation.

12 Q.  If someone is at 51 or 60, you'd expect a pretty hard

13     look at whether they should still be in solitary

14     confinement -- or the confinement that Ms. Rusher was

15     placed in.  Right?

16 A.  I think you are, kind of, trying to attach two things

17     together that I can't say yes or no to.  I think you

18     always consider where their housing is in a facility,

19     but it is not just because of this that we look at that.

20 Q.  You said other times, she was where on the GAF scale?

21 A.  Based on this record review?

22 Q.  Based on what she saw.

23 A.  She ran the full gamut between, like, 60 and down.  It

24     depended on what her mood was.

25 Q.  How often would you say she hit 60, based on those



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      222

1          evaluations?

2   A.    I can't quantify that.

3                (A document was marked as Exhibit 11)

4        BY MR. WEIL:

5   Q.    This was produced to us from ACH, an e-mail from

6        January of 2015.  It involves Grant County, Kentucky.

7        You appear to be copied or as a "To" recipient on this

8        e-mail.  Do you see that?

9   A.    Yes.

10  Q.    This e-mail discusses a DOJ letter of rejection.  Do you

11       see that in the first paragraph?

12  A.    Yes.

13  Q.    Do you know what that is referring to?

14  A.    I am guessing it is the poor audit that Grant got from

15       the Department of Justice.

16                (A document was marked as Exhibit 12)

17       BY MR. WEIL:

18  Q.    Did you ever see the audit that is being referred to?

19  A.    I have, and I think I referenced it before in terms of,

20       for example --

21                MR. MADDOX:  The answer is yes.

22  A.    Yes.

23       BY MR. WEIL:

24  Q.    Is that audit Exhibit 12 that you have just been handed,

25       that letter?



 1   A.   I am guessing so.

 2   Q.   In Exhibit 11, there is reference to a letter from DOJ.

 3        I am asking whether Exhibit 12 is that letter.

 4                  MR. MADDOX:  Object to foundation.

 5        She didn't author this e-mail.

 6                  MR. WEIL:  I understand, but she

 7        received it.

 8                  MR. MADDOX:  My objection remains

 9        the same.

10   A.   I guess that I have seen it before.  I don't know.

11   Q.   Well, do you recall there being, sort of, a dispute

12        between DOJ and Grant County about the care being

13        provided there?

14   A.   Yes.

15   Q.   Do you recall reading a DOJ letter that was sent to

16        Grant County by the DOJ?

17   A.   Say it again.

18   Q.   Were you involved in, sort of, the reaction or the

19        involvement of, sort of, the work-out of that dispute

20        between DOJ and Grant County?

21   A.   Aside from addressing a staffing question, that was my

22        role.

23   Q.   You are pointing to Exhibit 12.  Right?

24   A.   Yes.

25   Q.   What was the staffing question you were involved in



1    resolving?

2  A.  The site only wanted to have a master's level mental

3      health worker and they didn't want to hire a psychia-

4      trist.  I don't hire physicians.  However, it is a

5      mental health provider and we counseled that as under

6      DOJ, so you need to respond to it, about why we don't

7      have a psychiatrist.

8  Q.  At the time this letter came over to Grant County, you

9      were the director of mental health for ACH.  Is that

10     right?

11 A.  Yes.

12 Q.  ACH was the mental health vendor, among other services,

13     to Grant County.  Is that right?

14 A.  Yes.

15             MR. MADDOX:  Are we going to tie

16     this up to Sangamon County?  Counsel, we're not here

17     to --

18             MR. WEIL:  Why don't you just

19     let me ask some questions here, okay?

20             Turn to 427.  I will give you the full

21     Bates.  Theresa, for your benefit, the letter runs from

22     13419 to 13433.

23 Q.  I want to refer to Paragraph 10, which is Page 9 on the

24     letter and for Bates reference, it is 427.  Do you see

25     that?



```
 1  A.    (No response)

 2  Q.    Page 427.

 3               "The County has contracted with a mental

 4                health provider to provide all services for

 5                inmates' mental health treatment."

 6  Do you see that?

 7  A.    Yes.

 8  Q.    That was ACH.  Right?

 9  A.    Yes.

10  Q.            "The County will continue to ensure that the

11                mental health care provider will continue to

12                promptly perform a comprehensive mental health

13                evaluation of any inmate whose history or

14                responses to initial screening questions

15                indicate a need for such an evaluation."

16  Do you see that?

17  A.    Yes.

18  Q.            "The comprehensive mental health evaluation

19                shall include, if indicated, a recorded

20                diagnosis section conforming to generally

21                accepted professional standards."

22  Do you see that?

23  A.    Yes.

24  Q.    Here, it says, "partial compliance."  In the first

25        paragraph, read as much as you like, but I am interested
```

```
 1        in the sentence that says, "as a result."  It's the
 2        second paragraph.  I'm right here.  It says,
 3                   "As a result, the qualified mental health
 4                   professional."
 5        Do you see that?
 6   A.   Yes.
 7   Q.   It says,
 8                   "As a result, the qualified mental health
 9                   professional does not actually provide much
10                   documented testing, counseling or individu-
11                   alized treatment planning that he may
12                   be otherwise qualified to provide."
13        Do you see that?
14   A.   Yes.
15   Q.   Was one of the DOJ criticisms of the Grant County care
16        being provided there that there weren't treatment plans
17        being provided for people with serious mental illnesses?
18   A.   The crux of it was this was a psychiatrist who audited
19        who wanted a psychiatrist working in the jail.
20                       MR. WEIL:  That wasn't my
21        question.
22                       THE WITNESS:  That is the core of
23        the issue.
24        BY MR. WEIL:
25   Q.   What did the DOJ want?
```



 1                    MR. MADDOX:  Objection.  Foundation.

 2                    MR. WEIL:  She seems to understand

 3       the crux of the issue.

 4       BY MR. WEIL:

 5   Q.  Did the DOJ want a mental health provider that could

 6       provide treatment plans to inmates with serious mental

 7       health needs?

 8   A.  The auditor, in my opinion, did not understand what

 9       the --

10                    MR. WEIL:  Ma'am, I want you to

11       answer my question.

12                    MR. MADDOX:  Objection.  How do

13       you know --

14                    MR. WEIL:  She understood the

15       crux of the issue a moment ago, Matt, so she can answer

16       this question.

17                    THE WITNESS:  Can I speak to this

18       other jail?

19                    MR. MADDOX:  Hang on one second.

20                    Steve, I try to be professional and I

21       allow somebody else to make their statement.  I ask you

22       the same courtesy.  Is that unreasonable?

23                    MR. WEIL:  If you are going to

24       be coaching the witness, absolutely it is.  I am asking

25       the questions here, it is my deposition.   Okay?



1             MR. MADDOX:  And I am going to

2      make my objection, which, now, I've forgotten because

3      you got me off track.  My objection is foundation.

4      You keep asking her what the DOJ wants.  You have the

5       letter in front of you.  You can figure it out.

6             MR. WEIL:  She seems to

7      understand the crux of the DOJ's criticism and, then,

8      suddenly --

9             MR. MADDOX:  I also want to a

10     clarification, because this is not going to go on much

11     longer because this has nothing to do with the Sangamon

12     County jail.  You have not tied this up.

13             MR. WEIL:  We have a Monell

14     lawsuit against you, so it has everything to do with

15     the -- ACH knows to be the standards that the DOJ thinks

16     are constitutionally appropriate.  So it is utterly

17     relevant.  It is --

18             MR. MADDOX:  It is irrelevant.  I

19     don't agree with you there.  Go ahead and ask the

20     question.  See if she can answer.

21     BY MR. WEIL:

22  Q.  Let's turn to Page 422 real quick.  Maybe we can clear

23      this up.  Turn to 422, please.  It's Page 4 of the

24      report under "Mental Health Care."  As we have also --

25      It says --  Going on the second paragraph down on

1        "Mental Health Care."

2                    "Moreover, as we have also warned in the past,

3                    the Jail's qualified mental health profes-

4                    sional is only licensed to conduct certain

5                    tasks, such as providing some counseling and

6                    psychological assessments.  Other types of

7                    mental health care require a licensed

8                    psychiatric professional who can make

9                    appropriate judgments about medications and

10                   provide more specialized care."

11       Do you see that?

12   A.  Yes.

13   Q.  You said something about psychiatrists earlier, but was

14       one of the DOJ's criticisms of Grant County that treat-

15       ment plans for people with serious mental illness were

16       not being provided?

17   A.  I can't speak to it off the top of my recollection.

18       I can tell you there is a lot of erroneous things about

19       scope of practice and --

20                    MR. WEIL:  I am asking about the

21       DOJ's --  Ma'am, listen.

22                    MR. MADDOX:  Hold it.  She is

23       going to finish her answer or we are done.  It's your

24       choice.

25                    MR. WEIL:   Hold on just a

1    second.

2                    MR. MADDOX:  No.  Your choice

3    right now.

4                    MR. WEIL:  But I want to --

5    Hold on.  We are going long because I get filibuster

6    answers that don't really address the question I am

7    asking.

8                    MR. MADDOX:  Finish your answer.

9                    MR. WEIL:  She can finish her

10   answer, but we are sitting here because I am getting a

11   lot of non-answers to questions and they go on for quite

12   a long time.  I don't like being here.

13                   Go ahead.

14   BY MR. WEIL:

15   Q.  Ma'am --

16                   MR. WEIL:  Would the court

17   reporter, please, read back the question?

18           (Question read)

19                   MR. MADDOX:  Can you answer that

20   question?

21   A.  Without reading this and renewing my recollection, I

22   cannot speak to that.  My --

23   Q.  You seem to have a very good understanding --

24                   MR. MADDOX:  Let her finish.

25   A.  My recollection is that there were erroneous pieces



```
 1        as to what professional scope of practice was for the
 2        master's level professional, what are our role and
 3        autonomy was in being able to decide what staffing
 4        could be provided outside of the contract.
 5        Additionally, this is a psychiatrist auditing for DOJ
 6        who was very idiosyncratic and felt that unless there
 7        was a psychiatrist on staff, that there was not adequate
 8        psychiatric care; thus, a physician was not able to
 9        provide mental healthcare, which is erroneous.  That is
10        my independent recollection of this case.
11                    MR. MADDOX:  We are into the sixth
12        hour of this deposition.  Are you wrapping up?
13                    MR. WEIL:  I have gotten filibuster
14        answers to a bunch of questions.
15                    MR. MADDOX:   Are you wrapping up?
16        This is the last --
17                    MR. WEIL:  No, we are not.  It's
18        just complete non-answers to questions, including that
19        one, so I am trying to clean this up with some nice yes-
20        or-no --
21                    MR. MADDOX:  If you love yes-or-
22        no answers, you should ask questions that actually call
23        for them.  So move on.
24        BY MR. WEIL:
25   Q.   I think you said a moment ago, there was a criticism by
```



1      the DOJ about the level of practitioner that was at

2      Grant County jail?

3  A.  Yes.

4  Q.  And that the DOJ, if I am paraphrasing you correctly,

5      felt a higher level practitioner such as a psychiatrist

6      should be at the jail.  Is that right?

7  A.  A different level of professional.  I wouldn't say

8      "Higher level."

9  Q.  Point well taken.  A different level professional.  Is

10     my understanding, from what I read in the letter, the

11     DOJ's criticism was that there was access to psychiatry

12     services, but that was through off-site consultation

13     with a psychiatrist.  Is that right?

14 A.  That was one criticism, yes.

15 Q.  The DOJ felt that -- or stated in the letter and in

16     their criticism of Grant County that those psychiatric

17     services shouldn't be provided off site.  Is that right?

18 A.  Not that they shouldn't.  They wanted to have a psychia-

19     trist on site.  We were not contracted or paid for that

20     level of service.  In fact, Grant County reduced our

21     mental health services rather than increasing them or

22     changing them.  You asked about contracts where we were

23     not a good fit.  This is one of them, sir.

24                 MR. WEIL:  Do you understand why

25     I have trouble getting short answers here?



1          MR. MADDOX:  Do you know what?

2     Are we done with Grant County?

3          MR. WEIL:  No.

4          MR. MADDOX:  Then we are done.

5     You can take it up with the judge.  If you want to

6     resume this for Grant County, that is fine, but --

7          MR. WEIL:  Sir, this goes to a

8     Monell claim against your client.

9          MR. MADDOX:  I'll tell you what.

10    How about you take about 15 more minutes and --

11         MR. WEIL:  No.  I am allowed to

12    do seven hours here.  We haven't been kicked out of this

13    room.  That was the only reason we had a five-hour clock

14    on this thing.

15         THE WITNESS:  I need to arrange for

16    my child to get picked up.

17         MR. WEIL:  How much time do you

18    need?

19         THE WITNESS:  He was supposed to be

20    picked up five minutes ago.

21         MR. WEIL:  Make the arrangement.

22         (Discussion off the record)

23    BY MR. WEIL:

24 Q.  If you go to the e-mail that we looked at, we talked

25    about who Deborah Ash is.  Who is Karen Stocke?  She's



1        passed, I understand, but who was she?

2   A.   She had various roles.  I can't tell you all the titles.

3        She was VP of contract initiation, I think.

4   Q.   Sarah Gish?

5   A.   Sarah Gish was a regional nurse manager.

6   Q.   Jennifer Witherspoon?

7   A.   A director of medical operations.  Titles may have

8        changed.

9   Q.   That is for ACH overall?

10  A.   Yes.  No, for Southern.

11  Q.   Sherri Miller?

12  A.   She was our president and COO.

13  Q.   John Masella?

14  A.   Program consultant.

15  Q.   For Grant County specifically?

16  A.   Sorry.  He was also the director of the program

17       consultants.

18  Q.   Dr. Johnson.  You might not be able to do that one.

19       Try it.

20  A.   Dr. Johnson?

21  Q.   Yes.

22  A.   He was one of our company founders.

23  Q.   So he was upper level management?

24  A.   At that time, yes.

25  Q.   Mike Moriarity?



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                              235

1    A.   He was an accountant.

2    Q.   Jason Kolberg?

3    A.   An attorney.

4    Q.   In-house?

5    A.   Yes.

6    Q.   Reindollar?

7    A.   Carrie Hart Reindollar, she's had various roles,

8         but more currently, she works separately for EMR.

9    Q.   Celeste Keifner?

10   A.   A nurse.

11   Q.   Gregory Rakestraw?

12   A.   Medical director.

13   Q.   Medical director of what?

14   A.   The company.

15   Q.   Equivalent to your position, but medical, in general?

16   A.   Yes.

17   Q.   Angela Moriarity?

18   A.   Human resources.

19   Q.   So a lot of these folks were in management, fair to say,

20        at ACH?

21   A.   At various levels.  Some, not.

22   Q.   I want to go to the top of 11 on the DOJ letter that

23        is 429.

24   A.   Of 11?

25   Q.   Page 11 of the DOJ letter.



 1  A.   So Exhibit 12?

 2  Q.   Yes.  The very top, it says,

 3              "In some situations, a physician might decide

 4              to transfer a patient with severe mental

 5              health issues to a mental hospital.  The

 6              Jail's mental health professional cannot

 7              handle these types of treatment matters

 8              entirely on his own.  He needs to have regular

 9              and documented consultation and direction from

10          a higher level practitioner."

11       Do you see that?

12  A.   Yes.

13  Q.   In, sort of, discussing this with the jail and whatnot,

14       you understood that to mean --

15  A.   It is erroneous.

16              MR. MADDOX:  Let him finish his

17       question, please.

18              THE WITNESS:  Sorry.

19              MR. WEIL:  How am I supposed to

20       get --

21              THE WITNESS:  That was me.  I

22       apologize.

23              MR. MADDOX:  Let him finish his

24       question.

25       BY MR. WEIL:



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          237

1    Q.  This is referring to consultation with a psychiatrist,
2        from what you understand of the DOJ's criticism.  Is
3        that right?
4    A.  I don't know -- I can't tell you who they are saying is
5        a psychiatrist.  They say from a higher level practi-
6        tioner.
7    Q.  But you were involved in the whole shake-out of this.
8        There were discussions.  I mean, there wasn't simply
9        this letter.  I am asking to understand what the DOJ's
10       criticism was here.
11   A.  I would say it is fair to say that they were including a
12       psychiatrist in that.
13   Q.  And if you go down to the footnote, it says,
14               "The medical provider reportedly has a
15                psychiatrist on-staff, but there is no
16                documentation that he has ever been consulted
17                about a patient at the Jail."
18       Do you see that?
19   A.  Where is that?
20   Q.  Footnote 4.  So are those types of consultations docu-
21       mented by ACH?
22   A.  If we have a psychiatric consult, yes.
23   Q.  I am returning to Sangamon real quick.  There is no
24       psychiatrist on staff, but you offer, essentially, a
25       psychiatrist on the phone.  I am not trying to put words



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                              238

1    in your mouth.  Mickey Shmikler could have called up a

2    psychiatrist at ACH?

3  A.  He could have called and said, "I need a psychiatric

4    consultation."  That could have been done off site or,

5    in those days, we had Dr. Montesdeoca (phonetic) who did

6    some consultation stuff.

7  Q.  There were psychiatrists, not on site, but available

8    via contact by phone or e-mail or something like that.

9  A.  If a physician, for example, needed to consult and

10   wanted to confirm their medical approach, they have

11   consult with any specialty, as an example.

12 Q.  The DOJ's criticism was that person wasn't on site.

13   Correct?

14 A.  If they wanted it on site.

15 Q.  It appears to be in Footnote 4 here, they're saying

16   that there is very little record of these consultations

17   actually occurring.  Is that right?

18 A.  I am not sure where this comes from.

19              MR. MADDOX:  He just asked you if

20   that is what it says.  It says that or no, it does not.

21 A.  Yes, that is correct; there is very little documenta-

22   tion.

23 Q.  Again, I may have asked this question.  Are you aware

24   of Mr. Shmikler or Arun Abraham ever contacting a

25   psychiatrist about Tiffany Rusher?



MELISSA CALDWELL, M.D.                        October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          239

 1  A.  No.

 2  Q.  Are you aware of frequent or, at all, contacts outside

 3      of Sangamon County jail by Mr. Shmikler or Arun Abraham?

 4  A.  Say that again.  Frequent?

 5  Q.  At all.  Are you aware of consultations outside of the

 6      jail to the psychiatrists by folks at the jail, by Arun

 7      Abraham or Mickey Shmikler?

 8  A.  Not specifically by those two, no.

 9  Q.  I want to go to the next paragraph, Page 11.  Let me

10      back up to Page 10 real quickly.  I am right here at

11      "As a result" on Page 10.  It says,

12              "As a result, the qualified mental health

13              professional does not actually provide much

14              documented testing, counseling, or individ-

15              ualized treatment planning that he may other-

16              wise be qualified to provide."

17      Do you see that?

18  A.  Yes.

19  Q.  And so the DOJ is criticizing the mental health

20      professional at Grant County for not providing, among

21      other things, individualized treatment planning.

22      Right?

23  A.  No, it's because we had a decrease in hours, so we are

24      doing less.

25  Q.  I am trying to understand what the DOJ is criticizing.



1   A.   That is what it says.  "This is a decrease of four

2        hours" from similar coverage as a result.  So my

3        interpretation is that we do less because we have less

4        hours.

5                     MR. WEIL:  I am just --  Please

6        answer the question.  I am trying to get this done here.

7        I am trying to get you out of here.

8   Q.   One of the criticisms they had, whatever preceded the

9        reason, was that the mental health professional wasn't

10       doing treatment plans.

11  A.   No.

12  Q.   That is not what is being said here?

13  A.   No.

14  Q.           "The qualified mental health professional

15                does not actually provide much documented

16                testing, counseling, or individualized

17                treatment planning."

18       That is the sentence I am reading.  That seems, to me,

19       to be a criticism that the mental health professional,

20       among other things, isn't doing much individualized

21       treatment planning.  Is that right?  Is that one of the

22       DOJ's criticisms?

23  A.   Can you read the line before plus that?  It is that we

24       are not doing as much because we had a decrease of four

25       hours.



```
 1   Q.   I am not --

 2   A.   You said we are not doing treatment planning.  I won't

 3        agree to that.  It says we are not doing as much because

 4        we have less hours.  I'd agree with that.  When you have

 5        less staffing, you do less.

 6   Q.   So one of the criticisms was that the mental health

 7        professional at Grant County wasn't doing enough

 8        individualized treatment planning of inmates.

 9   A.   "Enough" is not the word and I won't agree with that.

10        It is not saying "enough", either.  It is saying,

11        "Does not actually provide much."  I think it could be

12        interpreting that.

13   Q.   The second line, the next line is,

14                    "Moreover, no meaningful clinical supervision

15                    exists for his work at the Jail."

16        And by "clinical", it says,

17                    "(Physician, psychiatrist, or psychologist)."

18        Do you see that?

19   A.   Yes.

20   Q.   This seems to be a criticism that someone at that level,

21        essentially, a doctor level isn't supervising the

22        clinical work of the qualified mental health profes-

23        sional.

24   A.   It is erroneous.  I was the supervisor.

25                    MR. MADDOX:  But that is what it
```



1      is saying.

2   A.   Yes.

3        BY MR. WEIL:

4   Q.   This was a DOJ criticism.  Right?

5   A.   Yes.

6   Q.   I want to turn you to Page 11 now.  It says,

7             "Technically, the Jail physician could help

8             fill the clinical gap" --

9        It is referring to the previous paragraphs that we

10       discussed.

11            -- "but that is not happening.  The Jail

12            physician does write some medication orders

13            for prisoners with mental health conditions.

14            However, what mental health care that he does

15            provide is very sporadic and limited.  He does

16            not participate in any type of comprehensive

17            or multi-disciplinary treatment planning."

18       Do you see that?

19  A.   Yes.

20  Q.   Was one of the DOJ's criticisms that the MD on site at

21       Grant County wasn't involved in a treatment planning for

22       mentally ill inmates?

23  A.   Based on that, yes.

24  Q.   Is that your recollection of what the DOJ was criti-

25       cizing at that time, given your involvement in this

1       episode?

2   A.  I told you my recollection, sir.  It was what I

3       summarized.

4   Q.  I'm asking you --

5   A.  I am reading this with you right now, so I am not

6       recollecting it.  I'm reading it.

7   Q.  You are not recollecting anything else beyond your

8       summary?  You don't have recollection of anything else?

9   A.  That is my independent recollection of it.

10                  MR. MADDOX:  She said she doesn't

11      have a recollection of what you recited.  You got your

12      answer.

13      BY MR. WEIL:

14  Q.  Going back to the e-mail, Exhibit 11, would all the

15      people on that e-mail -- was this document, this DOJ

16      letter, was this forwarded to the ACH management?

17  A.  Yes, I believe so.

18  Q.  Was one of the DOJ's criticisms at Grant County --

19      the Grant County dispute that the jail physician had no

20      meaningful role in the suicide assessment and monitoring

21      process for mentally ill detainees?

22  A.  Without reading this, I couldn't say yes or no.

23  Q.  You don't recall?

24  A.  No.

25  Q.  What was your role in responding to the DOJ's criticisms



1           of Grant County?  Did you have any role at all?

2   A.   I had a role.  I had a role in terms of what I recall

3        regarding the staffing or specific professional, and

4        this was five years ago.  I am sorry, sir.  I don't have

5        independent recollection.  I wasn't prepared to discuss

6        this.

7   Q.   Did ACH change any of its operations in light of the DOJ

8        criticisms of Grant County that you see in this letter

9        regarding mental health?

10  A.   Not that I am aware of.

11  Q.   Was there any discussion within ACH that you took part

12       in about changing the way ACH provided mental healthcare

13       in light of the DOJ's criticisms of Grant County?

14  A.   No.

15  Q.   Down on the last paragraph of Page 11 of Exhibit 12,

16       on 429, "if staff decides."  Do you see that?

17  A.   Yes.

18  Q.           "If staff decides that a prisoner may be a

19                suicide or mental health risk, they routinely

20                place such prisoners in 23 per hour day

21                isolation or restraints.  Prisoners on mental

22                health observation are treated like

23                individuals who are being punished for

24                breaking the rules, rather than as patients

25                who require a healthy therapeutic environ-



1                             ment."

2           Do you see that?

3    A.     Yes.

4    Q.     So was the -- were the conditions --  Are you familiar

5           with these conditions that they are referring to at

6           Grant County jail?

7    A.     Yes.

8    Q.     Were those conditions different than the conditions that

9           Ms. Rusher was subject to at Sangamon County jail?

10   A.     Yes.

11   Q.     How so?

12   A.     My recollection is that the cells were in a bit more

13          disrepair.  That is my recollection.  That was many,

14          many years ago.

15   Q.     Anything else?

16   A.     I think it is discussed here.

17   Q.     Anything else?

18   A.     No.  By "staff" --  Well, I won't answer.

19   Q.     Take a moment to read that paragraph that goes on to

20           the next page.  Was the DOJ's criticism that --

21          It says at -- the first full paragraph, it says,

22                  "Such harsh treatment of prisoners with mental

23                  illness is often counter-productive."

24          Do you see that?

25   A.     Yes.



MELISSA CALDWELL, M.D.                                October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                   246

1    Q.   Was the DOJ's criticism that the treatment that is

2         talked about with suicide watch or mental health

3         watch at Grant County jail was harsh and counter-

4         productive?

5    A.   Not the treatment, but by healthcare providers, the

6         treatment by custody.  That is the staff they were

7         alluding to.

8    Q.   So their opinion was that --  Did ACH have a clinical

9         role in deciding whether to place inmates who were a

10        suicide risk in isolation at Grant County?

11   A.   We have the responsibility to recommend whether someone

12        be placed on a suicide watch, continue on a suicide

13        watch or be removed off of suicide watch.  Housing and

14        property is a custody function.

15   Q.   Would that have been done through something similar to

16        that form that we reviewed earlier, the form you said

17         Mickey Shmikler recorded his treatment plan on?

18   A.   I believe so, yes.

19   Q.   Did you have any involvement in the decision to fire

20        Mickey Shmikler?

21   A.   Yes.

22   Q.   Did you make the decision to fire him?

23   A.   It was a joint decision.

24   Q.   Did you ever talk to Mickey Shmikler about Tiffany

25        Rusher?



```
 1   A.   No.
 2   Q.   Has ACH ever taken any kind of -- setting aside --
 3        I won't --  Has ACH ever taken any kind of review of its
 4        practices in light of Ms. Rusher's death, that you are
 5        aware of?
 6   A.   Whenever we have a negative patient outcome, we review
 7        the chart, we review practices.  It is a routine
 8        process.
 9   Q.   Are any documents generated as a result of that review?
10   A.   With our legal counsel, we will have some notation.
11   Q.   What is the purpose of the review?
12   A.   It is educational, it is to improve patient care, if
13        possible.
14   Q.   So that is part of the work you are doing with legal; to
15        improve patient care, the documents you are sharing with
16        legal?
17   A.   Yes.
18   Q.   What form does it take?  Is it a memo?  What is it?
19   A.   (No response)
20   Q.   You are saying you reviewed documents and there is --
21                     MR. MADDOX:  Is this a generalized
22        question?
23        BY MR. WEIL:
24   Q.   I am referring to Ms. Rusher's death.  You referred to
25        a general policy.  When there is a negative outcome --
```



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          248

1      this is a pretty severe negative outcome -- there is a

2      review conducted.  Right?

3  A.  I routinely review completed suicides.

4  Q.  That review involves going through the medical records

5      that pertain to Ms. Rusher.  Right?

6  A.  Correct.

7  Q.  What I was asking, is there any documents generated on

8      the review?  I understand you get a stack of documents,

9       but does anything get generated by that review?

10 A.  Generally, a notation as to whether there is any

11     concerns.

12 Q.  Is it, like, a memo or --

13 A.  I don't usually use the word "memo", but it's a very

14     brief notation to our legal as to whether there is

15     concerns.  If there are any concerns, my process is to

16     go back to those professionals to make any necessary

17     corrections.

18 Q.  Do you do that -- -

19 A.  In this case, it was a termination.

20 Q.  Do you do that via any written documents going back

21     to the professionals at all?

22 A.  To the professionals?

23 Q.  Yes.

24 A.  Performance reviews can be involved.  Professional

25     conferences as to areas that they need to improve or,



1      in some cases, if it is a termination, a summary of why.

2  Q.  In Mr. Shmikler's termination, I understand the testi-

3      mony of Lidia Hicks was that it was because of the

4      documentation problem, not necessarily because of

5      Ms. Rusher's suicide.  Is that right?

6  A.  Correct.

7  Q.  So, in a sense, it was coincidental.  It was discovered

8      that he had a big stack of uncharted documents or docu-

9      ments at home that he shouldn't have?

10 A.  Correct.  He was not complete in his documentation.

11 Q.  Was there any review of -- or assessment of how it was

12     that --  Well, we discussed this earlier, but was

13     there an assessment how it was that this problem with

14     Mr. Shmikler went undetected for so long?

15 A.  We talked with him.  I think he was pretty forthcoming,

16     he was embarrassed, he was apologetic.  But in terms of

17     peer reviews, peer reviews are intended to capture the

18     quality of the documentation that comes from the

19     clinical work.  His documentation was good.

20 Q.  The documentation you saw.

21 A.  That we saw, it was consistently good.  He took steps,

22     sadly, to, kind of, I would say take his documentation

23     home, which is something that we expressly disapprove

24     of.  I can only conjecture it was because he didn't

25     want us to discover that he was that far behind.



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      250

```
 1   Q.   Was there any assessment of maybe we should do these
 2        random documentation reviews we discussed earlier
 3        differently?
 4   A.   Was there discussion about that?
 5   Q.   Yes.
 6   A.   There was discussion about ways to best identify if
 7        somebody is not completing the documentation and one
 8        of those is making sure that we enforce that the nurse
 9        manager is the one picking for the mental health worker,
10        that they are not allowed to pick it for the nurse.
11   Q.   Beyond Mr. Shmikler and his failure to document or that
12        problem we have discussed, do you think anything was
13        done wrong by ACH in regard to Ms. Rusher's care?
14   A.   No.
15   Q.   Is there anything you think should have been done
16        differently?
17   A.   No.
18   Q.   How about the jail?
19   A.   You are asking a Monday morning quarterback.  It's not
20        fair to do that.  I don't believe they did anything
21        wrong.  It's a sad case, I am sorry.
22   Q.   Do you think, at any point, a psychiatrist should have
23        been consulted in connection with Ms. Rusher's treatment
24        while she was at Sangamon County jail?
25   A.   Not in her case, no.
```



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      251

```
 1   Q.   Why not?
 2   A.   She was afforded, I would say, appropriate defensible
 3        medical treatment.  Her medications were appropriate.
 4        That is not the reason why she harmed herself.
 5   Q.   Do you think a psychiatrist should have been determining
 6        whether her medications were appropriate?
 7   A.   She had continuity of care.  Her medications originated
 8        from a psychiatrist.
 9   Q.   And didn't need to be reassessed during her incarcera-
10        tion at Sangamon County jail?
11   A.   That would be up to whether it was beyond the scope
12        and competence of the physician and I can't speak for
13        Dr. Abraham, but I believe it was well within his means
14        to care for her medically.
15   Q.   Do you think it would have been important to have a
16        diagnosis of Ms. Rusher's condition from a mental health
17        perspective after she arrived at Sangamon County jail?
18   A.   Do I think what?
19   Q.   It would have been important, at some point after
20        Ms. Rusher was referred -- or arrived at Sangamon County
21        jail, to receive a diagnosis of her mental condition?
22   A.   If there wasn't a clearly documented diagnosis and it
23        wasn't confirmed, then yes, that's when we would do it.
24   Q.   Who would perform such a diagnosis?
25   A.   He was qualified to do it.
```



```
 1   Q.   Who is "he"?

 2   A.   Mr. Shmikler as well as Dr. Abraham.

 3                    MR. WEIL:  Thank you for your

 4        time.  I have nothing further.

 5                    MR. MADDOX:  Theresa, do you have

 6        any questions?

 7                    MS. POWELL:  No questions.  I

 8        won't ask any at this time.

 9                    MR. MADDOX:  No questions.  We

10        will reserve.

11        (WHEREUPON, THE DEPOSITION WAS CONCLUDED AT 3:45 P.M.)

12                    (Witness excused)

13

14

15

16

17

18

19

20

21

22

23

24

25
```



MELISSA CALDWELL, M.D.                                    October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                                      253

```
1              C E R T I F I C A T E

2              I, SUSAN K. TAYLOR, Shorthand Reporter

3    and Notary Public in and for the State of Wisconsin, do

4    hereby certify that there came before me the foregoing

5    named deponent at the date, time, and place set forth,

6    who was duly sworn and testified; that I took down in

7    shorthand, correctly, the proceedings and have caused

8    the same to be transcribed into typewriting; that the

9    foregoing pages constitute a true and correct transcript

10   of all of the proceedings had on the taking of said

11   deposition.

12       I further certify that I am not related in any way

13   to any party, their attorneys, or an employee of any of

14   them, and that I am not financially interested in the

15   action.

16              IN WITNESS WHEREOF, I have hereunto set my

17   hand and sealed this            day of            2019

18

19

20                              _____

21                              SUSAN K. TAYLOR
                                Court Reporter
22   My commission expires:
     January 15, 2021
23

24

25
```

1    DEPOSITION ERRATA SHEET

2

3

4        DECLARATION UNDER PENALTY OF PERJURY

5            I declare under penalty of perjury

6        that I have read the entire transcript of

7        my deposition taken in the captioned matter

8        or the same has been read to me, and

9        the same is true and accurate, save and

10       except for changes and/or corrections, if

11       any, as indicated by me on the DEPOSITION

12       ERRATA SHEET hereof, with the understanding

13       that I offer these changes as if still under

14       oath.

15           Signed on the _____ day of

16       _____, 20____.

17

18       _____

19               Witness Name

20

21

22

23

24

25



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                          255

```
 1        DEPOSITION ERRATA SHEET

 2     Page No._____Line No._____Change to:_____

 3     _____

 4     Reason for change:_____

 5     Page No._____Line No._____Change to:_____

 6     _____

 7     Reason for change:_____

 8     Page No._____Line No._____Change to:_____

 9     _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23

24     SIGNATURE:_____DATE:_____

25              Witness Name
```



MELISSA CALDWELL, M.D.                          October 21, 2019
KELLI ANDREWS vs SANGAMON COUNTY                        256

```
1              DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25             Witness Name
```

