E-FILED
Saturday, 20 March, 2021  12:04:22 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| KELLI ANDREWS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18 C 1100 |
| | ) | |
| v. | ) | Hon. Sue Myerscough, Judge |
| | ) | |
| COUNTY OF SANGAMON, *et al.*, | ) | Hon. Tom Schanzle-Haskins, |
| | ) | Magistrate Judge |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S MOTION TO EXCLUDE CERTAIN DEFENSE
EXPERT TESTIMONY AND MEMORANDUM IN SUPPORT**

Plaintiff, through her undersigned counsel, respectfully submits this motion to exclude and limit expert testimony offered by the defendants and memorandum in support.  In support of her motion Plaintiff states:

**INTRODUCTION**

This case involves Tiffany Rusher's incarceration and eventual suicide at the Sangamon County Jail.  In December 2016 Ms. Rusher was brought to the Jail after being arrested at the McFarland state mental hospital, where she was a patient.  Ms. Rusher was seriously mentally ill, and she presented an acute risk of suicide.  Instead of providing her with mental health care indicated for her serious mental illness, however, the defendants in this case put her in what the Jail's own policies referred to as an "isolation" cell, where they kept her for 24 hours per day. Every few days she was let out of her cell for a shower around midnight, at which time the Jail would allow her to make phone calls.  Besides that, the only times she got out of her cell were for *ad hoc* medical appointments, many of which came about only when she engaged in self-harm or made suicide attempts.  And instead of treating her mental illness, the defendants had a

social worker monitor her solitary confinement.  After three months she strangled herself when she was allowed to use a towel unmonitored and tied a strip around her neck.

Among other things, Plaintiff charges that in subjecting Ms. Rusher to long-term isolation and failing to provide her with mental health treatment, the defendants subjected Ms. Rusher to anguishing conditions that caused her to mentally decompensate, and made it more likely that she would try to kill herself.  Plaintiff has supported her claims with the opinions of expert witnesses.  Among other things, those witnesses have opined that:

- Extended isolation like that to which Ms. Rusher was subjected is psychologically devastating to persons with mental illness like Ms. Rusher.

- Ms. Rusher should have only been place in isolation for a few hours or a few days at most, and if her suicidality had not resolved she should have been moved to receive hospital-level mental healthcare.

- Placing Ms. Rusher in extended isolation increased the risk that she would attempt to harm herself.

Plaintiff's experts grounded each of these opinions not just on their own expertise and experience, but also in the consensus opinion in both medicine and correctional administration concerning the use of isolation for persons who are mentally ill and in suicidal crisis.  That consensus, which is reflected in medical journals and the country's leading correctional administration standards, is that suicidal inmates should be confined in isolation for a few days at most, and that thereafter an inmate who remains suicidal must be provided with a higher level of mental healthcare that provides treatment to resolve the crisis they are experiencing.  These standards were not implemented for their own sake.  Rather, they represent the consensus amongst experts in both corrections and medicine about how to respond to inmates who are suicidal or otherwise in crisis in a correctional or carceral setting.

 Defendants have retained multiple experts, each of whom opines that defendants' confinement and treatment of Ms. Rusher was appropriate.  But those opinions are based on

nothing more than the experts' declaration that the actions taken in this case were appropriate. Defendants' experts cite no standard upon which they assessed defendants' conduct, they articulate no methodology they used to reach their opinion, and they offer no mechanism by which their opinions could be applied outside of the case at hand. At bottom, the opinions are simply an attempt to present defendants' closing argument dressed up as expert opinion.  With no support in fields of either medicine or correctional administration, these experts resort to opinions that are largely unsupported by the record, amount to *ipse dixit*, would rewrite the laws governing the defendants' conduct, or which fall outside the expert's area of expertise.  As Plaintiff explains below, these opinions do not meet the requirements for admissibility under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). They should be excluded.

## DISCUSSION

Due to the difficulty of evaluating their testimony, "'[e]xpert evidence can be both powerful and quite misleading . . . .'" *United States v. Ozuna*, 561 F.3d 728, 736 (7th Cir. 2009) (quoting *Daubert*, 509 U.S. at 595).  Accordingly, to ensure that cases are tried fairly, efficiently, and on their merits, trial courts must weed out inadmissible opinion testimony by proffered experts, to ensure that expert testimony is not only relevant, but reliable.  *Id.*  Trial courts perform this gatekeeping function pursuant Federal Rule of Evidence 702.  Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:  (a) the expert's . . . knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 593-94.

While the reports of the defendants' experts are plagued with multiple admissibility problems that Plaintiff discusses herein, two stand out. ***First***, the defendants' experts almost uniformly fail to tie their opinions to any objective standard or methodology, and instead offer sweeping opinions based on their say-so. ***Second***, the defendants' experts offer multiple opinions that are premised on an incorrect understanding of the law, declaring, in essence, that jails are entitled to isolate mentally ill people instead of treating them. Plaintiff briefly reviews the law governing these two issues. They are both fatal flaws for an expert report, and Rule 702 bars their admission at trial.

**Expert opinions based on *ipse dixt*.** Rule 702 requires that "the expert is using a valid methodology (scientific or otherwise), that there is sufficient data to justify the use of the methodology in the particular case, and that the expert applied the methodology appropriately." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). This methodological requirement is not relaxed when an expert testifies based on their experience. To the contrary, "[i]f the [expert] witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory comm. note to the 2000 amendments (quotation omitted). Thus, "[e]xpert testimony that is more technical than scientific is governed by the same criteria as the admission of scientific expert testimony." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001) (citation omitted). While "an expert might draw a conclusion from a set of observations based on extensive and specialized experience," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,

156 (1999), the "expert's work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). (citations omitted).  As one district court recently put in excluding a police-practices expert, "[a]lthough [the expert] is unquestionably qualified to offer opinions about police practices, he gives little more than his subjective impressions as to the CPD's policies in this first opinion." *Hudson v. City of Chicago*, No. 16-cv-4452, 2021 WL 1020990, at *3 (N.D. Ill. Mar. 17, 2021).  "Instead of identifying the generally accepted police practices standards and then explaining how the CPD's policies are reasonable under these standards," *Hudson* explained, the expert "jumps to the conclusion that they are reasonable. There is no dispute that expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful, but [the expert] fails to make a connection between the applicable professional standards and the CPD's policies and investigations." *Id.* (quotation omitted).

The information explaining the expert's methodology, in turn, must be contained in the expert's report.  *See* Fed. R. Civ. P. 26 advisory comm. note to the 1993 amendments (stating that Rule 26(a)(2) expert reports must be "detailed and complete," and not "sketchy and vague"); *Jenkins v. Bartlett*, 487 F.3d 482, 487 (7th Cir. 2007) ("The purpose of the report is to set forth the substance of the direct examination." (internal quotation marks and citation omitted)).  In other words, "Expert reports" themselves "must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998)  If they lack this information the expert's opinion is not reliable and must be excluded.  *Cf. Potts v. Manos*, No. 11-cv-3952, 2017 WL 4365948, at *5 (N.D. Ill. Sept. 29, 2017) (excluding correctional expert opinion because the

expert "did not adequately explain how he reached his conclusions that particular policies and actions of [the jail] were reasonable and not excessive, other than to cite his experience.").

**Expert opinions based on an incorrect legal premise.**  An expert opinion premised on incorrect legal standards is inadmissible under Rule 702, because it is of no use to the jury in assessing the facts of the case and will only result in confusion.  *See, e.g., George v. Kraft Foods Glob., Inc.*, 800 F. Supp. 2d 928, 932 (N.D. Ill. 2011) (excluding expert testimony regarding the "proper fiduciary standard" as irrelevant and inadmissible under Rule 702 because it "based on an impermissible redefinition" of a fiduciary's legal obligations).  Such opinions are excluded because expert "[t]estimony based on an incorrect legal standard may confuse the jury . . . .  Part of the Court's gatekeeping function is to exclude largely irrelevant evidence." *Noskowiak v. Bobst SA*, No. 04-cv-0642, 2005 WL 2146073, at *5 (E.D. Wis. Sept. 2, 2005).  *Accord U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 737, 744 (N.D. Ill. 2009) (excluding expert testimony that relied on an incorrect legal standard to calculate damages); *Olin Corp. v. Lamorak Ins. Co.*, No. 84-cv-1968, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 17, 2018) ("Expert testimony . . . should be excluded when it applies the wrong legal standard"); *Martinez v. Porta*, 601 F. Supp. 2d 865, 866 (N.D. Tex. 2009) ("[A]n [expert] opinion cannot be based on an erroneous legal premise.").

\*       \*       \*

The defendants acted in defiance of both established standards and established law, and they have offered expert opinions that would negate the existence of both.  But that is not permissible.  Rule 702 does not permit the introduction of *ipse dixit* masquerading as science, nor does it allow experts to offer opinions that are premised on incorrect legal standards.  The Court should exclude the defendants' expert opinions as set forth herein.

6

### 1.  Multiple opinions offered by Dr. Michael Jarvis should be excluded.

The County defendants offer Dr. Michael Jarvis to offer a variety of opinions in this case. (**Ex.** 1 (Jarvis Rpt.).)  Dr. Jarvis is a professor of psychiatry at Washington University in St. Louis and practices at the university's hospital.  While Dr. Jarvis practices as a psychiatrist, he testified that he had never worked at a jail or prison and never provided care to anyone subject to prolonged isolation like Ms. Rusher.  (**Ex.** 2 (Jarvis Dep.) at 35:12-20.)  He also testified that at some point he had read about the effects of prolonged isolation on persons with mental illness, but he did not read any such literature in preparing his report, he could not identify a single piece of informative or authoritative literature on the topic, and could not say whether or not he had read any literature regarding the effect of isolation on persons with mental illness in the last 20 years.  (Jarvis Dep. at 49:1-50:12; 54:1-20.)  Nevertheless, Dr. Jarvis has offered wide-ranging opinions going to virtually every aspect of the case.

***Dr. Jarvis's opinions regarding jail amenities are unreliable***.  Dr. Jarvis's opinions are offered in a continuous narrative and are therefore hard to parse.  All the same, multiple "opinions" offered in this narrative fall demonstrably short of Rule 702.  Dr. Jarvis offers the opinion that "[i]t was reasonable to house Ms. Rusher alone," suggesting that her months of extended isolation were entirely appropriate.  (Jarvis Rpt. at 3.)  This opinion is entirely lacking in foundation.  Dr. Jarvis suggests that Ms. Rusher's extended isolation simply flowed from the fact that she was a jail inmate, claiming she was confined to her "isolation" cell was because "she was an inmate at [the Sangamon County Jail]," and that "Ms. Rusher's restrictions at SCJ were consistent with typical jail amenities." (Jarvis Rpt. at 4, 5.)  Dr. Jarvis does not explain the basis for these opinions.  And in fact they are contradicted by the record.  All detainees at the Jail, even those subject to maximum security, were allowed to go in and out of their cells freely

for much of the day.  (**Ex.** 3 Ealey Dep. at 53:14-56:16.)  Even detainees on disciplinary

segregation were allowed out of their cells at least one hour per day.  (*Id.* at 56:17-57:6.)  Dr.

Jarvis not only lacks the qualification to opine that Ms. Rusher's 24-hour isolation was typical of

confinement at the Jail, his opinions amount to off-the-cuff remarks that are flatly contradicted

by the record.

*Dr. Jarvis's opinions about the level of care offered to jail detainees are unfounded*.

Dr. Jarvis offers the opinion that "It is not reasonable to expect a jail and a hospital to have

similar amenities." (Jarvis Rpt. at 5.)  Once again, Dr. Jarvis not only lacks qualification to offer

such an opinion (he has never worked in a correctional setting); the opinion is offered as a

bottom-line declaration that is entirely unsupported by any explanation.  The opinion, moreover,

is premised on an incorrect understanding of the law.  It presumes that because they are

correctional facilities, jails are entitled to ignore, or not provide indicated treatment for, certain

serious medical needs.  That understanding of the law is flatly incorrect, as Plaintiff explains

regarding similar opinions by Dr. Amy Trivette and LCSW Michelle James, *infra* at 16.  As such

it is inadmissible, because it will not assist the jury in understanding the case, particularly the

legal standard by which they are to weigh the evidence in the case.  *Id.*

*Dr. Jarvis's opinion that it was reasonable for the defendants to subject Ms. Rusher to*

*prolonged isolation is* **ipse dixit**.  Dr. Jarvis also opines that Ms. Rusher's extended confinement

in isolation was reasonable because of her "unpredictable and extremely violent tendencies."

(Jarvis Rpt. at 3.)  This opinion, too, is unexplained.  Dr. Jarvis is speaking of a correctional

environment in which he has no experience.  More importantly, Dr. Jarvis offers no methodology

or standard by which to judge when a person should be placed in solitary confinement.  With

respect to her danger to others, Ms. Rusher was arrested for assault, but that would hardly be an

unusual charge for detainees at the Jail. Dr. Jarvis offers no standard by which to judge the circumstances under which it is reasonable to isolate someone because they are adjudged to pose a danger to others, and similarly cites to no published work (authoritative or otherwise) that discusses any such standard. His opinion is offered as nothing more than an unsupported declaration. Likewise, the suggestion in Dr. Jarvis's opinion that it was reasonable to isolate Ms. Rusher for months on end because she was a danger to herself is entirely unconnected to any standards in the field of psychiatry (or corrections, for that matter). Dr. Jarvis does not explain how or why, given what is known in the field of psychiatry, his bottom-line opinion would be appropriate in that discipline.

Plaintiff's experts have pointed to medical literature and correctional standards and practices, all of which reflect an understanding that isolation cells may should only be used to prevent self-harm for a matter of hours, but after that a patient must be moved to a higher standard of care. (*See, e.g.*, **Ex.** 4, Kupers Rpt. at 6-13.) Plaintiff's expert reports demonstrate that the fields of psychiatry and corrections have addressed the use of isolation cells and treatment for suicidal inmates, and it accordingly fell on Dr. Jarvis to explain why his opinion—*i.e.*, that it was reasonable to confine Ms. Rusher to an isolation cell for months—was reliable notwithstanding the consensus of the field to the contrary. Dr. Jarvis did not do this. Indeed his report does not reflect that he read any literature in preparation for his report—a fact that he confirmed at his deposition. (Jarvis Dep. at 48:21-50:12.) *Daubert* requires more. *See Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) (excluding expert who offered novel theory that was "unsupported by any article, text, study, scientific literature or scientific data produced by others in his field," particularly where the expert "failed to read any studies, surveys or analyses in support of his theory." (citation omitted)). *Accord In re Rezulin Prods.*

*Liab. Litig.*, 369 F. Supp.2d 398, 425 (S.D.N.Y. 2005) ("[I]f the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable." (quotations omitted)); *Clemente-Vizcarrondo v. United States*, No. 17-cv-1144, 2020 WL 748840, *5 (D.P.R. Feb. 14, 2020) ("When a proffered expert physician's report lacks any medical literature, data, or even a more basic explanation of how their conclusion was reached, as is the case here, said report is inherently unreliable."). In the face of a medical and correctional industry consensus that extended isolation should not be imposed on persons with mental illness, particularly as a means of addressing suicidality, Dr. Jarvis offers only his own *ipse dixit*. Rule 702 forbids parties to offer such unreliable expert testimony.

**Dr. Jarvis's "opinions" about Ms. Rusher's discharge from McFarland are ipse dixit.** Dr. Jarvis offers the opinion that Ms. Rusher would not have been re-admitted to McFarland Medical Center, the state hospital where she was arrested for assault. (Jarvis Rpt. at 4.) This opinion, too, is offered as *ipse dixit*. Dr. Jarvis does not connect his experience or specialized knowledge and explain why or how it gives him insight into McFarland's thinking about Ms. Rusher's care. Once more, Dr. Jarvis makes no connection between his expertise and the opinion he offers.

This "opinion," moreover, is not an expert opinion at all. It will not assist a jury, which is just as capable as Dr. Jarvis of weighing the evidence he cites regarding Ms. Rusher's departure from McFarland. Dr. Jarvis points out that on December 13, 2016, Ms. Rusher filled out a request to be released from McFarland. (Jarvis Rpt. at 4.) Noting that McFarland staff had a right to respond to this request but did not do so, he offers the "opinion" that "[i]t was reasonable to assume that McFarland Mental Health Center staff no longer felt she would benefit from being

at their facility." (*Id.*)  But under the relevant law, McFarland staff had *five business days* to respond to Ms. Rusher's request, and Ms. Rusher was arrested and taken to jail only *two* days later, on December 15. (**Ex.** 5, Jeetwani Dep. at 21:2-20; 204:1-16.)  Dr. Jarvis points to no other evidence in support of his opinion.  To be admissible under Rule 702 "the proffered [expert] testimony must assist the fact finder in understanding what otherwise might be outside its grasp." *Martinez v. City of Chicago*, No. 07-cv-422, 2009 WL 3462052, at *4 (N.D. Ill. Oct. 23, 2009). A lay jury will be just as capable as Dr. Jarvis in assessing a hospital's lack of response two days into a five-day response period.  Dr. Jarvis's "opinion" will not assist the jury at all.

      ***Dr. Jarvis's speculative claims about the future are ipse dixit***.  Dr. Jarvis offers the opinion that because of her mental illness, Ms. Rusher likely would have been re-incarcerated or would have died quickly of something or other.  (Jarvis Rpt. at 5.)  This "opinion" is also offered as a declaration with no support, to be taken on Dr. Jarvis's expertise alone.  It is wildly speculative.  Dr. Jarvis's opinion that Ms. Rusher was likely to be re-incarcerated, for example, depends on a cascading series of speculative assumptions.  Dr. Jarvis assumes that because of her mental illness Ms. Rusher is likely to take some act that the law classifies as a crime; that the authorities would be contacted; that the police would choose to charge her for the act in a manner that calls for incarceration; that a prosecuting attorney would likewise choose to press charges calling for incarceration, notwithstanding the demonstrably destructive impact that incarceration had on her previously; that defense attorneys would not effectively raise this disastrous history with the court; that a plea agreement involving an alternative to incarceration would not be reached; and/or that a court would impose incarceration instead of some sort of diversionary program, given the disastrous history of her incarceration.  To offer a reliable opinion, Dr. Jarvis would have had to account for these variables in some manner.  But, as with his opinion that Ms.

Rusher is likely to harm herself or reach some other early demise, he makes no effort to do so. These opinions, which are supported by nothing other than his say-so, fail to satisfy the methodological rigor that Rule 702 requires, and they should be excluded.

### 2. Multiple opinions offered by Dr. Amy Trivette should be excluded.

The ACH defendants offer the expert report of Dr. Amy Trivette to offer a variety of opinions regarding the standard of care in this case. (**Ex.** 6, Trivette Rpt.) Dr. Trivette is a psychiatrist who works in a prison. Her report indicates that while she reviewed documents that are in the record in this case, she did not review any medical or correctional literature in order to develop her expert opinions.

***Expert opinions premised on an incorrect legal standard***. Dr. Trivette's opinion regarding the standard of care amounts largely to the following: the standard of care is whatever jails and prisons commonly do, and the standard of care was satisfied here because Ms. Rusher was treated the same way numerous other mentally ill prisoners are treated—even if, as a medical matter, Ms. Rusher should have been treated differently. Under this standard, jails are free to isolate severely mentally ill people instead of providing them with mental health treatment because that is simply what jails do.

Plaintiff's medical expert, Dr. Kupers, offered the opinion that Ms. Rusher's treatment at the Jail was improper because, among other things, no treatment plan was ever developed to treat her mental illness. (*See* Kupers Rpt. at 20-24.) Dr. Trivette disagrees, arguing in her report that the relevant standard of care did not require treatment plans, because "[t]reatment plans are not developed in jail settings and rarely in prison settings," (Trivette Rpt. at 3), and that in general, "[t]he standard of care for mental health services in a jail setting differs from that in a

community hospital." (Trivette Rpt. at 4.) When she was asked about these opinions at her

deposition, Dr. Trivette clarified what she meant:

> Q. Are you saying that this is -- that jails just don't develop treatment plans even when a patient needs a treatment plan?
>
> A. Yes. It's not typical practice in a jail setting.
> . . . .
>
> Q. Okay. So even if somebody needed a treatment plan, a jail just wouldn't develop one?
>
> A. That's not the typical practice. I mean, there might be, you know, some behavioral guidelines or something occasionally developed. But as far as what you see with treatment planning in the community at a community hospital or an outpatient community mental health center for that matter, there are not those kinds of treatment plans developed.

(**Ex.** 7, Trivette Dep. at 64:5-65:6.) Failing to develop treatment plans for inmates who need

them meets the standard of care, Dr. Trivette explained, because "that's just what happens" in

jails.[1] (Trivette Dep. at 65:7-65-13.)

Dr. Trivette offered essentially the same reasoning regarding the extended isolation to

which Ms. Rusher was subjected. Plaintiff's expert, Dr. Kupers, explained that isolation had

been found through medical study to be exceptionally harmful to persons with mental illness,

and noted that it was for this reason that standards of the National Commission on Correctional

Healthcare ("NCCHC") provided that "a jail or prison must have available an inpatient

psychiatric unit for prisoners who remain suicidal or decompensated longer than the day or the

few days that they are permitted to remain in an Observation cell," referring to the type of high-

risk cell to which Ms. Rusher was confined. (Kupers Rpt. at 10.) Once again Dr. Trivette

---

[1] Dr. Trivette offered a similar opinion regarding individual and group therapy, which she acknowledged was helpful in "reduc[ing] the frequency or intensity of . . . self-injurious behavior," but observed such therapy "is not available in jails"—not because jail inmates did not need such therapy, but rather because jails simply did not offer it. (Trivette Dep. at 88:20-90:19.)

disagreed, offering the opinion that Ms. Rusher's extended "assignment to a high-risk observation cell was appropriate and consistent with the relevant standard of care in a correctional setting and the jail's suicide prevention policy." (Trivette Rpt. at 4.) At her deposition, Dr. Trivette said that such long-term confinement to an isolation cell was appropriate simply because jails do not commonly provide settings for patients to be out of their cells, and do not devote the staff necessary to watch such patients outside of their cells. (Trivette Dep. at 59:21-61:13.) Dr. Trivette explained further that jails do not provide staffing levels necessary to give mentally ill patients time out of their cells because "the intent of the jail is not to provide monitoring for suicidality; it's for correctional holding, and, you know, adjudicating criminal cases and that sort of thing," and as such jails do not provide the staffing necessary to monitor severely mentally ill detainees while they are outside their cells. (Trivette Dep. at 61:14-62:24.)

Dr. Trivette made clear that it was her opinion that it in jails, it is permissible to isolate severely mentally ill patients instead of providing them with recognized mental health treatment—because that is what jails do. She acknowledged that Ms. Rusher had a mental health treatment plan at McFarland, she agreed that mental health treatment plans were required at State hospitals and community mental health facilities, and she acknowledged that a person exhibiting Ms. Rusher's severe symptoms could have benefitted from a mental health treatment plan. (Trivette Dep. at 208:2-19; 211:5-12.) But that did not matter, Dr. Trivette said, because "it [*i.e.,* the development of treatment plans] is not done in jails . . . . You know, observation cells tend to stay full with patients similar to Ms. Rusher. . . . [W]e manage patients like this all the time. And sometimes that means they're housed alone with limited property for long periods of time to maintain safety, but as long as we're able to maintain safety, we're not going to be transferring them to an impatient psychiatric hospital in the community." (Trivette Dep. at 211:5-212:2.)

14

Dr. Trivette's opinion is premised on the position that once a severely mentally ill person enters a jail, the "standard of care" behind bars is that they are entitled to no meaningful mental health treatment, only incapacitation through isolation—even if, as a matter of medicine, the person needs mental health treatment. The premise underlying Dr. Trivette's opinions is thus that jails need not provide the staffing or facilities that are necessary for providing adequate mental health care (or even out-of-cell time) because a jail's purpose is "correctional holding," not the provision of medical care. (Trivette Dep. at 61:14-62:24.) That premise is anathema to the Constitution, and the Supreme Court and Seventh Circuit precedents interpreting it. It is a bedrock principle of the Eighth Amendment that "the government[ has an] obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The due process protections afforded to pretrial detainees, who are not being punished at all, are at least as protective if not more so. *See Pittman v. Cty. of Madison*, 970 F.3d 823, 827 (7th Cir. 2020). Under either standard, an inmate can establish a constitutional violation by showing that a jail has inadequate "staffing" or "facilities" that result in the prisoner being "denied access to adequate medical care." *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (quotation omitted). The premise of Dr. Trivette's opinion is the opposite—the defendants are free both to incarcerate Ms. Rusher, and thus prevent her from seeking mental health treatment; and they are also not required to provide her with mental health treatment because the Jail is an incarceration facility whose purpose is not to provide medical care. The law, which the jury will be obligated to follow, is the opposite. The premises underlying Dr. Trivette's expert opinions regarding the standard of care in jail settings are wrong as a legal matter. And as such, these opinions are inadmissible under Rule 702 because they will

simply confuse a jury, who will be instructed by this Court (not Dr. Trivette) about the legal standards that govern the defendants' conduct. Dr. Trivette's opinions regarding the standard of care in correctional settings must be excluded.

**Discharge from McFarland**. Like Dr. Jarvis, Dr. Trivette offers the opinion that "[Ms. Rusher] was discharged from McFarland Mental Health Center to the Jail, indicating that further treatment in that setting was not recommended. (Trivette Rpt. at 3.) This opinion is improper for the same reason Dr. Jarvis's opinion is improper—it is entirely unsupported, and offered as *ipse dixit*. As Plaintiff explained regarding Dr. Jarvis's equivalent opinion, *supra*, the evidence in the record is that Ms. Rusher was removed from McFarland because she was arrested—not because of a clinical decision about the mental healthcare that she needed. It is not enough for Dr. Trivette simply to declare with no support that Ms. Rusher's removal from McFarland was an indication that she did not require mental health treatment in a hospital setting. As with Dr. Jarvis, that unsupported opinion should be excluded.

### 3. Multiple opinions offered by Dr. Fowlkes should be excluded.

The ACH defendants offer the expert testimony of Dr. Thomas Fowlkes. (**Ex.** 8, Fowlkes Rpt.) Among other things, Dr. Fowlkes offers opinions regarding whether the ACH defendants satisfied the standard of care in their treatment of Ms. Rusher. Many of these opinions simply lack foundation, and are instead presented as bottom-line assertions. And many of Dr. Fowlkes's opinions regarding the standard of care appear to be premised on an incorrect legal principle—namely that jails, because they are jails, are excused from providing medically indicated mental health care to the detainees they house.

Like Dr. Trivette, Dr. Fowlkes offers multiple opinions regarding the standard of care. Chief among these, Dr. Fowlkes offers the opinion that (1) the defendants provided Ms. Rusher

with appropriate mental health treatment, and (2) her extended housing in isolation was also appropriate. (*See* Fowlkes Rpt. at 7-8.) Those opinions, however, are not based on any methodology. In fact, Dr. Fowlkes admitted at his deposition that he could not identify a standard of care in advance, but rather could only assess the standard of care after the fact, in "hindsight." (**Ex.** 9, Fowlkes Dep. 55:14-56:5.) Worse still, he could offer absolutely no methodology by which he reached his opinion that defendants' met the standard of care, leaving the parties without any ability to assess the reliability of his opinions. What results is an opinion in which Dr. Fowlkes does not identify actual standards by which to judge Ms. Rusher's treatment or confinement at the Jail, but rather describes what happened to Ms. Rusher and then opines that such treatment and confinement met the standard of care.

*Mental health treatment*. Dr. Fowlkes repeatedly asserts that Ms. Rusher's treatment was appropriate and met the relevant standard of care. (*See* Fowlkes Rpt. at 7.) Dr. Fowlkes, however, never describes any standard for judging what sort of mental health treatment would be appropriate for a woman with Ms. Rusher's condition. Nor does he ever describe what Ms. Rusher's mental health treatment actually consisted of. He appears to base his "treatment" claim on the fact that Ms. Rusher was "seen" by Mr. Shmikler 48 times, although elsewhere he acknowledges that these were merely evaluations, (Fowlkes at 5), which he admits is different than treatment (Fowlkes at 2). In this same vein, Dr. Fowlkes opines that an appropriate treatment plan was created for Ms. Rusher, (Fowlkes Rpt. at 18, 20-21), but does not identify what a "treatment plan" should contain, what Ms. Rusher's supposed treatment plan did contain, how he concluded that a treatment plan was developed, what document or documents the treatment plan was located in, or what sort of care the treatment plan contemplated.[2] With no

---

[2] It is noteworthy that in offering the opinion that Ms. Rusher had a treatment plan, Dr. Fowlkes contradicts Dr. Trivette, who testified that she did not see any sort of treatment plan

description either of an objective standard to judge the adequacy of Ms. Rusher's mental health treatment, nor even a description of what Ms. Rusher's mental health treatment consisted of, a jury is left simply to take Dr. Fowlkes's word for it that her mental health treatment—whatever it was—was appropriate.

***Ms. Rusher's solitary confinement***.  Dr. Fowlkes declares that Ms. Rusher's "housing assignment was appropriate," and therefore satisfied an undefined standard of care, but offers absolutely nothing else.  This opinion is offered in conclusory fashion; the sole reason he gives for it is that "[s]he was housed alone in a cell close to the booking area where she could be observed at frequent intervals."  (Fowlkes at 8.)  In a related opinion, Dr. Fowlkes states that there is no relevance to Dr. Kupers' opinion that "long-term consignment to solitary confinement is a major factor in the high suicide rate among prisoners," because Ms. Rusher was never placed in "solitary confinement," and her confinement was "not equivalent to the conditions of long-term housing in solitary confinement with extreme social isolation that has been reported in some prisons." (Fowlkes at 9, 13-14.)

Once again, Dr. Fowlkes offers this opinion as a declaration, with no support.  Though Dr. Fowlkes claims that Ms. Rusher's confinement is different what has been "reported in some prisons," he does not explain what reports he is talking about, nor does he explain what or how her isolation is different than the isolation to which Ms. Rusher was subjected.  Rule 702 requires more.  "Solitary confinement" is relevant in this case because Plaintiff claims Ms. Rusher was damaged by her extended housing in an isolation cell.  That claim is grounded in multiple studies cited in the expert report of Dr. Kupers, Plaintiff's expert, which have found that extended isolation has a devastating impact on persons with mental illness and is associated with a much

---

among Ms. Rusher's medical records, *supra*.

higher rate of suicide.  (*See* Kupers Rpt. at 6.)  And Dr. Kupers, who is an expert on the topic, linked the findings in those studies to the isolation that the record showed for Ms. Rusher.  (*See* Kupers Rpt. at 6-10.)  Dr. Fowlkes identifies no such literature, or anything other than his bottom-line blessing of the defendants' conduct as appropriate.

For Dr. Fowlkes's opinion to reliably assist the jury in assessing Plaintiff's claims, his opinion about what constitutes "solitary confinement" and his opinion about what "extreme isolation" is harmful would need to refer to some reliable or objective standards or criteria.  Here those would likely consist of the studies that have been conducted regarding the impact of isolation on the mentally ill, or the correctional standards discussed in Dr. Fowlkes's report; there are likely other sources that Dr. Fowlkes might have referred to as well.  But Dr. Fowlkes does none of this.  He does not explain what he means by "solitary confinement," does not describe the conditions in "some prisons" to which he compares Ms. Rusher's confinement, does not explain how Ms. Rusher's confinement is meaningfully different from those conditions, and does not give any other basis his opinion.[3]  In his opinion Dr. Fowlkes disputes the relevance of the literature cited by Dr. Kupers connecting solitary confinement with suicide, (Fowlkes Rpt. at 13-14), but at his deposition he conceded that he had never actually read any of this literature at all.  (Fowlkes Dep at 159:1-160:15.)  The jury is simply expected to take Dr. Fowlkes's word, with no support or reference to anything besides his say-so, for the proposition that Ms. Rusher's confinement was not of the type that Plaintiff's expert opines is psychologically harmful or that would increase the risk of suicide.

---

[3] At one point Dr. Fowlkes does state that the Jail's procedures complied with NCCHC standards set out in a 2014 manual (Fowlkes Rpt. at 14), but he offers nothing beyond this unadorned declaration—Dr. Fowlkes never describes what criteria the 2014 standards established, or how or why the Jail's policies satisfied those standards.

Dr. Fowlkes's opinions regarding the adequacy of Ms. Rusher's mental health treatment, and his opinions regarding the reasonableness of her confinement, are untethered from any external objective standard. For an expert's testimony to be reliable, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee note. Dr. Fowlkes's opinions do none of this. Rule 702 forbids the introduction of such opinions because they are not the product of a reliable methodology.

*Speculative opinions*. Dr. Fowlkes offers multiple speculative opinions that are either *ipse dixit* or are not expert opinion at all. They should be excluded.

• Like Dr. Jarvis and Dr. Trivette, Dr. Fowlkes offers the opinion, or at least the suggestion, that doctors at McFarland chose to discharge Ms. Rusher for clinical reasons. His report states that "Ms. Rusher had been housed long term in a mental health facility prior to SCJ. They had become unable to handle her condition and sent her to a county jail on criminal charges." (Fowlkes Rpt. at 10.) He also offers the "opinion" that "[h]ad McFarland felt that she needed inpatient psychiatric treatment, they could have kept her or sent her to another mental health facility. Instead, they sent her to a county jail." (Fowlkes Rpt. at 19) This "opinion" is unsupported by any explanation of how it was developed, and as with Dr. Jarvis's opinion on the same subject, it invades the province of the jury, which is perfectly capable of assessing, through testimony and documents, why Ms. Rusher was "discharged" from McFarland upon her arrest. The Court should exclude it for the same reasons that Dr. Jarvis's opinion should be excluded.

• Dr. Fowlkes opines that Ms. Rusher could not have been transferred to a mental health facility from the Jail. But this opinion is offered as a pure declaration. He states:

> [Ms. Rusher] had undergone a forensic psychiatric evaluation at SCJ and was found competent. It would be difficult, if not impossible, for a competent person

> with criminal charges who had been discharged from a state mental health facility
> to return to a mental health treatment facility without a court order or a significant
> deterioration in their mental condition.

(Fowlkes Rpt. at 10-11.)  A portion of this opinion—that Ms. Rusher was discharged from

McFarland—builds on Dr. Fowlkes's unfounded opinion that McFarland discharged Ms. Rusher

for clinical reasons.  Dr. Fowlkes offers no reliable foundation for that assumption, and it cannot

be laundered through incorporating it into a broader opinion.  The remainder of the opinion is an

unsupported declaration.  Dr. Fowlkes does not explain *why* a person in Ms. Rusher's position

could not be treated at a mental health facility; he simply declares that it cannot be so.  As with

Dr. Jarvis, the jury will be asked simply to take Dr. Fowlkes's word for it, and nothing more.

- Dr. Fowlkes opines that "Counterintuitively, Ms. Rusher likely functioned best in

an institutional setting  . . . ."  (Fowlkes Rpt. at 12).  This "opinion" is offered as an unadorned

declaration with zero elaboration or factual support.  The jury must take the word of Dr. Fowlkes

alone.  That is inadmissible.

- Dr. Fowlkes offers the "opinion" that "[t]here is no evidence in the record that

Mr. Shmikler was not aware of Ms. Rusher's past medical history and course at McFarland.

More likely than not, he was."  (Fowlkes Rpt. at 20.)  No support of any kind is offered for this

opinion.  It is offered as a naked declaration—an instruction from an expert to the jury about how

to resolve disputed facts—and is nothing more than inadmissible *ipse dixit.*

### 4.    Multiple opinions offered by Michelle James should be excluded.

Michelle James is a licensed clinical social worker with a background in corrections.  The

ACH defendants offer her to provide opinions regarding the mental healthcare provide to Ms.

Rusher during her confinement at the Jail.  (**Ex.** 10, James Rpt. at 3.) She reviewed a portion of

the record in the case, but did not refer to any literature or standards regarding mental health or corrections.  (James Rpt. at 1.)

***The standard of care***.  The core of Ms. James's opinion is that jails need not provide mental health treatment to detainees at all.  (James Rpt. at 5.)  At her deposition, Ms. James explained that whereas in a community setting, the standard of care for a mental health patient is treat their mental illness (**Ex.** 11, James Dep. at 33:2-15; 85:15-86:13.)  By contrast in jails, mental health "care" consists of "assessment" of a detainee's mental health; jails are not required to provide mental health care to "alleviat[e]" the symptoms being suffered by a mentally ill detainee or to "improve [the mentally ill detainee's] functioning." (James Dep. at 17:10-21.)

That, Ms. James opines, is because the purpose of a jail is to incarcerate, not provide medical treatment: "management of a detainee's symptoms must be weighed against the primary function of the jail," which is "is to provide secure detention of pre-trial detainees and inmates serving minimal sentences for low level criminal offenses."  (James Rpt. at 1.)  Jails should not be expected to provide mental health treatment, Ms. James opines, because they are not set up to do so: "Local jails were built to provide housing to detainees with the primary goal of security in mind."  (James Rpt. at 2.)

Over and over again in her deposition, Ms. James made clear that it would be entirely inappropriate to treat Ms. Rusher this way in a community setting, where actual mental health treatment should be provided. (James Dep. at 15:19-24; 16:18-17:5; 85:15-86:13.)  Jails, however, were apparently not required to provide such treatment:

> Q. So you said that it's a different standard of care at a jail versus a hospital. Is that because a mental health condition can be beyond the range of services available at the jail?
>
> A. That's not the primary function of why a person is at the jail. The jail itself and

the legal aspect is always going to be the main function. Managing their mental
health issues are always going to be secondary.

(James Dep. 89:20-90:9.)  James made this point repeatedly: while mental health

facilities in the community should provide mental health treatment, the standard of care is

different in jails because

> [t]he difference is the focus of the institution. A jail's focus is not to provide
> psychiatric care.  That is not the main reason they're there. They're there because they're
> housing inmates who have been charged with a crime who are awaiting trial or who have
> low-level sentences that they're serving out versus, say, for example, a psychiatric
> hospital like McFarland where the sole purpose is to provide psychiatric treatment
> to patients.

(James Dep. 16:20-17:5.)  It is Ms. James's opinion, in short, that Ms. Rusher was not entitled to

mental health treatment, but instead could be placed in an isolation cell for months, because the

purpose of jails is detention on criminal charges, not provision of healthcare.  Because adequate

mental healthcare was "not available in the [Jail, s]ingle cell housing in the high traffic booking

area at Sangamon was the most appropriate way to safely house Ms. Rusher during her

incarceration." (James Rpt. at 5.)  In Ms. James's opinion, in other words, jails are entitled to

isolate severely mentally ill persons in solitary cells and simply watch them until they are

released.

The opinion offered by Ms. James is similar to the opinion offered by Dr. Trivette, and it

is inadmissible for the same reason.  Its premise runs exactly contrary to the rights of pretrial

detainees under the Constitution, as interpreted by the Supreme Court and Seventh Circuit,

which the jury will be required to follow.:  it is premised on an incorrect understanding of the

law.  "Police must provide care for the serious medical conditions of persons in custody.  That

right is clearly established. . . . [and] it applies even if the custody is expected to be short."

*Paine v. Cason*, 678 F.3d 500, 506 (7th Cir. 2012) (citing *inter alia Estelle* and *Farmer v.*

*Brennan*, 511 U.S. 825 (1994)).  Such serious medical needs include mental health care.  *See, e.g.*, *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 671 (7th Cir. 2012) ("Because he was incarcerated, the jail had an obligation to address Rice's serious medical needs.  That obligation included a duty to provide psychiatric care to Rice as needed." (citing *Estelle*)).  Ms. James's opinion—that jails may simply isolate severely mentally ill detainees as a substitute for providing them with mental health treatment—endorses a standard of conduct that is *ultra vires*.  This opinion would not assist the jury; to the contrary, like the similar opinion of Dr. Trivette, it would sow confusion.  As Plaintiff has explained with respect to Dr. Trivette, under Rule 702 opinions like this, which are based on an incorrect legal standard, are not admissible evidence.

**5.        Multiple opinions offered by Sean Stewart should be excluded.**

The Sangamon defendants offer the expert report of Sean Stewart, a correctional official in Arizona, to offer a variety of opinions regarding the case.  (**Ex.** 12, Stewart Rpt.)  Mr. Stewart has experience in corrections; he disclaims any specialized knowledge regarding mental health care or medicine.  (Stewart Rpt. at 86; 112.)  Mr. Stewart's report is lengthy, running to more than 150 pages.  Ultimately, however, he provides little support for many of his opinions, offering instead simply his say-so without any explanation—and sometimes on subjects for which he is admittedly unqualified.  A number of his other opinions improperly seek to define the law for the jury, or are based on premises that are legally incorrect.  Under Rule 702 such opinions are inadmissible.

***Opinions regarding what laws govern the operation of the Sangamon County Jail.***  Mr. Stewart offers multiple opinions regarding what laws govern the operation of the Jail, and how those laws—including the U.S. Constitution—should be applied to the Jail's operations.  Mr. Stewart states that the Jail is not "beholden" to standards promulgated by the American

24

Correctional Association ("ACA") or the NCCHC, that these standards "simply do not establish the constitutional minima" and "are not determinative of the requirements of the Constitution," (Stewart Rpt. at 125), and because the Jail was not seeking ACA accreditation, the standards set forth in the ACA "have no bearing," by which Mr. Stewart appears to mean *legal* bearing, on the Jail's operators. (*Id.* at 123.) He also states that the Jail is instead "bound to Illinois Department of Corrections Office of Jail and Detention Standards." (*Id.* at 123, 127.) He offers the opinion that "The Sangamon County Detention Facility Defendants have to adopt their own policies and procedures as long as they meet constitutional muster." (Stewart Rpt. at 128.) He also offers opinions about how the Constitution should apply to a facility like the Jail:

> While the Constitution of the United States applies to all jails and counties, it should be obvious, a small jail and a very large jail will have to adopt and implement very different approaches to achieve compliance with legal requirements. . . . Officials must have the discretion to find the approach which allows them to comply with constitutional requirements while attempting to further the safety, security, order, discipline, control and other legitimate interests of the jail.

(Stewart Rpt. at 128.) In this same vein, Mr. Stewart offers the opinion that smaller facilities should be held to a lower legal standard: "it is irresponsible and impossible to expect a small, rural facility, with limited staff and resources, to operating utilizing the same performance-based standards as a large facility with a large budget." (Stewart Rpt. at 126.) Elsewhere, Mr. Stewart offers the opinions that certain practices "would not have passed constitutional muster," (Stewart Rpt. at 116), and that the Supreme Court has held that certain professional standards "hav[e] been improperly relied upon," (Stewart Rpt. at 125.) He also offers,

> Based on the materials reviewed the Sangamon County Detention Facility Defendants' [*sic*] must meet the requirement and standards set by clearly established law, the 7th Circuit, Illinois Circuit Court, Illinois State Statutes and the Illinois Department of Corrections.

(Stewart Rpt. at 123.)

25

These are legal opinions that seek to instruct the jury on the legal standards governing the case. Rule 702 forbids expert witnesses from offering such opinions. "[W]hen the purpose of [expert] testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed. In no instance can a witness be permitted to define the law of the case." *Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988) (cited with approval in *Covalt v. Carey Canada Inc.*, 860 F.2d 1434, 1438 (7th Cir. 1988)). The law is the same in the Seventh Circuit. *See United States v. Lupton*, 620 F.3d 790, 799-800 (7th Cir. 2010) ("Clearly, an opinion that purports to explain the law to the jury trespasses on the trial judge's exclusive territory." (quotation omitted)). When Mr. Stewart offers opinion about how the Constitution applies to different-sized facilities, the scope of discretion that the Constitution grants jailers in administering their facilities, which laws govern the operation of the Jail, and what legal relevance of correctional industry standards such as the ACA or NCCHC have to the claims in this case, he is offering legal opinions that are designed to "direct the jury's understanding of the legal standards upon which their verdict must be based." *Specht*, 853 F.2d at 810. That "cannot be allowed" under Rule 702. *Id.*

***Stewart's opinion that the Sangamon defendants could rely on the ACH defendants.*** Mr. Stewart notes that the Jail contracted with the ACH defendants to provide medical care, and opines that as such it was reasonable for the Sangamon defendants to rely on the ACH defendants in their medical decisions. (Stewart Rpt. at 85-96.) Beyond noting the contractual relationship, however, Mr. Stewart never explains what criteria should be used to assess the circumstances under which reliance is reasonable, and when it is not. Mr. Stewart's opinion, instead, is simply that because the Jail contracted with ACH, it was reasonable for the Jail to rely on the medical decisions that ACH made. (Stewart Rpt. at 85-87.)

When Mr. Stewart was asked about this opinion at his deposition, he made clear that he believed such reliance could be absolute:

> Q. … So in your experience, if you have reason to believe that a doctor isn't treating a prisoner correctly, what do you do?
>
> A. We can have a conversation with him. He can explain his thought process to me. But again, once he is -- if I talk to him and he's going to explain this to me, at that point if I still for some reason believe he may be doing something wrong, I don't have the ability to second guess that individual, nor would I.

(**Ex.** 13, Stewart Dep. at 99:11-20.) This opinion is premised on an incorrect legal standard, because a correctional official's reliance on medical staff cannot be absolute:

> [E]ven if they refer an inmate's complaints to medical staff, "nonmedical officials can 'be chargeable with . . . deliberate indifference' where they have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *Arnett v. Webster*, 658 F.3d 742, 755-56 (7th Cir.2011) . . . [because] "[t]here can be no reasonable reliance on the judgment of a medical staff where it is obvious that the staff is failing to exercise its medical judgment." *Martinez v. Garcia*, 2012 WL 266352, at *5 (N.D. Ill. Jan. 30, 2012).

*Ruiz v. Williams*, 144 F. Supp. 3d 1007, 1013 (N.D. Ill. 2015). It is thus not enough for Mr. Stewart to offer a blanket opinion that it was reasonable for the Sangamon defendants to rely on the ACH defendants for all medical decisions simply by having hired them; given the governing law in the Seventh Circuit, he was required to describe *when* and under *what circumstances* that reliance would be reasonable. His failure to do so renders his opinion unreliable under Rule 702, as it is both unfounded and will mislead the jury regarding the applicable standard governing the Jail's conduct. It should be excluded.

*Mr. Stewart's fabricated claim that Ms. Rusher "threatened" other detainees should be excluded*. Discussing the reasonableness of Ms. Rusher's housing in isolation, Mr. Stewart offers the opinion that "It was also appropriate to remove cell-mates when Tiffany Rusher

threatened them." (Stewart 146.)  This highly prejudicial opinion is refers on an "incident" that Mr. Stewart fabricated from whole cloth.  Ms. Stewart was briefly placed in Jail's general population, on January 11, 2017, and was removed back to her isolation cell the next day, on January 12. (Stewart Rpt. at 104.)  On January 16, several days later, she is recorded telling a friend on a recorded call, "When I was in GP them girls, I wanna beat their ass." (*See* Stewart Rpt. at 104.)  At his deposition, Mr. Stewart stated that based on this single January 16 statement, he reached the opinion that Ms. Rusher had been removed from the general population on January 12 because she had made "threats" the women in general population.  (Stewart Dep. 167:1-171:9.)  He conceded there were no reports anywhere indicating that she had threatened anyone at the Jail, at any time.  (Stewart Dep. 172:8-18.)

There was, however, a report explaining why Ms. Rusher had promptly been removed from the general population on January 12.  It was not because she had threatened anyone—it was because a day after arriving in general population, she had swallowed a spoon and had to be taken to the hospital.  (Stewart Rpt. at 104.)  Mr. Stewart's opinion, in other words, is founded on a demonstrably false and extremely prejudicial premise.  To offer it, Mr. Stewart fabricated an incident that there is no suggestion ever occurred.  And in offering his opinion, Mr. Stewart does not explain how he extrapolated from a statement by Ms. Rusher on January 16 that she was angry with someone several days before to his conclusion that she must have threatened the person at that time.  And he could not, because he invented the facts for the opinion.  The unfounded opinion is not based on a reliable methodology and should be excluded.

*Mr. Stewart's unfounded opinions regarding the Jail's training and policies*.  Mr. Stewart offers his opinion both that the Jail's written policies were sufficient, and that the Jail's training was adequate.  (Stewart Rpt. at 79.)  Mr. Stewart, however, offers both these opinions as

*ipse dixit* conclusions.  Critically lacking form his opinion is any explanation about what criteria Mr. Stewart was using to determine whether the Jail's policies and training practices were sufficient, or *why* the policies and training satisfied those criteria.  Instead, the opinion is offered merely as an unsupported conclusion.  Such opinions are inadmissible under Rule 702.

***Mr. Stewart's medical opinions***.  Despite disclaiming any expertise in medical matters (Stewart Rpt. at 86, 112), Mr. Steward offers multiple, conclusory opinions regarding medicine and psychiatry, many of which are offered as *ipse dixit* with no foundation.  These should be excluded.

- Mr. Stewart "agrees" with his characterization of Dr. Jeetwani's testimony that Ms. Rusher was likely to commit suicide sooner or later.  (Stewart Rpt. at 99.)  This opinion stated simply as a conclusion, and Mr. Stewart identifies zero qualifications to offer it.  It should be excluded.

- Mr. Stewart offers the opinion that "There is no evidence to suggest that ACH mental health staff were not providing appropriate care and treatment to Tiffany Rusher." (Stewart Rpt. at 115.)  Mr. Stewart, having disclaimed any specialized medical knowledge, has no qualification for offering this opinion.  It should be excluded.

- Mr. Stewart offers the opinion that it was reasonable for Jail officials to rely on an evaluation performed by a Dr. Killian finding that Ms. Rusher was competent to stand trial. (Stewart Rpt. at 115).  This opinion is entirely unexplained.  Setting aside the question of whether Jail officials would even have been aware that this competency evaluation had been performed, Mr. Stewart does not explain how Dr. Killian's opinion that Ms. Rusher was competent to stand trial would have provided information that Jail officials could use to

29

determine her suicidality, the nature of her mental illness, the psychological impact of isolation

on her, or her need for mental health treatment.  The opinion should be excluded.

- Like the other defense experts, Mr. Stewart offers the opinion that Dr. Jeetwani

"knowingly discharged" Ms. Rusher from McFarland.  (Stewart Rpt. at 113.)  This opinion is

offered as an unsupported declaration, and Mr. Stewart identifies no expertise that would permit

him to invade the jury's province in understanding the circumstances of Ms. Rusher's arrest and

removal from McFarland.  The Court should exclude it.

- Mr. Stewart offers the opinion that it is "not legal or possible" for jails to transfer

detainees to mental health facilities.  (Stewart Rpt. at 113.)  This is an impermissible legal

opinion; it is entirely unfounded; and Mr. Stewart, who is a jailer in Arizona, identifies no

special knowledge that would qualify him to offer it.  The opinion should be excluded.

- Mr. Stewart offers the opinion that the midnight phone calls Ms. Rusher was

permitted to make "constituted meaningful contact with others."  (Stewart Rpt. at 103), and that

"Her contacts with other people were meaningful and sufficient during her incarceration at the

jail." (Stewart 106.)  Mr. Stewart, however, is not qualified to offer this opinion.  Mr. Stewart

never defines what he means by "meaningful," but he indicates that he offers his "meaningful

contacts" opinion in response to the claim made by Plaintiff that Ms. Rusher lacked meaningful

social contact.  (*See* Stewart Rpt. at 106.)  That "claim," however, is contained in opinions

offered by Dr. Kupers, testifying in his capacity as a psychiatrist regarding the psychological

impact of isolation on persons with mental illness.  Dr. Kupers notes that Ms. Rusher did have

"contact" with certain persons during her isolation at the Jail, and offers the opinion that such

contact was not meaningful.  (*See, e.g.*, Kupers Rpt. at 27-28.)  This opinion however, is

grounded in the question of whether such interactions were sufficiently meaningful that they

would mitigate the impact of isolation on Ms. Rusher's psyche, as a medical matter. (*Id.*) Mr. Stewart, who disclaims any specialized medical knowledge, simply does not have the requisite expertise to disagree with Dr. Kupers—he is not qualified to offer the opinion that the contacts he describes were sufficiently "meaningful" to mitigate or ameliorate the psychological impact that isolation had on Ms. Rusher's mental health. Mr. Stewart does not appear to offer his "meaningful contact" opinion for any other purpose, and as such he is not qualified to offer it.

**WHEREFORE**, for the reasons set forth herein, Plaintiff respectfully requests that the Court issue an order excluding the opinions of defense experts described in this memorandum.

Dated: March 19, 2021

Respectfully submitted,

/s/ Stephen H. Weil

Alan Mills - alan@uplcchicago.org
Nicole Schult - nicole@uplcchicago.org
Bridget Geraghty - bridget@uplcchicago.org
Uptown People's Law Center
4413 North Sheridan Rd.
Chicago, Illinois 60640
Tel: (773) 769-1411
Fax: (773) 769-2224

Stephen H. Weil
Arthur Loevy
Sarah Grady
Loevy & Loevy
311 N. Aberdeen Street
Third Floor
Chicago, IL 60607
312-243-5900
weil@loevy.com
*Attorneys for Plaintiff*

31

## **CERTIFICATE OF SERVICE**

I, Steven H. Weil, an attorney, certified that on March 19, 2021 I served a copy of this pleading on all counsel of record by filing the same through the CM/ECF system.

/s/ Steven H. Weil