**Exhibit 9**

Deposition of Dr. Thomas Fowlkes



# Transcript of Dr. Thomas Fowlkes

**Date:** September 1, 2020
**Case:** Andrews -v- Sangamon County, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT FOR THE
2       CENTRAL DISTRICT OF ILLINOIS
3  - - - - - - - - - - - - x
4  KELLI ANDREWS,        :
5       Plaintiff,    :
6   v.           :  Civil Action No.
7  SANGAMON COUNTY,      :  18-CV-1100
8  et al.,          :
9       Defendants.   :
10  - - - - - - - - - - - - x
11
12       Deposition of THOMAS FOWLKES, M.D.
13           Conducted Virtually
14       Tuesday, September 1, 2020
15           10:01 a.m. CT
16
17
18
19
20
21
22  Job No.: 318999
23  Pages: 1 - 188
24  Reported By: Courtney Petros, RPR, CSR

**Page 2**

1       Deposition of THOMAS FOWLKES, M.D., conducted
2  virtually:
3
4
5
6
7
8
9       Pursuant to notice, before Courtney Petros, a
10  Certified Shorthand Reporter, Registered
11  Professional Reporter, and a Notary Public in and
12  for the State of Illinois.
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1       A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFF:
3       BRIDGET GERAGHTY, ESQUIRE
4       UPTOWN PEOPLE'S LAW CENTER
5       4413 North Sheridan Road
6       Chicago, Illinois 60640
7       (773) 769-1411
8
9  ON BEHALF OF THE PLAINTIFF:
10       STEPHEN WEIL, ESQUIRE
11       LOEVY & LOEVY
12       311 North Aberdeen Street
13       3rd Floor
14       Chicago, IL 60607
15       (312) 243-5900
16
17
18
19
20
21
22
23
24

**Page 4**

1  A P P E A R A N C E S  C O N T I N U E D
2  ON BEHALF OF THE DEFENDANTS:
3       MATTHEW J. MADDOX, ESQUIRE
4       BETSY WIRTH, ESQUIRE
5       QUINN JOHNSTON
6       Suite 102
7       400 South 9th Street
8       Peoria, IL 61602
9       (309) 674-1133
10
11  ON BEHALF OF THE COUNTY DEFENDANTS:
12       THERESA POWELL, ESQUIRE
13       HEYL ROYSTER
14       3731 Wabash Avenue
15       Springfield, IL 62711
16       (217) 522-8822
17
18  ALSO PRESENT:
19       CATHERINE COGHLAN
20
21
22
23
24

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

---

**Page 5**

C O N T E N T S

1
2  EXAMINATION OF THOMAS FOWLKES, M.D.    PAGE
3  BY MS. GERAGHTY                6
4
5          E X H I B I T S
6          (Retained by counsel.)
7

8  FOWLKES DEPOSITION EXHIBITS        PAGE
9
10 Exhibit 1  CV                10
11 Exhibit 2  Federal Case List        19
12 Exhibit 3  Rule 26 Report          42

13
14
15
16
17
18
19
20
21
22
23
24

---

**Page 6**

P R O C E E D I N G S

1
2      THE REPORTER:  Will counsel please
3  stipulate that in lieu of formally swearing in the
4  witness, the reporter will instead ask the witness
5  to acknowledge that their testimony will be true
6  under the penalties of perjury, that counsel will
7  not object to the admissibility of the transcript
8  based on proceeding in this way, and that the
9  witness has verified that he is, in fact,
10 Dr. Fowlkes.
11     ALL COUNSEL:  I agree.
12     THOMAS FOWLKES, M.D.,
13 having been duly sworn, testified as follows:
14     EXAMINATION BY COUNSEL FOR THE PLAINTIFF
15 MS. GERAGHTY:
16  Q Good morning, Dr. Fowlkes.
17  A Good morning.
18  Q Before we get started, can you see me on
19 the screen?
20  A I can.
21  Q Perfect.  Just wanted to make sure.  And
22 you can hear everything okay?
23  A It's not the greatest, but I'll ask you to
24 repeat if I don't understand.  I mean, I can

---

**Page 7**

1  understand you.
2      MR. WEIL:  Bridget, your audio is not
3  great.
4      MS. GERAGHTY:  So I tried to put in
5  headphones, and then they said they couldn't hear
6  me at all.
7      MR. WEIL:  Well, you might want to just
8  give it another shot or something, because it
9  won't be great -- it will be tough for the court
10 reporter, I think.
11     MR. WIRTH:  Make sure your mic is on the
12 360.  That usually helps a lot.  When you go to a
13 full screen, there will be two little microphone
14 icons at the top.  One has a circle all the way
15 around it.  Click on that.
16     MS. GERAGHTY:  Did that work?
17     MR. WEIL:  That's about the same.
18     THE WITNESS:  I was going to say that that
19 was about the same.
20     MR. WEIL:  Bridget, if that's the best we
21 can do, I mean, we can hear you.
22     THE WITNESS:  I'll ask you -- if I don't
23 understand clearly, I'll ask you to repeat.  Could
24 I also ask who this Mr. T.M. Powell that's showing

---

**Page 8**

1  up on the screen, who is that?
2      MS. POWELL:  That's Theresa Powell.  I
3  represent the county.
4      THE WITNESS:  Okay.  Thank you.
5      MS. GERAGHTY:  All right.
6  MS. GERAGHTY:
7   Q So, Dr. Fowlkes, you've been deposed many
8  times before, right?
9   A I've been deposed before, yes.
10  Q I do just want to go over a few ground
11 rules.  You may have heard them before, but I want
12 to make sure that we're on the same page.  This is
13 our only chance to talk to you before trial, so
14 we'd like to make sure that you give as complete
15 answers as possible.
16     MR. WEIL:  Bridget, I think we should try
17 to fix this, because there's some background noise
18 now.
19     (An off-the-record discussion was held.)
20 MS. GERAGHTY:
21  Q Before we took a break --
22     MS. GERAGHTY:  Are we back on the record
23 now?
24     THE REPORTER:  Back on.  Yes.

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

9

1    Q  We were going over some background rules.
2  I would ask you to answer yes or no to every
3  question rather than shaking your head or nodding,
4  just because it's easier for the court reporter to
5  pick up; is that all right?
6    **A  Yes.**
7    Q  And I know that it can be hard in a
8  virtual setting, I'm going to try not to talk over
9  you to make sure that you can finish your answers,
10 and if you can do your best to do the same for me,
11 I would appreciate it; is that all right?
12   **A  It is.**
13   Q  I will try to make my questions clear, but
14 I think, as you already said, you feel comfortable
15 asking for clarification if you don't understand
16 the question; is that true?
17   **A  That's correct.**
18   Q  And if you need a break, feel free to ask,
19 just not when a question is pending.  And if an
20 attorney objects, let them make their objection,
21 but then unless they tell you not to answer,
22 please go ahead and answer.
23   **A  Okay.**
24   Q  All right.  So I want to start with your

10

1  CV, and I just received an updated one this
2  morning.  So I'm going to share --
3      MS. GERAGHTY:  Actually, you know what,
4  Steve, can we go off the record for a second.
5      (An off-the-record discussion was held.)
6  MS. GERAGHTY:
7    Q  Dr. Fowlkes, I'm showing you what I will
8  mark as Exhibit 1; do you recognize what this is?
9      (Fowlkes Deposition Exhibit 1 marked for
10 identification and attached to the transcript.)
11   **A  I do.  If you could scroll down to the**
12 **bottom, I could see what date it represents, the**
13 **bottom of that page.  Yes.  That is my most**
14 **current CV.**
15   Q  I'm scrolling through all the pages now.
16 So this looks like a --
17   **A  Yes.  But it was page 1 that had the date**
18 **on it.**
19   Q  All right.  But this looks like a complete
20 version of your most updated CV, it's five pages
21 long?
22   **A  That is correct.**
23   Q  Can you identify for me the updates to
24 this CV that were not on the previous copy that

11

1  you submitted?
2    **A  To the best of my recollection, there is**
3  **probably one more presentation, and there may be**
4  **some update to licenses or certifications.  That**
5  **would be the only differences.**
6    Q  So in the section under presentations,
7  there might be an additional presentation there,
8  but, other than that, mostly the same?
9    **A  That is correct.**
10   Q  Okay.  So I want to turn to your
11 professional experience.  It looks like you have
12 kind of a few different roles that are listed as
13 to the present; is that correct?
14   **A  That is correct.**
15   Q  How much time do you spend in your role at
16 the Lafayette County Jail?
17   **A  168 hours a week.**
18   Q  So is that -- does that mean that you're
19 on call 24/7?
20   **A  That is correct.**
21   Q  Okay.  How much of that time would you say
22 you are actively engaged in work at the Lafayette
23 County Jail?
24   **A  Well, not all of my job at the Lafayette**

12

1  **County Jail is work directly at the jail, but I**
2  **also consult via telephone, work on other matters**
3  **at my home office as well.  So -- and it varies**
4  **entirely from week to week.  I cannot say.  I'm on**
5  **call 24 hours a day.  I talk to my nurses or the**
6  **staff multiple times.**
7    Q  Is that multiple times every day?
8    **A  I won't quantify it to say every single**
9  **day, no.**
10   Q  How much of your time at the Lafayette
11 County Jail is what you would classify as direct
12 patient care?
13   **A  Almost all of it.  I mean, in other words,**
14 **my administrative duties are, you know, ten or**
15 **some so percent but not -- not substantial.**
16   Q  How much time during an average week would
17 you say you spend doing your expert work as in
18 consulting on cases, giving depositions,
19 testifying, writing reports?
20   **A  That obviously varies from week to week.**
21 **I would -- I would have difficulty even guessing.**
22 **I would say something in the order of 10 to 15 if**
23 **you averaged it out.**
24   Q  And then how much time in an average week

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

---

**13**

1  would you say that you spend on your other
2  business pursuits?  So that includes as medical
3  director and co-owner of Express Care, medical
4  director for A&D Services for Region IV Community
5  Mental Health Center, deputy medical examiner
6  investigator, shareholder of Thomas Fowlkes, M.D.,
7  P.A., co-owner and physician at Right Track
8  Medical Group, prisoner advocate member, and
9  medical consultant for Third Circuit Judicial
10 District Drug Court?
11     A  I have almost no way of quantifying that.
12 I mean, there's no set schedule, so I don't have a
13 way of quantifying that.  As much time as
14 necessary in each week.  Many of those are not
15 even weekly commitments, though, but, you know,
16 the IRB, for instance, one hour a month.  So many
17 of those are not even within the -- the
18 shareholder of Thomas Fowlkes, M.D., P.A., is
19 primarily the expert witness work you already
20 addressed.  So --
21     Q  Okay.  Well, so maybe it would make sense
22 to go through them one by one then so we can get a
23 better idea of what's a weekly commitment and
24 what's not.  How much time would you say you spend

---

**14**

1  each week as a medical consultant for the Third
2  Circuit Judicial District Drug Court?
3     A  Not even on a weekly basis.  On a monthly
4  basis.  It's a consultant for difficult cases, so
5  they ask me about individual cases on an
6  infrequent basis.
7     Q  So you would say it's a monthly commitment
8  of approximately how many hours?
9     A  I can't give you a quantity.  I mean, I
10 cannot.  Sometimes I'm consulted multiple times in
11 a month, sometimes I'm not consulted at all.  So
12 there's no set time, no way I can give you an
13 answer, but it is infrequent.
14    Q  What do you mean by infrequent?
15    A  Not even every month am I consulted by
16 them.  I usually speak to the drug court at least
17 once a month, but I don't necessarily have any
18 particular work.  That is an unpaid position.  I
19 do it on a volunteer basis.
20    Q  Okay.  So I'm just trying to understand
21 how you spend your time professionally.
22    A  That varies drastically from week to week.
23 I don't have a -- I don't have a set time.  I work
24 at the Lafayette County Detention Center as the

---

**15**

1  medical director, and I am responsible for all the
2  medical care that's given 24 hours a day, 7 days a
3  week.  In addition to that, I'm the medical
4  director at a drug and alcohol treatment facility
5  which my role there primarily consists of
6  consulting with the nurse practitioner who handles
7  most of the direct patient care.
8     Q  Okay.  And what's the name of that
9  facility?
10    A  Region IV is -- it's --
11    Q  So that's this, right?
12    A  -- the third one.  Region IV.  That's
13 right.  My main role there is to consult via the
14 telephone with the nurse practitioner to go inside
15 and meet with her to answer questions about
16 difficult cases and sometimes to make prescription
17 recommendations.
18    Q  All right.  So how much time would you say
19 you spend in that role each week?
20    A  It varies, but I would say five or less.
21    Q  That's hours?
22    A  That's correct.
23    Q  And how about -- how much time do you
24 spend per week as the deputy medical examiner

---

**16**

1  investigator for Lafayette County, Mississippi?
2     A  I am not presently the deputy medical
3  examiner investigator.  I am the consultant to the
4  medical examiner investigator.  I was at one time
5  a deputy medical examiner investigator.  I am now
6  simply a consultant and answer questions when he
7  has medical questions.  He's not a doctor, so when
8  he has questions he wants to ask me about, he
9  calls me or asks me to assist him on a case.
10    Q  You said that Lafayette County coroner is
11 not a doctor?
12    A  That's correct.
13    Q  Okay.  And how much time would you say you
14 spend on that per week?
15    A  Very little.  I mean --
16    Q  Less than five hours?
17    A  Absolutely, yes.
18    Q  What about co-owner and physician at Right
19 Track Medical Group, an outpatient provider of
20 mental health services in North Mississippi; can
21 you describe your role there?
22    A  Yes.  That is an outpatient provider of
23 mental health services.  So, in other words, we
24 employ psychiatrists and psychiatric nurse

---

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

17

1 practitioners. And my primary role is as the CFO,
2 so I don't do direct patient care there.
3    Q All right. So how much time per week
4 would you say you spend on that pursuit?
5    A That's difficult to say, because that's
6 where my office is, so that's where you're talking
7 to me today. So I'm often at Right Track doing
8 other things, so it's where my primary office is
9 and I --
10    Q So you can't estimate how much time you
11 spend as the co-owner and physician at Right
12 Track?
13    A That's right. Sometimes, as we open new
14 offices, I have to spend all day going somewhere.
15 Sometimes I don't have anything to do at all, and
16 that's where my office is, so that's where I am
17 when I'm not engaged otherwise.
18    Q All right. How about medical director and
19 co-owner of Express Care of Mississippi?
20    A Essentially, that is a position where I am
21 a supervising or collaborating physician for the
22 nurse practitioners that work there. So, in other
23 words, as a co-owner, I'm responsible for
24 collaborating with the two full-time nurse

18

1 practitioners, and I do not normally provide
2 direct patient care in that role, normally.
3    Q So, again, how much time would you say you
4 spend per week in that role?
5    A Less than -- five or less.
6    Q All right. So the way I understand it
7 then is you spend 10 to 15 hours a week on your
8 expert role, 5 -- approximately 5 hours per week,
9 maybe, on your role at the Region IV Community
10 Mental Health Center, less than 5 hours a week in
11 your role consulting with the coroner, you can't
12 estimate how much time you spend at Right Track,
13 and 5 hours or less on Express Care of
14 Mississippi; does that sound right?
15    A Sounds reasonable. At this time -- I'll
16 also point out, that's at this time right now.
17    Q Okay. So I want to turn now to what I
18 would mark -- well, I guess before I do that, how
19 do you spend the rest of your time, other than the
20 hours we've just marked off for those first few?
21    A Personal business pursuits, recreation. I
22 mean, I'm on call 24 hours a day, so I always have
23 to be available for the jail, but a variety of
24 other nonmedical interests, I would say.

19

1    Q So turning now to what I'll call Exhibit
2 2; do you recognize this?
3       (Fowlkes Deposition Exhibit 2 marked for
4 identification and attached to the transcript.)
5    A Yes. And that date at the top says it's
6 my most recent federal case list.
7    Q So this is your most recent, you said,
8 federal case list?
9    A Well, yes. It's a required exhibit to
10 federal reports. Yes.
11    Q Okay. But it's not just reflecting cases
12 that you testified in that were federal cases?
13    A No, it's required by -- the federal rules
14 require you to put each case that you've provided
15 sworn testimony.
16    Q All right. Does this include cases where
17 you were deposed but didn't testify in court?
18    A Yes.
19    Q Can you give us an approximate idea of how
20 many of these cases you were retained by the
21 plaintiff?
22    A I would give you an estimate on that case
23 list that perhaps 25 or so percent -- 25 or 30
24 percent is plaintiff and the other is defense

20

1 attorneys.
2    Q Can you give us an estimate of how many of
3 these cases involve a jail setting?
4    A Most of the ones past the first page do,
5 and maybe some -- potentially, one or two on the
6 first page do, but almost all of the ones past the
7 first page are jail cases.
8    Q So that would start on page 2 with
9 Filichia v. Correct Care Solutions?
10    A Right. And if you wanted me to -- I could
11 potentially tell you any that were not jail cases
12 much more easily, but there would only be one or
13 two that weren't jail cases.
14    Q Okay.
15    A Let me be more accurate, correctional
16 health care cases.
17    Q Okay. So what do you categorize as
18 correctional health care that's not jail cases?
19    A State prisons.
20    Q All right. What about immigration
21 detention centers, have you ever consulted on
22 those?
23    A I have consulted on those. I don't think
24 they are on that case list. And just to clarify,

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

21

1 the one or two -- I could probably point them out,
2 if you really wanted me to, but there may be one
3 or two that are not specifically correctional,
4 that would be like an addiction treatment center,
5 I have consulted on a few of those.
6     Q   Can you give us an estimate of how many of
7 those cases in your entire case list involve a
8 suicide?
9     A   Not without looking at that case list, no.
10    Q   So you can't even get us an estimate of 10
11 percent or 15 percent or --
12    A   Well, you asked me about that specific
13 case list, so the ones that I've been deposed on.
14 I would say three or four of the -- I would have
15 to count the number, but I would say -- making a
16 guess that there are 30 cases on there, I would
17 say maybe three of them or ten percent involve
18 suicide.  That is essentially a guess, though.
19    Q   Would you be able to name those?
20    A   Possibly.  If I looked at them, I possibly
21 could, yes.  Would you mind if I look at the case
22 list that's in my report?  I could just --
23    Q   Sure.  Go ahead.
24    A   Okay.  On page 2, Benoit v. Lincoln

22

1 County, et al.  It's the third one.
2     Q   All right.  Is that the one I've
3 highlighted on the screen?
4     A   Yes.  The next one is on page 3, Estate of
5 Legros v. Choctaw County, Oklahoma.  And then --
6     Q   Is that the one I've highlighted on the
7 screen?
8     A   Yes.  And on page 4, I do not recall -- I
9 recall that -- that Wadman case may or may not be
10 suicide.  I recall one involving Southern Health
11 Partners.  I don't recognize the name.  So I --
12    Q   Okay.  So it's those two for certain,
13 Wadman may be, and that's it for this list of
14 cases?
15    A   That's correct.
16    Q   So thinking about your work as an expert
17 on the whole, taking your estimate of -- your
18 low-end estimate of ten hours a week, do you
19 charge the same rate for all your expert
20 testimony?
21    A   I do.
22    Q   And that's $500 an hour?
23    A   That is correct.
24    Q   So $500 an hour for ten hours a week is

23

1 about $5,000 per week; is that correct?
2     A   Okay.  I'll accept that.
3     Q   So that would add up to about $250,000 a
4 year?
5     A   In gross revenue, yes.
6     Q   Okay.  Do you know what your yearly income
7 is from your expert work?
8     A   In what year?
9     Q   Let's say the most recent year that you
10 filed taxes, so that would be 2019.
11    A   I do not specifically know.
12    Q   Okay.  Do you know for any other year?
13    A   Well, I know from -- prior to last year,
14 it was very small.  So, in other words, most of my
15 expert witness work -- my expert witness work has
16 increased starting in -- probably in 2018.
17    Q   So do you know the number for 2018?
18    A   No.  I would -- I could make an educated
19 guess of $50,000 for 2018.
20    Q   Do you know why your work as an expert
21 grew so much that year?
22    A   Well, because I wasn't holding myself -- I
23 mean, I wasn't doing much expert witness work
24 prior to that, 2017, 2018.

24

1     Q   Okay.  What led you to want to do more
2 expert witness work?
3     A   What led me to that; was that your
4 question?
5     Q   Yes, sir.
6     A   Well, primarily, up until 2015, I was very
7 busy with owning a drug and alcohol treatment
8 center.  I owned a drug and alcohol treatment
9 center from 2012 to 2015, and after I sold that
10 and was not as time committed to that, I began
11 doing a small amount of correctional expert
12 witness work as a result of my more than 20 years
13 of being the medical director at my county
14 detention facility.
15        And I enjoyed -- I started probably doing
16 it -- I had done a spattering of expert witness
17 work of other kinds during my career, but started
18 doing correctional cases after 2015, and I enjoyed
19 it, and I've just continued to do it since.
20    Q   All right.  So taking your estimate, what
21 percentage -- well, strike that.
22        What percentage of your annual income
23 would you say comes from expert work?
24    A   Less than ten percent.

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

25

1    Q   Okay.  So looking at our estimate from
2  earlier that took your low-end estimate of ten
3  hours a week, which was $250,000 a year, you're
4  saying that would be less than ten percent of your
5  annual income?
6    A   Well, first of all, that's for this year,
7  and I haven't calculated this year.  We're talking
8  about in the present.  But, yes.  The short answer
9  is, yes.  That would be -- now, also know the
10 number you mentioned was gross revenues, so I have
11 expenses that have to come out of that.  I have an
12 assistant that helps me, I have office expenses,
13 etc.  So I don't make -- even if I have gross
14 revenue of $250,000, that is not my take-home pay,
15 but, yes, that take-home pay is ten percent of my
16 income or rough -- that's an estimate.
17   Q   Can you tell us what your annual income
18 is?
19   A   For what year?
20   Q   Well, let's start with 2019.
21   A   I don't -- I don't know that my 2019 tax
22 returns are even filed, actually.
23   Q   Do you have an estimate of what it was?
24   A   No.  Not without consulting my tax return,

26

1  I do not.  Because I have other -- I have
2  investments.  So some years I have, you know, a
3  large income.  Many years, I have a large income.
4  There are other years where I have carried forward
5  losses or other such -- they're potentially
6  losses, so I couldn't -- I wouldn't estimate.
7    Q   Can you give us an estimate for 2018?
8    A   Yes.  That year, I believe, was
9  $3 million.
10   Q   Okay.  What about an estimate for 2020?
11   A   The year we're in right now?
12   Q   Mm-hmm.
13   A   I hope that it will be around $2 million
14 or so.
15   Q   Okay.  And how much of that is income from
16 work versus investments?
17   A   Very difficult to estimate.  So I work on
18 -- I hope that a good portion of that comes from
19 Right Track Medical Group, which I work at
20 building that business.
21   Q   What percentage would you say comes from
22 Right Track Medical Group?
23   A   Up until 2020, very little.  As a matter
24 of fact, it's been a growing businesses, so that's

27

1  the reason there's been losses up until now, but I
2  have ten offices we've been opening.  So, I mean,
3  it's a growing business.  Growing businesses often
4  generate losses.
5    Q   Okay.  So you can't estimate how much of
6  your annual income comes from work versus other
7  pursuits or other sources of income?
8    A   Well, I needed your definition of work.  I
9  guess I work at all the things that result in my
10 income, so I'm having a little difficulty with
11 that.
12   Q   Okay.  I think we can move on.
13       So would you consider correctional
14 medicine to be a specialized field of medicine?
15   A   The short answer is, yes.
16   Q   Why?
17   A   Because it is a unique environment, a
18 unique population, and unique challenges.
19   Q   What factors make it a unique environment?
20   A   Number one would be you're behind bars,
21 you're locked up with inmates, that's unlike most
22 other environments.
23   Q   Do you mean the medical providers are
24 locked up?

28

1    A   That is correct.
2    Q   Can you explain what you mean by that?
3    A   When you go into a jail, the door closes
4  behind you and it's locked, so you can't walk out.
5  You're locked in a building with many other --
6  with all the other inmates.
7    Q   Okay.  But you don't mean that you're
8  locked in their cells with them, right?
9    A   I mean, I'm locked in the jail with them.
10 I don't know -- I mean, sometimes I treat them in
11 their cells, not locked in their cells, but, I
12 mean -- I don't understand your question,
13 actually.
14   Q   All right.  You're able to get out of the
15 jail when you want to get out, right?
16   A   When I ask for them to open the doors and
17 when they see it's me and when they open the
18 doors, yes, they did.  You asked me what's unusual
19 about that environment, but it's unusual to be
20 treating people in an environment where you're
21 locked in there with them.  That is unique to
22 jails.
23   Q   Okay.  Is that the only thing you would
24 say is unique about correctional health in terms

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

29

1  of environment?
2      A  No.
3      Q  What else?
4      A  Well, it is not a health care -- I mean,
5  it's not -- in most cases, jails are not licensed
6  health care facilities.  You're providing health
7  care to people who have to receive their care from
8  you or you have to arrange their care.  In other
9  words, they don't have a choice about you being
10  their provider.  That's another thing.  There's
11  probably a long list.  I could go on, but that's
12  another example.
13      Q  So you said that they were a specialized
14  field because of the setting, because of the
15  population, and because of challenges.  So
16  specific setting, specific population, and
17  specific challenges --
18      A  That's correct.
19      Q  -- what makes correctional health care a
20  specialty based on the population?
21      A  Well, we're treating detainees or inmates
22  who, to some extent, have a lot of the
23  similarities of other populations, but they have
24  some special challenges.  There is a higher

30

1  percentage of substance abuse and a higher
2  percentage of mental health problems in our
3  patient population.
4      In addition, there are, you know,
5  particular challenges with people who haven't
6  necessarily had the best health or had health
7  care.  In other words, they haven't necessarily
8  been attending their health care before they come
9  in.  Those are some of the things I can think of.
10      Q  Any others?
11      A  Well, again, they have chronic conditions
12  that have often been undertreated or not treated
13  on the outside, and so we have to improve their
14  health while they're with us, and, you know,
15  there's different populations.  Our population
16  tends to have higher instances of certain
17  conditions, I mentioned two of them.  There are
18  others as well.  Untreated hypertension would be
19  one that comes to mind.
20      Q  So do you -- strike that.
21      Is that all the differences you can think
22  of in terms of population?
23      A  At this moment, I mean, I think that's
24  some good examples.  There are some other specific

31

1  things about the population.  We, as correctional
2  health care providers, have some responsibility
3  for public health that are not in other -- or it's
4  more pronounced in jail populations.  So, in other
5  words, screening for infectious diseases, public
6  health kinds of concerns that are not in every
7  other environment.
8      Q  All right.  Is that all the differences
9  you can think of that make the population -- all
10  the factors related to population that make it a
11  specialized field of health care?
12      A  Those are the ones that I can think of
13  right at this moment.
14      Q  All right.  And then the third thing you
15  said was challenges.  So what specific challenges
16  do you think make correctional health care a
17  specialized field?
18      A  Well, number one, the thing that comes to
19  the top of mind is that there are security
20  concerns which come into play when you're
21  delivering health care in the correctional
22  setting.  So, in other words, the security of the
23  facility, the staff, the other inmates has to be
24  paramount when one is delivering health care in a

32

1  correctional setting.
2      Q  And you said security concerns have to be
3  paramount, does that mean that security takes
4  precedence over health?
5      A  So that's a very broad statement, and the
6  answer -- that's a broad statement, but, in
7  general, at a specific moment in time, yes, the
8  security of the facility is paramount.  That is
9  correct.  Well, I'll give you that answer.  That's
10  good enough for right now.
11      Q  Is there anything else you want to say
12  about that?
13      A  No.  That is not true in general.  You
14  should not interpret that to mean that -- that we
15  do not deliver health care to the detriment -- you
16  know, we just care about security.  I'm just
17  talking about at an individual moment in time, the
18  most important thing is the security of the
19  facility, yes.  That, at a particular moment in
20  time, takes precedence over delivering routine
21  health care.
22      Q  What about emergency health care?
23      A  Well, of course, you're going to deliver
24  emergency health care.  You're going to take care

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

---

33

1  of whatever your pressing need is.  So as a for
2  instance, if a person is having cardiac arrest in
3  the midst of a fight, you're going to try to do
4  both.  But my point is only that when a riot
5  breaks out, you know, that's going -- the security
6  of the facility is going to take precedence over
7  delivering routine health care.  There may be
8  times when you can't deliver the health care that
9  you otherwise would like to because of some type
10 of security issue.
11     Q  Okay.  So we're on the challenges section
12 of what makes correctional health care a specific
13 field.  Are there any other challenges you can
14 think of that make correctional health care a
15 specialized field?
16     A  Yes.
17     Q  What are those?
18     A  Well, continuing down the list of just the
19 ones that I can think of.  I told you about the
20 security concerns.  The other is the logistical
21 concerns.  So, in other words, when you're going
22 to send someone out for, for instance, outside
23 referrals, you are, to some extent, dependent upon
24 the logistics of the administrative side of

---

34

1  corrections.  In other words, you're not the one
2  that's going to carry them.  The correctional
3  people will have to be the ones to transport.
4  That's one thing.
5       Another thing is that correctional
6  facilities are not able to just -- other than
7  emergency departments, you can't force an outside
8  doctor -- community doctor to see a person.  So,
9  in other words -- now, those challenges can occur
10 even in private practice.  But, in other words, I
11 can't make a provider in my community see someone.
12 And some -- not all providers in the community
13 want to treat incarcerated people, so it can be
14 difficult.  So those are some other examples I can
15 use that provide particular challenges.
16     Q  So you're saying it's -- it could be more
17 difficult to get a doctor to treat someone who is
18 incarcerated, and that's a difference between
19 correctional health and community health?
20     A  Absolutely.  Not everyone in the community
21 feels the same way about my patients that I do.
22     Q  All right.  Do correctional staff ever
23 limit the amount of care that you can deliver to a
24 patient?

---

35

1     A  Well, I believe that I just told you
2  before when I said that security can be paramount.
3  There are certain times when one is not able to
4  deliver some type of health care for a particular
5  security concern.  That is rare.  And, overall,
6  security staff don't dictate what we do, but, yes,
7  there are particular instances when one cannot do
8  what one would otherwise like to because of
9  security concerns.  Yes.
10     Q  Are there any other challenges you can
11 think of?  You've listed security, logistics,
12 anything else?
13     A  Well, I think the third one that I listed
14 was the problems with the referrals in the
15 community --
16     Q  Right.
17     A  -- not wanting to treat inmates.  I'm sure
18 there are plenty many more challenges.  I face
19 challenges about every day.  I could probably go
20 on, but that's the main ones.
21     Q  All right.  Is it possible to be board
22 certified in correctional medicine?
23     A  No.  There is no board certification in
24 correctional health care.

---

36

1     Q  But there is something called NCCHC
2  certification, right?
3     A  That's correct.  The certification is
4  called CCHP, certified correctional health care
5  professional.
6     Q  And you've achieved that certification,
7  right?
8     A  Yes.  The physician portion of that.  So,
9  in other words -- well, you had to be a basic
10 first, but, in order words, it's more than just
11 the CCHP, but CCHP for physicians.  And, yes, I
12 have achieved that certification.
13     Q  Okay.  And is that issued by the NCCHC?
14     A  It is.
15     Q  Why did you seek that certification?
16     A  Number one, to be able to demonstrate to
17 myself and to my medical peers my particular
18 expertise and experience in correctional health
19 care.  That's the main one.
20     Q  Okay.  Any other reasons?
21     A  Well, I was going to their conferences and
22 I was learning the content, so I decided to avail
23 myself of the certification.
24     Q  So you said that's to demonstrate to

---

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

37

1  yourself and to your peers your expertise.  Is
2  expertise in -- well, strike that.
3       NCCHC promulgates standards for
4  correctional health care; is that right?
5    A  That is correct.
6    Q  So you said that you attained the
7  certification to demonstrate to peers and to
8  yourself your expertise.  Is that expertise in
9  those standards that they promulgate?
10   A  Well, not to belabor the point, but that
11 is essentially what the CCHP basic certification
12 is.  So, in other words, nurses and other health
13 care administrators, when you take that CCHP test,
14 you are correct, it is primarily on the standards
15 that they promulgate.
16      It's a voluntary organization that
17 promulgates best practices standards.  The CCHP-P,
18 or physician, is not really so much on the
19 standards but on specific medical issues as it
20 relates to the incarcerated population.  So, for
21 instance, HIV, STDs, public health issues, those
22 kinds of things, more so than the standards
23 themselves.
24   Q  Okay.  Is your facility accredited by the

38

1  NCCHC?
2    A  It is not.
3    Q  Have you ever sought accreditation for
4  your facility?
5    A  So that's -- the reason I say that's a
6  loaded question is, I would like for my facility,
7  so I have sought in that regard.  In other words,
8  I would not mind it being certified, but I have
9  never attempted certification and been
10 unsuccessful or never have been certified before.
11   Q  Okay.  So if I can read between the lines
12 a little bit, does that mean that you would like
13 to seek certification or accreditation, but some
14 outside power is not allowing that?
15   A  Well, no.  That wasn't exactly correct.
16 We had a sheriff who was my boss for 20 years, and
17 he was the second longest-serving sheriff in
18 America.  He was a sheriff for 45 years.  And,
19 now, we have a new sheriff, and the new sheriff
20 and I are working toward accreditation.  So, in
21 other words, we've planned that.  There are other
22 accreditation agencies that have similar standards
23 besides NCCHC, one of them is the ACA, the
24 American Correctional Association, that covers

39

1  more than just medical facilities within a jail.
2  So we may not -- may or may not seek NCCHC
3  accreditation, but, yes, I would like for my
4  facility to become accredited one day.
5    Q  And why would you like your facility to be
6  accredited?
7    A  To demonstrate to others that we're
8  attempting to put into place best practices.
9    Q  So you mentioned the ACA standards, can
10 you give us kind of the broad strokes of how those
11 standards are different from the NCCHC Standards?
12   A  Yes.  From a broad stoke standpoint, the
13 medical standards are not particularly different
14 than NCCHC, but they have standards or best
15 practices for a number of other operational areas
16 of the jail besides just health care.
17      So financial, you know, inmate accounting,
18 recreation, library services, legal services,
19 dietary, all the things, those standards are not
20 addressed at NCCHC, but they are addressed in the
21 ACA standards.
22   Q  All right.  Would you say that you are
23 familiar with the NCCHC Standards?
24   A  I would.

40

1    Q  And are you familiar with all of the
2  standards that they promulgate for health care or
3  just the -- well, strike that.
4       NCCHC promulgates standards for -- in a
5  couple different areas; is that right?
6    A  That's correct.
7    Q  So, for example, they have a set of
8  standards for jails?
9    A  That's correct.
10   Q  And they have a set of standards for
11 mental health?
12   A  Yes.  For mental health facilities
13 essentially, yes.  For that -- I thought you were
14 going to say prisons next.  But they have prisons,
15 juvenile facilities, and mental health facilities,
16 and they issue them about every four years.  So
17 when you're talking about the standards, you have
18 to look at which edition you're talking about,
19 but, yes, I am generally familiar with those
20 standards.
21   Q  Do you know what the most recent edition
22 is?
23   A  For at least most of them it is 2018, not
24 necessarily all of them are on the same cycle, but

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

41

1  I believe 2018 is the most recent for most of
2  them.
3      Q  Okay.  So are you -- you're familiar with
4  the standards from 2018 for jails; is that
5  correct?
6      A  That's correct.
7      Q  Are you familiar with the standards from
8  2018 for mental health?
9      A  I have reviewed them before.  I am not
10 intimately familiar with them, but I have reviewed
11 them.  Yes.
12     Q  Did you review them at all when you were
13 preparing for this case, whether to write your
14 report or to testify today or be deposed today?
15     A  Not specifically for this case, no.
16     Q  When would you say was the last time you
17 reviewed them?
18     A  What, specifically, are you talking about
19 now?
20     Q  Sorry.  The mental health standards from
21 NCCHC.
22     A  I couldn't give you an answer, but it's
23 within the last year, but not within the last
24 month.

42

1      Q  Fair enough.  Did you consider them when
2  you were preparing for this case, whether to write
3  your report or to be deposed today?
4      A  Well, I believe that I did review -- in
5  preparation for my report, I did consider the
6  policies and procedures of the Sangamon County
7  Jail that were provided to me as they related to
8  the NCCHC Standards for jails, not specifically
9  the ones for mental health care facilities but for
10 jails, because it's a jail, not a mental health
11 care facility.
12     Q  So did you say that you considered the
13 Sangamon County Jail policies when you were
14 writing this report?
15     A  The ones that I was provided, yes.  And
16 you're using the term Sangamon County Jail, it
17 could have been -- I could look and tell you
18 specifically which ones they were that I was sent
19 and reviewed, but it could have been either ACH or
20 Sangamon County Jail or both.
21     Q  Okay.  I'm turning to Exhibit 3.  Do you
22 recognize what this is?
23         (Fowlkes Deposition Exhibit 3 marked for
24 identification and attached to the transcript.)

43

1      A  That is my Rule 26 report.
2      Q  I'm scrolling through it now just so you
3  can see that it's the whole report.  So scrolling
4  down towards the end, on page 22, is this a
5  complete list of everything that you considered
6  when you were writing your report?
7      A  Well, you're fixing to point out to me
8  that it doesn't have anything about policies and
9  procedures, so I'm going to have to say, no.
10     Q  So there were things that were sent to you
11 to review that are not contained in this list?
12     A  Just one moment, please.  Okay.  The short
13 answer is that I have been misleading you this
14 whole time.  If you would go to page 1 of my
15 report, you can see -- stop right there in the
16 scopes.  You see there -- number -- so, as a for
17 instance, one of those things is not to review
18 policies and procedures, so I have not in this
19 particular case.  I was apparently thinking of
20 another case.  I was not -- neither was I
21 provided, nor was it within the scope.  So when I
22 told you I had considered the NCCHCs, I was
23 reviewing the policies and procedures, that is
24 inaccurate.  That was not part of my scope of

44

1  work.
2      Q  Okay.  So just to clarify, you did not
3  receive or consider any Sangamon County or ACH
4  policies or procedures?
5      A  Not in this case.  That is correct.  I
6  just was -- sorry -- on another -- in another
7  matter or something, it came into my mind.  I was
8  speaking generally about -- often I am -- and I
9  was speaking generally.  I was not asked in this
10 case, nor did I consider it in this case.
11     Q  Okay.  So just to kind of get us back to
12 where we were, we were talking about NCCHC
13 Standards, and there are specific standards for
14 mental health care that you are familiar with but
15 -- is that correct?
16     A  Yes.  You're using the term specific
17 standards for mental health.  It's my recollection
18 that they are specific standards for mental health
19 facilities.  Now, I'm not certain what the title
20 is, and I could go pull the book off my shelf to
21 see whether it says mental health or mental health
22 facilities, but those standards you're referring
23 to for mental health are primarily used for mental
24 health facilities.

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

45

1    So, in other words, a mental health
2  hospital within a correctional facility or
3  something like that.  The standards which apply to
4  jails are entitled that, and they contain
5  standards on mental health, but the ones that
6  apply to jails are entitled standards for health
7  care in jails.
8    Q  Okay.  So would it be your position that
9  the standards specific to mental health don't
10 apply to jails only to mental -- specific mental
11 health correctional settings?
12   A  That is not my testimony.
13   Q  I'm just trying to clarify.
14   A  Okay.  My testimony is that the primary
15 standards that would apply to a jail, and which
16 are best practices and/or voluntary, would be the
17 NCCHC Standards for health care in jails, and they
18 contain standards on mental health within jails,
19 and those are the ones that I consider when I am
20 considering jails.
21    What I don't know is what the exact title
22 of the book or the standards are called for mental
23 health.  It was my recollection that they said
24 something like standards for mental health

46

1  facilities.  But, in any event, that's what I
2  consider them to primarily be used for.
3    Q  Okay.  Did you consider the standards for
4  jails in this case?
5    A  Not specifically in this case, no, since I
6  did not review the policies, and I was not asked
7  to do that, no.  But I mean, I am familiar with
8  them in general.  But, no, I was not asked to do
9  that in this case.
10   Q  So you're familiar with the standards, but
11 you didn't specifically review them when you were
12 writing your report or preparing to be deposed in
13 this case?
14   A  That is correct, contrary to anything I
15 said before, that is correct.
16   Q  Okay.  So the standards that NCCHC put
17 forth for jails don't form the basis for your
18 opinion today?
19   A  That is correct, nor do they establish a
20 standard of care.
21   Q  But they are best practices?
22   A  They do reflect best practices in the
23 industry.  Yes.
24   Q  All right.  I want to -- in thinking about

47

1  your CV, going back to Exhibit 1, you have listed
2  here areas of expertise, and it looks like you've
3  got drug abuse and effects of addiction, drug
4  testing interpretation, and effects of substances,
5  but, other than that, nothing on here represents
6  any specific area of expertise around mental
7  health, right?
8    A  Well, almost every one of those are --
9  mental health is a large portion of them.  That is
10 simply -- those are simply the areas in which I
11 take cases to review.  And, yes, correctional
12 health care quite often involves mental health.
13 Drug abuse and the effects of addiction is a
14 mental health diagnosis.
15   Q  Okay.  Have you, in the course of your
16 education or professional experience, received
17 specific training about suicide?
18   A  Yes.
19   Q  What specific training have you received?
20   A  Well, specifically, suicide and acute
21 mental health emergencies are portions of the
22 curriculum in emergency medicine, specifically, in
23 my addiction medicine training and board
24 certification, suicides amongst people with

48

1  substance use disorders are certainly prevalent
2  and contained in that training.  And NCCHC, in
3  their yearly conferences and other such training
4  programs, talks about suicide a pretty good bit.
5    Q  So it would be training that you received
6  before you became board certified and then the
7  annual training from NCCHC?
8    A  Board certified in what?
9    Q  Either of your board certifications.  I'm
10 trying to get at the time, actually, so maybe I'll
11 rephrase that question.
12    You've been board certified in emergency
13 medicine since 1993?
14   A  That's correct.
15   Q  And board certified in addiction medicine
16 since 2010, right?
17   A  That's correct.
18   Q  So any training that you received as to
19 suicide within those two specialties would have
20 been prior to 2010; is that right?
21   A  That's not correct.  There's ongoing
22 continuing education.  Physicians take ongoing
23 continuing education on a regular basis, take
24 courses, study, updates, etc., and those have

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

49

1  occurred.  I was describing some of the training
2  that is part of my -- was part of my residency
3  training, but, in addition to that, of course, we
4  receive ongoing training on a yearly basis.
5     Q  And you've received training since then
6  that's specific to suicide?
7     A  I'm quite certain I have, yes.
8     Q  Do you remember when or who provided the
9  training?
10    A  Well, it's been my custom over the last
11 few years to be going to one or more NCCHC
12 conferences yearly, and they have 3 days of 30 or
13 40 or 50 training sessions, a good portion of
14 which involve suicide or other mental health
15 conditions.
16    Q  Can you give an estimate of how many of
17 those you actually attended?
18    A  I cannot, but, I mean, it's in double
19 digits.  More than ten.  I do not know -- I could
20 not give a further estimate than that.
21    Q  But you can't remember any of the specific
22 trainings?
23    A  I'm sorry.  I just don't -- I don't get
24 your question.  Do I -- I mean, every year, NCCHC

50

1  has two three-day educational conferences where
2  they have 40 or 50 sessions, many of them the
3  topics involve suicide.  I have attended many of
4  them, and I recall many specifically I have
5  attended, but what are the names of them and
6  exactly which room I was in and which annual
7  conference it is, I cannot tell you that.
8     Q  Okay.  I guess I'm trying to clarify,
9  because at a two- or three-day conference with 40
10 or 50 presentations, you're obviously not
11 attending all of those 40 or 50 presentations,
12 right?
13    A  That is correct.  You choose.
14    Q  So if some of them pertain to suicide,
15 that doesn't necessarily mean you attended them,
16 right?
17    A  That's correct.  But I told you I
18 remembered attending more than ten.
19    Q  And that's in how many -- or over how many
20 years?
21    A  I don't know.  I'll make an estimate of
22 the last five.
23    Q  Why do you attend those trainings?
24    A  Well, the most succinct answer I can give

51

1  is to stay current in my field.
2     Q  Are they helpful for understanding the
3  standard of care in correctional health care?
4     A  They can be.
5     Q  And you consider them informative?
6     A  I learn something each time I go, yes.
7     Q  They're helpful to you in your practice?
8     A  Most of the time.
9     Q  All right.  So I'd like to move to -- back
10 to Exhibit 3, which is your report.  So you've
11 listed on here the things that you've considered,
12 and we kind of already talked about that a little
13 bit, but I want to see, did you talk to the
14 lawyers at all about this case?
15    A  I have spoken to the lawyers who retained
16 me, yes.
17    Q  Did you speak with them and receive
18 information from them -- without telling me
19 exactly what it was -- that you used in preparing
20 your report or preparing to be deposed today?
21    A  I didn't understand exactly your question.
22 Let me tell you what -- did I receive information
23 from them?  Yes.  Because they sent me documents
24 and asked me to review them.  Does that answer

52

1  your question, or did you ask a different
2  question?
3     Q  Yeah.  So I'm thinking more about the
4  conversations that you had with them.  Did they
5  give you information during those conversations
6  that you used for your report or to prepare to be
7  deposed?
8     A  Not that I recall.  I mean, they told me
9  they were sending me documents.  They sent me
10 documents, I formed my opinions, I spoke to them
11 about those opinions.  They may or may not have
12 sent me additional documents at that time, and I
13 formed my report.  And, obviously, I've spoken to
14 them in preparation for today, but that -- I've
15 told you the sequence of the events that occurred,
16 and that's -- I don't recall further than that.
17    Q  All right.  So since preparing your
18 report, have you received any additional documents
19 from them?
20    A  Not that I'm aware of.  I'm not aware of
21 any.  There's certainly none that they asked me to
22 supplement in my report, and I don't recall
23 receiving any additional documents.
24    Q  And then in your report, you reference

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

---

53

1 three specific articles that you referred to or
2 used as a reference. Are those the only outside
3 articles that you consulted with before writing
4 your report?
5    **A  To the best of my recollection, yes.**
6    Q  Did you do any other outside research like
7 books or other publications?
8    **A  To the best of my recollection, no.**
9    Q  And did you consult with anyone else about
10 the case in any way?
11   **A  No.**
12   Q  All right. So looking at page 22 --
13   **A  Did you say page 22? Yes. I'm there.**
14   Q  Yes. Page 22.
15   **A  That's correct.**
16   Q  This goes back to the section called, The
17 facts or data considered by the witness in forming
18 these opinions.
19   **A  That's correct.**
20   Q  I want to point you to No. 2 there. It
21 says, SCJ and ACH medical file prisoner logs and
22 related documents; do you see that?
23   **A  I do.**
24   Q  So SCJ there is referring to the Sangamon

---

54

1 County Jail, right?
2    **A  That is correct.**
3    Q  What do you mean by the term, related
4 documents?
5    **A  Well, I would be glad to go to that -- I**
6 **would be glad to tell you the names of those**
7 **files, but the point is that there were -- I**
8 **received the same documents in a number of**
9 **formats. Do you understand what I'm saying?**
10   Q  I'm not sure I understand. Could you
11 explain that differently?
12   **A  Well, I think I received plaintiff**
13 **production of documents, and then, you know,**
14 **Sangamon County production of documents, ACH**
15 **production of documents, which were similar and**
16 **some of them contain duplicates, but were -- they**
17 **were similar documents of the files, but they were**
18 **in several different versions, as I recall.**
19   Q  Okay. I'm going to pause right there.
20      MS. GERAGHTY: Matt or Betsy, could you
21 provide the -- or identify the Bates numbers and
22 then produce to us what was given to him?
23      MR. WIRTH: Yes.
24      MS. GERAGHTY: All right. Thank you.

---

55

1    Q  All right. So I want to turn right now to
2 the topic of standard of care, and I think it's
3 useful to sort of have a definition of that going
4 forward. What does standard of care mean to you?
5    **A  It is what a similarly trained**
6 **professional would do under the same or similar**
7 **circumstances. So it's reasonable actions of a**
8 **like-trained professional in the same or similar**
9 **circumstances.**
10   Q  Okay. So what a similarly trained
11 professional would do in the same or similar
12 circumstances; does that sound right?
13   **A  That's correct.**
14   Q  How do you identify the standard of care
15 in a given setting?
16   **A  What do you mean by in a given setting?**
17   Q  Well, you said -- your definition was what
18 a professional would do in the same or similar
19 circumstances. So I guess I can rephrase my
20 question to say, how do you identify the standard
21 of care in a set of circumstances?
22   **A  Well, I compare the actions or inactions**
23 **of the professionals involved in the case by**
24 **reviewing it in hindsight to see whether those**

---

56

1 **actions or inactions are reasonable in light of**
2 **what a similarly trained professional would do in**
3 **the same or similar circumstances. So I compared,**
4 **in hindsight, the actions to what a reasonably --**
5 **you know, a trained, reasonable provider would do.**
6    Q  If you are training someone about what the
7 standard of care is, what would you tell them?
8    **A  Well, I don't -- I don't provide training**
9 **to other people on the standard of care in**
10 **general. I mean, I provide -- I provide training**
11 **to people on how to provide correct care, so I**
12 **don't instruct them on meeting the standard of**
13 **care, per se. That would be something in a legal**
14 **lecture or something that I don't do. So I teach**
15 **people how to correctly practice -- or when I have**
16 **the -- you know, when that's my responsibility or**
17 **when I have an opportunity to, but I don't**
18 **specifically train regarding the standard of care.**
19   Q  Maybe there's a better way to get at this.
20      You said what a similarly-trained
21 professional would do in the same or similar
22 circumstances, and you said that's whether it's
23 reasonable or not, right?
24   **A  Yes. What a reasonable, similarly trained**

---

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

57

1 professional would do.  I probably should have
2 added that in the original definition.  But it's
3 what a reasonable similarly trained professional
4 would do in the same or similar circumstances.
5     Q  So how do you determine -- what sources do
6 you use when you're determining whether actions
7 were reasonable?
8     A  I draw upon my training experience, and,
9 you know, my education, my training, and my 25
10 years of experience.  I draw on all of those
11 things.
12    Q  Does that include any specific sources
13 like publications or standards or anything like
14 that?
15    A  It can, in certain circumstances, yes.
16    Q  What would those be?
17    A  What circumstances or what sources?
18    Q  Sources.
19    A  Say it again.  What sources, is that what
20 you said?
21    Q  What sources?
22    A  Well, it would depend on the circumstances
23 and the particular question one was trying to
24 identify.  In this particular case, I have not

58

1 identified any particular sources which I drew
2 upon as informing my standard of care other than
3 the three articles that I told you.  So it would
4 depend on the set of circumstances, and no
5 specific ones in this case.
6     Q  Other than the three articles that you
7 cited?
8     A  Right.  And you asked me before was I
9 generally familiar with NCCHC, and I'm generally
10 familiar with that, and so that informs my -- you
11 know, that, and the rest of my education,
12 training, and experience inform my -- me
13 determinations about whether something meets the
14 standard of care.  And in some particular
15 circumstances -- in some particular cases, I draw
16 upon other references, other sources, which I did
17 not do in this case.
18    Q  Is it possible to train someone in the
19 standard of care?
20    A  That's probably a better question to ask
21 for a lawyer or someone.  I think that one trains
22 health care professionals to practice their --
23 practice their profession and trains them to do it
24 in a professional way, trains them to do it

59

1 consistent with their training and their
2 experience and the laws, so all of those things go
3 into the standard of care.  One does not normally
4 train health care professionals specifically how
5 to meet the standard of care.  So, rather,
6 training them how to practice their profession,
7 and, hopefully, that will be within the standard
8 of care.
9     Q  You said, hopefully?
10    A  Well, that is the goal.  That is correct.
11 If you are training someone and you have trained
12 them to adequately practice their profession,
13 then, hopefully, their actions will, therefore, be
14 within the standard of care, but one does not
15 particularly train a person to meet the standard
16 of care.
17    Q  Okay.  So you referenced in your last
18 response, laws.  Can you tell us what laws you
19 referenced in identifying the standard of care in
20 this case?  And the answer may be none, but you
21 mentioned it.
22    A  Well, I guess going back to almost your
23 first question when you asked about the uniqueness
24 of correctional health care, correctional health

60

1 care is one of the few specialties of medicine
2 where there are specific, you know, constitutional
3 rights and constitutional standards that your care
4 must meet.  So you do have to train people about
5 that, to be aware of that.
6        And there are other specific laws that
7 pertain to incarcerated populations, laws or court
8 rulings, that one must be aware of.  So, I mean,
9 I'm just using as an example, the PREA, Prison
10 Rape Elimination Act.  I mean, those are -- that's
11 something that is a law that must be taken into
12 account when practicing within a correctional
13 health care setting.
14    Q  Okay.  So moving away from just generally
15 practicing in a correctional health care setting,
16 for this particular case, can you identify what
17 laws you referenced --
18    A  None that I recall.
19    Q  -- or relied on?
20    A  None that I'm aware of.
21    Q  So another definition of standard of care
22 might be a diagnostic and treatment process that a
23 clinician should follow for a certain type of
24 patient, illness, or clinical circumstance; does

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

61

1 that sound right to you?  I could repeat it, if
2 you want.
3      **A It's not the definition that I use, but,**
4 **I mean, I heard your description, and if you or a**
5 **court particularly wants to use that or wants to**
6 **ask me to use that, potentially, I can.  The issue**
7 **is that there can be several different ones of**
8 **those, and I don't remember the exact statement,**
9 **but there can be several different courses of**
10 **action which are reasonable and within the**
11 **standard of care.  So, in other words, one**
12 **particular course of action is not necessarily the**
13 **only standard.**
14     Q Would you say that laws are relevant for
15 identifying the standard of care in this case?
16     **A Well, as I've told you, laws, in general,**
17 **inform the care that must be delivered to inmates,**
18 **you know the Constitution.  But -- and, often,**
19 **there are state laws which -- or state regulations**
20 **which affect jails.  I am not aware how,**
21 **specifically, any particular law affected this**
22 **case, though.  I can't think of it at this moment.**
23 **If you'd like to ask me an example, and ask, do I**
24 **think it affects it, I'll tell you, but I can't**

62

1 **think of any off the top of my head.**
2     Q Okay.  So that means that you didn't think
3 of any or refer to any when you were preparing for
4 your report or preparing to be deposed?
5     **A Well, that's not entirely true, because,**
6 **as I just told, you there are -- the U.S.**
7 **Constitution guides care that's delivered in**
8 **jails, but I am not aware of any particular law**
9 **which I considered and reviewed in this case to**
10 **see whether the law was followed or not.  No, I am**
11 **not aware of that.**
12     Q Okay.  So as a -- so you're not aware of
13 any particular laws that would apply to this
14 particular case.  That's a fair statement of what
15 you just said?
16     **A No.**
17     Q Okay.  But you said the U.S. Constitution
18 does apply?
19     **A Many laws affect this case and affect**
20 **every case in a jail.  So as a for instance,**
21 **Ms. Rusher was charged with a crime.  She was**
22 **brought to jail having been charged with a crime.**
23 **There is a law that was allegedly broken that**
24 **resulted in her being in jail.  Also, she received**

63

1 **a forensic psychiatric evaluation, or competency**
2 **evaluation, subject to a law, subject to the**
3 **court, so all of those come into play as it**
4 **relates to the patient.  How any particular one of**
5 **them affect the care in this case, I cannot give**
6 **you a specific citation, but there are many laws**
7 **that are involved in this case.**
8     Q Okay.  Maybe I wasn't clear, then.  What
9 laws -- and the answer may be none -- would you
10 consider when you were identifying the standard of
11 care in this case?
12     **A I cannot think of any in this particular**
13 **case.**
14     Q So thinking about the standard of care, is
15 it different in a correctional setting versus a
16 community setting?
17     **A In general, the answer to that question is**
18 **no.  The standard of care is the same.  But the**
19 **standard of care is quite often affected by the**
20 **environment in which one practices.  And so, yes,**
21 **there can be particular challenges in a jail, as I**
22 **mentioned before, that would not be present in a**
23 **community setting and would affect the standard of**
24 **care.**

64

1     Q So you had previously identified a number
2 of challenges.  Are you saying that those
3 challenges could affect the standard of care in a
4 correctional setting?
5     A Yes.
6     Q And just to go back, those would be
7 security concerns, logistical concerns, and a
8 problem with referring to community doctors?
9     A Yes.
10     Q Are there any other things that you think
11 would affect the standard of care and make it
12 different in a correctional setting versus a
13 community setting?
14     **A Well, I'm certain there are many, and I**
15 **could probably -- could probably go on giving you**
16 **examples, but I will also give you another example**
17 **that a jail, in general, is not a licensed health**
18 **care facility.  So what goes on in a hospital, for**
19 **instance, is not equivalent to what goes on in a**
20 **jail.  There's a difference in the level of**
21 **testing available, the level of services that are**
22 **available, you have to send people out for things**
23 **you don't have to send people out from a hospital**
24 **for.  So, yes, all of those things would affect**

65

1  the standard of care.
2    Q  Okay.  So would you agree that the quality
3  of care should be the same in a correctional
4  setting as in any other setting?
5    A  Well, in general, as I've told you before,
6  the standard of care -- and, yes, we would strive
7  to give the same level of care, or, potentially,
8  better.  In many cases, in a jail, one gets better
9  health care than one gets outside, because, as a
10  for instance, using the example of compliance,
11  patients are much more compliant with their
12  medications in a jail than at home, because
13  somebody is giving them their pills every day.  So
14  the outcomes are different and the challenges are
15  different, but the quality of health care is not
16  changed or not diminished just because a person is
17  in jail.
18    Q  And you're saying sometimes it's even
19  improved just because someone is in jail.
20    A  Absolutely.
21    Q  So you cite a number of -- well, three
22  articles referring to borderline personality
23  disorder.  You believed that she had borderline
24  personality disorder, right?

66

1    A  Yes.  I don't believe there are three
2  articles regarding borderline personality
3  disorder.
4    Q  Oh, I apologize.  One of them is the
5  DSM-5, right?
6    A  Regarding pica, yes.
7    Q  So it's two articles about borderline
8  personality disorder?
9    A  That's correct.
10    Q  What features of borderline personality
11  disorder did she have?
12    A  A number of them.  Probably almost every
13  one of them that would be in a definition, but, I
14  mean, emotional dysregulation is one -- the main
15  one that you will see in this repeated
16  self-injurious behavior, as to examples.
17    Q  Can you name any of the others?  It's fine
18  if you can't, but I'm just curious if you know
19  what the features are that she specifically
20  exhibited.  And can I just ask you to identify
21  anything that you're referencing when you're
22  answering this?
23    A  I will.  So on page 2 of my report, well,
24  it starts at the bottom of page 1.  I say that she

67

1  appears to have borderline personality disorder.
2  So it appears to me that that is her primary
3  personality disorder, but it is, at the very
4  least, one of the cluster B personality disorders
5  which also includes anti-social personality.
6      And the next sentence goes on to say, Her
7  personality disorder had been characterized by
8  difficulties with impulse control and emotional
9  regulation, one often sees that described as
10  emotional dysregulation, manifested by many prior
11  suicide attempts/suicidal gestures and other
12  episodes of self-injurious behavior, or what we
13  used to call self-mutilation.  So those are the
14  primary examples (indiscernible) --
15    Q  Okay.  Did she have any others --
16    A  -- I'm sorry.
17    Q  -- did she have any other characteristics
18  that you didn't list in your report?
19    A  Not that I can name at this moment.  If
20  you wanted to give me a list, I could tell you if
21  I agreed or disagreed, but none come to mind at
22  this moment.
23    Q  Well, we can move on.
24      She was on a number of medications while

68

1  she was at the Sangamon County Jail, right?
2    A  That's correct, and before.
3    Q  Looking just at the ones she was on while
4  she was at Sangamon County Jail, do you remember
5  what any of those were?
6    A  I do.
7    Q  Can you tell us what they were?
8    A  Thorazine, I believe, Depakote, and, I
9  believe, Effexor, are the ones that come to mind.
10    Q  Okay.  Can you tell us what Thorazine is
11  generally indicated for?
12    A  It is an anti -- an older antipsychotic
13  medication.  So a major tranquilizer,
14  antipsychotic usually used for thought disorders.
15    Q  So can you tell us why Tiffany would have
16  been taking that particular medication?
17    A  Well, I can tell you why she would have
18  been taking it at the Sangamon County Jail, which
19  is that -- and this is a broad statement, so the
20  extent that you find that it's inaccurate, you're
21  welcome to point it out to me, but, in general,
22  her medications were continued from McFarland.  So
23  it's my understanding or my recollection that, in
24  general, her medications were continued.  So the

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

69

1  answer to why she was taking it at the Sangamon
2  County Jail is that she was taking the same or
3  similar medications before then as well, and they
4  were continued.
5      Q  Okay.  Can you tell us what specific
6  symptoms or problems that medication would have
7  been addressing for Tiffany or it would have been
8  trying to address?
9      A  Well, it's primarily indicated for a
10 thought disorder, which she did not have.  So I
11 can't get into the minds of the psychiatrists who
12 prescribed it to her at McFarland.  But, in
13 general, those kind of medications, for lack of a
14 better term, have a calming or sedative effect,
15 and that's probably what it was being used for, a
16 sedating effect.
17     Q  What about Depakote, can you tell us what
18 that's primarily indicated for?
19     A  It is an antiseizure medication that is
20 often used as what is called a mood stabilizer, so
21 for a mood disorder, for bipolar.
22     Q  So then can you tell us why, specifically,
23 that would have been prescribed for Tiffany, what
24 symptoms were they trying to manage, or what was

70

1  the purpose of it?
2      A  Well, she carried a -- I'm putting this
3  sort of in quotes -- but she carried a diagnosis
4  of bipolar disorder.  So, in other words, someone
5  had thought that she had that before, had
6  prescribed a mood stabilizer, Depakote, which was
7  continued at the Sangamon County Jail.  So it was
8  being used for a mood stabilizer.
9      Q  So when you say you're putting that
10 quotes, what does that mean?
11     A  Can the court reporter tell me what word
12 it was I was putting in quotes?
13         THE REPORTER:  Yes.  Give me just one
14 second here.
15         (Pending answer read.)
16     A  Okay.  The reason I said I'm putting that
17 in quotes is that that was a diagnosis she was
18 given.  I don't -- I don't necessarily agree that
19 she had -- actually had bipolar disorder.  But
20 that was one -- just like I don't believe she had
21 a major thought disorder.  But those were
22 diagnoses which she had been given in the past.
23 So that's why I said, quote, carried the diagnosis
24 of.

71

1      Q  Okay.  And then you said the other one was
2  Effexor, right?
3      A  Correct.
4      Q  Can you tell us what that's primarily
5  indicated for?
6      A  It is an antidepressant.  So another mood
7  disorder -- or treatment of mood disorder.
8      Q  And can you tell us why that would have
9  been prescribed to Tiffany, what it was trying to
10 treat or address?
11     A  It would be used for -- for addressing
12 depressive symptoms, and, again, she had a
13 diagnosis of bipolar which would indicate both
14 high moods and low moods, so they were being
15 addressed by those two medications.  Again, that
16 is not saying that I necessarily agree with that,
17 but those medications or those types of
18 medications had been used for a number of years
19 prior to the Sangamon County, and they
20 appropriately continued those medications once she
21 got there.
22     Q  Okay.  So you don't agree with the
23 diagnosis of bipolar, right?
24     A  I don't believe it was her major problem.

72

1  Her major problem was a personality disorder.  I
2  don't believe that she had any major mood disorder
3  or any major thought disorder.  Whether she at
4  some point in the past had technically met the
5  criteria of bipolar, that but, that I
6  don't believe that was her primary problem.
7      Q  So do you think that she met the criteria
8  for it while she was at the Sangamon County Jail?
9      A  I don't have an opinion about that.
10     Q  All right.  Did you -- they discontinued
11 some of the medications that she was taking at
12 McFarland when she came to the Sangamon County
13 Jail, is that correct?
14     A  I don't recall that specific -- I would
15 have to compare the medication list.  I know the
16 medication list was listed on the discharge
17 summary, and I know that many of the medications
18 were continued, but if you want to show me a
19 specific example, I'll tell you whether I agree or
20 not.
21     Q  But just -- without referring to anything,
22 you don't know whether some of them were
23 discontinued or not?
24     A  Well, one thing I recall is that the

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

---

73

1  hospital -- Memorial Hospital was listing Ambien
2  as a medication, and I don't remember whether they
3  were listing that as a medication from her time at
4  McFarland or from even before that.  But Ambien is
5  a controlled substance, I wouldn't expect it to be
6  given at the jail.  So to the extent she was on
7  Ambien -- I know she was reported as being on
8  Ambien at some point in the past, and to the
9  extent she was on it at McFarland, I would expect
10 them to discontinue it at Sangamon County.
11     Q  I'm going to look at page 2 of your
12 report.  And it says, She also had confirmed or
13 suspected diagnoses of bipolar disorder,
14 schizoaffective disorder, post-traumatic stress
15 disorder, and pica.  So I'd like to go through and
16 see -- can you tell us whether bipolar was
17 confirmed or suspected?
18     A  In general, I'm lumping those two
19 together.  So I don't -- I don't know.  Well,
20 first of all, those are not mutually exclusive.
21 Just because someone confirms it in the past,
22 doesn't mean that she really had it, if you follow
23 what I'm saying.
24     I mean, in other words, you would have to

74

1  know the exact time frame it was given in, whether
2  she was under the influence of substances at the
3  time, so I don't know that those are separable.
4  In order words, confirmed or -- I'm saying they
5  were listed in the chart, so she either had them
6  or some health care provider thought she had them,
7  and I can't separate the two.
8      Q  Okay.  Could you say whether she met the
9  criteria for any of those things while she was at
10 Sangamon County Jail?
11     A  I don't have a specific opinion about
12 that.  I have a specific opinion that her primary
13 problem was borderline personality disorder and
14 that she did not have a major thought disorder or
15 a major mood disorder.  Whether she technically
16 met the criteria for those conditions, I don't
17 have an opinion about.  And, by the way, could I
18 ask for a break at some convenient time?  I'm not
19 in a rush.
20     Q  Sure.  I think this would be a fine time
21 to take a break if you need one.
22         (A recess was taken.)
23 MS. GERAGHTY:
24     Q  Did you see, Dr. Fowlkes, any kind of a

75

1  treatment plan created for her while she was at
2  the Sangamon County Jail?
3      A  I saw -- I saw, essentially, a treatment
4  plan which had been provided by McFarland Mental
5  Health Facility, and I also saw what the plan was
6  for her as documented by the providers at the
7  Sangamon County Jail, both the medical providers
8  and also the mental health professional.
9      Q  But did you see that they created a
10 specific treatment plan for her at the Sangamon
11 County Jail?
12     A  You're talking about a specific written
13 treatment plan like an interdisciplinary team at a
14 mental health facility might provide; is that what
15 you're talking about?
16     Q  Well -- okay.  Let me clarify.  You said
17 there was a treatment plan created for her at
18 McFarland, right?
19     A  It was -- as I recall, the discharge
20 summary was pretty lengthy and, essentially, laid
21 out her treatment plan.  It was a summary of that
22 treatment plan.  Yes.
23     Q  I guess maybe we should start with, what
24 do you mean when you say treatment plan?

76

1      A  Well, I would ask you, what do you mean
2  when you say treatment plan?  That's what I was
3  asking.  I mean, I believe they laid out what
4  treatment they were going to provide for her, they
5  put it in writing, and then they did so.  So that
6  is a treatment plan.  If you're talking about a
7  specific document used by an interdisciplinary
8  treatment team at the mental health facility, I
9  saw that from McFarland.  I did not see one of
10 those in the Sangamon County records.
11     Q  Okay.  So let's say that with treatment
12 plan we're saying it's a written document that
13 lays out what a person's diagnosis or problem is
14 and then lays out a plan to address that problem
15 including medication, therapies, or other
16 interventions; does that sound like a fair
17 definition?
18     A  I accept that -- I accept that, and I saw
19 that in this case, yes.
20     Q  Okay.  Did you see that at the Sangamon
21 County Jail or at McFarland or both?
22     A  Well, I saw it at the Sangamon County --
23 so I'm now not talking about the McFarland.  But
24 so the treatment providers, the nurse

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

77

1  practitioner, and, I believe, specifically, the
2  physician in this case, listed her diagnoses and
3  what medications they were going to provide for
4  her, so that is one portion of the treatment plan
5  you referred to.
6        The other portion, Mr. Shmikler saw her
7  and on multiple occasions wrote a document called
8  something like -- I forget what the title of the
9  document is -- but something like review of
10 continued need for mental health treatment,
11 something along those lines, so that -- therein he
12 documented his plans for continued high-risk
13 observation, etc. So, yes, both of those were
14 then created. Not together but separately.
15    Q  So are those separate documents what you
16 would consider a treatment plan?
17    A  Well, yes. They were both part of a
18 treatment plan. That is correct that they both
19 outlined their treatment. Yes.
20    Q  Did you see any single unifying document
21 laying out a treatment plan for Ms. Rusher at
22 Sangamon County Jail?
23    A  I've already answered that. No. I did
24 not see that created at Sangamon County Jail. I

78

1  saw the one from McFarland that came with her and
2  was included within her records at the Sangamon
3  County Jail, but I did not see where they either
4  changed, altered, nor should have, the one from
5  McFarland County Jail [sic].
6    Q  Okay. But then you're saying that there
7  were, sort of, different documents that taken
8  together could be considered a treatment plan at
9  Sangamon County Jail; is that right?
10    A  What I'm saying is that the prescribing
11 providers listed her diagnoses and what
12 medications they were giving for that, therein,
13 outlining what their treatment plan was. The
14 mental health professional saw her on a regular
15 basis, and on some of those occasions, filled out
16 a document -- and I'm going to tell you the
17 correct -- I'm going to tell you what the name of
18 that document was. It is called, Placement review
19 of detainee and observation. So the need for --
20 that is a treatment plan, whether she is going to
21 continue on high-risk observation or not. So,
22 yes.
23    Q  Could you tell me the Bates stamp of the
24 document you were just looking at?

79

1    A  That -- okay. Yes, I will. The specific
2  one I was just looking at was ACH000430.
3    Q  Okay.
4    A  That is one example. That is not the --
5  that is not the only one, but that is the one I
6  was looking at.
7    Q  Fair to say there are five of those in the
8  record?
9    A  I'll trust your counting of that.
10    Q  So between those five documents and the
11 list of medications that you referenced earlier
12 from the doctors, are there any other documents
13 that you would say constitute part of her
14 treatment plan for her, or was it just those
15 things that you've already mentioned?
16    A  Well, every time that one of the providers
17 wrote a note, they laid out their treatment plan,
18 what they planned to do. Sometimes, it was to
19 send her to the hospital, sometimes, it was to
20 continue the medications. So there are a number
21 of progress notes besides just one. But, yes, in
22 general -- in total, those taken together laid out
23 their plan for her. Yes.
24    Q  So does that encompass all of the progress

80

1  notes that any -- any health care provider created
2  during her entire time at the Sangamon County
3  Jail?
4    A  Well, not necessarily, because some of
5  those may be just progress notes by a nurse for a
6  nursing sick call or some type of nursing
7  intervention that would not lay out a treatment
8  plan. Quite often, the nurses are not -- the
9  nurses sometimes do have a nursing plan, but, more
10 often, that would encompass the notes from the
11 prescriber, so the nurse practitioner and/or the
12 physician.
13    Q  Okay. Then I'll rephrase my question.
14      Any medical progress notes by a doctor or
15 a nurse practitioner, you would consider those
16 part of her treatment plan?
17    A  If they had an assessment and a plan
18 section to it, so if they were complete, yes. To
19 the extent they are -- you can show me one that's
20 not complete, it might not have either an
21 assessment or a plan, but to the extent they have
22 a plan at the bottom, yes.
23    Q  Okay. Other than the documents that we've
24 already identified, are there any other documents

81

1  you can identify that you consider to be part of
2  her treatment plan?
3      **A  Not that I can think of at this time.**
4      Q  Turning now -- turning now to your report,
5  Exhibit 3, and scrolling down --
6      **A  I'm going to look at my printed one in**
7  **front of me, if you don't mind, but just tell me**
8  **what page you're on.**
9      Q  Okay.  So looking at these first numbered
10 paragraphs that are all listed under -- make sure
11 I get the title right -- factual summary, are
12 these the facts that you relied on in reaching
13 your opinions?
14     **A  This is a summary of the important time**
15 **lines and important facts, yes.  It's not every**
16 **single one of them.**
17     Q  So there are facts not listed in this
18 factual summary that you relied on when coming to
19 your opinions?
20     **A  Absolutely.**
21     Q  So moving to these opinions.  Looking at
22 opinion 1, you used the term here, the medical
23 care provided to Ms. Rusher.  Medical care.  Does
24 that include her mental health care?

82

1      **A  Yes.**
2      Q  And then moving down to Roman numeral I,
3  No. 1, you said, The psychiatric medications she
4  had been prescribed by the psychiatrist at
5  McFarland were continued.  Her psychiatric
6  symptoms and presentation at SCJ remained
7  essentially unchanged from her symptoms and
8  condition at McFarland and previously.  There was
9  no indication to change her psychiatric medication
10 regimen or to alter her mental health treatment
11 plan.
12     So I'd like to dig into that a little bit.
13 You indicated that you did not think that her
14 primary problem was bipolar disorder or any other
15 major mood disorder or thought disorder, right?
16     **A  That's correct.**
17     Q  And that the medications that she was
18 prescribed at McFarland and at the jail are
19 indicated for major mood or thought disorders; is
20 that correct?
21     **A  Well, or -- or, potentially, indicated for**
22 **the management of symptoms in somebody like**
23 **Ms. Rusher with borderline personality disorder.**
24 **So I don't say they were inappropriately**

83

1  **prescribed.  In other words, the doctors had tried**
2  **her on a number of medications over the years, and**
3  **this medication regimen was, to some extent,**
4  **managing her symptoms.  So -- and that's the focus**
5  **of one of those articles.  So I'm not saying they**
6  **were inappropriately prescribed.  I was just**
7  **saying that she doesn't (indiscernible) that's not**
8  **her primary problem.**
9      Q  Okay.  So while she was at McFarland, she
10 continued to self injure, correct?
11     **A  Absolutely.**
12     Q  And she continued to attempt either
13 suicidal gestures or suicide attempts at
14 McFarland; is that correct?
15     **A  Absolutely.**
16     Q  But your opinion is that the medications
17 she was provided were managing her symptoms?
18     **A  No.  It's my opinion that that was the --**
19 **they were doing the best that they could.  There's**
20 **no other medications that would better manage her**
21 **symptoms.  So if her symptoms were primarily**
22 **behavioral, then no -- or personality disorder**
23 **driven, then no medications are going to be ideal.**
24 **Some of them may, some of the time, help some of**

84

1  **those symptoms, but if they had better**
2  **medications, they would have changed her to those**
3  **in some of those prior years, they didn't.  This**
4  **was the best that they had and they were using**
5  **them, and they continued them at the Sangamon**
6  **County Jail.**
7      Q  Okay.  What evidence did you see in the
8  record that they had tried other medications?
9      **A  Well, she had been -- there were some**
10 **6,000 pages or something of records from the**
11 **Department of Corrections, and, I believe, to the**
12 **best of my recollection, she had been on a number**
13 **of different medications previously.  That is the**
14 **best of my recollection, and I can't point you to**
15 **a specific page right at this moment, but that was**
16 **my interpretation of the records when I saw them.**
17     Q  So you don't remember what specific other
18 medications had been tried before?
19     **A  I do not.**
20     Q  Thinking sort of globally about this first
21 Roman numeral I, did your report contain a
22 complete statement of all of the bases and reasons
23 for this opinion I?
24     **A  I've done my best to summarize my opinions**

85

1  and the bases for them.  Yes.
2      Q  Is there anything -- well, strike that.
3        So you've done your best to summarize, but
4  there may be additional information that's not
5  listed here that you used to formulate your
6  opinion?
7      A  Well, first of all, I summarized on the
8  back page all the things that I reviewed.  So
9  there were some, you know, thousands and thousands
10 of pages of medical records that I reviewed.  I
11 did not list every single page, but all of the
12 information taken together that I was provided in
13 this case, I used to formulate my opinion.  So
14 that's the basis of my opinion, that set of facts
15 right there.
16     Now, I thought that you were also asking
17 about opinions, and I said this, I think, fairly
18 summarizes my opinions.  Might I have other
19 opinions?  Maybe so.  If you ask me a question, I
20 may have an opinion that's not listed here.  And
21 if you ask me a question that's not contained in
22 here, I'll give you an opinion if I have one.
23     Q  So I understand that you considered a lot
24 of different facts, right, and that that's -- when

86

1  you're talking about 6,000 pages of medical
2  records, obviously, you didn't include every fact
3  from those medical records, right?
4      A  That is correct.
5      Q  But did you include in your report all of
6  the facts that formed the basis of your opinions?
7      A  This report is the best that I could do to
8  summarize the facts which I considered.  So as you
9  point out, it's not every single fact that I
10 considered, because there were too many pages of
11 medical records, but it summarizes the important
12 facts that I considered and the bases for my
13 opinions which are then summarized in the opinion
14 section, and that's about the best answer I can
15 give you.
16     It's not every single fact that I
17 considered, but it is -- just like it's not every
18 opinion that I may have to every question, but I
19 did my best to summarize the facts that I
20 considered, the bases for my opinions, and those
21 opinions.
22     Q  Okay.  So putting aside the idea of
23 considering all the facts, does your report
24 contain a complete basis for all of your opinions

87

1  or -- I'll leave it there.
2      A  I believe that it does.
3      Q  All right.  So getting back to this first
4  opinion.  When she was at McFarland, she wasn't
5  just receiving medication.  She was also receiving
6  a number of other treatments; is that right?
7      A  Behavioral modifications, yes.  There were
8  certainly some -- they were trying things other
9  than medication.  In fact, they were realizing
10 that medications were not the most effective, so
11 they were trying other things to some varying
12 degree of success.  Yes.
13     Q  What other things do you recall them
14 trying?
15     A  Well, putting her -- so when she would act
16 out, they would not show her attention.  They were
17 trying to not draw attention to her, potentially
18 putting her in -- you know, sending her to her
19 room for a little while, etc., and then trying to
20 allow her, again, more freedom, etc., which would
21 work for a little while until she would have
22 another outburst.  But -- I mean, so behavioral
23 modifications they were trying.
24     Q  Okay.  Do you recall them offering her

88

1  therapy of any kind?
2      A  Well, it is a -- it is a mental hospital
3  -- a mental health hospital, and so there are
4  therapists employed there, and they spoke with her
5  regularly and provided her therapy.  Yes, I'm
6  quite sure they did.
7      Q  And so did they -- well, strike that.
8        You're certain that they provided her with
9  therapy, is that individual therapy, group
10 therapy, or both?
11     A  I don't recall specifically, in this case,
12 but having worked in a mental hospital before, I
13 would imagine that both types of therapy were
14 included.
15     Q  So you don't know from your review of the
16 records, you're just basing that on your
17 experience working in a mental hospital?
18     A  No.  I don't recall from the records
19 seeing group therapy notes, but every mental
20 hospital I've ever been associated with has both
21 individual and group therapy.  So if you wanted me
22 to review through the records and see if I could
23 find group therapy notes, I probably could.  I'm
24 just telling you I don't recall that, but I

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

89

1 imagine they were in there.

2    Q  So it seems to be your position, based on
3 what you said with the questions back, that
4 medication was not particularly effective for
5 Ms. Rusher; is that accurate?

6    A  Not particularly.  That's correct.

7    Q  Would you say -- let's see.

8       So you're saying her psychiatric symptoms
9 and presentation at SCJ remained essentially
10 unchanged from her symptoms and condition at
11 McFarland and previously.  What's that previously
12 based on?

13    A  The Department of Corrections.

14    Q  Did you review or look at anything or do
15 you remember seeing anything in what you reviewed
16 about what she was doing before she was at the
17 Department of Corrections?

18    A  Yes.

19    Q  What was that?

20    A  She had been homeless just before that,
21 but, I mean, she had bounced around a lot.  She
22 had been incarcerated for a number of years, so
23 she was about 21 when she went to the Department
24 of Corrections.  So for the prior, whatever that

90

1 is, six years, she had been incarcerated, but
2 before that she had been homeless for a time, she
3 had bounced around from place and was very
4 unstable on the outside.

5    Q  Okay.  What's the basis for your opinion
6 that she was very unstable on the outside?

7    A  The description from the Department of
8 Corrections, multiple social workers, multiple
9 different psychosocial assessments, her prior
10 history, it was all well documented in the
11 Department of Corrections records.

12    Q  All right.  Moving on to No. 2, which is
13 on page 8 of your report, it says, Mr. Shmikler
14 provided ongoing assessment and mental health
15 treatment for Ms. Rusher many dozens of times
16 while she was at SCJ.  So I want to kind of break
17 that down.  What assessments did you see him
18 providing for her?

19    A  He would speak to her, assess how she was
20 doing, and almost every time -- I believe the
21 testimony from other people was -- and it looked
22 like the records as well -- every time that he was
23 there, and I believe he was there four days a
24 week.

91

1    Q  Okay.  But was he doing a specific
2 assessment, a specific type of assessment, or just
3 a general, how you doing?

4    A  No.  I believe he was doing a specific
5 type of -- it's called a cell-side mental health
6 assessment, and he was doing that each time.

7    Q  So what are the components of -- well, I
8 guess I'll start with, is a cell-side mental
9 health assessment sort of a term of art in the
10 field?

11    A  I guess.  I don't like the term of art in
12 the field.  But, yes, it is a particular kind of
13 mental health assessment often used for people on
14 high-risk observation.  It's supposed to -- we use
15 it not just in mental health, but it's called
16 cell-side treatment.  In other words, where I'm
17 called or go by a person's cell.

18       So, for instance, quite often in my
19 facility, people on suicide watch, we don't take
20 them out of their cell more than necessary.  So I
21 would do a cell-side health assessment.  That
22 doesn't mean mental health.  That means -- in
23 other words, I'm doing it at the cell, sometimes
24 in cell, sometimes through the door, but, yes,

92

1 that is a term of art in a jail.  It references
2 providing the services at the person's cell as
3 opposed to them coming to a clinic area.

4    Q  So is a cell-side mental health
5 assessment, that's the term you used, right?

6    A  That's correct.

7    Q  Is that something that is defined by an
8 entity like NCCHC or any other organization, or is
9 that sort of just a general term?

10    A  As far as I know of, it's just a general
11 term that we use.

12    Q  And when you say we, who are you talking
13 about?

14    A  Correctional health care professionals.

15    Q  So what are the -- are there recognized
16 components of a cell-side mental health
17 assessment?

18    A  I would say that would be all dependent on
19 the mental health needs of the individual -- of
20 the patient.

21    Q  In Ms. Rusher's case, what would you say
22 the particular components of a cell-side mental
23 health assessment would be?

24    A  To assess her mental status.  So, in other

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

93

1  words, what is her level of alertness, what is her
2  mental status, to assess her mood and affect, to
3  assess her interaction and her ability to follow
4  instructions. Whether -- so the primary thing
5  that he would be assessing each time, in this
6  particular case, would be whether high-risk
7  observation cell status should be continued or
8  not, and, in this case, in most all the times, it
9  was continued. So that would be the main thing
10 that would be assessed.
11     Q  So let me make sure that I got that all
12 right. Assess her mental status, assess her mood
13 or affect, assess her ability to follow
14 instructions, and assess whether high-risk
15 observation status should be continued; is that
16 right?
17     A  Yes. And if you're going to make that as
18 an all-inclusive list, I need to probably add some
19 more. So does she have needs today, in other
20 words, how are you doing? Do you need anything?
21 Do you need for me -- do you need to make any
22 medical requests? Do you need forms? Do you need
23 legal assistance? There's a variety of things
24 that people on high-risk observation might ask you

94

1  for. So inquire how they're doing and what they
2  need and address those needs.
3      Q  Okay. Anything else?
4      A  No. Quite often, you would be providing
5  what we call motivational interviewing. I see
6  you're -- I'm going to use an example here that is
7  not directly related to this case but an example
8  of what I'm talking about. I'm glad to see,
9  Tiffany, that you haven't hurt yourself in a day
10 or two. Why don't you continue to keep up the
11 good work. You know, if you can keep up that good
12 work, you might get off this high-risk observation
13 status. Is there anything I can do for you? So
14 that kind of thing.
15     We call that motivational interviewing,
16 giving them positive reinforcements that they're
17 doing well. Or I'm sorry to see you swallowed a
18 toothbrush yesterday and had to go back to the
19 hospital. What caused you to do that? So it
20 would be dependent on the specific circumstances
21 of that day, but, yes, that's the basis of it.
22     Q  Okay. So you've identified potentially
23 six different things that would be components of a
24 cell-side mental health assessment for Ms. Rusher.

95

1  When you -- what is the basis for you to think
2  that he assessed her mental status on each of the
3  times that he met with her?
4      A  Well, there were the --
5      Q  And, actually, sorry. Let me put it this
6  way.
7      Is there something in the records that
8  indicates to you that he assessed her mental
9  status, or is that an assumption that you're
10 making based on your experience?
11     A  Two things, I will say, in addition to my
12 experience. But one of them is there was a
13 referral sheet and quite often had notes, so he
14 had specific notes on specific days when something
15 was particularly pertinent, as I recall from the
16 record. And then in addition to that, the
17 testimony of the -- of the other people, the
18 nurses and all, confirmed what he was, in fact,
19 doing, essentially. That was my overall
20 impression.
21     Now, it's my recollection, in this case,
22 that, perhaps -- that Mr. Shmikler has passed away
23 and was not actually deposed to ask what he did,
24 but that was my recollection from looking at the

96

1  notes that he made on the referral form and
2  reading the depositions of the other health care
3  professionals.
4      Q  Okay. So are there any -- thinking about
5  these six things that you identified, assessing
6  mental status, assessing mood and affect,
7  assessing her ability to follow instructions,
8  asking if she has any needs today, determining
9  whether high-risk observation status should be
10 continued, and using motivational interviewing, is
11 there anything in the records, other than the logs
12 that you just noted and deposition testimony from
13 other people, that tells you that any of these
14 things were happening?
15     A  Well, yes. On at least some of those
16 occasions, I believe you said five was the number
17 -- the form that I was referring to was filled
18 out, which indicates -- which is like a -- in
19 other words, on that day, on those particular
20 days, it was a more detailed assessment which was
21 documented. On the other days, those assessments
22 were not documented in as much detail, but, yes,
23 on those five occasions, then the specific
24 interval history was reported.

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

97

1    Q   Okay.  Did any of those five indicate that
2  he used motivational interviewing with her?
3    A   I would have to go back and review them --
4  I'd have to go back and review them to see whether
5  they did or whether they did not.  I would imagine
6  that he did, whether or not it's -- and, again,
7  that is based on my experience about what a mental
8  health professional normally does in a cell-side
9  assessment, but I don't recall whether it was
10  specifically documented or not.
11    Q   You also say in this particular subsection
12  he was providing mental health treatment for
13  Ms. Rusher.  What do you identify as the mental
14  health treatment he was providing?
15    A   The things we just mentioned.
16  Essentially, the same level of treatment she was
17  getting at McFarland or at the Department of
18  Corrections, talking to a mental health
19  professional, doing things to try to improve her
20  situation.  Can we -- you know, attempting to
21  place her in an environment where she was going to
22  be able to succeed.  They were trying -- she was
23  getting close to getting out.  He was talking to
24  her about succeeding once she got out of jail.  So

98

1  all of those things were documented.  The same
2  kinds of things that were going on at McFarland.
3    Q   All right.  So moving on to No. 3.  3A,
4  you said that her housing assignment was
5  appropriate --
6    A   You cut out.
7    Q   Sorry.  Before we do that, are you saying
8  that she was getting the same level of mental
9  health care at the jail that she was getting at
10  McFarland?
11    A   No.  Sangamon County Jail is a county
12  jail.  McFarland is a mental health hospital.  So,
13  no, I'm not saying that.
14    Q   Okay.  But correct me if I'm wrong -- and
15  maybe we could ask the court reporter to read this
16  back -- you said that she was getting the same --
17  that his cell-side mental assessments were the
18  same level of care that she was getting at
19  McFarland.
20    A   I believe I said the same type.  But, yes,
21  those assessments would be of the same type or the
22  same level she was getting at McFarland.  Now, in
23  a mental hospital, the frequency of interacting
24  with a mental health professional is much more

99

1  frequent, and they have a number of things that
2  don't occur at a county jail.  But the type of
3  things that Mr. Shmikler were doing were the same
4  types of things that they were doing at McFarland.
5  I'm quite sure it occurred more frequently at
6  McFarland.
7    Q   So what types of things occurred at
8  McFarland that were not occurring at the county
9  jail, in your opinion?
10    A   One of them I recall that you mentioned
11  earlier was I'm quite sure there was group therapy
12  at a mental hospital.  That does not normally
13  occur at a county jail.
14    Q   Are there any others?
15    A   I'm sure she was receiving individual
16  therapy more often than -- than the four times a
17  week that Mr. Shmikler was providing and for
18  probably more prolonged periods of time.
19    Q   Can you say, from looking at the records,
20  how long he spent talking with Tiffany Rusher each
21  time he was talking with her?
22    A   Not from looking at the records, no.  And
23  the reason I made the answer that way was I seem
24  to recall someone saying something, I believe it

100

1  was the mental health supervisor, but saying that
2  she saw -- at least she reviewed some video.  So
3  there was apparently video that was outside of the
4  cell and you could tell how long he was talking to
5  her, but, no, I did not review that.
6    Q   So do you know how much of the time that
7  he spent with her was devoted to assessment versus
8  encouraging her or using motivational
9  interviewing?
10    A   I do not.
11    Q   What's the basis for your opinion about
12  how much time he was -- well, I guess I'll clarify
13  this.
14      Can you give an estimate of how much time
15  he was spending with her each day that he saw her?
16    A   No, I'm not prepared to do that.
17    Q   And why is that?
18    A   Because I don't know.
19    Q   Moving on to this next section, Housing
20  assignment was appropriate.  She was housed alone
21  in a cell close to the booking area where she
22  could be observed at frequent intervals.  Have you
23  ever been to the Sangamon County Jail?
24    A   I have not.

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

26 (101 to 104)

101

1    Q  Did you ever look at a floor plan of it?
2    A  I don't recall.  I do not recall,
3  specifically.  And the reason I'm being a bit
4  hesitant in that answer is that I have a general
5  framework in my mind of how this high-risk
6  observation cell was in proximity to the booking
7  desk or the booking area.  I don't know if I saw a
8  specific schematic or if I just understood from
9  the descriptions in the depositions.
10    Q  What's your understanding of how it was
11 set up?
12    A  It's that it was in proximity to the
13 booking area.  Perhaps, the first -- I believe it
14 might have been down a hallway, but the first one.
15 So, in other words, it was, essentially, direct
16 line of sight to the booking area.
17    Q  (Indiscernible) maybe filling out
18 paperwork and where the guards would kind of be
19 stationed?
20    A  Well, yes.  But the booking area of a jail
21 also has lots of activity, people passing through
22 there.  That's how, often, people report to work,
23 people come and go, so it's the high traffic area
24 of the jail.

102

1    Q  All right.  Looking at C, it says, She was
2  seen by the nurses multiple times per day and was
3  assessed by a provider approximately weekly.  So
4  when you're saying she was seen by the nurses
5  multiple times per day, are you talking about
6  medication pass?
7    A  Yes.  Of course, in a jail, medication
8  pass is an interaction between -- so it's an
9  opportunity for people to turn in -- that usually
10 something more happens than just med pass.  In
11 other words, you turn in sick calls then, you tell
12 the nurse I need something, my medicine's not
13 right, can you tell the doctor I need to see them?
14 My medicine's increased.  So, yes, it is called
15 med pass, but it is an interaction with the nurse,
16 and that occurred, in Ms. Rusher's case, three
17 times each day.
18    Q  Did you see specific evidence in the
19 record that anything other than passing out
20 medication happened during the med passes with
21 her?
22    A  I specifically know that is what nurses do
23 in a jail is talk to people.  I mean, they --
24 that's -- apparently, if you don't see any sick

103

1  call forms, it's because -- my point is that
2  that's what the nurses do.  They walk around, they
3  talk to people, and they have to take action if
4  the people tell them they need something.  They
5  turn in a sick call form, they turn it in, have
6  them seen by a provider.  That's the way it works.
7    Q  So the basis for that opinion is your
8  experience in correctional facilities, not
9  anything specific from these records in this case?
10    A  It's my experience knowing that's how
11 medication passes work, yes.
12    Q  And then it says, Assessed by a provider
13 approximately weekly.  So those, you're talking
14 about either a nurse practitioner or a doctor?
15    A  That is correct.
16    Q  Do you have -- well, what's your
17 understanding of why she was being seen for those
18 assessments?
19    A  To the best of my recollection, the
20 primary reason was not in response to medical
21 requests but was because of her high-risk
22 observation status.  So that's the best
23 recollection -- that and then there would be, from
24 time to time, acute events.  So, in other words,

104

1  self-injurious behavior, they would have to
2  address that.  So I believe a combination of
3  high-risk observation and acute events.
4    Q  So your recollection is that when the
5  nurse practitioners and doctors were seeing her,
6  it had to do with assessing her high-risk
7  observation status?
8    A  I didn't say that.  I said they were
9  seeing her on a regular basis, and it is not
10 uncommon for providers to see people on high-risk
11 observation status on a regular basis.  I don't
12 recall if that was the specific reason, but that
13 was my recollection.
14    Q  Okay.  What's the basis for that opinion?
15    A  It's what is in the records themselves.
16 So, in other words, the most common reason for a
17 provider to see an inmate in a jail is in response
18 to a sick call request.  So, in other words, a
19 person turns in a piece of paper that says, I need
20 to be seen because of this, and then they're seen.
21 I did not see that being the case here.
22      In other words, I don't recall -- at least
23 I do not recall many, if any, actual written sick
24 call requests by Ms. Rusher.  In fact, they were

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

105

1  being seen not at her specific written request but
2  for another reason, and I told you the two reasons
3  I thought they were.
4     Q  Okay.  So looking again that this opinion,
5  do you know how many nurses there were at Sangamon
6  County Jail?
7     A  Not specifically, no.
8     Q  Do you have sort of an estimate, I mean,
9  are we talking 2 or 20 or 200?
10    A  More what I -- more than the number of
11  actual nurses, what my -- the way I would assess
12  nursing staffing in a jail is, number one, whether
13  they have 24-hour-a-day nursing, and then how many
14  that they have on staff at any particular time or
15  how many -- what I know that they had was at least
16  one nurse who was the HSA.  They had a nurse who
17  did medication pass in that area.  And so it was
18  my understanding that more than one nurse was on
19  duty at time, that's my recollection.
20    Q  Okay.  But is it your understanding there
21  was one nurse assigned to medication pass for each
22  medication pass?
23    A  Well, that's how it would work -- well,
24  I'm sorry.  No.  There is a nurse assigned to

106

1  medication pass.  Whether -- sometimes in some
2  jails, if they're big enough, there might be one
3  nurse assigned to medication pass on the first
4  floor, another nurse assigned to medication pass
5  on the second floor.  So I can't say whether more
6  than one nurse was assigned to medication pass.
7  But, yes, in -- so for the booking area, one nurse
8  would be assigned each day to do medication pass.
9     Q  Do you know how many people a nurse would
10  have to pass medication to in the booking area at
11  Sangamon County Jail?
12    A  In the booking area, specifically, no.  It
13  was my understanding that Sangamon County Jail is
14  about a 350-bed facility and -- but, no, not
15  specifically in the booking area.
16    Q  Do you -- was there anything in what you
17  reviewed -- strike that.
18        Was there any evidence in the record that
19  a nurse why had to do medication pass would only
20  be assigned medication pass for the booking area,
21  or would she have been doing it for the whole
22  jail, or do you not know?
23    A  I do not know.  I mean, I could probably
24  find it out from the records, but I don't recall

107

1  that.
2     Q  So you don't know how many people the
3  nurse doing medication pass would have to pass out
4  medication to?
5     A  That's correct.
6     Q  Do you have any idea how much time that
7  nurse would have been allotted to do that?
8     A  I have a general understanding of how a
9  nurse -- of how medication pass works, yes.
10    Q  But, I guess, is that knowledge based on
11  your experience in correctional facilities, or is
12  that knowledge specific to this case from
13  something that you reviewed in the records?
14    A  No.  My general knowledge of correctional
15  facilities.  What I mean -- and let me -- I'm not
16  trying to belabor the point.  But, normally, if
17  you have a big enough facility where medication
18  pass would take more than, let's say, two hours,
19  you need to divide it up amongst nurses, because
20  if you have 7:00 a.m. or 8:00 a.m. med pass, they
21  can't be doing med pass from -- for all morning,
22  because it's time to do the new meds again, if you
23  follow what I'm saying.
24        So if you're in the -- if you're in

108

1  Manhattan, one nurse could never do, you know,
2  everybody in Manhattan.  If you're in a midsize
3  jail, one or two nurses might be able to do it.
4  In a small jail, one nurse is going to do the
5  whole facility, but you have to be done within one
6  to two hours in order to be able to do your other
7  duties and start over for your next med pass.
8     Q  Okay.  So based on -- you don't -- strike
9  that.
10        There's nothing in the record to tell you
11  how many nurses were doing med pass at Sangamon on
12  any given day, right?
13    A  Not that I recall.  There might be, but
14  not that I recall.
15    Q  And there's nothing that you recall in the
16  record about how many people they would have had
17  to pass medications out to?
18    A  I don't recall that, no.
19    Q  And you don't have any idea how much time
20  they would have had to spend then with each person
21  they were passing medication to?
22    A  Well, that's not true, because I know how
23  med pass works.  I mean, you -- so, in other
24  words, a nurse with med pass has a cart, so a

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

28 (109 to 112)

109

1   person -- they pass by each area.  So, for
2   instance, other people in the booking area who are
3   not receiving pills still might talk to the nurse
4   during med pass.  Obviously, he or she interacts
5   with people that get pills longer than people that
6   people who don't, but it's an opportunity to,
7   essentially, lay eyes on each person in the
8   facility and give them an opportunity to request
9   medical needs, if they have them.
10    Q   You have never observed med pass happening
11  in Sangamon County Jail, right?
12    A   I have not, but I'm very familiar with how
13  med pass works in a county jail.
14    Q   So moving to -- well, I'm going to stick
15  with C for just maybe one or two more questions.
16  Generally speaking, not specific to this case,
17  when meeting with a patient to treat a patient, is
18  it important for a doctor to know -- or a nurse
19  practitioner, I'll say, provider, to know what a
20  person's preexisting diagnoses are?
21    A   As a general statement, I will say that is
22  important, yes.  If -- there are certain
23  circumstances where it would not matter.  So, for
24  instance, a person who has fallen off a ladder and

110

1   has broken their ankle, it is not overly relevant
2   what their past history is.  But, in general, that
3   is a true statement.
4     Q   And it would be important to accurately
5   note those diagnoses and records of the treatment
6   that you're providing?
7     A   Could you repeat -- either you or the
8   court reporter repeat the question, please?
9     Q   It would be important to accurately note
10  the diagnoses in records of treatment that you're
11  creating?
12    A   Well, if you're referring to all of their
13  prior diagnoses, no, I disagree with that.  So you
14  said -- your last question was, should a provider
15  know what they're prior diagnoses were, and I
16  said, yes, as a general statement, I agree.  Then
17  your next question was, should you note those
18  diagnoses, and I would say the answer to that, in
19  general, is no.  So if you, in general, know a
20  person has a mental health condition but you were
21  seeing them for a runny nose, no, it would not be
22  important to document that on each and every
23  encounter, because it's documented in the record
24  and you know that.

111

1     Q   What if you're seeing them for that mental
2   health diagnosis, would it be important to note
3   what their diagnosis is?
4     A   That would all depend on the circumstance.
5     Q   In what way?
6     A   Well, if the -- if you're continuing the
7   medications, the specific diagnoses, and
8   especially all of them, would be not overly
9   important.  And, in fact, in this case, I believe
10  that Ms. Rusher was also diagnosed with antisocial
11  personality disorder, so it would not be important
12  for her medications whether you wrote antisocial
13  personality disorder, borderline personality
14  disorder, neither one of those, because that's not
15  really what the medications were addressing, and
16  writing down each and every encounter would be a
17  waste of paper.
18    Q   So moving on to No. 4 here.  You said it
19  would not be reasonable to provide one-on-one
20  monitoring of Ms. Rusher for the entire time she
21  was housed at SCJ given her very long history of
22  frequent, repeated suicide attempts and other SIB,
23  which I take to mean self-injurious behavior --
24    A   That is correct.

112

1     Q   -- what's the basis for that opinion?
2     A   Because it's impossible and/or
3   impractical.
4     Q   What makes it impossible?
5     A   A county jail would not be capable of
6   assigning one officer to keep observation one on
7   one, 100 percent of the time, for four months.
8   It's not -- it's not -- it's neither possible,
9   practical, or reasonable, none of those things.
10    Q   Why is it not possible?
11    A   Primarily because they don't have an
12  officer to assign to only one inmate for four
13  months.  I mean, you could do it -- so, in other
14  words, that is appropriate or practical or
15  reasonable in a particular acute set of
16  circumstances.
17      So, in other words, if someone says, right
18  at this moment, I'm about to commit suicide, it is
19  reasonable to do one-on-one observation or even
20  have the person's one-on-one attention for a
21  period of time.  It's not reasonable to do it for
22  four months.
23    Q   You reviewed records from the Illinois
24  Department of Corrections, right?

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

113

1     A  I did.
2     Q  Was it reasonable for IDOC to put her on
3  constant watch for five months?
4     A  Well, so that's -- that's a whole
5  different -- that's a whole different matter.
6  Because, number one, what IDOC -- I'd have to look
7  at their definition of constant watch -- but
8  that's not one officer and one inmate.  That's not
9  what they mean.
10    Q  What do they mean?
11    A  I don't know for sure, but I can tell you
12  it's not one officer sitting outside of only
13  Tiffany Rusher's cell.
14    Q  How can you tell that's not what they
15  mean?
16    A  Because that's not what the Department of
17  Corrections does.  So, in other words, what I mean
18  by that is, you could have, potentially, 20, 30,
19  10 -- well, it doesn't matter the number -- of
20  glass-fronted cells and an officer sitting there
21  watching them, supposedly, on a constant basis,
22  but they don't have one officer watching one --
23  one inmate at Department of Corrections, not that
24  I'm ever aware of, and I don't believe the

114

1  Illinois Department of Corrections either.
2     Q  What's your -- have you ever been worked
3  for the Illinois Department of Corrections?
4     A  I have not.
5     Q  Did you talk to anyone at the Illinois
6  Department of Corrections in preparing for this
7  testimony or to write your report?
8     A  I did not.
9     Q  Okay.  So what knowledge do you have
10  specific to the Illinois Department of
11  Corrections?
12    A  It does not work that way in the
13  Department of Corrections --
14    Q  Okay.  Let me stop you there.
15    A  You said, Department of Corrections.
16    Q  I'm asking specifically about the Illinois
17  Department of Corrections.  What knowledge do you
18  have about that particular organization?
19    A  I have reviewed cases in the Department of
20  Corrections in Illinois, and I know, generally,
21  that that is a very large, state-run penal
22  institution, and I know, generally, how they run.
23  If you're asking about a specific facility and
24  their specific protocols, then, no, I do not.  But

115

1  I do know that I've never encountered, in my years
2  of encountering state prison systems, for them to
3  have one-on-one observation of one officer and one
4  inmate for a prolonged period of time.
5     Q  Okay.  So looking at this opinion, it
6  would not be reasonable to provide one-on-one
7  monitoring of Ms. Rusher for the entire time.  It
8  seems like you are differentiating between
9  constant watch and one-on-one monitoring; is that
10  fair?
11    A  That would be correct.  Constant watch
12  means a -- is a particular level of observation.
13  That's correct.
14    Q  And what is your understanding of constant
15  watch?
16    A  That would depend on the institution you
17  were in.
18    Q  Does it generally mean that someone is
19  watching someone constantly?
20    A  It generally means that is what is
21  supposed to be happening.  Quite often, that is
22  via video monitoring.  So, in other words -- I'm
23  giving examples, again.  I don't know how the
24  Department of Corrections works.

116

1     But constant watch might be 20 cells all
2  with cameras and one person watching 20 cameras.
3  And that -- that is supposed to be constant watch,
4  so that would meet the definition.  What does not
5  occur is one person sitting outside one cell and
6  watching it.  That is -- that, I've never
7  encountered.
8     Q  Okay.  Do you know if the Sangamon County
9  Jail had any cells equipped with video monitoring
10  systems?
11    A  I don't know for certain.  I know that
12  they did have videos in there, and so it would not
13  at all surprise me if they had one or more cells
14  with video monitoring, but I don't know for
15  certain.
16    Q  So you said it would not be reasonable to
17  provide one-on-one monitoring of Ms. Rusher, would
18  it be reasonable to keep her on constant watch?
19    A  I don't know that constant watch is a term
20  that was used by Sangamon County Jail as one of
21  their observation levels.  I know of -- I don't
22  know that they had an observation level called
23  constant watch.  I know they had high-risk
24  observation with 15 minute -- but I don't know

117

1 about constant watch.
2    Q  If you were to assume that they did have a
3 status called constant watch, would it be
4 reasonable to keep her on that status?
5    **A  It would not be either reasonable nor**
6 **unreasonable.  So, in other words, if -- it**
7 **wouldn't be unreasonable to keep her on that**
8 **status, but it would not be any better than what**
9 **they were doing.  In other words, they had her**
10 **near -- it might be better in a lot of**
11 **circumstances.  So, in order words, I would not**
12 **want for her to be way away from everyone in a pod**
13 **that had video cameras in there that someone was**
14 **supposed to be watching.  So that would not be as**
15 **good.  So it would just depend on the specific**
16 **circumstances, but I don't know anything about**
17 **that they had that available.**
18    Q  Okay.  So you said that one-on-one watch
19 would not be reasonable because they just couldn't
20 have a jail employee there with her constantly; is
21 that accurate?
22    **A  Not for four months.  That's correct.**
23    Q  Do you know how many people were employed
24 at the Sangamon County Jail?

118

1    **A  I do not.**
2    Q  From your review of the records, do you
3 know how many hours a week Mr. Shmikler was
4 working?
5    **A  I know that he went there 4 times a week,**
6 **and my recollection was maybe it was 4 or 5 hours**
7 **at a time.  So I would then say 16 to 20, but**
8 **that's -- I don't have specific information other**
9 **than that was my understanding from the record.**
10    Q  All right.  Do you know how many people he
11 was -- well, I'll back up a second.
12       Was he the only qualified mental health
13 professional assigned and working at the Sangamon
14 County Jail?
15    **A  To the best of my understanding, yes.**
16 **Now, obviously, he had a supervisor who filled in**
17 **when he was on vacation, but, yes, it was my**
18 **understanding that he was the primary qualified**
19 **mental health professional.**
20    Q  And do you know how many people he was
21 responsible for monitoring and caring for?
22    **A  I said before I think that there were --**
23 **it was a 350-bed jail.**
24    Q  Would he be responsible for monitoring all

119

1 350 people then?
2    **A  If they had mental health needs, yes.**
3    Q  Do you have an idea of how many people --
4 given the records -- how many people he was seeing
5 regularly or assessing on a regular basis?
6    **A  Well, yes.  I have some understanding from**
7 **-- so there were those lists -- I'm referring now**
8 **to pages in the record where there were lists and**
9 **there were a number of names redacted, and**
10 **Ms. Rusher's was not.  So, I mean, I can -- it**
11 **looked like there might have been 10 or 12 names**
12 **on that list, and 11 of them are crossed out, if**
13 **you follow what I'm saying, but, beyond that, no,**
14 **I don't have other specific information.**
15    Q  Okay.  So is it fair to say you don't
16 really know how many people he was seeing or
17 assessing or providing treatment for on a weekly
18 basis?
19    **A  Well, no.  That's not fair to say, because**
20 **those were, I believe, entitled his referral list,**
21 **so that was the people he was assigned to, to the**
22 **best of my understanding.  You understand what I'm**
23 **saying?  I mean, that list was called a referral**
24 **list, so, hence, that's the people he was going to**

120

1 see.
2    Q  Is it possible there were people in
3 addition to those people that he was also seeing?
4    **A  Absolutely, it's possible.**
5    Q  So without -- well, do you know how many?
6    **A  No.  I told you I didn't know it occurred.**
7 **You just asked if it's possible, anything's**
8 **possible.**
9    Q  So given your estimate of how many hours a
10 week he was working and sort of what you think the
11 number of people he might have been seeing was, do
12 you think it would have been possible for
13 Mr. Shmikler to provide any more services to
14 Tiffany than what he was providing to her?
15    **A  If she needed it, I'm quite sure that he**
16 **-- so, yes, if she had needed more time, I'm quite**
17 **sure more time could have been spent.  Yes.**
18    Q  How do you know that?
19    **A  Well, typically, in any health care**
20 **setting, including in a jail, and when a person is**
21 **there, one takes care of the most important issues**
22 **first, and that takes what length of time it does,**
23 **and then you get the rest of your duties done when**
24 **you've taken care of the most pressing issues that**

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

121

1  you had.
2      Q  Okay.  But are you basing your opinion
3  sort of on what you know generally or on specific
4  information you reviewed for this case?
5      A  I'm reviewing -- I mean, I'm basing my
6  opinion on how things generally work in a county
7  jail with a mental health professional who is
8  there a certain number of hours a week, and I am
9  familiar with that and know how that works.
10     Q  Do you know how many minutes he had
11  available to spend on each person with pressing
12  mental health needs at the jail?
13     A  I do not.
14     Q  All right.  So moving to the second part
15  of this section, The measures taken by the SCJ
16  security staff and ACH medical staff to limit the
17  number of episodes of SIB and to respond promptly
18  when they occurred were reasonable and
19  appropriate.
20        Are you an expert in jail security?
21     A  No.  In -- I'm -- I'm an expert in
22  correctional health care.  So what was your
23  specific question, though?
24     Q  I was asking if you're an expert in jail

122

1  security, and the answer is, no, right?
2      A  Specifically jail security, no.  Now, do
3  certain aspects of jail security play into my
4  expertise in correctional health care, absolutely.
5  So it depends on the specific -- the specific
6  topic we're talking about.
7      Q  Have you ever been qualified as an expert
8  in jail security?
9      A  Again, as I just told you, I am an expert
10  in correctional health care.  There are certain
11  aspects of jail security that impact correctional
12  health care.  If you're talking about the design
13  of -- in jail specific -- jail security, you have
14  to define that term for me.  What do you mean?
15  Design of jails?  No, I am not.  Use of force as
16  it relates to security?  No.  Breaking out of
17  jails?  No.  As it relates to correctional health
18  care?  Yes.  Which one are you talking about?
19     Q  Well, my question was, have you ever been
20  qualified as an expert in jail security.  So I
21  will clarify that to say, have you ever been
22  recognized by a court as an expert in jail
23  security, yes or no?
24     A  I do not know how to answer that question.

123

1      A  I do not know.
2      Q  You've testified in court before, right?
3      A  I have.  And I have told you I am not an
4  expert in jail design.  And I do not know what you
5  mean by the term, jail security.  I'm sorry.  I
6  just don't understand.
7      Q  All right.  We can move on.
8        What orders did you see in these records
9  restricting her access to specific items, if you
10  can recall, and list them out?
11     A  Which item -- which number are you
12  referring to?
13     Q  So I'm not looking specifically at your
14  opinions or your report at this point.  I'm just
15  saying, would you agree that there were specific
16  orders issued limiting her access to specific
17  types of items?
18     A  Yes.
19     Q  What types of items was she restricted
20  from having that you recall from looking at the
21  records?
22     A  Well, I believe they potentially varied at
23  different times.  But, number one, there was --
24  the most vivid thing I recall is that there was

124

1  some notice on her door saying specifically some
2  items she was not allowed to have.
3      Q  What items were those?
4      A  Let me find -- I'll need to turn to my
5  records.  I think I -- I don't see that particular
6  page printed out, but I recall it was that she --
7  I can probably more easily list the items that I
8  know.  I know from -- at least some of the time,
9  she was provided a suicide smock as opposed to
10  regular jail clothes.
11     Q  Okay.  So fair to say she was restricted
12  from having regular jail clothes?
13     A  As I recall, yes.
14     Q  And she was restricted to certain types of
15  foods?
16     A  At least some of the time, because I
17  believe -- it might have been finger foods.  So
18  there's two issues with foods, and McFarland at
19  least -- and, potentially, Sangamon County Jail,
20  but I don't believe Sangamon County Jail -- she
21  had attempted to choke herself on celery and
22  carrots.  I believe that was only at McFarland.  I
23  believe they limited her to finger foods at
24  Sangamon County Jail.  I don't recall that.

125

1    Same with a spork or utensils.  So in the
2 jail, sometimes there's a combination spoon and
3 fork which they refer to as a spork, and I know
4 she did swallow that.  Whether she was restricted
5 from that every single meal, I don't recall.  I
6 seem to recall that she was provided finger foods
7 and that they knew that she would try to choke
8 herself with carrots and celery, and they didn't
9 give those to her.  She also --
10    Q  Sorry.  Go ahead.
11    A  -- she also had tried to choke herself
12 with toilet paper, and I think that the sign -- if
13 I recall correctly, the sign said something like,
14 give her six or seven squares at a time, some
15 number of squares.  So she was restricted from
16 having unlimited access to toilet paper.  I don't
17 believe she was entirely restricted from that.
18 They were very cautious about giving her writing
19 utensils, because she would try to swallow them.
20 So pens, crayons, etc.  I think they would
21 sometimes let her use them under supervision, but
22 I recall that as well.
23    Q  Okay.  So fair to say they issued a
24 variety of different restrictions on her based on

126

1 -- to limit the types of items she could have
2 access to?
3    A  Absolutely.
4    Q  And you mentioned that she was in a
5 suicide smock instead of regular jail clothing,
6 right?
7    A  Yes.  I don't know was that the entire
8 time, I don't recall that or not, but, yes, at
9 least some of the time, and at least at the time
10 that she was -- that she did strangle herself, she
11 was in a suicide smock.
12    Q  What's your understanding of why she was
13 issued a suicide smock instead of regular
14 clothing?
15    A  Because she had repeated self-injurious
16 behavior and had tried to use clothing to put
17 around her neck, and a suicide smock doesn't allow
18 you to do that.
19    Q  Do you remember whether she was allowed
20 any kind of fabric in her cell, like sheets?
21    A  To the best of my recollection, no.  And I
22 would be very surprised -- the answer to that is
23 I'm almost 100 percent certain, no.  She had a
24 mattress.  Those mattresses are supposed to be

127

1 tear proof, and they have some material on the
2 inside of them that can be dug out and eaten,
3 which I think she did, but that's not exactly what
4 you would call fabric.  It's more difficult to
5 tear plastic.
6    Q  Okay.  So that was speaking about the
7 Sangamon County Jail, but do you remember -- was
8 she limited from different types of objects while
9 she was at DOC, as well?
10    A  I'm almost certain she was, yes.
11    Q  Do you recall that she was prohibited from
12 having towels for a period at DOC?
13    A  I don't specifically recall that, but I
14 certainly wouldn't be surprised.
15    Q  But you never saw that she was restricted
16 from having towels at Sangamon County Jail, did
17 you?
18    A  Well, yes.  I think, absolutely, she was
19 restricted from having towels.  So most inmates
20 are provided -- every inmate in a county jail is
21 dispensed sheets and towels, so they normally have
22 their own towel, and she was not given a towel.
23 She was only allowed to use a towel when she was
24 taking a shower, so that is restricted from a

128

1 towel.
2    Q  So it was restricted but not prohibited?
3 Restricted as in she couldn't have it in her cell,
4 but she wasn't prohibited from using one when she
5 was showering?
6    A  Right.  And some things are just simply
7 impractical.  So, for instance, it is -- one
8 cannot ever shower if one cannot -- I mean, you
9 can, I guess, let people drip dry and go down the
10 hallway, but that's unreasonable.  Just like
11 toilet paper, she was restricted from having too
12 much toilet paper, from having rolls of toilet
13 paper, but when she went to the bathroom, she had
14 to be allowed to use toilet paper.
15    Q  So was it unreasonable when IDOC
16 prohibited her from having a towel and said she
17 could just use her suicide smock to dry off?
18    A  I can't comment on that.  I don't recall
19 it, and I don't have an opinion about it.
20    Q  All right.  So moving on to the next -- so
21 you said a -- we're on page 9.  High-risk
22 observation cell with single-person housing near
23 the booking area in a county jail is not solitary
24 confinement.  It is not equivalent to the

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

---

129

1  conditions of long-term housing in solitary
2  confinement with extreme social isolation that has
3  been reported in some prisons.
4       What's your definition of solitary
5  confinement?
6     **A  Well, the definition I was referring to --**
7  **I was referring to -- essentially, it was used by**
8  **one or more of the plaintiff's experts, but,**
9  **essentially, solitary confinement is housing alone**
10 **whether there is very limited social interaction**
11 **with other people.  It's normally done for -- and**
12 **I say normally, because, fortunately, it's rare**
13 **these days to even have solitary confinement --**
14 **but done for disciplinary reasons where you're**
15 **housed alone, allowed limited social interactions,**
16 **limited times out of the cell, and, again, usually**
17 **for some type of disciplinary reason.**
18    Q  Could you quantify very limited social
19 interaction, the term you just used?
20    **A  Yes.  So that would be, as an example, in**
21 **a prison where the guards either pass -- I mean,**
22 **pass meals or prisoners even don't pass meals.**
23 **In other words, I've seen examples of solitary**
24 **confinement where there is not any interaction**

---

130

1  **between the guard and the inmate at mealtime.  But**
2  **a normal thing would be at least mealtime, so**
3  **three times a day you see a guard come by and pass**
4  **a meal tray in.**
5     Q  Okay.  So your definition of solitary
6  confinement then would be housing alone in a cell
7  with fewer than three interactions with someone
8  else each day -- three or fewer, I should say?
9     **A  Well, that wasn't all of my answer.  So**
10 **it's done for disciplinary reasons, and it would**
11 **usually be done with the idea of creating social**
12 **isolation, so in a unit.  For a number of reasons,**
13 **being in a high-risk observation cell in a booking**
14 **area in the Sangamon County Jail would not be**
15 **that.**
16      **Number one of which is it's not**
17 **disciplinary reasons but rather for administrative**
18 **reasons or security reasons or for medical**
19 **reasons.  In addition to that, it's in the busiest**
20 **area -- it's in the -- it's not designed to create**
21 **social isolation.  It's in the busiest area of the**
22 **jail.  People were talking to her and passing by**
23 **her cell and interacting with her many, many times**
24 **a day.**

---

131

1     Q  Okay.  Is there any other factor, you
2  would say, that contributes to your definition of
3  solitary confinement?
4     **A  Well, for one thing, jails, in general,**
5  **don't have solitary confinement, and, certainly,**
6  **suicide watch is not solitary confinement.  It's**
7  **not -- it's not done for the purposes of**
8  **disciplinary segregation.**
9     Q  Okay.  So you would say an important
10 factor of whether you consider something solitary
11 confinement is the purpose for which it's done?
12    **A  That's correct.**
13    Q  What is your definition of solitary
14 confinement based on?  And what I'm getting at
15 here is, is it based on books you've read about
16 solitary confinement or studies that you've read
17 about solitary confinement or is it based on your
18 experience?  I'm just trying to get to the basis
19 of what your definition is.
20    **A  I would say it's my general understanding.**
21 **And having read studies on the adverse effects of**
22 **solitary confinement, that is what they're talking**
23 **about in general.  So, in other words, if you read**
24 **those studies and look at what they're talking**

---

132

1  **about, they're talking about in prison, the types**
2  **of units that they are describing, so it's from**
3  **reading the studies.**
4     Q  Are you able to name any of the studies
5  that you've read about solitary confinement?
6     **A  No.  I was going to say, perhaps, Dr. -- I**
7  **believe you pronounce his name Dr. Kupers, but I'm**
8  **not sure.  He might have referenced some of those.**
9  **I don't recall.**
10    Q  Have you -- do you remember reading any
11 studies about the affects of isolation on inmates
12 regardless of whether it's called solitary
13 confinement?
14    **A  Yes.  Generally, I'm familiar with that.**
15    Q  Okay.  Have you -- do you recall any
16 specific articles or studies or books that you
17 have read about the affect of isolation on inmates
18 with mental illness?
19    **A  Not specifically that I can quote, no.**
20    Q  Is it that you haven't read such studies,
21 or you just don't know the names of them?
22    **A  The latter.**
23    Q  So you have read published materials about
24 the affects of isolation on people with mental

---

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

133

1 illness?

2    A  Yes.  Quite often, it's in the same
3 articles or same sources you were just talking
4 about with solitary confinement.  It's usually
5 addressed in there as well.

6    Q  Do you know the name of anyone you would
7 cite as sort of an authority on that particular
8 topic?

9    A  No.  No.  It's not an issue that I address
10 often in the county jail.

11    Q  Moving on to B on that same page.  It
12 says, Unfortunately, Ms. Rusher had a long history
13 of ingesting almost any foreign body she could get
14 her hands on, thus, her access to those items
15 necessarily had to be severely limited.

16       So I want to talk about the limits that
17 were placed on her at McFarland versus the limits
18 that were placed on her at the Sangamon County
19 Jail.  Do you know, from reading the records, if
20 she was locked into her room at McFarland?

21    A  I do not know the answer to that on some
22 specific occasions.  That wouldn't -- I would not
23 expect that she was.  That's not how -- that is
24 not how mental hospitals, in general, work,

134

1 especially not their room.  Sometimes there is
2 what they call a quiet room or a seclusion room,
3 but it's not normally where people are housed.

4    Q  And at the Sangamon County Jail,
5 obviously, she was locked into her cell, right?

6    A  As all inmates are, yes.

7    Q  Right.  At McFarland, from your review of
8 the records, do you -- could you tell if she had
9 interaction with the other patients on a daily
10 basis?

11    A  I believe that she did.

12    Q  And that she was able to get different
13 types of objects from other people that she was
14 interacting with, other patients?

15    A  Yes.  I think so.  That's, you know --
16 absolutely, I think she did.

17    Q  And at Sangamon County Jail, she was not
18 allowed to interact with other inmates there,
19 right?

20    A  I don't agree with that.

21    Q  Okay.  What -- what evidence did you see
22 that she was interacting with other inmates in the
23 jail?

24    A  So, number one, she was housed in a

135

1 suicide watch cell, which is housed by herself, so
2 she was not housed with anyone else.  But you just
3 asked did she interact with, and, as I told you
4 before, the booking area is the busiest area of a
5 jail.  There are inmates coming and going all day,
6 every day.  There are usually trustees working in
7 that area, and there are certainly staff members.
8 And my review of the records indicated that she
9 interacted with people on a very frequent basis.

10    Q  Do the records indicate that she was ever
11 allowed to interact in person, not through a door,
12 with other inmates?

13    A  I don't get the difference.

14    Q  Okay.  I'll move on to a different topic.
15 This might be, actually, a good point to take a
16 break, if we could.

17       (A recess was taken.)

18 MS. GERAGHTY:

19    Q  So moving to --

20    A  Hold on a minute.  I think I'm on mute.
21 Can you all hear me?

22    Q  Yes.

23    A  Okay.

24    Q  So moving to No. 6 which is -- section 6,

136

1 which is on page 10, you say, Ms. Rusher was sent
2 to the ED on more than one occasion while at SCJ
3 after serious suicide attempts.  The ED staff
4 could have admitted Ms. Rusher to the hospital or
5 obtained psychiatric consultation had they felt it
6 was indicated.  They did not.

7       What is this based on?

8    A  The record.

9    Q  Okay.  What specifically in the record is
10 it based on?

11    A  Well, number one, I believe it's based on
12 the Memorial Hospital record, but, at the very
13 least, what they sent back to the jail, if not the
14 entire record.  So we know what actions that they
15 took and know what they did or did not do.  So,
16 for instance, they sent her back to the jail.
17 They did not admit her to a psychiatric hospital.
18 She came back, and she was not admitted to a
19 psychiatric hospital.

20    Q  Did you review her full medical records
21 from each time she was admitted to the hospital?

22    A  You're going to have to give me a minute.

23    Q  Without looking at anything, just from
24 your recollection, do you remember looking at full

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

137

1    records?
2       A  I remember looking at the records.  What I
3    do not remember is whether they were the full
4    records from Memorial or whether they were, in
5    fact, just what came back to -- or just what the
6    jail acquired.
7       Q  Can you point me to -- can you point me to
8    where in your report you note the basis for this
9    particular opinion?
10      A  I'm going to need to look.  I don't
11   believe that I had the entire records from
12   Memorial Hospital.  I'm trying to look at that.  I
13   don't believe I did.  If I did, I'm not locating
14   it right at this point.  Just a moment.  I'm going
15   to need to satisfy for myself whether I reviewed
16   them or not.
17        So it appears that I did not have the
18   Memorial Hospital records themselves.  The
19   information that I got from Memorial records was
20   from either information that was sent back from
21   them, information that was contained in the
22   Sangamon County Jail records, or information in
23   the depositions.
24      Q  Okay.  So what you were just looking at,

138

1    was that the documents that you were provided, or
2    was that notes that you took about what you were
3    provided?
4       A  The documents I was provided.
5       Q  Okay.  What indication did you see in the
6    records that Memorial Health [sic] was alerted to
7    any mental health issues that Tiffany had?
8       A  She was sent to the hospital for a serious
9    suicide attempt from her chief complaint.
10      Q  Okay.  Did you see any record that they
11   were told what her diagnosis was or what her
12   history was?
13      A  Well, the answer to that is, yes, because
14   I recall, specifically, looking at the list of
15   records -- I'm sorry -- the list of medications
16   that they had from her.  So Memorial had a good
17   bit of information about Ms. Rusher's past medical
18   history.  They knew a lot of her past diagnoses,
19   from what I recall.
20      Q  And that's from looking at the records?
21      A  That's correct.
22      Q  And when you said that she was sent for a
23   serious suicide attempt, what instance is that
24   that you're referring to?

139

1       A  Well, I believe on one occasion she
2    swallowed a toothbrush.  On another occasion --
3    and I'm trying not to get them mixed up from
4    McFarland -- but I believe that she put something
5    -- the bootstrap -- the orthopedic bootstrap
6    around her neck and attempted to strangle herself.
7    That's the two instances I recall.  I believe
8    another time she ingested a foreign body, kind of
9    like a baggie, and was sent -- that was taken out
10   at one point too.  So I don't know if that was
11   identified as an episode of pica or a suicide
12   attempt.  I don't recall.
13      Q  Okay.  So -- but you think that the times
14   that she was sent to the hospital were for
15   attempted suicide?
16      A  Well, for self-injurious behavior.
17   Whether you're -- if you're asking me, do I
18   believe that Ms. Rusher intended to kill herself
19   and tried to kill herself, I don't know the answer
20   to that.  But serious episodes of self-injurious
21   behavior, that, to almost any bystander, would
22   appear to be a suicide attempt, strangling one's
23   neck with a cord.  I mean, again, I don't know her
24   motivation behind it.  I'm only calling it a

140

1    suicide attempt because it's self inflicted and
2    it's potentially very harmful.
3       Q  Did you see in the records whether the
4    emergency department at the hospital did any kind
5    of mental health assessment of her?
6       A  Again, I am not familiar enough with the
7    -- with what all records from the hospitalization
8    that I actually reviewed versus what information I
9    gleaned from other sources.  So I can't recall
10   that specifically, no.
11      Q  Do you -- so you're board certified in
12   emergency medicine, right?
13      A  That's correct.
14      Q  If you were an emergency room doctor and
15   someone came in because they had swallowed a
16   toothbrush or a fork, would you think they had a
17   mental health issue?
18      A  That would cross my mind, yes.
19      Q  What sort of assessment would you do on
20   that person to evaluate their needs?
21      A  I don't think I can give you a general
22   answer.  And the reason I say that is that you
23   would have to know about the person's past medical
24   history, where they came from, all those kinds of

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

---

141

1  things.  But, certainly, an emergency department,
2  such as Memorial, would be fully capable of
3  assessing her mental health needs, getting a
4  mental health consultation, and admitting her to
5  an inpatient psychiatric ward, had they thought
6  that was necessary.
7     Q  Are you familiar with the policies and
8  procedures from that particular hospital?
9     A  I am not.
10    Q  Back to my hypothetical, if you, as an
11 emergency room, were presented with a patient who
12 had swallowed a fork or a toothbrush, would you do
13 some kind of mental health assessment?
14    A  Yes.
15    Q  If somebody -- if that person who was
16 presenting you take came from a jail, would you
17 assume that person was getting mental health
18 treatment at the jail?
19    A  I would say it depends.  It depends on
20 which jail, what level of services they have, etc.
21    Q  Can you identify what would influence your
22 opinion there?
23    A  Yes.  A small rural county jail might have
24 no mental health professionals on staff.

---

142

1     Q  Okay.  What about a jail like Sangamon
2  County Jail?
3     A  I don't know what the Memorial Hospital
4  emergency department personnel did or didn't know
5  about the Sangamon County Jail.  I just don't have
6  information about that.
7     Q  Is it possible that Memorial Hospital
8  assumed she was getting mental health care at the
9  jail?
10    A  I would guess it was possible, yes.
11    Q  All right.  Moving on to paragraph 7 on
12 that same page.  It says, We can assume that ED
13 staff evaluated the need for inpatient mental
14 health treatment and concluded it was not
15 necessary.  What is -- can you tell me where in
16 your report you give us the basis for this
17 opinion?
18    A  Well, I don't know about in my report.  I
19 would say if there is a sentence that says she was
20 sent to hospital for self-injurious behavior and
21 came back, that would be the basis for them -- the
22 fact of them not admitting her to a psychiatric
23 hospital.
24    Q  Okay.  Did you see any actual evidence

---

143

1  that they evaluated the need for inpatient mental
2  health treatment, or are you just assuming that
3  that evaluation happened?
4     A  Well, based on my prior experience as an
5  emergency physician, I -- you answered the
6  question yourself.  You said -- I said, I would
7  assume that, so I would expect that in a normal
8  circumstance, in a normal emergency department,
9  staffed by trained emergency department personnel
10 who treat someone for a serious attempt at
11 self-injury that they would make some assessments
12 of their mental health and would take what action
13 is necessary.  So, as you point out, that is an
14 assumption on my part, because I have not directly
15 spoken to the health care professional.  I'm just
16 telling you, that's what one would expect from
17 reasonable emergency department personnel.
18    Q  All right.  Moving to the next paragraph
19 under 7.  It says, that had become unable to
20 handle her condition and sent her to a county jail
21 on criminal charges.
22       So in this paragraph, you know, you're
23 talking about the move from McFarland to the
24 Sangamon County Jail --

---

144

1     A  Yes.
2     Q  -- what's your understanding of how she
3  ended up at the jail?
4     A  They filed charges on her or called -- I
5  believe it was the state police, but, in any
6  event, one of her episodes of acting out she
7  injured both -- I think primarily another patient,
8  but also some staff members.  And as a result of
9  that, the state police were called and charges
10 were filed against her, and she was facing felony
11 charges, and she was removed from there and taken
12 to the Sangamon County Jail.
13    Q  Do you know who called the police?
14    A  I have not reviewed that specific request
15 for service, no.
16    Q  Do you know who alleged the charges or who
17 -- you used the term -- filed the charges against
18 her?
19    A  To the best of my recollection, there were
20 three charges.  There was one -- essentially one
21 -- again, I am paraphrasing or maybe not using the
22 terminology used in the record, but there was more
23 than one charge.  There was a felony charge, maybe
24 an aggravated assault, and two more maybe lesser

---

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

---

145

1  battery charges or something.  So there was
2  multiple charges.  And it was sort of my
3  understanding that one of the injuries -- and I
4  don't remember whether it was to the patient or to
5  one of the staff members -- was more serious than
6  the other.  So that's the best information I have
7  on it.
8     Q  Okay.  Where in your report do you set out
9  the basis for this opinion that McFarland was
10 unable to handle her and sent her to a county
11 jail?
12    A  She was there for six months.  They could
13 have kept her there, even with charges, had they
14 got ready to.  They did not.  They allowed those
15 state police to come, filed charges, and had her
16 removed to a county jail.  I mean, it's right
17 there on the face of it.  They could have kept her
18 if they wanted to.  They didn't.  So that, in and
19 of itself, shows they couldn't -- I won't say
20 couldn't, didn't want to, I don't know, but they
21 had charges, they sent her to a county jail.  They
22 didn't keep her.  That's the important portion.
23    Q  What's the basis of your opinion that they
24 could have kept her there if she had pending

146

1  criminal charges for which she did not have a
2  bond?
3     A  I don't know.  I don't know for certain.
4  But I will tell you, it's the same -- that opinion
5  is the same opinion -- so you're making the case
6  that the Sangamon County Jail, likewise, couldn't
7  have sent her to there.  I mean, so if you want to
8  make that case, that's fine.  I grasped that.  She
9  was facing criminal charges, and she was supposed
10 to be held in a jail, not in a mental health
11 facility, but that cuts both ways.  They couldn't
12 keep her, and the county jail couldn't send her
13 back, if you want to make that argument, but you
14 can make it if you want to.
15    Q  So I'm not making any argument.  I'm just
16 asking you, what is your opinion based on that
17 they could have kept her even if she had criminal
18 charges?
19    A  It's a mental health hospital.  They
20 didn't have to discharge her.
21    Q  Even if the police show up and say, we're
22 placing this person under arrest, they don't have
23 to let her go with the police?
24    A  They could have made arrangements with the

147

1  courts to keep her, had they thought that was
2  necessary.  Yes.
3     Q  Okay.  Is that anywhere in this 23-page
4  report that you submitted?
5     A  Is what in there?
6     Q  What you just stated.
7     A  Well, I think it's fairly summarized in
8  that second sentence of that paragraph.  They had
9  become unable to handle her condition and sent her
10 to a county jail on criminal charges.  That's --
11 that's what I just said.
12    Q  All right.  But the basis of that
13 understanding is that they had some power to hold
14 her at McFarland.  So where is that in your report
15 -- what is your basis for thinking they could have
16 kept her there even if the police came to arrest
17 her?  And it's fine if you don't know.
18    A  Well, the short answer is, I don't really
19 know -- I don't really know whether they could
20 have kept her or not, just like it's my opinion
21 that they could have made arrangements with the
22 court.  If -- I read in these records that there
23 is a possibility of involuntarily hospitalizing
24 people who are a danger to themselves.

148

1        In most states -- I don't know the
2  specific Illinois state statutes -- but in most
3  states, it's possible to involuntarily hospitalize
4  someone who is a danger to themselves or others.
5  In some states, it is more complicated than others
6  when a person is facing criminal charges.
7        To the extent that they were not able, not
8  allowed, to keep her, that makes a very strong
9  argument for why she had to remain at the Sangamon
10 County Jail and couldn't go back.  So I don't know
11 the specific statues.  If you'd like to point them
12 out to me, I'll make an interpretation of them.
13 But that's the way it works.
14    People who are mentally ill can be housed
15 in a hospital.  They don't have to go to jail.
16 Sometimes, when they are taken to jail, they have
17 to remain that there, even if they're mentally
18 ill, they can't go somewhere else.  So I agree
19 with your premise that it was possible that they
20 -- once they allowed her to get charged with a
21 felony, she could have to go to jail, and she
22 could have had to stay there.  So that is entirely
23 -- all those things are entirely reasonable.
24 Probably were.

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

38 (149 to 152)

---

149

1    Q  Okay.  So taking it just to your report,
2  the sentence that I had highlighted earlier, They
3  had become unable to handle her condition and sent
4  her to a county jail on criminal charges.  The
5  basis for that particular opinion is entirely
6  contained in this report?
7    **A  As I told you before, I did not put in my**
8  **report, in the fact summaries or data points**
9  **considered, I did not put every single page of the**
10 **McFarland county records.  There was hundreds of**
11 **pages of that record that indicated that this**
12 **lady's behavior got out of control, she injured**
13 **people, the police were called, and charges were**
14 **pressed, and she was removed from discharge, not**
15 **just removed, McFarland actually discharged her**
16 **with a discharge summary from there to the jail.**
17 **I don't know the specifics about was it**
18 **possible that she could have stayed there.  In**
19 **most cases, if a person is not competent, they --**
20 **charges won't be filed, and they will remain at**
21 **the state hospital.  That's the way it normally**
22 **works.  I cannot speak to the specifics in this**
23 **case.**
24 **I know that later she was found competent,**

---

150

1  **but I don't know about -- I certainly know that**
2  **crimes get committed by mental patients in mental**
3  **hospitals and the police are not called.  And, in**
4  **fact, they say, we have this schizophrenic person**
5  **who is delusional who thought somebody was trying**
6  **to hurt them and they hit this other person, we**
7  **don't feel charges should be filed.  That**
8  **certainly happens regularly.  I do not know the**
9  **specifics about this case.  If you want me to dig**
10 **back through those hundreds of pages of records**
11 **and come up with the specific documentation of how**
12 **it was decided that charges were going to be filed**
13 **and she was going to be discharged, I can probably**
14 **do that.**
15   Q  I think for now we can move on, because
16 I'm mostly just interested in what's in your
17 report.
18   I want to move now to lower on that same
19 page 11, No. 10.  You said that Ms. Rusher was not
20 displaying any symptoms indicating a heightened
21 risk of self harm in the immediate period leading
22 up to 3-18-2017 that should have been prompted the
23 ACH staff to take any additional actions other
24 than those which were already in place.

---

151

1    So she had -- you're aware from the
2  records that she had an incident on March 15th
3  where she reported an injury to her hand and
4  received an x-ray, right?
5    **A  That's correct.**
6    Q  And you're aware that also on the 15th a
7  guard stopped her from tearing up her sandals; is
8  that right?
9    **A  I'll take your word for that one.  I don't**
10 **remember what day that was.**
11   Q  Okay.  And you're aware that on the 16th
12 she reported swallowing a bag, right?
13   **A  Was that on -- was that the second time**
14 **that she reported swallowing the bag?  I don't**
15 **remember the details of that one.  I know there**
16 **were a couple of times.**
17   Q  Okay.  But so the day before -- well, on
18 the 16th, she reported swallowing a bag.  She
19 reported to staff that is she had swallowed a
20 bag --
21   **A  Okay.**
22   Q  -- would any of these incidents -- well,
23 strike that.
24   You said later in your report that her

---

152

1  upcoming release likely provoked anxiety and led
2  to her impulsive self strangulation; so when you
3  say that, what's the basis for that?
4    **A  Well, so, number one, she had an**
5  **interaction with Mr. Shmikler, I believe the day**
6  **before, when she said she was upbeat.  She was**
7  **excited.  There had been a -- I believe she used**
8  **the word something like probation deal worked out,**
9  **and she was going -- she thought, at that time,**
10 **she was going to be getting released the next**
11 **week, and she expressed being -- she, number one,**
12 **expressed being okay with that.**
13 **She had previously, though, in prior**
14 **interactions at I think the Department of**
15 **Corrections, I don't know about McFarland, but I**
16 **know the Department of Corrections, she had**
17 **expressed anxiety about upcoming releases.  And,**
18 **often, these people with these personality**
19 **disorders are most comfortable in a structured**
20 **setting or an environmental -- I mean, an**
21 **institutional setting.**
22 **So, quite often, these people are most**
23 **comfortable when they're in a structured setting**
24 **like a jail, and they become uncomfortable or more**

---

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

---

153

1  at dis-ease when there's an upcoming change, even
2  including an upcoming getting out of jail, and
3  I've seen that before. And it quite likely -- so
4  perversely, getting out of jail sometimes can make
5  people more anxious. That could have happened
6  here. I cannot say to a reasonable degree of
7  medical certainty it did occur. I'm just telling
8  you, it does happen from time to time. I've seen
9  it before, and I would not be surprised if that's
10  what happened here.
11     Q  So do you think that sort of general
12  knowledge among people involved -- people
13  providing either health care or mental health care
14  in jails that anxiety can provoke release -- sorry
15  -- release can provoke anxiety for people?
16     A  I think many people who work in jails
17  understand that. I don't know about general
18  knowledge.
19     Q  We had gone through before a few of the
20  different incidents of self harm, self-injurious
21  behavior, suicidal gestures, the various things,
22  whatever you want to call them, where she was
23  injuring herself, it being swallowing items, I
24  don't think we touched on, but, you know, she gave

154

1  herself some injuries on her arm. Was she, to
2  your knowledge, displaying any symptoms, prior to
3  any of those incidents, that would have indicated
4  she was about to do any of those things?
5     A  Well, her very long history of repetitive
6  self-injurious behavior is indication that she's
7  likely going to do it again at some time. Now, if
8  you're talking about specifically warning signs
9  that it's about to occur, I think that's sort of
10  the nature of this -- her impulsive nature was
11  indicated. No, because it's not something
12  rational.
13        In other words, it is not a rational
14  reaction to what you and I would consider a -- a
15  major problem. In other words, I think I saw
16  something in the records, she would get -- with
17  this emotional dysregulation, she would, quote,
18  fly off the handle over somebody not bringing her
19  a cup of coffee. So it's not rational from the
20  standpoint of you might -- could understand
21  somebody wanting to hurt themselves if they knew
22  they were being sentenced to a long period of time
23  in jail or something like that.
24        It's not rational kinds of insults or

155

1  kinds of interactions that should cause -- you
2  would not expect it to cause, quote, normal people
3  to be that way. She had a very serious
4  personality disorder and had emotional
5  dysregulation and would have impulsive explosive
6  reactions to very small slights.
7     Q  Okay. So fair to say that there generally
8  were not indications that she was about to self
9  injure in any of those other instances.
10     A  That's right. But there was a very good
11  indication she was going to do it again at some
12  time, because she had done it hundreds and
13  hundreds of times before, so it was coming, but
14  which exact incident, that's right, you couldn't
15  tell.
16     Q  So they just had to be on sort of constant
17  watch with her?
18     A  That would be fair enough. That's right.
19  You always had to be on alert, hence, they didn't
20  let her out of her cell a lot. Hence, they didn't
21  give her crayons a lot. I mean, that's the kind
22  of -- so we would be having a different discussion
23  -- you know, we would be having a different
24  discussion today if they had allowed her to, for

156

1  instance, go to the rec yard and being playing
2  with crayons all the time, because she would be
3  eating them. So, yes, they were taking reasonable
4  precautions, but people have to eat, people have
5  to bathe, so that's the nature of this whole
6  thing.
7     Q  So someone's impending release, can that
8  be a risk factor for potential suicidal gestures
9  or suicide attempts?
10     A  In a general way, it can be. But, in
11  other words -- but, in this particular case, I
12  don't think there was anything -- so, number one,
13  it was a week away. It was not impending. I
14  don't believe that the officers should -- the
15  officers or the mental health professionals or
16  anybody else should have said, oh, she's getting
17  released next week, so we need to be on particular
18  guard. No. But, as a general rule, it can be
19  anxiety provoking. Yes.
20     Q  So would you want jail mental health staff
21  to know about that potential risk?
22     A  Well, quite often, we don't know about
23  when people are being released. In this
24  particular case, Mr. Shmikler apparently did know

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

157

1 about it, did assess it, because he addressed it
2 in his note. But I can't say that -- no, I can't
3 say that I would want to know about people's
4 impending release and take some kind of
5 precautionary action.
6    Q So I'm going to clarify there. What I'm
7 talking about is if you were providing a training
8 to mental health staff about risks for suicide for
9 inmates, would you want them to know that an
10 inmate's pending release could provoke anxiety and
11 be a suicide risk --
12    A Well --
13    Q -- as a piece of general knowledge?
14    A You might. You might include that,
15 because it is true. But it is probably less of a
16 risk factor than, for instance, say, an impending
17 sentencing hearing. So, I mean, there is a list
18 of things, recent incarceration, recent bad news,
19 pending sentencing hearing, just got bad news,
20 family loss on the outside. So there are a series
21 of things that one could take into consideration,
22 but impending release is way down the list. And,
23 certainly, for most people, for most, quote,
24 normal people, they are excited about getting out

158

1 from jail, so it's not in general. It can be for
2 some people, and, apparently, for Ms. Rusher, it
3 was.
4    Q Okay. Going back to the bag incident, do
5 you think it would have been helpful for
6 Mr. Shmikler to know that she had swallowed a bag
7 the night before he assessed her on the 17th?
8    A I don't know that it would have changed
9 anything. One of the specific reasons is I don't
10 know that that swallowing a bag incident was --
11 that sounded more like not even an attempt at
12 self-injurious behavior but pica behavior, so I
13 don't know that it would have changed anything.
14    Q So I'm going to move to page -- well,
15 before I move on, can swallowing a bag kill you by
16 cutting off your breathing?
17    A It certainly could.
18    Q Moving on to page 13. In this section,
19 you talk about your disagreements with
20 Dr. Kupers --
21    A Could you please tell me how to correctly
22 pronounce his name?
23    Q It's Kupers.
24    A Okay. Thank you.

159

1    Q On page 13 at the bottom under subsection
2 A there, you say, On page 6, Dr. Kupers' statement
3 that long-term consignment to solitary confinement
4 is a major factor in the high suicide rate among
5 prisoners and the associated reference are
6 completely dissimilar.
7       So I want to clear this up. When you're
8 talking about the associated reference, is that
9 the footnote where you cited to a couple of
10 different articles and publications?
11    A Okay. So that -- that No. 2, this is the
12 part I'm referencing, is section 4, The management
13 and treatment of suicide crisis in jail, pages 6
14 through 13, and these are specific items within
15 there. And so I say on page 6, which is only, you
16 know, the first paragraph of that section that I'm
17 referring to and the footnote. You are correct.
18 That is exactly right.
19    Q Okay. So when you use the phrase the
20 associated reference, that's the footnote you're
21 talking about, right?
22    A Yes.
23    Q Okay. And that footnote includes a title
24 by Daniel Mears and Jamie Watson, Towards a Fair

160

1 and Balanced Assessment of Supermax Prisons?
2    A Exactly correct.
3    Q And it also includes, Review of Completed
4 Suicides in the California Department of
5 Corrections and Rehabilitation by Patterson and
6 Hughes?
7    A That's correct.
8    Q And it includes, Factors Related to
9 Suicide in New York State Prisons by Bruce Way; is
10 that correct?
11    A That is correct.
12    Q None of those three items were listed in
13 the materials that you reviewed for this report.
14 Did you read them in preparation for this report?
15    A I did not.
16    Q Okay. I'm sorry. My internet cut out
17 there. Did you say you did not?
18    A I did not.
19    Q So when you say, The associated reference
20 is completely dissimilar and not relevant to the
21 facts, you're saying something that -- you're
22 giving an opinion that something you didn't read
23 is completely dissimilar and not relevant to the
24 facts?

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

161

1    A  I would say, in general, that is correct.
2  That is based upon having read a number of similar
3  articles, perhaps even by these same authors, but,
4  more importantly, toward the title.  So, for
5  instance, Towards a Fair and Balanced Assessment
6  of Supermax Prisons.  So the Sangamon County Jail
7  is not a supermax prison and it has very limited,
8  if any, similarities to a supermax prison.  So
9  that article, from the title, I don't believe is
10  relevant.  The second --
11    Q  Can you tell the entire contents of an
12  article based only on what's in the title?
13    A  You are correct that you cannot.  But the
14  title normally tells the theme or what the study
15  is addressing, and that was supermax prisons which
16  is not county jails.
17    Q  Okay.  But you don't know whether that
18  article talked about county jails at all, right,
19  because you didn't read it?
20    A  I'll accept your criticism.
21    Q  And you don't know what either of the
22  other two -- whether either of the other two
23  titles talked about county jails at all?
24    A  I know, according to their titles, they

162

1  did not.
2    Q  But you agree that a publication can
3  address topics that are not covered in the title,
4  correct?
5    A  I would agree.
6    Q  All right.  Would you offer this -- well,
7  strike that.
8    I want to go to page 14, subsection B.
9  You say here that the records in this case reflect
10  that SCJ policies and procedures are in
11  substantial compliance with those standards.  And
12  those standards you're referring to are the NCCHC
13  Standards for jails; is that correct?
14    A  That's correct.  2014.
15    Q  When you say substantial compliance, could
16  you quantify that?  Do you have to be 90 percent
17  compliant or 99 compliant or more than 50 percent
18  compliant?
19    A  Well, I need to provide an even further
20  cautionary statement than that which is that I
21  said, The records in this case reflect.  So, in
22  other words, what I could glean from the records
23  about the policies and procedures.  Remember, I
24  told you I did not review the actual policies and

163

1  procedures.
2    Q  Okay.  So I understand that clarification.
3  But what I'm asking is whether you can quantify,
4  based on your review of the records, what you mean
5  by substantial compliance?
6    A  Well, what I mean is that since I did not
7  review the actual policies and procedures
8  themselves, that I could have overlooked -- I
9  mean, the records appeared that what they were
10  doing was in accordance with, in a substantial
11  way, and I would use the same definition as a
12  reasonable degree of medical probability more
13  likely than not in compliance.  But since I didn't
14  review all the policies and procedures, I
15  certainly can't say that they were all within
16  compliance with NCCHC.
17    Q  Did you ask to review any of their
18  policies?
19    A  I don't -- I don't recall asking one way
20  or the other.  I do know that sometimes I am asked
21  that as part of my scope of work, and I was not
22  asked that as part of my scope of work in this
23  particular case.  I don't know the reason.
24    Q  Now might be a good time to ask, how much

164

1  time did you spend preparing this report?
2    A  I can review my billing records.  If you
3  will trust my math in my head, it looks like
4  including -- so my review and review of additional
5  documents and preparation of reports, and those
6  are not broken out separately, but approximately
7  25 hours through the preparation of the report.
8    Q  So did you say that includes reviewing all
9  the records?
10    A  Yes.  My time through the preparation of
11  the report was approximately 25 hours.
12    Q  And you don't differentiate between
13  reviewing records and actually writing the report?
14    A  Well, sometimes I do, but -- sometimes I
15  do, but in this, I have one line that says, Review
16  additional documents and prepare report, so I
17  don't recall which was -- how much was review
18  additional documents and how much was prepare
19  report.  Do you understand?
20    Q  Yeah.  And so you're looking at your
21  billing statement there, right?
22    A  That's correct.
23    Q  And that's an accurate statement of the
24  hours that you spent working on this?

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

165

1    A  That's correct.
2    Q  That's all -- basically, that's all the
3 hours that you spent working on this?
4    A  That's correct.  And, again, you -- I just
5 want to clarify, I added that up in my head, I
6 mean, so I don't know -- I mean, if you want me to
7 specifically make sure I tell you the exact number
8 of hours, but it looks like about 25.
9    Q  Okay.  But whatever is listed on your
10 billing statement is an accurate summary of the
11 hours that you spent on this?
12    A  That is correct.
13    Q  So in 25 hours, you reviewed several
14 thousand pages of records and drafted a 23-page
15 report?
16    A  That is correct.
17    Q  All right.  Moving to page 18.  Let me
18 just find it.
19    A  You said page 18?
20    Q  I believe so, but let me just make sure
21 that's right.  This is where you're talking about
22 Mr. Kupers's -- sorry -- Dr. Kupers's report
23 section -- so it's labeled lower case, i, and then
24 No. 9.

166

1    A  Okay.  Let me find out which section
2 that's in.  That's still in that same section,
3 opinion section -- well, sorry, no.  Section 6,
4 opinion section.
5    Q  Right.  So you say here that she had not
6 been found incompetent, and, therefore, could not
7 have been placed in a long-term mental health
8 facility.  Was she found incompetent before she
9 went to McFarland?
10    A  You're going to have to just give me just
11 a moment to refresh my recollection, please.
12    Q  Can you tell me what you're looking at
13 right now?
14    A  I'm looking at Dr. Kupers's report.  I'm
15 trying to find the No. 9 to which that item
16 refers.  The reason I'm hesitating so much is that
17 that No. 9 appears to be on page -- could have
18 probably put what page number those opinions were
19 on and not just the opinion numbers, but opinions
20 1, 2.
21        Okay.  I have the opinion 9, and I'm just
22 -- it started out about solitary confinement, and
23 I was trying to see how that related.  Okay.  Your
24 question again was what?

167

1    Q  Was she found incompetent before she went
2 to McFarland?
3    A  Well, it was my understanding that -- that
4 that's how the -- she was involuntarily committed
5 to McFarland from the Department of Corrections.
6 So, in other words, she was involuntarily sent
7 there.  And, yes, I'm quite sure there was some
8 court proceeding that involuntarily committed her
9 and sent her there.
10    Q  Okay.  But involuntary commitment is not
11 the same at incompetence, right?
12    A  That is correct.  And I don't know the
13 answer to your question.  There was lots of
14 different proceedings over lots of many times, and
15 I don't know one way or the other had she been
16 found incompetent in a time in the past.  If,
17 though, as you point out, they're different,
18 likewise, that's at a particular moment in time.
19 So even if she had been found incompetent at some
20 prior time in her life would not mean she was
21 presently incompetent.
22    Q  All right.  So moving on.  You say,
23 Ms. Rusher's housing in a high-risk observation
24 cell was not only reasonable, it was the only

168

1 reasonable housing assignment for her.  Having her
2 housed anywhere else at the SCJ may well have been
3 found to be below the standard of care.
4        So is it fair to say that housing her in
5 general population would have been below the
6 standard of care?
7    A  Well, it only depends on the outcome, of
8 course.  In other words -- but, yes, I believe
9 that would be below the standard of care.
10    Q  And if you, as a provider, were
11 considering moving someone like Tiffany from where
12 she was assigned into general population, what
13 would you have wanted to see before you approved
14 that move?  Or is there just no situation in which
15 you would have approved it?
16    A  That's a hard question, because -- so you
17 would normally want to see that their behavior had
18 been under control for a certain period of time,
19 but she had such a long history of impulsive
20 actions that I don't know that any length of,
21 quote, good behavior would have been enough.
22        In other words, I don't know that two
23 weeks' worth of no self-injurious behavior would
24 have been enough or not.  So, specifically, I

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

43 (169 to 172)

**169**

1  guess, forgetting even about the self-injurious
2  behavior, she had a history of assaulting other
3  patients, other inmates, her peers.  So if she
4  didn't assault her peers for two weeks and then
5  you allow her in general population or to be with
6  somebody and she assaults them, is that
7  reasonable, or should you have foreseen that from
8  her numbers of times before, and I don't really
9  know the answer to that.
10      But my point is that the normal of
11  parameters of, quote, good behavior for a while
12  sort of don't apply, because she had such a long
13  history of this behavior.  It was going to happen
14  again.  It was just a matter of time.
15    Q  Okay.  So just to kind of sum up, you
16  would probably want to see some period of -- well,
17  actually.  Strike that.  I think I understand what
18  you mean.
19      Going back just a bit to that other
20  opinion higher up in the paragraph about she had
21  not been found incompetent, and, therefore, could
22  not have been placed in a long term -- can you
23  tell me what the basis of that opinion is?
24    A  Yes.  She was -- so, number one, no matter

**170**

1  what her status had been at McFarland or at the
2  Department of Corrections or before, she was
3  charged with a crime.  So, in other words, the
4  court had not found her incompetent and not
5  charged her with a crime.  She had been charged
6  with a crime.  She had been sent to the Sangamon
7  County Jail.  She was evaluated by a psychiatrist
8  there at the Sangamon County Jail there in
9  January.  I don't believe at the time of her death
10  the final report was done.
11      I don't know to what extent he gave his
12  findings, you know, verbally earlier or not.  I
13  don't have information about that.  But, in any
14  event, he did not -- he, meaning that
15  psychiatrist, I think his name might have been
16  Dr. Killian -- did not say, hey, this lady is
17  incompetent and you all need to have a hearing
18  because she's not going to be able to stand trial
19  and you should have a court hearing and dismiss
20  these charges.  That had not occurred.
21      She had not been found incompetent.  And,
22  in fact, when ultimately the report was issued,
23  his opinion was that she was competent.  So she
24  had not been ruled incompetent by anyone.  And, in

**171**

1  fact, the only person who had evaluated her for
2  that purpose while she was -- you know, in the
3  prior preceding months was that Dr. Killian, and
4  his opinion was that she was competent.
5    Q  So I agree with you that she was not found
6  incompetent.  What I'm getting at is, where in
7  your report do you describe that the fact that she
8  had not been found incompetent meant that she
9  could not have been placed in a long-term mental
10  health facility?  And I'm asking, specifically,
11  where do you describe that in your report, not
12  what you reviewed or what facts you have.
13    A  I don't believe I understand the question.
14  I'm very sorry.
15    Q  Okay.  So you give an opinion that she had
16  not been found competent, and, therefore, could
17  not have been placed in a long-term mental health
18  facility.  Thinking about your 23-page report,
19  where in your report do you describe the basis for
20  that opinion, and not the facts that led you to
21  that conclusion, but the basis for that opinion?
22    A  Well, the basis for that opinion is my 25
23  years of experience in dealing with the county
24  jail and mental health and with the understanding

**172**

1  that people who are charged with a crime and who
2  have not been found incompetent can, in most
3  cases, not be sent to a mental health facility as
4  opposed to the county jail.
5      Now, I am not saying it is entirely
6  without possibility that you could not approach a
7  court and say, this person is not incompetent,
8  they are charged with a crime, they have been
9  found competent so far, but we would like,
10  nevertheless, to remove them from this jail
11  facility and move them to a long-term mental
12  health facility.  I'm not saying that's entirely
13  impossible, but that is not the way the system
14  works, and that is not consistent with my
15  experience in 25 years.
16    Q  All right.  So I want to go to page -- the
17  last page, on page 21.
18    A  Are we going to be done talking about
19  Dr. Kupers's report?
20    Q  I think this last question may touch on
21  that.  So I wouldn't put it away just yet.
22    A  Okay.
23    Q  So it's on page 21, you say,
24  Mr. Shmikler's focus should have been --

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

173

1    A  Oh, it wasn't up there.  It now is.  Okay.
2  I see that.  By the way, though, you're now no
3  longer on Dr. Kupers's report, but now this is a
4  comment on Mr. Harrison's report.
5    Q  Okay.  And Mr. Harrison is a licensed
6  clinical social worker; is that right?
7    A  That is correct.
8    Q  So here you give this opinion that
9  Mr. Shmikler's focus should have been assessing
10  the continued need for intensive monitoring and
11  high-risk observation.  It would be unrealistic to
12  expect that Mr. Shmikler would be able to have any
13  significant impact on her chronic self harm and
14  her poor prognosis while she was at SCJ.  She
15  already -- stop there.
16    So, given that, would you say that he had
17  no obligation to try any additional care for her
18  that could have had an impact on her chronic self
19  harm and her poor prognosis?
20    A  That was not what I stated in my report,
21  and that's not my opinion.
22    Q  Okay.  So you do think that he had some
23  kind of an obligation to have an impact on her
24  chronic self harm and her poor prognosis?

174

1    A  An obligation -- an obligation to try is
2  different than the likelihood of having any
3  significant impact.  Yes.  Those are not mutually
4  exclusive.
5    Q  What mental health treatment would you
6  have recommended for Ms. Rusher?
7    A  At which time?
8    Q  While she was at the Sangamon County Jail.
9    A  Essentially, I don't have any -- I don't
10  have any magic bullet that was better than what
11  was done.  In other words, they were in a very
12  difficult situation.  I believe the care they
13  delivered was reasonable, and I don't really know
14  what they could have done differently.
15    Q  Okay.  So taking that to a hypothetical.
16  If you were faced with Ms. Rusher as a patient and
17  you had no limitations placed on you, whether by
18  correctional staff or security requirements or the
19  setting at all, what kind of mental health
20  treatment do you think she should have been
21  getting?
22    A  This may not directly answer your
23  question, but it's the best answer sort of that I
24  have.  I would be working toward getting her

175

1  placed in a long-term institution setting, in
2  other words, in a long-term structured environment
3  that wasn't a jail.  I mean, that's -- I don't
4  know if that's group home, whatever.  She couldn't
5  function very -- she functioned best in a
6  structured environment.  The medications weren't
7  very effective, so I wouldn't have other
8  medications.  It would be long-term behavioral
9  management in some kind of structured setting, and
10  I'd be working toward achieving that for her.  Do
11  you understand my answer?
12    Q  Sorry.  The internet was cutting in and
13  out.  So you basically said that you would be
14  working towards some kind of institutional setting
15  for her that wasn't the jail?
16    A  That's right.  I mean, so the medicines
17  weren't particularly effective, so changing
18  medications wouldn't necessarily do anything.
19  Just the kinds of therapies that had been being
20  provided at McFarland didn't seem to make much
21  difference.  I believe she was going to require
22  some kind of structured setting long term, and
23  exactly what that is or what even was available to
24  them, I don't know, but that's what I would be

176

1  working toward.
2    Q  Okay.  So going further in the
3  hypothetical, I'm going to change the terms just a
4  little bit.  If you were in the jail faced with
5  Tiffany Rusher and you had the option to refer her
6  out to that type of setting as opposed to keeping
7  her in the jail, would you do so?
8    A  So your question was, if I had the
9  option -- and I will tell you that not only -- I
10  mean, I'm not trying to make light of this or make
11  a joke of it at all, I don't mean this literally.
12  Any of us would have been glad for her -- I'm
13  quite sure if you ask everyone at the Sangamon
14  County Jail if Ms. Rusher could have been housed
15  somewhere else besides your jail, would you take
16  that option?
17    That's almost a -- again, I'm not trying
18  to make a joke.  But if you ask literally to a
19  person, everyone at the Sangamon County Jail, if
20  you could have Ms. Rusher housed somewhere else,
21  would you choose that or would you not, that's
22  almost a -- that's a no-brainer, right?  Do you
23  understand what I'm saying?
24    Q  I think I do, but it's not really getting

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

177

1    at the question that I asked.
2        MS. GERAGHTY:  Could I ask the court
3    reporter to repeat back the question that I asked?
4        (Pending question read.)
5    A    I sort of -- I'm sorry -- I believe that
6    answered the question.  And the reason that I'm
7    saying that is that if given the option, so, in
8    other words, if someone said, would you like to
9    recommend Ms. Rusher be somewhere else other than
10   the jail, and if you do that we will move her,
11   that's a different question than do you believe --
12   I mean, so, in all likelihood, no, I wouldn't
13   recommend moving Ms. Rusher, because I would know
14   she was faced with criminal charges, had no bond,
15   wasn't able to make bond, so there wasn't a place
16   to send her.  If I knew of a place to send her and
17   that would accept her, absolutely I would make
18   that referral, but that's the problem, no such
19   place existed either for me in my hypothetical or
20   for the Sangamon County Jail in reality.
21   Q    What's the basis of your opinion that no
22   such place existed?
23   A    The facts of the case.  She had been at
24   McFarland, they had put her out.  She had been

178

1    examined by a forensic psychiatrist, she had been
2    found to be competent -- or not been found to be
3    incompetent.  There wasn't anywhere to
4    particularly send her that was going to make a
5    difference.  I mean, yes, she could have been
6    acutely committed to a hospital for a couple of
7    days, but that doesn't change anything about the
8    situation.  She needed a long-term solution which
9    no one had.
10   Q    So are you -- how do you know that that
11   option didn't exist in the state of Illinois?
12   A    I don't know that for certain, and,
13   therefore, as I told you, if someone told me it
14   was an option -- I'm quite sure that if someone
15   told any one of these people it is an option that
16   Ms. -- you know, that she can be housed somewhere
17   else and doesn't have to be housed in your jail,
18   would you like for her to be housed somewhere
19   else, any of us in the correctional health care
20   setting would take that option.  The problem is
21   that's not the -- that's not a realistic option.
22   If it were a realistic option, of course, we would
23   prefer that.  Any of us would prefer that.
24   Q    Okay.  So let's make that part of the

179

1    hypothetical.  Assuming there is a place to refer
2    her to outside of the jail, you are faced, as a
3    medical provider, with Tiffany Rusher in the
4    Sangamon County Jail and you had the option to
5    refer her out to the institutional setting you
6    said would be better for her, would you do that?
7        MS. POWELL:  Let me object to the
8    hypothetical and the form of the question and that
9    it assumes facts that are contrary to the law.
10   A    Well, if the answer -- so if -- if she
11   were able to go somewhere else for a permanent
12   solution -- so, in other words, no, I would not
13   recommend just seeing if she can be in the
14   hospital for a couple of dates.  That's not going
15   to change anything.
16       If there were a long-term solution,
17   absolutely I would recommend it.  It is my belief
18   that quite likely there was not a long-term
19   solution, hence, she was in the Sangamon County
20   Jail under the conditions that she was and had not
21   been found incompetent.  So I don't know how to
22   further answer the hypothetical than that.
23       MS. GERAGHTY:  Okay.  It's about 2:07
24   right now.  I think it might be good to just take

180

1    one more quick five-minute break, and then I will
2    probably not have too many more questions after
3    that.
4        (A recess was taken.)
5    MS. GERAGHTY:
6    Q    So before we took our break, we were
7    talking about a hypothetical in which you sent
8    Tiffany Rusher out to another facility.  In
9    general terms, if an inmate has conditions beyond
10   the range of the services available at a jail,
11   would you transfer them out to a different
12   facility to receive those services?
13       MS. POWELL:  Same objection as before.
14   A    You would have to tell me what type of
15   services you're referring to.
16   Q    Services beyond what you can offer at the
17   jail -- let me -- hold on -- see if I can make
18   this clearer for you.
19       As a general proposition, if somebody
20   needs medical treatment that is beyond the range
21   of services offered at the jail, would you want to
22   transfer them out to receive those services?
23   A    Okay.  So with that clarification, medical
24   services beyond what can be provided at the jail,

Transcript of Dr. Thomas Fowlkes
Conducted on September 1, 2020

181

1  yes.
2      Q  Yes.
3      A  That's correct.
4      Q  All right.  And then -- is there something
5  else you wanted to add to that?
6      A  Well, yes.  So I would just say that, in
7  general, that's a fine proposition.  And, in
8  general, with regard to medical services,
9  especially, that is true.  There are sometimes
10 overriding reasons, security or other reasons,
11 where that's not -- not allowed or the courts
12 don't allow you to do that or something such as
13 that, even for medical things.  But, certainly,
14 for other -- if you were, you know, if you were
15 generalizing that to social housing, etc., or some
16 such fact, then there's certainly reasons why the
17 courts would overrule.
18     But as a for instance, someone might need
19 an elective procedure that you cannot do at your
20 jail.  You might want them to go to their --
21 you're approving their elective procedure, but the
22 courts or the administrative services don't allow
23 that to happen, so you don't always have the final
24 say.

182

1      Q  Okay.  Do you consider mental health
2  services to be medical services?
3      A  Well, they are distinct.  They are
4  distinct in that, you know, it is part of the
5  medical services, but that's why I was trying to
6  ask you, mental health housing certainly is
7  different.  So, in other words, in this case, just
8  because you would like her to be housed somewhere
9  else, that doesn't mean you can't provide mental
10 health services, but because you don't like her
11 housing -- you -- or the county jail doesn't have
12 the authority to house them somewhere else.  The
13 courts tell you who you're going to keep.
14     Q  On page 12 -- actually, I'm going to take
15 you back to your -- on page 12, can you see that?
16     A  Not yet.  I do now.  It's page 12 of my
17 report?
18     Q  Yes.
19     A  Okay.
20     Q  In Roman numeral II, section 1, you make
21 reference to an article that you call reference 3.
22 Is that article titled, Borderline Personality
23 Disorder, and it was published in The Lancet?
24     A  That is correct.

183

1      Q  You read that whole article, right?
2      A  I did.
3      Q  You believe that to be a reliable source
4  of information about borderline personality
5  disorder?
6      A  As a general statement, it probably -- it
7  has good information about borderline personality
8  disorder.  I would not consider this article or
9  any other article authoritative to the exclusion
10 of any other information.
11     Q  But you would agree that it has good
12 information in it about borderline personality
13 disorder?
14     A  I agree with that in general.  If you
15 would like to point out a particular statement, I
16 will tell you whether I agree with that particular
17 statement or not, but, in general, yes.
18     Q  Why do you believe that in general?
19     A  Well, number one, The Lancet is a
20 respected peer-reviewed worldwide medical journal
21 that I, in general, respect.  Number two, one of
22 the authors is Marsha Linehan who probably is the
23 world's authority on borderline personality
24 disorder.

184

1      Q  And -- I'm sorry.  I think the internet
2  might have cut out of me there, because I heard
3  you say Marsha Linehan, but then I didn't hear the
4  rest of that.
5      MS. GERAGHTY:  Can we have the court
6  reporter read back the response that you gave?
7      (Pending answer read.)
8      MS. GERAGHTY:  And just for the record,
9  Linehan is spelled L-I-N-E-H-A-N.
10     Q  All right.  So I'm going to read you a
11 portion of the article, and I'd like to know if
12 you agree with it.  On the fifth page of it, it
13 says, Evidence that medication will reduce the
14 risk of suicide or attempted suicide is scarce.
15 Do you agree with that, generally?
16     A  Could you tell me the page number?  You
17 said the fifth -- can you tell me the page number
18 at the bottom of the article?
19     Q  Sure.  It's 457.
20     A  Okay.  And can you point me to that
21 specific --
22     Q  It's in the first paragraph.  It's a
23 partial.  It's not a full paragraph.  So I'll read
24 it again, Evidence that medication will reduce the

185

1 risk of suicide or attempted suicide is scarce.

2 **A Right. Well, especially, in conjunction**
3 **with the sentence -- you picked out that sentence.**
4 **The sentence before it says, Pharmacotherapy or**
5 **hospitalization should not be assumed to be the**
6 **treatment of choice for suicidality of these**
7 **patients. So I agree with that and the sentence**
8 **that you read right there. Absolutely.**

9 Q Okay. And then going down a little bit
10 further in that paragraph it says, Substantial
11 evidence suggests that cognitive behavioral
12 treatments focused on active problem solving,
13 together with high therapeutic outreach and
14 availability will reduce the risk of suicidal
15 behaviors; do you agree with that?

16 **A As a general principle, yes.**

17 Q Was Ms. Rusher receiving cognitive
18 behavioral treatments in the jail?

19 **A I am not aware of any formal cognitive**
20 **behavioral therapies or dialectical behavioral**
21 **therapies she was receiving at the jail.**

22 Q I think that might be all. If you'll just
23 give me a moment to confer with my co-counsel, we
24 may be almost done here.

186

1 So thinking about the article as a whole,
2 it described cognitive behavioral treatments and
3 dialectal behavioral therapy, right?

4 **A As best I recall, that is a true general**
5 **statement, yes.**

6 Q I don't think I have anything further to
7 ask you, so I'm done.

8 MS. POWELL: I don't have any questions.
9 Thank you.

10 MR. WIRTH: We don't have anything for
11 Dr. Fowlkes.

12 THE WITNESS: Yes. I want to read and
13 sign, please.

14 (Off the record at 2:26 p.m.)

15
16
17
18
19
20
21
22
23
24

187

1 ACKNOWLEDGMENT OF DEPONENT

2 I, THOMAS FOWLKES, M.D., do hereby
3 acknowledge that I have read and examined the
4 foregoing testimony and the same is a true,
5 correct, and complete transcription of the
6 testimony given by me and any corrections appear
7 on the attached errata sheet signed by me.

8
9 _____  _____
10 (SIGNATURE)            (DATE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

188

1 CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2
3 I, Courtney Petros, Registered
4 Professional Reporter, Certified Shorthand
5 Reporter and Notary Public, the officer before
6 whom the foregoing deposition was taken, do hereby
7 certify that the foregoing transcript is a true
8 and correct record of the testimony given; that
9 said testimony was taken by me and thereafter
10 reduced to typewriting under my direction; that
11 reading and signing was requested; and that I am
12 neither counsel for, related to, nor employed by
13 any of the parties to this case and have no
14 interest, financial or otherwise, in its outcome.

15 IN WITNESS WHEREOF, I have hereunto signed
16 this 13th day of September, 2020.

17 My commission expires May 6th, 2023.

18
19 _____
20 COURTNEY PETROS, RPR, CSR
21 NOTARY PUBLIC IN AND FOR THE
22 STATE OF ILLINOIS
23
24