IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

KELLI ANDREWS, as Administrator )
of the Estate of Tiffany Ann Rusher, )
Deceased, )
 )
Plaintiff, )
 )
v. )          18-CV-1100
 )
COUNTY OF SANGAMON, )
et al., )
 )
Defendants. )

**ORDER**

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE.**

Tiffany Ann Rusher's life and death were tragic.  She suffered
from severe mental illness for years before taking her own life at the
Sangamon County Jail in March 2017.

Defendants move for summary judgment, arguing that
reasonable measures were taken to protect Ms. Rusher from herself
and to provide her mental health treatment.  A reasonable juror
could agree.  However, a reasonable juror could conclude otherwise,
which means that summary judgment must be denied for all
Defendants.  A jury trial is necessary to resolve these disputes.

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact." Fed. R. Civ. P. 56(c)(B). If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists. Id.; Harvey v. Town of Merrillville, 649 F.3d 526, 529 (7th Cir. 2011). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, the evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant.  Id.

### Facts

These facts are set forth through the summary judgment lens standard explained above.

In May 2016, Ms. Rusher finished serving her sentence in the Illinois Department of Corrections.[1]  Instead of being released from the Illinois Department of Corrections, Ms. Rusher was transferred to McFarland Mental Health Center (McFarland) because IDOC psychologists petitioned for Ms. Rusher's involuntary admission. [SD-SOF 52, 53.] [2]  Ms. Rusher remained at McFarland for seven months until she was arrested in December 2016 on charges of assault and taken to the Sangamon County Jail.  The discharge summary from McFarland recounts a troubled history of self-harm in both the IDOC and McFarland.  The summary reported that, while in the IDOC from October 2014 to April 2016, Plaintiff tried to

---

[1] A different case is pending about Ms. Rusher's treatment in the IDOC.  Andrews v. Rauner, et al., 18-cv-1101 (CDIL).  This case concerns Ms. Rusher's treatment in the Sangamon County Jail.
[2] The Court adopts the citation method in Plaintiff's response.

hang herself 10 times, swallowed pens three times, choked herself on toilet paper seven times, and blocked her own airway with food five times. [AD-SOF 3; PSOF 4.] The discharge summary further recounted that, while in McFarland, she swallowed ink pens, a ring, two quarters, and forks on separate occasions and also engaged in acts of aggression against staff and residents. [AD-SOF 7.] Plaintiff maintains that the discharge summary "indicated that Ms. Rusher had far fewer incidents of self-harm while at McFarland than at IDOC facilities," PSOF 4, but the Court does not see how the cite offered for that assertion, Pl.'s Ex. 1 p. 902, supports that assertion.

Defendant Arun Abraham, M.D., worked at the Sangamon County Jail during the relevant time, providing medical care to the detainees. Defendant Michael Shmikler, a licensed clinical social worker, worked at the Jail 28 hours per week. Both Dr. Abraham and Mr. Shmikler were employed by Defendant Advanced Correctional Healthcare, Inc. (ACH), a company contracted to provide medical and mental health services to the Jail. Mr. Shmikler has unfortunately passed away, and his estate's representative has been substituted in his place.

After Ms. Rusher arrived at the Sangamon County Jail, she was evaluated by ACH mental health professionals.  A special diet was ordered listing items Mr. Rusher should not be given, including "no plastic eating utensils, no pens, no caps, no paper, no potato chip bags . . . drinks must be supervised, cup remove immediately. No brush.  No comb.  No toothbrush.  No TP more than 8 squares. Must have finger foods." [SD-SOF 65.]  The day after her arrival at the Jail, Ms. Rusher was placed in a high-risk cell by herself and seen by Mr. Shmikler.

Over the next several months until her death, Ms. Rusher regularly harmed herself with whatever items she had available. She removed a hard cast on her leg before a fracture had healed, wrapped a strap from the medical boot (which had replaced the cast) around her neck, swallowed or tried to swallow a toothbrush, swallowed an apple core whole, ate mattress stuffing, stuffed toilet paper up her nose, swallowed or tried to swallow a pen, swallowed a bag, and abraded her wrist.  [SD-SOF 71, 94, 100, 110, 116, 117, 124, 134, 138, 139.]  When she injured herself, she received medical attention, including trips to the hospital.  She was also

taken to medical appointments outside the Jail for her leg fracture and a possible blood clot. [SD-SOF 73-80, 94.]

Ms. Rusher was kept alone in a high-risk cell in a suicide smock for most of her detention on orders of Mr. Shmikler and was checked on every 15 minutes per standard policy. [SD-SOF 84, 88, 89.] In January 2017, Ms. Rusher was placed back in general population after receiving clearance from Mr. Shmikler, but within hours she harmed herself again and was placed back in the high-risk cell. [SD-SOF 92-94 (swallowed spoon).] Ms. Rusher was placed with another female detainee from February 9-12, 2017, but Ms. Rusher reported thoughts of self-harm on February 10 and 11, and swallowed mattress stuffing on February 12. [SD-SOF 126-131, 134.]

The parties dispute the extent of the isolation imposed on Ms. Rusher by her placement in the high-risk cell. Defendants point out that Mr. Shmikler visited Ms. Rusher 48 times over the course of Ms. Rusher's detention and that Ms. Rusher was allowed out for daily showers, phone calls, visits with the nurses, and transports outside of the Jail for various court dates, doctor's appointments,

and hospital visits.  Defendants maintain that officers regularly talked to Ms. Rusher and observed her talking to others.

Plaintiff, on the other hand, characterizes the placement as akin to segregation.  According to Plaintiff, Mr. Shmikler's visits with Ms. Rusher were cursory monitoring visits, all the visits could ever be, given Mr. Shmikler's heavy caseload.  No meaningful mental health treatment was or could have been provided during Mr. Shmikler's visits, in Plaintiff's view.  Plaintiff points out that the showers and phone calls were not available daily and offered only during the midnight shift, when finding someone to pick up the line on the other end was difficult.  Additionally, Plaintiff maintains that Defendants exaggerate the interactions between Ms. Rusher and Jail employees.  For the most part, according to Plaintiff, Ms. Rusher was alone in her cell for 23 hours a day.  Plaintiff maintains that this isolation exacerbated Ms. Rusher's mental illness and caused her to harm herself in a desperate attempt for help and human interaction. [*See* Dr. Kupers' expert report, Pl.'s Ex. 3.] [3]

---

[3] Defendants challenge the admissibility of Dr. Kupers' testimony in their reply. The Court agrees with Plaintiff that the appropriate time to take up that challenge is in ruling on the motions to exclude, which were filed after the summary judgment motions were fully briefed.

As mentioned above, the parties dispute the extent of mental health treatment provided by Mr. Shmikler.  Defendants maintain that Mr. Shmikler talked to and evaluated Ms. Rusher frequently, but Plaintiff maintains that all the interactions were short and through a steel door.  According to Plaintiff, Mr. Shmikler did little more than have a perfunctory discussion to fill out a form.  Plaintiff maintains that Ms. Rusher was provided no actual mental health therapy, nor was any mental health treatment plan put in place.

On March 17, 2017, Mr. Shmikler noted that Ms. Rusher was "calm, cooperative and smiling[,] . . . den[ying] any self-harm intent or suicidal ideation.  [Mr.] Shmikler noted [Ms.] Rusher's expected upcoming release (March 29) and congratulated [Ms.] Rusher for her recent good behavior."  [SD-SOF 157.]

The next day, March 18, 2017 around 3:00 p.m., Ms. Rusher asked Correctional Officer Meyer if Ms. Rusher could use the shower because Ms. Rusher had soiled herself.  Defendant Meyer was the "rove" officer that day, responsible for checking on high-risk detainees every 15 minutes.  Officer Meyer relayed Ms. Rusher's request to Sergeant Bouvet.  Defendant Bouvet knew about Ms. Rusher's high-risk designation and placement in a mental health

Page **8** of **30**

cell.  Defendant Bouvet approved the request after determining that
Ms. Rusher was not showing signs of difficulty or agitation.  [SD-
SOF 167.]  Correctional Officers Whitley and Meyer, who are also
Defendants, together escorted Ms. Rusher to a linen storage area to
obtain a towel and a fresh smock and then escorted Ms. Rusher to
the shower. Officer Whitley checked the shower area for any items
that Ms. Rusher might try to swallow and found none.  [SD-SOF
175.]  While Ms. Rusher showered, Officers Whitley and Meyer did
not watch Ms. Rusher, since they were male officers and Ms.
Rusher was a female detainee, but the officers did maintain verbal
contact with Ms. Rusher while she showered.  After the shower,
Officer Meyer retrieved a different clean smock for Plaintiff because
the first smock had not fit, and asked Defendant Officer Ealey, a
female officer, to help Ms. Rusher put on the smock.  At the
doorway to the shower, Officer Ealey helped Plaintiff with the smock
and saw Ms. Rusher's towel on the shower room floor.  Officer Ealey
noticed that the towel had tattered ends but that did not strike
Officer Ealey as odd. [Ealey Dep. pp. 174-75.]  Officer Ealey then
escorted Ms. Rusher back to her cell.  Officer Meyer picked up the

two smocks and the bath towel and took them to the laundry.   [SD-SOF 173-204.]

At 3:16 p.m., Officer Meyer conducted a fifteen-minute cell check on Ms. Rusher.  At 3:30 p.m., Officer Meyer conducted another fifteen-minute cell check on Ms. Rusher and discovered that Ms. Rusher had tied something around her neck.   Officer Meyer called for assistance, and Ms. Rusher was taken to the hospital where she later died.  An investigation determined that Ms. Rusher had ripped a strip off of the long end of the shower towel and had used the strip to strangle herself.  [Pl.'s Ex. 58 (photo of strip); Pl.'s Ex. 47 (photo of towel).]  Strands of the ripped towel were left in the shower area which, in Plaintiff's view, would have been apparent had the officers checked the shower area after Ms. Rusher's shower.

Plaintiff's expert, Dr. Kupers, opines that isolation of a suicidal patient may be appropriate for a brief period, possibly up to 72 hours, but no longer.  According to Dr. Kupers, if the patient is still too unstable after that period, the patient must be transferred somewhere for more intensive mental health care, such as a residential treatment center like McFarland or to a hospital for

inpatient psychiatric care. [PSOF 14.]  Dr. Kupers opines that

continued isolation causes the patient to mentally decompensate

with "psychosis, mania, compulsive acts of self-abuse or suicide,

and in all too many cases bizarre acts of self-harm such as cutting,

hanging, swallowing foreign bodies, and so forth." [PSOF 16.]

According to Dr. Kupers, proper mental health treatment requires a

treatment plan, which in this case would have included group and

one-on-one therapy, counseling, consultations with a psychiatrist,

no extended periods of isolation, and opportunities to engage in

activities with others. [PSOF 68-74.]  Plaintiff's other expert, Mr.

Stanley, concurs.  Defendants dispute these opinions and the

admissibility of these opinions, but the Court draws inferences in

Plaintiff's favor at this stage.

## Analysis

### I.  Federal Claims

**A.  Fourteenth Amendment claims:  A reasonable juror could find that Defendants' response to Ms. Rusher's severe mental illness was objectively unreasonable in violation of Ms. Rusher's Fourteenth Amendment right to due process.  This claim survives against all Defendants.  Qualified immunity is denied.**

To survive summary judgment against an individual defendant on the Fourteenth Amendment claim, Plaintiff must have enough evidence for a rational juror to conclude that the defendant acted "purposefully, knowingly, or recklessly" and that the mental health treatment or protections Ms. Rusher received were "objectively unreasonable." Turner v. Paul, 953 F.3d 1011, 1015 (7th Cir. 2020). A purposeful, knowing, or reckless state of mind is more than negligence or even gross negligence. Id.; Pittman by and through Hamilton v. County of Madison, 970 F.3d 823, 828 (7th Cir. 2020)("At bottom, *Miranda's* first inquiry encompasses all states of mind except for negligence and gross negligence."). As for whether the act or omission was objectively unreasonable, the Court considers "'the totality of facts and circumstances faced by the individual alleged to have provided medical care and to gauge objectively - without regard to any subjective belief held by the individual - whether the response was reasonable.'" Turner, 953 F.3d at 1015 (*quoting parenthetical in* McCann v. Ogle County, 909 F.3d 881, 886 (7th Cir. 2018); Pittman, 970 F.3d at 828 (jury instruction requiring *conscious* failure to reasonably respond to

detainee's suicide risk "erroneously introduced a subjective element").

### 1. Dr. Abraham and Mr. Shmikler

Dr. Abraham and Michael Shmikler were both employed by ACH to provide care for jail detainees. A rational juror could find that they both played a part in purposefully deciding in keeping Ms. Rusher in the high-risk cell for extended periods of time. Drawing competing reasonable inferences in Plaintiff's favor, the isolation of that cell was extreme, exacerbating Ms. Rusher's mental illness.

A rational juror could also find that the decision to keep Ms. Rusher in prolonged isolation was objectively unreasonable, considering the severity of Ms. Rusher's mental illness and the detrimental effect of prolonged isolation on that illness. Defendants assert that Plaintiff identified no feasible alternative to the high-risk cell, *see* Rice ex rel. Rice v. Correctional Medical Serv., 675 F.3d 650 (7th Cir. 2012), [4] but a rational juror could find that Dr. Abraham and Mr. Shmikler could have referred Ms. Rusher to the hospital or to an outside psychiatrist, or could have attempted to

---

[4] Rice applied the deliberate indifference standard, which is a more difficult mens rea to prove than the current standard of purposeful, knowing, or reckless.

obtain Ms. Rusher's voluntary readmission to McFarland Mental Health Center.  [Dr. Abraham Dep. p. 99-100, 103-104.]    The parties dispute Defendants' ability to obtain or recommend these higher levels of treatment for Ms. Rusher, but that only demonstrates a disputed fact for the jury to decide.

Reasonable inferences also arise that Mr. Shmikler and Dr. Abraham purposefully or recklessly decided not to place Ms. Rusher on constant watch, including supervision by a female officer while Ms. Rusher showered.  A rational jury could conclude that this decision was objectively unreasonable, considering the extreme severity of Ms. Rusher's mental illness and her frequent suicide and self-harm attempts.

Mr. Shmikler and Dr. Abraham assert qualified immunity but acknowledge that this Court must follow Seventh Circuit precedent denying qualified immunity to private contractors. <u>Estate of Clark v. Walker</u>, 865 F.3d 544, 550 (7th Cir. 2017); <u>Petties v. Carter</u>, 836 F.3d 722, 734 (7th Cir. 2016)(*citing* <u>Shields v. IDOC</u>, 746 F.3d 782, 794 (7th Cir. 2014)). These defendants alternatively maintain that they are entitled to a "good faith" immunity which would be similar to qualified immunity.  The Court does not see how qualified

immunity under a different name would be consistent with Seventh Circuit precedent denying qualified immunity to private contractors. Defendants have not identified any case to support their good faith argument. A "good faith" defense might exist for reliance on a valid law later declared invalid, but that situation does not apply here. *See* <u>Mooney v. Ill. Educ. Assoc.,</u> 327 F.Supp. 690 (C.D. Ill. 2019)(good faith defense applied to unions' collection of fees before U.S. Supreme Court's decision in <u>Janus</u>), *affirmed by* <u>Mooney v. IEA</u>, 942 F.3d 368 (2019)**.** In any event, even if the ACH Defendants were entitled to assert qualified or good faith immunity, the Court would deny immunity for the same reasons the Court denies immunity to the individual county defendants.

### 2. Jail Superintendent Beck, Lt. Bouvet, and Jail Officers Easley, Meyer, and Whitley

Generally, jail administrators and employees may rely on and defer to the judgment of medical or mental health professionals regarding treatment decisions for a detainee. <u>Miranda v. County of Lake</u>, 900 F.3d 335, 343 (7th Cir. 2018). However, that reliance must be reasonable, not blind to the obvious. <u>Id.</u> ("On the other

hand, if jail officials had reason to know that their medical staff were failing to treat or inadequately treating an inmate, liability is possible.")

Here, a rational jury could find Ms. Rusher's mental illness was so obvious and severe that even a layperson would know that Ms. Rusher needed treatment that could not be provided in the jail and that confining her to isolation without constant supervision would only exacerbate her mental illness, leading to her suicide. A reasonable inference arises from the record that Defendant Beck knew this, yet purposely or recklessly declined to intervene. Defendant Beck asserts that he did not have the authority to involuntarily commit Plaintiff, but he does not dispute that he would have followed a recommendation by ACH to send Plaintiff for outside psychiatric care, which allows an inference that he could have intervened and done so himself. Even if Defendant Beck could not have done so, a reasonable inference that Ms. Rusher's need for constant supervision, including in the shower, would have been obvious to a layperson.

The obvious severity of Ms. Rusher's severe mental illness is also what precludes summary judgment for Sgt. Bouvet and

Officers Meyer, Whitley, and Easley.  The record allows an inference
that all these defendants were aware that Ms. Rusher was likely to
commit suicide or seriously harm herself if given the opportunity.  A
rational juror could find that Sgt. Bouvet purposefully or recklessly
decided not to require that a female officer watch Ms. Rusher while
Ms. Rusher showered.  A rational juror could also find that Officers
Meyer, Whitley, and Easley purposely or recklessly decided not to
inspect the towel before and after the shower, a standard
precaution.  The jury could find that these decisions were
objectively unreasonable regardless of Defendants' good intent.

Defendants liken this case to Rosario v. Brawn, 670 F.3d 816
(7th Cir. 2012).  In Rosario, officers transporting a seriously
mentally ill individual did not notice that the individual had
regained possession of his wallet which contained a hidden
razorblade, unbeknownst to the officers.  The individual used the
blade to commit suicide during the officers' transport of the
individual to a mental health facility.  The Seventh Circuit affirmed
the grant of summary judgment, reasoning:

> Admittedly, the officers' actions were not perfect.
> Specifically, the officers should have paid greater
> attention to the objects in Marc's nylon wallet and they

should have immediately inventoried the wallet for safekeeping. But this inattention to detail, although ultimately tragic, does not support a constitutional claim that the officers intentionally disregarded Marc's known safety risks. We do not require perfection. *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir.2004). Rather, we require Rosario to prove that the officers' conduct was "something approaching a total unconcern" for Marc's welfare, *Collins*, 462 F.3d at 762, and evidence of such mistreatment is absent.

670 F.3d at 822; *see also* <u>Balsewicz v. Blumer</u>, 788 Fed.Appx. 379 (7th Cir. 2019)(not published in Fed. Rptr.)(decision to allow suicidal inmate to wear regular clothes and possess eyeglasses was not deliberately indifferent, even if wrong in retrospect).

However, <u>Rosario</u> applied the deliberate indifference standard, which has been replaced by the objectively unreasonable standard. The case is also distinguishable on its facts. The events in <u>Rosario</u> occurred over a matter of hours, giving officers little notice of the extent of the individual's suicidal risk. Here, Ms. Rusher gave months of notice that she would use anything she could get her hands on to seriously hurt or kill herself. *See* <u>Redman v. Downs</u>, 2021 WL 1889749 (7th Cir. 2021)(not reported in Fed. Rptr.)(reversing in part for consideration of claim that guard left

suicidal inmate unattended in shower with access to a plastic trash bag detainee used to hang himself).  The Court cannot weigh the strength of inferences from the evidence at the summary judgment stage.  The jury may conclude that the omissions of Sgt. Bouvet, Meyer, Whitley, and Easley were only negligent, but that decision is for the jury, not the Court.

Neither is qualified immunity available.  Defendants are correct that the standard for constitutional liability changed after the incidents in this case.  In 2018, the Seventh Circuit Court of Appeals "clarified that pretrial detainees' medical-care claims are now governed by an 'objective unreasonableness inquiry.'"  Pulera v. Sarzant, 966 F.3d 540, 550 (7th Cir. 2020)(*quoting* Miranda v. Cty. of Lake, 900 F.3d 335, 352 (7th Cir. 2018)(*cert. denied,* Pulera, 141 S.Ct. 1509 (2021)).  Objectively unreasonable is easier to prove than deliberate indifference.  Id.

However, the facts of this case, construed in Plaintiff's favor, would require the denial of qualified immunity even under the deliberate indifference standard.  Ms. Rusher's right to treatment for her serious mental illness and protection from herself while in custody was clearly established well before 2017.  *See* Paine v.

Cason, 678 F.3d 500, 504 (7th Cir. 2012)(affirming denial of
qualified immunity on failure to provide care to detainee with
bipolar disorder while detainee was in custody; "Eilman alternated
between calm and manic conduct, sometimes chatting amiably
while sometimes screaming, chanting rap lyrics, smearing
menstrual blood on the cell's walls, and taking off her clothes.");
Miranda v. County of Lake, 900 F.3d 335, 349 (7th Cir. 2018)("We
repeatedly have recognized a jail or prison official's failure to protect
an inmate from self-harm as one way of establishing deliberate
indifference to a serious medical need. . . . The obligation to
intervene covers self-destructive behaviors up to and including
suicide.").  Resolving material factual disputes in Plaintiff's favor,
Plaintiff's known serious mental health needs were consciously
disregarded, as was her need for protection from suicide.

### 3.  Advanced Correctional Healthcare and Sheriff in Official Capacity

ACH and the Sheriff in his official capacity are liable on the
Fourteenth Amendment claims only if a policy or practice (or gap in
policy or practice) was the moving force behind the constitutional
violation.  Lapre v. City of Chicago, 911 F.3d 424, 430 (7th Cir.

2018). The elements of a policy, or *Monell*, claim are: "'(1) an action pursuant to a municipal [or corporate] policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the "moving force" behind the constitutional injury.'" <u>Pulera v. Sarzant</u>, 966 F.33d 540, 550 (7th Cir. 2020)(quoted citations omitted)(bracketed language added).   Though the idea of deliberate indifference no longer applies for individual liability on the Fourteenth Amendment claims, deliberate indifference still plays a part in analyzing the policy claims.  <u>Id.</u>; <u>Ruiz-Cortez v. City of Chicago</u>, 931 F.3d 592, 598 (7th Cir. 2019)(*Monell* claim requires "culpability, meaning, at a minimum, deliberate conduct")(*citing* <u>Bd of County Com'rs of Bryan County v. Brown</u> 520 U.S. 397 (1997)); <u>Whitney v. Khan</u>, 2021 WL 105803 * 6 (N.D. Ill. 2021)("'Deliberate indifference' to a detainee's medical needs is not, after *Miranda*, required to sustain a Fourteenth Amendment claim. But the concept of deliberate indifference does come into play in assessing liability of a governmental entity under *Monell*.").  However, whether the underlying constitutional violation occurred would still be governed

by the objectively unreasonable standard.  The interplay of these concepts is not entirely clear, but Plaintiff appears to need evidence that policymakers were deliberately indifferent to a known or obvious risk that the policy (or lack thereof) would cause objectively unreasonable responses to the needs of seriously mentally ill detainees.

Plaintiff argues in her response that the following policies or practices caused constitutionally inadequate mental health care at the jail:  (1) understaffing of mental health professionals; (2) a prohibition on placing suicidal detainees on "constant watch"; (3) no mental health treatment plans for detainees in high-risk cells; and, (4) no policy to ensure communications between mental health, medical, and security staff.

The Court concludes that Plaintiff has adduced sufficient evidence to proceed on her *Monell* claims against both ACH and the Sheriff in his official capacity.  A rational juror could conclude that Ms. Rusher received no meaningful psychiatric treatment besides medication, at least in part because the jail did not have enough mental health professionals to provide that level of psychiatric care to seriously mentally ill detainees.  A rational juror could find that

this was an obvious and predictable consequence of the understaffing, which must have been known by policymakers even without prior incidents.  The Sheriff argues that ACH was responsible for determining how ACH would meet its contractual obligations, but the Sheriff's Office "cannot shield itself from § 1983 liability by contracting out its duty to provide medical services." King v. Kramer, 680 F.3d 1013, 1020 (7th Cir. 2012).  Like the claims against the individuals, the Fourteenth Amendment claims against the entities are for the jury to decide.

**B.    ADA and RA claims:  A rational jury could find for Plaintiff on her ADA and RA claims against Sheriff Campbell in his official capacity.**

Ms. Rusher asserts that she was denied participation in services such as the dayroom, congregate meals, social interaction, and out-of-cell time, in violation of her rights under the Americans with Disabilities Act and the Rehabilitation Act.  The Sheriff contends that this claim is just a repackaged constitutional claim. Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996)(ADA is not violated by a "prison's simply failing to attend to the medical needs of its disabled prisoners.").

The Court has already rejected this argument in Plaintiff's other pending case, <u>Andrews v. Rauner</u>, 18-cv-1101 (8/6/18 Order, p. 14), which involves Plaintiff's care in the Illinois Department of Corrections.  The Court adopts the same reasoning in this case and concludes that Plaintiff's RA and ADA claims survive summary judgment.

## II.  State Claims:

### A.  Immunity

745 ILCS 10/4-103 provides immunity to local public entities and employees "for failure to provide a jail, detention or correctional facility, or if such facility is provided, for failure to provide sufficient equipment, personnel, supervision or facilities therein."  The County Defendants argue that all of the state law claims are based on the failure to provide sufficient personnel, supervision, and equipment.  Some of the allegations, such as understaffing, do fall under this statute, but other allegations do not.  The Court cannot rule out an inference that the individual county defendants could be liable for their actions or omissions on the basis that those actions or omissions were willful and wanton.  *See* 745 ILCS 10/4-105; 745 ILCS 10/2-202 (carving exceptions to immunity for willful and

wanton conduct). The obvious severity of Ms. Rusher's condition, as displayed over three months, allows that inference. The jury could certainly find in Defendants favor but would not be compelled to do so on this record.

### B.  Statute of Limitations

Defendants Bouvet, Meyer, Whitley, and Ealey argue that the state law claims against them are untimely because they were not named and served as defendants until more than one year after the incident. 745 ILCS 10/8-101 (setting one-year statute of limitations). Plaintiff counters that the third amended complaint relates back to the original complaint under Federal Rule of Civil Procedure 15.

Fed. R. Civ. Proc. 15 in relevant part allows relation back if the party brought in by the amendment "received such notice of the action that it will not be prejudiced in defending on the merits" and "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C).

 After the Supreme Court's decision <u>Krupski v. Costa Crociere S.P.A.</u>, 560 U.S. 538, 549 (2010), the Seventh Circuit stated:

The only two inquiries that the district court is now permitted to make in deciding whether an amended complaint relates back to the date of the original one are, first, whether the defendant who is sought to be added by the amendment knew or should have known that the plaintiff, had it not been for a mistake, would have sued him instead or in addition to suing the named defendant; and second, whether, even if so, the delay in the plaintiff's discovering his mistake impaired the new defendant's ability to defend himself.

Joseph v. Elan Motorsports Techs. Racing Corp., 638 F.3d 555, 559–60 (7th Cir. 2011).

The question remains what is considered a "mistake" after Krupski. Plaintiff does not address the Seventh Circuit's "John Doe rule," established in pre-Krupski cases, that a lack of knowledge of a defendant's identity is not a "mistake" within the meaning of Rule 15. Hall v. Norfolk, 469 F.3d 590, 596 (7th Cir. 2006)("Whether a plaintiff names a fictitious defendant like 'John Doe' because he does not know who harmed him or names an actual—but nonliable—railroad company because he does not know which of the two companies is responsible for his injuries, he has not made a 'mistake' concerning 'identity' within the meaning of Rule 15(c).") District courts in the Seventh Circuit have come to different conclusions on whether the John Doe rule survives Krupski. *See,*

Page **26** of **30**

*e.g.,* <u>Haroon v. Talbott</u>, 2017 WL 4280980 *5-6 (N.D. Ill.).  The Seventh Circuit cases cited by Defendants do not directly grapple with <u>Krupski</u>'s effect on the John Doe rule, and the issue appears to remain unsettled in the Seventh Circuit.  *See* <u>Phillips v. City of Chicago</u>, 2021 WL 1614505 * 3 (N.D. Ill.); <u>Headrick v. Wise</u>, 2021 WL 462203 *4-5 (S.D. Ill.).  The Court finds the reasoning of district court cases finding relation back available for John Doe defendants persuasive.  *See* <u>White v. City of Chicago</u>, 2016 WL 4270152 *15-18 (N.D. Ill.).

Defendants Bouvet, Meyer, Whitley, and Ealey do not address whether they knew or should have known that they were one of the Doe defendants before they were named as defendants.  The claims against them arise from the same conduct and occurrences identified in the original complaint, namely the failure to protect Ms. Rusher from killing herself.  The Court concludes that Defendants Bouvet, Meyer, Whitley, and Ealey knew or should have known they would be named as Defendants once their identities were discovered.  They do not contend that Plaintiff failed to diligently conduct discovery to find out their names or failed to promptly amend the complaint once the names were discovered.

Additionally, the ability of Defendants Bouvet, Meyer, Whitley, and Ealey to defend themselves has not been detrimentally affected by allowing the relation back—they are represented by the same counsel as Defendant Beck, who was originally named, and have had the same opportunities for discovery as the other defendants.

### C) Causation

Defendants argue that Ms. Rusher's suicide broke the chain of causation between any tortious act and Ms. Rusher's death. The parties agree that, "[u]nder Illinois law, suicide is considered an intervening event that breaks the causal chain between a tortious act and the injury unless (1) 'the defendant's conduct caused an injury, most often to the head, that made the decedent "so bereft of reason" as to cause him to attempt suicide,' or (2) where a patient has committed suicide under the custody or control of a psychiatric caregiver who failed to properly supervise the decedent." Saucedo v. City of Chicago, 2015 WL 3643417 *8 (N.D. Ill.)(quoted cite omitted). However, the parties do not address whether this rule applies if a duty exists to protect a person from committing suicide, such as here. Corbier v. Watson, 2019 WL 351498 *10 (S.D. Ill.)(suicide is not intervening event where jail officials had duty to

Page **28** of **30**

prevent suicide).  Additionally, the Court cannot rule out a
reasonable inference that the lack of mental health treatment and
isolation left Ms. Rusher "bereft of reason" or that this case falls
under the supervision exception.

Defendants also argue that nothing they did or did not do
caused Ms. Rusher to harm herself.  They assert that Ms. Rusher's
behavior was no different in McFarland, where Ms. Rusher admits
she received proper mental health treatment and was not isolated.
A rational jury could agree.  However, a rational juror might also
conclude that the lack of treatment and the isolation at the jail
exacerbated Ms. Rusher's existing mental illness to the point where
she was motivated to succeed in committing suicide and given an
opportunity to do so.  Whether Defendants' actions or inactions
caused Ms. Rusher harm is a question for the jury.

### D.  Survival Act and Indemnity

The county defendants argue that the Survival Act claim is
redundant of Plaintiff's other claims.  The Illinois Survival Act does
not create an independent cause of action but rather "allows an
action . . . to survive the death of the injured person." Carter v. SSC
Odin Operating Co., LLC, 2012 IL 113204 ¶ 34; Burris v. Cullinan,

Page **29** of **30**

2009 WL 3575420 *4 (C.D. Ill.)("The Illinois Survival Act, on the other hand, does not create a separate cause of action, but 'is merely the conduit through which a cause of action is transferred to the estate representative.'")(quoted cite omitted).  However, a wrongful death action differs from a survival action.  The former accrues at death, while the latter accrues before death.  <u>Erickson v. Baxter Healthcare, Inc.</u>, 94 F.Supp.2d 907, 911 (2000).  The counts seek damages for different injuries, so the Court does not see the Survival Act claim as redundant.  The causation arguments of Defendants are rejected for the reasons discussed above.

Defendants also argue that Sangamon County is a proper Defendant only on the indemnification claim, but that does not appear to be disputed, based on the Court's review of the third amended complaint.  The remainder of Defendants' arguments depend on the absence of an underlying violation of law, which Defendants have not established for the reasons explained above.

**THEREFORE, IT IS ORDERED** that Defendants' motions for summary judgment are denied.  [177, 180, 181.]

ENTERED:  July 1, 2021          **s/Sue E. Myerscough**
                                SUE E. MYERSCOUGH
                                U.S. DISTRICT JUDGE